**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-_____ (   ) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF MICHAEL J. LOTZ IN SUPPORT OF
## FIRST DAY MOTIONS PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

Michael J. Lotz, being duly sworn, hereby deposes and says:

1.     I am the President of Mesa Air New York, Inc. (a corporation organized under the laws of the State of New York), Mesa Air Group, Inc. ("Mesa")[2] (a corporation organized under the laws of the State of Nevada), Mesa In-Flight, Inc. (a corporation organized under the laws of the State of Colorado), Freedom Airlines, Inc. (a corporation organized under the laws of the State of Nevada), Mesa Airlines, Inc. (a corporation organized under the laws of the State of Nevada), MPD, Inc. (a corporation organized under the laws of the State of Nevada), Ritz Hotel Management Corporation (a corporation organized under the laws of the State of Nevada), Regional Aircraft Services, Inc. (a corporation organized under the laws of the State of Nevada), Air Midwest, Inc. (a corporation organized under the laws of the State of Kansas), Mesa Air Group Airline Inventory Management, LLC (a limited liability company organized under the laws of the State of Arizona), Nilchi, Inc. (a corporation organized under the laws of the State of Nevada), and Patar, Inc. (a corporation organized under the laws of the State of Nevada).  Mesa

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

[2] Mr. Lotz is also the Chief Financial Officer of Mesa Air Group, Inc.

and the foregoing affiliated entities are the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). In these capacities, I am generally familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2. I am authorized by the Debtors to submit this Declaration. I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases and in support of (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (ii) the requested relief, in the form of motions and applications, that the Debtors have filed with the Court (the "First Day Motions"). The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of their chapter 11 cases on their businesses.

3. Except as otherwise indicated, all facts set forth in this Declaration are based on either: my personal knowledge, information supplied by employees under my supervision, or my opinion based on experience, knowledge, and information concerning the operations of the Debtors and the airline industry as a whole and the regional airline industry in particular. It is my belief that the relief sought in the First Day Motions is essential to ensure the uninterrupted operation of the Debtors' business and to the success of the Debtors' reorganization. If I were called upon to testify, I would testify competently to the facts set forth herein. Unless otherwise indicated, the financial information contained herein is un-audited and provided on a consolidated basis.

4.      Sections I through VII of this Declaration provide an overview of the Debtors'
businesses, organizational structure, capital structure, history, and events giving rise to the
commencement of these chapter 11 cases.  Section VIII describes the bases for the relief
requested in the First Day Motions.  Section IX lists the schedules of information required by
Local Rule 1007-2.

# I.

## Overview of Restructuring

5.      Over the past two years, Mesa has worked closely with its lessors, creditors and
other constituents to restructure its financial obligations.  These efforts have led to the
elimination of over $160 million of debt obligations, the return of a number of aircraft, and the
restructuring of inventory management and engine overhaul agreements.  Mesa is nonetheless
faced with an untenable financial situation resulting primarily from its continued obligations on
aircraft excess to its current requirements.

6.      After careful consideration, Mesa determined that a chapter 11 filing provides the
most effective and efficient means to restructure its obligations with minimal impact on the
business and customers.  Chapter 11 will allow Mesa to eliminate excess aircraft to better match
its needs and give Mesa the flexibility to align its business to the changing regional airline
marketplace, ensuring a leaner and more competitive company poised for future success.

# II.

## The Debtors' Businesses

7.      Mesa Air Group, Inc. is a holding company whose principal direct and indirect
subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service.
As of the Petition Date, the Debtors' airline operations serve approximately 127 cities in

41 states, the District of Columbia, Canada, and Mexico. The Debtors operate a fleet of approximately 130 aircraft with approximately 700 daily system departures. The Debtors employ approximately 3,400 full and part-time employees.

8.     Mesa Airlines, Inc. operates regional jet and turboprop aircraft and operates under the names of regional carriers of certain major airlines pursuant to code-share agreements. Specifically, Mesa Airlines, Inc. (i) operates as US Airways Express under code-share agreements with US Airways, Inc. ("US Air"), (ii) operates as United Express under a code-share agreement with United Airlines, Inc. ("United"), and (iii) provides services to Mo-Go, L.L.C. in Hawaii as *go!* Mokulele ("*go!*").[3] *go!* is not subject to a code-sharing agreement with a major carrier. Freedom Airlines, Inc. operates regional jet aircraft and operates as Delta Connection under code-share agreements with Delta Air Lines, Inc ("Delta").[4]

9.     As of September 30, 2009, the Debtors had consolidated assets[5] of approximately $975 million, and consolidated liabilities of approximately $869 million. The Debtors' consolidated 2009 revenues were approximately $968 million. Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009 were derived from their code-share "revenue guarantee" agreements[6] with US Air, United, and Delta

---

[3] *go!* is not a debtor in these proceedings.

[4] Ritz Hotel Management Corporation was formed for the purpose of owning and operating certain property associated with the housing of company employees during training. Nilchi, Inc. and Patar, Inc. were formed for the purpose of holding certain investments.

[5] At book value.

[6] There are different types of code-share agreements but they can generally be grouped into two broad categories – "Pro-Rate" and "Revenue-Guarantee." Under a "Pro-Rate" agreement, passenger revenue generated on a code-share flight is divided by the carriers participating in the agreement, typically based upon a formula taking into account the distance traveled and the fare paid by the passenger. Under a "Revenue-Guarantee" agreement, one code-share partner effectively purchases all the seats of the other carrier and keeps all revenue from ticket sales in exchange for paying the other code-share partner an agreed upon amount for each flight operated. All of the Debtors' current code-share agreements are "Revenue Guarantee" agreements.

(collectively, the "Principal Carriers").  The Debtors' remaining passenger revenues are generated from their independent *go!* operations in Hawaii.

10.      Under the code-share agreements, the Debtors provide air transportation services to the Principal Carriers' customers on various flight routes, using the Principal Carriers' flight designator codes and the Principal Carriers' livery and service marks.  In exchange for providing flights and other services pursuant to the code-share agreements, the Debtors receive compensation (including minimum monthly amounts and additional amounts based on, for example, number of flights and block hours performed during the month) from the Principal Carriers and are also reimbursed for certain expenses by the Principal Carriers.  In some cases, the Principal Carriers also provide certain customer service, ground handling service and/or other functions to the Debtors in connection with the foregoing.

11.      The "revenue guarantee" that the Debtors charge the Principal Carrier is intended to cover 100% of the Debtors' costs.  The Debtors charge a margin on top of these amounts as profit.  The margin percentage can change based on how reliably the Debtors operate their aircraft.  As part of the fees paid to the Debtors for operating aircraft, certain significant costs (aircraft, fuel, airport fees and aircraft insurance) are a direct pass through to the Principal Carriers.  Accordingly, the Debtors are not impacted by varying prices for these costs. Additionally, because the Principal Carriers pay the Debtors a "revenue guarantee", the Debtors are not impacted by changes in fares or by the number of passengers carried on each flight. Lastly, the code-share agreements can be terminated if certain minimum operating thresholds are not met (currently we are well above these thresholds).

12.     Mesa Airlines, Inc.'s fleet currently consists of CRJ-200 (fifty seat), CRJ-700 (sixty-six seat), CRJ-900 (eighty-six seat) and Dash-8 (thirty-seven seat) aircraft.  Freedom Airlines, Inc. fleet consists of ERJ-145 (fifty seat) aircraft.

13.     Except as indicated above, the remaining Debtors operate businesses, or own interests in businesses, that facilitate or enhance the Debtors' regional or independent air carrier services.  Nilchi, Inc. and Patar, Inc. hold investments.

14.     Collectively, the Debtors employ approximately 3400 people in an active status, working in both full and part-time positions, both domestically and abroad, including pilots, mechanics, aviation maintenance support personnel, flight attendants, reservation sales agents, customer service agents, analysts, engineers, other technical and professional personnel, supervisors, managers, administrative support staff and other personnel.  As of December 31, 2009, approximately 56% of the Debtors' employees were represented by unions, including 1139 pilots and 751 flight attendants.

## III.

## Organizational Structure

15.     An organizational chart is annexed hereto as Exhibit A depicting the Debtors' and certain non-Debtors subsidiaries' corporate structure.

16.     As indicated by Exhibit A, Mesa is the direct parent of twelve (12) wholly-owned subsidiaries and two (2) indirect subsidiaries.  Mesa's indirect subsidiaries, Indigo Mirmar, LLC ("Indigo") and Finao Telserra Fund I LLP ("Finao") are owned by direct subsidiaries of Mesa, Nilchi, Inc. ("Nilchi") and Patar, Inc. ("Patar"), respectively.  Nilchi owns an 88% interest in Indigo and Patar owns a 43% interest in Finao.  Mesa also owns a 75% direct interest in Mo-Go, LLC, which contracts with Mesa Airlines, Inc. to service the *go!* operations in Hawaii.  Republic

Airways Holdings and certain minority investors own the remaining 25% and are each not affiliated with the Debtors and not Debtors in these chapter 11 cases.

## IV.

### Debt Structure

17.     The Debtors' debt structure consists of (i) three issuances of notes outstanding, all of which are general unsecured obligations of Mesa and jointly and severally guaranteed by certain wholly-owned subsidiaries, (ii) leveraged leases relating to the majority of the Debtors' aircraft, (iii) secured financings relating to the purchase of aircraft that make up the remaining portion of the Debtors' fleet, and (iv) ordinary course trade debt.

A.     The 2012 Notes

18.     Mesa, as borrower, issued 8% senior unsecured notes in the face amount of $16.2 million due February 10, 2012 pursuant to an agreement, dated February 10, 2009 (the "2012 Notes"), between Mesa and U.S. Bank National Association in its capacity as indenture trustee. The 2012 Notes were issued in conjunction of the restructuring of the 2023 Notes and 2024 Notes (each as defined below).  As of the Petition Date, approximately $17.2 million is outstanding under the 2012 Notes.

B.     The 2023 Notes

19.     Mesa, as borrower, issued 6.25% senior convertible notes due June 16, 2023 pursuant to an agreement, dated June 16, 2003 (the "2023 Notes"), between Mesa and U.S. Bank National Association in its capacity as indenture trustee.  The 2023 Notes resulted in gross proceeds of approximately $100 million.  Mesa used the proceeds of the 2023 Notes to fund general working capital requirements.

20.     The outstanding amounts under the 2023 Notes were reduced through a series of transactions with certain holders of the 2023 Notes in which Mesa agreed to pay cash, issue common stock, and issue the 2012 Notes.  After the consummation of these transactions and as of the Petition Date, approximately $6.8 million is outstanding under the 2023 Notes.

C.     The 2024 Notes

21.     Mesa, as borrower, issued 3.625% senior convertible notes due February 10, 2024 pursuant to an agreement, dated February 10, 2004 (the "2024 Notes"), between Mesa and U.S. Bank National Association in its capacity as indenture trustee.  The 2024 Notes resulted in gross proceeds of $100 million.  Mesa used the proceeds of the 2024 Notes to fund general working capital requirements.

22.     The outstanding amounts under the 2024 Notes were reduced through a series of transactions with certain holders of the 2024 Notes in which Mesa agreed to pay cash, issue common stock, and issue the 2012 Notes.  After the consummation of these transactions and as of the Petition Date, approximately $1.9 million is outstanding under the 2024 Notes.

D.     Beech Aircraft Financing

23.     The Debtors' fleet includes twenty (20) Beech Model 1900D Airliners that are financed by Raytheon Aircraft Credit Corporation ("RACC") pursuant to a series of airliner negotiable promissory notes, each of which is supported by an airliner aircraft security agreement.  The outstanding principal balance as of December 14, 2009 for all 20 aircraft was approximately $33.6 million.  The Debtors intend to abandon these aircraft upon authorization from the Court.

E.     CRJ Owned Aircraft Financing

24.     The Debtors' fleet also includes Canadair Regional Jets ("CRJ").  The Debtors own two (2) CRJ 200s, eight (8) CRJ 700s, and fourteen (14) CRJ 900s.  These aircraft are subject to security agreements and the aggregate outstanding principal balance as of December 31, 2009 with respect to these aircraft is approximately $393 million.

F.     Aircraft Lease Obligations

25.     The remainder of the Debtors' fleet consists of leased CRJs and Embraer Regional Jets ("ERJ").  The Debtors lease forty-six (46) CRJ 200s, twelve (12) CRJ 700s, and twenty-four (24) CRJ 900s, sixteen (16) Dash 8s, and thirty-six (36) ERJ 145s.  These aircraft are subject to leases with certain owner trustees.  The aggregate amount outstanding with respect to these aircraft is approximately $1.62 billion.

G.     Master Purchase Agreement and Obligations to Bombardier

26.     In 2001, Mesa and Bombardier Inc. ("Bombardier") entered into a Master Purchase Agreement (as amended from time to time, the "MPA") for the purchase of Bombardier aircraft.  Since 2001, the Debtors have purchased thirty-eight CRJ-900 and twenty CRJ-700 aircraft from Bombardier pursuant to the MPA.  As of the Petition Date, the Debtors and Bombardier owe each other amounts under the MPA pursuant to amendments to the MPA and for the future purchase of aircraft.  Bombardier has also guaranteed certain aircraft leases.

H.     Ordinary Course Trade Debt

27.     In addition to the institutional debt described above, the Debtors incur trade debt in the ordinary course of their business.  In as much as the Debtors were generally paying their debts as due prior to the Petition Date, the trade debt outstanding as of the Petition Date is not substantial in relation to the Debtors' other debt obligations.

# V.

## History of Debtors

28.     Mesa was founded in 1982 by Larry and Janie Risley who, after mortgaging their operation (primary provider of services to General Aviation Aircraft and Operators located at or adjacent to an airport) to acquire aircraft, began offering air shuttle services between Farmington, New Mexico and surrounding communities.  Driven by the strong demand of employees in the oil and gas industry in the Four-Corners region of the United States, Mesa quickly grew.  In its first ten years of business, Mesa grew from a company with one aircraft serving two cities to an organization operating thirty (38) aircraft serving sixty-three (63) cities.  During this same period, Mesa transformed itself from a small closely-held corporation to a publicly traded company on the NASDAQ exchange.

29.     In 1989, Mesa expanded its operations through a code-share agreement with Midwest Express, serving an extensive network of cities out of Milwaukee, Wisconsin.  Mesa's pattern of growth continued with its acquisition of Aspen Airways in 1990.  With the Aspen acquisition, Mesa gained a code-share agreement with United, operating as United Express out of Denver and providing a passenger feed to United's Denver hub.  Acquisitions continued with the purchase of Air Midwest in 1991 adding US Air as a code-share partner, and West Air in 1992 adding United Express flying in California and the Pacific Northwest.  In addition, Mesa expanded further with the creation of the Florida Gulf and Liberty Express divisions operating code-share flights in the Southeast and Northeast for US Airways, and added an America West code-sharing agreement in 1992.  Two years later, Pittsburgh, Pennsylvania based Crown Airways was acquired, further strengthening Mesa's ties to US Air.

30.	By 1995, the majority of Mesa's flying was derived from operations associated with code-sharing agreements with United, US Air and America West Airlines. Because of the significant aircraft commitment under these agreements, the agreements were generally long term. In 1996, Mesa laid the groundwork for its future success with the addition of Bombardier CRJ-200 aircraft placed in Revenue Guarantee code-share agreements. Regional jet growth continued from 1997–1999, increasing the fleet of CRJ-200 aircraft to 32. In addition to the significant expansion of its regional jet operations, in 1999 Mesa announced the acquisition of Charlotte based CCAir (a Pro-Rate operator of Dash-8 aircraft, adding additional US Air routes). In 1999 Mesa negotiated the purchase of 36 ERJ-145s that were placed into service pursuant to a code-share Revenue Guarantee agreement with US Air.

31.	The code-share agreements between the Debtors and their partners provided great benefits to all parties. Air Midwest continued Pro-Rate flying having consolidated the operations of the Florida Gulf and Liberty Express operating divisions. By 2000, Mesa had substantially increased its share of Revenue-Guarantee contracts. In 2001 Mesa concluded an agreement with America West to operate larger CRJ-700 and CRJ-900 aircraft under a revenue guarantee arrangement. Mesa's strong operational performance was noted throughout the regional airline industry and in 2005 Mesa was named Air Transport World's "Regional Airline of the Year."

32.	The growth of Mesa's Revenue-Guarantee operation occurred largely due to its focus on providing a high standard of operating performance, safety and cost efficiency by developing strategies around people, processes, and systems. An example of this effort is reflected by the selection of Mesa by America West Airlines (prior to the merger with US Air) to fly the CRJ-900 aircraft. In doing so, Mesa became the world launch customer of the CRJ-900 aircraft.

# VI.

## Events Leading to Chapter 11 Cases

A.      Aviation Bankruptcies / New Code-share Agreements

33.      While Mesa had successfully grown, it was not immune from the forces affecting the aviation industry.  Following September 2001, the airline industry began to experience continued financial difficulties including reduced demand, increased costs, sustained lower yields, and fundamental shifts in business travel and booking transparency.  These combined forces exerted tremendous strain on the aviation industry – a situation which was further exacerbated with record fuel prices.  These challenges pushed many carriers beyond their breaking point, resulting in a record number of airline bankruptcies including nearly all of the legacy carriers and all of Mesa's code-share partners except America West Airlines.

34.      Mesa's difficulties increased significantly following US Air's second set of chapter 11 cases in 2004.  In these cases, US Air rejected Mesa's code-share agreement, which resulted in the rejection of 59 aircraft and caused significant strain on Mesa's liquidity.

35.      Mesa has worked diligently to overcome these challenges, Mesa was able to successfully negotiate agreements with United and Delta during their respective chapter 11 cases.  The United Agreement was for 30 fifty seat aircraft with an expiration in April 2010, had reduced margins and included a $30 million payment by Mesa to United Airlines.  The Delta Agreement was for 30 aircraft through November 2012 with an option to remove 8 aircraft by May 2009.  Additionally, Mesa agreed to reimburse Delta for lease obligations on 30 Fairchild Dornier aircraft.  In March 2007 the Delta code-share was increased from 30 to 36 fifty seat aircraft with early out options on 14 aircraft.  These two agreements resulted in Mesa successfully mitigating some of the financial exposure resulting from the rejection of the

regional jets rejected during the US Airways bankruptcy albeit under significantly less favorable terms.

B.       Mesa's Fleet and Code-Share Requirements

36.       As currently configured, the Debtors' fleet significantly exceeds their code-share fleet requirements.  Approximately 52 aircraft are parked today and not being used.  In addition, over the next several months, the Debtors plan to retire 25 additional aircraft that are not needed to service the Debtors' customers.  As a result, the Debtors need to reduce and rationalize their fleet to eliminate the significant costs associated with retaining, maintaining, and storing the excess aircraft.

37.       The following table sets forth Mesa's current fleet composition by aircraft type and identifies the status of aircraft.

| Current Fleet Composition as of January 5, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | CRJ-200 | ERJ-145 | CRJ-900 | CRJ-700 | B-1900[7] | Dash-8 | Total |
| US Air | 8 | - | 38 | - | - | 6 | 52 |
| United | 18 | - | - | 20 | - | 7 | 50 |
| Delta | - | 22 | - | - | - | - | 22 |
| *go!* | 5 | - | - | - | - | - | 5 |
| Sublease | - | 2 | - | - | - | - | 2 |
| Excess Aircraft | 17 | 12 | - | - | 20 | 3 | **52** |
| Total Owned/Leased | 48 | 36 | 38 | 20 | 20 | 16 | 178 |
| | | | | | | | |
| Passenger Capacity | 50 | 50 | 86 | 66 | 19 | 37 | - |

38.       The terms of the Debtors' code-share agreements are not matched to the leasehold and ownership obligations associated with aircraft in service under such agreements.  As is

---

[7] These aircraft are associated with Air Midwest and are included within assets of discontinued operations.

typical in the regional airline industry, the Debtors acquired aircraft that were financed primarily through long-term leveraged leases with the exception of eight short term leases. The terms of these long-term lease obligations exceed the duration of the Debtors' various code-share agreements. As a result, as certain flight operations under code-share agreements come to an end, the Debtors remain obligated for remaining lease and installment payments and maintenance expenses for such aircraft – in some cases for significant periods of time. These risks were recognized at the time these aircraft were leased but given the fundamental changes to the aviation industry and the more recent downturn in the credit markets during the past year, it was not foreseeable that demand for certain regional aircraft would literally evaporate in less than three years.

39.      The Debtors worked diligently to develop contingency plans to place aircraft into alternative service, including the creation of its *go!* operations in Hawaii, Kunpeng (as defined and discussed below), and other attempts to sublease the aircraft to operators in the United States and around the world. *go!* did provide a vehicle for the mitigation of excess aircraft but *go!*'s capacity to absorb excess aircraft was limited. The Kunpeng venture, which was intended to operate 20 excess aircraft, was unsuccessful and ceased operations in 2009.

40.      While the Debtors pursued opportunities to operate, sublease, or sell their excess aircraft, these efforts have likewise been unsuccessful, as were attempts to negotiate terms under which these aircraft would be returned to their manufacturers or lessors.

41.      In addition, under the terms of the code-share agreement with United, United had the option to extend the term covering 26 CRJ 200 aircraft for an additional five (5) years provided such notice was issued by October 31, 2009. United elected not to exercise its renewal rights covering the 26 CRJ 200 aircraft. Mesa made numerous attempts to negotiate mutually

agreeable terms under which United would exercise its extension rights for these aircraft but such efforts were unsuccessful. Mesa had intended for up to 20 of these aircraft to be placed into service at Kunpeng; however, with the failure of the Kunpeng joint venture, Mesa has been unable to place these aircraft into revenue service.

42.     In response to these industry and company challenges, and as part of their ongoing efforts to reduce costs and maximize fleet flexibility, the Debtors reviewed the terms of their leases and security agreements to determine which aircraft have no utility or value. As of the date hereof, the Debtors have taken 52 aircraft out of service because they are not generating any value for the Debtors' estates. Idle aircraft (*i.e.*, parked aircraft not under an operating contract) require significant ongoing monthly lease, insurance, and storage costs without generating any benefit or value for the Debtors or their estates. Thus, the excess aircraft and the corresponding contractual obligations are burdensome to the Debtors and are no longer beneficial to the Debtors or their estates. In addition to the excess aircraft listed above, the Debtors expect to take 18 CRJ-200 aircraft and 7 Dash-8 aircraft out of service between the Petition Date and May 2010, increasing the total number of excess aircraft to seventy-seven (77).

43.     In addition to the foregoing, a certain share of the market has shifted away from the Debtors as a result of the changing model among code-share partners. For example, certain of the Debtors' competitors have negotiated extensions or amendments to their code-share agreements by providing their codes-share counterparties with (i) consideration in the form of stock or cash, (ii) secured term loans, or (iii) the deferral of the payment of claims owed to the regional carrier.

C.          Code-Share Litigation

    i.          Delta Litigation

44.          As has been asserted or will be asserted by the Debtors in certain of the Delta related actions (described below), Delta owes or is otherwise liable to the Debtors for more than $70 million in damages, including, without limitation, (i) the Debtors' significant profits that would have been gained over the term of the parties' agreement (improperly terminated by Delta) that is the subject matter of the Delta CRJ Litigation; (ii) the Debtors' substantial damages caused by Delta's failure to properly utilize the Debtors' aircraft fleet on a full-time basis in accordance with the Delta Agreement; (iii) the Debtors' damages caused by Delta's refusal to engage in the annual rate setting procedures set forth in the Delta Agreement; (iv) the Debtors' damages caused by Delta's wrongful interference with the Debtors' possessory interests in certain aircraft engines; and (v) the Debtors' claims for attorneys' fees and costs, punitive damages in respect to certain actions, and other damages.  The Debtors reserve their rights with respect to such claims and any other claims that they may have against Delta related to or under the Delta code-share agreement.

45.          Specifically, on or about April 7, 2008, Mesa commenced an action in the United States District Court for the Northern District of Georgia (the "Georgia District Court") to prevent Delta from attempting to terminate the Delta code-share agreement as to certain ERJ-145 aircraft (the "Delta ERJ Litigation").  Following an evidentiary hearing ending on May 29, 2008, the Georgia District Court issued a preliminary injunction against Delta prohibiting it from terminating the agreement and finding that Delta acted in bad faith.  Delta appealed the preliminary injunction, and on July 2, 2009, the Court of Appeals for the Eleventh Circuit affirmed the issuance of the injunction, finding that Mesa had demonstrated a substantial

likelihood of success on the merits. A trial date has not yet been set by the Georgia District Court.

46. On or about August 19, 2009, Delta commenced an action against Mesa in the Georgia District Court alleging that Mesa breached certain "most favored nations" ("MFN") provisions of the Delta code-share agreement covering the ERJ aircraft (the "Delta MFN Action"). Delta sought a declaratory judgment that, among other things, Mesa was in material breach of the Delta Agreement. On September 25, 2009, Mesa filed a motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Delta MFN Action as it related to the assertion that the alleged breach was material. The Georgia District Court has not yet ruled on Mesa's motion. Mesa anticipates filing a counterclaim against Delta in the Delta MFN Action related to Delta's failure to utilize Mesa's aircraft on a "full time basis" as required in the code-share agreement and Delta's refusal to comply with the annual rate setting provisions of the code-share agreement.

47. Following the commencement of the Delta ERJ Litigation, Delta terminated a separate agreement between Mesa and Delta relating to certain CRJ-900 aircraft, which were owned by Delta but operated by (the "Delta CRJ Litigation"). These aircraft were returned to Delta upon termination of the agreement. On March 20, 2009, Mesa commenced an action in the Georgia District Court seeking damages, including lost profits and costs associated with the re-training of pilots. Delta filed a counterclaim alleging breach of contract for failing to meet certain contract conditions, which allegations are disputed by the Debtors.

48. On August 6, 2008, Mesa commenced an action in the United States District Court for the District of Arizona against Delta seeking the return of seven aircraft engines that Delta had improperly retained following the termination of an engine maintenance memorandum

of understanding between Mesa and Delta (the "Engine Litigation").  On August 12, 2008, Delta agreed to return the engines to Mesa and on August 22, 2008, Delta filed a mechanics lien on the engines along with a counterclaim seeking to foreclose on the liens.  Mesa moved for judgment on the pleadings as to Delta's liens due to Delta's failure to comply with the Georgia lien statute.  On November 14, 2008, the Court ruled that Delta had forfeited its lien claims.  On November 20, 2008, Delta filed a notice of appeal to the Ninth Circuit Court of Appeals.  The issues raised by Delta on appeal have been fully briefed and await decision by the Court of Appeals.  During the pendency of the appeal, the parties have concluded discovery on the substantive claims, and Mesa's motion for summary judgment is pending.

      ii.       United Litigation

      49.      The Debtors are defendants in an action for declaratory relief filed by United prior to the Petition Date.  Under the United code-share agreement, Mesa has the right to place ten seventy seat aircraft ("RJ 70") in service for a term through October 31, 2018.  In October 2009, Mesa tendered notice of its intention to exercise its rights concerning the ten RJ-70 aircraft and provided United with the in-service dates for the aircraft as required under the United code-share agreement.  United has asserted that Mesa's notice was not in accordance with the terms of the code-share agreement.  Placement of the RJ 70's into service with United is important for Mesa's future growth.  On or about November 23, 2009, United commenced a declaratory judgment action in the U.S. District Court for the Northern District of Illinois (the "United Litigation") seeking a determination as to whether Mesa's notice to United was in compliance with the terms of the United code-share agreement as amended.  The United Litigation is currently stayed as a result of the Debtors' chapter 11 filings.

D.        Kunpeng Joint Venture

50.     On December 22, 2006, Mesa's subsidiaries, Ping Shan, SRL ("Ping Shan") and Shan Yue SRL ("Shan Yue") and Shenzhen Airlines entered into a joint venture agreement (the "Joint Venture Agreement"), pursuant to which the parties agreed to form Kunpeng Airlines ("Kunpeng"), an equity joint venture company organized under the laws of China. Kunpeng commenced common carrier passenger service on September 28, 2007.

51.     As of September 30, 2008, Mesa had contributed $6.5 million in capital to Kunpeng. Under the terms of the Joint Venture Agreement, Shenzhen Airlines and Mesa were obligated to contribute an additional RMB 204,000,000 and RMB 196,000,000, respectively (approximately $29.8 million and $28.6 million, respectively), to Kunpeng, no earlier than September 30, 2008 and no later than May 16, 2009 and in accordance with Kunpeng's operational requirements as determined by Kunpeng's board of directors.

52.     As part of Mesa's agreement to fund the start-up of Kunpeng, Kunpeng agreed to utilize 20 fifty seat aircraft to be provided by Mesa. After the fifth aircraft was put into service by Kunpeng, Kunpeng refused to accept any additional fifty seat aircraft.

53.     Ultimately, Kunpeng was unprofitable. Accordingly, instead of making the scheduled capital contributions, in April 2009, Mesa divested its 49% indirect interest in Kunpeng by selling to the nominees of Shenzhen all of Mesa's interest in each of Ping Shan and Shan Yue, both organized under the laws Barbados having limited liability. Kunpeng also agreed to pay $4.4 million for its outstanding aircraft lease obligations to the Mesa. In total, Mesa received $4.5 million, which included $100,000 for the Company's interests in Ping Shan and Shan Yue. Additionally, the five aircraft were never returned to Mesa. This resulted in a loss of $4.4 million in the second quarter of 2009.

E.             *go!*

54.     In 2006, Mesa launched *go!* the independent airline serving the Hawaiian inter-island market.  Upon its formation, Mesa was able to place a number of excess aircraft into revenue generating service at *go!* from the rejection of the US Air code-share agreement.

55.     *go!* and one of its primary competitors in this region, Republic Airways Holdings Inc. ("Republic"), were unable to operate their businesses profitably and decided to combine their operations in an effort to eliminate unnecessary costs and garners a larger share of the market in Hawaii.

56.     On October 13, 2009, Mesa entered into agreements with Mokulele Flight Services Inc. d/b/a/ Mokulele Airlines and its majority shareholder, Republic, to create a joint venture (Mo-Go, LLC) to provide Hawaii inter-island airline service under the *go!* and Mokulele brand names.  Under the terms of the agreement, Mesa owns 75% of the joint venture and the Mokulele shareholders own the remaining 25%.  Both parties have agreed to make initial cash contributions totaling $1 million, with total required cash contributions of up to $6 million on a *pro rata* basis.  Concurrently with the execution of the joint venture agreement, the joint venture entity entered into a services agreement with Mesa pursuant to which Mesa is responsible for operating the inter-island service on behalf of the joint venture and is entitled to be reimbursed for all of its costs and expenses of such operations.  In combination, the *go!* and Mokulele brands create the second largest airline serving the inter-island market and offer a strong competitive force and a  platform for successful operations.

57.     Several factors degraded revenues from the *go!* operation including, legal setbacks with certain competitors, significant aircraft and engine maintenance expense, a protracted fare war, the entrant of new competitors to the market, a sizable reduction in tourist

demand within the Hawaiian market and unpredictable fuel expenses. While *go!* achieved the goal of placing a number of excess aircraft into service and with Republic created the second largest airline servicing the inter-island market, *go!'s* operations were a drain on liquidity. Based on the most recent fares, load-factor, and fuel data, *go!* is projected to break even for the first six months of 2010.

## VII.

### Prepetition Aircraft Restructuring Efforts & Goals of Chapter 11 Cases

58. Prior to the Petition Date, the Debtors initiated discussions with manufacturers Bombardier and Embraer, and the Debtors' lessors, beneficial owners, guarantors and secured lenders of their aircraft in an effort to restructure or terminate the leases with respect to the Debtors' excess aircraft. The Debtors proposed a structure that would provide for the termination of certain leases and turn over the aircraft associated with the lease and a release of claims against the applicable Debtors. The Debtors and counterparties, however, were unable to agree on terms that would be mutually acceptable to all parties and were unable to effectuate an out-of-court restructuring.

59. Accordingly, through these chapter 11 cases, the Debtors intend to reduce their fleet in order to eliminate expenses associated with excess aircraft which will enable them to operate profitably. The Debtors have identified certain leases, subleases, and security agreements for aircraft that no longer fit into the Debtors business plan and are no longer profitable.

60. The Debtors believe that they will also be able to (i) resolve or prevail in the Delta Litigation and United Litigation, (ii) restructure bond and other debt, and (iii) restructure or reject the MPA, each of which will enable the Debtors to support future growth opportunities and

address the liquidity issues caused by the excess aircraft.  The Debtors believe that once their fleet has been rationalized and their balance sheet deleveraged that they will be in a better position to renegotiate the terms of their code-share agreements so that they track the obligations of their remaining fleet.

## VIII.

## First Day Motions

61.     Set forth below is a description of the various "First Day Motions" that the Debtors have filed and for which they seek interim approval. [8]

## Motion for Order Directing Joint Administration of Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(B) and Local Rule 1015(B)

62.     The twelve companies that comprise the Debtors are related entities.  I am informed and believe that joint administration of these cases is warranted.  I am also informed and believe joint administration of these cases for the reasons set forth in that motion will avoid the preparation, replication, filing, and service, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors and their estates considerable time and expense.

## Motion for An Order Granting An Extension of Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs

63.     The Debtors have filed a motion requesting an extension of the time within which they are required to file a panoply of documents including their schedules of assets and liabilities, schedules of contracts and leases and statements of financial affairs (collectively, the "Schedules").  I am informed and believe that these documents must be prepared and filed in the Debtors' cases and will take substantial time to create and prepare.

---

[8]  Unless otherwise noted, capitalized terms used and defined below have the meanings ascribed in the applicable First Day Motion.

64.     Given the size and complexity of their businesses and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' financial accounting systems, the Debtors have not had the opportunity to gather the necessary information to prepare and file the Schedules.

65.     In view of the amount of work entailed in completing such a project, as well as the size of the Debtors' cases and the competing demands upon the Debtors' employees in the initial post-petition period, I believe the Debtors will not be able to satisfactorily prepare the Schedules within fourteen days.

66.     At the present time, I believe that at least 45 days will be needed to complete the required Schedules.

67.     I believe that the Debtors should also be granted a waiver of the requirement to file a list of equity security holders and a waiver of the requirement to give notice of the order for relief to all equity security holders.  I believe that preparing a list of the Debtors' equity security holders with last known addresses and sending notices to all parties on the equity list would be extremely expensive and time-consuming.  To the extent it is determined that equity security holders are entitled to distributions from the Debtors' estates, I am informed and believe that those parties will be provided with notice of any bar date and will then have an opportunity to assert their interests.

**Application Of Debtors And Debtors In Possession, Pursuant To Bankruptcy Rule 2002, 28 U.S.C. § 156(c) And Local Bankruptcy Rule 5075-1, For An Order Appointing Epiq Bankruptcy Solutions, LLC As Claims And Noticing Agent**

68.     The Debtors have filed an application for the retention of Epiq Bankruptcy Solutions LLC ("Epiq") as claims and noticing agent (the "Claims and Noticing Agent") for the Debtors for the purposes set forth in that application.  With the large number of creditors that the

Debtors have identified, I believe it is in the best interests of their estates and their creditors to appoint Epiq as agent for the Clerk.

69.     I understand that Epiq is one of the country's leading chapter 11 administrators with experience in noticing, claims processing, assisting with claims reconciliation and distribution.  I believe Epiq is well qualified to provide the Debtors with experienced claims and noticing services in connection with theses cases and has substantial experience in the matters upon which it is to be engaged.

70.     Accordingly, I believe it is in the best interest of the Debtors' estates to seek the entry of an order retaining and appointing Epiq as the agent for the Clerk and as custodian of official court records and to perform such other services as may be required by the Debtors.

**Motion For Authorization To (I) Pay Prepetition Sales And Use Taxes,**
**And Other Similar Taxes and Fees And (II) Direct Financial Institutions**
**To Honor And Process Related Checks and Transfers (the "Tax Motion")**

71.     The Debtors seek to pay certain Taxes and Fees as set forth in the Tax Motion.  In connection with the normal operation of their businesses, the Debtors collect, withhold and incur sales, use, transportation, excise, fuel and employment taxes, as well as other fees and charges described in the Tax Motion (collectively, the "Taxes and Fees").  The Debtors remit Taxes and Fees to various federal, state and local government, and taxing, licensing and airport authorities (collectively, the "Governmental Authorities").  Taxes and Fees are remitted by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions (the "Banks").

**A.     The Debtors' Taxes**

***Federal Transportation Taxes***

72.     The Debtors are responsible for the collection of certain excise taxes related to air transportation (the "Transportation Taxes").  Transportation Taxes generally include (i) an excise

tax on the sale of each air travel passenger ticket calculated at 7.5% of the base fare, (ii) an excise tax payable in connection with any travel beginning and ending in the United States that is not subject to the tax described in section (i), (iii) a segment fee for each non-rural domestic segment of paid travel and (iv) an excise tax on the amount paid for the transportation of property by air that begins or ends in the United States.  I am informed and believe that the Debtors generally are required to remit these taxes to the relevant Governmental Authorities on a monthly basis.  As described below, Transportation Taxes are reduced by the amount of the refund credited to the Debtors on account of paid Fuel Taxes.

### *Federal Fuel Taxes*

73.     I am informed and believe that the Internal Revenue Code also imposes excise taxes on the purchase of aviation fuel (the "Fuel Taxes").  Because the purchaser itself is responsible for paying the fuel tax to the Internal Revenue Service (the "IRS"), the Debtors make payments for Fuel Taxes only in instances in which the Debtors themselves purchase fuel.  Accordingly, the Debtors do not pay any Fuel Taxes in connection with fuel purchased for their code-share flights with Delta, which arranges and purchases all fuel in connection with such flights.

74.     United purchases fuel at certain airport locations and the Debtors purchase fuel at other airport locations in connection with the Debtors' code-share flights with United.  At most of the airport locations where the Debtors purchase fuel, the Debtors pay Governmental Authorities 24.4 cents per gallon on account of Fuel Taxes. [9]  Under the United code-share agreement, the Debtors pre-bill United on a monthly basis in the amount of 4.4 cents per gallon of fuel the Debtors expect to purchase, and receive four reimbursement payments per month

---

[9]  Tax on fuel purchased at certain airport locations is less than 24.4 cents per gallon.

from United.  United and the Debtors true up the amounts pre-billed and amounts actually paid

by the Debtors approximately 90 days after the relevant month of service.  The Debtors file

quarterly tax returns pursuant to which they receive from the IRS a refund in the amount of 20

cents per gallon.  In the ordinary course of business, the Debtors pay the IRS approximately

$500,000 per month in federal fuel taxes (@ 24.4 cents per gallon) in connection with fuel

purchased by the Debtors for their United code-share flights.  United reimburses the Debtors in

the approximate amount of $100,000 per month and the remaining amount of approximately

$400,000 is refunded by the IRS on a quarterly basis.

     75.    US Air purchases fuel through Material Services Corporation ("MSC") in

connection with the Debtors' code-share flights with US Air.  Although US Air purchases fuel

by arrangement with MSC, the Debtors pay Governmental Authorities 24.4 cents per gallon on

account of Fuel Taxes. [10]  Under the US Air code-share agreement, the Debtors pre-bill US Air

on a monthly basis in the amount of 4.4 cents per gallon of fuel the Debtors expect to purchase,

and receive four reimbursement payments per month from US Air.  US Air and the Debtors true

up the amounts pre-billed and amounts actually paid by the Debtors approximately 120 days

after the relevant month of service.  The Debtors file quarterly tax returns pursuant to which they

are refunded the amount of 20 cents per gallon from the IRS.  In the ordinary course of business,

the Debtors pay the IRS approximately $800,000 per month in federal Fuel Taxes (@ 24.4 cents

per gallon) in connection with fuel purchased by the Debtors for their US Air code-share flights.

US Air reimburses the Debtors in the approximate amount of $140,000 per month and the

remaining amount of approximately $640,000 is refunded by the IRS on a quarterly basis.

---

[10]  Tax on fuel purchased at certain airport locations is less than 24.4 cents per gallon.

76.     The Debtors purchase their own fuel for flights operated by *go!* Mokulele. Accordingly, the Debtors pay 24.4 cents per gallon in Fuel Taxes for a total monthly amount of approximately $100,000.  The Debtors file quarterly tax returns pursuant to which they are refunded the amount of 20 cents per gallon for a total refund of approximately $240,000 per quarter.

77.     The Debtors expect to receive an aggregate refund in the amount of approximately $1,691,085.00 on account of Fuel Taxes incurred during the month of December 2009 and, accordingly, believe that no amount will be due on account of Fuel Taxes as of the Petition Date.  In addition, such refund will be applied to reduce Transportation Taxes incurred during the fourth quarter 2009 in the amount of approximately $926,630.00 and, accordingly, no amounts are due in connection with Transportation Taxes as of the Petition Date.

***Airport Fees and Passenger Charges***

78.     The Debtors are also responsible for the collection of various taxes related to customs, immigration, passenger services and security including, without limitation, fees for inspection of international passengers, baggage and cargo.  Certain of these types of taxes and fees collected before the Petition Date have not yet been remitted, including those amounts more specifically outlined below.

79.     The Debtors are required to collect passenger facility charges ("PFCs") from passengers on behalf of certain airport operators for use by those airports to finance approved airport improvement projects.  These charges must be remitted to the appropriate airport operators by the last day of the month following the month in which a ticket is sold.  In the ordinary course of business, the Debtors remit to applicable airport operators approximately $100 per month on account of PFCs incurred with respect to passengers who travel on *go!*

Mokulele flights. [11]  Approximately $100 of PFCs collected before the Petition Date have not been remitted to the relevant airport operators.  Collected PFCs are held in trust and I am informed and believe that they are not considered property of the Debtors' estates.

80.    The Debtors also collect fees related to security services ("Security Fees").  These fees must be remitted to the Undersecretary of Transportation or the Transportation Security Administration on or before the last day of the month following the month in which a ticket is sold.  In the ordinary course of business, the Debtors pay an average total amount of approximately $324,000 in Security Fees over a three-month period.  Approximately $100,000 of Security Fees have been collected but not remitted by the Debtors before the Petition Date.

81.    In addition, airlines typically pay fees to the airport authorities of the airports at which they land.  In many cases, the obligation to pay landing fees, apron rents and terminal rents is assured by a cash deposit, a surety bond or a standby letter of credit.  The surety bonds are often secured by a letter of credit and the letters of credit are often secured by cash deposits.  Similarly, certain obligations to the United States Customs ("U.S. Customs") authorities are bonded or secured by letters of credit.  Therefore, the secured airport authorities and U.S. Customs authorities will ultimately be paid notwithstanding a debtor's bankruptcy, and one claim (of the airport authority or U.S. Customs) simply will be exchanged for another claim (of the letter of credit issuer or bonding company).

82.    I believe that a failure to pay these fees at the outset of the cases could be harmful to the Debtors' operations and will result in the Debtors' estates needlessly incurring additional

---

[11]  PFCs incurred with respect to passengers who travel on flights operated by the Debtors in connection with their code-share agreements are remitted by the Debtors' respective code-share partners directly to the relevant airport operators.

costs as parties exercise their rights under surety bonds and letters of credit, charge fees to the Debtors and, in some instances, instigate litigation in this Court to enforce their rights.

83.     In the ordinary course of business, the Debtors pay approximately $3,000,000 per month to airport authorities on account of landing fees.  Approximately $2,700,000 of such fees are associated with flights operated by the Debtors under the code-share agreements, and the remaining fees in the approximate amount of $300,000 are associated with the Debtors' *go!* Mokulele flights.  Landing fees are paid by the Debtors directly to the applicable airport authorities.  Pursuant to the Debtors' code-share agreements, the Debtors are reimbursed by their code-share partners for landing fees paid by the Debtors in connection with flights they operate under such agreements.  As of the Petition Date, the Debtors owe approximately $2,530,000 in landing fees to certain airport authorities for the month of December 2009.  The Debtors are scheduled to remit such amounts to the airport authorities in mid-January 2010.

***Sales and Use and Other Taxes***

84.     In addition to the taxes and fees described above, the Debtors also collect or incur various general sales and use taxes ("Sales and Use Taxes").  I am informed and believe that the Debtors are required to remit these Sales and Use Taxes to the applicable Governmental Authorities on a periodic basis.  Approximately $402.00 in Sales and Use Taxes have been incurred or collected by the Debtors before the Petition Date.  Such amounts have not yet been remitted to the relevant Governmental Authorities but will be as they come due.  The Debtors generally will then pay any Sales and Use Taxes to the appropriate Governmental Authorities or, in some cases, to a third-party processor (the "Third Party Processor") that subsequently remits such taxes to the appropriate Governmental Authorities.

85.     The Debtors also collect, withhold or incur various other taxes, fees and charges, state and local taxes imposed on overall gross receipts, franchise taxes, corporate income taxes, real and personal property taxes, state and local fuel excise taxes, [12] local tourism taxes, charges in connection with the importation of goods, business and liquor license fees and other similar federal, state or local taxes, charges and fees (including, without limitation, any amounts required to be withheld or collected under applicable law) (the "Other Taxes").  The Debtors are required to remit these Other Taxes to the applicable Governmental Authorities on a periodic basis.  Approximately $6,127,038.00 in these Other Taxes have been incurred, withheld or collected by the Debtors before the Petition Date.  Of this amount, approximately (i) $2,849,263.00 consists of unpaid personal property taxes incurred during the year 2009 and due prior to the Petition Date, (ii) $3,144,708.99 consists of personal property taxes incurred during the year 2009 but not due until after the Petition Date, (iii) $8,958.00 consists of real property taxes incurred during the year 2009 but not due until after the Petition Date, (iv) $72,346.00 consists of corporate income taxes incurred during the year 2009 and (v) $51,762.00 consists of unpaid state fuel, excise, liquor, gross receipts, and environmental taxes incurred during the year 2009.  Amounts incurred on account of the Other Taxes have not yet been remitted to the relevant Governmental Authorities but will be as they come due.

86.     I am informed and believe that many federal and state statutes hold certain directors, officers and other employees of entities responsible for collecting or withholding taxes,

---

[12]  The Debtors make direct payments to Governmental Authorities for state and local fuel taxes in connection with their *go!* operations and their code-share flights with United.  The Debtors' state and local fuel tax liability in connection with their *go!* operations amounts to approximately $50,000 per month, and the Debtors' state and local fuel tax liability in connection with their code-share flights with United amount to approximately $150,000 per month.

  The Debtors do not pay any state and local fuel taxes in connection with their code-share flights with Delta and US Air, which parties pay such taxes directly to the Governmental Authorities.

or remitting certain taxes, personally liable for these types of taxes. I am informed and believe that the payment of the Taxes and Fees will avoid director and employee loss of focus and morale resulting from the risk of personal liability. I believe that any lawsuit and any ensuing liability would distract personnel from important tasks, to the detriment of all parties in interest in these chapter 11 cases. The dedicated and active participation of the Debtors' directors, officers and other employees is not only integral to the Debtors' continued, uninterrupted operations, but is also essential to their successful reorganization.

87. I believe that payment of certain of the prepetition Taxes and Fees is critical to the Debtors' continued, uninterrupted operations and to avoid immediate and irreparable harm to the Debtors' estates. Non-payment of the Taxes and Fees may cause certain Governmental Authorities to take precipitous action, including but not limited to conducting audits, filing liens, pursuing payment of Taxes and Fees from the Debtors' directors, officers and other employees, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs and burdens on the Debtors' estates. I believe that prompt payment of the Taxes and Fees will avoid these unnecessary and potentially costly governmental actions. Accordingly, I believe that the failure to pay the Taxes and Fees would cause immediate and irreparable harm to the Debtors.

88. The Debtors pay the Governmental Authorities on a periodic basis with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers"). Before the Petition Date, certain Governmental Authorities were sent Checks or Electronic Transfers for these obligations that may not have cleared as of the Petition Date.

89. I believe that the relief requested in the Tax Motion is essential, appropriate and in the best interest of the Debtors' estates and creditors. Absent this relief, I believe that the value of the Debtors' estates will suffer, possibly precipitously.

**Debtors' Motion For Authorization Pursuant To Sections 105, 363, 554, And 1110 Of The Bankruptcy Code And Bankruptcy Rules 6003, 6004 And 6007 To (I) Abandon Certain Aircraft, Engines, And Other Related Equipment, (II) Transfer Title To Certain Aircraft, Engines, And Other Related Equipment, And (III) Satisfy The Surrender And Return Requirements Under The Bankruptcy Code**

90. By this motion, the Debtors seek authorization to, among other things, abandon certain aircraft and other related equipment identified on Exhibit A to the motion, which equipment is owned by the Debtors and no longer necessary in the operation of their business (collectively, the "Excess Owned Equipment"), and relatedly, surrender and transfer title to the Excess Owned Equipment to the applicable mortgagees, security trustees, or indenture trustees having security interests in such Excess Owned Equipment (the "Secured Parties").

91. As currently configured, the Fleet is too large for the Debtors' operations. The Debtors need to reduce and rationalize the Fleet to eliminate the significant costs associated with retaining, maintaining, and storing the aircraft that is not in use. Prior to filing this motion, the Debtors conducted an extensive analysis of the Fleet and identified the aircraft and related equipment that are not necessary for continued operations or a successful reorganization. The Debtors' motion is the first in what the Debtors expect will be a series of motions to either abandon aircraft or reject the related leases. Once the Fleet is reduced and the excess aircraft are disposed of, the Debtors believe they will operate profitably and can successful emerge from chapter 11.

92. The Debtors believe that the relief requested by the motion is warranted because the Fleet reduction will eliminate obligations of the Debtors for which there is no corresponding benefit. Further, the proposed procedures establish an orderly and efficient process for the

surrender and return of the Excess Owned Equipment and related documentation, which procedures are reasonable and that, I am advised, are consistent with the requirements under section 1110 of the Bankruptcy Code. In this case, (a) the Excess Owned Equipment is not being used by the Debtors or (b) the liens against the Excess Owned Equipment exceed the value of such equipment to the Debtors' estates. Further, the market for these aircraft is depressed and the Debtors have a limited ability to remarket the Excess Owned Equipment as it would require a substantial expenditure to operate and maintain the aircraft during the remarketing period. The Debtors do not believe the Excess Owned Equipment poses an environmental hazard and such equipment is not likely to cause a serious risk to the public. Under these circumstances, I believe that transfer of title to the relevant Secured Parties is appropriate and in the best interest of the Debtors' estates.

93. Based on these reasons and circumstances, the Debtors believe that the motion for authorization to abandon the Excess Owned Equipment and for related relief is in the best interest of the estates.

**Motion Pursuant to Sections 105(A), 362, and 363 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 for Interim Authorization to Honor and Satisfy Prepetition Obligations in the Debtors' Discretion Under Certain Industry Related Agreements and Schedule Final Hearing for the Relief Sought Herein (the "Industry Agreement Motion")**

94. The airline business is an interdependent industry based upon a vast worldwide network of agreements that govern essentially all aspects of airline operations. Without agreements that provide for the sharing and exchange of services, it would be virtually impossible for the Debtors and any airline to provide efficient and cost-effective service. Most importantly, certain of the Industry Agreements allow the Debtors to fulfill their obligations to their codeshare partners, United Airlines, Inc. ("United"), Delta Air Lines, Inc. ("Delta"), and US Airways, Inc. ("US Air"), which codeshare arrangements generate most of the Debtors'

revenues. [13]  Certain of the other Industry Agreements provide for the exchange of services, rights to issues tickets, and the settlement of accounts among participating airlines and travel agents.  Finally, certain other Industry Agreements permit travel agents to make and confirm reservations, price and issue tickets automatically and also provide for publication of the Debtors' fares.  Such Industry Agreements facilitate basic levels of cooperation among the Debtors and other airlines with regard to vital activities, such as making reservations and transferring passengers, freight, baggage, mail, and advertising of fares.

95.    Agreements substantially similar to the Industry Agreements are an essential component to the Debtors' businesses.  Certain services under these agreements are the equivalent of industry wide utility services for which no readily available alternative exists.  Should the Debtors fail to honor or pay valid, accrued, and unpaid prepetition obligations owed to the parties pursuant to the Industry Agreements, these parties may refuse or delay their performance under the Industry Agreements or otherwise put at risk the parties' critical relationships, which would result in immediate and irreparable harm to the Debtors' estates and all stakeholders in these chapter 11 cases.  The Debtors seek to take immediate, active steps to preserve these essential relationships.  Accordingly, it is essential that the Debtors be allowed, honor and pay the valid, accrued, and unpaid prepetition obligations arising under the Industry Agreements in the ordinary course of business.

A.    **The Interline Agreements**

96.    In relation to the Debtors' *go!* Mokulele operations, the Debtors are party to agreements with other carriers that are commonly known as interline agreements (collectively, the "Interline Agreements").  A non-exclusive list of the Debtors' various Interline Agreements

---

[13] The Debtors are filing a motion to assume the Codeshare Agreements, shortly following the Petition Date.

are annexed to the Essential Industry Agreements Motion that sets forth the applicable Interline

Agreement and the parties thereto. All of the Interline Agreements are bilateral – two carriers

contract for interline passenger and baggage transfer and other services and provide for regular

periodic settlement of their accounts, either directly or through a clearinghouse. Pursuant to a

typical Interline Agreement, one airline authorizes the other airline to issue tickets for

transportation. Interline agreements permit airlines and travel agents to issue a single ticket that

can be used for travel on more than one airline. In addition, interline agreements allow airline

passengers whose flights are delayed or cancelled to use their tickets with another airline for a

different flight. These agreements are common throughout the airline industry due to the

operating efficiencies that they create.

97.     The Interline Agreements also facilitate the purchase of tickets through travel

agents. Travel agents and airlines often issue tickets with itineraries that involve more than one

carrier. If the Interline Agreements were not in place, a traveler purchasing a ticket directly from

a carrier would be issued a ticket only for those segments of the itinerary flown by that carrier

even though the desired itinerary might necessitate the use of a second carrier. Similarly, if the

traveler sought to buy his or her ticket from a travel agent and no interline agreement was in

place, the travel agent would be required to write at least two tickets, thus making it significantly

less efficient for the travel agent to book flights on a carrier that is not party to the interline

system.

98.     I believe that the Debtors would be at a significant competitive disadvantage if

they are not able to participate in the interline traffic network pursuant to their Interline

Agreements. Certain of the Debtors' revenues is derived from ticket sales from other airlines, as

well as ticket sales of travel agencies and other distributors. Travel agencies might be reluctant

to book customers on the Debtors' *go!* Mokulele flights if Mesa cannot effectively and efficiently honor its obligations under the applicable Interline Agreements.

99.     The Interline Agreements also provide for the transfer of luggage of passengers that are connecting from one airline to another. For example, without the Interline Agreements, a passenger of the Debtors that connects from a *go!* Mokulele flight to another carrier's flight in Honolulu would have to retrieve his or her luggage at the *go!* Mokulele terminal before boarding the connecting flight in Honolulu. The Interline Agreements enable the Debtors to book connecting flights and facilitate the transfer of luggage between carriers without having to impose the inconvenience of collecting and transferring luggage upon their customers, which would be time consuming and cause delays that would prohibit the efficient operation of all airlines.

100.    As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition obligations under the Interline Agreements is approximately $225,000. This estimate is a gross figure, and not net of certain amounts that may be owed to Mesa under certain Interline Agreements, and thus, the actual cash outlay by the Debtors will likely be materially less than $225,000.

**B.      Clearinghouse Agreements**

101.    The Debtors generally settle their accounts under certain Industry Agreements through a clearinghouse, either the Airlines Clearing House, Inc. ("ACH") or the International Air Transport Association Clearinghouse ("IATA"). The Debtors are associate members of the ACH, and are parties to two clearinghouse agreements with ACH (the "Clearinghouse Agreements"). One of the Debtors' Clearinghouse Agreements with ACH allows the Debtors to participate in IATA billing and settlement plan regions, which facilitate international sales

transactions similar to those domestic sales transactions facilitated by the other Clearinghouse Agreement with ACH.

102.    On a weekly basis, ACH aggregates invoices to the Debtors from IATA, other participating carriers (including the Principal Carriers (as defined below)), and certain vendors and service providers, and from the Debtors to such parties (as applicable), and calculates a net balance.  While this process is done on a weekly basis, some of the invoices or other charges may be for services rendered as far back as six months.  Once the net balance is calculated, ACH notifies the Debtors of the result.  For any given clearance month, the Debtors may be net debtors and be required to make a payment to ACH (i.e., if the total amount of invoices from the other participating carriers exceeds the total amount of the Debtors' invoices) or they may be net creditors and entitled to receive a payment from ACH (i.e., if their invoices exceed the amount invoiced by other carriers).  The Debtors pay ACH approximately $45,000 each month for its services under the Clearinghouse Agreements.

103.    As noted above, certain amounts are payable to third parties that are processed by the clearinghouse on behalf of such third parties ("ACH Settled Accounts").  The Debtors are not agreeing or otherwise obligating themselves to pay any prepetition claims to such third parties that are, or would otherwise be, processed through the Clearinghouse Agreements, except for such undisputed prepetition claims that the Debtors expressly agree to pay in accordance with an order of this Court.

104.    As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition obligations owed related to the Clearinghouse Agreements, including amounts that may be owed by the Debtors with respect to ACH Settled Accounts, is approximately $325,000 on a gross basis, which is comprised of approximately $225,000 owed by the Debtors under the

Interline Agreements (discussed above in paragraph 12) and approximately $100,000 that may be owed to GDSs (discussed below and in paragraph 28 of the Industry Agreement Motion). The actual cash expenditure by the Debtors will likely be substantially less, given certain amounts are owed to them under the Clearinghouse Agreements.

## C.     The ARC Agreement

105.     The Debtors are also party to a multi-lateral agreement (the "ARC Agreement") with the Airlines Reporting Corporation ("ARC") in relation to the Debtors' *go!* Mokulele operations as to account settlements not handled by ACH (discussed above). ARC serves as a clearinghouse and enables the refund claims of, and commissions owed to, travel agencies to be offset against the funds owed to airlines from travel agencies. The majority of travel agents located in the United States are members of ARC. Under the ARC Agreement, a participating travel agent's obligations to an airline are netted against the travel agent's claims against the airline, and the net amounts due to the airline and from the travel agent are paid in lump sums. The Debtors are generally net creditors of travel agents under the ARC Agreement as they have consistently been owed more money through ARC than they owe travel agents for commission adjustments and ticket refunds. Thus, as of the Petition Date, there are no outstanding claims under the ARC Agreement. Nonetheless, out of caution, the Debtors seek authority, but not direction, to pay accrued and unpaid prepetition obligations, if any, under the ARC Agreement, including any amounts that may be owed to ARC for its services (which the Debtors estimate may be approximately $24,000) and amounts that may be owed with respect to accounts handled by ARC, and to continue honoring this agreement in the ordinary course of business.

## D.     Codeshare Agreements

106.     Approximately 96% of the Debtors' consolidated passenger revenues are derived from their codeshare agreements (as amended, supplemented or modified from time to time, the "Codeshare Agreements") with US Airways, Inc., United Air Lines, Inc. and Delta Air Lines, Inc. (collectively, the "Principal Carriers").  Under the Codeshare Agreements, the Debtors provide air transportation services to the Principal Carriers' customers on various flight routes, using the Principal Carriers' flight designator codes and the Principal Carriers' livery and service marks.  In exchange for providing flights and other services pursuant to the Codeshare Agreements, the Debtors receive compensation (including minimum monthly amounts and additional amounts based on, for example, number of flights and block hours performed during the month) from the Principal Carriers and are also reimbursed for certain expenses by the Principal Carriers.  In some cases, the Principal Carriers also provide certain customer service, ground handling service and/or other functions to the Debtors in connection with the foregoing.

107.     The Principal Carriers also have codesharing agreements with other airlines (including members of their respective SkyTeam and Star Alliances), whereby one airline markets and sells air transportation to its passengers in conjunction with the scheduled services provided by another airline, and in doing so, each party is permitted to use the other's flight designator code.  These agreements afford customers the options and flexibility of traveling on multiple airlines while being treated as a customer traveling on a single airline.  Through these arrangements, the Principal Carriers and their respective codesharing counterparties are able to offer passenger services between cities by making available one-stop service via cities served among the Debtors, the Principal Carriers, and the other carriers.

108.     Typically, the Principal Carriers net out from payments due to the Debtors obligations owed by the Debtors under the Codeshare Agreements, or if necessary, the  Debtors

directly pay the Principal Carriers for any obligations. The Debtors believe that their accrued

and unpaid prepetition obligations under the Codeshare Agreements, if any, are *de minimis*, and

as noted, typically no cash outlay by the Debtors is required as generally, amounts owed are

netted against the substantially larger amounts due to the Debtors.

**E.**      **Alliance Agreements**

109.      The Debtors and certain airlines are party to agreements (the "<u>Alliance</u>

<u>Agreements</u>") that provide for cooperative marketing efforts. The Alliance Agreements provide

several benefits to the Debtors' partners and their customers, including reciprocal codeshare

arrangements, the ability for the Debtors' customers to accrue and redeem frequent flyer miles

on flights of the participating airlines, and the ability to have reciprocal airport lounge access. In

particular, the Debtors participate in the Star Alliance and SkyTeam Alliance in connection with

the Debtors' Codeshare Agreements with United, US Airways, and Delta.

110.    50.      The Debtors do not believe that, as of the Petition Date, any accrued

prepetition obligations are owed by them under the Alliance Agreements. Generally, the Debtors

have no financial obligations under such agreements; the Debtors' partners do. Nonetheless, out

of an abundance of caution, the Debtors seek authority, but not direction, to pay accrued and

unpaid prepetition obligations (if any) under the Alliance Agreements and to continue honoring

the Alliance Agreements in the ordinary course of business.

**F.**      **GDS Agreements**

111.      The Debtors are party to separate participation carrier agreements (the "GDS

Agreements") with various global distribution systems (the "<u>GDS</u>" or "<u>GDSs</u>"). The GDS

comprises a network of computer systems and databases that store, process, and distribute

information about available passenger air transportation. The GDS enables travel agents to

accept and record bookings of those services from remote locations.  In addition to storing

information, the GDS also allows travel agents to make and confirm reservations, price and issue

tickets automatically, and process the travel agencies' internal accounting.  The Debtors use

Sabre as their main GDS, although the Debtors distribute their fares for corporate, government,

and travel agent accounts through other GDSs:  Galileo and Amadeus.

112.     52.     A portion of the Debtors' air passenger transportation sales volume in its

*go!* Mokulele operations is derived from airline ticket sales made through travel agents.  Almost

all travel agents in the United States subscribe to GDS.  If the Debtors did not have access to and

participate in GDS to book tickets, travel agents would have to independently look up the flight

information, contact the Debtors, issue tickets manually, and complete the related accounting

without the assistance provided for under the GDS Agreements.  The amount of effort involved

in completing such a reservation would make it expensive and not practicable for travel agents to

sell tickets on the Debtors' airline.

113.     The Debtors spend approximately $100,000-$150,000 per month on GDSs, with

billing done by the GDSs weekly, semi-monthly or monthly (depending on the GDS).  The

obligations incurred under the GDS Agreements are paid and settled through the clearinghouse

ACH.  Because a material portion of *go!* Mokulele's air passenger transportation volume is

derived from sales that are processed through GDS, these systems are important to the Debtors'

business.

**G.     ATPCO Agreement**

114.     54.     Airline Tariff Publishing Company ("ATPCO") facilitates the publication

of airline tariff filings that are communicated by ATPCO to ticket vendors pursuant to an

agreement (the "ATPCO Agreement") with the Debtors.  The Debtors file all of their published

and private fares through ATPCO, and GDS accesses such information from ATPCO.  ATPCO also files fares for Mesa with government authorities, as is required for all airlines.  This process is important to the Debtors' ability to sell tickets in the marketplace on a competitive basis and to comply with governmental requirements.  The obligations incurred under the ATPCO Agreement (approximately $1,500 per month) are paid one month in arrears through the clearinghouse, ACH.

115.    The Debtors believe that, as of the Petition Date, they may owe a *de minimis* amount under the ATPCO Agreement – approximately $1,500 or less.  The Debtors seek authority to pay accrued and unpaid prepetition obligations under the ATPCO Agreement and to continue honoring the ATPCO Agreement in the ordinary course of business.

116.    56.    I believe that any disruption in performance by third parties under the Industry Agreements may well have a material adverse effect on the Debtors' business and their prospects for successful reorganization.  It is critical to the Debtors' operations that they are assured of uninterrupted participation under the Industry Agreements and uninterrupted collection of the revenues directly or indirectly produced from such participation under the applicable Industry Agreements.  The Debtors believe that they are not in default under any of the Industry Agreements and any outstanding claims relating to accrued and unpaid prepetition obligations are *de minimis* relative to the benefits the Debtors receive under these agreements.

117.    I believe that the Interline Agreements do not impose any material economic burdens on the Debtors.  Rather, the Debtors' continued ability to participate in and enforce the Interline Agreements is critical to the Debtors' ability to operate their business.  Similarly, without the Debtors' ability to preserve the Clearinghouse Agreements it would be impossible

for them to settle payment obligations to and collect payments from other airlines arising under the Industry Agreements.

118.     With respect to the ARC Agreement, if the Debtors are not permitted to honor their obligations to ARC, I believe that ARC might suspend offsets of prepetition travel agency refunds claims that have not been processed before the Petition Date.  The continuation of offsets pursuant to the ARC Agreement will help to preserve travel agency remittances to the Debtors.  I believe that it is essential that the Debtors maintain the confidence of travel agencies so that the agents will continue to sell and market the Debtors' services to the traveling public.  Notably, the sales revenue generated by these travel agents pursuant to the ARC Agreement exceeds the aggregate accrued and unpaid prepetition claims under this agreement.  Accordingly, I believe the benefits far out weigh the cost associated with the Debtors' obligations.

119.     As most of the Debtors' primary business is derived from their Codeshare Agreements, it is necessary for the Debtors to maintain these agreements with the Principal Carriers.  The Codeshare Agreements permit the Debtors to provide the necessary services to the Principal Carriers and in exchange, the Debtors realize most of their revenues from the Codeshare Agreements (approximately 96%).  Further, as discussed above, the Principal Carriers typically net out from – set off against – payments due to the Debtors any of the Debtors' obligations owed under the Codeshare Agreements.  By the relief requested in the Essential Industry Agreements Motion, any amounts that may be owed by the Debtors under the Codeshare Agreements would typically be satisfied through netting by the Principal Carriers, and consequently, the Debtors would likely not have to make any cash outlay for such claims.  Overall, the benefits of the Codeshare Agreements greatly outweigh the relatively *de minimis*

cost associated with honoring and satisfying any accrued and unpaid prepetition claims with respect thereto.

120.    Similarly, the Alliance Agreements, the GDS Agreements, and the ATPCO Agreement permit the Debtors to market their services in a cooperative and cost-effective manner with the other participants and/or utilize facilities in airports where the Debtors do not have free standing operations.

121.    By honoring and satisfying valid, accrued, and unpaid prepetition claims under the Industry Agreements, I believe that the Debtors will help to ensure that their transition into chapter 11 is seamless and does not affect their ability to generate revenue, maintain customer loyalty, enhance their continued viability, and preserve the value of these estates for all stakeholders in these chapter 11 cases.

122.    As a result of the commencement of these chapter 11 cases, and in the absence of an order of the Court providing otherwise, I believe that the Clearinghouses may reject or dishonor the Debtors' checks and other transfers with respect to prepetition obligations relating to the Industry Agreements.  Therefore, the Debtors request that the Court authorize the Clearinghouses and any other bank or clearinghouse authorized by the Court to administer the Debtors' bank accounts under the Cash Management Motion filed contemporaneously herewith to receive, process, honor, and pay all prepetition and postpetition transfers executed by the Debtors with respect to the Debtors' obligations under the Industry Agreements.

**Motion Pursuant To Sections 105, 362, and 541 of The Bankruptcy Code And Bankruptcy Rule 3001 Establishing Notification and Hearing Procedures for Trading in Claims and Equity Securities**

123.    The Debtors request that the Court enter an order establishing a notice and hearing procedure which must be satisfied before certain transfers of claims against, and equity securities in, the Debtors, or any beneficial interest therein, are deemed effective.

124.     The Debtors' net operating loss ("NOL") carryforwards are valuable assets of their estates.  I believe that unfettered trading in claims and equity securities in the Debtors, with no advance warning of such trades, jeopardizes these assets and, thus, a source of value to the Debtors' stakeholders.  Further, unfettered trading may potentially lead to the triggering of "change in control" termination provisions in the Debtors' codeshare agreements, unnecessarily putting at risk these critical agreements that the Debtors seek to assume.

***Change in Ownership/Control Matters Related to the
Debtors' Net Operating Loss Carryforwards and Codeshare Agreements***

125.     The Debtors estimate that as of December 31, 2009, they had a consolidated NOL carryforward of approximately $89,503,317.  In addition, the Debtors anticipate generating additional NOLs during 2010.  Based on current projections, the Debtors expect to use a substantial portion of their NOL carryforwards to offset future income and dramatically reduce their federal income tax liability, subject to certain limitations.  The Debtors' consolidated NOL carryforwards are valuable assets of the Debtors' estates.  I am informed that all applicable law generally permits corporations to carry forward NOLs to offset future income, thereby reducing federal income tax liability on such future income and significantly improving their cash position.  I am further informed that the ability of the Debtors to use their NOL carryforwards is subject to certain statutory limitations, including limitations on corporations that undergo a change of ownership to use their NOLs and certain other tax attributes to offset future income.

126.     I am informed that under applicable law an ownership change occurs when the percentage of a loss company's equity (measured by value) owned by one or more 5% shareholders increases by more than fifty percentage points over the lowest percentage of stock owned by such shareholders at any time during a three-year rolling testing period.  A change of

ownership before confirmation of any plan would effectively eliminate the Debtors' ability to use their NOL carryforwards and certain other tax attributes.

127.    There is a danger that if the relief requested in the NOL Motion is not granted, the Debtors could lose the substantial benefits of their NOL carryforwards before their emergence from chapter 11 as a result of continued trading and accumulation of claims by creditors in claims against, and by stockholders in interests in, the Debtors. Accordingly, consistent with the automatic stay, the Debtors need the ability to monitor and possibly object to changes in the ownership of stock and claims to assure that (i) a 50% change of ownership does not occur before the effective date of any chapter 11 plan in these cases and (ii) for a change of ownership occurring under a chapter 11 plan, the Debtors have the opportunity to avail themselves of the special relief provided under applicable law.

128.    Further, if such claims and securities trading were not monitored and restricted, the Debtors could effectively lose the benefit of their codeshare agreements with US Airways, Inc., United Air Lines, Inc. and Delta Air Lines, Inc. (collectively, the "Codeshare Agreements"). Approximately 96% of the Debtors' primary business is derived under the Codeshare Agreements, and thus, it is critical to the Debtors' reorganization that the Debtors maintain and continue with these agreements. These agreements, however, contain certain "change in control" provisions that may potentially allow the air carrier counterparties to terminate the agreement if, for example, a certain percentage of the voting power (through Mesa's equity securities) of Mesa is transferred and/or under similar circumstances. Absent the relief requested by this Motion and the Debtors' ability to closely monitor this situation, a scenario could develop whereby some or all of the change in control provisions in the Codeshare Agreements may be triggered (during the course of these cases or through a proposed plan of

reorganization that contemplates issuing common stock), in which case the Debtors may lose the value and benefit of the Codeshare Agreements prior to or after assumption thereof by the Debtors.

129. Under the NOL Motion, the Debtors request authorization to protect and preserve valuable NOLs in excess of $89 million, as well as protect the value of the Codeshare Agreements, by establishing notice and waiting periods to govern transfers of equity interests in and claims against the Debtors and procedures for objecting to such transfers in certain circumstances.

130. If left unrestricted, such trading could severely limit the Debtors' ability to use valuable assets of their estates, namely their NOLs and potentially the Codeshare Agreements, and could have significant negative consequences for the Debtors, their estates and the reorganization process.

131. Thus, in order to preserve to the fullest extent possible the flexibility to craft a plan of reorganization which maximizes the use of their NOL carryforwards, the Debtors seek limited relief that will enable them to closely monitor certain transfers of claims and equity securities and be in a position to act expeditiously to prevent such transfers if necessary to preserve their NOL carryforwards. I am informed that the procedure set forth in the NOL Motion preserve the Debtors' ability to seek relief at the appropriate time if it appears that additional trading may jeopardize the use of their NOL carryforwards or affect the Codeshare Agreements.

132. Once an NOL is limited under applicable law, I am informed and believe that its use is limited forever, and once a claim or equity interest is transferred, it cannot be undone. The relief sought in the NOL Motion is necessary to avoid an irrevocable loss of the Debtors' NOL

carryforwards, as well as potentially adverse consequences to the Debtors under the Codeshare Agreements – and the irreparable harm to the Debtors' estates and creditors which could be caused by unfettered trading in the Debtors' claims and equity securities, trading which jeopardizes the Debtors' ability to offset taxable income freely with NOL carryforwards and potentially, the effective value of the Codeshare Agreements.

133.    The Debtors' NOLs are valuable assets of their estates which will inure to the benefit of their stakeholders and facilitate their reorganization.  I believe that unfettered trading in claims and equity securities in the Debtors, with no advance warning of such trades, jeopardizes this asset, as well as potentially the value of the Codeshare Agreements.

**Motion for Authorization to (I) Honor Prepetition Obligations to Customers and Certain Other Business Entities and to Otherwise Continue Customer and Related Programs and Practices in the Ordinary Course of Business and (II) Authorize Financial Institutions to Honor and Process Related Checks and Transfers**

134.    The Debtors' Customer Programs include, among others, advance ticket sales, ticket refunds, a frequent flyer program, fee waivers, barter arrangements, corporate and government incentive programs, as well as arrangements with tour/vacation operators and sales outlet services.  The Customer Programs ensure customer satisfaction, generate goodwill, and address competitive pressures so that the Debtors can retain current customers, attract new customers and ultimately enhance net revenue.

**A.    The Debtors' Customer Programs**

135.    The Debtors need to continue during the postpetition period those Customer Programs that are beneficial and cost-effective to the *go!* business.  Such relief is necessary to preserve the Debtors' critical business relationships and customer goodwill for the benefit of their estates.  The revenue generated by the Customer Programs exceeds the operational and administrative cost to implement and maintain them, and for this and the other reasons set forth

herein, it is essential and in the best interests of the Debtors, their estates and their creditors that the Debtors be permitted to honor prepetition obligations in connection with the Customer Programs and to continue the Customer Programs in the ordinary course of business.

136.    Airlines routinely offer flights to many of the same locations as their competitors. This competition makes retaining loyal customers and attracting new customers critically important.  It is essential, therefore, that the Debtors maintain the current *go!* customers through this difficult period and position themselves to attract new customers.  The Customer Programs accomplish this goal by generating valuable goodwill, repeat business and net revenue increases.

137.    I believe that the filing of these chapter 11 cases is likely to negatively affect customers' attitudes and behavior toward the Debtors' services unless, among other things, the Debtors can take the measures requested by this Motion.  In particular, the Debtors' goodwill and ongoing business relationships may erode if their customers perceive that the Debtors are unable or unwilling to fulfill the prepetition promises they have made through the Customer Programs.  The same would be true if customers perceived that the Debtors would no longer be offering the types of services or quality of services they have come to expect and upon which they likely relied when purchasing the Debtors' services.  Further, the Debtors' competitors may increase their efforts during the pendency of these chapter 11 cases to lure away *go!* customers and to create doubts as to the Debtors' ability to emerge successfully from chapter 11.

138.    The following are general descriptions and examples of some, but not all, of the Debtors' Customer Programs.

**B.      Ticketholder Related Claims and Practices**

**1.      Prepetition Tickets**

139.     In relation to the Debtors' *go!* operation, out of an abundance of caution, the Debtors seek authority to honor all tickets and other contracts for airline travel that were purchased prepetition but have not yet been used (collectively, the "Prepetition Tickets") by providing the air transportation service purchased.  In addition to tickets purchased by individual travelers through traditional channels, the Prepetition Tickets include those sold or processed under the Frequent Flyer Program (as defined below).  The Debtors estimate that there may be approximately $6.4 million (gross amount, including related taxes) in Prepetition Tickets for *go!* flights outstanding and unused as of the Petition Date.

140.     I believe that the failure to honor Prepetition Tickets presented by customers in the hours and days following the commencement of these cases would be irreparably damaging to the reorganization of the Debtors.  If *go!* passengers were stranded during the early days of these cases, not only would an immediate loss of customers result, but the ensuing publicity of such an event would likely devastate the Debtors' *go!* operation, thereby harming the Debtors' business and prospects in these chapter 11 cases.  I believe that customer confidence and goodwill will be severely harmed if the Debtors are prevented from honoring Prepetition Tickets.

### 2.     Ticket Refund and Related Obligations

141.     Generally, tickets sold by *go!* are non-refundable.  However, certain *go!* customers purchase unrestricted tickets that offer the ability to change departure dates and times without penalties.  Further, the Department of Transportation requires the Debtors to refund tickets for certain events or circumstances (e.g., overbooked flights) at the time the customer is denied boarding.  The Debtors process these refunds by issuing checks at the airport ticket office.  Typically, the Debtors disburse approximately $500 or less per month on account of such refunds.  The Debtors request authority to honor all refund obligations and other miscellaneous

related customer charges (the "<u>Ticket Refunds</u>") as these commitments are nominal when compared to the Debtors' gross annual ticket sales.

142.     I believe that maintaining such refundability of tickets purchased prepetition is essential to preserving the public's confidence in the Debtors' continued reliability and operations, and in some cases, as noted, is required by the Department of Transportation. Such honoring of refunds will be more than offset by the future revenue from sales generated because this policy remains in place.

### 3.     Frequent Flyer Program

143.     The frequent flyer program, *go!* Miles, has approximately 70,000 members (the "<u>*go!* Miles Program</u>"). Such members earn miles each time they purchase an eligible ticket and fly on *go!* jet flights. Frequent flyer programs have been adopted by most air carriers and are considered an important marketing tool for developing brand loyalty among travelers and accumulating demographic data pertaining to business flyers. Such programs are essential to building and maintaining a loyal customer base, among both business and leisure travelers.

144.     Honoring *go!* Miles Program obligations does not involve any appreciable cash expense to the Debtors' estates. Rather, a majority of participants who redeem mileage credits receive only air transportation from the Debtors on flights that would operate in any event. The Debtors' costs of providing services to the award recipient, therefore, are often limited to incremental costs such as ticketing costs for what would otherwise be a vacant seat. As with other similar programs, the passengers receiving tickets under the *go!* Miles Program are responsible for the cash payment of all related taxes and fees.

145.     I believe that the failure to honor the obligations of the *go!* Miles Program will alienate the most loyal and valuable customers – an act that would severely harm the Debtors' competitive position and their reorganization efforts.

### 4.     Fee Waiver Practices

146.     The Debtors provide certain benefits to corporate and federal government client passengers, including the Debtors' waiver of baggage fees for up to three bags per traveler ("Fee Waivers").  Continuing to honor Fee Waiver related obligations comes at a relatively small expense to the Debtors, as compared to the business generated by maintaining loyal corporate and governmental clients.  Such waivers or similar vouchers or coupons are commonplace in the airline industry, and the Debtors' business would be significantly harmed if the Debtors could not or did not offer such benefits.

147.     Overall, if the Debtors are unable to continue ticketholder related Customer Programs, I believe that the Debtors risk alienating a large segment of their customers and encouraging them to select competing airlines, to the detriment of the Debtors, their creditors, and their estates.  For the foregoing reasons, out of an abundance of caution, the Debtors seek authority to honor prepetition obligations related to Customer Programs involving Prepetition Tickets, Ticket Refunds, the *go!*  Miles Program, Fee Waivers and similar ticketholder related practices (collectively, the "Ticketholder Related Claims"), and to continue honoring the Ticketholder Related Claims in the ordinary course of business.

### C.     Corporate Client Related Claims and Practices

### 1.     Barter Arrangements

148.     The Debtors maintain barter arrangements with a limited number of companies that provide primarily marketing/advertising services to the Debtors' operations in return for air

transportation (collectively, the "Barter Arrangements").  The Debtors use Barter Arrangements to contribute toward payment of needed services in exchange for the Debtors' services in lieu of cash.  Thus, the Debtors benefit from the Barter Arrangements by preserving their cash.  If the Debtors are unable to honor these Barter Agreements, third parties will likely demand cash for all future transactions, during this critical period for the Debtors.  The Debtors estimate that the amount of unredeemed air transportation obligations related to Barter Arrangements, as of the Petition Date, is small -- approximately $5,000.

149.    Many airlines, including the Debtors, enter into barter arrangements because of their benefits, including the positive impact on liquidity.  Accordingly, the Debtors request authority to honor their prepetition obligations related to the Customer Programs involving Barter Arrangements and to continue to honor the Barter Arrangements in the ordinary course of business.

## 2. Corporate Incentive Programs

150.    The Debtors offer corporate travel incentive programs (the "Corporate Incentive Programs") which include the availability of an online booking engine offering private fares for participating corporations.  The Corporate Incentive Programs encourage corporations to purchase more air travel from the Debtors (given the lower private fare rates) and facilitate such travel, resulting in larger revenue for the Debtors.  Special corporate incentive programs are frequently used by airlines.

151.    To effectuate the rehabilitative purposes of chapter 11, the Debtors request authorization to honor any prepetition obligations under the Corporate Incentive Programs and to continue the Corporate Incentive Programs as they see fit in the ordinary course of business.  I believe that Customer confidence and goodwill, as well as revenues, will be harmed if the

Debtors are prevented from honoring prepetition obligations under the Corporate Incentive Programs. I believe that maintaining the Corporate Incentive Programs will enhance their customers' confidence in the Debtors' continued operations. Any costs of such programs will be offset by the continued stream of ticket sale revenue generated by keeping the Corporate Incentive Programs in place.

**D.     Tour/Vacation Package and Sales Outlet Related Claims and Practices**

**1.     Tour/Vacation/Agency Related Obligations**

152.     The Debtors have tour operator fares and similar arrangements (collectively, "Tour Provider Arrangements") with various tour operators and similar service providers (collectively, "Tour Providers"). Generally, pursuant to such Tour Provider Arrangements, the Debtors provide blocks of seats on their *go!* jet flights to such parties at certain reduced rates, which seats are filled by such parties' customers purchasing tours or other vacation packages. There is no direct cash outlay by the Debtors; the Debtors honor the quoted fare rates and provide the air transportation services. Historically, the revenue generated by such Tour Provider Arrangements has been substantial (for example, for fiscal year 2009, approximately $2.5 million in revenue – 7% of total *go!* sales).

153.     In connection with the foregoing, in the ordinary course of the *go!* business, the Debtors issue "refunds" to Tour Providers ("Tour Provider Refunds/Credits") in certain circumstances – for example, when the applicable tour has less customers than expected. Typically, however, in lieu of a cash refund, the Debtors give the Tour Provider a credit in the applicable amount on the next invoice from the Debtors. The Debtors provide approximately $45,000 per month in such credits each month.

154.    If the Debtors do not honor any prepetition obligations related to Tour Provider

Arrangements, I believe that the affected tour operators or agencies may attempt to take their

business to other airlines and the affected ticketholders will lose confidence in the *go!*

operations.  Given the importance of these customers, the Debtors seek authority to continue

honoring Tour Provider Arrangement related obligations, including honoring any Tour Provider

Refunds/Credits (accrued prepetition or postpetition) in the ordinary course of business.

### 2.    Sales Outlet Related Obligations

155.    In addition to the more traditional travel agency relationships, the Debtors also

sell *go!* tickets to customers through certain online travel and other sales outlet services,

including Expedia, Orbitz Worldwide and OneTravel.com ("Sales Outlet Services").  Tickets

sold through such other services accounted for approximately 25% of the Debtors' *go!* passenger

revenues in 2009.  Through the use of such services, the Debtors have reduced their distribution

costs.  Pursuant to such relationships, the Debtors typically provide the service a per ticket fee

when a customer purchases a ticket for travel on the Debtors' *go!* jet flights.  The Debtors seek to

continue such relationships in the ordinary course of business, and seek authority to pay any

prepetition obligations related to Sales Outlet Services, which the Debtors estimate to be

approximately $300,000 as of the Petition Date.

156.    I believe that if the Debtors are prohibited from honoring prepetition obligations

and maintaining the Customer Programs consistent with their past business practices, customers

will likely be alienated and will lose confidence in the *go!* operations and the Debtors' ability to

reorganize.  Ultimately, the damage from refusing to honor these obligations far exceeds the cost

associated with honoring prepetition obligations and continuing these practices.  I believe that

the relief requested herein will protect the Debtors' goodwill during this critical time and

enhance the Debtors' ability to generate revenue.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

**Motion for Authorization (I) to Pay Prepetition Claims of Critical Vendors and Certain Administrative Claimholders and (II) to Authorize Financial Institutions to Honor and Process Related Checks and Transfers**

**A.      The Need To Pay Critical Vendors**

157.    By motion filed concurrently herewith (the "CV Motion"), the Debtors seek an interim order granting them the authority in their sole discretion, but not the obligation, (i) to pay all or a portion of the prepetition obligations of certain critical vendors who have obtained or may be able to assert statutory lien rights under applicable law (the "Lienor Critical Vendors"), to the extent such payment is necessary to satisfy such liens, and on the conditions described in the CV Motion, (ii) and to pay all or a portion of the prepetition obligations of certain critical vendors who have neither obtained nor have the right to assert statutory liens under applicable law (the "Non-Lienor Critical Vendors" and, collectively with the Lienor Critical Vendors, the "Critical Vendors"), subject to the Non-Lienor Critical Vendor Cap and provided that payment of such claims is conditioned upon the claimant's agreement to provide the Debtors with Customary Trade Terms and execute the Vendor Agreement (all as defined in the motion); and (iii) to pay the claims for the value of goods received by the Debtors in the ordinary course of their business during the 20-day period prior to the Petition Date, which are likely entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"), provided that payment of such claims is conditioned upon the claimant's agreement to provide the Debtors with Customary Trade Terms and execute the Vendor Agreement.  In addition, the Debtors seek entry of an order authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing.

158.     The Debtors operate in a highly specialized, highly regulated and highly competitive industry.  The uniqueness of the airline industry leaves airlines with few options when selecting vendors.  Certain suppliers and service providers at various venues are simply the only option available to the Debtors.  Even in those circumstances where more than one critical vendor can be located to provide a service, FAA regulations inhibit an airline's ability to switch expeditiously from one supplier of goods or services to another.

159.     The Debtors purchase goods and services from certain vendors and independent contractors who are unaffiliated with the Debtors and are, by and large, sole source or limited source suppliers without whom the Debtors could not operate, or who might be able to obtain (or have obtained) mechanics' liens, possessory liens, shippers' liens or similar state law trade liens on property necessary to the Debtors' ongoing operations.

160.     I submit, based on my experience in the industry, that the Critical Vendors can not be replaced within a reasonable time and on terms as beneficial to the Debtors as those already in place, or have obtained trade liens on property necessary to the Debtors' ongoing operations. Further, I believe that any time lag generated as a result of finding replacement vendors would disrupt the Debtors' operations to the detriment of their estates.  In addition, many of these limited source suppliers are in the unique position of holding a virtual monopoly over the services they provide.  Replacement vendors, even where available, would likely result in higher costs for the Debtors.  I believe that if the Debtors can benefit from maintaining lower costs of goods and services purchased during the postpetition period and avoid the severe disruption that might be occasioned by the cessation of service therefrom, it is prudent for the Debtors to pay selected Critical Vendors some or all of their prepetition claims.  However, except with respect to claims of Non-Lienor Critical Vendors who have obtained or have the right to assert statutory

liens under applicable law, the payment of claims held by Non-Lienor Critical Vendors and 503(b)(9) Claims would be conditioned, to the extent requested by the Debtors in their discretion, on an agreement that the critical vendors continue to sell their goods or services to the Debtors on a going forward basis on terms favorable to the Debtors.

161.    I am mindful of the Debtors' fiduciary obligations to seek to preserve and maximize the value of their estates.  The preservation of key business relationships is among management's primary goals as the Debtors transition into chapter 11.  Providing seamless service to customers is key to meeting those goals.  For these reasons, I believe that the Debtors should be authorized to minimize the adverse business effects as well as the cash flow impact of their chapter 11 filing, and possible irreparable harm, to the fullest extent possible by obtaining authority to pay certain necessary trade vendors who are so essential to the Debtors' business that the loss of their particular goods or services would cause immediate and irreparable harm to the Debtors' business, goodwill and market share.

162.    I believe that if the relief requested in the motion is not granted and certain essential Critical Vendors refuse to continue to supply goods and services to the Debtors postpetition, the Debtors may well be unable to continue portions of their operations, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.

**B.**     **Identification of Critical Vendors and Lien Claimants**

163.    In the CV Motion, the Debtors describe in detail the types of vendors they rely upon in the ordinary course of business, and the goods and services those vendors provide that are critical to the Debtors' on-going operations and ability to reorganize.  See CV Motion ¶¶ 13-52.  I incorporate by reference, as if set forth here in full, the descriptions of the vendors, and the goods and services provided by them, set forth in the CV Motion.

164.    I and others at the Debtors are working with our advisors to determine which vendors, and which goods and services, are critical to the Debtors' ability to safely maintain the same level of service and operations during these chapter 11 cases.

165.    In making these determinations, we have considered, and will consider, (a) whether there exists an alternate supply of the goods and services; (b) whether the goods and services can be obtained on similar or better terms; (c) the delay that might result from switching vendors; (d) the impact on safety and customer service that a change in vendor relationships might cause; (e) the extent to which the cost of replacing a vendor exceeds the cost of that vendor's pre-petition claim; (f) whether FAA approval is required to switch vendors; (g) whether executory contracts exist that may enable the Debtors to compel the vendor to perform; (h) whether a vendor can assert any liens over the Debtors' property; (i) whether the vendor has a 503(b)(9) claim; and (j) such other factors that management believes are appropriate.

166.    In addition to having a tightly controlled decision-making process with clearly defined considerations, the Debtors will also take all reasonable and practicable steps to ensure that only those critical vendors identified by management receive the intended benefits of the critical vendor designation.

## C.    The Proposed Payments Are Modest Relative to all Prepetition Trade Claims

167.    The Debtors currently estimate that prepetition vendor claims (including accrued claims) total approximately $60 million.

168.    In contrast, the Debtors seek to make critical vendor payments (without prejudice to making a further application) of approximately $4,778,000, consisting of: (a) $898,000.00 to Non-Lienor Critical Vendors; (b) $3,530,000 to Outside Maintenance & Service Providers that are Lienor Critical Vendors (who hold collateral believed to be worth approximately $12

million); and (c) $350,000 to shippers that are Lienor Critical Vendors (who hold collateral believed to be worth approximately $670,000.00).

169.     Together, the proposed critical vendor payments represent approximately 8.0% of the total prepetition vendor claims.

**D.      The Protections Afforded by the Proposed Order**

170.     The Debtors expect to receive certain benefits for the making of critical vendor payments.  In particular, the Debtors will benefit from the uninterrupted flow of goods and services from vendors with whom they have existing and firmly established relationships.  In addition, as a prerequisite, Non-Lienor Critical Vendors will be required to agree to Customary Trade Terms (as defined in the CV Motion), thereby providing the Debtors with certainty of cost.

171.     In an effort to provide transparency, to the maximum extent possible under the circumstances, the Debtors have agreed (and the proposed Order provides) that the Debtors will (a) maintain a matrix (the "Matrix") with the names of the critical vendors; the amounts paid to such critical vendors; and the goods and services provided by such vendors; and (b) provide the Matrix to the U.S. Trustee and the official committee of unsecured creditors (with the creditors committee subject to the limitations set forth in the proposed Order).

172.     Based on the foregoing, I believe that entry of the proposed Order relating to critical vendors is vital to the Debtors' ongoing operations and ability to reorganize, and provides appropriate oversight and other protections to ensure that payments are made consistent with the Debtors' best interests.

**Motion Pursuant To Sections 105(A), 362, 363(B) And 553 Of The Bankruptcy Code For Order (I) Authorizing Debtors To (A) Apply Prepetition Payments To Prepetition And Postpetition Obligations Under Fuel Supply Contracts, (B) Honor Other Fuel Supply, Storage Fuel Contracts, Into-Plane Service Contracts And Other Fuel Service Arrangements,**

**(C) Continue To Participate In Fuel Consortia And (II) Authorizing**
**Financial Institutions To Honor And Process Related Checks And Transfers**

173.     The Debtors require a ready supply of fuel for their continued operations.  The only reliable way to assure this fuel supply is for the Debtors to be authorized to continue to perform on an uninterrupted basis under existing domestic and international fuel purchase, distribution and storage agreements and arrangements.  Not only are these complex relationships essential to the Debtors' integrated efforts to manage fuel supply and costs, but any disruption in these relationships could leave the Debtors' passengers, as well as their aircraft and employees, stranded.  Without fuel, the Debtors cannot fly, and this result would be devastating to the Debtors' business.

174.     There are only a limited number of relationships by which the Debtors conduct fuel acquisition, delivery and storage through payment in arrears.  These credit relationships amount to only approximately 5% of the total amount spent on fuel for the Debtors.  This is a small percentage in relation to the Debtors' overall fuel costs and *de minimis* in relation to their overall operating expenses.  Moreover, nearly all of the Debtors' fuel-related costs are ultimately reimbursed or otherwise borne by the Debtors' code-share partners.  As a result, the impact of any payments of fuel-related pre-petition claims on other pre-petition creditors in these cases is necessarily small.

*The Debtors' Fuel Relationships*

**A.      Overview of the Debtors' Fuel Relationships**

175.     The Debtors currently require approximately 9 million gallons of jet fuel each month, excluding the fuel requirements for their Delta Air Lines, Inc. ("Delta") code-share operation for which the fuel acquisition and delivery is fully controlled by Delta.  The Debtors obtain fuel directly from several third-party fuel suppliers, maintain fuel inventory near the

airports utilized by their fleet (each an "Airport" and collectively, the "Airports"), and arrange for delivery of fuel from suppliers to their storage facilities and to and into their aircraft.

176.    116.    Pursuant to the terms of the Debtors' code-share agreements with various major airlines, approximately 97% of their fuel-related costs are ultimately borne by their code-share partners.  Nevertheless, with respect to substantial amounts of fuel and related services, the Debtors must purchase the fuel or incur the fuel-related expense directly in the first instance and receive reimbursement only afterwards from their code-share partners.  Approximately half of these total fuel-related costs are paid in cash by the Debtors, either in advance or on account.  The remaining costs, although recorded by the Debtors, are paid by their code-share partners and thus are not at issue here.

## B.    Fuel Acquisition

### *Prepaid Fuel Suppliers*

177.    Before the filing of these chapter 11 cases, and in the ordinary course of their business, the Debtors purchased aircraft fuel from fuel suppliers pursuant to fuel supply contracts or fuel purchase orders.  For a number of reasons, including current economic conditions, the fuel supplied by these arrangements may not be readily replaced on similar terms and conditions.  The majority of the Debtors' direct fuel purchases, including fuel purchased abroad in Canada and Mexico, are made by advance payments via wire transfer to approximately fifteen (15) suppliers (the "Prepaid Fuel Suppliers") on a weekly basis in the approximate amount of between $1 million to $1.3 million.  Accordingly, the Debtors expect to make advance payments of approximately $4 million to $5 million to the Prepaid Fuel Suppliers for the month following the Petition Date.  The fuel supplied by the Prepaid Fuel Suppliers cannot be readily replaced from other suppliers on similar terms and conditions.

*Fuel Suppliers Paid In Arrears*

178.     The Debtors' remaining fuel purchases are made on account and paid in arrears to certain other fuel suppliers (the "Other Fuel Suppliers" and, together with the Prepaid Fuel Suppliers, the "Fuel Suppliers").  Payments are generally made within a specified time after receipt by the Debtors of invoices from the Other Fuel Suppliers.  As it is difficult, or impossible, to calculate the actual amount owed to the Other Fuel Suppliers as of the Petition Date, the Debtors seek the authority to pay all pre-petition obligations owed to the Other Fuel Suppliers.

**C.     Fuel Delivery and Storage**

179.     The Debtors effectuate the delivery of fuel to Airports in several ways.  In certain cases, fuel is delivered directly to the Airport.  To accomplish direct delivery, from time-to-time, the Debtors may utilize pipelines to transport fuel from the point of purchase to various storage facilities pursuant to pipeline or transport agreements (the "Pipeline Agreements") with certain common carrier pipeline providers (the "Pipeline Providers").

180.     120.     The Debtors also use fuel storage facilities located at or near Airports.  In these cases, the Debtors may enter into storage agreements (the "Storage Agreements," and together with the Pipeline Agreements, the "Pipeline and Storage Agreements") with certain storage facility providers (the "Storage Providers," and together with the Pipeline Providers, the "Pipeline and Storage Providers").  The Pipeline and Storage Agreements generally have multi-year terms and are automatically renewable.  Storage services under Pipeline and Storage Agreements are generally prepaid on a weekly basis in the amount of approximately $7,000.  As of the Petition Date, the Debtors estimate that they owe approximately $66,000 in the aggregate to Pipeline and Storage Providers for services provided pre-petition.

181.     In addition, the Debtors utilize into-plane fueling service contracts (the "Into-Plane Service Contracts") to get fuel to airplanes.  Under these contracts, the service providers deliver "airport fuel" (the "Into-Plane Service Providers") from the Debtors' storage facilities located at or near airport terminals (by pipeline or vehicle) to and into the Debtors' aircraft.  The Into-Plane Service Contracts generally have yearly terms that do not necessarily renew automatically.  Under approximately 90% of these arrangements, the Debtors pay on account rather than prepay.  In some instances, into-plane service may be arranged and compensated indirectly through Fuel Suppliers or Storage Providers.  As of the Petition Date, the Debtors estimate that they owe approximately $700,000 in the aggregate for into-plane services provided pre-petition, and have an aggregate prepaid credit of less than $10,000.  Without the continued performance of the Pipeline and Storage Agreements, the Debtors will be unable to transport jet fuel from the point of purchase to the Airports.

## D.     Fuel Consortia and Other Arrangements

182.     The Debtors have ownership interests in approximately four (4) fuel consortia or fuel committee cost-sharing cooperatives (collectively, the "Fuel Consortia"), which lease, operate and manage fuel storage facilities, located at or near Airports, in which participating carriers and fuel suppliers store their fuel in one or more commingled fuel tanks.  Fuel Consortia are managed by fuel facility service providers that are responsible for fuel system operations and maintenance, including inventory accounting.  The Debtors can generally withdraw stored fuel at a Fuel Consortia at any time.  Fuel Consortia members pay a fee to the fuel facility service providers for their services in connection with the Fuel Consortia.

183.     Fuel Consortia are established by airlines to minimize and share the cost of local fuel storage.  Certain of these consortia are organized as separate corporations of which the

Debtors are an equal-share owner with the other members. The third-party vendors that operate the consortia are paid by the members of the consortia for services that include maintenance and operation of the system and all necessary accounting functions required to allocate costs to individual users. The Debtors' participation in these arrangements results in significant cost savings that would be unattainable if they could not make all payments as due and generally maintain existing relationships in the ordinary course of business. As of the Petition Date, the Debtors estimate that they owe approximately $157,000 in the aggregate to Fuel Consortia for services provided pre-petition, plus any amounts incurred for the month of December 2009, which have not yet been billed as of the Petition Date and will be due in mid-February 2010. The Fuel Consortia may attempt to cease providing post-petition services to the Debtors if the Debtors owe pre-petition amounts to the Fuel Consortia, which would be devastating. Accordingly, in order to ensure the continued supply of fuel post-petition and minimize the risk that the Fuel Consortia will discontinue post-petition services to the Debtors, and because it is difficult, or impossible, to calculate the actual amount owed to the Fuel Consortia as of the Petition Date, the Debtors seek the authority to pay all pre-petition obligations owed to the Fuel Consortia.

184.     Finally, the Debtors participate in certain other arrangements (the "Other Fuel Service Arrangements") by which numerous third parties provide a variety of services in connection with the purchase, sale and movement of fuel, including airport authorities, facilities, and fuel transportation, brokerage and related services. These services are all necessary to the Debtors' continued ability to transport fuel and to execute trading purchases or sales as necessary and maintain their business in the ordinary course. Amounts paid by the Debtors under the Other

Fuel Service Arrangements are included in invoices provided by the Pipeline and Storage Providers and Into-Plane Service Providers.

185.    The Debtors' agreements with Other Fuel Suppliers, the Prepaid Fuel Suppliers, the Pipeline and Storage Providers, the Fuel Consortia, the Into-Plane Service Providers and the Debtors' Other Fuel Service Arrangements are critical to their reorganization efforts.  I believe that, without these arrangements, the Debtors would have inadequate access to fuel and no infrastructure through which to distribute it.

**Motion for Entry of an Order Pursuant Sections 105(A) and 363(B) of the Bankruptcy Code Authorizing, But Not Directing, Debtors to (I) Pay Certain Prepetition Wages, Compensation and Employee Benefits; (II) Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business; (III) Authorizing and Directing Applicable Banks and Other Financial Institutions to Process and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Made By Debtors Relating to the Foregoing; and (IV) Schedule Final <u>Hearing for the Foregoing Relief Sought Herein (the "Wage Motion")</u>**

186.    By motion filed concurrently herewith, the Debtors request entry of an interim and final order (i) authorizing, but not directing, the Debtors to pay certain prepetition wages, compensation and employee benefits; (ii) authorizing, but not directing, the Debtors to continue payment of wages, compensation and employee benefit programs in the ordinary course of business and to pay other costs and expenses relating to the foregoing as described more fully below; (iii) authorizing and directing applicable banks and other financial institutions (the "<u>Banks</u>") to process and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors relating to the foregoing.

187.    The Debtors currently employ approximately 3,400 full and part-time employees (the "<u>Employees</u>") and approximately 2,000 of such Employees are covered by collective bargaining agreements ("<u>CBAs</u>") with certain Debtors.  In short, Mesa Airlines, Inc. employs approximately 2,600 employees, Freedom Airlines, Inc. employs approximately 415 Employees,

Regional Aircraft Services, Inc. employs approximately 285 Employees, and MPD, Inc., employs approximately 11 Employees.

188.    In the ordinary course of their businesses, the Debtors incur payroll and various other obligations, including benefit obligations, to the Employees for the performance of their services.  In this regard, the Debtors have costs and obligations in respect of the Employees relating to the period prior to the Petition Date.  In certain instances, these costs and obligations are outstanding and due and payable, and in other instances, these costs and obligations will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date.

189.    The Debtors propose to pay or honor, as the case may be, in their sole discretion and in accordance with prepetition customs and procedures, certain prepetition claims for, among other items, wages, salaries, incentives, vacation and other paid leave, and other forms of compensation and the applicable federal and state withholding taxes, payroll taxes with respect to the foregoing and the payments relating to certain Employee benefit plans and other Employee benefits that the Debtors pay in the ordinary course of business, and continue to pay such obligations as they arise in the ordinary course of the Debtors' business (collectively, the "Employee Compensation Obligations"), each of which are described in more detail below.

A.      **Payroll Obligations**

190.    In the ordinary course of business, the Debtors pay Employees in arrears on either a semi-monthly or bi-weekly basis.  The Debtors' flight crew Employees are paid semi-monthly on account of wages earned during the previous half-monthly pay period (the "Semi-Monthly Pay Period").  Thus, payments made on the first day of each month cover wages earned during from the 1st through the 15th of the previous month.  All other Employees are paid bi-weekly

(the "Bi-Weekly Pay Period" and together with the Semi-Monthly Pay Period, the "Pay Periods").  Employees paid bi-weekly are paid in arrears and are still owed one week's wages upon payment of their wages on each Bi-Weekly Pay Period.

191.    As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition payroll is approximately $6.5 million (the "Payroll Obligations").  These Payroll Obligations consist of (i) $4.5 million in accrued and unpaid wages that are due and payable on the Semi-Monthly Pay Period on January 15, 2010, (ii) $800,000 in accrued and unpaid wages that will not become due and payable until the Semi-Monthly Pay Period on January 30, 2010, and (iii) $1.2 million in accrued and unpaid wage obligations that are due and payable on the Bi-Weekly Pay Period on January 15, 2010.

192.    The Debtors are required by law to withhold certain taxes from the Payroll Obligations, which includes certain federal, state, and local income taxes, and social security and Medicare taxes (the "Trust Fund Taxes") and remit the same to the appropriate taxing authorities (the "Taxing Authorities").  The obligations relating to the Trust Fund Taxes withheld from the Payroll Obligations are remitted to the Taxing Authorities at the time the Compensation Obligations are satisfied.  On the date hereof, the Debtors estimate that the Trust Fund Taxes outstanding that relate to the period prior to the Petition Date are approximately $2.68 million, which is due and payable on or about January 15, 2010 in connection with the next Pay Period.

**B.      Payroll Administration**

193.    The Debtors employ Automatic Data Processing, Inc. ("ADP") as their payroll administrator to process the Payroll Obligations and coordinate the payment of the Trust Fund Taxes (the "Payroll Administration Obligations").  For each Pay Period, ADP calculates the Payroll Obligations and the Trust Fund Taxes based upon information provided by the Debtors.

ADP's compensation is approximately $15,000 per month for these services and paid a month in arrears. As of the Petition Date, the accrued and unpaid prepetition Payroll Administration Obligations aggregate approximately $15,000.

## C. Paid Time Off

194. Full time Employees are eligible to receive vacation time[14], as described below.

195. Vacation Time For Union Employees. Accrued vacation time varies between union and non-union Employees. Full-time union Employees are eligible for paid vacation only after completion of their first full year of service. Eligible union Employees earn vacation on an annual basis and receive their accrued vacation once per year on their anniversary. Union Employees earn additional vacation time as their seniority increases and may, in very certain limited circumstances, carry over certain earned vacation time from one year to the next.

196. Vacation Time for Non-Union Employees. After completion of the first full-time year of service, full-time non-union Employees receive 40 hours of accrued vacation, and thereafter accrue a specified number of vacation hours for each month of active service, dependent upon the non-union Employee's years of service. Full-time non-union Employees may generally carry over a maximum of 280 hours of unused vacation days from one year to the next.

197. By the Wage Motion, the Debtors proposed to permit Employees to use vacation time that was earned (the "Vacation Obligations") prior to the Petition Date in the ordinary course of business.

198. Holiday Time. In addition to vacation time, full-time non-union Employees are eligible to earn up to (5) holidays per year upon their completion of ninety (90) full days of

---

[14] Part-time Employees do not receive vacation time.

employment, (the "Holiday Obligations").  Eligible Employees accrue 1.5 hours per Pay Period toward the five holidays.  In the event that a non-union Employee is involuntary terminated without cause, the Debtors propose to pay out any unused Holidays Obligations.

199.    Sick Time.  Under the applicable CBA, unionized Employees are entitled to certain sick leave benefits ("Sick Leave Obligations" and together with Vacation Obligations and Holiday Obligations, the "PTO Obligations").  The Debtors proposed to allow union Employees to use sick days that were earned prior to the Petition Date but not to cash out the corresponding benefit upon the conclusion of their employment with the Debtors.

**D.    Severance Obligations**

200.    Prepetition, the Debtors did not have any formal severance program or policy. Postpetition, the Debtors intend to pay, in their sole discretion and on a case-by-case basis, severance to employees that were involuntarily terminated without cause.  I believe that it is critical for them to maintain a ready work force.  If, however, Employees voluntarily leave without providing at least two weeks' notice, the Debtors' business operations could be harmed. To avoid this result and encourage Employees to provide the Debtors with sufficient notice upon their voluntary departure, I believe that that it is in the best interests of the estates, on a case-by-case basis, severance equal to two-weeks' wages or salary to "rank and file" Employees that are involuntary terminated without cause (the "Severance Obligations").

**E.    Incentive Plan**

201.    In the ordinary course of business, certain of the Debtors maintain incentive plans for a variety of Employees that the Debtors employ in different capacities (collectively, the "Incentive Plan").  The Debtors' Incentive Plan relate to Employees that are involved with or related to (i) system operation control, (ii) warehouse and inventory, (iii) maintenance of

facilities and aircraft, (iv) the commission for the sale of items on the Debtors' Hawaiian flights on *go!*, (v) ground handling services at certain facilities, and (vi) general business performance. The Debtors' compensation structure involves a lower base salary combined with additional compensation, in the form of incentives. I believe that the Incentive Plan is an important component of employee compensation and provide substantial value to the Debtors' estates because the plan encourages Employees to achieve important financial performance and quality goals. Generally, the claims paid pursuant to the Incentive Plan are paid on a quarterly basis if the company was profitable during the applicable quarter.

202.     As noted above, amounts payable to Employees under the Incentive Plan, if any, would be based upon the Debtors' profitability. As of the Petition Date, the Debtors' profitability has not been determined. However, I estimate that as of the Petition Date, the accrued and unpaid Incentive Plan claims may aggregate approximately $400,000.

**F.     Executive Bonuses**

203.     In addition to the Incentive Plan Obligations disclosed above, two employees are entitled to certain payments pursuant to their respective employment contracts with the Debtors (the "Executive Bonuses"). The Executive Bonuses are determined in accordance with formulas set forth in the applicable Employee's employment contract.

204.     144.     Under their employment contract, Messrs. Ornstein (the Debtors' Chief Executive Officer) and I (the Debtors' President) are paid Executive Bonuses subject to and conditioned upon whether the Debtors achieve a positive change in the Debtors' earnings per share, which is defined as gross profit before taxes and one-time non-recurring items divided by basic outstanding shares compared with the same time period to the prior year ("Earnings Per Share)"

205.     Mr. Ornstein is entitled to a quarterly bonus payment if the Debtors record a positive change in Earnings Per Share compared to the same quarter for the prior year.  The paid quarterly bonus would be $13,125, $26,250, $52,500, or $105,000 if there is a positive change in Earnings Per Share of 0 to 4.99%, 5%, 10%, or 15%, respectively.  At the end of the year, the Debtors compare the annual Earnings Per Share amounts with preceding year.  If there is a positive change from Earnings Per Share 0 to 4.99%, 5%, 10%, or 15%, respectively for the current year compared to the prior year, Mr. Ornstein's bonus would be in the amounts of $52,500, $105,000, $210,000, or $420,000, respectively, minus any quarterly payments previously paid to him.  Thus, the aggregate bonus amounts that Mr. Ornstein is eligible to earn for a given year cannot exceed $420,000 under this program.

206.     I am entitled to a quarterly bonus payment if the Debtors record a positive change in Earnings Per Share compared to the same quarter for the prior year.  The paid quarterly bonus would be $10,000, $20,000, $40,000, or $80,000 if there is a positive change in Earnings Per Share of 0 to 4.99%, 5%, 10%, or 15%, respectively.  At the end of the year, the Debtors compare the annual Earnings Per Share amounts with preceding year.  If there is a positive change from Earnings Per Share 0 to 4.99%, 5%, 10%, or 15%, respectively for the current year compared to the prior year, my bonus would be in the amounts of $40,000, $80,000, $160,000, or $320,000, respectively, minus any quarterly payments previously paid to him.  Thus, the aggregate bonus amounts that I am eligible to earn for a given year cannot exceed $320,000 under this program.

207.     The Debtors estimate that the prepetition claims arising from Executive Bonuses relating to the two individuals described above and the five other executives may aggregate approximately $185,000 and relate to the three month period ending December 31, 2009.

208.     The Executive Bonuses are generally paid no later than 45 days after the end of each fiscal quarter.  The Earnings Per Share are based upon the Debtors' financial statements in their Form 10-Q or Form 10-K, as the case may be.

**G.      Deferred Compensation**

209.     The Debtors make certain deferred compensation payments into trust accounts established for Messrs. Ornstein, myself, and two other Employees (the "Deferred Compensation Program").  For Mr. Ornstein and myself, our  contributions under the Deferred Compensation Program were made monthly in the amount of their respective annual salaries and were through December 2009.  In the case of the other two Employees, the Debtors made a one-time contribution in March 2009 in the amount of $50,000 each to their respective trust accounts.

**H.      Employee Health and Welfare Benefits**

210.     The Debtors have established and sponsor various health and welfare plans and policies for their full time Employees, including, without limitation, (i) medical, dental, and other health plans, (ii) flexible spending programs for medical care, (iii) life, accidental death and dismemberment ("AD&D"), and disability insurance, and (iv) retirement savings benefits (collectively, the "Health and Welfare Benefit Plans").

211.     The Debtors estimate that their annual expenditures under the Health and Welfare Benefit Plans, in aggregate, are approximately $15 million.  The Debtors are self-insured and the Employees reimburse the Debtors via premium payments, in aggregate, approximately $7.5 million, resulting in a net annual expenditure by the Debtors of approximately $7.5 million (the "Health and Welfare Obligations" and together with the Employee Compensation Obligations, the "Employee Obligations").

212.     As of the Petition Date, the Debtors believe that the accrued and unpaid prepetition Health and Welfare Obligations aggregate approximately $3.2 million for the period ending December 31, 2009.  The Health and Welfare Obligations are described below.  The Debtors seek to pay accrued and unpaid prepetition Health and Welfare Obligations and to continue make such payments in accordance with their prepetition practices as they accrue and come due after the Petition Date.

## I.     Medical Benefits

213.     The Debtors provide primary health care coverage for their Employees that work thirty-five (35) or more hours per week (the "Full-time Employees").  Full-time Employees are eligible for health care coverage after ninety (90) full days of employment.

214.     The Debtors offer medical, dental, and vision benefits to their Employees under a group plan (the "Group Medical Plan") administered by Coventry Health Care ("Coventry").  With respect to medical benefits, the Debtors pay approximately 49% of the premiums, while the remainder is paid by the Employees.  With respect to dental benefits, the Debtors pay approximately 5% of the premiums, while the remainder is paid by the Employees.  With respect to the vision benefits, all eligible Employees are responsible for the full cost of such coverage.

215.     The Group Medical Plan has three (3) available tiers that Full-time Employees may select and each tier has its own policy limit:  basic ($25,000 annual limit / $100,000 lifetime limit); standard ($100,000 annual limit / $1,000,000 lifetime limit); premium ($250,000 annual limit / $2,000,000 lifetime limit).  Full-time Employees hired after February 1, 2006 may only enroll in the basic Group Medical Plan.  Full-time Employees hired before February 1, 2006 may enroll in any of the available Group Medical Plan tiers.

216.     The Group Medical Plan is self-insured by the Debtors, except for the  vision benefits that are provided by Vision Service Plan Insurance Company.  The Debtors make payments to the third-party administrator of the Group Medical Plan to cover claim reimbursements ("Medical Obligations").

217.     The Debtors' Group Medical Plan claims administrator, Coventry, is reimbursed on a weekly basis or Medical Obligations that it pays.  The actual amount of Medical Obligations varies based upon the specific month and is dependent upon the claims reconciliation cycle.  Based upon a recent three month analysis for the period ending September 30, 2009, the Medical Obligations can range from approximately $875,000 to $1.4 million per month.  As noted above, the actual amount paid for the Medical Obligations varies based upon the specific month.  Based upon the historical averages, the Debtors estimate that as of the Petition Date, the accrued and unpaid Medical Obligations is approximately $2.4 million, which does not include Coventry's administration fee that is paid a month in arrears and discussed below.  The Debtors estimate that approximately $135,000 of the Medical Obligations will be due and payable on January 5, 2010.  On January 12, 19, and 26, 2010, the Debtors estimate that they may owe payments on account of Medical Obligations in the range of $135,000 to 343,000.

**J.     Medical Administration Fee**

218.     In addition to the foregoing, the Debtors also pay a monthly plan administration fee to Coventry that varies between $88,000 and $100,000 (the "Medical Administration Fee").  Coventry's administration fee is $2.30 per pay period per participant and is paid by the participating Employee.  As of the Petition Date, the accrued and unpaid Medical Administration Fee is approximately $13,000, which will be due on or about January 11, 2010.

**K.     Flexible Spending Programs**

219.    The Debtors maintain flexible spending programs through Discovery Benefits ("Discovery") that allow participating Full-time Employees to contribute up to $5,000 per year of contribution, through payroll deductions, for eligible out-of-pocket medical expenses for participating Employees or their family members (the "Flexible Spending Program").  If the Employee does not use the contribution prior to February 15, 2010, the Employee loses the balance.

220.    Based upon a recent three month analysis for the period ending September 30, 2009, the approximate aggregate monthly contribution amount under the Flexible Spending Program is $22,256.  As of the Petition Date, the Debtors are holding approximately $21,000 (the "Flexible Spending Obligations") in contributions by 126 Full-time Employees during the period of January 1, 2009 through December 31, 2009.

**L.    Life, Accidental Death and Dismemberment, and Disability Insurance**

221.    Accidental Death & Dismemberment.  The Debtors provide an accidental death and dismemberment insurance plan and a life insurance plan to all of their Employees (collectively, the "AD&D Plan").  The AD&D Plan has a $10,000 cap, regardless of an Employee's position.  The AD&D Plan premiums are based upon the number of Employees and fluctuate monthly.  The Debtors pay their AD&D Plan premiums monthly in arrears for the previous month.  On a historical basis, the Debtors estimate that their AD&D Plan premiums are approximately $6,300 per month (the "AD&D Plan Obligation").  As of the Petition Date, the accrued and unpaid AD&D Plan Obligation is approximately $15,000.

222.    Life Insurance.  The Debtors administer certain voluntary programs for life insurance and accidental and death insurance with respect to which their Employees may opt in and the corresponding premium is deducted from their paycheck.  Certain of the Debtors'

Employees have elected this coverage for themselves or for their dependents (the "Life Insurance Obligations").  The approximately 590 participating Employees fund these voluntary programs and the Debtors have no obligations under these voluntary programs.

223.    Long Term Disability.  The Debtors also maintain long-term disability insurance for Employees (the "Long-Term Disability Insurance").  Full-time Employees are eligible for the employer-paid Long-Term Disability Insurance, which insures 40% of the Employee's earnings, to the program maximum of $1,500 per month.  The actual amount paid by the Debtors for the Long-Term Disability Insurance varies per month based upon the number of Employees.  Based upon a recent three month analysis, the amounts for long-term premiums total approximately $11,000 per month (the "Long-Term Disability Obligation").  As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition Long-Term Disability Obligation is approximately $10,881.

224.    Short Term Disability.  With respect to the Debtors' short-term disability plan (the "Short-Term Disability Insurance"), Employees may elect to participate in the Short-Term Disability Insurance plan and the corresponding premium is deducted from their paycheck. Employee contributions for the Short-Term Disability Insurance plans are withheld by the Debtors from payroll checks and are then paid monthly in arrears to the applicable insurance carrier (the "Short-Term Disability Obligations").  The Short-Term Disability Obligations are funded by the participating Employees and the Debtors do not incur any Short-Term Disability Obligations.

225.    Separate Disability and Life Insurance for Executives.  The Debtors provide a long-term disability and life insurance policy for their Chief Executive Officer and myself and also provide a separate long term disability program for certain senior executives (collectively,

the "Executive LTD Plans").  The Executive LTD Plans are provided by Unum Life Insurance Company of America, Reassure America Life Insurance Company, and Benefit Life Insurance Company.

226.    The Executive LTD Plans are fully funded by the Debtors at no cost to the participant and is estimated to be approximately $1,000 per month (except for the disability and life insurance policies that relate specifically to the Debtors' Chief Executive Officer and President, which range between $1,900 and $6,500 per month, per policy).  As of the Petition Date, there are no accrued and unpaid prepetition claims relating to the Executive LTD Plans other than the $600 portion of a premium that relates to the thirty-five (35) days prior to the Petition Date of a disability and life insurance policy that will become due in December of 2010 (the "Executive LTD Plan Obligations").

**M.**      **Retirement Savings**

227.    The Debtors maintain a retirement savings plan (the "401(k) Plan").  Full-time Employees can elect to make before-tax and after-tax contributions to the 401(k) Plan through payroll deductions.  The Debtors make matching contributions to the 401(k) Plan of 30% of Employee contributions, up to 10% each of Employees' eligible gross salary.  On a historical basis, the Debtors estimate that they pay approximately $78,000 per month in connection with 401(k) matching funds.   The Debtors deposit 401(k) Plan contributions (the "401(k) Obligations") into the 401(k) Plan no more than three (3) business days after the Payroll Obligations are satisfied.  As of the Petition Date, the accrued and unpaid prepetition 401(k) Obligations aggregate approximately $407,000  for the period ending December 31, 2009.  Of this amount, approximately $235,000 is due and payable January 5, 2010, the remainder will be due and payable on or about January 15, 2010.  The Debtors request authority, in their discretion,

to both continue their existing 401(k) Plan, including the ability, in their sole discretion, to continue to make matching contributions under the 401(k) Plan in the ordinary course of business, and to continue to fund all 401(k) Obligations made by their Employees.

**N.      Employee Benefits for Foreign Workers**

228.      Debtors employ approximately twenty-seven (27) employees in Mexico.  These foreign employees receive benefits from numerous programs varying widely based upon local laws and custom.  The Debtors' foreign employees receive the following mandated benefits: health benefits, labor insurance, death and disability insurance, retirement benefits, and certain other employee benefits (the "Foreign Benefit Plans").  The amounts expended under the Debtors' foreign benefit programs are *de minimis* in relation to those described in the Wage Motion, for the Debtors' nationally based Employees and do not exceed $18,000 monthly (the "Foreign Benefit Obligations").  The Debtors are, however, fully reimbursed for these expenses from the applicable code-share partner.  As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition Foreign Benefit Obligations is approximately $18,000 and are due and payable January 15 and 18, 2010.

**O.      Reimbursement Obligations**

229.      As is customary with most comparable businesses, the Debtors reimburse their Employees for certain business expenses incurred in the performance of their duties. Reimbursable business expenses include, among other expenses, those incurred in connection with domestic and overseas business travel, internet charges, gasoline charges, automobile maintenance, cellular phone charges, and meals (collectively, the "Reimbursement Obligations").

230.     Periodically, the Debtors will provide relocation expense reimbursements to certain of the Employees.  Pursuant to individual agreements with the Debtors, such Employees may be reimbursed for certain defined expenses, including temporary housing, moving expenses, and other costs attendant to relocation.  The Debtors do not believe that there are any obligations currently outstanding in this respect.

231.     As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition Reimbursement Obligations aggregate approximately $55,000, which are due and payable on January 7, 14, and 21, 2010, each in the approximate amount of $18,000.  The Debtors are seek authority to pay prepetition Reimbursement Obligations and continue to pay such obligations as they come due after the Petition Date.

**P.     Payroll Garnishments/Other Deductions**

232.     Periodically, the Debtors are presented with (i) garnishment or child support orders or (ii) union dues, each requiring the withholding of Employee Payroll Obligations to satisfy the applicable garnishment demand ("Garnishment Deductions").  Payment of the Garnishment Obligations is made from amounts otherwise payable to the Employees and is not an incremental cost obligation of the Debtors' estates.

233.     In addition, the Debtors' Employees often request that the Debtors make payment deductions from their payroll for the benefit of other parties, including, without limitation, union dues and/or charitable contributions ("Voluntary Deductions", and together with Garnishment Deductions, the "Payroll Deductions").  Payment of these obligations is made from amounts otherwise payable to the Employees and is not an incremental cost obligation of the Debtors' estates.

234.     As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition Payroll Deductions aggregates approximately $300,000 that are due and payable on the next pay period on January 15, 2010.

235.     The Debtors' employees are central to their operations and are vital to these chapter 11 cases.  A significant deterioration in Employee morale at this critical juncture would undoubtedly have a devastating effect on the Debtors, their customers and vendors, the value of the Debtors' assets and businesses, and the Debtors' ability to continue their operations.  I believe that any delay or failure to pay accrued and unpaid prepetition Employee Obligations, in the amounts described above, would impair morale, dedication, confidence, and cooperation of the Debtors' Employees, which in turn would subject the Debtors' businesses to immediate and irreparable harm.  At this stage, I believe that the Debtors cannot afford to risk any damage to their businesses or estates caused by any decline in Employee morale and dedication to perform their duties.

**Motion Pursuant to Sections 105(A), 362(D), 363(B), And 503(B) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 For Interim Authorization to (I) Continue Their Workers' Compensation Programs and Their Liability, Product, Property, and Other Insurance Programs, (II) Pay, in Their Discretion, All Prepetition Obligations Relating to Their Workers' Compensation Programs and Their Liability, Product, Property, and Other Insurance Programs, (III) Modify the Automatic Stay for the Sole Purpose of Permitting Employees to Proceed with Workers' Compensation Claims, (IV) Permit Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, and (V) Scheduling A Final Hearing on the Relief Requested Herein**

236.     In connection with the operation of their businesses, the Debtors maintain certain workers' compensation programs (the "Workers' Compensation Programs") and various liability, casualty, property, and other insurance programs and policies (together with the Workers' Compensation Programs, the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers").  Exhibit A to the Workers' Compensation Motion, is a list of each of the Insurance Programs that describes the type of coverage, the insured entity,

the limits and deductibles under the applicable policies, the coverage period, the insurance broker (if applicable), and the aggregate annual premium that are due.

237.    I am informed that the laws of the various states in which the Debtors operate require the Debtors to maintain workers' compensation policies and programs to provide certain of their employees (the "Employees") with workers' compensation benefits for claims arising from or related to their employment with the Debtors.  The Debtors maintain workers' compensation coverage through a fully-insured, third-party insurance program in each of the states in which they operate.

## A.    **The Chartis Policy**

238.    The Debtors' current workers' compensation benefits are provided by Chartis, Inc. ("Chartis") (shown as AIG on Exhibit A) pursuant to an annual policy that commences January 1, 2010 and expires December 31, 2010 (the "Chartis Policy").   The Chartis Policy is applicable to the Debtors' operations on a national basis.

239.    Under the Chartis Policy, Chartis acts as a third party administrator and provides guaranteed cost insurance coverage at the statutorily-required level for each state in which the Debtors operate.  Under the Chartis Policy, the Debtors pay a fixed annual premium and transfer 100% of their risk to Chartis.  The annual cost of the 2010 Chartis Policy is fixed at approximately $3.1 million.  The Debtors pay this amount on an accelerated schedule by making an initial payment of approximately $800,000 followed by nine equal payments of approximately $258,000.

## B.    **The Ace Policy**

240.    Commencing December 31, 2004 through December 31, 2008, the Debtors' Workers' Compensation Programs were provided through insurance policies (the "Ace Policy")

administered by Ace Indemnity Insurance Company of North America ("Ace").  The Ace Policy

is a self-insured policy that requires the Debtors to pay up to $500,000 per occurrence, per

employee.  Under the Ace Policy, the Debtors are billed monthly for claims that have matured

and are liable to the extent that the aggregate amount does not exceed the cap.  The Debtors

maintain a letter of credit to secure the obligations under the Ace Policy in the amount of $5.5

million.

241.    There are currently approximately 39 workers' compensation claims under the

Ace Policy pending against the Debtors for which the Debtors estimate the total liability to be

$2.5 million.  However, as of the Petition Date, the fixed and liquidated prepetition claims

relating to the Ace Policy are approximately $75,000.  These claims are due and payable during

the second week of January.  The Debtors expect that at some time subsequent to the Petition

Date, Ace may have additional fixed and liquidated claims for periods prior to the Petition Date.

On a historical basis, the average monthly claims under the Ace Policy have been approximately

$75,000 to $100,000 and such claims are expected to decrease as the Ace Policies age.

242.    I believe that payment of the claims arising under the Ace Policy is essential to

the continued operation of the Debtors' businesses.  In addition, if such claims are not paid when

they become due, I am informed and believe that Ace has the right, subject to the terms of the

applicable letter of credit, to satisfy such claims from the $5.5 million letter of credit securing the

Debtors' payment obligations.  I believe that the payment of the claims arising under the Ace

Policies benefits the estates and creditors because the potential exposure is far less than the value

of the letter of credit securing the Debtors' payment obligations.

## C.    Liability, Casualty, and Property Insurance Programs

243.    In connection with the operation of the Debtors' businesses, the Debtors maintain various liability, casualty, property and other insurance, reinsurance and risk control programs providing coverage for, among other things, general liability, passenger liability, property damage, product liability, aircraft loss or damage, baggage and cargo liability, directors and officers liability, aviation and hull liability, automotive liability, crime, and war risk (collectively, the "Liability, Casualty, and Property Insurance Programs").  The Liability, Casualty, and Property Insurance Programs are essential to the preservation of the Debtors' businesses, property and assets, and, in many cases such coverage is required by various regulations, laws, and contracts that govern the Debtors' business conduct.

244.    The Debtors' Liability, Casualty, and Property Insurance Programs are insured through two primary sources: (i) policies purchased from third party carriers (the "Third Party Insurance Policies") and (ii) reinsurance provided by the Debtors' wholly-owned captive insurance company subsidiary, MAGI Insurance, Ltd.  (the "Captive Insurance Company").

## D.    The Third Party Insurance Policies

245.    The Third Party Insurance Policies are maintained through several different Insurance Carriers, each of which are listed on Exhibit A annexed hereto that describes the type of coverage, the insured entity, the limits and deductibles under the applicable policies, the coverage period, the insurance broker, and the aggregate annual premium due.

246.    The Debtors are required to pay premiums under the Third Party Insurance Policies (the "Insurance Premiums") based upon fixed rates that are payable on a monthly, quarterly, or annual basis through the policy term.  The Insurance Premiums are paid directly to the applicable Insurance Carriers or indirectly through insurance brokers.  Pursuant to certain

Third Party Insurance Policies, the Insurance Premiums are subject to premium adjustments (the "Premium Adjustments") at the conclusion of the policy term on the basis of certain agreed upon business metrics, including the number of aircraft in the Debtors' fleet, number of passengers and total departures.

247. The annual premiums for the Third Party Insurance Policies aggregate approximately $7.9 million. The initial premium for the Third Party Insurance Policies that have a policy year of December 15, 2009 through December 15, 2010 was due on or about December 15, 2009 and was paid on January 4, 2010. The premiums for the Third Party Insurance Policies that have a policy year of March 23, 2009 through March 23, 2010 were fully paid prepetition. Accordingly, the Debtors do not believe there are any prepetition obligations due with respect to the Third Party Insurance Policies.

## E. The Captive Insurance Policies

248. The Debtors maintain direct hull and liability coverage under their Third Party Insurance Policies but utilize the Captive Insurance Company to reinsure some or all of the risk associated with this aspect of their business. Coverage provided by the Captive Insurance Company is generally backstopped by the Insurance Carriers, including La Reunion Aerienne, Sirius International, Tokio Fire & Marine, Glacier Re, and Partner Re, among others. The annual premiums associated with reinsurance provided by the Captive Insurance Company are approximately $2.15 million and are paid on a quarterly basis (the "Captive Insurance Policies").

## F. Insurance Brokers

249. The Debtors employ AON Risk Services (the "Broker"), to assist them with the procurement and negotiation of their Insurance Programs, and in certain circumstances, to remit payments to the Insurance Carriers on behalf of the Debtors. The Broker is paid in advance for

its services a fixed fee and in certain cases a commission by the Insurance Carriers that is paid as part of the premium due to the Insurance Carrier. On average, the Debtors are charged a fee in the approximate amount of $450,000 for the Broker's services. If the Broker is entitled to any commissions then such amount is credited toward the fee due from the Debtors. As of the Petition Date, I am informed that accrued and unpaid prepetition claims of the Broker are approximately $45,000.

250. In light of the importance of maintaining insurance coverage with respect to their business activities, the Debtors believe it is in the best interests of their estates to obtain the authority to pay, in their sole discretion, any of their pre-petition obligations under the Insurance Programs. Thus, the Debtors propose to pay certain pre-petition amounts under such programs to the extent that the Debtors determine in their discretion that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits or proceeds provided by the Captive Insurance Company or under the Third Party Insurance Policies.

251. It is essential that the Debtors maintain their Insurance Programs on an ongoing and uninterrupted basis. The non-payment of obligations under the Insurance Programs could result in one or more of the Insurance Carriers or the Captive Insurance Company attempting to terminate or declining to renew the Debtors' insurance policies, or refusing to enter into new insurance policies with the Debtors in the future. If any of the Insurance Programs lapse without renewal, I believe that the Debtors could be exposed to substantial liability to the detriment of all interested parties. In addition, as a prerequisite for certain of the Debtors' business operations, governmental agencies require the Debtors to maintain certain of the Insurance Programs.

**Motion Pursuant To Sections 105(A), 345(B), 363(C) And 364(C)
And Bankruptcy Rules 6003 And 6004 To (I) Continue Using Existing
Cash Management System And (II) Maintain Existing Bank Accounts
And Business Forms  (the "Cash Management Motion")**

252.     The Debtors have a cash management system (the "Cash Management System")
to collect and transfer funds generated by their operations.  In this regard, the Cash Management
System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the
Debtors to maintain control over the administration of their Bank Accounts located at various
financial institutions (the "Banks") identified on Exhibit 1 to the Cash Management Motion.

253.     The Cash Management System is primarily administered by employees (the
"Cash Management Personnel") located at the Debtors' offices in Phoenix, Arizona.  The Cash
Management Personnel are required to monitor the Cash Management System and manage the
proper collection and disbursement of funds even though the Cash Management System is
generally automated.

254.     The Cash Management System consists of an integrated network of twenty-six
(26) bank accounts maintained at twelve different banks.  To provide a general overview of the
movement of cash through the Debtors' Cash Management System, the Debtors have annexed
flow charts as Exhibits 2 -5 to the Cash Management Motion that illustrate the flow of funds
through the Cash Management System.  The summary below provides an overview of these
charts and the four principal components of the Cash Management System:  (a) cash collection,
(b) cash concentration, (c) cash disbursement, (d) intercompany transactions, and (e)
investments.

**A.      Cash Collection**

255.     The Debtors generate revenue from a wide variety of sources, including (i) direct
sales of passenger tickets, (ii) codeshare agreements, (iii) sales originating at international

stations, (iv) collection of credit card receivables, (v) travel agents, and (vi) a variety of other sources that include sales of passenger, cargo, and services to the United States Government and the sale of amenity services, such as food and beverages, audio headsets, and other similar goods to passengers on aircraft.

256.    The proceeds from these transactions are deposited into one of the following accounts: (i) the main concentration operating account (the "Main Operating Account") maintained at BBVA Compass Bank ("Compass Bank") and (ii) certain deposit accounts devoted to collecting accounts payable (the "Receivable Accounts") maintained at the following institutions, Compass Bank, JPMorgan Chase, Bank of America, Wells Fargo, Bank of Hawaii, Chevy Chase Bank, and Seaway Bank. Certain of the Receivable Accounts are devoted to a specific purpose as follows: (a) clearing house account maintained at JPMorgan Chase (the "JPM Clearinghouse Account"), (b) a payroll operating account maintained at Bank of America (the "BofA Operating Account"), (c) a deposit account (the "Hawaii Deposit Account") used in connection with the Debtors' *go!* Mokulele operations maintained at the Bank of Hawaii, (d) the accounts maintained at Banco Nacional de Mexico S.A. ("Banco Nacional") and Banco Mercantil del Norte S.A. ("Banco Mercantil") used in connection with the Debtors' stations located in Mexico, and (e) certain other accounts as discussed in greater detail below. A description of the use for these accounts is provided below and charts illustrating the flow of funds among the accounts is annexed as Exhibits 2-5 to the Cash Management Motion.

*(i)    Collections and Deposits Generated From Codeshare Agreements*

257.    The Debtors maintain codeshare agreements (collectively, the "Codeshare Agreements") with Delta Air Lines, Inc., United Air Lines, Inc., and US Airways, Inc. (collectively, the "Codeshare Partners"). A Codeshare Agreement refers to the practice of an

airline jointly marketing a flight for one or more other airlines.  The Debtors operate carriers and fly under the respective Codeshare Partners' livery (e.g. a US Airways, Inc. flight operated by Mesa Airlines).  The Codeshare Agreements are "<u>revenue guaranteed</u>" and thus the Debtors are paid a fixed amount under the terms of the respective Codeshare Agreement rather than based upon the number of seats sold.  Cash receipts related to the Codeshare Agreements are wired from the Codeshare Partners to the Debtors' Main Operating Account on a weekly basis.

> ### (ii)    Collections and Deposits Generated From
> ### go! Mokulele Direct Ticket Sales and Baggage Fees

258.    Under the Debtors' trade name *go!*, an independent airline that offers inter-island service in Hawaii, the Debtors sell passenger tickets to customers directly at airport ticketing counters, by telephone, and the Internet.  Passengers purchase tickets with cash, checks, credit cards, money orders, and other forms of payment at any one of the Debtors' five (5) ticket counters at the Debtors' stations in Hawaii.  The proceeds of these transactions are deposited into the Hawaii Deposit Account on a daily basis.  On a historical basis, the average monthly balance of the Hawaii Deposit Account is approximately $150,000 and such funds are swept manually into the Main Operating Account on a monthly basis.  Withdrawals from the Hawaii Deposit Account can only be made at a Bank of Hawaii branch office and are limited to emergency situations.  An authorized signor on the Hawaii Deposit Account is required to send a letter to the Debtors' bank representative specifying the individual and amount that may be withdrawn.

259.    *go!* generates approximately $200,000 per month from baggage fees (the "u").  Baggage Fees that are paid via credit card (approximately 60%) are processed in the same manner as the Credit Card Receivables as discussed below.  Cash receipts for Baggage Fees are deposited into the Hawaii Deposit Account, which is swept into the Main Operating Account on a monthly basis.

*(iii)     Collections and Deposits Generated From International Stations*

260.     The Debtors maintain stations in Mexico under their Codeshare Agreement with US Airways, Inc. and the Debtors deposit all ticket sale proceeds directly into a US Airways' controlled deposit account.  The Debtors' only source of revenue or cash collection at its Mexico stations are *de minimis* fees and taxes associated with employee guest flight passes (the "Guest Pass Tax Revenue") (approximately $500 per month).  The Debtors deposit the Guest Pass Tax Revenue into its collection account at Banco Nacional (the "Nacional Collection Account") on a daily basis.  The balance in the Nacional Collection Account is generally small and is swept into the Main Operating Account on a manual basis when the balances permit, which is usually every quarter.

261.     185.     The Debtors also maintain a disbursement account at Banco Nacional (the "Nacional Expense Account") that is funded by a series of transfers originating from the Main Concentration Account.  Payroll and other routine expenses associated with the operation of the Mexico stations are deducted from the Nacional Expense Account.  As expenses come due, transfers are made from the Debtors' peso account at Banco Mercantil (the "Mercantil Peso Account"), which is funded from the Debtors' dollar account at Banco Mercantil (the "Mercantil Dollar Account").  The Debtors wire approximately $120,000 to $250,000 per month from their Main Operating Account to the Mercantil Dollar Account.  The director of the Debtors' Mexico branch endeavors to transfer funds from the Mercantil Dollar Account to the Mercantil Peso Account during the week when exchange rates are optimal.  The Debtors fund the foregoing accounts only to the extent necessary to satisfy the operating expenses related to the station in Mexico or the Guest Pass Tax Revenue.  A chart describing the flow of funds is annexed as Exhibit 5 to the Cash Management Motion.

*(iv)     Collections and Deposits Generated From Credit Card Receivables – go!*

262.    Many customers of the Debtors' *go!* operations and entities use a credit card to purchase goods and services from the Debtors.  In these instances, the Debtors do not collect the proceeds of these transactions directly from the customers, but rather from the credit card companies or the banks and financial institutions that process the credit card transactions.  The Debtors have relationships with a variety of credit card companies and banks and other financial institutions that facilitate these transactions, including, but not limited to, U.S. Bank National Association, American Express Travel Related Services Company, Inc., Discover Financial Services, Inc., and JCB International Co., Ltd. (the "Credit Card Companies").  A chart describing the credit card process is annexed as Exhibit 4 to the Cash Management Motion.

263.    When a party purchases a ticket on *go!* using a credit card, the Debtors create a credit card receivable (the "Credit Card Receivable").  In this context, the Debtors function as a merchant while the Credit Card Companies are responsible for collecting payments from each party.  The Credit Card Companies remit payment to the Debtors generally within two (2) to fourteen (14) days after the Debtors generate the Credit Card Receivable.  As provided by their agreements with the Debtors, the Credit Card Companies retain a processing fee and forward the remainder of the transaction proceeds to the Debtors.  The Credit Card Companies wire payments for the Credit Card Receivables into the Main Operating Account.  The Debtors' aggregate annual Credit Card Receivables total approximately $40 million or $3.3 million per month.  The Debtors are seeking authorization to continue processing their Credit Card Receivables and pay any outstanding claims relating to processing fees arising from the transactions.  A chart describing the flow of funds through the clearinghouses is annexed as Exhibit 3 to the Cash Management Motion.

*(v)*     *Collections and Deposits Generated From Travel Agents*

264.     The Debtors offer the sale of passenger tickets and other goods and services to customers through travel agents and tour operators.  These travel agents and tour operators may be affiliated with the domestic Airlines Reporting Corporation ("ARC") or one of the many international Billing and Settlement Plans (the "BSPs"), which are clearinghouses to which the affiliated travel agents and tour operators (the "Clearinghouse Travel Agents") report and remit their sales.  ARC and the BSPs sort through the reports and remit payment to the Debtors for the price of the Debtors' goods and services, less any commissions or refunds due to the Clearinghouse Travel Agents.  The proceeds of these transactions are deposited in the Debtors' the JPM Clearinghouse Account.  The BSPs remit their payments to the Airline Clearing House via the International Air Transport Association Currency Clearance Service.  The JPM Clearinghouse Account is swept into the Debtors' BofA Operating Account on a monthly basis.

265.     Travel agents that are not Clearinghouse Travel Agents are not authorized to issue tickets for flights on the Debtors' aircraft.  Instead, such travel agents must purchase customer tickets directly from the Debtors' website or telephone reservation system.

*(vi)*     *Collections and Deposits Generated From Miscellaneous Sources*

266.     The Debtors also generate revenues from a variety of other sources such as (i) providing passenger, cargo, and mail delivery services to the United States Government, (ii) providing goods and services to other airlines and aircraft users (e.g., maintenance, fuel, ground-handling, and accounting services), and (iii) vendor refunds and providing amenity services to passengers (such as food and beverages, etc.).  The proceeds from these transactions are received periodically at the Debtors' Phoenix, Arizona station and are subsequently deposited into the Main Operating Account.

267.    The Debtors generate cash receipts on flights from the sale of alcohol.  For security purposes, the Debtors maintain a cash deposit account for Liquor Receipts originating from the Chicago O'Hare International Airport (Seaway Bank), Washington Dulles International Airport (Chevy Chase Bank), Denver International Airport (Wells Fargo Bank) (collectively, the "Liquor Accounts").  The Liquor Accounts are swept approximately twice a month into the Main Operating Account and the Debtors are required to maintain minimum balances of $1,000, $200, and $0.00, respectively.

**B.    Cash Concentration**

268.    As described above, the proceeds from various transactions are collected and deposited into their respective deposit accounts.  To manage their business, coordinate the payment of their outstanding obligations, and earn the maximum return on their money, the Debtors regularly draw these cash assets together into the Main Operating Account.  The Debtors use automated sweep transactions, standing instructions, and manual transfers to move available funds from the various accounts into the Debtors' Main Operating Account.  Except as indicated above, the Debtors hold the majority of their cash deposits in their Main Operating Account at Compass Bank.

**C.    Cash Disbursements**

269.    The Debtors maintain two (2) operating accounts:  Main Operating Account and BofA Operating Account.  Except for payroll, all operating expenses are settled from the Main Operating Account or settled through another disbursement account that is funded from the Main Operating Account, as discussed below.  Mesa's subsidiaries' operating expenses are paid in the same manner.

270. The Debtors also maintain disbursement accounts to fund various obligations, including, but not limited to, corporate payables, passenger refunds, employee health and welfare benefits, and insurance (collectively, "Disbursement Accounts"). The Debtors issue checks against or wire money from these Disbursement Accounts, which, in most cases, triggers an automatic transfer from the Main Operating Account when the expenses are presented for payment. The Cash Management System is designed to minimize overnight balances in the Disbursement Accounts so that any excess funds can be invested. A brief description of the Debtors' disbursements and the applicable accounts is provided below.

*(ii)    Corporate Disbursements*

271. In the operation of their business, the Debtors incur recurring obligations to vendors, suppliers, landlords, lessors, governmental agencies, certain employees pursuant to employment contract, and other entities. These obligations are generally paid via a wire through an interbank clearing system or by check payments through controlled disbursement accounts held by the Debtors. With respect to the employee related obligations, the Debtors make certain deferred compensation payment into trust accounts, as shown on Exhibit 2 to the Cash Management Motion. In addition, wire transfers for corporate payables are made from the Main Operating Account.

*(ii)    go! Ticket Refunds Disbursements*

272. Some customers purchase tickets but fail to commence traveling. Generally, tickets sold by *go!* are non-refundable. However, certain *go!* customers purchase unrestricted tickets that offer the ability to change departure dates and times without penalties. The Department of Transportation requires the Debtors to refund tickets for controllable events (*e.g.,* overbooked flights) at the time the customer is denied boarding. The Debtors process these

refunds by issuing checks at the airport ticket office (the "Inconvenienced Passenger Payments"). Inconvenienced Passenger Payments that are not processed at the airport ticket office are processed at the Debtors' Phoenix station and disbursed through one of the Debtors' Compass Bank Disbursement Accounts.

273.     The Debtors maintain a ticket refund account at the Bank of Hawaii ("Hawaii Ticket Refund Account") to make the Inconvenienced Passenger Payments.  The Debtors maintain a small balance in the Hawaii Ticket Refund Account for ticket refund checks and fund such account from the Main Operating Account to the extent necessary.  On a historical basis, the Debtors disburse approximately $500 per month from the Hawaii Ticket Refund Account and generally have a balance less than $2,000 in that account.  Refunds that are not processed at a Hawaii station are funded through the Debtors' Main Operating Account.  A chart describing these flow of funds is annexed as Exhibit 2 to the Cash Management Motion.

(iii)     *Workers' Compensation Disbursements*

274.     As described in more detail in the motion filed contemporaneously herewith regarding the Debtors' insurance programs, the Debtors' workers' compensation claims are administered by Chartis, Inc. ("Chartis"), a third party administrator that pays the claims on behalf of the Debtors.  The Debtors pay Chartis their guaranteed costs by check, which is drawn against the Main Operating Account, on an accelerated basis (i.e., substantial upfront payment followed by nine equal monthly payments).

275.     The Debtors previously received workers compensation coverage from ESIS, Inc., a member of the ACE Group of Companies ("ESIS").  The Debtors continue to incur claims under the ESIS plan and are billed monthly.  The Debtors wire ESIS payments on a monthly basis from the Main Operating Account.

### (iv)     Health and Welfare Benefit Disbursements

276.     The Debtors' self-insured medical benefits plan is provided by Coventry Health Care, Inc. ("Coventry").  Each week, the Debtors wire an amount equal to the previous week's medical benefits claims to Coventry from the Main Operating Account.  Each month, the Debtors wire administrative fees to Coventry from the Main Operating Account.

### (v)     Captive Insurance Disbursements

277.     In addition to operating airline subsidiaries, the Debtors own MAGI Insurance, Ltd., a Barbados, West Indies based, single parent captive insurance company ("MAGI") and not a Debtor.  MAGI was established for the dual purpose of obtaining access to the reinsurance market, thus reducing its overall insurance rate, and reducing its surplus lines tax exposure.  MAGI is managed by Towner Risk Management Limited ("Towner"), a Barbados-based captive insurance management company.  MAGI currently insures 30% of the Debtors' risk of loss.  Utilizing a variety of underwriters that reinsure captive insurance companies, MAGI reinsures 100% of their risk of loss.  The Debtors' remaining 70% risk of loss is insured through a collection of traditional underwriters.  The Debtors pay MAGI an annual premium, which is disbursed from the Main Operating Account.

### (vi)     Clearinghouse Disbursements

278.     Most major airlines participate in interline agreements with other airlines, pursuant to which the airlines agree to accept each other's tickets for transportation on one another's airlines or for the applicable services (e.g., ground handling).  The mutual payment obligations that arise under interline agreements are settled and adjusted through the Airlines Clearing House, Inc. (the "ACH").  ACH aggregates the amounts monthly invoiced by other airlines to the Debtors, and by the Debtors to other airlines, and calculates a net balance.  The

Debtors' JPM Clearinghouse Account is used for ACH settlement. The JPM Clearinghouse Account is funded by wire transfer from the Main Operating Account as necessary to settle a net payable position. The Debtors traditionally are in a net receivable position and the JPM Clearinghouse Account is swept into the Debtors' BofA Operating Account on a monthly basis. A chart describing the flow of funds is annexed as Exhibit 5 to the Cash Management Motion.

*(vii) Payroll Disbursements*

279. The Debtors' BofA Operating Account is also used as the Debtors' payroll account, which is funded via a monthly JPM Clearinghouse Account sweep, as discussed above and from the Main Operating Account to the extent necessary. Automatic Data Processing, Inc. ("ADP") manages the Debtors' payroll and receives a disbursement from the BofA Operating Account in accordance with the Debtors' regular payroll schedules.

*(viii) General Disbursements*

280. All wire requests are approved by the Debtors' Chief Executive Officer or the applicable individual that has corporate authority to process such transfers (currently, the Chief Financial Officer, Vice President of Finance, and the Treasurer). Generally, all invoices greater than $10,000 require the approval from one of the foregoing individuals. After the transaction has been approved, a treasury analyst inputs the payment into E-Access, a banking website used to process all wire and ACH Network transactions. Online approval is required by the Vice President of Finance. For both ACH Network and wire transfer transactions, payment files are transmitted to the bank immediately upon online approval.

281. Checks are written by the accounts payable department. Invoices are individually approved prior to issuance of a check. All checks over $20,000 require the signature of two officers. All vendor checks are issued from the Accounts Payable Account.

282.     The Debtors have four deferred compensation accounts.  The two accounts relating to Messrs. Gillman and Foley each have approximately $50,000.  Accordingly, the Debtors believe that these accounts are sufficiently secured by the FDIC's standard insurance limitation of $250,000 per account.  The remaining two deferred accounts, held for the benefit of Mr. Ornstein and myself, contain both cash and cash equivalents each in the amount of approximately $322,000 and $334,000, respectively.

## D.     **Intercompany Transactions**

283.     Prior to the Petition Date, the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Arrangements").  Intercompany transactions are recorded on the applicable Debtor's general ledgers as an intercompany payable, receivable or loan.  At any given time, there may be balances due and owing from one Debtor to another Debtor.  These balances represent extensions of intercompany credit made in the ordinary course of business.  The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Arrangements.

## E.     **Investments**

284.     To the extent the Debtors have excess cash, it is transferred from the Main Operating Account into an overnight money market investment account with Compass (the "Compass Money Market Account").  If additional funds are required to satisfy future disbursements, cash will be transferred from the Compass Market Account to the proper Disbursements Account or the Main Operating Account.  The money market accounts are reconciled on a monthly basis by the Debtors' Senior Treasury Analyst.  The Compass Money Market Account is an interest bearing account, the rate of which is determined by the

investments made by Compass Bank. Thus, the Debtors' deposits are fully insured up to the federal maximum and the only risk is the fluctuation of the interest rate.

285.    The Debtors' excess cash in its Mercantil Peso Account is swept into an overnight investment vehicle with Banco Mercantil (the "Mexico Money Market Account"). Like the Compass Money Market Account, the Mexico Money Market Account is an interest bearing account, the rate of which is determined by the investments made by the Banco Mercantil. The deposits made into the Mexico Money Market Account are guaranteed by the Mexican government to the extent that the deposit does not exceed $140,000. I am informed that the Debtors' deposits are fully insured up to the Mexican government's maximum and the only risk is the fluctuation of the interest rate.

286.    I believe that it is in the best interests of the Debtors to allow them to continue operating their Cash Management System consistent with their prepetition practices and to pay prepetition amounts outstanding as of the Petition Date, if any, owed to their Banks and Credit Card Companies as fees or service charges for the maintenance of the Cash Management System. I believe that the Cash Management System constitutes an essential business practice that provides significant benefits to the Debtors, including, but not limited to, the ability to (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

287.    Because the Debtors conduct business through their subsidiaries in a number of states, I believe that it would be difficult and wasteful to require the Debtors to establish and maintain a different and/or new cash management system. I believe the Cash Management

System is the most efficient and effective means to manage receipts and disbursements among the Debtors, vendors, and other counterparties

288.    I believe that if the Debtors are not permitted to maintain and utilize their Bank Accounts and continue to use their existing Business Forms, the resulting prejudice will include: (i) disruption of the ordinary financial affairs and business operations of the Debtors, (ii) delay in the administration of the Debtors' estates, and (iii) cost to the estates to set up new systems and open new accounts and to print new business forms.

## IX.

## Information Required by Local Rule 1007-2

289.    The information related to the Debtors required by Local Rule 1007-2 is set forth below.

290.    Pursuant to Local Rule 1007-2(a)(4), Schedule 1 hereto lists the following information with respect to each of the holders of the Debtors' thirty (30) largest unsecured claims on a consolidated basis, excluding claims of insiders.  Schedule 2 includes: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number and facsimile number; the name(s) of persons(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

291.    Pursuant to Local Rule 1007-2(a)(5), Schedule 2 hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, and facsimile number; the amount of the claim; a brief description of the collateral

securing the claim; an estimate of the value of the collateral and whether the claim or lien is disputed.

292.     Pursuant to Local Rule 1007-2(a)(6), Schedule 3 hereto provides a summary of the Debtors' assets and liabilities.

293.     Pursuant to Local Rule 1007-2(a)(7), Schedule 4 hereto provides a summary of the number and classes of shares of stock and other securities of the Debtors that are publicly held, the number of holders thereof, and listing any held by the Debtors' officers and directors and the amounts so held.

294.     Pursuant to Local Rule 1007-2(a)(8), Schedule 5 hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

295.     Pursuant to Local Rule 1007-2(a)(9), Schedule 6 hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

296.     Pursuant to Local Rule 1007-2(a)(10), Schedule 7 hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

297.     Pursuant to Local Rule 1007-2(a)(11), Schedule 8 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property.

298.     Pursuant to Local Rule 1007-2(a)(12), Schedule 9 hereto provides a list of the names of the individuals comprising the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

299.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 10 hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions.

300.     Pursuant to Local Rule 1007-2(b)(3), Schedule 11 hereto provides, for the thirty (30) day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

**Signature on Next Page**

The foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 5th day of January, 2010 at New York, New York.

_____
Michael J. Lotz

# EXHIBIT A

## (Organizational Chart)



<u>**Schedule 1**</u>

**Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)**

**CONSOLIDATED LIST OF CREDITORS
HOLDING 30 LARGEST UNSECURED CLAIMS[1]**

Following is a list of creditors holding, as of December 31, 2009, the consolidated 30 largest unsecured claims against Mesa Air New York, Inc. and its affiliated Debtors.[2]

Except as set forth above, the list of creditors has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure. This list does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of chapter 11 of title 11 of the United States Code or (ii) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

The Debtors have listed the estimated aircraft lease rejection claims of the beneficial holders of interest in the aircraft leases that the Debtors expect to seek to reject through motions that will be filed in the first 30 days following the filing of the petitions. In addition, for notice and informational purposes, the Debtors have also listed the "Owner Trustee" that is the nominal Lessor under those aircraft leases. In addition, the Debtors have also included estimates for the contingent guarantee claims that could arise as a result of the expected aircraft lease rejections. The Debtors reserve all rights, claims, defenses, objections, and other remedies at law or equity with respect to these aircraft lease rejection claims and guarantees related thereto.

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

[2] Certain affiliates of the Debtors have also filed chapter 11 cases: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653). The Debtors and the foregoing affiliates have filed a motion for joint administration of these cases.

| (1) Name of Creditor | (2) Complete mailing address, including zip code; employee, agent, or department of creditor familiar with claim who may be contacted; telephone number, fax, and email | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5) Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| Wells Fargo Bank Northwest, NA | 79 South Main Street<br>Salt Lake City, UT 84111<br>Attn: Corporate Trust Department<br>Tel: 801-246-5819; Fax: 801-246-5053<br><br>299 South Main Street<br>Salt Lake City, UT 84111<br>Attn: Corporate Trust Department<br>Tel: 801 246-5819; Fax: 801 246-5053 | "Owner Trustee" - - Aircraft Lease Rejection | Contingent | Unknown |
| Bombardier, Inc. | Bombardier, Inc.<br>123 Garratt Boulevard<br>Downsview, Ontario<br>Canada<br>M3K 1Y5<br>Fax: 416-375-4533<br>Attn: Cameron Mountenay and Martin Herman<br>Email:<br>cameron.mountenay@aero.bombardier.com<br>martin.herman@aero.bombardier.com | Aircraft Lease Guarantees; Loan; Contract Rejection Damages | Contingent Unliquidated Subject to Setoff | $133,000,000 |
| EMBRAER - Empresa Brasileira de Aeronautica S.A. | EMBRAER - Empresa Brasileira de Aeronautica S.A.<br>Av. Brigadeiro Faria Lima, 2170<br>12.227-901 Sao Jose dos Campos - SP<br>BRAZIL<br>Tel: +55-12 345 1410<br>Fax: +55-12 345 1257<br>Attn: Sergio B. Guedes & Paulo Cesar<br>T: 954 359 3786<br>F: 954 205 2285<br>Email: squedes@embraer.com | Aircraft Lease Guarantees | Contingent Unliquidated | $42,000,000 |
| GE Commercial Aviation Services, Inc. | GE Commercial Aviation Services, Inc.<br>201 High Ridge Road<br>Stamford, CT 06927<br>Tel: +1 480 778 1393<br>Fax: +1 480 778 0218<br>Attn: Nicolas P. Stable (VP & Counsel)<br>Email: nicolas.stable@gecas.com | Aircraft Lease Rejection | Contingent Unliquidated | $34,000,000 |
| Investissement Quebec | Investissement Quebec<br>393, rue Saint-Jacques, bureau 500<br>Montreal (Quebec) H2Y 1N9<br>Tel: 514 873 7159<br>Fax: 514 873 8490<br>Attn: Catherine Guillot<br>Email: Catherine.guillot@invest.quebec.com | Aircraft Lease Guarantees | Contingent, Unliquidated | $34,000,000 |

| (1) Name of Creditor | (2) Complete mailing address, including zip code; employee, agent, or department of creditor familiar with claim who may be contacted; telephone number, fax, and email | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5) Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| Polaris Holding Company (GECAS) | Polaris Holding Company (GECAS)<br>201 High Ridge Road<br>Stamford, CT 06927<br>Tel: 203 357 4482<br>Fax: 203 357 3201<br>Attn: Nicolas P. Stable - VP & Counsel<br>T: 203 585 5156<br>F: 203 567 8412<br>Email: nicolas.stable@gecas.com | Aircraft Lease Rejection | Unliquidated | $28,000,000 |
| AAR Corp. | AAR Corp.<br>One AAR Place<br>110 N. Wood Dale Road<br>Wood Dale, IL 60191<br>Attn: Jennifer Pulsifer - Senior Counsel<br>T: 630 227 2048<br>F: 630 227 2058<br>Email: jennifer.pulsifer@aarcorp.com | Trade Debt | Contingent Unliquidated | $26,257,453 |
| US Bank National Assoc. | US Bank National Assoc. (Indenture Trustee to Notes)<br>Corporate Trust Services<br>One Federal Street, 3rd Floor<br>Boston, MA 02110<br>Attn: David Ganss<br>T: 617 603 6568<br>F: 617 603 6667<br>Email: david.ganss@usbank.com | 8% Senior Unsecured Notes Due 2012<br><br>6.25% Senior Convertible Notes Due 2023<br><br>3.625% Senior Convertible Notes Due 2024 | | $25,907,087 |
| Philip Morris Capital Corporation | Philip Morris Capital Corporation<br>225 High Ridge Road, Suite 300 West<br>Stamford, CT 06905<br>Attn: Thomas Urbach<br>T: 203 708 8245<br>Email: tom.urbach@us.pm.com | Aircraft Lease Rejection | Contingent Unliquidated | $22,000,000 |
| Fleet National Bank | Fleet National Bank<br>111 Westminster Street<br>RIMO 199<br>Providence, RI 02903<br>Attn: Corporate Trust Administration<br>Tel: 401-278-3766<br>Fax: 401-278-3763 | Aircraft Lease Rejection | Contingent Unliquidated | $18,000,000 |

| (1) Name of Creditor | (2) Complete mailing address, including zip code; employee, agent, or department of creditor familiar with claim who may be contacted; telephone number, fax, and email | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5) Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| Raytheon Aircraft Credit Corporation | 8300 E. Thorn Drive, Suite 100 Wichita, KS 67226 Tel: 316-676-8821 Fax: 316-676-7636 Attn: Mike Scheidt Email: mike_scheidt@raytheon.com | Aircraft Loans | | $17,525,040 |
| IHI Corporation | IHI Corporation 229 Tonogaya, Mizuho-machi, Nishitama-gun Tokyo 190-1297, Japan Attn: Manager, Sales Group - Maintenance Department Fax: 81-42-568-7073 | Trade Debt | | $16,033,806 |
| GE Engine Services, Inc. | GE Engine Services, Inc. One Neumann Way Cincinnati, OH 45215 Attn: Senior Counsel | Promissory Note Trade Debt | | $15,759,012 |
| AT&T Capital Services, Inc. (Successor to TransAmerica) | AT&T Capital Services, Inc. 2000 W SBC Center Dr Hoffman Estates, IL 60196 T: 847 290 5000 Attn: Jeffrey Mason T:847 290 5080 F:847 290 0199 Email: jeffrey.mason@att.com | Aircraft Lease Rejection | Contingent Unliquidated | $15,000,000 |
| Rolls-Royce | Rolls-Royce Rolls-Royce plc 65 Buckingham Gate London SW1 6AT England Attn: Company Secretary Fax: 011 44 171 233 1733 Rolls-Royce North America, Inc. 14850 Conference Center Drive, Suite 100 Chantilly, VA 20151 Attn: Rhonda S. VanLowe - Counsel T: 703 621 2775 F: 703 834 5629 Email: rhonda.vanlowe@rolls-royce.com Rolls-Royce Allinson PO BOX 420, Mail Code U26A Indianapolis, IN 46206-0420 Attn: Marc Allinson Email: marc.allinson@rolls-royce.com | Aircraft Lease Guarantees and disputed trade debt | Contingent, Disputed | $12,812,190 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| **Name of Creditor** | **Complete mailing address, including zip code; employee, agent, or department of creditor familiar with claim who may be contacted; telephone number, fax, and email** | **Nature of claim (trade debt, bank loan, government contract, etc.)** | **Indicate if claim is contingent, unliquidated, disputed, or subject to setoff** | **Amount of claim (if secured, also state value of security)** |
| SW Holding Trust (CIT) | SW Holding Trust (CIT) c/o Wilmington Trust Company, as Owner Trustee Rodney Square North 1100 North Market Street Wilmington, DE 19890-0001 Attn: Corporate Trust Administration Tel: 302-636-6366 Fax: 302-636-4140 SW Holding Corp. c/o the CIT Group 1211 Avenue of the Americas New York, NY 10036 Attn: Chief Counsel Tel: 212-536-1375 Fax: 212-536-1388 | Aircraft Lease Rejection | Contingent Unliquidated | $11,000,000 |
| Transamerica Aviation LLC | Transamerica Aviation LLC (formerly Transamerica Aviation 429/448 Corp) 2700 West Plano Parkway Plano, TX 75075 Attn: Dean Stubbe 972-881-6612 972-881-6620 (fax) Email: dean.stubbe@transamerica.com | Aircraft Lease Rejection | Contingent Unliquidated | $11,000,000 |
| Bank of Hawaii Leasing, Inc. (Successor to Pacific Century Leasing, Inc.) | Bank of Hawaii Leasing, Inc. (formerly Pacific Century Leasing, Inc.) 130 Merchant Street, 19th Floor Honolulu, HI 96813 Tel: 808-537-8198 Fax: 808-526-0964 Email: marc.adelberger@boh.com | Aircraft Lease Rejection | Contingent Unliquidated | $11,000,000 |
| Wondefulworld Holding BV (DVB Bank) | Wondefulworld Holding BV (DVB Bank) DVB Bank SE 60325 Frankfurt/Main, Germany Attn: Carsten Gerlach Tel: +49 69 97504 306 Fax: +49 174 3258597 Cell: +49 69 97504 828 Email: carsten.gerlach@dvbbank.com | Aircraft Lease Rejection | Contingent Unliquidated | $8,000,000 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| **Name of Creditor** | **Complete mailing address, including zip code; employee, agent, or department of creditor familiar with claim who may be contacted; telephone number, fax, and email** | **Nature of claim (trade debt, bank loan, government contract, etc.)** | **Indicate if claim is contingent, unliquidated, disputed, or subject to setoff** | **Amount of claim (if secured, also state value of security)** |
| PNCEF, LLC dba PNC Equipment Finance, fka National City Commercial Capital Company, LLC | PNCEF, LLC dba PNC Equipment Finance 101 S. 5th Street Louisville, Kentucky 40202 Attn: VP of Operations Attn: Kenneth A. Kilmer T: 513 639 5759 F: 513 639 5413 Email: ken.kilmer@nationalcity.com | Aircraft Lease Rejection | Contingent Unliquidated | $8,000,000 |
| GECAS (ASC) | General Electric Capital Corporation c/o GE Capital Aviation Services, Inc. 201 High Ridge Road Stamford, CT 06927 Tel: (203) 357-4482 Fax (203) 357-3201 Attn: Nicolas P. Stable T: 203 585 5156 F: 203 567 8412 Email: nicolas.stable@gecas.com | Aircraft Lease Rejection | Contingent Unliquidated | $7,000,000 |
| Fluid CRJ One Statutory Trust | Fluid CRJ One Statutory Trust c/o Wells Fargo Bank Northwest, National Association 299 South Main St, 12th Floor Salt Lake City, UT 84111 Attn: Corporate Trust Office Tel: 801-246-5819 Fax: 801-246-5053 Email: michael.arsenault@wellsfargo.com With a copy to: Fluid Aviation, LLC 5131 NE Laurelcrest Lane Seattle, WA 98105 Attn: Sole Member Fax: 206-522-1586 Email: joel.hussey@comcast.net | Aircraft Lease Rejection | Contingent Unliquidated | $6,000,000 |
| Avmax International Aircraft Leasing, Inc. | Avmax International Aircraft Leasing, Inc. 2055 Pegasus Rd. N.E. Calgary, Alberta, T2E 8C3 Canada Attn: Don Parkin, Executive Vice President Tel: 403-291-2464 Fax: 403-291-5304 Email: dparkin@avmax.ca | Aircraft Lease Rejection | Contingent Unliquidated | $6,000,000 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| Name of Creditor | Complete mailing address, including zip code; employee, agent, or department of creditor familiar with claim who may be contacted; telephone number, fax, and email | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of claim (if secured, also state value of security) |
| NCBE Leasing Corp. | NCBE Leasing Corp.<br>227 Main Street<br>Evansville, IN 47708<br>Attn: President<br>Tel: (812) 464-9752 | Aircraft Lease Rejection | Contingent Unliquidated | $6,000,000 |
| Cargill Leasing Corporation | Cargill Leasing Corporation<br>6000 Clearwater Drive<br>Minnetonka, MN 55343 | Aircraft Lease Rejection | Unliquidated | $5,000,000 |
| debis Financial Services LLC | debis Financial Services LLC<br>201 Merritt 7, Suite 700<br>Norwalk, Connecticut 06856<br>Attn: Aircraft Finance<br>Tel: 203 847-4500<br>Fax: 203 750-7079 | Aircraft Lease Rejection | Unliquidated | $4,000,000 |
| Bombardier Services Corp. | Bombardier Services Corporation<br>261 Mountain View Drive<br>Colchester, VT 05446<br>Attn: Cameron Mountenay<br>Fax: 802-654-8434<br>T: 802 764 5203<br>F: 802 238 7245<br>Email:<br>Cameron.mountenay@aero.bombardier.com<br><br>With copy to:<br>Bombardier Aerospace Regional Aircraft<br>Garratt Boulevard M/S N17-27<br>Downsview, Ontario M3K 1Y5<br>Attn: Director, Contracts<br>Fax: 416-375-4573 | Aircraft Lease Rejection | Unliquidated | $3,000,000 |
| Wells Fargo Equipment Finance, Inc. | Wells Fargo Equipment Finance, Inc.<br>733 Marquette Ave.<br>Minneapolis, MN 55402<br>Tel: 612-667-9735<br>richard.e.johnson@wellsfargo.com | Aircraft Lease Rejection | Unliquidated | $3,000,000 |
| General Electric Capital Corporation | General Electric Capital Corporation<br>c/o GE Capital Aviation Services, Inc.<br>201 High Ridge Road<br>Stamford, CT 06927<br>Attn: Nicholas Stable & Todd Freeman<br>Tel: (203) 357-4482<br>Fax (203) 357-3201<br>Email: nicolas.stable@gecas.com &<br>todd.freeman@gecas.com | Aircraft Lease Rejection | Unliquidated | $2,000,000 |

| (1) Name of Creditor | (2) Complete mailing address, including zip code; employee, agent, or department of creditor familiar with claim who may be contacted; telephone number, fax, and email | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5) Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| Northstar Avlease Ltd. | Northstar Avlease Ltd.<br>600 Palmer Road NE<br>Calgary, Alberta<br>T2E 7R3<br>Attn: Peter Scheiwiller - Director<br>Tel: 403 717 1231<br>Email: peter@northgateaviation.ca | Aircraft Lease Rejection | Unliquidated | $2,000,000 |
| Transwestern Phoenix Gateway LLC | Transwestern Phoenix Gateway LLC<br>c/o Transwestern Investment Company, LLC<br>150 North Wacker Drive<br>Chicago, IL 60606<br>Tel: 312 499-1900<br>Fax: 312-499-1909 | Real Estate Lease Rejection | Contingent Unliquidated | $1,228,000 |

# Schedule 2

## Consolidated List of Holders of Five (5) Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following list the creditors holding, as of December 31, 2009, the five largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C.§ 101. The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights, claims, defenses, objections, and other remedies at law or equity with respect to these claims.

| Creditor | Contact | Mailing Address, Phone & Fax Numbers, E-mail | Amount of Claim | Type of Collateral | Value of Collateral | Contingent |
|---|---|---|---|---|---|---|
| CRJ Equipment Trust | Attn: Corporate Trust Admin | CRJ Equipment Trust, c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890 Tel: 302-636-4140 Fax: 302-636-4140 | $261,717,853 | Aircraft | $261,717,853 | |
| Export Development Canada | Attn: Sean Mitchell | Export Development Canada 151 O'Conner Street Ottawa Ontario K1A 1K3 Canada Tel: 613-598-2514 Fax: 613-598-3186 Email: smitchell@edc.ca | $105,881,022 | Aircraft | $105,881,022 | |
| Raytheon Aircraft Credit Corporation | Attn: Michael J. Scheidt | Raytheon Aircraft Credit Corporation 8300 E. Thorn Drive, Suite 100 Wichita, KS 67226 Tel: 316-676-8821 Fax: 316-676-7636 Email: mike_scheidt@raytheon.com | $33,525,040 | Aircraft | $16,000,000 | |

| Creditor | Contact | Mailing Address, Phone & Fax Numbers, E-mail | Amount of Claim | Type of Collateral | Value of Collateral | Contingent |
|---|---|---|---|---|---|---|
| Canadian Regional Aircraft Finance Transaction No. 1 Limited | Attn: Cameron Mountenay | Canadian Regional Aircraft Finance Transaction No. 1 Limited<br>22 Grenville Street<br>St. Helier<br>Jersey-Channel Islands<br><br>c/o Bombardier, as Servicer to CRAFT<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br>Tel: 802-764-5203<br>Fax: 802-238-7245<br>Email:<br>cameron.mountenay@aero.bombardier.com | $14,972,916 | Aircraft | $6,000,000 | |
| Bombardier Capital Inc. | Attn: Martin Herman | Bombardier Capital Inc.<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br>Tel: 802-764-5203<br>Fax: 802-238-7245<br>Email:<br>martin.herman@aero.bombardier.com | $10,369,201 | Aircraft | $10,369,201 | |

# Schedule 3

## Consolidated Balance Sheets (unaudited) as of September 30, 2009

**MESA AIR GROUP, INC.**
**CONSOLIDATED BALANCE SHEETS**

| | September 30, | |
| --- | --- | --- |
| | **2009** | **2008** |
| | (In thousands, except share data) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 31,292 | $ 50,763 |
| Marketable securities | 2 | 224 |
| Restricted cash | 12,958 | 13,947 |
| Receivables, net | 14,763 | 32,429 |
| Income tax receivable | 2,320 | 734 |
| Expendable parts and supplies, net | 27,478 | 31,067 |
| Prepaid expenses | 160,121 | 162,701 |
| Deferred income taxes | 12,133 | 18,379 |
| Assets of discontinued operations | 13,133 | 24,805 |
| Total current assets | 274,200 | 335,049 |
| Property and equipment, net | 559,275 | 577,183 |
| Lease and equipment deposits | 11,420 | 11,957 |
| Equity method investments | 29,252 | 13,697 |
| Other assets | 101,340 | 21,319 |
| Total assets | $ 975,487 | $ 959,205 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Current portion of long-term debt | $ 38,537 | $ 137,990 |
| Accounts payable | 36,824 | 28,898 |
| Air traffic liability | 4,312 | 7,861 |
| Accrued compensation | 9,362 | 7,394 |
| Income taxes payable | 1,647 | - |
| Other accrued expenses | 39,919 | 50,646 |
| Liabilities of discontinued operations | 33,633 | 39,620 |
| Total current liabilities | 164,234 | 272,409 |
| Long-term debt, excluding current portion | 415,042 | 420,878 |
| Deferred credits | 107,911 | 116,849 |
| Deferred income taxes | 156,719 | 15,734 |
| Other noncurrent liabilities | 24,685 | 23,678 |
| Total liabilities | 868,591 | 849,548 |
| | | |
| Stockholders' equity: | | |
| | | |
| Preferred stock of no par value, 2,000,000 shares authorized; no shares issued and outstanding; | — | — |
| Common stock of no par value and additional paid-in capital, 900,000,000 shares authorized; 106,217,249 and 26,773,479 shares issued and outstanding, respectively | 117,599 | 105,869 |
| Retained (deficit) earnings | (10,703) | 3,788 |
| Total stockholders' equity | 106,896 | 109,657 |
| Total liabilities and stockholders' equity | $ 975,487 | $ 959,205 |

## Schedule 4

### Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held ("Securities") and the number of holders thereof. The Securities held by the Debtors' officers and directors are listed separately.

### Common Stock

| Type of Security | Number of Shares | Approximate Number of Record Holders | As of |
|---|---|---|---|
| Common stock $0.00 par value, 900,000,000 shares authorized | 175,217,249 shares issued and outstanding | 798 | November 18, 2009 |

### Securities Held by Debtors' Directors and Officers

| Officers | Title | Shares Owned As of November 18, 2009 |
|---|---|---|
| Jonathan Ornstein | Chief Executive Officer | 199,956 |
| Michael Lotz | President | 33,113 |
| David Butler | Senior VP of Human Resources | 7,000 |
| Michael Ferverda | Senior VP of Operations | 4,000 |
| Paul Foley | Chief Operating Officer | 0 |
| Brian Gillman | Exec. VP and General Counsel | 11,934 |

| Directors | | Shares Owned As of November 18, 2009 |
|---|---|---|
| Jonathan Ornstein | | 199,956 |
| Richard Thayer | | 10,442 |
| Maurice Parker | | 17,942 |
| Peter Nostrand | | 84,942 |
| Joseph Manson | | 5,442 |
| Carlos Bonilla | | 7,942 |
| Bob Beleson | | 6,442 |
| Daniel Altobello | | 13,442 |

**Preferred Stock**

| Type of Security | Number of Shares | Approximate Number of Record Holders | As of |
|---|---|---|---|
| Preferred Stock 2,000,000 shares authorized | No shares issued and outstanding | None | December 31, 2009 |

**Notes/Bonds/Other Securities**

| Type of Security | Approximate Number of Record Holders | Net Principal Remaining As of |
|---|---|---|
| 8% Senior Unsecured Notes Due 2012 | 6 | $17.2M |
| 6.25% Senior Convertible Notes Due 2023 | 2 | $15.6M |
| 3.625% Senior Convertible Notes Due 2024 | 10 | $3.0M |
| Notes payable to CRJ Equipment Trust 2004, principal and interest due monthly, interest at LIBOR plus 3%, collateralized by the underlying aircraft, due 2019 | 1 | $267.293M |
| Note payable to GE Engine Services due 2012, principal and interest due monthly, interest at LIBOR plus 6%, unsecured | 1 | $16.404M |
| Notes payable to Raytheon Aircraft Credit Corporation due 2011, principal and interest due monthly, interest at LIBOR plus 1.8%, collateralized by the underlying aircraft | 1 | $32.463M |
| Note payable to M & T Investment Group due 2013, principal and interest due monthly at 7% per annum through 2008 converting to 12.5% thereafter, collateralized by the underlying aircraft | 1 | $18.099M |
| Notes payable to Export Development Canada, principal and interest due monthly through 2022, interest at LIBOR plus 2.25% (2.8% at June 30, 2009), collateralized by the underlying aircraft | 1 | $107.285 |
| Notes payable to Bombardier Capital, Inc., principal and interest due monthly through 2012, interest at 8.3% per annum, | 1 | $10.827M |

| Type of Security | Approximate Number of Record Holders | Net Principal Remaining As of |
|---|:---:|:---:|
| collateralized by the underlying aircraft | | |
| Unsecured note payable to CAE Inc, principal due semi-annually, interest at LIBOR plus 6% due quarterly through 2012 | 1 | $0.67M |
| Notes payable to Fokker Services, Inc., principal of $82,057 due monthly starting with the 21st month, interest at 3.2%, collateralized by rotable spare parts (2) | 1 | $3.029M |
| Unsecured note payable to AAR Corp., principal and interest at 9.5% due monthly through 2015 | 1 | $1.431M |
| Mortgage note payable to Bozidar Pesakovic and Nada Pesakovic, principal and interest at 7.5% due monthly through 2011, collateralized by Del Rio Hotel | 2 | $0.721M |

## Schedule 5

## Debtors' Property Not in the Debtors' Possession

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Cash Secured Letter of Credit ($5,526,192) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7066 | n/a |
| Cash Secured Letter of Credit ($400,531) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7067 | n/a |
| Cash Secured Letter of Credit ($160,200) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7068 | n/a |
| Cash Secured Letter of Credit ($113,436) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7069 | n/a |
| Cash Secured Letter of Credit ($936) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7070 | n/a |
| Cash Secured Letter of Credit ($74,771) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7071 | n/a |
| Cash Secured Letter of Credit ($855,924) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7072 | n/a |
| Cash Secured Letter of Credit ($600,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7073 | n/a |
| Cash Secured Letter of Credit ($200,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7074 | n/a |
| Cash Secured Letter of Credit ($168,444) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7075 | n/a |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Aircraft Engines | IHI Corporation | 229, Tonogaya, Mizuho-Machi, Nishitama-Gun, Tokyo, Japan 190-1297 | n/a |
| Cash Secured Letter of Credit ($40,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7076 | n/a |
| Cash Secured Letter of Credit ($115,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7077 | n/a |
| Cash Secured Letter of Credit ($122,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7078 | n/a |
| Cash Secured Letter of Credit ($58,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7079 | n/a |
| Cash Secured Letter of Credit ($903,990) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7080 | n/a |
| Cash Secured Letter of Credit ($311,695) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7081 | n/a |
| Cash Secured Letter of Credit ($6,800) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7082 | n/a |
| Cash Secured Letter of Credit ($40,189) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7083 | n/a |
| Cash Secured Letter of Credit ($14,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7084 | n/a |
| Cash Secured Letter of Credit ($150,000) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7085 | n/a |
| Cash Secured Letter of Credit ($18,050) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7086 | n/a |
| Cash Secured Letter of Credit ($24,560) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7087 | n/a |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Cash Secured Letter of Credit ($234,852) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7088 | n/a |
| Cash Secured Letter of Credit ($142,511) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7089 | n/a |
| Cash Secured Letter of Credit ($372,638) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7090 | n/a |
| Cash Secured Letter of Credit ($78,284) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>(602) 778-7091 | n/a |
| Cash Secured Letter of Credit ($47,504) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7092 | n/a |
| Cash Secured Letter of Credit ($124,213) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7093 | n/a |
| Cash Secured Letter of Credit ($156,568) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7094 | n/a |
| Cash Secured Letter of Credit ($95,007) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7095 | n/a |
| Cash Secured Letter of Credit ($248,425) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7096 | n/a |
| Cash Secured Letter of Credit ($156,568) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7097 | n/a |
| Cash Secured Letter of Credit ($95,007) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7098 | n/a |
| Cash Secured Letter of Credit ($248,425) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140<br>Phoenix, AZ 85016<br>Attn: Cynthia Owens<br>(602) 778-7099 | n/a |

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Cash Secured Letter of Credit ($156,568) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7100 | n/a |
| Cash Secured Letter of Credit ($95,007) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7101 | n/a |
| Cash Secured Letter of Credit ($248,425) | BBVA Compass Bank | 2886 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 Attn: Cynthia Owens (602) 778-7102 | n/a |
| Surety Bond ($1,093,541.34) | Fidelity and Deposit Company of Maryland | 1400 American Lane Schaumburg, IL 60196 | n/a |
| Surety Bond ($1,400,000.00) | International Fidelity Insurance Company | One Newark Center 20th Flr. Newark, NJ 07102 | n/a |
| Surety Bond ($5,000.00) | Zurich American Insurance Company | 1400 American Lane Schaumburg, IL 60196 | n/a |
| Credit Card Holdback ($2,959,406.43) | U.S. Bank (Visa / MC) | 7300 Chapman Hwy Knoxville, TN 37920 | n/a |
| Credit Card Holdback ($800,000) | American Express | American Express Tower 200 Zesey St. New York, NY 10285 | n/a |
| Credit Card Holdback ($175,000) | Discover Financial | P.O. Box 52145 Phoenix, AZ 85072 | n/a |
| Purchasing Card Deposit ($200,000) | BBVA Compass Bank | 2850 E. Camelback Rd. Suite 140 Phoenix, AZ 85016 | n/a |
| 26,000 gallons of fuel | Signature Flight Services | 201 South Orange Avenue Suite 1100-S Orlando, Florida, 32801 Tel: 1 407 648 7200 | n/a |

# Schedule 6

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses. The leased properties on this schedule are considered non-airport leases.

| Debtor | Owned/Leased Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Mesa Air Group | 4700 Yorkmont Road | Charlotte | NC | 28208 | USA |
| Mesa Air Group | 2299 Airport Road | Wichita | KS | 67209 | USA |
| Mesa Air Group | IAD Airport | Dulles | VA | 20166 | USA |
| Freedom Airlines | 1005 Virginia Ave., Suite 170 | Hapeville | GA | 30354 | USA |
| Mesa Airlines | 4818 Express Drive, Bldg #212 | Charlotte | NC | 28208 | USA |
| Mesa Airlines | CLT Airport, Express Drive | Charlotte | NC | 28208 | USA |
| Mesa Airlines | 4728 E. West Blvd. Charlotte, NC | Charlotte | NC | 28208 | USA |
| Mesa Airlines | Hangar 5/5A ORD Airport | Chicago | IL | 60666 | USA |
| Mesa Air Group | 2828 Walker Field Dr. Grand | Junction | CO | 81506 | USA |
| Mesa Airlines | 3410 E. University Dr. | Phoenix | AZ | 85034 | USA |
| Mesa Airlines | 3902-3912, 3914-3918, 3920-3922 Airlane | Phoenix | AZ | 85034 | USA |
| Mesa Air Group | 3917 Airlane | Phoenix | AZ | 85034 | USA |
| MPD, Inc. | 1296 W. Navajo St. | Farmington | NM | 87401 | USA |
| Mesa Air Group | 410 N. 44th St. | Phoenix | AZ | 85008 | USA |
| Mesa Airlines | 410 S. Madison #1 | Phoenix | AZ | 85003 | USA |
| Mesa Airlines | 2200 W. Main Bldg. A | Mesa | AZ | 85202 | USA |
| Mesa Airlines | 2200 W. Main Bldg. B | Mesa | AZ | 85202 | USA |
| Mesa Airlines | 2200 W. Main Bldg. C | Mesa | AZ | 85202 | USA |
| Mesa Airlines | 2200 W. Main Bldg. D | Mesa | AZ | 85202 | USA |
| Mesa Airlines | 2200 W. Main Bldg. E | Mesa | AZ | 85202 | USA |
| Mesa Airlines | 2200 W. Main Bldg. F | Mesa | AZ | 85202 | USA |
| Mesa Airlines | 3513 Air Commerce Drive | Columbia | SC | 29170 | USA |
| Mesa Airlines | 3948 Airlane | Phoenix | AZ | 85034 | USA |
| Mesa Airlines | IAD Airport | Washington | VA | 20166 | USA |
| Mesa Airlines | ORD Airport | Chicago | IL | 60666 | USA |
| Mesa Airlines | ORD Airport | Chicago | IL | 60666 | USA |
| Mesa Airlines | ORD Airport | Chicago | IL | 60666 | USA |
| Mesa Airlines | 6 Houses located in South Desert Village | Mesa | AZ | 85208 | USA |
| Mesa Airlines | 6900 S. Park Avenue | Tucson | AZ | 85756 | USA |
| Mesa Air Group | 2700 Farmington Avenue | Farmington | NM | 87401 | USA |
| Mesa Airlines | 146 Palekona Street | Honolulu | HI | 96818 | USA |
| Mesa Airlines, dba as *go!* | 302 Rodgers Blvd #23 | Honolulu | HI | 96819 | USA |
| Mesa Airlines | BNA Airport | Nashville | TN | 37214 | USA |
| Mesa Airlines | MRY Airport | Monterey | CA | 93940 | USA |
| Mesa Airlines | PSY Airport | Port Stanley | Falkland Islands | | UK |
| Mesa Air Group | 21010 Stanford Square, #102 | Sterling | VA | 20166 | USA |
| Mesa Air Group | 21010 Stanford Square, #200 | Sterling | VA | 20166 | USA |
| Mesa Air Group | 21010 Standord Square #400 | Sterling | VA | 20166 | USA |

The following is a list of premises at specific airports that the Debtors utilize their business that are made available pursuant to a lease or some other arrangement.

| Debtor | Airport | Address |
|---|---|---|
| Mesa Airlines, Inc. | Abraham Lincoln Capital | Springfield Arpt Auth<br>1200 Capital Airport Dr<br>Springfield, IL  62707-8413 |
| Freedom Airlines, Inc. | Adams Field | City Of Little Rock<br>Arpt Cmsn, No 1 Arpt Drive<br>Little Rock, AR  72202 |
| Mesa Airlines, Inc. | Akron-Canton Regional | Akron Canton Rgnl Arpt Auth<br>5400 Lauby Rd<br>North Canton, OH  44720 |
| Mesa Airlines, Inc. | Albany Intl | Albany County Arpt Auth<br>Arff Bldg Rm 200<br>Albany, NY  12211 |
| Mesa Airlines, Inc. | Albany Intl | Albany County Arpt Auth<br>Arff Bldg Rm 200<br>Albany, NY  12211 |
| Mesa Airlines, Inc. | Albert J. Ellis | Onslow County<br>521 Mill Ave<br>Jacksonville, NC  28540 |
| Mesa Airlines, Inc. | Albuquerque Intl' Sunport | City Of Albuquerque<br>Po Box 1293<br>Albuquerque, NM  87103 |
| Mesa Airlines, Inc. | Aspen-Pitkin Co/Sardy Field | Pitkin County<br>506 East Main<br>Aspen, CO  81611 |
| Mesa Airlines, Inc. | Austin Straubel Intl | Brown County<br>2077 Airport Drive<br>Green Bay, WI  54313-5596 |
| Mesa Airlines, Inc. | Austin-Bergstrom Intl | City Of Austin<br>Po Box 1088<br>Austin, TX  78767 |
| Mesa Airlines, Inc. | Austin-Bergstrom Intl | City Of Austin<br>Po Box 1088<br>Austin, TX  78767 |
| Freedom Airlines, Inc. | Baltimore/Washington Intl Thurgood Marshal | State Of Maryland<br>Po Box 8766<br>Bwi Airport, MD  21240-0766 |
| Mesa Airlines, Inc. | Birmingham-Shuttlesworth Intl | Birmingham Airport Authority<br>5900 Airport Hwy<br>Birmingham, AL  35212 |
| Mesa Airlines, Inc. | Birmingham-Shuttlesworth Intl | Birmingham Airport Authority<br>5900 Airport Hwy<br>Birmingham, AL  35212 |
| Freedom Airlines, Inc. | Blue Grass | Lexington-Fayette Co Arpt Brd<br>4000 Terminal Drive, Suite 206<br>Lexington, KY  40510 |
| Mesa Airlines, Inc. | Bob Hope | Burbank-Glendale-Pasadena Apt<br>2627 Hollywood Way<br>Burbank, CA  91505 |

| Debtor | Airport | Address |
|---|---|---|
| Freedom Airlines, Inc. | Bradley Intl | State Of Connecticut<br>Po Box 317546<br>Newington, CT 06131-7546 |
| Mesa Airlines, Inc. | Bradley Intl | State Of Connecticut<br>Po Box 317546<br>Newington, CT 06131-7546 |
| Mesa Airlines, Inc. | Bradley Intl | State Of Connecticut<br>Po Box 317546<br>Newington, CT 06131-7546 |
| Mesa Airlines, Inc. | Buffalo Niagara Intl | Niagara Frontier Tran Auth<br>181 Ellicott St, Po Box 5008<br>Buffalo, NY 14205 |
| Mesa Airlines, Inc. | Buffalo Niagara Intl | Niagara Frontier Tran Auth<br>181 Ellicott St, Po Box 5008<br>Buffalo, NY 14205 |
| Mesa Airlines, Inc. | Capital City | Capital Region Arpt Authority<br>4100 Capital City Blvd<br>Lansing, MI 48906 |
| Mesa Airlines, Inc. | Casper/Natrona County Intl | County Board Of Trustees<br>8500 Airport Parkway<br>Casper, WY 82604 |
| Mesa Airlines, Inc. | Charleston Afb/Intl | Usaf<br>437 ABG/OTM<br>Charleston AFB, SC 29404 |
| Mesa Airlines, Inc. | Charleston Afb/Intl | Usaf<br>437 ABG/OTM<br>Charleston AFB, SC 29404 |
| Freedom Airlines, Inc. | Charlotte/Douglas Intl | City Of Charlotte<br>600 East Fourth St<br>Charlotte, NC 28202 |
| Mesa Airlines, Inc. | Charlotte/Douglas Intl | City Of Charlotte<br>600 East Fourth St<br>Charlotte, NC 28202 |
| Mesa Airlines, Inc. | Charlotte/Douglas Intl | City Of Charlotte<br>600 East Fourth St<br>Charlotte, NC 28202 |
| Mesa Airlines, Inc. | Cherry Capital | Grand Traverse & Leelanau Co<br>Northwestern Rgnl Arpt Cmsn<br>Traverse City, MI 49686 |
| Freedom Airlines, Inc. | Chicago O'hare Intl | City Of Chicago<br>10510 West Zemke Road, P.O. Box 66848<br>Chicago, IL 60666 |
| Mesa Airlines, Inc. | Chicago O'hare Intl | City Of Chicago<br>P.O. Box 66848, 10510 West Zemke Road<br>Chicago, IL 60666 |
| Freedom Airlines, Inc. | Cincinnati/Northern Kentucky Intl | Kenton County Arpt Board<br>Po Box 752000<br>Cincinnati, OH 45275-2000 |
| Mesa Airlines, Inc. | City Of Colorado Springs Muni | City Of Colorado Springs<br>7770 Milton East Proby Pkwy, Suite 50<br>Colorado Springs, CO 80916 |
| Mesa Airlines, Inc. | City Of Colorado Springs Muni | City Of Colorado Springs<br>7770 Milton East Proby Pkwy, Suite 50<br>Colorado Springs, CO 80916 |

| Debtor | Airport | Address |
| --- | --- | --- |
| Freedom Airlines, Inc. | Cleveland-Hopkins Intl | City Of Cleveland<br>5300 Riverside Drive<br>Cleveland, OH 44135-3193 |
| Mesa Airlines, Inc. | Cleveland-Hopkins Intl | City Of Cleveland<br>5300 Riverside Drive<br>Cleveland, OH 44135-3193 |
| Mesa Airlines, Inc. | Cleveland-Hopkins Intl | City Of Cleveland<br>5300 Riverside Drive<br>Cleveland, OH 44135-3193 |
| Freedom Airlines, Inc. | Columbia Metropolitan | Richland Lexington<br>Po Box 280037<br>Columbia, SC 29228 |
| Mesa Airlines, Inc. | Columbia Metropolitan | Richland Lexington<br>Po Box 280037<br>Columbia, SC 29228 |
| Mesa Airlines, Inc. | Dane County Rgnl-Truax Field | Dane County<br>4000 International Lane<br>Madison, WI 53704 |
| Mesa Airlines, Inc. | Denver Intl | City & County Of Denver<br>Dept Of Aviation<br>Denver, CO 80249 |
| Mesa Airlines, Inc. | Denver Intl | City & County Of Denver<br>Dept Of Aviation<br>Denver, CO 80249 |
| Freedom Airlines, Inc. | Des Moines Intl | City Of Des Moines<br>East 1st & Locust<br>Des Moines, IA 50307 |
| Mesa Airlines, Inc. | Des Moines Intl | City Of Des Moines<br>East 1st & Locust<br>Des Moines, IA 50307 |
| Mesa Airlines, Inc. | Des Moines Intl | City Of Des Moines<br>East 1st & Locust<br>Des Moines, IA 50307 |
| Freedom Airlines, Inc. | Detroit Metropolitan Wayne County | Wayne County, Michigan<br>L C Smith Terminal Mezzanine<br>Detroit, MI 48242 |
| Mesa Airlines, Inc. | Detroit Metropolitan Wayne County | Wayne County, Michigan<br>L C Smith Terminal Mezzanine<br>Detroit, MI 48242 |
| Mesa Airlines, Inc. | Detroit Metropolitan Wayne County | Wayne County, Michigan<br>L C Smith Terminal Mezzanine<br>Detroit, MI 48242 |
| Mesa Airlines, Inc. | Durango-La Plata County | Durango City La Plata Co<br>1000 Airport Road Box 1<br>Durango, CO 81303 |
| Mesa Airlines, Inc. | Durango-La Plata County | Durango City La Plata Co<br>1000 Airport Road Box 1<br>Durango, CO 81303 |
| Mesa Airlines, Inc. | Eagle County Rgnl | Eagle County<br>Box 850<br>Eagle, CO 81631 |
| Mesa Airlines, Inc. | El Paso Intl | City Of El Paso<br>2 Civic Center Plaza<br>El Paso, TX 79901 |

| Debtor | Airport | Address |
|---|---|---|
| Mesa Airlines, Inc. | Eppley Airfield | Omaha Airport Authority<br>4501 Abbott Drive, Suite 2300<br>Omaha, NE 68110 |
| Mesa Airlines, Inc. | Flagstaff Pulliam | City Of Flagstaff<br>211 W Aspen Ave<br>Flagstaff, AZ 86001 |
| Mesa Airlines, Inc. | Fresno Yosemite Intl | City Of Fresno<br>4995 E Clinton Way<br>Fresno, CA 93727 |
| Mesa Airlines, Inc. | General Edward Lawrence Logan Intl | Mass Port Authority<br>One Harborside Dr Ste 200s<br>Boston, MA 02128 |
| Mesa Airlines, Inc. | George Bush Intercontinental/Houston | City Of Houston<br>Po Box 60106<br>Houston, TX 77205 |
| Freedom Airlines, Inc. | Gerald R. Ford Intl | Kent Co Dept Of Aeronautics<br>5500 44th St Se<br>Grand Rapids, MI 49512 |
| Mesa Airlines, Inc. | Gerald R. Ford Intl | Kent Co Dept Of Aeronautics<br>5500 44th St Se<br>Grand Rapids, MI 49512 |
| Mesa Airlines, Inc. | Grand Junction Regional | Grand Junction Reg Arpt Auth<br>2828 Walker Fld Dr Suite 301<br>Grand Junction, CO 81506 |
| Mesa Airlines, Inc. | Grand Junction Regional | Grand Junction Reg Arpt Auth<br>2828 Walker Fld Dr Suite 301<br>Grand Junction, CO 81506 |
| Mesa Airlines, Inc. | Greater Rochester Intl | County Of Monroe<br>County Office Bldg<br>Rochester, NY 14614 |
| Mesa Airlines, Inc. | Greenville Spartanburg Intl | Greenville-Spartanburg Acmsn<br>2000 Gsp Drive, Suite 1<br>Greer, SC 29651-9202 |
| Mesa Airlines, Inc. | Gunnison-Crested Butte Rgnl | County Of Gunnison<br>519 Rio Grande<br>Gunnison, CO 81230 |
| Freedom Airlines, Inc. | Harrisburg Intl | Susquehanna Area Regional Arpt Auth<br>One Terminal Drive<br>Middletown, PA 17057 |
| Mesa Airlines, Inc. | Harrisburg Intl | Susquehanna Area Regional Arpt Auth<br>One Terminal Drive<br>Middletown, PA 17057 |
| Mesa Airlines, Inc. | Harrisburg Intl | Susquehanna Area Regional Arpt Auth<br>One Terminal Drive<br>Middletown, PA 17057 |
| Mesa Airlines, Inc. | Hartsfield - Jackson Atlanta Intl | City Of Atlanta<br>City Hall<br>Atlanta, GA 30303 |
| Mesa Airlines, Inc. | Hartsfield - Jackson Atlanta Intl | City Of Atlanta<br>City Hall<br>Atlanta, GA 30303 |
| *go!* | Hilo Intl | State Of Hawaii Arpt Div Dot<br>Honolulu Intl Arpt<br>Honolulu, HI 96819 |

| Debtor | Airport | Address |
|---|---|---|
| *go!* | Honolulu Intl | State Of Hawaii<br>Honolulu Intl Airport<br>Honolulu, HI 96819 |
| Mesa Airlines, Inc. | Huntsville Intl-Carl T Jones Field | Huntsville Madison County<br>1000 Glen Hearn Blvd, Box 20008<br>Huntsville, AL 35824 |
| Freedom Airlines, Inc. | Indianapolis Intl | Indianapolis Airport Auth<br>2500 S. High School Rd-Bx 100<br>Indianapolis, IN 46241 |
| Mesa Airlines, Inc. | Indianapolis Intl | Indianapolis Airport Auth<br>2500 S. High School Rd-Bx 100<br>Indianapolis, IN 46241 |
| Mesa Airlines, Inc. | Jackson Hole | Jackson Hole Airport Board<br>Box 159<br>Jackson, WY 83001 |
| Mesa Airlines, Inc. | Jacksonville Intl | Jacksonville Intl Airport<br>Box 18018<br>Jacksonville, FL 32229 |
| Mesa Airlines, Inc. | James M Cox Dayton Intl | City Of Dayton, Ohio<br>101w 3rd St<br>Dayton, OH 45402 |
| Mesa Airlines, Inc. | Joe Foss Field | Sioux Falls Regnl Arpt Auth<br>2801 Jaycee Lane<br>Sioux Falls, SD 57104 |
| Mesa Airlines, Inc. | John F Kennedy Intl | Port Authority Of Ny And Nj<br>225 Park Ave South 9th Floor<br>New York, NY 10003 |
| Mesa Airlines, Inc. | John Wayne Airport-Orange County | Orange County<br>3160 Airway Avenue<br>Costa Mesa, CA 92626 |
| *go!* | Kahului | Hawaii State Airports Div<br>Honolulu Intl Arpt<br>Honolulu, HI 96819 |
| Freedom Airlines, Inc. | Kansas City Intl | City Of Kansas City<br>601 Brasilia; Po Box 20047<br>Kansas City, MO 64141 |
| Mesa Airlines, Inc. | Kansas City Intl | City Of Kansas City<br>601 Brasilia; Po Box 20047<br>Kansas City, MO 64141 |
| Mesa Airlines, Inc. | Kansas City Intl | City Of Kansas City<br>601 Brasilia; Po Box 20047<br>Kansas City, MO 64141 |
| *go!* | Kona Intl At Keahole | Hawaii St Arpts Div<br>Honolulu Intl Arpt<br>Honolulu, HI 96819 |
| Mesa Airlines, Inc. | La Guardia | Port. Auth. Of N.Y. & N.J.<br>225 Park Ave. South<br>New York, NY 10003 |
| Freedom Airlines, Inc. | Lambert-St Louis Intl | City Of St Louis<br>1320 Market St.<br>St Louis, MO 63103 |
| Mesa Airlines, Inc. | Lambert-St Louis Intl | City Of St Louis<br>1320 Market St.<br>St Louis, MO 63103 |

| Debtor | Airport | Address |
|---|---|---|
| Mesa Airlines, Inc. | Lehigh Valley Intl | Lehigh Northampton A Auth<br>3311 Airport Rd<br>Allentown, PA 18109-3040 |
| *go!* | Lihue | Hawaii St Arpts Div<br>Honolulu Intl Arpt<br>Honolulu, HI 96819 |
| Mesa Airlines, Inc. | Long Beach /Daugherty Field/ | City Of Long Beach<br>City Hall 333 W. Ocean<br>Long Beach, CA 90802 |
| Mesa Airlines, Inc. | Los Angeles Intl | City Of Los Angeles<br>No 1 World Way Box 92216<br>Los Angeles, CA 90009-2216 |
| Mesa Airlines, Inc. | Louis Armstrong New Orleans Intl | City Of New Orleans<br>Po Box 20007<br>New Orleans, LA 70141 |
| Freedom Airlines, Inc. | Louisville Intl-Standiford Field | Regional Arpt Auth<br>Po Box 9129<br>Louisville, KY 40209-0129 |
| Mesa Airlines, Inc. | Louisville Intl-Standiford Field | Regional Arpt Auth<br>Po Box 9129<br>Louisville, KY 40209-0129 |
| Mesa Airlines, Inc. | Manchester | City Of Manchester<br>City Hall<br>Manchester, NH 03101 |
| Mesa Airlines, Inc. | Mbs Intl | Mbs International<br>8500 Garfield Rd Ste 101<br>Freeland, MI 48623 |
| Mesa Airlines, Inc. | Mc Carran Intl | Clark County<br>P O Box 11005<br>Las Vegas, NV 89111 |
| Freedom Airlines, Inc. | Mc Ghee Tyson | Metro Knoxville Arpt Auth<br>Mc Ghee Tyson Airport<br>Alcoa, TN 37701 |
| Mesa Airlines, Inc. | Mc Ghee Tyson | Metro Knoxville Arpt Auth<br>Mc Ghee Tyson Airport<br>Alcoa, TN 37701 |
| Mesa Airlines, Inc. | Meadows Field | County Of Kern<br>Dept Of Arpts, 3701 Wings Way, #300<br>3701 Wings Way, Suite 300<br>Bakersfield, CA 93308 |
| Freedom Airlines, Inc. | Memphis Intl | Memphis Shelby Cnty Arpt Auth<br>2491 Winchester Rd.<br>Memphis, TN 38116-3856 |
| Mesa Airlines, Inc. | Memphis Intl | Memphis Shelby County Airport Authorities<br>2491 Winchester Rd.<br>Memphis, TN 38116-3856 |
| Mesa Airlines, Inc. | Memphis Intl | Memphis Shelby County Airport Authorities<br>2491 Winchester Rd.<br>Memphis, TN 38116-3856 |
| Mesa Airlines, Inc. | Metropolitan Oakland Intl | Port Of Oakland<br>530 Water St.<br>Oakland, CA 94607 |

| Debtor | Airport | Address |
|---|---|---|
| Freedom Airlines, Inc. | Minneapolis-St Paul Intl/Wold-Chamberlain | Metro Arpt Cmsn<br>6040 28th Av So<br>Minneapolis, MN 55450 |
| Mesa Airlines, Inc. | Minneapolis-St Paul Intl/Wold-Chamberlain | Metro Arpt Cmsn<br>6040 28th Av So<br>Minneapolis, MN  55450 |
| Mesa Airlines, Inc. | Monterey Peninsula | Monterey Penin Arpt Dist<br>200 Fred Kane Dr., Suite 200<br>Monterey, CA  93940 |
| Mesa Airlines, Inc. | Montrose Rgnl | Montrose County-Building Authority<br>161 South Townsend<br>Montrose, CO  81401 |
| Mesa Airlines, Inc. | Myrtle Beach Intl | Horry County<br>P O Box 1236<br>Conway, SC  29526 |
| Freedom Airlines, Inc. | Nashville Intl | Metro Nashville Arpt Auth<br>One Terminal Dr. Suite 501<br>Nashville, TN  37214 |
| Mesa Airlines, Inc. | Nashville Intl | Metro Nashville Arpt Auth<br>One Terminal Dr. Suite 501<br>Nashville, TN  37214 |
| Mesa Airlines, Inc. | Nashville Intl | Metro Nashville Arpt Auth<br>One Terminal Dr. Suite 501<br>Nashville, TN  37214 |
| Mesa Airlines, Inc. | Newark Liberty Intl | Port Authority Of NY & NJ<br>225 Park Avenue<br>New York, NY  10048 |
| Mesa Airlines, Inc. | Newark Liberty Intl | Port Authority Of NY & NJ<br>225 Park Avenue<br>New York, NY  10048 |
| Mesa Airlines, Inc. | Norfolk Intl | Norfolk Airport Auth<br>2200 Norview Ave<br>Norfolk, VA  23518-5807 |
| Mesa Airlines, Inc. | Norfolk Intl | Norfolk Airport Auth<br>2200 Norview Ave<br>Norfolk, VA  23518-5807 |
| Freedom Airlines, Inc. | Northwest Arkansas Rgnl | NW Arkansas Rgnl Arpt Auth.<br>1 Airport Blvd, Suite 100<br>Bentonville, AR  72712 |
| Mesa Airlines, Inc. | Ontario Intl | City Of Los Angeles<br>No 1 World Way,LA Intl Arpt<br>Los Angeles, CA  90009 |
| Mesa Airlines, Inc. | Outagamie County Rgnl | Outagamie County<br>W6390 Challenger Dr-Suite 201<br>Appleton, WI  54915 |
| Mesa Airlines, Inc. | Palm Springs Intl | City Of Palm Springs<br>3400 E. Tahquitz Canyon Way<br>Palm Springs, CA  92262 |
| Mesa Airlines, Inc. | Pensacola Rgnl | City Of Pensacola<br>2430 Airport Blvd Suite 225<br>Pensacola, FL  32504 |
| Freedom Airlines, Inc. | Philadelphia Intl | City Of Philadelphia<br>Div Of Aviation Terminal E<br>Philadelphia, PA  19153 |

| Debtor | Airport | Address |
|---|---|---|
| Mesa Airlines, Inc. | Phoenix Sky Harbor Intl | City Of Phoenix<br>3400 Sky Harbor Blvd, Suite 3300<br>Phoenix, AZ  85034 |
| Mesa Airlines, Inc. | Piedmont Triad Intl | Piedmont Triad Arpt Auth.<br>Po Box 35445<br>Greensboro, NC  27425 |
| Freedom Airlines, Inc. | Pittsburgh Intl | Allegheny Co Arpt Authority<br>Po Box 12370, Suite. 4000<br>Pittsburgh, PA  15231-0370 |
| Mesa Airlines, Inc. | Pittsburgh Intl | Allegheny Co Arpt Authority<br>Po Box 12370, Suite. 4000<br>Pittsburgh, PA  15231-0370 |
| Mesa Airlines, Inc. | Pittsburgh Intl | Allegheny Co Arpt Authority<br>Po Box 12370, Suite. 4000<br>Pittsburgh, PA  15231-0370 |
| Mesa Airlines, Inc. | Portland Intl Jetport | City Of Portland<br>City Hall, 389 Congress St<br>Portland, ME  04101 |
| Mesa Airlines, Inc. | Quad City Intl | Metropolitan Airport Auth<br>Box 9009<br>Moline, IL  61265 |
| Mesa Airlines, Inc. | Raleigh-Durham Intl | Raleigh-Durham Arpt Auth<br>P.O. Box 80001<br>RDU Airport, NC  27623 |
| Mesa Airlines, Inc. | Raleigh-Durham Intl | Raleigh-Durham Arpt Auth<br>P.O. Box 80001<br>RDU Airport, NC  27623 |
| Mesa Airlines, Inc. | Rapid City Rgnl | City Of Rapid City<br>4550 Terminal Rd - Ste 102<br>Rapid City, SD  57703 |
| Freedom Airlines, Inc. | Richmond Intl | Capital Region Arpt Comm.<br>1 Richard East Byrd Terminal Dr<br>Richmond, VA  23250 |
| Mesa Airlines, Inc. | Richmond Intl | Capital Region Arpt Comm.<br>1 Richard East Byrd Terminal Dr<br>Richmond, VA  23250 |
| Mesa Airlines, Inc. | Roanoke Rgnl/Woodrum Field | Roanoke Reg Arpt Cmsn<br>5202 Avn Dr.<br>Roanoke, VA  24012-1148 |
| Mesa Airlines, Inc. | Rock Springs-Sweetwater County | City Of Rock Springs<br>Box 1987<br>Rock Springs, WY  82902-1987 |
| Mesa Airlines, Inc. | Salt Lake City Intl | Salt Lake City<br>City And County Bldg<br>Salt Lake City, UT  84101 |
| Mesa Airlines, Inc. | San Antonio Intl | City Of San Antonio<br>100 Military Plaza<br>San Antonio, TX  78207 |
| Mesa Airlines, Inc. | San Antonio Intl | City Of San Antonio<br>100 Military Plaza<br>San Antonio, TX  78207 |
| Mesa Airlines, Inc. | San Diego Intl | San Diego Cnty Reg Arpt Authority<br>3225 North Harbor Drive<br>San Diego, CA  92101-1022 |

| Debtor | Airport | Address |
|---|---|---|
| Mesa Airlines, Inc. | San Francisco Intl | Cty & Co Of San Francisco<br>San Francisco Arpt Comm/SFIA<br>San Francisco, CA 94102 |
| Mesa Airlines, Inc. | San Luis County Rgnl | San Luis Obispo County<br>County Government Center<br>San Luis Obispo, Ca 93408 |
| Mesa Airlines, Inc. | Santa Barbara Muni | City Of Santa Barbara<br>City Hall<br>Santa Barbara, CA 93101 |
| Mesa Airlines, Inc. | Sarasota/Bradenton Intl | Sarasota Manatee Arpt Authority<br>6000 Airport Circle<br>Sarasota, FL 34243-2105 |
| Mesa Airlines, Inc. | Savannah/Hilton Head Intl | Savannah Airport Commission<br>400 Airways Ave.<br>Savannah, GA 31408 |
| Mesa Airlines, Inc. | Savannah/Hilton Head Intl | Savannah Airport Commission<br>400 Airways Ave.<br>Savannah, GA 31408 |
| Mesa Airlines, Inc. | South Bend Rgnl | St Joseph Cnty Arpt Authority<br>4477 Progress Drive, South Bend Regional Airport<br>South Bend, IN 46628 |
| Freedom Airlines, Inc. | Syracuse Hancock Intl | City Of Syracuse<br>City Hall<br>Syracuse, NY 13212 |
| Mesa Airlines, Inc. | Syracuse Hancock Intl | City Of Syracuse<br>City Hall<br>Syracuse, NY 13212 |
| Mesa Airlines, Inc. | Syracuse Hancock Intl | City Of Syracuse<br>City Hall<br>Syracuse, NY 13212 |
| Mesa Airlines, Inc. | Telluride Rgnl | Telluride Regional Arpt Auth<br>1500 Last Dallar Rd. Suite 1<br>Telluride, CO 81435 |
| Mesa Airlines, Inc. | The Eastern Iowa | City Of Cedar Rapids<br>City Hall, 2nd Ave Island<br>Cedar Rapids, IA 52406 |
| Freedom Airlines, Inc. | Theodore Francis Green State | State Of Rhode Island<br>RI Airport Corp<br>Warwick, RI 02886 |
| Mesa Airlines, Inc. | Theodore Francis Green State | State Of Rhode Island<br>RI Airport Corp<br>Warwick, RI 02886 |
| Mesa Airlines, Inc. | Theodore Francis Green State | State Of Rhode Island<br>RI Airport Corp<br>Warwick, RI 02886 |
| Freedom Airlines, Inc. | Tri-Cities Rgnl Tn/Va | Bristol Johnson Kingsport<br>Box 1055 Tri-City Arpt Stn<br>Blountville, TN 37617 |
| Freedom Airlines, Inc. | Tri-State/Milton J. Ferguson Field | Tri-State Airport Auth.<br>1449 Airport Road<br>Huntington, WY 25704 |

| Debtor | Airport | Address |
|---|---|---|
| Mesa Airlines, Inc. | Tucson Intl | Tucson Airport Authority<br>Tucson Apt Auth 7005 S Plumer<br>Tucson, AZ  85706 |
| Freedom Airlines, Inc. | Tulsa Intl | City Of Tulsa<br>Tulsa Arpt Auth. Box 581838<br>Tulsa, OK  74158 |
| Freedom Airlines, Inc. | Washington Dulles Intl | Metro Wash Arpt Authority<br>1 Aviation Circle,  Reagan Wash. Nat'l. Arpt<br>Wash; Dc, VA  20001-0600 |
| Mesa Airlines, Inc. | Washington Dulles Intl | Metro Wash Arpt Authority<br>1 Aviation Circle,  Reagan Wash. Nat'l. Arpt<br>Wash; Dc, VA  20001-0600 |
| Mesa Airlines, Inc. | Washington Dulles Intl | Metro Wash Arpt Authority<br>1 Aviation Circle,  Reagan Wash. Nat'l. Arpt<br>Wash; Dc, VA  20001-0600 |
| Freedom Airlines, Inc. | Will Rogers World | Oklahoma City Airport Trust<br>7100 Terminal Dr; Box 937<br>Oklahoma City, OK  73159-0937 |
| Mesa Airlines, Inc. | Will Rogers World | Oklahoma City Airport Trust<br>7100 Terminal Dr; Box 937<br>Oklahoma City, OK  73159-0937 |
| Mesa Airlines, Inc. | Wilmington Intl | New Hanover County<br>1740 Airport Blvd<br>Wilmington, NC  28405 |
| Mesa Airlines, Inc. | Yampa Valley | Routt County<br>Po Box 773598<br>Steamboat Sprngs CO  804773598 |
| Freedom Airlines, Inc. | Yeager | Central Wva Reg Arpt Auth<br>100 Airport Road Suite 175<br>Charleston, WV 25311 |
| Mesa Airlines, Inc. | Yellowstone Rgnl | City Of Cody<br>1338 Rumsey Ave<br>Cody, WV 82414 |
| Mesa Airlines, Inc. | Edmonton International | Transport Canada<br>330 Sparks Street<br>Ottawa, Ontario K1A 0N5 |
| Mesa Airlines, Inc. | Yuma | Yuma County And USMC<br>2191 E 32nd St<br>Yuma, AZ  85365 |
| Mesa Airlines, Inc. | Calgary International Airport-Banff | Transport Canada<br>330 Sparks Street<br>Ottawa, Ontario K1A 0N5 |
| Mesa Airlines, Inc. | Ixtapa-Zihuatanejo | Grupo Aeroportuario Centro Norte (Owner)<br>Aeropuerto Internacional De Monterrey<br>Zona De Carga Aérea Carretera Miguel<br>Aleman Km. 24 S/N<br>Apodaca, Nuevo Leon  66600 |
| Mesa Airlines, Inc. | Acapulco | Grupo Aeroportuario Centro Norte (Owner)<br>Aeropuerto Internacional De Monterrey<br>Zona De Carga Aérea Carretera Miguel<br>Aleman Km. 24 S/N<br>Apodaca, Nuevo Leon 66600 |

| Debtor | Airport | Address |
|---|---|---|
| Mesa Airlines, Inc. | Guadalajara | Grupo Aeroportuario Del Pacifico (Owner)<br>Av. Mariano Otero No. 1249-B Piso 6 Torre Pacifico<br>Rinconada Del Bosque<br>Guadalajara, Jalisco 44530 |
| Mesa Airlines, Inc. | Guaymas Yanez | Aeropuertos Y Servicios Auxiliares (Owner)<br>Av. 602 No. 161 Col. San Juan De Aragon<br>Delegacion Venustiano Carranza<br>Mexico, D.F. 15620 |
| Mesa Airlines, Inc. | Hermosillo-Gen. Pesqueira Garcia | Grupo Aeroportuario Del Pacifico (Owner)<br>Av. Mariano Otero No. 1249-B Piso 6 Torre Pacifico<br>Rinconada Del Bosque<br>Guadalajara, Jalisco 44530 |
| Mesa Airlines, Inc. | Puerto Vallarta | Grupo Aeroportuario Del Pacifico (Owner)<br>Av. Mariano Otero No. 1249-B Piso 6 Torre Pacifico<br>Rinconada Del Bosque<br>Guadalajara, Jalisco 44530 |
| Mesa Airlines, Inc. | Los Cabos | Grupo Aeroportuario Del Pacifico (Owner)<br>Av. Mariano Otero No. 1249-B Piso 6 Torre Pacifico<br>Rinconada Del Bosque<br>Guadalajara, Jalisco 44530 |

## Schedule 7

## Location of Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors have assets in every location from which they operate their businesses, including the premises listed on Schedule 6. The majority of the Debtors' cash is held in Arizona. To the best of my knowledge, the Debtors have no substantial assets outside the United States, other than aircraft that continuously fly between the United States and certain foreign locations.

| Debtor | Location of Substantial Asset |
|---|---|
| Air Midwest, Inc. | Phoenix, AZ |
| Freedom Airlines, Inc. | Phoenix, AZ |
| Mesa Air Group Airline Inventory Management, LLC. | Phoenix, AZ |
| Mesa Air Group, Inc. | Phoenix, AZ |
| Mesa Air New York, Inc. | Phoenix, AZ |
| Mesa Airlines, Inc. | Phoenix, AZ |
| Mesa In-Flight, Inc. | Phoenix, AZ |
| MPD, Inc. | Phoenix, AZ |
| Nilchi, Inc. | Phoenix, AZ |
| Patar, Inc. | Phoenix, AZ |
| Regional Aircraft Services, Inc. | Phoenix, AZ |
| Ritz Hotel Management Corp. | Mesa, AZ |

### Books and Records

| Debtor | Location of Books and Records |
|---|---|
| Air Midwest, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Freedom Airlines, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Mesa Air Group Airline Inventory Management, LLC. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Mesa Air Group, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Mesa Air New York, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Mesa Airlines, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Mesa In-Flight, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| MPD, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Nilchi, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Patar, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Regional Aircraft Services, Inc. | 410 N. 44th Street, Suite 700, Phoenix, AZ |
| Ritz Hotel Management Corp. | 410 N. 44th Street, Suite 700, Phoenix, AZ |

## Schedule 8

### Litigation

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending, or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Action or Proceedings | Nature of Action or Proceeding | Status |
|---|---|---|
| n/a | n/a | n/a |

## Schedule 9

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name / Position | Experience / Responsibilities |
|---|---|
| **Jonathan G. Ornstein**<br><br>Chairman and Chief Executive Officer<br>Mesa Air Group, Inc. | Jonathan G. Ornstein was appointed President and Chief Executive Officer of the Company effective May 1, 1998. Mr. Ornstein became a director in January 1998. Mr. Ornstein assumed the role of Chairman of the Board in June 1999. On June 21, 2000, Mr. Ornstein relinquished his position as President of the Company. From April 1996 until his joining the Company as Chief Executive Officer, Mr. Ornstein served as President and Chief Executive Officer and Chairman of Virgin Express S.A./ N.V., a European airline. From 1995 to April 1996, Mr. Ornstein served as Chief Executive Officer of Virgin Express Holdings, Inc. Mr. Ornstein joined Continental Express Airlines, Inc., as President and Chief Executive Officer in July 1994 and, in November 1994, was named Senior Vice President, Airport Services at Continental Airlines, Inc. Mr. Ornstein was previously employed by the Company from 1988 to 1994, as Executive Vice President and as President of the Company's subsidiary, WestAir Holding, Inc. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **Michael J. Lotz**<br><br>President and Chief Financial Officer<br>Mesa Air Group, Inc. | Michael J. Lotz is the President and Chief Financial Officer of Mesa and has been with the company since July 1998. He graduated from Iona College Hagen School of Business in New York City with a BBA degree in Financial Accounting in 1983. From 1983 to 1985, he started his career at John Brown Engineering in Connecticut as a junior accountant and after two years, was assistant Corporate Controller. He began his aviation career not far from his home at LaGuardia Airport at New York Air in 1985 as the Maintenance Division Controller. When Continental Airlines acquired New York Air in 1987, Lotz went to Continental in Los Angeles and Houston Intercontinental as a Senior Analyst in the Purchasing and Materials Distribution Division. He was promoted to manager of finance and administration for the technical services division, then was promoted to Director of Finance for the Western Region of Continental Airlines, based out of Denver.<br><br>When Continental closed its Denver hub in 1994, Lotz was promoted to Senior Director of Contract Services and Airport administration, based at the company's headquarters in Houston. In 1995, Lotz left Continental and joined Ornstein at Continental Express as Senior Director of purchasing and was later promoted to Vice President of Airport Operations. When Ornstein left the company to start new entrant Virgin Express in Brussels, Belgium, Lotz made the move and took over as COO. Together, Ornstein and Lotz grew Virgin Express to 25 Boeing 737s in two short years and took the company public. Ornstein left Virgin Express in early 1998 to run Mesa Air Group as CEO. Lotz signed on as a consultant in July 1998 to help Ornstein start the turnaround of the troubled company. In January 1999, he was named COO of Mesa, also serving a short stint as CFO. In June 2000, he was named president of Mesa. |
| **Paul F. Foley**<br><br>Executive Vice President and Chief Operating Officer<br>Mesa Air Group, Inc. | Paul F. Foley was appointed Executive Vice President and Chief Operating Officer, Mesa Air Group in October 2008. Prior to joining Mesa he was President and Chief Executive Officer of MAIR Holdings Inc. where he served on the Board of Directors and on the Executive and Safety |

| Name / Position | Experience / Responsibilities |
|---|---|
| | Committees. He was also President and Chief Executive Officer of Mesaba Aviation and Chairman & Chief Executive officer of Big Sky Airlines.<br><br>Mr. Foley began his career in June of 1974 with American Airlines. He has held a number of executive level positions in airline and airline related industries including Atlas Air, Continental Airlines, LSG/Sky Chefs and as Chairman of the Board for the Regional Airline Association. His broad and successful background includes a variety of assignments including acquisitions and start-ups, throughout the United States, Europe, South America, and Southeast Asia.<br><br>Mr. Foley holds a Bachelor of Science degree from Cornell University and an (MBA) from The Edwin L. Cox Graduate School of Business at Southern Methodist University, Dallas, Texas. |
| **Brian S. Gillman**<br><br>Executive Vice President, General Counsel and Secretary<br>Mesa Air Group, Inc. | Brian Gillman joined Mesa in February 2001 as Vice President, General Counsel and Secretary. From July 1996 to February 2001, Brian was Vice President, General Counsel and Secretary at Vanguard Airlines, Inc. in Kansas City, Mo.<br><br>From September 1994 to July 1996, Mr. Gillman was a corporate and securities law associate in the law firm of Stinson, Mag & Fizzell, P.C., Kansas City, Mo. Mr. Gillman received his Juris Doctorate with High Distinction and B. B. A. in Accounting with Distinction from the University of Iowa in 1994 and 1991, respectively. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **David Butler**<br><br>Senior Vice President of Administration and Human Resources<br>Mesa Airlines, Inc. | David Butler began working with Mesa as a consultant in August of 2006 and was appointed Senior Vice President for Administration and Human Resources in November of 2006. Prior to coming to Mesa, Mr. Butler was Associate Vice President and Chief Human Resources Officer for Arizona State University when he led a key transformation of the human resources function. Mr. Butler has held senior leadership positions with Hewlett Packard Company, Merck Pharmaceuticals, and Kaiser Hospitals and has over 25 years experience as a human resources executive. He was also a senior partner with Butler & Associates, a company providing peak performance and strategic planning solutions for Fortune 500 companies. Mr. Butler has a B.A. degree from California State University and a M.A. Degree in Organizational Management from the University of Phoenix. |
| **Michael Ferverda**<br><br>Senior Vice President of Operations<br>Mesa Air Group | Mr. Ferverda joined the Company in 1990. In 2007 he was appointed Chief Operating Officer of Kunpeng Airlines, Mesa Air Group Inc's joint-venture with Shenzhen Airlines, of China. Captain Ferverda served in that capacity until his return to Phoenix corporate in May 2009. During his tenure in China he also occupied the positions of Director of Operations and Chief Pilot for Kunpeng Airlines. Prior to that, Mr Ferveda was appointed President of Freedom Airlines in May 2002 and Senior Vice President-West Coast Operations in February 2003. Prior to the appointments, Mr. Ferverda served as the Senior Vice President of Operations for Mesa Airlines, Inc. Mr. Ferverda has served the Company in various capacities including pilot, Flight Instructor/ Check Airman, Assistant Chief Pilot, FAA Designated Examiner, FAA Director of Operations and Divisional Vice President. Mr. Ferverda was a pilot with Eastern Airlines from 1973 to 1989. Prior to joining Eastern Airlines, Mr. Ferverda served as an Aviator in the United States Navy. Mr. Ferverda is a graduate of Indiana University. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **Gary Appling**<br><br>Senior Vice President of Technical Services and Purchasing<br>Mesa Airlines, Inc. | Gary Appling joined Mesa in June 2006 as the Director of MRO Services (Maintenance Repair and Overhaul) and was promoted to Vice President of Technical Services and Purchasing in December 2006. Mr. Appling began his airline career as a Ramp Agent with Delta Air Lines and later also worked for Continental Airlines, Airborne Express and TIMCO Aviation Services. While at these companies Mr. Appling held positions of increasing responsibility, primarily in Purchasing and MRO management. Mr. Appling also served in the US Air Force from 1981 to 1989 and is a licensed A&P Technician. Mr. Appling lives in Phoenix and is married with two sons, the eldest being a First Officer with Air Midwest. |
| **Kenley Chambers**<br><br>Vice President of Inflight Services<br>Mesa Airlines, Inc. | Kenley Chambers began working for Mesa as a flight attendant in December 2003. Within six months Ms. Chambers became an IOE supervisor and in October 2004 was promoted to In-flight Supervisor. In this position, Ms. Chambers ran various bases, such as Nashville (BNA), Chicago (ORD) and Denver (DEN) for approximately 2 years. Ms. Chambers was promoted to Vice President for Inflight Services in July 2006. Ms. Chambers attended the University of South Alabama from 1997 – 2001. |
| **Ed Gomes**<br><br>Vice President of Customer Service<br>*go!* / Mesa Airlines, Inc. | Ed Gomes began working at the Mesa subsidiary, West Air Airlines as a ramp agent in March 1995. Mr. Gomes has excelled in various departments at Mesa, including the Ramp, Training and Ground Operations. Mr. Gomes most recently held the position of the Regional Director USX –West prior to his promotion to Vice President. Mr. Gomes played an important role in the start up of the Company's Philadelphia (PHL), Columbus (CMH) and Phoenix (PHX) RJ hub operations and was the liaison to the FAA during the Company's ERJ-145 and CRJ-200 certification process. Mr. Gomes also spearheaded the PHX transition from a station 24 prop aircraft, 6 CRJ-200s and 79 flights a day to a station that grew to a fleet of 35 CRJ 200/900 and 6 Dash-8 aircraft with over 130 flights a day. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **Eric Gust**<br><br>Vice President Flight Operations<br>Mesa Airlines, Inc. | Eric Gust is the Vice President of Flight Operations for Mesa. He joined Mesa in February 1995 in Bull Head City, Ariz., as a mechanic and inspector on the Beech 1900Ds. In February 1997, he transferred to the Internal Evaluations department, working as an airworthiness auditor. Eric was appointed Vice President Safety and Regulatory Compliance in 2001, a position he held until his current appointment in early 2008. He is qualified as a pilot on the CRJ and previously flew the Beech 1900D. Eric attended A&P and flight school at Colorado Northwestern and obtained his bachelor of science in aviation management from Metropolitan State College of Denver. |
| **Robert Hornberg**<br><br>Vice President and Chief Information Officer<br>Mesa Airlines, Inc. | Bob Hornberg joined Mesa in July 1998 as Director of Information Services. Bob attended Rochester Community College and Arizona State University. He has held various positions in Information Technology with Western Pacific Airlines and America West Airlines before joining Mesa Air Group. He was promoted to Vice President and CIO in September 2000. |
| **Keith Kranzow**<br><br>Vice President of Finance<br>Mesa Air Group, Inc. | Keith Kranzow began working at Mesa Air Group as Senior Director of Financial Planning & Analysis in January of 2008 and was appointed Vice President of Finance in June of 2008. Prior to coming to Mesa, Mr. Kranzow was Senior Director of Finance for US Shared Operations at ACCO Brands Corporation in Lincolnshire, IL.<br><br>Mr. Kranzow began his finance career at Northwest Airlines and held various finance and management positions at R. R. Donnelley & Sons Company. Mr. Kranzow holds a Bachelor of Arts degree in Economics and Political Science from Northwestern University and a law degree (J.D.) from Loyola University Chicago School of Law. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **Christopher Pappaioanou**<br><br>Vice President - Legal Affairs<br>Mesa Air Group, Inc. | Christopher J. Pappaioanou joined Mesa in March, 2001 as staff counsel in the Legal Department. In December, 2002 he was named Director of Legal Affairs. From September, 1999 to February, 2001 Chris served as Managing Partner of 413 Group, LLC based in Telluride Colorado. From May, 1997 to September, 1999 Mr. Pappaioanou was an associate with Ogletree, Deakins, Nash, Smoak & Stewart, P.C. at the firm's Charleston, S.C. office specializing in labor and employment matters.<br><br>Mr. Pappaioanou received his Juris Doctorate with honors from Indiana University School of Law in 1997 and his Bachelors of Science with honors in Corporate Financial Management from Ball State University in 1994. |
| **Ryan Gumm**<br><br>Chief Operating Officer<br>Freedom Airlines | Ryan Gumm joined Mesa in January of 2000 as a First Officer on the Beech 1900D and then transitioned to EMB-145 Captain. Ryan has held several management positions starting as Regional Chief Pilot for Mesa Airlines before transitioning to the Assistant Chief Pilot and then the Chief Pilot at Freedom Airlines. Ryan has also held the position of Check Airman for the simulator and line operations on the EMB-145.<br><br>Prior to joining Mesa, Ryan served in the US Navy and as a Flight Instructor/Charter Pilot in Northern West Virginia. |

## Schedule 10

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of the payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payment to Employees (Not Including Officers, Directors, and Stockholders)** | $4,300,000 |
| **Payments to Officers, Directors, and Stockholders** | 267,000 |
| **Payments to Financial and Business Consultants**[1] | $200,000 |

---

[1] This does not include any payments to attorneys or auditors.

## Schedule 11

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, the for the 30-day period following the filing of the chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $60,000,000 |
| **Cash Disbursements** | $43,000,000 |
| **Net Cash Gain or Loss** | $17,000,000 |
| **Unpaid Obligations** | $18,000,000 |
| **Unpaid Receivables** | $ 2,000,000 |