PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski (*pro hac vice* pending)
Laura Davis Jones (*pro hac vice* pending)
Debra I. Grassgreen (*pro hac vice* pending)
Maria A. Bove
John W. Lucas

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-_____ (   ) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(A), 362, AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULES 4001, 6003, AND 6004
FOR INTERIM AND FINAL ORDERS FOR AUTHORIZATION TO HONOR
AND SATISFY PREPETITION OBLIGATIONS IN THE DEBTORS'
<u>DISCRETION UNDER CERTAIN INDUSTRY RELATED AGREEMENTS</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Mesa Air Group, Inc. ("<u>Mesa</u>") and certain of its direct and indirect subsidiaries in the

above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"<u>Debtors</u>"), hereby  file this motion (the "<u>Motion</u>") and respectively represent as follows:

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110);
Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688);
Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management,
LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

## Background

1. On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. The Debtors have requested authorization to consolidate their chapter 11 cases for procedural purposes only so that they may be jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Mesa's Business

3. Mesa is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service. As of the Petition Date, the Debtors' airline operations serve approximately 127 cities in 41 states, the District of Columbia, Canada, and Mexico. The Debtors operate a fleet of approximately 130 aircraft with approximately 700 daily system departures. The Debtors employ approximately 3,400 full and part-time employees.

4. Mesa Airlines, Inc. ("Mesa Airlines") operates regional jet and turboprop aircraft under the names of regional carriers of certain major airlines pursuant to code-share agreements. Specifically, Mesa Airlines operates as (i) US Airways Express under code-share agreements with US Airways, Inc., (ii) as United Express under a code-share agreement with United Airlines, Inc., and (iii) independently in Hawaii as *go!* Mokulele ("*go!*"). Freedom Airlines, Inc. operates regional jet aircraft as Delta Connection under code-share agreements with Delta Air Lines, Inc. The remaining Debtors operate businesses, or own interests in businesses, that

facilitate or enhance the Debtors' regional or independent air carrier services. Nilchi, Inc. and Patar, Inc. hold investments.

5.    As of September 30, 2009, the Debtors had consolidated assets[2] of approximately $975 million, and consolidated liabilities of approximately $869 million. The Debtors' consolidated 2009 revenues were approximately $968 million. Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009 were derived from operations associated with code-share agreements. The Debtors' remaining passenger revenues are generated from their independent *go!* operations in Hawaii.

6.    A detailed description of the Debtors' businesses, capital structure, and the circumstances that precipitated the commencement of these chapter 11 cases is set forth in the *Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2* (the "Lotz Declaration"), filed contemporaneously herewith.

## Jurisdiction

7.    This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.    The Debtors are seeking interim and final orders for authorization, pursuant to sections 105(a), 362(d), and 363(b) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, to (i) honor and satisfy accrued and unpaid prepetition and postpetition obligations under the Interline Agreements, Clearinghouse Agreements, ARC Agreement, Alliance Agreements, Codeshare Agreements, and ATPCO Agreement (each as defined below and collectively referred to herein, the "Industry Agreements") in the ordinary course of business and

---

[2] At book value.

(ii) direct the applicable clearinghouse – Airlines Clearing House, Inc. – and any other applicable bank or financial institution (collectively, the "Clearinghouses") – to process payments and transfers and to honor all funds transfer requests made by the Debtors relating to the Industry Agreements.

## The Debtors' Business And the Industry Agreements

9.      The airline business is an interdependent industry based upon a vast worldwide network of agreements that govern essentially all aspects of airline operations.  Without agreements that provide for the sharing and exchange of services, it would be virtually impossible for the Debtors and any airline to provide efficient and cost-effective service.  Most importantly, certain of the Industry Agreements allow the Debtors to fulfill their obligations to their codeshare partners, United Airlines, Inc. ("United"), Delta Air Lines, Inc. ("Delta"), and US Airways, Inc. ("US Air"), which codeshare arrangements generate most of the Debtors' revenues.[3]  Certain of the other Industry Agreements provide for the exchange of services, rights to issues tickets, and the settlement of accounts among participating airlines and travel agents.  Finally, certain other Industry Agreements permit travel agents to make and confirm reservations, price and issue tickets automatically and also provide for publication of the Debtors' fares.  Such Industry Agreements facilitate basic levels of cooperation among the Debtors and other airlines with regard to vital activities, such as making reservations and transferring passengers, freight, baggage, mail, and advertising of fares.

10.      As it has been recognized in other chapter 11 airline cases, agreements substantially similar to the Industry Agreements are an essential component to the Debtors' businesses.  Certain services under these agreements are the equivalent of industry wide utility

---

[3] The Debtors are filing a motion to assume the Codeshare Agreements (as defined herein), shortly following the Petition Date.

services for which no readily available alternative exists. Should the Debtors fail to honor or pay valid, accrued, and unpaid prepetition obligations owed to the parties pursuant to the Industry Agreements, these parties may refuse or delay their performance under the Industry Agreements or otherwise put at risk the parties' critical relationships, which would result in immediate and irreparable harm to the Debtors' estates and all stakeholders in these chapter 11 cases. Subject to the conditions in this Motion, the Debtors seek to take immediate, active steps to preserve these essential relationships. Accordingly, it is essential that the Debtors be authorized, but not directed, to honor and pay the valid, accrued, and unpaid prepetition obligations arising under the Industry Agreements in the ordinary course of business.[4]

## A.      The Interline Agreements

11.      In relation to the Debtors' *go!* Mokulele operations, the Debtors are party to agreements with other carriers that are commonly known as interline agreements (collectively, the "Interline Agreements"). A non-exclusive list of the Debtors' various Interline Agreements are annexed hereto as Exhibit A that sets forth the applicable Interline Agreement and the parties thereto. All of the Interline Agreements are bilateral – two carriers contract for interline passenger and baggage transfer and other services and provide for regular periodic settlement of their accounts, either directly or through a clearinghouse. Pursuant to a typical Interline Agreement, one airline authorizes the other airline to issue tickets for transportation. Interline agreements permit airlines and travel agents to issue a single ticket that can be used for travel on more than one airline. In addition, interline agreements allow airline passengers whose flights are delayed or cancelled to use their tickets with another airline for a different flight. These

---

[4] Because of interrelated elements of the Debtors' operations, out of an abundance of caution, certain of the relief requested herein may overlap to a limited extent with certain of the relief requested in the Debtors' Motion for Authorization (I) to Pay Prepetition Claims of Critical Vendors and Certain Administrative Claimholders and (II) to Authorize Financial Institutions to Honor and Process Related Checks and Transfers, being filed concurrently herewith.

agreements are common throughout the airline industry due to the operating efficiencies that they create.

12.     The Interline Agreements also facilitate the purchase of tickets through travel agents.  Travel agents and airlines often issue tickets with itineraries that involve more than one carrier.  If the Interline Agreements were not in place, a traveler purchasing a ticket directly from a carrier would be issued a ticket only for those segments of the itinerary flown by that carrier even though the desired itinerary might necessitate the use of a second carrier.  Similarly, if the traveler sought to buy his or her ticket from a travel agent and no interline agreement was in place, the travel agent would be required to write at least two tickets, thus making it significantly less efficient for the travel agent to book flights on a carrier that is not party to the interline system.

13.     The Debtors would be at a significant competitive disadvantage if they are not able to participate in the interline traffic network pursuant to their Interline Agreements.  Certain of the Debtors' revenues is derived from ticket sales from other airlines, as well as ticket sales of travel agencies and other distributors.  Travel agencies might be reluctant to book customers on the Debtors' *go!* Mokulele flights if Mesa cannot effectively and efficiently honor its obligations under the applicable Interline Agreements.

14.     The Interline Agreements also provide for the transfer of luggage of passengers that are connecting from one airline to another.  For example, without the Interline Agreements, a passenger of the Debtors that connects from a *go!* Mokulele flight to another carrier's flight in Honolulu would have to retrieve his or her luggage at the *go!* Mokulele terminal before boarding the connecting flight in Honolulu.  The Interline Agreements enable the Debtors to book connecting flights and facilitate the transfer of luggage between carriers without having to

impose the inconvenience of collecting and transferring luggage upon their customers, which would be time consuming and cause delays that would prohibit the efficient operation of all airlines.

15.     As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition obligations under the Interline Agreements is approximately $225,000.  This estimate is a gross figure, and not net of certain amounts that may be owed to Mesa under certain Interline Agreements, and thus, the actual cash outlay by the Debtors will likely be materially less than $225,000.  The Debtors seek authority, but not direction, to pay accrued and unpaid prepetition obligations under the Interline Agreements and to continue honoring the Interline Agreements in the ordinary course of business.

**B.      Clearinghouse Agreements**

16.     The Debtors generally settle their accounts under certain Industry Agreements through a clearinghouse, either the Airlines Clearing House, Inc. ("<u>ACH</u>") or the International Air Transport Association Clearinghouse ("<u>IATA</u>").  The Debtors are associate members of the ACH, and are parties to two clearinghouse agreements with ACH (the "<u>Clearinghouse Agreements</u>").  One of the Debtors' Clearinghouse Agreements with ACH allows the Debtors to participate in IATA billing and settlement plan regions, which facilitate international sales transactions similar to those domestic sales transactions facilitated by the other Clearinghouse Agreement with ACH.

17.     On a weekly basis, ACH aggregates invoices to the Debtors from IATA, other participating carriers (including the Principal Carriers (as defined below)), and certain vendors and service providers, and from the Debtors to such parties (as applicable), and calculates a net balance.  While this process is done on a weekly basis, some of the invoices or other charges may be for services rendered as far back as six months.  Once the net balance is calculated, ACH

notifies the Debtors of the result. For any given clearance month, the Debtors may be net debtors and be required to make a payment to ACH (*i.e.*, if the total amount of invoices from the other participating carriers exceeds the total amount of the Debtors' invoices) or they may be net creditors and entitled to receive a payment from ACH (*i.e.*, if their invoices exceed the amount invoiced by other carriers). The Debtors pay ACH approximately $45,000 each month for its services under the Clearinghouse Agreements.

18. As noted above, certain amounts are payable to third parties that are processed by the clearinghouse on behalf of such third parties ("ACH Settled Accounts"). The Debtors are not agreeing or otherwise obligating themselves to pay any prepetition claims to such third parties that are, or would otherwise be, processed through the Clearinghouse Agreements, except for such undisputed prepetition claims that the Debtors expressly agree to pay in accordance with an order of this Court.

19. As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition obligations owed related to the Clearinghouse Agreements, including amounts that may be owed by the Debtors with respect to ACH Settled Accounts, is approximately $325,000 on a gross basis, which is comprised of approximately $225,000 owed by the Debtors under the Interline Agreements (discussed above in paragraph 12) and approximately $100,000 that may be owed to GDSs (discussed in paragraph 28 below). The actual cash expenditure by the Debtors will likely be substantially less, given certain amounts are owed to them under the Clearinghouse Agreements. The Debtors seek authority, but not direction, to pay accrued and unpaid prepetition obligations under or covered by the Clearinghouse Agreements, including any amounts that may be owed to ACH for its services (which would be *de minimis*) and amounts

that may be owed with respect to ACH Settled Accounts, and to continue honoring the

Clearinghouse Agreements in the ordinary course of business.

**C.     The ARC Agreement**

20.     The Debtors are also party to a multi-lateral agreement (the "<u>ARC Agreement</u>")

with the Airlines Reporting Corporation ("<u>ARC</u>") in relation to the Debtors' *go!* Mokulele

operations as to account settlements not handled by ACH (discussed above).  ARC serves as a

clearinghouse and enables the refund claims of, and commissions owed to, travel agencies to be

offset against the funds owed to airlines from travel agencies.  The majority of travel agents

located in the United States are members of ARC.  Under the ARC Agreement, a participating

travel agent's obligations to an airline are netted against the travel agent's claims against the

airline, and the net amounts due to the airline and from the travel agent are paid in lump sums.

The Debtors are generally net creditors of travel agents under the ARC Agreement as they have

consistently been owed more money through ARC than they owe travel agents for commission

adjustments and ticket refunds.  Thus, as of the Petition Date, there are no outstanding claims

under the ARC Agreement.  Nonetheless, out of caution, the Debtors seek authority, but not

direction, to pay accrued and unpaid prepetition obligations, if any, under the ARC Agreement,

including any amounts that may be owed to ARC for its services (which the Debtors estimate

may be approximately $24,000) and amounts that may be owed with respect to accounts handled

by ARC, and to continue honoring this agreement in the ordinary course of business.

**D.     Codeshare Agreements**

21.     Approximately 96% of the Debtors' consolidated passenger revenues are derived

from their codeshare agreements (as amended, supplemented or modified from time to time, the

"<u>Codeshare Agreements</u>") with US Airways, Inc., United Air Lines, Inc. and Delta Air Lines,

Inc. (collectively, the "<u>Principal Carriers</u>").  Under the Codeshare Agreements, the Debtors

provide air transportation services to the Principal Carriers' customers on various flight routes, using the Principal Carriers' flight designator codes and the Principal Carriers' livery and service marks. In exchange for providing flights and other services pursuant to the Codeshare Agreements, the Debtors receive compensation (including minimum monthly amounts and additional amounts based on, for example, number of flights and block hours performed during the month) from the Principal Carriers and are also reimbursed for certain expenses by the Principal Carriers. In some cases, the Principal Carriers also provide certain customer service, ground handling service and/or other functions to the Debtors in connection with the foregoing.

22. The Principal Carriers also have codesharing agreements with other airlines (including members of their respective SkyTeam and Star Alliances), whereby one airline markets and sells air transportation to its passengers in conjunction with the scheduled services provided by another airline, and in doing so, each party is permitted to use the other's flight designator code. These agreements afford customers the options and flexibility of traveling on multiple airlines while being treated as a customer traveling on a single airline. Through these arrangements, the Principal Carriers and their respective codesharing counterparties are able to offer passenger services between cities by making available one-stop service via cities served among the Debtors, the Principal Carriers, and the other carriers.

23. Typically, the Principal Carriers net out from payments due to the Debtors obligations owed by the Debtors under the Codeshare Agreements, or if necessary, the Debtors directly pay the Principal Carriers for any obligations. The Debtors believe that their accrued and unpaid prepetition obligations under the Codeshare Agreements, if any, are *de minimis*, and as noted, typically no cash outlay by the Debtors is required as generally, amounts owed are

netted against the substantially larger amounts due to the Debtors.  The Debtors seek authority, but not direction, to pay or otherwise satisfy accrued and unpaid prepetition obligations under the Codeshare Agreements and to continue honoring the Codeshare Agreements in the ordinary course of business.[5]

**E.      Alliance Agreements**

24.      The Debtors and certain airlines are party to agreements (the "Alliance Agreements") that provide for cooperative marketing efforts.  A non-exclusive list of the Debtors' various Alliance Agreements are annexed hereto as Exhibit B that sets forth the applicable Alliance Agreement and the parties thereto.  The Alliance Agreements provide several benefits to the Debtors' partners and their customers, including reciprocal codeshare arrangements, the ability for the Debtors' customers to accrue and redeem frequent flyer miles on flights of the participating airlines, and the ability to have reciprocal airport lounge access.  In particular, the Debtors participate in the Star Alliance and SkyTeam Alliance in connection with the Debtors' Codeshare Agreements with United, US Airways, and Delta.

25.      The Debtors do not believe that, as of the Petition Date, any accrued prepetition obligations are owed by them under the Alliance Agreements.  Generally, the Debtors have no financial obligations under such agreements; the Debtors' partners do.  Nonetheless, out of an abundance of caution, the Debtors seek authority, but not direction, to pay accrued and unpaid prepetition obligations (if any) under the Alliance Agreements and to continue honoring the Alliance Agreements in the ordinary course of business.

---

[5] The Debtors have filed concurrently herewith a motion to assume their Codeshare Agreements with United, US Airways and Delta under section 365 of the Bankruptcy Code.

**F.    GDS Agreements**

26.    The Debtors are party to separate participation carrier agreements (the "GDS Agreements") with various global distribution systems (the "GDS" or "GDSs").  A non-exclusive list of the GDS Agreements is annexed hereto as Exhibit C.  The GDS comprises a network of computer systems and databases that store, process, and distribute information about available passenger air transportation.  The GDS enables travel agents to accept and record bookings of those services from remote locations.  In addition to storing information, the GDS also allows travel agents to make and confirm reservations, price and issue tickets automatically, and process the travel agencies' internal accounting.  The Debtors use Sabre as their main GDS, although the Debtors distribute their fares for corporate, government, and travel agent accounts through other GDSs:  Galileo and Amadeus.

27.    A portion of the Debtors' air passenger transportation sales volume in its *go!* Mokulele operations is derived from airline ticket sales made through travel agents.  Almost all travel agents in the United States subscribe to GDS.  If the Debtors did not have access to and participate in GDS to book tickets, travel agents would have to independently look up the flight information, contact the Debtors, issue tickets manually, and complete the related accounting without the assistance provided for under the GDS Agreements.  The amount of effort involved in completing such a reservation would make it expensive and not practicable for travel agents to sell tickets on the Debtors' airline.

28.    The Debtors spend approximately $100,000-$150,000 per month on GDSs, with billing done by the GDSs weekly, semi-monthly or monthly (depending on the GDS).  The obligations incurred under the GDS Agreements are paid and settled through the clearinghouse ACH.  Because a material portion of *go!* Mokulele's air passenger transportation volume is

derived from sales that are processed through GDS, these systems are important to the Debtors' business.

29.     As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition obligations under the GDS Agreements is approximately $100,000.  Mesa seeks authority, but not direction, to pay accrued and unpaid prepetition obligations under the GDS Agreements and to continue honoring the GDS Agreements in the ordinary course of business.

**G.     ATPCO Agreement**

30.     Airline Tariff Publishing Company ("ATPCO") facilitates the publication of airline tariff filings that are communicated by ATPCO to ticket vendors pursuant to an agreement (the "ATPCO Agreement") with the Debtors.  The Debtors file all of their published and private fares through ATPCO, and GDS accesses such information from ATPCO.  ATPCO also files fares for Mesa with government authorities, as is required for all airlines.  This process is important to the Debtors' ability to sell tickets in the marketplace on a competitive basis and to comply with governmental requirements.  The obligations incurred under the ATPCO Agreement (approximately $1,500 per month) are paid one month in arrears through the clearinghouse, ACH.

31.     The Debtors believe that, as of the Petition Date, they may owe a *de minimis* amount under the ATPCO Agreement – approximately $1,500 or less.  The Debtors seek authority, but not direction, to pay accrued and unpaid prepetition obligations under the ATPCO Agreement and to continue honoring the ATPCO Agreement in the ordinary course of business.

**Honoring and Paying Prepetition Claims**
**Under the Industry Agreements Is Warranted Under the Circumstances**

32.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Debtors seek interim authority to honor and/or pay, in their sole discretion, the accrued and unpaid prepetition

obligations under, and to continue honoring, performing, and exercising in the ordinary course of business their respective rights and obligations (whether prepetition or postpetition) under the Industry Agreements which are necessary to the effective and efficient operation of their businesses.

33.     Section 363(b)(1) of the Bankruptcy Code provides, "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In determining whether to approve the debtor's use of estate property, courts generally apply a business judgment test.

34.     In addition, section 105(a) of the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provisions of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). Section 105(a) provides a statutory basis for the Court to permit the use of estate funds under section 363 to authorize payment of a prepetition obligation, outside a plan of reorganization, when the payment is essential to the continued operation of the debtor. *In re Boston & Maine Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtor's continued operation); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("courts have used their equitable power under section 105(a) . . . to authorize the payment of pre-petition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization"); *In re CoServ, L.L.C.*, 273

B.R. 487, 497 (Bankr. N.D. Tex. 2002) (reasoning that because the debtor-in-possession has fiduciary duties it must meet, it is logical that the bankruptcy court may "authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate" under section 105(a)); *In re Synteen Techs., Inc.*, Case No. 00-02203-W, 2000 WL 33709667 at *2 (Bankr. D.S.C. Apr. 14, 2000) (courts are authorized to "allow payment of a pre-petition claim 'when essential to the continued operation of the debtor.'"); *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) *quoting Chateaugay Corp.*, 80 B.R. at 287 (indicating its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately'"); *In re Gulf Air, Inc.*, 112 B.R. 152 (Bankr. W.D. La. 1989) (allowing payment of prepetition employee claims because such payment was in the best interest of creditors and necessary to successful reorganization).

35.     Moreover, the necessity of payment doctrine derived from section 105(a) of the Bankruptcy Code supports the relief requested.  Under this doctrine and first invoked by the United States Supreme Court in *Miltenberger v. Logansport, D.&S.W.R. Co.*, 106 U.S. 286 (1882), a bankruptcy court may use its powers under section 105 of the Bankruptcy Code to permit a debtor in possession to pay prepetition claims when payment is necessary to effectuate a debtor restructuring goals.  *See also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition wages and benefits on the basis that such relief was necessary for the continued operation of the debtor and the reorganization).  Thus, section 105(a) of the Bankruptcy Code empowers a court to "permit pre-plan payment of a

prepetition obligation when essential to the continued operation of the debtor." *In re NVR L.P., et al.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere*).

36.     The Debtors believe that any disruption in performance by third parties under the Industry Agreements may well have a material adverse effect on the Debtors' business and their prospects for successful reorganization.  It is critical to the Debtors' operations that they are assured of uninterrupted participation under the Industry Agreements and uninterrupted collection of the revenues directly or indirectly produced from such participation under the applicable Industry Agreements.  The Debtors believe that they are not in default under any of the Industry Agreements and any outstanding claims relating to accrued and unpaid prepetition obligations are *de minimis* relative to the benefits the Debtors receive under these agreements.

37.     In particular, the Interline Agreements do not impose any material economic burdens on the Debtors' estates.  Rather, the Debtors' continued ability to participate in and enforce the Interline Agreements is critical to the Debtors' ability to operate their business.  Similarly, without the Debtors' ability to preserve the Clearinghouse Agreements it would be impossible for them to settle payment obligations to and collect payments from other airlines arising under the Industry Agreements.

38.     With respect to the ARC Agreement, if the Debtors are not permitted to honor their obligations to ARC, it might suspend offsets of prepetition travel agency refunds claims that have not been processed before the Petition Date.  The continuation of offsets pursuant to the ARC Agreement will help to preserve travel agency remittances to the Debtors.  It is essential that the Debtors maintain the confidence of travel agencies so that the agents will continue to sell and market the Debtors' services to the traveling public.  Notably, the sales revenue generated by these travel agents pursuant to the ARC Agreement exceeds the aggregate

accrued and unpaid prepetition claims under this agreement. Accordingly, the benefits far out weigh the cost associated with the Debtors' obligations.

39. As most of the Debtors' primary business is derived from their Codeshare Agreements, it is necessary for the Debtors to maintain these agreements with the Principal Carriers. The Codeshare Agreements permit the Debtors to provide the necessary services to the Principal Carriers and in exchange, the Debtors realize most of their revenues from the Codeshare Agreements (approximately 96%). Further, as discussed above, the Principal Carriers typically net out from – set off against – payments due to the Debtors any of the Debtors' obligations owed under the Codeshare Agreements, and thus, to the extent the Principal Carriers have valid setoffs,[6] they may have secured claims under section 506(a)(1) of the Bankruptcy Code that would be satisfied prior to the payment of unsecured claims in these cases. Relatedly, by the relief requested herein, any amounts that may be owed by the Debtors under the Codeshare Agreements would typically be satisfied through netting by the Principal Carriers, and consequently, the Debtors would likely not have to make any cash outlay for such claims. Overall, the benefits of the Codeshare Agreements greatly outweigh the relatively *de minimis* cost associated with honoring and satisfying any accrued and unpaid prepetition claims with respect thereto.

40. Similarly, the Alliance Agreements, the GDS Agreements, and the ATPCO Agreement permit the Debtors to market their services in a cooperative and cost-effective manner with the other participants and/or utilize facilities in airports where the Debtors do not have free standing operations.

---

[6] Absent Court authorization for the Codeshare Agreements and Clearinghouse Agreements to be honored in the ordinary course of business, the Principal Carriers would have to obtain relief from the stay to exercise any setoffs. As noted above, the Principal Carriers' accounts with the Debtors are handled and processed by ACH under the Clearinghouse Agreements.

41.     By honoring and satisfying valid, accrued, and unpaid prepetition claims under the Industry Agreements, the Debtors are helping to ensure that their transition into chapter 11 is seamless and does not affect their ability to generate revenue, maintain customer loyalty, enhance their continued viability, and preserve the value of these estates for all stakeholders in these chapter 11 cases.

42.     Courts in chapter 11 cases involving airlines have recognized the importance of inter-airline and similar and related agreements in the airline industry and permitted debtors to honor and/or assume such agreements in connection with their first day motions.  *See, e.g.*, *In re Northwest Airlines Corporation*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005, Oct. 7, 2005) [Docket Nos. 85, 619]; *In re Frontier Airlines, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Apr. 14, 2008, July 1, 2008) [Docket Nos. 45, 387]; *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 14, 2005, Oct. 6, 2005) [Docket Nos. 156, 647]; *In re UAL Corp.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) [Docket No. 6]; *In re US Airways Group, Inc.*, Case No. 02-83984 (RGM) (Bankr. E.D. Va. Aug. 12, 2002) [Docket No. 82].

43.     The relief requested herein should not be construed to limit, or in any way affect, the Debtors' ability to contest any invoice or other charge or claim of a counterparty to the Industry Agreements on any grounds.  Nothing contained in this Motion will constitute or be regarded as an assumption or rejection by the Debtors, as debtors in possession, of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code. As such, the Debtors reserve all of their rights to assume or reject the agreements subject to this Motion in accordance with the applicable provisions of the Bankruptcy Code.

**Applicable Banks Should Be Authorized
to Honor and Clear Checks Issued and Make Other Transfers
Relating to Debtors' Obligations Under the Industry Agreements**

44.     As a result of the commencement of these chapter 11 cases, and in the absence of an order of the Court providing otherwise, the Clearinghouses may reject or dishonor the Debtors' checks and other transfers with respect to prepetition obligations relating to the Industry Agreements.  Therefore, the Debtors request that the Court authorize the Clearinghouses and any other bank or clearinghouse authorized by the Court to administer the Debtors' bank accounts under the "Cash Management Motion"[7] filed contemporaneously herewith to receive, process, honor, and pay all prepetition and postpetition transfers executed by the Debtors with respect to the Debtors' obligations under the Industry Agreements.  In addition, the Debtors also seek authority to issue new postpetition checks, or effect new fund transfers, on account of prepetition obligations relating to the Industry Agreements and to replace or reissues, to the extent necessary, any prepetition checks or transfers requests that may be dishonored or rejected.

45.     In addition, the Debtors request that the Court modify the automatic stay for the limited purpose and to the extent necessary to permit the Clearinghouses to follow its normal procedures for settling accounts.

**Necessity for Immediate Relief**

46.     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . ." Fed. R. Bankr. P. 6003(b).  For the reasons discussed herein and in the

---

[7] Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(c), and 364(c) and Bankruptcy Rules 6003 and 6004 to (I) Continue Using Existing Cash Management System and (II) Maintain Existing Bank Accounts and Business Forms.

Declaration of Michael J. Lotz in Support of First Day Motions being filed concurrently herewith, the Debtors will suffer immediate and irreparable harm without authorization to continue their ordinary business operations by honoring and paying the accrued and unpaid prepetition obligations under the Industry Agreements. Consequently the relief requested herein is consistent with Bankruptcy Rule 6003(b).

**Waiver of Stay**

47. Further, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

**Interim Order**

48. The Debtors seek the relief requested in this Motion in the form of the interim order (the "Interim Order") attached hereto at Exhibit D. Within three business days of the entry of the Interim Order, the Debtors will serve a copy of the Interim Order and this Motion on (a) the Office of the United States Trustee, (b) those creditors holding the five (5) largest secured claims against the Debtors' estates, (c) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, and (e) the Securities and Exchange Commission.

49. The deadline to file an objection ("Objection") to the Motion shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of the Interim Order (the "Objection Deadline"). An Objection shall be considered timely only if, on or prior to the Objection Deadline, it is (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York

10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the attorneys for any official committee of unsecured creditors then appointed in these cases.

50.     Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing.

51.     If no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested herein, which order shall be submitted and may be entered with no hearing and no further notice or opportunity to be heard afforded to any party.  If an Objection is timely filed, a hearing will be held at a date and time to be established by the Court.

52.     The foregoing notice procedures satisfy Bankruptcy Rule 9014 by providing the parties in interest with notice and an opportunity to object and be heard at a hearing.  *See*, *e.g.*, *In re Drexel Burnham Lambert*, 160 B.R. 729, 734 (S.D.N.Y. 1993) (an opportunity to present objections satisfies due process); *In re Colorado Mountain Cellars, Inc.*, 226 B.R. 244, 246 (D. Colo. 1998) (a hearing is not required to satisfy Bankruptcy Rule 9014).  Furthermore, the proposed notice procedures protect the due process rights of the parties in interest without unnecessarily exposing the Debtors' estates to unwarranted administrative expenses.

### <u>Notice</u>

53.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) those creditors holding the largest thirty (30) unsecured claims against

the Debtors' estates (on a consolidated basis), (iii) those creditors or their agents holding the five (5) largest secured claims against the Debtors' estates, (iv) the Internal Revenue Service, and (v) the Securities and Exchange Commission.

54.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors requests entry of the attached order granting the relief requested herein and such other and further relief as is just.

Dated:   January 5, 2010
         New York, New York          PACHULSKI STANG ZIEHL & JONES LLP


                                     _/s/ Maria A. Bove_____
                                     Richard M Pachulski (*pro hac vice* pending)
                                     Laura Davis Jones (*pro hac vice* pending)
                                     Debra I. Grassgreen (*pro hac vice* pending)
                                     Maria A. Bove
                                     John W. Lucas
                                     780 Third Avenue, 36th Floor
                                     New York, New York 10017
                                     Telephone:  (212) 561-7700
                                     Facsimile:  (212) 561-7777

                                     Proposed Attorneys for Debtors
                                     and Debtors in Possession

## EXHIBIT A

| Counterparty | Agreement (including all amendments and supplements) |
|---|---|
| Alaska Airlines | Interline E-Ticket Agreement |
| American Airlines | Interline E-Ticket Agreement |
| Delta Airlines, Inc. | Interline Agreement (for employee travel) |
| Delta Air Lines / Northwest Airlines | Interline E-Ticket Agreement |
| Hawaii Island Air, Inc. | Interline E-Ticket Agreement |

## EXHIBIT B

| Counterparty | Agreement (including all amendments and supplements) |
|---|---|
| Air Wisconsin Airlines Corp. | Alliance Agreement re: United Express Codeshare Agreement |
| Aer Lingus | Alliance Agreement re: United Express Codeshare Agreement |
| Air Canada | Alliance Agreement re: United Express Codeshare Agreement |
| Air China | Alliance Agreement re: United Express Codeshare Agreement |
| Asiana Airlines | Alliance Agreement re: United Express Codeshare Agreement |
| Austrian Airlines | Alliance Agreement re: United Express Codeshare Agreement |
| British Midland Airways Ltd. (BMI) | Alliance Agreement re: United Express Codeshare Agreement |
| Deutsche Lufthansa Aktiengesellschaft | Alliance Agreement re: United Express Codeshare Agreement |
| Jet Airways | Alliance Agreement re: United Express Codeshare Agreement |
| Nippon Airways & affiliates | Alliance Agreement re: United Express Codeshare Agreement |
| Qatar Airways | Alliance Agreement re: United Express Codeshare Agreement |
| SAS Scandinavian Airways | Alliance Agreement re: United Express Codeshare Agreement |
| Societe Air France | Alliance Agreement re: Delta Connection Agreement |
| South African Airways | Alliance Agreement re: United Express Codeshare Agreement |
| TACA Airlines | Alliance Agreement re: United Express Codeshare Agreement |
| TAP Portugal | Alliance Agreement re: United Express Codeshare Agreement |

## EXHIBIT C

| Counterparty | Agreement |
|---|---|
| Sabre Inc. | GDS Agreement & all addendums |
| Sabre Travel International Ltd. | GDS Agreement & all addendums |
| Worldspan, L.P. | GDS Agreement & all addendums |

**EXHIBIT D**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-_____ (   ) |
| Debtors.[1] | (Jointly Administered) |

**INTERIM ORDER PURSUANT TO SECTIONS**
**105(A), 362, AND 363 OF THE BANKRUPTCY CODE AND**
**BANKRUPTCY RULES 4001, 6003, AND 6004 FOR INTERIM AUTHORIZATION**
**TO HONOR AND SATISFY PREPETITION OBLIGATIONS IN THE DEBTORS'**
**DISCRETION UNDER CERTAIN INDUSTRY RELATED AGREEMENTS**

Upon the motion, dated January 5, 2010 (the "Motion"), of Mesa Air Group, Inc. and its

affiliated debtors and debtors in possession (the "Debtors") for interim authorization, pursuant to

sections 105(a), 362(d), and 363(b) of the title 11 of the United States Code (the "Bankruptcy

Code") and Rules 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure, to (i)

honor and pay the accrued and unpaid prepetition claims, and to continue honoring, performing

and exercising in the ordinary course of business their respective rights and obligations (whether

prepetition or postpetition) under the Interline Agreements, Clearinghouse Agreements, ARC

Agreement, Alliance Agreements, Codeshare Agreements, and the ATPCO Agreement (each as

defined in the Motion and collectively referred to herein, the "Industry Agreements"), (ii) direct

all applicable clearinghouses and financial institutions, including Airlines Clearing House, Inc.

(collectively, the "Clearinghouses"), to process payments and transfers and to honor all funds

transfer requests made by the Debtors relating to the Industry Agreements, and (iii) schedule a

hearing (the "Final Hearing") to consider the relief requested herein on a permanent basis, all as

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

more fully described in the Motion; and the Court having jurisdiction is to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and due and proper notice of the Motion having been provided and that no other or further notice is necessary; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that such relief is necessary to avoid immediate and irreparable harm as contemplated by Bankruptcy Rule 6003(b) and that the legal and factual bases set forth in the Motion and the Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2 establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted and approved on an interim basis to the extent provided herein; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are authorized, but not directed, to honor and/or pay the valid, accrued, and unpaid prepetition obligations under the Industry Agreements in the ordinary course of the Debtors' businesses, to the extent necessary to avoid immediate and irreparable harm; and it is further

ORDERED that, pursuant to section 362(d) of the Bankruptcy Code, the automatic stay extant pursuant to section 362(a) of the Bankruptcy Code is modified for the sole and limited purpose to permit ARC to follow its normal procedures for settling accounts; and it is further

ORDERED that the Clearinghouses and any other bank authorized to administer the Debtors' bank accounts under the Cash Management Motion (as defined in the Motion) shall be, and hereby are authorized, when the Debtors request in the Debtors' sole discretion, to receive,

process, honor, and pay and any other transfers that are related to the prepetition obligations under the Industry Agreements and the costs and expenses incidental thereto, whether those checks or transfers were presented prior to or after the commencement of these chapter 11 cases, provided that sufficient funds are available in the accounts to make such payments; and it is further

ORDERED that any Clearinghouse may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the commencement of these chapter 11 cases should be honored pursuant to this order (the "Interim Order"), and such Clearinghouse shall not have any liability to any party for relying on such representations by the Debtors as provided for herein; and it is further

ORDERED that this Interim Order shall not be construed to limit, or in any way affect, the Debtors' right to contest any invoice, charge, or claim under the Industry Agreements on any grounds; and it is further

ORDERED that any payment made pursuant to this Interim Order is not, and shall not be, deemed an admission to the validity of the underlying obligation or waiver of any rights any party may have to subsequently dispute such obligation; and it is further

ORDERED that the automatic stay extant under section 362(a) of the Bankruptcy Code is modified for the limited purpose and to the extent necessary to permit the Clearinghouses to follow their normal procedures for settling accounts relating to the Industry Agreements, and the foregoing relief shall not otherwise affect the Debtors' rights to enforce the automatic stay provisions of section 362(a) of the Bankruptcy Code with respect to any creditor who demands payment of their prepetition debts as a condition to doing business with the Debtors postpetition, which such rights are preserved; and it is further

ORDERED that nothing contained in this Interim Order shall constitute a rejection or assumption by the Debtors, as debtors in possession, of any executory contract or unexpired lease by virtue of reference of any such contract or lease in the Motion; and it is further

ORDERED that service of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that Bankruptcy Rule 6003(b) has been satisfied; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rule 6004, the terms of this Interim Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that within three business days of the entry of this Interim Order, the Debtors shall serve a copy of the Interim Order and the Motion on (a) the Office of the United States Trustee for the Southern District of New York, (b) those creditors holding the five largest secured claims against the Debtors' estates, (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, and (e) the Securities and Exchange Commission; and it is further

ORDERED that any objection (the "Objection") to the relief requested in the Motion on a permanent basis must, by 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of this Interim Order (the "Objection Deadline"), be: (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and John W. Lucas and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the

attorneys for any official committee of unsecured creditors then appointed in these cases; and it is further

ORDERED that a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing; and it is further

ORDERED that if timely Objections are received there shall be a hearing to consider such timely Objections to the Motion; and it is further

ORDERED that if no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Interim Order, which Order shall be submitted and may be entered with no further notice or opportunity to be heard afforded any party, and the Motion shall be approved nunc pro tunc to the date of the commencement of these chapter 11 cases; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

Dated: _____
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE