PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski (*pro hac vice* pending)
Laura Davis Jones (*pro hac vice* pending)
Debra I. Grassgreen (*pro hac vice* pending)
Maria A. Bove
John W. Lucas

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case |
| MESA AIR GROUP, INC., et al., | Case No. 10-_____ (___) |
| Debtors.[1] | |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS FOR
AUTHORIZATION TO (I) HONOR PREPETITION OBLIGATIONS TO
CUSTOMERS AND CERTAIN OTHER BUSINESS ENTITIES AND TO
OTHERWISE CONTINUE CUSTOMER AND RELATED PROGRAMS
AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS AND (II)
AUTHORIZE FINANCIAL INSTITUTIONS TO HONOR AND
PROCESS RELATED CHECKS AND TRANSFERS**

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries in the

above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"Debtors"), hereby file this motion (the "Motion") and respectively represent as follows:

---

[1] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

## Background

1.      On the date hereof (the "<u>Petition Date</u>"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors have requested authorization to consolidate their chapter 11 cases for procedural purposes only so that they may be jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## Mesa's Business

3.      Mesa is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service.  As of the Petition Date, the Debtors' airline operations serve approximately 127 cities in 41 states, the District of Columbia, Canada, and Mexico.  The Debtors operate a fleet of approximately 130 aircraft with approximately 700 daily system departures.  The Debtors employ approximately 3,400 full and part-time employees.

4.      Mesa Airlines, Inc. ("<u>Mesa Airlines</u>") operates regional jet and turboprop aircraft under the names of regional carriers of certain major airlines pursuant to code-share agreements. Specifically, Mesa Airlines operates as (i) US Airways Express under code-share agreements with US Airways, Inc., (ii) as United Express under a code-share agreement with United Airlines, Inc., and (iii) independently in Hawaii as *go!* Mokulele ("*go!*").  Freedom Airlines, Inc. operates regional jet aircraft as Delta Connection under code-share agreements with Delta Air Lines, Inc.  The remaining Debtors operate businesses, or own interests in businesses, that

facilitate or enhance the Debtors' regional or independent air carrier services.  Nilchi, Inc. and Patar, Inc. hold investments.

5.      As of September 30, 2009, the Debtors had consolidated assets  of approximately $975 million, and consolidated liabilities of approximately $869 million.  The Debtors' consolidated 2009 revenues were approximately $968 million.  Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009 were derived from operations associated with code-share agreements.  The Debtors' remaining passenger revenues are generated from their independent *go!* operations in Hawaii.

6.      A detailed description of the Debtors' businesses, capital structure, and the circumstances that precipitated the commencement of these chapter 11 cases is set forth in the *Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2* (the "Lotz Declaration"), filed contemporaneously herewith.

## Jurisdiction

7.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.      Prior to the Petition Date and in the ordinary course of their business, in relation to the *go!* Mokulele operations, the Debtors offered and engaged in certain customer and other programs and practices to develop and sustain a positive reputation in the marketplace for this business, to engender customer loyalty, and to enhance revenue (the "Customer Programs"), certain of which are described in greater detail below.  As discussed further in the Lotz Declaration, the Debtors own 75% of a joint venture – Mo-Go, LLC ("Mo-Go") – to provide Hawaii inter-island airline service under the *go!* and Mokulele brand names.  Pursuant to that

certain Services Agreement entered in October 2009 (the "<u>Mo-Go Services Agreement</u>") by

Mesa Airlines, Inc. ("<u>Mesa</u>"), Mo-Go and Republic Airways Holdings, Inc., Mesa operates all

*go!* jet flights and provides related services on behalf of the joint venture, including ticketing,

marketing, reservation, check-in, security, and customer services.  Mo-Go itself is not a debtor in

these chapter 11 proceedings; however, the Debtors have brought this motion relating to the

Customer Programs because they are operated and implemented by the Debtors pursuant to the

service provider arrangement with Mo-Go and the Debtors have an economic interest in the

success of Mo-Go and the *go!* business.[2]

      9.     More specifically, pursuant to the Mo-Go Services Agreement, the Debtors remit

to Mo-Go any adjusted collections (on a net basis) from the *go!* operations, after deducting for

certain operating and business expenses (excluding the *pro rata* portion of certain expenses

which is the Debtors' responsibility under the joint venture arrangement).  However, if the *go!*

business operates at a loss for the applicable period, the joint venture partners, including the

Debtors, are required to make up for the shortfall on a *pro rata* basis (75% since the Debtors

have a 75% stake in Mo-Go) up to certain limits.  In effect, the Debtors backstop (up to certain

limits) any *go!* operating losses.  Thus, as discussed further herein, the Customer Programs

directly impact the *go!* business, the strength and competitiveness of which, in turn, impact (i)

the reimbursement and funding obligations of the Debtors pursuant to the Mo-Go Services

Agreement and joint venture arrangement and (ii) the value of the Debtors' stake in Mo-Go.

      10.     The Customer Programs include, among others, advance ticket sales, ticket

refunds, a frequent flyer program, fee waivers, barter arrangements, corporate and government

---

[2] Nothing in this Motion or the proposed order hereon is intended to admit or acknowledge any liability of the Debtors in relation to the Customer Programs or the *go!* Mokulele operations, or to expressly or implicitly expand or otherwise modify  the Debtors' liabilities or responsibilities under the Mo-Go Services Agreement and the Mo-Go joint venture arrangement.

incentive programs, as well as arrangements with tour/vacation operators and sales outlet services. The Customer Programs ensure customer satisfaction, generate goodwill, and address competitive pressures so that the Debtors can retain current customers, attract new customers and ultimately enhance net revenue.

11.     By this Motion, the Debtors request entry of interim and final orders, pursuant to sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code, authorizing but not directing them in their business judgment to (a) perform and honor such of their prepetition obligations related to the Customer Programs as they deem appropriate and (b) continue, renew, replace, implement new, and/or terminate Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court.

### The Debtors' Customer Programs

12.     The Debtors need to continue during the postpetition period those Customer Programs that are beneficial and cost-effective to the *go!* business. Such relief is necessary to preserve the Debtors' critical business relationships and customer goodwill for the benefit of their estates. The revenue generated by the Customer Programs exceeds the operational and administrative cost to implement and maintain them, and for this and the other reasons set forth herein, it is essential and in the best interests of the Debtors, their estates and their creditors that the Debtors be permitted to honor prepetition obligations in connection with the Customer Programs and to continue the Customer Programs in the ordinary course of business.

13.     Airlines routinely offer flights to many of the same locations as their competitors. This competition makes retaining loyal customers and attracting new customers critically important. It is essential, therefore, that the Debtors maintain the current *go!* customers through this difficult period and position themselves to attract new customers. The Customer Programs accomplish this goal by generating valuable goodwill, repeat business and net revenue increases.

14.     The filing of these chapter 11 cases is likely to negatively affect customers'
attitudes and behavior toward the Debtors' services unless, *inter alia*, the Debtors can take the
measures requested by this Motion.  In particular, the Debtors' goodwill and ongoing business
relationships may erode if their customers perceive that the Debtors are unable or unwilling to
fulfill the prepetition promises they have made through the Customer Programs.  The same
would be true if customers perceived that the Debtors would no longer be offering the types of
services or quality of services they have come to expect and upon which they likely relied when
purchasing the Debtors' services.  Further, the Debtors' competitors may increase their efforts
during the pendency of these chapter 11 cases to lure away *go!* customers and to create doubts as
to the Debtors' ability to emerge successfully from chapter 11.

15.     The following are general descriptions and examples of some, but not all, of the
Debtors' Customer Programs.

**A.      Ticketholder Related Claims and Practices**

**1.      Prepetition Tickets**

16.     In relation to the Debtors' *go!* operation, out of an abundance of caution, the
Debtors seek authority to honor all tickets and other contracts for airline travel that were
purchased prepetition but have not yet been used (collectively, the "Prepetition Tickets") by
providing the air transportation service purchased.  In addition to tickets purchased by individual
travelers through traditional channels, the Prepetition Tickets include those sold or processed
under the Frequent Flyer Program (as defined below).  The Debtors estimate that there may be
approximately $6.4 million (gross amount, including related taxes) in Prepetition Tickets for
*go!* flights outstanding and unused as of the Petition Date.

17.     The failure to honor Prepetition Tickets presented by customers in the hours and
days following the commencement of these cases would be irreparably damaging to the

reorganization of the Debtors.  If *go!* passengers were stranded during the early days of these cases, not only would an immediate loss of customers result, but the ensuing publicity of such an event would likely devastate the Debtors' *go!* operation, thereby harming the Debtors' business and prospects in these chapter 11 cases.  Customer confidence and goodwill will be severely harmed if the Debtors are prevented from honoring Prepetition Tickets.  Moreover, if the Prepetition Tickets are not honored, a majority of the prepetition ticketholders may have priority claims under section 507(a)(7) of the Bankruptcy Code.  Thus, to the extent individual claims do not exceed $2,425, paying such claims may represent an acceleration of payment of amounts that would otherwise be required to be paid under any plan of reorganization reasonably contemplated in these cases, and would not be detrimental to the Debtors' general unsecured creditors.  Valid priority claims would have to be paid in full in any event before the general unsecured creditors could receive any distribution.

### 2. Ticket Refund and Related Obligations

18.     Generally, tickets sold by *go!* are non-refundable.  However, certain *go!* customers purchase unrestricted tickets that offer the ability to change departure dates and times without penalties.  Further, the Department of Transportation requires the Debtors to refund tickets for certain events or circumstances (*e.g.*, overbooked flights) at the time the customer is denied boarding.  The Debtors process these refunds by issuing checks at the airport ticket office. Typically, the Debtors disburse approximately $500 or less per month on account of such refunds.  The Debtors request authority to honor all refund obligations and other miscellaneous related customer charges (the "Ticket Refunds") as these commitments are nominal when compared to the Debtors' gross annual ticket sales.[3]

---

[3] Relatedly, the Debtors seek authority to honor certain "refund" type obligations related to Tour Provider Arrangements (defined and discussed in Section C).

19.     Maintaining such refundability of tickets purchased prepetition is essential to preserving the public's confidence in the Debtors' continued reliability and operations, and in some cases, as noted, is required by the Department of Transportation.  Such honoring of refunds will be more than offset by the future revenue from sales generated because this policy remains in place.  Moreover, if refunds are denied, the affected ticketholders may have priority claims under section 507(a)(7) in the maximum amount of $2,425 each.  Thus, in such case, paying such refunds represents an acceleration of payment of amounts that would otherwise be required to be paid under any plan of reorganization reasonably contemplated in these cases, and would not be detrimental to the Debtors' general unsecured creditors.

**3.     Frequent Flyer Program**

20.     The frequent flyer program, *go!* Miles, has approximately 70,000 members (the "*go!* Miles Program").  Such members earn miles each time they purchase an eligible ticket and fly on *go!* jet flights.  Frequent flyer programs have been adopted by most air carriers and are considered an important marketing tool for developing brand loyalty among travelers and accumulating demographic data pertaining to business flyers.  Such programs are essential to building and maintaining a loyal customer base, among both business and leisure travelers.

21.     Honoring *go!* Miles Program obligations does not involve any appreciable cash expense to the Debtors' estates.  Rather, a majority of participants who redeem mileage credits receive only air transportation from the Debtors on flights that would operate in any event.  The Debtors' costs of providing services to the award recipient, therefore, are often limited to incremental costs such as ticketing costs for what would otherwise be a vacant seat.  As with other similar programs, the passengers receiving tickets under the *go!* Miles Program are responsible for the cash payment of all related taxes and fees.

22.     The Debtors seek the authority, but not the direction, to honor prepetition obligations relating to the *go!* Miles Program, including honoring the miles earned or purchased by *go!* customers, and to continue to honor such obligations in the ordinary course of business. Failure to honor the obligations of the *go!* Miles Program will alienate the most loyal and valuable customers – an act that would severely harm the Debtors' competitive position and their reorganization efforts.

**4.      Fee Waiver Practices**

23.     The Debtors provide certain benefits to corporate and federal government client passengers, including the Debtors' waiver of baggage fees for up to three bags per traveler ("Fee Waivers").  Continuing to honor Fee Waiver related obligations comes at a relatively small expense to the Debtors, as compared to the business generated by maintaining loyal corporate and governmental clients.  Such waivers or similar vouchers or coupons are commonplace in the airline industry, and the Debtors' business would be significantly harmed if the Debtors could not or did not offer such benefits.

24.     Overall, if the Debtors are unable to continue ticketholder related Customer Programs, the Debtors risk alienating a large segment of their customers and encouraging them to select competing airlines, to the detriment of the Debtors, their creditors, and their estates.  For the foregoing reasons, out of an abundance of caution, the Debtors seek authority to honor prepetition obligations related to Customer Programs involving Prepetition Tickets, Ticket Refunds, the *go!* Miles Program, Fee Waivers and similar ticketholder related practices (collectively, the "Ticketholder Related Claims"), and to continue honoring the Ticketholder Related Claims in the ordinary course of business.

**B.      Corporate Client Related Claims and Practices**

   **1.      Barter Arrangements**

   25.      The Debtors maintain barter arrangements with a limited number of companies that provide primarily marketing/advertising services to the Debtors' operations in return for air transportation (collectively, the "Barter Arrangements").  The Debtors use Barter Arrangements to contribute toward payment of needed services in exchange for the Debtors' services in lieu of cash.  Thus, the Debtors benefit from the Barter Arrangements by preserving their cash.  If the Debtors are unable to honor these Barter Agreements, third parties will likely demand cash for all future transactions, during this critical period for the Debtors.  The Debtors estimate that the amount of unredeemed air transportation obligations related to Barter Arrangements, as of the Petition Date, is small -- approximately $5,000.

   26.      Many airlines, including the Debtors, enter into barter arrangements because of their benefits, including the positive impact on liquidity.  Accordingly, the Debtors request authority to honor their prepetition obligations related to the Customer Programs involving Barter Arrangements and to continue to honor the Barter Arrangements in the ordinary course of business.

   **2.      Corporate Incentive Programs**

   27.      The Debtors offer corporate travel incentive programs (the "Corporate Incentive Programs") which include the availability of an online booking engine offering private fares for participating corporations.  The Corporate Incentive Programs encourage corporations to purchase more air travel from the Debtors (given the lower private fare rates) and facilitate such travel, resulting in larger revenue for the Debtors.  Special corporate incentive programs are frequently used by airlines.

28.     To effectuate the rehabilitative purposes of chapter 11, the Debtors request authorization to honor any prepetition obligations under the Corporate Incentive Programs and to continue the Corporate Incentive Programs as they see fit in the ordinary course of business. Customer confidence and goodwill, as well as revenues, will be harmed if the Debtors are prevented from honoring prepetition obligations under the Corporate Incentive Programs. The Debtors believe that maintaining the Corporate Incentive Programs will enhance their customers' confidence in the Debtors' continued operations. Any costs of such programs will be offset by the continued stream of ticket sale revenue generated by keeping the Corporate Incentive Programs in place.

**C.      Tour/Vacation Package and Sales Outlet Related Claims and Practices**

**1.      Tour/Vacation/Agency Related Obligations**

29.     The Debtors have tour operator fares and similar arrangements (collectively, "Tour Provider Arrangements") with various tour operators and similar service providers (collectively, "Tour Providers"). Generally, pursuant to such Tour Provider Arrangements, the Debtors provide blocks of seats on their *go!* jet flights to such parties at certain reduced rates, which seats are filled by such parties' customers purchasing tours or other vacation packages. There is no direct cash outlay by the Debtors; the Debtors honor the quoted fare rates and provide the air transportation services. Historically, the revenue generated by such Tour Provider Arrangements has been substantial (for example, for fiscal year 2009, approximately $2.5 million in revenue – 7% of total *go!* sales).

30.     In connection with the foregoing, in the ordinary course of the *go!* business, the Debtors issue "refunds" to Tour Providers ("Tour Provider Refunds/Credits") in certain circumstances – for example, when the applicable tour has less customers than expected. Typically, however, in lieu of a cash refund, the Debtors give the Tour Provider a credit in the

applicable amount on the next invoice from the Debtors.  The Debtors provide approximately $45,000 per month in such credits each month.

31.     If the Debtors do not honor any prepetition obligations related to Tour Provider Arrangements, the affected tour operators or agencies may attempt to take their business to other airlines and the affected ticketholders will lose confidence in the *go!* operations.  Given the importance of these customers, the Debtors seek authority to continue honoring Tour Provider Arrangement related obligations, including honoring any Tour Provider Refunds/Credits (accrued prepetition or postpetition) in the ordinary course of business.

## 2.     Sales Outlet Related Obligations

32.     In addition to the more traditional travel agency relationships, the Debtors also sell *go!* tickets to customers through certain online travel and other sales outlet services, including Expedia, Orbitz Worldwide and OneTravel.com ("Sales Outlet Services").  Tickets sold through such other services accounted for approximately 25% of the Debtors' *go!* passenger revenues in 2009.  Through the use of such services, the Debtors have reduced their distribution costs.  Pursuant to such relationships, the Debtors typically provide the service a per ticket fee when a customer purchases a ticket for travel on the Debtors' *go!* jet flights.  The Debtors seek to continue such relationships in the ordinary course of business, and seek authority to pay any prepetition obligations related to Sales Outlet Services, which the Debtors estimate to be approximately $300,000 as of the Petition Date.

## The Debtors Should Be Authorized to Honor
## Prepetition Obligations in Relation to Customer Programs

33.     Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in possession to continue to operate its business.  Section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to

use property of the estate in the ordinary course of business without notice or a hearing. Consequently, continuing, renewing, replacing, initiating and terminating their Customer Programs in the ordinary course of business is permitted by sections 363(c), 1107(a) and 1108 of the Bankruptcy Code, without further application to the Court. However, out of an abundance of caution, the Debtors request the relief stated herein.

34. As to honoring prepetition claims, section 105(a) of the Bankruptcy Code empowers the Court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. A bankruptcy court s use of its equitable powers to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept. *In re Ionosphere Clubs, Inc*., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Under 11 U.S.C. § 105, the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor. *In re NVR L.P., et al*., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Club*, 98 B.R. at 177). The Debtors strongly believe that the uninterrupted supply of services and the continuing support of their customers are critical to the ongoing operations of the Debtors.

35. The necessity of payment doctrine further supports the relief requested by this Motion. This doctrine recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor. *Ionosphere Clubs*, 98 B.R. 176; *see also Michigan Bureau of Workers Disability Compensation v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 285 86 (S.D.N.Y. 1987). The rationale for the necessity of payment rule is consistent with the paramount goal of chapter 11, which is facilitating the continued operating and rehabilitation of the debtor. *Ionosphere Clubs*, 98 B.R. at 176.

36.     As described above, the loyalty and continued patronage of the Debtors'
customers and the implementation of customer related practices and arrangements are critical to
the Debtors' financial health and reorganization.  Where retaining loyalty and patronage of
customers is critical to a successful reorganization, courts in this and other districts have granted
relief similar to that requested herein. *See, e.g., In re PLVTZ, Inc.*, No. 07-13532 (REG) (Bankr.
S.D.N.Y. Nov. 9, 2007); *In re Dana Corp.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 7,
2006); *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 8, 2005); *In re
Worldcom, Inc., et al.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Jul. 22, 2002); *In re AI
Realty Marketing of New York, Inc*., Case Nos. 01-40252 through 01-40290 (AJG) (Bankr.
S.D.N.Y. 2001).  Courts have also granted similar relief in substantial airline reorganization
cases.  *See, e.g., In re Northwest Airlines Corp., et al.*, Case No. 05-17930 (ALG) (Bankr.
S.D.N.Y. Sept. 15, 2005); *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (Bankr. S.D.N.Y.
Sept. 16, 2005); *In re US Airways Group, Inc*., *et al.*, Case No. 04-13819 (SSM) (Bankr. E.D.
Va. Sept. 14, 2004); *In re Hawaiian Airlines, Inc.*, Case No. 03-00817 (Bankr. D.Haw. Dec. 11,
2002); *In re UAL Corp., et al.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 9, 2002); *In re US
Airways Group, Inc., et al*., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Aug. 11, 2002).

37.     Moreover, section 363(b)(1) of the Bankruptcy Code empowers the Court to
allow the debtor to use, sell, or lease, other than in the ordinary course of business, property of
the estate.  11 U.S.C. § 363(b)(1).  Debtors' decisions to use, sell or lease assets outside the
ordinary course of business must be based upon the sound business judgment of the debtor.  *See
In re Chateaugay Corp*., 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a
section 363(b) application must find from the evidence presented before him a good business
reason to grant such application); *see also Committee of Equity Sec. Holders v. Lionel Corp. (In*

*re Lionel Corp*.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd*., 295

B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr.

S.D.N.Y. 1989) (noting that standard for determining a section 363(b) motion is good business

reason ).

38.     The business judgment rule is satisfied where the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.  *Official Committee of Subordinated Bondholders v. Integrated Res.,*

*Inc*. (*In re Integrated Res., Inc*.), 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d

49 (2d Cir. 1993) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). In fact, where

the debtor articulates a reasonable basis for its business decisions (as distinct from a decision

made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct.  *Committee of Asbestos-Related Litigants v. Johns-Manville Corp*. (*In re Johns-*

*Manville Corp*.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts in this district have

consistently and appropriately been loath to interfere with corporate decisions absent a showing

of bad faith, self-interest, or gross negligence, and will uphold a debtor's decisions as long as

they are attributable to any rational business purpose.  *In re Integrated Res. Inc.*, 147 B.R. at 656.

39.     The Debtors submit that the requested relief represents a sound exercise of the

Debtors' business judgment and is justified under section 363(b), as well as under section 105(a)

of the Bankruptcy Code.  This is because if the Debtors are prohibited from honoring prepetition

obligations and maintaining the Customer Programs consistent with their past business practices,

customers will likely be alienated and will lose confidence in the *go!* operations and the Debtors'

ability to reorganize.  Ultimately, the damage from refusing to honor these obligations far

exceeds the cost associated with honoring prepetition obligations and continuing these practices.

The relief requested herein will protect the Debtors' goodwill during this critical time and enhance the Debtors' ability to generate revenue. Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

40.     Accordingly, the Debtors request that they be authorized, but not directed, in their business judgment, to (a) perform and honor their prepetition obligations under the Customer Programs as they deem appropriate and (b) continue, renew, replace, implement new, and terminate such of the Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court.

41.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, any expansion of the Debtors' liabilities under the Mo-Go Services Agreement, a waiver of the Debtors' right to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order granting the Motion is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Honoring of Payments Related to the Customer Programs by Banks and Other Institutions

42.     The Debtors also request that all applicable banks and other institutions be authorized to receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay pursuant to this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, provided, however, that: (a) funds are available in the Debtors' accounts to cover the checks and fund transfers and (b) all the

banks and other institutions are authorized to rely on the Debtors' designation of any particular check as approved by the attached proposed Interim Order.

## Necessity for Immediate Relief

43.     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . .".  Any delay in the relief sought (indeed, even being forced to advise customers that further judicial relief is necessary) could result in the Debtors losing a substantial portion of the *go!* customer base and severely harm the Debtors' operations.  If the Debtors are not permitted to maintain their Customer Programs without interruption, it could very well cause immediate and irreparable harm to the Debtors' operations.  Accordingly, the interim relief requested herein is consistent with Bankruptcy Rule 6003.

## Interim Order

44.     The Debtors seek the relief requested in this Motion in the form of the interim order (the "Interim Order") attached hereto as Exhibit A.  Within three business days of the entry of the Interim Order, the Debtors will serve a copy of the Interim Order and this Motion on (a) the Office of the United States Trustee, (b) those creditors holding the five (5) largest secured claims against the Debtors' estates, (c) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, and (e) the Securities and Exchange Commission.

45.     The deadline to file an objection ("Objection") to the Motion shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of the Interim Order (the "Objection Deadline").  An Objection shall be considered timely only if, on or prior to

the Objection Deadline, it is (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the attorneys for any official committee of unsecured creditors then appointed in these cases.

46.     Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing.

47.     If no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested herein, which order shall be submitted and may be entered with no hearing and no further notice or opportunity to be heard afforded to any party.  If an Objection is timely filed, a hearing will be held at a date and time to be established by the Court.

48.     The foregoing notice procedures satisfy Bankruptcy Rule 9014 by providing the parties in interest with notice and an opportunity to object and be heard at a hearing.  *See*, *e.g.*, *In re Drexel Burnham Lambert*, 160 B.R. 729, 734 (S.D.N.Y. 1993) (an opportunity to present objections satisfies due process); *In re Colorado Mountain Cellars, Inc.*, 226 B.R. 244, 246 (D. Colo. 1998) (a hearing is not required to satisfy Bankruptcy Rule 9014).  Furthermore, the proposed notice procedures protect the due process rights of the parties in interest without unnecessarily exposing the Debtors' estates to unwarranted administrative expenses.

## **Notice**

49.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) those creditors holding the largest thirty (30) unsecured claims against the Debtors' estates (on a consolidated basis), (iii) those creditors or their agents holding the five (5) largest secured claims against the Debtors' estates, (iv) the Internal Revenue Service, and (v) the Securities and Exchange Commission.  The Debtors submit that no other or further notice need be provided.

50.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated:    January 5, 2010
          New York, New York                   PACHULSKI STANG ZIEHL & JONES LLP

                                                */s/ Maria A. Bove*
                                                Richard M Pachulski (*pro hac vice* pending)
                                                Laura Davis Jones (*pro hac vice* pending)
                                                Debra I. Grassgreen (*pro hac vice* pending)
                                                Maria A. Bove
                                                John W. Lucas

                                                780 Third Avenue, 36th Floor
                                                New York, New York 10017
                                                Telephone:  (212) 561-7700
                                                Facsimile:  (212) 561-7777

                                                Proposed Attorneys for Debtors
                                                and Debtors in Possession

**Exhibit A**

**Proposed Order**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-_____ (   ) |
| Debtors.[1] | (Jointly Administered) |

**INTERIM ORDER AUTHORIZING DEBTORS TO (I) HONOR PREPETITION OBLIGATIONS TO CUSTOMERS AND CERTAIN OTHER BUSINESS ENTITIES AND TO OTHERWISE CONTINUE CUSTOMER AND RELATED PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS AND (II) AUTHORIZE FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

Upon the motion (the "Motion")[2] of Mesa Air Group, Inc. and its affiliated debtors and debtors in possession (the "Debtors") for an order, pursuant to sections 105(a), 363, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing, but not directing, them in their business judgment to (a) perform and honor such of their prepetition obligations related to the Customer Programs as they deem appropriate and (b) continue, renew, replace, implement new, and/or terminate Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court; and the Court having jurisdiction is to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and due and proper notice of the Motion having

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

been provided and that no other or further notice is necessary; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, it is

ORDERED that the Motion is granted and approved on an interim basis, to the extent provided herein; and it is further

ORDERED that the Debtors, in their business judgment, are authorized to (a) perform and honor their prepetition obligations related to the Customer Programs as they deem appropriate, and (b) continue, renew, replace, implement new, and terminate, Customer Programs as they deem appropriate and in the ordinary course of business, without further application to the Court, including making all payments, satisfying all obligations and permitting and effecting all setoffs in connection therewith, whether relating to the period prior or subsequent to the Petition Date; and it is further

ORDERED that all applicable banks and other institutions are authorized and directed, when requested by the Debtors and in the Debtors' sole discretion, to receive, process, honor and pay any and all checks and fund requests drawn on the Debtors' accounts related to the claims and obligations permitted to be paid by the Debtors pursuant to the foregoing provision, whether such checks and fund requests were presented prior to or after the Petition Date, provided that: (i) funds are available in the Debtors' accounts to cover the checks and fund transfers and (ii) the applicable banks and other institutions are authorized to rely on the Debtors' designation of any particular check or fund request as approved by this Order;

ORDERED that nothing herein shall be construed to limit, or in any way affect, the Debtors' ability to dispute any claim by any party with respect to any Customer Program; and it is further

ORDERED that any payment made pursuant to this Order is not, and shall not be, deemed an admission to the validity of the underlying obligation or waiver of any rights the Debtors may have to subsequently dispute such obligation; and it is further

ORDERED that nothing contained in this Order or the Motion shall constitute a rejection or assumption by the Debtors of any executory contract or unexpired lease;

ORDERED that the Debtors are hereby authorized to execute and deliver all instruments and documents and take any additional actions as may be necessary or appropriate to implement and effectuate the relief granted herein; and it is further

ORDERED that within three business days of the entry of this Interim Order, the Debtors shall serve a copy of the Interim Order and the Motion on (a) the Office of the United States Trustee for the Southern District of New York, (b) those creditors holding the five largest secured claims against the Debtors' estates, (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, and (e) the Securities and Exchange Commission; and it is further

ORDERED that any objection (the "Objection") to the relief requested in the Motion on a permanent basis must, by 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of this Interim Order (the "Objection Deadline"), be: (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the

attorneys for any official committee of unsecured creditors then appointed in these cases; and it is further

ORDERED that a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing; and it is further

ORDERED that if timely Objections are received there shall be a hearing to consider such timely Objections to the Motion; and it is further

ORDERED that if no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Interim Order, which Order shall be submitted and may be entered with no further notice or opportunity to be heard afforded any party, and the Motion shall be approved nunc pro tunc to the date of the commencement of these chapter 11 cases; and it is further

ORDERED that this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Interim Order.

Dated: _____
      New York, New York

                               _____
                               UNITED STATES BANKRUPTCY JUDGE