PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski (*pro hac vice* pending)
Laura Davis Jones (*pro hac vice* pending)
Debra I. Grassgreen (*pro hac vice* pending)
Maria A. Bove
John W. Lucas

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-_____ (   ) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
DEBTORS (I) TO PAY PREPETITION CLAIMS OF CRITICAL VENDORS AND
CERTAIN ADMINISTRATIVE CLAIMHOLDERS AND (II) TO AUTHORIZE
FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED
CHECKS AND TRANSFERS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries in the

above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"Debtors"), hereby file this motion (the "Motion") and respectively represent as follows:

---

[1] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

## Background

1.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors have requested authorization to consolidate their chapter 11 cases for procedural purposes only so that they may be jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Mesa's Business

3.      Mesa is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service.  As of the Petition Date, the Debtors' airline operations serve approximately 127 cities in 41 states, the District of Columbia, Canada, and Mexico.  The Debtors operate a fleet of approximately 130 aircraft with approximately 700 daily system departures.  The Debtors employ approximately 3,400 full and part-time employees.

4.      Mesa Airlines, Inc. ("Mesa Airlines") operates regional jet and turboprop aircraft under the names of regional carriers of certain major airlines pursuant to code-share agreements.  Specifically, Mesa Airlines operates as (i) US Airways Express under code-share agreements with US Airways, Inc., (ii) as United Express under a code-share agreement with United Airlines, Inc., and (iii) independently in Hawaii as *go!* Mokulele ("*go!*").  Freedom Airlines, Inc. operates regional jet aircraft as Delta Connection under code-share agreements with Delta Air Lines, Inc.  The remaining Debtors operate businesses, or own interests in businesses, that

facilitate or enhance the Debtors' regional or independent air carrier services. Nilchi, Inc. and Patar, Inc. hold investments.

5. As of September 30, 2009, the Debtors had consolidated assets[2] of approximately $975 million, and consolidated liabilities of approximately $869 million. The Debtors' consolidated 2009 revenues were approximately $968 million. Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009 were derived from operations associated with code-share agreements. The Debtors' remaining passenger revenues are generated from their independent *go!* operations in Hawaii.

6. A detailed description of the Debtors' businesses, capital structure, and the circumstances that precipitated the commencement of these chapter 11 cases is set forth in the *Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2* filed contemporaneously herewith.

## Jurisdiction

7. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8. The Debtors operate in a highly specialized, highly regulated and highly competitive industry. The uniqueness of the airline industry leaves airlines with few options when selecting vendors. Certain suppliers and service providers at various venues are simply the only option available to the Debtors. Even in those circumstances where more than one critical vendor can be located to provide a service, Federal Aviation Administration (the "FAA")

---

[2] At book value.

regulations inhibit an airline's ability to switch expeditiously from one supplier of goods or services to another.

9.    Pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors seek an interim order in the form attached hereto as <u>Exhibit A</u>:

(i)    granting them the authority in their sole discretion (but not the obligation):

- to pay all or a portion of the prepetition obligations of certain critical vendors who have obtained or may be able to assert statutory lien rights under applicable law (the "<u>Lienor Critical Vendors</u>"), to the extent such payment is necessary to satisfy such liens, and on the conditions described below; and

- to pay all or a portion of the prepetition obligations of certain critical vendors who have neither obtained nor have the right to assert statutory liens under applicable law (the "<u>Non-Lienor Critical Vendors</u>" and, collectively with the Lienor Critical Vendors, the "<u>Critical Vendors</u>"), subject to the Non-Lienor Critical Vendor Cap (as defined below) and provided that payment of such claims is conditioned upon the claimant's agreement to provide the Debtors with Customary Trade Terms (as defined below) and execute the Vendor Agreement (as defined below); and

- to pay the claims of Critical Vendors for the value of goods received by the Debtors in the ordinary course of their business during the 20-day period prior to the Petition Date, which are likely entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code (the "<u>503(b)(9) Claims</u>"), provided that payment of such claims is conditioned upon the claimant's agreement to provide the Debtors with Customary Trade Terms and execute the Vendor Agreement;[3] and

(ii)    authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing; and

(iii)    granting related relief.

---

[3] Because of interrelated elements of the Debtors' operations, out of an abundance of caution, certain of the relief requested herein may overlap to a limited extent with certain of the relief requested in the *Debtors' Motion Pursuant to Sections 105(a), 362 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 for Interim Authorization to Honor and Satisfy Prepetition Obligations in the Debtors' Discretion Under Certain Industry Related Agreements and Schedule Final Hearing* being filed contemporaneously herewith.

10.     If the requested relief is not granted and certain essential trade vendors refuse to continue to supply goods and services to the Debtors postpetition, the Debtors may well be unable to continue portions of their operations, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.

**The Debtors' Critical Vendors**

11.     The Debtors purchase goods and services from certain vendors and independent contractors who are unaffiliated with the Debtors and are, by and large, sole source or limited source suppliers without whom the Debtors could not operate, or who might be able to obtain (or have obtained) mechanics' liens, possessory liens, shippers' liens or similar state law trade liens on property necessary to the Debtors' ongoing operations. The Critical Vendors could not be replaced within a reasonable time and on terms as beneficial to the Debtors as those already in place, or have obtained trade liens on property necessary to the Debtors' ongoing operations. Further, any time lag generated as a result of finding replacement vendors would disrupt the Debtors' operations to the detriment of their estates. In addition, many of these limited source suppliers are in the unique position of holding a virtual monopoly over the services they provide. Replacement vendors, even where available, would likely result in higher costs for the Debtors. If the Debtors can benefit from maintaining lower costs of goods and services purchased during the postpetition period and avoid the severe disruption that might be occasioned by the cessation of service therefrom, it is prudent for the Debtors to pay selected Critical Vendors some or all of their prepetition claims. However, except with respect to claims of Lienor Critical Vendors who have obtained or have the right to assert statutory liens under applicable law, the payment of claims held by Non-Lienor Critical Vendors and 503(b)(9) Claims held by Critical Vendors would be conditioned, to the extent requested by the Debtors in their discretion, on an agreement

that the critical vendors continue to sell their goods or services to the Debtors on a going forward basis on terms favorable to the Debtors.

12.     The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates.  The preservation of key business relationships is among management's primary goals as the Debtors transition into chapter 11.  Providing seamless service to customers is key to meeting those goals.  For these reasons, the Debtors seek to minimize the adverse business effects as well as the cash flow impact of their chapter 11 filing, and possible irreparable harm, to the fullest extent possible by obtaining authority to pay certain necessary trade vendors who are so essential to the Debtors' business that the loss of their particular goods or services would cause immediate and irreparable harm to the Debtors' business, goodwill and market share.

13.     As of the Petition Date, the Debtors estimate that the total accrued, unpaid, prepetition, trade claims aggregate approximately $60,000,000.00.  As of the Petition Date, the Debtors estimate that the accrued, unpaid, prepetition claims subject to this Motion aggregate approximately $4,778,000.00, or approximately 8.0% of the total aggregate trade debt, and are described in detail below.  The Debtors have provided to the Office of the United States Trustee a list of the amounts sought to be paid to Critical Vendors pursuant to this Motion.

A.      **Lienor Critical Vendors**

14.     In the ordinary course of their business, the Debtors purchase goods from or engage a variety of third-party service providers that are in possession of equipment or goods of the Debtors that are vital to the operation of the Debtors' business and may assert possessory or mechanics' liens if their claims are not satisfied.  It is difficult for the Debtors to estimate the valid accrued, unpaid, prepetition claims at any given time because the goods and services

fluctuate. The Debtors seek authority to pay accrued, unpaid, prepetition claims of Lienor Critical Vendors in the aggregate amount of $3,880,000.00, as described below.

1. **Categories of Lienor Critical Vendors**

a. <u>Outside Maintenance & Service Providers</u>

15. The Debtors are required to perform significant maintenance and overhaul work to maintain their fleet of aircraft properly and safely and in accordance with the regulations of the FAA. *See*, *e.g.*, 14 C.F.R. §§ 125.241 to 125.251 (setting forth regular and extensive maintenance requirements for certain types of aircraft). Thus, in order to maintain safety standards, flight schedules and on-time performance, the Debtors must repair aircraft parts and make on-the-spot repairs to aircraft on little or no notice. Any disruption in the flow of such services immediately affects on-time performance, a key component on which customer satisfaction is measured. Further, any disruption in the flow of services causes the Debtors immediate and substantial economic harm and erodes their valuable customer base.

16. In addition to the services provided by the Debtors' employees, the Debtors rely on third-party mechanics, repairmen and non-aircraft service providers (the "<u>Outside Maintenance & Service Providers</u>") to perform a material portion of their aircraft, engine, and other equipment maintenance and repair work. As part of their maintenance and repair work, the Outside Maintenance & Service Providers also supply to the Debtors certain aircraft component parts, most of which are replacement parts. The Debtors also have relationships with other non-aircraft related Outside Maintenance & Service Providers.

17. The Debtors' relationship with their mechanics is subject to many mandatory layers of oversight and control by the FAA and the Debtors' engineers. Passenger aircraft mechanics are subject to mandatory certification and approval by several entities before an

airline can use the mechanics' services and, as a result, are difficult to source. Thus, the Debtors have very limited options with regard to mechanics.

18.     Aircraft mechanics are subject to licensing and certification by the FAA. The work they perform on commercial aircraft must be inspected and approved by qualified and trained inspectors, themselves licensed and highly-trained mechanics, in accordance with the Debtors' FAA-approved maintenance programs. The Debtors rely on these mechanics and inspectors, who must stay current with FAA regulations and Debtors' manuals, policies and procedures, to provide on-the-spot repairs as necessary.

19.     While the Debtors themselves employ mechanics at many of the airports they serve, no airline can afford to employ sufficient mechanics to repair and maintain all the specialized equipment they operate in all possible locations at which service might be required. Accordingly, the Debtors have service agreements (standard in the industry) with other airlines, maintenance service providers and even individuals trained and licensed to provide maintenance services at various airports across the country. The Debtors have, over the years, nurtured and developed their relationships with these service providers and have come to rely on the high quality and priority service they receive. It is essential to the continuity of the Debtors' operations that they maintain their relationships with these essential maintenance service providers.

20.     Additionally, many of the Outside Maintenance & Service Providers are, in the ordinary course of the Debtors' business, in possession of aircraft, engines and other equipment that are vital to the Debtors' operations and may assert possessory liens and refuse to redeliver these items to the Debtors until they are paid pre-petition amounts. In some circumstances, these liens can be perfected notwithstanding the automatic stay established by section 362(a) of the

Bankruptcy Code. Indeed, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting certain of such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[4]

21. Without the appropriate mechanics to service the Debtors' fleet, the Debtors will be unable to fly. Without the ability to make on-the-spot repairs in remote locations, planes will be stranded. In every case, the Debtors would be less competitive and would rapidly lose their customer base. The Debtors need to protect their hard-earned relationships with their most essential mechanics to continue to strengthen their relationship with their customers. At this nascent stage of the Debtors' restructuring efforts, being forced to switch multiple mechanics (where even possible) would be extremely detrimental to the uninterrupted operation of the Debtors' business. Additionally, as already stated, the options for switching mechanics is extremely limited and, in many instances, non-existent. The relief requested herein is essential to the maintenance of the Debtors' safe, uninterrupted and efficient operations, and restructuring efforts.

22. The estimated value of the goods or property of the Debtors in the possession of the Outside Maintenance & Service Providers is approximately $12,500,000.00. As of the Petition Date, the Debtors estimate that the valid, accrued, unpaid, prepetition claims of the Outside Maintenance & Service Providers that are Lienor Critical Vendors aggregate approximately $3,530,000.00.

b. <u>Shippers</u>

23. Another integral part of the Debtors' operations is the use of commercial common carriers, movers, shippers, freight forwarders/consolidators, delivery services, warehousing

---

[4] Nothing contained herein shall be deemed an acknowledgement or admission by the Debtors regarding the existence or validity of any liens, and the Debtors rights with respect thereto are hereby reserved.

companies, customs brokers, shipping auditing services and certain other third-party services providers (collectively, the "Shippers") to ship, transport, store, move through customs and deliver goods and packages through established distribution networks.

24.     The Debtors rely extensively on Shippers to transport parts, goods and packages to and from third parties including, without limitation, their outside maintenance providers. The nature of the Debtors' business requires timely deliveries of critical parts and other goods necessary to the Debtors' operations. Only a small number of providers are capable of delivering the Debtors' goods reliably and on a timely basis. The services provided by Shippers, therefore, are critical to the Debtors' daily operations. To the extent the Debtors have not paid them for their services, the Shippers may be able, pursuant to state law, to assert liens on the goods in their possession to secure the charges and expenses incurred in connection with the transportation, storage or preservation of the Debtors' goods and merchandise. In some circumstances, these liens can be perfected notwithstanding the automatic stay established by section 362(a) of the Bankruptcy Code. Indeed, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting certain of such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.

25.     The estimated value of the goods or property of the Debtors in transit or in the possession of the Shippers is approximately $670,000.00. As of the Petition Date, the Debtors estimate that the valid, accrued, unpaid, prepetition claims of the Shippers that are Lienor Critical Vendors aggregate approximately $350,000.00.

26.     It is essential that the Debtors be permitted to pay the valid, accrued, unpaid, prepetition claims owed to Outside Maintenance & Service Providers and Shippers in the amounts set forth herein to enable the Debtors to maintain and service their fleet consistent with

the various deadlines and timeframes applicable to their business operations.  The payment of these claims not only helps ensure there will be no disruption in the Debtors' business operations, but also fulfills their obligations under the codeshare agreements that are the cornerstone of the Debtors' business.  Without prompt payment, the Outside Maintenance & Service Providers and Shippers may refuse to redeliver the equipment or goods in their possession, all of which are necessary for the efficient operation of the Debtors' business.

27.     Only by maintaining the highest levels of safety can the Debtors retain the confidence, support and goodwill of their customers.  Moreover, any disruption could also impair the Debtors' ability to comply with the FAA maintenance regulations, with which the Debtors are required to comply as debtors in possession.  *See* 28 U.S.C. § 959(b) (requiring debtors in possession to comply with all state and federal laws).  Planned maintenance for aircraft is scheduled months ahead of time, both internally at the Debtors and with certain of the Outside Maintenance & Service Providers.  It is important to the Debtors' successful operations that this planned maintenance schedule is not disrupted.  Any disruption could impair the Debtors' operations and lower confidence in the Debtors' safety and performance records.

28.     Furthermore, unless the Outside Maintenance & Service Providers and Shippers are paid promptly, Outside Maintenance & Service Providers and Shippers may refuse to redeliver the Debtors' aircraft, engines and other equipment that are vital to the Debtors' operations.  The value of aircraft and aircraft components - both intrinsically and for revenue generation - in the possession of the Outside Maintenance & Service Providers or Shippers far exceeds the value of the claims against the Debtors.  Accordingly, creditors will benefit from the satisfaction of prepetition obligations to such parties because such payments will release valuable equipment and help preserve the going-concern value of the Debtors' business.  Moreover, such

claims would likely be entitled to treatment as secured claims which must be satisfied in full prior to the payment of any unsecured claims in these cases.

29.     To avoid undue delay and to facilitate the continued operation of the Debtors' businesses, the maintenance and repair of their aircraft, engines and other equipment, gates, terminals, and hangars, the Debtors seek immediate authority to pay and discharge, on a case-by-case basis, and in their sole discretion, all claims of Outside Maintenance & Service Providers and Shippers that have given or could give rise to liens and/or interests against the Debtors' property, regardless of whether such Outside Maintenance & Service Providers or Shippers already have perfected such liens and/or interests. Notwithstanding the foregoing, however, with respect to each Claim: (a) the Debtors shall not pay a claim unless the Outside Maintenance & Service Provider or Shipper has perfected or, in the Debtors' judgment, is presently capable of perfection or will be capable of perfecting in the future one or more liens and/or interests (that is/are not subject to avoidance) giving rise to such claim; (b) the payment of such claim shall be made with a full reservation of rights regarding the extent, validity, perfection or possible avoidance of any liens and/or interests, if any; and (c) the Outside Maintenance & Service Provider or Shipper agrees to promptly release any liens and/or interests, if any, upon payment of such claim.

30.     Permitting the Debtors to pay prepetition obligations to the Outside Maintenance & Service Providers or Shippers to honor the Maintenance Contracts will enable the Debtors to continue their operations without the potentially serious disruptions that would result if the Outside Maintenance & Service Providers or Shippers refuse to redeliver aircraft, engines and other equipment in their possession, or refuse to service the Debtors' aircraft on an ongoing basis.

31.     Permitting the Debtors to make such payments will be without prejudice to the Debtors and will not preclude the Debtors from pursuing any claims under the Bankruptcy Code or applicable non-bankruptcy law that they may have against the Outside Maintenance & Service Providers or Shippers including, without limitation, claims for failure to deliver, provide service to or supply additional parts for the Debtors' aircraft, engines and other equipment and components.

**B.      Non-Lienor Critical Vendors**

32.     The Debtors' Non-Lienor Critical Vendors fall into seven general categories, among them sole source or limited source suppliers: (i) Outside Maintenance & Service Providers that neither have nor may assert liens under applicable law; (ii) aircraft parts suppliers; (iii) flight training services providers; (iv) essential amenity providers; (v) ground support services providers; (vi) crew and employee-related services providers; (vii) information technology suppliers and service providers; and (viii) flight navigation systems providers. While the Debtors hope and expect to be able to assure a continuing postpetition supply of goods and services by consensual negotiation with the vendors in the categories above, the Debtors recognize that their fiduciary duties bind them to consider and plan for the many vendors which may refuse to provide future goods or services unless their prepetition claims are paid. The Non-Lienor Critical Vendors are so essential to the Debtors' business that the lack of any of their particular services, even for a short duration, might disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill and market share. This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment of the prepetition claims of the Non-Lienor Critical Vendors.

### 2. Categories of Non- Lienor Critical Vendors

#### a. Outside Maintenance & Service Providers

33.     As described above, the Debtors seek authority to pay claims of Outside Maintenance & Service Providers that are Lienor Critical Vendors in the aggregate amount of $2,030,000.00.  In addition, the Debtors seek authority to pay claims of certain Outside Maintenance & Service Providers that have not and may not assert liens under applicable statutory law.  Notwithstanding their lack of lien rights, the services provided by such vendors are critical for all of the reasons set forth above in Section A.

#### b. Aircraft Parts Suppliers

34.     In order to maintain safety standards, flight schedules and on-time performance, the Debtors must purchase aircraft parts and components on a regular basis on little or no notice.  Any disruption in the flow of such parts immediately affects on-time performance, a key component on which customer satisfaction is measured.  Further, any disruption in the flow of parts causes the Debtors immediate and substantial economic harm and erodes their valuable customer base.

35.     Like the Debtors' relationship with their mechanics, the Debtors' relationship with their parts suppliers is subject to many mandatory layers of oversight and control by the FAA, the original equipment manufacturers ("OEMs"), and the Debtors' engineers.  Passenger aircraft parts suppliers are subject to mandatory certification and approval by several entities before an airline can use the parts or the mechanics services and, as a result, are difficult to source.  Thus, the Debtors have very limited options with regard to parts suppliers.

36.     Unlike other industries, the available pool of experienced and reliable parts suppliers in the aircraft industry is severely limited.  The parts used in aircraft fall into three general categories (i) proprietary parts, (ii) alternate source parts and (iii) non- proprietary parts.

Proprietary parts (i.e., fundamental flight components, without which an aircraft cannot fly) typically are only available from a single supplier, the OEM. Alternate source parts, which frequently involve safety equipment and other essential systems, without which the aircraft is not permitted to fly, typically are available through no more than two or three suppliers. If the Debtors need to switch suddenly to an alternate source supplier, they may have to wait months for the new supplier to receive FAA, OEM and internal engineering approval. In the meantime, the affected aircraft could be grounded and the Debtors' business harmed. Non-proprietary parts, such as aircraft-quality nuts, bolts, carpeting, etc., are available through a mere handful of suppliers and, again, only after those suppliers have obtained FAA, OEM and internal engineering approval. Thus, the parts the Debtors need the most to continue operations and stay competitive are controlled by sole or limited source suppliers and constrained by applicable FAA approvals with respect to eligible vendors that may supply the Debtors' parts.

37.     Aside from the availability of suppliers, the quality of the suppliers varies. Suppliers differ in the products they carry, turn around time from order to delivery, prices, warranties and terms and conditions. It can take years for the Debtors to groom their suppliers for maximum efficiency and effectiveness. Thus, a sudden need to switch multiple suppliers would result, at the very least, in unnecessary inefficiencies and expenses, would disrupt normal flight operations and would distract the Debtors from their restructuring efforts.

38.     Without readily available OEM parts, the Debtors will be unable to fly. Without alternate source parts, the FAA could ground aircraft. Without the non-proprietary parts, like aircraft-quality nuts, bolts, screws, carpeting and the like, many customary amenities, such as carpeting or the ability to recline seats in-flight, will disappear. In every case, the Debtors would be less competitive and would rapidly lose their customer base. The Debtors need to protect

their hard-earned relationships with their most essential suppliers to continue to strengthen their relationship with their customers. The Debtors' aircraft parts suppliers are essential because they are frequently less expensive than their competitors, they have been developed to serve the Debtors' particular needs, they have been fully approved, and they have proven their reliability. At this nascent stage of the Debtors' restructuring efforts, being forced to switch multiple suppliers (where even possible) would be extremely detrimental to the uninterrupted operation of the Debtors' business. Additionally, as already stated, the options for switching suppliers or mechanics is extremely limited and, in many instances, non-existent. The relief requested herein is essential to the maintenance of the Debtors' safe, uninterrupted and efficient operations, and restructuring efforts.

c.     Flight Training Providers

39.     Continuous and rigorous training of pilots and flight attendants is an essential component of maintaining a safe airline. To comply with FAA regulations, pilots and flight attendants must receive both initial qualifications and continuous proficiency training. The Debtors use specialized products, devices and facilities, including flight simulators, to meet FAA requirements and assure that all flight crews perform at the highest level of competency.

40.     Commercial aircraft are extraordinarily complex. Pilots of commercial jet aircraft typically fly only one type of plane at a time. Before he or she pilots a different type of aircraft, each pilot must undergo substantial ground school and simulator training for either initial training on that aircraft type or as part of continuous recurrent training, required every nine months, on the intricacies and the unique characteristics of that particular type of aircraft. Every time a pilot switches aircraft or switches seats (going from first officer to captain), substantial additional training is required by FAA regulations.

41.     Flight simulators are essential to the airline industry.  They offer a far less expensive and completely safe method of training compared to using actual aircraft.  In addition to the savings on fuel, wear and tear and servicing, the flight simulators are highly sophisticated and can be programmed to create specific conditions and maneuvers to train crews without risk. The demand for simulator time is intense.

42.     The aircraft and simulator manufacturers are the exclusive producers of certain of the replacement parts for simulators.  If the Debtors were unable to purchase the spare parts to service their simulators and get them back online for training, they would be severely disadvantaged in the operation of their business as more and more pilots lost their FAA authorization to fly, or could not be trained to switch to other aircraft.  The loss of pilot certification would hamper or harm the Debtors' ability to continue flight operations and, thus, the reorganization effort.

d.     Essential Amenity Providers

43.     In order to comply with their code-share agreements, meet customer expectations and maintain brand integrity, the Debtors provide essential customer amenities on the ground and in flight.  These include, among other things and depending upon the specific flight, food for purchase, beverages, and other products.  The Debtors are reimbursed by their code-share partners under their respective code-share agreements for a portion of payments made directly by the Debtors to Critical Vendors on account of such essential amenities.

44.     The Debtors have built a solid reputation by offering high quality amenities, which their passengers have come to expect and which, for flights operated under code-share agreements, are required.  A drop-off in the supply or quality of these customer-facing products would certainly damage business and result in a loss of customer confidence.  Thus, the Debtors realize the importance of protecting and enhancing service amenities.

45.     The airport distribution and catering requirements for in-flight meals and related goods are extremely high and cannot be met by most food service suppliers.  Many of the goods require airline-specific packaging and product identification to meet requirements under the Debtors' code-share agreements and to avoid pilferage.  As each aircraft is configured differently internally, the packaging requirements must be set up well in advance, requiring substantial lead times.  Thus, the Debtors would be unable to replace these Critical Vendors without severely harming their image with the traveling public and, in turn, harming their business, due to the availability of few, if any, alternatives, long lead times and tooling requirements.

e.     Ground Support Services Providers

46.     At certain locations around the United States, the Debtors rely on third parties to perform all the normal functions associated with the airline business.  At these selected airports, the ticket agents, gate handlers, ground crews, ramp handlers, cabin cleaners and de-icing crews are provided by third party vendors.  At such locations, these vendors are the only source of those services unless the Debtors place their own personnel at each such location, which would be impractical, costly and inefficient.  Putting into place a full complement of the Debtors' ground services staff, and accompanying equipment, to accommodate only one or a few daily flights to a given airport could negate any financial benefit generated by such flights.  Without the support of these third party vendors, the Debtors would not be able to fly into these airports on an economical basis while providing the required level of service and maintenance to their customers and aircraft.  Therefore, if the Debtors are not allowed to honor prepetition obligations to customer handling suppliers, and if such vendors refused to do business with the Debtors postpetition, the Debtors' operations would be disrupted, their revenue would decrease and their efforts to reorganize would be hampered.

### f. Crew and Employee Related Providers

47.     As a labor-intensive business, the Debtors require significant infrastructure to support a large workforce.  In addition, the Debtors require airline industry-specific automated and standardized tracking, scheduling and flight-bidding programs to run their businesses.  Each of these programs is customized to the Debtors' needs or is required by FAA regulations or other constraints.  The Debtors' work rules, including those arising under their union contracts, have been painstakingly integrated into these systems over a matter of years.  Further, the systems are all integral to the operation of the Debtors' business and produce information that is required by the FAA (e.g., reports regarding crew rest) and critical to safe operations.  If any of these suppliers refused to supply the necessary parts or refused to maintain and repair their products or support their software, the Debtors would be required to purchase and implement entirely new systems or programs at exorbitant cost and with long lead times, which could severely disrupt the Debtors' operations.

### g. Information Technology Suppliers and Service Providers

48.     The Debtors' business requires a complex constellation of management and information systems which must be able to communicate effectively with each other.  The very nature of the airline business is information intensive, and relies upon a vast complement of interrelated computer software, hardware systems and other equipment.  The Debtors rely on a number of systems to provide some of their most critical business functions, most notably flight operations activities.  Without steady access to and constant processing of certain information, such as the amount of fuel or weight on each plane, the Debtors would be unable to fly.

49.     The applications and infrastructure knowledge of suppliers related to the Debtors' information technology environment is unique to the airline industry and critical to maintaining smooth operations.  The Debtors cannot simply replace them without concerns that the new

information systems would be less than completely accurate; replacement systems would require comprehensive and lengthy evaluation and testing. Even if the Debtors could replace such suppliers, replacement would take substantial time and would come at great cost to the Debtors' business.

h.    <u>Flight Navigation Systems Providers</u>

50.      In the regular course of the Debtors' businesses, the Debtors use various systems, services and products central to flight operations. In particular, these include radio services and flight charts. Each of the providers of these services or products is, by and large, a monopoly vendor for that service or product.

51.      The Debtors' operations require advanced radio communication capabilities. These communications are the aircraft's lifeline to the outside world. The communication capabilities are essential to providing weather updates, communications between the cockpit and ground services, and form an essential link between pilots and central dispatch. The need for reliable ground-to-plane communications permeates virtually every aspect of the Debtors' operations and must be maintained without interruption. The loss of this communication capability would be crippling to the Debtors' business and the extant restructuring efforts.

52.      The Debtors' flight operations further rely on flight charts that detail airport layouts, radio frequencies, obstructions, approach routes and other essential information regarding airports and air routes. The flight charts are updated regularly. The FAA requires flight manuals, which include updated flight charts, aboard every aircraft. Without updated flight charts, an aircraft cannot safely fly and is not permitted to fly. All flight charts used by U.S. airlines are produced and updated by a single company. As the flight charts are mandatory FAA equipment on passenger aircraft, the Debtors must assure they have an uninterrupted supply of the most current and accurate charts available.

53.     As aircraft communications and up-to-date flight charts are indispensable components of flight operations, the Debtors need assurance that the flow of such services and products will be unaffected by the filing of the bankruptcy petitions.  Alternatives to such flight navigation services and products are unavailable.

### 3.     Application of Non-Lienor Vendor Claims Cap

54.     While the Debtors hope and expect to be able to assure a continuing postpetition supply of goods and services by consensual negotiation with the Non-Lienor Critical Vendors, the Debtors recognize that their fiduciary duties bind them to consider and plan for the many vendors that may refuse to provide future goods or services unless their prepetition claims are paid.  The Non-Lienor Critical Vendors are so essential to the Debtors' business that the lack of any of their particular goods and services, even for a short duration, might disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill and market share.  This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment of the prepetition claims of the Non-Lienor Critical Vendors.

55.     The Debtors therefore seek the authority to pay, in their sole discretion and business judgment, some or all of the prepetition obligations of certain Non-Lienor Critical Vendors to maintain their operations.  Without this authority, these Non-Lienor Critical Vendors may refuse to continue to supply goods and services to the Debtors postpetition.  As is illustrated in detail above, the Non-Lienor Critical Vendors are an essential component of the Debtors' continuing operations.  The Debtors estimate the maximum amount needed to pay the prepetition claims of Non-Lienor Critical Vendors is approximately $898,000.00 (the "Non-Lienor Vendor Claims Cap").

56.     In determining the amount of the Non-Lienor Vendor Claims Cap, the Debtors have carefully reviewed all of their suppliers to determine, among other things, (a) which

suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, or (b) which suppliers would be prohibitively expensive to replace, and (c) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies. The Debtors then considered the financial condition of each provider, where that information was known, including the level of dependence each provider has on the Debtors' continued business. After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services. The Non-Lienor Vendor Claims Cap represents this estimated amount.

57. The Non-Lienor Vendor Claims Cap represents only a small percentage of the total amount of the prepetition vendor claims in these cases. It represents the Debtors' best estimate as to how much must be paid to such creditors to continue the supply of critical goods and services. The Debtors hope to pay far less than the requested amount. The Debtors' proposed Non-Lienor Vendor Claims Cap is within the range of amounts awarded by the courts in other cases. *See*, *e.g.*, *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 15, 2008) (court approved similar motion authorizing debtors to pay up to an aggregate amount of $6 million in critical vendor and fuel claims); *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) (court granted the debtor authority to pay $20,000,000 in critical vendor claims); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 14, 2005) (court granted debtor authority to pay $90,000,000 in the debtors vendor rescue program); *In re UAL Corporation, et al.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) (court approved similar motion seeking to pay up to approximately $34,900,000 or 13.7% of the total trade debt); *In re WorldCom, Inc., et al.*, Case No. 02-13533 (AJG) (Bankr.

S.D.N.Y. Jul. 21, 2002) (court granted debtor authority to pay $70,000,000 in critical vendor claims); *In re U.S. Airways Group, et al.*, Case No. 02-83984 (SSM) (Bankr. E.D. Va. 2002) (court approved $10,000,000 in critical vendor claims); *In re Exide Technologies, et al.*, Case No. 02-11125 (JCA) (Bankr. D. Del. Apr. 18, 2002) (approved essential trade amount was 20% of the debtors' total trade debt); *In re Enron Corp., et al.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 12, 2001) (court approved $48,000,000 in critical vendor claims); *In re Trans World Airlines, Inc., et al.*, Case No. 01-0056 (PJW) (Bankr. D. Del. Jan. 10, 2001) (approved essential trade amount was 19% of the debtors total trade debt).

## C.     **Claims Under Section 503(b)(9)**

58.     The Debtors are not required to reconcile or pay the 503(b)(9) Claims prior to the conclusion of these cases.  Notwithstanding the foregoing, the Debtors request that the Court enter an order clarifying that the Debtors are authorized in their sole discretion in the ordinary course of their businesses, but not required, to pay the 503(b)(9) Claims, or any portion thereof, of any claimant that is a Critical Vendor, <u>provided</u> <u>that</u> any payment of 503(b)(9) Claims shall be conditioned upon the claimant's agreement to Customary Trade Terms (as defined below) and execution of the Vendor Agreement (as defined below), to the extent requested by the Debtors in their discretion, in accordance with this Motion, and any other terms and conditions as the Debtors deem appropriate.  The Debtors request that payments of 503(b)(9) Claims made to Non-Lienor Critical Vendors not count against the Non-Lienor Vendor Claims Cap.  For the avoidance of doubt, the Debtors will not pay any 503(b)(9) Claims asserted by claimants that are not Critical Vendors.

## D.     **Customary Trade Terms and Vendor Agreement**

59.     The Debtors propose to pay, in their sole discretion, the claims of each Non-Lienor Critical Vendor that agrees to continue to supply goods or services to the Debtors on such

vendor's Customary Trade Terms for a period of time and on other such terms and conditions as are acceptable to and requested by the Debtors in their discretion. As used herein, Customary Trade Terms means, with respect to a Non-Lienor Critical Vendor, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Debtors and in effect between such vendor and the Debtors prior to the Petition Date, or (b) such other trade terms as agreed by the Debtors and such vendor. However, as noted above, in determining the Non-Lienor Vendor Claims Cap, the Debtors were careful to include only such payments the Debtors, in their best estimate, determined would be required to continue the supply of critical goods and services as a condition of continued sales. Therefore, it may be necessary to pay certain Non-Lienor Critical Vendors only a portion of such vendors' claims in return for the continued supply of critical goods and supplies even if not on such vendor's Customary Trade Terms. Further, in certain circumstances a Non-Lienor Critical Vendor may refuse to provide services to the Debtors on such vendor's Customary Trade Terms even after payment of such vendor's claim. To accommodate these circumstances, the Debtors seek approval to enter into separate agreements, at the Debtors' discretion, with each such vendor on a case-by-case basis.

60. The Debtors further propose that if a Non-Lienor Critical Vendor later refuses to continue to supply goods or services to the Debtors on the Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such vendor, then the Debtors may, in their discretion, and without further order of the Court: (i) declare that the payment of such creditor's claim is a voidable postpetition transfer pursuant

to section 549(a) of the Bankruptcy Code that the Debtors may recover from such vendor in cash or in goods and (ii) demand that the creditor immediately return such payments in respect of the claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or setoffs of any type whatsoever, and the creditor's claim shall be reinstated in such an amount as to restore the Debtors and the Non-Lienor Critical Vendor to their original positions, as if the agreement had never been entered into and the payment of such claim had not been made. In sum, the Debtors will return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

61.     To ensure that Non-Lienor Critical Vendors and holders of 503(b)(9) Claims transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures as a condition to paying such creditors' claims: (a) in the sole discretion of the Debtors, that a letter or contract including provisions substantially in the form of the letter attached hereto as Exhibit B (a "Vendor Agreement") be delivered to, and executed by, the Critical Vendors along with a copy of the order granting the relief sought herein and (b) that payment of Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the Southern District of New York, dated _____, 2009, in the chapter 11 cases of Mesa Air Group, Inc., et al. (Cases No. 0[-] _____(_) through 0[ ]- _____(_), entitled Order Authorizing Debtors to (i) Pay Prepetition Claims Of Critical Vendors and Certain Administrative Claimholders and (ii) Authorize Financial Institutions to Honor and Process Related Checks and Transfers and submits to the jurisdiction of that Court for enforcement thereof.

62.     The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor paid on account of such vendor's claim, (b) the amount paid to each Critical Vendor on

account of its claim and (c) a brief description of the goods or services provided by such Critical Vendor.  This matrix will periodically be provided to the United States Trustee for the Southern District of New York (the "U.S. Trustee") and the official committee of unsecured creditors (the "Committee"), provided, however, that the Committee's professionals shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of the Committee, without prior written consent from the Debtors.

63.    The Debtors believe that payment of some or all claims owed to Critical Vendors will be necessary to preserve operations and successfully reorganize.  The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date.  During this period, the Debtors, their attorneys and financial advisors, and their other professionals will be focusing on stabilizing operations and developing a long-term business plan.  At the same time, while the Debtors are distracted with stabilization of the business and long-term planning, Critical Vendors may attempt to assert their considerable leverage and deny provision of goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment.

64.    The continued availability of trade credit, in amounts and on terms consistent with those the Debtors have obtained over the years, is clearly advantageous to the Debtors.  It allows the Debtors to maintain and enhance necessary liquidity and focus on returning to profitability.  The Debtors believe that preserving working capital through the retention or reinstatement of their normally advantageous trade credit terms will enable the Debtors to stabilize business operations at this critical time, to maintain their competitiveness and to maximize the value of their business for the benefit of all interested parties.  Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods or provision of essential services,

could spell disaster for the restructuring efforts.  Finally, the relief requested herein also may help to avert the institution of numerous reclamation claims, suits and motions.  Avoiding the time and expense of evaluating and litigating such claims will provide another incremental benefit for the Debtors, their estates and their creditors.  Any occurrence affecting operations could prolong the Debtors' chapter 11 cases, increase administrative expenses and jeopardize their reorganization.

**Request for Authority for Financial Institutions**
**to Honor and Process Related Checks and Transfers**

65.    The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, provided, however, that: (a) funds are available in the Debtors' accounts to cover the checks and fund transfers and (b) all the banks and other financial institutions are authorized to rely on the Debtors' designation of any particular check as approved by the attached proposed order and any further order on this Motion.

**Applicable Authority**

66.    Section 105(a) of the Bankruptcy Code empowers the Court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. 11 U.S.C. § 105(a).  *See*, *e.g.*, *Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Develop. Group, Inc.)*, 352 F.3d 671, 680 (2d Cir. 2003) ("[I]t is axiomatic that bankruptcy courts are 'courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.'"); *Official Comm. of Unsecured Creditors v. PSS S.S. Co. Inc. (In re*

*Prudential Lines, Inc.)*, 928 F.2d 565, 574 (2d Cir. 1991) ("This provision has been construed liberally to enjoin [actions] that might impede the reorganization process.") quoting *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93 (2d Cir.), cert denied, 488 U.S. 869 (1988). A bankruptcy court s use of its equitable powers to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept. *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Under Section 105, the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor. *In re NVR L.P., et al.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177). The Debtors strongly believe that the uninterrupted supply of goods and services, on the terms set forth herein, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors.

67.     The necessity of payment doctrine further supports the relief requested herein. This doctrine recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor. *Ionosphere Clubs*, 98 B.R. at 176; *see also Michigan Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987). The rationale for the necessity of payment rule is consistent with the paramount goal of chapter 11 facilitating the continued operation and rehabilitation of the debtor. *Ionosphere Clubs*, 98 B.R. at 176; *In re Boston & Maine Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under 11 U.S.C. § 105 the court can permit

pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Just for Feet. Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("courts have used their equitable power under section 105 (a) ... to authorize the payment of pre-petition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization"); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (reasoning that because the debtor-in-possession has fiduciary duties it must meet, it is logical that the bankruptcy court may "authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate" under § 105(a)); *In re Svnteen Techs., Inc.*, No. 00-02203-W, 2000 WL 33709667 at *2 (Bankr. D.S.C. Apr. 14, 2000) (courts have permission to "allow payment of a pre-petition claim 'when essential to the continued operation of the debtor'") (citation omitted); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) quoting *Chateaugav Corp.*, 80 B.R. at 287 (indicating its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately'"); *In re Gulf Air. Inc.*, 112 B.R. 152 (Bankr. W.D. La. 1989) (allowing payment of pre-petition employee claims because such payment was in the best interest of creditors and necessary to successful reorganization).

68.     Similar relief has repeatedly been granted in other chapter 11 cases in this district. *See*, *e.g.*, *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 15, 2008); *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005); *In re Delta Air Lines, Inc., et al.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005); *In re Worldcom, Inc.*, Case No. 02-13533 (ALG) (Bankr. S.D.N.Y. 2002); *In re Enron Corp.*, Case

No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2001); *In re AI Realty Marketing of New York, Inc.*, Case

Nos. 01-40252 through 01-40290 (AJG) (Bankr. S.D.N.Y. 2001).

69.     Moreover, in recognition of the large and essential role played by a distinct group

of vendors in the airline industry, courts have consistently granted similar relief in other major

airline reorganization cases.  *See*, *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298

(RDD) (Bankr. S.D.N.Y. May 15, 2008) [Docket No. 239]; *In re Delta Air Lines, Inc.*, Case No.

05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) [Docket No. 155]; *In re UAL Corporation, et

al.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. 2002); *In re US Airways Group, Inc., et al.*,

Case No. 02-83984 (SSM) (Bankr. E.D. Va. 2002).

70.     In addition, section 363(b)(1) of the Bankruptcy Code empowers the Court to

allow the debtor to use, sell, or lease, other than in the ordinary course of business, property of

the estate.  Debtors' decisions to use, sell or lease assets outside the ordinary course of business

must be based upon the sound business judgment of the debtor.  *See*, *In re Chateaugay Corp.*,

973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application

must find from the evidence presented before him a good business reason to grant such

application); *see also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722

F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr.

S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting

that the standard for determining a section 363(b) motion is good business reason ).

71.     The business judgment rule is satisfied where the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.

(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d

Cir. 1993) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  In fact, [w]here the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.

*Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-*

*Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts in this district have

consistently and appropriately been loath to interfere with corporate decisions absent a showing

of bad faith, self-interest, or gross negligence and will uphold a board s decisions as long as they

are attributable to any rational business purpose.  *In re Integrated Res. Inc.*, 147 B.R. at 656.

72.     The Debtors submit that the requested relief represents a sound exercise of the

Debtors' business judgment and is justified under section 363(b), as well as under section 105(a)

of the Bankruptcy Code.  The Debtors strongly believe that the uninterrupted supply of goods

and services, on customary trade terms, and the continuing support of their customers are

imperative to the ongoing operations and viability of the Debtors.  Authority to pay the Critical

Vendors and 503(b)(9) Claims in the ordinary course of the Debtors' business is in the best

interest of the Debtors' estates and creditors.  Absent such payment, the operations and value of

the Debtors' estates will suffer, possibly precipitously, and the requested relief is necessary to

avoid immediate and irreparable harm.  This irreparable harm to the Debtors and to the recovery

of all creditors will far outweigh the cost of payment.  Bankruptcy Rule 6003 provides that

[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court

shall not, within 21 days after the filing of the petition, grant . . . (b) a motion to use, sell, lease or

otherwise incur an obligation regarding property of the estate including a motion to pay all or

part of a claim that arose before the filing of the petition . . . .  If the Debtors are not permitted to

pay their Critical Vendors and 503(b)(9) Claims, it could well cause immediate and irreparable

harm to the Debtors' operations.  Accordingly, the relief requested herein is consistent with Bankruptcy Rule 6003.

**Request for Waiver of Stay**

73.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), an order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise.  As set forth above, the Debtors require immediate relief to continue ordinary business operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

**Necessity for Immediate Relief**

74.     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."  For all the reasons set forth herein, if the Debtors are not authorized to pay certain Critical Vendors, immediate and irreparable harm would almost surely be caused to the Debtors' estates.  Accordingly, the interim relief requested herein is consistent with Bankruptcy Rule 6003.

**Interim Order**

75.     The Debtors seek the relief requested in this Motion in the form of the interim order (the "Interim Order") attached hereto as Exhibit A.  Within three business days of the entry of the Interim Order, the Debtors will serve a copy of the Interim Order and this Motion on (a)

the Office of the United States Trustee, (b) those creditors holding the five (5) largest secured claims against the Debtors' estates, (c) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, (e) the Securities and Exchange Commission and (f) the Providers.

76.     The deadline to file an objection ("Objection") to the Motion shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of the Interim Order (the "Objection Deadline").  An Objection shall be considered timely only if, on or prior to the Objection Deadline, it is (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the attorneys for any official committee of unsecured creditors then appointed in these cases.

77.     Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing.

78.     If no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested herein, which order shall be submitted and may be entered with no hearing and no further notice or opportunity to be heard afforded to any party.  If an Objection is timely filed, a hearing will be held at a date and time to be established by the Court.

79.     The foregoing notice procedures satisfy Bankruptcy Rule 9014 by providing the

parties in interest with notice and an opportunity to object and be heard at a hearing.  *See*, *e.g.*, *In*

*re Drexel Burnham Lambert*, 160 B.R. 729, 734 (S.D.N.Y. 1993) (an opportunity to present

objections satisfies due process); *In re Colorado Mountain Cellars, Inc.*, 226 B.R. 244, 246 (D.

Colo. 1998) (a hearing is not required to satisfy Bankruptcy Rule 9014).  Furthermore, the

proposed notice procedures protect the due process rights of the parties in interest without

unnecessarily exposing the Debtors' estates to unwarranted administrative expenses.

## Reservation of Rights

80.     Nothing in this Motion should be construed as impairing the Debtors' rights to

contest the validity or amount of any claims asserted by any Critical Vendor or paid pursuant to

authority granted under this Motion, and the Debtors expressly reserve all of their rights with

respect thereto.

## Notice

81.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors

have served notice of this motion on (i) the Office of the United States Trustee for the Southern

District of New York, (ii) those creditors holding the largest thirty (30) unsecured claims against

the Debtors' estates (on a consolidated basis), (iii) those creditors or their agents holding the five

(5) largest secured claims against the Debtors' estates, (iv) the Internal Revenue Service, and

(v) the Securities and Exchange Commission.

82.     No previous request for the relief sought herein has been made by the Debtors to

this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: January 5, 2010
       New York, New York                PACHULSKI STANG ZIEHL & JONES LLP


                                          /s/ Maria A. Bove
                                          Richard M Pachulski (*pro hac vice* pending)
                                          Laura Davis Jones (*pro hac vice* pending)
                                          Debra I. Grassgreen (*pro hac vice* pending)
                                          Maria A. Bove
                                          John W. Lucas

                                          780 Third Avenue, 36th Floor
                                          New York, New York 10017
                                          Telephone: (212) 561-7700
                                          Facsimile: (212) 561-7777

                                          Proposed Attorneys for Debtors
                                          and Debtors in Possession

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:

      MESA AIR GROUP, INC., *et al*.,

               Debtors.[1]

Chapter 11

Case No. 10-_____ (  )

(Jointly Administered)

---

### INTERIM ORDER AUTHORIZING DEBTORS TO (I) PAY PREPETITION CLAIMS OF CRITICAL VENDORS AND CERTAIN ADMINISTRATIVE CLAIMHOLDERS AND (II) AUTHORIZE FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Upon the motion dated January 5, 2010 (the "Motion")[2] of Mesa Air Group, Inc. and its

affiliated debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections

105(a) and 363(b) of the Bankruptcy Code, for authority to pay in the ordinary course of

business prepetition claims of critical vendors, as more fully described in the Motion; and upon

consideration of the Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to

Local Bankruptcy Rule 1007-2; and the Court having jurisdiction to consider the Motion and the

relief requested therein pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases

to Bankruptcy Court Judges of the District Court for the Southern District of New York dated

July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the requested relief

being a core proceeding the Bankruptcy Court can determine pursuant to 28 U.S.C. § 157(b); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to (a) the Office of the United States Trustee

for the Southern District of New York; (b) those creditors holding the five largest secured claims

---

[1] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

against the Debtors' estates; (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis); (d) the Internal Revenue Service, and (e) the Securities and Exchange Commission, and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion and having held a hearing with appearances of parties in interest noted in the transcript hereof (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that immediate relief is necessary to avoid irreparable harm; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Motion is hereby granted and approved on an interim basis to the extent provided herein; provided that until the 22nd day after the Petition Date, the relief requested by the Debtors is granted only to the extent that it is necessary to avoid irreparable harm; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Lienor Critical Vendors; and it is further

ORDERED that, pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Non-Lienor Critical Vendors up to the Non-Lienor Critical Vendor Claims Cap, who agree to continue to supply goods or services to the Debtors on such vendors' Customary Trade Terms for a period following the date of the agreement and on other such terms and conditions as are acceptable to and requested by the

Debtors in their discretion.  As used herein, Customary Trade Terms means, with respect to a Non-Lienor Critical Vendor, (i) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Debtors and in effect between such vendor and the Debtors prior to the Petition Date or (ii) such other trade terms as agreed by the Debtors and such vendor; and it is further

ORDERED that after the date hereof, the Debtors shall determine, in the ordinary course of business, who is a Critical Vendor by considering, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies and (d) the extent to which suppliers may be able to obtain or have obtained trade liens on equipment, supplies or goods of the Debtors; and it is further

ORDERED that the Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor paid on account of vendor claims, (b) the amount paid to each Critical Vendor on account of its vendor claim and (c) the goods or services provided by such Critical Vendor. This matrix will be provided to the U.S. Trustee and the official committee of unsecured creditors (the "Committee"), provided, however, that the Committee and its professionals shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of the Committee, without prior written consent from the Debtors; and it is further

ORDERED that the Debtors shall, to the extent they deem required in their sole discretion, undertake all appropriate efforts to cause Non-Lienor Critical Vendors and holders of 503(b)(9) Claims to enter into an agreement (the "<u>Vendor Agreement</u>") including provisions substantially in the form attached to the Motion as <u>Exhibit B</u>; and it is further

ORDERED that, pursuant to section 503(b)(9) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the 503(b)(9) Claims held by Critical Vendors, <u>provided</u> <u>that</u> any payment of 503(b)(9) Claims shall be conditioned upon the claimant's agreement to Customary Trade Terms and execution of the Vendor Agreement, and any other terms and conditions as the Debtors deem appropriate.  Payments of 503(b)(9) Claims shall not count against the Non-Lienor Vendor Claims Cap.  For the avoidance of doubt, the Debtors shall not pay any 503(b)(9) Claims asserted by claimants that are not Critical Vendors.

ORDERED that the Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so.  However, the Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' operations; and it is further

ORDERED that if the Debtors, in their discretion, determine that a Non-Lienor Critical Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such vendor, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Non-Lienor Critical Vendor as contained in this interim order (the "<u>Interim Order</u>"), provided, however, that the

Vendor Agreement may be reinstated if (x) such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the vendor; (y) the underlying default under the Vendor Agreement is fully cured by the vendor not later than five business days after the date the initial default occurred; or (z) the Debtors, in their discretion, reach a subsequent agreement with the vendor; and it is further

ORDERED that if a Vendor Agreement is terminated as set forth above, or if a Non-Lienor Critical Vendor that has received payment of a prepetition claim later refuses to continue to supply goods or services for the applicable period in compliance with the Vendor Agreement or this Interim Order, then (a) the Debtors may, in their discretion, declare that the payment of the such vendor's claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such vendor, (b) the creditor shall immediately return such payments in respect of its claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever and (c) the creditor's claim shall be reinstated in such an amount so as to restore the Debtors and the Non-Lienor Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of the claim had been made; and it is further

ORDERED that all Vendor Agreements shall be deemed to have terminated, together with the other benefits to Critical Vendors as contained in this Interim Order, upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; and it is further

ORDERED that each of the banks and financial institutions at which the Debtors maintain their accounts relating to the payment of the claims that the Debtors request authority to pay in the Motion are authorized to receive, process, honor and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts, and are authorized to rely on the Debtors' designation of any particular check as approved by this Interim Order; and it is further

ORDERED that nothing contained herein shall be deemed as an impairment of the Debtors' rights to contest the validity or amount of any claims asserted by any Critical Vendor or paid pursuant to authority granted under this Interim Order, and the Debtors' rights in connection therewith are hereby preserved; and it is further

ORDERED that nothing contained in this Interim Order shall be deemed to constitute an assumption of any executory contract or to require the Debtors to make any of the payments or to post any of the deposits authorized herein; and it is further

ORDERED that notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that within three business days of the entry of this Interim Order, the Debtors shall serve a copy of the Interim Order and the Motion on (a) the Office of the United States Trustee for the Southern District of New York, (b) those creditors holding the five largest secured claims against the Debtors' estates, (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, (e) the Securities and Exchange Commission and (f) the Providers; and it is further

ORDERED that any objection (the "Objection") to the relief requested in the Motion on a permanent basis must, by 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of this Interim Order (the "Objection Deadline"), be: (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and John W. Lucas and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the attorneys for any official committee of unsecured creditors then appointed in these cases; and it is further

ORDERED that a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing; and it is further

ORDERED that if timely Objections are received there shall be a hearing to consider such timely Objections to the Motion; and it is further

ORDERED that if no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Interim Order, which Order shall be submitted and may be entered with no further notice or opportunity to be heard afforded any party, and the Motion shall be approved nunc pro tunc to the date of the commencement of these chapter 11 cases; and it is further

ORDERED that this Court shall retain jurisdiction with respect to any matters, claims,

rights or disputes arising from or related to the implementation of this Interim Order.

Dated: [ENTER DATE]
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

Mesa Air Group, Inc.

_____, 2010

TO:     [Critical Vendors]
[Name]
[Address]

Dear Valued Supplier:

As you are aware, Mesa Air Group, Inc. and certain of its subsidiaries (collectively, the "Company") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Case" and the "Bankruptcy Court," respectively) on _____, 2010 (the "Petition Date").  On the Petition Date, the Company requested the Bankruptcy Court's authority to pay the pre-bankruptcy claims of certain suppliers in recognition of the importance of the Company s relationship with such suppliers and its desire that the Bankruptcy Cases have as little effect on the Company s ongoing business operations as possible.  On [ ], the Bankruptcy Court entered an order (the "Order") authorizing the Company, under certain conditions, to pay the prepetition claims of certain trade creditors that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.

In order to receive payment on account of prepetition claims, you must agree to continue to supply goods and services to the Company based on Customary Trade Terms.  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Company and in effect between you and the Company prior to the Petition Date, or such other trade terms as you and the Company agree.

For purposes of administration of this trade program as authorized by the Bankruptcy Court, you and the Company both agree that:

1.      The estimated balance of the prepetition claim (net of any setoffs, credits or discounts) (the Vendor Claim ) that you will receive from the Company is $_____.

2.      You agree to waive any general unsecured claim against the Company.

3.      You will provide an open trade balance or credit line to the Company for shipment of postpetition goods in the amount of $ _____ (which shall not be less than the greater of the open trade balance outstanding: (a) on _____, or (b) on normal and customary terms on a historical basis before and up to the Petition Date).

4.      The terms of such open trade balance or credit line are as follows (if more space is required, attach continuation pages):

5.      During the pendency of the Bankruptcy Case you will continue to extend to the Company all Customary Trade Terms (as defined in the Order).

6.      You will not demand a lump sum payment upon consummation of a plan of reorganization in these chapter 11 cases on account of any administrative expense priority claim that you assert, but instead agree that such claims will be paid in the ordinary course of business after consummation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

7.      The undersigned, a duly authorized representative of [Critical Vendor], has reviewed the terms and provisions of the Order and agrees that [Critical Vendor] is bound by such terms;

8.      You will not separately seek payment for reclamation and similar claims outside of the terms of the Order unless your participation in the Critical Vendor payment program authorized by the Order (the Critical Vendor Payment Program ) is terminated;

9.      You agree not to file or otherwise assert against the Company, the estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to you by the Company arising from agreements entered into prior to the Petition Date.  Furthermore, you agree to take (at your own expense) all necessary steps to remove any such lien as soon as possible; and

10.      If either the Critical Vendor Payment Program or your participation therein terminates as provided in the Order, or you later refuse to continue to supply goods to the Company on Customary Trade Terms during the pendency of the Bankruptcy Case, any payments you receive on account of your Vendor Claim will be deemed voidable postpetition transfers pursuant to section 549(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  You will immediately repay to the Company any payments made to you on account of your Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever.  Your Vendor Claim shall be reinstated in such an amount so as to restore the Company and you to the same positions as would have existed if payment of the Vendor Claim had not been made.

11.     Any dispute with respect to this letter agreement, the Order and/or your participation in the Critical Vendor Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call.

Sincerely,



Mesa Air Group, Inc.
By:
[Name] [Title]

Agreed and Accepted by: [Critical Vendor]

By: Its:

Dated: _____