PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile:  212-561-7777
Richard M. Pachulski (*pro hac vice* pending)
Laura Davis Jones (*pro hac vice* pending)
Debra I. Grassgreen (*pro hac vice* pending)
Maria A. Bove
John W. Lucas

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-_____ (   ) |
| Debtors.[1] | (Jointly Administered) |

**MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER PURSUANT TO
SECTIONS 105(a), 363(b), and 503(b) OF THE BANKRUPTCY CODE
AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO (I) PAY
CERTAIN PREPETITION WAGES, COMPENSATION AND EMPLOYEE
BENEFITS; (II) CONTINUE PAYMENT OF WAGES, COMPENSATION AND
EMPLOYEE BENEFITS IN THE ORDINARY COURSE OF BUSINESS;
(III) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER
FINANCIAL INSTITUTIONS TO PROCESS AND PAY ALL CHECKS PRESENTED
FOR PAYMENT AND TO HONOR ALL FUNDS TRANSFER REQUESTS MADE
BY DEBTORS RELATING TO THE FOREGOING; AND (IV) SCHEDULE
FINAL HEARING FOR THE FOREGOING RELIEF SOUGHT HEREIN**

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

1

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), hereby file this motion (the "Motion") and respectively represent as follows:

**Background**

1.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors have requested authorization to consolidate their chapter 11 cases for procedural purposes only so that they may be jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Mesa's Business**

3.      Mesa is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service. As of the Petition Date, the Debtors' airline operations serve approximately 127 cities in 41 states, the District of Columbia, Canada, and Mexico.  The Debtors operate a fleet of approximately 130 aircraft with approximately 700 daily system departures.  The Debtors employ approximately 3,400 full and part-time employees.

4.      Mesa Airlines, Inc. ("Mesa Airlines") operates regional jet and turboprop aircraft under the names of regional carriers of certain major airlines pursuant to code-share agreements.  Specifically, Mesa Airlines operates as (i) US Airways Express under code-share

2

agreements with US Airways, Inc., (ii) as United Express under a code-share agreement with United Airlines, Inc., and (iii) independently in Hawaii as *go!* Mokulele ("*go!*").  Freedom Airlines, Inc. operates regional jet aircraft as Delta Connection under code-share agreements with Delta Air Lines, Inc.  The remaining Debtors operate businesses, or own interests in businesses, that facilitate or enhance the Debtors' regional or independent air carrier services. Nilchi, Inc. and Patar, Inc. hold investments.

5.    As of September 30, 2009, the Debtors had consolidated assets  of approximately $975 million, and consolidated liabilities of approximately $869 million.  The Debtors' consolidated 2009 revenues were approximately $968 million.  Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009 were derived from operations associated with code-share agreements.  The Debtors' remaining passenger revenues are generated from their independent *go!* operations in Hawaii.

6.    A detailed description of the Debtors' businesses, capital structure, and the circumstances that precipitated the commencement of these chapter 11 cases is set forth in the Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2 (the "*Lotz Declaration*"), filed contemporaneously herewith.

## Jurisdiction

7.    This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.    By this motion ("Motion"), the Debtors request entry of an interim and final order in the form annexed hereto ("Order"), pursuant to sections 105(a), 363, and 503(b) of

3

the Bankruptcy Code (i) authorizing, but not directing, the Debtors to pay certain prepetition

wages, compensation and employee benefits; (ii) authorizing, but not directing, the Debtors to

continue payment of wages, compensation and employee benefit programs in the ordinary course

of business and to pay other costs and expenses relating to the foregoing as described more fully

below; (iii) authorizing and directing applicable banks and other financial institutions (the

"Banks") set forth on Exhibit A to process and pay all checks presented for payment and to

honor all funds transfer requests made by the Debtors relating to the foregoing, and (iv) schedule

a final hearing on the Motion (the "Final Hearing").

### The Debtors' Employee Compensation Obligations

9.       As noted above, the Debtors currently employ approximately 3,400 full

and part-time employees (the "Employees") and approximately 2,000 of such Employees are

covered by collective bargaining agreements ("CBAs")[2] with certain Debtors.  Specifically,

Mesa Airlines, Inc. employs approximately 2,600 employees, Freedom Airlines, Inc. employs

approximately 415 Employees, Regional Aircraft Services, Inc. employs approximately 285

Employees, and MPD, Inc., employs approximately 11 Employees.  Except as described herein

with respect to paid time off and sick time, union Employees are entitled to the same benefit as

non-union Employees.

10.       In the ordinary course of their businesses, the Debtors incur payroll and

various other obligations, including benefit obligations, to the Employees for the performance of

---

[2] Mesa Airlines, Inc. and Freedom Airlines, Inc. are parties with Air Line Pilots Association, International to that certain *Agreement between Mesa Airlines, Inc., Freedom Airlines, Inc., and The Air Line Pilots in the Service of Mesa Airlines, Inc., Freedom Airlines, Inc., as represented by the Air Line Pilots Association, International* and Mesa Airlines, Inc is a party with Association of Flight Attendants, AFL-CIO to that certain *Agreement between Mesa Airlines, Inc. and the Flight Attendants in the service of Mesa Airlines, Inc. as Represented by the Association of Flight Attendants, AFL-CIO.*

4

their services.  In this regard, the Debtors have costs and obligations in respect of the Employees

relating to the period prior to the Petition Date.  In certain instances, these costs and obligations

are outstanding and due and payable, and in other instances, these costs and obligations will

become due and payable in the ordinary course of the Debtors' businesses on and after the

Petition Date.

   11. The Debtors propose to pay or honor, as the case may be, in their sole

discretion and in accordance with prepetition customs and procedures, certain prepetition claims

for, among other items, wages, salaries, incentives, vacation and other paid leave, and other

forms of compensation and the applicable federal and state withholding taxes, payroll taxes with

respect to the foregoing and the payments relating to certain Employee benefit plans and other

Employee benefits that the Debtors pay in the ordinary course of business, and continue to pay

such obligations as they arise in the ordinary course of the Debtors' business (collectively, the

"Employee Compensation Obligations"), each of which are described in more detail below.

**A.**  **Payroll Obligations**

   12. In the ordinary course of business, the Debtors pay Employees in arrears

on either a semi-monthly or bi-weekly basis.  The Debtors' flight crew Employees are paid semi-

monthly on account of wages earned during the previous half-monthly pay period (the "Semi-

Monthly Pay Period").  Thus, payments made on the first day of each month cover wages earned

during from the 1st through the 15th of the previous month.  All other Employees are paid bi-

weekly (the "Bi-Weekly Pay Period" and together with the Semi-Monthly Pay Period, the "Pay

Periods").  Employees paid bi-weekly are paid in arrears and are still owed one week's wages

upon payment of their wages on each Bi-Weekly Pay Period.

13.     As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition payroll is approximately $6.5 million (the "Payroll Obligations"). These Payroll Obligations consist of (i) $4.5 million in accrued and unpaid wages that are due and payable on the Semi-Monthly Pay Period on January 15, 2010, (ii) $800,000 in accrued and unpaid wages that will not become due and payable until the Semi-Monthly Pay Period on January 30, 2010, and (iii) $1.2 million in accrued and unpaid wage obligations that are due and payable on the Bi-Weekly Pay Period on January 15, 2010. The Payroll Obligations with respect to each Employee do not exceed the $10,950 cap as provided under section 507(a)(4) of the Bankruptcy Code. The Debtors seek authorization to pay their prepetition Payroll Obligations and to pay postpetition Payroll obligations in the ordinary course as they become due.

14.     The Debtors are required by law to withhold certain taxes from the Payroll Obligations, which includes certain federal, state, and local income taxes, and social security and Medicare taxes (the "Trust Fund Taxes") and remit the same to the appropriate taxing authorities (the "Taxing Authorities"). The obligations relating to the Trust Fund Taxes withheld from the Payroll Obligations are remitted to the Taxing Authorities at the time the Compensation Obligations are satisfied. On the date hereof, the Debtors estimate that the Trust Fund Taxes outstanding that relate to the period prior to the Petition Date are approximately $2.68 million, which is due and payable on or about January 15, 2010 in connection with the next Pay Period.[3] The Trust Fund Taxes do not constitute property of the Debtors' estate and must be remitted to the applicable parties to whom they belong. Out of an abundance of caution, and solely to the extent required, The Debtors request authority to remit the Trust Fund Taxes to the applicable

---

[3] The Debtors are attempting to determine whether there are additional Trust Fund Taxes outstanding relating to periods prior to the Petition Date. The Debtors seek permission to pay any undisputed amounts that they subsequently determine may be due and owing.

6

authorities and to continue to remit Trust Fund Taxes postpetition in the ordinary course of business.

**B.      Payroll Administration**

15.      The Debtors employ Automatic Data Processing, Inc. ("ADP") as their payroll administrator to process the Payroll Obligations and coordinate the payment of the Trust Fund Taxes (the "Payroll Administration Obligations").  For each Pay Period, ADP calculates the Payroll Obligations and the Trust Fund Taxes based upon information provided by the Debtors.  ADP's compensation is approximately $15,000 per month for these services and paid a month in arrears.  As of the Petition Date, the accrued and unpaid prepetition Payroll Administration Obligations aggregate approximately $15,000.  The Debtors seek authority  to pay prepetition Payroll Administrative Obligations and to continue to pay such obligations in the course of business as they come due after the Petition Date.

**C.      Paid Time Off**

16.      Full time Employees are eligible to receive vacation time,[4] as described below.

17.      Vacation Time For Union Employees.  Accrued vacation time varies between union and non-union Employees.  Full-time union Employees are eligible for paid vacation only after completion of their first full year of service.  Eligible union Employees earn vacation on an annual basis and receive their accrued vacation once per year on their anniversary.  Union Employees earn additional vacation time as their seniority increases and may, in very certain limited circumstances, carry over certain earned vacation time from one year to the next.

---

[4] Part-time Employees do not receive vacation time.

7

18.    <u>Vacation Time for Non-Union Employees</u>.  After completion of the first full-time year of service, full-time non-union Employees receive 40 hours of accrued vacation, and thereafter accrue a specified number of vacation hours for each month of active service, dependent upon the non-union Employee's years of service.  Full-time non-union Employees may generally carry over a maximum of 280 hours of unused vacation days from one year to the next.

19.    By this Motion, the Debtors proposed to permit Employees to use vacation time that was earned (the "<u>Vacation Obligations</u>") prior to the Petition Date in the ordinary course of business.  The Debtors also request authority to pay out unused and accrued vacation owed to Employees solely upon separation from the Debtors, provided that the amount of any such payment will not exceed the statutory cap under section 507(a)(4) of the Bankruptcy Code with respect unpaid wages and vacation time earned within 180 days prior to the Petition Date.

20.    <u>Holiday Time.</u>  In addition to vacation time, full-time non-union Employees are eligible to earn up to (5) holidays per year upon their completion of ninety (90) full days of employment, (the "<u>Holiday Obligations</u>").  Eligible Employees accrue 1.5 hours per Pay Period toward the five holidays.  The Debtors seek authority to allow eligible non-union Employees to use holiday days earned prior to the Petition Date in the ordinary course of business.  In the event that a non-union Employee is involuntary terminated without cause, the Debtors propose to pay out any unused Holidays Obligations provided that such payment will not exceed the cap under section 507(a)(4) of the Bankruptcy Code and was earned within the 180 days prior to the Petition Date.

21.    <u>Sick Time.</u>  Under the applicable CBA, unionized Employees are entitled to certain sick leave benefits ("<u>Sick Leave Obligations</u>" and together with Vacation Obligations

and Holiday Obligations, the "PTO Obligations").  The Debtors proposed to allow union

Employees to use sick days that were earned prior to the Petition Date but not to cash out the

corresponding benefit upon the conclusion of their employment with the Debtors.[5]

22.    The Debtors further reserve the right to limit the amount paid to

Employees under PTO Obligations.  The Debtors also request that, in the event an Employee

uses, (or is paid cash on account of PTO Obligations from and after the Petition Date with

respect to Vacation Obligations), such vacation days, sick-days, and holidays, as applicable, will

first be applied against vacation days, sick-days, and holidays accruing postpetition and

thereafter to vacation days, sick-days, and holidays accruing prepetition.

## D.    Severance Obligations

23.    Prepetition, the Debtors did not have any formal severance program or

policy.  Postpetition, the Debtors intend to pay, in their sole discretion and on a case-by-case

basis, severance to employees that were involuntarily terminated without cause.  The Debtors

believe that it is critical for them to maintain a ready work force.  If, however, Employees

voluntarily leave without providing at least two weeks' notice, the Debtors' business operations

could be harmed.  To avoid this result and encourage Employees to provide the Debtors with

sufficient notice upon their voluntary departure, the Debtors propose to provide, on a case-by-

case basis, severance equal to two-weeks' wages or salary to those Employees that are not

insiders that are involuntary terminated without cause (the "Severance Obligations").  The

Debtors believe that payment of Severance Obligations is warranted and does not implicate the

limitations set forth under section 503(c) of the Bankruptcy Code because the potential

---

[5] Union Employees are not provided sick time.

beneficiaries of the proposed discretionary payments are the Debtors' general rank and file

Employees, not insiders.

E.    **Incentive Plan**

24.    In the ordinary course of business, certain of the Debtors maintain

incentive plans for a variety of Employees that the Debtors employ in different capacities

(collectively, the "Incentive Plan").  The Debtors' Incentive Plan relate to Employees that are

involved with or related to (i) system operation control, (ii) warehouse and inventory,

(iii) maintenance of facilities and aircraft, (iv) the commission for the sale of items on the

Debtors' Hawaiian flights on *go!*, (v) ground handling services at certain facilities, and (vi)

general business performance.  The Debtors' compensation structure involves a lower base

salary combined with additional compensation, in the form of incentives.  The Incentive Plan is

an important component of employee compensation and provide substantial value to the Debtors'

estates because the plan encourages Employees to achieve important financial performance and

quality goals.  Generally, the claims paid pursuant to the Incentive Plan are paid on a quarterly

basis if the company was profitable during the applicable quarter.

25.    As noted above, amounts payable to Employees under the Incentive Plan,

if any, would be based upon the Debtors' profitability.  As of the Petition Date, the Debtors'

profitability has not been determined.  The Debtors, however, estimate that as of the Petition

Date, the accrued and unpaid Incentive Plan claims may aggregate approximately $400,000 (the

"Incentive Plan Obligations").  Except for potentially six (6) Employees, the Debtors believe that

the Incentive Plan Obligations as they relate to each Employee do not exceed the $10,950 cap as

provided under section 507(a)(4) of the Bankruptcy Code inclusive of the other obligations

10

subject to this Motion.[6]  The Debtors submit that payments under the Incentive Plan are amounts

that are consistent with historic practices and in the ordinary course of their businesses.  The

Debtors seek the authority, to continue the Incentive Plan in accordance with their prepetition

practices and pay the prepetition amounts for the last quarter of 2009.  The Debtors <u>do not</u> seek

authority to pay any Incentive Plan Obligations at the interim hearing on this Motion, but will

request that the Court authorize, but not direct, the Debtors to make any such payments that may

become due under the Incentive Plan at the final hearing on this Motion.

**F.    <u>Executive Bonuses</u>**

26.    In addition to the Incentive Plan Obligations disclosed above, two

employees are entitled to certain payments pursuant to their respective employment contracts

with the Debtors (the "<u>Executive Bonuses</u>").  The Executive Bonuses are determined in

accordance with formulas set forth in the applicable Employee's employment contract.

27.    Under their employment contract, Messrs. Ornstein (the Debtors' Chief

Executive Officer) and Lotz (the Debtors' President) are paid Executive Bonuses subject to and

conditioned upon whether the Debtors achieve a positive change in the Debtors' earnings per

share, which is defined as  gross profit before taxes and one-time non-recurring items divided by

basic outstanding shares compared with the same time  period to the prior year ("<u>Earnings Per

Share)</u>"

28.    Mr. Ornstein is entitled to a quarterly bonus payment if the Debtors record

a positive change in Earnings Per Share compared to the same quarter for the prior year.  The

paid quarterly bonus would be $13,125, $26,250, $52,500, or $105,000 if there is a positive

---

[6] The Debtors believe that six (6) Employees may be entitled to payments under the Incentive Plan in excess of the $10,950 amount provided under section 507(a)(4) of the Bankruptcy Code (the "<u>Excess Amounts</u>").  The Debtors estimate that the Excess Amounts will not exceed $100,000.

change in Earnings Per Share of 0 to 4.99%, 5%, 10%, or 15%, respectively.  At the end of the

year, the Debtors compare the annual Earnings Per Share amounts with preceding year.  If there

is a positive change from Earnings Per Share 0 to 4.99%, 5%, 10%, or 15%, respectively for the

current year compared to the prior year, Mr. Ornstein's bonus would be in the amounts of

$52,500, $105,000, $210,000, or $420,000, respectively, minus any quarterly payments

previously paid to him.  Thus, the aggregate bonus amounts that Mr. Ornstein is eligible to earn

for a given year cannot exceed $420,000 under this program.

29.    Mr. Lotz is entitled to a quarterly bonus payment if the Debtors record a

positive change in Earnings Per Share compared to the same quarter for the prior year.  The paid

quarterly bonus would be $10,000, $20,000, $40,000, or $80,000 if there is a positive change in

Earnings Per Share of 0 to 4.99%, 5%, 10%, or 15%, respectively.  At the end of the year, the

Debtors compare the annual Earnings Per Share amounts with preceding year.  If there is a

positive change from Earnings Per Share 0 to 4.99%, 5%, 10%, or 15%, respectively for the

current year compared to the prior year, Mr. Lotz's bonus would be in the amounts of $40,000,

$80,000, $160,000, or $320,000, respectively, minus any quarterly payments previously paid to

him.  Thus, the aggregate bonus amounts that Mr. Lotz is eligible to earn for a given year cannot

exceed $320,000 under this program.

30.    The Debtors estimate that the prepetition claims arising from Executive

Bonuses relating to the two individuals described above and the five other executives may

aggregate approximately $185,000 and relate to the three month period ending December 31,

2009.

31.    The Executive Bonuses are generally paid no later than 45 days after the

end of each fiscal quarter.  The Earnings Per Share are based upon the Debtors' financial

12

statements in their Form 10-Q or Form 10-K, as the case may be.  The Debtors believe that the

Executive Bonuses do not implicate the limitations set forth under section 503(c) of the

Bankruptcy Code because they are not paid for the purpose of inducing these individuals to

remain with the Debtors.  Rather, the Executive Bonuses are determined by objective criteria, not

subject to the discretion of the of Mesa, and not paid unless the performance metrics are

satisfied.  If the performance metrics are not satisfied, the Executive Bonuses will not be paid.

       32.     As with the Incentive Plan Obligations, the Debtors <u>do not</u> seek authority

to pay the Executive Bonuses at the interim hearing on the Motion.  Rather, the Debtors seek a

hearing to pay any Executive Bonuses on notice, after final approval of this Motion, and as such

bonuses become due and in accordance with practices that were in place prior to the Petition

Date.

**G.**      **Deferred Compensation**

       33.     The Debtors make certain deferred compensation payments into trust

accounts established for Messrs. Ornstein, Lotz, and two other Employees (the "<u>Deferred</u>

<u>Compensation Program</u>").  For Messrs Ornstein and Lotz, their contributions under the Deferred

Compensation Program were made monthly in the amount of their respective annual salaries and

were through December 2009.  In the case of the other two Employees, the Debtors made a one-

time contribution in March 2009 in the amount of $50,000 each to their respective trust accounts.

       34.     The contributions made prior to the Petition Date are subject to the valid

prepetition claims of general creditors of the Debtors.  As such, the Debtors will not permit any

distributions to be made from the trust accounts unless such distributions are made under a plan

of reorganization approved by this Court or by order of the Court.

35.    The Debtors do not seek authority to make any contributions to the current Deferred Compensation Program for these individuals.  However, postpetition, the Debtors, in the ordinary course of business and in their discretion, intend to establish a new deferred compensation plan such that any contributions that are made after the Petition Date will be accounted for separately from the prepetition contributions and only subject to the valid postpetition claims of general creditors of the Debtors.  As is true with the current Deferred Compensation Program, the Debtors will not permit any distributions to be made unless such distributions are made under a plan of reorganization approved by this Court or by order of the Court.

### Employee Health and Welfare Benefits

36.    The Debtors have established and sponsor various health and welfare plans and policies for their full time Employees, including, without limitation, (i) medical, dental, and other health plans, (ii) flexible spending programs for medical care, (iii) life, accidental death and dismemberment ("AD&D"), and disability insurance, and (iv) retirement savings benefits (collectively, the "Health and Welfare Benefit Plans").[7]

37.    The Debtors estimate that their annual expenditures under the Health and Welfare Benefit Plans, in aggregate, are approximately $15 million.  The Debtors are self-insured and the Employees reimburse the Debtors via premium payments, in aggregate, approximately $7.5 million, resulting in a net annual expenditure by the Debtors of

---

[7] The Debtors' worker compensation insurance obligations are addressed in a motion filed contemporaneously herewith and titled as *Motion Pursuant to Sections 105(A), 362(D), 363(B), And 503(B) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 For Interim Authorization to (I) Continue Their Workers' Compensation Programs and Their Liability, Product, Property, and Other Insurance Programs, (II) Pay, in Their Discretion, All Prepetition Obligations Relating to Their Workers' Compensation Programs and Their Liability, Product, Property, and Other Insurance Programs, (III) Modify the Automatic Stay for the Sole Purpose of Permitting Employees to Proceed with Workers' Compensation Claims, (IV) Permit Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, and (V) Scheduling A Final Hearing on the Relief Requested Herein.*

approximately $7.5 million (the "<u>Health and Welfare Obligations</u>" and together with the

Employee Compensation Obligations, the "<u>Employee Obligations</u>").

38.    As of the Petition Date, the Debtors believe that the accrued and unpaid

prepetition Health and Welfare Obligations aggregate approximately $3.2 million for the period

ending December 31, 2009.  The Health and Welfare Obligations are described below.  The

Debtors seek to pay accrued and unpaid prepetition Health and Welfare Obligations and to

continue make such payments in accordance with their prepetition practices as they accrue and

come due after the Petition Date.

**A.    <u>Medical Benefits</u>**

39.    The Debtors provide primary health care coverage for their Employees

that work thirty-five (35) or more hours per week (the "<u>Full-time Employees</u>").  Full-time

Employees are eligible for health care coverage after ninety (90) full days of employment.

40.    The Debtors offer medical, dental, and vision benefits to their Employees

under a group plan (the "<u>Group Medical Plan</u>") administered by Coventry Health Care

("<u>Coventry</u>").  With respect to medical benefits, the Debtors pay approximately 49% of the

premiums, while the remainder is paid by the Employees.  With respect to dental benefits, the

Debtors pay approximately 5% of the premiums, while the remainder is paid by the Employees.

With respect to the vision benefits, all eligible Employees are responsible for the full cost of such

coverage.

41.    The Group Medical Plan has three (3) available tiers that Full-time

Employees may select and each tier has its own policy limit:  basic ($25,000 annual limit /

$100,000 lifetime limit); standard ($100,000 annual limit / $1,000,000 lifetime limit); premium

($250,000 annual limit / $2,000,000 lifetime limit).  Full-time Employees hired after February 1,

2006 may only enroll in the basic Group Medical Plan.  Full-time Employees hired before

February 1, 2006 may enroll in any of the available Group Medical Plan tiers.

42.    The Group Medical Plan is self-insured by the Debtors, except for the

vision benefits that are provided by Vision Service Plan Insurance Company.  The Debtors make

payments to the third-party administrator of the Group Medical Plan to cover claim

reimbursements ("Medical Obligations").

43.    The Debtors' Group Medical Plan claims administrator, Coventry, is

reimbursed on a weekly basis or Medical Obligations that it pays.  The actual amount of Medical

Obligations varies based upon the specific month and is dependent upon the claims

reconciliation cycle.  Based upon a recent three month analysis for the period ending September

30, 2009, the Medical Obligations can range from approximately $875,000 to $1.4 million per

month.  As noted above, the actual amount paid for the Medical Obligations varies based upon

the specific month.  Based upon the historical averages, the Debtors estimate that as of the

Petition Date, the accrued and unpaid Medical Obligations is approximately $2.4 million, which

does not include Coventry's administration fee that is paid a month in arrears and discussed

below.  The Debtors estimate that approximately $135,000 of the Medical Obligations will be

due and payable on January 5, 2010.  On January 12, 19, and 26, 2010, the Debtors estimate that

they may owe payments on account of Medical Obligations in the range of $135,000 to 343,000.

The Debtors seek authority to pay the prepetition Medical Obligations and authorization to

continue to pay such obligations in the course of business postpetition.

**B.    Medical Administration Fee**

44.    In addition to the foregoing, the Debtors also pay a monthly plan

administration fee to Coventry that varies between $88,000 and $100,000 (the "Medical

16

Administration Fee"). Coventry's administration fee is $2.30 per pay period per participant and is paid by the participating Employee. As of the Petition Date, the accrued and unpaid Medical Administration Fee is approximately $13,000, which will be due on or about January 11, 2010. The Debtors seek authority to pay the prepetition Medical Administration Fee and to continue to pay such obligations in the course of business as they come due after the Petition Date.

**C.**    **Flexible Spending Programs**

45.    The Debtors maintain flexible spending programs through Discovery Benefits ("Discovery") that allow participating Full-time Employees to contribute up to $5,000 per year of contribution, through payroll deductions, for eligible out-of-pocket medical expenses for participating Employees or their family members (the "Flexible Spending Program"). If the Employee does not use the contribution prior to February 15, 2010, the Employee loses the balance.

46.    Based upon a recent three month analysis for the period ending September 30, 2009, the approximate aggregate monthly contribution amount under the Flexible Spending Program is $22,256. As of the Petition Date, the Debtors are holding approximately $21,000 (the "Flexible Spending Obligations") in contributions by 126 Full-time Employees during the period of January 1, 2009 through December 31, 2009. The funds related to the Flexible Spending Obligations belong to the Debtors' Employees and do not constitute estate property. Out of an abundance of caution, the Debtors are seeking authorization to remit these amounts to Employees in accordance with the Flexible Spending Program in the ordinary course of business.

**D.**    **Life, Accidental Death and Dismemberment, and Disability Insurance**

47.    Accidental Death & Dismemberment. The Debtors provide an accidental death and dismemberment insurance plan and a life insurance plan to all of their Employees

17

(collectively, the "AD&D Plan").  The AD&D Plan has a $10,000 cap, regardless of an Employee's position.  The AD&D Plan premiums are based upon the number of Employees and fluctuate monthly.  The Debtors pay their AD&D Plan premiums monthly in arrears for the previous month.  On a historical basis, the Debtors estimate that their AD&D Plan premiums are approximately $6,300 per month (the "AD&D Plan Obligation").  As of the Petition Date, the accrued and unpaid AD&D Plan Obligation is approximately $15,000.  The Debtors seek authority to pay the AD&D Olan Obligation and to continue to pay such obligations in the course of business as they come due after the Petition Date.

48.    Life Insurance.  The Debtors administer certain voluntary programs for life insurance and accidental and death insurance with respect to which their Employees may opt in and the corresponding premium is deducted from their paycheck.  Certain of the Debtors' Employees have elected this coverage for themselves or for their dependents (the "Life Insurance Obligations").  The approximately 590 participating Employees fund these voluntary programs and the Debtors have no obligations under these voluntary programs.

49.    Long Term Disability.  The Debtors also maintain long-term disability insurance for Employees (the "Long-Term Disability Insurance").  Full-time Employees are eligible for the employer-paid Long-Term Disability Insurance, which insures 40% of the Employee's earnings, to the program maximum of $1,500 per month.  The actual amount paid by the Debtors for the Long-Term Disability Insurance varies per month based upon the number of Employees.  Based upon a recent three month analysis, the amounts for long-term premiums total approximately $11,000 per month (the "Long-Term Disability Obligation").  As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition Long-Term Disability Obligation is approximately $10,881.  The Debtors seek authority to pay the prepetition Long

18

Term Disability Obligations and to continue to pay such obligations in the course of business as they come due after the Petition Date.

50.    <u>Short Term Disability</u>.  With respect to the Debtors' short-term disability plan (the "<u>Short-Term Disability Insurance</u>"), Employees may elect to participate in the Short-Term Disability Insurance plan and the corresponding premium is deducted from their paycheck. Employee contributions for the Short-Term Disability Insurance plans are withheld by the Debtors from payroll checks and are then paid monthly in arrears to the applicable insurance carrier (the "<u>Short-Term Disability Obligations</u>").  The Short-Term Disability Obligations are funded by the participating Employees and the Debtors do not incur any Short-Term Disability Obligations.

51.    <u>Separate Disability and Life Insurance for Executives.</u>  The Debtors provide a long-term disability and life insurance policy for their Chief Executive Officer and President and also provide a separate long term disability program for certain senior executives (collectively, the "<u>Executive LTD Plans</u>").  The Executive LTD Plans are provided by Unum Life Insurance Company of America, Reassure America Life Insurance Company, and Benefit Life Insurance Company.

52.    The Executive LTD Plans are fully funded by the Debtors at no cost to the participant and is estimated to be approximately $1,000 per month (except for the disability and life insurance policies that relate specifically to the Debtors' Chief Executive Officer and President, which range between $1,900 and $6,500 per month, per policy).  As of the Petition Date, there are no accrued and unpaid prepetition claims relating to the Executive LTD Plans other than the $600 portion of a premium that relates to the thirty-five (35) days prior to the Petition Date of a disability and life insurance policy that will become due in December of 2010

19

(the "<u>Executive LTD Plan Obligations</u>").  The Debtors seek authority to pay prepetition

Executive LTD Plan Obligations and to continue to pay such obligations in the ordinary course

of business as they come due after the Petition Date.

## E.      <u>Retirement Savings</u>

53.      The Debtors maintain a retirement savings plan (the "<u>401(k) Plan</u>") that is

a qualified defined contribution plan pursuant to section 401 of the Internal Revenue Code of

title 26 of the United States Code.  Full-time Employees can elect to make before-tax and after-

tax contributions to the 401(k) Plan through payroll deductions.  The Debtors make matching

contributions to the 401(k) Plan of 30% of Employee contributions, up to 10% each of

Employees' eligible gross salary.  On a historical basis, the Debtors estimate that they pay

approximately $78,000 per month in connection with 401(k) matching funds.[8]  The Debtors

deposit 401(k) Plan contributions (the "<u>401(k) Obligations</u>") into the 401(k) Plan no more than

three (3) business days after the Payroll Obligations are satisfied.  As of the Petition Date, the

accrued and unpaid prepetition 401(k) Obligations aggregate approximately $407,000[9] for the

period ending December 31, 2009.  Of this amount, approximately $235,000 is due and payable

January 5, 2010, the remainder will be due and payable on or about January 15, 2010.  The

Debtors request authority, in their discretion, to both continue their existing 401(k) Plan,

including the ability, in their sole discretion, to continue to make matching contributions under

the 401(k) Plan in the ordinary course of business, and to continue to fund all 401(k) Obligations

made by their Employees

---

[8] Under the terms of the CBAs with the Debtors' union Employees, the Debtors are required to make matching contributions.

[9] These amounts are not included in the Trust Fund Taxes discussed above.

**F.**    **Employee Benefits for Foreign Workers**

54.    Debtors employ approximately twenty-seven (27) employees in Mexico. These foreign employees receive benefits from numerous programs varying widely based upon local laws and custom.  The Debtors' foreign employees receive the following mandated benefits: health benefits, labor insurance, death and disability insurance, retirement benefits, and certain other employee benefits (the "Foreign Benefit Plans").  The amounts expended under the Debtors' foreign benefit programs are *de minimis* in relation to those described herein for the Debtors' nationally based Employees and do not exceed $18,000 monthly (the "Foreign Benefit Obligations").  The Debtors are, however, fully reimbursed for these expenses from the applicable code-share partner.  As of the Petition Date, the Debtors estimate that the accrued and unpaid prepetition Foreign Benefit Obligations is approximately $18,000 and are due and payable January 15 and 18, 2010.  The Debtors seek authority to pay any prepetition Foreign Benefit Obligations and to continue to pay such obligations as they come due after the Petition Date.

**G.**    **Reimbursement Obligations**

55.    As is customary with most comparable businesses, the Debtors reimburse their Employees for certain business expenses incurred in the performance of their duties. Reimbursable business expenses include, among other expenses, those incurred in connection with domestic and overseas business travel, internet charges, gasoline charges, automobile maintenance, cellular phone charges, and meals (collectively, the "Reimbursement Obligations").

56.    Periodically, the Debtors will provide relocation expense reimbursements to certain of the Employees.  Pursuant to individual agreements with the Debtors, such

Employees may be reimbursed for certain defined expenses, including temporary housing,

moving expenses, and other costs attendant to relocation.  The Debtors do not believe that there

are any obligations currently outstanding in this respect.

57.    As of the Petition Date, the Debtors estimate that the accrued and unpaid

prepetition Reimbursement Obligations aggregate approximately $55,000, which are due and

payable on January 7, 14, and 21, 2010, each in the approximate amount of $18,000.  The

Debtors are seek authority to pay prepetition Reimbursement Obligations and continue to pay

such obligations as they come due after the Petition Date.

**H.    Payroll Garnishments/Other Deductions**

58.    Periodically, the Debtors are presented with (i) garnishment or child

support orders or (ii) union dues, each requiring the withholding of Employee Payroll

Obligations to satisfy the applicable garnishment demand ("Garnishment Deductions").

Payment of the Garnishment Obligations is made from amounts otherwise payable to the

Employees and is not an incremental cost obligation of the Debtors' estates.

59.    In addition, the Debtors' Employees often request that the Debtors make

payment deductions from their payroll for the benefit of other parties, including, without

limitation, union dues and/or charitable contributions ("Voluntary Deductions", and together

with Garnishment Deductions, the "Payroll Deductions").  Payment of these obligations is made

from amounts otherwise payable to the Employees and is not an incremental cost obligation of

the Debtors' estates.

60.    As of the Petition Date, the Debtors estimate that the accrued and unpaid

prepetition Payroll Deductions aggregates approximately $300,000 that are due and payable on

the next pay period on January 15, 2010.  The Debtors believe that the Payroll Deductions

constitute Withholding Obligations that are not estate property.  Out of an abundance of caution and to the extent required, the Debtors seek authority to remit these amounts and to continue to honor such obligations as they come due after the Petition Date.

### Payment of Prepetition Employee Compensation Obligations
### And Health and Welfare Obligations Is Warranted Under The Circumstances

61.    Pursuant to section 507(a)(4) of the Bankruptcy Code, the Debtor's Employees' claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within 180 days before the petition date are afforded priority unsecured status to the extent of $10,950 per employee.  11 U.S.C. § 507(a)(4).  Similarly, section 507(a)(5) of the Bankruptcy Code provides that employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status to the extent of $10,950 per employee covered by such plan, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.  11 U.S.C. § 507(a)(5).

62.    Furthermore, section 363(b)(1) of the Bankruptcy Code provides, "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provisions of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).  In addition, Bankruptcy Rule 6003(b) permits a debtor to use property of the estate during the first twenty-one (21) days of a case only to the extent it is necessary to avoid immediate and irreparable harm.

23

63.     Except as otherwise indicated above, the Debtors believe that all of the

Employee Obligations relating to the period prior to the Petition Date constitute priority claims

under section 507(a)(4) and (5) of the Bankruptcy Code, except, for instance, the *de minimis* fees

owed to various plan administrators as noted above.  As priority unsecured claims, the Employee

Obligations must be paid in full before any general unsecured obligations of the Debtors may be

satisfied.  Accordingly, the relief requested may affect only the timing of the payment of these

priority obligations and will not prejudice the rights of general unsecured creditors or other

parties in interest.

64.     The necessity of payment doctrine "recognizes the existence of the judicial

power to authorize a debtor in a reorganization case to pay prepetition claims where such

payment is essential to the continued operation of the debtor."  *In re Ionosphere Clubs, Inc.*, 98

B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition employee wages

and benefits); *see also Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp.*

(*In re Chateaugay Corp.*), 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order

authorizing payment of prepetition wages, salaries, expenses, and benefits).  This doctrine is

consistent with the paramount goal of chapter 11 of "facilitating the continued operation and

rehabilitation of the debtor."  *Ionosphere Clubs*, 98 B.R. at 176.

65.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the

payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the

debtor is not a novel concept."  *Ionosphere Clubs*, 98 B.R. at 175. "Under Section 105, the court

can permit pre-plan payment of a pre-petition obligation when essential to the continued

24

operation of the debtor." *In re NVR L.P., et al.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992)

(citing *Ionosphere Clubs*, 98 B.R. at 177).  Moreover, section 363(b)(1) of the Bankruptcy Code

provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

66.    The Debtors are seeking interim authorization, but not the direction, to

pay, in their sole discretion, the following accrued and unpaid prepetition Employee Obligations

to the extent set forth above and upon final authorization to continue to pay such obligations as

they accrue and become due after the Petition Date:

(a)    Payroll Obligations;

(b)    Trust Fund Taxes;

(c)    Payroll Administration Taxes;

(d)    Health and Welfare Obligations;

(e)    Medical Obligations;

(f)    Flexible Spending Obligation;

(g)    AD&D Plan Obligations;

(h)    Life Term Disability Obligations;

(i)    Medical Administration Fee;

(j)    Executive LTD Plan Obligations;

(k)    401(k) Obligations;

(l)    Foreign Benefit Obligations;

(m)    Reimbursement Obligations;

(n)    Payroll Deductions; and

(o)        Any other benefit program described in this Motion[10]

67.        The foregoing Employee Obligations as they relate to each Employee (i) do not exceed the cap under sections 507(a)(4) and (5) of the Bankruptcy Code (including the Employee Compensation Obligations and Health and Welfare Obligations, (ii) are not property of the estate and held in trust for the Taxing Authorities (Trust Fund Taxes), or (iii) are essential to administering benefits giving rise to the Employee's claims described above (including Reimbursement Obligations, Payroll Administration Tax Obligations, and Medical Administrative Fees).

68.        In addition, the Debtors' payment of their prepetition obligations to their Employees in the ordinary course of business should neither unduly prejudice general unsecured creditors nor materially affect the Debtors' estates since claims subject to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code are entitled to payment in full under a reorganization plan. *See* 11 U.S.C. § 1129(a)(9)(B).

69.        As to Trust Fund Taxes, they are held in trust for the benefit of the Taxing Authorities at the time they are withheld from an Employee's wages or salary.  As such, the Trust Fund Taxes are not property of the Debtors' estates under section 541 of the Bankruptcy Code.  *See e.g.*, *Begier v. IRS*, 496 U.S. 53 (1990).

70.        The continued utilization of ADP and Coventry and the payment of the Payroll Administration Tax Obligations and Medical Administrative Fees is essential because without the associated services there could be a delay in the payment of wages and salaries, medical or dental benefits jeopardizing the Employees' access to essential benefits.

---

[10] As noted above, the Debtors seek approval of the Incentive Plan Obligations and prepetition Executive Bonuses at a final hearing on the Motion.

71.     The Reimbursement Obligations relate to charges for travel, including airfare and hotel, and other goods used by Employees in connection with their services that benefit the Debtors' business.  It would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors with the understanding that they would be reimbursed or, in the case of purchases on American Express corporate cards, that the Debtors would pay for the purchases.

72.     The Debtors' employees are central to their operations and are vital to these chapter 11 cases.  A significant deterioration in Employee morale at this critical juncture would undoubtedly have a devastating effect on the Debtors, their customers and vendors, the value of the Debtors' assets and businesses, and the Debtors' ability to continue their operations. The Debtors submit that any delay or failure to pay accrued and unpaid prepetition Employee Obligations, in the amounts described above, would impair morale, dedication, confidence, and cooperation of the Debtors' Employees, which in turn would subject the Debtors' businesses to immediate and irreparable harm.  At this stage, the Debtors cannot afford to risk any damage to their businesses or estates caused by any decline in Employee morale and dedication to perform their duties.

73.     The total amount of prepetition Employee Obligations is relatively modest and less than the limitations set forth under sections 507(a)(4) and (5) of the Bankruptcy Code. Therefore, any amounts paid now will not affect distributions to general unsecured claimholders because such holders are not entitled to payment on their claims until all or the vast majority of Employee Obligations are satisfied in full.

74.     It should be noted that the Debtors do not seek to alter any of the plans or policies described herein.  This Motion is intended only to permit the Debtors, in their discretion,

27

to make payments consistent with the Debtors' existing policies and practices to the extent that,

without the benefit of an order approving this Motion, such payments may be inconsistent with

the relevant provisions of the Bankruptcy Code, and that the Debtors, in their discretion, be

permitted to continue to operate their businesses in an economical, efficient, and seamless

manner without any disruption as a result of these chapter 11 cases.

75.    In addition, that the relief requested herein and the Debtors' actions in

connection with the performance of relief requested will not be deemed or construed as (i) an

admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' right

to dispute or contest any claim for any reason; (iii) a promise or requirement to pay any claim;

(iv) an implication or admission that any particular claim is of a type specified or defined

hereunder; (v) a request or authorization to assume any agreement, contract, or lease pursuant to

section 365 of the Bankruptcy Code or that any such agreement is executory or an unexpired

lease; or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable

non-bankruptcy law.

76.    In other chapter 11 cases, this Court and others in different districts have

approved the payment of prepetition claims for compensation, benefits, and expense

reimbursements substantially similar to those described herein.  *See*, *e.g.*, *In re The Reader's

Digest Assoc., Inc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Sept. 17, 2009) [Docket No.

97]; *In re Finlay Enter.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 3, 2009) [Docket No.

190]; *In re Lear Corporation*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 31, 2009)

[Docket No. 256]; *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr.

S.D.N.Y. April 14, 2008) [Docket No. 52]; *In re Delta Air Lines Inc.*, Case No. 05-17923 (PCB)

(Bankr. S.D.N.Y. Sept. 16, 2005) [Docket No. 150]; *In re Northwest Airlines Corporation*, Case

No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005) [Docket No. 67].

**Applicable Banks Should Be Authorized**
**To Honor and Clear Checks Issued and Make Other Transfers**
**To Pay Employee Compensation Obligations and Health and Welfare Obligations**

77.    As a result of the commencement of these chapter 11 cases, and in the

absence of an order of the Court providing otherwise, the Banks may reject or dishonor the

Debtors' checks, wire transfers, and direct deposit transfers with respect to prepetition Employee

Obligations.  Therefore, the Debtors request that the Court authorize the Banks listed on Exhibit

A annexed hereto, and any other bank authorized by the Court to administer the Debtors' bank

accounts under the "Cash Management Motion"[11] filed contemporaneously herewith to receive,

process, honor, and pay all prepetition and postpetition transfers executed by the Debtors with

respect to Employee Obligations.  In addition, the Debtors also seek authority to issue new

postpetition checks, or effect new fund transfers, on account of prepetition Employee Obligations

to replace, to the extent necessary, any prepetition checks or transfers requests that may be

dishonored or rejected.

78.    The Debtors represent that each of these checks or transfers is or will be

drawn on the Debtors' payroll and general disbursement accounts and can be identified as

relating directly to payment of the prepetition Employee Obligations.  Accordingly, the Debtors

believe that prepetition checks and transfers other than those for prepetition Employee

Obligations will not be honored inadvertently.

79.    Authorization to pay all amounts, under this Motion, including on account

of the prepetition Employee Obligations shall not be deemed to constitute postpetition

---

[11]  *Motion for Entry of an Interim and Final Order Pursuant to Sections 105(a), 345(b), 363(c), 364(c) 507(a) and Bankruptcy Rules 6003 and 6004 to (I) Continue Using Existing Cash Management System; (II) Maintain Existing Bank Accounts and Business Forms and (III) Granting Related Relief.*

29

assumption or adoption of any contract, program or policy pursuant to section 365 of the

Bankruptcy Code.  The Debtors are in the process of reviewing these matters and reserve all their

rights under the Bankruptcy Code with respect thereto.  Moreover, authorization to pay all

amounts under this Motion, including on account of prepetition Employee Obligations shall not

affect the Debtors' right to contest the amount or validity of any prepetition Employee

Obligations, including without limitation the Trust Fund Taxes that may be due to any taxing

authority.

        80.    Further, to implement the foregoing successfully, the Debtors seek a

waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of

an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the

extent these rules are applicable.

        81.    Based on the foregoing, the Debtors submit that the relief requested is

necessary and appropriate, is in the best interests of their estates and creditors, and should be

granted in all respects.

## **Necessity for Immediate Relief**

        82.    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is

necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the

filing of the petition, grant . . . (b) a motion to use, sell, lease, or otherwise incur an obligation

regarding property of the estate, including a motion to pay all or part of a claim that arose before

the filing of the petition . . . ."  The Debtors will suffer immediate and irreparable harm without

authorization to continue their ordinary business operations by continuing to pay and provide

benefits to employees, and to assure their employees that authority has been granted to honor all

such claims.  Accordingly, the interim relief requested herein is consistent with Bankruptcy Rule 6003.

## **Interim Order**

83.    The Debtors seek the relief requested in this Motion in the form of the interim order (the "Interim Order") attached hereto as Exhibit B.  Within three business days of the entry of the Interim Order, the Debtors will serve a copy of the Interim Order and this Motion on (a) the Office of the United States Trustee, (b) those creditors holding the five (5) largest secured claims against the Debtors' estates, (c) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, (e) the Securities and Exchange Commission and (f) the Providers.

84.    The deadline to file an objection ("Objection") to the Motion shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of the Interim Order (the "Objection Deadline").  An Objection shall be considered timely only if, on or prior to the Objection Deadline, it is (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the attorneys for any official committee of unsecured creditors then appointed in these cases.

85.    Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing.

86.    If no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested herein, which order shall be submitted and may be entered with no hearing and no further notice or opportunity to be heard afforded to any party.  If an Objection is timely filed, a hearing will be held at a date and time to be established by the Court.

87.    The foregoing notice procedures satisfy Bankruptcy Rule 9014 by providing the counterparties with notice and an opportunity to object and be heard at a hearing. *See*, *e.g.*, *In re Drexel Burnham Lambert*, 160 B.R. 729, 734 (S.D.N.Y. 1993) (an opportunity to present objections satisfies due process); *In re Colorado Mountain Cellars, Inc.*, 226 B.R. 244, 246 (D. Colo. 1998) (a hearing is not required to satisfy Bankruptcy Rule 9014).  Furthermore, the proposed notice procedures protect the due process rights of the parties in interest without unnecessarily exposing the Debtors' estates to unwarranted administrative expenses.

## Notice

88.    No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) those creditors holding the largest thirty (30) unsecured claims against the Debtors' estates (on a consolidated basis), (iii) those creditors or their agents holding the five (5) largest secured claims against the Debtors' estates, (iv) the Internal Revenue Service, (v) the Securities and Exchange Commission, and (vi) the Banks listed on Exhibit A.

89.    No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors requests entry of the attached order granting the relief requested herein and such other and further relief as is just.

32

Dated:    January 5, 2010
          New York, New York          PACHULSKI STANG ZIEHL & JONES LLP


                                      */s/ Maria A. Bove*
                                      Richard M Pachulski (*pro hac vice* pending)
                                      Laura Davis Jones (*pro hac vice* pending)
                                      Debra I. Grassgreen (*pro hac vice* pending)
                                      Maria A. Bove
                                      John W. Lucas

                                      780 Third Avenue, 36th Floor
                                      New York, New York 10017
                                      Telephone:  (212) 561-7700
                                      Facsimile:  (212) 561-7777

                                      Proposed Attorneys for Debtors
                                      and Debtors in Possession

## EXHIBIT A

### (Banks and Payroll Accounts)

| Bank Name & Address | Account Name | Account Number |
|---|---|---|
| **Banco Nacional De Mexico S.A.** | Nacional Expense Account | 887-54XXXX |
| **Banco Nacional De Mexico S.A.** | Nacional Collection Account | 887-54 XXXX |
| **Banco Mercantil del Norte S.A.** | Mercantil Peso Account | 006300 XXXX |
| **Banco Mercantil del Norte S.A.** | Mercantil Dollar Account | 1038 XXXX |
| **Banco Mercantil del Norte S.A.** | Mexico Money Market Account | 50033 XXXX |
| **Bank of Hawaii** | Hawaii Deposit Account | 0003-23 XXXX |
| **Bank of Hawaii** | Hawaii Ticket Refund Account | 0003-87 XXXX |
| **Wells Fargo Bank** | Wells Fargo DIA Liquor Account | 103-750 XXXX |
| **Wells Fargo Bank** | Workers Comp. Account | 106-038 XXXX |
| **BBVA Compass Bank** | Main Operating Account | 250105 XXXX |
| **BBVA Compass Bank** | Compass Money Market Account | 250119 XXXX |
| **BBVA Compass Bank** | Accounts Payable | 1286 XXXX |
| **BBVA Compass Bank** | Compass Bank Emergency Reserve | 8449 XXXX |
| **BBVA Compass Bank** | Freedom Airlines LOC Account | 251193 XXXX |
| **Bank of America** | Payroll | 942837 XXXX |
| **Bank of America** | MPD ASU | 942912 XXXX |
| **Bank of America** | Operating | 942845 XXXX |
| **Citizens Bank** | MPD Operating Account | 11717 XXXX |
| **JPMorgan Chase** | JP Morgan Clearinghouse Account | 910-2-46 XXXX |
| **Imperial Capital** | Bonds | 7LU-13 XXXX |
| **Chevy Chase Bank** | IAD Liquor deposits | 142430 XXXX |
| **Seaway Bank** | ORD Liquor deposits | 8012 XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 208-95S24 / 2089XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-95S31 / 412-2XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-9XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-9XXXX |

1

**Exhibit B**

**Proposed Order**

56772-001\DOCS_NY:19651.4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-_____ (   ) |
| Debtors.[12] | (Jointly Administered) |

**INTERIM ORDER PURSUANT TO SECTIONS 105(a), 363(b), and 503(b) OF THE
BANKRUPTCY CODE AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO (I)
PAY CERTAIN PREPETITION WAGES, COMPENSATION AND EMPLOYEE
BENEFITS; (II) CONTINUE PAYMENT OF WAGES, COMPENSATION AND
EMPLOYEE BENEFITS IN THE ORDINARY COURSE OF BUSINESS; (III)
AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL
INSTITUTIONS TO PROCESS AND PAY ALL CHECKS PRESENTED FOR
PAYMENT AND TO HONOR ALL FUNDS TRANSFER REQUESTS MADE BY
DEBTORS RELATING TO THE FOREGOING; AND (IV) SCHEDULE FINAL
HEARING FOR THE FOREGOING RELIEF SOUGHT HEREIN**

Upon the motion, dated January 5, 2010 (the "Motion"), of Mesa Air Group, Inc.

and its affiliated debtors and debtors in possession (the "Debtors") for authorization and

approval, but not directing, pursuant to sections 105(a), 363(b), 503(b) of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 6003(b) and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), to (i) pay certain prepetition wages,

compensation, and benefits (the "Employee Obligations") of employees (the "Employees"), (ii)

continue payment of wages, compensation, and employee benefits in the ordinary course, (iii)

authorize banks and other financial institutions (the "Banks") to honor all funds transfers, and

(iv) schedule a final hearing (the "Final Hearing") for the relief sought in the Motion, all as more

fully described in the Motion; and the Court having jurisdiction is to consider the Motion and the

---

[12] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110);
Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688);
Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management,
LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

1

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion

and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and

due and proper notice of the Motion having been provided and that no other or further notice is

necessary; and the Court having found and determined that the relief sought in the Motion is in

the best interests of the Debtors, their estates and creditors, and all parties in interest and that

such relief is necessary to avoid immediate and irreparable harm as contemplated by Bankruptcy

Rule 6003(b) and that the legal and factual bases set forth in the Motion and the Declaration of

Michael J. Lotz in Support of First Day Motions establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis as provided herein; and

it is further

ORDERED that pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are authorized, but not directed, to continue to honor existing practices, programs,

and policies with respect to their Employees as such practices, programs, and policies were in

effect as of the date of the commencement of these chapter 11 cases; and it is further

ORDERED that pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are authorized on an interim basis, but not directed, to make all payments with

respect to prepetition Employee Obligations as described in the Motion in accordance with the

Debtors' prepetition practices, programs, and policies except that the Debtors shall not pay any

amounts in respect of the Incentive Plan Obligations and the Executive Bonuses pursuant to this

Order, the payment of which shall be subject to approval at the Final Hearing on the Motion; and

it is further

56772-001\DOCS_NY:19651.4

ORDERED that the Banks set forth on <u>Exhibit A</u> annexed hereto and any other bank authorized to administer the Debtors bank accounts under the Cash Collateral Motion (as defined in the Motion) shall be, and hereby are authorized, when the Debtors request in the Debtors' sole discretion, to receive, process, honor, and pay any and all checks drawn on the Debtors payroll or disbursement accounts and any other transfers that are related to the prepetition Employee Obligations and the costs and expenses incidental thereto, whether those checks or transfers were presented prior to or after the commencement of these chapter 11 cases, provided that sufficient funds are available in the accounts to make such payments; and it is further

ORDERED that any Bank may rely on the representations of the Debtors with the respect to whether any check or other transfer drawn or issued by the Debtors prior to the commencement of these chapter 11 cases should be honored pursuant to this Order, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein; and it is further

ORDERED that the Debtors are authorized to issue postpetition checks or to effect postpetition funds transfers requests in replacement of any checks or funds transfers requests related to Employee Obligations dishonored or rejected as a consequence of the commencement of these chapter 11 cases; and it is further

ORDERED that nothing in the Motion or in this Order shall be deemed a request by or approval of the Debtors to assume any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that nothing in the Motion or this Order shall be construed as impairing the Debtors' rights to contest the validity or amount of any Employee Obligation,

3

including without limitation any taxes that may be due to any Taxing Authority (as defined in the Motion); and it is further

ORDERED that Bankruptcy Rule 6003(b) has been satisfied; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rule 6004, the terms of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are waived; and it is further

ORDERED that within three business days of the entry of this Interim Order, the Debtors shall serve a copy of the Interim Order and the Motion on (a) the Office of the United States Trustee for the Southern District of New York, (b) those creditors holding the five largest secured claims against the Debtors' estates, (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, (e) the Securities and Exchange Commission and (f) the Providers; and it is further

ORDERED that any objection (the "Objection") to the relief requested in the Motion on a permanent basis must, by 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of this Interim Order (the "Objection Deadline"), be: (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the

4

attorneys for any official committee of unsecured creditors then appointed in these cases; and it is further

ORDERED that a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing; and it is further

ORDERED that if timely Objections are received there shall be a hearing to consider such timely Objections to the Motion; and it is further

ORDERED that if no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Interim Order, which Order shall be submitted and may be entered with no further notice or opportunity to be heard afforded any party, and the Motion shall be approved *nunc pro tunc* to the date of the commencement of these chapter 11 cases; and it is further

ORDERED that this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Interim Order.

ORDERED that the relief granted herein and the Debtors' actions in connection with the performance of such relief shall not be deemed or construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' right to dispute or contest any claim for any reason; (iii) a promise or requirement to pay any claim; (iv) an implication or admission that any particular claim is of a type specified or defined hereunder; (v) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or that any such agreement is executory or an unexpired lease; or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable non-bankruptcy law; and it is further

5

ORDERED that the Final Hearing to consider entry of an order granting the relief requested in the Motion on a permanent basis shall be held on [ENTER DATE] at [ENTER TIME] and any objections to the entry of such order shall be in writing, filed with the Court and served upon (i) the attorneys for the Debtors, (ii) the Office of the United States Trustee for the Southern District of New York, (iii) those creditors holding the largest thirty (30) unsecured claims against the Debtors' estates (on a consolidated basis) (unless a statutory committee is appointed, in which case such objection shall be filed on counsel to the committee), (iv) those creditors or their agents holding the five (5) largest secured claims against the Debtors' estates, (v) the Internal Revenue Service, (vi) the Securities and Exchange Commission, and (vi) the Banks, in each case so as to be received no later than ten (10) days prior to the Final Hearing.

Dated: January __, 2010
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

### (Banks and Payroll Accounts)

| Bank Name & Address | Account Name | Account Number |
|---|---|---|
| **Banco Nacional De Mexico S.A.** | Nacional Expense Account | 887-54XXXX |
| **Banco Nacional De Mexico S.A.** | Nacional Collection Account | 887-54 XXXX |
| **Banco Mercantil del Norte S.A.** | Mercantil Peso Account | 006300 XXXX |
| **Banco Mercantil del Norte S.A.** | Mercantil Dollar Account | 1038 XXXX |
| **Banco Mercantil del Norte S.A.** | Mexico Money Market Account | 50033 XXXX |
| **Bank of Hawaii** | Hawaii Deposit Account | 0003-23 XXXX |
| **Bank of Hawaii** | Hawaii Ticket Refund Account | 0003-87 XXXX |
| **Wells Fargo Bank** | Wells Fargo DIA Liquor Account | 103-750 XXXX |
| **Wells Fargo Bank** | Workers Comp. Account | 106-038 XXXX |
| **BBVA Compass Bank** | Main Operating Account | 250105 XXXX |
| **BBVA Compass Bank** | Compass Money Market Account | 250119 XXXX |
| **BBVA Compass Bank** | Accounts Payable | 1286 XXXX |
| **BBVA Compass Bank** | Compass Bank Emergency Reserve | 8449 XXXX |
| **BBVA Compass Bank** | Freedom Airlines LOC Account | 251193 XXXX |
| **Bank of America** | Payroll | 942837 XXXX |
| **Bank of America** | MPD ASU | 942912 XXXX |
| **Bank of America** | Operating | 942845 XXXX |
| **Citizens Bank** | MPD Operating Account | 11717 XXXX |
| **JPMorgan Chase** | JP Morgan Clearinghouse Account | 910-2-46 XXXX |
| **Imperial Capital** | Bonds | 7LU-13 XXXX |
| **Chevy Chase Bank** | IAD Liquor deposits | 142430 XXXX |
| **Seaway Bank** | ORD Liquor deposits | 8012 XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 208-95S24 / 2089XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-95S31 / 412-2XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-9XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-9XXXX |