PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor


PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile:  212-561-7777
Richard M. Pachulski (*pro hac vice* pending)
Laura Davis Jones (*pro hac vice* pending)
Debra I. Grassgreen (*pro hac vice* pending)
Maria A. Bove
John W. Lucas

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-_____ (   ) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
SECTIONS 105(a), 345(b), 363(c), 364(c) AND 507(A) AND BANKRUPTCY
RULES 6003 AND 6004 TO (I) CONTINUE USING EXISTING CASH
MANAGEMENT SYSTEM; (II) MAINTAIN EXISTING BANK ACCOUNTS
AND BUSINESS FORMS; AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries in the

above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"Debtors"), hereby file this motion (the "Motion") and respectively represent as follows:

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

## Background

1.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors have requested authorization to consolidate their chapter 11 cases for procedural purposes only so that they may be jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Mesa's Business

3.      Mesa is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service. As of the Petition Date, the Debtors' airline operations serve approximately 127 cities in 41 states, the District of Columbia, Canada, and Mexico.  The Debtors operate a fleet of approximately 130 aircraft with approximately 700 daily system departures.  The Debtors employ approximately 3,400 full and part-time employees.

4.      Mesa Airlines, Inc. ("Mesa Airlines") operates regional jet and turboprop aircraft under the names of regional carriers of certain major airlines pursuant to code-share agreements.  Specifically, Mesa Airlines operates as (i) US Airways Express under code-share agreements with US Airways, Inc., (ii) as United Express under a code-share agreement with United Airlines, Inc., and (iii) independently in Hawaii as *go!* Mokulele ("*go!*").  Freedom Airlines, Inc. operates regional jet aircraft as Delta Connection under code-share agreements with Delta Air Lines, Inc.  The remaining Debtors operate businesses, or own interests in

businesses, that facilitate or enhance the Debtors' regional or independent air carrier services. Nilchi, Inc. and Patar, Inc. hold investments.

5.     As of September 30, 2009, the Debtors had consolidated assets of approximately $975 million, and consolidated liabilities of approximately $869 million. The Debtors' consolidated 2009 revenues were approximately $968 million. Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009 were derived from operations associated with code-share agreements. The Debtors' remaining passenger revenues are generated from their independent *go!* operations in Hawaii.

6.     A detailed description of the Debtors' businesses, capital structure, and the circumstances that precipitated the commencement of these chapter 11 cases is set forth in the Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2 (the "Lotz Declaration"), filed contemporaneously herewith.

## Jurisdiction

7.     This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.     The Debtors request (i) authorization, pursuant to sections 105(a), 363(c), 345(b), and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003(b) and 6004, to (a) continue to operate their cash management system (the "Cash Management System") with their existing banks and financial institutions (the "Banks"), (b) fund the Debtors' operations, and (c) maintain the Debtors' existing bank accounts (the "Bank Accounts") and business forms and (ii) a waiver of the requirements of section 345 of the Bankruptcy Code to the extent the

Cash Management System is not in compliance, so that they may continue to manage their businesses efficiently and seamlessly immediately following the Petition Date and throughout these cases.

## The Debtors' Cash Management System

9. The Debtors utilize their Cash Management System to collect and transfer funds generated by their operations. In this regard, the Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their Bank Accounts located at various financial institutions (the "Banks") identified on Exhibit 1 hereto. Several aspects of the Debtors' Cash Management System is similar to the cash management systems utilized by other major corporate enterprises.

10. The Cash Management System is primarily administered by employees (the "Cash Management Personnel") located at the Debtors' offices in Phoenix, Arizona. The Cash Management Personnel are required to monitor the Cash Management System and manage the proper collection and disbursement of funds even though the Cash Management System is generally automated.

11. The Cash Management System consists of an integrated network of twenty-six (26) bank accounts maintained at twelve different banks. To provide a general overview of the movement of cash through the Debtors' Cash Management System, the Debtors have annexed flow charts as Exhibits 2 -5 that illustrate the flow of funds through the Cash Management System. The summary below provides an overview of these charts and the four principal components of the Cash Management System: (a) cash collection, (b) cash concentration, (c) cash disbursement, (d) intercompany transactions, and (e) investments.

A. **Cash Collection**

12.     The Debtors generate revenue from a wide variety of sources, including (i) direct sales of passenger tickets, (ii) codeshare agreements, (iii) sales originating at international stations,[2] (iv) collection of credit card receivables, (v) travel agents, and (vi) a variety of other sources that include sales of passenger, cargo, and services to the United States Government and the sale of amenity services, such as food and beverages, audio headsets, and other similar goods to passengers on aircraft.

13.     The proceeds from these transactions are deposited into one of the following accounts:  (i) the main concentration operating account (the "Main Operating Account") maintained at BBVA Compass Bank ("Compass Bank") and (ii) certain deposit accounts devoted to collecting accounts payable (the "Receivable Accounts") maintained at the following institutions, Compass Bank, JPMorgan Chase, Bank of America, Wells Fargo, Bank of Hawaii, Chevy Chase Bank, and Seaway Bank.  Certain of the Receivable Accounts are devoted to a specific purpose as follows:  (a) clearing house account maintained at JPMorgan Chase (the "JPM Clearinghouse Account"), (b) a payroll operating account maintained at Bank of America (the "BofA Operating Account"), (c) a deposit account (the "Hawaii Deposit Account") used in connection with the Debtors' *go!* Mokulele operations maintained at the Bank of Hawaii, (d) the accounts maintained at Banco Nacional de Mexico S.A. ("Banco Nacional") and Banco Mercantil del Norte S.A. ("Banco Mercantil") used in connection with the Debtors' stations located in Mexico, and (e) certain other accounts as discussed in greater detail below.  A description of the use for these accounts is provided below and charts illustrating the flow of funds among the accounts is annexed hereto as Exhibits 2-5.

---

[2] A "station" is an airport location that is staffed by the Debtors' employees.

*(i) Collections and Deposits Generated From Codeshare Agreements*

14.     The Debtors maintain codeshare agreements (collectively, the "Codeshare Agreements") with Delta Air Lines, Inc., United Air Lines, Inc., and US Airways, Inc. (collectively, the "Codeshare Partners").  A Codeshare Agreement refers to the practice of an airline jointly marketing a flight for one or more other airlines.  The Debtors operate carriers and fly under the respective Codeshare Partners' livery (*e.g.* a US Airways, Inc. flight operated by Mesa Airlines).  The Codeshare Agreements are "revenue guaranteed" and thus the Debtors are paid a fixed amount under the terms of the respective Codeshare Agreement rather than based upon the number of seats sold.  Cash receipts related to the Codeshare Agreements are wired from the Codeshare Partners to the Debtors' Main Operating Account on a weekly basis.

*(ii)     Collections and Deposits Generated From*
*go! Mokulele Direct Ticket Sales and Baggage Fees*

15.     Under the Debtors' trade name *go!*, an independent airline that offers inter-island service in Hawaii, the Debtors sell passenger tickets to customers directly at airport ticketing counters, by telephone, and the Internet.  Passengers purchase tickets with cash, checks, credit cards, money orders, and other forms of payment at any one of the Debtors' five (5) ticket counters at the Debtors' stations in Hawaii.  The proceeds of these transactions are deposited into the Hawaii Deposit Account on a daily basis.  On a historical basis, the average monthly balance of the Hawaii Deposit Account is approximately $150,000 and such funds are swept manually into the Main Operating Account on a monthly basis.  Withdrawals from the Hawaii Deposit Account can only be made at a Bank of Hawaii branch office and are limited to emergency situations.  An authorized signor on the Hawaii Deposit Account is required to send a letter to the Debtors' bank representative specifying the individual and amount that may be withdrawn.

16.     *go!* generates approximately $200,000 per month from baggage fees (the "Baggage Fees"). Baggage Fees that are paid via credit card (approximately 60%) are processed in the same manner as the Credit Card Receivables as discussed below. Cash receipts for Baggage Fees are deposited into the Hawaii Deposit Account, which is swept into the Main Operating Account on a monthly basis.

*(iii)     Collections and Deposits Generated From International Stations*

17.     The Debtors maintain stations in Mexico under their Codeshare Agreement with US Airways, Inc. and the Debtors deposit all ticket sale proceeds directly into a US Airways' controlled deposit account. The Debtors' only source of revenue or cash collection at its Mexico stations are *de minimis* fees and taxes associated with employee guest flight passes (the "Guest Pass Tax Revenue") (approximately $500 per month). The Debtors deposit the Guest Pass Tax Revenue into its collection account at Banco Nacional (the "Nacional Collection Account") on a daily basis. The balance in the Nacional Collection Account is generally small and is swept into the Main Operating Account on a manual basis when the balances permit, which is usually every quarter.

18.     The Debtors also maintain a disbursement account at Banco Nacional (the "Nacional Expense Account") that is funded by a series of transfers originating from the Main Concentration Account. Payroll and other routine expenses associated with the operation of the Mexico stations are deducted from the Nacional Expense Account. As expenses come due, transfers are made from the Debtors' peso account at Banco Mercantil (the "Mercantil Peso Account"), which is funded from the Debtors' dollar account at Banco Mercantil (the "Mercantil Dollar Account"). The Debtors wire approximately $120,000 to $250,000 per month from their Main Operating Account to the Mercantil Dollar Account. The director of the Debtors' Mexico

branch endeavors to transfer funds from the Mercantil Dollar Account to the Mercantil Peso Account during the week when exchange rates are optimal. The Debtors fund the foregoing accounts only to the extent necessary to satisfy the operating expenses related to the station in Mexico or the Guest Pass Tax Revenue. A chart describing the flow of funds is annexed hereto as Exhibit 5.

(iv)     *Collections and Deposits Generated From Credit Card Receivables – go!*

19.     Many customers of the Debtors' *go!* operations and entities use a credit card to purchase goods and services from the Debtors. In these instances, the Debtors do not collect the proceeds of these transactions directly from the customers, but rather from the credit card companies or the banks and financial institutions that process the credit card transactions. The Debtors have relationships with a variety of credit card companies and banks and other financial institutions that facilitate these transactions, including, but not limited to, U.S. Bank National Association, American Express Travel Related Services Company, Inc., Discover Financial Services, Inc., and JCB International Co., Ltd. (the "Credit Card Companies"). A chart describing the credit card process is annexed hereto as Exhibit 4.

20.     When a party purchases a ticket on *go!* using a credit card, the Debtors create a credit card receivable (the "Credit Card Receivable"). In this context, the Debtors function as a merchant while the Credit Card Companies are responsible for collecting payments from each party. The Credit Card Companies remit payment to the Debtors generally within two (2) to fourteen (14) days after the Debtors generate the Credit Card Receivable. As provided by their agreements with the Debtors, the Credit Card Companies retain a processing fee and forward the remainder of the transaction proceeds to the Debtors. The Credit Card Companies wire payments for the Credit Card Receivables into the Main Operating Account. The Debtors'

aggregate annual Credit Card Receivables total approximately $40 million or $3.3 million per month. The Debtors are seeking authorization to continue processing their Credit Card Receivables and pay any outstanding claims relating to processing fees arising from the transactions. A chart describing the flow of funds through the clearinghouses is annexed hereto as Exhibit 3.

> *(v)    Collections and Deposits Generated From Travel Agents*

21.    The Debtors offer the sale of passenger tickets and other goods and services to customers through travel agents and tour operators. These travel agents and tour operators may be affiliated with the domestic Airlines Reporting Corporation ("ARC") or one of the many international Billing and Settlement Plans (the "BSPs"), which are clearinghouses to which the affiliated travel agents and tour operators (the "Clearinghouse Travel Agents") report and remit their sales. ARC and the BSPs sort through the reports and remit payment to the Debtors for the price of the Debtors' goods and services, less any commissions or refunds due to the Clearinghouse Travel Agents. The proceeds of these transactions are deposited in the Debtors' the JPM Clearinghouse Account. The BSPs remit their payments to the Airline Clearing House via the International Air Transport Association Currency Clearance Service. The JPM Clearinghouse Account is swept into the Debtors' BofA Operating Account on a monthly basis.

22.    Travel agents that are not Clearinghouse Travel Agents are not authorized to issue tickets for flights on the Debtors' aircraft. Instead, such travel agents must purchase customer tickets directly from the Debtors' website or telephone reservation system.

*(vi)*     *Collections and Deposits Generated From Miscellaneous Sources*

23.     The Debtors also generate revenues from a variety of other sources such as (i) providing passenger, cargo, and mail delivery services to the United States Government, (ii) providing goods and services to other airlines and aircraft users (*e.g.*, maintenance, fuel, ground-handling, and accounting services), and (iii) vendor refunds and providing amenity services to passengers (such as food and beverages, etc.).  The proceeds from these transactions are received periodically at the Debtors' Phoenix, Arizona station and are subsequently deposited into the Main Operating Account.

24.     The Debtors generate cash receipts on flights from the sale of alcohol.  For security purposes, the Debtors maintain a cash deposit account for Liquor Receipts originating from the Chicago O'Hare International Airport (Seaway Bank), Washington Dulles International Airport (Chevy Chase Bank), Denver International Airport (Wells Fargo Bank) (collectively, the "Liquor Accounts").  The Liquor Accounts are swept approximately twice a month into the Main Operating Account and the Debtors are required to maintain minimum balances of $1,000, $200, and $0.00, respectively.

**B.     Cash Concentration**

25.     As described above, the proceeds from various transactions are collected and deposited into their respective deposit accounts.  To manage their business, coordinate the payment of their outstanding obligations, and earn the maximum return on their money, the Debtors regularly draw these cash assets together into the Main Operating Account.  The Debtors use automated sweep transactions, standing instructions, and manual transfers to move available funds from the various accounts into the Debtors' Main Operating Account.  Except as indicated

above, the Debtors hold the majority of their cash deposits in their Main Operating Account at Compass Bank.

## Cash Disbursements

26.    The Debtors maintain two (2) operating accounts:  Main Operating Account and BofA Operating Account.  Except for payroll, all operating expenses are settled from the Main Operating Account or settled through another disbursement account that is funded from the Main Operating Account, as discussed below.  Mesa's subsidiaries' operating expenses are paid in the same manner.

27.    The Debtors also maintain disbursement accounts to fund various obligations, including, but not limited to, corporate payables, passenger refunds, employee health and welfare benefits, and insurance (collectively, "Disbursement Accounts").  The Debtors issue checks against or wire money from these Disbursement Accounts, which, in most cases, triggers an automatic transfer from the Main Operating Account when the expenses are presented for payment.  The Cash Management System is designed to minimize overnight balances in the Disbursement Accounts so that any excess funds can be invested.  A brief description of the Debtors' disbursements and the applicable accounts is provided below.

*(i)  Corporate Disbursements*

28.    In the operation of their business, the Debtors incur recurring obligations to vendors, suppliers, landlords, lessors, governmental agencies, certain employees pursuant to employment contract, and other entities.  These obligations are generally paid *via* a wire through an interbank clearing system or by check payments through controlled disbursement accounts held by the Debtors.  With respect to the employee related obligations, the Debtors make certain deferred compensation payment into trust accounts, as shown on Exhibit 2.  In addition, wire transfers for corporate payables are made from the Main Operating Account.

*(ii) go! Ticket Refunds Disbursements*

29.     Some customers purchase tickets but fail to commence traveling. Generally, tickets sold by *go!* are non-refundable.  However, certain *go!* customers purchase unrestricted tickets that offer the ability to change departure dates and times without penalties. The Department of Transportation requires the Debtors to refund tickets for controllable events (*e.g.*, overbooked flights) at the time the customer is denied boarding.  The Debtors process these refunds by issuing checks at the airport ticket office (the "Inconvenienced Passenger Payments"). Inconvenienced Passenger Payments that are not processed at the airport ticket office are processed at the Debtors' Phoenix station and disbursed through one of the Debtors' Compass Bank Disbursement Accounts.

30.     The Debtors maintain a ticket refund account at the Bank of Hawaii ("Hawaii Ticket Refund Account") to make the Inconvenienced Passenger Payments.  The Debtors maintain a small balance in the Hawaii Ticket Refund Account for ticket refund checks and fund such account from the Main Operating Account to the extent necessary.  On a historical basis, the Debtors disburse approximately $500 per month from the Hawaii Ticket Refund Account and generally have a balance less than $2,000 in that account.  Refunds that are not processed at a Hawaii station are funded through the Debtors' Main Operating Account.  A chart describing these flow of funds is annexed hereto as Exhibit 2.

*(iii) Workers' Compensation Disbursements*

31.     As described in more detail in the motion filed contemporaneously herewith regarding the Debtors' insurance programs,[3] the Debtors' workers' compensation claims are administered by Chartis, Inc. ("Chartis"), a third party administrator that pays the claims on behalf of the Debtors.  The Debtors pay Chartis their guaranteed costs by check, which is drawn against the Main Operating Account, on an accelerated basis (*i.e.*, substantial upfront payment followed by nine equal monthly payments).

32.     The Debtors previously received workers compensation coverage from ESIS, Inc., a member of the ACE Group of Companies ("ESIS").  The Debtors continue to incur claims under the ESIS plan and are billed monthly.  The Debtors wire ESIS payments on a monthly basis from the Main Operating Account.

*(iv) Health and Welfare Benefit Disbursements*

33.     The Debtors' self-insured medical benefits plan is provided by Coventry Health Care, Inc. ("Coventry").  Each week, the Debtors wire an amount equal to the previous week's medical benefits claims to Coventry from the Main Operating Account.  Each month, the Debtors wire administrative fees to Coventry from the Main Operating Account.

*(v) Captive Insurance Disbursements*

34.     In addition to operating airline subsidiaries, the Debtors own MAGI Insurance, Ltd., a Barbados, West Indies based, single parent captive insurance company ("MAGI") and not a Debtor.  MAGI was established for the dual purpose of obtaining access to

---

[3] *See, Motion Pursuant to Sections 105(A), 362(D), 363(B), and 503(B) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004 ror Interim Authorization to (I) Continue Their Workers' Compensation Programs and Their Liability, Product, Property, and Other Insurance Programs, (II) Pay, in Their Discretion, All Prepetition Obligations Relating to Their Workers' Compensation Programs and Their Liability, Product, Property, and Other Insurance Programs, (III) Modify the Automatic Stay for the Sole Purpose of Permitting Employees to Proceed with Workers' Compensation Claims, (IV) Permit Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, and (V) Scheduling A Final Hearing on the Relief Requested Herein.*

the reinsurance market, thus reducing its overall insurance rate, and reducing its surplus lines tax exposure. MAGI is managed by Towner Risk Management Limited ("Towner"), a Barbados-based captive insurance management company. MAGI currently insures 30% of the Debtors' risk of loss. Utilizing a variety of underwriters that reinsure captive insurance companies, MAGI reinsures 100% of their risk of loss. The Debtors' remaining 70% risk of loss is insured through a collection of traditional underwriters. The Debtors pay MAGI an annual premium, which is disbursed from the Main Operating Account.

### (vi) Clearinghouse Disbursements

35.　　Most major airlines participate in interline agreements with other airlines, pursuant to which the airlines agree to accept each other's tickets for transportation on one another's airlines or for the applicable services (*e.g.*, ground handling). The mutual payment obligations that arise under interline agreements are settled and adjusted through the Airlines Clearing House, Inc. (the "ACH"). ACH aggregates the amounts monthly invoiced by other airlines to the Debtors, and by the Debtors to other airlines, and calculates a net balance. The Debtors' JPM Clearinghouse Account is used for ACH settlement. The JPM Clearinghouse Account is funded by wire transfer from the Main Operating Account as necessary to settle a net payable position. The Debtors traditionally are in a net receivable position and the JPM Clearinghouse Account is swept into the Debtors' BofA Operating Account on a monthly basis. A chart describing the flow of funds is annexed hereto as Exhibit 5.

### (vii) Payroll Disbursements

36.　　The Debtors' BofA Operating Account is also used as the Debtors' payroll account, which is funded via a monthly JPM Clearinghouse Account sweep, as discussed above and from the Main Operating Account to the extent necessary. Automatic Data Processing, Inc.

("ADP") manages the Debtors' payroll and receives a disbursement from the BofA Operating Account in accordance with the Debtors' regular payroll schedules.

*(viii) General Disbursements*

37.     All wire requests are approved by the Debtors' Chief Executive Officer or the applicable individual that has corporate authority to process such transfers (currently, the Chief Financial Officer, Vice President of Finance, and the Treasurer).  Generally, all invoices greater than $10,000 require the approval from one of the foregoing individuals.  After the transaction has been approved, a treasury analyst inputs the payment into E-Access, a banking website used to process all wire and ACH Network transactions.  Online approval is required by the Vice President of Finance.  For both ACH Network and wire transfer transactions, payment files are transmitted to the bank immediately upon online approval.

38.     Checks are written by the accounts payable department.  Invoices are individually approved prior to issuance of a check.  All checks over $20,000 require the signature of two officers.  All vendor checks are issued from the Accounts Payable Account.

### Intercompany Transactions

39.     Prior to the Petition Date, the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Arrangements").  Intercompany transactions are recorded on the applicable Debtor's general ledgers as an intercompany payable, receivable or loan.  At any given time, there may be balances due and owing from one Debtor to another Debtor.  These balances represent extensions of intercompany credit made in the ordinary course of business.  The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these

Intercompany Arrangements.  The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

**Investments**

40.     To the extent the Debtors have excess cash, it is transferred from the Main Operating Account into an overnight money market investment account with Compass (the "Compass Money Market Account").  If additional funds are required to satisfy future disbursements, cash will be transferred from the Compass Market Account to the proper Disbursements Account or the Main Operating Account.  The money market accounts are reconciled on a monthly basis by the Debtors' Senior Treasury Analyst.  The Compass Money Market Account is an interest bearing account, the rate of which is determined by the investments made by Compass Bank.  Thus, the Debtors' deposits are fully insured up to the federal maximum and the only risk is the fluctuation of the interest rate.

41.     The Debtors' excess cash in its Mercantil Peso Account is swept into an overnight investment vehicle with Banco Mercantil (the "Mexico Money Market Account").  Like the Compass Money Market Account, the Mexico Money Market Account is an interest bearing account, the rate of which is determined by the investments made by the Banco Mercantil.  The deposits made into the Mexico Money Market Account are guaranteed by the Mexican government to the extent that the deposit does not exceed $140,000.  Thus, the Debtors' deposits are fully insured up to the Mexican government's maximum and the only risk is the fluctuation of the interest rate.

**Continuing the Cash Management System Is In The
Best Interest Of The Debtors, Their Estates, And All Parties In Interest**

42.     Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a

hearing." 11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) of the Bankruptcy Code is to

provide a debtor in possession with the flexibility to engage in the ordinary transactions required

to operate its business without the unneeded oversight by its creditors or the court..  *Med.*

*Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384 (2d Cir. 1997); *In re Enron*

*Corp.*, 2003 WL 1562202, *15 (Bankr. S.D.N.Y. Mar. 21, 2003); *Chaney v. Official Comm. of*

*Unsecured Creditors of Crystal Apparel, Inc.* (*In re Crystal Apparel, Inc.*), 207 B.R. 406, 409

(S.D.N.Y. 1997).  Included in the purview of section 363(c) is a debtor's ability to continue

"routine transactions" necessitated by a debtor's cash management system.  *Amdura Nat'l*

*Distrib. Co. v. Amdura Corp.* (*In re Amdura Corp.*), 75 F.3d 1447, 1453 (10th Cir. 1996).  The

maintenance of a debtor's prepetition "cash management systems and related procedures and

transactions employed in the ordinary course of a debtor's business is common, particularly

where . . . a bankruptcy case involves large and complex multiple affiliated debtors." *In re*

*Federated Dep't Stores, Inc.*, 1990 LEXIS 84, *2 (Bankr. S.D. Ohio Jan. 15, 1990).

      43.    The Bankruptcy Code also provides a debtor in possession the

authorization to obtain unsecured credit and incur unsecured debt in the ordinary course of

business with out notice and a hearing.  11 U.S.C. § 364(a); *Amdura*, 75 F.3d at 1453; *LNC Inv.,*

*Inc. v. First Fidelity Bank*, 247 B.R. 38, 45 (S.D.N.Y. 2000).  The Debtors, therefore, seek

authorization, to the extent necessary, to obtain unsecured credit or incur unsecured debt in the

ordinary operation of their Cash Management System.

      44.    Furthermore, section 345 of the Bankruptcy Code governs a debtor's

deposit and investment of cash during a chapter 11 case and authorizes deposits or investments

of money as "will yield the maximum reasonable net return on such money, taking into account

the safety of such deposit or investment." 11 U.S.C. § 345(a).  For deposits or investments that

are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires the estate to obtain from the entity with which the money is deposited or invested a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise. 11 U.S.C. § 345(a). In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303. Section 9303 provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation. 31 U.S.C. § 9303.

45. Strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in a case such as this, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." 11 U.S.C. § 345(a). Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H 10,767 (Oct. 4, 1994), 1994 WL 54577338.

46. The Debtors seek authorization pursuant to sections 105(a), 345(b), and 363(c)(1) of the Bankruptcy Code, to continue operating their Cash Management System consistent with their prepetition practices and to pay prepetition amounts outstanding as of the Petition Date, if any, owed to their Banks and Credit Card Companies as fees or service charges for the maintenance of the Cash Management System. The Cash Management System constitutes an ordinary course and essential business practice that provides significant benefits to

the Debtors, including, but not limited to, the ability to (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

47.     Because the Debtors conduct business through their subsidiaries in a number of states, it would be difficult and wasteful to require the Debtors to establish and maintain a different and/or new cash management system.  The Debtors believe the Cash Management System is the most efficient and effective means to manage receipts and disbursements among the Debtors, vendors, and other counterparties.

48.     The Debtors believe that funds held in the Bank Accounts are secure and that all of the Bank Accounts are in compliance with section 345(b) of the Bankruptcy Code, except as set forth below.

49.     <u>UST Approved Depository Accounts</u>.  The Debtors' accounts at Bank of America, Wells Fargo, and JPMorgan Chase are all sufficiently secured since they are all on the United States Trustee's list of approved depositories.

50.     <u>FDIC Insured Accounts</u>.  The Debtors' Main Operating Account and related accounts at Compass Bank are all sufficiently secure because Compass Bank participates in the FDIC's Transaction Account Guarantee Program, which provides an unlimited guarantee on all non-interest bearing accounts. [4]

---

[4] As set forth in the *Debtors' Motion for Order Authorizing Debtors to Continue and Renew Letter of Credit and Surety Bond Programs* (the "Surety Motion") filed contemporaneously herewith, the Debtors posted approximately $12.5 million in outstanding letters of credit to secure the Debtors' letter of credit and surety bond obligations as explained in the Surety Motion. As such, under the Debtors cannot access these amounts because they are effectively pledged to secure the Debtors' potential obligations under the Surety Motion and not within the control of the Debtors.

51.     The accounts located at Chevy Chase Bank, Seaway Bank, and Citizen's generally have between $1,000 to $10,000 in each account and as such are secured by the FDIC's standard insurance limitation of $250,000 per account.

52.     The Bank of Hawaii Deposit generally has a balance of approximately $150,000 per month, except upon the collection of Baggage Fees, which could average about $200,000 per month.  However, the Debtors sweep the Baggage Fees from the Bank of Hawaii Deposit Account into the Main Operating Account on a monthly basis.  The Hawaii Ticket Refund Account generally has a balance of no more than $2,000 per month.  Accordingly, the Debtors believe that the Bank of Hawaii accounts are sufficiently protected by the FDIC's standard insurance limitation of $250,000 per account and believe that a waiver of the section 345(b) requirements is warranted given that the amounts that exceed the applicable FDIC limits are *de minim*is and that the excess amounts are swept into the fully protected Main Operating Account on a monthly basis.

53.     Mexican Bank Accounts.  The bank accounts located in Mexico are not in strict compliance with section 345(b) of the Bankruptcy Code because they are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."  These accounts are, however, insured by the Mexican government up to $140,000 per account.  The average balances in the Mexican bank accounts are generally less than the $140,000 insurance limitation except for the Mercantil Dollar Account, which at the beginning of each expense cycle has approximately $250,000.  However, the balance in the Mercantil Dollar Account reduced throughout the month as the funds are used to pay various operating expenses.  According, while the Debtors are not in strict compliance with section 345(b) of the Bankruptcy Code with respect to all of the Mexican

bank accounts, the Debtors believe that the amounts at issue and the attendant risk is *de minimis* and, as such, warrants a waiver to the extent required.

54.     Deferred Compensation Accounts.  The Debtors have four deferred compensation accounts.  The two accounts relating to Messrs. Gillman and Foley each have approximately $50,000.  Accordingly, the Debtors believe that these accounts are sufficiently secured by the FDIC's standard insurance limitation of $250,000 per account.  The remaining two deferred accounts, held for the benefit of Messrs. Ornstein and Lotz, contain both cash and cash equivalents each in the amount of approximately $322,000 and $334,000, respectively. While these last two accounts are not in strict compliance with section 345(b) of the Bankruptcy Code, the Debtors believe that the amounts and the risk is *de minimis* and, as such, warrant a waiver to the extent that these account are not in compliance.

55.     As noted above, to the extent the Debtors are not in compliance with section 345(b) of the Bankruptcy Code, the Debtors believe that "cause" exists to waive the requirements under section 345(b) because, among other considerations, the Debtors believe there is little risk and the benefit of waiving the 345(b) requirement and permitting the Debtors to maintain their current Bank Accounts far outweighs any potential harm to the estates.  *See generally*, *In re Service Merchandise Co., Inc.*, 240 B.R. 894 (Bankr. M.D. Tenn. 1999).

56.     To the extent necessary, such as if the Debtors open new accounts, or if any of their existing accounts that are currently in compliance with Section 345(b) fall out of compliance, the Debtors will attempt to cause any Bank that is not currently a party to a Uniform Depository Agreement with the Office of the United States Trustee to execute such agreement in the form prescribed by the Office of the United States Trustee within the forty-five day extension sought herein.

57.     Strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in these chapter 11 cases.  As to investments in securities of private entities, any corporate surety that might be obtained to guarantee the safety of an investment would likely not have significantly greater strength than the private and public entities in which the Debtors would invest in connection with the Money Market Account.  Moreover, a bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond is available at all, and could offset much of the financial gain derived from investing in private as well as federal or federally guaranteed securities.  Also, the yield on their available cash will be greater through utilization of the Money Market Account than if the Debtors were restricted to direct investment solely in government securities.

58.     Lastly, the Court may exercise its equitable powers to grant the relief requested herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a).  Continuing the Cash Management System without interruption is vital to the efficient and economic administration of these chapter 11 cases.  Therefore, it is within the Court's equitable power under section 105(a) of the Bankruptcy Code to approve the continued use of the Cash Management System.

## Intercompany Claims Between Affiliated Debtors

59.     The Debtors hereby request authority to continue to operate the Cash Management System to enable the Intercompany Arrangements to continue postpetition in the ordinary course of business.  To ensure each individual entity will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims between and

among affiliated Debtors arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status to the extent that such Intercompany Arrangements are not subsequently reconciled and/or repaid in the ordinary course of business. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

**Maintenance Of The Debtors' Existing
Bank Accounts And Business Forms Is Warranted**

60.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors maintained twenty-six (26) Bank Accounts with the financial institutions identified on Exhibit 1 annexed hereto.

61.     The Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11" mandate the closure of the Debtors' prepetition bank accounts, the opening of new accounts and the immediate printing of new checks with a "Debtor in Possession" designation on them. If the Debtors are required to comply with these guidelines, their operations would be severely harmed by the disruption, confusion, delay and cost that would most certainly result from the closure of their existing Bank Accounts.

62.     The Debtors believe, therefore, that their transition to chapter 11 will be more orderly, with a minimum of harm to operations and minimum costs, if all Bank Accounts are continued following the Petition Date with the same account numbers; *provided*, *however*, that checks issued on account of prepetition claims will not be honored, absent a prior order of the Court. By preserving business continuity and avoiding the disruption and delay to the

Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best served. Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course Bank fees that may be incurred in connection with the Bank Accounts prior to or following the Petition Date.

63. Unless otherwise ordered by this Court, no Bank shall honor or pay any check issued on account of a prepetition claim. The Banks may honor any checks issued on account of prepetition claims where this Court has specifically authorized such checks to be honored. Furthermore, notwithstanding anything to the contrary in any other "first day" order or other order of this Court, the Debtors request the Banks be authorized to accept and honor all representations from the Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date. The Banks shall not be liable to any party on account of following the Debtors' instructions or representations regarding which checks should be honored. The Banks shall also be permitted to accept and process chargebacks against the Bank Accounts arising out of returned deposits into such accounts without regard to the date such return item was deposited.

64. In addition, to minimize expenses, the Debtors further request they be authorized to continue to use their correspondence and business forms, including, but not limited to, purchase orders, multi-copy checks, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession,

*provided*, *however*, that within seven days after the Petition Date the Debtors shall print "Debtor in Possession" and the chapter 11 case number under which these cases are being jointly administered on their check stock and wire transfer instructions.

65.     If the Debtors are not permitted to maintain and utilize their Bank Accounts and continue to use their existing Business Forms, the resulting prejudice will include: (i) disruption of the ordinary financial affairs and business operations of the Debtors, (ii) delay in the administration of the Debtors' estates, and (iii) cost to the estates to set up new systems and open new accounts and to print new business forms.

66.     In other large chapter 11 cases, courts in this and other districts have recognized that strict enforcement of the requirement that a debtor in possession close its bank accounts does not serve the rehabilitative process of chapter 11. Accordingly, this Court and others have waived those requirements and replaced them with similar alternative procedures. *In re The Reader's Digest Assoc., Inc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Nov. 23, 2009) [Docket No. 306]; *In re Finlay Enter.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) [Docket No. 121]; *In re Lear Corporation*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 31, 2009) [Docket No. 255]; *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 2, 2008) [Docket No. 184]; *In re Delta Air Lines Inc.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) [Docket No. 148]; *In re Northwest Airlines Corporation*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) [Docket No. 615].

67.     Further, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

68.     Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

## **Necessity for Immediate Relief**

69.     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."  If the Debtors are not permitted to maintain and utilize their Bank Accounts and continue to use their existing Business Forms it would cause immediate and irreparable harm including:  (i) disruption of the ordinary financial affairs and business operations of the Debtors, (ii) delay in the administration of the Debtors' estates, and (iii) cost to the estates to set up new systems and open new accounts and to print new business forms. Accordingly, the interim relief requested herein is consistent with Bankruptcy Rule 6003.

## **Interim Order**

70.     The Debtors seek the relief requested in this Motion in the form of the interim order (the "Interim Order") attached hereto as Exhibit A.  Within three business days of the entry of the Interim Order, the Debtors will serve a copy of the Interim Order and this Motion on (a) the Office of the United States Trustee, (b) those creditors holding the five (5) largest secured claims against the Debtors' estates, (c) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, (e) the Securities and Exchange Commission and (f) the Banks.

71.     The deadline to file an objection ("Objection") to the Motion shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of the Interim Order (the "Objection Deadline").  An Objection shall be considered timely only if, on or prior to the Objection Deadline, it is (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the attorneys for any official committee of unsecured creditors then appointed in these cases.

72.     Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing.

If no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested herein, which order shall be submitted and may be entered with no hearing and no further notice or opportunity to be heard afforded to any party.  If an Objection is timely filed, a hearing will be held at a date and time to be established by the Court.

73.     The foregoing notice procedures satisfy Bankruptcy Rule 9014 by providing the counterparties with notice and an opportunity to object and be heard at a hearing. *See*, *e.g.*, *In re Drexel Burnham Lambert*, 160 B.R. 729, 734 (S.D.N.Y. 1993) (an opportunity to present objections satisfies due process); *In re Colorado Mountain Cellars, Inc.*, 226 B.R. 244, 246 (D. Colo. 1998) (a hearing is not required to satisfy Bankruptcy Rule 9014).  Furthermore,

the proposed notice procedures protect the due process rights of the parties in interest without unnecessarily exposing the Debtors' estates to unwarranted administrative expenses.

**<u>Notice</u>**

74.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) those creditors holding the largest thirty (30) unsecured claims against the Debtors' estates (on a consolidated basis), (iii) those creditors or their agents holding the five (5) largest secured claims against the Debtors' estates, (iv) the Internal Revenue Service, (v) the Securities and Exchange Commission, (vi) the Banks listed on <u>Exhibit 1</u>, and (vii) the Credit Card Companies.

75.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:    January 5, 2010
            New York, New York         PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Maria A. Bove*
Richard M Pachulski (*pro hac vice* pending)
Laura Davis Jones (*pro hac vice* pending)
Debra I. Grassgreen (*pro hac vice* pending)
Maria A. Bove
John W. Lucas

780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

Proposed Attorneys for Debtors
and Debtors in Possession

# EXHIBIT 1

## (Bank Accounts)

# Bank Accounts

| Bank Name & Address | Account Name | Account Number |
|---|---|---|
| **Banco Nacional De Mexico S.A.** | Nacional Expense Account | 887-54XXXX |
| **Banco Nacional De Mexico S.A.** | Nacional Collection Account | 887-54 XXXX |
| **Banco Mercantil del Norte S.A.** | Mercantil Peso Account | 006300 XXXX |
| **Banco Mercantil del Norte S.A.** | Mercantil Dollar Account | 1038 XXXX |
| **Banco Mercantil del Norte S.A.** | Mexico Money Market Account | 50033 XXXX |
| **Bank of Hawaii** | Hawaii Deposit Account | 0003-23 XXXX |
| **Bank of Hawaii** | Hawaii Ticket Refund Account | 0003-87 XXXX |
| **Wells Fargo Bank** | Wells Fargo DIA Liquor Account | 103-750 XXXX |
| **Wells Fargo Bank** | Workers Comp. Account | 106-038 XXXX |
| **BBVA Compass Bank** | Main Operating Account | 250105 XXXX |
| **BBVA Compass Bank** | Compass Money Market Account | 250119 XXXX |
| **BBVA Compass Bank** | Accounts Payable | 1286 XXXX |
| **BBVA Compass Bank** | Compass Bank Emergency Reserve | 8449 XXXX |
| **BBVA Compass Bank** | Freedom Airlines LOC Account | 251193 XXXX |
| **Bank of America** | Payroll | 942837 XXXX |
| **Bank of America** | MPD ASU | 942912 XXXX |
| **Bank of America** | Operating | 942845 XXXX |
| **Citizens Bank** | MPD Operating Account | 11717 XXXX |
| **JPMorgan Chase** | JP Morgan Clearinghouse Account | 910-2-46 XXXX |
| **Imperial Capital** | Bonds | 7LU-13 XXXX |
| **Chevy Chase Bank** | IAD Liquor deposits | 142430 XXXX |
| **Seaway Bank** | ORD Liquor deposits | 8012 XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 208-95S24 / 2089XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-95S31 / 412-2XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-9XXXX |
| **Merrill Lynch Trust Company** | Deferred Comp. Account | 412-9XXXX |

**Exhibit 2**
**Cash Flow Diagram**

# EXHIBIT 2

## **Cash Flow Diagram**



**Receipts**

Investments

Disbursements

Captive Insurance

Note: (z) = zero balance account

**Exhibit 3**
**Clearinghouse Descriptions**

# EXHIBIT 3

## Clearinghouse Descriptions



**Exhibit 4**
**Go! Mokulele Credit Card Process**

# EXHIBIT 4

## go! Mokulele Credit Card Process



**Exhibit 5**
**Mexico Station Accounts**

# EXHIBIT 5

## <u>Mexico Station Accounts</u>



**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-_____ (    ) |
| Debtors.[1] | (Jointly Administered) |

**ORDER PURSUANT TO SECTIONS 105(a), 345(b), 363(c), 364(c) AND 507(A) AND
BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING DEBTORS TO (I) CONTINUE
USING EXISTING CASH MANAGEMENT SYSTEM (II) MAINTAIN EXISTING BANK
ACCOUNTS AND BUSINESS FORMS AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated January 5, 2010 (the "Motion"), of Mesa Air Group, Inc.

("Mesa") and certain of its subsidiaries and affiliates, as debtors and debtors in possession

(collectively, the "Debtors"), seeking (i) authorization, pursuant to sections 105(a), 363(c), 345(b),

364(a) and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003(b) and 6004, to

(a) continue to operate their cash management system (the "Cash Management System"), (b) fund

the Debtors' operations, and (c) maintain the Debtors' existing bank accounts (the "Bank

Accounts") and business forms and (ii) a waiver of the requirements of section 345 of the

Bankruptcy Code to the extent the Cash Management System and Bank Accounts are not in

compliance with the Bankruptcy Code, all as described more fully in the Motion; and the Court

having jurisdiction is to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward Acting

C.J.); and consideration of the Motion and the relief requested therein being a core proceeding

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110);
Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688);
Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management,
LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

56772-001\DOCS_NY:19653.4

pursuant to 28 U.S.C. § 157(b)(2); and due and proper notice of the Motion having been provided and that no other or further notice is necessary; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in and that the legal and factual bases set forth in the Motion and the Declaration of Michael J. Lotz in Support of First Day Motions establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted and approved on an interim basis to the extent provided herein; and it is further

ORDERED that the Debtors are authorized and empowered, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained by the Debtors prior to the commencement of their chapter 11 cases (the "Petition Date"), as modified by this Order, and to collect, concentrate, and disburse cash in accordance with the Cash Management System, including intercompany and interdivision transfers of funds; and it is further

ORDERED that the Debtors shall maintain accurate records of all transfers within the Cash Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors prior to the Petition Date; and it is further

ORDERED that the Debtors are authorized to: (i) designate, maintain and continue to use any or all of their existing Bank Accounts listed on Exhibit 1 annexed hereto, in the names and with the account numbers existing immediately prior to the Petition Date, (ii) deposit funds in and withdraw funds from such accounts by all usual means including, without limitation, checks, wire transfers, automated clearinghouse transfers and other debits, (iii) pay any Bank or Credit

Card Company fees or charges associated with the Bank Accounts or Credit Card Receivables, and (iv) treat their prepetition Bank Accounts for all purposes as debtors in possession accounts; and it is further

ORDERED that nothing contained herein shall prevent the Debtors from opening any new bank accounts or closing any existing bank accounts as they may deem necessary and appropriate, with notice to the United States Trustee and any statutory committee appointed in these cases; provided that such account shall be with a bank that is insured by the Federal Deposit Insurance Corporation and organized under the laws of the United States or any state therein; and it is further

ORDERED that except as otherwise provided in this Order, all financial institutions in which the Debtors maintain the Bank Accounts as of the commencement of their chapter 11 cases are authorized and directed to continue to maintain, service, and administer such Bank Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires, or other transfers by the holders or makers thereof, as the case may be; provided, however, that nothing contained herein shall authorize any such financial institution to honor any check, draft, wire, or other transfer issued or dated prior to the Petition Date, except as otherwise provided by further order of this Court; *provided*, *however*, that any such financial institution may rely on the representations of the Debtors with respect to whether any check, draft, wire, or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to an order of this Court, and such bank shall not have any liability to any party for relying on such representation by the Debtors as provided for herein; and it is further

ORDERED that no later than the close of business on the fifth (5th) business day following entry of this Order, the Debtors shall make reasonable efforts to provide the Banks a list

(the "Prepetition Check List") of applicable checks that have not been honored prior to the Petition Date (the "Prepetition Checks"), designate whether or not such Prepetition Checks should be honored pursuant to any orders entered by the Court, and that a Bank's reasonable reliance on the Prepetition Check List in connection with its honoring or dishonoring of a Prepetition Check, as the case may be, shall not constitute a violation of this Order; and it is further

ORDERED that the Debtors shall use best efforts to cause any Bank that is not currently a party to a Uniform Depository Agreement to execute such agreement within 45 days from the date of this Order, subject to the Debtors' right to seek such a waiver of requirements of Section 345(b) of the Bankruptcy Code at the Final Hearing on the Motion; and it is further

ORDERED that to the extent that it later becomes necessary for the Debtors to obtain execution of a Uniform Depository Agreement between the Office of the United States Trustee and any Bank (or other new institution at which the Debtors may open an account), the Debtors shall have 45 days (or such additional time as the U.S. Trustee may agree to) from the entry of this Order to either come into compliance with section 345(b) of the Bankruptcy Code or to make such other arrangements as the U.S. Trustee may agree to; and it is further

ORDERED that, as soon as practicable after the Petition Date, the Debtors shall mark "Debtor in Possession" and the chapter 11 case number under which these cases are being jointly administered on their check stock, business form stock, and wire transfer instructions and shall not be required to order new stock with such marking until they exhaust their current stock; and it is further

ORDERED that, pursuant to section 364(a) of the Bankruptcy Code, the Debtors are authorized in connection with the ordinary course of their Cash Management System to obtain

4

unsecured credit and incur unsecured debt in the ordinary course of business without notice and a hearing; and it is further

ORDERED that the Debtors are authorized, but not directed, to pay prepetition amounts outstanding as of the Petition Date, if any, owed to their banks as fees or service charges for the maintenance of the Cash Management System; and it is further

ORDERED that within three business days of the entry of this Interim Order, the Debtors shall serve a copy of the Interim Order and the Motion on (a) the Office of the United States Trustee for the Southern District of New York, (b) those creditors holding the five largest secured claims against the Debtors' estates, (c) those creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis), (d) the Internal Revenue Service, (e) the Securities and Exchange Commission and (f) the Providers; and it is further

ORDERED that any objection (the "Objection") to the relief requested in the Motion on a permanent basis must, by 4:00 p.m. (prevailing Eastern Time) on the date that is 10 days after the date of the entry of this Interim Order (the "Objection Deadline"), be: (a) filed with the Court and (b) served upon and actually received by (i) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, (ii) the attorneys for the Debtors, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attn: Debra I. Grassgreen and Joshua M. Fried and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attn: Maria A. Bove, and (iii) the attorneys for any official committee of unsecured creditors then appointed in these cases; and it is further

ORDERED that a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (prevailing Eastern Time) on the day that is at least two business days before the date of the applicable hearing; and it is further

ORDERED that if timely Objections are received there shall be a hearing to consider such timely Objections to the Motion; and it is further

ORDERED that if no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Interim Order, which Order shall be submitted and may be entered with no further notice or opportunity to be heard afforded any party, and the Motion shall be approved *nunc pro tunc* to the date of the commencement of these chapter 11 cases; and it is further

ORDERED that this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Interim Order.

Dated: January __, 2010
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

56772-001\DOCS_NY:19653.4