PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**AFFIDAVIT OF MARC A. BILBAO IN SUPPORT OF THE DEBTORS' APPLICATION FOR ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF IMPERIAL CAPITAL, LLC, AS FINANCIAL ADVISOR AND INVESTMENT BANKER TO THE DEBTOR, *NUNC PRO TUNC* TO THE PETITION DATE**

Marc A. Bilbao, being duly sworn, deposes and says:

1.     I am a managing director of Imperial Capital, LLC ("Imperial") which

maintains its principal offices at 2000 Avenue of the Stars, 9th Floor South, Los Angeles,

California 90067.  I am authorized to execute this affidavit (the "Affidavit") on behalf of

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

Imperial. Unless otherwise stated in this Affidavit, I have personal knowledge of the facts set forth herein.

2. I submit this Affidavit in support of the *Application for Order Authorizing the Employment and Retention of Imperial Capital, LLC, as Financial Advisor and Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date* (the "<u>Application</u>").[2] I submit this Affidavit in compliance with sections 105, 327, 328 and 1107(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and to provide the disclosure required under Rules 2014(a), 2016 and 5002 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

3. To the extent that any information disclosed herein requires amendment or modification upon Imperial's completion of further analysis or as additional information becomes available to Imperial, I intend to submit, or cause to be submitted, a supplemental Affidavit to the Court reflecting the same.

### Imperial's Qualifications

4. Imperial is a full-service investment bank offering sophisticated institutional sales and trading, a wide range of investment banking advisory, capital markets and restructuring services, and institutional research. Imperial's institutional sales and trading professionals service over 1,200 institutional accounts. Imperial's investment banking professionals provide advisory services to middle market corporations, institution investors, and private equity funds.

5. In particular, Imperial and its professionals have extensive experience working with financially troubled companies in complex financial restructurings both in chapter

---

[2] Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

11 cases and in out-of-court situations. Imperial is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings.

6. As an active bankruptcy and restructuring advisor with significant experience in a variety of industries, Imperial is well-qualified to serve as financial advisor and investment banker to the Debtors. Imperial specializes in assisting and advising debtors, creditors, creditor's committees, shareholders, bondholders and other parties involved with financially distressed companies, both during and outside of bankruptcy cases, and has served as financial and strategic advisors for debtors, creditors, and other constituents in numerous chapter 11 cases. *See, e.g., In re MagnaChip Semiconductor Finance Co.*, No. 09-12008 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Dkt No. 274], *In re Monaco Coach Corp.,* No. 09-10750 (KJC) (Bankr. D. Del. April 9, 2009) [Dkt No. 132], *In re Qimonda Richmond LLC,* No. 09-10589 (MFW) (Bankr. D. Del. May 18, 2009) [Dkt No. 370], *In re Landsource Communities Development LLC,* No. 08-11111 (KJC) (Bankr. D. Del. Aug. 27, 2008) [Dkt No. 504], *In re Aloha Airlines Inc.,* No. 08-00337 (LK) (Bankr. D. Haw. April 8, 2008) [Dkt No. 203], *In re Movie Galley Inc.,* No. 07-33849 (DOT) (Bankr. E.D. Va. Nov. 27, 2007) [Dkt No. 1016], *In re Custom Food Products, Inc.,* No. 07-10495 (PJW) (Bankr. D. Del. June 14, 2007) [Dkt No. 307], and *In re Mesaba Aviation, Inc.*, No. 05-39258 (GFK) (Bankr. D. Minn. June 8, 2005) [Dkt No. 641].

7. Imperial also has significant knowledge of the Debtors' businesses and the airline industry. In early 2009, Imperial served as financial advisor to the Debtors in the successful restructuring of approximately $150 million of convertible notes. Imperial's investment bankers have also advised numerous other airlines and their constituents in a variety

of matters, including, but not limited to, Aloha Airlines, Hawaiian Airlines, the Official Committee of Unsecured Creditors for Mesaba Aviation, the Air Line Pilots Association ("ALPA") and its United Master Executive Council.

8.    In light of the size and complexity of these chapter 11 cases, the Debtors require the service of a seasoned and experienced financial advisor and investment banker, and one that is familiar with (i) the Debtors' businesses and operations and (ii) the chapter 11 process. Additionally, the Debtors believe that by having an advisor provide these services in these chapter 11 cases, other professionals in these cases – and company officers who might otherwise handle complex financial and financing matters – will be able to focus better on their respective competencies and their core tasks and efficiently and effectively advise in the management of the Debtors' businesses and operations and to facilitate a successful chapter 11 process. Imperial is well-qualified to provide the services being sought by the Debtors, and the employment of Imperial under the terms contained in the Engagement Letter will benefit the Debtors' estates and their reorganization efforts.

### Imperial's Disinterestedness

9.    In connection with the preparation of this Affidavit, Imperial reviewed the list of potential parties in interest that Imperial received from the Debtors (the "Parties in Interest"), a copy of which is attached hereto as Exhibit 2.

10.    To the best of my knowledge and belief, Imperial has not represented any of the Parties in Interest in connection with matters relating to the Debtors, their estates, assets or businesses and will not represent other entities which are creditors of, or have other relationships

to, the Debtors in matters relating to the Debtors, their estates, assets or businesses, except as otherwise set forth herein.

11.     Imperial provides financial advisory services to an array of clients in the areas of restructuring and distressed debt.  As a result, Imperial has represented, and may in the future represent, certain Parties in Interest in matters unrelated to these chapter 11 cases, either individually or as part of representation of a committee of creditors or interest holders.

12.     Imperial frequently has been and will continue to be engaged to perform corporate finance activities in the airline industry.  Notwithstanding, none of those engagements will involve airlines that are currently either creditors or equity holders of the debtors and where the work does not present a conflict with the debtors.

13.     Imperial and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Debtors pursuant to which Imperial may acquire information of interest to the Debtors.  Imperial has previously and may again represent Hawaiian Airlines with respect to various investment banking activities.  Imperial has previously and may again represent ALPA to provide ALPA and ALPA's United Master Executive Council with investment banking and other financial advisory services and advice with respect to UAL Corporation.  Imperial shall have no obligation to disclose such information to the Debtors, or to use such information in connection with the matters set forth in Section 1 of the Engagement Letter.

14.     To the best of my knowledge and belief, neither Imperial nor I, nor any other employee of Imperial that will work on the Debtors' engagement has any connection with

or holds any interest adverse to the Debtors, their estates or the Parties in Interest in the matters on which Imperial is proposed to be retained, except as otherwise set forth below:

a. Before the commencement of these cases, Imperial rendered prepetition services to the Debtors. As noted above, although Imperial's records indicate that it is not owed any amounts in respect of prepetition services provided to the Debtors, it is possible that certain expenses that were incurred by Imperial, and that are reimbursable under the terms of the Engagement Letter (attached hereto as Exhibit 1), were not yet reflected on Imperial's books and records as of the Petition Date to the extent such amounts are not covered by amounts paid to Imperial for estimated expenses. Upon entry of the Order approving the Application, Imperial will waive any claim for such unreimbursed expenses in excess of amounts paid to Imperial prepetition. Any surplus amounts paid to Imperial for estimated expenses will be applied to post-petition expenses.

b. Various departments within Imperial have numerous clients, past and present, which are located throughout the world, in a variety of industries. Such clients include certain of the equity holders of the Debtors and certain of the persons or entities that are identified as creditors of the Debtors. Imperial or its affiliates may have investments in certain of the Debtors' creditors and Imperial's research department may have issued research covering some of the Debtors' creditors, and may in the future issue research on additional creditors. The management of these investments and the direction of any Imperial research are not within my purview or the purview of Imperial's corporate finance department. Nevertheless, insofar as I have been able to ascertain based on the results of the foregoing, to the best of my knowledge, other than as described herein, except for the Debtors, Imperial has not advised any party in interest in connection with these chapter 11 cases.

c. Imperial is a large financial advisory firm and has likely provided services unrelated to the Debtors for companies and individuals that have conducted business in the past and/or currently conduct business with the Debtors, and who may be creditors of the Debtors. To the best of my knowledge, information and belief, Imperial's services to these parties were and are wholly unrelated to the Debtors, their estates or these chapter 11 cases.

d. As part of its practice, Imperial appears in numerous cases, proceedings, and transactions involving many different professionals, some of which may represent claimants and parties in interest in the Debtors' chapter 11 cases. Furthermore, Imperial

has in the past and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to these cases. Based on my current knowledge of the professionals involved, and to the best of my knowledge and information, none of these business relationships represents an interest materially adverse to the Debtors herein in matters upon which Imperial is to be engaged.

15.     To the best of my knowledge, information, and belief, Imperial has not been retained to assist any entity or person other than the Debtors on matters relating to these chapter 11 cases. If the Court approves Imperial's retention, Imperial will not accept any engagement or perform any service for any entity or person other than the Debtors in these chapter 11 cases. Imperial will, however, continue to provide professional services to entities or persons that may be creditors or equity security holders of the Debtors or Parties in Interest in these chapter 11 cases; provided that such services do not relate to, or have any direct connection with, these chapter 11 cases or the Debtors.

16.     If any new relevant facts or relationships are discovered or arise during the pendency of these chapter 11 cases, Imperial will use reasonable efforts to identify such further developments and will promptly file a supplemental affidavit as required by Bankruptcy Rule 2014.

17.     Accordingly, except as otherwise set forth herein, insofar as I have been able to determine, none of Imperial, I, nor any employee of Imperial who will work on the engagement holds or represents any interest adverse to the Debtors or their estates, and Imperial is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as

modified by section 1107(b) of the Bankruptcy Code, in that Imperial, and its professionals and employees who will work on the engagement:

a. are not creditors, equity security holders, or insiders of the Debtors;

b. were not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and

c. do not have an interest materially adverse to the interest of the Debtors' estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtors, or for any other reason.

## Reasonableness of Compensation

18. The Debtors and Imperial have acknowledged that (i) the hours worked, (ii) the results achieved and (iii) the ultimate benefit to the Debtors of the work performed in connection with the services provided under the Engagement Letter may be variable. The Debtors and Imperial have taken such factors into account in setting the Fee Structure set forth in the Engagement Letter.

19. The Fee Structure described in the Application and Engagement Letter is consistent with Imperial's normal and customary billing practices for comparably-sized and complex cases and transactions, both in and out of court, involving the services to be provided in connection with these chapter 11 cases. The Fee Structure was established to reflect the difficulty of the assignments Imperial expects to undertake.

20. Imperial will file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the

United States Bankruptcy Court for the Southern District of New York and any applicable orders of the Court, provided that Imperial and its professionals shall only be required to provide summary time records for services rendered postpetition, in hourly increments.

21.     As more fully described in the Engagement Letter, if the Application is granted, the Debtors will indemnify and hold Imperial harmless against liabilities arising out of or in connection with its retention by the Debtors except for any such liability for losses, claims, damages or liabilities incurred by the Debtors that are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the gross negligence, willful misconduct, bad faith or fraud of Imperial or a material breach of a term or condition of the Engagement Letter.

22.     Prior to the Petition Date and according to the terms of the Engagement Letter and the amendment dated December 29, 2009, Imperial received a total of $700,988 from the Debtors, including $625,000 from the Debtors on account of advisory fees, $50,000 on account of deposit for prepayment of certain estimated expenses (the "Deposit"), and $25,988 for reimbursable expenses.  Imperial will hold any amounts received prepetition in excess of fees and expenses that accrued prepetition, including the Deposit, and apply such excess amounts towards fees and expenses that accrue postpetition, subject to the entry of an order of the Court authorizing the payment of such fees and expenses.

23.     To the best of my knowledge, Imperial has no agreement with any other entity to share with such entity any compensation received by Imperial in connection with the Debtors' bankruptcy cases.

Dated: 1/5/10

Marc A. Bilbao

SWORN TO AND SUBSCRIBED before me on
this _____5_____ day of January, 2010.

NOTARY PUBLIC
My Commission expires:

**ANN MASON**
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01MA6159286
Qualified in Queens County
Commission Expires Jan. 16, 20 11

10

# EXHIBIT 1

## (Engagement Letter)



# Imperial Capital

2000 Avenue of the Stars, 9ᵗʰ Floor South    Los Angeles, California 90067    TEL 310 246 3700    800 929 2299    FAX 310 246-3794

July 2, 2009

Mesa Air Group, Inc.
410 North 44th Street, Ste. 700
Phoenix, AZ 85008
Attention: Jonathan Ornstein
          Executive Chairman and Chief Executive Officer

Dear Jonathan:

       Pursuant to this letter agreement (this *"Agreement"*) Mesa Air Group, Inc. (together with its subsidiaries and affiliates, the *"Company"*) hereby engages Imperial Capital, LLC (*"Imperial Capital"*) as the exclusive financial advisor to the Company to provide advisory services to the Company in connection with the evaluation of strategic alternatives and (i) the analysis, consideration, formulation and implementation of a restructuring of the existing securities, debt, aircraft leases or obligations (including, without limitation, an offer by the Company or any of its subsidiaries or affiliates with respect to the existing securities, debt or obligations, a solicitation of votes, approvals or consents giving effect thereto, the execution of any supplemental indenture giving effect thereto, an offer to exchange or acquire the existing securities, debt or obligations any modifications to, or suspensions of, the obligations to pay interest on the existing securities, debt, or obligations, or any amendments thereto) (a *"Restructuring"*) and (ii) a potential transaction, which transaction may include a merger, consolidation, or any other business combination, in one or a series of transactions, or a purchase or sale involving all or substantially all of the business, securities or assets of the Company, or one or more subsidiaries or divisions of the Company, or any transaction structured to substantially achieve the same result (each a *"Transaction"*) .

       Section 1. <u>Services to be Rendered</u>. As advisor to the Company, Imperial Capital shall perform the following services as may be requested in writing by the Company: (i) analysis of the Company's business, operations, properties, financial condition, competition, prospects and management; (ii) assisting the Company is the preparation of its financial forecasts and scenarios related thereto; (iii) financial valuation of the ongoing operations of the Company; (iv) assisting the Company in arranging and preparing for due diligence investigations and participating in meetings with the Company's creditor groups related to a Transaction and/or Restructuring; (v) assisting the Company in the preparation of reports and other materials related to a potential Restructuring, and updates on the Company and its financial performance and assisting the Company in the communication of such materials with its existing key constituents; (vi) assisting the Company in developing, evaluating, structuring and negotiating the terms and conditions of a potential Restructuring or Transaction, including the value of securities, if any, that may be issued to certain creditors under a Restructuring; (vii) assisting the Company in the preparation of solicitation materials with respect to a Transaction, and/or Restructuring including without limitation the preparation of an offering memorandum subject to the provisions of Section 4 herein (*"Offering Materials"*); (viii) identification of and contacting selected qualified buyers (*"Buyers"*) for a Transaction and furnishing them, on behalf of the Company, with copies of the Offering Materials related to a Transaction; and (ix) providing such other financial advisory services with respect to the Company's financial issues as may from time to time be agreed upon between the Company and Imperial Capital.

       Section 2. <u>Compensation</u>. In consideration for the services to be provided under this Agreement, Imperial Capital shall be paid:

          (i)     A financial advisory fee of $100,000 in the aggregate for July, August & September 2009 increasing to $125,000 per month beginning October 1, 2009  (the *"Monthly Advisory Fee"*), payable monthly in advance

during the term of this Agreement. The first Monthly Advisory Fee shall be payable upon execution of this Agreement and each subsequent Monthly Advisory Fee shall be payable in advance on the first day of each month. If the first Monthly Advisory Fee is payable for a partial month, such first Monthly Advisory Fee shall be pro rated from the date hereof to the end of the month.

        (ii)     A base fee of $2,500,000 (the *"Completion Fee"*), payable in cash upon the closing of a Restructuring or upon consummation of a Transaction. Provided, however, that the Completion Fee will be increased to $4,000,000 if the Restructuring or Transaction involves the raising of significant new financing or any substantial modification, to the benefit of the Company or the Company's estate, of existing aircraft lease agreements; capacity purchase agreements; maintenance agreements; or any other material contractual obligation of the Company. A Transaction shall be deemed to have been consummated upon the earliest of any of the following events to occur: (a) the acquisition of a majority of the outstanding common stock of the Company by the Buyer; (b) a merger or consolidation of the Company with or into the Buyer; (c) the acquisition by the Buyer of substantially all of the Company's assets; or (d) in the case of any other Transaction, the consummation thereof.

In addition, without regard to whether a Restructuring or Transaction is consummated or this Agreement expires or is terminated, all fees, disbursements and out-of-pocket expenses (the *"Expenses"*) incurred by Imperial Capital in connection with the services to be rendered hereunder (including, without limitation, reasonable attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses and other customary expenditures) shall be reimbursed to Imperial Capital, or paid on behalf of Imperial Capital, promptly as billed. Imperial Capital shall be paid a cash deposit of $50,000 (the *"Deposit"*) against Expenses upon the execution of this Agreement. Provided however, Imperial Capital will obtain the Company's prior written consent to any expenditure in excess of $10,000 and any expenditure of attorneys' fees. Any unused amounts of the Deposit will be returned to the Company upon demand. Further, the Company shall be responsible for all other Expenses associated with a Restructuring or Transaction, including, without limitation, its own reasonable and documented accounting and attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses, printing costs and other expenditures.

As further consideration, the Company agrees to the indemnification and other obligations set forth in Schedule I attached hereto, which such schedule is an integral part hereof and incorporated herein by reference. All fees and expenses payable to Imperial Capital pursuant to this Section 2 shall be payable in cash via wire transfer to an account designated by Imperial Capital. Except where noted in section 2, no fee paid or payable to Imperial Capital or any of its affiliates shall be credited against any other fee paid or payable to Imperial Capital or any of its affiliates.

In the event a Restructuring is consummated pursuant to a prepackaged plan of reorganization under Chapter 11 (*"Chapter 11"*), Title 11 of the United States Code (the *"Bankruptcy Code"*), the fees payable to Imperial Capital hereunder shall be deemed earned in full and the services of Imperial Capital pursuant to Section 1 hereof shall be deemed completed upon the receipt by the Company of the votes necessary to approve the plan of reorganization (whether through cramdown procedures or otherwise) prior to the filing of the Chapter 11 (as hereinafter defined) case. Additionally, in the event a Restructuring is consummated pursuant to a prenegotiated plan of reorganization, the fees payable to Imperial Capital hereunder shall be deemed earned in full and the services of Imperial Capital pursuant to Section 1 hereof shall be deemed completed upon the receipt by the Company of lock up agreements or other commitments to support a plan of reorganization from members of the Committee prior to the filing of the Chapter 11 case. In either of such events, Imperial Capital shall provide during the Chapter 11 case such additional services as are reasonably necessary (including testimony) to confirm and consummate the prepackaged or prenegotiated plan, as applicable, without additional compensation.

If the Company becomes a debtor under Chapter 11 and a Restructuring is not consummated pursuant to a prepackaged or prenegotiated plan of reorganization, or the fees payable to Imperial Capital pursuant to Section 2 hereof are not deemed earned and payable in full prepetition (for any reason whatsoever), or upon the request of Imperial Capital, the Company shall promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 bankruptcy case or cases of the Company (the *"Bankruptcy Court"*) for the approval of this Agreement and Imperial Capital's retention hereunder pursuant to sections 327 and 328 of the Bankruptcy Code and not subject to any other standard of review under Section 330 of the Bankruptcy Code. The Company shall supply Imperial Capital with a draft of such application and any proposed order authorizing Imperial Capital's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of its

filing, to provide Imperial Capital with a reasonable opportunity to review and comment thereon. Imperial Capital shall have no obligation to provide any services under this Agreement if the Company becomes a debtor under the Bankruptcy Code unless Imperial Capital's retention is approved under Section 328(a) of the Bankruptcy Code, by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Imperial Capital. If the Company becomes a debtor under the Bankruptcy Code and Imperial Capital's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Imperial Capital hereunder as promptly as practicable in accordance with the terms hereof or in accordance with any applicable Order of the Bankruptcy Court. Prior to commencing a Chapter 11 case, the Company shall pay all undisputed amounts theretofore due and payable to Imperial Capital in cash. If applicable, the Company shall also use its best efforts to provide for the payment of the fees and expenses set forth in Section 2 hereof in full in any plan of reorganization submitted to the Bankruptcy Court with the Completion Fee payable upon consummation of a Restructuring.

Section 3. <u>Term and Scope of Engagement</u>. The advisory services and compensation arrangements set forth herein do not encompass other investment banking services or any other specific services not set forth in Section 1 hereof. The compensation arrangements hereunder shall commence effective as of the date hereof and shall continue thereafter on a month-to-month basis pursuant to the terms hereof until the consummation of a Transaction or Restructuring. This Agreement may be terminated by either the Company or Imperial Capital upon fifteen (15) days prior written notice. Upon any termination or expiration of this Agreement, Imperial Capital shall be entitled to receive prompt payment of all unpaid fees and expenses accrued pursuant to Section 2 hereof up to and including the date of such termination or expiration. Sections 3, 5, 6, 8, 9 and 10 of this Agreement and the indemnity and other provisions contained in Schedule I shall remain operative and in full force and effect regardless of any termination or expiration of this Agreement.

In addition, if at any time within eighteen (18) months after the termination or expiration of this Agreement the Company completes a transaction similar to a Restructuring or Transaction contemplated herein and Imperial has not been paid under Section 2 (ii) of this Agreement, Imperial Capital shall be entitled to payment in full of the Completion Fee set forth in Section 2 hereof with respect to such transaction.

Section 4. <u>Cooperation</u>. To the extent possible, the Company shall: (i) furnish Imperial Capital with all current and historical financial and other information and data regarding the business and financial condition of the Company ("*Information*") as Imperial Capital reasonably believes appropriate in connection with its services hereunder; (ii) provide Imperial Capital with access to the officers, directors, employees and professional advisors of the Company as Imperial Capital reasonably believes appropriate in connection with its services hereunder; and (iii) with the assistance of Imperial Capital, be responsible for preparation of the Offering Materials. The Company agrees that it and its counsel will be solely responsible for ensuring that any Offering Materials comply in all respects with applicable law. The Company agrees that neither the Information nor Offering Materials will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made. The Company will promptly notify Imperial Capital if it learns of any material inaccuracy or misstatement in, or material omission from, any Information or Offering Materials theretofore delivered to Imperial Capital. The Company will also cause to be furnished to Imperial Capital at any closing of a Restructuring or Transaction, copies of such agreements, opinions, certificates and other documents delivered at the closing as Imperial Capital may reasonably request.

The Company recognizes and confirms that Imperial Capital, in connection with performing its services hereunder: (i) will be relying without investigation upon information that is available from public sources and upon the Information and Offering Materials supplied to it by or on behalf of the Company; (ii) shall not in any respect be responsible for the accuracy or completeness of such public information, Information or Offering Materials or have any obligation to verify the same; (iii) shall not conduct any appraisal or valuation of any assets or liabilities of the Company in connection with its services hereunder; and (iv) may require that any Offering Materials contain appropriate disclaimers consistent with the foregoing.

Section 5. <u>Confidentiality</u>. The Company agrees that any reference to Imperial Capital in any release, communication, or other material is subject to Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion. Any advice, written or oral, provided by Imperial Capital pursuant to this Agreement shall be treated by the Company as confidential, shall be solely for the information and assistance of the Company in connection with its consideration and negotiations with its creditors and other interested parties of the matters set forth in Section 1 hereof

and shall not, except as otherwise provided herein, be used, circulated, quoted or otherwise referred to for any other purpose, nor shall it be filed with, included in or referred to, in whole or in part, in any registration statement, proxy statement, offering materials or other communication, whether written or oral, prepared, issued or transmitted by the Company or any of their affiliates, directors, officers, employees, agents or representatives, without, in each instance, Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion; *provided, however,* that the foregoing shall not apply to any information which becomes publicly available other than as a result of the breach by the Company of the undertakings hereunder, or that which the Company is required to disclose by judicial or administrative process in connection with any action, suit, proceeding or claim.

Section 6. Conflicts. The Company acknowledges that Imperial Capital and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Company pursuant to which Imperial Capital may acquire information of interest to the Company. Imperial Capital shall have no obligation to disclose such information to the Company, or to use such information in connection with the matters set forth in Section 1 hereof. Notwithstanding the Company's obligation to pay the fees and expenses of Imperial Capital hereunder, to indemnify Imperial Capital and to provide Imperial Capital with Information, the Company recognizes that Imperial Capital is being engaged hereunder to provide the services described above only to the Company and is not acting as an agent or fiduciary of, and shall have no duties or liability to, the equity holders of the Company or any third party in connection with its engagement hereunder, all of which are hereby expressly waived. No one other than the Company is authorized to rely upon the engagement of Imperial Capital hereunder or any statements, advice or conduct by Imperial Capital.

The Company acknowledges that Imperial Capital or its affiliates may, from time to time, quote a market in or make purchases or sales for their own accounts or the accounts of its brokerage customers in debt or equity securities of or claims against the Company and Imperial Capital's research department may express views or opinions with respect thereto. Imperial Capital has, and agrees to maintain, information barriers between Imperial Capital's corporate finance department and its sales and trading department and research department, pursuant to which Imperial Capital's corporate finance employees are prohibited from disclosing confidential information to Imperial Capital's sales and trading or research employees.

Section 7. Public Announcements. Subject to the prior written consent of the Company, Imperial Capital shall have the right to place announcements and advertisements in financial and other newspapers and journals, at its own expense, describing its services in connection with the Restructuring or Transaction and other services rendered pursuant to this Agreement.

Section 8. Entire Agreement; Severability; Amendments; Assignments. This Agreement constitutes the entire agreement among the parties hereto related to the subject matter hereof and supersedes all prior agreements or understandings related to the subject matter hereof. If any provision of this Agreement is determined to be invalid, unlawful or unenforceable in any respect, such determination shall not affect such provision in any other respect or any other provision of this Agreement, which shall remain in full force and effect. This Agreement may not be amended or otherwise modified or waived except by an instrument in writing duly executed by both Imperial Capital and the Company. No waiver by either party of any provision hereof shall be taken or held to be a waiver of any subsequent breach thereof. This Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of the Company, Imperial Capital, each Indemnified Person (as defined in Schedule I hereto) and their respective permitted successors and assigns, and no other person or persons shall have the right to enforce the provisions hereof.

Section 9. Governing Law; Forum. This Agreement shall be construed, interpreted, governed and applied in all respects in accordance with the internal laws of the State of New York, without giving effect to principles of conflicts of laws. Except for Indemnification claims under schedule I any controversy, claim or dispute relating to this Agreement shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association pursuant to arbitration conducted in New York County, New York. Judgment upon such arbitration may be entered in any court having jurisdiction thereof. With respect to claims for Indemnification under schedule I the parties hereby consent to the jurisdiction of any State or Federal Court located within the New York County, State of New York. The parties further acknowledge that they waive any right they have or may have to a trial by jury with regard to the claims of Indemnification provided under Schedule I. If any litigation or arbitration shall ensue among the parties in connection with this Agreement

or arising out of Imperial Capital's engagement hereunder, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable attorneys' fees and other costs and expenses in connection therewith.

Section 10. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts (including by facsimile), each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument.

Section 11. <u>Board Approval.</u> This Agreement and Mesa's obligations herein are conditioned upon and subject to approval by the Company's Board of Directors.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Imperial Capital the enclosed original copy of this Agreement.

Very truly yours,

**IMPERIAL CAPITAL, LLC**

By: _____
Name:    Marc Bilbao
Title:    Managing Director

Accepted and agreed as of the date first above written:

**MESA AIR GROUP, INC**

By: _____
Name:    Jonathan Ornstein
Title:    Chief Executive Officer

## Schedule I

This Schedule I is a part of and is incorporated into that certain letter agreement (the "*Agreement*") dated June 22, 2009 by and between Mesa Airgroup, Inc. (together with its subsidiaries and affiliates, the "*Company*") and Imperial Capital, LLC ("*Imperial Capital*").

If the Company commences a case under title 11 of the United States Code, any and all obligations and agreements of the Company under this Schedule I shall be equally applicable to, and binding upon, each of the Company's bankruptcy estates and any chapter 7 trustee appointed in the Company's bankruptcy cases, in each such case to the extent applicable.

Because Imperial Capital will be acting on behalf of the Company in connection with the services contemplated by the Agreement, and as part of the consideration for the agreement of Imperial Capital to furnish its services pursuant to the Agreement, the Company (the "*Indemnifying Party*") agrees, jointly and severally, to indemnify and hold harmless Imperial Capital and its affiliates, and their respective officers, directors, partners, members, shareholders, employees, representatives and agents and each person, if any, who controls Imperial Capital or any of its affiliates within the meaning of the Securities Act of 1933, as amended, (Imperial Capital and each such other person being referred to as an "*Indemnified Person*"), to the full extent lawful, from and against all claims, liabilities, losses, damages and expenses, or actions in respect thereof, as incurred, based upon, related to, arising out of, or in connection with (i) actions taken or omitted to be taken by the Company and their affiliates, officers, directors, counsel, employees or agents, (ii) actions taken or omitted to be taken by any Indemnified Person pursuant to the terms of, or in connection with, the services rendered pursuant to the Agreement or in connection with any Restructuring or Transaction or proposed transaction contemplated thereby or any Indemnified Person's role in connection therewith, and (iii) any untrue statement or alleged untrue statement of a material fact contained in any of the Information or Offering Materials (each as defined in the Agreement) or omission or alleged omission to state a material fact required to be stated therein to make the statements therein not misleading, and shall reimburse each Indemnified Person promptly upon demand for any legal or other expenses (including, without limitation, fees and expenses of counsel) reasonably incurred by that Indemnified Person in connection with investigating, preparing to defend, defending against, or appearing as a third party witness, in connection with any such claims, liabilities, losses, damages, expenses or actions; *provided, however*, that the Indemnifying Party shall not be responsible for any claims, liabilities, losses, damages, expenses or actions of any Indemnified Person to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person. No Indemnified Person shall have any liability to the Company, or any of their respective affiliates, officers, directors, partners, members, shareholders, employees, representatives and agents in connection with the services rendered pursuant to the Agreement except to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person.

Promptly upon receipt by an Indemnified Person of notice of any claim or the commencement of any action, if an indemnification claim in respect thereof is to be made against the Indemnifying Party, the Indemnified Person shall notify the Indemnifying Party in writing of the claim or commencement of such action; *provided, however*, that the failure to so notify shall not relieve the Indemnifying Party from any liability which it may have pursuant to this Schedule I except to the extent, and only to the extent, that it has been materially prejudiced by such failure to so notify; and, *provided, further*, that the failure to so notify shall not relieve the Indemnifying Party from any liability it may have to an Indemnified Person otherwise than pursuant to this Schedule I. If any such claim or action shall be brought against an Indemnified Person, the Indemnifying Party shall be entitled to participate therein and to assume the defense thereof at its expense with counsel reasonably satisfactory to the Indemnified Person. After notice from the Indemnifying Party to the Indemnified Person of its election to assume the defense of such claim or action, the Indemnifying Party shall not be liable to the Indemnified Person under this Schedule I for any legal or other expenses subsequently incurred by the Indemnified Person in connection with the defense thereof other than reasonable costs of investigation; *provided, however*, that any Indemnified Person shall have the right to employ separate counsel in any such action and to participate in the defense thereof; and, *provided, further*, that Indemnifying Party shall continue to be liable for the legal or other expenses incurred by the Indemnified Person in connection with the defense of such action if (i) the employment of such separate counsel has been specifically authorized by the Indemnifying Party in writing, (ii)

such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Indemnifying Party and in the reasonable judgment of such counsel it is advisable for the Indemnified Person to employ separate counsel (in which case the Indemnifying Party shall not have the right to assume the defense of such action on behalf of the Indemnified Person), (iii) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Person would, in the reasonable judgment of the Indemnified Person, present such counsel with a conflict of interest, or (iv) the Indemnifying Party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the Indemnified Person, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Persons. The Indemnifying Party shall not settle or compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action or claim in which any Indemnified Person is or could be a party and as to which indemnification or contribution has or could have been sought by such Indemnified Person pursuant to this Schedule I, unless such Indemnified Person has given its prior written consent to the settlement, compromise, consent or termination or such settlement, compromise, consent or termination includes an express complete and unconditional release of such Indemnified Person.

In order to provide for just and equitable contribution, if any claim for indemnification with respect to claims, liabilities, losses, damages, expenses or actions in respect thereof covered by this Schedule I is found to be unenforceable in a final judgment (not subject to further appeal) by a court of competent jurisdiction or is otherwise unavailable or insufficient to hold harmless an Indemnified Person (except directly due to the fraud, willful misconduct or gross negligence of the Indemnified Person), then the Indemnifying Party shall, in lieu of indemnifying such Indemnified Person, contribute to the amount paid or payable by such Indemnified Person as a result of such claims, liabilities, losses, damages, expenses or actions in respect thereof, in such proportion as shall be appropriate to reflect the relative benefits received and relative fault of the Indemnifying Party on the one hand and the Indemnified Person on the other, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnifying Party agrees that it would not be just and equitable if contributions pursuant to this Schedule I were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein. No person found liable for a fraudulent misrepresentation or omission shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation or omission. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Persons with respect to such claims, liabilities, losses, damages, expenses or actions in respect thereof shall not exceed the amount of fees actually received by Imperial Capital for its services pursuant to the Agreement.

The foregoing indemnity, contribution and expense reimbursement provisions are not exclusive and shall be in addition to any liability which the Indemnifying Party might otherwise have and shall not limit any rights or remedies which may otherwise be available at law or in equity to the Indemnified Persons. These indemnification provisions shall (i) remain operative and in full force and effect regardless of any termination or expiration of the Agreement; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Indemnified Person, and (iv) shall be binding on any successor or assign of the Indemnifying Party and each of its successors or assigns.



2000 Avenue of the Stars, 9ᵗʰ Floor South    Los Angeles, California 90067    TEL 310 246 3700    800 929 2299    FAX 310 246-3794

December 29, 2009

Mesa Air Group, Inc.
410 North 44th Street, Ste. 700
Phoenix, AZ 85008
Attention:  Jonathan Ornstein
            Executive Chairman and Chief Executive Officer

Dear Jonathan:

This letter (the "*Letter Agreement*") will amend the letter agreement dated as of July 2, 2009 between Mesa Air Group, Inc. (together with its direct and indirect subsidiaries and affiliates, the "*Company*") and Imperial Capital LLC ("*Imperial*") (the "*Engagement Letter*"), as follows (capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Engagement Letter):

1.  Section 2(i) of the Engagement Letter shall be amended in its entirety to read as follows:

    "Section 2(i)   A financial advisory fee of $150,000 per month beginning January 1, 2010 (the "*Monthly Advisory Fee*"), payable monthly in advance during the term of this Agreement.  The first Monthly Advisory Fee shall be payable upon execution of this Agreement and each subsequent Monthly Advisory Fee shall be payable in advance on the first day of each month."

2.  Section 2(ii) of the Engagement Letter shall be amended in its entirety to read as follows:

    "Section 2(ii)   A base fee of $2,500,000 (the "*Completion Fee*"), payable in cash upon the closing of a Restructuring or upon consummation of a Transaction.  Provided, however, that the Completion Fee will be increased to $3,800,000 if the Restructuring or Transaction involves the raising of significant new financing (not less than $15.0 million) or if the present value of expected future cash benefits resulting from the Restructuring or Transactions exceeds $20.0 million[1]. A Transaction shall be deemed to have been consummated upon the earliest of any of the following events to occur: (a) the acquisition of a majority of the outstanding common stock of the Company by the Buyer; (b) a merger or consolidation of the Company with or into the Buyer; (c) the acquisition by the Buyer of substantially all of the Company's assets; or (d) in the case of any other Transaction, the consummation thereof.

    ---

    [1]  *Which benefits could include, without duplication: reduced expected future cash losses; reduced future cash expenses; increased future cash revenues; reduced future customer inducement payments; with all such expected future cash benefits discounted at 10.0% for the purposes of determining the fees pursuant to 2(ii) above.*"

Except as expressly amended hereby, the Engagement Letter is in all respects ratified and confirmed and all the terms thereof shall be and remain in full force and effect.

In addition, the parties hereto expressly agree that the terms of the indemnification as set forth in Schedule I and incorporated by reference into the Engagement Letter providing for the indemnification by the Company of Imperial and

certain related persons and entities shall remain in full force and effect and shall be deemed to cover the engagement as amended hereby.

If you are in agreement with the above amendment, please so indicate by signing this letter in the space designated below and returning it to us whereupon this amendment shall be binding on the parties hereto.

Very truly yours,

IMPERIAL CAPITAL, LLC

By: _____
      Marc Bilbao
      Managing Director

Accepted and agreed as of the date first written above:

MESA AIR GROUP, INC.

By: _____
    Jonathan Ornstein
    Executive Chairman and Chief Executive Officer

# EXHIBIT 2

## Parties-In-Interest

**Debtors and Non-Debtor Affiliates**

Air Midwest, Inc.
Freedom Airlines, Inc.
Mesa Air Group, Inc.
Mesa Air Group Airline Inventory Management, LLC
Mesa Air New York, Inc.
Mesa Airlines, Inc.
Mesa In-Flight, Inc.
MPD, Inc.
Nilchi, Inc.
Patar, Inc.
Regional Aircraft Services, Inc.
Ritz Hotel Management Corp.

**Directors**

Jonathan Ornstein
Michael J. Lotz
Daniel J. Altobello
Robert Beleson
Carlos E. Bonilla
Joseph L. Manson
Peter F. Nostrand
Maurice A. Parker
Richard R. Thayer
Brian Gillman
Christopher Pappaioanou

**Secured Lenders**

AAR Corp.
Ameritech Credit Corporation
BCI Aircraft Leasing
Bombardier
Bombardier Services Corp.
Brafco
CIT Group
Citibank
Citicorp North America
Craft
Debis Financial Services
EDC
Fleet Bank
Fluid Aviation, LLC
GE
GE Commercial Aviation Services
General Electric Credit Corporation
National City Leasing Corporation

Pacific Century Leasing Inc.
Philip Morris Credit Corp
Raspro
Phillip Morris Credit Corp
Raytheon
Transamerica Finance
Wonderfulworld Holding BV

**Significant Litigation Claimants**

Association of Flight Attendants, AFL-CIO
Carole Diamond
Decedent Walter Hilderbrand - executrix Brenda Hilderbrand
Delta Air Lines, Inc.
Emily Gillette
FAA/MMAC
Jodi Harmon
Randy Klinckhardt
Robert Herbstreith
Roy Oliver
TSA
United Air Lines, Inc.

**Significant Noteholders**

Acuity Capital Management, LLC
Argent Funds Group, LLC
Anchorage Advisors LLC
Bank of Ireland
Bank of Scotland
BNP Paribas Arbitrage SNC
Cetus Capital, LLC
Citi Global Markets, Inc.
Duquesne Capital Management
Fir Tree Partners
Geode Capital Management, LLC
Lampe, Conway & Co.
Marathon Asset Management
Quattro Global Capital, LLC
QVT Financial LP
Varde Partners Inc.
WilmerHale
Wolverine Asset Management, LLC
York Capital

**Largest Unsecured Creditors**

AAR Corp.
AT&T Capital Services
Avmax
Bank of Hawaii
Bombardier
Bombardier Services Corp.
Cargill
Debis Financial Services
Embraer
Fleet Bank
Fluid Aviation
Fokker Services Inc
GE Capital Aviation Services (GECAS)
GE Engine Services
Goodrich
Holiday Inn
IHI Corporation
Invissement Quebec
Messier Services Americas
NCBE
Northstar
Philip Morris Credit Corp
PNC
Pratt & Whitney Canada
Pratt & Whitney Engine Service
Rolls-Royce
SW Holding Trust
Swissport USA, Inc.
TransAmerica
US Bank National Assoc.
Wells Fargo Equipment Finance
Wondefulworld Holding BV

**Shareholders Holding More than 5% Equity Interests**

AAR Corp.
Deutsche Bank
Goldman Sachs
LC Capital Master Fund, Ltd.
Zazove Associates

**Professionals**

Deloitte & Touche
Imperial Capital, LLC
Jones Day

**Unions**

Air Line Pilots Association
Association of Flight Attendants, AFL-CIO

**Other Parities in Interest**

Internal Revenue Service
Federal Communications Commission