PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Proposed Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MESA AIR GROUP, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 10-10018 (MG)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR AUTHORIZATION
PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE TO
ASSUME CODE-SHARE AGREEMENT, AS AMENDED, WITH
DELTA AIR LINES, INC.**

TO THE HONORABLE MARTIN GLENN:

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), hereby file this motion (the "Motion") and respectfully represent as follows:

---

[1] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

## Background

1. On January 5, 2010 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. On January 13, 2010, the United States Trustee formed an Official Committee of Unsecured Creditors in the Debtors' cases (the "Committee"), which Committee is comprised of Bombardier, Inc., Embraer-Empresa Brasilieire de Aeronautica S.A., U.S. Bank National Association, AT&T Capital Services, Wilmington Trust Company, IHI Corporation, and Air Line Pilots Association. No trustee or examiner has been appointed in the Debtors' cases.

## Mesa's Business

4. Mesa is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service. As of the Petition Date, the Debtors' airline operations serve approximately 127 cities in 41 states, the District of Columbia, Canada, and Mexico. The Debtors operate a fleet of approximately 130 aircraft with approximately 700 daily system departures. The Debtors employ approximately 3,400 full and part-time employees.

5. Mesa Airlines, Inc. ("Mesa Airlines") operates regional jet and turboprop aircraft

under the names of regional carriers of certain major airlines pursuant to code-share agreements. Specifically, Mesa Airlines operates (i) as US Airways Express under code-share agreements with US Airways, Inc., (ii) as United Express under a code-share agreement with United Airlines, Inc., and (iii) independently in Hawaii as *go!* Mokulele ("*go!*").

6. Debtor Freedom Airlines, Inc. ("Freedom") operates regional jet aircraft as Delta Connection under a code-share agreement with Delta Air Lines, Inc. ("Delta"). The remaining Debtors operate businesses, or own interests in businesses, that facilitate or enhance the Debtors' regional or independent air carrier services. Nilchi, Inc. and Patar, Inc. hold investments.

7. The Debtors' consolidated 2009 revenues were approximately $968 million. Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009, were derived from operations associated with code-share agreements, including the Delta Agreement (as defined below).

## Jurisdiction

8. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

9. The Debtors request, pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006, authorization to assume, and perform all obligations under, the Delta Agreement (as defined below). The Debtors submit that the relief sought herein is reasonable and represents an appropriate exercise of their sound business judgment.

## The Debtors' Code-Share Agreement With Delta Air Lines, Inc.

A. **In General**

10. Generally under the Debtors' code-share agreements, the Debtors provide air transportation services to the applicable principal carrier's customers on various flight routes, using the principal carrier's flight designator codes and its livery and service marks.[2] In exchange for providing flights and other services pursuant to the applicable code-share agreement, the Debtors receive compensation (including minimum monthly amounts and additional amounts based on, for example, number of flights and block hours performed during the month) from the principal carriers and are also reimbursed for certain expenses by the principal carriers. In some cases, the principal carriers also provide certain customer service, ground handling service and/or other functions to the Debtors in connection with the foregoing.

11. The applicable principal carriers also have code-sharing agreements with other airlines (including members of their respective SkyTeam and Star Alliances), whereby one airline markets and sells air transportation to its passengers in conjunction with the scheduled services provided by another airline, and in doing so, each party is permitted to use the other's flight designator code. These agreements afford customers the options and flexibility of traveling on multiple airlines while being treated as a customer traveling on a single airline. Through these arrangements, the applicable carriers and their respective code-sharing counterparties are able to offer passenger services between cities by making available one-stop service via cities served among the Debtors, the principal carriers, and the other carriers.

12. Typically, the principal carriers net out from payments due to the Debtors

---

[2] The Debtors also have code-share agreements with US Airways, Inc. and United Air Lines, Inc. This Motion deals only with the Debtors' code-share agreement with Delta. The Debtors reserve all their rights with respect to their other code-share agreements.

obligations owed by the Debtors under the applicable code-share agreement, or if necessary, the Debtors directly pay the principal carriers for any obligations.

B. **Debtors' Agreement with Delta Air Lines, Inc.**

13. Mesa, Freedom and Delta are parties to that certain Delta Connection Agreement dated as of May 3, 2005 (as amended, the "Delta Agreement"), pursuant to which, among other things, Freedom agreed to provide certain regional air transportation services under Delta's flight designator code as a Delta Connection Carrier under Delta's Connection Program. A redacted copy of the Delta Agreement (including all amendments thereto) is attached hereto as Exhibit A.[3] The Delta Agreement affects approximately 64 flight routes, serving approximately 33 cities throughout the United States, predominantly in the Cincinnati, Ohio and Detroit, Michigan hubs, and the Debtors operate 22 ERJ-145 aircraft as part of the Delta Connection Program. The Debtors currently utilize approximately 220 aircraft pilots, 110 flight attendants, and over 100 maintenance and support staff, to provide services under or in connection with the Delta Agreement. As discussed further below, the Delta Agreement has historically been a source of a substantial portion of the Debtors' revenues, and will constitute approximately 18% of Mesa's consolidated passenger revenues, effective May 2010. Further, at that point, the aircraft used in connection with the Delta Agreement will constitute approximately 22% of the Debtors' entire operating fleet.

14. The Debtors believe that they are current under the Delta Agreement (*i.e.*, no amounts are overdue and payable).[4] Subject to the entry of an order authorizing the Debtors'

---

[3] The Debtors have concurrently filed herewith a motion to file under seal portions of the Delta Agreement containing confidential business and financial information. A redacted copy of the Delta Agreement is attached hereto.

[4] On the Petition Date, the Debtors filed a motion to honor and satisfy prepetition obligations (if any) under certain industry related agreements, including the Debtors' code-share agreements, and to continue honoring such agreements in the ordinary course of business. The Debtors have been paying any amounts owed to Delta under the

assumption of the Delta Agreement, the Debtors will continue to honor the Delta Agreement in the ordinary course of business.

15. The Debtors believe that Delta owes the Debtors approximately $10.1 million as of the date hereof in claims arising under or relating to the Delta Agreement (in addition to the over-$70 million in damages discussed in paragraph 17 below), including pre-billed items, 2009 rate increases mitigated by the MFN provisions (discussed below), maintenance related charges, and other miscellaneous items. The Debtors reserve their rights with respect to such claims and any other claims that they may have against Delta related to or under the Delta Agreement.

16. Notwithstanding the Debtors' belief that there are no pending defaults under the Delta Agreement, Delta disputes such contention. Delta and the Debtors are parties to several prepetition actions (collectively, the "Delta Related Actions"),[5] in certain of which Delta has alleged defaults by the Debtors, which allegations are disputed by the Debtors:

***Delta Agreement Related Litigation:***

(i) On or about March 28, 2008, Delta sent a letter to the Debtors, purporting to terminate the Delta Agreement with respect to certain ERJ-145 aircraft, on the basis that the Debtors allegedly failed to maintain certain flight completion rates (which were retroactively adjusted by Delta) during certain prior time periods. Prior to this notification letter, the Debtors were unaware of any dispute or issue with respect to the Debtors' completion rates and method of calculation thereof, and as set forth in the Preliminary Injunction Order (defined below), the Debtors justifiably relied on the

---

Delta Agreement in the ordinary course of business, pursuant to the Court's interim order on the motion entered on January 5, 2010.

[5] The Debtors will shortly file motions in the Georgia District Court seeking to transfer the Delta ERJ Litigation and the Delta MFN Litigation, as such terms are defined above, pending in that court to this Court, pursuant to 28 U.S.C. § 1412.

representations, omissions and conduct of Delta to believe that the Debtors' method of calculating the completion rates during the months in question was acceptable to Delta. On or about April 7, 2008, Mesa and Freedom commenced an action in the United States District Court for the Northern District of Georgia (the "Georgia District Court") to prevent such termination attempt by Delta (the "Delta ERJ Litigation"). Following an evidentiary hearing ending on May 29, 2008, the Georgia District Court issued a preliminary injunction against Delta (the "Preliminary Injunction Order", a copy of which is attached hereto as Exhibit B) prohibiting it from terminating the Delta Agreement and finding that Delta acted in bad faith. Delta appealed the Preliminary Injunction Order, and on July 2, 2009, the Court of Appeals for the Eleventh Circuit affirmed the issuance of the injunction, finding that Mesa and Freedom had demonstrated a substantial likelihood of success on the merits. A trial date has not yet been set by the Georgia District Court.

(ii) On or about August 19, 2009, Delta commenced an action against Mesa in the Georgia District Court alleging that Mesa breached certain "most favored nations" ("MFN") provisions of the Delta Agreement covering the ERJ aircraft (the "Delta MFN Litigation"). Delta sought a declaratory judgment that, among other things, Mesa was in material breach of the Delta Agreement. On September 25, 2009, Mesa filed a motion to dismiss the Delta MFN Litigation as it relates to the assertion that the alleged breach was material. The Georgia District Court has not yet ruled on Mesa's motion. Mesa anticipates filing a counterclaim against Delta in the Delta MFN Litigation related to Delta's failure to utilize Mesa's aircraft on a "full time basis" as required in the Delta

Agreement and Delta's refusal to comply with the annual rate setting provisions of that agreement.

***Other Delta Litigation:***

(i) Following the commencement of the Delta ERJ Litigation, Delta terminated a separate agreement between Mesa and Delta relating to certain CRJ-900 aircraft, which were owned by Delta but operated by Mesa. These aircraft were returned to Delta upon termination of that agreement. On March 20, 2009, Mesa commenced an action in the Georgia District Court seeking damages, including lost profits and costs associated with the re-training of pilots (the "Delta CRJ Litigation"). Delta filed a counterclaim alleging breach of contract for failing to meet certain contract conditions, which allegations are disputed by the Debtors.

(ii) On August 6, 2008, Mesa commenced an action in the United States District Court for the District of Arizona against Delta seeking the return of seven aircraft engines that Delta had improperly retained following the termination of an engine maintenance memorandum of understanding between Mesa and Delta (the "Engine Litigation"). On August 12, 2008, Delta agreed to return the engines to Mesa, and on August 22, 2008, Delta filed a mechanics lien on the engines along with a counterclaim seeking to foreclose on the liens. Mesa moved for judgment on the pleadings as to Delta's liens due to Delta's failure to comply with the Georgia lien statute. On November 14, 2008, the Court ruled that Delta had forfeited its lien claims. On November 20, 2008, Delta filed a notice of appeal to the Court of Appeals for the Ninth Circuit (the "Ninth Circuit"). The issues raised by Delta on appeal have been fully briefed and await decision by the Ninth Circuit. During the pendency of the appeal, the

parties have concluded discovery on the substantive claims, and Mesa's motion for summary judgment is pending.

17. As has been asserted or will be asserted by the Debtors in the foregoing actions, Delta owes or is otherwise liable to the Debtors for more than $70 million in damages in connection with all of the Delta Related Actions, including, without limitation: (i) the Debtors' significant profits that would have been gained over the term of the parties' agreement (improperly terminated by Delta) that is the subject matter of the Delta CRJ Litigation; (ii) the Debtors' substantial damages caused by Delta's failure to properly utilize the Debtors' aircraft fleet on a full-time basis in accordance with the Delta Agreement; (iii) the Debtors' damages caused by Delta's refusal to engage in the annual rate setting procedures set forth in the Delta Agreement; (iv) the Debtors' damages caused by Delta's wrongful interference with the Debtors' possessory interests in certain aircraft engines; and (v) the Debtors' claims for attorneys' fees and costs, punitive damages in respect to certain actions, and other damages. The Debtors reserve their rights with respect to such claims and any other claims that they may have against Delta related to or under the Delta Agreement.

**Assumption of the Delta Agreement is Supported by the Debtors' Business Judgment, is in the Debtors' Best Interests, and Should Be Approved By the Court**

18. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (reaffirming that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to renounce title to and abandon

burdensome property.") (internal quotations and citation omitted).

19. The standard to be applied by a court in determining whether assumption of an executory contract pursuant to section 365(a) should be approved is the "business judgment" test, which requires that the debtor determine that the requested assumption would be beneficial to its estate. *See, e.g., In re Group of Inst. Investors, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp.*, 4 F.3d at 1098-99 (to decide a motion to assume, the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996) (decision to assume was exercise of good business judgment); *In re Nat'l Sugar Refining Co.*, 26 B.R. 765, 767 (Bankr. S.D.N.Y. 1983) (debtor seeking to assume a profitable contract should be allowed to do so).

20. Upon finding that the debtor has exercised sound business judgment in determining that the assumption of an executory contract is in the best interests of the debtor, the court should approve such assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997); *In re Bradlees Stores, Inc.*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). A debtor's decision to assume an executory contract based on its business judgment will generally not be disturbed "absent a showing of bad faith or abuse of business discretion." *In re Chipwich, Inc.*, 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985).

21. The Debtors' assumption of the Delta Agreement is clearly in the best interest of the estates. Revenue under the Delta Agreement will constitute approximately 18% of

Mesa's consolidated passenger revenues, effective May 2010.[6] Thus, it is a significant piece of the Debtors' reorganization that the Debtors maintain and continue with this agreement with Delta. The Debtors provide the applicable services to Delta under the Delta Agreement, and in return, the Debtors receive a sizable portion of their aggregate revenues. Given the key role of such arrangements in the Debtors' business in general and the importance of the Delta Agreement in particular, the Debtors' prospects of successfully reorganizing through these chapter 11 proceedings are greatly impacted by the Debtors' ability to continue to generate revenue under the Delta Agreement. Relatedly, the Debtors' assumption of the Delta Agreement will have important workforce consequences. As noted above, the Debtors currently utilize the services of over 400 workers to provide services under or in connection with the Delta Agreement. Assumption of the Delta Agreement will preserve jobs for this workforce (and, among other things, also minimize termination or rejection related claims against the estates that would otherwise arise).

22. Given the critical importance of a debtor's code-share or related agreements in the airline industry, various courts have authorized the assumption of such or similar agreements by debtors. *See, e.g., In re Hawaiian Airlines, Inc., et al.*, Case No. 03-00817 (RJF) (Bankr. D. Haw. Mar. 24, 2003) [Docket No. 84]; *In re GP Express Airlines, Inc.*, 200 B.R. 222 (Bankr. D. Neb. 1996); *In re Northwest Airlines Corporation, et al.*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) [Docket No. 619]; *In re US Airways, Inc., et al.*, Case No. 04-13819 (SSM) (Bankr. E.D. Va. Sept. 14, 2004) [Docket No. 103]; *In re UAL Corp., et al.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 10, 2002) [Docket No. 200].

---

[6] Over several months, there will be a contractually planned scale-down in the Debtors' services under the Debtors' code-share agreement with United Airlines, Inc., as a result of which, from that point, the revenue from the Delta Agreement will be approximately 18% of total passenger revenues, and the aircraft used to provide services under the Delta Agreement will constitute 22% of the Debtors' operating fleet.

23. Further, as discussed above, the Debtors are current with respect to their obligations under the Delta Agreement and no adequate assurance need be provided by the Debtors. It is well-established that if a debtor has not defaulted under an executory contract, it need not provide adequate assurance of future performance under section 365(b)(1)(C), based on a plain reading of the statute. *See, e.g., In re United Airlines Inc.*, 368 F.3d 720, 726 (7th Cir. 2004) ("[Counterparty] concedes that United has never defaulted on its obligations under the agreement but nonetheless contends that the bankruptcy judge should have required United to provide the same assurances that would have been required had it done so. That would effectively remove the 'if' clause from subsection (b)(1) and make adequate assurances a universal requirement. The bankruptcy judge was right to rebuff such a proposal for amending the statute; it was directed to the wrong branch of government. . . . A bankruptcy judge properly may withhold approval of assumption when an executory contract is no longer in the debtor's interest, or the debtor is unlikely to perform its obligations, but not on an open-ended ground such as 'unreasonable' risk to the other contracting party."); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 389 (Bankr. D. Colo. 1986) ("If there are no defaults under the contract sought to be assumed, there is no statutory mandate for the debtor to have to provide 'adequate assurance of future performance' before assumption."); *In re Perretta*, 7 B.R. 103, 105 (Bankr. N.D. Ill. 1980) (section 365(b)(1)(C) inapplicable because "lessor has failed to show that the debtor defaulted upon his lease obligations"). *See also In re Commonwealth Mortgage Co., Inc.*, 149 B.R. 4, 8 n. 24 (Bankr. D. Mass. 1992) ("Because the Court finds that there has been no default under the Servicing Agreement, the cure and adequate assurance provisions of § 365(b) are inapplicable."); *In re Ridgewood Sacramento, Inc.*, 20 B.R. 443, 445 (Bankr. E.D. Cal. 1982) ("because the executory obligation was not in default on the date that the debtor assumed it, subsection (b) [of

section 365] is inapplicable to the facts of this case and the debtor is not required to provide adequate assurances to the creditor"). Notwithstanding the foregoing, if Delta proves defaults by the Debtors under the Delta Agreement that must be cured, as to be demonstrated at the hearing (or trial) on this matter, the Debtors can and will provide adequate assurance of future performance under section 365(b)(1)(C).

24. Based on the foregoing, assumption of the Delta Agreement is in the best interests of the Debtors' estates and creditors and constitutes a proper exercise of the Debtors' sound business judgment.

## Notice

25. The Debtors have served notice of this motion on the following parties, or on their counsel if known: (i) the Office of the United States Trustee for the Southern District of New York, (ii) proposed counsel to the Committee, (iii) the Securities and Exchange Commission, (iv) Delta, and (v) those parties that have requested notice in these cases.

26. No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors requests entry of the order attached hereto as <u>Exhibit C</u>, granting the relief requested herein and such other and further relief as is just.

Dated:   January 19, 2010
           New York, New York

PACHULSKI STANG ZIEHL & JONES LLP

<u>/s/ Maria A. Bove</u>
Richard M Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

Proposed Attorneys for Debtors
and Debtors in Possession