### AIRLINER
### NEGOTIABLE PROMISSORY NOTE.
### DATE:MAY 28, 1996

## Table 1: PARTIES AND TERMS

| (a) Secured Party: Raytheon Aircraft Credit Corporation P.O. Box 85 Wichita, Kansas 67201 | (c) Debtor: Mesa Air Group, Inc. 2325 East 30th Street Farmington, New Mexico 87401 |
|---|---|
| (b) Aircraft: Manufacturer: Raytheon Aircraft Company Model: Beech 1900D Airliner Serial No.: UE-126 Reg. No.: N126YV | (d) Commencement Date: May 31, 1996 (e) Principal Sum: $3,966,252 (f) Financing Term: 163 months (g) Due Date: |
| | (h) Liability Insurance: $50,000,000.00 |

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Debtor unconditionally promises to pay to the order of Secured Party, or its assigns, the Principal Sum, together with accrued interest at the applicable Interest Rate specified in Table 2 (see Section 3) and such other charges and fees as herein provided. This Negotiable Promissory Note is sometimes hereinafter referred to as the "Promissory Note" or "Agreement".

The Principal Sum and accrued interest shall be repaid by Debtor during the Financing Term in accordance with the terms and subject to the conditions specified below:

1. Interest Rate. In addition to Debtor's repayment of the Principal Sum, Debtor shall pay interest to Secured Party on the unpaid balance of the Principal Sum at the applicable rate of interest, if any, specified in Table 2. Debtor's payment of accrued interest shall be made in conjunction with its monthly payments of principal as specified in Table 2. The term "LIBOR" as used in Table 2 and elsewhere in this agreement refers to the interest rate that is announced from time to time as the 90 Day London Inter Bank Offered Rate. The effective rate of interest shall be adjusted on the first business day of each calendar year quarter (i.e., January 1, April 1, July 1 and October 1) to reflect any increase or decrease in the LIBOR as of that date, plus the percent per annum specified in Table 2.
The annual rate of interest applicable hereunder from time to time, as specified above, is sometimes referred to herein as the "Interest Rate". All interest shall be calculated on the basis of a 360-day year and actual days outstanding. Notwithstanding anything set forth herein to the contrary, in no event shall the Interest Rate payable hereunder be higher than the maximum amount permitted under applicable law.

2. Payment of Principal and Interest. The Principal Sum shall be repaid by Debtor to Secured Party, together with accrued interest at the applicable Interest Rate specified in Table 2, in consecutive monthly installments during the Financing Term specified in Table 1(f). Debtor's first monthly installment payment shall be due and payable one month following the Commencement Date identified in Table 1(d). Each subsequent monthly installment payment shall be paid by Debtor on the same date of each succeeding calendar month. The final monthly installment payment shall be due and payable on the Due Date.

3. Payments. The amount of Debtor's monthly payments of principal and accrued interest are specified below in Table 2. The following definitions apply to the "Payment Type" which may be specified in Table 2:

5/24/96
c:\contr96\mesa.ejd\66

a) May 31, 1996 payment - This Principal Reduction Payment shall be an amount sufficient to reduce the Principal Sum to ninety percent (90%) of the price of the 1900D Airliner at the time the 1900D Airliner was originally delivered. Mesa will receive a credit for $175,000.00 of the lease deposit Mesa has paid on this 1900D Airliner. In addition, a per aircraft prorated credit will be received from returned 1900C Airliner lease deposits in the amount of $23,131.00. If the total lease deposit credits are not sufficient to reduce the Principal Sum to ninety percent (90%) of the price of the 1900D at the time of its original delivery, the difference , or $45,332 ,will be paid by Mesa on May 31, 1996, in a lump sum via wire transfer to the following account: RAYTHEON AIRCRAFT CREDIT CORPORATION, Bank IV, Kansas, N.A., ABA Routing # 101100045, RACC Account No. 018000004634.

b) FIXED - Debtor's monthly payments to Secured Party will remain fixed at the specified payment amount for the specified period.

c) VARIABLE - The amount of Debtor's monthly payment of principal and accrued interest shall be calculated by Secured Party, and advised to Debtor in writing, at the beginning of each calendar year quarter, based upon the LIBOR in effect on the first business day of said quarter plus the specified percent per annum. Each of Debtor's monthly payments during this period shall be sufficient in amount to fully amortize the Principal Sum, less any Balloon Payment, on the Due Date.

d) BALLOON - an amount payable as a Balloon Payment.

### TABLE 2:    PAYMENT AND INTEREST SCHEDULE

| PAYMENT | PAYMENT AMOUNT AND TYPE | INTEREST RATE PER ANNUM |
|---|---|---|
| May 31, 1996 Payment | $45,332 | Zero |
| 1 - 67("Fixed Payment Period") | $30,007.00 Fixed | Libor 1.5% |
| 68 - 162 ("Variable Payment Period") | Variable | Libor Plus 1.8% |
| 163 Last Month of Term | Variable Plus $1,400,000.00 Balloon | Libor Plus 1.8% |

THE ACTUAL PAYMENT WILL BE CALCULATED AND ADVISED TO DEBTOR IN ACCORDANCE WITH SECTION 3(b).

4. Fixed Interest Rate Option during Fixed Payment Period ("Option"). During the Fixed Payment Period Mesa may elect to convert to a fixed interest rate by providing RACC with written notice of its intention to convert to a fixed interest rate seven (7) days prior to the conversion to the fixed interest rate. Mesa is entitled to receive this fixed interest rate for any full months remaining during the Fixed Payment Period of the Financing Term commencing after the conversion referred to above. The fixed interest rate will be 116 basis points over the composite U.S. government treasury interest rate yield for the term of the Fixed Payment Period plus 64 additional basis points, or 180 basis points over the above noted composite U.S. government treasury interest rate yield. The fixed interest rate will be determined seven (7) days after Mesa provides RACC with written notice of its intention to convert to a fixed interest rate. The monthly payments due and payable to RACC during the Option period will remain at $30,007.00. If Mesa elects to convert to a fixed interest rate and then does not continue to finance the 1900D Airliner through the Fixed Payment period, Mesa will pay RACC for any costs RACC may incur as a result of the early termination of the financing. These costs, hereinafter referred to as "Breakage Costs", are described in Section 5.

5. Breakage Costs. In order to provide fixed interest rate financing to Mesa, RACC will enter into a "VARIABLE FOR FIXED INTEREST RATE SWAP AGREEMENT" with a financial institution. If Mesa does not continue to

finance the 1900D Airliner at the fixed interest rate through the Fixed Payment Period, that portion of said financing which would cease to be operative for the remaining portion of the Fixed Payment Period will be subject to an "Unwinding". Such Unwinding will be achieved by RACC entering into an offsetting "FIXED FOR VARIABLE INTEREST RATE SWAP AGREEMENT" for the unused portion of the original "VARIABLE FOR FIXED INTEREST RATE SWAP AGREEMENT". The swaps referred to above are based upon the prevailing U.S. treasury bills, note and/or bond interest rate yields for specific maturities at the time of entering into such swap agreements plus a swap spread, which are both determined by the financial market to adjust for the difference between a commercial borrower and the sovereign undertaking of the U.S. Government and the duration of the swap. Accordingly, to Unwind a VARIABLE FOR FIXED INTEREST RATE SWAP AGREEMENT, RACC would enter into a FIXED FOR VARIABLE INTEREST RATE SWAP AGREEMENT with the variable interest rate components offsetting each other since the components are based on the same benchmark, i.e, Thirty (30) Day LIBOR. A cost may result due to the difference between the fixed interest rate yield and swap spread components of the VARIABLE FOR FIXED INTEREST RATE SWAP AGREEMENT and the FIXED FOR VARIABLE INTEREST RATE SWAP AGREEMENT

If a cost results due to the difference described above, RACC will provide Mesa written notice of the Breakage Costs due RACC as a result of Mesa's termination of the fixed interest rate financing. Said notice will be provided Mesa within ten (10) days following termination of the fixed interest rate financing with RACC.

Payment of the Breakage Costs are due and payable to RACC immediately upon receipt of said notice by Mesa.

6. Repayment and Prepayment. The aforesaid payments of principal and interest shall be made to Secured Party at its office in Wichita, Kansas. All payments shall be due and payable, without demand or notice to Debtor, in strict accordance with the aforesaid monthly schedule of payments. Any payment due on a non-business day may be made on the next succeeding business day. Debtor's payments hereunder, when received, shall be applied first to the payment of accrued interest (computed upon the unpaid balance of the Principal Sum) and any late payment charges owed as of the date such payment is received by Secured Party (if any), and the remainder of Debtor's payment shall be applied to payment of the unpaid Principal Sum. The unpaid Principal Sum and all accrued interest and late payment charges due hereunder must be paid in full on the Due Date. Debtor may prepay the unpaid balance of the Principal Sum in part or in full at any time and without any penalty, except as provided in Section 5.

7. Late Payment Charge. In the event Debtor is more than ten (10) days late in making any payment due hereunder as specified above, a late payment charge in an amount equal to three percent (3%) of the amount of the delayed payment shall be assessed against Debtor and added to the amount of the delayed payment due hereunder for the purpose of defraying Secured Party's expenses incident to handling the delinquent payment. Any late payment charge assessed against Debtor shall be immediately due and payable to Secured Party. The late payment charge shall be in addition to, and not in lieu of, any other remedy provided to Secured Party in this Agreement for default by Debtor.

8. Secured Transaction. To secure the payment of Debtor's obligation hereunder and any and all other indebtedness owed by Debtor to Secured Party (whether now existing or hereafter arising), as well as any renewals, extensions or changes in the form of said obligation or indebtedness, Debtor has contemporaneously herewith executed an Aircraft Security Agreement (hereinafter "Security Agreement") granting to Secured Party a security interest in the property set forth therein, together with all instruments, avionics, equipment, parts and accessories attached to or installed in said aircraft; all aircraft and engine log books; all additions, accessions and substitutions of any of the foregoing property; all of Debtor's inventory (whether now existing or hereafter acquired) of air carrier aircraft engines, propellers, appliances, spare parts, avionics, accessories, instruments, rotables, equipment (including ground support equipment), subassemblies, tools, kits, consumables, components and related items for installation in or use in connection with the Aircraft described in Table 1(b) not to exceed an aggregate of $75,000.00 per Aircraft, all unearned insurance premiums and insurance proceeds of any of the foregoing property; and the proceeds of all of the foregoing property.

5/24/96
c:\contr96\mesa.ejd\66

The above-mentioned property is hereinafter collectively referred to (as appropriate within the context of this Agreement) as either the "Aircraft" or the "Collateral".

Secured Party's security interest in the Collateral is a purchase money security interest under the Kansas Uniform Commercial Code. The proceeds of this loan (i.e., the Principal Sum) will be used by Debtor to purchase the Collateral described therein.

9.  Purpose of Loan.  Debtor warrants and represents to Secured Party that this loan is for business, commercial or agricultural purposes and not primarily for personal, family or household purposes.

10. Debtor's Default.  The parties agree that the occurrence of any of the following events shall constitute an "Event of Default":

(a )Debtor's failure to make any timely payment of either principal, interest, late payment charges required hereunder, or Debtor's failure to make any payment required under any other promissory note, security agreement or lease agreement between Debtor and Secured Party, if such failure continues for a period of ten (10) days beyond the due date of such payment;

(b) Debtor's failure to perform any promise, agreement, obligation, warranty or covenant made by it herein or in the Security Agreement if such failure continues for a period of thirty (30) days after Secured Party has given Debtor notice of such failure;

(c) Debtor's failure to maintain the insurance coverage as specified in the Security Agreement;

(d) any material misrepresentation made by Debtor to Secured Party in connection with the Security Agreement or this Agreement;

(e) entry of a money judgment against Debtor, if such judgment is nonappealable and remains undischarged or unstayed for a period in excess of sixty (60) days;

(f) dissolution, termination of existence, insolvency, business failure, inability to pay debts as they mature, assignment for the benefit of creditors, or the commencement, with respect to Debtor, of any proceedings (either voluntary or involuntary) under any bankruptcy or insolvency laws;

(g) appointment of a receiver of any material part or all of Debtor's assets if such appointment or proceeding continues for a period of more than sixty (60) days;

(h) Debtor entering into any transaction, without the prior written consent of Secured Party, whereby all or substantially all of Debtor's undertakings, property and assets would become the property of any other company, whether by way of reconstruction, reorganization, consolidation, amalgamation, merger, transfer, sale or otherwise; which transaction would reasonably justify Secured Party in deeming itself insecure; provided, however, that this subparagraph (h) shall not apply to any transaction involving Debtor and any "Permitted Assignee" (reference 17 below);

(i) default in the payment by Debtor of any indebtedness for borrowed money owed to any creditor resulting in the acceleration of a material amount of indebtedness that would reasonably justify Secured Party in deeming itself insecure, unless such default is being disputed by Debtor in good faith;

(j) the prospect of payment, performance or realization on the Collateral is significantly impaired;

5/24/96
c:\contr96\mesa.ejd\66

(k) Debtor's ceasing to be licensed pursuant to U.S. law to operate a commercial air service; or

(l) the occurrence of a material breach by Debtor of any of the terms and conditions of the Beechcraft 1900D Airliner Acquisition Master Agreement between Debtor and Secured Party dated September 18, 1991 and any amendments thereto.

Should an Event of Default occur, Secured Party may employ all remedies allowed by law, including declaring all indebtedness owed hereunder, as well as any other indebtedness or liability of Debtor owed to Secured Party, immediately due and payable. Additionally, Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties. The requirements of the Kansas Uniform Commercial Code for reasonable notification to Debtor of the time and place of any proposed public sale of the Collateral or of the time after which any private sale or other intended disposition of the Collateral is to be made shall be met if such notice is mailed, postage prepaid, to Debtor's address, as specified herein, at least ten (10) days before the time of the sale or disposition. After deduction of all reasonable expenses incurred in realizing on Secured Party's security interest, and after the payment of all principal, interest and late payment charges due under this Agreement, the balance of the proceeds of sale, if any, may be applied to the payment of any or all other indebtedness which Debtor owes Secured Party, regardless of whether such indebtedness is due or not. Debtor shall be liable for any deficiency in its financial obligation under this Agreement after application of such proceeds. Debtor agrees to pay the reasonable attorneys' fees incurred by Secured Party to repossess the Collateral as well as the attorneys' fees incurred in pursuing and collecting any deficiency. If, after a default by Debtor, the Collateral is returned to or recovered by Secured Party, Debtor agrees that Secured Party may fly or otherwise move the Collateral for demonstration and other purposes reasonably related to a proposed public or private sale or other disposition of the Collateral.

11. <u>Obligation to Make Payments</u>. Debtor acknowledges and agrees that its obligation to make all payments due and owing under the provisions hereof shall be absolute and unconditional and not subject to any abatement, setoff or counter claim.

12. <u>Waivers</u>. Debtor hereby waives any requirements pertaining to presentment, demand for payment, notice of dishonor, and all other notices or demands in connection with the delivery, acceptance, performance, default or endorsement of this Promissory Note. No waiver of any covenant, warranty or condition of this Agreement, nor of any breach or default hereunder, shall be effective for any purpose whatsoever unless such waiver is in writing and signed by an officer of Secured Party. It is expressly agreed that Secured Party's waiver of any breach or default by Debtor shall constitute a waiver only as to such particular breach or default and not a waiver of any future breach or default.

13. <u>Legal, Valid, Binding and Enforceable Obligation</u>. Debtor represents and warrants to Secured Party that this Promissory Note, upon execution and delivery, will constitute the legal, valid and binding obligation of Debtor and shall be enforceable in accordance with its terms. Debtor agrees to furnish Secured Party with written legal opinions, satisfactory in form and substance to Secured Party, verifying the aforesaid representation and warranty.

14. <u>Changes of Address</u>. Debtor shall immediately notify Secured Party in writing of any change of address from that shown in Table 1(c) in this Agreement.

15. <u>GOVERNING LAW AND FORUM CHOICE. THIS AGREEMENT WAS MADE AND ENTERED INTO IN THE STATE OF KANSAS AND THE LAW GOVERNING THIS TRANSACTION SHALL BE THAT OF THE STATE OF KANSAS AS IT MAY FROM TIME TO TIME EXIST. THE LAW OF THE STATE OF KANSAS SHALL APPLY TO ANY AND ALL MATTERS ARISING FROM OR RELATED TO THIS AGREEMENT AND TRANSACTION, INCLUDING ANY ACTIONS UNDERTAKEN BY SECURED PARTY SHOULD AN "EVENT</u>

OF DEFAULT" OCCUR, SUCH AS AN ACTION TO OBTAIN POSSESSION OF AND FORECLOSE UPON THE
COLLATERAL, AND ALL OTHER REMEDIES WHICH MAY BE AVAILABLE INCLUDING SEEKING A
DEFICIENCY JUDGMENT AGAINST DEBTOR.  THE PARTIES AGREE THAT ANY LEGAL PROCEEDING
BASED UPON THE PROVISIONS OF THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN EITHER
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS AT WICHITA, KANSAS, OR IN
THE EIGHTEENTH JUDICIAL DISTRICT COURT OF SEDGWICK COUNTY, KANSAS, TO THE EXCLUSION
OF ALL OTHER COURTS AND TRIBUNALS.  NOTWITHSTANDING THE ABOVE, IN THE EVENT AN
"EVENT OF DEFAULT" SHOULD OCCUR, SECURED PARTY (AT ITS SOLE OPTION) MAY INSTITUTE A
LEGAL PROCEEDING IN ANY JURISDICTION AS MAY BE APPROPRIATE IN ORDER FOR SECURED
PARTY TO OBTAIN POSSESSION OF AND FORECLOSE UPON THE COLLATERAL.  THE PARTIES
HEREBY CONSENT AND AGREE TO BE SUBJECT TO THE JURISDICTION OF THE AFORESAID COURTS
IN SUCH PROCEEDINGS.

16.  Enforceability.  The provisions of this Agreement shall be severable and, if any provisions are for any reason determined to be invalid, void or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect; provided that the purpose of the remaining valid, effective and enforceable provisions is not frustrated; and provided further that no party is substantially and materially prejudiced thereby.

17.  Assignability.  Secured Party shall have the absolute right to assign, transfer or sell any of its rights under this Promissory Note to any party of its choosing upon giving written notice thereof to Debtor.  If under any assignment the Assignor (Secured Party) shall continue to be the party for collection of Debtor's monthly payments of principal and interest owed hereunder, no Assignee may declare a default for non-payment of the monthly payments or interfere in Debtor's peaceful possession of the Aircraft for non-payment of such monthly payments, so long as Debtor has not failed to pay Assignor (Secured Party), when due, any monthly payment owed hereunder.  Debtor may not assign, or delegate any of its rights or obligations hereunder without the prior written consent of Secured Party; provided, however, that Debtor may assign its rights and obligations hereunder to (a) any of its wholly-owned subsidiaries, (b) its parent company if Debtor is a wholly-owned subsidiary thereof, or (c) any other company which is a wholly-owned subsidiary of the aforesaid parent company (collectively "Permitted Assignee"), subject to the condition that Debtor shall remain primarily liable hereunder, both jointly and severally, with any such Permitted Assignee.

18.  Binding Agreement.  All obligations of Debtor hereunder shall bind the heirs, legal representatives, successors and assigns of Debtor.  If there be more than one Debtor hereunder, their liabilities shall be joint and several.  All rights of Secured Party hereunder shall inure to the benefit of its successors and assigns.

19.  Entire Agreement.  This Agreement and the Security Agreement constitutes the entire agreement between and among the parties with respect to the subject matter hereof.  There are no verbal understandings, agreements, representations or warranties between the parties which are not expressly set forth herein.  This Agreement shall not be changed orally, but only in writing signed by the parties hereto.

20.  Notices.  Any notice pertaining to this Agreement shall be deemed sufficiently given if personally delivered or sent by registered or certified mail, return receipt requested, to the party to whom said notice is to be given.  Notices sent by registered or certified mail shall be deemed given on the third day after the date of postmark.  Until changed by written notice given by either party, the addresses of the parties shall be as stated in Table 1(a) and (c) of the Agreement.  The designated addresses of both parties must be located within the United States of America.

5/24/96
c:\contr96\mesa.ejd\66

In witness of the foregoing, Debtor has caused its duly authorized officer to execute and deliver this Agreement at Wichita, Kansas on the Date herein stated.

Mesa Air Group, Inc.

By: _____
W. Stephen Jackson, CFO
"Debtor"

STATE OF KANSAS )
                        ) ss:
COUNTY OF SEDGWICK )

This instrument was acknowledged before me on the 28th day of May, 1996 by W. Stephen Jackson, who is the CFO of Mesa Air Group, Inc.., on behalf of the corporation.

Notary Public _Deborah Moon_

My Commission Expires: _September 28, 1998_

DEBORAH MOON
Notary Public - State of Kansas
My Appt. Expires  9-28-98

5/24/96
c:\contr96\mesa.ejd\66