H. Slayton Dabney Jr., Esq.
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone:     (212) 556-2100
Facsimile:     (212) 556-2222
Email:  sdabney@kslaw.com

and

Sarah R. Borders, Esq.
Harris Winsberg, Esq.
Michelle L. Carter, Esq.
King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5128
Email:  sborders@kslaw.com
        hwinsberg@kslaw.com
        mcarter@kslaw.com

*Attorneys for Delta Air Lines, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **MESA AIR GROUP, INC, <u>et al.</u>,** | Case Nos. 10-10018 (MG) |
| Debtors. | (Jointly Administered) |

### **MOTION OF DELTA AIR LINES, INC. FOR RELIEF FROM AUTOMATIC STAY**

Delta Air Lines, Inc. ("Delta") moves this Court, pursuant to 11 U.S.C. § 362(d), for relief from the automatic stay, and in support of this Motion hereby shows this Court as follows:

**JURISDICTION**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(G). Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

**BACKGROUND**

Delta is one of the world's largest commercial airlines. Delta operates its own "mainline" flights, and also operates the Delta Connection program, in which it contracts with other carriers to provide regional flight services that connect Delta's main hubs with smaller cities and airports. Freedom Airlines, Inc. ("Freedom"), a wholly-owned subsidiary of Mesa Air Group, Inc. ("Mesa," together with Freedom, the "Debtors"), is one of those regional carriers operating 50-seat regional aircraft in the Delta Connection program.

**A.  The ERJ Agreement**

The codeshare relationship between Delta and the Debtors is governed by a 2005 Delta Connection Agreement dated May 3, 2005 (the "ERJ Agreement").[1] The ERJ Agreement is a "capacity-purchase" arrangement under which Delta pays Freedom to supply and operate regional aircraft according to schedules that Delta establishes. The ERJ Agreement gives Delta the exclusive right to set schedules for aircraft flown by Freedom, choose the airports from which Freedom must operate (sometimes called "hubs"), sell all tickets for the flights, and collect all passenger revenue. Freedom's obligation is to operate the flights Delta schedules and

---

[1] Delta and the Debtors were also parties to a 2007 Delta Connection Agreement which governed Freedom's operation of 76-seat aircraft as a Delta Connection carrier. Delta terminated that Agreement in 2008. The Debtors filed suit against Delta arising from the termination of the Agreement, but seek only damages; they do not seek to enjoin the termination. See Civil Action No.1:09-CV-0772-ODE; see also Debtors' Application for an Order Pursuant to Section 327(e) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Bankruptcy Rules 2014-1 and 2016-1, Authorizing Debtors to Employ and Retain Jones Day as Special Counsel with Respect to Designated Matters, Nunc Pro Tunc to the Petition Date ("Application to Retain Jones Day"), ¶ 9. Delta does not seek to lift the automatic stay in that action, and has therefore not discussed the facts of that case here.

offers for sale to the flying public.

A key aspect of any "capacity-purchase" arrangement is, of course, the price of that capacity. No less than eight pages of the ERJ Agreement are devoted to the issue of Freedom's compensation.

Delta reimburses Freedom for the "Base Rate Costs" and "Pass Through Costs" that Freedom incurs in operating its regional aircraft.[2] Delta also pays Freedom a 4% mark-up on those costs if Freedom achieves a "completion rate" of at least 95% for a given month's operations. A "completion rate" is simply the percentage of scheduled flights that actually reach their destination.

The ERJ Agreement includes two important limitations on the costs the Debtors can charge to Delta. First, the Debtors expressly agreed that the Base Rate Costs and Pass Through Costs that Freedom charged to Delta would be no higher than those of any other carrier operating similarly-configured aircraft in the Delta Connection program; in other words, Freedom would at all times be the lowest cost operator of 50-seat aircraft in the Delta Connection program. *See* ERJ Agreement §§ 3(A)(i)–(ii). Second, the Debtors expressly agreed that the Base Rate Costs and Pass Through Costs that Freedom charged to Delta would be no higher than those that Freedom charged to any other commercial carrier for whom Freedom, or an affiliate of Freedom, operated. *Id.*

Delta may terminate the ERJ Agreement under certain circumstances; three of which are relevant at this time. First, Delta is entitled to terminate without cause and at its sole discretion

---

[2] Base Rate Costs are Freedom's direct, operating costs, including "engine maintenance expenses, aircraft rent/ownership costs, terminal facility rent and use charges, recurrent training costs, and general overhead." ERJ Agreement § 3(A)(i). Pass Through Costs are "variable operating costs for which Delta assumes the risk of price and volume fluctuations by compensating Freedom based on the actual costs incurred each month," including "landing fees, insurance, fuel, glycol and de-icing services, and catering costs." ERJ Agreement § 3(A)(ii).

-3-

90 months after the effective date of the ERJ Agreement or November 2012. ERJ Agreement § 11(G). Second, Delta may terminate in the event of a material breach by Mesa and/or Freedom. ERJ Agreement § 11(C). To do so, Delta must first provide the Debtors with written notice of their material breach. ERJ Agreement § 11(C). If the Debtors do not cure the material breach within thirty days of that notice, Delta may immediately terminate the ERJ Agreement at its sole discretion. ERJ Agreement § 11(C). Third, the ERJ Agreement provides that "Delta shall have the right to terminate this ERJ Agreement immediately and at its sole option . . . if [Freedom] fails to maintain a completion rate of ninety-five percent (95%) with respect to the Delta Connection Flights during any three (3) months during any consecutive six (6) month period." ERJ Agreement § 11(F)(vi).

**B.  Litigation Concerning the ERJ Agreement**

Prior to the Debtors' bankruptcy filing, the parties were engaged in two lawsuits relating to the ERJ Agreement, both of which are pending before Judge Clarence Cooper of the United States District Court for the Northern District of Georgia (the "Georgia Court").

1.  <u>The ERJ Litigation</u>.  Freedom's performance under the ERJ Agreement was inconsistent, at best, as Freedom failed to complete 95% of its flights in June 2007, July 2007, August 2007, October 2007, December 2007 and February 2008. On March 28, 2008, Delta notified the Debtors that it was terminating the ERJ Agreement based upon Freedom's failure to complete 95% of its flights in three of six consecutive months: October 2007, December 2007 and February 2008. On April 7, 2008, the Debtors initiated an action against Delta, captioned *Mesa Air Group, Inc. and Freedom Airlines, Inc. v. Delta Air Lines, Inc.*, Civil Action 1:08-CV-1334-CC (the "ERJ Litigation"), to enjoin Delta from terminating the ERJ Agreement. In May, 2008, after allowing preliminary, expedited discovery and after conducting a three-day

evidentiary hearing, Judge Cooper preliminarily enjoined Delta from terminating the ERJ Agreement, concluding that there had been an oral modification of the contract and that the Debtors might succeed on a claim for equitable estoppel as a result of that modification.[3] The United States Court of Appeals for the Eleventh Circuit affirmed that preliminary injunction on July 1, 2009.

The ERJ Litigation is now back before Judge Cooper pending a full trial on the merits. The parties were permitted additional discovery prior to trial, and that discovery had not yet been completed when the case was automatically stayed by the filing of the Debtors' bankruptcy petitions. The parties have two additional depositions to take and must resolve certain outstanding document issues to complete discovery. Although a trial date had not been set by the Georgia Court, the parties discussed the schedule for completing discovery and the possibility of holding a trial in March 2010.

On January 19, 2010, Judge Cooper entered an order staying Delta's counterclaim[4] in the ERJ Litigation because of the bankruptcy, but his order explicitly does not stay Mesa's claims in the ERJ Litigation. The order reads, "[p]laintiff's filing of bankruptcy does not disrupt the continuation of these proceedings as to Plaintiff's claims."

2. <u>The MFN Litigation</u>. On August 19, 2009, Delta initiated an action against the Debtors, captioned *Delta Air Lines, Inc. v. Mesa Air Group, Inc. and Freedom Airlines, Inc.*, Civil Action 1:09-CV-2267-CC (the "MFN Litigation"), relating to Mesa's refusal to honor its contractual obligation to be Delta's lowest cost carrier and to reduce its Base Rate and Pass Through costs to match those of Pinnacle Airlines, which, following the 2008 merger of Delta

---

[3] Judge Cooper allowed Freedom and Mesa to amend their Complaint at the conclusion of the preliminary injunction hearing to add the equitable estoppel claim.

[4] A copy of Delta's Answer to Third Amended Complaint and Counterclaim is attached hereto as Exhibit A.

and Northwest, has been the lowest-cost operator of 50-seat aircraft within the Delta Connection program. Delta seeks a judgment declaring that it has the right to terminate the ERJ Agreement immediately because of Mesa's material breach, and to recover all overpayments made to the Debtors in 2009 and beyond.[5] Delta also alleges that it is entitled under the ERJ Agreement to information from the Debtors about the Base Rate Costs and Pass Through Costs that Freedom charges to other commercial airlines for similarly-configured aircraft. Delta seeks an order directing the Debtors to produce the requested information so that Delta can confirm whether Debtors are in compliance with their obligation under the ERJ Agreement to charge Delta rates that are no higher than those charged to other codeshare partners.

Although the MFN Litigation was initially assigned to a different district judge, Mesa moved to reassign the case to Judge Cooper. Mesa argued that the claims and defenses at issue in the MFN Litigation would raise issues of fact that Judge Cooper already had developed and reviewed in the ERJ Litigation. Mesa therefore argued that the interests of judicial efficiency required Judge Cooper to preside over both cases. Indeed, according to Mesa, Judge Cooper had invested much time and effort to understand the issues in the cases, had reviewed batches of written discovery, and had conducted a three-day evidentiary hearing in which he was able to consider the testimony of numerous witnesses.

Over Delta's objection, the Georgia Court granted Mesa's motion to reassign the MFN Litigation to Judge Cooper. Since then, the parties have fully briefed Mesa's partial motion to dismiss the MFN Litigation, which at the time of Mesa's bankruptcy filing was awaiting decision by Judge Cooper, but have conducted no discovery. In its Application to Retain Jones Day,

---

[5] Delta is continuing to issue payment under the ERJ Agreement using the Base Rate in effect as of December 31, 2008. Delta reserves all rights it may have, including but not limited to, its right to recoup the overpayments for Base Rate and Pass Through Costs charged during the period January 1, 2009 through and including the date of termination of the ERJ Agreement.

Mesa asserted that it anticipates filing counterclaims against Delta in the MFN Litigation. Application to Retain Jones Day, ¶ 11.

## ARGUMENT

### A. The Legal Standard for Relief from the Automatic Stay

Section 362(a) of the Bankruptcy Code acts as an automatic stay to cease "the commencement or continuation …. of a judicial, administrative, or other action or proceeding against the debtor that was … commenced before the commencement of the case under this title." Pursuant to section 362(d)(1), however, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay … for cause."

The Bankruptcy Code does not define what constitutes cause for the purposes of section 362(d). The authoritative Congressional Reports provide that "[a] desire to permit an action to proceed to completion in another tribunal may provide another cause." H.R. Rep. No. 595, 95th Cong., 1st Sess. 343-44 (1977), *reprinted in* 1978 U.S.C.A.A.N. 5878, 6300; S. Rep. 95-989, 95th Cong. 2d Sess., 52-3 (1978), *cited in In re Anton*, 145 B.R. 767, 769 (Bankr. E.D.N.Y. 1992). The Reports also provide that "it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere." *Anton*, 145 B.R. at 769.

The party moving for relief from the automatic stay must make an initial showing of cause. *In re Bogdanovich*, 292 F.2d 104, 110 (2d Cir. 2002). Once the initial burden is met, the burden shifts to the debtor who bears the ultimate burden of proving that cause does not exist. *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

Courts in this circuit weigh several factors when determining whether to lift the automatic stay to allow litigation to proceed in another forum. The court in *Sonnax Indus., Inc. v. Tri Component Products Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990) adopted the following list of non-exclusive factors to consider in determining whether to lift the automatic stay:

- a) whether relief would result in a partial or complete resolution of the issues;
- b) lack of any connection with or interference with the bankruptcy case;
- c) whether the other proceeding involves the debtor as a fiduciary;
- d) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
- e) whether the debtor's insurer has assumed full responsibility;
- f) whether the action involves primarily third parties;
- g) whether litigation in another forum would prejudice the interests of other creditors;
- h) whether the judgment claim arising from the other action is subject to equitable subordination;
- i) whether the movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
- j) the interests of judicial economy and the expeditious and economical resolution of litigation;
- k) whether the parties are ready for trial in the other proceeding; and
- l) the impact of the stay on the parties and the balance of harm.

A party seeking relief from the automatic stay does not need to satisfy all twelve of the foregoing factors. Nor is the Court required to give equal weight to each factor. Rather, only the relevant factors need to be considered. *In re Anton*, 145 B.R. at 770.

**B.     Cause Exists for this Court to Grant Relief from the Automatic Stay**

By this Motion, Delta seeks relief from the automatic stay to allow the ERJ Litigation to proceed to resolution before Judge Cooper.[6] Further, Delta seeks relief from the stay to pursue the MFN Litigation, either before Judge Cooper, should he decide that he wishes to maintain jurisdiction of that matter,[7] or before this Court in accordance with the proposed schedule previously submitted to this Court by letter dated January 27, 2010.

In considering whether to grant the relief from the automatic stay, the relevant factors for this Court to consider are (1) whether granting the relief would result in a partial or complete resolution of the issues; (2) whether litigation in another forum would prejudice the interests of other creditors; (3) how the litigation would further the interests of judicial economy and the expeditious and economical resolution of the litigation; (4) whether the parties are ready for trial in the other proceeding; and (5) the impact of the stay on the parties and the balance of harm. As set forth more fully below, these factors demonstrate that cause exists for this Court to grant relief from the automatic stay.

1.     Relief would result in complete resolution of the issues.

In the Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2 (the "Declaration"), the Debtors state that industry agreements including the ERJ Agreement are essential components to the Debtors' businesses, and they intend to file a motion to assume the industry agreements shortly after the petition date.

---

[6] Although Judge Cooper's order in the case suggests that no stay relief is required to conduct the final hearing on the merits of Debtors' claim, Delta is seeking relief out of an abundance of caution. Additionally, Delta has asserted counterclaims in that case, arising out of the identical facts as Debtors' claim, which cannot proceed without such relief.

[7] As this Court may recall, Debtors filed a motion to transfer the MFN Litigation to this Court. Given the procedural posture of the case, and the specific nature of the claims, Delta responded that it was not opposed to the transfer, if Judge Cooper were inclined to grant it.

Declaration, ¶¶ 94-95. In fact, Mesa recently filed a motion to assume the ERJ Agreement, and the parties have submitted letters to the Court on the scheduling of the motion to assume.

Delta disputes that Debtors have any continuing ability to perform under the ERJ Agreement because the ERJ Agreement was properly terminated by Delta prepetition. Moreover, Delta disputes that the Debtors' accrued and unpaid prepetition obligations are *de minimis* and believes that the ERJ Agreement is not assumable because of, among other reasons, the nature and size of the Debtors' defaults under the ERJ Agreement.[8] The Debtors' defaults include, but are not limited to, the following: (a) Freedom's failure to complete 95% of its flights in three of six consecutive months pursuant to section 11(F) of the ERJ Agreement; (b) Mesa's refusal to honor its contractual obligation to reduce its Base Rate Costs and Pass Through Costs to match those of the lowest-cost operator of 50-seat aircraft within the Delta Connection program; (c) the Debtors' refusal to produce information to Delta about the Base Rate Costs and Pass Through Costs that Freedom charges to other commercial airlines for similarly-configured aircraft pursuant to its obligations under section 3(I) of the ERJ Agreement; (d) the Debtors' failure to ensure that their invoices are accurate pursuant to sections 3(A), (H) and (I) of the ERJ Agreement; and (e) the Debtors' failure to report accurately on a daily basis certain operational data, including their completion rate, pursuant to section 10 of the ERJ Agreement.

Resolution of the ERJ Litigation and the MFN Litigation will resolve substantial issues between the parties with respect to the ERJ Agreement. A final judgment in the ERJ Litigation will resolve whether Delta, in fact, terminated the ERJ Agreement, thereby avoiding the need for any further litigation on the question of the Debtors' ability to assume that agreement. The MFN Litigation, moreover, will determine whether Delta has a further right to recover millions of

---

[8] For example, Delta also asserts that due to the trademark implications in the ERJ Agreement, the ERJ Agreement is not assumable pursuant to 11 U.S.C. § 365(c)(1).

-10-

dollars in overpayments that it has made to the Debtors since January 2009. To the extent Mesa files a counterclaim in the MFN Litigation, the validity of that counterclaim and the amount of damages, if any, owed to the Debtors will be determined.[9] In short, at the conclusion of the ERJ Litigation and the MFN Litigation, there should be few, if any, remaining issues with respect to the ERJ Agreement.

2. <u>Relief would not prejudice the interests of other creditors</u>. Litigation in the Georgia Court will not prejudice the interests of other creditors. The actions are essentially breach of contract actions in which other creditors will not have any interest other than the impact of any damage award against the estates. Delta will not be able to enforce any judgment against the Debtors without relief from this Court, so there will be no harm to the other creditors. *See In re G.S. Distribution, Inc.*, 331 B.R. 552, 568 (Bankr. S.D.N.Y. 2005) (lifting the automatic stay to allow prepetition litigation to proceed). To the contrary, other creditors likely will benefit from reduced litigation costs that may result from handling the ERJ lawsuits, in particular, in the court in which they have been pending and litigated for some time.

3. <u>Relief promotes the interests of judicial economy</u>. The interests of judicial economy will be best served by this Court granting relief from the automatic stay so the parties may proceed in the Georgia Court. In the Georgia Court, Judge Cooper presided over a multi-day hearing in the ERJ Litigation and is very familiar with the ERJ Agreement and the parties. At trial, the parties will be able to build upon the record that already has been developed in the Georgia Court and presented to Judge Cooper, eliminating the need to recall a large number of witnesses for live testimony.

---

[9] Delta recognizes that it may be equally efficient for this Court to resolve the MFN Litigation.

Furthermore, according to Mesa, the Debtors are "compelled to pursue, and to pursue promptly, claims against Delta and to defend claims asserted or to be asserted by Delta" as a fundamental component of their reorganization. Application to Retain Jones Day, ¶ 20. It will be much more expedient and economical to resolve these matters in the Georgia Court as the ligation is underway and Judge Cooper has familiarity with the ERJ Agreement and the issues. Finally, Judge Cooper explicitly did not stay Mesa's claims in the ERJ Litigation.

4. <u>The parties are almost ready for trial</u>. Although the parties are not ready for trial, the ERJ Litigation could be tried in a matter of a few short months. Only two depositions remain to be taken, and a few document issues remain to be resolved, until discovery is complete. Relief from the stay is appropriate when the underlying litigation is "well under way," as it is in Georgia Court. *See In re Knight Jewelry*, 168 B.R. 199, 202 (Bankr. W.D. Mo. 1994).

5. <u>The balance of the harm weighs in favor of granting relief</u>. Finally, the balance of hardships also weighs in favor of allowing the litigation before the Georgia Court to continue. Although the litigation will require the Debtors to incur legal expenses and other fees, the Debtors will incur these expenses regardless of the forum in which the parties litigate Delta's right to terminate the ERJ Agreement and liquidate its claim for overpayments; and, indeed, the cost may well be less to complete the trials before the Georgia Court rather than to begin again in a new forum. In any event, the cost of a debtor's defense is an insufficient justification for denying relief from the automatic stay. *See United Imports, Inc.*, 203 B.R. 162 (Bankr. D. Neb. 1996); *Anton*, 145 B.R. at 770.

This Court should grant relief from the automatic stay to allow the parties to litigate their claims in their chosen forum because (1) granting the relief would result in substantial resolution of the issues; (2) litigation in the Georgia Court would not prejudice the interests of other

-12-

creditors; (3) the interests of judicial economy and the expeditious and economical resolution of litigation would be best served by allowing the litigation to continue in the Georgia Court; (4) the parties are close to trial in the other proceedings; and (5) the impact of the stay on the parties and the balance of harm weigh in favor of granting relief from the automatic stay.

WHEREFORE, pursuant to the foregoing, Delta respectfully requests that this Court enter an order granting relief from the automatic stay so that it may proceed with the litigation captioned *Mesa Air Group, Inc. and Freedom Airlines, Inc. v. Delta Air Lines, Inc.*, Civil Action 1:08-CV-1334-CC (N.D. Ga.) and *Delta Air Lines, Inc. v. Mesa Air Group, Inc. and Freedom Airlines, Inc.*, Civil Action 1:09-CV-2267-CC (N.D. Ga.).

This 4th day of February, 2010.

Respectfully submitted,

KING & SPALDING

/s/ H. Slayton Dabney Jr.
H. Slayton Dabney Jr., Esq.
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Email: sdabney@kslaw.com

Attorneys for Delta Air Lines Inc.