Michael M. Krauss (MK-9699)
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Tel: (612) 766-8514
Fax: (612) 766-1600
E-mail: mkrauss@faegre.com

*Attorneys for Cargill, Incorporated*

Hearing Date: **February 23, 2010**
Hearing Time: **2:00 p.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**In re:**

**MESA AIR GROUP, INC., et al.**

                           **Debtors.**

**Chapter 11**

**Case No. 10-10018**

---

**CARGILL, INCORPORATED'S (AS ASSIGNEE OF CARGILL LEASING CORPORATION) OBJECTION TO DEBTORS' MOTION FOR ORDER PURSUANT TO SECTIONS 105, 363, 365, 554 AND 1110 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004, 6006, AND 6007 FOR (I) AUTHORIZATION TO (A) REJECT LEASES RELATING TO CERTAIN AIRCRAFT AND OTHER RELATED EQUIPMENT, (B) ABANDON CERTAIN AIRCRAFT, ENGINES, AND OTHER RELATED EQUIPMENT, (C) TRANSFER TITLE TO CERTAIN AIRCRAFT, ENGINES, AND OTHER RELATED EQUIPMENT, AND (D) SATISFY THE SURRENDER AND RETURN REQUIREMENTS UNDER THE BANKRUPTCY CODE, AND (II) APPROVAL OF RELATED NOTICES AND PROCEDURES**

Cargill, Incorporated, as assignee of Cargill Leasing Corporation (**"Cargill"**), through its undersigned counsel, hereby objects to the Debtors' Motion for Order Pursuant to Sections 105, 363, 365, 554, and 1110 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 6007 for (I) Authorization to (A) Reject Leases Relating to Certain Aircraft and Other Related Equipment, (B) Abandon Certain Aircraft, Engines, and Other Related Equipment, (C) Transfer Title to Certain Aircraft, Engines, and Other Related Equipment, and (D) Satisfy the Surrender and Return Requirements Under the Bankruptcy Code, and (II) Approval of Related Notices and

Procedures, filed on behalf of the debtors herein (the "**Debtors**") on January 25, 2010 [Docket No. 168], and amended by that certain Notice of (1) Filing of Amended Exhibits A-1, A-2, B-1 And B-2 and (2) Continuance of Hearing on Debtors' Motion for Order Pursuant to Sections 105, 363, 365, 554, and 1110 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 6007 for (I) Authorization to (A) Reject Leases Relating to Certain Aircraft and Other Related Equipment, (B) Abandon Certain Aircraft, Engines, and Other Related Equipment, (C) Transfer Title to Certain Aircraft, Engines, and Other Related Equipment, and (D) Satisfy the Surrender and Return Requirements Under the Bankruptcy Code, and (II) Approval of Related Notices and Procedures, filed on behalf of the Debtors on February 5, 2010 [Docket No. 267] (the **"Rejection Procedures Motion**"[1]), and respectfully represents as follows:

## RELEVANT BACKGROUND FACTS

1.       On January 5, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## CARGILL'S LEASES

2.       Cargill is the owner participant with respect to that certain de Havilland DHC 8-200 aircraft, bearing United States Registration Number N437YV (the **"N437YV Aircraft"**), pursuant to (a) that certain Trust Agreement (N437YV) dated as of July 31, 1996, by and between Cargill, as owner participant (in such capacity, the **"Owner Participant"**), and Wells

---

[1] Capitalized term used herein but not otherwise defined herein shall have the meaning ascribed to them in the Rejection Procedures Motion.

fb.us.4852397.01

Fargo Bank, National Association, as successor-by-merger to First Security Bank, National Association, as owner trustee (in such capacity, the **"Owner Trustee"**), as the same may have been amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, and (b) that certain Trust Indenture and Security Agreement dated as of July 31, 1996, by and between the Owner Trustee and U.S. Bank National Association, as successor-by-merger to Fleet National Bank, as indenture trustee (in such capacity, the **"Indenture Trustee"**), as the same may have been amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

3.      The Owner Trustee leased the N437YV Aircraft to Mesa Air Group, Inc. pursuant to that certain Lease Agreement (N437YV) dated as of July 31, 1996, by and between the Owner Trustee and Mesa Air Group, Inc., as supplemented by Lease Supplement No. 1 dated August 7, 1996 (as the same may have been further amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the **"N437YV Lease"**).

4.      Cargill is also the Owner Participant with respect to that certain de Havilland DHC 8-202 Aircraft, bearing United States Registration Number N449YV (the **"N449YV Aircraft"**, and together with the N437YV Aircraft, collectively, the **"Aircraft"**), pursuant to (a) that certain Trust Agreement (N449YV) dated as of December 19, 1996, by and between the Owner Participant and the Owner Trustee, as the same may have been amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, and (b) that certain Trust Indenture and Security Agreement dated December 19, 1996, by and between the Owner Trustee and the Indenture Trustee, as the same may have been amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

5.      The Owner Trustee leased the N449YV Aircraft to Mesa Airlines, Inc. pursuant to

that certain Lease Agreement (N449YV) dated as of December 19, 1996, by and between the Owner Trustee and Mesa Airlines, Inc., as supplemented by Lease Supplement No. 1 dated December 19, 1996 (as the same may have been further amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the **"N449YV Lease"**, and together with the N437YV Lease, collectively, the **"Leases"**).

6.     On January 25, 2010, the Debtors filed the Rejection Procedures Motion seeking entry of an order that, among other things, establishes procedures for the Debtors to file notices of rejection (**"Rejection Notices"**) of certain leases of aircraft, engines and related equipment (the "**Rejection Procedures**").

## ARGUMENT

7.     The Rejection Procedures Motion should be denied because the Debtors' proposed Rejection Procedures: (1) improperly and impermissibly abridge the rights of lessors to adequate notice with respect to Rejection Notices, and (2) fail to comply with the return requirements established by Section 1110(c) of the Bankruptcy Code.

**I.     The Rejection Procedures Motion Should Be Denied Because The Proposed Rejection Procedures Provide For Lessors To Receive Notice Of Less Than The Ten (10) Days Required By Local Bankruptcy Rules 6006-1(a) and 9006-1.**

8.     The Debtors' proposed Rejection Procedures provide that the Debtors' rejection of a lease will be effective as of the fifth (5th) business day after the date of service of a rejection notice. (*Rejection Procedures Motion*, ¶ 27(b)).

9.     Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the **"Local Bankruptcy Rules"**) 6006-1(a) and 9006-1(b) require that motions to assume, reject, or assign an executory contract or unexpired lease shall be served at least ten (10) days before the return date.

10.    The Debtors' Rejection Procedures improperly and impermissibly abridge the

rights of lessors to adequate notice, and violate the express requirements of Local Bankruptcy Rules 6006-1(a) and 9006-1(b), and accordingly the Rejection Procedures Motion should be denied.

## II.    The Rejection Procedures Motion Should Be Denied Because The Proposed Rejection Procedures Fail To Comply With The Return Requirements In Section 1110(c) Of The Bankruptcy Code.

11.    The Debtors' proposed Rejection Procedures are inconsistent with the express provisions of Section 1110 of the Bankruptcy Code.

12.    Section 1110(c) of the Bankruptcy Code provides that:

> In any case under this chapter, the trustee shall immediately surrender and return to a secured party, lessor, or conditional vendor, described in subsection (a)(1), equipment described in subsection (a)(3), if at any time after the date of the order for relief under this chapter such secured party, lessor, or conditional vendor is entitled pursuant to subsection (a)(1) to take possession of such equipment and makes a written demand for such possession to the trustee. 11 U.S.C. § 1110(c).

13.    The obligation to surrender and return also includes an obligation to comply with applicable provisions of the Leases that govern the conditions of the Aircraft and equipment. The right to enforce those provisions is confirmed by Section 1110(a)(1) of the Bankruptcy Code, which states that:

> Except as provided in paragraph (2) and subject to subsection (b), the right of a secured party with a security interest in equipment described in paragraph (3), or of a lessor or conditional vendor of such equipment in compliance with a security agreement, lease, or conditional sale contract, and to enforce any of its other rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease, or otherwise retain or dispose of such equipment, is not limited or otherwise affected by any other provisions of this title or by any power of the court.

11 U.S.C. § 1110(a)(1).

14.    In the Return Procedures Motion, the Debtors request entry of an order that grants the Debtors, among other things, the right to: (i) ignore the terms of the Leases;

(ii) unilaterally decide the nature of return of Excess Equipment (including the Aircraft), including the right to swap engines among airframes leased to the Debtors, "subject to a lease or security agreement with the same counterparty (including owner participants) or such counterparty granted a security interest in such lease or security agreement to a common lender or group of lenders [sic]…"; and (iii) deliver airframes, without engines, if the "applicable engines are not on-wing", with no time limit on delivery of the proper engines.  (*Rejection Procedures Motion*, Exhibit E, p. 7.)

15.     Section 5 of each Lease, of which true and correct copies are attached as Exhibit A hereto, enumerates the requirements for the return of the Aircraft, including, without limitation, that the Aircraft should:

(a)     be returned, at the applicable Debtor's expense, either to the Debtors' facility in Farmington, New Mexico, or, if Cargill elects, to Denver International Airport;

(b)     be in a regular passenger configuration used by the applicable Debtor and be in as good of a condition as when originally delivered to the applicable Debtor, ordinary wear and tear excepted, and otherwise be in the condition required to be maintained under the applicable Debtor's FAA- approved maintenance program;

(c)     include all current logs, manuals and data and maintenance, inspection, modification and overhaul records and similar records for the airframe, engines, propellers and other components of the Aircraft;

(d)     have installed, in good operating condition, the full complement of engines (on wing), propellers and all other equipment and parts;

(e)     be clean by United States commercial airline standards;

(f)     have all of Debtors' exterior insignia painted over or removed in a good and workmanlike manner and all of the Debtors' interior markings should be removed in accordance with industry standards;

(g)     be free and clear of all liens other than the liens in favor of the Indenture Trustee, the Owner Trustee and the Owner Participant; and

(h)     have (or be capable of obtaining) a valid certificate of airworthiness.

16.     Rejection of the Aircraft should be effective only when the return conditions in

the Leases have been satisfied in accordance with Section 1110 of the Bankruptcy Code.

17.     Contrary to the express language and the spirit of Section 1110 of the Bankruptcy Code, the Debtors' proposed Rejection Procedures seek to abridge the contractual rights of lessors, including Cargill, under the applicable leases.

18.     Because the Debtors' proposed Rejection Procedures fail to comply with the express requirements of Section 1110 of the Bankruptcy Code and the terms of the Leases, the Rejection Procedures Motion should be denied.

## RESERVATION OF RIGHTS

19.     Cargill reserves its right to further object to the Rejection Procedures Motion on any and all grounds at or prior to any hearing on the Rejection Procedures Motion, to assert any and all claims (including administrative expense claims) in connection with any failure, in whole or in part, of the Debtors to satisfy the surrender and return obligations under Section 1110 of the Bankruptcy Code and the Leases, including, without limitation, any claims with respect to the condition of the Aircraft and any missing or damaged parts, books, logs and records.

20.     Additionally, Cargill expressly reserves its right to assert an administrative expense claim or other claim, as appropriate, against the Debtors for: (i) rejection damage claims; (ii) all claims arising from the Debtors' failure to satisfy all contractual or turnover provisions of the Leases and related documents, including, but not limited to, entitlement to rent or supplemental rent, if any, or as required under the Bankruptcy Code; (iii) claims arising from the Debtors' failure to comply with their obligations under the Bankruptcy Code; and (iv) reservation of any and all tax indemnity claims and any other types of claims that Cargill may have as a result of the Rejection Procedures Motion and the terms of the Leases.

WHEREFORE, Cargill respectfully requests that the Court (a) deny the relief requested

fb.us.4852397.01

in the Rejection Procedures Motion, and (b) grant such other and further relief as this Court

deems just and equitable under the circumstances.

Dated: February 16, 2010          **FAEGRE & BENSON  LLP**

By:  /s/ *Michael M. Krauss*
Michael M. Krauss (MK-9699)
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Tel:  (612) 766-8514
Fax:  (612) 766-1600
E-mail:  mkrauss@faegre.com

*Attorneys for Cargill, Incorporated*

fb.us.4852397.01

**Section 5 of N437YV Lease**
**(Return of Aircraft)**

1.02

LEASE AGREEMENT

(N437YV)

Dated as of July 31, 1996

Between

FIRST SECURITY BANK, NATIONAL ASSOCIATION,
Owner Trustee
Lessor

and

MESA AIR GROUP, INC.
Lessee

---

One de Havilland DHC 8-200 Aircraft
U.S. Registration No. N437YV

---

Lessor has assigned to the Indenture Trustee certain of its right, title and interest in and to this Lease. To the extent, if any, that this Lease constitutes chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction) no security interest in this Lease may be created through the transfer or possession of any counterpart other than the original executed counterpart, which shall be identified as the counterpart containing the receipt therefor executed by the Indenture Trustee on the signature page thereof.

IMPLIED, WITH RESPECT TO THE AIRCRAFT OR ANY PART THEREOF, except as set forth in Section 6(d)(v) and 6(j) of the Participation Agreement and except that Lessor (in its individual capacity and as trustee) (i) represents and warrants that on the Delivery Date, Lessor shall have received whatever title to the Aircraft was conveyed to it by Manufacturer, (ii) covenants that it will not, through its own actions or inactions, interfere in Lessee's or any Sublessee's quiet enjoyment of the Aircraft unless this Lease shall have been declared in default pursuant to Section 15 hereof, (iii) agrees that it will not directly or indirectly create, incur, assume or suffer to exist any Lessor Lien attributable to it in its individual capacity on or with respect to the Airframe or any Engine or Propeller and (iv) represents and warrants that it is a Citizen of the United States. None of the provisions of this Section 4 or any other provision of this Lease shall be deemed to amend, modify or otherwise affect the representations, warranties or other obligations (express or implied) of the Manufacturer, any Affiliate thereof, any subcontractor or supplier of the Manufacturer or any Affiliate thereof, with respect to the Airframe, Engines, Propellers or any Parts, or to release the Manufacturer, any Affiliate thereof, or any such subcontractor or supplier from any such representation, warranty or obligation. Unless an Event of Default shall have occurred and be continuing, Lessor agrees to make available to Lessee such rights as Lessor may have under any warranty with respect to the Aircraft made by the Manufacturer or any Affiliate thereof or any of its subcontractors or suppliers and any other claims against the Manufacturer or any Affiliate thereof, or any such subcontractor or supplier with respect to the Aircraft, all pursuant to and in accordance with the terms of the Purchase Agreement Assignment.

      SECTION 5.   <u>Return of the Aircraft</u>.  (a) <u>Condition Upon Return</u>.  Unless the Aircraft has been sold pursuant to Section 9(b) or 19(b) hereof, upon the termination of this Lease at the end of the Basic Term or any Renewal Term or pursuant to Section 9(b) or Section 15, Lessee, at its own expense, will return the Aircraft to Lessor at Lessee's principal operating facility in Farmington, New Mexico or, if Lessor so elects, at Denver International Airport (unless Lessee has provided storage pursuant to Section 5(g), in which event the location of return shall be the location of such storage so long as such storage is within the continental United States).  At the time of such return, (i), the Aircraft shall be registered under the laws of the United States with the FAA in the name of Lessor or its designee unless such registration is prohibited by reason of the failure of Lessor, the Owner Participant or Lessor's designee to be eligible on such date to own an aircraft registered with the FAA, (ii) the Airframe will be

fully equipped with the Engines installed thereon and (iii) the Engines will be fully equipped with the Propellers installed thereon.

At the time of such return, such Airframe, Engines and Propellers:

(A) shall have a valid certificate of airworthiness issued by the FAA and be eligible for operation under Part 121 or any successor regulation;

(B) shall be free and clear of all Liens (other than Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens);

(C) shall be in a regular passenger configuration used by Lessee and in as good condition as when originally delivered to Lessee, ordinary wear and tear excepted, and otherwise in the condition required to be maintained under Lessee's FAA-approved maintenance plan;

(D) shall have all of Lessee's exterior insignia painted over or removed in a good and workmanlike manner (and any repainted or stripped down areas shall match the existing exterior colors) and all of Lessee's interior markings removed in accordance with industry standards;

(E) shall be in a state of cleanliness suitable under Lessee's normal standards for use in its fleet operations and by U.S. commercial airline standards;

(F) shall be maintained by cleaning and treating all mild and moderate corrosion and correcting all severe or exfoliate corrosion in accordance with Lessee's FAA-approved maintenance program or Manufacturer's structural repair manual; and

(G) shall be cleared through all applicable customs;

and in all such cases the Aircraft shall not have been discriminated against in its maintenance, use or operation by reason of its leased status.

(b) <u>Airworthiness Directives</u>. All FAA Airworthiness Directives and amendments or changes to the Federal Aviation Regulations applicable to the Airframe, Engines (or Acceptable

Alternate Engines), Propellers (or Acceptable Alternate Propellers) or Parts, as well as all mandatory service bulletins applicable to any of the foregoing, shall have been accomplished by terminating action in compliance with the issuing agency's or the manufacturer's specific instructions, regardless of any waivers that the Lessee may have negotiated with the FAA, as the case may be, to the extent that any such directives, regulations or bulletins have an effective date for terminating compliance (i) prior to the date of return, or (ii) after the date of return but only if Lessee has begun termination action in regard thereto on other aircraft in Lessee's fleet, and such termination action is accomplished by Lessee concurrently with a particular type of maintenance procedure, and the Aircraft is scheduled (or in the normal course would be scheduled) for such maintenance procedure prior to the date of return.

(c) <u>Scheduled Maintenance</u>. (i) <u>Airframe</u>. At the time of return, the Airframe shall meet the following conditions:

(A) if the C Check is performed in phases, the Airframe shall have completed the next due phase of the C Check and all lower checks or phases of checks next due, including system, power plant and zonal inspection requirements, per Lessee's FAA-approved maintenance program within 100 flight hours prior to redelivery, and all discrepancies revealed by such check shall have been corrected. If the Airframe is not on a phased maintenance program, it shall not have less than one half-time or 2,000 hours, whichever is less, remaining until the next scheduled C Check (based on the Manufacturer's recommended airframe maintenance program at the time of return); and

(B) if the last sentence of the preceding paragraph shall be applicable but the Airframe does not meet the conditions specified therein, Lessee shall pay or cause to be paid to Lessor, concurrently with the return thereof, an amount computed by multiplying (I) the fair market cost to Lessor of obtaining a C Check by (II) a fraction of which (x) the numerator shall be the excess of 50% of the hours of operation allowable between C Checks over the actual number of hours of operation remaining on the Airframe to the next C Check and (y) the denominator shall be the number of hours of operation allowable between C Checks in accordance with Lessee's program.

(ii) <u>Engines</u>. At the time of return, the Engines shall meet the following requirements:

-8-

If Lessee's FAA-approved engine maintenance program with respect to major overhauls and hot section inspections is based on engine condition trend monitoring or a comparable program in accordance with the Engine Manufacturer's or Lessee's FAA-approved trend monitoring program or a comparable program, each Engine (or Acceptable Alternate Engine) shall have satisfactorily completed, immediately prior to return, a videotaped boreoscope inspection in accordance with such program (and Lessee will provide Lessor with a copy of such videotape and the accompanying report) and Lessee shall provide or cause to be provided all trend data for each Engine (or Acceptable Alternate Engine). If the boreoscope inspection and/or the trend data indicate that any action should be taken as soon as possible in order to prevent (i) any material engine deterioration or (ii) the need for any immediate component replacement, then Lessee shall complete, or cause to be completed, at its cost and expense, all such action required, prior to the return of any Engine (or Acceptable Alternate Engine) to Lessor.

If Lessee's FAA-approved engine maintenance program is not based on engine condition trend monitoring or a comparable program, each Engine (or Acceptable Alternate Engine) shall have, individually, at least 3,000 engine hours and, the Engines (or Acceptable Alternate Engines) shall have in aggregate, at least 6,000 engine hours remaining until scheduled overhaul (based on the manufacturer's recommended engine maintenance program at the time of return).

If the prior paragraph of this Section shall be applicable but the Engines (or Acceptable Alternate Engines) do not meet the conditions specified in said paragraph:

if any Engine (or Acceptable Alternate Engine) shall have, individually, less than 3,000 engine hours remaining until scheduled overhaul (based on manufacturer's recommended engine maintenance program at the time of return), Lessee shall pay or cause to be paid to Lessor, with respect to such Engine, concurrently with the return thereof, an amount computed by multiplying

(I) the fair market cost to Lessor of obtaining the scheduled engine heavy maintenance under the manufacturer's recommended maintenance program for an engine of the same model as the Engines (or Acceptable Alternate Engines) by

(II) a fraction of which (x) the numerator shall be the excess of 50% of the hours or cycles (whichever is applicable) of operation of one Engine between engine heavy maintenance allowable under the maintenance program then in use with respect to such Engines (or Acceptable Alternate Engines) over the actual number of hours or cycles of operation of such Engine (or Acceptable Alternate Engine) remaining until the next such scheduled engine heavy maintenance and (y) the denominator shall be the number of hours or cycles allowable between such scheduled engine heavy maintenance in accordance with manufacturer's recommended maintenance program.

(d) <u>Return of the Engines and Propellers</u>. In the event that an Acceptable Alternate Engine or Acceptable Alternate Propeller, as the case may be, shall be delivered with the returned Airframe, Lessee, concurrently with such delivery, will, at no cost to Lessor, furnish, or cause to be furnished, to Lessor a full warranty (as to title) bill of sale with respect to each such Acceptable Alternate Engine, or Acceptable Alternate Propeller, as the case may be, in form and substance reasonably satisfactory to Lessor (together with an opinion of counsel (which may be Lessee's General Counsel)) to the effect that such full warranty bill of sale has been duly authorized and delivered, and is enforceable in accordance with its terms and that such Acceptable Alternate Engines or Acceptable Alternate Propellers, as the case may be, are free and clear of all Liens other than Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens)), against receipt from Lessor of a bill of sale evidencing the transfer, without recourse or warranty (except as to the absence of Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens)) by Lessor to Lessee or its designee of all of Lessor's right, title and interest in and to any Engine or Propeller not installed on the Airframe at the time of the return of the Airframe.

(e) <u>Structural Inspection Tasks</u>. The Airframe shall have accomplished all structural tasks due within the next 3,750 landings or for any structural checks accomplished on a calendar basis within 12 months, such check shall have been performed by Lessee concurrent with Lessor's ground inspection prior to return.

(f) <u>Landing Gear Life</u>. The main gear and the nose landing gear shall have at least fifty percent (50%) of the

-10-

landings remaining or ten thousand (10,000) landings, whichever is less, since its last removal and overhaul or original installation for the main gear and the nose landing gear in the Lessee's FAA-approved maintenance program.

(g) <u>Tires and Brakes</u>. Shall have remaining fifty percent (50%) or more of the full service life.

(h) <u>Condition of Controlled Components</u>. Aircraft and engine hour and/or cycle controlled components at time of return to Lessor shall have remaining, as a minimum, one half life and/or fifty percent (50%) of the manufacturer's recommended overhaul interval in hours or cycles, whichever is applicable, before any scheduled removals for overhaul, test or disassembly. All components controlled on a calendar basis shall have remaining at least half-time before scheduled removal for testing or overhaul. Such hour/cycle or calendar controlled components are defined as those components controlled under Lessee's FAA-approved maintenance program.

(i) <u>Deferred Maintenance</u>. There shall be no open, outstanding or deferred maintenance items, scheduled or unscheduled, against the Aircraft.

(j) <u>Manuals</u>. Upon the return of the Aircraft upon any termination of this Lease in accordance with paragraph (a) of this Section 5, Lessee shall deliver or cause to be delivered to Lessor all current logs, manuals and data and maintenance, inspection, modification and overhaul records and similar records incorporating the latest revisions required to be maintained with respect to the Aircraft and Parts under FAA rules under Part 121, the Aircraft FAA-approved maintenance program and all other applicable laws and applicable rules and regulations of each country under the laws of which the Aircraft has been registered during the period of operation thereof, which logs, manuals, records and other data shall be in the English language or accompanied by an English translation thereof. If any such logs, manuals, records or other data are missing, incomplete or otherwise not in accordance with FAA standards applicable to Lessee, Lessee shall reaccomplish the maintenance tasks under Part 121 necessary to produce such records in accordance with its FAA-approved maintenance program prior to delivery of the Aircraft or otherwise perform all necessary acts (without regard to any applicable waivers or deferrals) to obtain such records in a manner satisfactory to the FAA.

(k) <u>Storage Upon Return</u>. If, at least 15 days prior to expiration of this Lease at the end of the Basic Term or any

Renewal Term or prior to a termination pursuant to Section 9(b) or Section 15, Lessee receives from Lessor a written request for storage of the Aircraft upon its return hereunder, Lessee will provide Lessor, or cause Lessor to be provided, with storage facilities for the Aircraft (x) at Lessee's risk and expense for a period not exceeding 60 days, and (y) thereafter at Lessor's risk and at Lessor's cost for insurance, maintenance and Lessee's out-of-pocket expenses plus a reasonable parking fee for such storage for a period not exceeding 120 days commencing on the date of such expiration or termination; in the case of each of (x) and (y), at Lessee's facility at Farmington, New Mexico or at any other location in the continental United States selected by Lessee and used by Lessee as a location for the long-term parking or storage of aircraft.

(l)  <u>Severable Parts</u>.  At any time after Lessee has advised Lessor that it has determined not to renew this Lease or purchase the Aircraft, or the Aircraft is otherwise to be returned to Lessor, Lessee shall, at Lessor's request, advise Lessor of the nature and condition of all severable nonproprietary Parts (other than Parts otherwise required by Sections 7 or 8 to be maintained on the Aircraft) owned by Lessee which have been used by Lessee during the prior six months and which Lessee has or intends to remove from the Aircraft in accordance with Section 8 hereof. Lessor may, at its option, upon 30 days notice to Lessee, purchase any or all of such nonproprietary Parts from Lessee upon the expiration of the Term at their fair market value.

(m)  <u>Acceptance Flights</u>.  Lessee shall provide for acceptance test flights, each not to exceed one (1) hour in duration, as necessary to demonstrate the airworthiness of the Aircraft (including for this purpose Acceptable Alternate Engines and/or Acceptable Alternate Propellers to be returned) and the proper functioning of all systems and components in accordance with the Manufacturer's flight functional procedures.  The Lessee shall pay for any costs associated with the first such flight and any subsequent flights to the extent that such initial flight demonstrated material discrepancies, including, but not limited to, costs for fuel, oil, airport fees, insurance, takeoff/landing fees, customs duties and any other costs incurred by the Lessor.  Lessee shall permit not more than two (2) Lessor's representatives onboard during any flight tests as direct observers of the functional tests.

(n)  <u>Appraisal Procedure</u>. Following expiration of the 60-day cure period provided for in Section 14(d) hereof, if there remains any dispute between Lessee and Lessor as to compliance with

-12-

the provisions of this Section 5 and the parties are unable to agree on the cost necessary to remedy such disputed items, Lessee and Lessor shall submit such dispute to the Appraisal Procedure I (as such term is defined in the Residual Agreement) and Lessee shall pay to Lessor any Adjustment Amount (as defined in the Residual Agreement) determined to be due as a result of such deficiency, if any, as determined by Appraisal Procedure I, without duplication of any amounts otherwise payable under the preceding provisions of this Section 5.

SECTION 6.   <u>Liens</u>.   Lessee will not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to the Aircraft, Airframe, Engines or Propellers, title thereto or any interest therein or in this Lease, except

(i)   the respective rights of Lessor as owner of the Aircraft and Lessee as herein provided and any other rights of the parties to the other Operative Documents,

(ii)   Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens),

(iii)   Liens for Taxes of Lessee either not yet due or being contested in good faith by appropriate proceedings diligently conducted so long as adequate reserves are available to Lessee for the payment of such Taxes and such proceedings do not involve any material risk of the sale, forfeiture or loss of the Airframe or any Engine or Propeller or any interest therein,

(iv)   materialmen's, mechanics', workmen's, repairmen's, employees', or other like Liens arising in the ordinary course of Lessee's or any Sublessee's business securing obligations that are not overdue for a period of more than 30 days or are being contested in good faith by appropriate proceedings diligently conducted so long as adequate reserves are available to the Lessee for the payment of such obligation and during such 30-day period there is not, or such proceedings do not involve, any material risk of the sale, forfeiture or loss of the Airframe or any Engine or Propeller or any interest therein,

(v)   Liens arising out of any judgment or award against Lessee with respect to which at the time an appeal or proceeding for review is being prosecuted in good faith by appropriate proceedings diligently conducted so long as

-13-

**Section 5 of N449YV Lease**
**(Return of Aircraft)**

1.02

---

LEASE AGREEMENT

(N449YV)

Dated as of December 19, 1996

Between

FIRST SECURITY BANK, NATIONAL ASSOCIATION,
Owner Trustee
Lessor

and

MESA AIRLINES, INC.
Lessee

---

One de Havilland DHC 8-202 Aircraft
U.S. Registration No. N449YV

---

---

Lessor has assigned to the Indenture Trustee certain of its right, title and interest in and to this Lease. To the extent, if any, that this Lease constitutes chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction) no security interest in this Lease may be created through the transfer or possession of any counterpart other than the original executed counterpart, which shall be identified as the counterpart containing the receipt therefor executed by the Indenture Trustee on the signature page thereof.

Citizen of the United States. None of the provisions of this Section 4 or any other provision of this Lease shall be deemed to amend, modify or otherwise affect the representations, warranties or other obligations (express or implied) of the Manufacturer, any Affiliate thereof, any subcontractor or supplier of the Manufacturer or any Affiliate thereof, with respect to the Airframe, Engines, Propellers or any Parts, or to release the Manufacturer, any Affiliate thereof, or any such subcontractor or supplier from any such representation, warranty or obligation. Unless an Event of Default shall have occurred and be continuing, Lessor agrees to make available to Lessee such rights as Lessor may have under any warranty with respect to the Aircraft made by the Manufacturer or any Affiliate thereof or any of its subcontractors or suppliers and any other claims against the Manufacturer or any Affiliate thereof, or any such subcontractor or supplier with respect to the Aircraft, all pursuant to and in accordance with the terms of the Purchase Agreement Assignment.

SECTION 5. <u>Return of the Aircraft</u>. (a) <u>Condition Upon Return</u>. Unless the Aircraft has been sold pursuant to Section 9(b) or 19(b) hereof, upon the termination of this Lease at the end of the Basic Term or any Renewal Term or pursuant to Section 9(b) or Section 15, Lessee, at its own expense, will return the Aircraft to Lessor at Lessee's principal operating facility in Farmington, New Mexico or, if Lessor so elects, at Denver International Airport (unless Lessee has provided storage pursuant to Section 5(g), in which event the location of return shall be the location of such storage so long as such storage is within the continental United States). At the time of such return, (i), the Aircraft shall be registered under the laws of the United States with the FAA in the name of Lessor or its designee unless such registration is prohibited by reason of the failure of Lessor, the Owner Participant or Lessor's designee to be eligible on such date to own an aircraft registered with the FAA, (ii) the Airframe will be fully equipped with the Engines installed thereon and (iii) the Engines will be fully equipped with the Propellers installed thereon.

At the time of such return, such Airframe, Engines and Propellers:

(A) shall have a valid certificate of airworthiness issued by the FAA and be eligible for operation under Part 121 or any successor regulation;

(B)  shall be free and clear of all Liens (other than Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens);

(C)  shall be in a regular passenger configuration used by Lessee and in as good condition as when originally delivered to Lessee, ordinary wear and tear excepted, and otherwise in the condition required to be maintained under Lessee's FAA-approved maintenance plan;

(D)  shall have all of Lessee's exterior insignia painted over or removed in a good and workmanlike manner (and any repainted or stripped down areas shall match the existing exterior colors) and all of Lessee's interior markings removed in accordance with industry standards;

(E)  shall be in a state of cleanliness suitable under Lessee's normal standards for use in its fleet operations and by U.S. commercial airline standards;

(F)  shall be maintained by cleaning and treating all mild and moderate corrosion and correcting all severe or exfoliate corrosion in accordance with Lessee's FAA-approved maintenance program or Manufacturer's structural repair manual; and

(G)  shall be cleared through all applicable customs;

and in all such cases the Aircraft shall not have been discriminated against in its maintenance, use or operation by reason of its leased status.

(b)  <u>Airworthiness Directives</u>.  All FAA Airworthiness Directives and amendments or changes to the Federal Aviation Regulations applicable to the Airframe, Engines (or Acceptable Alternate Engines), Propellers (or Acceptable Alternate Propellers) or Parts, as well as all mandatory service bulletins applicable to any of the foregoing, shall have been accomplished by terminating action in compliance with the issuing agency's or the manufacturer's specific instructions, regardless of any waivers that the Lessee may have negotiated with the FAA, as the case may be, to the extent that any such directives, regulations or bulletins have an effective date for terminating compliance (i) prior to the date of return, or (ii) after the date of return but only if Lessee has begun termination action in regard thereto on

other aircraft in Lessee's fleet, and such termination action is accomplished by Lessee concurrently with a particular type of maintenance procedure, and the Aircraft is scheduled (or in the normal course would be scheduled) for such maintenance procedure prior to the date of return.

(c) <u>Scheduled Maintenance</u>. (i) <u>Airframe</u>. At the time of return, the Airframe shall meet the following conditions:

(A) if the C Check is performed in phases, the Airframe shall have completed the next due phase of the C Check and all lower checks or phases of checks next due, including system, power plant and zonal inspection requirements, per Lessee's FAA-approved maintenance program within 100 flight hours prior to redelivery, and all discrepancies revealed by such check shall have been corrected. If the Airframe is not on a phased maintenance program, it shall not have less than one half-time or 2,000 hours, whichever is less, remaining until the next scheduled C Check (based on the Manufacturer's recommended airframe maintenance program at the time of return); and

(B) if the last sentence of the preceding paragraph shall be applicable but the Airframe does not meet the conditions specified therein, Lessee shall pay or cause to be paid to Lessor, concurrently with the return thereof, an amount computed by multiplying (I) the fair market cost to Lessor of obtaining a C Check by (II) a fraction of which (x) the numerator shall be the excess of 50% of the hours of operation allowable between C Checks over the actual number of hours of operation remaining on the Airframe to the next C Check and (y) the denominator shall be the number of hours of operation allowable between C Checks in accordance with Lessee's program.

(ii) <u>Engines</u>. At the time of return, the Engines shall meet the following requirements:

If Lessee's FAA-approved engine maintenance program with respect to major overhauls and hot section inspections is based on engine condition trend monitoring or a comparable program in accordance with the Engine Manufacturer's or Lessee's FAA-approved trend monitoring program or a comparable program, each Engine (or Acceptable Alternate Engine) shall have satisfactorily completed, immediately prior to return, a videotaped boreoscope inspection in accordance with such program (and Lessee will provide Lessor with a copy of such

videotape and the accompanying report) and Lessee shall provide or cause to be provided all trend data for each Engine (or Acceptable Alternate Engine). If the boreoscope inspection and/or the trend data indicate that any action should be taken as soon as possible in order to prevent (i) any material engine deterioration or (ii) the need for any immediate component replacement, then Lessee shall complete, or cause to be completed, at its cost and expense, all such action required, prior to the return of any Engine (or Acceptable Alternate Engine) to Lessor.

If Lessee's FAA-approved engine maintenance program is not based on engine condition trend monitoring or a comparable program, each Engine (or Acceptable Alternate Engine) shall have, individually, at least 3,000 engine hours and, the Engines (or Acceptable Alternate Engines) shall have in aggregate, at least 6,000 engine hours remaining until scheduled overhaul (based on the manufacturer's recommended engine maintenance program at the time of return).

If the prior paragraph of this Section shall be applicable but the Engines (or Acceptable Alternate Engines) do not meet the conditions specified in said paragraph:

if any Engine (or Acceptable Alternate Engine) shall have, individually, less than 3,000 engine hours remaining until scheduled overhaul (based on manufacturer's recommended engine maintenance program at the time of return), Lessee shall pay or cause to be paid to Lessor, with respect to such Engine, concurrently with the return thereof, an amount computed by multiplying

(I) the fair market cost to Lessor of obtaining the scheduled engine heavy maintenance under the manufacturer's recommended maintenance program for an engine of the same model as the Engines (or Acceptable Alternate Engines) by

(II) a fraction of which (x) the numerator shall be the excess of 50% of the hours or cycles (whichever is applicable) of operation of one Engine between engine heavy maintenance allowable under the maintenance program then in use with respect to such Engines (or Acceptable Alternate Engines) over the actual number of hours or cycles of operation of such Engine (or Acceptable

Alternate Engine) remaining until the next such scheduled engine heavy maintenance and (y) the denominator shall be the number of hours or cycles allowable between such scheduled engine heavy maintenance in accordance with manufacturer's recommended maintenance program.

(d) <u>Return of the Engines and Propellers</u>. In the event that an Acceptable Alternate Engine or Acceptable Alternate Propeller, as the case may be, shall be delivered with the returned Airframe, Lessee, concurrently with such delivery, will, at no cost to Lessor, furnish, or cause to be furnished, to Lessor a full warranty (as to title) bill of sale with respect to each such Acceptable Alternate Engine, or Acceptable Alternate Propeller, as the case may be, in form and substance reasonably satisfactory to Lessor (together with an opinion of counsel (which may be Lessee's General Counsel)) to the effect that such full warranty bill of sale has been duly authorized and delivered, and is enforceable in accordance with its terms and that such Acceptable Alternate Engines or Acceptable Alternate Propellers, as the case may be, are free and clear of all Liens other than Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens)), against receipt from Lessor of a bill of sale evidencing the transfer, without recourse or warranty (except as to the absence of Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens)) by Lessor to Lessee or its designee of all of Lessor's right, title and interest in and to any Engine or Propeller not installed on the Airframe at the time of the return of the Airframe.

(e) <u>Structural Inspection Tasks</u>. The Airframe shall have accomplished all structural tasks due within the next 3,750 landings or for any structural checks accomplished on a calendar basis within 12 months, such check shall have been performed by Lessee concurrent with Lessor's ground inspection prior to return.

(f) <u>Landing Gear Life</u>. The main gear and the nose landing gear shall have at least fifty percent (50%) of the landings remaining or ten thousand (10,000) landings, whichever is less, since its last removal and overhaul or original installation for the main gear and the nose landing gear in the Lessee's FAA-approved maintenance program.

(g) <u>Tires and Brakes</u>. Shall have remaining fifty percent (50%) or more of the full service life.

(h) <u>Condition of Controlled Components</u>. Aircraft and engine hour and/or cycle controlled components at time of return to Lessor shall have remaining, as a minimum, one half life and/or fifty percent (50%) of the manufacturer's recommended overhaul interval in hours or cycles, whichever is applicable, before any scheduled removals for overhaul, test or disassembly. All components controlled on a calendar basis shall have remaining at least half-time before scheduled removal for testing or overhaul. Such hour/cycle or calendar controlled components are defined as those components controlled under Lessee's FAA-approved maintenance program.

(i) <u>Deferred Maintenance</u>. There shall be no open, outstanding or deferred maintenance items, scheduled or unscheduled, against the Aircraft.

(j) <u>Manuals</u>. Upon the return of the Aircraft upon any termination of this Lease in accordance with paragraph (a) of this Section 5, Lessee shall deliver or cause to be delivered to Lessor all current logs, manuals and data and maintenance, inspection, modification and overhaul records and similar records incorporating the latest revisions required to be maintained with respect to the Aircraft and Parts under FAA rules under Part 121, the Aircraft FAA-approved maintenance program and all other applicable laws and applicable rules and regulations of each country under the laws of which the Aircraft has been registered during the period of operation thereof, which logs, manuals, records and other data shall be in the English language or accompanied by an English translation thereof. If any such logs, manuals, records or other data are missing, incomplete or otherwise not in accordance with FAA standards applicable to Lessee, Lessee shall reaccomplish the maintenance tasks under Part 121 necessary to produce such records in accordance with its FAA-approved maintenance program prior to delivery of the Aircraft or otherwise perform all necessary acts (without regard to any applicable waivers or deferrals) to obtain such records in a manner satisfactory to the FAA.

(k) <u>Storage Upon Return</u>. If, at least 15 days prior to expiration of this Lease at the end of the Basic Term or any Renewal Term or prior to a termination pursuant to Section 9(b) or Section 15, Lessee receives from Lessor a written request for storage of the Aircraft upon its return hereunder, Lessee will provide Lessor, or cause Lessor to be provided, with storage facilities for the Aircraft (x) at Lessee's risk and expense for a period not exceeding 60 days, and (y) thereafter at Lessor's risk and at Lessor's cost for insurance, maintenance and Lessee's out-

of-pocket expenses plus a reasonable parking fee for such storage for a period not exceeding 120 days commencing on the date of such expiration or termination; in the case of each of (x) and (y), at Lessee's facility at Farmington, New Mexico or at any other location in the continental United States selected by Lessee and used by Lessee as a location for the long-term parking or storage of aircraft.

(1) <u>Severable Parts</u>.  At any time after Lessee has advised Lessor that it has determined not to renew this Lease or purchase the Aircraft, or the Aircraft is otherwise to be returned to Lessor, Lessee shall, at Lessor's request, advise Lessor of the nature and condition of all severable nonproprietary Parts (other than Parts otherwise required by Sections 7 or 8 to be maintained on the Aircraft) owned by Lessee which have been used by Lessee during the prior six months and which Lessee has or intends to remove from the Aircraft in accordance with Section 8 hereof. Lessor may, at its option, upon 30 days notice to Lessee, purchase any or all of such nonproprietary Parts from Lessee upon the expiration of the Term at their fair market value.

(m) <u>Acceptance Flights</u>.  Lessee shall provide for acceptance test flights, each not to exceed one (1) hour in duration, as necessary to demonstrate the airworthiness of the Aircraft (including for this purpose Acceptable Alternate Engines and/or Acceptable Alternate Propellers to be returned) and the proper functioning of all systems and components in accordance with the Manufacturer's flight functional procedures.  The Lessee shall pay for any costs associated with the first such flight and any subsequent flights to the extent that such initial flight demonstrated material discrepancies, including, but not limited to, costs for fuel, oil, airport fees, insurance, takeoff/landing fees, customs duties and any other costs incurred by the Lessor.  Lessee shall permit not more than two (2) Lessor's representatives onboard during any flight tests as direct observers of the functional tests.

(n) <u>Appraisal Procedure</u>. Following expiration of the 60-day cure period provided for in Section 14(d) hereof, if there remains any dispute between Lessee and Lessor as to compliance with the provisions of this Section 5 and the parties are unable to agree on the cost necessary to remedy such disputed items, Lessee and Lessor shall submit such dispute to the Appraisal Procedure I (as such term is defined in the Residual Agreement) and Lessee shall pay to Lessor any Adjustment Amount (as defined in the Residual Agreement) determined to be due as a result of such

deficiency, if any, as determined by Appraisal Procedure I, without duplication of any amounts otherwise payable under the preceding provisions of this Section 5.

SECTION 6. Liens. Lessee will not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to the Aircraft, Airframe, Engines or Propellers, title thereto or any interest therein or in this Lease, except

(i) the respective rights of Lessor as owner of the Aircraft and Lessee as herein provided and any other rights of the parties to the other Operative Documents,

(ii) Lessor Liens (including for this purpose Liens that would be Lessor Liens but for the proviso to the definition of Lessor Liens),

(iii) Liens for Taxes of Lessee either not yet due or being contested in good faith by appropriate proceedings diligently conducted so long as adequate reserves are available to Lessee for the payment of such Taxes and such proceedings do not involve any material risk of the sale, forfeiture or loss of the Airframe or any Engine or Propeller or any interest therein,

(iv) materialmen's, mechanics', workmen's, repairmen's, employees', or other like Liens arising in the ordinary course of Lessee's or any Sublessee's business securing obligations that are not overdue for a period of more than 30 days or are being contested in good faith by appropriate proceedings diligently conducted so long as adequate reserves are available to the Lessee for the payment of such obligation and during such 30-day period there is not, or such proceedings do not involve, any material risk of the sale, forfeiture or loss of the Airframe or any Engine or Propeller or any interest therein,

(v) Liens arising out of any judgment or award against Lessee with respect to which at the time an appeal or proceeding for review is being prosecuted in good faith by appropriate proceedings diligently conducted so long as adequate reserves are available to Lessee for the payment of such obligations and there is not any material risk of the sale, forfeiture or loss of the Airframe or any Engine or Propeller or any interest therein or there shall have been