# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 22 2009

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

|  |  |
|---|---|
| DELTA AIR LINES, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| MESA AIR GROUP, INC. and FREEDOM AIRLINES, INC., | ) ) ) |
| Defendants. | ) ) |

CIVIL ACTION NO.
1:09-CV-2267

**TCB**

## MOTION TO REASSIGN RELATED CASE AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Defendants Mesa Air Group, Inc. ("Mesa Air") and Freedom Airlines, Inc.

("Freedom") (collectively, "Mesa") file this motion for reassignment to inform the

Court of a pending related action, *Mesa Air Group, Inc. v. Delta Air Lines, Inc.*,

No. 08-CV-1334-CEC (N.D. Ga.) (the "Related Action"). Both this case and the

Related Action involve attempts by Delta Air Lines, Inc. ("Delta") to terminate the

same agreement between the parties. Mesa obtained a preliminary injunction to

prevent the unlawful termination of the agreement in the Related Action, and that

injunction has been affirmed on appeal. *See Mesa Air Group, Inc. v. Delta Air

Lines, Inc.*, 573 F.3d 1124, 1132 (11th Cir. July 1, 2009). Now, Delta seeks the

same relief—termination of the agreement—that it was denied in the Related Action.  Accordingly, the claims and defenses in this case will raise the same issues of fact (to the extent that the Complaint alleges facts sufficient to state a claim as to the purported materiality of the alleged breach, which Mesa and Freedom contend that it does not).  In such circumstances, the Northern District's Internal Operating Procedure Rule 905-2(a) provides for reassignment of related cases to the same judge.  Mesa understands that the decision to reassign this case resides within the discretion of the Court and wishes merely to identify the Related Action and the commonality of issues so that the Court may decide whether, in the interest of promoting judicial efficiency, reassignment of this case would be appropriate.

## MEMORANDUM OF LAW

### I.    FACTUAL BACKGROUND

On May 3, 2005, Mesa Air and its subsidiary Freedom entered into a Delta Connection Agreement (the "Agreement"), according to which Freedom agreed to provide regional jet air service to Delta customers using ERJ-145 aircraft. (Compl. ¶¶ 1, 16.)  Under the Agreement, Freedom is compensated for its operating costs and receives additional mark-up and incentive compensation for achieving certain performance standards.  (*Id.* ¶ 17.)

In March 2008, Delta attempted to terminate the Agreement, purportedly based on Freedom's failure to meet the performance standards set by the Agreement. On April 7, 2008, Mesa filed suit in the Related Action seeking to enjoin the termination. Following an expedited discovery schedule and a three-day evidentiary hearing during which numerous fact and expert witnesses testified, Judge Clarence E. Cooper entered a preliminary injunction against the termination of the Agreement. *See* Order Granting Mot. for Prelim. Inj., *Mesa Air Group, Inc. v. Delta Air Lines, Inc.*, No. 08-CV-1334-CEC (N.D. Ga. June 25, 2008) (Ex. A).

Judge Cooper found that Delta's attempt to terminate the Agreement was part of a "strategy upon which Delta had embarked upon, in response to rising fuel prices, to reduce the regional jet capacity in Delta's fleet." *Id.* ¶ 50. Judge Cooper noted that Delta's strategy documents specifically identified "[c]ancellation of all or part of Freedom (Mesa) agreement" as a means of realizing Delta's goal to reduce its costs. *Id.* And, moreover, Delta's plan called for it to "[a]ggressively monitor carrier performance and costs to actively enforce exit provisions in contracts," including the "Freedom (Mesa)" agreement. *Id.* ¶ 51. Judge Cooper concluded that Delta breached its implied and express duties of good faith by attempting to terminate the Agreement on the grounds stated by Delta. *Id.* ¶ 79. Judge Cooper also reviewed the evidence related to the financial impact

termination would have on Mesa and determined that "unless enjoined, termination of the Contract would jeopardize Mesa and Freedom as going concerns and likely result in an imminent filing of bankruptcy." *Id.* ¶ 57. As noted, Judge Cooper's grant of the preliminary injunction was affirmed on appeal, *see* 573 F.3d at 1132, and the case remains pending in the district court awaiting a final order.

On August 19, 2009, Delta filed the present action seeking, among other relief, a declaration that Mesa had materially breached the same ERJ-145 Agreement and that, as a result, Delta is entitled to terminate the Agreement.[1] This time, Delta has not alleged that Freedom has failed to meet the performance standards set by the Agreement, but rather that Freedom has breached the Agreement by refusing to reduce the rates charged to Delta pursuant to most-favored nations provisions in the Agreement and Delta's assertions about the facts that would trigger those provisions. (Compl. ¶¶ 25-28.)

Delta seeks the same remedy that it was denied in the Related Action. Delta's first count specifically requests declaratory relief that will enable it to terminate the Agreement. (*Id.* ¶¶ 35-45.) Although the grounds for termination are new, the Agreement and the parties are the same, and, as explained below, whether

---

[1] Mesa contends that Count I of the complaint for declaratory judgment fails to state a claim and should be dismissed, a contention to be fully set forth in a Partial Motion to Dismiss.

the breach Delta alleges is really a material one will depend on a number of factors, including Mesa's substantial performance of the Agreement, Delta's actual motivation for seeking termination, and the undue forfeiture that termination would impose on Mesa—all issues that overlap substantially with issues currently before Judge Cooper in the Related Action.

## II.    ARGUMENT AND CITATION OF AUTHORITY

Rule 905-2 of this Court's Internal Operating Procedures provides that "all related cases shall be assigned to the same judge." Internal Operating Procedures for the U.S. Dist. Court N. Dist. of Ga. Rule 905-2 (1984) (amended 2007) ("IOP"). Rule 905-2 expressly contemplates reassignment of a later-filed case "whenever the possibility of a pending related case comes to the attention of the Clerk by other means." *Id.* For the purpose of reassignment, cases are considered related when the later-filed case involves "[t]he same issue of fact or arises out of the same event or transaction included in an earlier numbered pending suit." IOP Rule 905-2(a)(2). By contrast, cases are not related if they have merely "the same legal issue; if any issue of fact is only similar rather than identical; or if the event or transaction is only similar rather than identical." IOP Rule 905-2(a); *see also Frazier v. Williams Fund Private Equity Group*, 2006 WL 898178, at *3 (N.D. Ga. Apr. 5, 2006).

This action and the Related Action are "related case[s]" within the meaning of IOP Rule 905-2. The parties are identical. The Agreement is identical. But more to the point, deciding whether Delta has demonstrated a *material* breach of the Agreement justifying termination would involve the Court in the identical factual issues currently before Judge Cooper. *First*, under New York law, any allegation of a material breach must be considered in light of Freedom's substantial performance of the Agreement. *See, e.g., Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 457 (S.D.N.Y. 2003).[2] The central issue before Judge Cooper in the Related Action is Freedom's performance and whether Freedom has met the performance standards set by the Agreement. Second, a breach is only material if it "defeats the object of the parties in making the contract." *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 731 (S.D.N.Y. 2000), *aff'd*, 294 F.3d 383 (2d Cir. 2002). As in the Related Action, a key issue in this case therefore will be whether Delta's strategy to reduce the costs of its Delta Connection fleet – rather than any real concern about the performance that was the object of the Agreement – has motivated Delta's attempts to terminate the Agreement. *Third*, a breach is less likely to be found material where the alleged breaching party's preparation for performance

---

[2] The Agreement provides that it "is subject to, and will be governed by and interpreted in accordance with, the laws of the State of New York." Art. 20(A).

will cause a drastic forfeiture if the contract is terminated. *See, e.g., Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 576-77, 389 N.E.2d 113, 115 (N.Y. 1979). Judge Cooper already has reviewed the evidence of Mesa and Freedom's financial commitment to the ERJ-145 Agreement and found that termination would likely result in imminent bankruptcy. The *absolute identity* of the irreparable harm inquiry in the Related Action and the forfeiture to Mesa and Freedom upon a finding of material breach alone warrant reassignment.

Moreover, these issues are not just identical, they have been substantially developed and reviewed in the Related Action. Reassignment therefore would promote judicial economy. *See KEG Techs., Inc. v. Laimer*, No. 1:08-CV-393-JEC (N.D. Ga. Sept. 9, 2008) (Batten, J.) (Ex. B) ("[T]he main purposes of Rule 905-2 are to promote judicial economy and achieve uniform results."). Judge Cooper already has received evidence and analyzed the issues related to the terms of the Agreement and Delta's desire to terminate the Agreement. Reassignment will reduce the burden on witnesses, the parties and the Court by eliminating redundant proceedings, obviating the need for duplicative orders, and expediting the resolution of the parties' claims. *Cf. id.* (denying reassignment because "it is unlikely that Judge Story spent much time analyzing the patents at issue inasmuch as the 2004 case was disposed of on procedural grounds"). Here, Judge Cooper

has invested much time and effort to understand the issues in these cases, has reviewed batches of written discovery, and has conducted a three-day evidentiary hearing in which he was able to consider the testimony of numerous witnesses. The Court's reassignment procedure exists to avoid the needless waste of judicial resources of having two judges review identical evidence to reach identical factual determinations.

To be sure, there are differences between this case and the Related Action. Mesa acknowledges that Delta has alleged a different ground for termination—the rates charged to Delta as opposed to Freedom's flight performance. But given the numerous overlapping and identical issues presented by the two Actions, the Court would be acting well within its discretion to reassign this case. Mesa therefore seeks reassignment to the extent the Court finds that reassignment would promote the efficient disposition of the case.

## **CONCLUSION**

For these reasons, Mesa respectfully requests that the Court enter an order

reassigning this action to Judge Clarence E. Cooper as a related case to *Mesa Air*

*Group, Inc. v. Delta Air Lines, Inc.*, No. 08-CV-1334-CEC (N.D. Ga.).

Dated:      September 22, 2009

Respectfully submitted,

G. Lee Garrett, Jr.
Ga. Bar No. 286519
David M. Monde
Ga. Bar No. 515710
Robert A. Schmoll
Ga. Bar No. 100178
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA  30309-3053
Telephone:  (404) 521-3939
Facsimile:   (404) 581-8330

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| DELTA AIR LINES, )<br><br>Plaintiffs, )<br><br>v. )<br><br>MESA AIR GROUP, INC. and )<br>FREEDOM AIRLINES, INC., )<br><br>Defendants. ) | CIVIL ACTION NO.<br>1:09-CV-2267 |

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font, in accordance with Local Rule 5.1(C).

Dated: September 22, 2009.

_____
Robert A. Schmoll
Ga. Bar No. 100178

JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA 30309-3053
Telephone:  (404) 581-3939
Facsimile:   (404) 581-8330

Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DELTA AIR LINES,                    )
                                    )
        Plaintiffs,               )    CIVIL ACTION NO.
                                    )    1:09-CV-2267
        v.                        )
                                    )
MESA AIR GROUP, INC. and            )
FREEDOM AIRLINES, INC.,             )
                                    )
        Defendants.               )
                                    )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day manually filed a true and correct copy of

the foregoing MOTION TO REASSIGN RELATED CASE AND

INCORPORATED MEMORANDUM OF LAW IN SUPPORT with the Clerk of

Court and that I have served by e-mail and first-class mail the following counsel of

record:

                 Catherine M. O'Neil
                   (coneil@kslaw.com)
                 David E. Meadows
                   (demeadows@kslaw.com)
                 Joseph P. Rockers
                   (jrockers@kslaw.com)
                 KING & SPALDING LLP
                 1180 Peachtree Street
                 Atlanta Georgia 30309

Dated: September 22, 2009.

_____
Robert A. Schmoll
Ga. Bar No. 100178

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309-3053
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

Attorney for Plaintiffs

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 2 5 2008

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

MESA AIR GROUP, INC. and    :
FREEDOM AIRLINES, INC.,    :
    :
      Plaintiffs,    :
    :
    v.    :    **CIVIL ACTION**
    :    **FILE NO. 1:08-CV-1334-CC**
DELTA AIR LINES, INC.,    :
    :
    :
      Defendant.    :

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

This case came before the Court for hearing on May 27-29, 2008, on

Plaintiffs' Motion for Preliminary Injunction [Doc. No. 24]. Having carefully

considered the evidence presented on behalf of Plaintiffs Mesa Air Group, Inc.

("Mesa"), and its wholly-owned subsidiary, Freedom Airlines, Inc. ("Freedom")

and Defendant Delta Air Lines, Inc. ("Delta"), the credibility of the witnesses, the

briefing of the parties and the applicable law, the Court **GRANTS** Plaintiffs'

motion, and makes the following findings of fact and conclusions of law as

provided in Federal Rule of Civil Procedure 52(a):

# I. FINDINGS OF FACT

## A.    The Delta Connection Agreement.

1.    Mesa, Freedom and Delta entered into the "Delta Connection

Agreement" on May 3, 2005, under which Freedom operates up to 36 ERJ-145

regional jet aircraft (the "Aircraft") for Delta, under the Delta name and airline

code, "DL."  (Am. Compl. ¶ 1; Pls.' Ex. 21.)[1]

2.    Freedom's schedules and fares are set and published by Delta.

Freedom supplies the Aircraft, flight crews and other personnel and operates the

Aircraft.  (Am. Compl. ¶ 17; Answer ¶¶ 1, 17; Hr'g Tr. at 97:25; 98:1-5; Pls.' Ex.

21.)

3.    Delta is obligated to pay Mesa: (1) certain "Direct Costs" defined in

the Contract; (2) a "Base Mark-up," consisting of a 4% mark-up of Direct Costs for

any month in which Mesa achieves a "completion rate" of at least 95%; and (3)

"Monthly Incentive Compensation," consisting of an additional 1% mark-up of

Direct Costs for any month in which Mesa achieves a designated monthly

---

[1] Mesa and Delta entered into "Amendment Number One" on March 13, 2007.
(Am. Compl. ¶ 16; Answer ¶ 16) (the Delta Connection Agreement, together with
Amendment Number One, is referred to herein as the "Contract").  Amendment Number
One provided for the addition and removal of certain Aircraft and addressed issues
related to Delta's emergence from bankruptcy, but the Contract terms relevant to this
action were unchanged.  (*Id.*)

incentive goal – generally a "completion rate" of 97% or more.  (Pls.' Ex. 21, Art.
3; Hr'g Tr. at 221:18-222:14.)  The Contract provides Mesa with monthly revenues
of approximately $20 million.  (Hr'g Tr. at 102:15-17.)

     4.     The Contract does not allow termination without cause or for the
convenience of Delta until November 2012; however, Delta is entitled to terminate
the Contract early if Freedom "fails to maintain a completion rate of 95% during
any three months of any consecutive six month period ...."  (Pls.' Ex. 21, Art.
11.F(vi).)  The Contract does not expressly define "completion rate."  (Pls Ex. 21;
Hr'g Tr. at 416:4-6.)  Delta contends that Freedom's completion rate was less than
95% in October and December 2007, and February 2008, and purported to
terminate the Contract on that basis.  (Pls.' Ex. 57.)

**B.    Coordinated Or Commanded Cancellations.**

     5.     Freedom's completion rate is impacted by flight cancellations for
various causes.  One cause is advance cancellations of flights due to forecasted
weather events, expected congestion or other restrictions projected to impact flight
operations, known at various times as "coordinated cancellations," "OCC-
coordinated cancellations," "prioritized cancellations," "mainline-initiated," or
"commanded cancellations."  For consistency, the Court will refer to them as

"Coordinated Cancellations." (Hr'g Tr. at 77:13-78:12; 208:12-210:25; 545:16-546:24.)

6.      During periods of irregular operations involving weather, congestion, or other air traffic control ("ATC") restrictions, it is often not possible to fly all of the flights scheduled to operate during a given period of time.  In anticipation of such circumstances, Delta's Operations Control Center ("OCC") convenes "coordination calls" with Freedom and other Delta Connection Carriers. (*Id.* at 167:2-168:4; 545:21-546:10.)

7.      During these calls, Delta asks its regional carriers, including Freedom, to make Coordinated Cancellations of flights in anticipation of weather and congestion-related restrictions. (*Id.* at 161:24-162:17; 167:10-169:14; 208:19-210:25; 546:11-24.)  Such cancellations enable Delta's own aircraft (so-called "mainline aircraft," typically larger aircraft with more passengers) to operate during times when not all scheduled flights can operate. (*Id.* at 77:13-78:4; 173:3-10.)

8.      The coordination calls occur about 24 hours in advance of the weather or ATC event for which Delta is preparing. (*Id.* at 545:24-546:10.) Delta's objective is to have the regional carriers pre-cancel flights, notify passengers

impacted by those Coordinated Cancellations before they leave for the airport, and re-accommodate them on other flights. (*Id.* at 544:4-545:23.)

9.    Unlike Delta, Freedom has no incentive to and does not pre-cancel flights. (*Id.* at 176:9-25.) Freedom's goal is to "complete as many flights as possible," because, as Mesa's Director of Contract Revenue Management, Bud Tyler, testified, "to the extent we were requested to cancel flights, we lose the revenue associated with those flights." (*Id.* at 225:01-05.) Thus, when Freedom considers whether to cancel a specific flight due to weather or ATC restrictions, it typically waits until "about an hour and a half before its scheduled departure time." (*Id.* at 176:9-17.)

10.    When Freedom takes a Coordinated Cancellation, it loses any chance to operate the flight, because even if Delta's weather forecast proves to be wrong and Freedom could have operated the flight at or near the scheduled time, the passengers will all have been notified of the Coordinated Cancellation and placed on different flights. (Hr'g Tr. at 79:23-80:10; 207:1-5; 212:13-25; 213:1-20; 423:22-424:16; 548:19-24.) As Mesa's COO, Mike Lotz testified, "[t]his is not the FAA or ATC system telling us we can only fly so many flights. This is Delta operations center calling us and asking us to reduce the number of flights that we are operating . . . ." (*Id.* at 80:03-10.) In contrast, if Freedom did not agree to the

Coordinated Cancellation, it could wait until close to scheduled departure time to determine if weather and ATC conditions permitted the flight to operate. (*Id.* at 76:22-77:12; 80:3-10; 198:4-200:20; 204:13-23.)

11.    FAA regulations prevent Delta from unilaterally cancelling Freedom's flights because only the aircraft certificate holder and the pilot may execute on the decision not to fly. (*Id.* at 184:10-15). Nonetheless, Delta expected that its requests for Coordinated Cancellations would be honored, and communicated this expectation to Freedom and the other regional carriers from people in the field to the highest levels of management. (*Id.* at 162:13-17; 211:01-06; 275:05-23; 358:14-17; 364:1-12; 555:16-558:11; N. Stronach Dep. [#57] at 40:2-14; 47:10-17; Bastian Dep. [#61] at 38:23-39:2; 44:16-19.)

12.    Recordings of the Delta OCC coordination calls bear this out.  On one call in December 2007, Delta's James Ford said "there just can't be any debate about who runs the network, and it's got to be the OCC.  And we need you folks to follow the direction of the OCC." (Pls.' Ex. 49; Hr'g Tr. at 179:02-24.) Mr. Ford reiterated this in an email reminding Freedom and the other Delta regional carriers about the "REQUIREMENT to follow the lead of the [Delta] OCC," (Pls.' Ex. 60) (all caps in original), and testified that Delta had an "expectation" that the regional carriers would cooperate with Coordinated Cancellations.  (Hr'g Tr. at 364:1-12.)

**C.    Freedom Commences Operations Under The Contract In Florida, Where Coordinated Cancellations Are Infrequent.**

13.    Freedom began operating under the Contract by flying the Aircraft throughout Florida, with the base of its operations in Orlando. (*Id.* at 69:12-16). Freedom often posted a monthly completion rate greater than 99 percent, due to the favorable operating conditions in the region that made Coordinated Cancellations infrequent. (*Id.* at 69:17-24; 223:21-224:14.)

14.    The Contract does not expressly address the method of accounting for Coordinated Cancellations. (*Id.* at 415:16-416:1; Pls.' Ex. 21). Prior to September 2007, and while its base of operations remained in Orlando, Freedom submitted invoices to Delta based on a completion rate equal to the ratio of completed flights to scheduled flights, counting all cancellations, regardless of reason, against Freedom. (Hr'g Tr. at 222:25-223:04.) Because Coordinated Cancellations were so infrequent, they did not impact Freedom's compensation. (*Id.* at 223:21-224:14.)

**D.    Delta Moves Freedom Flights To JFK, Where Coordinated Cancellations Are More Frequent, And Assures Freedom That It Will Not Be Penalized For The Move.**

15.    In late 2006 or early 2007, Delta announced that it would move a "significant portion" of Freedom's flights to JFK. (*Id.* at 73:6-16; 270:1-271:11; 391:12-16.)

16.   JFK is in one of the most congested air travel spaces in the world and poor weather impacting flight operations is more common. (*Id.* at 70:06-17.) Moreover, because JFK is one of Delta's largest hubs, with over 400 flights per day on average arriving from and departing to domestic and international destinations, Delta makes operation of those international and long-haul domestic flights a top priority. (*Id.* at 160:25-162:12.) These conditions make Coordinated Cancellations much more frequent at JFK relative to Florida. (Ex. 53; Hr'g Tr. at 83:19-85:7; 347:22.)

17.   At its major hubs like JFK, when not all of the flights scheduled can operate due to weather and other factors, Delta uses Coordinated Cancellations of smaller regional jet flights like those operated by Freedom to make way for its own larger mainline aircraft, including those departing to or arriving from international destinations. (Hr'g Tr. at 162:5-17; 223:5-20.) Delta's objective is to create the smallest possible inconvenience for the smallest possible group of passengers. (*Id.* at 273:15-25; 274:1-19.) As Delta's former COO explained, "Delta does control most [Delta Connection] flying and typically cancel[s] and/or delay[s] more [regional jet] flights to allow bigger aircraft to be less delayed." (Pls.' Ex. 58; Hr'g Tr. at 271:22-273:07.) Delta's CFO, Ed Bastian, testified that: "when there are operational problems . . . and coordinated cancellations, typically the smaller

planes are cancelled to allow the larger international jets to land and take off."
(Bastian Dep. [#61] at 46:15-47:8.)[2] Delta's former President of Delta Connection,
J.T. Fisher, conceded that revenue considerations "absolutely" played a role in
Delta's decision-making regarding Coordination Cancellations. (Fisher Dep. [#63]
at 57:15-20.)

18.     Freedom was concerned that moving a significant number of flights to
the difficult operating environment at JFK would negatively impact Freedom's
performance. (Hr'g Tr. at 391:12-16.)

19.     Upon learning of Delta's plans to relocate a significant number of the
ERJ Aircraft to JFK, Mesa's CEO, Jonathan Ornstein, raised the issue with then
Delta COO Jim Whitehurst, sometime early in 2007. (Hr'g Tr. at 73:17-74:18;
282:3-21.) Mr. Whitehurst assured Mr. Ornstein "we're not trying to screw you
with the move," and said words to the effect of "it's not our intention to penalize
you for moving up to JFK. You know, that's a decision that we decided to make,

---

[2] For example, during October 2007, Coordinated Cancellations accounted for 4.2
percent of Freedom's flights at JFK, even though Delta cancelled only 0.3 percent of its
flights for ATC and weather reasons. In December 2007, Delta cancelled 6.8 percent of
Freedom's flights out of the JFK hub, even though Delta cancelled only 2.9 percent of its
own JFK flights for ATC and weather reasons. In February 2008, Delta cancelled 5.2
percent of Freedom's flights out of the JFK hub, while cancelling only 1.9 percent of its
own JFK flights for ATC and weather reasons. (Pls.' Ex. 53; Hr'g Tr. at 83:19-84:20.)

and so we are happy to work with you on the terms." (*Id.* at 277:19-278:13; *see also id.* at 73:17-74:11; 282: 22-283:6.)

### E.   Freedom and Delta Agree that Coordinated Cancellations Will Not Count Against Freedom's Completion Rate.

20.   Around the same time, Freedom's Chief Operating Officer, Jorn Bates, discussed the issue of Coordinated Cancellations with Courtney Boyd, the Delta manager responsible for the commercial relationship with Freedom. (*Id.* at 303:16-22; 395:15-22.) As Mr. Bates explained:

> Freedom had historically operated primarily in the Orlando or Florida marketplace which was a quite favorable operating environment. We had placed some other airplanes in New York [Dash-8's] and I saw the effects of that and also learned that our ERJ-145's would soon be moving up to New York. Being that would be a significant change to our operational landscape, I felt it was time to talk to her about that and get a proper interpretation of the contract.

(*Id.* at 304:01-08.) Mr. Bates wanted an understanding with Ms. Boyd that when the move to JFK took place, Coordinated Cancellations would not be counted against Freedom in calculating completion rate. (*Id.* at 304:12-16.)[3]

---

[3] Plaintiffs additionally contend that, notwithstanding contractual language providing that flights completed more than four hours late would be considered as not completed, Mr. Bates reached an agreement with Ms. Boyd to the effect that flights arriving four hours late but completed at Delta's request would be treated as completed flights. The Court need not consider this argument here, insofar as the Court's findings regarding Coordinated Cancellations are sufficient to establish Plaintiffs' entitlement to a preliminary injunction.

21.    On February 6, 2007, Mr. Bates sent an email to Ms. Boyd "to recap for agreement" a discussion they had the day before, stating that "when Delta requests Freedom to cancel flights, those flights will be credited to Freedom for purposes of incentive payments and minimum performance calculations on the commercial side." (Pls.' Ex. 47; Hr'g Tr. at 305:3-10.)

22.    Despite two follow-up emails from Mr. Bates, Ms. Boyd did not respond and never rejected such an agreement.   (Pls.' Ex. 47; Hr'g Tr. at 305:15-306:1-7; 430:2-14.)  She conceded that "it wasn't a very high priority on [her] list to get this resolved." (Hr'g Tr. at 431:18-432:1.)

23.    Mr. Bates met with Ms. Boyd in her office in late March or early April 2007. (*Id.* at 306:8-307:4.) He testified that Ms. Boyd agreed in that meeting that Coordinated Cancellations would not count against Freedom's completion rate on the commercial side. (*Id.*)

24.    Mr. Bates did not put that agreement with Ms. Boyd in writing because he "had her word," and had no reason to believe that he did not have an agreement with Ms. Boyd. (*Id.* at 307:17-24.) Nonetheless, Mr. Bates did refer to the agreement in several contemporaneous communications.

25.    In March or April of 2007, Mr. Bates reported to Mesa's Mike Lotz that he had reached an agreement with Ms. Boyd that Coordinated Cancellations

would not be held against Freedom in calculating completion rates, and that Freedom would be responsible for cancellations within its own control – maintenance cancellations and crew cancellations – as well as weather and ATC cancellations. (*Id.* at 74:19-76:11.)

26.    In a July 13, 2007, email to Ms. Boyd, Wayne Aaron, a Delta Connection Vice-President, Jim Ford, and others at Delta, Mr. Bates objected to Delta's requirement that Freedom list all cancellations, including Coordinated Cancellations, in the same field in a daily operations report required by Delta. Mr. Bates told Delta that reporting all cancellations in the same field will "cloud the commanded cancellations we get credit for on the commercial side," per his agreement with Ms. Boyd. (Pls.' Ex. 45; Hr'g Tr. at 309:6-311:22.)

27.    Neither Ms. Boyd nor anyone else at Delta challenged or questioned Mr. Bates' assertion of the agreement. (Hr'g Tr. at 312:2-22, 368:15-17; Aaron Dep. [#60] at 75:20-25; 76:1; 81:19-25; 82:1-2.) Although Ms. Boyd conceded that she "should have come back and communicated a little more with [Mr. Bates] about this," it "just unfortunately wasn't a very high priority." (Hr'g Tr. at 438:06-17.)

28.    The Court finds that the testimony of Jorn Bates regarding the agreement reached with Delta's Courtney Boyd is credible, and corroborated by

other evidence. The Court acknowledges Ms. Boyd's testimony that she never reached an agreement with Mr. Bates, (*id.* at 396:11-16), but the Court does not find Ms. Boyd's testimony on this point to be credible. (*Id.* at 631:1-8.)

29.     Regardless of this finding, even if the Court did not consider witness credibility or the agreement between Mr. Bates and Ms. Boyd, the Court finds that Delta knew or reasonably should have known of Freedom's practice of taking credit for Coordinated Cancellations in the calculation of the completion rate, but failed to inform Freedom that Delta considered this practice to be contrary to the Contract. (*Id.* at 631:9-14.)

## F.   Delta Knows Of Freedom's Practice Of Backing Out Coordinated Cancellations, Does Not Object, And Pays Freedom On That Basis.

30.     After the move to JFK, Coordinated Cancellations rose significantly. (*Id.* at 224:15-20.) In the seven months between September 2007 through March 2008, Delta directed Freedom to cancel more than 400 flights. (Mesa's Resp. to Delta's Interrog. No. 10.) In the three months during which Delta now claims Freedom fell below a 95% completion rate (October 2007, December 2007 and February 2008), Coordinated Cancellations totaled 78 (4.2%), 92 (6.8%), and 59 (5.2%) flights out of JFK, respectively. In contrast, Freedom incurred only 60 Coordinated Cancellations during the entire 21 months while Freedom operated out of Orlando. (Pls.' Brief in Support of Prelim. Inj. [#24] at 9; Pls.' Ex. 53 at 3.)

31.     From the Fall of 2007, Freedom reported to Delta Coordinated Cancellations and weather/ATC cancellations as separate statistics, on both a daily and monthly basis. (Pls.' Ex. 1-13, 16; Hr'g Tr. at 80:11-81:02; 152:5-153:13; 173:11-174:17; 181:08-183:14; 262:2-264:4.) Delta understood that Freedom was reporting Coordinated Cancellations separately from weather/ATC cancellations. (Hr'g Tr. at 213:21-215:01; 449:6-17.)

32.     Delta admitted that its own Operations Group started tracking Coordinated Cancellations during this time. (Pls.' Ex. 64; Hr'g Tr. at 424:17-426:24; 559:14-21.)

33.     With the shift of flying to JFK, for the first time Coordinated Cancellations affected the compensation to which Freedom was entitled. (Pls.' Ex. 44; Hr'g Tr. at 261:12-18; 313:09-17.) Freedom's invoice for September 2007 flying (submitted to Delta in December 2007) excluded Coordinated Cancellations. (Pls.' Ex. 14, 44; Hr'g Tr. at 224:15-227:9; 241:25-242:04; 312:23-25; 313:1-21.) Freedom did not attempt to hide the basis of the calculation or mislead Delta on this issue. (Hr'g Tr. at 631:14-16.)

34.     For example, in a December 21, 2007, e-mail, Freedom's Bud Tyler informed Delta's Hemang Patel and his superior, Chris Higgins – Freedom's primary points of contact at Delta regarding billing issues – that the September

2007 invoice backed out Coordinated Cancellations, based on "the proviso that these flights would not count against our completion factor." (Pls.' Ex. 14, 40; Hr'g Tr. 227:10-228:23.)

35.    From Mr. Tyler's email, Mr. Higgins acknowledged that Delta was aware of Freedom's position that it could back out Coordinated Cancellations from the completion factor. He conceded that it was wrong not to do anything to address Mr. Tyler's explanation of completion factor, testifying: "it should have been looked into and responded to. . . . I should have done more with that email." (Hr'g Tr. at 353:13-354:21; *see also* H. Patel Dep. [#58] at 53:10-25; 56:20-23; 59-62, 76.) Delta had its own data available to verify the completion rate data provided by Freedom. (Hr'g Tr. at 456:18-457:14.)

36.    Neither Mr. Patel nor Mr. Higgins ever responded to Mr. Tyler. (*Id.* at 228:24-229:16; 352:24-353:14.) No one at Delta objected to Freedom about its method of invoicing for September 2007. (*Id.*) Delta's only response was to pay Freedom -- based on the completion rate calculation as reported and explained by Freedom. (Pls.' Ex. 40; Hr'g Tr. at 228:24-229:23; 353:2; 455:14-24.)

37.    Freedom submitted its invoice for October 2007 flying in late December 2007, and its invoice for November 2007 flying in January 2008. As before, the invoices backed out Coordinated Cancellations. (Pls.' Ex. 15, 16; Hr'g

Tr. at 230:07-232:19; 233:14-21; 455:14-456:11.)  As before, Delta voiced no

objection, did nothing to alert Freedom that it disagreed with Freedom's

calculation of completion rate, and paid Freedom based on the completion rates

reported and invoiced by Freedom.  (Hr'g Tr. at 231:7-24; 232:25-233:3; 455:14-

456:11.)  Delta credited Freedom for the November invoice in February 2008.

    38.    Freedom submitted its invoice for December 2007 flying in February

2008.  It too backed out Coordinated Cancellations.  (Pls.' Ex. 17; Hr'g Tr. at

233:25-234:19.)  On March 4, 2008, Mr. Patel e-mailed Mr. Tyler, indicating for

the first time that Delta's calculation of completion rate differed from Freedom's,

based on Delta treating Coordinated Cancellations as uncompleted flights.  (Pls.'

Ex. 41; Hr'g Tr. at 234:20-235:17.)

    39.    Delta did not take Freedom's invoices and completion rates at face

value, but always performed an internal reconciliation before issuing a payment or

credit.  (Pls.' Ex. 39-41, Hr'g Tr. at 238:12-239:25; 349:22-350:12; 454:05-13.)

The Contract requires Delta "to reconcile the actual costs incurred by [Freedom] . .

. including actual performance in the Performance Categories [which include

completion rate and on-time performance.]"  (Pls.' Ex. 21, Art. 3.H.)  Delta raised

questions when it could not verify or reconcile Freedom's invoices with its own

records on other issues.  (Hr'g Tr. at 238:12-240:17.)

40.    The Court finds that Delta knew of Freedom's practice of taking credit for Coordinated Cancellations in the calculation of the completion rate but failed to inform Freedom that Delta considered this practice to be contrary to the Contract. In other words, Delta knowingly acquiesced to Freedom's practice. Moreover, Delta has proffered no explanation for its failure to inform Freedom that the calculation of the completion rate was not appropriate, indicating bad faith on the part of Delta. The Contract requires Delta to discuss with Mesa any concerns about performance under the Contract. (Pls.' Ex. 21, Art. 10.B.) Delta did nothing to put Freedom on notice that Delta disagreed with Freedom's backing out Coordinated Cancellations until February 28, 2008 -- when it was too late for Freedom to decline further Coordinated Cancellations as a means to avoid default. (*Id.* at 459:15-23.) As late as March 20, 2008, Delta was telling Freedom it would see "increased flying at JFK by summer." (Hr'g Tr. at 463:15-464:15; Pls.' Ex. 66.)

41.    Freedom justifiably relied on the representations, omissions and conduct of Delta to believe that its method of calculating completion rate during the three months at question (October and December 2007, and February 2008) was acceptable to Delta. Moreover, Mesa's Mike Lotz testified that had Freedom been aware that Coordinated Cancellations were going to count against Freedom in

calculating its monthly completion rate, Freedom "would have immediately stopped cooperating with Delta and we would not have taken those requested cancellations. We would have told Delta no, we would not do it." (Hr'g Tr. at 88:07-16.) The evidence shows that had Freedom not honored Delta's requests for Coordinated Cancellations, Freedom would likely have operated a number of those flights. (*See* Ex. 53 at 4, showing that in October 2007, for example, Freedom's Coordinated Cancellations at JFK were 78 (4.2% of its scheduled flights), while Delta cancelled only 8 flights (0.3%) of its flights due to weather/ATC; Hr'g Tr. at 86:18-87:10.)

42.   Freedom's reliance on the agreement between Mr. Bates and Ms. Boyd was reasonable for the additional reason that the parties had previously acted upon agreements and modifications to the Contract that were not reduced to writing. (Hr'g Tr. at 247:8-248:6.)

**G.   The Parties Have A History Of Modifying The Contract Without Signed Writings.**

43.   Article 23 of the Contract states that no amendment or modification shall be effective unless it is in a signed writing. (Pls.' Ex. 21, Art. 23.) The Court finds, however, that on several occasions unrelated to the present dispute, Delta agreed without signed writings to modify the Contract, and to perform in ways different than the Contract terms that benefited Delta.

44.     For example, Article 3.J details procedures for annual adjustments to the rates paid by Delta to Freedom for Base Compensation. (Pls.' Ex. 21, Art. 3.J.; Hr'g Tr. at 406:13-18.)  In late 2005, however, Freedom agreed verbally to freeze its rates for 2006 rather than revise them through the process set forth in the Contract.  Delta accepted the benefits of this verbal agreement without a signed writing. (Hr'g Tr. at 408:01-13; 411:11-15.)

45.     In 2006, Freedom verbally agreed to adjust its Base Compensation rates for 2007 in an amount equal to the annual change to the consumer price index (CPI), rather than the method provided for by the Contract. (*Id.* at 406:19-407:25.) Delta accepted the benefits of this verbal agreement without a signed writing. (*Id.* at 409:1-6.)

46.     In 2008, the parties again adjusted the Base Compensation rates pegged to CPI, simply by extending their past practice, and without a signed writing or express verbal agreement. (Boyd Dep. at 100:23-101:19.)  Again, Delta accepted the benefits of this unsigned agreement.  Collectively, this represented a savings of hundreds of thousands of dollars to Delta based on nothing more than verbal agreements and conduct to depart from the Contract's terms. (Hr'g Tr. at 411:11-19.)

47.     As another example, Freedom agreed, at Delta's request, to remove

two of the Aircraft from the Contract early, before the time set by the Contract's

terms.  Although the parties contemplated a signed agreement, Freedom acted upon

this agreement, reached through discussion and emails, and removed the Aircraft

as promised, without a signed writing.  Delta accepted the benefits of this

agreement without a signed writing, and through the date of the hearing, no such

signed writing existed.  (*Id.* at 410:6-411:9.)

48.     This history of verbal agreements and agreements by conduct to

depart from the Contract terms, makes all the more reasonable Freedom's reliance

on Delta's representations, omissions and conduct (including payment of invoices)

regarding Freedom's method of calculating completion rate by backing out

Coordinated Cancellations.

**H.    As A Basis To Terminate The Contract, Delta Recalculates Completion
       Rates, But Does Not Inform Freedom Until It Sends Its Termination
       Letter.**

49.     On February 28, 2008, Delta Connection Senior VP Don Bornhorst

told Mesa's Jonathan Ornstein, Mike Lotz and Jorn Bates that Delta would not

credit Freedom for Coordinated Cancellations, and that if it had so previously, that

"was wrong."  (*Id.* at 313:22-314:24; 578:12-579:3.)  Following the call, Mr. Bates

e-mailed Ms. Boyd, describing their agreement that "any [coordinated]

cancellations would be backed out for the purpose of commercial purposes and not operational performance goals." (Pls.' Ex. 43; Hr'g Tr. at 314:12-24.) At the direction of her superior, Mr. Bornhorst, Ms. Boyd did not respond to this e-mail or in any way indicate to Mr. Bates that there was no such agreement. (Hr'g Tr. at 314:25-315:6; 439:22-441:5.)

50.    On about March 14, 2008, Delta senior management met to discuss an internal presentation entitled "2008 Reduction Strategy Briefing – Delta Connection Contract Carriers." (Pls.' Ex. 56; Hr'g Tr. at 447:10-20.) Under a heading called "Action Plan – Contract Carriers," the document states: "Financial savings from reductions will be sourced from 3 perspectives: . . . Cancellation of all or part of Freedom (Mesa) agreement." (Pls.' Ex. 56, page 3; Hr'g Tr. at 447:21-448:10.) This plan was consistent with a strategy upon which Delta had embarked upon, in response to rising fuel prices, to reduce the regional jet capacity in Delta's fleet. (Hr'g Tr. at 159:10-160:12; 450:16-451:15; 461:25-463:9; Pls.' Ex. 17, 55.) As Edward Bastian, Delta's Vice President and Chief Financial Officer said, "we have too many 50-seat jets." (Bastian Dep. at 12:8-13 [#61]; Pls.' Ex. 55.) Delta made reduction of regional jet capacity a priority. (Bastian Dep. [#61] at 9:19-23; 24:24-25; 25:1-19; Pls.' Ex. 56.)

51.    The "Reduction Strategy Briefing" further states, under the "Action

Plan" section: "Aggressively monitor carrier performance and costs to actively

enforce exit provisions in contracts: Freedom (Mesa) only true opportunity (on 1st

of 3 strikes)." (Pls.' Ex. 56, page 3) (emphasis added).    There was no dispute that

Freedom's completion rate for February 2008 was less than 95%, even with credit

for Coordinated Cancellations.    Thus it appears that, as late as March 14, 2008,

even Delta believed that Freedom was not in default for the months of October and

December 2007. (Hr'g Tr. at 448:11-449:5.)

52.    Sometime after March 14, 2008, Delta recalculated Freedom's

completion rates back to at least October 2007.    Delta found that it could show

completion rates less that 95% for October and December 2007, as well as

February 2008.    Delta, however, did not share this belief or its recalculations with

Freedom. (Hr'g Tr. at 90:5-19: 457:15-458:13.)

53.    Instead, in late March, 2008, Delta's Don Bornhorst called Mesa's

CEO, Jonathan Ornstein, to discuss a possible buyout of the Contract. (Id. at

585:07-586:11.)  Mr. Ornstein said he was open to discussion, but that given the

disruption to Mesa and Freedom that would result from early termination, the price

would likely be too high for Delta. (Id. at 585:07-586:11; Bornhorst Dep. [#56] at

176:10-183:22.) Shortly after, Delta sent its purported termination letter to Freedom, on March 28, 2008 ("the Termination Letter"). (Pls.' Ex. 57.)

54.    The sole reason for termination given in the Termination Letter was that Freedom had dropped below a completion rate of 95% in October and December 2007 and February 2008, and had thus allegedly defaulted on the Contract. (*See id.*)

55.    It is undisputed that prior to the Termination Letter, Delta never communicated to Freedom that its completion rate had fallen below 95% for any three months during any consecutive six month period. (*See* Pls.' Ex. 48, Delta's Resp. to Request for Admission, No. 52.) Prior to March 28th, no one at Delta ever suggested that Freedom was at risk for default. (Hr'g Tr. at 313:22-25; 314:1-11.) To the contrary, in late January 2008, Mr. Bornhorst had told Mr. Ornstein that Freedom's recent operational performance under the Contract and customer satisfaction scores had been excellent. (Pls.' Ex. 42; Hr'g Tr. at 283:14-284:23; 581:8-17.) As late as March 20, 2008, just eight days prior to the Termination Letter, Delta's Courtney Boyd e-mailed the Mesa and Freedom Chief Operating Officers stating that Freedom should expect "increased flying at JFK by summer." (Pls.' Ex. 66; Hr'g Tr. at 463:15-464:15.)

56.     Freedom thus relied both on its understanding that there was an agreement with Delta and on the belief that Delta would not hold against Freedom the actions taken in conformity with Delta's requests -- actions intended to show good partnership with the mainline carrier. (Hr'g Tr. at 88:17-89:01.) Freedom would not have accepted Delta's Coordinated Cancellation requests if it had known that Delta could then use Freedom's cooperation as grounds to terminate the Contract. (*Id.* at 88:3-89:1.)

## I.     Unless Enjoined, Termination of the Contract Would Jeopardize Mesa and Freedom As Going Concerns and Likely Result in Bankruptcy.

57.     Mesa and Freedom proffered evidence that unless enjoined, termination of the Contract would jeopardize Mesa and Freedom as going concerns and likely result in an imminent filing of bankruptcy. (Pls.' Ex. 26; Hr'g Tr. at 116:05-119:10.)

58.     The revenue from the Contract is about $20 million per month. (Hr'g Tr. at 102:15-17.) Mesa's COO testified that the company does not see "any possibility" of replacing that revenue stream by redeploying the Aircraft. (*Id.* at 102:21-103:1.) Without the Contract revenue, the company's cash flow projection indicates that Mesa will have only $6.4 million in cash as of August 1, 2008 (Pls.' Ex. 26), and an overall negative adjusted cash flow by the end of calendar year 2009 (Pls.' Ex. 25). As Mr. Lotz testified, as a $1.2 billion revenue company,

- 24 -

Mesa cannot reasonably operate with $6.4 million in cash, together with the restrictions on raising capital imposed by the attempted Contract termination. (Hr'g Tr. at 114:18-23.)

59.    The lost Contract revenue would offset all the cash generated by Mesa's other businesses, such that Mesa would not be able to make the $18 million payment on the Aircraft leases in July 2008. (*Id.* at 114:12-115:13.) This would trigger the cross-default provisions in those leases, causing Mesa to default on agreements relating to other aircraft. (*Id.* at 103:09-17; 115:14-17.)

60.    None of the Aircraft lessors have agreed to give Mesa any relief, and Mesa's COO testified that "there is no market for redeploying those aircraft." (*Id.* at 97:10-98:19.) To date, Mesa has been able to sublease only two of the Aircraft. (*Id.* at 98:8-15.)

61.    While Mesa has a spare parts inventory valued at $30 million, it has been unable to use that as collateral to secure financing, "given the impact that the contract termination would have on our company." (*Id.* at 98:20-99:14.)

62.    Mesa has bond indentures due in the relatively near term. (*Id.* at 99:15-25.) Despite some success in renegotiating some of these payments, Mesa still has $17.4 million to pay to its bond holders in the June quarter ($12 million of which has not yet been paid), and nearly $100.6 million to pay in March 2009.

(Pls.' Ex. 25; Hr'g Tr. at 107:11-18.)  Mesa shareholders have authorized the sale

of additional stock to pay the bondholders, but with the stock price at less than $1,

the amount of stock that Mesa would need to sell would cause a "change in

control" of the company.  This would trigger termination provisions in its

codeshare agreements with US Airways, United and Delta.  (Hr'g Tr. at 101:04-

102:10.)

     63.    As a result of the attempted Contract termination, Mesa has retained

an outside financial advisor and bankruptcy counsel.  (*Id.* at 116:22-118:12.)  The

papers necessary to file bankruptcy have been prepared and can be filed with 24

hour's notice.  (*Id.* at 117:3-18.)  The company's COO testified that without an

injunction, and "if nothing changes from what we know today, we will be filing

bankruptcy sometime between the end of this trial and July 20th . . . and more

likely closer to June 27."  (*Id.* at 115:18-116:13; 9:10.)

## II. CONCLUSIONS OF LAW

**A.    The Standard for Issuance of a Preliminary Injunction.**

    64.    To obtain a preliminary injunction, the moving party must

demonstrate "(1) a substantial likelihood of success on the merits; (2) that

irreparable injury will be suffered unless the injunction is issued; (3) the threatened

injury to the moving party outweighs whatever damage the proposed injunction

might cause the non-moving party; and (4) if issued, the injunction would not be

adverse to the public interest." *BellSouth Tel., Inc. v. MCIMetro Access*

*Transmission Svcs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005).

**B.   Plaintiffs Have Presented Sufficient Evidence Entitling Them To A Preliminary Injunction.**

**(1)   Likelihood of Success on the Merits**

65.   By its terms, the Contract "is subject to, and will be governed by and

interpreted in accordance with, the laws of the State of New York, excluding

conflicts of laws principles . . . ." (Pls.' Ex. 21, Art. 20.A.)

66.   Based on the foregoing factual findings, the Court holds that Plaintiffs

have clearly established a likelihood of success on the merits as to their claim of

equitable estoppel. To the extent that such a claim did not appear in the initial

complaint filed in this action, the Court has permitted Plaintiffs to file an amended

complaint.

67.   "The general principle of equitable estoppel prevents one party from

enforcing rights which would result in a fraud or injustice upon a second party

who, in justifiable reliance, has been misled into acting upon the belief that such

enforcement would not be sought." *Travellers Int'l AG v. Trans World Airlines,*

*Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989) (enjoining termination of contract

based on equitable estoppel), *citing Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269 (N.Y. 1982).

68.    Contrary to defense counsel's suggestion, the Court finds that credibility determinations are appropriately made at the preliminary injunction stage. (Hr'g Tr. at 631:1-3.) *See, e.g., Cumulus Media, Inc. v. Clear Channel Comms.*, 304 F.3d 1167, 1178 (11th Cir. 2002) ("An evidentiary hearing is required for entry of a preliminary injunction only 'where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relieve should issue.'") *quoting McDonald's Corp. v. Robertson*, 147 F.3d 1301, 13012 (11th Cir. 1998).

69.    The Court finds that the testimony of Jorn Bates regarding the agreement reached with Delta's Courtney Boyd is credible, and corroborated by the various e-mails introduced in evidence. The Court does not find Ms. Boyd's testimony on this point to be credible. (Hr'g Tr. at 631:1-8.)

70.    In any event, and as Ms. Boyd herself admitted, Delta knew of Freedom's subsequent practice of taking credit for Coordinated Cancellations in the calculation of the completion rate, but failed to inform Freedom that Delta considered this practice to be contrary to the Contract. (*Id.* at 631:9-14.)

- 28 -

71.    By its conduct, including payment to Freedom based on its method of calculating completion rate, Delta acted in such a manner that Freedom could reasonably have believed that Delta agreed with Freedom's practice of backing out Coordinated Cancellations in calculating completion rate.

72.    Freedom did not know that Delta disagreed with Freedom's method of calculation, and Delta failed to inform Freedom that Delta considered it to be contrary to the Contract.  Delta did nothing to put Freedom on notice that Delta disagreed with Freedom's method of calculating completion rate until March 2008, when it was too late for Freedom to decline further Coordinated Cancellations as a means to avoid default.

73.    Freedom justifiably relied upon Delta's assurances, conduct, including payment, and ensuing silence and acquiescence to its detriment by honoring Delta's requests for Coordinated Cancellations during the months of October and December 2007, and February 2008, when doing so placed it below a 95% completion rate for the months at issue, based on Delta's method of calculation.

74.    The evidence shows that had Freedom known that it was Delta's position that Coordinated Cancellations would be counted against Freedom in calculating completion rate, Freedom would not have cooperated with Delta's requests to take Coordinated Cancellations.  (*Id.* at 88:07-16.)

75.    Delta is thus equitably estopped from terminating the Contract based on Freedom's method of calculating completion rate through March 31, 2008. *Travellers Int'l.*, 722 F. Supp. at 1098. *See also Rosenthal v. National Life Ins. Co.*, 486 F. Supp. 1018, 1022 (S.D.N.Y. 1980)

76.    Therefore, based on the foregoing findings of fact, the Court finds that Delta is equitably estopped from terminating the Contract based on Freedom's inclusion of Coordinated Cancellations as completed flights when calculating the completion rates through March 2008, when Freedom first learned of Delta's position that such Coordinated Cancellations should not be considered as completed flights in the completion factor calculation. (Hr'g Tr. at 631:24-632:6.)

77.    Beginning in April 2008, however, the Court finds that Freedom was on notice as to Delta's position regarding the calculation of the completion rate and could no longer reasonably rely on Ms. Boyd's representations and Delta's acquiescence. Accordingly, beginning in April 2008 and going forward, the calculation of the completion rate should conform to the Contract. (*Id.* at 632:16-22.)

78.    Success on the merits is likely for the additional reason that "the obligation to deal in good faith 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract.'" *Dalton v. Educ. Testing Serv.*, 663

N.E.2d 289, 291 (N.Y. 1995) (internal quotation omitted). The duty of good faith

applies to contractual provisions that contemplate the exercise of discretion. *Id.*

The Contract expressly provides that "[e]ach party shall exercise good faith in its

dealings with the other party hereto and in performance of its obligations under this

Agreement." (Pls.' Ex. 21, Art. 26.)

79.    Delta purported to exercise its discretion to terminate the Contract

based on its recalculation of completion rates for the three months in question, but

Delta has proffered no explanation for its failure to inform Freedom, prior to

termination, that Delta disagreed with Freedom's practice of calculating

completion rates. This indicates bad faith. There is no evidence that Delta alerted

Freedom, prior to the Termination Letter, that Freedom risked default if it honored

Delta's requests to take Coordinated Cancellations. Indeed, the evidence shows

that but for Freedom's cooperation with Delta's requested Coordinated

Cancellations, Freedom's completion rate in October and December 2007 would

have exceeded 95%. (Pls.' Ex. 54, page 3.) Delta claims it made "an error in the

[invoice] processing process for a couple of months" and that when it discovered

this "error" Delta "fixed it" by terminating the Contract. (Hr'g Tr. at 469:5-22.)

For Delta to exercise its discretion to terminate the Contract on this basis is

contrary to the express duty of good faith in the Contract and the duty of good faith

implied in every contract.

### (2)    Irreparable Harm

80.    The Court finds that Plaintiffs have clearly established the remaining

three factors necessary to award injunctive relief.  (*Id.* at 632:7-9.)

81.    Plaintiffs have presented persuasive evidence that they will suffer

irreparable harm in the absence of this preliminary injunction.  The U.S. Supreme

Court has recognized that the substantial loss of one's business and the threat of

bankruptcy constitutes irreparable harm that warrants injunctive relief:

> [A]bsent preliminary relief [plaintiffs] would suffer a substantial loss
> of business and perhaps even bankruptcy.  Certainly the latter type of
> injury sufficiently meets the standards for granting interim relief, for
> otherwise a favorable final judgment might well be useless.

*Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  *See also Rhodes v. Gwinnett*

*County, Georgia,* 557 F. Supp. 30, 33 n.9 (N.D. Ga. 1982) ("Where plaintiff's

potential economic loss thus threatens his entire business, an injunction is

appropriate even though the amount of direct financial harm is readily

ascertainable.") (*citing Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 198 F.

Supp. 557 (S.D. Ga. 1962), *aff'd* 305 F.2d 647 (5th Cir. 1962)); *Tucker Anthony*

*Realty Corp. v. Schlesinger*, 888 F.2d  969, 975 (2d Cir. 1989) (financial evidence

proved threat of bankruptcy, which constituted irreparable harm.); *Travellers Int'l*

*AG v. Trans World Airlines*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1988) ("loss of a business constitutes irreparable injury and thus is not compensable by a damage award."); *Newlife Homecare, Inc. v. Express Scripts, Inc.*, No. 3:07-CV-761, 2007 WL 1314861 (M.D. Pa. May 4, 2007) (cash flow projections, showing impending negative cash flow that would force the plaintiff's business into bankruptcy absent injunction, established irreparable harm).

82.    Mesa presented sufficient evidence, through the testimony of its Chief Operating Officer and cash flow projections, that absent an injunction enjoining termination of the Contract, a bankruptcy filing by Mesa and Freedom is both likely and imminent.

### (3)    Balance of Hardships

83.    The Court finds that Mesa and Freedom have met their burden of showing that the threatened injury to them outweighs whatever damage the proposed injunction might cause Delta.

84.    While Mesa and Freedom will suffer irreparable harm absent an injunction, by enjoining early termination, the injunction merely requires that Delta continue performing under it.  Delta will continue to receive the benefit of its bargain and assumes no greater risk of loss than it agreed to assume, and has assumed, since the Contract was formed in 2005.

- 33 -

85.    Moreover, for several months, Delta planed merely to shift the
flights that Freedom would have operated to other regional carriers. (Hr'g Tr. at
587:10-22.) A preliminary injunction would not force Delta to operate flights it
does not intend to; it simply directs that those flights be operated by Freedom and
preserves the status quo. Moreover, the Contract states that but for one operational
spare and one maintenance spare, "the remaining Aircraft . . . shall be in service on
a full time basis." (Pls.' Ex. 21, Art. 1.A.) *See Roso-Lino Beverage Distrib., Inc.*
*v. The Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 126 (2d Cir. 1984) (loss
of plaintiff's business tipped equities decidedly in favor of plaintiff where
defendant merely had to continue its contractual relationship with plaintiff);
*Travellers Int'l AG*, 722 F. Supp. at 1105 (balance of equities tipped markedly in
favor of plaintiff when contract termination would put plaintiff out of business,
while defendant, enjoined from terminating, would retain its benefits under that
contract).

86.    Thus, the balance of equities tips decidedly in Plaintiffs' favor.

**(4)    Public Interest**

87.    Finally, the evidence shows that this preliminary injunction is not
adverse to the public interest. A preliminary injunction would serve the public
interest by (i) preserving a going concern business, (ii) preserving the ongoing

- 34 -

relationship that Mesa has with its vendors, (iii) allowing Mesa to honor its lease

obligations with third parties, and (iv) saving the jobs of hundreds of employees

who serve Delta under the Contract. *See St. Petersburg Harbourview Hotel Corp.*

*v. First Union Nat'l Bank of Fla.,* 168 B.R. 770, 773 (Bankr. M.D. Fla. 1994)

(granting preliminary injunction).

### (5)    Consideration of Bond

88.    Having decided to grant the preliminary injunction, Federal Rule of

Civil Procedure 65(c) requires the Court to consider the issue of a bond.  Article

20.H of the Contract states in pertinent part that:

> Because a breach of the provisions of this Agreement
> could not adequately be compensated by money damages,
> any party shall be entitled to an injunction restraining
> such breach or threatened breach and to specific
> performance of any provision of this Agreement and, in
> either case, no bond or other security shall be required in
> connection therewith . . . .

(Pls.' Ex. 21, Art. 20.H.)  The Court raised the issue of bond at the hearing.  (Hr'g

Tr. at 633:7-8.)  Counsel for Delta advised that bond was not an issue, based on the

Contract.  (*Id.* at 633:9-10.)  Moreover, having considered the issue of bond, the

Court may in its discretion find that no bond is required. *BellSouth Tel.,* 425 F.3d

at 971.  The Court so finds here.

Based on the foregoing findings of fact and conclusions of law, and for good cause shown, Plaintiffs' Motion for Preliminary Injunction is **GRANTED**, and the Court hereby enters the following preliminary injunction:

(1)    Delta is hereby restrained and enjoined from terminating the Delta Connection Agreement based on Freedom's inclusion of Coordinated Cancellations as completed flights when calculating the completion factor for October and December 2007 and February 2008;

(2)    Beginning in April 2008 and going forward, the calculation of the completion factor should conform to the Contract.

SO ORDERED this 25th day of June, 2008.

CLARENCE E. COOPER
UNITED STATES DISTRICT COURT JUDGE

- 36 -