PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Joshua M. Fried
Maria A. Bove

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case |
| MESA AIR GROUP, INC., et al., | Case No. 10-10018 (MG) |
| Debtors.[1] | |

**NOTICE OF DEBTORS' APPLICATION FOR AN ORDER PURSUANT TO
SECTION 327(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2014
AND 2016, AND LOCAL RULE 2014-1 AUTHORIZING THE EMPLOYMENT
AND RETENTION OF DELOITTE & TOUCHE LLP TO PROVIDE AUDIT
SERVICES TO THE DEBTORS _NUNC PRO TUNC_ TO THE PETITION DATE**

> **PLEASE TAKE NOTICE** that a hearing on the _Debtors' Application For An Order Pursuant To Section 327(A) Of The Bankruptcy Code, Bankruptcy Rules 2014 And 2016, And Local Rule 2014-1 Authorizing The Employment And Retention Of Deloitte & Touche LLP to Provide Audit Services to the Debtors Nunc Pro Tunc to the Petition Date_ (the "Motion") filed herewith by Mesa Air Group Inc., and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), will be held before the Honorable Martin

[1] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364), Mesa Airlines, Inc. (4800), MPD, Inc. (7849), Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

Glenn, at the United States Bankruptcy Court, Alexander Hamilton Customs House, One Bowling Green, New York, New York, 10004, Courtroom 501, **at 10:00 a.m. on May 13, 2010**.

PLEASE TAKE FURTHER NOTICE that any response or objection to the relief sought in the Motion must be filed with the Bankruptcy Court and served upon: (i) the chambers of the Honorable Martin Glenn, One Bowling Green, New York, New York 10004, Courtroom 501; (ii) Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111 (Attn: Debra I. Grassgreen and Joshua M. Fried), and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017 (Attn: Maria A. Bove), attorneys for the Debtors; (iii) Mesa Air Group, Inc., Law Department 410 N. 44th St. Suite 700, Phoenix, Arizona 85008, (Attn: Brian S. Gillman, Esq.); (iv) Deloitte LLP 1633 Broadway, New York, New York 10019 (Attn: Irene Cannon-Geary, Associate Gen. Counsel); (v) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Andrea B. Schwartz); (vi) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Brett H. Miller, Lorenzo Marinuzzi, and Todd M. Goren), attorneys for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases; and (vii) any person or entity with a particularized interest in the subject matter of the Motion, on or before **May 6, 2010**.

Dated: April 28, 2010
New York, New York

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Debra Grassgreen*

Richard M Pachulski
Laura Davis Jones
Debra I. Grassgreen
Joshua M. Fried
Maria A. Bove
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

Proposed Attorneys for Debtors
and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile:  212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Joshua M. Fried
Maria A. Bove

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' APPLICATION FOR AN ORDER PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2014 AND 2016, AND LOCAL RULE 2014-1 AUTHORIZING THE EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP TO PROVIDE AUDIT SERVICES TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries

in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"Debtors"), hereby  file this application (the "Application") and respectively represent as

follows:

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

## Background

1.          On January 5, 2010 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.          The Debtors' chapter 11 cases are jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.          On January 14, 2010, the Office of the U.S. Trustee appointed an Official Committee of Unsecured Creditors in these cases (the "Committee"). The members of the Committee are: Bombardier, Inc., Embraer-Empresa Brasileira de Aeronáutica S.A., IHI Corporation, U.S. Bank National Association, AT&T Capital Services, Wilmington Trust Company, the Air Line Pilots Association, and the Association of Flight Attendants – CWA (ex-officio member).

4.          A detailed description of the Debtors' businesses, capital structure, and the circumstances that precipitated the commencement of these chapter 11 cases is set forth in the *Declaration of Michael J. Lotz in Support of First Day Motions Pursuant to Local Bankruptcy Rule 1007-2*, filed on the Petition Date.

## Jurisdiction

5.          This Court has jurisdiction to consider this application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Relief Requested**

6.      By this Application, the Debtors request that this Court enter an order in the form attached here as <u>Exhibit A</u> pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Rule 2014-1 of the Local Rules for the Southern District of New York (the "<u>Local Rules</u>"), authorizing the Debtors to retain and employ Deloitte & Touche LLP ("<u>Deloitte & Touche</u>") as their independent auditor and accountant to perform audit and accounting services *nunc pro tunc* to the Petition Date.  In support of this Application, the Debtors submit herewith the affidavit of Robert P. Gordon III, a partner of Deloitte & Touche (the "<u>Gordon Declaration</u>").  The Gordon Declaration is attached hereto as <u>Exhibit B</u>.

7.      In light of the size and complexity of these chapter 11 cases, the Debtors require the services of an independent auditor and professional services firm that is familiar with the Debtors' businesses and operations and the chapter 11 process.  The Debtors have selected Deloitte & Touche, subject to the Court's approval, to continue to serve as their independent auditor and accountant in connection with these chapter 11 cases.  Deloitte & Touche has provided similar services to the Debtors for approximately ten years.  As of January 8, 2010, the Debtors engaged Deloitte & Touche to provide such services as described in the Engagement Letters (as defined below).  In providing audit and accounting services to the Debtors previously, Deloitte & Touche's professionals have worked closely with the Debtors' management and other professionals and have become well acquainted with the Debtors' operations, debt structure, creditors, business and operations and related matters.  Accordingly, Deloitte & Touche has developed significant relevant experience regarding the Debtors that will assist Deloitte & Touche in providing effective and efficient services in these chapter 11 cases.

## Scope of Services

8.      The retention of Deloitte & Touche shall be based on the terms and conditions set forth herein and in accordance with the two engagement letters each dated January 8, 2010 between the Debtors and Deloitte & Touche (the "Financial Statement Audit  Letter" and the "401(k) Plan Audit Letter", collectively, the "Engagement Letters") and as may be agreed to by Deloitte & Touche and the Debtors.  The Debtors anticipate that Deloitte & Touche will render the following audit services:

1)      Audit of the financial statements of Mesa Air Group, Inc. and subsidiaries for the year ending September 30, 2010 and reviews of interim financial information consistent with the terms and conditions of the Financial Statement Audit Letter;

2)      Audit of financial statement of Mesa Air Group, Inc.'s 401(k) Plan financial statements for the year ended September 30, 2009 in accordance with the standards of the Public Accounting Oversight Board and auditing standards generally accepted in the United States of America consistent with the terms and conditions of the 401(k) Plan Audit Letter and related opinions, and

3)      Such other related or similar services as may be requested by the Debtors and agreed to by Deloitte & Touche including pursuant to separate engagement letters.

Copies of the Engagement Letters are attached collectively to the Gordon Declaration as Exhibit 1.

9.      The Debtors believe that the services to be provided by Deloitte & Touche to the Debtors will not be unnecessarily duplicative of those provided by any other of the Debtors' professionals.  Deloitte & Touche will seek to coordinate any services performed at the Debtors' request with the Debtors' other retained professionals, including Deloitte Tax LLP ("Deloitte Tax"), Imperial Capital LLC, and Pachulski Stang Ziehl & Jones LLP, as appropriate, to avoid duplication of effort.  If the Debtors seek to expand the scope of Deloitte & Touche's retention, a supplemental affidavit will be filed with the Court and served on the U. S. Trustee and the Committee.

10.     Subject to this Court's approval of the Application, Deloitte & Touche is willing to serve as the Debtors' independent auditor and accountants and to perform the services described in the Engagement Letters on the terms set forth therein.  At the Debtors' request, Deloitte & Touche has been providing necessary services to the Debtor since the Petition Date and the Debtors have incurred fees and related expenses in the approximate amount of  less than $10,000 to date for which, upon approval of its retentions, it will seek to be compensated in accordance with the fee application process.

### Disinterestedness of Professionals

11.     To the best of the Debtors' knowledge, and except as disclosed in the Gordon Declaration, Deloitte & Touche (i) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and as required by section 327(a) of the Bankruptcy Code, and neither holds nor represented an interest adverse to the Debtors and their estates and (ii) has no connection to the Debtors, their significant creditors or to certain other parties-in-interest in these chapter 11 cases whose names were supplied by the Debtors to Deloitte & Touche.

12.     The Debtors have been informed that if any new relevant facts or relationships are discovered that Deloitte & Touche deems require disclosure in these chapter 11 cases, Deloitte & Touche will supplement its disclosures to the Court.

### Basis for Relief

13.     The Debtors have reviewed the qualifications and experience of Deloitte & Touche's personnel and believe that such personnel have considerable experience providing debtors with audit and accounting services during bankruptcy proceedings.  Personnel of Deloitte & Touche have assisted debtors in numerous bankruptcy cases and out-of-court restructurings.

Deloitte & Touche is a highly-qualified professional services firm whose professionals have experience in matters of this type. Deloitte & Touche's depth of experience and breadth of service capabilities render it particularly well-qualified and able to provide services to the Debtors during the pendency of these chapter 11 cases.

14.     Pursuant to sections 327 of the Bankruptcy Code, a debtor in possession may employ one or more professionals, that do not hold or represent an interest adverse to the estate and that are disinterested persons, to assist in carrying out a debtor's duties under the Bankruptcy Code.

15.     Specifically, section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval:

> may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title.

11 U.S.C. § 327(a). Bankruptcy Rule 2014 requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

Fed. R. Bankr. Pro. 2014.

16.     By this Application, the Debtors request that the Court approve the compensation arrangements described in the Engagement Letters pursuant to section 327(a) of the Bankruptcy Code. The compensation arrangements contained in the Engagement Letters are fair and reasonable for the Debtors' estates.

**Compensation and Fee Applications**

17.     Pursuant to the terms and conditions of the Engagement Letters, and subject to the Court's approval, the professional fees charged for Deloitte & Touche's services are calculated from the actual hours expended in providing the services multiplied by the hourly billing rates for the specific personnel involved.

18.     The proposed overall compensation structure is consistent with Deloitte & Touche's normal and customary billing practices for comparably-sized and complex cases and transactions, both in and out of court, involving the audit and accounting services to be provided in connection with these chapter 11 cases.

19.     Subject to the Court's approval and pursuant to the terms and conditions of the Financial Statement Audit Letter, Deloitte & Touche's integrated audit and the reviews of the related interim financial information will be billed at a hourly rate of $200 per hour. Engagement-related expenses, such as costs of travel, telephone and postage incurred will be billed in addition to the fees and will be stated separately on the invoices.  In the event the time necessary for Deloitte & Touche to complete the integrated audit and the reviews of the related interim financial information is more than the estimate of $1,070,000 provided under the Engagement Letter, the following fee structure will be used.

| Partner/Principal/Director | $350 - $450/hour |
| Senior Manager/Manager | $300 - $400/hour |
| Senior | $200 - $250/hour |
| Staff | $150 - $200/hour |

20.     Pursuant to the 401(k) Plan Audit Letter, Deloitte & Touche estimates that its fees will be approximately $45,000 and $55,000.  For these services, Deloitte & Touche will bill at an hourly rate of $200 per hour, plus reasonable expenses, not to exceed $5,000.  To the extent that certain circumstances, as listed in Appendix D of the 401(k) Plan Audit Letter, arise

during this engagement, additional fees may be necessary. Deloitte & Touche will notify the Debtors promptly of any circumstances it encounters that could significantly affect its estimate and discuss with the Debtors any additional fees, as necessary. Additional services provided beyond the scope of services described in the Engagement Letters will be subject to a separate engagement and approval of the Court.

21.      The billing rates reflect, among other things, geographical differentials, differences in experience levels within classifications, and differences between types of services being provided. In the normal course of business, Deloitte & Touche revises its regular hourly rates to reflect changes in responsibilities, increased experience and increased costs of doing business. Accordingly, Deloitte & Touche requests that the aforementioned rates be revised to the applicable hourly rates that will be in effect from time to time. Deloitte & Touche , however, will provide ten (10) business days notice to the Debtors, Committee, and the U.S. Trustee prior to any increases in the rate structure discussed herein. After such notice, changes in applicable hourly rates will be noted on the invoices for the first time period in which the revised rates became effective.

22.      As noted above, Deloitte & Touche will also seek reimbursement for all necessary and reasonable related expenses. Reasonable and documented actual expenses, including travel (with air travel based on coach fares consistent with this Court's guidelines), report production, delivery services, and other expenses incurred in providing the services, will be included in the total billed.

23.      As of the Petition Date, the Debtors do not owe Deloitte & Touche any amounts for its prepetition services. The Debtors have paid Deloitte & Touche $546,718 in the

90 days prior to the Petition Date. Deloitte & Touche has provided services valued at less than $10,000 in fees since the Petition Date.

24. Deloitte & Touche will charge the Debtors for its expenses in a manner and at rates consistent with charges made generally to its other clients, the Court's Administrative Order M-389 (Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases), and the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 promulgated by the Executive Office for the United States Trustees. Deloitte & Touche understands that (a) it shall accept as compensation such sums as may be allowed by the Court and (b) interim and final fee awards are subject to approval by this Court.

25. Except as may be set forth in the Gordon Declaration, Deloitte & Touche has not shared or agreed to share any of its compensation in connection with this matter with any other nonaffiliated person, except as permitted by section 504 of the Bankruptcy Code.

26. Deloitte & Touche will file interim and final fee applications for allowance of its compensation and expenses, with respect to its services, and Deloitte & Touche will seek compensation and reimbursement of expenses, as specified in the Engagement Letters, with the payment of such fees and expenses to be approved in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code, applicable Bankruptcy Rules, local rules and orders of the Court, guidelines established by the United States Trustee for the Southern District of New York, and such other procedures as may be fixed by order of this Court, including but not limited to the Court's *Order to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, dated January 26, 2010 [Docket No. 181].

## Notice

27.    No trustee or examiner has been appointed in these chapter 11 cases.  The

Debtors have served notice of this Application on (i) counsel for the Committee; and (ii) parties

in interest listed on the Master Service List (as defined in the *Order Pursuant to Section 105(a)*

*of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Authorizing the Implementation*

*of Notice and Case Management Procedures*, entered on January 15, 2010 [Docket No. 103]).  In

light of the nature of the relief requested, the Debtors submit that no further notice need be

provided.

## No Prior Request

28.    No previous request for the relief sought herein has been made to this

Court or any other court.

WHEREFORE, the Debtors request entry of the order attached hereto as Exhibit A

granting the relief requested herein and such other and further relief as is just.

Dated: April 28, 2010            MESA AIR GROUP, INC.; MESA AIR NEW
                                 YORK, INC.; MESA IN-FLIGHT, INC.;
       New York, New York        FREEDOM AIRLINES, INC.; MESA AIRLINES,
                                 INC.; MPD, INC.; RITZ HOTEL
                                 MANAGEMENT CORPORATION; REGIONAL
                                 AIRCRAFT SERVICES, INC.; AIR MIDWEST,
                                 INC.; MESA AIR GROUP AIRLINE
                                 INVENTORY MANAGEMENT, LLC; NILCHI,
                                 INC.; AND PATAR, INC.


                                 */s/ Michael J. Lotz*
                                 By:  Michael J. Lotz
                                 Its: President

## EXHIBIT A

## (Proposed Order)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

### ORDER PURSUANT TO SECTION 327(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2014 AND 2016, AND LOCAL RULE 2014-1 AUTHORIZING THE EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP TO PROVIDE AUDIT SERVICES TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

Upon the Application of Mesa Air Group, Inc., and certain of its direct and indirect subsidiaries (the "Debtors") for an Order, pursuant to sections 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Rule 2014-1, authorizing and approving the employment and retention of Deloitte & Touche LLP ("Deloitte & Touche") to provide audit and accounting services to the Debtors *nunc pro tunc to the Petition Date* (the "Application");[2] and upon the Declaration of Robert P. Gordon III (the "Gordon Declaration"), filed in support of the Application, and the Court being satisfied, based on the representations made in the Gordon Declaration, that Deloitte & Touche represents no interest adverse to the Debtors or the Debtors' estates with respect to the matters upon which it is to be engaged, under section 327(a) of the Bankruptcy Code as modified by section 1107(b); and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Application and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Application having been provided, and it

appearing that no other or further notice need be provided; and a hearing having been held to

consider the relief requested in the Motion (the "Hearing"); and the appearances of all interested

parties having been noted in the record of the Hearing; and the Court having found and

determined that the relief sought in the Application is in the best interests of the Debtors, their

estates and creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is hereby

ORDERED that the Application is granted to the extent provided herein; and it is

further

ORDERED that, in accordance with section 327(a) of the Bankruptcy Code, the

Debtors are authorized to employ and retain Deloitte & Touche to provide audit and accounting

services, *nunc pro tunc* to the Petition Date, on the terms set forth in the Engagement Letters and

the Application, as modified by this Order to provide the following services:

1) Audit of the financial statements of Mesa Air Group, Inc. and subsidiaries for the year ending September 30, 2010 and reviews of interim financial information consistent with the terms and conditions of the Financial Statement Audit Letter;

2) Audit of financial statement of Mesa Air Group, Inc.'s 401(k) Plan financial statements for the year ended September 30, 2009 in accordance with the standards of the Public Accounting Oversight Board and auditing standards generally accepted in the United States of America consistent with the terms and conditions of the 401(k) Plan Audit Letter and related opinions, and

3)  Such other related or similar services as may be requested by the Debtors and agreed to by Deloitte & Touche including pursuant to separate engagement letters;

and it is further

ORDERED that Deloitte & Touche shall be compensated in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Amended Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals, dated November 25, 2009, the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, dated November 25, 2009, and the United States Trustee Fee Guidelines (collectively, the "Fee Guidelines"), and the Court's *Order to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, dated January 26, 2010 [Docket No. 181]; and it is further

ORDERED that Deloitte & Touche's integrated audit and the reviews of the related interim financial information shall be billed at a hourly rate of $200 per hour. Engagement-related expenses, such as costs of travel, telephone and postage incurred will be billed in addition to the fees and will be stated separately on the invoices. In the event the time necessary for Deloitte & Touche to complete the integrated audit and the reviews of the related interim financial information is more than the estimate of $1,070,000, the following fee structure will be used.

| Partner/Principal/Director | $350 - $450/hour |
| Senior Manager/Manager | $300 - $400/hour |
| Senior | $200 - $250/hour |
| Staff | $150 - $200/hour |

; and it is further

ORDERED that Deloitte & Touche's fees relating to the 401(k) Plan Audit Letter,

are estimated to be approximately $45,000 and $55,000 and these services will be billed at an hourly rate of $200 per hour, plus reasonable expenses, not to exceed $5,000; *provided*, *however*, to the extent that certain circumstances, as listed in Appendix D of the 401(k) Plan Audit Letter, arise during this engagement, Deloitte & Touche shall notify the Debtors promptly of any circumstances it encounters that could significantly affect this estimate and discuss with the Debtors any additional fees, as necessary; and it is further

ORDERED that Deloitte & Touche shall be reimbursed only for reasonable and necessary expenses as provided by the Fee Guidelines; and it is further

ORDERED that ten (10) business days' notice must be provided by Deloitte & Touche to the Debtors, the Committee, and the U.S. Trustee prior to any increases in the rates set forth in the Engagement Letters and such notice must be filed with the Court; and it is further

ORDERED that Deloitte & Touche will not seek to use independent contractors or entities not affiliated with Deloitte & Touche to perform services under the Engagement Letters without Court approval; and it is further

ORDERED that Deloitte & Touche professionals are hereby authorized to keep reasonably detailed time records in half-hour increments and will submit, with any interim or final fee application, a narrative summary, by project category, of services rendered and will identify each professional rendering services, the category, of services rendered, and the amount of compensation requested; and it is further

ORDERED that Disputes as defined in the Dispute Resolution provision of the General Business Terms of the Engagement Letters shall be referred to mediation or arbitration consistent with their terms to the extent that this Court does not have, or retain, or exercise jurisdiction as set forth in the Engagement Letters; and it is further

4

ORDERED that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  To the extent this Order is inconsistent with the Engagement Letters or the Application, this Order shall govern; and it is further

ORDERED that notwithstanding any provision to the contrary in the Application or the Engagement Letters the Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.


Dated: May __, 2010
      New York, New York

                                     _____
                                     UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**(Declaration of Robert P. Gordon III)**

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Joshua M. Fried
Maria A. Bove

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF ROBERT P. GORDON III IN SUPPORT OF THE
DEBTORS' APPLICATION FOR AN ORDER PURSUANT TO SECTION
327(a) OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2014 AND
2016, AND LOCAL RULE 2014-1 AUTHORIZING THE EMPLOYMENT
AND RETENTION OF DELOITTE & TOUCHE LLP TO PROVIDE AUDIT
SERVICES TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

Robert P. Gordon III, being duly sworn, deposes and says:

1.         I am a partner of the firm of Deloitte & Touche LLP ("Deloitte &

Touche"), which has an office located at 111 S. Wacker Dr. Chicago, IL 60606.  I make this

declaration (the "Declaration") in support of the *Debtors' Application for an Order Pursuant to*

*Section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Rule 2014-*

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

*1 Authorizing the Employment and Retention of Deloitte & Touche LLP to Provide Audit Services to the Debtors Nunc Pro Tunc to the Petition Date* (the "<u>Application</u>"). The above–captioned debtors (the "<u>Debtors</u>") seek to retain Deloitte & Touche effective as of the Petition Date pursuant to the terms and conditions set forth in the two engagement letters, each dated January 8, 2010, attached hereto as <u>Exhibit 1</u> (the "<u>Financial Statement Audit Letter</u>" and the "<u>401(k) Plan Audit Letter</u>", collectively, the "<u>Engagement Letters</u>").[2]

2. The statements set forth in this Declaration are based upon my personal knowledge, upon information and belief, and upon client matter records kept in the ordinary course of business that were reviewed by me or other personnel of Deloitte & Touche or its affiliates.

## Deloitte & Touche's Disinterestedness

3. In connection with the preparation of this Declaration, Deloitte & Touche reviewed the list of potential parties in interest that Deloitte & Touche received from the Debtors.

4. Except as set forth herein, to my knowledge based on reasonable inquiry, (a) Deloitte & Touche, and its partners, principals, and directors that are anticipated to provide the services in connection with the engagement (the "<u>Deloitte & Touche Professionals</u>") do not hold or represent an interest adverse to any of the Debtors with respect to the matters on which Deloitte & Touche is to be retained in these chapter 11 cases, and (b) Deloitte & Touche or the Deloitte & Touche Professionals have no relationship to any of the Debtors, any of the Debtors' significant creditors, other known significant parties-in-interest in these chapter 11 cases, or to

---

[2] Capitalized terms used herein shall have the same meaning ascribed to them in the Application, unless otherwise specified.

the Debtors' attorneys that have been identified as assisting the Debtors in these chapter 11 cases, except as described herein or on attachments hereto.

5.       From time to time, Deloitte & Touche or its affiliates have provided, currently provide, or may currently provide services and likely will continue to provide services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to these chapter 11 cases.

6.       Deloitte & Touche and its affiliates have or may have provided professional services to, currently provide or may currently provide professional services to, and may in the future provide professional services in matters unrelated to these chapter 11 cases to certain of the Debtors' creditors, other parties-in-interest, or to attorneys and accountants that have been identified to us to be assisting the Debtors or various committees. Additionally, certain of these creditors, parties-in-interest, attorneys or accountants have or may have provided goods or services to, currently provide or may currently provide goods or services to, and may in the future provide goods or services to, Deloitte & Touche or its affiliates in matters unrelated to these chapter 11 cases.

7.       Despite the efforts described above to identify and disclose Deloitte & Touche's connections with the parties-in-interest in these chapter 11 cases, because Deloitte & Touche is a nationwide firm with thousands of personnel, and because the Debtors are a large enterprise, Deloitte & Touche is unable to state with certainty that every client relationship or other connection has been disclosed. In this regard, if Deloitte & Touche discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court.

8.        To check upon and disclose possible relationships with parties-in-interest in these chapter 11 cases, Deloitte & Touche has researched its client databases and performed reasonable due diligence to determine whether it or its affiliates had any relationships with any of the Debtors or their affiliates, subsidiaries, directors or officers, or the Debtors' significant secured and unsecured creditors whose names were supplied to it by the Debtors' counsel, significant noteholders and equity holders, other professionals or other such persons or entities whose names were supplied with significant relationships with the Debtors, including the individual names of the attorneys in the United States Trustee's Office as were identified to Deloitte & Touche by the Debtors' counsel.  The identities of these parties in interest were provided by counsel to the Debtors.

9.        From the internal research, Deloitte & Touche has determined that certain relationships should be disclosed, as follows:

(a)        Deloitte & Touche or its affiliates provide services in matters unrelated to these chapter 11 cases to certain of the Debtors' largest secured or unsecured creditors or interest holders and to other entities listed on Exhibit 2.

(b)        Pachulski Stang Ziehl & James LLP ("Pachulski Stang") the Debtor's Bankruptcy Counsel, may have provided, currently provides and may in the future provide legal services to Deloitte & Touche or its affiliates in matters unrelated to these chapter 11 cases, and/or Deloitte & Touche and/or its affiliates may have provided, may currently provide, and may in the future provide services to Pachulski Stang.

(c)        Certain financial institutions or their respective affiliates which are listed on Exhibit 2, including Wells Fargo/Wachovia Bank, are lenders to Deloitte & Touche or its affiliates.  Deloitte & Touche is a guarantor of certain such indebtedness. Certain of these financial institutions have also financed a portion of the capital and/or capital loan requirements of various partners and principals, respectively, of Deloitte & Touche and its affiliates.

(d)        Deloitte & Touche LLP ("Deloitte Tax"), an affiliate of Deloitte & Touche, or its affiliates have provided and may continue to provide professional services to the Debtors, including without limitation, post-bankruptcy services pursuant to a separate retention application.

10. Deloitte & Touche and its affiliates are sued on occasion by entities or individuals, who may be parties in interest in a chapter 11 case, in connection with matters that are unrelated to such case. Various parties in interest may, on occasion, be co-defendants in civil litigation in which Deloitte & Touche or its affiliates are named defendants. Accordingly, Deloitte & Touche customarily disclosures, as it did here, that this may be the case, but such litigation, if any is in connection with matters unrelated to the Debtors or to their chapter 11 cases.

11. Except as may be disclosed herein or on exhibits hereto, to the best of my knowledge, Deloitte & Touche and the Deloitte & Touche Professionals do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte & Touche and the Deloitte & Touche Professionals are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code.

## Scope of Services

12. Subject to the terms of the Engagement Letters, Deloitte & Touche proposes to render, as may be requested by the Debtors and as may be agreed to by Deloitte & Touche, various audit and related services which may include the following:

1) Audit of the financial statements of Mesa Air Group, Inc. and subsidiaries for the year ending September 30, 2010 and reviews of interim financial information consistent with the terms and conditions of the Financial Statement Audit Letter;

2) Audit of financial statement of Mesa Air Group, Inc.'s 401(k) Plan financial statements for the year ended September 30, 2009 in accordance with the standards of the Public Accounting Oversight Board and auditing standards generally accepted in the United States of America consistent with the terms and conditions of the 401(k) Plan Audit Letter and related opinions, and

3)     Such other related or similar services as may be requested by the
        Debtors and agreed to by Deloitte & Touche including pursuant to
        separate engagement letters.

**<u>Reasonableness of Compensation</u>**

13.     The fee structure described in the Application and Engagement Letters is
consistent with Deloitte & Touche's normal and customary billing practices for comparably-
sized and complex cases and transactions, both in and out of court, involving the audit and
accounting services to be provided in connection with these chapter 11 cases.

14.     So far as I am aware the proposed overall compensation structure is
comparable to compensation generally charged by tax consultants of similar stature for
comparable engagements, both in and out of court.

15.     Subject to the Court's approval and pursuant to the terms and conditions
of the Financial Statement Audit Letter, Deloitte & Touche's integrated audit and the reviews of
the related interim financial information will be billed at a hourly rate of $200 per hour.
Engagement-related expenses, such as costs of travel, telephone and postage incurred will be
billed in addition to the fees and will be stated separately on the invoices.  In the event the time
necessary for Deloitte & Touche to complete the integrated audit and the reviews of the related
interim financial information is more than the estimate of $1,070,000 provided under the
Engagement Letter, the following fee structure will be used.

| | |
|---|---|
| Partner/Principal/Director | $350 - $450/hour |
| Senior Manager/Manager | $300 - $400/hour |
| Senior | $200 - $250/hour |
| Staff | $150 - $200/hour |

16.     Pursuant to the 401(k) Plan Audit Letter, Deloitte & Touche estimates that
its fees will be approximately $45,000 and $55,000.  For these services, Deloitte & Touche will
bill at an hourly rate of $200 per hour, plus reasonable expenses, not to exceed $5,000.  To the

6

56772-001\DOCS_SF:69650.5

extent that certain circumstances, as listed in Appendix D of the 401(k) Plan Audit Letter, arise during this engagement, additional fees may be necessary. Deloitte & Touche will notify the Debtors promptly of any circumstances it encounters that could significantly affect its estimate and discuss with the Debtors any additional fees, as necessary. Additional services provided beyond the scope of services described in the Engagement Letters will be subject to a separate engagement and approval of the Court.

17.     The billing rates reflect, among other things, geographical differentials, differences in experience levels within classifications, and differences between types of services being provided. In the normal course of business, Deloitte & Touche revises its regular hourly rates to reflect changes in responsibilities, increased experience and increased costs of doing business. Accordingly, Deloitte & Touche requests that the aforementioned rates be revised to the applicable hourly rates that will be in effect from time to time. Deloitte & Touche , however, will provide ten (10) business days notice to the Debtors, Committee, and the U.S. Trustee prior to any increases in the rate structure discussed herein. After such notice, changes in applicable hourly rates will be noted on the invoices for the first time period in which the revised rates became effective.

18.     Deloitte & Touche will also seek reimbursement for all necessary and reasonable related expenses. Reasonable and documented actual expenses, including travel (with air travel based on coach fares consistent with this Court's guidelines), report production, delivery services, and other expenses incurred in providing the services, will be included in the total billed.

19.     Deloitte & Touche will file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in

accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the United States Bankruptcy Court for the Southern District of New York and any applicable orders of the Court. Deloitte & Touche respectfully requests that Deloitte & Touche shall only be required to provide summary time descriptions for services rendered postpetition in half-hourly increments.

20.     As of the Petition Date, the Debtors do not owe Deloitte & Touche any amounts for its prepetition services.  The Debtors have paid Deloitte & Touche $546,718 in the 90 days prior to the Petition Date.  Deloitte & Touche has provided services valued at less than $10,000 in fees since the Petition Date.

21.     To the best of my knowledge, Deloitte & Touche has no agreement with any other non-affiliated entity to share with such entity any compensation from revenue received by Deloitte & Touche in connection with the Debtors' bankruptcy cases.

22.     Deloitte & Touche recently completed a reorganization of some of its business units, including its financial advisory services, tax services, solutions, human capital, and outsourcing business functions.  This reorganization was indented to align the organizational structure more closely with the manner with in which business is conducted.  These business functions are now being conducted by entities affiliated with Deloitte & Touche, including Deloitte Financial Advisory Services LLP ("Deloitte FAS"), Deloitte Consulting LLP ("Deloitte Consulting"), and Deloitte Tax.  Accordingly, some services incidental to the tasks to be performed by Deloitte & Touche in these chapter 11 cases may be performed by personnel now employed by or associated with Deloitte FAS, Deloitte Consulting, Deloitte Tax and/or their respective subsidiaries, including subsidiaries located outside of the United States.  The fees and

8

expenses with respect to such services will be included in the fee applications of Deloitte &

Touche unless subject to a spate retention application and order.

Dated: April 28, 2010

Robert P. Gordon

SWORN TO AND SUBSCRIBED before me on
this 28 day of April , 2010

NOTARY PUBLIC
My Commission expires: 4-4-2012

"OFFICIAL SEAL"
TRACY N. KELLY
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 04/04/2012

9

**EXHIBIT 1**

**(Audit Engagement Letters)**

**(Financial Statement Audit)**

# Deloitte.

January 8, 2010

Deloitte & Touche LLP
111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

Mr. Richard Thayer
Chairman
Audit Committee of the Board of Directors
The Audit Committee of Mesa Air Group
410 North 44th Street, Suite 100
Phoenix, AZ 85008

Mr. Michael J. Lotz
Chief Financial Officer
Mesa Air Group
410 N. 44th Street, Suite 100
Phoenix, AZ 85008

Dear Mr. Thayer and Mr. Lotz:

Deloitte & Touche LLP (D&T or "we" or "us") is pleased to serve as the independent registered public accounting firm for Mesa Air Group, Inc. and subsidiaries (the "Company" or the "Debtor"). Mr. Robert Gordon III, partner, will be responsible for the services that we perform for the Company hereunder.

In addition to the audit and review services we are engaged to provide under this engagement letter, we would also be pleased to assist the Company on issues as they arise throughout the year. Hence, we hope that you will call Mr. Gordon whenever you believe D&T can be of assistance. This assistance will require approval by the Company's audit committee (the "Audit Committee") in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services. D&T acknowledges that no such services will commence without approval of the Audit Committee or Management of the Company.

For the purposes of this Engagement Letter and its attached General Business Terms, "Bankruptcy Court" shall mean the Bankruptcy Court with which the Debtor has filed a petition.

Debtor agrees that it will promptly seek the Bankruptcy Court's approval of this Engagement. The application, proposed order and other supporting documents (collectively, the "Application") submitted to the Bankruptcy Court seeking its approval of this engagement must be satisfactory to D&T in all respects. In addition to D&T's other rights or remedies hereunder, it may, in its sole discretion and without any liability arising therefrom, terminate this engagement in the event that (a) a third party objects or threatens to object, or D&T reasonably believes that a third party may object, in the form of an objection or otherwise, to D&T's retention by Debtor in the Case on the terms and conditions set forth in this Engagement Letter, (b) a final order authorizing the employment of D&T is not issued by the Bankruptcy Court on or before sixty (60) days from the date of filing the Application on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to D&T, or (c) the Application is denied by the Bankruptcy Court. In such event, Debtor hereby agrees to withdraw or amend, promptly upon D&T's request, any Application filed or to be filed with the Bankruptcy Court to retain D&T's services in the bankruptcy proceeding.

**Audit of Financial Statements and the Effectiveness of the Company's Internal Control Over Financial Reporting**

Our engagement is to perform an integrated audit in accordance with the standards of the Public Company Accounting Oversight Board (PCAOB) (United States) (the "PCAOB Standards"). The objectives of an integrated audit conducted in accordance with the PCAOB Standards are:

- To express an opinion on the fairness of the presentation of the Company's financial statements for the year ending September 30, 2010, in conformity with accounting principles generally accepted in the United States of America ("generally accepted accounting principles"), in all material respects

- To express an opinion on the effectiveness of the Company's internal control over financial reporting as of September 30, 2010, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission

Appendix A contains a description of an integrated audit under the PCAOB Standards.

Our ability to express such opinions and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete the integrated audit or are unable to form or have not formed such opinions, we may decline to express any opinion or decline to issue any report as a result of this engagement. If we are unable to complete our integrated audit or if any report to be issued by D&T as a result of this engagement requires modification, the reasons therefor will be discussed with the Audit Committee and the Company's management.

**Reviews of Interim Financial Information**

We will also perform reviews of the Company's condensed consolidated interim financial information (the "interim financial information") in accordance with the PCAOB Standards for each of the quarters in the year ending September 30, 2010, prepared for submission to the Securities and Exchange Commission (SEC). The objective of a review of interim financial information performed in accordance with the PCAOB Standards is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles.

The objective of a review of interim financial information performed in accordance with the PCAOB Standards is also to provide us with a basis for determining whether we are aware of any material modifications that, in our judgment, should be made to management's disclosures about changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting for such disclosures to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations.

Appendix B contains a description of an interim review under the PCAOB Standards.

If we become aware of material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles, or if we become aware of deficiencies

in internal control over financial reporting so significant that they would preclude management's preparation of interim financial information in conformity with generally accepted accounting principles, we may be precluded from completing any of our reviews. If, for any reason, we are unable to complete any of our reviews, the reasons therefor will be discussed with the Audit Committee and the Company's management.

## Management's Responsibilities

Appendix C describes management's responsibilities for (1) the financial statements and the effectiveness of internal control over financial reporting, (2) representation letters, (3) the process for obtaining preapproval of services, (4) independence matters relating to financial interests and providing certain services, and (5) independence matters relating to hiring.

## Audit Committee's Responsibility and Auditor Communications

As the independent registered public accounting firm of the Company, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work, and accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

Under the PCAOB Standards and SEC Rule 2-07 of Regulation S-X, we are required to communicate with the Audit Committee about various matters in connection with our integrated audit and reviews of the related interim financial information. Appendix D describes such communications.

## Fees

Our fees for the integrated audit and the reviews of the related interim financial information will be billed at a blended rate of $200 per hour for 5,350 hours. For billing purposes, all work (in hours) will be pre-approved 30 days in advance and will be billed monthly.

We anticipate sending invoices for the integrated audit monthly, and payments are due 30 days from the date of the invoice, subject to applicable provisions of the Bankruptcy Court. Engagement-related expenses, such as actual costs of travel, telephone and postage incurred as we perform the audit, will be billed in addition to the fees and will be stated separately on the invoices.

To the extent that certain circumstances, such as hours incurred related to the Company's voluntary filing of petitions to reorganize under Chapter 11 of the U.S. Bankruptcy Code or other matters as listed in Appendix F, arise during this engagement, our preliminary prebankruptcy fee estimate also may be significantly affected and additional fees may be necessary. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary. Such additional services provided beyond the scope of services described herein will be billed separately at the following applicable hourly rates:

| Partner/Principal/Director | $350–$450/hour |
| Senior Manager/Manager | 300–400/hour |
| Senior | 200–250/hour |
| Staff | 150–200/hour |

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with the SEC or other regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company also agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company. Any request by the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any services that would need to be performed in connection with any such request; fees for such services (and their scope) would be subject to the mutual agreement of the Company and D&T at such time as D&T is engaged to perform the services and would be described in a separate engagement letter.

## Other Services

*Preparation of Tax Returns*

The engagement to prepare the Company's 2010 federal and state income tax returns will be described in a separate engagement letter.

*2011 Interim Reviews or Annual Audit*

The parties acknowledge and agree that each performance of an annual integrated audit and any related review of interim financial information or issuance of a report by D&T on the Company's financial statements and the effectiveness of the Company's internal control over financial reporting is a separate engagement that is expected to be performed under the terms of a separate mutually agreed upon engagement letter. If the Company requests and we agree to commence performing any such separate engagement prior to the execution of a separate mutually agreed-upon engagement letter specific to such engagement, our performance of such engagement shall be governed by terms identical to the terms hereof unless and until a separate engagement letter specific to such engagement has been entered into by the parties.

* * * * * *

This engagement letter, including appendices attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

Mr. Richard Thayer
Mr. Michael J. Lotz
January 8, 2010
Page 6

If the above terms are acceptable and the services described are in accordance with your
understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and approved on behalf of
the Audit Committee of Mesa Air Group, Inc.:


By: _____


Title:_____


Date:_____

Accepted and agreed to by
Mesa Air Group, Inc.:


By: _____


Title:_____


Date:_____

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and approved on behalf of
the Audit Committee of Mesa Air Group, Inc.:

By: _____

Title: _____

Date: _____

Accepted and agreed to by
Mesa Air Group, Inc.:

By: _____

Title: _____
Michael Lotz
Presic...

Date: _____ 4/12/10 _____

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and approved on behalf of
the Audit Committee of Mesa Air Group, Inc.:

By: _____

Title: Chairman of the Audit Committee

Date: 15 April 2010

Accepted and agreed to by
Mesa Air Group, Inc.:

By: _____

Title: _____

Date: _____

**DESCRIPTION OF AN INTEGRATED AUDIT UNDER THE PCAOB
STANDARDS
Mesa Air Group, Inc.
Year Ending September 30, 2010**

This Appendix A is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. and approved by the Audit Committee of Mesa Air Group, Inc.

**Components of an Integrated Audit**

An integrated audit includes the following:

- Examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements

- Inquiring directly of the Audit Committee regarding its views about the risk of fraud and whether the Audit Committee has knowledge of any fraud or suspected fraud affecting the Company

- Assessing the accounting principles used and significant estimates made by management

- Evaluating the overall financial statement presentation

- Examining, on a test basis, evidence supporting the design and operating effectiveness of the Company's internal control over financial reporting

- Evaluating the effectiveness of the Company's internal control over financial reporting

**Reasonable Assurance**

An integrated audit is planned and performed to obtain reasonable, rather than absolute, assurance about (1) whether the financial statements are free of material misstatement, whether caused by error or fraud and (2) whether material weaknesses exist as of the date specified in management's assessment of the effectiveness of the Company's internal control over financial reporting. Because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement or material weakness. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Also, an integrated audit is not designed to detect error or fraud that is immaterial to the financial statements or deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness.

**Inherent Limitations of Internal Control Over Financial Reporting**

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may occur and not be detected. Also, projections of any evaluation of the internal control over financial reporting to future periods are subject to the risk that the internal control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**DESCRIPTION OF AN INTERIM REVIEW UNDER THE PCAOB
STANDARDS
Mesa Air Group, Inc.
Year Ending September 30, 2010**

This Appendix B is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. and approved by the Audit Committee of Mesa Air Group, Inc.

A review of interim financial information is substantially less in scope than an audit in accordance with the PCAOB Standards, the objective of which is to express an opinion on the financial statements taken as a whole. Accordingly, a review will not result in the expression of an opinion concerning the fairness of the presentation of the interim financial information in conformity with generally accepted accounting principles and cannot be relied on to reveal all significant matters that would be disclosed in an audit.

A review consists principally of applying analytical procedures to pertinent financial data and making inquiries of, and evaluating responses from, certain management personnel of the Company who have responsibility for financial and accounting matters.

A review also includes obtaining sufficient knowledge of the Company's business and its internal control as they relate to the preparation of both annual and interim financial information to (1) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence and (2) select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. A review is not designed to provide assurance on internal control or to identify control deficiencies.

A review also includes procedures, principally observation and inquiries, relating to management's disclosures about changes in internal control over financial reporting to provide us with a basis for communicating whether we are aware of any modifications that, in our judgment, should be made to such disclosures for them to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations. These procedures are substantially less in scope than an audit of internal control over financial reporting in accordance with the PCAOB Standards. Accordingly, a review cannot be relied on to reveal all significant matters that would be disclosed in an audit of internal control over financial reporting, and we will not express an opinion on the effectiveness of internal control over financial reporting.

**MANAGEMENT'S RESPONSIBILITIES**
**Mesa Air Group, Inc.**
**Year Ending September 30, 2010**

This Appendix C is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. and approved by the Audit Committee of Mesa Air Group, Inc.

## Financial Statements and the Effectiveness of Internal Control Over Financial Reporting

The overall accuracy of the financial statements, including interim financial information, and their conformity with generally accepted accounting principles is the responsibility of the Company's management. The assessment of the effectiveness of internal control over financial reporting to comply with Section 404 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations is also the responsibility of the Company's management. In this regard, management has the responsibility for, among other things:

- Establishing and maintaining effective internal control over financial reporting and informing D&T of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's evaluation, including separately disclosing to D&T all such deficiencies that management believes to be significant deficiencies or material weaknesses in internal control over financial reporting

- Informing D&T of significant changes in the design or operation of the Company's internal control over financial reporting that occurred during each fiscal quarter or subsequent to the date being reported on

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of any known material violations of such laws or regulations

- Adjusting the financial statements to correct material misstatements

- Making all financial records and related information available to us

## Representation Letters

We will make specific inquiries of the Company's management about the representations embodied in the financial statements and management's assessment of the effectiveness of the Company's internal control over financial reporting. Additionally, we will request that management provide to us the written representations the Company is required to provide to its independent registered public accounting firm under the PCAOB Standards. As part of our integrated audit procedures, we will request that management provide us with a representation letter that includes, among other things:

- Acknowledgment of management's responsibility for the preparation of the financial statements and for establishing and maintaining effective internal control over financial reporting

- Affirmation of management's belief that the effects of any uncorrected financial statement misstatements aggregated by us during the current audit engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole

- Acknowledgment that management disclosed to us all deficiencies in the design or operation of internal control over financial reporting identified by management, including separately disclosing to us all such deficiencies that management believes to be significant deficiencies or material weaknesses in internal control over financial reporting

We will also request that management confirm certain representations made to us during our audit. The responses to those inquiries and related written representations of management required by the PCAOB Standards are part of the evidential matter that D&T will rely on in forming its opinions.

We will also request a similar representation letter as part of our interim review procedures.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company.

*Subscription Services*

D&T makes available to clients and nonclients, primarily free of charge, but in some cases with a fee, various educational, informational, and other tools in the form of, among other things, webcasts, podcasts, websites, database subscriptions, checklists, research reports, and similar or related tools and services ("Subscriptions"). These Subscriptions may include, among other things, the Dbrief Webcasts series, Technical Library (also known as the Deloitte Accounting Research Tool – DART), Deloitte Recap. The Company hereby confirms that any use or receipt by the Company or its affiliates of these Subscriptions will be approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## Independence Matters Relating to Financial Interests and Providing Certain Services

In connection with our engagement, D&T, management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Gordon.

In connection with the foregoing, the Company agrees to furnish to D&T and keep D&T updated with respect to (1) a corporate tree that identifies the legal names of the Company's affiliates (e.g., parents, subsidiaries, investors, or investees), together with the ownership relationship among such entities and (2) equity and debt securities of the Company and its affiliates (including, without limitation, tax-advantaged debt of such entities that is issued through governmental authorities) that are available to individual investors (whether through stock, bond, commodity, futures, or similar markets or equity, debt, or any other securities offerings), together with related securities identification information (e.g., ticker symbols or CUSIP®, ISIN®, or Sedol® numbers). The Company acknowledges and consents that such information may be treated by D&T as being in the public domain.

## Independence Matters Relating to Hiring

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Gordon and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the Company's Board of Directors; (3) as a member of the Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding five paragraphs, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; and, in all cases, any successor or assignee.

**AUDIT COMMITTEE COMMUNICATIONS**
**Mesa Air Group, Inc.**
**Year Ending September 30, 2010**

This Appendix D is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. and approved by the Audit Committee of Mesa Air Group, Inc.

### Independence Communications

We have the responsibility to comply with the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC regarding auditor independence. To demonstrate compliance with those requirements and in accordance with PCAOB Ethics and Independence Rule 3526, *Communication with Audit Committees Concerning Independence* ("Rule 3526"), we will describe to the Audit Committee, in writing, all relationships between D&T and the Company or persons in "financial reporting oversight roles" (as defined in SEC Rule 2-01 of Regulation S-X) at the Company, that may reasonably be thought to bear on our independence and affirm to the Audit Committee in such communication whether we are independent of the Company within the meaning of the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC. We also will discuss our independence with the Audit Committee in accordance with Rule 3526. For purposes of this paragraph, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; and, in all cases, any successor or assignee.

### Other Communications Arising From the Audit or Reviews

*Fraud and Illegal Acts*

We will report directly to the Audit Committee any fraud of which we become aware that involves senior management and any fraud (whether caused by senior management or other employees) of which we become aware that causes a material misstatement of the financial statements. We will report to senior management any fraud perpetrated by lower-level employees of which we become aware that does not cause a material misstatement of the financial statements; however, we will not report such matters directly to the Audit Committee, unless otherwise directed by the Audit Committee.

We will inform the appropriate level of management of the Company and determine that the Audit Committee is adequately informed with respect to illegal acts that have been detected or have otherwise come to our attention in the course of our audit, unless the illegal acts are clearly inconsequential.

*Internal Control Matters*

We will communicate, in writing, to management and the Audit Committee all material weaknesses identified during the integrated audit prior to the issuance of our report on the effectiveness of the Company's internal control over financial reporting. We will also communicate in writing to the Audit Committee any significant deficiencies identified during the integrated audit. If we conclude that the oversight of the Company's external financial reporting and internal control over financial reporting by the Audit Committee is ineffective, we will also communicate that conclusion in writing to the Company's Board of Directors.

A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting, that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

In addition, we will communicate to management, in writing, all deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than material weaknesses) identified during the integrated audit and inform the Audit Committee when such a communication has been made. When making this communication, we will not repeat information about such deficiencies that has been included in previously issued written communications, whether those communications were made by us, internal auditors, or others within the Company.

### Other Matters

We will communicate matters required by PCAOB AU 380, *Communication With Audit Committees*, and SEC Rule 2-07 of Regulation S-X prior to the Company filing our report or consent with the SEC.

### Communications Related to Interim Reviews

At the Audit Committee's request, we will not issue a written review report upon completion of our interim reviews; however, we will report to the Audit Committee and the Company's management (1) matters that cause us to believe that material modifications should be made to the interim financial information for it to conform with generally accepted accounting principles or (2) that the Company filed the Form 10-Q before the completion of our review. When conducting our review of interim financial information, we will also determine whether any other matters required by regulations or the PCAOB Standards as they relate to interim financial information have been identified. If such matters have been identified, we will communicate them to the Audit Committee prior to the filing of interim financial information with the SEC or, if such communication cannot be made before the filing, as soon as practicable under the circumstances.

**COORDINATION OF THE INTEGRATED AUDIT**
**Mesa Air Group, Inc.**
**Year Ending September 30, 2010**

This Appendix E is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. and approved by the Audit Committee of Mesa Air Group, Inc.

We will plan the performance of our integrated audit in accordance with the following estimated timetable:

|  | Estimated to Begin | Targeted for Completion |
|---|---|---|
| Review performance schedule: |  |  |
| First quarter | January 25, 2010 | February 16, 2010 |
| Second quarter | April 19, 2010 | May 17, 2010 |
| Third quarter | July 19, 2010 | August 16, 2010 |
|  |  |  |
| Integrated audit performance schedule: |  |  |
| Planning |  | June 15, 2010 |
| Interim audit procedures |  | August 31, 2010 |
| Year-end procedures, including review of fourth quarter | October 18, 2010 | December 15, 2010 |
|  |  |  |
| Audit Committee communications: |  |  |
| Independence matters |  | December 15, 2010 |
| Report on reviews of interim financial statements: |  |  |
| First quarter |  | February 12, 2010 |
| Second quarter |  | May 14, 2010 |
| Third quarter |  | August 13, 2010 |
| Report on integrated audit, including all required communications |  | December 15, 2010 |

**CIRCUMSTANCES AFFECTING TIMING AND FEE ESTIMATE**
**Mesa Air Group, Inc.**
**Year Ending September 30, 2010**

This Appendix F is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. and approved by the Audit Committee of Mesa Air Group, Inc.

The fees quoted for the integrated audit are based on certain assumptions. Circumstances may arise during the engagement that may significantly affect the targeted completion dates or our fee estimate. As a result, changes to the fees may be necessary. Such circumstances include but are not limited to the following:

**Audit Facilitation**

1.  Changes to the timing of the engagement at the Company's request. Changes to the timing of the engagement usually require reassignment of personnel used by D&T in the performance of services hereunder. However, because it is often difficult to reassign individuals to other engagements, D&T may incur significant unanticipated costs.

2.  All audit schedules, including documentation of the Company's internal control over financial reporting, are not (a) provided by the Company on the date requested, (b) completed in a format acceptable to D&T, (c) mathematically correct, or (d) in agreement with the appropriate Company records (e.g., general ledger accounts). D&T will provide the Company with a separate listing of required schedules, information requests, and the dates such items are needed.

3.  Significant delays in responding to our requests for information, such as reconciling variances or providing requested supporting documentation (e.g., invoices, contracts, and other documents).

4.  Deterioration in the quality of the Company's accounting records during the current-year engagement in comparison with the prior-year engagement.

5.  A completed trial balance, referenced to the supporting analyses and schedules and financial statements, is not provided timely by the Company's personnel.

6.  Draft financial statements with appropriate supporting documentation are not prepared accurately and timely by the Company's personnel.

7.  Electronic files in an appropriate format and containing the information requested are not provided by the Company on the date requested for our use in performing file interrogation. D&T will provide the Company with a separate listing of the required files and the dates the files are needed.

8.  The agreed-upon level of support by the Company's internal audit department is not provided or is not suitable for our purposes.

**Significant Issues or Changes**

9. Significant deficiencies or material weaknesses in the design or operating effectiveness of the Company's internal control over financial reporting are identified during our audit that result in either an expansion of the scope of our testing procedures related to internal control over financial reporting and/or an expansion of our audit procedures on the related financial statement accounts.

10. A significant level of proposed audit adjustments is identified during our audit.

11. A significant number of drafts of the financial statements are submitted for our review, or we identify a significant level of deficiencies in the draft financial statements.

12. Significant new issues or changes as follows:

    a. Significant new accounting issues.

    b. Significant changes in accounting policies or practices from those used in prior years.

    c. Significant events or transactions not contemplated in our budgets.

    d. Significant changes in the Company's financial reporting process or information technology systems.

    e. Significant changes in the Company's accounting personnel, their responsibilities, or their availability.

    f. Significant changes in auditing standards.

    g. Significant changes in the Company's use of specialists or the specialists or their work product does not meet the qualifications required by the PCAOB Standards for our reliance upon their work.

13. The procedures necessary to adopt new Financial Accounting Standards Board Accounting Standards Codification topics have not been completed by the Company's personnel.

14. Changes in audit scope caused by events that are beyond our control.

**Payment for Services Rendered**

15. Without limiting its rights or remedies, D&T may halt or terminate its services entirely if payment is not received within 30 days of the date of the invoice.

**GENERAL BUSINESS TERMS**
**Mesa Air Group, Inc.**
**Year Ending September 30, 2010**

This Appendix G is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. ("Debtor") and approved by the Audit Committee of Mesa Air Group, Inc.

1. <u>Independent Contractor.</u> Nothing contained in these terms shall alter in any way the duties imposed by law on D&T in respect of services to be provided by D&T under this engagement. It is understood and agreed that D&T is an independent contractor and that D&T is not, and will not be considered to be, an agent, partner, or representative of the Company or the Audit Committee.

2. <u>Survival.</u> The agreements and undertakings of the Company and the Audit Committee contained in the engagement letter to which these terms are attached (the "Engagement Letter"), together with the appendices to the engagement letter including these terms, will survive the completion or termination of this engagement.

3. <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign, transfer, or delegate any of its rights or obligations relating to this engagement (including, without limitation, interests or claims relating to this engagement) without the prior written consent of the other parties. The Company and the Audit Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4. <u>Severability.</u> If any term of the engagement letter, including its appendices, is determined to be invalid or unenforceable, such term shall not affect the other terms hereof or thereof, but such invalid or unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein and therein.

5. <u>Force Majeure.</u> No party shall be deemed to be in breach of the engagement letter (including its appendices) as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

6. <u>Dispute Resolution.</u> Any Dispute (as defined below) arising out of or relating to Services performed under the Engagement Letter prior to the effective date of (a) a plan of reorganization of the Debtor or (b) a court order dismissing the Debtor's chapter 11 case or cases (the "Bankruptcy Effective Date") shall be brought in the Bankruptcy Court (as defined below) (or the District Court (as defined below), if such District Court withdraws the reference to the Bankruptcy Court). All other Disputes, including, without limitation, Disputes arising out of or relating to services performed after the Bankruptcy Effective Date and Disputes over which the Bankruptcy Court (or the District Court) does not have, retain or exercise jurisdiction, shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix H and made a part hereof (the "Dispute Resolution Provision"). The parties each hereby irrevocably waive, to the fullest extent permitted by law, all rights to trial by jury in any Dispute. Except with respect to the interpretation and enforcement of the arbitration procedures set forth in the Dispute Resolution Provision (which shall be governed by the Federal Arbitration Act), the laws of the State of New York (without giving effect to its choice of law principles) shall apply in arbitration or any other forum in connection with any Dispute. Damages that are punitive or exemplary in nature, or that are not based on a party's actual damages, shall be unavailable in arbitration or any other forum (and the parties expressly waive their right to receive such damages). The foregoing shall be binding upon the parties and any and all of their respective permitted successors and assigns. This paragraph and the Dispute Resolution Provision shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise.

For purposes of the foregoing, (a) "Dispute" shall mean any controversy or claim between the parties arising out of or relating to the Engagement Letter, including its exhibits or appendices, or this engagement, (b) "Bankruptcy Court" shall mean the United States Bankruptcy Court where the Debtor's chapter 11 case or cases are pending and (c) "District Court" shall mean the United States District Court of which the Bankruptcy Court constitutes a unit.

**DISPUTE RESOLUTION PROVISION**
**Mesa Air Group, Inc.**
**Year Ending September 30, 2010**

This Appendix H is part of the engagement letter dated January 8, 2010, between Deloitte & Touche LLP and Mesa Air Group, Inc. and approved by the Audit Committee of Mesa Air Group, Inc.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Client and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the Engagement Letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators shall have no power to award punitive, exemplary or other damages not based on a party's actual damages (and the parties expressly waive their right to receive such damages). The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

**(401(k) Audit)**

# Deloitte.

Deloitte & Touche LLP
111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

January 8, 2010

Mr. Richard Thayer
Chairman of the Audit Committee of the Board of Directors
The Audit Committee of Mesa Air Group, Inc.
410 North 44th Street, Suite 100
Phoenix, AZ 85008

Mr. Michael J. Lotz
Chief Financial Officer
Mesa Air Group, Inc.
410 North 44th Street, Suite 100
Phoenix, AZ 85008

Dear Mr. Thayer and Mr. Lotz:

Deloitte & Touche LLP (D&T or "we" or "us") is pleased to serve as the independent registered public accounting firm for Mesa Air Group, Inc. 401(k) Plan (the "Plan"). Mr. Robert Gordon III, partner, will be responsible for the services that we perform for the Plan hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Plan on issues as they arise throughout the year. Hence, we hope that you will call Mr. Gordon whenever you believe D&T can be of assistance. This assistance will require approval by Mesa Air Group, Inc.'s (the "Plan Sponsor"), audit committee (the "Audit Committee") in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

For purposes of this Engagement Letter and its attached General Business Terms, "Bankruptcy Court" shall mean the Bankruptcy Court with which Mesa Air Group, Inc. (together with its debtor affiliates, the "Debtor") has filed a petition.

Debtor agrees that it will promptly seek the Bankruptcy Court's approval of this Engagement. The application proposed order and other supporting documents (collectively, the "Application") submitted to the Bankruptcy Court seeking its approval of this engagement must be satisfactory to D&T in all respects. In addition to D&T's other rights or remedies hereunder, it may, in its sole discretion and without any liability arising therefrom, terminate this engagement in the event that (a) a third party objects or threatens to object, or D&T reasonably believes that a third party may object, in the form of an objection or otherwise, to D&T's retention by Debtor in the Case on the terms and conditions set forth in this Engagement Letter, (b) a final order authorizing the employment of D&T is not issued by the Bankruptcy Court on or before sixty (60) days from the date of the commencement of the Case on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to D&T, or (c) the Application is denied by the Bankruptcy Court. In such event, Debtor hereby agrees to

withdraw or amend, promptly upon D&T's request, any Application filed or to be filed with the Bankruptcy Court to retain D&T's services in the bankruptcy proceeding.

## Audit of Financial Statements

Our engagement is to perform a financial statement audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) (the "PCAOB Standards") and auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). We are required to perform our audit of the financial statements in accordance with the PCAOB Standards for reporting to the U.S. Securities and Exchange Commission (SEC). We are also required to perform our audit of the financial statements in accordance with generally accepted auditing standards for reporting to the Department of Labor (DOL) on Form 5500 as required by the Employee Retirement Income Security Act of 1974, as amended (ERISA). Therefore, we will issue two separate opinions. The objective of a financial statement audit conducted in accordance with the PCAOB Standards and generally accepted auditing standards is to express an opinion on the fairness of the presentation of the Plan's financial statements for the year ended September 30, 2009, in conformity with accounting principles generally accepted in the United States of America ("generally accepted accounting principles"), in all material respects, and to evaluate the fairness of presentation of the supplemental schedules, as applicable, in conformity with the DOL's rules and regulations, in all material respects, when considered in relation to the basic financial statements taken as a whole.

As part of our audit, we will perform certain procedures, as required by the PCAOB Standards and generally accepted auditing standards, directed at considering the Plan's compliance with applicable Internal Revenue Code (IRC) requirements for tax-exempt status, including reading the Plan's latest tax determination letter from the Internal Revenue Service (IRS). As we conduct our audit, we may become aware that events affecting the Plan's tax status may have occurred. Similarly, we may become aware that events affecting the Plan's compliance with the requirements of ERISA may have occurred. We will inform Plan management of any instances of tax or ERISA noncompliance that come to our attention during the course of our audit. Plan management should recognize, however, that our audit is not designed or intended to determine the Plan's overall compliance with applicable provisions of the IRC or ERISA.

Appendix A contains a description of our responsibilities and a financial statement audit under the PCAOB Standards and generally accepted auditing standards.

Our ability to express our opinions and the wording of our opinions will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete the financial statement audit or are unable to form or have not formed such opinions, we may decline to express any opinions or decline to issue any reports as a result of this engagement. If we are unable to complete our financial statement audit or if any reports to be issued by D&T as a result of this engagement require modification, the reasons therefor will be discussed with the Audit Committee and Plan management.

## Form 5500

We have not prepared or reviewed the Plan's Form 5500 to be filed with the DOL; however, the audited financial statements of the Plan are required to be filed with the Plan's Form 5500. The PCAOB Standards and generally accepted auditing standards require that we read the Plan's Form 5500 prior to its filing. The purpose of this procedure is to consider whether such information or the manner of its presentation is materially inconsistent with the information or the manner of its presentation in the financial statements. These procedures are not sufficient or intended for purposes of ensuring that the Plan's Form 5500 is complete or accurately prepared. In the event that our report is issued prior to our having read the Plan's Form 5500, Plan management agrees not to attach such report to the financial statements included with the Plan's Form 5500 filing until we have read the completed Form 5500.

## Management's Responsibilities

Appendix B describes Plan management's responsibilities for (1) the financial statements, (2) representation letters, (3) the process for obtaining preapproval of services, (4) independence matters relating to financial interests and providing certain services, and (5) independence matters relating to hiring.

## Audit Committee's Responsibility and Auditor Communications

As the independent registered public accounting firm of the Plan, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work, and accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

Under the PCAOB Standards and SEC Rule 2-07 of Regulation S-X, we are required to communicate with the Audit Committee about various matters in connection with our audit. Appendix C describes such communications.

## Fees

We estimate that our fees for the audit of the Plan's financial statements for the year ended September 30, 2009, will range between $45,000 and $55,000, which is based on an estimated range of 225 to 275 hours and an hourly billing rate of $200 per hour. In addition to professional fees, our invoices will include actual expenses incurred, such as administrative services, travel, telephone, and postage, not to exceed $5,000. Expenses will be stated separately on the invoices. Billings will be based on actual hours incurred, plus expenses, and payments are due 30 days from the date of the invoice, subject to applicable orders of the Bankruptcy Court.

To the extent that certain circumstances, as listed in Appendix D, arise during this engagement, our fee estimate also may be significantly affected, and additional fees may be necessary. We will notify you

promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary. Additional services provided beyond the scope of services described herein will be billed separately.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Plan or Plan Sponsor intends to publish or otherwise reproduce in any document our reports on the Plan's financial statements, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator), thereby associating D&T with such document, the Plan agrees that its management, and the Plan agrees to ensure that the Plan Sponsor's management, will provide D&T with a draft of the document to read and will obtain our approval for the inclusion or incorporation by reference of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of our reports in any such document would constitute the reissuance of our reports. The Plan and the Plan Sponsor also agree that their management will notify us and obtain our approval prior to including our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Plan or the Plan Sponsor. Any request by the Plan or the Plan Sponsor to reissue our reports, to consent to their inclusion or incorporation by reference in an offering or other document, or to agree to their inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any services that would need to be performed in connection with any such request; fees for such services (and their scope) would be subject to the mutual agreement of the Plan and D&T at such time as D&T is engaged to perform the services and would be described in a separate engagement letter.

## Access to Working Papers by Regulators

We may be requested to make certain working papers available to the DOL, IRS, or other governmental agency pursuant to authority given to such governmental agencies by law or regulation. If such a request is made, we will inform Plan management prior to providing such access. The working papers for this engagement are the property of D&T and constitute D&T's confidential information. Access to the requested working papers will be provided to the DOL, IRS, or other governmental agency under the supervision of D&T audit personnel and at a location designated by us. If photocopies are requested, we will mark the photocopies as confidential and maintain control over the duplication of such photocopies. However, notwithstanding the above, the DOL, IRS, or other governmental agency may intend or decide to distribute the photocopies or information contained therein to others, including other governmental agencies, or further duplicate such information for themselves or others. All photocopying fees and professional services will be charged as an additional expense to the Plan.

## 2010 Annual Audit

Prior to or following the completion of the financial statement audit for the year ended September 30, 2009, contemplated by this engagement letter, the Plan may request that we commence a separate engagement to perform the annual audit for the year ending September 30, 2010. If we agree to commence providing such separate services prior to the execution of an engagement letter specific to such services, our performance of such services shall be governed by the terms hereof until a separate engagement letter specific to such services has been entered into by the parties.

\* \* \* \* \* \*

This engagement letter, including the appendices attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes all other prior and contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and approved on behalf of
the Audit Committee of Mesa Air Group, Inc.:

By: _____

Title: _____

Date: _____

Accepted and agreed to by
Mesa Air Group, Inc. 401(k) Plan:

By: _____

Title: _____

Date: _____

Accepted and agreed to by Mesa Air Group, Inc.:

By: _____

Title: _____

Date: _____

**DESCRIPTION OF OUR RESPONSIBILITIES AND A FINANCIAL
STATEMENT AUDIT UNDER THE PCAOB STANDARDS AND
GENERALLY ACCEPTED AUDITING STANDARDS
Mesa Air Group, Inc. 401(k) Plan
Year Ended September 30, 2009**

**Our Responsibilities**

Our responsibilities under generally accepted auditing standards and the PCAOB Standards include forming and expressing an opinion about whether the financial statements that have been prepared by Plan management with the oversight of the Audit Committee are presented fairly, in all material respects, in conformity with generally accepted accounting principles. The audit of the financial statements does not relieve Plan management or the Audit Committee of its responsibilities.

**Components of a Financial Statement Audit**

A financial statement audit includes the following:

- Obtaining an understanding of the Plan and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures

- Consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Plan's internal control over financial reporting

- Examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements

- Inquiring directly of the Audit Committee regarding its views about the risk of fraud and whether the Audit Committee has knowledge of any fraud or suspected fraud affecting the Plan

- Assessing the accounting principles used and significant estimates made by Plan management

- Evaluating the overall financial statement presentation

**Reasonable Assurance**

An audit is planned and performed to obtain reasonable, rather than absolute, assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud. However, because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement. Accordingly, there is some risk that a material misstatement would remain undetected. Also, a financial statement audit is not designed to detect error or fraud that is immaterial to the financial statements nor is it designed to provide assurance on internal control or to identify control deficiencies.

**MANAGEMENT'S RESPONSIBILITIES**
**Mesa Air Group, Inc. 401(k) Plan**
**Year Ended September 30, 2009**

**Financial Statements**

The overall accuracy of the financial statements and their conformity with generally accepted accounting principles are the responsibility of Plan management. In this regard, Plan management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Establishing and maintaining effective internal control over financial reporting and informing D&T of any changes in the Plan's internal control over financial reporting that occurred during the year that have materially affected or are reasonably likely to materially affect the Plan's internal control over financial reporting

- Designing and implementing programs and controls to prevent and detect fraud

- Identifying and ensuring that the Plan complies with the laws and regulations applicable to its activities, including the tax-qualified status of the Plan, and informing us of any known material violations of such laws or regulations

- Adjusting the financial statements to correct material misstatements

- Making all financial records and related information available to us

- Providing sufficient appropriate documentation to support the determination of all fair value measurements and disclosures

**Representation Letters**

We will make specific inquiries of Plan management about the representations embodied in the financial statements and supplemental schedules. Additionally, we will request that Plan management provide to us the written representations the Plan is required to provide to its independent registered public accounting firm under the PCAOB Standards and generally accepted auditing standards. As part of our audit procedures, we will request that Plan management provide us with a representation letter that includes, among other things:

- Acknowledgment of Plan management's responsibility for the preparation of the financial statements and for establishing and maintaining effective internal control over financial reporting

- Affirmation of Plan management's belief that the effects of any uncorrected financial statement misstatements aggregated by us during the current audit engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole

We will also request that Plan management confirm certain representations made to us during our audit. The responses to those inquiries and related written representations of Plan management required by the PCAOB Standards and generally accepted auditing standards are part of the evidential matter that D&T will rely on in forming its opinions on the Plan's financial statements.

## Process for Obtaining Preapproval of Services

Plan management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Plan.

## Independence Matters Relating to Financial Interests and Providing Certain Services

In connection with our engagement, D&T, Plan management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Plan is an attest client and that independence must also be maintained for the Plan Sponsor. Plan management will ensure that the Plan and the Plan Sponsor have policies and procedures in place for the purpose of ensuring that neither the Plan nor the Plan Sponsor, together with their subsidiaries and other entities that comprise the Plan Sponsor for purposes of the consolidated financial statements, will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Gordon.

In connection with the foregoing, the Plan Sponsor agrees to furnish to D&T and keep D&T updated with respect to (1) a corporate tree that identifies the legal names of the Plan Sponsor's affiliates (e.g., parents, subsidiaries, investors, or investees), together with the ownership relationship among such entities, and (2) equity and debt securities of the Plan Sponsor and its affiliates (including, without limitation, tax-advantaged debt of such entities that is issued through governmental authorities) that are available to individual investors (whether through stock, bond, commodity, futures or similar markets, or equity, debt, or any other securities offerings), together with related securities identification information (e.g., ticker symbols or CUSIP®, ISIN®, or Sedol® numbers). The Plan Sponsor acknowledges and consents that such information may be treated by D&T as being in the public domain.

## Independence Matters Relating to Hiring

Plan management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Plan management will ensure that the Plan and the Plan Sponsor also have policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Plan or the Plan Sponsor for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Gordon and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Plan or the Plan Sponsor; (2) on the Plan Sponsor's board of directors; (3) as a member of the Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding four paragraphs, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; and, in all cases, any successor or assignee.

**AUDIT COMMITTEE COMMUNICATIONS**
**Mesa Air Group, Inc. 401(k) Plan**
**Year Ended September 30, 2009**

### Independence Communications

We have the responsibility to comply with the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC regarding auditor independence. To demonstrate compliance with those requirements and in accordance with PCAOB Ethics and Independence Rule 3526, *Communication with Audit Committees Concerning Independence* ("Rule 3526"), we will describe to the Audit Committee, in writing, all relationships between D&T and the Plan, Plan Sponsor, or persons in "financial reporting oversight roles" (as defined in SEC Rule 2-01 of Regulation S-X) at the Plan or Plan Sponsor that may reasonably be thought to bear on our independence and affirm to the Audit Committee in such communication whether we are independent of the Plan and the Plan Sponsor within the meaning of the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC. We also will discuss our independence with the Audit Committee in accordance with Rule 3526. For purposes of this paragraph, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu and its member firms; and, in all cases, any successor or assignee.

### Other Communications Arising from the Audit

*Fraud and Illegal Acts*

We will report directly to the Audit Committee any fraud of which we become aware that involves senior Plan management and any fraud (whether caused by senior Plan management or other employees) of which we become aware that causes a material misstatement of the financial statements. We will report to senior Plan management any fraud perpetrated by lower-level employees of which we become aware that does not cause a material misstatement of the financial statements; however, we will not report such matters directly to the Audit Committee, unless otherwise directed by the Audit Committee.

We will inform the appropriate level of Plan management and determine that the Audit Committee is adequately informed with respect to illegal acts that have been detected or have otherwise come to our attention in the course of our audit, unless the illegal acts are clearly inconsequential.

We will also report directly to the Audit Committee and Plan management, to the extent that they come to our attention during the course of our audit, illegal acts that we believe may be prohibited transactions with parties in interest or other violations of ERISA rules and regulations.

*Internal Control Matters*

We will report directly, in writing, to the Audit Committee and Plan management all significant deficiencies and material weaknesses identified during the audit. Our written communication will distinguish clearly between those matters considered by D&T to be significant deficiencies and those

considered by D&T to be material weaknesses. If we become aware that the oversight of the Plan's external financial reporting and internal control over financial reporting by the Audit Committee is ineffective, we will communicate that information in writing to the board of directors.

A significant deficiency is a deficiency, or combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. A material weakness is a deficiency, or combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the Plan's financial statements will not be prevented or detected and corrected on a timely basis.

### Other Matters

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Audit Committee. However, we will communicate to the Audit Committee matters required by American Institute of Certified Public Accountants (AICPA) AU 380, *The Auditor's Communication With Those Charged With Governance.*

We will also communicate matters required by PCAOB AU 380, *Communication With Audit Committees*, and SEC Rule 2-07 of Regulation S-X prior to the Plan filing our report or consent with the SEC.

**CIRCUMSTANCES AFFECTING TIMING AND FEE ESTIMATE**
**Mesa Air Group, Inc. 401(k) Plan**
**Year Ended September 30, 2009**

The fees quoted for the audit are based on certain assumptions. Circumstances may arise during the engagement that may significantly affect the targeted completion dates or our fee estimate. As a result, changes to the fees may be necessary. Such circumstances include but are not limited to the following:

**Audit Facilitation**

1. Changes to the timing of the engagement at the Plan's request. Changes to the timing of the engagement usually require reassignment of personnel used by D&T in the performance of services hereunder. However, because it is often difficult to reassign individuals to other engagements, D&T may incur significant unanticipated costs.

2. All audit schedules are not (a) provided by the Plan or service provider on the date requested, (b) completed in a format acceptable to D&T, (c) mathematically correct, or (d) in agreement with the appropriate Plan records. D&T will provide the Plan with a separate listing of required schedules, information requests, and the dates such items are needed.

3. Significant delays in responding to our requests for information, such as reconciling variances or providing requested supporting documentation (e.g., invoices, contracts, and other documents).

4. Deterioration in the quality of the Plan's accounting records during the current-year engagement in comparison with the prior-year engagement.

5. A completed trial balance, referenced to the supporting analyses and schedules and financial statements, is not provided timely by the Plan's personnel.

6. Draft financial statements with appropriate supporting documentation are not prepared accurately and timely by the Plan's personnel.

7. Electronic files in an appropriate format and containing the information requested are not provided by the Plan on the date requested for our use in performing file interrogation. D&T will provide the Plan with a separate listing of the required files and the dates the files are needed.

8. The agreed-upon level of support by the Plan Sponsor's internal audit department is not provided or is not suitable for our purposes.

**Significant Issues or Changes**

9. Significant deficiencies or material weaknesses in the design or operating effectiveness of the Plan's internal control over financial reporting are identified during our audit that result in the expansion of our audit procedures.

10. A significant level of proposed audit adjustments is identified during our audit.

11. Items are found indicating that the Plan has not been in compliance with the Plan document or ERISA rules and regulations.

12. A significant number of drafts of the financial statements are submitted for our review, or we identify a significant level of deficiencies in the draft financial statements.

13. Significant new issues or changes as follows:

    a.  Significant new accounting issues (e.g., investment in guaranteed investment contracts, derivatives, or nonreadily marketable securities; plan mergers or terminations.)

    b.  Significant changes in accounting policies or practices from those used in prior years.

    c.  Significant events or transactions not contemplated in our budgets.

    d.  Significant changes in the Plan's financial reporting process or information technology systems.

    e.  Significant changes in the Plan's accounting personnel, their responsibilities, or their availability.

    f.  Changes in the Plan's service providers.

    g.  Significant changes in auditing requirements set by regulators.

    h.  Significant changes in auditing standards.

    i.  Significant changes in the Plan's use of specialists, or the specialists or their work products do not meet the qualifications required by generally accepted auditing standards or the PCAOB Standards for our reliance upon their work.

14. The procedures necessary to apply FSP AAG INV-1 and SOP 94-4-1, *Reporting of Fully Benefit-Responsive Investment Contracts Held by Certain Investment Companies Subject to the AICPA Investment Company Guide and Defined-Contribution Health and Welfare and Pension Plans*, have not been completed by the Plan's personnel. Such procedures will include obtaining all information pertinent to accounting, auditing, and disclosing in the financial statements matters relating to certain funds which the Plan offers to its participants as investments elections. For each applicable fund, the Plan must obtain audited financial statements, details of the underlying investments within each fund, and all other information necessary to ensure proper disclosure in the financial statements.

15. Changes in audit scope caused by events that are beyond our control.

**Payment for Services Rendered**

16. Without limiting its rights or remedies, D&T may halt or terminate its services entirely if payment is not received within 30 days of the date of the invoice.

**GENERAL BUSINESS TERMS**
**Mesa Air Group, Inc. 401(k) Plan**
**Year Ended September 30, 2009**

1. <u>Independent Contractor.</u> Nothing contained in these terms shall alter in any way the duties imposed by law on D&T in respect of services to be provided by D&T under this engagement. It is understood and agreed that each party hereto is an independent contractor and that neither party is, nor shall be considered to be, the other's agent, partner, or representative of the Plan, the Plan Sponsor, or the Audit Committee.

2. <u>Survival.</u> The agreements and undertakings of the Plan, Plan Sponsor, and the Audit Committee contained in the engagement letter to which these terms are attached (the "engagement letter"), together with the appendices to the engagement letter including these terms, will survive the completion or termination of this engagement.

3. <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign, transfer, or delegate any of its rights or obligations relating to this engagement (including, without limitation, interests or claims relating to this engagement) without the prior written consent of the other parties. The Plan, Plan Sponsor, and the Audit Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4. <u>Severability.</u> If any term of the engagement letter, including its appendices, is determined to be invalid or unenforceable, such term shall not affect the other terms hereof or thereof, but such invalid or unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein and therein.

5. <u>Force Majeure</u>. No party shall be deemed to be in breach of the engagement letter (including its appendices) as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6. <u>Dispute Resolution.</u> Any Dispute (as defined below) arising out of or relating to Services performed under the Engagement Letter prior to the effective date of (a) a plan of reorganization of the Debtor or (b) a court order dismissing the Debtor's chapter 11 case or cases (the "Bankruptcy Effective Date") shall be brought in the Bankruptcy Court (as defined below) (or the District Court (as defined below), if such District Court withdraws the reference to the Bankruptcy Court). All other Disputes, including, without limitation, Disputes arising out of or relating to services performed after the Bankruptcy Effective Date and Disputes over which the Bankruptcy Court (or the District Court) does not have, retain or exercise jurisdiction, shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix F and made a part hereof (the "Dispute Resolution Provision"). The parties each hereby irrevocably waive, to the fullest extent permitted by law, all rights to trial by jury in any Dispute. Except with respect to the interpretation and enforcement of the arbitration procedures set forth in the Dispute Resolution Provision (which shall be governed by the Federal Arbitration Act), the laws of the State of New York (without giving effect to its choice of law principles) shall apply in arbitration or any other forum in connection with any Dispute. Damages that are punitive or exemplary in nature, or that are not based on a party's actual damages, shall be unavailable in arbitration or any other forum (and the parties expressly waive their right to receive such damages). The foregoing shall be binding upon the parties and any and all of their respective permitted successors and assigns. This paragraph and the Dispute Resolution Provision shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise.

For purposes of the foregoing, (a) "Dispute" shall mean any controversy or claim between the parties arising out of or relating to the Engagement Letter, including its exhibits or appendices, or this engagement, (b) "Bankruptcy Court" shall mean the United States Bankruptcy Court where the Debtor's chapter 11 case or cases are pending and (c) "District Court" shall mean the United States District Court of which the Bankruptcy Court constitutes a unit.

**DISPUTE RESOLUTION PROVISION**
**Mesa Air Group, Inc. 401(k) Plan**
**Year Ended September 30, 2009**

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Client and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the Engagement Letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators shall have no power to award punitive, exemplary or other damages not based on a party's actual damages (and the parties expressly waive their right to receive such damages). The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

## EXHIBIT 2

Deloitte & Touche LLP and/or its affiliates have provided or are currently providing certain services in matters unrelated to these chapter 11 cases to, or otherwise have business relationships (including banking relationships) with, the following parties-in-interest and/or their respective affiliates:

AAR Corporation
AT&T Capital Services, Inc. and their affiliates
Bank of Hawaii Leasing, Inc. and their affiliates
Bombardier, Inc. and their affiliates
Cargill Leasing Corporation and their affiliates
Debis Financial Services LLC and their affiliates
Deutsche Bank and their affiliates
DVB Bank
Embraer and their affiliates
Epiq Bankruptcy Solutions and their affiliates
Federal Communications Commission
Fleet National Bank and their affiliates
GE Commercial Aviation Services and their affiliates
Goldman Sachs and their affiliates
IHI Corporation
Imperial Capital LLC and their affiliates
Indigo Miramar LLC and their affiliates
Investissement Quebec and their affiliates
Internal Revenue Service
Jones Day LLC
LCC Capital Master Fund Ltd. And their affiliates
Mesa Air Group, Inc. and their affiliates
MPD, Inc.
Nilchi, Inc.
Pacific Century Leasing, Inc.
Pachulski Stang Ziehl & Jones LLP
Patar, Inc.
Philip Morris Capital Corporation and their affiliates
PNC and their affiliates
Raytheon Aircraft Credit Corporation and their affiliates
Ritz Hotel Management Corp.
Rolls-Royce and their affiliates
SW Holding (CIT) and their affiliates
Transamerica Finance and their affiliates
US Bank N.A. and their affiliates
Wells Fargo Equipment Finance and their affiliates
Zazove Associates LLC and their affiliates