PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile:  212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OBJECTION TO THE REQUEST BY ENGINE LEASE
FINANCE CORPORATION AND DEUCALION ENGINE LEASING (IRELAND)
LIMITED FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE
PURSUANT TO SECTION 503(b) AND 507(a)(2) OF THE BANKRUPTCY CODE**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries

in these chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"),

hereby file this objection to the *Request for Allowance and Payment of Administrative Expense*

*Pursuant to Section 503(b) and 507(a)(2) of the Bankruptcy Code*, dated August 23, 2010

[Docket No. 1095] (the "Administrative Expense Request").  This Objection is based on the

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

arguments set forth herein and the *Declaration of Gary Appling in Support of Debtors' Objection to the Request By Engine Lease Finance Corporation and Deucalion Engine Leasing (Ireland) Limited for Allowance and Payment of Administrative Expense Pursuant to Section 503(b) and 507(a)(2) of the Bankruptcy Code* (the "<u>Appling Declaration</u>") which is annexed hereto as <u>Exhibit B</u>..[2]  The Appling Declaration is incorporated herein by reference in its entirety.

### <u>Preliminary Statement</u>

1.    ELFC seeks an administrative expense claim for parts that were listed in its engine leases and were not returned when the engines were surrendered following the lease rejection.  ELFC speculates that the missing parts were used postpetition and removed by the Debtors.  ELFC is simply wrong.  The Debtors are not in possession of the missing parts and have no record of ever having received them.  ELFC has no evidence to the contrary and therefore has not established any entitlement to an administrative expense claim.  The fact that the underlying leases require the missing parts to be returned is irrelevant.  Under section 1110 of the Bankruptcy Code and the case law interpreting this provision, the Debtors are not required to return the equipment in accordance with the underlying leases.[3]  All that is required is that the Debtors return whatever equipment is in their possession (or was as of the Petition Date) and that the Debtors do so in a reasonable manner.

2.    ELFC also argues that it is entitled to an administrative expense claim for breach of lease provisions that require the Debtors to return all parts in a serviceable condition.  However, these administrative claims are barred by the express terms of the Rejection

---

[2] Capitalized terms not defined herein shall have the meanings used in the Appling Declaration.

[3] *In re Northwest Airlines Corp.*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) Transcript 70:24-25 – 71:3-12 (section 1110 does not require to return leased equipment in accordance with the terms of the lease); *In re Northwest Airlines Corp.*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 19, 2005) at 33 (confirming prior ruling); *In re UAL Corporation, et al.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 17, 2004) Transcript 14:1-14 (same); *In re Continental Airlines, Inc.*, 146 B.R. 520, 528 (Bankr. D. Del. 1992) (same).  The foregoing cases are discussed in greater detail below and the transcripts are annexed hereto.

Procedures Order.  While the Rejection Procedures Order reserved the rights of aircraft parties to

assert that "missing parts" and "wrong parts" are entitled to administrative priority (and the

Debtors' right to dispute those assertions), the Rejection Procedures Order unequivically

relegated lease return condition claims to prepetition general unsecured claim status.

3.      Accordingly, for these reasons and the reasons set forth below, the

Administrative Expense Request should be denied.

**Background**

4.      On January 5, 2010 (the "<u>Petition Date</u>"), each of the Debtors commenced

with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the

"<u>Bankruptcy Code</u>").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  On January 14, 2010, the United States Trustee for the Southern

District of New York appointed a statutory committee of unsecured creditors pursuant to section

1102 of the Bankruptcy Code.

5.      On February 23, 2010, the Court entered the *Order (I) Authorizing*

*Debtors to (A) Reject Leases Relating to Certain Aircraft and Other Related Equipment, (B)*

*Abandon Certain Aircraft, Engines, and Other Related Equipment, (C) Transfer Title to Certain*

*Aircraft, Engines, and Other Related Equipment, and (D) Satisfy the Surrender and Return*

*Requirements Under the Bankruptcy Code, and (II) Approving Related Notices and Procedures*

[Docket No. 353] (the "<u>Rejection Procedures Order</u>").[4]

---

[4] On February 24, 2010, the Debtors filed with the Court an amended Exhibit A-2 to the Order [Docket No. 360].

6.    The Rejection Procedures Order set forth the procedures regarding the

rejection of aircraft equipment leases and the abandonment of aircraft equipment subject to

financing agreements.  The Rejection Procedures Order approved (i) the form of notice, (ii) the

amount of notice required, (iii) the turnover location for the equipment, (iv) the conditions when

engines may be turned over unassembled, (v) the conditions when unserviceable engines may be

shipped and the airframes may be ferried with spare engines, and (vi) the return of the related

aircraft equipment records.  Rejection Procedures Order ¶12.  A copy of the Rejection

Procedures Order is annexed hereto as <u>Exhibit A</u>.

7.    The Rejection Procedures Order set forth certain "Minimum Standards"

for surrender and return of aircraft equipment.  In connection with the Rejection Procedures

Order, the Court did not make any findings regarding whether the Debtors' performance of the

Minimum Standards was sufficient to satisfy the "surrender and return" requirements of section

1110(c) of the Bankruptcy Code.  However, under the Rejection Procedures Order, the Aircraft

Counterparties' rights to assert that additional acts were required was limited to four (4)

"Enumerated Matters."  Specifically, the Rejection Procedures reserved the rights of the Aircraft

Counterparties to assert (and the Debtors' right to contest) that the following actions are part of

the Debtors' surrender and return obligations under section 1110(c) of the Bankruptcy Code:

(i) deliver the aircraft equipment to the location specified in the operative documents or in

accordance with paragraph 12(a)(i) of the Rejection Procedures Order, (ii) deliver the aircraft

equipment free and clear of liens and claims, (iii) deliver <u>all</u> excess equipment and <u>all</u> aircraft

equipment records, and (iv) install parts and equipment on any engine or airframe (collectively,

the "<u>Enumerated Matters</u>").  Rejection Procedures Order ¶13.

4

8.    Notably, in addition to the foregoing, the Rejection Procedures Order limited the scope of claims that could be asserted as administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, to:  (i) breaches of the Rejection Procedures Order, (ii) breach of obligations under an election made pursuant to section 1110(a) of the Bankruptcy Code or an agreement made pursuant to section 1110(b) of the Bankruptcy Code, (iii) postpetition actions causing the diminution, depreciation, or change in the condition of aircraft equipment, and (iv) any Enumerated Matter (collectively, the "Retained Administrative Claims").  Rejection Procedures Order ¶14.  The agreed scope of Retained Administrative Claims did not change the burden of satisfying the standard under section 503(b) of the Bankruptcy Code and reserved the Debtors' rights to contest the validity of such claims.

9.    On February 23, 2010, the Court entered the *Order (A) Establishing Procedures Authorizing Debtors, Subject to Subsequent Court Approval, to Perform Obligations and Cure Defaults Pursuant to Section 1110(A) of the Bankruptcy Code and to Enter Into Agreements to Extend the 60-Day Period Specified in Section 1110(A) Pursuant to Section 1110(B) of the Bankruptcy Code and (B) Authorizing the Filing of Redacted Section 1110(A) Election Notices and Section 1110(B) Agreements Under Seal* [Docket No. 352] (the "Section 1110 Procedures Order").

10.    The Section 1110 Procedures Order authorized the Debtors to enter into agreements (the "Section 1110(b) Agreements") that governed the terms and conditions under which the Debtors' various aircraft counterparties would permit the Debtors' continued use of their leased and owned aircraft equipment.  In certain cases, a Section 1110(b) Agreement supplemented or modified the Debtors' obligations to return and surrender aircraft equipment after the underlying lease was rejected.

5

11.     The form of the Rejection Procedures Order was the product of extensive, arms'- length negotiations among the Debtors, the Official Committee of Unsecured Creditors (the "Committee") and their aircraft counterparties regarding the surrender and return requirements of aircraft equipment that was to be abandoned or leases to be rejected and was approved by this Court.  The Rejection Procedures Order is final and non-appealable.  The Rejection Procedures Order formulated a process that was designed to facilitate the efficient surrender and return of aircraft equipment to its owners or secured parties on terms that are reasonable from the perspective of each party and in context of the aircraft equipment involved.

**The Purpose of the Surrender and
Return Conditions Under Section 1110(c) of the Bankruptcy Code**

12.     Section 1110 of the Bankruptcy Code was designed to ensure aircraft equipment financiers and lessors the benefit of their bargain by compelling air carrier debtors to cure and perform as prescribed by section 1110 of the Bankruptcy Code or provide the equipment financiers/lessors unfettered access to their collateral.  Curing and performing or providing access to collateral are the two means by which equipment financiers/lessors may realize the benefit of their bargain or preserve the value of their collateral.  As discussed herein, section 1110 was not intended to do more.

13.     At the outset of commercialized aviation travel, aircraft finance providers maintained that they could not continue to provide reasonable financing to air carriers when such carriers stopped paying their financial obligations when they commenced a bankruptcy case and the bankruptcy laws prevented the finance parties from repossessing their collateral.  In this regard, Congress provided aircraft financers special treatment in a 1957 amendment to the Bankruptcy Act of 1898 (section 116(5) of the former Bankruptcy Act) that allowed aircraft financiers unfettered access to their collateral by making "chapter X proceedings inapplicable

6

insofar as they affect title and the right to possess aircraft and aircraft equipment" so that "in the

event of default, the right of these creditors to take possession would be preserved."  H.R. Rep.

No. 944, 85th Cong., 1st Sess. 2 (1957).

14.    When enacting the current Bankruptcy Code, Congress recognized that an

aircraft financiers' "absolute veto power over a reorganization," prevented businesses from

reorganizing without the financiers' agreement.  S. Rep. No. 989, 95th Cong., 2d Sess. 116-17

(1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5902, 5903.  Aircraft financiers maintained that

without having immediate access to their collateral, they "would simply cease financing of the

relevant equipment if the protections were removed."  H.R. Rep. No. 595, 95th Cong., 1st Sess.

(1977), 239, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6199.

15.    In response to these demands, Congress enacted section 1110 of the

Bankruptcy Code to provide the equipment financer/lessor access to its collateral at the

conclusion of 60 days after the petition date unless the debtor (i) elects to perform and cure all

obligations pursuant to section 1110(a) of the Bankruptcy Code or (ii) enters into an agreement

regarding the terms and conditions of the debtor's use of the aircraft equipment beyond the initial

60 day period pursuant to section 1110(b) of the Bankruptcy Code.  H.R. Rep. No. 595, 95th

Cong., 1st Sess. (1977), 240, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6199, 6200, 5787, 5902,

5903.  Thus, curing and performing or repossession was Congress's way of protecting the rights

of and the benefit of the bargain of aircraft equipment financers/lessors.  H.R. Rep. No. 595, 95th

Cong., 1st Sess. (1977), 405, *reprinted in* 1978 U.S.C.C.A.N. 6361.

16.    Since its enactment of in 1978, Congress has twice amended section 1110

of the Bankruptcy Code solely for the purpose of clarifying which aircraft parties and equipment

are covered by and subject to its restrictions and the time period for its application.  In this

7

regard, the Bankruptcy Reform Act of 1994 revised section 1110 of the Bankruptcy Code to "protect all lease financing agreements and all debt financings that involve a security interest, not only security interests obtained at the time the equipment is acquired." H.R. Rep. 835, 103rd Cong., 2d Sess. (1994) 44, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3353.

17.    In 2000, Congress amended section 1110 in response to *In re Western Pacific Airlines, Inc. v. GATX Capital* (*In re Western Pacific Airlines, Inc.*), 219 B.R. 305, *reaff'd on rehearing*, 221 B.R. 1 (D. Colo. 1998), which held that the cure provisions of section 1110 only applied to breaches occurring during the initial 60-day period after the petition date. The 2000 amendments clarified that the limited cure rights apply to defaults occurring both before and after the initial 60-day period. H. Conf. Rep. 513, 106th Cong. 2d Sess. (2000) 218, *reprinted in* 2000 U.S.C.C.A.N. 80, 155. In addition, Congress added section 1110(a)(3)(B) to make clear that the records and documents relating to covered aircraft equipment are included in the property to be surrendered and returned. This latter provision was added because air carrier debtors had refused to turnover such documents and records. 5 *Norton Bankr. L. & Prac.* 3d § 101.3 n.3.

### The Facts Do Not Support and ELFC Fails to Satisfy Its Burden for an Allowed Administrative Expense Claim

18.    In the context of section 1110 of the Bankruptcy Code, in the Northwest chapter 11 cases, Judge Gropper held that the standard for the allowance of administrative expense claims are subject to and determined by "the usual principles of *In re: Mammoth Mart* as adopted by the Second Circuit in *Trustees of Amalgamated Insurance Fund v. MacFarlands* will apply." *In re Northwest Airlines Corp.*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) Transcript 72:13-17 (internal citation omitted). A true and correct copy of the October 7, 2005 Transcript is annexed hereto as Exhibit C.

8

19.     Section 503(b)(1)(A) of the Bankruptcy Code defines an administrative expenses as "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A); *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986). An expense is entitled to administrative priority (i) if it arises out of a transaction between the debtor-in-possession and creditor and (ii) only to the extent that the consideration provided by the creditor actually benefited the operation of the debtor's business. *Id.* Congress enacted the administrative expense provision to induce creditors to continue their business relationship with the debtor for the purpose of facilitating the rehabilitation of a debtor's business "for the benefit of all the estate's creditors." *Id.* (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir. 1976)).

20.     The purpose of an administrative expense claim is to prevent the unjust enrichment of a debtor's estate, <u>not to compensate a creditor for its loss</u>. *In re Enron Corp.*, 279 B.R. 695, 705 (Bankr. S.D.N.Y. 2002) (emphasis supplied) (citing *R.H. Macy & Co., Inc.*, 170 B.R. 69, 78 (Bankr. S.D.N.Y. 1994)). As a result, the court's determination turns on the actual benefit the estate gained, not the loss incurred by the creditor. *Enron*, 279 B.R. at 705 (citing *In re CIS Corp.*, 142 B.R. 640, 642 (Bankr. S.D.N.Y. 1992)). Congress's use of the words "actual" and "necessary" in section 503(b)(1)(A) requires that (i) the estate receive a "real benefit" from the transaction, not a potential benefit and (ii) the debtor actually used the creditor's property, not merely have the option to use the property. *Enron*, 279 B.R. at 705-06.

21.     The terms "actual" and "necessary" are strictly construed. *See In re Globe Metallurgical, Inc.*, 312 B.R. 34, 40 (Bankr. S.D.N.Y. 2004) (holding that "there must be a strict construction of the terms 'actual' and 'necessary' . . . ."). It is the claimant's burden to establish that it is entitled to an administrative expense claim. *See In re Bethlehem Steel Corp.*, 479 F.3d

9

167, 172 (2d Cir. 2007) (holding that the "burden of proving entitlement to priority payment as

an administrative expense . . . rests with the party requesting it"); *In re Drexel Burnham Lambert*

*Group Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) (holding that administrative claim

requests "should only be granted under extraordinary circumstances, to wit, when the parties

seeking priority have sustained their burden of demonstrating that their services are actual and

necessary to preserve the estate") (quoting *In re Amfesco Indus., Inc.*, 81 B.R. 777, 785 (Bankr.

E.D.N.Y. 1988).

22.    In the context of section 1110 of the Bankruptcy Code, Judge Gropper

held that "it is important also not to read into the words of the statute rights that Congress did not

afford." *Northwest Airlines*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005)

Transcript 69:16-18. In this regard, Judge Gropper held that requiring an air carrier debtor to

> comply with all of the return provisions of a given lease or security agreement . . .
> is precisely what Section 1110 does not provide. Section 1110(a)(1) of the
> Bankruptcy Code states that the right of a lessor or secured party to take
> possession of the equipment in compliance with the security agreement or lease,
> etc., shall not be limited. The corresponding obligation of the trustee or debtor-in-
> possession is to surrender and return of the property in compliance with the
> security agreement or lease, no doubt recognizing the cost and burdens this would
> place on the debtors, their estates and their other creditors.

*Id.* at 70:24-25 – 71:3-12. Subsequently Judge Gropper made his ruling abundantly clear when it

explained that "I ruled last time, and I'll hear anyone who wishes to argue to the contrary, that

the one thing 1110 doesn't say is that a debtor has an obligation to return the equipment in

accordance with the underlying document." *In re Northwest Airlines Corp.*, Case No 05-17930

(ALG) (Bankr. S.D.N.Y. Oct. 19, 2005) at 33. A true and correct copy of the October 19, 2005

Transcript is annexed hereto as <u>Exhibit D</u>.

23.    Other chapter 11 cases have reached the same conclusions regarding

return conditions and the allowance of administrative expense claims. For example, in *In re*

*UAL Corporation, et al.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 17, 2004), the court

denied a request for an administrative expense on account of the debtors' failure to return aircraft

equipment in accordance with the redelivery conditions under the lease.  December 17, 2004

Transcript 14:1-14.  A true and correct copy of the relevant pages from the December 17, 2004

Transcript is annexed hereto as <u>Exhibit E</u>.  In this regard, the court held that

> return obligations cannot be a ground for allowance of an administrative expense
> in their own right.  It may well be that property is returned by the debtor in a
> condition contrary to that required by the lease.  But if the property was damaged
> by the debtor prior to the filing of the case, that damage would be a pre-petition
> claim, not a priority claim arising during the administration of the bankruptcy
> case.

*Id.*

24.    Similarly, in *In re Continental Airlines, Inc.*, 146 B.R. 520, 528 (Bankr. D.

Del. 1992), an aircraft lessor sought an administrative expense claim on account of the debtors'

failure to redeliver the aircraft equipment free of the distinctive marking (*i.e.*, logos) and return

engines with a certain amount of hours and cycles remaining.  Both of these requirements were

conditions under the lease.

25.    In *Continental*, the court denied the request for an administrative expense

claim because the debtors cannot be held liable for breaches under a lease that has been rejected.

*Id.* at 527.  There is no dispute that the rejection of a lease is supported by a debtor's business

judgment if assuming or continuing to perform would be burdensome or detrimental to the

estate.  *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*) 4 F.3d

1095, 1098 (2d Cir. 1993).  If the rejected lease is not beneficial to the estate, then any obligation

to continue to perform thereunder or any claims arising from the breach thereof are not and

cannot be "necessary" and "beneficial" as required by section 503(b) of the Bankruptcy Code.

*Continental*, 146 B.R. at 528.

11

A.     ELFC Cannot Demonstrate the Debtors Used
       or Were Unjustly Enriched at ELFC's Expense

26.     ELFC's request for priority of payment is devoid of any factual support

and relies entirely on erroneous assumptions.  Accordingly, ELFC has not met its burden to

establish that it is entitled to an administrative expense claim.

27.     ELFC asserts that the "Rolls-Royce Engines could not have been operated

by the Debtors during that time without the Missing [ELFC] FADECs" and speculates that they

were removed by the Debtors postpetition for use with other engines.  Administrative Expense

Request ¶15.  ELFC is simply wrong on both counts.  The Rolls-Royce Engines may be operated

with any FADEC that is manufactured to control Rolls-Royce Engines.  Appling Declaration ¶6.

As set forth in the Appling Declaration and discussed below, the entire time the Rolls-Royce

Engines were in service, they were operated by FADECs that the Debtors received from a source

other than ELFC.  Appling Declaration ¶¶10-23.  Accordingly, the ELFC FADECs were not

separated from the Rolls-Royce Engines after the Petition Date.

28.     Even though the lease document indicates that the Rolls-Royce Engines

were accompanied with the ELFC FADECs, the Debtors have no record of ever having received

that equipment.  Specifically, the Debtors' computerized inventory tracking system –Purchasing,

Maintenance, and Inventory ("PMI") –has no record of the ELFC FADECs.  In fact, the Debtors

have asked ELFC to provide the applicable serial numbers to help locate the parts, Appling

Declaration ¶[10], and ELFC has not been able to produce the applicable serial numbers or proof

of delivery of the ELFC FADECs to the Debtors.  Appling Declaration at ¶[10].  Moreover, there

is no evidence that the Debtors ever used the ELFC FADECs pre or postpetition.  Thus, ELFC's

request fails because it cannot establish that the Debtors actually used the ELFC FADECs.

12

29.     As set forth in the Appling Declaration, the Debtors' PMI system demonstrates that the ELFC FADECs were not operated with the Rolls-Royce Engines or any other airframe or engine in the Debtors' fleet of ERJ Aircraft.  Appling Declaration at ¶¶[11-24] and [25-28] and Exhibit 1.  The Debtors' PMI reflects that the FADECs utilized with the Rolls-Royce Engines were either purchased from another source or installed on an ERJ Aircraft prior to the time the Debtors entered into the ELFC Leases.  *See* Appling Declaration, Exhibit 1 and Exhibit 2.

B.     Debtors' Failure to Return the
       ELFC FADECs Is a Prepetition General Unsecured Claim

30.     The Debtors' failure to return the Rolls-Royce Engines in accordance with the return conditions under the ELFC Leases or physically return the ELFC FADECs (assuming they are not in the Debtors' possession) entitles ELFC to nothing more than a prepetition general unsecured claim.  As set forth in the Appling Declaration, the Debtors have no record of the ELFC FADECs.  Appling Declaration, Exhibit 2 and ¶¶25-26.  As discussed above, there is no evidence that the Debtors ever used the ELFC FADECs or disassociated them from the Rolls-Royce Engines and used them with different engines after the Petition Date.  Assuming ELFC actually purchased and delivered the ELFC FADECs to the Debtors, the Debtors records reflect that they were either lost or destroyed prior to the Petition Date because the Debtors have no present record of the ELFC FADECs.

31.     In fact, the only case cited by ELFC in support of its request for an administrative expense claim actually supports the Debtors' Objection.  In *United Trucking Service, Inc. v. Trailer Rental Company, Inc.* (*In re United Trucking Service, Inc.*), 851 F.2d 159, 163 (6th Cir. 1988), the Sixth Circuit held that a request for an administrative expense claim was not warranted when there was no evidence showing that the debtor used and benefited from

13

certain trailers since they were not in the debtor's possession after the petition date (the trailers were lost prior to the petition date). Similarly, ELFC cannot establish that the Debtors were ever in possession of the ELFC FADECs or that they were lost or destroyed by the Debtors after the Petition Date. Thus, the Debtors' failure to return the ELFC FADECs in accordance with the ELFC Leases is a "casualty loss" that "must be regarded as arising pre-petition," even when the Debtors continued to pay rent on the Rolls-Royce Engines after the Petition Date. *United Trucking*, 851 F.2d at 163.

32.     Hypothetically, if the Debtors had returned damaged or non-operating FADECs to ELFC it would not be entitled to an administrative expense claim on account of returning damaged equipment because section 1110 of the Bankruptcy Code does not require the Debtors to return equipment in accordance with the governing lease and the Rejection Procedures Order relegated any claim for breach of lease return conditions to general unsecured status. *Northwest Airlines*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) Transcript 69:16-18; *Continental*, 146 B.R. at 528. As set forth in the Appling Declaration, the Debtors are not in possession of the ELFC FADECs and they have no record of ever taking possession of them. The claim arising on account of the Debtors' failure to return the ELFC FADECs is a casualty event that is no different than having returned damaged and no longer operational equipment (in both instances the equipment would have to be replaced). If there was no use or benefit, the Debtors' estates should not be penalized and required to pay an administrative expense claim.

33.     Furthermore, there was no time after the Petition Date that Debtors used and did not pay for the Rolls-Royce Engines. The Debtors rejected the ELFC Leases because they determined they were burdensome and no longer beneficial to their estates. ELFC is not

14

entitled to an administrative expense claim for a breach of the return conditions of the ELFC

Leases. The Debtors turned over all of the equipment under the lease in their possession. ELFC

is not entitled to anything more. As Judge Gropper held in the Northwest case – section 1110

simply does not require aircraft equipment to be returned in accordance with the governing lease.

C.    The Serviceability Tags Are in
      Compliance with the ELFC Leases

        34.    ELFC also seeks an administrative expense claim on the basis that

serviceability tags for certain parts were not prepared properly. Again, ELFC is mistaken.

Contrary to its statements otherwise, the serviceability tag or CCFs that were returned with the

Tagged Parts were in compliance with the ELFC Leases. However, even if the CCFs were not in

compliance with the ELFC Leases, any claims arising from such non-compliance gives rise to

nothing more than a prepetition breach that entitles ELFC to a general unsecured claim.

        35.    The Debtors' operation and maintenance of their fleet of ERJ Aircraft was

governed by their GPM (Freedom General Procedures Manual). Appling Declaration ¶29. The

GPM is in full compliance with and approved by the FAA. As set forth in Exhibit 4 to the

Appling Declaration, the Redelivery Requirements in the ELFC Leases permits the Debtors to

redeliver the applicable parts with a "return to service certificate completed by an authorized

inspector of Lessee or Lessee's Authorized Repairer." *See* Appling Declaration ¶34 and Exhibit

4 thereto, Redelivery Requirements at ¶3(b). The CCF's annexed to the Appling Declaration as

Exhibit 3 fully satisfy the Redelivery Requirements in the ELFC Leases. Appling Declaration

¶¶30-32. The CCFs contain all of the relevant and necessary information as required by the

GPM. Appling Declaration ¶33.

        36.    Because the Tagged Parts were returned with valid CCFs and in

compliance with the ELFC Leases, ELFC has no claim, prepetition or otherwise, related to the

15

serviceability tags.  Whether the CCFs permit ELFC to relet the Tagged Parts to prospective

lessees without requiring ELFC to incur additional expenses or costs has no bearing on EFLC's

entitlement to an administrative expense claim.  *In re Enron Corp.*, 279 B.R. 695, 705 (Bankr.

S.D.N.Y. 2002) (holding that an administrative expense is not supported by a creditor's loss)

(citing *R.H. Macy & Co., Inc.*, 170 B.R. 69, 78 (Bankr. S.D.N.Y. 1994).

      37.      Even if the Court were to find that the CCFs are not in compliance with

the ELFC Leases, the Debtors' failure to provide the relevant supporting documents is nothing

more than a prepetition breach since the Debtors have turned over all of the documents and

records in their possession relating to the Rolls-Royce Engines.  Section 1110 of the Bankruptcy

Code only requires the Debtors to turn over the documents and records in their possession, not

create documents they do not have or are not authorized to produce, or incur postpetition

expenses to overhaul parts to meet lease return obligations.

      38.      In further support of its claim, ELFC cites *Interface Group-Nevada, Inc. v.*

*Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*), 145 F.3d 124, 142 (3d Cir. 1998)

for the proposition that a debtor's failure to maintain and operate equipment in accordance with

the governing lease gives rise to an allowable administrative expense claim.  The legal

justification for and facts in *TWA* have no application to ELFC's Administrative Expense

Request.  In *TWA*, after the petition date, the debtors made an election to cure all defaults and

perform all obligations under the lease pursuant to section 1110(a)(2) of the Bankruptcy Code.

*Id.* at 129 and 137, 138.  During the election period and prior to the rejection of the lease, a

maintenance obligation accrued and became due.  *Id.* at 139.  The court granted the

administrative expense request because the debtors' failure to perform the maintenance

obligation became due during the time it agreed to perform all obligations and the debtors' use of the equipment during that period was presumed to have benefited the estates. *Id.* at 142.

39.     Unlike *TWA*, ELFC fails to allege or establish any facts that demonstrate the Debtors failed to "maintain and operate" the Rolls-Royce Engines in compliance with the ELFC Leases. ELFC alleges that the serviceability tags for the Tagged Parts are not in compliance with the ELFC Leases, not that the Tagged Parts or the Rolls-Royce Engines were not "maintained and operated" properly. The CCFs, however, demonstrate that the Tagged Parts were maintained properly because the CCFs reflect that at the time the Rolls-Royce Engines were taken out of service, the Tagged Parts were removed in a serviceable condition. Appling Declaration ¶¶29-34 and Exhibit 3. ELFC's assertion that the Debtors failed to "maintain and operate" the Rolls-Royce Engines falls flat since the Debtors could have placed  the Tagged Parts back into service since they were removed from the Rolls-Royce Engines in serviceable condition. Appling Declaration ¶33. Furthermore, EFLC does not make any allegations that the Rolls-Royce Engines themselves were not properly operated and maintained.

40.     For reasons discussed herein, the Debtors believe that ELFC and Deucalion have failed to sustain their burden that they are entitled to a claim for administrative expense priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

41.     The Debtors' reserve all rights to object to the claims asserted in the Administrative Expense Request including but not limited to whether they are valid prepetition general unsecured claims.

WHEREFORE, the Debtors request that the Court sustain the Objection and deny the

Administrative Expense Request and such other and further relief as is just.

Dated:    October 20, 2010
          New York, New York              PACHULSKI STANG ZIEHL & JONES LLP


                                          */s/ John W. Lucas*
                                          Richard M Pachulski
                                          Laura Davis Jones
                                          Debra I. Grassgreen
                                          Maria A. Bove
                                          John W. Lucas

                                          780 Third Avenue, 36th Floor
                                          New York, New York 10017
                                          Telephone:  (212) 561-7700
                                          Facsimile:  (212) 561-7777

                                          Attorneys for Debtors and Debtors in Possession

18

## EXHIBIT A

**(Rejection Procedures Order)**

56772-002\DOCS_SF:74246.6

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

## ORDER (I) AUTHORIZING DEBTORS TO (A) REJECT LEASES RELATING TO CERTAIN AIRCRAFT AND OTHER RELATED EQUIPMENT; (B) ABANDON CERTAIN AIRCRAFT, ENGINES, AND OTHER RELATED EQUIPMENT; (C) TRANSFER TITLE TO CERTAIN AIRCRAFT, ENGINES, AND OTHER RELATED EQUIPMENT; AND (D) SATISFY THE SURRENDER AND RETURN REQUIREMENTS UNDER THE BANKRUPTCY CODE AND (II) APPROVING RELATED NOTICES AND PROCEDURES

Upon the motion dated January 25, 2010 [Docket No. 168] (the "Motion"),[2] of Mesa Air

Group, Inc. and its affiliated debtors and debtors in possession (the "Debtors"), pursuant to

sections 105(a), 363(b), 365(a), 554(a), and 1110 of title 11 of the United States Code (the

"Bankruptcy Code") and Rules 6004, 6006, and 6007 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for, *inter alia*, (a) approval of procedures relating to (i) the

rejection of executory contracts and unexpired leases including certain leases and related

subleases (collectively, the "Leases") relating to certain aircraft, engines and other related

equipment identified on the schedules annexed hereto as Exhibit A-1 and Exhibit A-2

(collectively, the "Excess Leased Equipment") and the return of applicable Excess Leased

Equipment to the applicable lessor, beneficial owner (if different and if known to the Debtors),

any indenture trustee, loan trustee, or collateral trustee known to the Debtors to be acting on

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).
[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

behalf of debt holders who are the controlling party under the transaction documents, any

guarantor, and, if known to the Debtors, any loan participant (collectively, the "Lessors"); (ii) the

abandonment of certain aircraft, engines and other related equipment identified on the schedule

annexed hereto as Exhibit B (collectively, the "Excess Owned Equipment"); (iii) the transfer of

title to such abandoned Excess Owned Equipment to mortgagees, security trustees, or indenture

trustees having a security interests in such Excess Owned Equipment, along with any associated

guarantor, servicer and/or loan participant (collectively, the "Secured Parties", and, along with

the Lessors, the "Aircraft Finance Parties" and each an "Aircraft Finance Party"); and (iv) the

surrender and return of the Excess Leased Equipment and the Excess Owned Equipment

(collectively, the "Excess Equipment"); and (b) approval of the form of the Subsequent

Rejection/Abandonment Notice to be served upon the counterparties to the applicable executory

contracts and unexpired leases annexed hereto as Exhibit C, as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy

Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated

July 10, 1984 (Ward Acting C.J.); and consideration of the Motion and the relief requested

therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and due and proper notice of

the Motion having been provided and that no other or further notice is necessary; and, as

evidenced by the affidavit of service filed by the Debtors [Docket No. 200], the parties identified

on Exhibit A-1, among other parties, were previously served with, *inter alia*, a copy of the

Motion; and the Debtors having filed and served on parties in interest a notice of amended

exhibits to the Motion ("Amendment Notice"), which amended exhibits are substantively

identical to the attached Exhibit A-1, Exhibit A-2 and Exhibit B (which Exhibit B corresponds to

amended Exhibit B-2 attached to the Amendment Notice) [Docket No. 267]; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates and creditors, and that the legal and factual bases set forth in the Motion

and the arguments and representations of Debtors' counsel at the hearing on the Motion establish

just cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

      1.      ORDERED that the Motion is granted as provided herein; and it is further

      2.      ORDERED that, pursuant to section 365 of the Bankruptcy Code, the rejection of

the Leases of Excess Leased Equipment set forth on Exhibit A-1 annexed hereto is authorized

and approved effective as of the Effective Date (as defined below).  With respect to any Excess

Equipment abandoned or Lease of Excess Equipment that is rejected, in each case, in accordance

with the provisions of this Order, the "Effective Date" for such abandonment or rejection, as the

case may be, shall be the date, subject to adjustment, if any, as set forth in subparagraph 6(d)

hereof, that the Debtors surrender and return such Excess Equipment and related Aircraft

Documents (as defined herein) in compliance with the terms of this Order; *provided*, *however*,

that unless the Debtors and the affected Aircraft Financing Party agree to an earlier date with

respect to any Excess Equipment, the Effective Date (and the Deemed Effective Date (as defined

below)) shall not be prior to the eighth (8th) business day after the filing and service of (y) with

respect to the rejection of the Leases of Excess Leased Equipment set forth on Exhibit A-1

annexed hereto, the Motion upon the affected Aircraft Finance Parties (*i.e.*, the Effective Date

and the Deemed Effective Date as to such Leases are no earlier than February 4, 2010), and (z)

with respect to all other Excess Equipment, the applicable Subsequent Rejection/Abandonment

Notice (described below) upon the affected Aircraft Finance Parties and other Notice Parties (as

defined in paragraph 8 hereof); *provided further* that if any affected Aircraft Finance Party or

other party in interest wishes to object to the rejection of the applicable Lease or abandonment of

equipment which is covered by a Subsequent Rejection/Abandonment Notice, such Aircraft

Finance Party or other party in interest, as the case may be, must file and serve such objection in

accordance with the terms set forth below and the effective date of such rejection or

abandonment, if any, shall be established by this Court; *provided additionally* that absent further

order of the Bankruptcy Court establishing a different date, with respect to Excess Equipment

identified in <u>Exhibit A-2</u> and <u>Exhibit B</u>, the "Effective Date" for all purposes hereunder shall be

deemed to be the date set forth by the Debtors in the Subsequent Rejection/Abandonment Notice

(or the date as agreed upon between the Debtors and the applicable controlling Aircraft

Financing Party) (the "<u>Deemed Effective Date</u>"); *provided additionally* that, notwithstanding the

other terms of this Order, the Aircraft Finance Parties may request by motion filed, no later than

sixty (60) days after the original Effective Date, that the Bankruptcy Court adjust the Effective

Date for such Excess Equipment on account of the Enumerated Matters (as such term is defined

herein) or any other breach of this Order, as appropriate, to a later date to the extent required

under section 1110(c) or the other provisions of the Bankruptcy Code; *provided finally* that,

notwithstanding any of the foregoing, the "Effective Date" of the rejection of any sublease

identified on <u>Exhibit A-2</u> shall be effective as of (a) the Deemed Effective Date set forth in the

applicable Subsequent Rejection/Abandonment Notice or (b) if the applicable sublessee timely

and properly objects to the applicable Subsequent Rejection/Abandonment Notice in accordance

with the procedures set forth herein, such other date as may be determined by the Court as

described in paragraph 6(d) below; and it is further

      3.      ORDERED that, pursuant to section 365 of the Bankruptcy Code, the rejection of

the Leases of Excess Leased Equipment set forth on <u>Exhibit A-2</u> annexed hereto is authorized

and approved and shall be effective as of the relevant Effective Date for such rejection; and it is

further

4.      ORDERED that, pursuant to section 554(a) of the Bankruptcy Code, the

abandonment of the Excess Owned Equipment listed in <u>Exhibit B</u> annexed hereto is authorized

and approved and shall be effective as of the Effective Date for such abandonment; and it is

further

5.      ORDERED that, pursuant to sections 363(b) and 1110 of the Bankruptcy Code,

the Debtors are authorized to and shall transfer title, if requested by the applicable Secured Party

or other Aircraft Financing Party, to any Excess Owned Equipment that is subject to this Order,

to such applicable Aircraft Financing Party (unless such Aircraft Financing Party directs

otherwise or waives in writing its security interests in such Excess Owned Equipment) and to the

extent that the Debtors may have transferred title consistent with the procedures and provisions

set forth in this Order subsequent to the filing of the Motion but prior to the entry of this Order,

such prior transfer is deemed effective and approved without need of further notice; and it is

further

6.      ORDERED that the following procedures are approved with respect to the

rejection of any Lease or abandonment of any equipment identified in <u>Exhibit A-2</u> and <u>Exhibit

B</u>:

(a)      within three (3) business days after the entry of this Order, the
Debtors will serve a copy of the Order on the Notice Parties, the applicable
Aircraft Finance Parties, and each Aircraft Finance Party's respective counsel (if
known), and the sublessees identified in <u>Exhibit A-2</u> (the "<u>Sublessees</u>"), via
electronic delivery, facsimile, messenger, or overnight delivery;

(b)      as soon as reasonably practical after the Debtors have determined
to reject an applicable Lease or abandon the applicable equipment, the Debtors
shall file with the Court a notice of rejection or abandonment substantially in the

form attached hereto as <u>Exhibit C</u>, which either in the notice itself or in exhibit(s) thereto shall in all events contain the information required under Bankruptcy Rule 6006(f) in the case of any rejected Leases and which notices will be consecutively numbered in the caption (a "Subsequent Rejection/Abandonment Notice"), and serve such notice on the applicable Aircraft Finance Parties and/or Sublessees via electronic delivery (if the applicable party's electronic mail address is known to the Debtors), with a copy sent concurrently pursuant to one of the following methods - facsimile, messenger, or overnight delivery, and serve such notice on the other Notice Parties in accordance with the case management order, with such notice setting forth the Debtors' intent to reject the Lease or abandon the Excess Equipment in accordance with the terms of this Order, as applicable.  The Subsequent Rejection/Abandonment Notice shall also set forth (i) the Deemed Effective Date for the surrender and return of the Excess Equipment (which Effective Date shall be subject to change in accordance with paragraphs 2 and 6(d) hereof), (ii) as applicable, type of aircraft, engine(s) and equipment involved, (iii) the FAA registration number and manufacturer serial numbers for the affected airframe and engines, (iv) the location at which the Excess Equipment will be surrendered and returned (which location must comply with the requirements of paragraph 12(a) hereof) and (v) to the extent known by the Debtors, the Aircraft Finance Parties relating to such Excess Equipment; *provided* that the Debtors may in their discretion utilize one or more Subsequent Rejection/Abandonment Notices to cover single or multiple proposed Lease rejections and/or abandonment of equipment; *provided further* that, upon delivery of the Subsequent Rejection/Abandonment Notice, the Debtors agree to provide the applicable Lessor, Secured Party, or other party in interest reasonably prompt access to the Excess Equipment and Aircraft Documents (as defined in paragraph 12(d) herein) applicable thereto for inspection and review (which inspection rights are without prejudice to any rights for inspection as required under the operative documents and/or applicable law), *provided* that such inspections do not unreasonably interfere with the Debtors' operation, if any, of the Excess Equipment;

(c)      the Debtors' rejection of the applicable Lease that is rejected pursuant to these procedures or the Debtors' abandonment of the applicable Excess Owned Equipment, as the case may be, in accordance with the terms of this Order, shall be effective as of the Deemed Effective Date without the need of any further order or notice unless an objection is filed and served by 4:00 p.m. (prevailing Eastern Time) on the seventh (7th) business day after filing and service of such Subsequent Rejection/Abandonment Notice on the applicable Aircraft Finance Parties;

(d)      if a timely objection is filed and served, the effective date of rejection or abandonment, as applicable, will be (i) the Deemed Effective Date for such Excess Equipment that would have applied in the absence of such objection if such objection is overruled or (ii) such other date as determined by the Bankruptcy Court after a hearing on the objection.  A hearing on any objection to a Subsequent Rejection/Abandonment Notice will be held on the next scheduled

omnibus hearing date in the Debtors' cases, *provided* that the objecting party shall have been given by the Debtors at least five (5) business days' prior written notice of such hearing date and time, and *provided further* that the foregoing is without prejudice to the right of the Debtors and/or objecting party to move for an expedited hearing (on less than five (5) business days' notice).  The Debtors must file and serve any reply to any objection at least two (2) business days prior to the scheduled hearing; and

(e)    if the Debtors seek to abandon any Excess Owned Equipment or reject a Lease for any Excess Equipment in accordance with the procedures set forth herein, subject to the terms hereof, the applicable Aircraft Finance Party (or its respective nominee) (unless in the case of any Excess Equipment mortgaged by the Debtor(s), the applicable Secured Party waives in writing its security interests in such Excess Owned Equipment prior to the Deemed Effective Date) is required to accept the surrender and return of such equipment and documents on the latest of:  (i) if no objection is filed with respect to such abandonment or rejection, on the Deemed Effective Date of such rejection or abandonment, (ii) if an objection is interposed with respect to such abandonment or rejection, on the fifth (5th) business day after the Bankruptcy Court issues an unstayed order approving such abandonment or rejection, (iii) if applicable, such other date as agreed upon by the respective party(ies)-in-interest, and (iv) if applicable, such other date as determined by the Bankruptcy Court; and it is further

7.    ORDERED that the proposed form of Subsequent Rejection/Abandonment Notice, substantially in the form attached hereto as <u>Exhibit C</u> (subject to the additional requirements set forth in paragraph 6(b)), is hereby approved; and it is further

8.    ORDERED that as soon as reasonably practicable after entry of this Order, the Debtors shall serve a copy of this Order on (i) the Office of the United States Trustee for the Southern District of New York, (ii) proposed counsel to the Committee, (iii) the Securities and Exchange Commission, (iv) each of the applicable Aircraft Finance Parties (or their respective counsel of record), (v) the Sublessees, and (vi) all parties who have requested notice in these chapter 11 cases (the parties identified in (i), (ii), (iv), (v) and (vi) are referred to herein as the "<u>Notice Parties</u>"); and it is further

9.    ORDERED that all claims arising from the rejection of a Lease or abandonment of Excess Equipment as provided for herein shall be filed in accordance with any order pursuant

to Bankruptcy Rule 3003(c) establishing a deadline by which prepetition general unsecured

claims must be filed (the "Bar Date") and this Order, on or before the latest of (i) the Bar Date,

(ii) sixty (60) days after the Effective Date of the rejection or abandonment of the Excess Leased

Equipment or Excess Owned Equipment, as applicable, and (iii) sixty (60) days after the Court

determines any objection to such rejection or abandonment of the Excess Leased Equipment or

Excess Owned Equipment, as applicable; and that any claim, whether unsecured or

administrative, not filed in accordance with the foregoing deadlines shall be barred and shall not

be entitled to share in any distributions from the Debtors' estates as approved by the Court unless

otherwise ordered by the Court; *provided, however*, that properly filed amendments to any proof

of claim or proof of administrative claim shall not be affected by the provisions of this

paragraph; and it is further

10.     ORDERED that if an applicable Aircraft Finance Party (that is the controlling

party or equivalent pursuant to the underlying transaction documents) (unless in the case of any

Excess Equipment mortgaged by the Debtor(s), the applicable Secured Party waives in writing

its security interests in such Excess Owned Equipment prior to the Deemed Effective Date)

whose equipment has been surrendered and returned to it (whether pursuant to a rejected Lease

of Excess Leased Equipment or abandoned Excess Owned Equipment), as applicable, pursuant

to this Order fails to accept the Debtors' surrender and return, as provided in this Order, then,

unless otherwise agreed between the Debtors and the applicable controlling Aircraft Finance

Party, after the latest of (i) ten (10) calendar days after the Deemed Effective Date, (ii) ten (10)

calendar days after the date the Court resolves the applicable objection, if any (and such order of

the Bankruptcy Court is not stayed), and (iii) ten (10) calendar days after the date of this Order,

such applicable Aircraft Finance Party (that is the controlling party or equivalent pursuant to the

underlying transaction documents) shall be responsible to the Debtors from that latest date forward for any out-of-pocket costs and expenses actually incurred by the Debtors to a third party arising from the storage, insurance and maintenance of such equipment; *provided, however*, that to the extent that the Bankruptcy Court adjusts the Effective Date pursuant to paragraphs 2 and/or 6(d) hereof to a date other than the Deemed Effective Date, the Court shall grant an administrative expense priority claim against the Debtors to the extent appropriate to readjust the foregoing described expenses actually paid by an Aircraft Finance Party to reflect the change in the Effective Date; *provided further* that nothing in this paragraph shall affect in any way any rights that such applicable Aircraft Finance party (that is the controlling party or equivalent pursuant to the underlying transaction documents) may possess against any other Aircraft Finance Party, all of which rights are reserved; and it is further

11.    ORDERED that the filing of the Motion obviates the need for any Aircraft Finance Parties to demand possession of the applicable aircraft pursuant to section 1110(c)(1) of the Bankruptcy Code; *provided*, *however*, that (a) this Order is without prejudice to the rights of any applicable Aircraft Finance Party to make a section 1110(c) demand upon the Debtor(s) and (b) upon receipt of any Subsequent Rejection/Abandonment Notice relating to any Excess Equipment, any affected Aircraft Finance Party is hereby authorized to make a section 1110(c) demand upon an applicable Debtor; and it is further

## Section 1110(c) Surrender and Return Requirements

12.    ORDERED that unless otherwise agreed between the Debtors and the applicable counterparty, to satisfy the minimum requirements under section 1110(c) of the Bankruptcy Code to "surrender and return" the applicable equipment, the Debtors shall:

(a)    surrender and return the Excess Equipment (including, without limitation, all "equipment" as defined in section 1110(a)(3)(A) of the Bankruptcy

Code) (i) at one of the following locations:  (A) a location required by section 1110(c) of the Bankruptcy Code, (B) at a location in compliance with the terms of the applicable operative documents with the affected Lessor or Secured Party, or (C) at any other location (and upon such terms as) agreed to by the Debtors and the applicable counterparty, and (ii) with, as applicable, the associated engines and all parts and equipment installed (serviceable or unserviceable) thereon (including, without limitation, all "equipment" as defined in section 1110(a)(3)(A) of the Bankruptcy Code) to the extent required by section 1110(c) of the Bankruptcy Code; *provided*, *however*, that the Debtors are not required to surrender and return any Excess Equipment with, as applicable, originally installed or replaced engines, equipment or other parts therein, but instead may surrender and return replacement engine(s), equipment and other parts installed on the airframe or engine, if one of the following conditions is satisfied: (1) such replacement or substitution is made in strict compliance with the terms of the operative documents to the extent permitted under such operative documents (and such replacement or substitute is not subject to any other party's lien, claim or interest), (2) the Debtors and the applicable controlling counterparties agree to terms for such substitution or replacement, or (3) if the following two terms are satisfied - (a) both the original engine, equipment, and/or other parts, as applicable, on the one hand, and the replacement engine, equipment and/or other parts, as applicable, on the other hand, are of the same model and from the same manufacturer and the same or better modification level, and (b) both the original engine, equipment and/or other parts, as applicable, on the one hand, and the replacement engine, equipment and/or other parts, as applicable, on the other hand, are associated with, as applicable, the same loan participants, owner participants and guarantors;

(b)    notwithstanding subparagraph 12(a), and solely with respect to the engine(s), if the applicable engine(s) are currently not assembled and assembling such engine would require the Debtors to incur material costs (*i.e.,* more than $10,000 of out-of pocket costs per engine), the Debtors may elect (as an alternative to the requirements of paragraph 12(a) hereof) the following treatment, at Debtors' expense: (i) the Debtors shall provide a substitute engine(s) for the limited purpose of transporting the Excess Equipment to the location at which the associated aircraft is being surrendered and returned and, upon arrival, the Debtors shall remove and retain possession of the substitute engine(s), and (ii) the Debtors shall deliver the applicable engine(s) (and all parts and equipment that are part of such engine(s)) to the same location with full QEC and properly packaged;

(c)    notwithstanding subparagraph 12(a), and solely with respect to the engine(s), if the applicable engines are currently not serviceable and/or not properly preserved and making such engine serviceable and/or properly preserved would require the Debtors to incur material costs (*i.e.,* more than $10,000 of out-of pocket costs per engine), the Debtors may elect (as an alternative to the requirements of paragraph 12(a) hereof) the following treatment, at Debtors' expense: (i) the Debtors shall provide a substitute engine(s) for the limited purpose of transporting the Excess Equipment to the location at which the

associated aircraft is being surrendered and returned and, upon arrival, the Debtors shall remove and retain possession of the substitute engine(s), and (ii) the Debtors shall deliver the applicable engine(s) (and all parts and equipment that are part of such engine(s)) to the same location with full QEC on an approved transport stand (with such transport stand or equivalent replacement to be promptly returned to the Debtors) correctly preserved and inhibited per manufacturer's approved requirements (without any obligation to install the same on the associated airframe); and

(d)    in all cases, the Debtors shall surrender and return on the applicable Effective Date, and at the same location as the aircraft and/or engines are being surrendered and returned (or such other location as agreed in writing between the Debtors and the applicable Aircraft Finance Party (that is the controlling party or equivalent pursuant to the underlying transaction documents)), all records, logs, manuals and other documents (collectively, the "Aircraft Documents") relating to the Excess Equipment to the extent required by sections 1110(a)(3)(B) and 1110(c) of the Bankruptcy Code; *provided, however*, that, without limiting or affecting the scope of the foregoing obligation (including, without limitation, with respect to whether FAR 121 compliant documentation is required to be delivered for Excess Equipment that is not in airworthy condition), if any such Excess Equipment was in airworthy condition as of the Petition Date, then the Debtors shall provide such Aircraft Documents in a condition qualifying for FAR 121 operation, including, *inter alia*, a then valid and effective FAA certificate of airworthiness.

The above subparagraphs 12(a) through (d) shall be collectively referred to as the "Minimum Standards". The Court is not currently making any finding that the Debtors' performance of the foregoing Minimum Standards will be sufficient, or that such performance will be insufficient, to fully comply with the "surrender and return" requirements imposed under section 1110(c) of the Bankruptcy Code. The rights and claims, if any, of the Aircraft Finance Parties to assert that the Enumerated Matters as set forth in paragraph 13 hereof are required under Section 1110(c) of the Bankruptcy Code are fully reserved and preserved; and it is further

13.    ORDERED that each Aircraft Financing Party retains the right to assert in any action or claim that the Debtors are required (in whole or in part) to take any of the following actions in order to satisfy the surrender and return requirements under Bankruptcy Code section 1110(c) (such actions, the "Enumerated Matters"):

(a) deliver any Excess Equipment at one of the locations specified under the operative documents or as provided in paragraph 12(a)(i) hereof;

(b) deliver any Excess Equipment free and clear of any liens, claims, and interests;

(c) deliver "all" Excess Equipment and Aircraft Documents (*i.e.*, a claim that the Debtors delivered the Excess Equipment with missing "equipment" (as defined in section 1110(a)(3)(A) of the Bankruptcy Code) (or part, portion or component thereof), or the Debtors delivered the wrong "equipment" (or part, portion or component thereof); and

(d) other than the requirements regarding installation of the engines on the applicable airframes (which are governed by paragraph 12 hereof), install on any engine or airframe any associated parts and other "equipment" as defined in section 1110(a)(3)(A)(i) of the Bankruptcy Code) (or part, portion or component thereof).

Notwithstanding any other provision of paragraph 12 hereof, with respect to such Enumerated

Matters:

(w) each Aircraft Financing Party's rights under section 1110(c) of the Bankruptcy Code, its operative documents and/or other applicable law or agreement to claim or bring an action for specific performance, administrative claims or to adjust the "Effective Date" or any other action or claim against the Debtors or any other person or entity on account of such Enumerated Matters are fully reserved and preserved;

(x) the Debtors' or any other party in interest's right under section 1110(c) of the Bankruptcy Code, its operative documents and/or other applicable law or agreement to object or contest such claims or actions in any manner are fully reserved and preserved;

(y) nothing in this Order shall be deemed to impose any additional obligations upon or detract from any obligations of the Debtors or any other person or entity (rather, the obligations upon the Debtors or any other person or entity with respect to any Enumerated Matters and such obligations with respect to any Enumerated Matters shall be as provided under section 1110(c) of the Bankruptcy Code or other applicable law); and

(z) nothing in this Order shall be deemed to alter any burden of proof imposed upon the Debtors or any other person or entity under section 1110(c) of the Bankruptcy Code;

*provided* that nothing in this paragraph 13 modifies the Debtors' obligation under paragraph 12

hereof to return all of an applicable Excess Equipment (including, without limitation, as

applicable, any associated engines, parts and equipment, Aircraft Documents and other

"equipment" as defined in section 1110(a)(3)(A) of the Bankruptcy Code) to one location or

other matters set forth in paragraph 12 that are not Enumerated Matters.  If the Debtors fully

comply with the Minimum Standards and any Enumerated Matters that the Court subsequently

determines the Debtors must perform, then the Debtors' surrender and return of Excess

Equipment (including, without limitation, the airframe, the engines and all parts and equipment

related thereto, and the Aircraft Documents) and, in the case of Excess Owned Equipment, the

Debtors' execution and delivery of title documents, and, in the case of Excess Leased

Equipment, the Debtors' execution of documents canceling the lease (under Uniform

Commercial Code §2A-505(1)) and releasing the relevant aircraft and/or engines from the terms

thereof, in each case as provided pursuant to paragraph 17 of this Order, shall be deemed to

satisfy in full the "surrender and return" requirements of section 1110(c) of the Bankruptcy

Code.  Notwithstanding the foregoing, the surrender and return are without prejudice to the rights

of (collectively, the following are the "Reserved Rights"): (i) a Lessor and/or other affected

Aircraft Finance Party to assert damages as part of its general unsecured claim (or as an

administrative claim to the extent that such constitutes a Retained Administrative Claim/Specific

Performance Right) for rejection and other damages, if any (including, without limitation, the

failure to return any aircraft, engine or documents in accordance with the applicable return

conditions under the applicable operative documents, applicable law or other agreements); (ii) a

Secured Party and/or other affected Aircraft Finance Party to assert damages as part of any

unsecured deficiency claim, if any (including, without limitation, the failure to return any

aircraft, engine or documents in accordance with the applicable return conditions under the

applicable operative documents, applicable law or other agreements); (iii) a Lessor, Secured

Party and/or other affected Aircraft Finance Party to assert damages for failure to satisfy all

contractual return or turnover provisions of the applicable Lease or security agreement; (iv) any

party to assert any other general unsecured claims (or as an administrative claim to the extent

that such constitutes a Retained Administrative Claim/Specific Performance Right) against the

Debtors or any other person or entity under the operative documents or applicable law; (v) any

and all Retained Administrative Claim/Specific Performance Rights (as defined in paragraph 14)

against the Debtors or any other person or entity; or (vi) subject to paragraph 14 hereof, the

Debtors or any other party in interest to object to any such claims or rights; and it is further

14.    ORDERED that the right to assert administrative expense priority under sections

503 and 507(a)(1) of the Bankruptcy Code for claims relating to any abandonment of any Excess

Equipment or rejection of a Lease of any Excess Equipment, the rights to seek specific

performance, and the right to request adjustment of the Effective Date, as such may be required

under the Bankruptcy Code or other applicable law, shall be limited to the following matters (the

"Retained Administrative Claim/Specific Performance Rights"):  (a) any breach of this Order

(excluding claims for Enumerated Matters); (b) in the event that the Debtor(s) made a section

1110(a) election with respect to any Excess Equipment, claims for any breach of any obligation

on account of such election; (c) claims for breach of any Bankruptcy Code section 1110(b)

agreement with respect to any Excess Equipment; (d) any postpetition use, diminution,

depreciation, or other postpetition act, omission, or change in condition affecting any Excess

Equipment (or portion thereof) that is subject to abandonment or rejection under the terms of this

Order (which shall include, without limitation, claims for rent, maintenance reserves,

postpetition deterioration from use or failure to maintain or replace parts, and postpetition

damages to equipment); and (e) any Enumerated Matter (to the extent required under applicable

law).  The Debtors' or any other party in interest's right to object to or contest the amount of any

such claims or suits is fully reserved and preserved; *provided, however,* that, to the extent any

party seeks to challenge any Retained Administrative Claim/Specific Performance Right of the

types set forth in subparagraphs 14(a), (b), (c) and (d) above (provided that with respect to

subparagraph 14(d), the following preclusion shall only apply to matters covered by such

subparagraph 14(d) that are caused by, relate to or arise from the postpetition use or postpetition

damage to the applicable "equipment" (as defined in Bankruptcy Code Section 1110(a)(3)) and

with respect to subparagraph 14(b), the following preclusion shall only apply to obligations

arising prior to (if applicable and permitted) the Debtors' termination or revocation of such

section 1110(a) election or the rejection or abandonment of the applicable "equipment"), such

party shall be precluded from challenging the administrative expense priority thereof.

Notwithstanding the limitations in this paragraph, nothing herein shall affect in any way any

obligations owed by any person or entity, other than the Debtors, to any affected Lessor or

Secured Party and/or other affected Aircraft Finance Party under any guaranty, loan deficiency

agreement, equity deficiency agreement or other similar agreement relating to any Excess

Equipment; *provided further* that to the extent that the obligations or liabilities would be

construed to be affected or limited under any such guaranty, loan deficiency agreement, equity

deficiency agreement or other similar agreement, the limitation set forth in this paragraph shall

be deemed to be automatically modified to the extent necessary to eliminate any such effect; and

it is further

      15.     ORDERED that the rejection of any Lease and the related Excess Leased

Equipment and the abandonment of any Excess Owned Equipment pursuant to this Order are

without prejudice to the Reserved Rights; and it is further

16.    ORDERED that the Debtors will provide to an affected Aircraft Finance Party

aircraft data contained in a computerized maintenance program in soft copy format with respect

to the applicable Excess Equipment in which the Aircraft Party has an interest if both the

following conditions are satisfied:  (a) such records are requested in writing by such Aircraft

Financing Party and addressed via e-mail to the following people:  Debra Grassgreen

(dgrassgreen@pszjlaw.com) and Brian Gillman (Brian.Gillman@mesa-air.com)) (such request,

the "Computerized Data Request") and (b) such records are possessed by or in the control of the

Debtors with respect to any such Excess Equipment; provided that the Debtors shall provide such

computerized records by the latest of the following dates:

> (x)    ten (10) days after the applicable Aircraft Finance Party (that is the controlling party or equivalent pursuant to the underlying transaction documents) in respect of any Excess Equipment accepts delivery of such Excess Equipment,

> (y)    ten (10) days after the earlier of (i) the lapse of the deadline set forth in paragraph 2 hereof for requesting an adjustment of the Effective Date for such Excess Equipment and (ii) the date, if any, that the applicable Aircraft Finance Party (that is the controlling party or equivalent pursuant to the underlying transaction documents) for such Excess Equipment waives its right to seek an adjustment of the Effective Date for such Excess Equipment, which waiver must be set forth in writing and delivered by e-mail to the following people:  Debra Grassgreen (dgrassgreen@pszjlaw.com) and Brian Gillman (Brian.Gillman@mesa-air.com); and

> (z)    ten (10) days after the Debtors have received the Computerized Data Request in the manner as set forth above in this paragraph 16;

and it is further.

17.    ORDERED that, without limiting the provisions of paragraph 12 hereof, upon

written request from any affected Aircraft Finance Party, the Debtors (at the Debtors' expense)

shall reasonably cooperate with such affected Aircraft Finance Party to the extent that is

reasonably practicable with respect to the execution of or provision of information required for a lease termination document, bill of sale, or quitclaim deed, as appropriate, in form acceptable for filing with the Federal Aviation Administration (the "FAA") in connection with such Excess Leased Equipment or Excess Owned Equipment and provide, upon written request, to the extent reasonably practicable with respect to such Excess Equipment, a special flight permit; *provided, however*, that the affected Lessor or Secured Party shall be solely responsible for all costs associated with the filing, as applicable, thereof with the FAA; and it is further

18.     ORDERED that nothing herein is intended to limit, expand or otherwise modify any right of any Aircraft Finance Party to set off mutual debts subject to sections 362, 553 and/or 1110 of the Bankruptcy Code or, as applicable, of the Debtor or any other party in interest to object thereto; and it is further

19.     ORDERED that the Debtors are hereby authorized to execute and deliver all instruments and documents and take any additional actions as may be necessary or appropriate to implement and effectuate the relief granted herein; and it is further

20.     ORDERED that notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective immediately upon its entry; and it is further

21.     ORDERED that the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: February 23, 2010
       New York, New York

                                        /s/Martin Glenn
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

## (Appling Declaration)

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF GARY APPLING IN SUPPORT OF**
**DEBTORS' OBJECTION TO THE REQUEST BY ENGINE LEASE**
**FINANCE CORPORATION AND DEUCALION ENGINE LEASING (IRELAND)**
**LIMITED FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE**
**PURSUANT TO SECTION 503(b) AND 507(a)(2) OF THE BANKRUPTCY CODE**

Gary Appling, being duly sworn, hereby deposes and says:

1.      I am the Senior Vice President of Technical Services and Purchasing of

Mesa Air Group, Inc. and its affiliated debtors and debtors in possession (collectively, the

"Debtors"),[2] and have been working in this capacity with the Debtors since June 2006.  I manage

the general maintenance of the Debtors' aircraft fleet, aircraft equipment, and base maintenance

facilities.

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

[2] Capitalized terms not defined herein shall have the meanings used in the Objection.

2.      I graduated from Hallmark Institute of Technology in 1989 with a

Technical Aviation Degree.  I began my career in aircraft service and maintenance as a Ramp

Agent/Customer Service Agent with Delta Air Lines and later worked for Continental Airlines,

Airborne Express and TIMCO Aviation Services.  While at these companies I held positions of

increasing responsibility, primarily in Purchasing and Modification Repair and Overhaul

management overseeing the repair of engines, components and airframe, inventory and technical

purchasing.  I also served in the U.S. Air Force from 1981 to 1989 as a passenger service agent

and jet engine technician.  I am also a licensed FAA licensed Airframe and Power Plant

Technician.

3.      I am authorized by the Debtors to submit this declaration (the

"Declaration").  I submit this Declaration in support of the *Debtors' Objection to Request by*

*Engine Lease Finance Corporation and Deucalion Engine Leasing (Ireland) Limited for*

*Allowance and Payment of Administrative Expense Pursuant to Section 503(b) and 507(a)(2)*

(the "Objection"), dated October 19, 2010, filed contemporaneously herewith.

4.      Except as otherwise indicated, all facts set forth in this Declaration are

based on either:  (a) my personal knowledge, (b) information supplied by employees under my

supervision, or (c) my opinion based on my experience described above, my personal

knowledge, and information maintained by the Debtors in the ordinary course of business

regarding the Debtors' aircraft maintenance operations.  It is my belief that the relief sought in

the Administrative Expense Request is not supported by the facts and circumstances cited

therein.  If I were called upon to testify, I would testify competently to the facts set forth herein.

A.    **The Rolls-Royce Engines**

5.    The Debtors leased one (1) Allison AE300-7A1 having an engine serial number of 312344 ("Engine 1") from Engine Lease Finance Corporation ("ELFC") pursuant to an individual engine lease agreement dated April 25, 2003 ("April 2003 Engine Lease").  The Debtors leased one (1) Allison AE300-7A1 having an engine serial number of 311935 ("Engine 2" and together with Engine 1, the "Rolls-Royce Engines") from ELFC pursuant to an individual engine lease agreement dated December 16, 2003 ("December 2003 Engine Lease" and together with the April 2003 Engine Lease, the "ELFC Leases").

6.    Aircraft engines, such as the Rolls-Royce Engines, are operated with an external part commonly referred to as a full authority digital engine control (a "FADEC").[3] FADECs are not attached directly to an aircraft engine but are affixed to the aircraft's airframe and control the associated engine remotely.  The operation of an aircraft engine is not dependent upon a specific pair of FADECs.  An aircraft engine may be operated by any FADECs that are manufactured to operate with the particular type of engine.

7.    The Debtors originally leased Engine 2 directly from Rolls-Royce pursuant to a short-term lease (the "Rolls Short-Term Lease") in which the Debtors took delivery of Engine 2 on July 25, 2001.  A true and correct copy of the Rolls Short-Term Lease is annexed hereto as Exhibit 1.  Subsequently, Rolls-Royce agreed to sell Engine 2 to ELFC and at that time ELFC leased Engine 2 to the Debtors pursuant to the December 2003 Engine Lease.  The terms of the Rolls Short-Term Lease did not provide for two (2) FADECs.

---

[3] A FADEC is microprocessor that controls all aspects of engine performance.  A FADEC operates by receiving multiple input variables of the current flight condition including air density, throttle lever position, engine temperatures, engine pressures, and many other parameters and adjust accordingly the engine operating parameters such as fuel flow, stator vane position, bleed valve position, and others.  In addition, a FADEC also controls engine starting and restarting and allows the manufacturer to program engine limitations and receive engine health and maintenance reports.  The FADEC's basic purpose is to provide optimum engine efficiency (*i.e.*, power output) relative to the existing flight conditions.

**B.**    **The Embraer ERJ-145 Fleet**

8.    Prior to and after the Petition Date, the Debtors operated certain Embraer

ERJ-145 aircraft (collectively, the "ERJ Aircraft"). When the Debtors originally acquired the

ERJ Aircraft, each ERJ Aircraft was installed with FADECs. From time to time, the Debtors

serviced or replaced one or more of the engines originally associated with the ERJ Aircraft on

account of maintenance requirements. The Rolls-Royce Engines were leased by the Debtors for

this purpose.

9.    At the time the Debtors leased the Rolls-Royce Engines, ELFC states that

Engine 1 and Engine 2 were each delivered with two (2) FADECs (the "ELFC FADEC"). As

discussed in greater detail in Part E below, the Debtors' Purchasing, Maintenance & Inventory

("PMI") system has no record of receiving FADECs from ELFC. Nearly all of the FADECs in

the Debtors' control and possession are either (i) original and delivered with the applicable ERJ

Aircraft, (ii) a replacement of an original that was obtained from a vendor/supplier other than

ELFC, (iii) an original that was repaired, or (iv) installed on an ERJ Aircraft prior to the Debtors'

entry into the ELFC Leases.

10.    On or about August 4, 2010, the Debtors requested that ELFC supply the

serial numbers for the ELFC FADECs, but ELFC was unable to do so. The Rolls-Royce Engines

are not manufactured with FADECs or by the same company that manufactures the FADECs.

Instead, FADECs are manufactured by and purchased from an entirely different company. If

ELFC did deliver the ELFC FADECs at the same time as the Rolls-Royce Engines, then I

believe that ELFC would have been required to purchase the ELFC FADECs from a third party

prior to leasing them to the Debtors and should have some record of this purchase. ELFC has

not supplied the Debtors with a record of such purchase.

C.    **Debtors' Operation of Engine 1**

11.    On August 27, 2003, the Debtors installed Engine 1 in the first position on the ERJ Aircraft having a U.S. Registration Number N849MJ ("Aircraft 849").  The ELFC FADECs that are associated with Engine 1 were not installed on such Aircraft 849 because the Debtors were able to utilize the FADECs that were previously installed on Aircraft 849.  The FADECs utilized during this time were BX160345 in position 1A and BX160360 in position 1B.

12.    On April 27, 2007, the Debtors removed Engine 1 from Aircraft 849.  At this time, the FADECs associated with Engine 1 and Aircraft 849 were BX55224 in position 1A and BX160360 in position 1B.  On August 14, 2007, the Debtors installed Engine 1 in the first position on the ERJ Aircraft having a U.S. Registration Number N848MJ ("Aircraft 848").  The ELFC FADECs that are associated with Engine 1 were not installed on Aircraft 848 because the Debtors were able to utilize the FADECs that were previously installed on Aircraft 848.  The FADECs utilized during this time were BX160191 in position 1A and BX160422 in position 1B.

13.    On July 28, 2009, the Debtors removed Engine 1 from Aircraft 848.  At this time, the FADECs associated with Engine 1 and Aircraft 848 were BX160191 in position 1A and BX160422 in position 1B.  On July 30, 2009, the Debtors installed Engine 1 in the first position on the ERJ Aircraft having a U.S. Registration Number N850MJ ("Aircraft 850").  The ELFC FADECs that were delivered with Engine 1 were not installed on Aircraft 850 because the Debtors were able to utilize the FADECs that were previously installed on Aircraft 850.  The FADECs utilized during this time were BX70164 in position 1A and BX56008 in position 1B.

14.    On March 12, 2010, the Debtors removed Engine 1 from Aircraft 850.  At this time, the FADECs associated with Engine 1 and Aircraft 850 were BX70164 in position 1A and BX56008 in position 1B.  On April 17, 2010, the Debtors installed Engine 1 in the first

position on the ERJ Aircraft having a U.S. Registration Number N838MJ ("Aircraft 838").  The

ELFC FADECs that were delivered with Engine 1 were not installed on Aircraft 838 because the

Debtors were able to utilize the FADECs that were previously installed on Aircraft 838.  The

FADECs utilized during this time were BX160144 in position 1A and BX56225 in position 1B.

15.     On June 8, 2010, Engine 1 was removed from Aircraft 838.  The FADECs

associated with Aircraft 838 were BX160144 in position 1A and BX56225 in position 1B.  When

Engine 1 was removed from Aircraft 838 and returned to ELFC, the Debtors did not remove the

FADECs associated with Aircraft 838 and return them with Engine 1 because the FADECs were

not the ELFC FADECs associated with Engine 1 as referenced in the Administrative Expense

Request.

16.     All of the FADECs utilized by the Debtors both prior to and after the

Petition Date are not and were never associated with the delivery of Engine 1.  The Debtors were

able to utilize Engine 1 on account of the FADECs described above, which are not the ELFC

FADECs.  All other parts associated with Engine 1 were returned to ELFC.

**D.     Debtors' Operation of Engine 2**

17.     On January 15, 2002, the Debtors installed Engine 2 in the first position

on the ERJ Aircraft having a U.S. Registration Number N844MJ ("Aircraft 844").[4]  The ELFC

FADECs that are associated with Engine 2 were not installed on such Aircraft 844 because the

Debtors were able to utilize the FADECs that were previously installed on Aircraft 844.  The

FADECs utilized during this time were BX75011 in position 1A and BX75022 in position 1B.

18.     On April 29, 2006, the Debtors removed Engine 2 from Aircraft 844.  At

this time, the FADECs associated with Engine 2 and Aircraft 849 were BX75011 in position 1A

---

[4] The installation date of Engine 2 on Aircraft 844 predates the December 2003 Engine Lease because at this time
Engine 2 was leased directly from Rolls-Royce.

and BX75022 in position 1B.  On June 27, 2006, the Debtors installed Engine 2 in the second

position on the ERJ Aircraft having a U.S. Registration Number N835MJ ("Aircraft 835").  The

ELFC FADECs that are associated with Engine 2 were not installed on Aircraft 835 because the

Debtors were able to utilize the FADECs that were previously installed on Aircraft 835.  The

FADECs utilized during this time were BX60278 in position 2A and BX60136 in position 2B.

        19.     On March 14, 2008, the Debtors removed Engine 2 from Aircraft 835.  At

this time, the FADECs associated with Engine 2 and Aircraft 835 were BX60278 in position 2A

and BX60136 in position 2B.  On April 17, 2008, the Debtors installed Engine 2 in the second

position on Aircraft 844.  The ELFC FADECs that were delivered with Engine 2 were not

installed on Aircraft 844 because the Debtors were able to utilize the FADECs that were

previously installed on Aircraft 844.  The FADECs utilized during this time were BX60178 in

position 2A and BX161273 in position 2B.

        20.     On January 24, 2009, the Debtors removed Engine 2 from Aircraft 844.

At this time, the FADECs associated with Engine 2 and Aircraft 848 were BX60178 in position

2A and BX161273 in position 2B.  On January 24, 2009, the Debtors installed Engine 2 in the

second position on the ERJ Aircraft having a U.S. Registration Number N852MJ ("Aircraft

852").  The ELFC FADECs that were delivered with Engine 2 were not installed on Aircraft 852

because the Debtors were able to utilize the FADECs that were previously installed on Aircraft

852.  The FADECs utilized during this time were BX160368 in position 2A and BX160128 in

position 2B.

        21.     On June 8, 2009, the Debtors removed Engine 2 from Aircraft 852.  At

this time, the FADECs associated with Engine 2 and Aircraft 852 were BX160368 in position 2A

and BX160128 in position 2B.  On June 17, 2009, the Debtors installed Engine 2 in the second

position on the ERJ Aircraft having a U.S. Registration Number N847MJ ("Aircraft 847").  The

ELFC FADECs that were delivered with Engine 2 were not installed on Aircraft 847 because the

Debtors were able to utilize the FADECs that were previously installed on Aircraft 847.  The

FADECs utilized during this time were BX56032 in position 2A and BX160551 in position 2B.

22.    On June 27, 2009, the Debtors removed Engine 2 from Aircraft 847.  At

this time, the FADECs associated with Engine 2 and Aircraft 852 were BX56032 in position 2A

and BX160551 in position 2B.  On August 9, 2009, the Debtors installed Engine 2 in the second

position on the ERJ Aircraft having a U.S. Registration Number N857MJ ("Aircraft 857").  The

ELFC FADECs that were delivered with Engine 2 were not installed on Aircraft 857 because the

Debtors were able to utilize the FADECs that were previously installed on Aircraft 857.  The

FADECs utilized during this time were BX161268 in position 2A and BX160244 in position 2B.

23.    On May 7, 2010, Engine 2 was removed from Aircraft 857.  The FADECs

associated with Aircraft 857 were BX161268 in position 2A and BX160244 in position 2B.

When Engine 2 was removed from Aircraft 857 and returned to ELFC, the Debtors did not

remove the FADECs associated with Aircraft 857 and return them with Engine 2 because the

FADECs were not the ELFC FADECs associated with Engine 2 as referenced in the

Administrative Expense Request.

24.    All of the FADECs utilized by the Debtors both prior to and after the

Petition Date are not and were never associated with the delivery of Engine 2.  The Debtors were

able to utilize Engine 2 on account of the FADECs described above, which are not the ELFC

FADECs.  All other parts associated with Engine 2 were returned to ELFC.

**E.**      **The Debtors' FADECs**

25.      Annexed hereto as <u>Exhibit 2</u> is a schedule (the "<u>FADEC Schedule</u>") of the

Debtors' FADECs that were utilized with each ERJ Aircraft.  The FADEC Schedule lists every

FADEC associated with every ERJ Aircraft.  For example, Column A lists all of the FADECs by

serial number in the Debtors' possession.  Column B lists the ERJ Aircraft that is associated with

the FADEC in Column A.  Column C lists the date the FADEC was installed on the ERJ Aircraft

listed in Column A.  Column D reflects whether the FADEC is an original, exchanged, or

repaired.  Column E lists the source or origin of the FADEC, which is described by listing the

original ERJ Aircraft, the new replacement part number, or the number that shows it has been

repaired.

26.      All of the FADECs referenced in <u>Exhibit 2</u> were originally delivered with

the ERJ Aircraft, exchanged for a refurbished FADEC by one of the Debtors' vendors, repaired,

or installed on the applicable ERJ Aircraft prior to the Debtors' entry into the ELFC Leases.

Accordingly, I believe that the FADECs on Exhibit 2 are not ELFC's (in part because I believe

the Debtors never received the ELFC FADECs) because such FADECs were not obtained from

ELFC or were installed on the applicable ERJ Aircraft prior to the entry into the ELFC Leases.

**F.**      **Serviceability Tags**

27.      The Debtors' tracking of parts and related maintenance requirements is

governed by their General Procedures Manual (210) (the "<u>GPM</u>").  The Debtors' operation of the

ERJ Aircraft and related equipment (including the Rolls-Royce Engines) are governed by the

GPM.   A true and correct copy of the relevant pages of the GPM is annexed hereto as <u>Exhibit 3</u>.

The GPM has been approved by the Federal Aviation Authority ("<u>FAA</u>") and is in compliance

with Federal Aviation Regulation ("FAR") part 121 (Operational Requirements of Commercial

Air Carriers).  *See* Exhibit 3.

28.    The GPM provides that all rotable, repairable, and hard time aircraft parts

(part such as the ones referenced in the Administrative Expense Request) shall be properly

identified when received from a manufacturer, vendor, or a Debtor's repair facility or when such

parts are removed from an aircraft or received from any other source.  GPM § 17(B)(1).  If the

Debtors remove a part from an aircraft or an engine, the FAA requires that a qualified Required

Inspection Item Mechanic or Quality Control Inspector physically inspect the part.  Once

inspected, the part identified by a serviceability tag, which is described in the Debtors' GMP as a

"Component Control Form MO15" ("CCF").  GMP § 17(B)(3).  The CCF memorializes

information relating to the origin of the part and certifies whether the part is serviceable (in an

operable condition) or unserviceable (in an inoperable condition without further repair or

refurbishment).  The CCF is completed when it is signed by the inspector.

29.    The Debtors are an authorized commercial aircraft carrier that operates

pursuant to FAR 121.  As such, pursuant to the GPM, the Debtors are not required to provide

FAA Form 8130-3.  Such forms are utilized by authorized aircraft repair stations pursuant to

FAR 145.  Instead, the FAA has authorized the Debtors to utilize the CCF in lieu of Form 8130-

3.

30.    Annexed hereto as Exhibit 4, are the three CCF's or serviceability tags

referenced in the Administrative Expense Request that relate to Engine 1's engine oil tank and

Engine 2's fuel flow sensor and stator alternator (collectively, the "Tagged Parts").

31.    As reflected on the CCFs for the engine oil tank, the fuel flow sensor, and

the stator alternator, each CCF includes all necessary information required by the GPM, which

includes (i) part name, (ii) part number, (iii) part serial number, (iv) the numbers hours since the part was new (TSN), (v) the number of hours since last overhaul (TSO), (vi) the number of cycles since new (CSN), (vii) the number of cycles since last overhaul (CSO), and (ix) the inspector's signature.  The Debtors FAA approved GPM does not require any additional documentation for the Tagged Parts.

32.    Annexed hereto as <u>Exhibit 5</u> is a true and correct copy of the record redelivery requirements (the "<u>Redelivery Requirements</u>") under the master lease that governs the ELFC Leases.  Section 3(b) of the Redelivery Requirements provides that the Debtors must supply a FAA Form 8130-3 and serviceable tag or a return to service certificate completed by an authorized inspector of the Debtors.  As described above and as reflected on the CCFs annexed hereto as <u>Exhibit 4</u>, the Tagged Parts comply with the terms of the ELFC Leases because the CCFs for the Tagged Parts are service certificates completed by an authorized inspector of the Debtors in accordance with the Redelivery Requirements.  The CCFs reflect that when the Tagged Parts were removed from the Rolls-Royce Engines, they were in a serviceable condition, which means the Debtors could have reinstalled the Tagged Parts and operated them in compliance with the ELFC Leases and the applicable FAA regulations.

33.    Neither the ELFC Leases nor the FAA require the Debtors to provide any other information or documentation than the information that is set forth on the attached CCF's regarding the serviceability and tracing of the Tagged Parts.

The foregoing is true and correct to the best of my knowledge, information, and belief.  Executed this 20th day of October, 2010 in Phoenix, Arizona.

_____
*/s/ Gary Appling*
Gary Appling

# **EXHIBIT 1**

## **(Rolls Short-Term Lease)**

Rolls-Royce Corporation
2001 South Tibbs Ave.,
Indianapolis,
IN 46206



**ATTACHMENT B        LEASE PROPOSAL**

October 9th, 2001
Attention :Rob Stone (CFO)
Mesa Airlines
410 North 44th Street
Suite 700
Phoenix,
AZ 85008

    **Re:    Lease Proposal for AE3007A1 series engine, serial number CAE311935**

Dear Rob:

This letter is in regards to a  lease proposal, for a period of twelve months, for engine CAE311935, which is currently positioned in Birmingham, Alabama to support your operation. The terms of the lease will be in accordance with the following enclosures:

A · Standard Terms of Business Leasing,
B – Lease Supplement 1 to the STOBL,

The following are the proposed terms of the lease:

- Signed Standard Terms of Business Lease (STOBL) in place between Mesa Air Group and Rolls-Royce Corporation.

- Mesa Air Group will provide proof of insurance coverage (equal to $2,000,000) with Rolls-Royce Corporation as an additional insured.

- Monthly Lease payment of $28,000, one month in advance, payable on the 15th of each month.



kwiktag®        020 232 211

Page 21 of
33

- The first Lease payment will be due on signature of this letter and will represent the following :

| | | |
|---|---|---|
| July, | 6 days | $ 5,600 |
| August, | 1 month | $ 28,000 |
| September, | 1 month | $ 28,000 |
| October, | 1 month | $ 28,000 |
| November, | 1 month | $ 28,000 |
| Total payment due | | $117,600 |

- Mesa Air Group will report hours and cycles flown each month by the 5th of the following month and in respect of maintenance reserves an invoice will be raised and payable on the 15th of each month in accordance with the following:
  $57.92 per Engine Flight Hour,
  $30.33 per Engine Flight Cycle.

- Hours and cycles to date on this engine are estimated at 100 hours and 90 cycles, therefore the following would also be due on signature of this letter:

| | |
|---|---|
| $57.92 multiplied by 100 hours | $5,792 |
| $30.33 multiplied by 90 cycles | $2,730 |
| Total payment due | $8,522 |

- All pricing listed above are in US Dollars at 2001 levels and will be escalated in accordance with Exhibit A to this letter.

- The term of this Lease will be for a period of 12 months, commencing on July 25th 2001 and terminating on July 25th,2002.

- At the end of the 12-month lease period Mesa Air Group may choose to purchase this AE3007A1 engine from Rolls-Royce, or return it in a serviceable condition to Rolls-Royce Corporation. In the event Mesa Air Group choose to purchase the engine all maintenance reserve payments made by Mesa Air Group to Rolls-Royce Corporation will be applied to the payment of the purchase price of the engine. The purchase price of the engine will be $2,325,791.50 at 2001 economics.

- Mesa Air Group must pay all filing costs and fees that Rolls-Royce Corporation incur in connection with the lease of this engine.

- In respect to payments in accordance with this Lease Agreement, if Mesa Air Group fails to make payments by the due date, , Rolls-Royce Corporation may charge Mesa Air Group interest at the rate of .05% per day from the payment due date.

OCT 29 2001 07:35 FR COMMERICAL ENGINES        317 2306475 TO 91626858352        P.23/34

OCT 29 2001 12:09                               817 633 3417                      PAGE.03

By signing and returning the Standard Terms of Business Leasing, the Lease Supplement, and this letter you agree to the above listed terms and conditions.

This Lease Proposal is only valid for acceptance up to and including October 17th, 2001. Once signed by Mesa Air Group the terms and conditions of this letter will become part of this Lease Agreement.

If you require any further information please contact me.

Regards

Sarah Hern
Commercial Account Manager

AGREED:

**MESA AIR GROUP**

By:
Name:
Title: CFO

IN WITNESS hereof, the Parties hereto have caused this Agreement to be signed on their behalf
by duly authorized officers on the day and year last written below.

For and on behalf of:                           For and on behalf of:

**Mesa Air Group**                              **Rolls-Royce Corporation**

By: _____                           By: _Michael A. Nellinger_

Printed _RBStone_                                Printed _Michael A. Nellinger_

Title _CFO_                                      Title _Project Executive – Commercial_

Date _10/29/01_                                  Date _October 26, 2001_

## EXHIBIT 2

**(FADEC Schedule)**

Part installation information

| FADEC S/N | ERJ Aircaft | Install Date | Status | Source |
|---|---|---|---|---|
| BX161246 | N825MJ | 8/10/2009 | Original | OEL - N857MJ |
| BX161677 | N825MJ | 10/14/2005 | Exchange | 505001930 |
| BX47395 | N825MJ | 12/9/2009 | Exchange | 505000930 |
| BX75011 | N825MJ | 5/24/2010 | Original | OEL - N844MJ |
| BX160230 | N826MJ | 10/4/2006 | Original | OEL - N848MJ |
| BX48626 | N826MJ | 10/1/2006 | Exchange | 502002354 |
| BX56034 | N826MJ | 6/2/2004 | Original | OEL - N825MJ |
| BX70959 | N826MJ | 10/4/2006 | Original | OEL - N852MJ |
| BX46004 | N827MJ | 12/22/2007 | Exchange | 505002083 |
| BX56190 | N827MJ | 3/8/2001 | Original | OEL - N827MJ |
| BX56191 | N827MJ | 3/8/2001 | Original | OEL - N827MJ |
| BX56249 | N827MJ | 3/8/2001 | Original | OEL - N827MJ |
| BX161640 | N828MJ | 12/21/2006 | Exchange | 506002365 |
| BX55130 | N828MJ | 1/25/2007 | Exchange | 505000260 |
| BX56232 | N828MJ | 3/8/2001 | Original | OEL - N828MJ |
| BX56234 | N828MJ | 3/8/2001 | Original | OEL - N828MJ |
| BX160130 | N829MJ | 8/17/2009 | Original | OEL - N845MJ |
| BX161303 | N829MJ | 6/13/2005 | Exchange | 504002959 |
| BX48449 | N829MJ | 11/7/2009 | Original | OEL - N831MJ |
| BX70880 | N829MJ | 5/22/2003 | Original | OEL - N839MJ |
| BX160729 | N830MJ | 8/26/2005 | Repair | 305015955 |
| BX55218 | N830MJ | 12/16/2006 | Exchange | 505002179 |
| BX70952 | N830MJ | 9/9/2004 | Original | OEL - N841MJ |
| BX70979 | N830MJ | 9/9/2004 | Original | OEL - N841MJ |
| BX160142 | N831MJ | 3/10/2006 | Original | OEL - N846MJ |
| BX160539 | N831MJ | 4/30/2009 | Original | OEL - N855MJ |
| BX56155 | N831MJ | 3/11/2009 | Original | OEL - N831MJ |
| BX75009 | N831MJ | 3/13/2009 | Original | OEL - N842MJ |
| BX70019 | N832MJ | 1/15/2004 | Original | OEL - N832MJ |
| BX70020 | N832MJ | 1/15/2004 | Original | OEL - N832MJ |
| BX70021 | N832MJ | 1/15/2004 | Original | OEL - N832MJ |
| BX70066 | N832MJ | 8/3/2008 | Repair* | 307039982 |
| BX160045 | N833MJ | 2/19/2009 | Original | OEL - N847MJ |
| BX160195 | N833MJ | 7/11/2005 | Exchange | 505000701 |
| BX60104 | N833MJ | 8/7/2002 | Original | OEL - N833MJ |
| BX75120 | N833MJ | 1/13/2009 | Original | OEL - N854MJ |
| BX160196 | N834MJ | 10/31/2007 | Exchange | 507001291 |
| BX70087 | N834MJ | 8/8/2002 | Original | OEL - N834MJ |
| BX70090 | N834MJ | 8/8/2002 | Original | OEL - N834MJ |
| BX70091 | N834MJ | 8/8/2002 | Original | OEL - N834MJ |
| BX60127 | N835MJ | 8/8/2002 | Original | OEL - N835MJ |
| BX60136 | N835MJ | 8/8/2002 | Original | OEL - N835MJ |
| BX60139 | N835MJ | 5/16/2006 | Original | OEL - N835MJ |
| BX60278 | N835MJ | 8/8/2002 | Original | OEL - N835MJ |
| BX160249 | N836MJ | 11/14/2006 | Original | OEL - N849MJ |
| BX70135 | N836MJ | 10/26/2006 | Original | OEL - N836MJ |
| BX70190 | N836MJ | 1/22/2004 | Exchange | 503003733 |
| BX75026 | N836MJ | 6/27/2009 | Exchange | 504002567 |
| BX160418 | N837MJ | 1/27/2009 | Original | OEL - N856MJ |
| BX161753 | N837MJ | 11/13/2005 | Exchange | 505002304 |
| BX56252 | N837MJ | 8/20/2001 | ELFC leases post-date installation of this FADEC. | |
| BX75023 | N837MJ | 11/13/2005 | Original | OEL - N841MJ |

Part installation information

| FADEC S/N | ERJ Aircaft | Install Date | Status | Source |
|---|---|---|---|---|
| BX160144 | N838MJ | 10/17/2007 | Repair* | 304031130 |
| BX160463 | N838MJ | 11/5/2003 | Exchange | 502001154 |
| BX48463 | N838MJ | 9/7/2005 | Exchange | 505001278 |
| BX56225 | N838MJ | 8/9/2002 | ELFC leases post-date installation of this FADEC. | |
| BX160131 | N839MJ | 4/4/2009 | Original | OEL - N845MJ |
| BX48624 | N839MJ | 4/10/2009 | Exchange | 505000445 |
| BX70877 | N839MJ | 4/10/2009 | Original | OEL - N839MJ |
| BX70957 | N839MJ | 4/10/2009 | Original | OEL - N842MJ |
| BX160181 | N840MJ | 9/14/2007 | Original | OEL - N847MJ |
| BX56237 | N840MJ | 9/14/2007 | Original | OEL - N826MJ |
| BX70900 | N840MJ | 5/24/2001 | Original | OEL - N840MJ |
| BX70931 | N840MJ | 5/24/2001 | Original | OEL - N840MJ |
| BX160461 | N841MJ | 9/12/2004 | Exchange | 504001259 |
| BX160474 | N841MJ | 7/22/2010 | Original | OEL - N855MJ |
| BX59012 | N841MJ | 1/9/2008 | Exchange | 507002707 |
| BX70130 | N841MJ | 2/23/2006 | Original | OEL - N836MJ |
| BX160026 | N842MJ | 11/10/2008 | Original | OEL - N843MJ |
| BX70176 | N842MJ | 11/15/2007 | Original | OEL - N838MJ |
| BX75101 | N842MJ | 6/1/2004 | Original | OEL - N842MJ |
| BX75125 | N842MJ | 6/1/2004 | Original | OEL - N842MJ |
| BX160024 | N843MJ | 8/15/2002 | Original | OEL - N843MJ |
| BX160061 | N843MJ | 8/15/2002 | Original | OEL - N843MJ |
| BX160062 | N843MJ | 8/15/2002 | Original | OEL - N843MJ |
| BX70166 | N843MJ | 4/8/2008 | Exchange | 507002709 |
| BX160360 | N844MJ | 8/9/2010 | Original | OEL - N850MJ |
| BX161314 | N844MJ | 8/11/2010 | Original | OEL - N860MJ |
| BX56241 | N844MJ | 8/9/2010 | Original | OEL - N831MJ |
| BX75022 | N844MJ | 8/9/2010 | Original | OEL - N844MJ |
| BX160117 | N845MJ | 3/7/2009 | Original | OEL - N852MJ |
| BX160133 | N845MJ | 3/9/2009 | Original | OEL - N845MJ |
| BX160694 | N845MJ | 3/11/2009 | Original | OEL - N856MJ |
| BX56346 | N845MJ | 3/11/2009 | Exchange | 504000766 |
| BX47383 | N846MJ | 9/17/2004 | Exchange | 504002395 |
| BX55993 | N846MJ | 5/27/2004 | Original | OEL - N825MJ |
| BX60071 | N846MJ | 2/10/2004 | Original | OEL - N830MJ |
| BX75025 | N846MJ | 8/14/2002 | Original | OEL - N846MJ |
| BX160111 | N847MJ | 1/26/2009 | Original | OEL - N847MJ |
| BX160551 | N847MJ | 3/13/2009 | Original | OEL - N856MJ |
| BX56032 | N847MJ | 5/11/2007 | Original | OEL - N825MJ |
| BX70126 | N847MJ | 1/26/2009 | Original | OEL - N837MJ |
| BX160191 | N848MJ | 8/14/2002 | Original | OEL - N848MJ |
| BX160422 | N848MJ | 11/11/2002 | Original | OEL - N851MJ |
| BX70117 | N848MJ | 9/3/2005 | Repair | 305017514 |
| BX70878 | N848MJ | 4/30/2009 | Original | OEL - N839MJ |
| BX161270 | N849MJ | 4/15/2008 | Original | OEL - N858MJ |
| BX48678 | N849MJ | 2/2/2006 | Exchange | 506000045 |
| BX55224 | N849MJ | 3/9/2010 | Exchange | 504000709 |
| BX56256 | N849MJ | 7/1/2010 | Repair (New) | 302009298 |
| BX56008 | N850MJ | 5/24/2010 | Original | OEL - N825MJ |
| BX60178 | N850MJ | 3/20/2009 | Original | OEL - N844MJ |
| BX60382 | N850MJ | 9/12/2005 | Original | OEL - N833MJ |
| BX70164 | N850MJ | 4/17/2007 | Exchange | 506000796 |

Part installation information

| FADEC S/N | ERJ Aircaft | Install Date | Status | Source |
|-----------|-------------|--------------|--------|--------|
| BX160411 | N851MJ | 7/20/2002 | Exchange | 502001156 |
| BX47343 | N851MJ | 6/19/2002 | Repair (New) | 302001149 |
| BX56239 | N851MJ | 6/19/2002 | Repair (New) | 302001043 |
| BX60203 | N851MJ | 2/27/2003 | Exchange | 502003159 |
| BX160046 | N852MJ | 5/21/2008 | Original | OEL - N844MJ |
| BX160118 | N852MJ | 8/7/2002 | Original | OEL - N852MJ |
| BX160128 | N852MJ | 2/18/2005 | Original | OEL - N845MJ |
| BX160386 | N852MJ | 12/14/2005 | Repair (New) | 302006985 |
| BX160113 | N853MJ | 6/2/2004 | Original | OEL - N853MJ |
| BX160273 | N853MJ | 2/16/2010 | Original | OEL - N849MJ |
| BX70169 | N853MJ | 8/26/2002 | Original | OEL - N853MJ |
| BX70232 | N853MJ | 8/26/2002 | Original | OEL - N853MJ |
| BX160078 | N854MJ | 8/13/2002 | Original | OEL - N854MJ |
| BX160091 | N854MJ | 7/9/2004 | Original | OEL - N854MJ |
| BX48430 | N854MJ | 10/24/2009 | Exchange | 507000348 |
| BX70876 | N854MJ | 7/9/2004 | Original | OEL - N839MJ |
| BX160501 | N855MJ | 1/11/2007 | Exchange | 502001169 |
| BX160589 | N855MJ | 8/8/2002 | Original | OEL - N855MJ |
| BX60095 | N855MJ | 11/5/2008 | Exchange | 505002706 |
| BX70244 | N855MJ | 8/24/2009 | Original | OEL - N853MJ |
| BX160044 | N856MJ | 8/24/2010 | Original | OEL - N847MJ |
| BX161273 | N856MJ | 3/14/2009 | Original | OEL - N858MJ |
| BX60100 | N856MJ | 3/6/2009 | Original | OEL - N833MJ |
| BX70805 | N856MJ | 8/26/2002 | Original | OEL - N856MJ |
| BX160244 | N857MJ | 5/19/2009 | Original | OEL - N849MJ |
| BX161253 | N857MJ | 12/1/2003 | Original | OEL - N857MJ |
| BX161268 | N857MJ | 8/28/2003 | Original | OEL - N857MJ |
| BX161269 | N857MJ | 12/1/2003 | Original | OEL - N857MJ |
| BX161249 | N858MJ | 12/1/2003 | Original | OEL - N858MJ |
| BX161250 | N858MJ | 4/21/2010 | Exchange | 504002033 |
| BX161271 | N858MJ | 12/1/2003 | Original | OEL - N858MJ |
| BX56261 | N858MJ | 2/3/2008 | Original | OEL - N827MJ |
| BX161252 | N859MJ | 6/3/2004 | Original | OEL - N859MJ |
| BX161296 | N859MJ | 6/3/2004 | Original | OEL - N859MJ |
| BX161297 | N859MJ | 6/3/2004 | Original | OEL - N859MJ |
| BX161311 | N859MJ | 6/3/2004 | Original | OEL - N859MJ |
| BX161280 | N860MJ | 5/1/2001 | Original | OEL - N860MJ |
| BX161287 | N860MJ | 5/1/2001 | Original | OEL - N860MJ |
| BX161313 | N860MJ | 5/1/2001 | Original | OEL - N860MJ |
| BX60074 | N860MJ | 12/30/2009 | Original | OEL - N830MJ |

## EXHIBIT 3

**(General Procedures Manual)**

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: 0.1



# GENERAL PROCEDURES MANUAL
## MANUAL NUMBER 210

THIS MANUAL ASSIGNED TO _____    CONTROL # _____

Manual: 210
Revision: 9
Date: 10/30/05
Page: 12.4

# Freedom Airlines, Inc.
## General Procedures Manual

B.    Tagging and Identification Procedures

(1)    All rotable, repairable or hard time aircraft parts will be properly identified when received from a manufacturer, vendor, Freedom Airlines, Inc. repair facility, or parts removed from an aircraft or received from any other source.

(2)    All raw or common stock items (e.g., sheet metal, hardware, extrusions, etc.) will be properly identified when received from a manufacturer or vendor. To properly identify raw or common stock, a computer generated tag (PMI batch tag) with Purchase Order (P.O.) and manufacturer's certifications must be placed with the material. Additionally, raw stock (e.g., sheet metal) must be identified with the P.O. number approximately every square foot. This will allow each piece cut from the sheet to be properly identified.

(3)    Each rotable or repairable or hard time part will be identified as to its condition status using the following tags as appropriate:

(a)    Component Control Form (Form M015)

(b)    Rejected Part Tag (Form M016)

(c)    Serviceable Part Tag (Form M017)

C.    For work performed in-house,(using shop workorder) the serviceable part data section of the Component Control Form (Form M015) will be filled out and include the PMI Workorder (Form M156) and Job Card (Form M157) number on which the maintenance action was accomplished.

After performing a physical inspection of in-house repaired parts, an inspector will sign (including employee number) and date the tag in the appropriate blocks.

Manual: 210
Revision: 9
Date: 10/30/05
Page: 12.10

# Freedom Airlines, Inc.
## General Procedures Manual

5. **FORMS**

   A. COMPONENT CONTROL FORMS

   (1) A Component Control Form (Form M015) will be retained with rotables, hard time components, and repairables which have received final inspection and have been determined to be serviceable. The Component Control Form (Form M015) is a three-part self duplicating form which is divided into three sections.

   (a) Serviceable Part Data

   (b) Installation Data

   (c) Removed Part Data

   NOTE      No used parts, either rotables or repairables, are to be placed back in service unless they have been inspected and retagged as "serviceable."

   (2) When a part is installed on an aircraft, the Component Control Form (Form M015) will be completely filled out. The mechanic will separate the top copy from the bottom two copies.  The top copy and all supporting documentation is to be forwarded to Centralized Records, through the Quality Assurance Department. Attach the bottom two copies to the removed unit or component.

   (3) Procedures for documenting a serviceable part removed from one aircraft to be used on another (Robbed Part):

   (a) If it is determined that a serviceable component or unit must be taken off an aircraft for use on another, a new Component Control Form (Form M015) will be initiated as outlined above.

   (b) The Serial Number of the component removed will be placed in the "Serial Number" blank of the Serviceable Part Data Section of the form.

   (c) When the component is placed on the other aircraft, place the removed unserviceable components Serial Number in the "Serial Number" block of the Removed Part Data Section of the form.

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 18
Date: 05/08/09
Page: 6.23

B. The Component Control Form (Form M015) will be filled out completely in accordance with the procedures outlined in the GPM. Once completed, the white copy of the form and supporting documentation will be attached to the Work Packet and forwarded to the Centralized Records Department for processing.

C. The part removed must be tagged with the completed bottom two copies of the Component Control Form (Form M015) or a completed Rejected Part Tag (Form M016), depending upon the condition of the part, and will be routed to Stores for further processing.

## 18. CANNIBALIZATION (ROBBED PART) PROCEDURES

A. There are instances when a component, part or appliance is not readily available to correct a maintenance defect. Reasons for this non-availability may be that the part is not in Stores or the part is not available at the immediate station. When such occurrences arise, the need to borrow or rob these components, parts or appliances from other similar installations may be necessary. This is commonly known as "cannibalization."

B. To cannibalize any item it must be recognized that it is very important that the process be done in an orderly manner. The procedure described herein MUST be followed to ensure a properly controlled and documented transaction:

(1) Once it is recognized that a given item is needed but not available, a decision by the Freedom Airlines, Inc. DOM, DQA (or designees) must be made as to where and how the item will be obtained.

(2) The Freedom Airlines, Inc. DOM (or designee) will ensure that Stores has ordered the replacement part. The DOM (or designee) is responsible to follow up on the status of the ordered part.

(3) Removal:

(a) The Job Card Controller or Maintenance Planning will open a Work Order called "Cannibalization" on the aircraft from which the part is removed. Two Non-Routine Job Cards will be attached to that work order.

1 The first Non-Routine will be used to document the removal of the part from its original location (e.g. aircraft, engine, prop or component). This documentation must include a statement containing why the item is being cannibalized.

2 The second Non-Routine will be used to document the future installation of the serviceable part on the donor aircraft.

Manual: 210
Revision: 18
Date: 05/08/09
Page: 6.24

# Freedom Airlines, Inc.
## General Procedures Manual

(b)    The Mechanic will initiate a Freedom Airlines, Inc. Component Control Form (Form M015) for the item that is cannibalized. The Mechanic is required to present the part and the Component Control Form to a RII Inspector for inspection. The Inspector must ensure that the continuing time of any constrained part is recorded in the blocks provided. The CCF will be completed as described in the GPM, Appendix A (see note).

> **NOTE**    For constrained parts, an Inspector or RII certified Mechanic must verify that the remaining time is correct and sign the INSPECTOR block certifying the airworthiness of the item.

(c)    For items cannibalized from an aircraft, an AFML entry must be generated stating that the part has been removed. The part removal Work Order number will be placed in the CONTROL NO block of the AFML. All other blocks will be completed using normal procedures as described in the GPM.

(d)    Once the Component Control Form (Form M015) has been completed, the Job Card Controller/Inspector will make an entry in the PMI system to remove the part from the donor aircraft and install on the receiving aircraft. The Component Control Form (Form M015) will be routed to Central Aircraft Records with the receiving aircraft's work packet. The Manager of Records (or designee) is responsible for moving the component records from the donor aircraft file to the receiving aircraft file.

(4)    Installation:

When the cannibalized part is installed on the aircraft requiring the part, the maintenance action will be recorded on the current, open AFML or NRJC for that aircraft, including the statement, "Cannibalized from aircraft N # ____".

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 10
Date: 03/25/06
Page: A.15

To document additional cannibalized part information, the technician will complete the following items of the Cannibalized Part Data Section of the form:

| | FIELD | DESCRIPTION |
|---|---|---|
| 29. | OFF ACFT N# | Enter the registration number of the aircraft the part was removed from. |
| 30. | ON ACFT # | Enter the registration number of the aircraft the part was installed on. |
| 31. | CANNIBALIZATION WORK ORDER # | Enter the work order number which documents the removal of the unit or component for installation. |

To document additional Ship or Shelf (SOS) part information, the technician will complete the following items on the SOS Part Data section of the form:

| | FIELD | DESCRIPTION |
|---|---|---|
| 32. | OFF ACFT N# | Enter the registration number of the aircraft the part was removed from. |
| 33. | DATE REMOVED | Enter the date the part was removed from the aircraft. |
| 34. | REMOVAL W/O OR MX CONTROL# | Enter the work order number which documents the removal of the unit or component. |

## M015   COMPONENT CONTROL FORM

FREEDOM AIRLINES, INC.

| SERVICEABLE PART DATA | | INSTALLATION DATA | | REMOVED PART DATA |
|---|---|---|---|---|
| NOMENCLATURE (1) | | ACFT REGISTRATION NUMBER (16) | | PART NUMBER (25) |
| PART NUMBER (2) | | DATE (17) | POSITION (18) | SERIAL NUMBER (26) |
| SERIAL NUMBER (3) | ATA (4) | A/C TOTAL TIME (19) | A/C TOTAL CYCLES (20) | FAULT CODES (27) |
| VENDOR (5) | | AFML PAGE (21) | | |
| W.O./P.O./R.O./E.O. NUMBER (6) | | MX CONTROL NUMBER (22) | | REASON FOR REMOVAL (28) |
| ☐REPAIRED ☐OVERHAULED ☐INSPECTED ☐NEW ☐EXCHANGED ☐MAJOR INSPECTION ☐ REMOVED SVC A/C (7) POS | | WORK ORDER NUMBER (23) | | |
| TSN (8) | CSN (9) | TECHNICIAN SIGNATURE (24) | | |
| TSO (8) | CSO (9) | CANNIBALIZED PART DATA | | |
| | | OFF A/C N# ___29___ | ON A/C N# ___30___ | |
| SHELF LIFE EXP(10) | MFR DATE (12) | CANNIBALIZATION W/O# ___31___ | | |
| EXPIRATION DATE (11) | HYDRO DATE (13) | SHIP OR SHELF | | |
| RECEIVING INSPECTOR (14) | DATE (15) | OFF A/C N# ___32___ DATE REMOVED ___33___ REMOVAL W/O OR MX CONTROL # ___34___ | | |

M015 (03/06)

Manual: 210
Revision: 18
Date: 05/08/09
Page: 6.22

# Freedom Airlines, Inc.
## General Procedures Manual

    (2)    The FMU/Line Manager of Maintenance (or designee) is responsible to ensure all unfinished maintenance or inspections are properly recorded.

    (3)    Information turned over using handwritten documents should include specific details about any open discrepancies, inspections or other tasks being turned over.

## 16. PARTS REQUEST PROCEDURES

A.    While Mechanics are working on aircraft and their components, it is often necessary to order replacement parts to replace items found to be unserviceable.

B.    When a Mechanic/Repairman requires a part, a picklist will be generated following the PMI procedures. The Stores Clerk will supply the Mechanic/Repairman with the requested item. The Mechanic/Repairman will verify that it is the correct part and that all supporting documentation is correct (Form M020 can be discarded at this time).

    (1)    When a picklist is created for a part, the part is moved into an allocated status unless it is issued or updated. If the part is in an allocated status, it is unavailable to other users (AOG or Purchasing). Therefore the Inspector should run an open picklist report to verify parts status before closing a work order. This will allow the inspector to determine if all the parts transactions have been completed in PMI.

    (2)    If the part is not available at that location but is shown in the computer to be available at another location, Stores will coordinate with the maintenance supervisor on duty to determine the urgency of the request, and then take action to secure the needed part in a timely manner.

## 17. PARTS TAGGING

A.    When a rotable or repairable part or component is changed on a Freedom Airlines, Inc. aircraft, the part installed must be tagged with a Component Control Form (Form M015) and supporting documentation (e.g., vendor invoice, vendor serviceable release tag and/or FAA Form 8130-3). The Maintenance Technician installing a part must verify the shelf-life supporting documentation and inspection status prior to installation.

    (1)    All parts removed to facilitate maintenance will be properly identified by use of the Serviceable Parts tag (Form M017) and placed in identified stands, shelves or bins in an order that all parts will be segregated and protected from damage or contamination. In this case, the Serviceable Parts tag (Form M017) can be discarded after the part is reinstalled.

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.1

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| 0.1 | 19 | 06/25/09 | TOC.8 | 19 | 06/25/09 | 1.21 | 18 | 05/08/09 |
| 0.2 | 16 | 05/30/08 | TOC.9 | 19 | 06/25/09 | 1.22 | 16 | 05/30/08 |
| ROR.1 | 16 | 05/30/08 | TOC.10 | 19 | 06/25/09 | 1.23 | 18 | 05/08/09 |
| ROR.2 | 16 | 05/30/08 | TOC.11 | 19 | 06/25/09 | 1.24 | 16 | 05/30/08 |
| ROR.3 | 16 | 05/30/08 | TOC.12 | 19 | 06/25/09 | | | |
| ROR.4 | 16 | 05/30/08 | TOC.13 | 19 | 06/25/09 | | | |
| LOEP.1 | 19 | 06/25/09 | TOC.14 | 16 | 05/30/08 | 2.1 | 19 | 06/25/09 |
| LOEP.2 | 16 | 05/30/08 | | | | 2.2 | 19 | 06/25/09 |
| LOEP.3 | 19 | 06/25/09 | | | | 2.3 | 19 | 06/25/09 |
| LOEP.4 | 16 | 05/30/08 | | | | 2.4 | 13 | 07/15/07 |
| LOEP.5 | 19 | 06/25/09 | | | | 2.5 | 19 | 06/25/09 |
| LOEP.6 | 16 | 05/30/08 | 1.1 | 16 | 05/30/08 | 2.6 | 17 | 11/04/08 |
| LOEP.7 | 19 | 06/25/09 | 1.2 | 8 | 06/01/05 | 2.7 | 18 | 05/08/09 |
| LOEP.8 | 16 | 05/30/08 | 1.3 | 15 | 12/20/07 | 2.8 | 19 | 06/25/09 |
| LOEP.9 | 19 | 06/25/09 | 1.4 | 14 | 11/14/07 | 2.9 | 19 | 06/25/09 |
| LOEP.10 | 16 | 05/30/08 | 1.5 | 15 | 12/20/07 | 2.10 | 17 | 11/04/08 |
| LOEP.11 | 19 | 06/25/09 | 1.6 | 15 | 12/20/07 | 2.11 | 17 | 11/04/08 |
| LOEP.12 | 16 | 05/30/08 | 1.7 | 15 | 12/20/07 | 2.12 | 17 | 11/04/08 |
| LOEP.13 | 19 | 06/25/09 | 1.8 | 13 | 07/15/07 | 2.13 | 19 | 06/25/09 |
| LOEP.14 | 16 | 05/30/08 | 1.9 | 19 | 06/25/09 | 2.14 | 19 | 06/25/09 |
| LOEP.15 | 19 | 06/25/09 | 1.10 | 19 | 06/25/09 | 2.15 | 19 | 06/25/09 |
| LOEP.16 | 16 | 05/30/08 | 1.11 | 16 | 05/30/08 | 2.16 | 19 | 06/25/09 |
| LOEP.17 | 19 | 06/25/09 | 1.12 | 15 | 12/20/07 | 2.17 | 17 | 11/04/08 |
| LOEP.18 | 16 | 05/30/08 | 1.13 | 16 | 05/30/08 | 2.18 | 19 | 06/25/09 |
| LOEP.19 | 19 | 06/25/09 | 1.14 | 18 | 05/08/09 | 2.19 | 19 | 06/25/09 |
| LOEP.20 | 16 | 05/30/08 | 1.15 | 18 | 05/08/09 | 2.20 | 18 | 05/08/09 |
| LOEP.21 | 19 | 06/25/09 | 1.16 | 16 | 05/30/08 | 2.21 | 18 | 05/08/09 |
| LOEP.22 | 16 | 05/30/08 | 1.17 | 16 | 05/30/08 | 2.22 | 18 | 05/08/09 |
| LOEP.23 | 19 | 06/25/09 | 1.18 | 18 | 05/08/09 | 2.23 | 18 | 05/08/09 |
| LOEP.24 | 16 | 05/30/08 | 1.19 | 16 | 05/30/08 | 2.24 | 18 | 05/08/09 |
| TOC.1 | 19 | 06/25/09 | 1.20 | 16 | 05/30/08 | 2.25 | 18 | 05/08/09 |
| TOC.2 | 16 | 05/30/08 | | | | | | |
| TOC.3 | 19 | 06/25/09 | | | | | | |
| TOC.4 | 19 | 06/25/09 | | | | | | |
| TOC.5 | 19 | 06/25/09 | | | | | | |
| TOC.6 | 19 | 06/25/09 | | | | | | |
| TOC.7 | 19 | 06/25/09 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.3

### LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|------|---------|------|------|---------|------|------|---------|------|
| 2.26 | 19 | 06/25/09 | 2.62 | 19 | 06/25/09 | | | |
| 2.27 | 18 | 05/08/09 | 2.63 | 19 | 06/25/09 | | | |
| 2.28 | 17 | 11/04/08 | 2.64 | 19 | 06/25/09 | | | |
| 2.29 | 17 | 11/04/08 | 2.65 | 19 | 06/25/09 | | | |
| 2.30 | 18 | 05/08/09 | 2.66 | 19 | 06/25/09 | | | |
| 2.31 | 19 | 06/25/09 | 2.67 | 19 | 06/25/09 | | | |
| 2.32 | 19 | 06/25/09 | 2.68 | 19 | 06/25/09 | | | |
| 2.33 | 18 | 05/08/09 | 2.69 | 19 | 06/25/09 | | | |
| 2.34 | 18 | 05/08/09 | 2.70 | 19 | 06/25/09 | | | |
| 2.35 | 18 | 05/08/09 | 2.71 | 19 | 06/25/09 | | | |
| 2.36 | 18 | 05/08/09 | 2.72 | 19 | 06/25/09 | | | |
| 2.37 | 18 | 05/08/09 | 2.73 | 19 | 06/25/09 | | | |
| 2.38 | 18 | 05/08/09 | 2.74 | 19 | 06/25/09 | | | |
| 2.39 | 18 | 05/08/09 | 2.75 | 19 | 06/25/09 | | | |
| 2.40 | 18 | 05/08/09 | 2.76 | 19 | 06/25/09 | | | |
| 2.41 | 18 | 05/08/09 | 2.77 | 19 | 06/25/09 | | | |
| 2.42 | 18 | 05/08/09 | 2.78 | 19 | 06/25/09 | | | |
| 2.43 | 19 | 06/25/09 | 2.79 | 19 | 06/25/09 | | | |
| 2.44 | 19 | 06/25/09 | 2.80 | 19 | 06/25/09 | | | |
| 2.45 | 19 | 06/25/09 | 2.81 | 19 | 06/25/09 | | | |
| 2.46 | 18 | 05/08/09 | 2.82 | 19 | 06/25/09 | | | |
| 2.47 | 17 | 11/04/08 | 2.83 | 19 | 06/25/09 | | | |
| 2.48 | 19 | 06/25/09 | 2.84 | 19 | 06/25/09 | | | |
| 2.49 | 19 | 06/25/09 | | | | | | |
| 2.50 | 19 | 06/25/09 | | | | | | |
| 2.51 | 19 | 06/25/09 | | | | | | |
| 2.52 | 19 | 06/25/09 | | | | | | |
| 2.53 | 19 | 06/25/09 | | | | | | |
| 2.54 | 19 | 06/25/09 | | | | | | |
| 2.55 | 19 | 06/25/09 | | | | | | |
| 2.56 | 19 | 06/25/09 | | | | | | |
| 2.57 | 19 | 06/25/09 | | | | | | |
| 2.58 | 19 | 06/25/09 | | | | | | |
| 2.59 | 19 | 06/25/09 | | | | | | |
| 2.60 | 19 | 06/25/09 | | | | | | |
| 2.61 | 19 | 06/25/09 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED:                          FAA ACCEPTED:
Principal Maintenance              Principal Avionics
Inspector, FDKA                    Inspector, FDKA
DATE: 8-7-09                       DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.5

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|------|---------|------|------|---------|------|------|---------|------|
|  |  |  |  |  |  | 3.7 | 0 | 09/10/02 |
|  |  |  |  |  |  | 3.8 | 13 | 07/15/07 |
|  |  |  |  |  |  | 3.9 | 0 | 09/10/02 |
|  |  |  |  |  |  | 3.10 | 0 | 09/10/02 |
|  |  |  |  |  |  | 3.11 | 0 | 09/10/02 |
|  |  |  |  |  |  | 3.12 | 10 | 03/25/06 |
|  |  |  |  |  |  | 3.13 | 19 | 06/25/09 |
|  |  |  |  |  |  | 3.14 | 0 | 09/10/02 |
|  |  |  |  |  |  | 3.15 | 0 | 09/10/02 |
|  |  |  |  |  |  | 3.16 | 0 | 09/10/02 |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  | 4.1 | 19 | 06/25/09 |
|  |  |  |  |  |  | 4.2 | 0 | 09/10/02 |
|  |  |  |  |  |  | 4.3 | 19 | 06/25/09 |
|  |  |  |  |  |  | 4.4 | 19 | 06/25/09 |
|  |  |  |  |  |  | 4.5 | 19 | 06/25/09 |
|  |  |  |  |  |  | 4.6 | 19 | 06/25/09 |
|  |  |  | 3.1 | 5 | 10/04/04 | 4.7 | 19 | 06/25/09 |
|  |  |  | 3.2 | 0 | 09/10/02 | 4.8 | 19 | 06/25/09 |
|  |  |  | 3.3 | 19 | 06/25/09 | 4.9 | 19 | 06/25/09 |
|  |  |  | 3.4 | 19 | 06/25/09 | 4.10 | 19 | 06/25/09 |
|  |  |  | 3.5 | 17 | 11/04/08 | 4.11 | 19 | 06/25/09 |
|  |  |  | 3.6 | 19 | 06/25/09 | 4.12 | 19 | 06/25/09 |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.7

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| 4.13 | 19 | 06/25/09 | 5.10 | 19 | 06/25/09 | 6.1 | 19 | 06/25/09 |
| 4.14 | 19 | 06/25/09 | 5.11 | 19 | 06/25/09 | 6.2 | 0 | 09/10/02 |
| 4.15 | 19 | 06/25/09 | 5.12 | 19 | 06/25/09 | 6.3 | 18 | 05/08/09 |
| 4.16 | 19 | 06/25/09 | 5.13 | 19 | 06/25/09 | 6.4 | 18 | 05/08/09 |
| 4.17 | 19 | 06/25/09 | 5.14 | 19 | 06/25/09 | 6.5 | 18 | 05/08/09 |
| 4.18 | 19 | 06/25/09 | 5.15 | 19 | 06/25/09 | 6.6 | 17 | 11/04/08 |
| 4.19 | 19 | 06/25/09 | 5.16 | 16 | 05/30/08 | 6.7 | 19 | 06/25/09 |
| 4.20 | 19 | 06/25/09 | 5.17 | 16 | 05/30/08 | 6.8 | 13 | 07/15/07 |
| 4.21 | 19 | 06/25/09 | 5.18 | 13 | 07/15/07 | 6.9 | 18 | 05/08/09 |
| 4.22 | 19 | 06/25/09 | 5.19 | 15 | 12/20/07 | 6.10 | 19 | 06/25/09 |
| 4.23 | 19 | 06/25/09 | 5.20 | 13 | 07/15/07 | 6.11 | 18 | 05/08/09 |
| 4.24 | 19 | 06/25/09 | 5.21 | 13 | 07/15/07 | 6.12 | 19 | 06/25/09 |
| 4.25 | 19 | 06/25/09 | 5.22 | 13 | 07/15/07 | 6.13 | 18 | 05/08/09 |
| 4.26 | 19 | 06/25/09 | 5.23 | 13 | 07/15/07 | 6.14 | 19 | 06/25/09 |
| 4.27 | 19 | 06/25/09 | 5.24 | 13 | 07/15/07 | 6.15 | 18 | 05/08/09 |
| 4.28 | 19 | 06/25/09 | 5.25 | 13 | 07/15/07 | 6.16 | 18 | 05/08/09 |
| 4.29 | 19 | 06/25/09 | 5.26 | 13 | 07/15/07 | 6.17 | 19 | 06/25/09 |
| 4.30 | 19 | 06/25/09 | 5.27 | 18 | 05/08/09 | 6.18 | 19 | 06/25/09 |
| 4.31 | 19 | 06/25/09 | 5.28 | 19 | 06/25/09 | 6.19 | 18 | 05/08/09 |
| 4.32 | 19 | 06/25/09 | 5.29 | 16 | 05/30/08 | 6.20 | 18 | 05/08/09 |
| 4.33 | 19 | 06/25/09 | 5.30 | 18 | 05/08/09 | 6.21 | 18 | 05/08/09 |
| 4.34 | 19 | 06/25/09 | 5.31 | 16 | 05/30/08 | 6.22 | 18 | 05/08/09 |
| 4.35 | 19 | 06/25/09 | 5.32 | 16 | 05/30/08 | 6.23 | 18 | 05/08/09 |
| 4.36 | 19 | 06/25/09 | 5.33 | 16 | 05/30/08 | 6.24 | 18 | 05/08/09 |
| 4.37 | 19 | 06/25/09 | 5.34 | 16 | 05/30/08 | 6.25 | 18 | 05/08/09 |
| 4.38 | 19 | 06/25/09 | 5.35 | 18 | 05/08/09 | 6.26 | 18 | 05/08/09 |
| 4.39 | 19 | 06/25/09 | 5.36 | 16 | 05/30/08 | 6.27 | 18 | 05/08/09 |
| 4.40 | 19 | 06/25/09 | 5.37 | 15 | 12/20/07 | 6.28 | 18 | 05/08/09 |
| 4.41 | 19 | 06/25/09 | 5.38 | 19 | 06/25/09 | 6.29 | 18 | 05/08/09 |
| 4.42 | 19 | 06/25/09 | 5.39 | 13 | 07/15/07 | 6.30 | 18 | 05/08/09 |
| 4.43 | 19 | 06/25/09 | 5.40 | 13 | 07/15/07 | | | |
| 4.44 | 19 | 06/25/09 | 5.41 | 17 | 11/04/08 | 7.1 | 19 | 06/25/09 |
| | | | 5.42 | 16 | 05/30/08 | 7.2 | 0 | 09/10/02 |
| | | | 5.43 | 16 | 05/30/08 | 7.3 | 13 | 07/15/07 |
| 5.1 | 16 | 05/30/08 | 5.44 | 16 | 05/30/08 | 7.4 | 13 | 07/15/07 |
| 5.2 | 0 | 09/10/02 | | | | 7.5 | 19 | 06/25/09 |
| 5.3 | 19 | 06/25/09 | | | | 7.6 | 16 | 05/30/08 |
| 5.4 | 15 | 12/20/07 | | | | | | |
| 5.5 | 19 | 06/25/09 | | | | | | |
| 5.6 | 19 | 06/25/09 | | | | | | |
| 5.7 | 19 | 06/25/09 | | | | | | |
| 5.8 | 19 | 06/25/09 | | | | | | |
| 5.9 | 19 | 06/25/09 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.9

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| 7.7 | 13 | 07/15/07 | 9.5 | 12 | 03/02/07 | 9.36 | 13 | 07/15/07 |
| 7.8 | 13 | 07/15/07 | 9.6 | 13 | 07/15/07 | 9.37 | 13 | 07/15/07 |
| 7.9 | 13 | 07/15/07 | 9.7 | 13 | 07/15/07 | 9.38 | 13 | 07/15/07 |
| 7.10 | 13 | 07/15/07 | 9.8 | 19 | 06/25/09 | 9.39 | 13 | 07/15/07 |
| 7.11 | 13 | 07/15/07 | 9.9 | 13 | 07/15/07 | 9.40 | 18 | 05/08/09 |
| 7.12 | 19 | 06/25/09 | 9.10 | 13 | 07/15/07 | 9.41 | 18 | 05/08/09 |
| 7.13 | 19 | 06/25/09 | 9.11 | 18 | 05/08/09 | 9.42 | 18 | 05/08/09 |
| 7.14 | 19 | 06/25/09 | 9.12 | 13 | 07/15/07 | 9.43 | 18 | 05/08/09 |
| 7.15 | 18 | 05/08/09 | 9.13 | 12 | 03/02/07 | 9.44 | 17 | 11/04/08 |
| 7.16 | 13 | 07/15/07 | 9.14 | 12 | 03/02/07 | 9.45 | 18 | 05/08/09 |
| 7.17 | 15 | 12/20/07 | 9.15 | 12 | 03/02/07 | 9.46 | 18 | 05/08/09 |
| 7.18 | 15 | 12/20/07 | 9.16 | 0 | 09/10/02 | 9.47 | 18 | 05/08/09 |
| 7.19 | 13 | 07/15/07 | 9.17 | 12 | 03/02/07 | 9.48 | 19 | 06/25/09 |
| 7.20 | 13 | 07/15/07 | 9.18 | 12 | 03/02/07 | 9.49 | 19 | 06/25/09 |
| 7.21 | 19 | 06/25/09 | 9.19 | 12 | 03/02/07 | 9.50 | 18 | 05/08/09 |
| 7.22 | 19 | 06/25/09 | 9.20 | 13 | 07/15/07 | 9.51 | 18 | 05/08/09 |
| 7.23 | 19 | 06/25/09 | 9.21 | 13 | 07/15/07 | 9.52 | 18 | 05/08/09 |
| 7.24 | 19 | 06/25/09 | 9.22 | 13 | 07/15/07 | 9.53 | 18 | 05/08/09 |
| 7.25 | 19 | 06/25/09 | 9.23 | 13 | 07/15/07 | 9.54 | 18 | 05/08/09 |
| 7.26 | 19 | 06/25/09 | 9.24 | 0 | 09/10/02 | | | |
| 7.27 | 19 | 06/25/09 | 9.25 | 12 | 03/02/07 | | | |
| 7.28 | 19 | 06/25/09 | 9.26 | 0 | 09/10/02 | | | |
| | | | 9.27 | 9 | 10/30/05 | | | |
| | | | 9.28 | 13 | 07/15/07 | | | |
| 8.1 | 19 | 06/25/09 | 9.29 | 13 | 07/15/07 | | | |
| 8.2 | 0 | 09/10/02 | 9.30 | 18 | 05/08/09 | | | |
| 8.3 | 5 | 10/04/04 | 9.31 | 13 | 07/15/07 | | | |
| 8.4 | 5 | 10/04/04 | 9.32 | 13 | 07/15/07 | | | |
| 8.5 | 19 | 06/25/09 | 9.33 | 16 | 05/30/08 | | | |
| 8.6 | 19 | 06/25/09 | 9.34 | 13 | 07/15/07 | | | |
| 8.7 | 19 | 06/25/09 | 9.35 | 13 | 07/15/07 | | | |
| 8.8 | 18 | 05/08/09 | | | | | | |
| | | | | | | | | |
| 9.1 | 18 | 05/08/09 | | | | | | |
| 9.2 | 0 | 09/10/02 | | | | | | |
| 9.3 | 18 | 05/08/09 | | | | | | |
| 9.4 | 12 | 03/02/07 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.11

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| 10.1 | 19 | 06/25/09 | 12.7 | 19 | 06/25/09 | 13.1 | 13 | 07/15/07 |
| 10.2 | 0 | 09/10/02 | 12.8 | 17 | 11/04/08 | 13.2 | 0 | 09/10/02 |
| 10.3 | 16 | 05/30/08 | 12.9 | 9 | 10/30/05 | 13.3 | 18 | 05/08/09 |
| 10.4 | 19 | 06/25/09 | 12.10 | 9 | 10/30/05 | 13.4 | 18 | 05/08/09 |
| 10.5 | 19 | 06/25/09 | 12.11 | 17 | 11/04/08 | 13.5 | 13 | 07/15/07 |
| 10.6 | 19 | 06/25/09 | 12.12 | 17 | 11/04/08 | 13.6 | 13 | 07/15/07 |
| 10.7 | 19 | 06/25/09 | 12.13 | 17 | 11/04/08 | | | |
| 10.8 | 19 | 06/25/09 | 12.14 | 18 | 05/08/09 | | | |
| | | | 12.15 | 9 | 10/30/05 | | | |
| | | | 12.16 | 9 | 10/30/05 | | | |
| 11.1 | 16 | 05/30/08 | 12.17 | 9 | 10/30/05 | | | |
| 11.2 | 0 | 09/10/02 | 12.18 | 9 | 10/30/05 | 14.1 | 16 | 05/30/08 |
| 11.3 | 18 | 05/08/09 | 12.19 | 9 | 10/30/05 | 14.2 | 0 | 09/10/02 |
| 11.4 | 18 | 05/08/09 | 12.20 | 18 | 05/08/09 | 14.3 | 13 | 07/15/07 |
| 11.5 | 15 | 12/20/07 | 12.21 | 9 | 10/30/05 | 14.4 | 16 | 05/30/08 |
| 11.6 | 18 | 05/08/09 | 12.22 | 17 | 11/04/08 | 14.5 | 0 | 09/10/02 |
| 11.7 | 18 | 05/08/09 | 12.23 | 13 | 07/15/07 | 14.6 | 16 | 05/30/08 |
| 11.8 | 18 | 05/08/09 | 12.24 | 16 | 05/30/08 | 14.7 | 0 | 09/10/02 |
| 11.9 | 15 | 12/20/07 | 12.25 | 19 | 06/25/09 | 14.8 | 13 | 07/15/07 |
| 11.10 | 15 | 12/20/07 | 12.26 | 9 | 10/30/05 | 14.9 | 13 | 07/15/07 |
| 11.11 | 18 | 05/08/09 | 12.27 | 9 | 10/30/05 | 14.10 | 16 | 05/30/08 |
| 11.12 | 15 | 12/20/07 | 12.28 | 9 | 10/30/05 | | | |
| | | | 12.29 | 18 | 05/08/09 | | | |
| | | | 12.30 | 18 | 05/08/09 | | | |
| | | | 12.31 | 18 | 05/08/09 | | | |
| | | | 12.32 | 9 | 10/30/05 | | | |
| 12.1 | 18 | 05/08/09 | | | | | | |
| 12.2 | 0 | 09/10/02 | | | | | | |
| 12.3 | 17 | 11/04/08 | | | | | | |
| 12.4 | 9 | 10/30/05 | | | | | | |
| 12.5 | 17 | 11/04/08 | | | | | | |
| 12.6 | 17 | 11/04/08 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.13

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| 15.1 | 8 | 06/01/05 | 16.23 | 19 | 06/25/09 | 19.1 | 19 | 06/25/09 |
| 15.2 | 0 | 09/10/02 | 16.24 | 19 | 06/25/09 | 19.2 | 0 | 09/10/02 |
| 15.3 | 18 | 05/08/09 | | | | 19.3 | 19 | 06/25/09 |
| 15.4 | 5 | 10/04/04 | | | | 19.4 | 19 | 06/25/09 |
| 15.5 | 0 | 09/10/02 | | | | 19.5 | 19 | 06/25/09 |
| 15.6 | 5 | 10/04/04 | | | | 19.6 | 19 | 06/25/09 |
| 15.7 | 8 | 06/01/05 | | | | 19.7 | 19 | 06/25/09 |
| 15.8 | 5 | 10/04/04 | | | | 19.8 | 19 | 06/25/09 |
| 15.9 | 5 | 10/04/04 | | | | 19.9 | 19 | 06/25/09 |
| 15.10 | 5 | 10/04/04 | | | | 19.10 | 19 | 06/25/09 |
| | | | | | | 19.11 | 19 | 06/25/09 |
| | | | | | | 19.12 | 19 | 06/25/09 |
| 16.1 | 19 | 06/25/09 | | | | 19.13 | 19 | 06/25/09 |
| 16.2 | 0 | 09/10/02 | | | | 19.14 | 19 | 06/25/09 |
| 16.3 | 19 | 06/25/09 | 17.1 | 9 | 10/30/05 | | | |
| 16.4 | 19 | 06/25/09 | 17.2 | 0 | 09/10/02 | | | |
| 16.5 | 19 | 06/25/09 | 17.3 | 9 | 10/30/05 | | | |
| 16.6 | 19 | 06/25/09 | 17.4 | 0 | 09/10/02 | | | |
| 16.7 | 19 | 06/25/09 | | | | | | |
| 16.8 | 19 | 06/25/09 | 18.1 | 16 | 05/30/08 | | | |
| 16.9 | 19 | 06/25/09 | 18.2 | 0 | 09/10/02 | 20.1 | 5 | 10/04/04 |
| 16.10 | 19 | 06/25/09 | 18.3 | 13 | 07/15/07 | 20.2 | 0 | 09/10/02 |
| 16.11 | 19 | 06/25/09 | 18.4 | 19 | 06/25/09 | 20.3 | 5 | 10/04/04 |
| 16.12 | 19 | 06/25/09 | 18.5 | 19 | 06/25/09 | 20.4 | 9 | 10/30/05 |
| 16.13 | 19 | 06/25/09 | 18.6 | 18 | 05/08/09 | 20.5 | 4 | 06/18/03 |
| 16.14 | 19 | 06/25/09 | | | | 20.6 | 4 | 06/18/03 |
| 16.15 | 19 | 06/25/09 | | | | 20.7 | 8 | 06/01/05 |
| 16.16 | 19 | 06/25/09 | | | | 20.8 | 5 | 10/04/04 |
| 16.17 | 17 | 11/04/08 | | | | | | |
| 16.18 | 17 | 11/04/08 | | | | | | |
| 16.19 | 19 | 06/25/09 | | | | | | |
| 16.20 | 19 | 06/25/09 | | | | | | |
| 16.21 | 19 | 06/25/09 | | | | | | |
| 16.22 | 19 | 06/25/09 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.15

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|------|---------|------|------|---------|------|------|---------|------|
| 20.9 | 4 | 06/18/03 | | | | 23.11 | 19 | 06/25/09 |
| 20.10 | 4 | 06/18/03 | | | | 23.12 | 19 | 06/25/09 |
| 20.11 | 8 | 06/01/05 | | | | | | |
| 20.12 | 4 | 06/18/03 | | | | | | |
| 20.13 | 10 | 03/25/06 | | | | A.1 | 19 | 06/25/09 |
| 20.14 | 10 | 03/25/06 | | | | A.2 | 19 | 06/25/09 |
| | | | | | | A.3 | 10 | 03/25/06 |
| | | | | | | A.4 | 10 | 03/25/06 |
| | | | | | | A.5 | 19 | 06/25/09 |
| | | | | | | A.6 | 19 | 06/25/09 |
| | | | | | | A.7 | 19 | 06/25/09 |
| | | | | | | A.8 | 19 | 06/25/09 |
| | | | | | | A.9 | 19 | 06/25/09 |
| | | | | | | A.10 | 19 | 06/25/09 |
| | | | | | | A.11 | 19 | 06/25/09 |
| | | | | | | A.12 | 19 | 06/25/09 |
| 21.1 | 19 | 06/25/09 | | | | A.13 | 19 | 06/25/09 |
| 21.2 | 0 | 09/10/02 | | | | A.14 | 10 | 03/25/06 |
| 21.3 | 9 | 10/30/05 | | | | A.15 | 10 | 03/25/06 |
| 21.4 | 19 | 06/25/09 | | | | A.16 | 10 | 03/25/06 |
| 21.5 | 19 | 06/25/09 | | | | A.17 | 10 | 03/25/06 |
| 21.6 | 19 | 06/25/09 | | | | A.18 | 19 | 06/25/09 |
| 21.7 | 19 | 06/25/09 | | | | A.19 | 19 | 06/25/09 |
| 21.8 | 19 | 06/25/09 | | | | A.20 | 19 | 06/25/09 |
| | | | | | | A.21 | 19 | 06/25/09 |
| | | | 23.1 | 19 | 06/25/09 | A.22 | 19 | 06/25/09 |
| | | | 23.2 | 0 | 09/10/02 | A.23 | 19 | 06/25/09 |
| | | | 23.3 | 19 | 06/25/09 | A.24 | 19 | 06/25/09 |
| 22.1 | 19 | 06/25/09 | 23.4 | 19 | 06/25/09 | A.25 | 19 | 06/25/09 |
| 22.2 | 0 | 09/10/02 | 23.5 | 19 | 06/25/09 | A.26 | 19 | 06/25/09 |
| | | | 23.6 | 19 | 06/25/09 | A.27 | 19 | 06/25/09 |
| | | | 23.7 | 19 | 06/25/09 | A.28 | 19 | 06/25/09 |
| | | | 23.8 | 19 | 06/25/09 | A.29 | 19 | 06/25/09 |
| | | | 23.9 | 19 | 06/25/09 | A.30 | 19 | 06/25/09 |
| | | | 23.10 | 19 | 06/25/09 | A.31 | 19 | 06/25/09 |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.17

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|------|---------|------|------|---------|------|------|---------|------|
| A.32 | 19 | 06/25/09 | A.68 | 19 | 06/25/09 | A.98 | 19 | 06/25/09 |
| A.33 | 19 | 06/25/09 | A.69 | 19 | 06/25/09 | | | |
| A.34 | 19 | 06/25/09 | A.70 | 19 | 06/25/09 | | | |
| A.35 | 19 | 06/25/09 | A.71 | 19 | 06/25/09 | | | |
| A.36 | 19 | 06/25/09 | A.72 | 19 | 06/25/09 | | | |
| A.37 | 19 | 06/25/09 | A.73 | 19 | 06/25/09 | | | |
| A.38 | 19 | 06/25/09 | A.74 | 19 | 06/25/09 | | | |
| A.39 | 19 | 06/25/09 | A.75 | 19 | 06/25/09 | | | |
| A.40 | 19 | 06/25/09 | A.76 | 19 | 06/25/09 | | | |
| A.41 | 19 | 06/25/09 | A.77 | 19 | 06/25/09 | | | |
| A.42 | 19 | 06/25/09 | A.78 | 19 | 06/25/09 | | | |
| A.43 | 19 | 06/25/09 | A.79 | 19 | 06/25/09 | | | |
| A.44 | 19 | 06/25/09 | A.80 | 19 | 06/25/09 | | | |
| A.45 | 19 | 06/25/09 | A.81 | 19 | 06/25/09 | | | |
| A.46 | 19 | 06/25/09 | A.82 | 19 | 06/25/09 | | | |
| A.47 | 19 | 06/25/09 | A.83 | 19 | 06/25/09 | | | |
| A.48 | 19 | 06/25/09 | A.84 | 19 | 06/25/09 | | | |
| A.49 | 19 | 06/25/09 | A.85 | 19 | 06/25/09 | | | |
| A.50 | 19 | 06/25/09 | A.86 | 19 | 06/25/09 | | | |
| A.51 | 19 | 06/25/09 | A.87 | 19 | 06/25/09 | | | |
| A.52 | 19 | 06/25/09 | A.88 | 19 | 06/25/09 | | | |
| A.53 | 19 | 06/25/09 | A.89 | 19 | 06/25/09 | | | |
| A.54 | 19 | 06/25/09 | A.90 | 19 | 06/25/09 | | | |
| A.55 | 19 | 06/25/09 | A.91 | 19 | 06/25/09 | | | |
| A.56 | 19 | 06/25/09 | A.92 | 19 | 06/25/09 | | | |
| A.57 | 19 | 06/25/09 | A.93 | 19 | 06/25/09 | | | |
| A.58 | 19 | 06/25/09 | A.94 | 19 | 06/25/09 | | | |
| A.59 | 19 | 06/25/09 | A.95 | 19 | 06/25/09 | | | |
| A.60 | 19 | 06/25/09 | A.96 | 19 | 06/25/09 | | | |
| A.61 | 19 | 06/25/09 | A.97 | 19 | 06/25/09 | | | |
| A.62 | 19 | 06/25/09 | | | | | | | |
| A.63 | 19 | 06/25/09 | | | | | | | |
| A.64 | 19 | 06/25/09 | | | | | | | |
| A.65 | 19 | 06/25/09 | | | | | | | |
| A.66 | 19 | 06/25/09 | | | | | | | |
| A.67 | 19 | 06/25/09 | | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.19

### LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|------|------|------|------|------|------|------|------|------|
| B.1 | 19 | 06/25/09 | C.1 | 19 | 06/25/09 | C.29 | 18 | 05/08/09 |
| B.2 | 0 | 09/10/02 | C.2 | 10 | 03/25/06 | C.30 | 18 | 05/08/09 |
|  |  |  | C.3 | 18 | 05/08/09 | C.31 | 19 | 06/25/09 |
|  |  |  | C.4 | 18 | 05/08/09 | C.32 | 19 | 06/25/09 |
|  |  |  | C.5 | 18 | 05/08/09 | C.33 | 18 | 05/08/09 |
|  |  |  | C.6 | 18 | 05/08/09 | C.34 | 18 | 05/08/09 |
|  |  |  | C.7 | 10 | 03/25/06 | C.35 | 18 | 05/08/09 |
|  |  |  | C.8 | 10 | 03/25/06 | C.36 | 18 | 05/08/09 |
|  |  |  | C.9 | 10 | 03/25/06 | C.37 | 18 | 05/08/09 |
|  |  |  | C.10 | 10 | 03/25/06 | C.38 | 18 | 05/08/09 |
|  |  |  | C.11 | 10 | 03/25/06 | C.39 | 19 | 06/25/09 |
|  |  |  | C.12 | 14 | 11/14/07 | C.40 | 19 | 06/25/09 |
|  |  |  | C.13 | 14 | 11/14/07 | C.41 | 18 | 05/08/09 |
|  |  |  | C.14 | 10 | 03/25/06 | C.42 | 18 | 05/08/09 |
|  |  |  | C.15 | 10 | 03/25/06 | C.43 | 18 | 05/08/09 |
|  |  |  | C.16 | 19 | 06/25/09 | C.44 | 18 | 05/08/09 |
|  |  |  | C.17 | 10 | 03/25/06 | C.45 | 18 | 05/08/09 |
|  |  |  | C.18 | 10 | 03/25/06 | C.46 | 19 | 06/25/09 |
|  |  |  | C.19 | 10 | 03/25/06 | C.47 | 19 | 06/25/09 |
|  |  |  | C.20 | 10 | 03/25/06 | C.48 | 18 | 05/08/09 |
|  |  |  | C.21 | 14 | 11/14/07 | C.49 | 18 | 05/08/09 |
|  |  |  | C.22 | 19 | 06/25/09 | C.50 | 18 | 05/08/09 |
|  |  |  | C.23 | 19 | 06/25/09 | C.51 | 18 | 05/08/09 |
|  |  |  | C.24 | 10 | 03/25/06 | C.52 | 18 | 05/08/09 |
|  |  |  | C.25 | 10 | 03/25/06 | C.53 | 18 | 05/08/09 |
|  |  |  | C.26 | 10 | 03/25/06 | C.54 | 18 | 05/08/09 |
|  |  |  | C.27 | 10 | 03/25/06 | C.55 | 19 | 06/25/09 |
|  |  |  | C.28 | 10 | 03/25/06 | C.56 | 18 | 05/08/09 |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.21

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| C.57 | 18 | 05/08/09 | C.92 | 19 | 06/25/09 | C.122 | 19 | 06/25/09 |
| C.58 | 18 | 05/08/09 | C.93 | 19 | 06/25/09 | C.123 | 19 | 06/25/09 |
| C.59 | 18 | 05/08/09 | C.94 | 19 | 06/25/09 | C.124 | 19 | 06/25/09 |
| C.60 | 18 | 05/08/09 | C.95 | 19 | 06/25/09 | C.125 | 19 | 06/25/09 |
| C.61 | 19 | 06/25/09 | C.96 | 19 | 06/25/09 | C.126 | 19 | 06/25/09 |
| C.62 | 19 | 06/25/09 | C.97 | 19 | 06/25/09 | C.127 | 19 | 06/25/09 |
| C.63 | 19 | 06/25/09 | C.98 | 19 | 06/25/09 | C.128 | 19 | 06/25/09 |
| C.64 | 19 | 06/25/09 | C.99 | 19 | 06/25/09 | C.129 | 19 | 06/25/09 |
| C.65 | 19 | 06/25/09 | C.100 | 19 | 06/25/09 | C.130 | 19 | 06/25/09 |
| C.66 | 19 | 06/25/09 | C.101 | 19 | 06/25/09 | C.131 | 19 | 06/25/09 |
| C.67 | 19 | 06/25/09 | C.102 | 19 | 06/25/09 | C.132 | 19 | 06/25/09 |
| C.68 | 18 | 05/08/09 | C.103 | 19 | 06/25/09 | C.133 | 19 | 06/25/09 |
| C.69 | 18 | 05/08/09 | C.104 | 19 | 06/25/09 | C.134 | 19 | 06/25/09 |
| C.70 | 18 | 05/08/09 | C.105 | 19 | 06/25/09 | C.135 | 19 | 06/25/09 |
| C.71 | 19 | 06/25/09 | C.106 | 19 | 06/25/09 | C.136 | 19 | 06/25/09 |
| C.72 | 18 | 05/08/09 | C.107 | 19 | 06/25/09 | C.137 | 19 | 06/25/09 |
| C.73 | 18 | 05/08/09 | C.108 | 19 | 06/25/09 | C.138 | 19 | 06/25/09 |
| C.74 | 18 | 05/08/09 | C.109 | 19 | 06/25/09 | C.139 | 19 | 06/25/09 |
| C.75 | 19 | 06/25/09 | C.110 | 19 | 06/25/09 | C.140 | 19 | 06/25/09 |
| C.76 | 18 | 05/08/09 | C.111 | 19 | 06/25/09 | C.141 | 19 | 06/25/09 |
| C.77 | 18 | 05/08/09 | C.112 | 19 | 06/25/09 | C.142 | 19 | 06/25/09 |
| C.78 | 18 | 05/08/09 | C.113 | 19 | 06/25/09 | C.143 | 19 | 06/25/09 |
| C.79 | 18 | 05/08/09 | C.114 | 19 | 06/25/09 | C.144 | 19 | 06/25/09 |
| C.80 | 18 | 05/08/09 | C.115 | 19 | 06/25/09 | C.145 | 19 | 06/25/09 |
| C.81 | 18 | 05/08/09 | C.116 | 19 | 06/25/09 | C.146 | 19 | 06/25/09 |
| C.82 | 19 | 06/25/09 | C.117 | 19 | 06/25/09 | C.147 | 19 | 06/25/09 |
| C.83 | 18 | 05/08/09 | C.118 | 19 | 06/25/09 | C.148 | 19 | 06/25/09 |
| C.84 | 18 | 05/08/09 | C.119 | 19 | 06/25/09 | C.149 | 19 | 06/25/09 |
| C.85 | 18 | 05/08/09 | C.120 | 19 | 06/25/09 | C.150 | 19 | 06/25/09 |
| C.86 | 19 | 06/25/09 | C.121 | 19 | 06/25/09 | C.151 | 19 | 06/25/09 |
| C.87 | 19 | 06/25/09 | | | | C.152 | 19 | 06/25/09 |
| C.88 | 18 | 05/08/09 | | | | | | |
| C.89 | 18 | 05/08/09 | | | | | | |
| C.90 | 18 | 05/08/09 | | | | | | |
| C.91 | 19 | 06/25/09 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____ Principal Maintenance Inspector, FDKA  DATE: 8-7-09

FAA ACCEPTED: _____ Principal Avionics Inspector, FDKA  DATE: 8-11-09

# Freedom Airlines, Inc.
## General Procedures Manual

Manual: 210
Revision: 19
Date: 06/25/09
Page: LOEP.23

## LIST OF EFFECTIVE PAGES

| PAGE | REV NO. | DATE | PAGE | REV NO. | DATE | PAGE | REV NO. | DATE |
|------|---------|------|------|---------|------|------|---------|------|
| D.1 | 19 | 06/25/09 | D.35 | 13 | 07/15/07 | | | |
| D.2 | 10 | 03/25/06 | D.36 | 13 | 07/15/07 | | | |
| D.3 | 19 | 06/25/09 | D.37 | 18 | 05/08/09 | | | |
| D.4 | 19 | 06/25/09 | D.38 | 13 | 07/15/07 | | | |
| D.5 | 19 | 06/25/09 | D.39 | 19 | 06/25/09 | | | |
| D.6 | 19 | 06/25/09 | D.40 | 19 | 06/25/09 | | | |
| D.7 | 16 | 05/30/08 | D.41 | 18 | 05/08/09 | | | |
| D.8 | 13 | 07/15/07 | D.42 | 18 | 05/08/09 | | | |
| D.9 | 16 | 05/30/08 | D.43 | 18 | 05/08/09 | | | |
| D.10 | 13 | 07/15/07 | D.44 | 18 | 05/08/09 | | | |
| D.11 | 13 | 07/15/07 | D.45 | 18 | 05/08/09 | | | |
| D.12 | 18 | 05/08/09 | D.46 | 18 | 05/08/09 | | | |
| D.13 | 18 | 05/08/09 | D.47 | 18 | 05/08/09 | | | |
| D.14 | 18 | 05/08/09 | D.48 | 13 | 07/15/07 | | | |
| D.15 | 18 | 05/08/09 | D.49 | 13 | 07/15/07 | | | |
| D.16 | 13 | 07/15/07 | D.50 | 13 | 07/15/07 | | | |
| D.17 | 13 | 07/15/07 | D.51 | 13 | 07/15/07 | | | |
| D.18 | 13 | 07/15/07 | D.52 | 13 | 07/15/07 | | | |
| D.19 | 13 | 07/15/07 | D.53 | 18 | 05/08/09 | | | |
| D.20 | 13 | 07/15/07 | D.54 | 18 | 05/08/09 | | | |
| D.21 | 13 | 07/15/07 | D.55 | 18 | 05/08/09 | | | |
| D.22 | 13 | 07/15/07 | D.56 | 18 | 05/08/09 | | | |
| D.23 | 17 | 11/04/08 | D.57 | 18 | 05/08/09 | | | |
| D.24 | 17 | 11/04/08 | D.58 | 18 | 05/08/09 | | | |
| D.25 | 13 | 07/15/07 | D.59 | 18 | 05/08/09 | | | |
| D.26 | 13 | 07/15/07 | D.60 | 16 | 05/30/08 | | | |
| D.27 | 13 | 07/15/07 | D.61 | 13 | 07/15/07 | | | |
| D.28 | 13 | 07/15/07 | D.62 | 13 | 07/15/07 | | | |
| D.29 | 19 | 06/25/09 | | | | | | |
| D.30 | 19 | 06/25/09 | | | | | | |
| D.31 | 13 | 07/15/07 | | | | | | |
| D.32 | 13 | 07/15/07 | | | | | | |
| D.33 | 13 | 07/15/07 | | | | | | |
| D.34 | 13 | 07/15/07 | | | | | | |

FOR FAA USE ONLY

FAA ACCEPTED: _____
Principal Maintenance
Inspector, FDKA
DATE: 8-7-09

FAA ACCEPTED: _____
Principal Avionics
Inspector, FDKA
DATE: 8-11-09

# **EXHIBIT 4**

## **(CCFs Tagged Parts)**

# ENGINE 1 – ENGINE OIL TANK

# MO15 COMPONENT CONTROL FORM

**FREEDOM AIRLINES, INC.**

| SERVICEABLE PART DATA | | INSTALLATION DATA | | REMOVED PART DATA |
|---|---|---|---|---|
| NOMENCLATURE Engine Oil TANK | | ACFT REGISTRATION NUMBER | | PART NUMBER |
| PART NUMBER 23070328 | | DATE | POSITION | SERIAL NUMBER |
| SERIAL NUMBER RJ 13589 | ATA 79 | A/C TOTAL TIME | A/C TOTAL CYCLES | FAULT CODES |
| VENDOR FREEDom | | AFML PAGE | | REASON FOR REMOVAL |
| W.O./P.O./R.O./E.O. NUMBER 71000 8708 | | MX CONTROL NUMBER | | |
| ☐ REPAIRED ☐ OVERHAULED ☐ INSPECTED ☐ NEW ☐ EXCHANGED ☐ MAJOR INSPECTION ☒ REMOVED SVC/AC 837ms POS #2 | | WORK ORDER NUMBER | | |
| TSN 356. 13 | CSN 327 | TECHNICIAN SIGNATURE | | |
| TSO 356:13 | CSO 327 | CANNIBALIZED PART DATA | | |
| SHELF LIFE EXP. | MFR. DATE | OFF A/C N# _____ | ON A/C N# _____ | |
| EXPIRATION DATE | HYDRO DATE | CANNIBALIZATION W/O # _____ | | |
| | | SHIP OR SHELF | | |
| RECEIVING INSPECTOR | DATE 8/17/10 | OFF A/C N# _____ | DATE REMOVED _____ | |
| | | REMOVAL W/O OR MX CONTROL # _____ | | |

MO15 (03/06)

# ENGINE 2 – ENGINE STATOR ALTERNATOR

# MO15 COMPONENT CONTROL FORM

**FREEDOM AIRLINES, INC.**

| SERVICEABLE PART DATA | | INSTALLATION DATA | | REMOVED PART DATA |
|---|---|---|---|---|

| SERVICEABLE PART DATA | | INSTALLATION DATA | | REMOVED PART DATA |
|---|---|---|---|---|
| NOMENCLATURE<br>Engine Stator Alternator | | ACFT REGISTRATION NUMBER | | PART NUMBER |
| PART NUMBER<br>23075489 | | DATE | POSITION | SERIAL NUMBER |
| SERIAL NUMBER<br>UN4899 | ATA<br>72 | A/C TOTAL TIME | A/C TOTAL CYCLES | FAULT CODES |
| VENDOR<br>Freedom | | AFML PAGE | | |
| W.O./P.O./R.O./E.O. NUMBER<br>710008708 | | MX CONTROL NUMBER | | REASON FOR REMOVAL |
| ☐ REPAIRED ☐ OVERHAULED ☐ INSPECTED<br>☐ NEW ☐ EXCHANGED ☐ MAJOR INSPECTION<br>☒ REMOVED SVC/AC 857 POS #2 | | WORK ORDER NUMBER | | |
| TSN<br>16861:05 | CSN<br>15878 | TECHNICIAN SIGNATURE | | |
| TSO<br>16861:05 | CSO<br>15878 | CANNIBALIZED PART DATA | | |
| SHELF LIFE EXP. | MFR. DATE | OFF A/C N# _____<br>CANNIBALIZATION W/O # _____ | | ON A/C N# _____ |
| EXPIRATION DATE | HYDRO DATE | SHIP OR SHELF | | |
| RECEIVING INSPECTOR<br>JP —18592 | DATE<br>8/17/10 | OFF A/C N# _____<br>REMOVAL W/O OR MX CONTROL # _____ | | DATE REMOVED _____ |

MO15 (03/06)

# ENGINE 2 – FUEL FLOW SENSOR

## MO15 COMPONENT CONTROL FORM

**FREEDOM AIRLINES, INC.**

| SERVICEABLE PART DATA | | INSTALLATION DATA | | REMOVED PART DATA |
|---|---|---|---|---|
| NOMENCLATURE<br>Fuel Flow Sensor | | ACFT REGISTRATION NUMBER | | PART NUMBER |
| PART NUMBER<br>23052613 | | DATE | POSITION | SERIAL NUMBER |
| SERIAL NUMBER<br>P9494 | ATA<br>73 | A/C TOTAL TIME | A/C TOTAL CYCLES | FAULT CODES |
| VENDOR<br>Freedom | | AFML PAGE | | i |
| W.O./P.O./R.O./E.O. NUMBER<br>71 0005129 | | MX CONTROL NUMBER | | REASON FOR REMOVAL |
| ☐ REPAIRED ☐ OVERHAULED ☐ INSPECTED<br>☐ NEW ☐ EXCHANGED ☐ MAJOR INSPECTION<br>☑ REMOVED SVC/AC front POS #1 | | WORK ORDER NUMBER | | |
| TSN<br>13321:39 | CSN<br>12608 | TECHNICIAN SIGNATURE | | |
| TSO<br>13321:39 | CSO<br>12608 | CANNIBALIZED PART DATA | | |
| SHELF LIFE EXP. | MFR. DATE | OFF A/C N# _____ | ON A/C N# _____ | |
| | | CANNIBALIZATION W/O # _____ | | |
| EXPIRATION DATE | HYDRO DATE | SHIP OR SHELF | | |
| RECEIVING INSPECTOR<br>30  18547 | DATE<br>8/17/10 | OFF A/C N# _____ | DATE REMOVED _____ | |
| | | REMOVAL W/O OR MX CONTROL # _____ | | |

M015 (03/06)

# **EXHIBIT 5**

**(Redelivery Requirements)**

### Section 2: Engine Technical Records at Redelivery

The following documents shall be furnished with the Engine together with the original Engine Technical Records in a current, up-to-date and correct status in accordance with the provisions of FAR 121\JAR OPS 1.

1.    Airworthiness Directives Documentation

    (a)    A single, complete and current status list of the AD's applicable to the Engine model.  This list shall be provided in a format acceptable to Lessor and shall include:

        (i)    A.D. and revision number;

        (ii)    A.D. title;

        (iii)    Specification whether the AD is applicable, terminated or repetitive and stated means by which compliance was accomplished (e.g. modified, repaired, inspected);

        (iv)    Date of accomplishment and\or of last maintenance accomplishment if repetitive and state next "inspection due date/time";

        (v)    Manufacturers' Service Bulletin references, engineering documentation references and cross references where appropriate;

        (vi)    Name and number of the internal maintenance form or work order used to document accomplishment.

    The list shall be typed and certified by an authorised quality assurance representative in compliance with the applicable regulatory body of Lessee or by Lessee's Authorised Repairer quality assurance inspector.

    (b)    Legible copies of the work instruction/completion documents that accomplish each AD.  If the AD is a repetitive inspection, documentation of the last accomplishment is sufficient.  These documents must have date of accomplishment, signature of a certified mechanic and/or inspector, and the mechanic's/inspector's certificate number or repair station number of the mechanic accomplishing the work. The document must reference the AD number and company authorisation which covered the AD.

    (c)    Exemptions or deviations granted by the FAA (or equivalent) to Lessee on AD compliance, including copy of exemption request.

2.    Engineering Documentation

    (a)    A single, current list of all service bulletins incorporated in the Engine since original manufacture.  Such list shall identify any and all service bulletins required to comply with the Host· Aircraft extended range requirements (if applicable);

    (b)    One copy of all non-manufacturer/non-FAA approved repairs or alternatives;

    (c)    Latest amendment to the Maintenance Programme.

3.    One copy of the following individual Engine Records

EPREC GTA

(a)  A certified non incident or accident statement and/or incident reports and major damage reports, if any;

(b)  **FAA Form 8130-3** and serviceable tag or return to service certificate completed by an authorised inspector of Lessee or Lessee's Authorised Repairer;

(c)  Last test cell run report for the Engine;

(d)  Borescope history for current installation for the Engine including video thereof if available;

(e)  Latest available Engine trend monitoring report for a minimum period of three months prior to removal for Redelivery;

(f)  Life Limited Parts data including full traceability since new satisfactory to Lessor;

(g)  All issued FAA Form 337's and 8130-3's or JAA Form 1's together with detailed Authorised Repairer Engine Shop Visit reports related to each Engine Shop Visit during the Lease Period including updated complete Engine data submittal or equivalent issued by the Authorised Repairer which shall include the TSN, CSN and TSO of the HPT airfoils;

(h)  Engine logbook and Module logcards or listing of status of Engine Modules, Hard Life Parts, Life Limited Parts and accessories by description, part number, serial number, TSN, CSN, TSO, CSO, TSLSV, CSLSV, time remaining to scheduled removal, inspection, bench test, overhaul (as appropriate);

(i)  Accessory and QEC listing and status;

(j)  Export certificate of airworthiness. If Lessee's Aviation Authority does not normally issue such a certificate, Lessor will accept an equivalent letter from the Aviation Authority confirming that the Engine complies in all respects with the requirements in force at that time if it were installed on a Host Aircraft which itself qualifies for an export certificate of airworthiness;

(k)  Any SOAP analysis performed pursuant to Clause 20.2.

59

# <u>EXHIBIT C</u>

**(Northwest Airlines October 7, 2005 Transcript)**

56772-002\DOCS_SF:74246.6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------X
                                      :
In Re the Matter of:                  :  05-17930
                                      :
      NORTHWEST AIRLINES CORP.,       :  One Bowling Green
                                      :  New York, New York
             Debtors.                 :  October 7, 2005
--------------------------------------X
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ALLAN G. GROPPER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          BRUCE ZIRINSKY, ESQ.
                          NATHAN HAYNES, ESQ.
                          MARC ELLENBERG, ESQ.

For Unsec. Creditors:     SCOTT HAZAN, ESQ.

For U.S. Bank:            RICHARD HIERSTEINER, ESQ.

For Goldman, Sachs:       DOUGLAS LIPKY, ESQ.

For ADHN Leasing:         THOMAS MCAULEY, ESQ.

For Ad Hoc Committee:     RISA ROSENBERG, ESQ.

For ABN Amro:             MICHAEL RICHMAN, ESQ.

For GE Comm. Aviation:    RICHARD P. KRASNOW, ESQ.

Court Transcriber:        SHARI RIEMER
                          TypeWrite Word Processing Service
                          356 Eltingville Boulevard
                          Staten Island, New York 10312

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1              THE COURT:  Good morning.

2              This is a hearing in <u>Northwest Airlines</u>.

3              May I have appearances, please, from all parties who

4    expect to speak or who want their appearance noted on the

5    record.

6              MR. ZIRINSKY:  Good morning, Your Honor.

7              Bruce Zirinsky from Cadwalader, Wickersham & Taft on

8    behalf of Northwest Airlines and the other debtors.

9              Mr. Nathan Haynes from my office, Mr. Mark Ellenberg,

10   Mr. Gregory Petrick.

11             THE COURT:  We have a committee.

12             MR. HAZAN:  Yes, Your Honor, you have a committee.

13             More importantly, or of equal importance --

14             THE COURT:  Well, the creditors have a committee.

15             MR. HAZAN:  Good morning, Your Honor.

16             Scott Hazan and Brett Miller from Otterberg,

17   Steinham, Houston & Rosen, P.C., proposed counsel subject to an

18   order of Your Honor for the official unsecured creditors

19   committee.

20             MS. MARTINI:  Deidre Martini, United States Trustee.

21             THE COURT:  So the United States Trustee is still

22   alive notwithstanding the impending date of October 17th?

23             MS. MARTINI:  We're hanging in there, Judge.  Thanks

24   for asking.

25             THE COURT:  All right.

3

1              MR. MOSUMOTO:  Brian Mosumoto for the Office of the

2 United States Trustee.

3              MR. RICHMAN:  Good morning, Your Honor.

4              Michael Richman of Mayer, Brown Rowe & Maw.  I'm

5 representing ABN Amro, one of the objectors on Schedule A and

6 B.

7              MR. STEWART:  Michael Stewart of Sheppard, Mullin,

8 Richter & Hamton, LLP on behalf of U.S. Bank in its commercial

9 capacity.

10             MR. MCCARTY:  Good morning, Your Honor.

11             David McCarty of Sheppard, Mullin, Richter & Hampton,

12 LLP, appearing for U.S. Bank National Association as indenture

13 trustee for airport revenue bonds [sic].

14             MS. WEISS:  Good morning, Your Honor.

15             Allison Weiss from LeBoeuf, Lamb, Greene & MacRae,

16 appearing for U.S. Bank as trustee.

17             MR. HIERSTEINER:  Good morning, Your Honor.

18             Richard Hiersteiner of Palmer & Dodge in Boston,

19 representing U.S. Bank National Association and U.S. Bank Trust

20 National Association as trustee.

21             MR. BENNETT:  Good morning, Judge.

22             Marc Bennett of Allen & Overy for KLM Dutch Airlines.

23             MS. TRUM:  Good morning, Your Honor.

24             Sarah Trum from Winston & Strawn on behalf of First

25 Chicago Leasing Corporation.

4

1

2          MR. WATSON:  Jason Watson of Austin & Byrd in Atlanta

3   on behalf of Wachovia Bank, N.A.

4          MR. FORNIEL:  Good morning, Your Honor.

5          Joseph Forniel [Ph.] from Reed, Smith on behalf of

6   Wells Fargo National Bank.

7          MR. LIPKY:  Good morning, Your Honor.

8          Douglas Lipky of Vedder, Price on behalf of Goldman,

9   Sachs, Bank of America, MBIA Insurance, Sumitoma Bank and

10  several other German banks.

11         Good morning.

12         THE COURT:  Good morning.

13         MR. HOLLANDER:  Good morning, Your Honor.

14         Evan Hollander from White & Case, LLP, counsel to

15  SMDC Capital Markets.  We represent one of the aircraft

16  pursuant to Exhibit B.

17         I'm not certain that we're going to have to speak

18  today but we reserve the right.

19         THE COURT:  All right.

20         Thank you for noting that you're on Exhibit B, Mr.

21  Hollander.

22         As I've stated before in hearings in this case, I was

23  a partner of White & Case more than five years ago at this

24  point but I'm still a pensioner and, therefore, am conflicted

25  with White & Case so I can't act on any matters on which White

5

1  & Case appears.  I don't believe, however, that under the

2  circumstances of this motion that it will present any

3  difficulty today.

4          White & Case is in Exhibit B, represents an Exhibit B

5  party and we're really dealing principally today with the so-

6  called Exhibit A parties and I will if necessary refer the

7  issues relating to Exhibit B or relating to White & Case to

8  another judge.

9          That will be a general principle in this case and I

10  don't believe it should create any serious difficulties.  If it

11  does we'll deal with them appropriately.  If any party feels

12  that this is inappropriate, they are certainly welcome to let

13  me know at any time in the near future.  Obviously, you don't

14  have to do so now.

15          Yes, sir.

16          MR. CHIU:  Thank you, Your Honor.

17          Conrad Chiu of Pitney, Hardin on behalf of The Fifth

18  Third Leasing Company.

19          MR. MCAULEY:  Good morning, Your Honor.

20          Thomas McAuley [Ph.] on behalf of ADHN Leasing and

21  Pitt Aviation [sic].

22          We filed an objection relating to the Exhibit A

23  leases last night and I just wanted to make sure Your Honor was

24  aware of that.

25          THE COURT:  All right.

6

1           MR. MCAULEY:  Thank you.

2           THE COURT:  I have a number of objections.  I think

3 they cover the gamut and I hope that the objecting parties will

4 find some way to deal with the issues in common or at least

5 whoever speaks first is welcome to make their points and then

6 we'll hear only additional argument to the extent it's

7 necessary; that it adds something.

8           MR. MCAULEY:  Thank you.

9           MS. ROSENBERG:  Good morning, Your Honor.

10           Risa Rosenberg from Milbank, Tweed, also Dennis Dunne

11 from Milbank, Tweed on behalf of an ad hoc committee senior

12 holders of aircraft related securities.

13           THE COURT:  I have your multiple objections.

14           MS. ROSENBERG:  Thank you, Your Honor.

15           THE COURT:  They're all the same, I believe, but

16 they're for different parties.

17           MS. ROSENBERG:  That is correct, Your Honor.

18           THE COURT:  Word processing is wonderful.

19           MS. ROSENBERG:  That's correct.

20           MR. PETTIT:  Good morning, Your Honor.

21           I'm Peter Pettit [Ph.].  I'm here on behalf of NCC

22 Heat Company, Bell Atlantic, Tricom Leasing, BATCL2 1991, Inc.

23 and various other participants and their respective owner

24 trustees.

25           THE COURT:  Well, I give you a great deal of credit

7

1   for being able to do that without notes.

2            MR. BARRACK:  Good morning, Your Honor.

3            David Barrack of Fullbright & Jaworski on behalf of

4   the International Air Transport Association.

5            MS. MAI:  Good morning, Your Honor.

6            Stephanie Mai and Mark Fucci of Bingham, McCutchen, h

7   here on behalf of UBS, A.G., Stamford Branch.

8            THE COURT:  All right.

9            Well, thank you.

10           We have a number of matters that were adjourned or

11  put on for today but, I believe, many of them are being

12  adjourned.  The debtors filed yesterday an agenda which is

13  available to all parties on the internet.  Hopefully, we can

14  follow that practice and all parties will know where they stand

15  and where the calendar stands.

16           Obviously, all parties will have an opportunity to be

17  heard on matters that need to be heard.  We're going to set a

18  schedule for the next couple of hearings and then we can,

19  perhaps, schedule hearings in the future on specific dates so

20  that parties will be convenienced as much as possible.

21           With regard to Exhibit B, it seems to me that

22  although I'll hear argument from the parties to extent

23  necessary, it seems to me what we're really talking about on

24  Exhibit B is a question of scheduling.

25           The debtors have in effect, through Exhibit B,

8

1  informed the world that they are considering seriously

2  rejecting those particular leases or abandoning the secured

3  property.  It certainly helps the secured creditor to know what

4  list you're on, at least provisionally, and during the

5  remainder of the sixty days since the date of the order for

6  relief the parties can move forward.

7          If I need a formal motion on Exhibit B, that is if I

8  accept the principle that the debtors are prematurely giving

9  notice of abandonment or rejection, then we'll schedule a

10  hearing.  We'll put all of those on for another date and give

11  parties an opportunity to be heard but it's hard -- and I'll

12  hear argument on the subject but it's hard for me to see any

13  prejudice to any party from being told that, "You're on a

14  provisional list for rejection or abandonment as the case may

15  be" and the parties can then act responsibly and pursue their

16  best business interests and if necessary I'll hear them and

17  I'll hear them before the 60th day or on the 60th day,

18  depending upon where the parties are.  But it does seem to me

19  that in connection with abandonment or rejection, the hallmark

20  of the action of all parties is reasonableness.

21          With having been stated I'll hear from the parties on

22  that motion but should we take care, first, Mr. Zirinsky, of

23  the adjournments and the other matters that we need to take

24  care of today?

25          We can proceed any way you want to.

9

1           MR. ZIRINSKY:  I think, Your Honor, it would probably

2  be more workable if we put the -- this is the only contested

3  matter today.

4           THE COURT:  Right.

5           MR. ZIRINSKY:  So, perhaps, we should go through the

6  rest of the motions, all of which are either resolved or we

7  have agreements to adjourn.

8           THE COURT:  All right.

9           MR. ZIRINSKY:  If I may, Your Honor, I'd like to turn

10  the podium over to my colleague, Mr. Nathan Haynes, who will

11  take the Court through the first part of the agenda and we'll

12  be submitting to Your Honor proposed final orders or orders as

13  the case may be.

14           THE COURT:  All right.

15           MR. HAYNES:  Good morning, Your Honor.

16           Nathan Haynes of Cadwalader, Wickersham & Taft for

17  the debtors.

18           Your Honor, turning to Page 3 of the first amended

19  agenda, uncontested resolved matters, which is Subsection 2.1

20  of the binder.

21           Initially, Your Honor, we have the debtor's motion to

22  maintain and use their existing bank accounts and cash

23  management system.  Your Honor granted this motion on an

24  interim basis on the first day of the case.  We received some

25  informal responses from the State Street and U.S. Banks with

10

1  respect to some language in the order that we've worked out to

2  the parties' satisfaction an will be reflected in the final

3  order that we submit to the Court.

4          Additionally, Your Honor, we got an objection from

5  Fifth Third Bank with respect to a certain bank account that to

6  my understanding has about $15,000.00 in it so it's not a giant

7  issue but all the same, we've agreed to put this matter over

8  solely as it relates to Fifth Third Bank's limited objection to

9  the next hearing date which we understand to be October 19th at

10  10:00 a.m.

11          THE COURT:  All right.

12          All of these or many of these orders were entered in

13  interim form to give the committee an opportunity to review

14  them so I assume the committee has had an adequate opportunity

15  to review these orders and has no further comment?

16          MR. HAZAN:  Good morning, again, Your Honor, Scott

17  Hazan.

18          That is a correct assumption.  We will stand where we

19  think it is appropriate.  But if we don't stand it's because we

20  are fine with the proposed relief.

21          THE COURT:  I'm certainly not urging you to stand at

22  any time.

23          MR. HAZAN:  Your Honor, I would just like to make one

24  notation for the record.

25          The exhibits that were attached to the debtor's cash

11

1   management motion reflected the debtor's enterprise bank

2   account system.  So, accordingly, there are a couple of bank

3   accounts on there that are actually in the name of non-debtors

4   and I just was requested by a party-in-interest to mention that

5   for the record.

6             THE COURT:  All right.

7             MR. HAYNES:  With that, Your Honor, we respectfully

8   request that the Court enter the revised cash management order

9   as a final order of the Court?

10            THE COURT:  All right.

11            MR. HAYNES:  Your Honor, I suggest we have a sheaf of

12  orders --

13            THE COURT:  You can hand them up all at the end.

14            If anybody wishes to be heard on any of these they

15  are welcome to speak up.

16            Next.

17            MR. HAYNES:  Your Honor, the next is our motion to

18  allow us the authority to pay outside maintenance and the

19  service providers; shippers and contractors similarly.  Your

20  Honor, this order was entered on an interim basis on the second

21  day of the case.

22            Your Honor, we received three objections; one was

23  from Wells Fargo and U.S. Bank.  The basis of that objection

24  was relating to the portion of the debtor's motion which

25  addressed that debtor's status as a pass through entity for

12

1  certain funds including construction funds relating to bond

2  facilities.  They may not necessarily be a property of the

3  debtor's estate and the language that we've come to agree with

4  with U.S. Bank and Wells Fargo essentially makes it clear that

5  this order is neutral with respect to parties' obligations with

6  respect to those construction fund payments.

7          Secondly, Your Honor, we've received another

8  objection filed by Aerothrust [Ph.] to request some clarity

9  with respect to ongoing obligations and terms and provisions of

10 the mechanics lien order.  We have made revisions that are

11 satisfactory to each of the parties in that respect and I

12 understand that Aerothrust will not be asserting their

13 objection.

14          With that, Your Honor, I would respectfully request

15 that the Court enter the mechanics lien order as a final order

16 of the Court.

17          THE COURT:  Does anybody wish to be heard?

18                      (No response.)

19          THE COURT:  All right.

20          That will be done.

21          MR. HAYNES:  Turning now to the third item, the

22 debtor's motion to assume certain underlying traffic

23 agreements, industry agreements and clearing house agreements,

24 together with a request to perform certain pre-petition

25 obligations that are settled in connection with the clearing

13

1  house agreements.

2        Your Honor, we've received an informal response

3  Alaska and Hawaiian Airlines.  We have made revisions to the

4  order that the parties have agreed to that have resolved Alaska

5  and Horizon's [sic] issues with the order.

6        Additionally, Your Honor, both the clearing houses,

7  ACH and IATA, reached out to the debtors with respect to

8  certain concerns and we were able to amicably resolve those

9  concerns without either clearing house having to file an

10 objection to the motion.

11       Accordingly, Your Honor, there being no other

12 objections to this relief, we would respectfully request that

13 the Court enter this order as a final order of the Court.

14       THE COURT:  Does anyone wish to be heard?

15              (No response.)

16       THE COURT:  All right.

17       That will be done.

18       MR. HAYNES:  Turning now to the debtor's motion for

19 approval of investment guidelines and authorizing the debtors

20 to continue to perform and provide credit support under their

21 hedging and derivative arrangements.

22       Your Honor, we did not receive any objections to the

23 interim order.  We did receive some informal comments from the

24 State Street Bank but we have inserted, "that are agreeable to

25 both of the parties."

14

1          There being no objections to this motion we would

2  respectfully request that the Court enter the interim order as

3  a final order of the Court as revised pursuant to State

4  Street's comments.

5          THE COURT:  Does anyone wish to be heard?

6                    (No response.)

7          THE COURT:  All right.

8          That will be done.

9          MR. HAYNES:  Turning now, Your Honor, to No. 6.  This

10  is actually a motion that was filed after the petition date.

11  It's a motion under 365 to reject eleven leases and one

12  guaranty relating to real property that the debtors have not

13  been occupying since the petition date.

14          Your Honor, these properties, as I mentioned, were

15  providing no value to these estates as the debtors are not

16  currently resident of any of the properties.

17          The debtors made efforts to market these properties

18  in the pre-petition period as well as during the post-petition

19  period but they received no offers for any of the properties.

20          There being in the debtor's business judgment no

21  value to the estate and continuing to carry these properties,

22  the debtors filed this motion to reject.

23          Your Honor, we received one informal response from

24  the Metropolitan Airport Commission with respect to a mail sort

25  facility lease.  We expect that we will come to an agreement

15

1  with the MAC shortly but with respect to that lease only, we're

2  requesting that the Court move this hearing to the October 19th

3  date and enter the order authorizing the debtors to reject the

4  balance of the leases and the guaranty as listed on the

5  exhibit.

6          THE COURT:  All right.

7          Does anyone wish to be heard?

8          MR. HAZAN:  For Your Honor's benefit, this is one of

9  the matters that we had asked the debtor yesterday when we met

10 with the debtor to make a presentation so that the committee

11 could be satisfied on the process utilized.  The same thing

12 applied with the aircraft on Exhibit A so the committee could

13 be satisfied as to those which the debtor was seeking authority

14 to reject now and the committee was satisfied as to the process

15 that was utilized here on Item 6.

16         The debtor has skipped over Item 5 which is probably

17 the colloquy going on right here.  I'm sure that was

18 inadvertent and they'll be going back to it in a moment.

19         THE COURT:  All right.

20         Then with respect to Item 6, the rejection of certain

21 non-residential real property, leases and a related guaranty,

22 I'll sign an appropriate order also adjourning the one matter.

23         MR. HAYNES:  Thank you, Your Honor.

24         Rolling back to Item 5 which I inadvertently skipped

25 over, this is the debtor's motion to authorize them to continue

16

1  to perform under certain credit card processing agreements and

2  to assume these agreements.

3          Your Honor, this order was entered on an interim

4  basis at the initial hearing.  We've received no response and

5  we respectfully request that the Court enter the order as the

6  final order of the Court.

7          THE COURT:  Does anyone wish to be heard?

8                    (No response.)

9          THE COURT:  All right.

10          Then that will be done.

11          MR. HAYNES:  Your Honor, if I could just move down to

12  the adjourned matters section to No. 1, the motion to establish

13  notification procedures for trading in claims and equities

14  securities.

15          Your Honor, as indicated by the notice of adjournment

16  filed with the Court yesterday, the debtors are requesting that

17  this be moved to October 19th.  There is a concern, however,

18  that the interim order that was entered by the Court on the

19  first day of hearings is not entirely clear as to whether the

20  relief granted would extend past today.

21          Accordingly, Your Honor, we've created something of a

22  bridge order that will keep the relief granted in the interim

23  order in place until such time as the Court enters a final

24  order on the NOL procedures motion or otherwise disposes of the

25  motion.

17

1          THE COURT:  All right.

2          Does anybody wish to be heard on the issue of

3  adjournment of the motion to restrict trading in claims and

4  securities and to enter a bridge order that retains the status

5  quo pending a hearing at a later date?

6          MR. HAZAN:  Judge, Scott Hazan again for the

7  committee.

8          We requested, I think, among other parties, that this

9  matter be adjourned so that we could work with the debtor and

10 the other parties to, hopefully, come up with a consensual

11 order that accomplishes the debtor's goals and, yet, doesn't

12 impinge in any material way on people's rights so that in part

13 it is our request for the adjournment.

14         THE COURT:  Ms. Rosenberg.

15         MS. ROSENBERG:  Your Honor, just a technical matter.

16         We were advised by the debtors that they were seeking

17 this adjournment.

18         We were never asked to give our consent.  We don't

19 give our consent because we're not authorized to do so and if

20 this Court orders the adjournment, this Court will order the

21 adjournment.

22         We gave the debtors detailed comments on the interim

23 order which we feel is insufficiently protective of the

24 legitimate rights of parties.  We, late last night, we received

25 a response for the first time in writing from the debtors to

18

1  those comments.

2          THE COURT:  All right.

3          Does anybody else wish to be heard?

4                  (No response.)

5          THE COURT:  It is certainly the Court's view that the

6  order is an important one.  As to which notice should be

7  provided, I believe you've published notice and are providing

8  notice to all security holders through the indenture trustees

9  and the transfer agents and will eventually provide a notice to

10 all creditors.

11         But it does not seem to me that the interim relief

12 that was entered on the first day of the case was of such a

13 nature as to irreparably or even damage any parties and that if

14 we keep the status quo and allow all parties an opportunity to

15 review the terms of the order and the order, itself, that that

16 is an appropriate step.

17         So we'll enter an order that adjourns this matter and

18 continues the interim order in effect pending a hearing and

19 determination on the motion.

20         Yes, sir.

21         MR. HIERSTEINER:  Your Honor, if I may?

22         Richard Hiersteiner on behalf of U.S. Bank National

23 Association and U.S. Bank Trust National Association Indenture

24 Trustee with respect some aircraft financing.

25         Do I understand that the order will extend the

19

1   interim order through October 19th and not beyond that?

2           THE COURT:  Well, is October 19th going to be

3   sufficient to deal with the issues that have been raised do you

4   believe?  I'm not asking you, I'm asking the debtors.

5           I assume you're not asking that it be adjourned any

6   further?

7           MR. HIERSTEINER:  Correct.

8           Our problem, Your Honor, as indentured trustee is

9   that we maintain the register for claims transfers and there's

10  a provision of the order which provides that the transfers are

11  avoid if they're not in compliance with the terms of the notice

12  provisions which leaves the trustee in the position of not

13  knowing whether a transfer is actually valid or not so we don't

14  know whose instructions to follow and we don't know who to pay.

15          It's a problem for us if it extends for any period of

16  time.

17          MR. ZIRINSKY:  Your Honor, for the record, Bruce

18  Zirinsky.

19          We have engaged in extensive discussions with

20  numerous parties on this order and I think we're working

21  towards what, I hope, will be a global resolution.

22          Our approach is to try to take all of the comments

23  and complaints that we get from each party and we're trying to

24  coalesce it into a unified response that we think will

25  substantially if not entirely resolve people's concerns to the

20

1  extent we have any flexibility to do that.

2          In addition, as Mr. Hayes has indicated, the

3  committee was just formed.  They've just retained counsel and

4  financial advisors.  The committee has asked us to put over the

5  hearing so that the committee can get up to speed and --

6          THE COURT:  I understand.

7          MR. ZIRINSKY:  -- I can't promise we'll be at the

8  finish line by the 19th but we're certainly going to do our

9  best.

10          THE COURT:  Well, ordinarily, the adjournment of a

11  matter like this is an adjournment pending the hearing and

12  determination of a motion.  We'll adjourn the motion to the

13  19th, I'll have a hearing that date.  Any party who wishes to

14  come in and argue that this should be it can do so.

15          If the matter is adjourned further it will be

16  adjourned to another definite date so the indenture trustee

17  will know today and on the 19th exactly where things stand.  I

18  think the indenture trustee needs to know how things stand more

19  than anything else.

20          MR. HIERSTEINER:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          All right.

23          MR. HAYNES:  Your Honor, with respect to the balance

24  of the adjourned matters, I'm happy to run through them to

25  discuss each of them.  Alternatively, I can work with your --

21

1          THE COURT:  I think just so you can report for the
2  people here, just go through them and state the adjournment.
3          MR. HAYNES:  Very well.
4          Your Honor, with respect to No. 2, the motion to
5  establish reclamation procedures, the committee has requested
6  time to review such procedures.
7          Accordingly, we have agreed to adjourn that to
8  October 19th.
9          THE COURT:  All right.
10          MR. HAYNES:  With respect to the bevy of passenger
11  facility charge motions, we have come to an agreement with all
12  the airport movants to move this hearing also to the 19th to
13  give the parties time to seek to amicably resolve these issues.
14          With respect to the balance of the adjournments, they
15  are relating to adequate protection motions filed by various
16  aircraft lenders and I'll turn the podium over to Mr. Marc
17  Ellenberg.
18          MR. ELLENBERG:  If the Court please, Marc Ellenberg
19  of Cadwalader, Wickersham & Taft on behalf of the debtors.
20          Your Honor, a motion for my admission pro hac vice
21  was previously filed with the Court.
22          THE COURT:  I have it.  Please, go ahead.
23          MR. ELLENBERG:  Thank you.
24          Your Honor, all of the adequate protection motions
25  that were noticed for today have been adjourned.

22

1              THE COURT:  Do you need another date?

2              MR. ELLENBERG:  Your Honor, I think for today we

3    should adjourn them to October 19th.  Many of the parties would

4    agree to adjourn them to a longer date and we will, between now

5    and October 19th, work that out with the Court.

6              THE COURT:  All right.

7              We'll adjourn them then until the 19th for holding

8    purposes.  Clearly, I'm not going to hold evidentiary hearings

9    in multiple matters on that date and my policy ordinarily is

10   not to hold evidentiary hearings on the date of a motion

11   calendar.

12             On the other hand, if someone is coming in from out-

13   of-town, that can be varied but ordinarily evidentiary hearings

14   need to be scheduled separately and we still are in the very

15   early stages of the case.

16             So we'll adjourn matters until the 19th and further

17   if necessary.

18             MR. ELLENBERG:  Thank you, Your Honor.

19             As I said, with respect to many of the motions, I

20   already know that we will not need a hearing on the 19th and

21   with respect to the other ones we will try our best to avoid a

22   hearing at any time apart from the 19th.

23             Your Honor, with respect to the adequate protection

24   motions filed by the New York office of Milbank and by the U.S.

25   Bank represented by Palmer & Dodge, I've been asked to read

23

1   into the record some agreements we've made in connection with

2   the adjournment.

3          I would also say that we've made similar agreements

4   with most of the other parties who have adjourned.  At the

5   moment, just Milbank has asked me to read these in and so I

6   will do that.  But I will say for the record to the extent

7   we've made commitments with other parties we intend to live

8   with them and by them.

9          We've agreed, Your Honor, that any adjournment would

10  be without prejudice and not limit, hinder or impair the

11  parties' respective rights under Section 1110 of the Bankruptcy

12  Code.  The parties including both the debtor and the defendant

13  respondents to the adequate protection --

14          THE COURT:  How could that be?  How could the

15  parties' rights under 1110 be effected without their consent?

16          But, please, go ahead.

17          MR. ELLENBERG:  We've agreed that any adjournment

18  will not prejudice and the parties will be entitled to the same

19  rights and to make the same arguments as if the motion had been

20  heard on October 7th.

21          In addition, Your Honor, the debtors have committed

22  to provide the following relief sought in the motions

23  immediately.  First, the immediate right to inspection at a

24  mutually convenient time and a commitment to cooperate in

25  scheduling of such inspections.  Second, access to and copies

24

1    of all maintenance, records and other aircraft equipment

2    documents.  Third, confirmation that insurance is being

3    maintained in accordance with the provisions of the underlying

4    documentation and that the airline is complying with FAA

5    regulations including FAA mandated maintenance procedures.

6    Fourth, that the subleasing covenants, to the extent they

7    exist, are not being violated and, finally, that the aircraft

8    have their matching engines on them unless the engines are

9    taken off for maintenance in the ordinary course of business.

10          Thank you.

11          THE COURT:  I assume these are in general the

12   debtor's policies with regard to all aircraft, at least to the

13   extent reasonably possible?

14          MR. ELLENBERG:  That's correct, Your Honor,

15   particularly the part about complying with FAA regulations.

16          THE COURT:  I think we'll take judicial notice of

17   that until informed otherwise.

18          MR. ELLENBERG:  Thank you, Your Honor.

19          MR. HAYNES:  Your Honor, Nathan Haynes again from

20   Cadwalader.

21          Turning now to Page 17 of the agenda, motions with no

22   current hearing date scheduled, just to provide the Court with

23   an update as to where we are.

24          Two fuel companies filed motions seeking

25   reconsideration of the fuel supply order that was entered on

25

1    the first day of hearings in these cases.  Your Honor, we are

2    continuing to work with Conoco as well as Valero to resolve

3    their issues without having to bring this matter before the

4    Court.  We are endeavoring to get that completed by the next

5    hearing date on October 19th.

6              With that, Your Honor, I would respectfully request

7    that I would be able to turn the podium over to Mr. Bruce

8    Zirinsky to discuss on Page 7 of the agenda the adversary

9    proceeding of Northwest Airlines v. American Express.

10             MR. ZIRINSKY:  This will be very short, Your Honor.

11             We are on the verge of completing an agreement with

12   American Express.  We are optimistic that we will actually have

13   a signed agreement early next week which we would then be in a

14   position to present to the Court on appropriate notice for

15   approval.

16             With the consent of counsel for American Express, my

17   request today is to put over the hearing for one week just for

18   holding purposes, which would be the 14th, I believe.  I

19   believe we already have one other matter on Your Honor's

20   calendar that day.  I believe it's with respect to the

21   utilities --

22             MR. HAYNES:  That's the carry over date for the

23   utility motion, Your Honor.

24             THE COURT:  All right.

25             MR. ZIRINSKY:  I don't expect we would go forward on

26

1  that date, Your Honor, but I would go to the 19th except Mr.

2  Schwartz and I agree that we put it over for a week.

3          THE COURT:  We'll put it over then until the 14th

4  with a possible further consensual adjournment to the 19th and

5  beyond if the parties wish.

6          MR. ZIRINSKY:  Thank you, Your Honor.

7          Yes, if we reach agreement, Your Honor, obviously we

8  would seek to withdraw the adversary proceeding as part of the

9  Court's approval of the settlement.

10         Thank you.

11         THE COURT:  Now, I disclosed at a hearing on Monday

12 and I will repeat it today because there are many more parties

13 here, that I learned to my considerable dismay that I was

14 apparently a creditor of Northwest Airlines.  I spoke at the

15 International Bar Association Conference last week and had

16 purchased a ticket, I thought, on KLM and found to my dismay

17 after I entered first day orders in this case reinstating

18 Northwest tickets and ticketholders rights, that I was a holder

19 of a Northwest ticket and I found to my -- I guess I should

20 have anticipated it -- that since I paid with an American

21 Express card I was an interested party in the American Express

22 adversary proceeding with has to do with if you've seen the

23 papers the rights of parties who may hold tickets on Northwest

24 and surrender them for a refund and my American Express bill

25 duly says Northwest, not KLM.

27

1              So I see no way out of this dilemma since I've

2    entered orders that would otherwise directly effect my rights

3    just to lose the ticket and take the loss.  So I have a ticket,

4    I didn't use it, I did not fly on KLM, I flew on another

5    airline last week.  I will not put the ticket in for a refund,

6    I will not file a claim as a creditor or Northwest for this

7    ticket.  I will take the loss and rack that up to experience.

8    I don't see any other way to proceed in an appropriate fashion.

9              So I make these disclosures because I think this

10   matter should be disclosed, although it's a very small matter,

11   maybe some creditors and security holders will feel that at

12   least the Judge is sharing a little of their pain in the

13   bankruptcy case and I'm sure the debtor is also feeling the

14   pain of a Chapter 11 case that I assume it did not want if it

15   could have avoided it.

16             In any case, I make those disclosures and we'll

17   proceed.

18             Mr. Zirinsky, what else do we have on the calendar

19   today?

20             MR. ZIRINSKY:  The only matter remaining, Your Honor,

21   is the rejection motion with respect to Exhibit A and as Mr.

22   Ellenberg will handle that, he will also indicate to the Court

23   that there are thirteen aircraft on Exhibit A and we have

24   reached agreements with parties with respect to six of those

25   aircraft.  We're engaged in negotiations whereby they would

28

1  modify the economic terms of those aircraft together with other

2  aircraft they have in Exhibit B.  The agreement we've reached

3  for the moment -- for today at least we would move those six

4  from Exhibit A to Exhibit B.  Exhibit B is being adjourned,

5  which Mr. Ellenberg will describe, but we are prepared to go

6  forward with the balance of the aircraft on Exhibit A and with

7  respect to any objections that the Court may hear.

8            THE COURT:  All right.

9            MR. ZIRINSKY:  Thank you.

10            MR. ELLENBERG:  If the Court please, Marc Ellenberg

11  of Cadwalader, Wickersham & Taft on behalf of the debtors.

12            Your Honor, before the Court is the debtor's motion

13  for an order authorizing the rejection of certain aircraft

14  leases under Section 365 of the Bankruptcy Code and the

15  abandonment of certain aircraft which are securing claims of

16  creditors under Section 544 of the Bankruptcy Code.

17            Your Honor, the motion as you know, divides the

18  transactions at issue into two categories; Exhibit A consists

19  of aircraft which we request be rejected immediately or

20  abandoned immediately, although I think in fact they are now

21  all leases.  These aircraft have been parked in the desert.

22  They are not flying.  They are not providing value to the

23  estate.  On Exhibit B we have aircraft which under their

24  existing lease or financing terms are burdensome to the estate.

25   However, because of the nature of the aircraft involved,

29

1  should we be able to renegotiate the terms of the leases or

2  financings, it is possible that they would then become valuable

3  to the debtor and so as to those we've requested the authority

4  to reject or abandon but, also, the discretion not to exercise

5  that authority for a 45 day period.

6           THE COURT:  Does that 45 day period take us beyond

7  the 1110 -- sixty days?

8           MR. ELLENBERG:  We had not intended it to when we

9  filed the motion, Your Honor.  I think at this point it will,

10 however, we don't override 1110 by requesting this relief so to

11 the extent 1110 obligations were to mature before the end of

12 the 45 day period we would have to deal with that wholly apart

13 from any relief granted under this motion.

14          THE COURT:  All right.

15          I think what we need -- I'll hear from any party with

16 regard to the Exhibit B leases but consistent with what I said

17 earlier, I think what we need is an order which I'd ask you to

18 draft and discuss with the interested parties that will adjourn

19 the Exhibit B portion of the motion that gives the debtor the

20 right to designate finally any property for abandonment or

21 rejection on very short notice -- I'm contemplating two or

22 three days -- so that any party who wishes to be heard on the

23 subject of abandonment or rejection could be heard and I'll

24 hear any issues but I have not seen any issues yet that go to

25 the debtor's fundamental business judgment.

30

1          As far as I understand the issues that have been

2    raised with Exhibit A, it all goes to the obligations -- what

3    does Section 1110 mean if it's relevant at all with respect to

4    the obligation to surrender and return and that I'll hear today

5    assuming that it's still an issue and I guess it is with some

6    of the parties.

7          On the abstract question of does the debtor have the

8    right to reject or abandon in the abstract under Exhibit B, it

9    seems to me that whole issue can be avoided by a scheduling

10   order.  You certainly have the right to bring on a motion to

11   reject or an abandonment notice on very, very short notice.

12   Indeed, an abandonment notice may not require any notice at all

13   but since I do think parties should act reasonably, there

14   should be a date on which you make the final determination

15   unless you agree differently with a party.  If a party at that

16   point wants to come in and say, "You can't abandon or you can't

17   reject," I'll hear it on very short notice but I'm not sure

18   that there will be any issue on that score.  The issue is what

19   are you obligations with respect to abandonment.

20         If anybody has any further issues with regard to the

21   handling of Exhibit B I'll hear them but I don't see any reason

22   to get into abstract issues of bankruptcy law if we can avoid

23   them simply by having a reasonable scheduling order.

24          All right?

25          MR. ELLENBERG:  Thank you, Your Honor.

31

1              Your Honor, as Mr. Zirinsky mentioned, we have

2    revised Exhibit A.  In the course of negotiations with certain

3    of the Exhibit B parties who also had plans on Exhibit A, the

4    negotiations broadened to include some of the Exhibit A

5    aircraft and so we have migrated six planes from Exhibit A to

6    Exhibit B.

7              Your Honor, I have revised exhibits here which I

8    would like to hand up.

9              THE COURT:  Well, I think when we enter an order on

10   these motions it ought to be an order that you would give an

11   opportunity for parties to see.  Certainly, we can so order the

12   movement of Exhibit A aircraft to Exhibit B aircraft with the

13   consent of the parties.

14             MR. ELLENBERG:  Okay, Your Honor.

15             We will handle it that way.

16             Just for the record, what is now left on Exhibit A

17   I'll just give tail numbers:  N646US, N211NW, N524US, N926RC,

18   N983US, N985US, N986US.

19             I may need to retire soon, Your Honor, because this

20   print was just barely large enough for me to able to do that.

21             So, Your Honor, what we have left today then are a

22   motion to reject those aircraft which I just mentioned which

23   remain on Exhibit A.  The relief, Your Honor, is very simple

24   and I believe quite narrow.

25             With respect to Section 365 we need to convince this

32

1   Court that the rejection is in the best interests of the

2   estate.

3          THE COURT:  Well, as I understand it, the issues that

4   have really been raised are (1) whether 1110 applies at all and

5   you say it doesn't in the first sixty days; and (2) if it does

6   apply, what surrender and return means.  I think those are the

7   real issues for today, although I'm not trying to create any

8   issues that don't need to be decided today.

9          MR. ELLENBERG:  Actually, I see that just a bit

10  differently, Your Honor.

11          I believe, certainly, that the only issues for today

12  are have we met the standards of 365 or 544 to either reject or

13  abandon and no objection has questioned that we've met those

14  standards.

15          The objections, then, I think take several forms.

16  One is that either some conditions have to be attached to that

17  rejection or abandonment and we don't believe there's any basis

18  in the Code for conditioning the effectiveness of rejection or

19  abandonment.  The second related argument is that if you reject

20  or abandon you still need to comply with Section 1110 and, more

21  specifically, 1110(c).

22          If I could take those two in order, Your Honor.  With

23  respect to whether there are conditions to rejection or

24  abandonment, we don't believe that the Code provides any basis

25  for that.  Rejection is by definition a breach and by

33

1 definition it creates a claim.  We are not through this motion

2 trying to address what those claims are.  We are not trying to

3 foreclose those claims.  By definition we're creating the

4 claims through the rejection.  If parties believe that

5 subsequent to rejection we have continuing obligations and that

6 we're not meeting them, then they can either file a claim or

7 they can seek injunctive relief if they believe they have a

8 basis for it.

9           I would say the same is true with respect to

10 abandonment.  Once we've met the standard, we've abandoned.

11 That means that they have relief from the automatic stay and

12 can foreclose.  They still have a claim.  To some extent it may

13 still be a secured claim, to some extent it may not.  They may

14 have other claims based on their access to the collateral but

15 none of that is raised by this motion.  None of that will be

16 decided by this motion.

17           With respect to 1110, Your Honor, we do not believe

18 that 1110 and, more particularly, 1110(c) is triggered because

19 we are not turning over the aircraft -- let me say it another

20 way -- relief from stay is not being triggered by our failure

21 to make an 11(a)(2) commitment within sixty days and that on

22 the face of the statute is what triggers 1110(c).

23           THE COURT:  What do you do with Judge Marx' opinion

24 which one of the parties has given me?  You don't mention it in

25 your reply papers.

34

1          MR. ELLENBERG:  I understand, Your Honor, and the

2     reason we don't mention it and didn't want to get into it is

3     that I think the real issue for today is whether or not 1110(c)

4     applies.  Is this motion in any way addressing the consequences

5     of that?  We think the answer is no.  If we have obligations

6     under 1110(c) and we're failing to meet them and that creates

7     claims then, again, the parties can assert those claims.  If

8     that creates the basis for injunctive relief then the parties

9     can seek that relief.

10          We're not addressing those issues.  All we are

11     addressing is have we met the standard to reject under 365 or

12     abandon under 544.

13          THE COURT:  That seems to invite a whole series of

14     adversary proceedings in which some of the creditors who have

15     taken more extreme positions come in and move to require you to

16     comply with 1110(c).

17          MR. ELLENBERG:  Your Honor, that is their right to

18     do.  We're not inviting those actions.  We are in active

19     dialogue with most if not all of the objectors.  We hope that

20     we can work those issues out but there is an amazing

21     constellation of demands which have been put on us all under

22     the umbrella assertedly under Section 1110(c) and we're trying

23     to work through those issues and I'm sure we will work through

24     many of those issues but I don't think any of those issues need

25     to be decided today.  We are seeking to reject -- period.  It's

35

1    a breach.  To say that we have to comply with certain

2    provisions of the lease that we've just rejected, if we fail to

3    do that well that's just another breach.  We've already

4    breached.  That's what rejection is about.  If we have

5    continuing obligations and we don't meet those then the parties

6    can seek recourse but today's motion is not about that.  It's

7    not about what those obligations are.  It's not about what our

8    liability would be.  It's not about the priority of their

9    claims.  It's about whether we have authority to reject the

10   lease.  That is the first step.  If we need to address the

11   other steps, we'll address them at a future date.

12              I think there are only two other issues, Your Honor;

13   one is insurance and maintenance.  We don't believe under

14   Section 365 or 544 that post-rejection or abandonment we have

15   any obligation to either maintain or insure the aircraft.

16   Nonetheless, because we are trying to create a dialogue with

17   the counterparties and work constructively towards a

18   renegotiation if possible of many of our relationships, we have

19   volunteered to bound by a commitment for thirty days to

20   continue to insure and do storage maintenance on the aircraft.

21    Some of the parties have complained that thirty days isn't

22   long enough or that it should be thirty days or the date they

23   pick up the aircraft, whichever is later and, Your Honor, I

24   would note two things; first, I'd note there is some

25   inconsistency with a request for more time and the demands

36

1  under 1110(c) that surrender needs to be immediate, second,

2  we're doing this as a volunteer, we're agreeing to be bound by

3  it but, really --

4          THE COURT:  Well, you know no good deed goes

5  unpunished.

6          I'm not determining that there are any good deeds or

7  that there aren't but, certainly, that adage applies here and

8  most cases.

9          MR. ELLENBERG:  It applies in every bankruptcy case

10 I've been in, Your Honor.

11         In any event, we do believe that this is a good deed.

12  We think what we've proposed is reasonable and we don't think

13 there's any legal basis for imposing greater obligations on us

14 and so we would request that those objections be overruled.

15         The other issue, Your Honor, and I think it's

16 probably a tempest in a teapot, is whether the rejection can be

17 effective as of the date the motion was filed which in this

18 case was the petition date or whether it is only effective on

19 the entry of the order.  The reason I think it's a tempest in a

20 teapot, Your Honor, is that I'm not sure what the overall

21 difference a ruling on that issue will have.  I assume the

22 concern on both sides is whether the debtor is incurring an

23 administrative expense claim during the period between

24 commencement of the case and the effectiveness of the rejection

25 order.

37

1          I don't believe we could possibly be incurring such a

2     claim even if the order were only effective as of today because

3     we're not getting any benefit from these aircraft.  We're

4     certainly not inducing performance by the other side.  The

5     other side has been on notice that they could come and pick up

6     these planes and if they really wanted them they could have

7     asked us for them and Section 365(d)(10) provides that with

8     respect to leases of real property the debtor basically has a

9     sixty day free ride --

10          THE COURT:  Leases of personal property.

11          MR. ELLENBERG:  Yes, which is what the aircraft are,

12     Your Honor.

13          So, I don't see any way in which we could be

14     incurring administrative expense even if the order is only

15     effective today.

16          THE COURT:  But consistent with your prior position

17     you'll leave that for another day?

18          MR. ELLENBERG:  Well, Your Honor, if the parties will

19     let me I'd be happy to do that.  We do believe that we have

20     cited adequate authority in our reply brief on Pages 8 and 9

21     for the proposition that the Court could make this order

22     effective as of the date that the motion was filed because the

23     notice provided by the motion is, itself, equitably adequate to

24     support the relief and as one Court ruled in the In Re:

25     Buyrite Distributing case, the Court's approval is really

38

1   conditioned subsequent to the rejection which has effectively

2   already occurred.

3           So we believe the Court could enter that order as

4   we've requested it and that is the relief we continue to ask

5   for, although again, I'm not sure that as a practical matter it

6   makes all that much difference.

7           Thank you.

8           THE COURT:  Thank you.

9           All right.

10          Who wishes to speak in opposition?

11          MR. RICHMAN:  I'll volunteer.

12          THE COURT:  All right.

13          MR. RICHMAN:  Good morning again, Your Honor.

14          Michael Richman of Mayer, Brown, Rowe & Maw.

15          Before I begin, I think counsel's recitation of the

16  tail numbers may have been wrong.  That is I think you were

17  reading from the B schedule and not the ones removed from the A

18  or remaining on the A because we're on the A schedule and I

19  didn't hear our tail numbers mentioned.  So I just wanted to

20  get that clear.

21          MR. ELLENBERG:  I was reading A.  I can read them

22  again if you'd like.

23          MR. RICHMAN:  Well, I thought ours were 528 and 529.

24          MR. ELLENBERG:  They may have been moved.

25          MR. RICHMAN:  Well, if they were moved nobody

39

1  informed us and we don't have an agreement and my client is in

2  the court.  I don't think we have an agreement and now is when

3  to move.  So I think we're still supposed to be on A.  We

4  certainly didn't consent to an adjournment.

5          MR. ELLENBERG:  Nos. 528 and 529 are on B.

6          MR. RICHMAN:  Well, does somebody want to tell me who

7  consented to that before I argue?

8          MR. ELLENBERG:  Well, frankly, I'm not sure you need

9  to consent.  It's really our decision as to whether we're

10 rejecting you or not.

11         THE COURT:  Well, if you want to make your argument,

12 you may make your argument for the whole group.

13         MR. RICHMAN:  Your Honor, in an abundance of caution

14 I'll make the argument and I'll try to be as succinct as

15 possible.

16         THE COURT:  Well, yes, I've read your papers.  I

17 think you gave me a copy or you referred to Judge Marx'

18 decision and I've read that.

19         MR. RICHMAN:  Yes, Your Honor.

20         Also, it is -- and I think Your Honor recognized this

21 earlier -- the Exhibit B issues to the extent they cover return

22 are, of course, overlapping with A.  That is whatever authority

23 that is given with respect to rejecting the leases in the

24 future would still have to comport with whatever the Court

25 decides on the return conditions issue.  But I think Your Honor

40

1  is correct that the issue that really is being argued even

2  though Mr. Ellenberg says we're not arguing that 1110 applies

3  or not, the issue is really whether if you reject an aircraft

4  lease in the first sixty days of the case that any part of 1110

5  applies.

6         So I think -- and it's always useful to start with

7  exactly what the Bankruptcy Code says and I think we should

8  look at that language.

9         Section 1110(c) is really the provision that we are

10 most concerned with.  1110(c)(1) says that the trustee or in

11 this case the debtor "shall immediately surrender and return"

12 and, of course, the words "surrender and return," a statutory

13 performance obligation is the key to this dispute.

14        THE COURT:  Well, I've read the statute and I see the

15 words "surrender and return" but it's also, I think, of some

16 little interest that what I don't see is in accordance with the

17 provisions of the applicable lease or security agreement.

18        MR. RICHMAN:  That is correct, Your Honor.

19        However, to give meaning to the word "return," we

20 have to say it means something more than "abandon wherever the

21 aircraft and its parts may be."  In fact, let me just make this

22 point.  It's not so simple as if to say "the aircraft are

23 sitting in the desert" because the leases cover not just the

24 aircraft but the parts such as the engines.  I don't know about

25 the other parties.  In our case we've been informed that one of

41

1 our engines is in a repair shop in Germany.

2           THE COURT:  Well, repair shops in Germany is a unique

3 situation that would seem to me requires some cooperation

4 between the parties and, I fear [sic], a commitment on the

5 debtor's part to cooperate and somebody cited to me a Chapter

6 13 case where the Chapter 13 debtor said in exactly these

7 circumstances to the secured party, "Go pick up the car in the

8 repair shop and, by the way, pay the repair bill and the

9 storage costs and then you'll have your property back" in a

10 Chapter 13 case.

11          So I understand that argument but I don't see in

12 1110(c) the language in accordance with the provisions of the

13 lease which, by the way, appears in 1110(a).  So if Congress

14 wanted to use those words or was induced by the lenders to use

15 those words, it did, and when the lenders' rights were not

16 quite so broad, Congress just said "surrender and return,"

17 whatever that means.

18          MR. RICHMAN:  Well, Your Honor, respectfully we

19 disagree for the reason that the parties in the lease, not just

20 our parties but all the other parties, actually negotiated and

21 agreed to what they meant by "return" and "return" is defined

22 in the leases.  So it would be logical to say that if there's a

23 performance obligation to return, that you look to what the

24 parties actually agreed that "return" meant.

25          But in addition to that, even if that's not the right

42

1  answer or not the answer that the Court would adopt, "return"

2  has to mean something that requires much more than mere

3  abandonment from a performance as well as from a claims

4  standpoint but I appreciate and agree with the way Your Honor

5  is construing how Congress acts and that is directly relevant

6  to the question of whether 1110(c) applies here because if we

7  look further in 1110(c) it says that this "surrender and

8  return" obligation applies any time after the date of the order

9  for relief that the secured party becomes entitled to take

10 possession.  Well, Your Honor, it doesn't say "any time after

11 the 60th day."  It says, "any time after the order for relief.

12        THE COURT:  That's what Judge Marx held.

13        MR. RICHMAN:  Right.

14        So there is clearly an acknowledgement that where a

15 lease is rejected -- and I think its indisputable that when a

16 lease is rejected the secured party has the right to take

17 possession that 1110(c) has to apply and that if we were to say

18 it doesn't that we would be engrafting a judicial amendment to

19 the Bankruptcy Code.

20        The debtor's response to that is probably, "Well, who

21 cares because we don't have to determine that today.  Go spend

22 what you have to spend."  I think we have to pay the repair

23 shop in Germany $2 million which is what they're owed by

24 Northwest in order to get that engine back and then probably

25 complete the repairs which it was their obligation to repair.

43

1  So they can say, "Well, you can monetize it all and, therefore,

2  bring an administrative claim and argue 1110 later."  The

3  problem is that it's a statutory performance obligation and

4  Northwest is in a much better position to make deals, to

5  deliver the goods, to assemble them wherever they are and to

6  get them to at least an agreed return point.  The leases do

7  have agreed return points.  They aren't arbitrary and they were

8  negotiated with respect to where the parties did business.  So

9  they're in a much better position to do that at much less

10  expense then say that a secured creditor has to essentially

11  finance a future litigation and then take a chance of getting

12  that back.  We don't have the same information base as they

13  have.  It's a very different matter.  So they say, "Well, all

14  we're doing is breaching the lease" but if 1110(c) applies

15  they're flouting the statute and the statute has an affirmative

16  performance obligation and fundamentally they're asking this

17  Court today to agree that they don't have to comport with the

18  performance obligation imposed by Congress.  So even though

19  they take the position that they don't think it applies, this

20  whole debate is really in the nature of a motion for

21  declaratory relief that they don't have to comply with that

22  because if they don't have to perform that and it just becomes

23  an administrative claims controversy later, then they've

24  essentially been given relief from the statute.  Congress

25  didn't them a choice.  Congress didn't say, "You can either

44

1  surrender and return or put it to the secured creditor to take

2  care of themselves and you can fight about it later."

3         THE COURT:  But if I understand what Mr. Ellenberg is

4  saying today, he is saying that the Court can't effectively

5  decide any of these issues in the abstract.  They relate to

6  specific leases, they relate to general obligations even if the

7  leases aren't complied with.  Altogether, they relate to the

8  reasonableness of telling a secured party to go to Germany and

9  pick up your engine there and pay a $2 million bill and all of

10 that can be resolved on a case-by-case basis later and we're

11 dealing with sophisticated parties who have the wherewithal to

12 protect themselves in the meantime.

13        What the statute says as clearly as it can state is

14 that the right of the secured lender or lessor to take

15 possession shall not be interfered with by the debtor and

16 they're saying, "We're not interfering with it."

17        MR. RICHMAN:  I think it's more than that because if

18 the Court doesn't require compliance with 1110(c), even if the

19 Court doesn't say what that means today, we know that their

20 position is that we have an unsecured claim at best and that

21 they will leave the property where it is.

22        THE COURT:  You don't agree with that and you have

23 your remedies.

24        MR. RICHMAN:  We think at a minimum that the Court

25 should direct compliance with 1110(c).  They may be right that

45

1  the precise -- if they flout the Court's order and they don't

2  comply and they just leave it where it is, I'm not sure what

3  implications that has but it has to be something more punitive

4  than an administrative claim.  I don't think a party should be

5  able to deliberately flout express statutory performance

6  requirements and it may well be that if the debtors were

7  informed that return does mean something more than just leaving

8  a secured creditor to pick it up that, perhaps, given the

9  reasonableness benchmark that Your Honor indicated earlier,

10  that reasonable agreements would be reached and litigation

11  wouldn't be needed.

12          The issue also -- and particularly, Mr. Ellenberg's

13  position on nunc pro tunc, does have an issue insofar as the

14  insurance coverage is concerned because, again, they take the

15  position that they're volunteering to provide insurance for

16  thirty days but if we can't get the engine, say, out of Germany

17  within that frame of time then we're completely exposed and the

18  exposure is particularly implicated by saying that this can be

19  a nunc pro tunc.

20          If you look at the cases on nunc pro tunc, I don't

21  believe any of them involve aircraft leases, they involve real

22  property leases where the landlord has actually had possession

23  from the time that the debtor indicated it was giving up

24  possession for the most part.  But, here, where we're dealing

25  with physical goods that may be scattered around the country or

46

1  around the world, it's a little too clever to say, "Oh, nunc

2  pro tunc is done all the time" because it means effectively --

3  in fact, they said they don't feel they're obligated to insure

4  even back to the petition date if they get nunc pro tunc relief

5  --  that we would, again, be exposed until we can get

6  everything back.

7          So the requirement ought to be -- and this is, again,

8  embedded in the concept of surrender and return -- that until

9  the return is actually effectuated they have to cover the

10 machinery and that's the equipment and that's why, looking at

11 it as an affirmative performance obligation is so much

12 different than considering it an administrative claim because

13 if it's their obligation to perform and to return it, we know

14 that until they do that the equipment is going to be covered by

15 insurance because they're required to.  But if they just say,

16 "We're done, go pick it up," then we can't control the outcome

17 and we could be damaged even further and it shouldn't be that

18 they can say, "Well, that's too bad, if you have a problem make

19 a claim.  That just isn't right.  That, I don't believe is what

20 Congress intended."

21         The Atlas Air decision may be the only one on this

22 issue and I know Your Honor has read it.  It is interesting and

23 I'll note I believe that that decision was in part influenced

24 by the very persuasive brief that the Cadwalader firm put in on

25 behalf of, I think it was Morgan Stanley.  So I agree with the

47

1 position that Cadwalader took in <u>Atlas Air</u> and I think that's

2 the position that Your Honor should take here.

3          THE COURT:  Well, I'm not going to be effected by

4 that.  The decision may or may not be correct but it doesn't

5 matter who advocated for it.

6          MR. RICHMAN:  I think, Your Honor, that I covered the

7 principal issues.  The main point is even if Your Honor is not

8 prepared to say today, "You have to comply with the precise

9 provisions of the ABN Amro leases," although we believe that

10 they should, that it's important to say today that, "There is

11 no exception from 1110(c) where an aircraft finance lease is

12 rejected in the first sixty days and that return means

13 something more than abandoned so work it out and we'll have

14 another hearing."

15          Thank you, Your Honor.

16          THE COURT:  Anyone else who wishes to be heard on the

17 issue?

18          I would appreciate it if you did not duplicate

19 argument.

20          Yes, sir.

21          MR. HIERSTEINER:  I'll try not to, Your Honor.

22          Richard Hiersteiner on behalf of U.S. Bank National

23 Association and U.S. Bank Trust National Association.

24          I'd like to make three points, Your Honor.

25          THE COURT:  Come forward.

48

1          You bought a seat at the table, I'm sure.

2          Yes, sir.

3          MR. HIERSTEINER:  It seems to me, Your Honor, that

4    the debtor's arguments that the issue of how claims are

5    resolved is not implicated here is belied by their argument

6    that the rejection should be effective as at the petition

7    filing date or the date that they file their motion.

8          We would concede that courts on occasion have granted

9    retroactive application to rejections but only under

10   extraordinary circumstances and the only circumstance that the

11   debtors have referred to in their responsive pleading was the

12   due process rights of the aircraft creditors which doesn't seem

13   to me to be the extraordinary circumstance to which the other

14   courts were addressing.

15         Furthermore, I'd like to make the point that aircraft

16   are not like real estate.  We believe it is incumbent upon the

17   debtor, whether under 1110 or otherwise, to surrender and

18   return an aircraft and an aircraft that is returned without its

19   engines and without its manuals and without its logs and

20   maintenance information is not an airplane, it's a very

21   expensive metal sculpture that can't move and as long as the

22   debtors withhold the wherewithal to the creditors to operate

23   the aircraft that they say they've returned, they should be

24   responsible for the aircraft.

25         I can tell you that we've made requests for the

49

1  maintenance data which is almost the most important piece of

2  this equation.  There is no way to monetize the absence of the

3  maintenance data and the manuals that the aircraft are

4  accompanied with.  Those are also items which are referred to

5  in 1110, I might add.

6          THE COURT:  Yes.

7          Didn't Congress tell us exactly what has to be

8  returned or made available in describing the equipment and I

9  assume that was written by the aircraft lending industry and

10 it's right there.

11         MR. HIERSTEINER:  And we don't have it and because we

12 don't have it we don't have --

13         THE COURT:  I don't have it either by the way.

14         MR. HIERSTEINER:  No, I'm sure you don't.

15         My inquiry is whether or not the debtors have it

16 because we haven't been able to extract it from them.

17         Lastly, Your Honor, there are as Mr. Richman

18 indicated, a number of provisions in the leases that refer to

19 return conditions and I won't belabor them but they do run

20 contrary in many instances to the proposal that the debtor has

21 made for the rejection of the aircraft.  In particular, the

22 fact that the aircraft should be returned within the contiguous

23 United States to a major airport agreed between the creditor

24 and the debtor that the aircraft be re-registered, that the

25 collateral engines be on wing, that the air frame and the

50

1  engines be certified as airworthy and, lastly, to repeat that

2  the logs, manuals and maintenance data be provided.

3          THE COURT:  Well, Congress picked up some of that in

4  describing the equipment but some it did not and I certainly

5  understand the concern of many aircraft lessors with regard to

6  other carriers that engines are moved but if the engine of this

7  plane happens to be in the shop, it seems to me that the

8  parties have some obligation to act reasonably under the

9  circumstances.

10         MR. HIERSTEINER:  We're willing to act reasonably,

11 Your Honor, but we're concerned that the debtor is attempting

12 to tilt the playing field by establishing a rejection date

13 before it in fact may have made the aircraft available to us

14 even if they didn't return it because without those logs and

15 maintenance data it's not an airplane.  We can't fly it.  We

16 can't market it, we can't fly it.

17         THE COURT:  All right.

18         MR. HIERSTEINER:  The last thing I'd like to say,

19 Your Honor, is that there was a reference in the debtor's

20 response to the automatic stay and that a reference in the

21 order to the automatic stay was not necessary.  In general, I

22 would agree with that, however, in this case we are trustee for

23 transactions in which the debtor or one of the debtor entities

24 is an owner/participant in a financing transaction.  They may

25 not be the 100 percent owner but they are an owner/participant

51

1 and we would like to be sure that the grant of the rejection of

2 the lease, we do not face the down road an argument that the

3 automatic stay precludes us from taking remedies with respect

4 to the ownership of the aircraft since that would be the

5 debtor.

6        Thank you.

7        THE COURT:  It seems to me that that would be a

8 drafting issue to work out with regard to the specific order.

9        MR. HIERSTEINER:  Happy to try.

10       THE COURT:  All right.

11       MR. HIERSTEINER:  Thank you, Your Honor.

12       MR. MCAULEY:  Good morning, Your Honor.

13       Thomas McAuley on behalf of Aviation Leasing and Pent

14 Aviation, three of the six that were still listed on Exhibit A.

15       As I mentioned previously, we filed our response late

16 last night with a couple of declarations saying why we filed

17 our response late last night and I appreciate Your Honor

18 hearing us this morning.

19       I also would file motion my motion for pro hac vice.

20       THE COURT:  Right.

21       That will be granted.  You need to file a disk with

22 the Court and an order.

23       MR. MCAULEY:  Thank you, Your Honor.

24       To just pick up a couple of points, Section 1110(c) -

25 - first of all, I will say that although the debtor has

52

1  obviously met with some people and moved them to Exhibit B, we

2  have not had a chance.  Our client was facing down a shotgun

3  so-to-speak and so we're here.  We're certainly willing to be

4  reasonable and speak with the debtor.

5          THE COURT:  Well, I'm sure as soon as this hearing is

6  over I'm sure that can be arranged.

7          MR. MCAULEY:  Thank you, Your Honor.

8          With respect to 1110(c), it's a self-executing

9  provision similar to 365(d)(3) for instance.  It's a provision

10 that the Court can condition a rejection order on without the

11 requirement of a motion as Your Honor had noted and in an

12 instance like this it doesn't make sense to simply get a bare

13 bones rejection and place the onus on the lessors to come in

14 and seek further relief.  They want the relief that they want.

15  This should be conditioned based on the lessor's ability to

16 get the appropriate return of the aircraft as well as all the

17 other materials.

18         That's really the only additional point I'd like to

19 make.

20         THE COURT:  Thank you.

21         MR. MCAULEY:  Thank you.

22         MR. LIPKY:  If I may, Your Honor, Douglas Lipky on

23 behalf of several aircraft lessors.

24         I have just one concern and request one

25 clarification.

53

1          We do not have any aircraft on Exhibit A.  By

2  agreement, we've agreed to continue the arguments while we work

3  out arrangements with the debtors relating to our twenty-

4  something aircraft that are on Exhibit B.

5          I'm concerned about a ruling by Your Honor relating

6  to these seven aircraft that are sitting in the desert which

7  may be quite different than the twenty that we have that are

8  not that it will be the rule of the case, for example --

9          THE COURT:  Well, you can certainly make any argument

10 on the general issues today that may be relevant to those

11 planes on Exhibits A and B but are you agreeing with the

12 debtors who take the position that it's really premature to

13 decide any of these issues and we should leave them all to a

14 later date and to a motion for a preliminary injunction or a

15 proof of administrative claim or a general unsecured claim?

16         MR. LIPKY:  If the agreement -- for example, the nunc

17 pro tunc effect of the orders --

18         THE COURT:  Well, do you have anything to say?  I

19 assume you don't want the orders to be nunc pro tunc?

20         MR. LIPKY:  We do not.

21         THE COURT:  Do you have anything in addition to the

22 argument that Mr. Richman made on that issue?

23         MR. LIPKY:  The only addition that I would make is

24 that it's extremely extraordinary relief and I don't think,

25 particularly with respect to the Bs, that the debtor has met

54

1  the burden that it's that type of extraordinary relief that it

2  would have nunc pro tunc effect.

3          THE COURT:  I don't think that I'm looking for nunc

4  pro tunc to the date of the petition, they're looking for nunc

5  pro tunc to the date that they actually state, "We're going to

6  reject your contract" and I'm not sure that the issue would

7  have much relevance.

8          If we set up a very abbreviated schedule where the

9  debtors have to finally fish or cut bait on a given date and

10 they can have a hearing three days later as long as you can get

11 an opportunity to be heard if you want to on that rejection,

12 then we're really talking about a three day period.  I'm not

13 sure that's worth --

14         MR. LIPKY:  I don't have a problem with that.

15         I'm sorry, excuse me.

16         THE COURT:  That's not, I don't think, worth arguing

17 too long about.

18         Is that what we're talking about, Mr. Ellenberg?

19         MR. ELLENBERG:  Nunc pro tunc is requested only as to

20 A.  It is not requested as to B.

21         THE COURT:  It is not requested as to B.

22         MR. LIPKY:  Okay.

23         With that clarification, I'm fine.

24         THE COURT:  All right.

25         MR. LIPKY:  Again, Your Honor, if Your Honor rules

55

1  nunc pro tunc on As that if they ask for it later when they

2  give that short notice that that would not be the rule of the

3  case that would hurt us on the Bs.

4          THE COURT:  No.

5          But if it's a three day issue I don't think we're

6  going to spend too much time arguing that issue.

7          MR. LIPKY:  Very good.

8          Thank you, Your Honor.

9          MS. ROSENBERG:  Good morning, Your Honor.

10         Risa Rosenberg from Milbank on the ad hoc committee.

11         Even with the changes to Exhibit A, members of the

12  committee have interest in two of the planes in the revised

13  Exhibit A and have interest in many of the planes on this

14  proposed Exhibit B.

15         THE COURT:  What do you have to add to the arguments

16  that have already been made?

17         MS. ROSENBERG:  Well, I want to address a technical

18  point on the debtor's refusal to provide relief from the

19  automatic stay because they say it's not necessary.  I think

20  they are incorrect as a matter of law; unless you are under

21  1110 where they have actually surrendered and returned the

22  aircraft.

23         THE COURT:  You think it would be appropriate to

24  include in this order the type of language that we see in many

25  that to the extent necessary "the automatic stay is hereby

56

1  modified to permit the foregoing transactions to take place"?

2          MS. ROSENBERG:  Yes, Your Honor, and we had proposed

3  such language to the debtor and were unable to reach agreement

4  but we do believe it is necessary, both for abandonment and for

5  rejection.

6          On abandonment, the automatic stay is terminated as

7  to the estate but not as to the debtor and even though it's a

8  little bizarre when you talk about corporations, there is a

9  difference between the debtor's estate and the debtor-in-

10 possession and the debtor.  So abandonment of the aircraft does

11 not take it out the debtor and, therefore, does not take it out

12 of 362(a)(5).  So you need automatic stay relief for

13 abandonment.

14         For rejections, I think Congress noted that there was

15 a glitch because they fixed it in the amendments that aren't in

16 effect yet; the new 365(p)(1) terminates the automatic stay

17 when there's a rejection of personal property.

18         THE COURT:  Well, why don't I hear from Mr. Ellenberg

19 as to why you shouldn't get some appropriate language.

20         MR. ELLENBERG:  We don't object to that, Your Honor.

21         THE COURT:  All right.

22         MR. ELLENBERG:  It was the four thousand other things

23 she wanted.

24         MS. ROSENBERG:  I don't think it was four thousand

25 but there were other things.

57

1            I do want to echo and reinforce the issues raised on

2  the documents.

3            Where you don't have the documents, it is

4  disingenuous for the debtor to say they have made the aircraft

5  available.  Without the documents that are necessary to even

6  move the aircraft -- you can't even move the aircraft from one

7  part of --

8            THE COURT:  Well, that's a very interesting point

9  because a number of parties are arguing that these planes must

10 be returned to, let us say, an airport in Michigan and you're

11 telling me they can't move them.

12           MS. ROSENBERG:  The debtor can because the debtor has

13 the documents.

14           THE COURT:  Oh, the debtor can?

15           MS. ROSENBERG:  But we can't.

16           THE COURT:  I see.

17           MS. ROSENBERG:  In order to move the aircraft the

18 entity that is moving it has to have the documents.

19           THE COURT:  But do you agree that if it should happen

20 in a given case that the aircraft is in the desert now and the

21 lender, having recovered possession is really planning to leave

22 the aircraft right where it is pending another transaction

23 that, perhaps, the aircraft could be returned in the desert and

24 that wouldn't make too much sense to fly the aircraft somewhere

25 and then return it?

58

1              MS. ROSENBERG:  I think the parties can certainly

2    agree as to a location that they would return --

3              THE COURT:  I gather from one of the preceding

4    arguments that that is so provided in some of the leases.

5              MS. ROSENBERG:  Many of the leases have either a

6    precise location or a type of location, usually within the

7    continental United States, usually either a maintenance or an

8    airport facility, but also, parties can agree to that.

9              But saying that, that doesn't address the issue of

10   the documents and maintenance logs, manuals, records, all of

11   these things, because you can't even market the aircraft.  It

12   really is, as I think, counsel for U.S. Bank described it, a

13   very expensive piece of sculpture because you basically would

14   have to rebuild it if you don't get those records and there's

15   no commitment from this debtor saying, "Maybe you'll get them,

16   maybe you won't get them."  That really is a burden.

17             The records have no value to the debtor, the ones

18   that --

19             THE COURT:  I understand your argument and I've

20   already stated that it seems to me that Congress provided in

21   1110 for a definition of what the equipment was and that

22   includes flight manuals if I recall the specific language of

23   1110 if it applies.

24             MS. ROSENBERG:  Thank you, Your Honor.

25             I do join the prior arguments that say it does apply

59

1  as we stated in our numerous papers.

2         MR. KRASNOW:  Good morning, Your Honor.

3         Richard Krasnow of Weil, Gotshal & Manges, LLP on

4  behalf of GE Commercial Aviation Services.

5         Your Honor, I had not noted my appearance at the

6  outset of the hearing because I really didn't have any

7  expectation that I would be standing up and addressing the

8  Court.

9         No aircraft in which we have an interest is on

10 Exhibit A and I just have a very, very narrow point that I want

11 to raise, Your Honor, and that goes to the timing of rejection

12 with respect to Exhibit B, the effective date and the like.

13        We have been engaged in what, I think, have been very

14 productive discussions with the debtor on a variety of issues

15 pertaining to potential rejections and abandonments and

16 procedures.  One of the elements of that goes to the effective

17 date of a rejection, appropriate notice periods and the like.

18        Your Honor had indicated, perhaps, specifically with

19 Exhibit B that maybe two to three days might be an appropriate

20 time frame.  I'd rather not in fact address this right now but

21 simply note that the debtor has agreed to adjourn the hearing

22 with respect to Exhibit B to October 19th which isn't that far

23 away from today and I would request in light of that, given

24 that in fact timing is part and parcel of the discussions that

25 we are having with the debtor; that rather fix in stone whether

60

1   it's two, three, ten --

2           THE COURT:  My intent was not to impinge on the

3   parties' ability to come to reasonable agreements on any of

4   this and I'll simply adjourn the motion without further ado.

5           My suggestion was simply to avoid the abstract legal

6   issue that could be raised; can a debtor reject in the

7   abstract?  As a mechanism for avoiding that, I'm just

8   suggesting that when they make a decision they should make a

9   final decision and then bring that on for a hearing and that

10  nobody could object to they're bringing the hearing on quickly.

11   The only issue would be could a party such as your client get

12  a fair hearing or does it impinge on the business deal of the

13  parties?

14          MR. KRASNOW:  Actually, Your Honor, I think there

15  were two issues that that goes to; first, is challenging the

16  business judgment, perhaps, a 365 issue and the other issue

17  which is actually one that we've been more focused on with our

18  discussions with Northwest has been reasonable notice, assuming

19  that aircraft is going to be returned pursuant to rejection or

20  abandonment, but reasonable notice to the secured party or the

21  lessor with respect to when that rejection would be effective

22  because as has been noted by others and, I think, Northwest

23  would concede, an aircraft is not a piece of real property.

24  It's a lot more complicated in terms of repossession.  Many

25  more arrangements need to be made.  Some parties are more adept

61

1   at that than others and that's really what has been the subject

2   of our discussions with Northwest.

3          So I'm here before you, Your Honor, because you had

4   indicated something about on Exhibit B, two to three days'

5   notice for parties to come in and given that the hearing is

6   going to be adjourned to October 19th, my only request is that

7   in fact that issue not be addressed in any order issued today

8   with respect to the Exhibit B aircraft.

9          Thank you, Your Honor.

10         THE COURT:  Mr. Ellenberg, any response?

11         MR. ELLENBERG:  If the Court please, just a few

12   things.

13         With respect to whether 1110(c) applies, which I

14   continue to believe the Court does not need to decide today,

15   but if we're going to look at it let's look at the entire

16   statute, not just selected parts of it.

17         If we look just at (c)(1), counsel stopped reading it

18   at a somewhat inappropriate point because it says that "the

19   trustee shall immediately surrender and return when they are

20   entitled pursuant to (a)(1) to take possession of such

21   equipment."  It doesn't say "pursuant to 365" or 544 or any

22   other provision.  It says "pursuant to (a)(1)" and it goes on

23   to say "and makes a written demand for such possession from the

24   trustee."  We haven't received any written demands and their

25   rights under (a)(1) have not been triggered.

62

1              So with all due respect to Judge Marx, we think the

2    correct interpretation of this statute is that unless there is

3    a triggering under (a)(1) there is no applicability of (c) and,

4    indeed, we believe that (c) really just rules that the party

5    doesn't have to file a motion for relief from the stay, that if

6    we don't make the (a)(2) undertaking then they're immediately

7    entitled to the surrender and return of the aircraft.  We don't

8    dispute that but we don't believe that what we're doing here

9    triggers that and we certainly don't believe that what we're

10   doing here can be conditioned on compliance with (c)(1) and

11   that's really, I think, the issue, Your Honor, that most of the

12   objections miss.

13             We're not refusing to return records, we're not

14   refusing to return engines, we're not refusing to do anything.

15    What we're saying is that the relief we're seeking here today

16   does not need to be conditioned on any of those things.  We'll

17   do whatever else we need to do under the law but everything

18   we're required to do isn't at issue in this hearing today.  The

19   only thing at issue today is are the leases rejected?  Are the

20   planes abandoned?  If we just look at (c)(2), Your Honor, the

21   fact that (c)(1) is not a conditioned precedent to the

22   effectiveness of a rejection is made absolutely clear because

23   (c)(2) says that "at the time the trustee is required to

24   surrender," not at the time they have surrendered and returned

25   but at the time they're "required to surrender and return the

63

1  lease shall be deemed rejected."  So (c)(2), itself, says the

2  rejection triggered by (a)(1) is immediately effective,

3  notwithstanding that surrender and return are not complete.

4          THE COURT:  Well, it doesn't say "immediately

5  effective," it doesn't say "as of the date of the filing of the

6  petition or the order for relief or the date of the motion," it

7  says "on the date when the required action on the part of the

8  debtor comes into effect."

9          MR. ELLENBERG:  No, Your Honor.

10         It says, "At such time as the trustee is required

11 under Paragraph 1 to surrender and return the equipment."  So

12 that is the time.  It's the time that we're required -- and

13 (c)(1) says that we're required to do it immediately.

14         So it's the requirement that triggers the rejection,

15 not the compliance with the requirement and that's absolutely

16 clear and, again, that's even assuming that the supplies --

17         THE COURT:  You just said that you're not required,

18 there has been no requirement to date.

19         MR. ELLENBERG:  That's correct.

20         THE COURT:  Because there's been no written demand.

21         MR. ELLENBERG:  That's correct, Your Honor.

22         But even if we're reading that wrong, if the issue

23 here is can our rejection or abandonment be conditioned on

24 compliance with (c)(1), that's the real issue before the Court

25 today and there's absolutely no support and not a single case

64

1  that says that it's a condition to the effectiveness of

2  rejection or abandonment.  That's the issue.

3           THE COURT:  I understand.

4           MR. ELLENBERG:  Okay.

5           Your Honor, with respect to the engine in Germany,

6  that is an unusual case.

7           THE COURT:  I hope so.

8           But it seems to come up in every airline bankruptcy

9  that I've ever been involved in.

10          MR. ELLENBERG:  I'm sure that's correct, Your Honor,

11 but particularly --

12          THE COURT:  Not always Germany but usually some

13 foreign nation.

14          MR. ELLENBERG:  -- particularly with respect to

15 Exhibit A it's an unusual case and in general, Your Honor, we

16 have been agreeing that we will return aircraft in the 48

17 contiguous states.

18          So, again, many of the requests here are not

19 unreasonable and we're trying to meet them.  The issue is does

20 today's motion implicate them?

21          With respect to insurance, Your Honor, they can get

22 their own insurance.  They're on notice.  Are we required to

23 insure these planes forever?  When does our obligation to

24 insure them stop?  They're on notice.  We're giving them thirty

25 days.  If they're worried beyond that point, then they can get

65

1    their own insurance.  If we have to pay for that, they think we

2    have to pay for that, they can file a claim and they can bring

3    an action.

4             I think it's also interesting, Your Honor, how the

5    concept of surrender and return seem to expand every time

6    somebody else got up to speak.  One assertion is that it must

7    mean whatever's in the lease or the loan agreement.  As Your

8    Honor observed, the statute simply doesn't say that.  The

9    statute does say certain things but we've heard many other

10   things that we were supposed to do like the engines on wing and

11   certified air brake.  That's nowhere in 1110.  That's the

12   problem we have trying to meet the various demands is that it's

13   an ever-expanding list and everyone has their own view as to

14   what we're obligated to do under 1110(c)(1) and we'll deal with

15   that but that's an issue for another day.

16            I think that's all I have, Your Honor.

17            THE COURT:  All right.  Thank you.

18            One final word, Mr. Richman, and then I'll take a

19   brief recess.

20            MR. RICHMAN:  Thank you, Your Honor.

21            I just want to take issue with the construction of

22   the statute because I respectfully have to disagree with Mr.

23   Ellenberg.

24            Section 1110(a)(1) is a general rule.  1110(a)(1)

25   applies to all aircraft leases and it says that the financiers

66

1   are not estopped by the automatic stay except in circumstances

2   of (a)(2).  So the general rule is that the automatic stay

3   doesn't apply, you can repossess immediately.  The section I

4   was reading from which I only stopped because Your Honor

5   indicated that you had read it and was not the section that Mr.

6   Ellenberg was reading from was (c)(1) which says that in any

7   case under this Chapter, all of Chapter 11, that surrender and

8   return applies when the secured party has the right to take

9   possession.  Mr. Ellenberg was reading from (c)(2).  (c)(2), I

10  submit, is the section that tells you what happens if the sixty

11  days expires under (a)(2) and, therefore, the secured party can

12  make demands or it applies -- because it tells you that in

13  those circumstances the lease is deemed rejected.  Well, we

14  don't need (c)(2), it doesn't apply here at all because in

15  (c)(2) we're not dealing with a deemed rejection, we're dealing

16  with the debtor's attempt to reject in the first sixty days.

17  So in that case (c)(1) applies because, now, we have the right

18  to take possession.  So to say that, "Well, it doesn't really

19  apply because we haven't yet made the demand for the return" is

20  to say that "we don't have a concept of anticipatory

21  repudiation anymore" and it's kind of silly to say -- I mean

22  the argument has been briefed and it's before the Court and to

23  say, "Well, technically speaking, because we haven't gotten to

24  tomorrow yet when we can actually demand this, that doesn't

25  apply," is really, I think, an inefficient way to avoid the

67

1  issue and in fact we did serve a notice on them which said,

2  "When you reject we're going to demand possession" because we

3  couldn't yet demand possession so they know we're going to

4  demand possession when they reject and so, again, I would say

5  that (c)(1) is going to come into play and it's not limited the

6  way Mr. Ellenberg described to only a situation where they are

7  required.

8          Section 1110 applies because 1110(a) applies to all

9  secured financed leverage leases in the aircraft industry.  So

10  1110 applies and 1110(c) has to apply if they are acting to

11  reject the lease in the first sixty days.  There's nothing in

12  the Bankruptcy Code that says that you can ignore 1110 if

13  there's an action in the first sixty days.

14          THE COURT:  Give me a few minutes and I'll issue a

15  decision on this.

16                         (Recess.)

17          THE COURT:  Be seated.

18          These are motions by the debtors for an order

19  pursuant to Section 365 and 544 of the Bankruptcy Code

20  authorizing rejection or abandonment of certain aircraft.

21          It appears that only leases to be rejected are

22  currently the subject of the aircraft on Exhibit A to the

23  motion.

24          Creditors claiming to be lessors of the aircraft have

25  objected to certain aspects of the motion and lenders claiming

68

1  security interests in the aircraft have made very similar

2  objections.

3          None of the parties has questioned the right of the

4  debtors to reject leases or abandon collateral to the secured

5  party or the business judgment of the debtors in taking the

6  indicated action.  The debtors suggest that I stop here and not

7  decide any of the collateral issues that have been raised and

8  ably briefed by the parties.  Ordinarily, I would happily

9  accept this position and leave any issues that don't need to be

10 decided today to a later date.  I do leave the specific

11 resolution of the disputes between the parties to a later date.

12  On the other hand, I think under the circumstances I must

13 provide some guidance so that we do not have multiple motions

14 for preliminary injunctive relief and so that we avoid to the

15 greatest extent possible disputes over administrative claims

16 and so that I provide some indication of my views based upon

17 the arguments that the parties have in fact made.

18          The issues raised are two-fold; first, the objectors

19 claimed certain rights under Section 1110 of the Bankruptcy

20 Code that, they argue, restrict a debtor's usual rights with

21 respect to the rejection of a lease or abandonment of property.

22  As a related matter, certain objectors claim that the debtor's

23 proposed retroactive rejection either violates Section 1110 or

24 should not be approved under the general provisions of Section

25 365 because the circumstances here are extraordinary.

69

1        Some of the parties also object to the rejection of

2 aircraft on Exhibit B to the motion which is called a

3 provisional rejection or a conditional rejection and said to be

4 unauthorized under the Bankruptcy Code.

5        With regard to Exhibit B, I'll simply adjourn the

6 matter to the 19th of the month and we can deal with all

7 remaining Exhibit B issues if any at that time.

8        With respect to Exhibit A aircraft, there is no

9 question that these debtors are subject to Section 1110

10 generally.  There is also no question that Section 1110 gives

11 lessors of aircraft rights over and above the rights of other

12 lessors and secured creditors with a security interest in

13 aircraft, See, In Re:  Air Vermont, Inc., 761 F.2d 130, 2d.

14 Cir., 1985.  However, since Congress gave such parties

15 extraordinary rights under Section 1110, even amending the

16 statute to reinforce certain rights, it is important also not

17 to read into the words of the statute rights that Congress did

18 not afford.  With these basic principles in mind, let's look at

19 the issues that have been raised.

20        Section 1110.  The debtors claim that Section 1110 is

21 not implicated with respect to the surrender and the return of

22 the aircraft because they are still within the initial sixty

23 day period and that within the specific language of Section

24 1110(c)(1), no lender or lessor has made a specific written

25 demand for return of aircraft.  Indeed, during this period they

70

1  probably could not.  The lenders and lessors cite Judge Marx'

2  unreported order in In Re:  Atlas Worldwide Holdings, Inc., 04-

3  10792, Bankruptcy Court, Southern District of Florida dated May

4  7, 2004 as the only authority directly on point.  There, a

5  court reasoned that the basic surrender and return obligations

6  of Section 1110(c)(1) apply "if at any time after the date of

7  the order for relief the lessor is entitled to take possession

8  and makes a written demand, the debtor shall immediately

9  surrender and return the equipment."  The Court noted that this

10 obligation commences at any time after the date of the order

11 for relief and that a rejection order should not logically give

12 a lessor any fewer rights.  It stated, "Section 1110(c)(2) says

13 that once a party is entitled to take possession under

14 1110(a)(1) the lease is rejected.  By this order the Court

15 concludes that the converse is also true, upon rejection of the

16 lease under 365 a lessor is entitled to possession under

17 Section 1110(a)(1) and to immediate surrender and return under

18 Section 1110(c)(1)."  It is true that no demands have been made

19 under the strict terms of Section 1110(c)(1) but that should be

20 excused under the circumstances where the debtors have made the

21 motion and have made the demand superfluous under the

22 circumstances.  The Court adopts the analysis of Judge Marx but

23 this does not mean, as some of the objectors argue, that the

24 debtors must comply with all of the return provisions of a

25 given lease or security agreement or that the debtors must

71

1  "propose procedures for the rest of the rejection and

2  abandonment process for creditors to review and be heard on."

3  That is precisely what Section 1110 does not provide.  Section

4  1110(a)(1) of the Bankruptcy Code states that the right of a

5  lessor or secured party to take possession of the equipment in

6  compliance with a security agreement or lease, etc., shall not

7  be limited.  The corresponding obligation of the trustee or

8  debtor-in-possession is to surrender and return the property.

9  Congress did not require surrender and return of the property

10  in compliance with the security agreement or lease, no doubt

11  recognizing the cost and burdens this would place on the

12  debtors, their estates and their other creditors.

13        The objectors have cited non-Section 1110 cases for

14  the proposition that surrender and return mean something more

15  than "go and pick it up," See, In Re: Smith, 207 BR 26,

16  Bankruptcy Northern District of Georgia, 1997, where the

17  Chapter 13 debtor told a finance company to pick up the car at

18  a garage and pay the repair and storage bills.

19        This Court is not at this time going to set the

20  precise surrender and return requirements as those terms are

21  used in Section 1110(c).  The hallmark as in any case is

22  reasonableness.  If the collateral of property is in storage

23  and is to remain in storage in the desert, presumably, it

24  should be returned there.  If individual lessors or secured

25  creditors have administrative claims because of the debtor's

72

1   failure to comply with the surrender and return provisions of

2   Section 1110, they will not lose these rights because of the

3   order on these motions to reject and these rights can be

4   determined on a case-by-case basis on motions for payment of

5   administrative claims or motions with respect to the creditor's

6   general claims.

7          On the other hand, the hallmark of Section 1110 is

8   speed.  Congress heeded the insistence of aircraft lenders and

9   lessors that they be able to retrieve their property without

10  delay.  It will be difficult to convince this Court that a

11  lender has acted reasonably if it tarries in accepting

12  surrender and return or taking possession of its property.

13  Moreover, in a determination of what constitutes an

14  administrative expense, the usual principles of In Re:  Mammoth

15  Mart as adopted by the Second Circuit in Trustees of

16  Amalgamated Insurance Fund v. MacFarlands, 789 F.2d 98 101, 2d.

17  Cir. 1986, will apply.  That is not to say that the debtors

18  cannot be liable for unreasonable surrender and return policies

19  and as I stated, I am not making any final determinations

20  today.  All rights of the parties are reserved but I would

21  except from this the right to act unreasonably under the

22  circumstances.

23          That brings up the question of the date or rejection

24  of the contract.  The debtors state correctly that in certain

25  cases rejection has been made retroactive.  Lessors correctly

73

1 note that this relief usually requires extraordinary

2 circumstances.  It appears that the key to this issue is,

3 again, Section 1110 which deals with the effective date of

4 rejection.  Section 1110(c)(2) provides that "at such time as

5 the trustee is required under Paragraph 1 to surrender and

6 return equipment described in subsection (a)(3), any lease of

7 such equipment and any security agreement or conditional sale

8 contract relating to such equipment if such security agreement

9 or conditional sale contract is an executory contract shall be

10 deemed rejected."

11          If the Court holds that (c)(1) applies, despite the

12 lack of a written demand, (c)(2) should also apply, setting the

13 date for the rejection to be deemed effective.  This is not the

14 filing date of the case or the filing date of the motions, that

15 would be particularly unreasonable in this case, it would

16 appear, because of the fact that there has been significant

17 negotiation since the filing date.

18          In any event, the debtor has been paying for the

19 storage costs and has been insuring the property but it would

20 seem to me that under (c)(2) the appropriate date would be the

21 date for this particular motion of the order providing for

22 rejection and in all cases I would certainly look to (c)(2) for

23 the appropriate date of rejection.

24          The remaining issues relate to the aircraft on

25 Exhibit B and that motion is adjourned until October 19th.

74

1          We have hearings on for October 14th, I believe.

2     Let's set those for 11:00 rather than 10:00 and for October

3     19th, we'll start at 10:00.

4          Now, why don't I let the parties discuss a subsequent

5     date for hearings.  I will be unavailable during the period of

6     the National Conference of Bankruptcy Judges when I assume many

7     counsel will also be unavailable.  That's the first week of

8     November.  So we can certainly have hearings the week before,

9     not Friday, but on the 27th is certainly possible and then the

10    second week of November should be available.  So we should

11    probably set another date.

12         Mr. Ellenberg.

13         MR. ELLENBERG:  Yes, Your Honor.

14         With respect to Exhibit A and particularly in light

15    of your last ruling are you so ordering today the relief we've

16    requested?

17         THE COURT:  Well, I think that the parties should

18    have an opportunity to see the form of an order and there was

19    some question as to what planes are really on Exhibit A and

20    what planes aren't.  So I'd ask you to try to see if you can

21    agree on the form of an order this afternoon and I'll enter the

22    order as soon as you have an agreement.

23         If there is any delay we can make the date today

24    rather than the date of entry of the order.

25         MR. ELLENBERG:  Thank you, Your Honor.

75

1          THE COURT:  Thank you very much.

2                        *  *  *  *  *

76

1                          * * * * *

2        I certify that the foregoing is a transcript from an

3   electronic sound recording of the proceedings in the above-

4   entitled matter.

5

6

7                              SHARI RIEMER

8

9   Dated:  October 8, 2005

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## <u>EXHIBIT D</u>

**(Northwest Airlines October 19, 2005 Transcript)**

56772-002\DOCS_SF:74246.6

```
 1                     UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2
     ----------------------------------------X
 3                                            :
     In re:                                   :   Case No. 05-17930
 4                                            :
        NORTHWEST AIRLINES CORPORATION,       :
 5                                            :   One Bowling Green
                                              :   New York, NY
 6                              Debtor.       :   October 19, 2005
     ----------------------------------------X
 7

 8                        TRANSCRIPT OF MOTIONS
                   BEFORE THE HONORABLE ALLAN L. GROPPER
 9                    UNITED STATES BANKRUPTCY JUDGE

10
     APPEARANCES:
11
     For the Debtor:            GREGORY M. PETRICK, ESQ.
12                              CADWALADER, WICKERSHAM & TAFT, LLP
                                One World Financial Center
13                              New York, New York  10281-0006

14                              MARK C. ELLENBERG
                                CADWALADER, WICKERSHAM & TAFT, LLP
15                              1201 F Street N.W.
                                Washington, D.C.  20004
16
     For The Committee for
17   Unsecured Creditors:       LORENZO MARINUZZI, ESQ.
                                TODD M. GOREN, ESQ.
18                              OTTERBOURG, STEINDLER, HOUSTON &
                                ROSEN
19                              230 Park Avenue
                                New York, New York  100169-0075
20
     For the U.S. Trustee:      BRIAN MASUMOTO, ESQ.
21
     For U.S. Bank and
22   U.S. Bank Trust:           RICHARD HIERSTEINER, ESQ.
                                PALMER & DODGE
23                              111 Huntington Avenue at Prudential
                                Center
24                              Boston, Massachusetts  02199-7613

25
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   For GE Commercial
     Aviation Services:        RICHARD P. KRASNOW, ESQ.
 4                             WEIL, GOTSHAL & MANGES, LLP
                               767 Fifth Avenue
 5                             New York, New York  10153

 6   For Pacific Gas and
     Chromalloy:               JULIE D. DYAS, ESQ.
 7                             HALPERIN BATTAGLIA RAICHT, LLP
                               55 Madison Avenue, 9th Floor
 8                             New York, New York  10022

 9   For National City
     Leasing Corporation:      HEATHER LENNOX, ESQ.
10                             JONES DAY
                               North Point, 901 Lakeside Avenue
11                             Cleveland, Ohio  44114-1190

12   For the Ad Hoc Committee
     of Public Aircraft
13   Finance Creditors:        RISA M. ROSENBERG, ESQ.
                               MILBANK, TWEED, HADLEY & MC CLOY
14                             One Chase Manhattan Plaza
                               New York, New York  10005-1413
15
     For Bank of America;
16   MBIA Insurance Company;
     Goldman Sachs Credit Partners;
17   Halifax Bank, PLC;
     Sumotomo Bank; and
18   Transamerica Aviation:    JOHN I. KARESH, ESQ.
                               VEDDER, PRICE KAUFMAN & KAMMHOLZ
19                             805 Third Avenue
                               New York, New York  10022
20
     For Wachovia Bank:        JASON H. WATSON, ESQ.
21                             ALSTON & BIRD, LLP
                               One Atlantic Center
22                             1201 West Peachtree Street
                               Atlanta, Georgia  30309-3424
23
     For UBS and
24   Morgan Stanley:           MARK FUSEY, ESQ.

25
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3    For Lehman Brothers,
      et al:                    JAMES L. BROMLEY, ESQ.
 4                              CLEARY GOTTLIEB STEEN & HAMILTON
                                One Liberty Plaza
 5                              New York, New York  10008-1470

 6

 7    Court Transcriber:        LISA LUCIANO
                                TypeWrite Word Processing Service
 8                              356 Eltingville Boulevard
                                Staten Island, New York 10312
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

4

THE COURT:  Northwest Airlines.

May I have appearances, please?

MR. ELLENBERG:  If the Court, please, Mark Ellenberg, Cadwalader, Wickersham & Taft, on behalf of the debtor.

MR. MARINUZZI:  Good morning, Your Honor.  Lorenzo Marinuzzi and Todd Goren from Otterbourg, Steindler, Houston & Rosen on behalf of the official committee of unsecured creditors.

MR. MASUMOTO:  Brian Masumoto for the Office of the United States Trustee.  Good morning,  Your Honor.

MR. HIERSTEINER:  Good morning, Your Honor.  Richard Hiersteiner, Palmer & Dodge on behalf of U.S. Bank and U.S. Bank Trust as indentured trustee.

MR. KRASNOW:  Good morning, Your Honor.  Richard Krasnow, Weil, Gotshal & Manges, on behalf of GE Commercial Aviation Services.

MS. DYAS:  Good morning, Your Honor.  Julie Dyas with Halperin Battaglia Raicht, on behalf of Pacific Gas and Chromalloy.

THE COURT:  All right.  Anyone who is going to appear is welcome to sit up front.  I'm sure you bought a seat at the table.

MS. LENNOX:  Good morning, Your Honor.  Heather Lennox of Jones Day on behalf National City Leasing Corporation.

MS. ROSENBERG:  Good morning, Your Honor.  Risa

5

Rosenberg from Milbank Tweed on behalf of the ad hoc committee of public aircraft finance creditors.

THE COURT:  I assume the ad hoc committee has filed a statement pursuant to bankruptcy Rule 2019?

MS. ROSENBERG:  We are in the process of working on that, Your Honor, but it will be filed promptly.

THE COURT:  All right.  But I know you're representing a group of creditors.

MS. ROSENBERG:  Yes, Your Honor.

THE COURT:  Thank you.

MR. KARESH:  Good morning, Your Honor.  John Karesh of Vedder Price for the Bank of America, MBIA Insurance Company, Goldman Sachs Credit Partners, Halifax Bank, PLC: Sumotomo Bank [Ph.], and Transamerica Aviation.

MR. WATSON:  Your Honor, Jason Watson from Alston & Bird on behalf of Wachovia Bank, N.A. as equipment trust trustee.

THE COURT:  All right.

MR. FUSEY:  Good morning, Your Honor.  Mark Fusey [Ph.] from [inaudible] & Cutcheon [Ph.] on behalf of UBS & Morgan Stanley.

THE COURT:  All right.  Mr. Ellenberg?  Mr. Petrick.

MR. PETRICK:  Good morning, Your Honor.  I apologize for being late.

THE COURT:  No, I thought with Mr. Ellenberg here

6

alone that we were perhaps going to have a more-simplified

hearing, but perhaps it will be a bit simplified.  I do

appreciate the debtor's efforts to get me an agenda, which is on

-- put on our system, but our system was down because of the

enormous number of filings last week and the fact that they had

to be digested before we could go into the new system.

I think in the future you're filing your agendas the

day before the hearing and that will be available to all who

are interested in what is actually on the calendar.

MR. PETRICK:  Thank you, Your Honor.  Gregory Petrick

of Cadwalader, Wickersham & Taft, on behalf of Northwest.

Your Honor, there are a number of items on the agenda

today, most of which are being adjourned to another date.  Your

Honor, the contested matter on the calendar relates to the

rejection of the so-called Exhibit B aircraft and Mr. Ellenberg

will be addressing that.

If I may, Your Honor, I would like to run through the

remainder of the agenda and let you know where we stand with

respect to the other matters.

THE COURT:  Are you objecting to going over the

agenda, Counsel?

COUNSEL:  I'm not objecting to anything, Your Honor.

We just can't hear anything.

THE COURT:  All right.  Well, come forward.

COUNSEL:  I think maybe the microphone [inaudible].

7

THE COURT:  You can -- I'm sure you could sit next to
Mr. Ellenberg without any concessions that -- I'm afraid you
have to -- that may or may not work.  If it does, I will
appreciate whoever is able to -- good.  Well, thank you.

But if you talk right into the microphone --

MR. PETRICK:  Yes, Your Honor.

Your Honor, the debtor's motion authorizing the use of
existing bank accounts and to maintain existing cash-management
systems was approved by the Court subject to a limited
objection by Fifth Third Bank.  We are continuing our
discussions with Fifth Third Bank regarding a fifteen-thousand-
dollar cash collateral account that they hold, an account that
they say is subject to cash collateral and we want to move --
continue that objection from today until October 27th.

THE COURT:  All right.  Then we're adjourning that
last piece of the cash management order to October 27th.  I
think you've given me a final cash management order.  Actually,
I signed one.

I had one question.  In the heading of the cash
management order there's a reference to a super-priority status
for inter-company receivables.  Was that actually maintained in
the order as finally entered?

MR. PETRICK:  I believe it was, Your Honor.

THE COURT:  It is?  All right.  I'd just appreciate
your checking that.

8

MR. PETRICK:  I will check that, Your Honor.

THE COURT:  So we're just adjourning then --

MR. PETRICK:  The limited objection of --

THE COURT:  -- small piece.  Right.

MR. PETRICK:  -- Fifth Third Bank's objection.

THE COURT:  All right.

MR. PETRICK:  Your Honor, the next matter is the debtor's motion to reject certain unexpired non-residential real property leases.  We had received one objection from the Metropolitan Airport Commission.  We have resolved that objection.  The objection related to the effective date of the rejection and the parties have agreed that it will occur no later than October 7th, 2005, and otherwise reserve their rights to contest -- to argue about what the proper date is. We have a stipulation that has been executed by the debtors.

THE COURT:  All right.  You can hand that up to the PN.

MR. PETRICK:  Thank you, Your Honor.

Your Honor, the next matter on the agenda is the debtor's motion to establish reclamation procedures.  There was one objection we received from Chromalloy Gas Turbine Corporation and Pacific Gas Turbine Center.  Both those objections have been resolved and there are no other objections and so we would pose to submit an order to approve those procedures.

9

THE COURT:  All right.  Does anybody wish to be heard with regard to the reclamation procedures?

[No response.]

THE COURT:  Then that order will be entered.

MR. PETRICK:  Thank you, Your Honor.

Your Honor, the next matters on the agenda are a number of interim retention orders for debtor's professionals. All had objection dates of October 17th, I believe, and with respect to all the debtor's -- all the professionals, no objections were received.

At the request of the United States Trustee's office we are withholding presentment of a final order with respect to professionals The Paul Hastings Firm [Ph.] and the Huron Consulting Firm [Ph.] so that the United States Trustee has certain questions about their applications that are not yet resolved.  So we would propose to submit final orders for the retention of the Cadwalader firm, Arnold & Porter, the Groom Law Group [Ph.], The Boyce Schiller firm. [Ph.], Dorsey & Whitney [Ph.], and Curtis Malay [Ph.], none of whom have objected and all of whose issues with the United States Trustee's office has been resolved.

THE COURT:  Well, all right.  Does anybody wish to be heard with regard to the entry of final orders with regard to the law firms and other professionals who have just been named?

[No response.]

10

THE COURT:  We will enter, then, those orders on a final basis.  The two firms whose orders are being held will be entered, unless any party wishes to be heard, after the United States Trustee's questions are resolved and assuming they're resolved.

I also received on my desk this morning a proposed interim order with regard to the retention of Ernst & Young, LLP as accountants and auditors for the debtors.  The practice -- earlier in the case, it was at an earlier stage -- was to enter retention orders on an interim basis giving all parties an opportunity to object to the retention of the firm on a final basis after they'd had an opportunity to review the order.  I would propose to proceed in that same fashion and that's apparently what the debtors are asking me to do unless anyone wishes to be heard at this stage since, obviously, we have a committee now and we have many other interested counsel.

[No response.]

THE COURT:  If no one objects, then, I will, assuming the papers are in order and the United States Trustee has no question, I'll enter the retention of Ernst & Young on an interim basis and set it down for a hearing.  I think our next hearing date is probably too soon, it's October 27th, and after that I believe we have November 16th.  Is that right?

THE CLERK:  That's right.

THE COURT:  So those are the next dates coming up.

11

MR. PETRICK:  Thank you, Your Honor.

Your Honor, the next application is the debtor's application to employ ordinary course professionals.  The application basically excludes from the normal Chapter 11 process professionals who are expected to bill less than $50,000 per month.  There have been no objections to that motion either, Your Honor.  I'd ask that that be approved as well.

THE COURT:  Does anybody wish to be heard?

Did we enter an order on an interim basis?

MR. PETRICK:  Yes, Your Honor.

THE COURT:  We did and this would be the final order. All right.  As long as White & Case isn't one of the firms I'm approving, as it was earlier, I'll approve it, there being no objections.  You may certainly apply for retention of White & Case if you wish, but another judge will have to deal with it.

MR. PETRICK:  Yes, Your Honor.

THE COURT:  This was actually for Mexico.  It was the White & Case Mexican office.

MR. PETRICK:  Your Honor, the next matter is the debtors have a -- the Court has entered an interim order establishing procedures for compensation of professionals.  We have reviewed that order and -- with the United States Trustee's office.  There are no objections to that motion.  I then would enter -- we'd ask that that order be entered on a final basis as

12

well.

THE COURT:  Does anybody wish to be heard?

[No response.]

THE COURT:  All right.  I'll enter that order on a
final basis and we'll state that I think it's important, as I
have stated in other large cases, that the debtor review the
applications of all professionals with the same care that any
company would use in the ordinary course of business and I
assume someone has been or will be designated within the
corporation to review these applications with the same care, at
a minimum, that the corporation would review all bills that it
would be expected to pay of a legal or a professional nature;
that that person be charged with the responsibility and that
bills be reviewed on a current basis because it's always seemed
to me that the best time to look at bills is as the amounts are
being incurred.  It's unfair to the professional and unfair to
all parties to have huge amounts accrue and the matter to come
up years later.  The time to take steps to keep bills
reasonable is as the amounts are being incurred.

I'm sure the company will do that, but I state that at
the time I enter all interim-fee orders and think it's obviously
particularly important in a case such as this, which is one
where the amounts may appear high and they certainly may appear
high in the press, rightly or wrongly.

MR. PETRICK:  Yes, Your Honor.  Certain to remind the

13

company of Your Honor's comments.

THE COURT:  Goes for the committee as well,
obviously.

MR. MARINUZZI:  Your Honor, we will be reviewing fee
applications, yes.

MR. PETRICK:  Your Honor, the next matter on the
agenda is the adversary proceeding commenced by Northwest
against American Express.  We have now, in fact, reached a
settlement with American Express.  That settlement is being
reviewed by the committee and we would hope to bring it to the
Court for approval on the next October 27th hearing date.

THE COURT:  All right.

MR. PETRICK:  Your Honor, the next several matters on
the agenda are all adjourned matters.  The first is the debtor's
motion to establish procedures for claims trading and this,
Your Honor, is going to take a little bit of explanation.

We received -- the debtors received, in connection
with the trading objection, objections from thirteen parties.
We have had extensive negotiations with a large number of
parties that have taken a great deal of time.  I believe that
we have probably resolved about ninety percent of the
objections, although there are still significant issues that
remain outstanding and we have not been able to bridge the gap.

Late last week on Friday we were asked by the
committee to -- we had just began to review the existing orders

14

and the issues -- to adjourn today's hearing from today to
October 27th, which we agreed to do.

We would like, Your Honor, obviously, for the interim
order to be continued from now until October 27th, which has
caused some issues with respect to the interim relief that's
appropriate.  What we would propose to do, Your Honor, is to --
we received some comments from parties late yesterday and from
the committee last night.  We would like to -- we have revised
what I would call the new-and-improved interim order and we'd
like the opportunity to circulate that to the parties who have
raised objections and to have Your Honor enter that new-and-
improved interim order which basically addresses many of the
concerns raised in the objections.

The one issue that we have with respect to that, Your
Honor, is that if we can't get consensus that this new-and-
improved order is what should be entered on an interim basis,
we will need an interim order to carry us from today until
whenever we can get everybody on board that order.  It would be
our intent to try to get to the Court a new interim order that
addresses, I would say, ninety percent of the concerns of the
parties who have objected.

There is an additional issue, Your Honor, with
respect to certain objections, certain objectors who have
obligations that they undertook to take in securities of
Northwest Airlines that will mature in the next week and that

15

is causing them, they say, certain issues with respect to the
interim relief.

What I would suggest, Your Honor, is that before Your
Honor agrees to close consideration of this adjournment, that
we deal with the rest of the agenda so that I may have some
more opportunity to talk to my colleagues from Cleary out in
the hall to see if we can find a mechanism to adjourn -- so we
can have their consent for the adjournment of this hearing from
now until October 27th and then come back to you at the
conclusion of the hearing, to either argue it before you or let
us report to you what we've been able to resolve.

THE COURT:  Well, has everyone who is interested in
the matter had a chance to review the order in its amended
form?  Does everybody know what we're dealing with?

MR. PETRICK:  Yes, we -- I think --

THE COURT:  Everyone who is interested.

MR. PETRICK:  Yes, Your Honor.

There was an order circulated Friday.  The version
that will be circulated today includes comments from the
committee, which everybody has not seen, and that's the reason
we want some additional time to try to circulate that order so
that everybody can --

THE COURT:  That's fine.  I can certainly adjourn it
until the end of the hearing today.  I can adjourn it until
tomorrow if the parties want to use the twenty-four hours to

16

see if the issues can be narrowed and then we can adjourn it
until next week.

          MR. PETRICK:  Well, perhaps, Your Honor, if we can
continue the existing interim order for twenty-four hours, I
think that might give us the opportunity to try to solve the
problems that remain.  I can circulate the revised order and
also try to address the remaining issue.

          THE COURT:  All right.  Does anybody wish to be heard
on that point?

          COUNSEL:  I do, Your Honor.

          THE COURT:  If you say no, then I'll just adjourn it
until the end of the hearing today and we'll see where we are in
an hour.

          COUNSEL:  No.

          THE COURT:  All right.  We'll see where we are in an
hour.

          COUNSEL:  Thank you, Your Honor.

          MR. PETRICK:  Thank you, Your Honor.

          Your Honor, the next adjourned matter is the motion
of the Greater Orlando Aviation Authority to compel the debtor
to segregate passenger facility charges.  That motion was
joined in by virtually every airport in the United States.  We
have I think made some progress to try to resolve that
objection and we would ask that that matter be put over to the
October 27th hearing.

17

THE COURT:  Does anybody wish to be heard?

[No response.]

THE COURT:  Then we'll do that.

MR. PETRICK:  Your Honor, the next items on the agenda are a large number of applications for payment of adequate protection.  All of those motions have been adjourned.  The vast majority of them have been adjourned to the November 16th date.  There are certain adjourned dates -- motions which have been adjourned but for which we did not have adjourn dates.

I could, if Your Honor wishes, read down the list of the motions which we have specific adjourn dates, and also indicate those for which we do not have an adjourn date.

THE COURT:  Was there any reason not to adjourn them all to October 16th -- pardon me, November 16th?

MR. ELLENBERG:  If the Court please, Mark Ellenberg.

Your Honor, it would, with one exception, it would certainly be agreeable to the debtor if they were all extended to November 16th.  There are seven motions filed which consist of six motions filed by Milbank New York, Ms. Rosenberg's clients, and one filed by UBS, which -- I'm sorry, U.S. Bank which requested that it only be a two-week adjournment.  If you could persuade them to go to November 16th, we would certainly agree to that.

There is one additional motion, Your Honor, which is

18

filed by UBS involving a single aircraft to which there is not

1110 protection and they would like to schedule a hearing date

on that motion, which would thirty to forty-five days from

today.

THE COURT:  Well, we can certainly schedule a hearing

date if we need one.  I'm not in the persuasion business, I'm in

the ruling business, so someone can tell me as to why their

matter should be adjourned until October 27th, but I don't want

to take everybody's time unnecessarily.

Is there some compelling reason why I should adjourn

this to October 27th, Ms. Rosenberg?

MS. ROSENBERG:  Thank you, Your Honor.

Well, first of all, because we were asked for a two-

week extension and that's what we agreed to --

THE COURT:  That's not the question I asked you.  Is

there a compelling reason why this needs to be heard on October

27th?

MS. ROSENBERG:  I can't give you a compelling reason

other than --

THE COURT:  Well, then I guess we'll hear it on

November 16th.

MS. ROSENBERG:  But I do have one thing to add to it.

THE COURT:  Yes?

MS. ROSENBERG:  I believe Mr. Ellenberg will agree.

The adjournment is on the same terms as the prior adjournment

19

that Mr. Ellenberg put on the record, with one clarification,

and that clarification is the debtor's agreement not to swap

engines, except in the ordinary course of maintenance or to put

engines back on the right aircraft for return also applies to

parts.  They're not going to be swapping parts out of the

aircraft during the adequate-protection period.

I believe Mr. Ellenberg, on behalf of the debtors,

has agreed with that.

MR. ELLENBERG:  Except in the ordinary course.

MS. ROSENBERG:  Yes, on the same terms.

MR. ELLENBERG:  That is correct

THE COURT:  All right.  Anyone else?

[No response.]

THE COURT:  All right.  Then we'll hear them all -- if

I'm unfortunate enough, we'll hear them all on November 16th or

we'll see how the matter can be resolved.

Is November 16th the right -- November 16th is

probably the 60th day.

MR. ELLENBERG:  It's two days after the 16th day, Your

Honor, and with the exception of the UBS motion that I

mentioned, I think virtually all of these have 1110 coverage,

so -- actually there's one other group that doesn't, but we're

hoping that because most of them involve 1110, that by November

16th we actually will have dealt with the aircraft in a more

complete way.

20

THE COURT:  So November 16th is a good date for our next hearing.  I can obviously hear any party as to what an appropriate date is.  I think we set that date without counting the days from the date of the filing.

MR. ELLENBERG:  Well, we had asked for one which was after November 14th and that's the one we got.

THE COURT:  All right.  Then it's November 16th and if we need hearings in the mean time, I'm open for business most days.

Mr. Petrick?

MR. PETRICK:  Thank you, Your Honor.

THE COURT:  Anyone else?

MR. FUSEY:  Your Honor, Mark Fusey for UBS.

I don't want to take the Court's time, but we do need a hearing on our particular client --

THE COURT:  You'll get one.  Why don't you talk to the debtor and call chambers and we'll get you a date.

Anyone else?

[No response.]

THE COURT:  All right.

MR. PETRICK:  Thank you, Your Honor.

The last two matters that I have to report on, there were two motions filed, one by Conoco Phillips and one by Valero Marketing for reconsideration of the fuel supply order. Those motions have both been resolved by the debtor.  I

21

understand that Conoco and Valero will both be withdrawing

those motions.

       THE COURT:  All right.

       MR. PETRICK:  Your Honor, thank you.  That's all I

have for this morning, subject to coming back on the trading

order adjournment.

       THE COURT:  All right.  You're welcome to use my room

right next door here.

       MR. PETRICK:  Thank you.

       THE COURT:  Anybody who wishes to use it, they can go

straight through to the room.

       All right.  Now we're turning to the motion to reject

the Exhibit B planes or aircraft and engines.

       MR. ELLENBERG:  If the Court please, Mark Ellenberg.

       Yes, Your Honor, we're here to address the

rejection/abandonment motion that was filed on the first day of

the case.  That motion had requested authority with respect to

two categories of aircraft, Exhibit A aircraft and Exhibit B

aircraft.

       We had a hearing on October 7th with respect to

Exhibit A and Exhibit B was continued to today.

       THE COURT:  Right.  I entered an order on Exhibit A.

 I had considered, notwithstanding the date of the order -- it

was entered until the next day and I'd considered all of the

letters I received.  The order did not, as originally entered,

22

attach Exhibits A and Exhibit B.  So yesterday I signed an

identical order that simply attached -- virtually identical

amended order that simply attaches Exhibit A and Exhibit B.  I'm

sure all parties knew whether their aircraft was on Exhibit A

or Exhibit B.

            So that's the state of the record as of the moment.

            MR. ELLENBERG:  Thank you, Your Honor.

            Your Honor, our original request --

            MR. KRASNOW:  I'm sorry, Mr. Ellenberg.

            Your Honor said Exhibits A and B?

            THE COURT:  Or maybe Exhibit -- was Exhibit A the

only exhibit -- anyway, there was no exhibit on the order as

entered.  We didn't enter relief as to what was originally

Exhibit B and I don't -- what was the status of the order as

entered, the amended order?  Was there an Exhibit B?

            MR. ELLENBERG:  Yes, Your Honor, but only to schedule

it for today.

            THE COURT:  And that adjourned.  All it did was

adjourn the --

            MR. ELLENBERG:  That's right.

            MR. KRASNOW:  Thank you.

            THE COURT:  Adjourned the hearing to today.

            MR. ELLENBERG:  That's correct, Your Honor.

            Your Honor, our original request with respect to

Exhibit B aircraft was that the Court determined that the

23

debtors have authority to reject or abandon those transactions
based on their current terms and that the debtor then have
forty-five days within which to file an actual notice that
would trigger the rejection or abandonment because the debtor
believes that it is possible that if it could change some of
the terms through negotiation, that it could retain some of
those aircraft.

At the last hearing on October 7th Your Honor
suggested that rather than have to tackle the issue as to
whether that kind of contingent rejection authority was
appropriate, that what we should do instead was essentially
request a procedures order which would defer the determination
as to the debtor's authority with respect to any particular
transaction or aircraft, but that we could bring that on two-
or-three days' notice.

So what we have done, Your Honor, and what we are
requesting today is that the relief be modified.  We submitted
an order to Your Honor last night which modifies the relief
that is being requested and that order has been circulated to
all of the objectors.  We began circulating that order on
Monday and it went through several iterations before it arrived
in the form that was delivered to Your Honor last night.  There
is not consent to that order, Your Honor, which I'll get to in a
minute.

What we are now requesting, Your Honor, is that we be

24

able to reject or abandon aircraft on two-or-three days' -- I'm
sorry, on three days' notice which would be sent by electronic
mail.  We've been asked to add overnight mail to that this
morning, which we're certainly prepared to do.

There are, I think, two categories of disputes that
remain as to this order, Your Honor.  The main dispute goes to
the three days.  The objectors, with one exception, had asked
for notice periods ranging from ten to fifteen days.  Of
course, if we simply did nothing and just walked in with a
motion, the local rules would give us ten days automatically,
so it was hard for us to understand why to go beyond that.  But
in any even, Your Honor, we believe that the three-day notice
period under the facts of the circumstances is a fair and
reasonable approach, given that we do have an 1110 deadline
ticking against us and that we want to exhaust all our ability
to negotiate, but at the same time have the ability to let go
the aircraft if we can't reach acceptable restructuring of the
transactions.

So we have proposed the three-day period.  The
proposal is that if there are no objections within the three
days, then the rejection or abandonment would be automatically
effective without further order of the Court, but that if there
were objections the Court would hold a hearing on the third day
or the first available date after that.

THE COURT:  How many aircraft are we talking about on

25

the -- it's now -- that are now provisionally on Exhibit B?

What was Exhibit B?  I think it's Schedule 1 to the new order.

Approximately.

          MR. ELLENBERG:  It's approximately 100.

          THE COURT:  About 100.  A large number.  And how many

individual -- individually-represented lessors -- let's do it by

lawyer.  That might be the easiest way.

          MR. ELLENBERG:  Ten or less, I think.

          MR. HIERSTEINER:  I don't know about lessors, Your

Honor.  The trustee, U.S. Bank and U.S. Bank Trust as

indentured trustee or in other capacities is involved with in

excess of ninety of those --

          THE COURT:  Ninety of them?  And GECC has how many?

          MR. KRASNOW:  Your Honor, I was going to point

something out to the Court.  Your Honor has asked a question

with respect to Exhibit B to this motion.  I think in answering

the question, and I don't know if people can answer the

question, Your Honor should take into account the fact that

Northwest has filed yet a second motion seeking to stop the

same procedures and, by my count, and I'm a lawyer so you

shouldn't count on me for accuracy as to the numbers, it's

something like 134 aircraft so that in the context of these

three days you're basically talking about something in the area

of 221 aircraft which accounts for, by our calculations,

something like a third of the fleet.

26

          I just don't know whether or not everybody in this

courtroom can say that they represent everybody --

          THE COURT:  No, I just wanted an idea of how many

we're talking about.

          MR. KRASNOW:  No, that's why I was -- wanted to have -

-

          THE COURT:  And how many do you have of the 234?  How

many does GECC have?

          MR. KRASNOW:  Your Honor, I really can't answer the

question.

          THE COURT:  All right.  Okay.  Please, go ahead, Mr.

Ellenberg.

          MR. ELLENBERG:  And there is a second motion, Your

Honor, and we filed it in the same form that we filed the first

motion asking for the contingent forty-five-day relief.  Our

intention would be to confirm that order to what --

          THE COURT:  And that motion is returnable formally

when?

          MR. ELLENBERG:  The 27th.

          THE COURT:  The 27th.  All right.

          MR. ELLENBERG:  So in any event, Your Honor, the

period of notice is hotly in dispute.

          THE COURT:  All right.  That's the one -- one of the

main issues?

          MR. ELLENBERG:  Yes.

27

THE COURT:  The second?

MR. ELLENBERG:  Your Honor, there have been additional requests and, frankly, I don't know at this point how many there are because I heard a wholly new one for the first time this morning, that people want added to the motion going to really return conditions, in my view.  Our position on that is that we are going to be reasonable, as it were said, and that we don't necessarily disagree with some of the things that have been requested, but we don't think they belong in this order.

We think this order is not about return conditions, we think this order is about the effectiveness of a rejection or an abandonment.  Every time I add one thing that somebody requests that kind of expands us into the return-condition mode, somebody then asks for something else.

THE COURT:  I stated before that I read all of the -- or had read to me all of the objections to the entry of the order and I entered the order in the form that it was entered.  That order was entered as to Exhibit A only.  I can certainly hear any party who is concerned for some theoretical, abstract reason that there's some vagueness or inconsistency or something confusing about that order.

I stated on the record before and I will repeat today and the order says as clearly as any order could say as far as I'm concerned, that parties' rights to request an administrative

28

expense for their aircraft or engines are reserved, as is the
debtor's ability to object to that.  I will hear, if I have to,
motions in this regard at an appropriate time in the case.

The only way to determine the propriety of an
administrative claim is on a case-by-case basis.  I would be
delighted to do it on a general basis, but I think I would be
doing a disservice to the debtors and I'd be doing a disservice
to the parties.

That having been said, parties will have to convince
me that the order already entered as to Exhibit A is truly
inappropriate as to Exhibit B.  The notice period is a
different issue.  That's a new issue --

MR. ELLENBERG:  Thank you, Your Honor.

THE COURT:  -- but I'll hear from any party who wishes
to be heard.  I'll hear about all of your nervousness and
concerns if you wish to put it on the record today.

MR. ELLENBERG:  Thank you, Your Honor.

And indeed, we already expanded this order somewhat
beyond the Exhibit A order to try and address some of those
concerns.

Your Honor, just one last point.  After I circulated
the order that we delivered to the Court last night, some of my
colleagues were good enough to point out some inadvertent
errors that we had made.  So I have a moderately-revised order
with just a few, I believe, technical corrections.

29

THE COURT:  Do you want to read those into the record
or at the end of the hearing I can take a break or you can give
me the order obviously later in the day after parties have had
a chance to see it?  I don't want to cause you and any other
parties to have to go through another two or three days of
negotiating the commas.

MR. ELLENBERG:  Your Honor, we have already revised
the order.  I think most counsel got to review the revised form
prior to the hearing.  I would just like to point out what the
few changes are and it will only take a minute.

THE COURT:  That's fine.

MR. ELLENBERG:  In Paragraph 3 where we say that we
will serve the notice by electronic mail upon the lessor and,
if known, its counsel.  We've added, "And if known, lenders or
indentured trustees, as applicable."  We had added the
indentured-trustee language in Paragraph 4; we had not added it
to Paragraph 3.

THE COURT:  Now it's always helpful in this regard,
and I don't know that we need to put in the order, for each
effected party to give you notice of who they want notice to go
to so that there's no issue, that they'll get notice
immediately, that the right party will get notice, and that
they know that the notice may come in the next thirty days.
We're dealing with less than thirty days.  We're dealing with a
very abbreviated period and parties should be alert, and I'm

30

sure they will be, if they're good business people.

Similarly, I assume they know who at the debtors to talk to or the debtor's law firm.  That may be you.  I guess your hair was gray when we started these proceedings, but undoubtedly it will be grayer when we finally get to the 60th day of this case.

Similarly, I will invite anyone who doesn't know the name of -- and phone number of my law clerk, whose hair may also be gray when this case is over, to have an opportunity to schedule a hearing on very short notice or the debtor can schedule a hearing and we'll hear them telephonically if we have to.  I'm not making any determinations that three days is the right period.  I'll hear from the parties, but we will cooperate and get you a hearing, if you really want a hearing, on the fundamental issue of rejection of the contract.

MR. ELLENBERG:  Thank you, Your Honor.

We clearly would be happy to receive instructions as to notice from any party.  Those instructions should come to me and we will deal with it.

I also believe that all parties know, but I will say it again if they don't, that the substantive negotiations as to revised terms are being handled by the Seabury Group [Ph.] and particularly Mike Cox and Greg Ethier [Ph.] of Seabury.  If anybody's client has not yet heard from them, those are the people to contact.  If there are any questions about that,

31

again, contact me.

Your Honor, we have also added to both Paragraph 3 and Paragraph 4 a new sentence which says, "The notice shall also be served on counsel for the official committee of unsecured creditors."

The last change, Your Honor, is in Paragraph 6 where, in the first two sentences, wherever there was a reference to "aircraft" we also added "and engines."

THE COURT:  And do I understand from Paragraph 6 that no matter what the effective date of rejection, no matter what the course of rejection, you will maintain insurance, as I read this, for the shorter of the following periods, coverage period:  The 30th day after notice of rejection or abandonment becomes effective, which takes us beyond November 14th, I believe, for all of these; or the date on which the lessor, lender, or other effected parties as the case may be takes possession of such aircraft and equipment.

So these aircraft and engines are going to be insured up until either after the 60th day of this case or the date on which possession is actually taken.

MR. ELLENBERG:  They will be both insured and maintained.

THE COURT:  And maintained.

MR. ELLENBERG:  If they're in storage, they will be in maintenance storage.  If they're flying, they obviously will be

32

maintained to fly.

THE COURT:  Anybody who wishes to can get up and tell me that's unreasonable.  I'll let Mr. Ellenberg finish and then I'll hear from any party.

MR. ELLENBERG:  Your Honor, we had also agreed just this morning, we were requested to add overnight mail to the email notice that is provided for in the order.  I'm happy to commit to do that.  I would prefer just to be able to hand up the order today without having to make that amendment, but if someone feels strongly about it --

THE COURT:  We can all -- we can write it in when we enter the order.  I think it may take a few hours or longer to enter any orders on our system.  We're still backed up.

MR. ELLENBERG:  I believe, Your Honor, the ability to open the door to the jury box had something to do with the October 17th amendment section.

THE COURT:  All right.  Now I'll be happy to hear from any party on any issue relating to this motion.

MR. KRASNOW:  Your Honor, I may, just one or two.

THE COURT:  If you'd come to the podium just so -- to be sure everyone who is interested can hear you.  You're more interested in the upcoming motion, but that's fair.  I would be happy to hear from any party because I think inevitably the procedures set for this motion do not necessarily determine anybody's rights with regard to the next motion, but it will be

33

harder to convince me that we should change the procedures, or
the form of the order, for that matter.

MR. KRASNOW:  I understand, Your Honor.  Richard
Krasnow for GE Commercial Aviation Services.

I'll address some of the issues.  Other parties may
address certain of the others.

Your Honor, I think Mr. Ellenberg overstated where,
at least I think, the matters stand.  I don't believe this is a
situation where aircraft creditors who have engaged in
discussions with Mr. Ellenberg have been seeking to change a
process that Your Honor generally described at the last hearing
and seek to impose upon the debtor's return conditions, as
spelled out with great specificity, in the underlying
documents.

THE COURT:  Right.  I ruled last time, and I'll hear
anyone who wishes to argue to the contrary, that the one thing
1110 doesn't say is that a debtor has an obligation to return
the equipment in accordance with the underlying documents.

MR. KRASNOW:  And, Your Honor, I think speaking for
myself and I believe most, if not all, of the other aircraft
creditors who are represented today, we understand that and we
understood that in our discussions with Mr. Ellenberg and we
understand that here today.

We haven't been, Mr. Ellenberg's observations
notwithstanding, seeking to impose return conditions.  What we

34

have been is taking a step back and looking at what we are

dealing with.  What we are dealing with is somewhat different

than what Your Honor had before you at the last hearing with

respect to Exhibit A.

    With respect to Exhibit A, you basically had aircraft

on the ground.  These were not aircraft which were in service,

being operated by Northwest.  That is not the case with respect

to substantially all of the aircraft on Exhibit B and that

certainly does not appear to be the case with respect to the

aircraft which is the subject of the second motion.

    Therefore, the approach one needs to take and

consider with regards to certain basic issues is somewhat

different.  We are not dealing with copying machines, Your

Honor.  We are dealing with rather sophisticated, very

expensive pieces of equipment that are being operated that

simply can't be picked up, if you will, and put on a truck.

    But again, Your Honor, we were not focusing at all on

the specifics of the return order.

    THE COURT:  All right.  What's wrong with the order?

    MR. KRASNOW:  Your Honor, there are, from our

perspective, three issues.

    THE COURT:  All right.  What's the first one?

    MR. KRASNOW:  There's a notice issue, which I think

others will address.

    THE COURT:  All right.  What's the second one?

35

MR. KRASNOW:  The second, Your Honor, which we don't
think should be an issue, and it was the item which Mr.
Ellenberg alluded to as something that was raised for the first
time, I think we forgot to focus on it.  It has to do with
something as to which Mr. Ellenberg had previously represented
that Northwest was prepared to do.  They certainly have agreed
to it in the context of the adequate protection and that is
that any aircraft would be delivered within the contiguous
forty-eight states.

It's kind of obvious, Your Honor, it's been done I
think in every single aircraft -- airline case that I've been
involved in and we think it should just be in the order.  It's a
simple paragraph.  It isn't return conditions, as one normally
thinks of it, it's where you can pick up the aircraft.

The other issue, Your Honor --

THE COURT:  All right.

MR. KRASNOW:  -- goes to Paragraph 6.  Your Honor had
asked the question as to whether or not that which is in
Paragraph 6 or the concept of what's there in terms of the
airline continuing to insure and maintain is unreasonable.
Certainly, that's not unreasonable; it's appropriate.  It doesn't
strictly deal with return conditions, it deals with the reality
that if, in fact, books and records are not available to the
aircraft creditor, they can't pick up the aircraft.  We think
this is fine, but it doesn't go far enough because, again,

36

implicit in this paragraph is the concept that if the aircraft
creditor can't pick up the airframe, the aircraft because of
something that the debtor hasn't done, then the debtor should at
least incur the cost of the maintenance and the insurance until
such time as the aircraft creditor can pick it up.

THE COURT:  Doesn't this give any individual lender or
lessor an opportunity for a hearing on that precise issue
before the thirty-day period comes to an end, as a practical
matter?  Isn't that -- that's how -- do I mis-read the next part
of Paragraph 6, which seems to say, at the conclusion of that
period, if we're in the situation that you described, either the
debtor can agree to continue the insurance and maintenance for
a longer period because they can't supply you with the flight
manuals or whatever you need to move the aircraft; or, B, the
Court determines, and we can have a hearing again on short
notice, that they're at fault and that in this particular
circumstance they should insure the plane further?

MR. KRASNOW:  Your Honor, I'm going to that which
follows, which was -- the sentence that follows, which was a
recognition by the debtor, as one would expect, given that it
is an airline, that if you don't have the books and records, you
can't move the aircraft.  That's what I'm focusing on because --

THE COURT:  All right.

MR. KRASNOW:  -- there are two -- I guess there are
three essential components in relocating or moving the aircraft

37

on the part of an aircraft creditor.  I'll go in reverse order.

THE COURT:  Well, rather than that, tell me what's wrong with the paragraph.  What words would you add to the paragraph?

MR. KRASNOW:  The problem is the engines.  The only thing we've said to the debtor is if the engines that are required to be on the airframe aren't on the airframe, then that, too, is clearly a circumstance where the aircraft creditor can't pick up the aircraft.  So all we have said is, under those circumstances, you should continue to incur that which, in the context of this case, is not -- can't be an extraordinary expense.  You continue to pay the storage and insurance until the engine is on the airframe because unless those airframes are going to be converted to trucks, I need the engines to fly the aircraft.

That is, Your Honor, the sole issue.  We're not talking about returns --

THE COURT:  And let me ask you this question.  We're talking about a specific circumstance, but not necessarily an unusual one, so I realize that engines go into the shop, engines are, in the ordinary course of business --

MR. KRASNOW:  Swapped.

THE COURT:  -- swapped.  And again, in the ordinary course of business, without any maliciousness or effort to damage anyone.

38

It would seem to me that there are going to be unique circumstances for each of these and the question is why shouldn't we, if we're faced with this problem and the business people can't resolve it, why shouldn't we have a hearing and we'll resolve it?  We can't provide for everything.

MR. KRASNOW:  Your Honor, we are not suggesting anything other than if the engines aren't on the airframe, they continue to pay the maintenance and insurance.  The same point that Your Honor just made arguably could be made with respect to the books and records.  There's really no difference between the two.

We're not talking about extraordinary expenses.  What we're talking about is a clear recognition on the part of the debtor that if we don't have our books and records, we can't relocate the aircraft.

THE COURT:  Don't we have a potential circumstance where let us say a lessor has leased to Northwest twenty aircraft and a dozen additional spare engines and there's been swapping.  The debtors return an aircraft with one of that lessor's engines, but not the engine that I assume "should be" on that airframe.

MR. KRASNOW:  Somebody else's engine?

THE COURT:  No, not somebody else's, but same lessor. Now is that -- is the lessor acting unreasonable if the lessor refuses that entire aircraft because there's a different engine

39

on that aircraft?  Is the lessor acting unreasonably if the

particular engine is in the shop but Northwest puts another

engine on in order to be able to return the aircraft?

It seems to me that in that circumstance a -- I may

have no choice but to have a separate hearing if the parties

can't act reasonably and work it out.

MR. KRASNOW:  Your Honor, one answer to that is if

that were an acceptable circumstance, I suspect -- and we're

talking about theoretical situations -- that an aircraft

creditor, if that was otherwise acceptable and reasonable, is

not going to engage in a fight about whether or not Northwest

should continue to insure that aircraft or pay for storage as

against that aircraft creditor repossessing the aircraft so it

can, in fact, place it in service with somebody else.

Again, Your Honor, we're talking about who pays for

the insurance and who pays for the storage.  We're not talking

about larger issues here, such as Mr. Ellenberg is suggesting

this was, which was the return conditions.  We're just talking

about maintenance and insurance.  That's all.

THE COURT:  All right.  Thank you.

MR. KRASNOW:  And I don't know whether or not someone

else wanted to address the notice issue.

THE COURT:  All right.  I assume someone will.  If

not, you're welcome to stand again.

MR. KRASNOW:  Yes, Your Honor.  Thank you.

40

MR. HIERSTEINER:  Good morning, Your Honor.  Richard
Hiersteiner on behalf of U.S. Bank and U.S. Bank Trust,
trustees.

Our issue is precisely the notice.

THE COURT:  All right.  What do you think is
reasonable?

MR. HIERSTEINER:  We think ten days is reasonable,
Your Honor.  We think that --

THE COURT:  Why do you need that long?  You've now
gotten your clients, who I assume are the real parties in
interest, have gotten notice that the aircraft is on a list of
possible rejection.  Let us put it that way.  I do not know the
status of the parties' negotiations, nor is it appropriate for
me to speculate as to it, but there is notice that this
aircraft or these aircraft -- there is a system, I assume,
electronically whereby your client can get notice to the
beneficial owners forthwith where parties know who they're
dealing with.

It would seem to me that by increasing the notice
period, I am decreasing the parties' flexibility.  I have no
desire to bring the negotiations down to the wire, but you're
basically saying that the final step, if there's ten days'
notice, has to be by the 4th of November, rather than by some
later date.  Is that what you're saying, basically?

MR. HIERSTEINER:  That's correct, Your Honor, and the

41

reason for that is I think that there's a misunderstanding about
the line of communication between the trustee and the
beneficial holders in these transactions which are implicated
by the various debtor motions.

There are a number of public transactions, ETCs,
pass-through transactions, and enhanced equipment trust
certificate transactions in which the beneficial holders are
identified only through the Depository Trust Company system,
which means that they are anonymous to us.  In order for us to
communicate with them, we need to communicate through
Depository Trust, down through the levels of nominees to the
beneficial holders and back through Depository Trust to us.

In most cases, that's not a three-day process.  We
need that communication because we act on the instruction of
the controlling holders in those transactions and we need to
know what their position is with respect to these --

THE COURT:  And you're telling me that some of these
controlling holders have not made themselves known to you
through counsel or an agent?

MR. HIERSTEINER:  Some have, some have not.

THE COURT:  And how many have not?

MR. HIERSTEINER:  Most have not.

THE COURT:  Well, it would seem to me that that's
their problem.  That's the way they want to leave it, that's
their problem.

42

MR. HIERSTEINER:  Your Honor, we have to act on what
we can confirm as the holdings.  We can't --

THE COURT:  That's their problem.

MR. HIERSTEINER:  No, it's not.

THE COURT:  I mean, they may -- I don't know why I
should impose their problem on the debtor by giving you ten
days' notice.

MR. HIERSTEINER:  Your Honor, if we're going to act on
instructions of parties who own the certificates beneficially,
we need to know and confirm what those holdings are.

THE COURT:  That can be started today.  That process
can be started today and procedures can be put in place in
order to keep the beneficial holders hidden if they want to be
hidden, or otherwise protect their anonymity.

MR. HIERSTEINER:  But that they trade and that's the
reason for the Depository Trust system.  So we need -- when an
instruction needs to be given, it needs to be given from the
current holders and if they're trading, the fact that we have
anticipated this three weeks in advance doesn't help us know
that we have the right holders instructing us at the time.

Three days' notice, Your Honor, in all honesty, means
we could receive a notice on Friday afternoon and not know how
to deal, not even know that we have it until Monday, which is
the third day.  So there needs to be at least a procedure which
gives us the opportunity to avoid the ambush.  Remember, these

43

planes are flying.  We don't know where they are.

So we may receive notice that the plane is being
rejected in Washington.  It may be in Maine.  It may be
anywhere in the contiguous United States and we can't react to
that pro-actively unless we have some way to anticipate where
those planes will be and how we organize our response to that.
 Three days is just too short.

MS. LENNOX:  Good morning, Your Honor.  Heather
Lennox again on behalf of National City Leasing Corporation.

Unlike many of the parties in the court today, we
have only three planes on Exhibit B, but I stand to raise one
issue and, perhaps, for clarification.  It goes to the three-
day notice period.

It's my understanding from reading the transcript that
the Court said at the last hearing that it wouldn't decide what
the 1110(c) return and surrender condition requirements are and
that's very clear to the parties in this courtroom.  So
according to what --

THE COURT:  I said that they had to be reasonable.

MS. LENNOX:  Correct.  And certainly one would hope
that the parties will be reasonable, but there may come a set
of circumstances where they can't agree.

And accordingly it would seem to us that the proper
time for us to raise the issue, if there is an issue, as to
what a reasonable return condition is, is during this three-day

44

objection period.  If Your Honor re-think that they reasonably
need to do something rather than just reserving our right to
make a claim for it, because that would be reasonable on return
and surrender, you would have a three-day period to make that
case to the Court.  Frankly, Your Honor, since we don't know
where the planes are and what those conditions would be in
because we can't expect them until we even have the notice,
three days is just too short to put that case on before this
Court.  So I would suggest that ten days is more appropriate.

        THE COURT:  I had not contemplated that any party
needed to put on its case within that three-day period.  You're
right to the return of the aircraft, in accordance with 1110,
is preserved.  The statute, the way the statute is written,
requires the debtor's immediate return on the 60th day,
surrender and return.  The statute is written in a fashion that
requires very prompt action on the part of the debtors.

        You're right to reserve.  A claim for damages is
reserved, but I hear your argument.  Thank you.

        MS. LENNOX:  Thank you.

        THE COURT:  Anyone else?

        MR. KRASNOW:  Your Honor, if I may just clarify?

        THE COURT:  Certainly, yes.  You may -- and you may,
obviously, speak to the three-day notice because your client
may be in a different position than the indentured trustee for
unknown beneficial holders.

45

MR. KRASNOW:  Your Honor --

THE COURT:  Do you know who your client is?

MR. KRASNOW:  Yes, I do.  Richard Krasnow, Your

Honor, for the record.

Your Honor, I think that we were actually -- may be

the one Mr. Ellenberg indicated had asked --- had suggested a

time frame which was less than ten days and I think it would be

helpful to focus Your Honor on what -- I mentioned earlier the

number of aircraft involved overall, which are 220 aircraft.

The issue, I believe, in part, and maybe in

substantial part, goes to the arrangements that an aircraft

creditor must make to pick up the aircraft and affording them

reasonable notice to take possession of the aircraft.  As I

said earlier, Your Honor, we're not talking about copying

machines, we're not talking about a store where they can simply

say pick up the keys.  Presumably, if the aircraft is going to

be returned someplace within the contiguous forty-eight states,

still don't know where that's going to be or how many aircraft

may be affected until you get the notice.

You then need to make the arrangements in order to

get the right people in the right place to actually fly the

aircraft.  That's not going to be done in --

THE COURT:  Maybe I'm missing something.  I can

understand the concept that three days is too short to do

anything in this life.  Let's put that aside.  Whether it should

46

be three business days or five days, five business days, that I
understand, but I'm not sure we're -- I understand exactly what
the burden is on the leasing company or the lender or parties
interested in the aircraft because you get notice.  It has to
be before the 16th of -- 14th of November, I assume, unless
parties agree otherwise, and that's up to them, assuming these
are 1110 equipment and I'm assuming that most, if not all, of
the equipment is.

        The equipment is going to be insured for at least
thirty days from today, which takes us to the 19th of November
or the 18th of November, so it takes us beyond -- at least four
days beyond the 14th of November and they haven't sent out any
notices yet with regard to Exhibit B, so we're talking about
insurance through the 21st, 22nd, 23rd of November at a minimum
and we're talking about an order that says they should insure
for at least that thirty-day period or the date the lender
picks it up, actually takes possession of the aircraft.

        Then there are provisions, and I heard you about
impediments to taking possession and other problems and there's
a provision for getting a court hearing to deal with special
treatment.  So I don't read this order as saying you must pick
up that aircraft on the third day after getting the notice.  I
don't -- because the -- you have an obligation I think under
1110 to act very promptly, but the insurance is going to be in
place for at least a short period after that notice, assuming

47

the notice goes out before the 60th day under 1110.

This simply gets the matter started in terms of
rejection.  Obviously, the debtor can give greater notice if it
wishes to.

You all have notice today that you're on the
provisional list, so I just don't understand what the problem
is.

MR. KRASNOW:  Your Honor, the issue isn't about
insurance.  As I said earlier, it's an -- it's in the aircraft
creditor's interest not to let the aircraft sit somewhere
because Northwest is going to insure it.  It's in its interest
to pick up the aircraft.

What we're trying to approach is a reasonable --
what's a reasonable period of time to allow the aircraft
creditor to put the appropriate infrastructure in place so that
they could pick up the aircraft.  Assuming --

THE COURT:  Let me ask -- answer this question.  What
does that business problem have to do with the number of days'
notice you get from Northwest that your plane is on Exhibit B?

MR. KRASNOW:  Your Honor, parties knowing that 221
aircraft are on Exhibit B is meaningless, other than to tell
them -- other than for Northwest to tell those parties they'd
like to renegotiate the terms of their arrangements.  It is
impossible, Your Honor, for the aircraft creditors as a group
to line up everybody who needs to be lined up today on the

48

possibility that somewhere in the United States over the next
forty-five days they may get a notice that there's going to be a
rejection with respect to up to 221 aircraft.

All we're trying to do, Your Honor, is to try to come
up with a reasonable time frame within which, once there is
notice, we can then go about, do the necessary, so that if the
books and records are immediately available, if, in fact, the
engines are on the aircraft, we can pick up our property.
That's all it is.

We happen to believe, speaking for ourselves, that an
eight-day time frame would be a reasonable period of time.
Three days, we think, is too short.  Others believe eight days
or ten days of fifteen days is more appropriate.  We attempted
to and are still attempting to come up with a reasonable
approach, we just don't believe three days is adequate, Your
Honor.

THE COURT:  Thank you.

MS. ROSENBERG:  Your Honor, Risa Rosenberg.

Just to give the flip side of what the trustee said,
from the aircraft creditor's side, many of the members of the
committee hold in the public debt where U.S. Bank is a trustee,
it also takes time to get an instruction to the trustee and
even when you have a majority of holders, to have that work
perfectly takes time, even with the best will in the world and
open communication.

49

Also, it's not just three-days' notice for the --
there are all the mechanical and procedural issues dealing with
the actual equipment that Mr. Krasnow has described so
eloquently.  There's also the issue of preparing objections and
I think the point of the 200 planes shouldn't be lost.

What might be sensible for one aircraft may not apply
to another so if parties have to make arrangements, figure out
where their aircraft -- look at the notice, figure out where
their aircraft is going to be, and prepare whatever objection
they deem appropriate --

THE COURT:  I haven't yet heard anyone suggest any
contingent viable objection to the debtor's business judgment in
rejecting one of these leases or abandoning aircraft that is
owned to the secured party.  Obviously, I'm not determining that
in advance.  I'm not in any way suggesting that there might not
be such objections and I understand what you're saying, but we
are dealing with an area of the law where the grounds for
objecting to a debtor's business judgment in rejecting equipment
leases, even if we're not dealing with Xerox copiers, is pretty
broad.

MS. ROSENBERG:  Even granted that, there are
objections on file to the procedure, the contingent --

THE COURT:  Well, I accept -- we're doing it
differently.

MS. ROSENBERG:  Right.  We're past that.

50

THE COURT:  We're going to avoid that legal issue.

MS. ROSENBERG:  But I think everyone has reserved the issue because we don't know which aircraft are actually going to be rejected or abandoned and we won't know until we get the notice.  Three days, not even business days, I think Your Honor, in one of your comments, said you haven't prejudged that issue.

If a notice comes in to a trustee in -- on a Friday, it may or may not get to anyone who can react to it before that three days is up.

THE COURT:  Well, let us agree that notices must come in before four o'clock on a Friday afternoon and that, for the next couple of weeks, parties ought to be working until five o'clock on Friday afternoons and have their electronic mail ready to go out.  I also take the point that we probably ought to deal with business days.  Seems to me that we should probably deal with business days.

MS. ROSENBERG:  And the debtors are getting an advantage here, even with a longer notice period than their ideal three days, because they are getting their procedure. They don't have to file a motion on each plane.  They don't have to go through all of that burden, they just have to send a notice, so they are getting a procedural advantage here. Giving a reasonable notice to people so that they can react in a reasonable way is fair and certainly anything less than ten

51

days, the local rules don't -- requires that it be business days
that you count, not calendar days.

        THE COURT:  Thank you.  Anyone else?

                [No response.]

        THE COURT:  All right.  Anything further?

                [No response.]

        THE COURT:  Well, there are two issues that are
outstanding on the order with regard to what I will call for
shorthand Exhibit B.  One is the length of the notice period
and the other is the extent to which the order entered should
attempt to deal with matters such as the return of engines
together with the aircraft to which they were originally
attached or to which they are attached by virtue of contract.

        As to the latter issue, it seems to me that this form
of order need not deal with all possible contingencies, such as
the engine issue, that if there are issues that need to be
brought the Court on very short notice, I'll be available.  I
will not be available easily, at least I'll be out of town for
three days in early November, November 2nd, 3rd, and 4th, but
otherwise I will make myself available to the parties if
necessary to resolve individual disputes, but I'm not going to
anticipate that the parties are not going to be able to resolve
these issues reasonably.

        Obviously, we'll have another motion on the 27th and I
don't want to cause the parties unnecessary agony in terms of

52

trying to anticipate issues, but I certainly do not preclude

them from attempting to deal with as many issues in an order as

they can with regard to engines or otherwise.  This is only a

final decision with respect to this order before me which

relates to the motion that is before me today.

    With regard to the number of days, I understand the

concern of having to react to a final notice within three days.

 I do not understand the order to require a lender or lessor

necessarily to take possession of an aircraft within three

days.  Parties can argue later that, for one reason or another,

that period was too short and an administrative claim should go

beyond the official date of rejection.

    On the other hand -- and I certainly do not want to

suggest that the debtors should not agree, if they wish, with

any lessor to a longer period.  It may make sense, particularly

where the indentured trustee is dealing with unknown beneficial

holders.  It certainly may make sense for parties to agree to a

totaling of the sixty-day period, with respect to 1110, but

that's up to them.  I'm not taking any position on that.

    But the debtors have committed, in this order, to

continue to insure the property during a period beyond that

three-day period, at least as I understand it.  Assuming this

is all 1110 property and there has to be another agreement to

deal with aircraft beyond the 60th day of the case, as I read

this order, the property would be insured beyond that blank-day

53

period provided for in the order and it would be maintained
during that period.  The order, therefore, gives each of the
lessors and lenders that additional protection.  They are not
going to be compelled, on three-days' notice, to come and get
their aircraft or the insurance and maintenance is going to be
cut off.  The debtors have gone beyond that.

Now with regard to a reasonable period, I would hope
that the debtors could live with five business days.  That is
practically an eight-day period but it solves the weekend
problem.  Obviously, any party can agree otherwise and they can
agree to extend the 1110 period, they can agree to vary this
period as well if the negotiations are going successfully.

So that is the order that I would anticipate
entering.

Mr. Krasnow?

MR. KRASNOW:  Your Honor, I had raised one other
issue and that was Northwest -- Mr. Ellenberg had indicated in
the adequate protection arena that any aircraft that was
returned would be returned within the contiguous forty-eight
states, we wouldn't have to go to Timbuktu, if  you will, to
take possession of the aircraft.   We had also requested that,
consistent with that representation, assuming it still applies
-- and I'm not sure Mr. Ellenberg said it does -- that the order
at least provide that the aircraft will be returned within the
contiguous forty-eight states.  So that was one open issue that

54

I had raised.

THE COURT:  I'll ask Mr. Ellenberg if he wishes to comment one way or another.

MR. ELLENBERG:  Your Honor, it is our intention to do that.  I don't believe it belongs in this order.  I don't believe we should be ordered to do that.  It is our intention to do that.

THE COURT:  Well, I ruled last time and I would repeat today that the parties should act reasonably and it does appear that return within the contiguous forty-eight states is reasonable under the circumstances.  Obviously, the debtors have to deal with some of the lenders and lessors for many years in the future and a reorganization is not going to get off to a great start if the debtors don't act reasonably.

On the other hand, I already ruled that the requirements of the underlying documentation are not imported into 1110.  I know you're not trying to import all of the requirements, but I haven't specified any of them, other than insurance and maintenance for a specific period of time and, therefore, I don't think it would be appropriate to add to this order this requirement.

You may be right and you may have an administrative claim and you may not, depending upon circumstances.  So I don't believe it necessary to add that clause to this order, the clause requiring return within the contiguous forty-eight

55

states.

Anything else today?

[No response.]

THE COURT:  Then you may want to consider, Mr.
Ellenberg, with parties when we break, exactly what words need
to be changed.  Maybe we just need a couple of words changed
with regard to the time period.

MR. ELLENBERG:  I think, Your Honor, it's only
changing three days to five business days.

THE COURT:  And wasn't there -- there was one other --

MR. ELLENBERG:  Adding overnight notice in addition
to --

THE COURT:  Overnight mail.  Why don't you mark that
up in hand and then you can bring that down to chambers.

MR. ELLENBERG:  Your Honor, just one minor
housekeeping issue.  Although we noticed all of our hearings
today for ten o'clock, the calendar by the door of the courtroom
actually had Northwest starting at 10:30.  You went through a
number of issues with Mr. Petrick before 10:30.  Perhaps we
should just canvas the courtroom to make sure nobody who got
here at 10:30 had any issues with respect to those earlier
motions.

THE COURT:  I thought it was on at ten, but was
anybody late?  Not late, was anybody here at 10:30 rather than
ten?

56

[No response.]

THE COURT:  All right.  Then I think everybody's had an opportunity to be heard.

Is there anybody who has not had an opportunity to be heard on an issue that they wish to raise, other than the question of the order on trading and claims?

[No response.]

THE COURT:  All right.  Then we'll turn to that order.  Is that going to be brief, Mr. Petrick or is it going to be lengthy?

MR. PETRICK:  I think it's brief, Your Honor.

THE COURT:  All right.  I just want to give parties who are not interested in that an opportunity to leave, but it may be very brief.

MR. PETRICK:  Your Honor, we thank you for the opportunity to use your chambers.  We've agreed to take up Your Honor's suggestion trying to use the next twenty-four hours to resolve the issue of the extension of the interim trading order.  I have committed to circulate as early today as we can a revised, new-and-improved order and to try to accommodate within that order certain concerns that Mr. Bromley's clients have, as well as Ms. Rosenberg's clients.

We would ask, Your Honor, that if we are not successful at that, that we would have a time to come back tomorrow.

57

THE COURT:  You want tomorrow at eleven or tomorrow at 2:30?

MR. PETRICK:  The earlier the better.

THE COURT:  Eleven?

MR. PETRICK:  Eleven would be fine.

THE COURT:  All right.  Tomorrow at eleven.

Can you tell me what issues -- or you may not. Perhaps by the end of the day you might be able to inform chambers as to what issues are likely to come up.  You mentioned a timing issue and then you mentioned also issues that you did not foresee agreement on.  What can you, without prejudice to your negotiations, at least tell me what issues are likely to come before me or may come before me?

MR. PETRICK:  Your Honor, I am hopeful that we'll have them all resolved before we come back next Friday.  I think that the issues that are out there is whether the threshold limitation, the number of -- the dollar amount of claims that any one individual may have or an individual institution may accumulate without becoming a substantial claim holder is a potential issue.

I think that there is going to be a mechanism that if somebody accumulates more than the allowed amount of claims, if the 385L-2 election becomes meaningful, there would be a sell-down notice and people would be required to sell down.  Then the consequences of what happens if somebody does not comply

58

with the sell-down notice are the issues, the big issues that I think remain outstanding.

THE COURT:  That sounds like issues the tax lawyers and the tax accountants are going to have to look at.  I think I probably should adjourn the motion for at least two or three months.

MR. PETRICK:  Thank you, Your Honor.

THE COURT:  No, that's without prejudice, obviously, to anyone's arguments, but when we get into that area, I don't know.  I hope you can move quickly.

Mr. Bromley, do you have a statement?

MR. BROMLEY:  Yes, Your Honor.  James Bromley, Cleary Gottlieb, on behalf of ten of the largest investment banks on Wall Street including Lehman Brothers, who is represented here in the courtroom today, Your Honor.

There are a number of problems that we have with --

THE COURT:  I don't want to hear about the number of problems you have with the order, other than --

MR. BROMLEY:  If you'll allow me to say this.

THE COURT:  -- what I need to in terms of the issues that are likely to come before me tomorrow.

MR. BROMLEY:  Well, to focus on the issues, Your Honor, first is the form of the order.  We haven't seen the markup that the creditors' committee has given and so we'd need time to look at that.

59

        I have ten clients, as I mentioned.  We need to have
a conference call as to the proposal that Mr. Petrick has made.
 The biggest issue we're facing is credit default swaps and the
clearance of those credit default swaps, which is taking --
which is scheduled to take place thirty days after the
declaration of the credit events.  The credit events is the
bankruptcy and there has to be a declaration because the
bankruptcy was filed on the 14th.  Those declarations took
place in the few days thereafter and so the credit default swap
under the ISDA [Ph.] forms is coming due now and we've had
trades fail yesterday and trades will fail again today as a
result of the interim order.

        The proposal that Mr. Petrick has made is that we
would receive a waiver with respect to the credit default
swaps, though bear the risk that if those trades are not -- if
those trades end up moving bonds into the hands of substantial
claim holders and the form of the final order does not deal
with it, that the so-called void admonitio provision of the
final order could make those trades some day in the future have
to be unwound, which we find very prejudicial to the street.

        So we have asked that the void admonitio provision,
which is encompassed in the final order -- in the interim order
be waived over the next period of time so the credit default
swaps can close without prejudice.  He has said that he'd get
back to us on that by this time tomorrow.

60

So that is the major issue that I see in terms of
allowing the matter to roll over to the 27th.  Obviously, we
would reserve all our rights with respect to the objection that
we filed and with respect to all of these other tax issues,
believe me, the tax lawyers have been talking amongst
themselves quite a bit over the past few weeks because we have
the exact same issue in two other courtrooms in this building -
-

THE COURT:  Well, don't let them talk among themselves
exclusively.

MR. BROMLEY:  Oddly enough, the tax lawyers are much
more cooperative, it seems, than the courtroom lawyers, but
hopefully we'll be able to bring it to a conclusion.  But that's
the issue, I think, that's really prime for tomorrow, Your
Honor.

THE COURT:  All right.

So Mr. Jacobs has been busy, Ms. Rosenberg?

MS. ROSENBERG:  Well, actually Mr. Jacobs has
retired.

THE COURT:  He's retired.  All right.

MS. ROSENBERG:  But others who have followed in his
footsteps have been busy.

THE COURT:  All right.

MS. ROSENBERG:  If I understand, from the whispered
conversation I just had with Mr. Petrick, and based upon a

61

prior conversation, the procedure is he's going to circulate an

order substantially in the form of the order we've previously

seen as an interim order and preserve other -- the rest of the

issues for the 27th.  If that is my correct understanding and

we'd be back tomorrow if we don't have agreement on this revised

interim order, then I think we're okay with the one-day

extension on that basis so that we can reach agreement on a

revised interim order.

        MR. PETRICK:  Yes, Your Honor.

        THE COURT:  All right.  Then I'll adjourn the matter

until tomorrow at eleven o'clock.  All interim relief remains in

effect.

        Thank you very much.

                * * * * *

    I certify that the foregoing is a court transcript from an

electronic sound recording of the proceedings in the above-

entitled matter.

                        Lisa Luciano

Dated:  10/22/05

62

<u>**EXHIBIT E**</u>

**(UAL December 17, 2004 Transcript)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                          )
                                ) No. 02 B 48191
UAL CORPORATION, et al.,        )
                                ) Chicago, Illinois
                                ) December 17, 2004
                    Debtors.    ) 9:30 a.m.


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF


APPEARANCES:

MR. JAMES SPRAYREGEN
MR. MARC KIESELSTEIN
MR. DANIEL LAYTIN
MR. DAVID SELIGMAN
MR. MARC CARMEL
MR. ERIC PREZANT
MR. ANDY MAROVITZ
MR. TODD GALE
on behalf of the debtors;

MR. FRUMAN JACOBSON
on behalf of the official creditors committee;

MR. FIL AGUSTI
on behalf of the IFS;

MS. THERESA GEE
on behalf of the Secretary of Labor for the U.S.
Department of Labor;

MR. JOHN MENKE
on behalf of the Pension Benefit Guaranty
Corporation;

MR. JACK CARRIGLIO
on behalf of the United Retired Pilots Benefit
Protection Association;

MR. TOM REDBURN
on behalf of the IAM;

MR. ROBERT CLAYMAN
on behalf of the Association of Flight Attendants;

MS. KATY GLEASON
on behalf of the United States Trustee;

MR. DANIEL CURTH
MR. DAVID KANE
on behalf of OurHouse;

MR. ANDREW ROSENMAN
on behalf of UAL Loyalty Services;

MR. RICHARD LORENZEN (TELEPHONICALLY)
on behalf of Best Western;

MR. FRANK CITERA
on behalf of the city of Chicago;

MS. CAROL CONNER FLOWE
on behalf of SunTrust Bank;

MR. PATRICK MCLAUGHLIN
on behalf of U.S. Bank as trustee;

MR. ROBERT FISHMAN
on behalf of the 2000 A ad hoc committee;

MR. MARK HEBBELN
on behalf of HSBC Bank.

Page 5

1            THE CLERK:   January 21st.

2            THE COURT:   Pardon me?

3            THE CLERK:   21.

4            THE COURT:   21.  Excuse me.

5                 The only problem here is that

6    January 21 is also listed as the date for filing of

7    a reply brief.  It will do me no good if the reply

8    brief is filed the day of the hearing.

9            MR. SPRAYREGEN:   We were going to suggest

10   a new objection deadline of January 14 and reply of

11   January 19, if that works.

12           THE COURT:   That's fine.

13           MR. SPRAYREGEN:   Okay.  At 2:00 p.m.,

14   actually.

15           THE COURT:   Okay.  We turn then to matters

16   that are listed as uncontested.  There are several

17   of these uncontested motions that seek court

18   approval for what appears to be ordinary course

19   transactions.  The understanding I have is that if

20   these really are ordinary course transactions, the

21   impact of filing a motion seeking court approval is

22   to give any party an opportunity to object to the

23   action that the debtors propose to take.

24                 In the event that I believe that

25   they're ordinary course transactions, I'm going to

Page 6

1    deny the motions as unnecessary.  But every party

2    will have had notice and an opportunity to object.

3    And I would expect that any future objections to

4    these transactions as being out of the ordinary

5    course would be waived.  So let's just go through

6    them.  And to the extent that that's the appropriate

7    disposition, that's what we'll do.

8              The first of these is a motion to

9    authorize United Airlines nunc pro tunc to enter

10   into an express agreement with Trans States Airline.

11   And this is one of the motions of the sort that I

12   just described.  The debtors and Trans States appear

13   to have taken the position that this was an ordinary

14   course transaction at the time it was entered into.

15   I understand that there is some lender of Trans

16   States that is concerned that this might be viewed

17   as a not ordinary course transaction.  By virtue of

18   the ruling that I am making today, that lender

19   should be assured that this is an ordinary course

20   transaction that does not need bankruptcy court

21   approval, and that is the sole basis on which the

22   motion is being denied as unnecessary.

23             MR. SPRAYREGEN:  Thank you, your Honor.

24             THE COURT:  Next, item four on the agenda,

25   is a motion to approve assumption and assignment of

1    the Miami International Airport cargo facilities

2    lease.  This is a matter that requires a court

3    ruling.  There has been no objection to the

4    assumption and assignment.

5              MR. SPRAYREGEN:  Correct, Your Honor.

6              THE COURT:  And given the lack of

7    objection, the motion will be granted.

8              Number five on the agenda is a motion

9    to approve a license between United Airlines and

10   Verizon Airfone, Inc.  This appears to be

11   replacement of one agreement for these communication

12   services with another agreement.  The only reason

13   it's suggested this might be outside the ordinary

14   course is that there are releases involved in

15   entering into the new agreement.  I don't see that

16   as outside the ordinary course at all.  In the

17   course of negotiating a new agreement, it would be

18   ordinary course to give releases as to any

19   obligations arising under the old agreement.  And

20   so, again, given a determination that it's not

21   outside the ordinary course, I would be inclined to

22   deny it as unnecessary.

23             MR. SPRAYREGEN:  Just to make sure the

24   court is aware, and I don't think this will change

25   the court's view, but as part of this deal, Airfone

Page 56

1   has heard, there is -- when you make a minimum

2   funding contribution, there is the normal cost

3   portion which relates to a particular plan year and

4   there is a past service liability that relates to

5   prior years.  And we disagree with the proposition

6   that when an employee is working post-petition, that

7   necessarily that means that that's in consideration

8   for not only funding the normal cost for the

9   benefits that are accruing in that particular year,

10  but also for the past service liability for that

11  particular employee for all previous years

12  pre-petition, and also for retired employees who

13  maybe haven't worked for the company for 10 years

14  because a lot of the payments that we're making on

15  account of past service liability are amortized

16  payment -- are amortized payments on account of

17  that.

18              The other -- I think the last point

19  that I would like to make is that -- is this tax

20  issue that was raised by the PBGC.  We didn't -- I

21  know the independent fiduciary talked about taxes,

22  but I don't think the word "taxes" was mentioned at

23  all in his brief.  The issue of taxes was raised for

24  the first time by the PBGC in their reply -- or in

25  their supposed response, I should say, to the