PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile:  212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., et al., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF HEARING ON OBJECTION OF MESA AIR GROUP, INC., ET AL.,
TO (1) THE ALLEGED ADMINISTRATIVE PORTIONS OF CLAIMS 1430 AND 1431
OF U.S. BANK NATIONAL ASSOCIATION, AS SECURITY TRUSTEE, ON BEHALF
OF AGENCIA ESPECIAL DE FINANCIAMENTO INDUSTRIAL-FINAME AND (2)
CLAIMS THAT WERE AMENDED AND SUPERSEDED BY CLAIMS 1430 AND 1431**

TO U.S. BANK NATIONAL ASSOCIATION, AS SECURITY TRUSTEE, ON BEHALF OF
AGENCIA ESPECIAL DE FINANCIAMENTO INDUSTRIAL-FINAME, THE OFFICE OF
THE UNITED STATES TRUSTEE AND ALL PARTIES REQUESTING SPECIAL NOTICE:

> **PLEASE TAKE NOTICE that** Mesa Air Group, Inc. and its affiliated debtors in the

above-referenced chapter 11 cases (collectively, the "Debtors") have filed their *Objection to (1)*

*the Alleged Administrative Portions of Claims 1430 and 1431 of U.S. Bank National Association,*

*as Security Trustee, on behalf of Agencia Especial de Financiamento Industrial-Finame and (2)*

---

[1]  The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110);
Freedom Airlines, Inc. (9364), Mesa Airlines, Inc. (4800), MPD, Inc. (7849), Ritz Hotel Management Corp. (7688);
Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management,
LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

*Claims that were Amended and Superseded by Claims 1430 and 1431* (the "Objection"). The Objection is appended to this Notice.

Before these chapter 11 cases were commenced on January 5, 2010 (the "Petition Date"), Mesa Airlines, Inc. ("Mesa Airlines") leased the eleven ERJ-145 aircraft (the "Aircraft") that are the subject of the Objection.[2] Before the bankruptcy, the Debtors decided that the Aircraft were no longer necessary to their operations and took them out of service. The first Aircraft was put into storage in December of 2008, with the last being parked in November of 2009. The Debtors never operated any of the Aircraft post-petition. On or about August 11, 2010, the Debtors rejected the leases for the Aircraft and surrendered possession.

Pursuant to Claim 1431 filed by U.S. Bank National Association ("U.S. Bank") against Mesa Airlines, U.S. Bank asserted a claim on behalf of lender Agencia Especial de Financiamento Industrial-Finame ("FINAME"), in the amount of $189,560,201.66, of which it contends that $11,016,708.66 is entitled to administrative priority under section 503(a) of the Bankruptcy Code (the "Alleged Administrative Claim") and $178,553,493.00 is a general unsecured claim (the "Alleged Unsecured Claim"). U.S Bank filed an identical claim, Claim 1430, against Mesa Air Group, Inc. ("Mesa Air Group") based on Mesa Air Group's guaranty of the Aircraft leases. (Claims 1430 and 1431 are collectively the "Objectionable Claims"). The Objection addresses only the Alleged Administrative Claim, which, generally speaking, seeks to charge the Debtors' estates with $11 million in administrative expense claims for parts that U.S. Bank contends were missing from the Aircraft and for maintenance records that it contends were either missing or inadequate.[3]

---

[2] The U.S. registration numbers for the Aircraft are N827MJ, N839MJ, N841MJ, N842MJ, N843MJ, N844MJ, N845MJ, N846MJ, N847MJ, N848MJ and N851MJ.

[3] The Debtors reserve their rights to object to the Alleged Unsecured Claim as well as to bring additional objections to the Alleged Administrative Claim.

As is more fully detailed in the Objection and the Declaration of Gary Appling in support thereof, the parts and records are neither missing nor inadequate. Even if they were, however, there can be no administrative claim on account of missing parts or records related to these Aircraft as a matter of law. These Aircraft were never used post-petition. There were parked and in long-term storage for months before the Petition Date and were turned over at the stored location in the same condition they were in on the Petition Date. Accordingly, the Debtors have asked the Court to deny administrative expense priority to the entirety of the Alleged Administrative Expense Claim, as a matter of law.

Should the Court determine that some or all of the Alleged Administrative Expense Claim is entitled to priority under Bankruptcy Code section 503, the Debtors request that the Court schedule an evidentiary hearing to determine the amount of the claim. Finally, the Debtors ask the Court to expunge the claims previously filed by U.S. Bank that were amended and superseded by the Objectionable Claims. Specifically, the Debtors request the Court disallow claims 958, 959, 1420 and 1421.[4]

**PLEASE TAKE FURTHER NOTICE that** on **November 18, 2010 at 10:00 a.m., prevailing Eastern Time**, a hearing (the "Hearing") on the Objection will be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Courtroom 501 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408.[5] Pursuant to the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) for Approval of (I) Claim Objection Procedures and (II) Settlement Procedures [Docket No. 893] (the "Claims

---

[4] Claim 959 ($438,827.10) was amended and superseded by Claim 1420 ($189,165,949.09), which was amended and superseded by Claim 1430. In addition, Claim 958 ($438,827.10) was amended and superseded by Claim 1421 ($189,165,949.09), which was amended and superseded by Claim 1431.
[5] Both U.S. Bank and FINAME agreed that the Debtors could file and serve the Objection on October 21, 2010.

Protocol Order"), any Response must be filed within twenty-one (21) calendar days after service of the Objection.

Written responses (a "Response") to the Objection must be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408 no later than **November 10, 2010 at 5:00 p.m., prevailing Eastern Time**; and (b) served so as to be actually received no later than **November 10, 2010 at 5:00 p.m., prevailing Eastern Time**, by the following parties: (1) Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, Attention: Debra Grassgreen and John W. Lucas (such service may be effected by e-mail to dgrassgreen@pszjlaw.com and jlucas@pszjlaw.com), and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017, Attention: Maria A. Bove (such service may be effected by e-mail to mbove@pszjlaw.com), attorneys for the Debtors; (2) Mesa Air Group, Inc., Law Department 410 N. 44th St. Suite 700, Phoenix, Arizona 85008, Attention: Brian S. Gillman, Esq. (such service may be effected by e-mail to brian.gillman@mesa-air.com); (3) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attention: Lorenzo Marinuzzi, attorneys for the Committee, and (4) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Andrea B. Schwartz; and (5) the parties on the Master Service List in these cases, established under the Order Pursuant to Section 105(a) of the Bankruptcy Code And Bankruptcy Rules 1015(c) and 9007 Authorizing the Implementation of Notice And Case Management Procedures [Docket No. 103] (as it may be amended, the "Case Management Order").

Any Response should contain the following:

- The approved case caption (including the hearing date in the upper right-hand corner) and the title of the Objection to which the Response is directed;

- The name of the claimant and description of the bases for the amount and priority of the underlying claim;

- A concise statement setting forth the reasons why the Court should not sustain the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection;

- A copy of all documentation or other evidence of the claim upon which the claimant will rely in opposing the Objection at the Hearing, potentially including a declaration of a person with personal knowledge, to the extent that such documentation or evidence is not included with the claimant's proof of claim; and

- The name(s), addresse(es), telephone number(s), facsimile number(s) and e-mail addresse(es) of the person(s) (who may be the claimant and/or the claimant's legal representative) to whom the Debtors' attorneys should serve any reply to the Response.

If a Response is not timely filed and served in accordance with the above-referenced procedures, the Court may enter an order granting the relief requested in the Objection. Only those Responses made in accordance with the above-referenced requirements and timely filed and received by the Court and the Debtors' attorneys will be considered by the Court at the Hearing. If you fail to respond in accordance with this Notice, the Court may grant the relief requested in the Objection without further notice or hearing.

Additional copies of the Objection and copies of the Case Management Order, the Master Service List, and the Claims Protocol Order may be obtained from the Court's website at http://ecf.nysb.uscourts.gov or, free of charge, at: www.epiqsystems.com/chapter11.

Dated:   October 21 2010          PACHULSKI STANG ZIEHL & JONES LLP
         San Francisco, CA

                                  */s/ John W. Lucas*
                                  Richard M Pachulski
                                  Laura Davis Jones
                                  Debra I. Grassgreen
                                  Maria A. Bove
                                  John W. Lucas
                                  780 Third Avenue, 36th Floor
                                  New York, New York 10017
                                  Telephone:  (212) 561-7700
                                  Facsimile:  (212) 561-7777

                                  Attorneys for Debtors
                                  And Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., et al., | Case No. 10-10018 (MG) |
| Debtors[1]. | (Jointly Administered) |

**DEBTORS' OBJECTION OF TO (1) THE ALLEGED
ADMINISTRATIVE PORTIONS OF CLAIMS 1430 AND 1431 OF U.S.
BANK NATIONAL ASSOCIATION, AS SECURITY TRUSTEE, ON BEHALF
OF AGENCIA ESPECIAL DE FINANCIAMENTO INDUSTRIAL-FINAME AND
(2) CLAIMS THAT WERE AMENDED AND SUPERSEDED BY CLAIMS 1430 AND 1431**

---

[1] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110);
Freedom Airlines, Inc. (9364), Mesa Airlines, Inc. (4800), MPD, Inc. (7849), Ritz Hotel Management Corp. (7688);
Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management,
LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 1

    **A.**    General Background ........................................................................................ 1

    **B.**    The Aircraft Leases ........................................................................................ 1

    **C.**    Post-Petition Procedures Governing Aircraft Leases ............................................ 3

        **i.**    The Rejection Procedures ........................................................................... 3

        **ii.**    The Section 1110 Procedures ..................................................................... 4

    **D.**    The Objectionable Claims ............................................................................... 5

        **i.**    Alleged Missing Parts ................................................................................. 7

        **ii.**    Alleged Record Deficiencies ...................................................................... 8

ARGUMENT ................................................................................................................... 10

    **E.**    Introduction ................................................................................................ 10

    **F.**    Nothing in Section 1110 Mandates the Conversion of a Rejection Claim to an Administrative Claim .................................................................................. 14

    **G.**    The Facts Do Not Support and US Bank Fails to Satisfy Its Burden for an Allowed Administrative Expense Claim ......................................................... 18

    **H.**    The Court Should Disallow Claims 958, 959, 1420 and 1421. ........................... 24

CONCLUSION ................................................................................................................ 24

NOTICE ......................................................................................................................... 24

NO PRIOR REQUEST .................................................................................................... 24

# TABLE OF AUTHORITIES

Page

## CASES

*General American Transportation Corp. v. Martin (In re Mid Region Petroleum, Inc.),*
1 F.3d 1130 (10th Cir. 1993) ................................................................... 21

*In re Air South Airlines, Inc.,*
2000 WL 33281490 (Bankr. D.S.C. Dec. 18, 2000) ................................ 22

*In re Amfesco Indus., Inc.,*
81 B.R. 777 (Bankr. E.D.N.Y. 1988) ..................................................... 19

*In re Atlantic Container Corp.,*
133 B.R. 980 (Bankr.N.D.Ill.1991) ....................................................... 23

*In re Bethlehem Steel Corp.,*
479 F.3d 167 (2d Cir. 2007) .................................................................. 19

*In re CIS Corp.,*
142 B.R. 640 (Bankr. S.D.N.Y. 1992) ................................................... 19

*In re Continental Airlines, Inc.,*
146 B.R. 520 (Bankr. D. Del. 1992) ................................................ 10, 21

*In re Drexel Burnham Lambert Group Inc.,*
134 B.R. 482 (Bankr. S.D.N.Y. 1991) ................................................... 19

*In re Enron Corp.,*
279 B.R. 695 (Bankr. S.D.N.Y. 2002) .............................................. 19, 21

*In re Globe Metallurgical, Inc.,*
312 B.R. 34 (Bankr. S.D.N.Y. 2004) ..................................................... 19

*In re Hayes-Lemmerz International, Inc.,*
340 B.R. 461 (Bankr. D. Del. 2006) ...................................................... 23

*In re ICS Cybernetics, Inc.,*
111 B.R. 32 (Bankr. N.D.N.Y. 1989) ..................................................... 22

*In re Mammoth Mart, Inc.,*
536 F.2d 950 (1st Cir. 1976) ................................................................. 18

*In re Patient Education Media, Inc.,*
221 B.R. 97 (Bankr. S.D.N.Y. 1998) ..................................................... 22

*In re Western Pacific Airlines, Inc. v. GATX Capital (In re Western Pacific Airlines, Inc.),*
219 B.R. 305, *reaff'd on rehearing,* 221 B.R. 1 (D. Colo. 1998) ............. 16

*R.H. Macy & Co., Inc.,*
170 B.R. 69 (Bankr. S.D.N.Y. 1994) ..................................................... 19

*Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.,*
789 F.2d 98 (2d Cir. 1986) ................................................................... 18

**STATUTES**

11 U.S.C. § 1110 .......................................................................................................... 14, 15

11 U.S.C. § 502 ................................................................................................................. 17

11 U.S.C. § 503 ................................................................................................................. 21

**OTHER AUTHORITIES**

124 Cong. Rec. H11101-03 ............................................................................................... 13

5 *Norton Bankr. L. & Prac*. 3d § 101 ........................................................................ 13, 17

H. Conf. Rep. 513, 106th Cong. 2d Sess. (2000) ............................................................. 16

H.R. Rep. 835, 103rd Cong., 2d Sess. (1994) .................................................................. 16

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ....................................................... 15, 16

H.R. Rep. No. 944, 85th Cong., 1st Sess. 2 (1957) .......................................................... 15

S. Rep. No. 989, 95th Cong., 2d Sess. 116-17 (1978) ..................................................... 15

**REGULATIONS**

14 C.F.R. § 121.380 .......................................................................................................... 11

**TO THE HONORABLE MARTIN GLENN, UNITED STATES BANKRUPTCY JUDGE:**

Mesa Air Group, Inc. and its affiliated debtors (collectively, the "Debtors") submit this *Objection to (1) the Alleged Administrative Portions of Claims 1430 and 1431 of U.S. Bank National Association, as Security Trustee, on behalf of Agencia Especial de Financiamento Industrial-Finame and (2) Claims that were Amended and Superseded by Claims 1430 and 1431* (the "Objection"). The Objection is supported by the *Declaration of Gary Appling* (the "Declaration"), attached hereto as Exhibit A. In support of the Objection, the Debtors respectfully represent as follows:

**BACKGROUND**

A.    **General Background**

1.    On January 5, 2010 (the "Petition Date"), the Debtors commenced voluntary cases under title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    **The Aircraft Leases**

2.    Before the Petition Date, Mesa Airlines, Inc. ("Mesa Airlines") leased eleven ERJ-145 aircraft (the "Aircraft") that are the subject of the Objection from either Wells Fargo Bank Minnesota, N.A., or Wells Fargo Bank Northwest, N.A., each in its capacity as Owner Trustee (the "Owner Trustee").[1] The Aircraft were leased to Mesa Airlines pursuant to eleven separate lease agreements (the "Leases"), and each Lease was guaranteed by Mesa Air Group,

---

[1] The U.S. registration numbers for the Aircraft are N827MJ, N839MJ, N841MJ, N842MJ, N843MJ, N844MJ, N845MJ, N846MJ, N847MJ, N848MJ and N851MJ.

Inc. ("Mesa Air Group").[2]  Declaration ¶5.  In connection with the lease transactions, the Owner

Trustee granted security interests in each of the Aircraft to U.S. Bank National Association, as

security trustee, ("U.S. Bank"), on behalf of the lender, Agencia Especial de Financiamento

Industrial-Finame ("FINAME").

3.      The Debtors did not operate any of the Aircraft postpetition.  Before the

bankruptcy, the Debtors determined the Aircraft were no longer necessary to their operations and

took them out of service.  Specifically, each Aircraft was grounded as of the following date:

N827MJ (11/12/09), N839MJ (4/13/09), N841MJ (12/22/08), N842MJ (12/15/08), N843MJ

(4/1/09), N844MJ (1/19/09), N845MJ (4/2/09), N846MJ (8/12/09) , N847MJ (6/19/09), N848MJ

(8/7/09), and N851MJ (6/1/09) .  Since having been taken out of service and before being

surrendered, ten of the Aircraft were parked at 525 Airport Road, Hgr A14, in Hot Springs,

Arkansas (the "Hot Springs Facility").  N844MJ was parked at the Debtors' maintenance facility

at 2625 Aviation Way, West Columbia, South Carolina (the "South Carolina Facility").

Declaration ¶6.

---

[2]  The specific Leases are as follows: (a) Aircraft Lease Agreement (N827MJ) dated as of July 28, 2000 between
Wells Fargo Bank Minnesota, N.A., Lessor and Mesa Airlines, Inc., Lessee; (b) Aircraft Lease Agreement
(N839MJ) dated as of April 23, 2001 between Wells Fargo Bank Minnesota, N.A., Lessor and Mesa Airlines, Inc.,
Lessee; (c) Aircraft Lease Agreement (N841MJ) dated as of June 7, 2001 between Wells Fargo Bank Northwest,
N.A, Lessor and Mesa Airlines, Inc., Lessee; (d) Aircraft Lease Agreement (N842MJ) dated as of December 21,
2001 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (e) Aircraft Lease
Agreement (N843MJ) dated as of December 21, 2001 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa
Airlines, Inc., Lessee; (f) Aircraft Lease Agreement (N844MJ) dated as of December 21, 2001 between Wells Fargo
Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (g) Aircraft Lease Agreement (N845MJ) dated as of
December 21, 2001 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (h)
Aircraft Lease Agreement (N846MJ) dated as of December 20, 2001  between Wells Fargo Bank Northwest, N.A.,
Lessor and Mesa Airlines, Inc., Lessee; (i) Aircraft Lease Agreement (N847MJ) dated as of July 17, 2002 between
Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (j) Aircraft Lease Agreement (N848MJ)
dated as of July 17, 2002 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (k)
Aircraft Lease Agreement (N849MJ) dated as of July 17, 2002 between Wells Fargo Bank Northwest, N.A., Lessor
and Mesa Airlines, Inc., Lessee; (l) Aircraft Lease Agreement (N851MJ) dated as of July 2002 between Wells Fargo
Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee.

### C.    Post-Petition Procedures Governing Aircraft Leases

4.    At the beginning of these cases, the Debtors needed time regarding the disposition

of their fleet, which then consisted of 178 aircraft.  To insure that assumptions, rejections and/or

amendments of aircraft leases could proceed efficiently, the Debtors sought approval of

procedures governing the rejection of aircraft leases and procedures pursuant to which the

Debtors could enter into agreements under Bankruptcy Code section 1110.  Following extensive

negotiations with the principal counterparties (the "Aircraft Counterparties"), including

FINAME, the Court approved both requests, entering the Rejections Procedures Order and the

Section 1110 Procedures Order (both as defined in footnote 3) on February 23, 2010.[3]

### i.    The Rejection Procedures

5.    The Rejection Procedures Order set forth, *inter alia*, the procedures regarding the

rejection of aircraft equipment leases, including (i) the form of notice, (ii) the amount of notice

required, (iii) the turnover location for the equipment, (iv) the conditions when unserviceable

engines may be shipped and the airframes may be ferried with spare engines, and (v) the return

of the related aircraft equipment records.  Rejection Procedures Order ¶12.

6.    The Rejection Procedures Order set forth certain "Minimum Standards" for

surrender and return of aircraft equipment.  In connection with the Rejection Procedures Order,

the Court did not make any findings regarding whether the Debtors' performance of the

Minimum Standards was sufficient to satisfy the "surrender and return" requirements of section

1110(c) of the Bankruptcy Code.  However, under the Rejection Procedures Order, the Aircraft

Counterparties' rights to assert that additional acts were required was limited to four (4)

---

[3] On February 23, 2010 the Court entered its *Order* governing rejection and abandonment procedures [Docket No. 353] (the "Rejection Procedures Order") and the *Order* governing elections and agreements under section 1110(a) and (b) [Docket No. 352] (the "Section 1110 Procedures Order").  On February 24, 2010, the Debtors filed with the Court an amended Exhibit A-2 to the Order [Docket No. 360].

"Enumerated Matters."  Specifically, the Rejection Procedures Order reserved the rights of the Aircraft Counterparties to assert (and the Debtors' right to contest) that the following actions are part of the Debtors' surrender and return obligations under section 1110(c) of the Bankruptcy Code:  (i) deliver the aircraft equipment to the location specified in the operative documents or in accordance with paragraph 12(a)(i) of the Rejection Procedures Order, (ii) deliver the aircraft equipment free and clear of liens and claims, (iii) deliver all excess equipment and all aircraft equipment records, and (iv) install parts and equipment on any engine or airframe (collectively, the "Enumerated Matters").  Rejection Procedures Order ¶13.

7.     Notably, in addition to the foregoing, the Rejection Procedures Order limited the scope of claims that could be asserted as administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, to:  (i) breaches of the Rejection Procedures Order, (ii) breaches of obligations under an election made pursuant to section 1110(a) of the Bankruptcy Code or an agreement made pursuant to section 1110(b) of the Bankruptcy Code, (iii) postpetition actions causing the diminution, depreciation, or change in the condition of aircraft equipment, and (iv) any Enumerated Matter (collectively, the "Retained Administrative Claims").  Rejection Procedures Order ¶14.  The agreed scope of Retained Administrative Claims did not change the burden of the parties asserting such claims of satisfying the standard under section 503(b) of the Bankruptcy Code and reserved the Debtors' rights to contest the validity of such claims.

### ii.     The Section 1110 Procedures

8.     The Section 1110 Procedures Order authorized the Debtors to enter into agreements (the "Section 1110 Agreements") that governed the terms and conditions under which the Debtors' various aircraft counterparties would permit the Debtors' continued use of

their leased and owned aircraft equipment.  In certain cases, a Section 1110 Agreement supplemented or modified the Debtors' obligations to return and surrender aircraft equipment after the underlying lease was rejected.

9.      In accordance with the Section 1110 Procedures Order, the Debtors and U.S. Bank entered into numerous stipulations that extended the 60-day period under section 1110(a)(2) of the Bankruptcy Code through and including August 31, 2010 [Docket Nos. 542 711, and 939] (collectively the "1110(b) Stipulations").  Under the 1110(b) Stipulations,[4] **[REDACTED]** 110(b) Stipulation [Docket No. 939] ¶1(c).  Cumulatively, the 1110(b) Stipulations provide that until July 31, 2010, the Debtors, at their sole expense, shall:

> **[REDACTED]**

*Id.*, ¶1(e).  They also  provide:

> **[REDACTED]**

*Id.*, ¶7.  Finally, the parties agreed that the 1110(b) Stipulations [REDACTED].  *Id.*,¶11.

10.     The Rejection Procedures Order, the Section 1110 Procedures, and each 1110(b) Stipulation was the product of extensive, arms'- length negotiations among the Debtors and Aircraft Counterparties.  They established a process that was designed to facilitate the efficient surrender and return of aircraft equipment to its owners on terms that are reasonable from the perspective of each party and in the context of the aircraft equipment involved.

## D.      The Objectionable Claims

11.     The Debtors rejected the Leases for each Aircraft (effective August 11, 2010) pursuant to the *Nineteenth Notice of Intent to Reject Leases Relating to Certain Aircraft*

---

[4] Because the 1110(b) Stipulations were filed with the Court under seal, the Debtors have redacted from the Court filed Objection any citations to them.

*Pursuant to Debtors' Procedures Set Forth in Amended Order Entered on February 23, 2010.*
The Aircraft were surrendered at the Hot Springs Facility and the South Carolina Facility. As detailed below, the Aircraft were delivered to and inspected by Embraer, U.S. Bank's "ST Designee" under the 1110(b) Stipulations.

12.     Pursuant to Claim 1431, U.S. Bank asserts a claim on behalf of lender FINAME in the amount of $189,560,201.66, of which it contends that $11,016,708.66 is entitled to administrative priority under section 503(a) of the Bankruptcy Code (the "Alleged Administrative Claim") and $178,553,493.00 is a general unsecured claim (the "Alleged Unsecured Claim"). U.S Bank filed an identical claim, Claim 1430, against Mesa Air Group based on its guaranty of the Aircraft leases. (Claims 1430 and 1431 are collectively the "Objectionable Claims"). This Objection addresses only the Alleged Administrative Claim, which, generally speaking, seeks to charge the Debtors' estates with $11 million in administrative expense claims for parts that U.S. Bank contends were missing from the Aircraft and for maintenance records that it contends were either missing or inadequate.[5]

13.     The details concerning the amounts and components of the Alleged Eleven Million Dollar Claim are not in the proofs of claim filed with the Court. They are instead in Aircraft Technical Reports that were submitted by U.S. Bank to the Debtors. When U.S. Bank transmitted the Technical Reports, it invoked the terms of a confidentiality agreement with the Debtors. The Debtors have asked U.S. Bank to identify, with specificity, which portions of the reports are confidential. Due to the invocation of confidentiality, the Debtors can address the

---

[5] This Objection addresses only the alleged administrative expense portion of the Objectionable Claims. The Debtors reserve their rights to bring additional objections, including to the general unsecured aspects of the claims, which include damages for stipulated loss value ("SLV") of the Aircraft, return conditions (which the Debtors contend are duplicative of the amounts already included in SLV and may also be overstated given that some maintenance is not required while aircraft are in storage) and attorneys fees and costs.

Alleged Administrative Claim in only the most general terms and will file supplemental briefing, if necessary and evidence in support of the Objection after they are able to work out the terms of a protective order. Irrespective of the detail in the Technical Reports, as a matter of law, there can be no administrative expense liability to U.S. Bank for any of the Enumerated Matters for the reasons set forth below.

### i. Alleged Missing Parts

14. The majority of the Alleged Administrative Claim is for parts that U.S. Bank contends were missing when the Aircraft were surrendered (the "<u>Alleged Missing Parts</u>"). As was mentioned above, the Aircraft had been out of service and parked at the Hot Springs Facility for months (and in certain cases, years) before the Petition Date. In many instances, the Debtors (or a contracting agency (AAR) acting on the Debtors' behalf) removed parts from the Aircraft and placed them in storage to protect and preserve the parts when the Aircraft were taken out of service. The Debtors were unaware that U.S. Bank did not realize that certain Aircraft and certain parts were not all in the same location until it filed its claims. As is set forth in detail in the Declaration, as soon as the Debtors reviewed the Technical Reports and became aware that U.S. Bank did not realize certain Aircraft and certain parts were not in the same location, Mesa sent a team of inventory employees to Hot Springs to locate and reconcile them. They were able to locate substantially all of the Alleged Missing Parts, which are now at the Hot Springs Facility, and are available to reconcile the parts with U.S. Bank. Declaration at ¶10-11. Post-reconciliation, the Debtors believe that U.S. Bank will have little more than a *di minimis* claim based on Alleged Missing Parts, a claim which the Debtors believe must be denied administrative status.[6]

---

[6] To the extent necessary, the Debtors will be able to provide a detailed response on the Alleged Missing Parts when the confidentiality issue has been decided or a protective order has been entered.

15.     While the Debtors are not asking this Court, at this time, to rule on the amount of the Alleged Administrative Claim, only on the priority, it should be noted that even if U.S. Bank has a claim for Alleged Missing Parts, its claim is grossly overstated. In some instances, the amounts claimed by U.S. Bank are well above market.  For example, the Objectionable Claims included estimates for flashlights, at roughly $2,000.00 each, even though an acceptable flashlight costs under $275.00.  Declaration at ¶11.

### ii.     Alleged Record Deficiencies

16.     The other significant aspect of the Alleged Administrative Claim is a claim for records that U.S. Bank contends were missing or incomplete when the Aircraft were surrendered (the "Alleged Record Deficiencies").  The issue raised by U.S. Bank is not the Debtors' failure or refusal to turn over the records.  As is set forth in the Declaration, the Debtors gave all the records in the Debtors' possession, and worked with the Embraer auditor to resolve any discrepancies, even though many of those resolved items are still included in the Alleged Administrative Claim.  Instead, the Alleged Administrative Claim is based on U.S. Bank's subjective opinion that the Debtors' records are not adequate.

17.     The Debtors maintained their records for the Aircraft in compliance with the record keeping requirements in the Leases[7] and under Code of Federal Regulation 121.380,

---

[7]  With respect to records, the Leases generally provide:, "(i) All records as required under the Lease and all those necessary and required by the FAA to certify the Aircraft and place the Aircraft on an FAA-approved maintenance program and in compliance with the Scheduled Maintenance Requirements Document ("SMRD 145") shall be delivered with the Aircraft. Lessee shall have retained all hard copy records in an organized fashion and shall provide such records to Lessor. In no event will Lessee destroy or dispose of any hard copy records required to be retained by the FAA. These records shall be all-inclusive for the Aircraft, Airframe, Engines, components, rotables, assemblies and all Parts, and at a minimum shall include all activities associated with each of the last completed maintenance checks and all back to birth records for all life limited parts, SMRD 145 significant structural inspections (SSI) sampling program, aging aircraft and corrosion control tasks, repairs, scheduled inspections and functional tests, and overhauls performed to Lessee's FAA-approved maintenance program and the Manufacturer's recommended program, including tasks and compliance associated with noise and emissions requirements. (ii) All Parts, components and assemblies identified with safe-life, hard time or condition monitored limits shall be provided with part number, serial number, their service histories, accumulated cycles and flight hours, safe-life, hard time or condition monitored limits and remaining service lives on a separate listing and where practicable, be physically

which generally requires that an air carrier maintain records on engines, propellers, airframes and appliances since the last complete overhaul.[8]  With respect to all other parts of the aircraft, a carrier has to maintain only one year's worth of records.  The Debtors maintained their records in compliance with these provisions.  From a review of the Alleged Record Deficiencies asserted by U.S. Bank, it appears that U.S. Bank is trying to hold the Debtors to a higher standard than the one that applies under Federal law or the Leases.   Based on the Debtors' participation in the audit and a review of the Aircraft Technical Reports, the Debtors believe that substantially all of the required records were provided.  To the extent any deficiencies may exist (there are still a number of open items that the Debtors are attempting to reconcile with U.S. Bank, including a

---

verified as installed and have hard copy documentation (i.e., appropriate overhaul or serviceable vendor tags and work orders) to verify their service histories. (iii) All components and assemblies which are identified on the maintenance records by part numbers and/or serial numbers other than the Manufacturer's or other manufacturer's shall be provided with two way cross-reference listing necessary to establish complete traceability. (iv) All documentation, flight records, and maintenance records as specified by the Lease and as specified by Federal Aviation Regulations Sections 121.380, and, as applicable, Section 91.417 and 91.419 (or FAR's as amended), and which normally accompany the transfer of an aircraft or engine shall be delivered to Lessor with the Aircraft. In the event of missing or incomplete records, Lessee shall accomplish the tasks necessary to produce such complete records in accordance with its FAA-approved maintenance program and SMRD 145 prior to return of the Aircraft. (v) All documentation and records shall be in English and shall be made available to Lessor for review at Lessee's maintenance facility, which location shall permit direct access to the Aircraft, at least 90 days before the date that the Aircraft is required to be returned to Lessor. (vi) Lessee shall provide any and all documentation, data, drawings, records and manuals as required to be maintained by the FAA and SMRD 145, regardless of whether Lessee considers such information proprietary.  The head of Lessee's quality control department shall sign a statement certifying that the data and information contained in the documentation and records is true and correct.  Lease (N827MJ) at Exhibit E, ¶ 5(f).

[8]  14 C.F.R. § 121.380 provides:  (a) Each certificate holder shall keep (using the system specified in the manual required in § 121.369) the following records for the periods specified in paragraph (c) of this section: (1) All the records necessary to show that all requirements for the issuance of an airworthiness release under § 121.709 have been met. (2) Records containing the following information: (i) The total time in service of the airframe. (ii) Except as provided in paragraph (b) of this section, the total time in service of each engine and propeller. (iii) The current status of life-limited parts of each airframe, engine, propeller, and appliance. (iv) The time since last overhaul of all items installed on the aircraft which are required to be overhauled on a specified time basis. (v) The identification of the current inspection status of the aircraft, including the times since the last inspections required by the inspection program under which the aircraft and its appliances are maintained. (vi) The current status of applicable airworthiness directives, including the date and methods of compliance, and, if the airworthiness directive involves recurring action, the time and date when the next action is required. (vii) A list of current major alterations to each airframe, engine, propeller, and appliance. . . . .(c) Each certificate holder shall retain the records required to be kept by this section for the following periods: (1) Except for the records of the last complete overhaul of each airframe, engine, propeller, and appliance, the records specified in paragraph (a)(1) of this section shall be retained until the work is repeated or superseded by other work or for one year after the work is performed. (2) The records of the last complete overhaul of each airframe, engine, propeller, and appliance shall be retained until the work is superseded by work of equivalent scope and detail. (3) The records specified in paragraph (a)(2) of this section shall be retained and transferred with the aircraft at the time the aircraft is sold.

dispute over the records relating to certain thrust reversers); however, after rejection, a claim

based on those alleged deficiencies is a general unsecured claim, not an administrative one.

Declaration ¶12-16.

## ARGUMENT

### E.    Introduction

18.     U.S. Bank contends that its claims for Alleged Missing Parts Deficiencies and

Alleged Records Deficiencies are entitled to priority under section 503(a) of the Bankruptcy

Code.  Based on its proofs of claim, it appears that its argument is that upon rejection of an

aircraft lease, Bankruptcy Code section 1110 spontaneously converts some portion of what

would normally be a plain vanilla pre-petition rejection claim into an administrative expense

claim.  This contention is supported by neither the facts, nor the law, nor the legislative intent

behind section 1110, and it should be rejected just as similar arguments have been rejected in

other airline case discussed in detail in paragraphs 35-45 *infra*.  *See  In re Continental Airlines,*

*Inc.*, 146 B.R. 520, 528 (Bankr. D. Del. 1992) (denying a request for an administrative expense

on account of the debtors' failure to return aircraft equipment in accordance with the redelivery

conditions under the lease); *In re UAL Corporation, et al.*, Case No. 02-48191 (ERW) (Bankr.

N.D. Ill. Dec. 17, 2004) (same); *Northwest Airlines*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y.

Oct. 7, 2005) Transcript 69:16-18 (holding that section 1110 does not require debtors to comply

with all of the return provisions of a given lease).

19.     Section 1110 requires the debtor-in-possession to "agree to perform all

obligations of the debtor" under an aircraft lease (or financing) and cure all pre- and post-petition

defaults by the 60th day after the bankruptcy filing.  In the absence of a consensual extension of

this 60-day period, the debtor in possession's failure to "assure and cure" voids the automatic

stay and allows the aircraft lessor to exercise its contractual remedies against the aircraft, which typically give it the right to repossess.  If the debtor elects to comply with Section 1110(a) and keep the property, it does not constitute an assumption of the lease.[9]  As an alternative to making an 1110(a) election, a debtor in possession may enter into a consensual extension of the 60-day period under section 1110(b).[10]  This is precisely what happened here. The Debtors did not make an 1110(a) election.  Instead, they entered into a series of stipulations pursuant to section 1110(b).  More importantly, there is no evidence to support that the Debtors have breached its 1110(b) Stipulations with U.S. Bank.

20.     At issue in this case is what happens when the stipulations expire, the debtor rejects the lease and the lessor becomes entitled to retake possession of the aircraft?  In that event, section 1110(c) requires the debtor to immediately surrender and return the "equipment described in subsection (a)(3)."[11]  The equipment described in subsection (a)(3) includes, "an aircraft, aircraft engine, propeller, appliance, or spare part (as defined in section 40102 of title

---

[9]  Section 1110 provides, "(a)(1) Except as provided in paragraph (2) and subject to subsection (b), the right of a secured party with a security interest in equipment described in paragraph (3), or of a lessor or conditional vendor of such equipment, to take possession of such equipment in compliance with a security agreement, lease, or conditional sale contract, and to enforce any of its other rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease, or otherwise retain or dispose of such equipment, is not limited or otherwise affected by any other provision of this title or by any power of the court. (2) The right to take possession and to enforce the other rights and remedies described in paragraph (1) shall be subject to section 362 if -(A) before the date that is 60 days after the date of the order for relief under this chapter, the trustee, subject to the approval of the court, agrees to perform all obligations of the debtor under such security agreement, lease, or conditional sale contract; and (B) any default, other than a default of a kind specified in section 365(b)(2), under such security agreement, lease, or conditional sale contract - (i) that occurs before the date of the order is cured before the expiration of such 60-day period; (ii) that occurs after the date of the order and before the expiration of such 60-day period is cured before the later of -(I) the date that is 30 days after the date of the default; or (II) the expiration of such 60-day period; and (iii) that occurs on or after the expiration of such 60-day period is cured in compliance with the terms of such security agreement, lease, or conditional sale contract, if a cure is permitted under that agreement, lease, or contract."  11 U.S.C. § 1110(a)(1)-(2).

[10]  Section 1110(b) provides, "(b) The trustee and the secured party, lessor, or conditional vendor whose right to take possession is protected under subsection (a) may agree, subject to the approval of the court, to extend the 60-day period specified in subsection (a)(1)." 11 U.S.C. § 1110(b).

[11]  Section 1110(c) provides, "In any case under this chapter, the trustee shall immediately surrender and return to a secured party, lessor, or conditional vendor, described in subsection (a)(1), equipment described in subsection (a)(3), if at any time after the date of the order for relief under this chapter such secured party, lessor, or conditional vendor is entitled pursuant to subsection (a)(1) to take possession of such equipment and makes a written demand for such possession to the trustee." 11 U.S.C. § 1110(c)(1).

49) . . . and . . . all records and documents relating to such equipment that are required, under the terms of the . . . lease . . . to be surrendered or returned by the debtor in connection with the surrender or return of such equipment." 11 U.S.C. §1110(a)(3).

21. As was mentioned above, the Debtors believe that after a further parts and records reconciliation, there will be very few missing parts and that except with respect to the status reports on the thrust reversers (which are still in the process of being documented), they have complied with both the Leases and Federal regulations with respect to records. The Debtors are prepared to establish this at an evidentiary hearing if necessary. Assuming *arguendo*, however, that they had not and that U.S. Bank has a valid claim in some amount for Alleged Missing Parts or Alleged Records Deficiencies, the question becomes whether that claim is an administrative claim or a general unsecured claim.

22. Recall that at issue here are 11 Leases for Aircraft that the Debtors grounded pre-petition and never operated post-petition. If the Debtors had given U.S. Bank the keys on January 4, 2010, there is no question but that it would not have an administrative claim, even if the Debtors had returned the planes with two wings missing and nary a maintenance record because the most basic tenant of bankruptcy law is this: a pre-petition breach equals a pre-petition claim. And pre-petition claims get paid in bite-sized bankruptcy dollars, not supersized administrative expense dollars.

23. The Debtors did not return the Aircraft pre-petition or reject the Leases on day one of the bankruptcy. Instead, they entered into the 1110(b) Stipulations, which the Debtors believe they have complied with. The aircraft still remained on the ground and in storage. The Leases still went unassumed. But according to U.S. Bank, the mere fact that the Leases were rejected post-petition converted large portions of the rejection claim from a general unsecured

claim into an administrative one. If U.S. Bank is right and merely entering into an 1110(b) stipulation converts claims for missing parts and/or records into administrative expenses, what debtor in its right mind would ever enter into an 1110(b) extension? Aircraft debtors would be faced with an untenable choice-- restructure your entire fleet in 59 days or risk sinking your case with Titanic administrative liabilities.

24.     Granting an automatic administrative expense priority for records or parts deficiencies (which is apparently what U.S. Bank is advocating), particularly where, as here, the debtor never elected to perform pursuant to section 1110(a) of the Bankruptcy Code and never operated the aircraft post-petition, would be a radical expansion of a statute that should be strictly construed. 5 *Norton Bankr. L. & Prac*. 3d § 101:6 ("In general, because of its narrow focus and special protections, courts have strictly construed Code § 1110."). It would essentially require reading section 1110 to impose a *de facto* assumption of the return conditions and records requirements provisions of the leases. In other words, while a debtor may be able to reject a lease, by imposing automatic administrative status, a debtor can never get the benefit of that rejection with respect to the equipment required to be surrendered under 1110(a)(3), resulting in either a terribly impotent rejection or a partial de facto assumption. Whatever it is, it is not contemplated by Section 1110, which was never intended to effect an assumption of an aircraft lease. 124 Cong. Rec. H11101-03 (daily ed. Sept. 28, 1978) ("It should additionally be noted that under section 1110(a) the trustee or debtor in possession is not required to assume the executory contract or unexpired lease under section 1110; rather if the trustee or debtor in possession complies with the requirement of section 1110(a), the trustee or debtor in possession is entitled to retain the aircraft or vessels subject to the normal requirements of section 365."); 5 *Norton Bankr. L. & Prac*. 3d § 101:1 ("Both Congress and courts interpreting Code § 1110 have

long recognized that an agreement to perform under Code § 1110 is not the same as a contract assumption under § 365.").

**F.    Nothing in Section 1110 Mandates the
Conversion of a Rejection Claim to an Administrative Claim**

25.    Absent section 1110, it is clear that amounts owing on account of breaches of rejected leases would simply be tossed on top of the "502(g)(1)" pile along with amounts owing on account of the rent due under the Leases, damages from unexercised renewal options and/or the obligations to service the aircraft, return it with all its parts, and maintain and provide adequate records.[12]  The language of section 1110 does not mandate a different result.  Section 1110 conspicuously does <u>not</u> say that in the event that a part has gone missing or a record is incomplete that the lessor is entitled to an administrative claim. To read such a requirement into the statute does against the plain language of the statute (which does not include any such priority), bankruptcy policy and the intent behind section 1110.

26.    Section 1110 of the Bankruptcy Code was designed to ensure aircraft equipment financiers and lessors the benefit of their bargain by compelling an air carrier debtor to cure and perform as prescribed by section 1110 of the Bankruptcy Code or permit the equipment financiers/lessors unfettered access to their collateral.  Curing and performing or providing access to collateral are the two means by which the equipment financiers/lessors may realize the benefit of their bargain or preserve the value of their collateral.  Section 1110 was not intended to do more.

---

[12]  Bankruptcy Code section 502(g)(1) provides, "A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12 or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b) or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."  11 U.S.C. § 502(g)(1).

27.     At the outset of commercialized aviation travel, aircraft finance providers maintained that they could not continue to provide reasonable financing to air carriers when such carriers stopped paying their financial obligations when they commenced a bankruptcy case and the bankruptcy laws prevented the finance parties from repossessing their collateral.  Congress responded to the problem by providing aircraft financers special treatment in a 1957 amendment to the Bankruptcy Act of 1898.  Section 116(5) of the former Bankruptcy Act was intended to increase the availability of aircraft financing by allowing aircraft financiers immediate access to their collateral by making "chapter X proceedings inapplicable insofar as they affect title and the right to possess aircraft and aircraft equipment" so that "in the event of default, the right of these creditors to take possession would be preserved."  H.R. Rep. No. 944, 85th Cong., 1st Sess. 2 (1957).

28.     When enacting the current Bankruptcy Code, Congress recognized that an aircraft financiers' "absolute veto power over a reorganization" prevented businesses from reorganizing without the financiers' agreement. S. Rep. No. 989, 95th Cong., 2d Sess. 116-17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5902, 5903.  Aircraft financiers maintained that without having immediate access to their collateral, equipment financers maintained they "would simply cease financing of the relevant equipment if the protections were removed."  H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977), 239, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6199.

29.     In response to these demands, Congress enacted section 1110 of the Bankruptcy Code to provide the equipment financer/lessor unfettered access to its collateral at the conclusion of 60 days after the petition date unless the debtor (i) elects to perform and cure all obligations pursuant to section 1110(a) of the Bankruptcy Code or (ii) enters into an agreement regarding the terms and conditions of the debtor's use of the aircraft equipment beyond the initial 60 day

period pursuant to section 1110(b) of the Bankruptcy Code. ."  H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977), 240, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6199, 6200, 5787, 5902, 5903. Thus, curing and performing or repossession was Congress's way of protecting the rights and the benefit of the bargain of aircraft equipment financers/lessors.  H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977), 405, *reprinted in* 1978 U.S.C.C.A.N. 6361.

30.     Since its enactment of in 1978, Congress has amended section 1110 of the Bankruptcy Code twice solely for the purpose of clarifying which aircraft parties are covered by its restrictions, the time period for its application, and the equipment.  In this regard, the Bankruptcy Reform Act of 1994 revised section 1110 of the Bankruptcy Code to "protect all lease financing agreements and all debt financings that involve a security interest, not only security interests obtained at the time the equipment is acquired."  H.R. Rep. 835, 103rd Cong., 2d Sess. (1994) 44, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3353.

31.     In 2000, Congress amended section 1110 in response to *In re Western Pacific Airlines, Inc. v. GATX Capital* (*In re Western Pacific Airlines, Inc.*), 219 B.R. 305, *reaff'd on rehearing*, 221 B.R. 1 (D. Colo. 1998), which interpreted the cure provisions of section 1110 to include only those that occurred during the initial 60-day period after the petition date.  In its current form, section 1110 now makes clear that if an air carrier debtor intends to retain equipment after a default, it must cure such default in accordance with section 1110 of the Bankruptcy Code whether or not the default occurs before and after the initial 60-day period. H. Conf. Rep. 513, 106th Cong. 2d Sess. (2000) 218, *reprinted in* 2000 U.S.C.C.A.N. 80, 155.

32.     The first time that any reference to a records requirement appears in the statute is in the 2000 amendments to section 1110 that were a part of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century.  Pub. L. 106-181, Title VII § 744(b), April 5, 2000, 114 Stat 177.  The new section 1110(a)(3)(B) made clear that the records and documents relating to covered aircraft equipment are included in the property to be surrendered and returned.  This provision was added because air carrier debtors had refused to turnover such documents and records.  5 *Norton Bankr. L. & Prac*. 3d § 101.3 n.3.  It was intended to facilitate the return of records, which were in some cases being withheld, not to create a new class of administrative claim that could potentially destroy an airline debtor's reorganization prospects.

33.     In the same way that the old Bankruptcy Act gave aircraft financiers an absolute veto power over an airline debtor's reorganization, so too would the decision to treat section 1110(a)(3) parts or records deficiencies as administrative expenses.  If a debtor has a fleet of 200 aircraft and ultimately decides to reject 80 of those leases, each of which have some missing or damaged parts and some alleged records deficiencies, the administrative liabilities could destroy the possibility of reorganization.  So while the debtors are able to retain the collateral for some period of time post-petition in order to decide how to restructure the business, the retention would come at such a high cost that the aircraft lessor has essentially decided the fate of the company. This is precisely the problem that the amendments were designed to prevent.

34.     Furthermore, in the Northwest chapter 11 cases, Judge Gropper held that with respect to a debtor's surrender and return obligations pursuant to section 1110(c) of the Bankruptcy Code that the "hallmark in any case is reasonableness."  *Northwest Airlines*, Case No

05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) Transcript 71:21-22.  A true and correct copy

of the October 7, 2005 Transcript is annexed hereto as <u>Exhibit B</u>.

> **G.**     **The Facts Do Not Support and US Bank**
> **Fails to Satisfy Its Burden for an Allowed Administrative Expense Claim**

35.     In the context of administrative expense claims arising under section 1110 of the

Bankruptcy Code, in the Northwest chapter 11 cases, Judge Gropper held that the "determination

of what constitutes an administrative expense, the usual principles of *In re Mammoth Mart* as

adopted by the Second Circuit in *Trustees of Amalgamated Insurance Fund v. MacFarlands* will

apply.  *In re Northwest Airlines Corp.*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005)

Transcript 72:13-17 (internal citation omitted).

36.     Section 503(b)(1)(A) of the Bankruptcy Code defines an administrative expenses

as "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A);

*Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.

1986).  An expense is entitled to administrative priority (i) if it arises out of a transaction

between the debtor-in-possession and creditor and (ii) only to the extent that the consideration

provided by the creditor actually benefited the operation of the debtor's business. *Id.*  Congress

enacted the administrative expense provision to induce creditors to continue their business

relationship with the debtor for the purpose of facilitating the rehabilitation of a debtor's business

"for the benefit of all the estate's creditors." *Id.* (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950,

953 (1st Cir. 1976)).

37.     The purpose of an administrative expense claim is to prevent the unjust

enrichment of a debtor's estate, <u>not compensate a creditor for its loss</u>.  *In re Enron Corp.*, 279

B.R. 695, 705 (Bankr. S.D.N.Y. 2002) (emphasis supplied) (citing *R.H. Macy & Co., Inc.*, 170 B.R. 69, 78 (Bankr. S.D.N.Y. 1994)). As a result, the court's determination turns on the actual benefit the estate gained, not the loss incurred by the creditor. *Enron*, 279 B.R. at 705 (citing *In re CIS Corp.*, 142 B.R. 640, 642 (Bankr. S.D.N.Y. 1992)). Congress's use of the words "actual" and "necessary" in section 503(b)(1)(A) requires that (i) the estate receive a "real benefit" from the transaction, not a potential benefit and (ii) the debtor actually used the creditor's property, not have the mere option to use the property. *Enron*, 279 B.R. at 705-06.

38.     The terms "actual" and "necessary" are strictly construed. *See In re Globe Metallurgical, Inc.*, 312 B.R. 34, 40 (Bankr. S.D.N.Y. 2004) (holding that "there must be a strict construction of the terms 'actual' and 'necessary' . . . .") It is the claimant's burden to establish that it is entitled to an administrative expense claim. *See In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007) (holding that the "burden of proving entitlement to priority payment as an administrative expense . . . rests with the party requesting it"); *In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) (holding that administrative claim requests "should only be granted under extraordinary circumstances, to wit, when the parties seeking priority have sustained their burden of demonstrating that their services are actual and necessary to preserve the estate") (quoting *In re Amfesco Indus., Inc.*, 81 B.R. 777, 785 (Bankr. E.D.N.Y. 1988).

39.     The Bankruptcy Court for the Southern District of New York has held that with respect to section 1110 of the Bankruptcy Code that "it is important also not to read into the words of the statute rights that Congress did not afford." *Northwest Airlines*, Case No 05-17930

(ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) Transcript 69:16-18.  In this regard, the court held that

requiring an air carrier debtor to

> comply with all of the return provisions of a given lease or security agreement . . .
> is precisely what Section 1110 does not provide.  Section 1110(a)(1) of the
> Bankruptcy Code states that the right of a lessor or secured party to take
> possession of the equipment in compliance with the security agreement or lease,
> etc., shall not be limited.  The corresponding obligation of the trustee or debtor-in-
> possession is to surrender and return of the property in compliance with the
> security agreement or lease, no doubt recognizing the cost and burdens this would
> place on the debtors, their estates and their other creditors.

*Id.* at 70:24-25 – 71:3-12.  Subsequently the Court made its ruling abundantly clear when it

explained that "I ruled last time, and I'll hear anyone who wishes to argue to the contrary, that

the one thing 1110 doesn't say is that a debtor has an obligation to return the equipment in

accordance with the underlying document."  *In re Northwest Airlines Corp.*, Case No 05-17930

(ALG) (Bankr. S.D.N.Y. Oct. 19, 2005) Transcript, p.33.  A true and correct copy of the October

19, 2005 Transcript is annexed hereto as <u>Exhibit C</u>.

        40.     Other chapter 11 cases have made the same findings regarding return conditions

and the allowance of administrative expense claims.  For example, in *In re UAL Corporation, et

al.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 17, 2004), the court denied a request for an

administrative expense on account of the debtors' failure to return aircraft equipment in

accordance with the redelivery conditions under the lease.  December 17, 2004 Transcript 14:1-

14.  A true and correct copy of the relevant pages from the December 17, 2004 Transcript is

annexed hereto as <u>Exhibit D</u>.  In this regard, the court held that

> return obligations cannot be a ground for allowance of an administrative expense
> in their own right.  It may well be that property is returned by the debtor in a
> condition contrary to that required by the lease.  **But if the property was
> damaged by the debtor prior to the filing of the case, that damage would be a**

> **pre-petition claim, not a priority claim arising during the administration of the bankruptcy case**.

*Id.* (emphasis added).

41.     Similarly, in *In re Continental Airlines, Inc.*, 146 B.R. 520, 528 (Bankr. D. Del. 1992), the aircraft lessor sought an administrative expense claim for the debtors' failure to redeliver the aircraft equipment free of the distinctive marking (*i.e.*, logos) and with the engines with a certain amount of hours and cycles remaining, both of which were required by the underlying lease.  The court denied the request for an administrative expense, holding that when a lease is rejected under Bankruptcy Code section 365, the estate is no longer bound by its terms and the debtor is only liable for a general unsecured claim for its breach.  In rejecting the creditor's argument, the court expressed concern that granting administrative expense status to breaches of a rejected lease covenant could convert almost any breach into an administrative expense. *In re Continental*, 146 B.R. at 527-58.

42.     A similar principle applies here.  U.S. Bank has provided no actual and necessary benefit to the estates.  The Aircraft were not operated post-petition.  The Debtors did not use its collateral to generate revenue or otherwise increase its business.  The fact that the Debtors had possession of the Aircraft post-petition pursuant to the 1110(b) Stipulations is not sufficient.  To prove a benefit to the estate, mere possession is not enough.  Actual use by the debtor of the creditor's property is required.  *See In re Continental,* 146 B.R. at 527; *In re Enron Corp.*, 279 B.R. 695, 706 (Bankr. S.D.N.Y. 2002) (citing *General American Transportation Corp. v. Martin* (*In re Mid Region Petroleum, Inc.*), 1 F.3d 1130, 1133 (10th Cir. 1993).  The "option" to use the property that is inherent in mere possession is not sufficient to establish benefit to the estate if

the debtor does not actually use the property. *In re Patient Education Media, Inc.*, 221 B.R. 97, 102 (Bankr. S.D.N.Y. 1998). Here, the Aircraft were not serviceable and could not have been utilized or provided any benefit to the Debtors. Thus, the Debtors' possession of the Aircraft did not even confer a potential benefit to an estate. Storage is not the equivalent of actual use. *In re ICS Cybernetics, Inc.*, 111 B.R. 32, 38 (Bankr. N.D.N.Y. 1989). Because there was no concrete, discernible benefit from the Debtors' actual of use of the Aircraft, no administrative priority can be established.

43.     The case at bar most closely resembles in *In re Air South Airlines, Inc.,* 2000 WL 33281490 (Bankr. D.S.C. Dec. 18, 2000) in which the bankruptcy court denied administrative expense status for post-petition rent under a lease for 5 aircraft that had ceased operating pre-petition on the grounds that the creditor had conferred no benefit to the estate, stating

> In this case, Debtor, a commercial airline, retained aircraft with the consent of the lessor, GECAS, during the first 60 days of the case; however, it was prohibited, pursuant to the Consent Order, from using the aircraft in the ordinary course of business. Furthermore, there was no § 1110 agreement, no adequate protection in the form of lease payments, no formal assumption of the lease, and no administrative claim for lease payments. Thus, the Court finds that, in this case, GECAS' claim did not meet the requirements of § 503(b)(1)(A) for it to be granted administrative expense status.

*Id*. at *4.

44.     Furthermore, U.S. Bank has not and cannot show that the Debtors' estates will be unjustly enriched if the Court denies administrative expense status. Hypothetically, if the Debtors had returned damaged or non-operating parts to U.S. Bank it would not be entitled to an administrative expense claim on account of returning damaged or non-operating equipment because section 1110 of the Bankruptcy Code does not require the

Debtors to return equipment in accordance with the governing lease and the Rejection

Procedures Order relegated any claim for breach of lease return conditions to general unsecured

status. *Northwest Airlines*, Case No 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) Transcript

69:16-18; *Continental*, 146 B.R. at 528. To the extent the Debtors are not in possession the

Alleged Missing Parts, any claim arising on account of the Debtors' failure to return the Alleged

Missing Parts is a casualty event that is no different than having returned damaged and no longer

operational equipment because in both instances the equipment would have to be replaced).

45.     Finally, U.S. Bank has not established that any of the Alleged Record

Deficiencies arose post-petition or Alleged Missing Parts occurred post-petition. Courts outside

the airline context have held that where damaged or missing parts under a rejected lease can be

traced to the pre-petition period, no administrative expense claim is warranted. *See, e.g. In re*

*Hayes-Lemmerz International, Inc*., 340 B.R. 461, 473 (Bankr. D. Del. 2006) (denying

administrative expense status for lessor's claims based on damaged equipment and missing parts

for metal cutting tools that were damaged pre-petition); *In re Atlantic Container Corp.,* 133 B.R.

980, 992 (Bankr.N.D.Ill.1991) ("Only the costs of remedying damages to the Premises which

actually occurred *after* the filing of the bankruptcy petition may be treated as administrative

expenses.") (emphasis added).

**H.    The Court Should Disallow Claims 958, 959, 1420 and 1421.**

46.     The Debtors ask the Court to expunge and disallow the claims previously filed by

U.S. Bank that were amended and superseded by the Objectionable Claims. Specifically, the

Debtors request the Court disallow claims 958, 959, 1420 and 1421.[13]

## CONCLUSION

47.     For reasons discussed herein, the Debtors believe that US Bank has failed to

sustain its burden that it is entitled to a claim for administrative expense priority pursuant to

sections 503(b) and 507(a)(2) of the Bankruptcy Code.

## NOTICE

48.     In compliance with the Claim Objection Order, notice of this Objection and a

complete copy of the Objection have been provided to: (a) the United States Trustee: (b) counsel

to the Committee of Unsecured Creditors; (c) the Claimants whose claims are the subject of this

Objection and their counsel, if known. A redacted version of this Objection has also been served

on all parties in interest having requested service in these chapter 11 cases (i.e., those parties

identified on the Master Service List as such term is defined in the Case Management Order).

The Debtors submit that no other or further notice need be provided under the circumstances.

## NO PRIOR REQUEST

49.     No prior request for the relief sought in this Objection has been made to

this or any other court in connection with these chapter 11 cases.

---

[13]  Claim 959 ($438,827.10) was amended and superseded by Claim 1420 ($189,165,949.09), which was amended
and superseded by Claim 1430.  In addition, Claim 958 ($438,827.10) was amended and superseded by Claim 1421
($189,165,949.09), which was amended and superseded by Claim 1431.  True and correct copies of the claims that
are subject to this objection are attached hereto as follows: Claim 958 (Exhibit E), Claim 959 (Exhibit F), Claim
1420 (Exhibit G), Claim 1421 (Exhibit H), Claim 1430 (Exhibit I), Claim 1431 (Exhibit K).

WHEREFORE, the Debtors request that the Court sustain the Objection and enter an order: (a) denying administrative expense priority to the entirety of the Alleged Administrative Expense Claim; (b) expunging claims 958, 959, 1420 and 1421; and (c) granting such other and further relief to the Debtors as the Court may deem proper.

Dated:   October 21, 2010            PACHULSKI STANG ZIEHL & JONES LLP
         San Francisco, CA

                                     /s/ John W. Lucas
                                     _____
                                     Richard M Pachulski
                                     Laura Davis Jones
                                     Debra I. Grassgreen
                                     Maria A. Bove
                                     John W. Lucas
                                     780 Third Avenue, 36th Floor
                                     New York, New York 10017
                                     Telephone:  (212) 561-7700
                                     Facsimile:  (212) 561-7777

                                     Attorneys for Debtors
                                     and Debtors in Possession

**Exhibit A**

**(Appling Declaration)**

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF GARY APPLING IN SUPPORT OF OBJECTION OF MESA AIR GROUP, INC., ET AL., TO (1) THE ALLEGED ADMINISTRATIVE PORTIONS OF CLAIMS 1430 AND 1431 OF U.S. BANK NATIONAL ASSOCIATION, AS SECURITY TRUSTEE, ON BEHALF OF AGENCIA ESPECIAL DE FINANCIAMENTO INDUSTRIAL-FINAME AND (2) CLAIMS THAT WERE AMENDED AND SUPERSEDED BY CLAIMS 1430 AND 1431**

Gary Appling, being duly sworn, hereby deposes and says:

        1.      I am the Senior Vice President of Technical Services and Purchasing of

Mesa Air Group, Inc. and its affiliated debtor and debtor in possession (collectively, the

"Debtors"),[2] and have been working in this capacity with the Debtors since June 2006.  I manage

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

[2] Capitalized terms not defined herein shall have the meanings used in the Objection.

the general maintenance of the Debtors' aircraft fleet, aircraft equipment, and base maintenance facilities.

2.    I graduated from Hallmark Institute of Technology in 1989 with a Technical Aviation Degree.  I began my career in aircraft service and maintenance as a Ramp Agent/Customer Service Agent with Delta Air Lines and later also worked for Continental Airlines, Airborne Express and TIMCO Aviation Services.  While at these companies I held positions of increasing responsibility, primarily in Purchasing and Modification Repair and Overhaul management overseeing the repair of engines, components and airframe, inventory and technical purchasing.  I also served in the U.S. Air Force from 1981 to 1989 as a passenger service agent and jet engine technician.  During time, I became a licensed FAA licensed Airframe and Power Plant Technician.

3.    I am authorized by the Debtors to submit this declaration (the "Declaration").  I submit this Declaration in support of the *Debtors' Objection to (1) the Alleged Administrative Portions of Claims 1430 and 1431 of U.S. Bank National Association, as Security Trustee, on behalf of Agencia Especial de Financiamento Industrial-Finame and (2) Claims that were Amended and Superseded by Claims 1430 and 1431* (the "Objection"), dated October 20, 2010, filed contemporaneously herewith.

4.    Except as otherwise indicated, all facts set forth in this Declaration are based on either on my personal knowledge, information supplied by employees under my supervision, or my opinion based on my experience described above, and information maintained by the Debtors in the ordinary course of business regarding the Debtors' aircraft maintenance operations.  If I were called upon to testify, I would testify competently to the facts set forth herein.

5.     Before the Petition Date, Mesa Airlines, Inc. ("Mesa Airlines") leased the eleven ERJ-145 aircraft (the "Aircraft") that are the subject of the Objection from either Wells Fargo Bank Minnesota, N.A., or Wells Fargo Bank Northwest, N.A., each in its capacity as Owner Trustee (the "Owner Trustee").[3] The Aircraft were leased to Mesa Airlines, Inc. ("Mesa Airlines") pursuant to 11 separate leases (the "Leases"), and each Lease was guaranteed by Mesa Air Group, Inc. ("Mesa Air Group").[4]  In connection with the lease transactions, the Owner Trustee granted security interests in each of the Aircraft to U.S. Bank National Association, as security trustee, ("U.S. Bank"), on behalf of the lender, Agencia Especial de Financiamento Industrial-Finame ("FINAME").

6.     None of the Aircraft was operated post-petition.  Specifically, each Aircraft was grounded as of the following date:  N827MJ (11/12/09), N839MJ (4/13/09), N841MJ (12/22/08), N842MJ (12/15/08), N843MJ (4/1/09), N844MJ (1/19/09), N845MJ (4/2/09), N846MJ (8/12/09) , N847MJ (6/19/09), N848MJ (8/7/09), and N851MJ (6/1/09) . Since being taken out of service and before being surrendered, ten of the Aircraft were parked at 525 Airport Road, HGR A14, in Hot Springs, Arkansas (the "Hot Springs Facility").  N844MJ

---

[3] The U.S. registration numbers for the Aircraft are N827MJ, N839MJ, N841MJ, N842MJ, N843MJ, N844MJ, N845MJ, N846MJ, N847MJ, N848MJ and N851MJ.

[4]  The specific Leases are as follows: (a) Aircraft Lease Agreement (N827MJ) dated as of July 28, 2000 between Wells Fargo Bank Minnesota, N.A., Lessor and Mesa Airlines, Inc., Lessee; (b) Aircraft Lease Agreement (N839MJ) dated as of April 23, 2001 between Wells Fargo Bank Minnesota, N.A., Lessor and Mesa Airlines, Inc., Lessee; (c) Aircraft Lease Agreement (N841MJ) dated as of June 7, 2001 between Wells Fargo Bank Northwest, N.A, Lessor and Mesa Airlines, Inc., Lessee; (d) Aircraft Lease Agreement (N842MJ) dated as of December 21, 2001 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (e) Aircraft Lease Agreement (N843MJ) dated as of December 21, 2001 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (f) Aircraft Lease Agreement (N844MJ) dated as of December 21, 2001 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (g) Aircraft Lease Agreement (N845MJ) dated as of December 21, 2001 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (h) Aircraft Lease Agreement (N846MJ) dated as of December 20, 2001  between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (i) Aircraft Lease Agreement (N847MJ) dated as of July 17, 2002 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (j) Aircraft Lease Agreement (N848MJ) dated as of July 17, 2002 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (k) Aircraft Lease Agreement (N849MJ) dated as of July 17, 2002 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee; (l) Aircraft Lease Agreement (N851MJ) dated as of July 2002 between Wells Fargo Bank Northwest, N.A., Lessor and Mesa Airlines, Inc., Lessee.

was parked at the Debtors' maintenance facility located at 2625 Aviation Way, West Columbia South Carolina (the "South Carolina Facility").

7.     After these chapter 11 cases were filed, I am informed and believe that the Debtors and U.S. Bank entered into a number of stipulations that extended the 60-day period set forth under section 1110(a)(2) of the Bankruptcy Code (the "Section 1110 Period") through and including August 31, 2010 [Docket Nos. 542, 711 and 939].

8.     Pursuant to the *Debtors' Nineteenth Notice of Intent to Reject Leases Relating to Certain Aircraft Pursuant to Debtors' Procedures Set Forth in Amended Order Entered on February 23, 2010* served on July 30, 2010, the Debtors rejected the leases for each Aircraft, effective as of August 11, 2010. The Aircraft were surrendered on that date, ten at the Hot Springs Facility and one at the South Carolina Facility.

9.     Pursuant to Claim 1431 filed by U.S. Bank National Association ("U.S. Bank") against Mesa Airlines, U.S. Bank asserted a claim on behalf of lender Agencia Especial de Financiamento Industrial-Finame ("FINAME"), in the amount of $189,560,201.66, of which it contends that $11,016,708.66 is entitled to administrative priority under section 503(a) of the Bankruptcy Code (the "Alleged Administrative Claim") and $178,553,493.00 is a general unsecured claim (the "Alleged Unsecured Claim"). U.S Bank filed an identical claim, Claim 1430, against Mesa Air Group, Inc. ("Mesa Air Group") based on Mesa Air Group's guaranty of the Aircraft leases. (Claims 1430 and 1431 are collectively the "Objectionable Claims"). I have reviewed and am familiar with the Objectionable Claims. I have also reviewed and am familiar with the Aircraft Technical Reports that were submitted by U.S. Bank in support of the Objectionable Claims. I am also aware that there is an issue about whether the information

contained in the Aircraft Technical Reports is subject to a confidentially agreement. Therefore, I am able to address the Alleged Administrative Claim in only a very general manner at this time.

10.     The majority of the Alleged Administrative Claim is for parts that U.S. Bank contends were missing when the Aircraft were surrendered (the "Alleged Missing Parts"). As was mentioned in above, the Aircraft had been out of service and parked at the Hot Springs Facility or the South Carolina Facility since before the Petition Date. In many instances, the Debtors or a contracting agency (AAR) (acting on the Debtors' behalf) removed parts from the Aircraft and placed the parts in storage to protect and preserve them when the Aircraft were taken out of service. I did not become aware that U.S Bank did not realize that certain Aircraft and certain parts were located in different locations until supplied the Aircraft Technical Reports.

11.     On September 24, 2010, I sent a team of four (4) inventory employees to Hot Springs to locate the Alleged Missing Parts. They were able to locate substantially all of the Alleged Missing Parts, which are now at the Hot Springs Facility. We are available to reconcile the parts with U.S. Bank. Post-reconciliation, the Debtors believe that U.S. Bank will have little more than a *di minimis* claim based on Alleged Missing Parts.[5] Even if U.S. Bank had a claim for Alleged Missing Parts, its claim would be grossly overstated. In some instances, the amounts claimed by U.S. Bank are well above market price. For example, the Objectionable Claims included estimates for replacements flashlights, at a cost of roughly $2,000.00 each, while the actual cost is under $275.00.

12.     The other significant aspect of the Alleged Administrative Claim is a claim for records that U.S. Bank contends were missing or incomplete when the Aircraft were surrendered (the "Alleged Record Deficiencies"). The Debtors maintain their records in

---

[5] I will be able to provide a detailed response on the Alleged Missing Parts when the confidentiality issue has been decided or a protective order has been entered.

compliance with applicable Federal guidelines, specifically 14 C.F.R. § 121.380. From a review

of the Alleged Record Deficiencies asserted by U.S. Bank, it appears that U.S. Bank is trying to

hold the Debtors to a higher standard than the one that applies under Federal law or the Leases.

13.     When the Debtors surrendered the Aircraft, we surrendered all the records

that that were in our possession relating to the Aircraft. Furthermore, my team and I reviewed

the Aircraft Technical Reports and verified that none of the Alleged Record Deficiencies

occurred post-petition. Finally, my team and I also verified that the records for the Aircraft are

in compliance with the record keeping requirements in the Leases and under Code of Federal

Regulation 121.380 which generally requires that an air carrier maintain records on engines,

propellers, airframes and appliances since the last complete overhaul. With respect to all other

parts of the aircraft, a carrier has to maintain only one year's worth of records. The Debtors

maintained their records in compliance with these provisions.

14.     In connection with the surrender of the Aircraft, U.S. Bank's designee,

Embraer, sent an auditor to audit the Debtors' maintenance records. The audit was conducted

during May and June of 2010. My team generated an initial list of parts that had been installed

on the Aircraft and the service records relating to those parts. To the extent that the ECC auditor

had issues or questions about the reports, we tried to resolve those issues and did in many cases.

However, many of those resolved items are still included in the Alleged Administrative Claim.

15.     A final aspect of the Alleged Administrative Claim is the Debtor's

historical records relating to thruster reverses (the "Alleged Thruster Reverser Record

Deficiencies"). A thrust reverser is a device installed on the engine that assists the aircraft in

slowing upon landing or rejected take off. The thrust reversers at issue were installed on the

Aircraft at the beginning of the Leases. At inception, the thrust reversers came with a "log card"

that was included in the aircraft documentation package.  The log card general lists the parts that make up the thrust reversers.  US Bank contends that the Debtors are required to provide the original log card that came with the thrust reverses at the inception of the Leases and that unless the Debtors provide the original log card or a detailed tracing the maintenance history of each of the components of the thrust reverses back to the inception of the Leases, they will consider the thrust reversers to be unserviceable and have charged the entire cost of the reverser to the estates as an administrative expense.

16.     Pursuant to C.F.R. § 121.380, the Debtors are not required to provide the original log card, nor are they required to provide a detailed history tracing the maintenance history of each of the life limited components of the thrust reverser back to inception of the leases.  We are merely required to provide a current status of the part.  This is done in two parts.  First, we provide an installed parts listing that shows any part that is loaded in our system that is physically installed on the aircraft.  The parts listing will show the part numbers, serial numbers, position, hours and cycles on the part.  The second part is the maintenance due report which would show the time remaining on a life limited part before it would have to be changed.  My team is in the process of tracing the history and has been able to do so with respect to a number of the trust reversers at issue to date.  This process is ongoing.[6]

17.     Based on my participation in the audit and a review of the Aircraft Technical Reports, I believe that substantially all of the required records were provided or will be provided when the work on the thrusters has been completed.

---

[6] I will be able to provide a detailed response on the Alleged Thruster Records Deficiencies when the confidentiality issue has been decided or a protective order has been entered.

The foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 21st day of October, 2010 in Phoenix, Arizona.

_/s/ Gary Appling_
Gary Appling

**Exhibit B**

**(Northwest October 7, 2005 Transcript)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------X
                                        :
In Re the Matter of:                    :  05-17930
                                        :
      NORTHWEST AIRLINES CORP.,         :  One Bowling Green
                                        :  New York, New York
             Debtors.                   :  October 7, 2005
---------------------------------------X
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ALLAN G. GROPPER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          BRUCE ZIRINSKY, ESQ.
                          NATHAN HAYNES, ESQ.
                          MARC ELLENBERG, ESQ.

For Unsec. Creditors:     SCOTT HAZAN, ESQ.


For U.S. Bank:            RICHARD HIERSTEINER, ESQ.


For Goldman, Sachs:       DOUGLAS LIPKY, ESQ.


For ADHN Leasing:         THOMAS MCAULEY, ESQ.


For Ad Hoc Committee:     RISA ROSENBERG, ESQ.


For ABN Amro:             MICHAEL RICHMAN, ESQ.


For GE Comm. Aviation:    RICHARD P. KRASNOW, ESQ.


Court Transcriber:        SHARI RIEMER
                          TypeWrite Word Processing Service
                          356 Eltingville Boulevard
                          Staten Island, New York 10312

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE COURT:  Good morning.

2          This is a hearing in <u>Northwest Airlines</u>.

3          May I have appearances, please, from all parties who

4   expect to speak or who want their appearance noted on the

5   record.

6          MR. ZIRINSKY:  Good morning, Your Honor.

7          Bruce Zirinsky from Cadwalader, Wickersham & Taft on

8   behalf of Northwest Airlines and the other debtors.

9          Mr. Nathan Haynes from my office, Mr. Mark Ellenberg,

10  Mr. Gregory Petrick.

11         THE COURT:  We have a committee.

12         MR. HAZAN:  Yes, Your Honor, you have a committee.

13         More importantly, or of equal importance --

14         THE COURT:  Well, the creditors have a committee.

15         MR. HAZAN:  Good morning, Your Honor.

16         Scott Hazan and Brett Miller from Otterberg,

17  Steinham, Houston & Rosen, P.C., proposed counsel subject to an

18  order of Your Honor for the official unsecured creditors

19  committee.

20         MS. MARTINI:  Deidre Martini, United States Trustee.

21         THE COURT:  So the United States Trustee is still

22  alive notwithstanding the impending date of October 17th?

23         MS. MARTINI:  We're hanging in there, Judge.  Thanks

24  for asking.

25         THE COURT:  All right.

1           MR. MOSUMOTO:  Brian Mosumoto for the Office of the
2  United States Trustee.

3           MR. RICHMAN:  Good morning, Your Honor.

4           Michael Richman of Mayer, Brown Rowe & Maw.  I'm
5  representing ABN Amro, one of the objectors on Schedule A and
6  B.

7           MR. STEWART:  Michael Stewart of Sheppard, Mullin,
8  Richter & Hamton, LLP on behalf of U.S. Bank in its commercial
9  capacity.

10          MR. MCCARTY:  Good morning, Your Honor.

11          David McCarty of Sheppard, Mullin, Richter & Hampton,
12  LLP, appearing for U.S. Bank National Association as indenture
13  trustee for airport revenue bonds [sic].

14          MS. WEISS:  Good morning, Your Honor.

15          Allison Weiss from LeBoeuf, Lamb, Greene & MacRae,
16  appearing for U.S. Bank as trustee.

17          MR. HIERSTEINER:  Good morning, Your Honor.

18          Richard Hiersteiner of Palmer & Dodge in Boston,
19  representing U.S. Bank National Association and U.S. Bank Trust
20  National Association as trustee.

21          MR. BENNETT:  Good morning, Judge.

22          Marc Bennett of Allen & Overy for KLM Dutch Airlines.

23          MS. TRUM:  Good morning, Your Honor.

24          Sarah Trum from Winston & Strawn on behalf of First
25  Chicago Leasing Corporation.

1

2          MR. WATSON:  Jason Watson of Austin & Byrd in Atlanta
3  on behalf of Wachovia Bank, N.A.

4          MR. FORNIEL:  Good morning, Your Honor.

5          Joseph Forniel [Ph.] from Reed, Smith on behalf of
6  Wells Fargo National Bank.

7          MR. LIPKY:  Good morning, Your Honor.

8          Douglas Lipky of Vedder, Price on behalf of Goldman,
9  Sachs, Bank of America, MBIA Insurance, Sumitoma Bank and
10  several other German banks.

11          Good morning.

12          THE COURT:  Good morning.

13          MR. HOLLANDER:  Good morning, Your Honor.

14          Evan Hollander from White & Case, LLP, counsel to
15  SMDC Capital Markets.  We represent one of the aircraft
16  pursuant to Exhibit B.

17          I'm not certain that we're going to have to speak
18  today but we reserve the right.

19          THE COURT:  All right.

20          Thank you for noting that you're on Exhibit B, Mr.
21  Hollander.

22          As I've stated before in hearings in this case, I was
23  a partner of White & Case more than five years ago at this
24  point but I'm still a pensioner and, therefore, am conflicted
25  with White & Case so I can't act on any matters on which White

1 & Case appears. I don't believe, however, that under the

2 circumstances of this motion that it will present any

3 difficulty today.

4          White & Case is in Exhibit B, represents an Exhibit B

5 party and we're really dealing principally today with the so-

6 called Exhibit A parties and I will if necessary refer the

7 issues relating to Exhibit B or relating to White & Case to

8 another judge.

9          That will be a general principle in this case and I

10 don't believe it should create any serious difficulties. If it

11 does we'll deal with them appropriately. If any party feels

12 that this is inappropriate, they are certainly welcome to let

13 me know at any time in the near future. Obviously, you don't

14 have to do so now.

15          Yes, sir.

16          MR. CHIU: Thank you, Your Honor.

17          Conrad Chiu of Pitney, Hardin on behalf of The Fifth

18 Third Leasing Company.

19          MR. MCAULEY: Good morning, Your Honor.

20          Thomas McAuley [Ph.] on behalf of ADHN Leasing and

21 Pitt Aviation [sic].

22          We filed an objection relating to the Exhibit A

23 leases last night and I just wanted to make sure Your Honor was

24 aware of that.

25          THE COURT: All right.

1           MR. MCAULEY:  Thank you.

2           THE COURT:  I have a number of objections.  I think

3  they cover the gamut and I hope that the objecting parties will

4  find some way to deal with the issues in common or at least

5  whoever speaks first is welcome to make their points and then

6  we'll hear only additional argument to the extent it's

7  necessary; that it adds something.

8           MR. MCAULEY:  Thank you.

9           MS. ROSENBERG:  Good morning, Your Honor.

10          Risa Rosenberg from Milbank, Tweed, also Dennis Dunne

11  from Milbank, Tweed on behalf of an ad hoc committee senior

12  holders of aircraft related securities.

13          THE COURT:  I have your multiple objections.

14          MS. ROSENBERG:  Thank you, Your Honor.

15          THE COURT:  They're all the same, I believe, but

16  they're for different parties.

17          MS. ROSENBERG:  That is correct, Your Honor.

18          THE COURT:  Word processing is wonderful.

19          MS. ROSENBERG:  That's correct.

20          MR. PETTIT:  Good morning, Your Honor.

21          I'm Peter Pettit [Ph.].  I'm here on behalf of NCC

22  Heat Company, Bell Atlantic, Tricom Leasing, BATCL2 1991, Inc.

23  and various other participants and their respective owner

24  trustees.

25          THE COURT:  Well, I give you a great deal of credit

for being able to do that without notes.

        MR. BARRACK:  Good morning, Your Honor.

        David Barrack of Fullbright & Jaworski on behalf of the International Air Transport Association.

        MS. MAI:  Good morning, Your Honor.

        Stephanie Mai and Mark Fucci of Bingham, McCutchen, h here on behalf of UBS, A.G., Stamford Branch.

        THE COURT:  All right.

        Well, thank you.

        We have a number of matters that were adjourned or put on for today but, I believe, many of them are being adjourned.  The debtors filed yesterday an agenda which is available to all parties on the internet.  Hopefully, we can follow that practice and all parties will know where they stand and where the calendar stands.

        Obviously, all parties will have an opportunity to be heard on matters that need to be heard.  We're going to set a schedule for the next couple of hearings and then we can, perhaps, schedule hearings in the future on specific dates so that parties will be convenienced as much as possible.

        With regard to Exhibit B, it seems to me that although I'll hear argument from the parties to extent necessary, it seems to me what we're really talking about on Exhibit B is a question of scheduling.

        The debtors have in effect, through Exhibit B,

1 informed the world that they are considering seriously

2 rejecting those particular leases or abandoning the secured

3 property.  It certainly helps the secured creditor to know what

4 list you're on, at least provisionally, and during the

5 remainder of the sixty days since the date of the order for

6 relief the parties can move forward.

7         If I need a formal motion on Exhibit B, that is if I

8 accept the principle that the debtors are prematurely giving

9 notice of abandonment or rejection, then we'll schedule a

10 hearing.  We'll put all of those on for another date and give

11 parties an opportunity to be heard but it's hard -- and I'll

12 hear argument on the subject but it's hard for me to see any

13 prejudice to any party from being told that, "You're on a

14 provisional list for rejection or abandonment as the case may

15 be" and the parties can then act responsibly and pursue their

16 best business interests and if necessary I'll hear them and

17 I'll hear them before the 60th day or on the 60th day,

18 depending upon where the parties are.  But it does seem to me

19 that in connection with abandonment or rejection, the hallmark

20 of the action of all parties is reasonableness.

21         With having been stated I'll hear from the parties on

22 that motion but should we take care, first, Mr. Zirinsky, of

23 the adjournments and the other matters that we need to take

24 care of today?

25         We can proceed any way you want to.

1          MR. ZIRINSKY:  I think, Your Honor, it would probably
2   be more workable if we put the -- this is the only contested
3   matter today.

4          THE COURT:  Right.

5          MR. ZIRINSKY:  So, perhaps, we should go through the
6   rest of the motions, all of which are either resolved or we
7   have agreements to adjourn.

8          THE COURT:  All right.

9          MR. ZIRINSKY:  If I may, Your Honor, I'd like to turn
10  the podium over to my colleague, Mr. Nathan Haynes, who will
11  take the Court through the first part of the agenda and we'll
12  be submitting to Your Honor proposed final orders or orders as
13  the case may be.

14         THE COURT:  All right.

15         MR. HAYNES:  Good morning, Your Honor.

16         Nathan Haynes of Cadwalader, Wickersham & Taft for
17  the debtors.

18         Your Honor, turning to Page 3 of the first amended
19  agenda, uncontested resolved matters, which is Subsection 2.1
20  of the binder.

21         Initially, Your Honor, we have the debtor's motion to
22  maintain and use their existing bank accounts and cash
23  management system.  Your Honor granted this motion on an
24  interim basis on the first day of the case.  We received some
25  informal responses from the State Street and U.S. Banks with

respect to some language in the order that we've worked out to the parties' satisfaction an will be reflected in the final order that we submit to the Court.

Additionally, Your Honor, we got an objection from Fifth Third Bank with respect to a certain bank account that to my understanding has about $15,000.00 in it so it's not a giant issue but all the same, we've agreed to put this matter over solely as it relates to Fifth Third Bank's limited objection to the next hearing date which we understand to be October 19th at 10:00 a.m.

THE COURT: All right.

All of these or many of these orders were entered in interim form to give the committee an opportunity to review them so I assume the committee has had an adequate opportunity to review these orders and has no further comment?

MR. HAZAN: Good morning, again, Your Honor, Scott Hazan.

That is a correct assumption. We will stand where we think it is appropriate. But if we don't stand it's because we are fine with the proposed relief.

THE COURT: I'm certainly not urging you to stand at any time.

MR. HAZAN: Your Honor, I would just like to make one notation for the record.

The exhibits that were attached to the debtor's cash

1 management motion reflected the debtor's enterprise bank

2 account system.  So, accordingly, there are a couple of bank

3 accounts on there that are actually in the name of non-debtors

4 and I just was requested by a party-in-interest to mention that

5 for the record.

6            THE COURT:  All right.

7            MR. HAYNES:  With that, Your Honor, we respectfully

8 request that the Court enter the revised cash management order

9 as a final order of the Court?

10           THE COURT:  All right.

11           MR. HAYNES:  Your Honor, I suggest we have a sheaf of

12 orders --

13           THE COURT:  You can hand them up all at the end.

14           If anybody wishes to be heard on any of these they

15 are welcome to speak up.

16           Next.

17           MR. HAYNES:  Your Honor, the next is our motion to

18 allow us the authority to pay outside maintenance and the

19 service providers; shippers and contractors similarly.  Your

20 Honor, this order was entered on an interim basis on the second

21 day of the case.

22           Your Honor, we received three objections; one was

23 from Wells Fargo and U.S. Bank.  The basis of that objection

24 was relating to the portion of the debtor's motion which

25 addressed that debtor's status as a pass through entity for

1　certain funds including construction funds relating to bond

2　facilities.  They may not necessarily be a property of the

3　debtor's estate and the language that we've come to agree with

4　with U.S. Bank and Wells Fargo essentially makes it clear that

5　this order is neutral with respect to parties' obligations with

6　respect to those construction fund payments.

7　　　　Secondly, Your Honor, we've received another

8　objection filed by Aerothrust [Ph.] to request some clarity

9　with respect to ongoing obligations and terms and provisions of

10　the mechanics lien order.  We have made revisions that are

11　satisfactory to each of the parties in that respect and I

12　understand that Aerothrust will not be asserting their

13　objection.

14　　　　 With that, Your Honor, I would respectfully request

15　that the Court enter the mechanics lien order as a final order

16　of the Court.

17　　　　THE COURT:  Does anybody wish to be heard?

18　　　　　　　　　(No response.)

19　　　　THE COURT:  All right.

20　　　　That will be done.

21　　　　MR. HAYNES:  Turning now to the third item, the

22　debtor's motion to assume certain underlying traffic

23　agreements, industry agreements and clearing house agreements,

24　together with a request to perform certain pre-petition

25　obligations that are settled in connection with the clearing

1 house agreements.

2          Your Honor, we've received an informal response

3 Alaska and Hawaiian Airlines.  We have made revisions to the

4 order that the parties have agreed to that have resolved Alaska

5 and Horizon's [sic] issues with the order.

6          Additionally, Your Honor, both the clearing houses,

7 ACH and IATA, reached out to the debtors with respect to

8 certain concerns and we were able to amicably resolve those

9 concerns without either clearing house having to file an

10 objection to the motion.

11          Accordingly, Your Honor, there being no other

12 objections to this relief, we would respectfully request that

13 the Court enter this order as a final order of the Court.

14          THE COURT:  Does anyone wish to be heard?

15                    (No response.)

16          THE COURT:  All right.

17          That will be done.

18          MR. HAYNES:  Turning now to the debtor's motion for

19 approval of investment guidelines and authorizing the debtors

20 to continue to perform and provide credit support under their

21 hedging and derivative arrangements.

22          Your Honor, we did not receive any objections to the

23 interim order.  We did receive some informal comments from the

24 State Street Bank but we have inserted, "that are agreeable to

25 both of the parties."

1   There being no objections to this motion we would
2   respectfully request that the Court enter the interim order as
3   a final order of the Court as revised pursuant to State
4   Street's comments.

5          THE COURT:  Does anyone wish to be heard?

6                         (No response.)

7          THE COURT:  All right.

8          That will be done.

9          MR. HAYNES:  Turning now, Your Honor, to No. 6.  This
10  is actually a motion that was filed after the petition date.
11  It's a motion under 365 to reject eleven leases and one
12  guaranty relating to real property that the debtors have not
13  been occupying since the petition date.

14         Your Honor, these properties, as I mentioned, were
15  providing no value to these estates as the debtors are not
16  currently resident of any of the properties.

17         The debtors made efforts to market these properties
18  in the pre-petition period as well as during the post-petition
19  period but they received no offers for any of the properties.

20         There being in the debtor's business judgment no
21  value to the estate and continuing to carry these properties,
22  the debtors filed this motion to reject.

23         Your Honor, we received one informal response from
24  the Metropolitan Airport Commission with respect to a mail sort
25  facility lease.  We expect that we will come to an agreement

1 with the MAC shortly but with respect to that lease only, we're

2 requesting that the Court move this hearing to the October 19th

3 date and enter the order authorizing the debtors to reject the

4 balance of the leases and the guaranty as listed on the

5 exhibit.

6       THE COURT:  All right.

7       Does anyone wish to be heard?

8       MR. HAZAN:  For Your Honor's benefit, this is one of

9 the matters that we had asked the debtor yesterday when we met

10 with the debtor to make a presentation so that the committee

11 could be satisfied on the process utilized.  The same thing

12 applied with the aircraft on Exhibit A so the committee could

13 be satisfied as to those which the debtor was seeking authority

14 to reject now and the committee was satisfied as to the process

15 that was utilized here on Item 6.

16       The debtor has skipped over Item 5 which is probably

17 the colloquy going on right here.  I'm sure that was

18 inadvertent and they'll be going back to it in a moment.

19       THE COURT:  All right.

20       Then with respect to Item 6, the rejection of certain

21 non-residential real property, leases and a related guaranty,

22 I'll sign an appropriate order also adjourning the one matter.

23       MR. HAYNES:  Thank you, Your Honor.

24       Rolling back to Item 5 which I inadvertently skipped

25 over, this is the debtor's motion to authorize them to continue

to perform under certain credit card processing agreements and
to assume these agreements.

Your Honor, this order was entered on an interim
basis at the initial hearing.  We've received no response and
we respectfully request that the Court enter the order as the
final order of the Court.

THE COURT:  Does anyone wish to be heard?

(No response.)

THE COURT:  All right.

Then that will be done.

MR. HAYNES:  Your Honor, if I could just move down to
the adjourned matters section to No. 1, the motion to establish
notification procedures for trading in claims and equities
securities.

Your Honor, as indicated by the notice of adjournment
filed with the Court yesterday, the debtors are requesting that
this be moved to October 19th.  There is a concern, however,
that the interim order that was entered by the Court on the
first day of hearings is not entirely clear as to whether the
relief granted would extend past today.

Accordingly, Your Honor, we've created something of a
bridge order that will keep the relief granted in the interim
order in place until such time as the Court enters a final
order on the NOL procedures motion or otherwise disposes of the
motion.

1             THE COURT:  All right.

2             Does anybody wish to be heard on the issue of

3      adjournment of the motion to restrict trading in claims and

4      securities and to enter a bridge order that retains the status

5      quo pending a hearing at a later date?

6             MR. HAZAN:  Judge, Scott Hazan again for the

7      committee.

8             We requested, I think, among other parties, that this

9      matter be adjourned so that we could work with the debtor and

10     the other parties to, hopefully, come up with a consensual

11     order that accomplishes the debtor's goals and, yet, doesn't

12     impinge in any material way on people's rights so that in part

13     it is our request for the adjournment.

14            THE COURT:  Ms. Rosenberg.

15            MS. ROSENBERG:  Your Honor, just a technical matter.

16            We were advised by the debtors that they were seeking

17     this adjournment.

18            We were never asked to give our consent.  We don't

19     give our consent because we're not authorized to do so and if

20     this Court orders the adjournment, this Court will order the

21     adjournment.

22            We gave the debtors detailed comments on the interim

23     order which we feel is insufficiently protective of the

24     legitimate rights of parties.  We, late last night, we received

25     a response for the first time in writing from the debtors to

1 those comments.

2          THE COURT:  All right.

3          Does anybody else wish to be heard?

4                    (No response.)

5          THE COURT:  It is certainly the Court's view that the

6 order is an important one.  As to which notice should be

7 provided, I believe you've published notice and are providing

8 notice to all security holders through the indenture trustees

9 and the transfer agents and will eventually provide a notice to

10 all creditors.

11          But it does not seem to me that the interim relief

12 that was entered on the first day of the case was of such a

13 nature as to irreparably or even damage any parties and that if

14 we keep the status quo and allow all parties an opportunity to

15 review the terms of the order and the order, itself, that that

16 is an appropriate step.

17          So we'll enter an order that adjourns this matter and

18 continues the interim order in effect pending a hearing and

19 determination on the motion.

20          Yes, sir.

21          MR. HIERSTEINER:  Your Honor, if I may?

22          Richard Hiersteiner on behalf of U.S. Bank National

23 Association and U.S. Bank Trust National Association Indenture

24 Trustee with respect some aircraft financing.

25          Do I understand that the order will extend the

interim order through October 19th and not beyond that?

THE COURT:  Well, is October 19th going to be sufficient to deal with the issues that have been raised do you believe?  I'm not asking you, I'm asking the debtors.

I assume you're not asking that it be adjourned any further?

MR. HIERSTEINER:  Correct.

Our problem, Your Honor, as indentured trustee is that we maintain the register for claims transfers and there's a provision of the order which provides that the transfers are avoid if they're not in compliance with the terms of the notice provisions which leaves the trustee in the position of not knowing whether a transfer is actually valid or not so we don't know whose instructions to follow and we don't know who to pay.

It's a problem for us if it extends for any period of time.

MR. ZIRINSKY:  Your Honor, for the record, Bruce Zirinsky.

We have engaged in extensive discussions with numerous parties on this order and I think we're working towards what, I hope, will be a global resolution.

Our approach is to try to take all of the comments and complaints that we get from each party and we're trying to coalesce it into a unified response that we think will substantially if not entirely resolve people's concerns to the

1  extent we have any flexibility to do that.

2          In addition, as Mr. Hayes has indicated, the

3  committee was just formed.  They've just retained counsel and

4  financial advisors.  The committee has asked us to put over the

5  hearing so that the committee can get up to speed and --

6          THE COURT:  I understand.

7          MR. ZIRINSKY:  -- I can't promise we'll be at the

8  finish line by the 19th but we're certainly going to do our

9  best.

10          THE COURT:  Well, ordinarily, the adjournment of a

11  matter like this is an adjournment pending the hearing and

12  determination of a motion.  We'll adjourn the motion to the

13  19th, I'll have a hearing that date.  Any party who wishes to

14  come in and argue that this should be it can do so.

15          If the matter is adjourned further it will be

16  adjourned to another definite date so the indenture trustee

17  will know today and on the 19th exactly where things stand.  I

18  think the indenture trustee needs to know how things stand more

19  than anything else.

20          MR. HIERSTEINER:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          All right.

23          MR. HAYNES:  Your Honor, with respect to the balance

24  of the adjourned matters, I'm happy to run through them to

25  discuss each of them.  Alternatively, I can work with your --

1        THE COURT:  I think just so you can report for the

2 people here, just go through them and state the adjournment.

3        MR. HAYNES:  Very well.

4        Your Honor, with respect to No. 2, the motion to

5 establish reclamation procedures, the committee has requested

6 time to review such procedures.

7        Accordingly, we have agreed to adjourn that to

8 October 19th.

9        THE COURT:  All right.

10        MR. HAYNES:  With respect to the bevy of passenger

11 facility charge motions, we have come to an agreement with all

12 the airport movants to move this hearing also to the 19th to

13 give the parties time to seek to amicably resolve these issues.

14        With respect to the balance of the adjournments, they

15 are relating to adequate protection motions filed by various

16 aircraft lenders and I'll turn the podium over to Mr. Marc

17 Ellenberg.

18        MR. ELLENBERG:  If the Court please, Marc Ellenberg

19 of Cadwalader, Wickersham & Taft on behalf of the debtors.

20        Your Honor, a motion for my admission pro hac vice

21 was previously filed with the Court.

22        THE COURT:  I have it.  Please, go ahead.

23        MR. ELLENBERG:  Thank you.

24        Your Honor, all of the adequate protection motions

25 that were noticed for today have been adjourned.

1        THE COURT:  Do you need another date?

2        MR. ELLENBERG:  Your Honor, I think for today we

3 should adjourn them to October 19th.  Many of the parties would

4 agree to adjourn them to a longer date and we will, between now

5 and October 19th, work that out with the Court.

6        THE COURT:  All right.

7        We'll adjourn them then until the 19th for holding

8 purposes.  Clearly, I'm not going to hold evidentiary hearings

9 in multiple matters on that date and my policy ordinarily is

10 not to hold evidentiary hearings on the date of a motion

11 calendar.

12        On the other hand, if someone is coming in from out-

13 of-town, that can be varied but ordinarily evidentiary hearings

14 need to be scheduled separately and we still are in the very

15 early stages of the case.

16        So we'll adjourn matters until the 19th and further

17 if necessary.

18        MR. ELLENBERG:  Thank you, Your Honor.

19        As I said, with respect to many of the motions, I

20 already know that we will not need a hearing on the 19th and

21 with respect to the other ones we will try our best to avoid a

22 hearing at any time apart from the 19th.

23        Your Honor, with respect to the adequate protection

24 motions filed by the New York office of Milbank and by the U.S.

25 Bank represented by Palmer & Dodge, I've been asked to read

into the record some agreements we've made in connection with
the adjournment.

I would also say that we've made similar agreements
with most of the other parties who have adjourned.  At the
moment, just Milbank has asked me to read these in and so I
will do that.  But I will say for the record to the extent
we've made commitments with other parties we intend to live
with them and by them.

We've agreed, Your Honor, that any adjournment would
be without prejudice and not limit, hinder or impair the
parties' respective rights under Section 1110 of the Bankruptcy
Code.  The parties including both the debtor and the defendant
respondents to the adequate protection --

THE COURT:  How could that be?  How could the
parties' rights under 1110 be effected without their consent?

But, please, go ahead.

MR. ELLENBERG:  We've agreed that any adjournment
will not prejudice and the parties will be entitled to the same
rights and to make the same arguments as if the motion had been
heard on October 7th.

In addition, Your Honor, the debtors have committed
to provide the following relief sought in the motions
immediately.  First, the immediate right to inspection at a
mutually convenient time and a commitment to cooperate in
scheduling of such inspections.  Second, access to and copies

1 of all maintenance, records and other aircraft equipment

2 documents.  Third, confirmation that insurance is being

3 maintained in accordance with the provisions of the underlying

4 documentation and that the airline is complying with FAA

5 regulations including FAA mandated maintenance procedures.

6 Fourth, that the subleasing covenants, to the extent they

7 exist, are not being violated and, finally, that the aircraft

8 have their matching engines on them unless the engines are

9 taken off for maintenance in the ordinary course of business.

10          Thank you.

11          THE COURT:  I assume these are in general the

12 debtor's policies with regard to all aircraft, at least to the

13 extent reasonably possible?

14          MR. ELLENBERG:  That's correct, Your Honor,

15 particularly the part about complying with FAA regulations.

16          THE COURT:  I think we'll take judicial notice of

17 that until informed otherwise.

18          MR. ELLENBERG:  Thank you, Your Honor.

19          MR. HAYNES:  Your Honor, Nathan Haynes again from

20 Cadwalader.

21          Turning now to Page 17 of the agenda, motions with no

22 current hearing date scheduled, just to provide the Court with

23 an update as to where we are.

24          Two fuel companies filed motions seeking

25 reconsideration of the fuel supply order that was entered on

1  the first day of hearings in these cases.  Your Honor, we are

2  continuing to work with Conoco as well as Valero to resolve

3  their issues without having to bring this matter before the

4  Court.  We are endeavoring to get that completed by the next

5  hearing date on October 19th.

6          With that, Your Honor, I would respectfully request

7  that I would be able to turn the podium over to Mr. Bruce

8  Zirinsky to discuss on Page 7 of the agenda the adversary

9  proceeding of <u>Northwest Airlines v. American Express</u>.

10         MR. ZIRINSKY:  This will be very short, Your Honor.

11         We are on the verge of completing an agreement with

12 American Express.  We are optimistic that we will actually have

13 a signed agreement early next week which we would then be in a

14 position to present to the Court on appropriate notice for

15 approval.

16         With the consent of counsel for American Express, my

17 request today is to put over the hearing for one week just for

18 holding purposes, which would be the 14th, I believe.  I

19 believe we already have one other matter on Your Honor's

20 calendar that day.  I believe it's with respect to the

21 utilities --

22         MR. HAYNES:  That's the carry over date for the

23 utility motion, Your Honor.

24         THE COURT:  All right.

25         MR. ZIRINSKY:  I don't expect we would go forward on

1  that date, Your Honor, but I would go to the 19th except Mr.

2  Schwartz and I agree that we put it over for a week.

3          THE COURT:  We'll put it over then until the 14th

4  with a possible further consensual adjournment to the 19th and

5  beyond if the parties wish.

6          MR. ZIRINSKY:  Thank you, Your Honor.

7          Yes, if we reach agreement, Your Honor, obviously we

8  would seek to withdraw the adversary proceeding as part of the

9  Court's approval of the settlement.

10         Thank you.

11         THE COURT:  Now, I disclosed at a hearing on Monday

12  and I will repeat it today because there are many more parties

13  here, that I learned to my considerable dismay that I was

14  apparently a creditor of Northwest Airlines.  I spoke at the

15  International Bar Association Conference last week and had

16  purchased a ticket, I thought, on KLM and found to my dismay

17  after I entered first day orders in this case reinstating

18  Northwest tickets and ticketholders rights, that I was a holder

19  of a Northwest ticket and I found to my -- I guess I should

20  have anticipated it -- that since I paid with an American

21  Express card I was an interested party in the American Express

22  adversary proceeding with has to do with if you've seen the

23  papers the rights of parties who may hold tickets on Northwest

24  and surrender them for a refund and my American Express bill

25  duly says Northwest, not KLM.

1   So I see no way out of this dilemma since I've

2   entered orders that would otherwise directly effect my rights

3   just to lose the ticket and take the loss.  So I have a ticket,

4   I didn't use it, I did not fly on KLM, I flew on another

5   airline last week.  I will not put the ticket in for a refund,

6   I will not file a claim as a creditor or Northwest for this

7   ticket.  I will take the loss and rack that up to experience.

8   I don't see any other way to proceed in an appropriate fashion.

9   So I make these disclosures because I think this

10  matter should be disclosed, although it's a very small matter,

11  maybe some creditors and security holders will feel that at

12  least the Judge is sharing a little of their pain in the

13  bankruptcy case and I'm sure the debtor is also feeling the

14  pain of a Chapter 11 case that I assume it did not want if it

15  could have avoided it.

16  In any case, I make those disclosures and we'll

17  proceed.

18  Mr. Zirinsky, what else do we have on the calendar

19  today?

20  MR. ZIRINSKY:  The only matter remaining, Your Honor,

21  is the rejection motion with respect to Exhibit A and as Mr.

22  Ellenberg will handle that, he will also indicate to the Court

23  that there are thirteen aircraft on Exhibit A and we have

24  reached agreements with parties with respect to six of those

25  aircraft.  We're engaged in negotiations whereby they would

modify the economic terms of those aircraft together with other
aircraft they have in Exhibit B.  The agreement we've reached
for the moment -- for today at least we would move those six
from Exhibit A to Exhibit B.  Exhibit B is being adjourned,
which Mr. Ellenberg will describe, but we are prepared to go
forward with the balance of the aircraft on Exhibit A and with
respect to any objections that the Court may hear.

THE COURT:  All right.

MR. ZIRINSKY:  Thank you.

MR. ELLENBERG:  If the Court please, Marc Ellenberg
of Cadwalader, Wickersham & Taft on behalf of the debtors.

Your Honor, before the Court is the debtor's motion
for an order authorizing the rejection of certain aircraft
leases under Section 365 of the Bankruptcy Code and the
abandonment of certain aircraft which are securing claims of
creditors under Section 544 of the Bankruptcy Code.

Your Honor, the motion as you know, divides the
transactions at issue into two categories; Exhibit A consists
of aircraft which we request be rejected immediately or
abandoned immediately, although I think in fact they are now
all leases.  These aircraft have been parked in the desert.
They are not flying.  They are not providing value to the
estate.  On Exhibit B we have aircraft which under their
existing lease or financing terms are burdensome to the estate.
 However, because of the nature of the aircraft involved,

should we be able to renegotiate the terms of the leases or

financings, it is possible that they would then become valuable

to the debtor and so as to those we've requested the authority

to reject or abandon but, also, the discretion not to exercise

that authority for a 45 day period.

THE COURT:  Does that 45 day period take us beyond

the 1110 -- sixty days?

MR. ELLENBERG:  We had not intended it to when we

filed the motion, Your Honor.  I think at this point it will,

however, we don't override 1110 by requesting this relief so to

the extent 1110 obligations were to mature before the end of

the 45 day period we would have to deal with that wholly apart

from any relief granted under this motion.

THE COURT:  All right.

I think what we need -- I'll hear from any party with

regard to the Exhibit B leases but consistent with what I said

earlier, I think what we need is an order which I'd ask you to

draft and discuss with the interested parties that will adjourn

the Exhibit B portion of the motion that gives the debtor the

right to designate finally any property for abandonment or

rejection on very short notice -- I'm contemplating two or

three days -- so that any party who wishes to be heard on the

subject of abandonment or rejection could be heard and I'll

hear any issues but I have not seen any issues yet that go to

the debtor's fundamental business judgment.

1       As far as I understand the issues that have been

2   raised with Exhibit A, it all goes to the obligations -- what

3   does Section 1110 mean if it's relevant at all with respect to

4   the obligation to surrender and return and that I'll hear today

5   assuming that it's still an issue and I guess it is with some

6   of the parties.

7       On the abstract question of does the debtor have the

8   right to reject or abandon in the abstract under Exhibit B, it

9   seems to me that whole issue can be avoided by a scheduling

10  order.  You certainly have the right to bring on a motion to

11  reject or an abandonment notice on very, very short notice.

12  Indeed, an abandonment notice may not require any notice at all

13  but since I do think parties should act reasonably, there

14  should be a date on which you make the final determination

15  unless you agree differently with a party.  If a party at that

16  point wants to come in and say, "You can't abandon or you can't

17  reject," I'll hear it on very short notice but I'm not sure

18  that there will be any issue on that score.  The issue is what

19  are you obligations with respect to abandonment.

20      If anybody has any further issues with regard to the

21  handling of Exhibit B I'll hear them but I don't see any reason

22  to get into abstract issues of bankruptcy law if we can avoid

23  them simply by having a reasonable scheduling order.

24       All right?

25       MR. ELLENBERG:  Thank you, Your Honor.

1    Your Honor, as Mr. Zirinsky mentioned, we have
2 revised Exhibit A.  In the course of negotiations with certain
3 of the Exhibit B parties who also had plans on Exhibit A, the
4 negotiations broadened to include some of the Exhibit A
5 aircraft and so we have migrated six planes from Exhibit A to
6 Exhibit B.

7    Your Honor, I have revised exhibits here which I
8 would like to hand up.

9    THE COURT:  Well, I think when I enter an order on
10 these motions it ought to be an order that you would give an
11 opportunity for parties to see.  Certainly, we can so order the
12 movement of Exhibit A aircraft to Exhibit B aircraft with the
13 consent of the parties.

14    MR. ELLENBERG:  Okay, Your Honor.

15    We will handle it that way.

16    Just for the record, what is now left on Exhibit A
17 I'll just give tail numbers:  N646US, N211NW, N524US, N926RC,
18 N983US, N985US, N986US.

19    I may need to retire soon, Your Honor, because this
20 print was just barely large enough for me to able to do that.

21    So, Your Honor, what we have left today then are a
22 motion to reject those aircraft which I just mentioned which
23 remain on Exhibit A.  The relief, Your Honor, is very simple
24 and I believe quite narrow.

25    With respect to Section 365 we need to convince this

Court that the rejection is in the best interests of the estate.

THE COURT: Well, as I understand it, the issues that have really been raised are (1) whether 1110 applies at all and you say it doesn't in the first sixty days; and (2) if it does apply, what surrender and return means. I think those are the real issues for today, although I'm not trying to create any issues that don't need to be decided today.

MR. ELLENBERG: Actually, I see that just a bit differently, Your Honor.

I believe, certainly, that the only issues for today are have we met the standards of 365 or 544 to either reject or abandon and no objection has questioned that we've met those standards.

The objections, then, I think take several forms. One is that either some conditions have to be attached to that rejection or abandonment and we don't believe there's any basis in the Code for conditioning the effectiveness of rejection or abandonment. The second related argument is that if you reject or abandon you still need to comply with Section 1110 and, more specifically, 1110(c).

If I could take those two in order, Your Honor. With respect to whether there are conditions to rejection or abandonment, we don't believe that the Code provides any basis for that. Rejection is by definition a breach and by

definition it creates a claim.  We are not through this motion

trying to address what those claims are.  We are not trying to

foreclose those claims.  By definition we're creating the

claims through the rejection.  If parties believe that

subsequent to rejection we have continuing obligations and that

we're not meeting them, then they can either file a claim or

they can seek injunctive relief if they believe they have a

basis for it.

I would say the same is true with respect to

abandonment.  Once we've met the standard, we've abandoned.

That means that they have relief from the automatic stay and

can foreclose.  They still have a claim.  To some extent it may

still be a secured claim, to some extent it may not.  They may

have other claims based on their access to the collateral but

none of that is raised by this motion.  None of that will be

decided by this motion.

With respect to 1110, Your Honor, we do not believe

that 1110 and, more particularly, 1110(c) is triggered because

we are not turning over the aircraft -- let me say it another

way -- relief from stay is not being triggered by our failure

to make an 11(a)(2) commitment within sixty days and that on

the face of the statute is what triggers 1110(c).

THE COURT:  What do you do with Judge Marx' opinion

which one of the parties has given me?  You don't mention it in

your reply papers.

1       MR. ELLENBERG:  I understand, Your Honor, and the

2 reason we don't mention it and didn't want to get into it is

3 that I think the real issue for today is whether or not 1110(c)

4 applies.  Is this motion in any way addressing the consequences

5 of that?  We think the answer is no.  If we have obligations

6 under 1110(c) and we're failing to meet them and that creates

7 claims then, again, the parties can assert those claims.  If

8 that creates the basis for injunctive relief then the parties

9 can seek that relief.

10       We're not addressing those issues.  All we are

11 addressing is have we met the standard to reject under 365 or

12 abandon under 544.

13       THE COURT:  That seems to invite a whole series of

14 adversary proceedings in which some of the creditors who have

15 taken more extreme positions come in and move to require you to

16 comply with 1110(c).

17       MR. ELLENBERG:  Your Honor, that is their right to

18 do.  We're not inviting those actions.  We are in active

19 dialogue with most if not all of the objectors.  We hope that

20 we can work those issues out but there is an amazing

21 constellation of demands which have been put on us all under

22 the umbrella assertedly under Section 1110(c) and we're trying

23 to work through those issues and I'm sure we will work through

24 many of those issues but I don't think any of those issues need

25 to be decided today.  We are seeking to reject -- period.  It's

1  a breach.  To say that we have to comply with certain

2  provisions of the lease that we've just rejected, if we fail to

3  do that well that's just another breach.  We've already

4  breached.  That's what rejection is about.  If we have

5  continuing obligations and we don't meet those then the parties

6  can seek recourse but today's motion is not about that.  It's

7  not about what those obligations are.  It's not about what our

8  liability would be.  It's not about the priority of their

9  claims.  It's about whether we have authority to reject the

10  lease.  That is the first step.  If we need to address the

11  other steps, we'll address them at a future date.

12          I think there are only two other issues, Your Honor;

13  one is insurance and maintenance.  We don't believe under

14  Section 365 or 544 that post-rejection or abandonment we have

15  any obligation to either maintain or insure the aircraft.

16  Nonetheless, because we are trying to create a dialogue with

17  the counterparties and work constructively towards a

18  renegotiation if possible of many of our relationships, we have

19  volunteered to bound by a commitment for thirty days to

20  continue to insure and do storage maintenance on the aircraft.

21   Some of the parties have complained that thirty days isn't

22  long enough or that it should be thirty days or the date they

23  pick up the aircraft, whichever is later and, Your Honor, I

24  would note two things; first, I'd note there is some

25  inconsistency with a request for more time and the demands

1  under 1110(c) that surrender needs to be immediate, second,

2  we're doing this as a volunteer, we're agreeing to be bound by

3  it but, really --

4          THE COURT:  Well, you know no good deed goes

5  unpunished.

6          I'm not determining that there are any good deeds or

7  that there aren't but, certainly, that adage applies here and

8  most cases.

9          MR. ELLENBERG:  It applies in every bankruptcy case

10  I've been in, Your Honor.

11          In any event, we do believe that this is a good deed.

12   We think what we've proposed is reasonable and we don't think

13  there's any legal basis for imposing greater obligations on us

14  and so we would request that those objections be overruled.

15          The other issue, Your Honor, and I think it's

16  probably a tempest in a teapot, is whether the rejection can be

17  effective as of the date the motion was filed which in this

18  case was the petition date or whether it is only effective on

19  the entry of the order.  The reason I think it's a tempest in a

20  teapot, Your Honor, is that I'm not sure what the overall

21  difference a ruling on that issue will have.  I assume the

22  concern on both sides is whether the debtor is incurring an

23  administrative expense claim during the period between

24  commencement of the case and the effectiveness of the rejection

25  order.

1    I don't believe we could possibly be incurring such a

2 claim even if the order were only effective as of today because

3 we're not getting any benefit from these aircraft.  We're

4 certainly not inducing performance by the other side.  The

5 other side has been on notice that they could come and pick up

6 these planes and if they really wanted them they could have

7 asked us for them and Section 365(d)(10) provides that with

8 respect to leases of real property the debtor basically has a

9 sixty day free ride --

10    THE COURT:  Leases of personal property.

11    MR. ELLENBERG:  Yes, which is what the aircraft are,

12 Your Honor.

13    So, I don't see any way in which we could be

14 incurring administrative expense even if the order is only

15 effective today.

16    THE COURT:  But consistent with your prior position

17 you'll leave that for another day?

18    MR. ELLENBERG:  Well, Your Honor, if the parties will

19 let me I'd be happy to do that.  We do believe that we have

20 cited adequate authority in our reply brief on Pages 8 and 9

21 for the proposition that the Court could make this order

22 effective as of the date that the motion was filed because the

23 notice provided by the motion is, itself, equitably adequate to

24 support the relief and as one Court ruled in the In Re:

25 Buyrite Distributing case, the Court's approval is really

1   conditioned subsequent to the rejection which has effectively

2   already occurred.

3       So we believe the Court could enter that order as

4   we've requested it and that is the relief we continue to ask

5   for, although again, I'm not sure that as a practical matter it

6   makes all that much difference.

7       Thank you.

8       THE COURT:  Thank you.

9       All right.

10      Who wishes to speak in opposition?

11      MR. RICHMAN:  I'll volunteer.

12      THE COURT:  All right.

13      MR. RICHMAN:  Good morning again, Your Honor.

14      Michael Richman of Mayer, Brown, Rowe & Maw.

15      Before I begin, I think counsel's recitation of the

16  tail numbers may have been wrong.  That is I think you were

17  reading from the B schedule and not the ones removed from the A

18  or remaining on the A because we're on the A schedule and I

19  didn't hear our tail numbers mentioned.  So I just wanted to

20  get that clear.

21      MR. ELLENBERG:  I was reading A.  I can read them

22  again if you'd like.

23      MR. RICHMAN:  Well, I thought ours were 528 and 529.

24      MR. ELLENBERG:  They may have been moved.

25      MR. RICHMAN:  Well, if they were moved nobody

1  informed us and we don't have an agreement and my client is in
2  the court.  I don't think we have an agreement and now is when
3  to move.  So I think we're still supposed to be on A.  We
4  certainly didn't consent to an adjournment.

5          MR. ELLENBERG:  Nos. 528 and 529 are on B.

6          MR. RICHMAN:  Well, does somebody want to tell me who
7  consented to that before I argue?

8          MR. ELLENBERG:  Well, frankly, I'm not sure you need
9  to consent.  It's really our decision as to whether we're
10 rejecting you or not.

11         THE COURT:  Well, if you want to make your argument,
12 you may make your argument for the whole group.

13         MR. RICHMAN:  Your Honor, in an abundance of caution
14 I'll make the argument and I'll try to be as succinct as
15 possible.

16         THE COURT:  Well, yes, I've read your papers.  I
17 think you gave me a copy or you referred to Judge Marx'
18 decision and I've read that.

19         MR. RICHMAN:  Yes, Your Honor.

20         Also, it is -- and I think Your Honor recognized this
21 earlier -- the Exhibit B issues to the extent they cover return
22 are, of course, overlapping with A.  That is whatever authority
23 that is given with respect to rejecting the leases in the
24 future would still have to comport with whatever the Court
25 decides on the return conditions issue.  But I think Your Honor

1  is correct that the issue that really is being argued even

2  though Mr. Ellenberg says we're not arguing that 1110 applies

3  or not, the issue is really whether if you reject an aircraft

4  lease in the first sixty days of the case that any part of 1110

5  applies.

6          So I think -- and it's always useful to start with

7  exactly what the Bankruptcy Code says and I think we should

8  look at that language.

9          Section 1110(c) is really the provision that we are

10 most concerned with.  1110(c)(1) says that the trustee or in

11 this case the debtor "shall immediately surrender and return"

12 and, of course, the words "surrender and return," a statutory

13 performance obligation is the key to this dispute.

14         THE COURT:  Well, I've read the statute and I see the

15 words "surrender and return" but it's also, I think, of some

16 little interest that what I don't see is in accordance with the

17 provisions of the applicable lease or security agreement.

18         MR. RICHMAN:  That is correct, Your Honor.

19         However, to give meaning to the word "return," we

20 have to say it means something more than "abandon wherever the

21 aircraft and its parts may be."  In fact, let me just make this

22 point.  It's not so simple as if to say "the aircraft are

23 sitting in the desert" because the leases cover not just the

24 aircraft but the parts such as the engines.  I don't know about

25 the other parties.  In our case we've been informed that one of

1  our engines is in a repair shop in Germany.

2        THE COURT:  Well, repair shops in Germany is a unique

3  situation that would seem to me requires some cooperation

4  between the parties and, I fear [sic], a commitment on the

5  debtor's part to cooperate and somebody cited to me a Chapter

6  13 case where the Chapter 13 debtor said in exactly these

7  circumstances to the secured party, "Go pick up the car in the

8  repair shop and, by the way, pay the repair bill and the

9  storage costs and then you'll have your property back" in a

10 Chapter 13 case.

11       So I understand that argument but I don't see in

12 1110(c) the language in accordance with the provisions of the

13 lease which, by the way, appears in 1110(a).  So if Congress

14 wanted to use those words or was induced by the lenders to use

15 those words, it did, and when the lenders' rights were not

16 quite so broad, Congress just said "surrender and return,"

17 whatever that means.

18       MR. RICHMAN:  Well, Your Honor, respectfully we

19 disagree for the reason that the parties in the lease, not just

20 our parties but all the other parties, actually negotiated and

21 agreed to what they meant by "return" and "return" is defined

22 in the leases.  So it would be logical to say that if there's a

23 performance obligation to return, that you look to what the

24 parties actually agreed that "return" meant.

25       But in addition to that, even if that's not the right

1  answer or not the answer that the Court would adopt, "return"

2  has to mean something that requires much more than mere

3  abandonment from a performance as well as from a claims

4  standpoint but I appreciate and agree with the way Your Honor

5  is construing how Congress acts and that is directly relevant

6  to the question of whether 1110(c) applies here because if we

7  look further in 1110(c) it says that this "surrender and

8  return" obligation applies any time after the date of the order

9  for relief that the secured party becomes entitled to take

10  possession.  Well, Your Honor, it doesn't say "any time after

11  the 60th day."  It says, "any time after the order for relief.

12          THE COURT:  That's what Judge Marx held.

13          MR. RICHMAN:  Right.

14          So there is clearly an acknowledgement that where a

15  lease is rejected -- and I think its indisputable that when a

16  lease is rejected the secured party has the right to take

17  possession that 1110(c) has to apply and that if we were to say

18  it doesn't that we would be engrafting a judicial amendment to

19  the Bankruptcy Code.

20          The debtor's response to that is probably, "Well, who

21  cares because we don't have to determine that today.  Go spend

22  what you have to spend."  I think we have to pay the repair

23  shop in Germany $2 million which is what they're owed by

24  Northwest in order to get that engine back and then probably

25  complete the repairs which it was their obligation to repair.

So they can say, "Well, you can monetize it all and, therefore, bring an administrative claim and argue 1110 later." The problem is that it's a statutory performance obligation and Northwest is in a much better position to make deals, to deliver the goods, to assemble them wherever they are and to get them to at least an agreed return point. The leases do have agreed return points. They aren't arbitrary and they were negotiated with respect to where the parties did business. So they're in a much better position to do that at much less expense then say that a secured creditor has to essentially finance a future litigation and then take a chance of getting that back. We don't have the same information base as they have. It's a very different matter. So they say, "Well, all we're doing is breaching the lease" but if 1110(c) applies they're flouting the statute and the statute has an affirmative performance obligation and fundamentally they're asking this Court today to agree that they don't have to comport with the performance obligation imposed by Congress. So even though they take the position that they don't think it applies, this whole debate is really in the nature of a motion for declaratory relief that they don't have to comply with that because if they don't have to perform that and it just becomes an administrative claims controversy later, then they've essentially been given relief from the statute. Congress didn't them a choice. Congress didn't say, "You can either

1  surrender and return or put it to the secured creditor to take

2  care of themselves and you can fight about it later."

3       THE COURT:  But if I understand what Mr. Ellenberg is

4  saying today, he is saying that the Court can't effectively

5  decide any of these issues in the abstract.  They relate to

6  specific leases, they relate to general obligations even if the

7  leases aren't complied with.  Altogether, they relate to the

8  reasonableness of telling a secured party to go to Germany and

9  pick up your engine there and pay a $2 million bill and all of

10 that can be resolved on a case-by-case basis later and we're

11 dealing with sophisticated parties who have the wherewithal to

12 protect themselves in the meantime.

13      What the statute says as clearly as it can state is

14 that the right of the secured lender or lessor to take

15 possession shall not be interfered with by the debtor and

16 they're saying, "We're not interfering with it."

17      MR. RICHMAN:  I think it's more than that because if

18 the Court doesn't require compliance with 1110(c), even if the

19 Court doesn't say what that means today, we know that their

20 position is that we have an unsecured claim at best and that

21 they will leave the property where it is.

22      THE COURT:  You don't agree with that and you have

23 your remedies.

24      MR. RICHMAN:  We think at a minimum that the Court

25 should direct compliance with 1110(c).  They may be right that

1  the precise -- if they flout the Court's order and they don't

2  comply and they just leave it where it is, I'm not sure what

3  implications that has but it has to be something more punitive

4  than an administrative claim.  I don't think a party should be

5  able to deliberately flout express statutory performance

6  requirements and it may well be that if the debtors were

7  informed that return does mean something more than just leaving

8  a secured creditor to pick it up that, perhaps, given the

9  reasonableness benchmark that Your Honor indicated earlier,

10 that reasonable agreements would be reached and litigation

11 wouldn't be needed.

12         The issue also -- and particularly, Mr. Ellenberg's

13 position on nunc pro tunc, does have an issue insofar as the

14 insurance coverage is concerned because, again, they take the

15 position that they're volunteering to provide insurance for

16 thirty days but if we can't get the engine, say, out of Germany

17 within that frame of time then we're completely exposed and the

18 exposure is particularly implicated by saying that this can be

19 a nunc pro tunc.

20         If you look at the cases on nunc pro tunc, I don't

21 believe any of them involve aircraft leases, they involve real

22 property leases where the landlord has actually had possession

23 from the time that the debtor indicated it was giving up

24 possession for the most part.  But, here, where we're dealing

25 with physical goods that may be scattered around the country or

around the world, it's a little too clever to say, "Oh, nunc
pro tunc is done all the time" because it means effectively --
in fact, they said they don't feel they're obligated to insure
even back to the petition date if they get nunc pro tunc relief
--  that we would, again, be exposed until we can get
everything back.

So the requirement ought to be -- and this is, again,
embedded in the concept of surrender and return -- that until
the return is actually effectuated they have to cover the
machinery and that's the equipment and that's why, looking at
it as an affirmative performance obligation is so much
different than considering it an administrative claim because
if it's their obligation to perform and to return it, we know
that until they do that the equipment is going to be covered by
insurance because they're required to.  But if they just say,
"We're done, go pick it up," then we can't control the outcome
and we could be damaged even further and it shouldn't be that
they can say, "Well, that's too bad, if you have a problem make
a claim.  That just isn't right.  That, I don't believe is what
Congress intended."

The Atlas Air decision may be the only one on this
issue and I know Your Honor has read it.  It is interesting and
I'll note I believe that that decision was in part influenced
by the very persuasive brief that the Cadwalader firm put in on
behalf of, I think it was Morgan Stanley.  So I agree with the

1 position that Cadwalader took in <u>Atlas Air</u> and I think that's

2 the position that Your Honor should take here.

3      THE COURT:  Well, I'm not going to be effected by

4 that.  The decision may or may not be correct but it doesn't

5 matter who advocated for it.

6      MR. RICHMAN:  I think, Your Honor, that I covered the

7 principal issues.  The main point is even if Your Honor is not

8 prepared to say today, "You have to comply with the precise

9 provisions of the ABN Amro leases," although we believe that

10 they should, that it's important to say today that, "There is

11 no exception from 1110(c) where an aircraft finance lease is

12 rejected in the first sixty days and that return means

13 something more than abandoned so work it out and we'll have

14 another hearing."

15      Thank you, Your Honor.

16      THE COURT:  Anyone else who wishes to be heard on the

17 issue?

18      I would appreciate it if you did not duplicate

19 argument.

20      Yes, sir.

21      MR. HIERSTEINER:  I'll try not to, Your Honor.

22      Richard Hiersteiner on behalf of U.S. Bank National

23 Association and U.S. Bank Trust National Association.

24      I'd like to make three points, Your Honor.

25      THE COURT:  Come forward.

1          You bought a seat at the table, I'm sure.

2          Yes, sir.

3          MR. HIERSTEINER:  It seems to me, Your Honor, that

4    the debtor's arguments that the issue of how claims are

5    resolved is not implicated here is belied by their argument

6    that the rejection should be effective as at the petition

7    filing date or the date that they file their motion.

8          We would concede that courts on occasion have granted

9    retroactive application to rejections but only under

10   extraordinary circumstances and the only circumstance that the

11   debtors have referred to in their responsive pleading was the

12   due process rights of the aircraft creditors which doesn't seem

13   to me to be the extraordinary circumstance to which the other

14   courts were addressing.

15         Furthermore, I'd like to make the point that aircraft

16   are not like real estate.  We believe it is incumbent upon the

17   debtor, whether under 1110 or otherwise, to surrender and

18   return an aircraft and an aircraft that is returned without its

19   engines and without its manuals and without its logs and

20   maintenance information is not an airplane, it's a very

21   expensive metal sculpture that can't move and as long as the

22   debtors withhold the wherewithal to the creditors to operate

23   the aircraft that they say they've returned, they should be

24   responsible for the aircraft.

25         I can tell you that we've made requests for the

maintenance data which is almost the most important piece of
this equation.  There is no way to monetize the absence of the
maintenance data and the manuals that the aircraft are
accompanied with.  Those are also items which are referred to
in 1110, I might add.

THE COURT:  Yes.

Didn't Congress tell us exactly what has to be
returned or made available in describing the equipment and I
assume that was written by the aircraft lending industry and
it's right there.

MR. HIERSTEINER:  And we don't have it and because we
don't have it we don't have --

THE COURT:  I don't have it either by the way.

MR. HIERSTEINER:  No, I'm sure you don't.

My inquiry is whether or not the debtors have it
because we haven't been able to extract it from them.

Lastly, Your Honor, there are as Mr. Richman
indicated, a number of provisions in the leases that refer to
return conditions and I won't belabor them but they do run
contrary in many instances to the proposal that the debtor has
made for the rejection of the aircraft.  In particular, the
fact that the aircraft should be returned within the contiguous
United States to a major airport agreed between the creditor
and the debtor that the aircraft be re-registered, that the
collateral engines be on wing, that the air frame and the

1   engines be certified as airworthy and, lastly, to repeat that

2   the logs, manuals and maintenance data be provided.

3         THE COURT:  Well, Congress picked up some of that in

4   describing the equipment but some it did not and I certainly

5   understand the concern of many aircraft lessors with regard to

6   other carriers that engines are moved but if the engine of this

7   plane happens to be in the shop, it seems to me that the

8   parties have some obligation to act reasonably under the

9   circumstances.

10        MR. HIERSTEINER:  We're willing to act reasonably,

11   Your Honor, but we're concerned that the debtor is attempting

12   to tilt the playing field by establishing a rejection date

13   before it in fact may have made the aircraft available to us

14   even if they didn't return it because without those logs and

15   maintenance data it's not an airplane.  We can't fly it.  We

16   can't market it, we can't fly it.

17        THE COURT:  All right.

18        MR. HIERSTEINER:  The last thing I'd like to say,

19   Your Honor, is that there was a reference in the debtor's

20   response to the automatic stay and that a reference in the

21   order to the automatic stay was not necessary.  In general, I

22   would agree with that, however, in this case we are trustee for

23   transactions in which the debtor or one of the debtor entities

24   is an owner/participant in a financing transaction.  They may

25   not be the 100 percent owner but they are an owner/participant

1   and we would like to be sure that the grant of the rejection of

2   the lease, we do not face the down road an argument that the

3   automatic stay precludes us from taking remedies with respect

4   to the ownership of the aircraft since that would be the

5   debtor.

6           Thank you.

7           THE COURT:  It seems to me that that would be a

8   drafting issue to work out with regard to the specific order.

9           MR. HIERSTEINER:  Happy to try.

10          THE COURT:  All right.

11          MR. HIERSTEINER:  Thank you, Your Honor.

12          MR. MCAULEY:  Good morning, Your Honor.

13          Thomas McAuley on behalf of Aviation Leasing and Pent

14  Aviation, three of the six that were still listed on Exhibit A.

15          As I mentioned previously, we filed our response late

16  last night with a couple of declarations saying why we filed

17  our response late last night and I appreciate Your Honor

18  hearing us this morning.

19          I also would file motion my motion for pro hac vice.

20          THE COURT:  Right.

21          That will be granted.  You need to file a disk with

22  the Court and an order.

23          MR. MCAULEY:  Thank you, Your Honor.

24          To just pick up a couple of points, Section 1110(c) -

25  - first of all, I will say that although the debtor has

1 obviously met with some people and moved them to Exhibit B, we

2 have not had a chance.  Our client was facing down a shotgun

3 so-to-speak and so we're here.  We're certainly willing to be

4 reasonable and speak with the debtor.

5          THE COURT:  Well, I'm sure as soon as this hearing is

6 over I'm sure that can be arranged.

7          MR. MCAULEY:  Thank you, Your Honor.

8          With respect to 1110(c), it's a self-executing

9 provision similar to 365(d)(3) for instance.  It's a provision

10 that the Court can condition a rejection order on without the

11 requirement of a motion as Your Honor had noted and in an

12 instance like this it doesn't make sense to simply get a bare

13 bones rejection and place the onus on the lessors to come in

14 and seek further relief.  They want the relief that they want.

15  This should be conditioned based on the lessor's ability to

16 get the appropriate return of the aircraft as well as all the

17 other materials.

18          That's really the only additional point I'd like to

19 make.

20          THE COURT:  Thank you.

21          MR. MCAULEY:  Thank you.

22          MR. LIPKY:  If I may, Your Honor, Douglas Lipky on

23 behalf of several aircraft lessors.

24          I have just one concern and request one

25 clarification.

1       We do not have any aircraft on Exhibit A.  By
2  agreement, we've agreed to continue the arguments while we work
3  out arrangements with the debtors relating to our twenty-
4  something aircraft that are on Exhibit B.

5       I'm concerned about a ruling by Your Honor relating
6  to these seven aircraft that are sitting in the desert which
7  may be quite different than the twenty that we have that are
8  not that it will be the rule of the case, for example --

9       THE COURT:  Well, you can certainly make any argument
10 on the general issues today that may be relevant to those
11 planes on Exhibits A and B but are you agreeing with the
12 debtors who take the position that it's really premature to
13 decide any of these issues and we should leave them all to a
14 later date and to a motion for a preliminary injunction or a
15 proof of administrative claim or a general unsecured claim?

16      MR. LIPKY:  If the agreement -- for example, the nunc
17 pro tunc effect of the orders --

18      THE COURT:  Well, do you have anything to say?  I
19 assume you don't want the orders to be nunc pro tunc?

20      MR. LIPKY:  We do not.

21      THE COURT:  Do you have anything in addition to the
22 argument that Mr. Richman made on that issue?

23      MR. LIPKY:  The only addition that I would make is
24 that it's extremely extraordinary relief and I don't think,
25 particularly with respect to the Bs, that the debtor has met

1   the burden that it's that type of extraordinary relief that it

2   would have nunc pro tunc effect.

3        THE COURT:  I don't think that I'm looking for nunc

4   pro tunc to the date of the petition, they're looking for nunc

5   pro tunc to the date that they actually state, "We're going to

6   reject your contract" and I'm not sure that the issue would

7   have much relevance.

8        If we set up a very abbreviated schedule where the

9   debtors have to finally fish or cut bait on a given date and

10  they can have a hearing three days later as long as you can get

11  an opportunity to be heard if you want to on that rejection,

12  then we're really talking about a three day period.  I'm not

13  sure that's worth --

14       MR. LIPKY:  I don't have a problem with that.

15       I'm sorry, excuse me.

16       THE COURT:  That's not, I don't think, worth arguing

17  too long about.

18       Is that what we're talking about, Mr. Ellenberg?

19       MR. ELLENBERG:  Nunc pro tunc is requested only as to

20  A.  It is not requested as to B.

21       THE COURT:  It is not requested as to B.

22       MR. LIPKY:  Okay.

23       With that clarification, I'm fine.

24       THE COURT:  All right.

25       MR. LIPKY:  Again, Your Honor, if Your Honor rules

1   nunc pro tunc on As that if they ask for it later when they

2   give that short notice that that would not be the rule of the

3   case that would hurt us on the Bs.

4        THE COURT:  No.

5        But if it's a three day issue I don't think we're

6   going to spend too much time arguing that issue.

7        MR. LIPKY:  Very good.

8        Thank you, Your Honor.

9        MS. ROSENBERG:  Good morning, Your Honor.

10       Risa Rosenberg from Milbank on the ad hoc committee.

11       Even with the changes to Exhibit A, members of the

12  committee have interest in two of the planes in the revised

13  Exhibit A and have interest in many of the planes on this

14  proposed Exhibit B.

15       THE COURT:  What do you have to add to the arguments

16  that have already been made?

17       MS. ROSENBERG:  Well, I want to address a technical

18  point on the debtor's refusal to provide relief from the

19  automatic stay because they say it's not necessary.  I think

20  they are incorrect as a matter of law; unless you are under

21  1110 where they have actually surrendered and returned the

22  aircraft.

23       THE COURT:  You think it would be appropriate to

24  include in this order the type of language that we see in many

25  that to the extent necessary "the automatic stay is hereby

1  modified to permit the foregoing transactions to take place"?

2           MS. ROSENBERG:  Yes, Your Honor, and we had proposed

3  such language to the debtor and were unable to reach agreement

4  but we do believe it is necessary, both for abandonment and for

5  rejection.

6           On abandonment, the automatic stay is terminated as

7  to the estate but not as to the debtor and even though it's a

8  little bizarre when you talk about corporations, there is a

9  difference between the debtor's estate and the debtor-in-

10 possession and the debtor.  So abandonment of the aircraft does

11 not take it out the debtor and, therefore, does not take it out

12 of 362(a)(5).  So you need automatic stay relief for

13 abandonment.

14          For rejections, I think Congress noted that there was

15 a glitch because they fixed it in the amendments that aren't in

16 effect yet; the new 365(p)(1) terminates the automatic stay

17 when there's a rejection of personal property.

18          THE COURT:  Well, why don't I hear from Mr. Ellenberg

19 as to why you shouldn't get some appropriate language.

20          MR. ELLENBERG:  We don't object to that, Your Honor.

21          THE COURT:  All right.

22          MR. ELLENBERG:  It was the four thousand other things

23 she wanted.

24          MS. ROSENBERG:  I don't think it was four thousand

25 but there were other things.

1          I do want to echo and reinforce the issues raised on
2    the documents.
3          Where you don't have the documents, it is
4    disingenuous for the debtor to say they have made the aircraft
5    available.  Without the documents that are necessary to even
6    move the aircraft -- you can't even move the aircraft from one
7    part of --
8          THE COURT:  Well, that's a very interesting point
9    because a number of parties are arguing that these planes must
10   be returned to, let us say, an airport in Michigan and you're
11   telling me they can't move them.
12         MS. ROSENBERG:  The debtor can because the debtor has
13   the documents.
14         THE COURT:  Oh, the debtor can?
15         MS. ROSENBERG:  But we can't.
16         THE COURT:  I see.
17         MS. ROSENBERG:  In order to move the aircraft the
18   entity that is moving it has to have the documents.
19         THE COURT:  But do you agree that if it should happen
20   in a given case that the aircraft is in the desert now and the
21   lender, having recovered possession is really planning to leave
22   the aircraft right where it is pending another transaction
23   that, perhaps, the aircraft could be returned in the desert and
24   that wouldn't make too much sense to fly the aircraft somewhere
25   and then return it?

1    MS. ROSENBERG:  I think the parties can certainly
2    agree as to a location that they would return --
3    THE COURT:  I gather from one of the preceding
4    arguments that that is so provided in some of the leases.
5    MS. ROSENBERG:  Many of the leases have either a
6    precise location or a type of location, usually within the
7    continental United States, usually either a maintenance or an
8    airport facility, but also, parties can agree to that.
9    But saying that, that doesn't address the issue of
10   the documents and maintenance logs, manuals, records, all of
11   these things, because you can't even market the aircraft.  It
12   really is, as I think, counsel for U.S. Bank described it, a
13   very expensive piece of sculpture because you basically would
14   have to rebuild it if you don't get those records and there's
15   no commitment from this debtor saying, "Maybe you'll get them,
16   maybe you won't get them."  That really is a burden.
17   The records have no value to the debtor, the ones
18   that --
19   THE COURT:  I understand your argument and I've
20   already stated that it seems to me that Congress provided in
21   1110 for a definition of what the equipment was and that
22   includes flight manuals if I recall the specific language of
23   1110 if it applies.
24   MS. ROSENBERG:  Thank you, Your Honor.
25   I do join the prior arguments that say it does apply

1  as we stated in our numerous papers.

2        MR. KRASNOW:  Good morning, Your Honor.

3        Richard Krasnow of Weil, Gotshal & Manges, LLP on

4  behalf of GE Commercial Aviation Services.

5        Your Honor, I had not noted my appearance at the

6  outset of the hearing because I really didn't have any

7  expectation that I would be standing up and addressing the

8  Court.

9        No aircraft in which we have an interest is on

10 Exhibit A and I just have a very, very narrow point that I want

11 to raise, Your Honor, and that goes to the timing of rejection

12 with respect to Exhibit B, the effective date and the like.

13       We have been engaged in what, I think, have been very

14 productive discussions with the debtor on a variety of issues

15 pertaining to potential rejections and abandonments and

16 procedures.  One of the elements of that goes to the effective

17 date of a rejection, appropriate notice periods and the like.

18       Your Honor had indicated, perhaps, specifically with

19 Exhibit B that maybe two to three days might be an appropriate

20 time frame.  I'd rather not in fact address this right now but

21 simply note that the debtor has agreed to adjourn the hearing

22 with respect to Exhibit B to October 19th which isn't that far

23 away from today and I would request in light of that, given

24 that in fact timing is part and parcel of the discussions that

25 we are having with the debtor; that rather fix in stone whether

1  it's two, three, ten --

2          THE COURT:  My intent was not to impinge on the

3  parties' ability to come to reasonable agreements on any of

4  this and I'll simply adjourn the motion without further ado.

5          My suggestion was simply to avoid the abstract legal

6  issue that could be raised; can a debtor reject in the

7  abstract?  As a mechanism for avoiding that, I'm just

8  suggesting that when they make a decision they should make a

9  final decision and then bring that on for a hearing and that

10 nobody could object to they're bringing the hearing on quickly.

11  The only issue would be could a party such as your client get

12 a fair hearing or does it impinge on the business deal of the

13 parties?

14         MR. KRASNOW:  Actually, Your Honor, I think there

15 were two issues that that goes to; first, is challenging the

16 business judgment, perhaps, a 365 issue and the other issue

17 which is actually one that we've been more focused on with our

18 discussions with Northwest has been reasonable notice, assuming

19 that aircraft is going to be returned pursuant to rejection or

20 abandonment, but reasonable notice to the secured party or the

21 lessor with respect to when that rejection would be effective

22 because as has been noted by others and, I think, Northwest

23 would concede, an aircraft is not a piece of real property.

24 It's a lot more complicated in terms of repossession.  Many

25 more arrangements need to be made.  Some parties are more adept

1  at that than others and that's really what has been the subject

2  of our discussions with Northwest.

3          So I'm here before you, Your Honor, because you had

4  indicated something about on Exhibit B, two to three days'

5  notice for parties to come in and given that the hearing is

6  going to be adjourned to October 19th, my only request is that

7  in fact that issue not be addressed in any order issued today

8  with respect to the Exhibit B aircraft.

9          Thank you, Your Honor.

10         THE COURT:  Mr. Ellenberg, any response?

11         MR. ELLENBERG:  If the Court please, just a few

12 things.

13         With respect to whether 1110(c) applies, which I

14 continue to believe the Court does not need to decide today,

15 but if we're going to look at it let's look at the entire

16 statute, not just selected parts of it.

17         If we look just at (c)(1), counsel stopped reading it

18 at a somewhat inappropriate point because it says that "the

19 trustee shall immediately surrender and return when they are

20 entitled pursuant to (a)(1) to take possession of such

21 equipment."  It doesn't say "pursuant to 365" or 544 or any

22 other provision.  It says "pursuant to (a)(1)" and it goes on

23 to say "and makes a written demand for such possession from the

24 trustee."  We haven't received any written demands and their

25 rights under (a)(1) have not been triggered.

So with all due respect to Judge Marx, we think the correct interpretation of this statute is that unless there is a triggering under (a)(1) there is no applicability of (c) and, indeed, we believe that (c) really just rules that the party doesn't have to file a motion for relief from the stay, that if we don't make the (a)(2) undertaking then they're immediately entitled to the surrender and return of the aircraft. We don't dispute that but we don't believe that what we're doing here triggers that and we certainly don't believe that what we're doing here can be conditioned on compliance with (c)(1) and that's really, I think, the issue, Your Honor, that most of the objections miss.

We're not refusing to return records, we're not refusing to return engines, we're not refusing to do anything. What we're saying is that the relief we're seeking here today does not need to be conditioned on any of those things. We'll do whatever else we need to do under the law but everything we're required to do isn't at issue in this hearing today. The only thing at issue today is are the leases rejected? Are the planes abandoned? If we just look at (c)(2), Your Honor, the fact that (c)(1) is not a conditioned precedent to the effectiveness of a rejection is made absolutely clear because (c)(2) says that "at the time the trustee is required to surrender," not at the time they have surrendered and returned but at the time they're "required to surrender and return the

1  lease shall be deemed rejected."  So (c)(2), itself, says the

2  rejection triggered by (a)(1) is immediately effective,

3  notwithstanding that surrender and return are not complete.

4           THE COURT:  Well, it doesn't say "immediately

5  effective," it doesn't say "as of the date of the filing of the

6  petition or the order for relief or the date of the motion," it

7  says "on the date when the required action on the part of the

8  debtor comes into effect."

9           MR. ELLENBERG:  No, Your Honor.

10          It says, "At such time as the trustee is required

11  under Paragraph 1 to surrender and return the equipment."  So

12  that is the time.  It's the time that we're required -- and

13  (c)(1) says that we're required to do it immediately.

14          So it's the requirement that triggers the rejection,

15  not the compliance with the requirement and that's absolutely

16  clear and, again, that's even assuming that the supplies --

17          THE COURT:  You just said that you're not required,

18  there has been no requirement to date.

19          MR. ELLENBERG:  That's correct.

20          THE COURT:  Because there's been no written demand.

21          MR. ELLENBERG:  That's correct, Your Honor.

22          But even if we're reading that wrong, if the issue

23  here is can our rejection or abandonment be conditioned on

24  compliance with (c)(1), that's the real issue before the Court

25  today and there's absolutely no support and not a single case

1  that says that it's a condition to the effectiveness of

2  rejection or abandonment.  That's the issue.

3          THE COURT:  I understand.

4          MR. ELLENBERG:  Okay.

5          Your Honor, with respect to the engine in Germany,

6  that is an unusual case.

7          THE COURT:  I hope so.

8          But it seems to come up in every airline bankruptcy

9  that I've ever been involved in.

10          MR. ELLENBERG:  I'm sure that's correct, Your Honor,

11  but particularly --

12          THE COURT:  Not always Germany but usually some

13  foreign nation.

14          MR. ELLENBERG:  -- particularly with respect to

15  Exhibit A it's an unusual case and in general, Your Honor, we

16  have been agreeing that we will return aircraft in the 48

17  contiguous states.

18          So, again, many of the requests here are not

19  unreasonable and we're trying to meet them.  The issue is does

20  today's motion implicate them?

21          With respect to insurance, Your Honor, they can get

22  their own insurance.  They're on notice.  Are we required to

23  insure these planes forever?  When does our obligation to

24  insure them stop?  They're on notice.  We're giving them thirty

25  days.  If they're worried beyond that point, then they can get

1  their own insurance.  If we have to pay for that, they think we

2  have to pay for that, they can file a claim and they can bring

3  an action.

4       I think it's also interesting, Your Honor, how the

5  concept of surrender and return seem to expand every time

6  somebody else got up to speak.  One assertion is that it must

7  mean whatever's in the lease or the loan agreement.  As Your

8  Honor observed, the statute simply doesn't say that.  The

9  statute does say certain things but we've heard many other

10  things that we were supposed to do like the engines on wing and

11  certified air brake.  That's nowhere in 1110.  That's the

12  problem we have trying to meet the various demands is that it's

13  an ever-expanding list and everyone has their own view as to

14  what we're obligated to do under 1110(c)(1) and we'll deal with

15  that but that's an issue for another day.

16       I think that's all I have, Your Honor.

17       THE COURT:  All right.  Thank you.

18       One final word, Mr. Richman, and then I'll take a

19  brief recess.

20       MR. RICHMAN:  Thank you, Your Honor.

21       I just want to take issue with the construction of

22  the statute because I respectfully have to disagree with Mr.

23  Ellenberg.

24       Section 1110(a)(1) is a general rule.  1110(a)(1)

25  applies to all aircraft leases and it says that the financiers

1  are not estopped by the automatic stay except in circumstances

2  of (a)(2).  So the general rule is that the automatic stay

3  doesn't apply, you can repossess immediately.  The section I

4  was reading from which I only stopped because Your Honor

5  indicated that you had read it and was not the section that Mr.

6  Ellenberg was reading from was (c)(1) which says that in any

7  case under this Chapter, all of Chapter 11, that surrender and

8  return applies when the secured party has the right to take

9  possession.  Mr. Ellenberg was reading from (c)(2).  (c)(2), I

10 submit, is the section that tells you what happens if the sixty

11 days expires under (a)(2) and, therefore, the secured party can

12 make demands or it applies -- because it tells you that in

13 those circumstances the lease is deemed rejected.  Well, we

14 don't need (c)(2), it doesn't apply here at all because in

15 (c)(2) we're not dealing with a deemed rejection, we're dealing

16 with the debtor's attempt to reject in the first sixty days.

17 So in that case (c)(1) applies because, now, we have the right

18 to take possession.  So to say that, "Well, it doesn't really

19 apply because we haven't yet made the demand for the return" is

20 to say that "we don't have a concept of anticipatory

21 repudiation anymore" and it's kind of silly to say -- I mean

22 the argument has been briefed and it's before the Court and to

23 say, "Well, technically speaking, because we haven't gotten to

24 tomorrow yet when we can actually demand this, that doesn't

25 apply," is really, I think, an inefficient way to avoid the

1  issue and in fact we did serve a notice on them which said,

2  "When you reject we're going to demand possession" because we

3  couldn't yet demand possession so they know we're going to

4  demand possession when they reject and so, again, I would say

5  that (c)(1) is going to come into play and it's not limited the

6  way Mr. Ellenberg described to only a situation where they are

7  required.

8       Section 1110 applies because 1110(a) applies to all

9  secured financed leverage leases in the aircraft industry.  So

10 1110 applies and 1110(c) has to apply if they are acting to

11 reject the lease in the first sixty days.  There's nothing in

12 the Bankruptcy Code that says that you can ignore 1110 if

13 there's an action in the first sixty days.

14      THE COURT:  Give me a few minutes and I'll issue a

15 decision on this.

16                         (Recess.)

17      THE COURT:  Be seated.

18      These are motions by the debtors for an order

19 pursuant to Section 365 and 544 of the Bankruptcy Code

20 authorizing rejection or abandonment of certain aircraft.

21      It appears that only leases to be rejected are

22 currently the subject of the aircraft on Exhibit A to the

23 motion.

24      Creditors claiming to be lessors of the aircraft have

25 objected to certain aspects of the motion and lenders claiming

security interests in the aircraft have made very similar objections.

None of the parties has questioned the right of the debtors to reject leases or abandon collateral to the secured party or the business judgment of the debtors in taking the indicated action. The debtors suggest that I stop here and not decide any of the collateral issues that have been raised and ably briefed by the parties. Ordinarily, I would happily accept this position and leave any issues that don't need to be decided today to a later date. I do leave the specific resolution of the disputes between the parties to a later date. On the other hand, I think under the circumstances I must provide some guidance so that we do not have multiple motions for preliminary injunctive relief and so that we avoid to the greatest extent possible disputes over administrative claims and so that I provide some indication of my views based upon the arguments that the parties have in fact made.

The issues raised are two-fold; first, the objectors claimed certain rights under Section 1110 of the Bankruptcy Code that, they argue, restrict a debtor's usual rights with respect to the rejection of a lease or abandonment of property. As a related matter, certain objectors claim that the debtor's proposed retroactive rejection either violates Section 1110 or should not be approved under the general provisions of Section 365 because the circumstances here are extraordinary.

1    Some of the parties also object to the rejection of
2 aircraft on Exhibit B to the motion which is called a
3 provisional rejection or a conditional rejection and said to be
4 unauthorized under the Bankruptcy Code.

5    With regard to Exhibit B, I'll simply adjourn the
6 matter to the 19th of the month and we can deal with all
7 remaining Exhibit B issues if any at that time.

8    With respect to Exhibit A aircraft, there is no
9 question that these debtors are subject to Section 1110
10 generally.  There is also no question that Section 1110 gives
11 lessors of aircraft rights over and above the rights of other
12 lessors and secured creditors with a security interest in
13 aircraft, See, In Re:  Air Vermont, Inc., 761 F.2d 130, 2d.
14 Cir., 1985.  However, since Congress gave such parties
15 extraordinary rights under Section 1110, even amending the
16 statute to reinforce certain rights, it is important also not
17 to read into the words of the statute rights that Congress did
18 not afford.  With these basic principles in mind, let's look at
19 the issues that have been raised.

20    Section 1110.  The debtors claim that Section 1110 is
21 not implicated with respect to the surrender and the return of
22 the aircraft because they are still within the initial sixty
23 day period and that within the specific language of Section
24 1110(c)(1), no lender or lessor has made a specific written
25 demand for return of aircraft.  Indeed, during this period they

probably could not.  The lenders and lessors cite Judge Marx'

unreported order in <u>In Re:  Atlas Worldwide Holdings, Inc.</u>, 04-

10792, Bankruptcy Court, Southern District of Florida dated May

7, 2004 as the only authority directly on point.  There, a

court reasoned that the basic surrender and return obligations

of Section 1110(c)(1) apply "if at any time after the date of

the order for relief the lessor is entitled to take possession

and makes a written demand, the debtor shall immediately

surrender and return the equipment."  The Court noted that this

obligation commences at any time after the date of the order

for relief and that a rejection order should not logically give

a lessor any fewer rights.  It stated, "Section 1110(c)(2) says

that once a party is entitled to take possession under

1110(a)(1) the lease is rejected.  By this order the Court

concludes that the converse is also true, upon rejection of the

lease under 365 a lessor is entitled to possession under

Section 1110(a)(1) and to immediate surrender and return under

Section 1110(c)(1)."  It is true that no demands have been made

under the strict terms of Section 1110(c)(1) but that should be

excused under the circumstances where the debtors have made the

motion and have made the demand superfluous under the

circumstances.  The Court adopts the analysis of Judge Marx but

this does not mean, as some of the objectors argue, that the

debtors must comply with all of the return provisions of a

given lease or security agreement or that the debtors must

1  "propose procedures for the rest of the rejection and

2  abandonment process for creditors to review and be heard on."

3  That is precisely what Section 1110 does not provide.  Section

4  1110(a)(1) of the Bankruptcy Code states that the right of a

5  lessor or secured party to take possession of the equipment in

6  compliance with a security agreement or lease, etc., shall not

7  be limited.  The corresponding obligation of the trustee or

8  debtor-in-possession is to surrender and return the property.

9  Congress did not require surrender and return of the property

10 in compliance with the security agreement or lease, no doubt

11 recognizing the cost and burdens this would place on the

12 debtors, their estates and their other creditors.

13        The objectors have cited non-Section 1110 cases for

14 the proposition that surrender and return mean something more

15 than "go and pick it up," See, In Re: Smith, 207 BR 26,

16 Bankruptcy Northern District of Georgia, 1997, where the

17 Chapter 13 debtor told a finance company to pick up the car at

18 a garage and pay the repair and storage bills.

19        This Court is not at this time going to set the

20 precise surrender and return requirements as those terms are

21 used in Section 1110(c).  The hallmark as in any case is

22 reasonableness.  If the collateral of property is in storage

23 and is to remain in storage in the desert, presumably, it

24 should be returned there.  If individual lessors or secured

25 creditors have administrative claims because of the debtor's

failure to comply with the surrender and return provisions of
Section 1110, they will not lose these rights because of the
order on these motions to reject and these rights can be
determined on a case-by-case basis on motions for payment of
administrative claims or motions with respect to the creditor's
general claims.

On the other hand, the hallmark of Section 1110 is
speed.  Congress heeded the insistence of aircraft lenders and
lessors that they be able to retrieve their property without
delay.  It will be difficult to convince this Court that a
lender has acted reasonably if it tarries in accepting
surrender and return or taking possession of its property.
Moreover, in a determination of what constitutes an
administrative expense, the usual principles of In Re:  Mammoth
Mart as adopted by the Second Circuit in Trustees of
Amalgamated Insurance Fund v. MacFarlands, 789 F.2d 98 101, 2d.
Cir. 1986, will apply.  That is not to say that the debtors
cannot be liable for unreasonable surrender and return policies
and as I stated, I am not making any final determinations
today.  All rights of the parties are reserved but I would
except from this the right to act unreasonably under the
circumstances.

That brings up the question of the date or rejection
of the contract.  The debtors state correctly that in certain
cases rejection has been made retroactive.  Lessors correctly

note that this relief usually requires extraordinary

circumstances.  It appears that the key to this issue is,

again, Section 1110 which deals with the effective date of

rejection.  Section 1110(c)(2) provides that "at such time as

the trustee is required under Paragraph 1 to surrender and

return equipment described in subsection (a)(3), any lease of

such equipment and any security agreement or conditional sale

contract relating to such equipment if such security agreement

or conditional sale contract is an executory contract shall be

deemed rejected."

If the Court holds that (c)(1) applies, despite the

lack of a written demand, (c)(2) should also apply, setting the

date for the rejection to be deemed effective.  This is not the

filing date of the case or the filing date of the motions, that

would be particularly unreasonable in this case, it would

appear, because of the fact that there has been significant

negotiation since the filing date.

In any event, the debtor has been paying for the

storage costs and has been insuring the property but it would

seem to me that under (c)(2) the appropriate date would be the

date for this particular motion of the order providing for

rejection and in all cases I would certainly look to (c)(2) for

the appropriate date of rejection.

The remaining issues relate to the aircraft on

Exhibit B and that motion is adjourned until October 19th.

1          We have hearings on for October 14th, I believe.

2   Let's set those for 11:00 rather than 10:00 and for October

3   19th, we'll start at 10:00.

4          Now, why don't I let the parties discuss a subsequent

5   date for hearings.  I will be unavailable during the period of

6   the National Conference of Bankruptcy Judges when I assume many

7   counsel will also be unavailable.  That's the first week of

8   November.  So we can certainly have hearings the week before,

9   not Friday, but on the 27th is certainly possible and then the

10  second week of November should be available.  So we should

11  probably set another date.

12         Mr. Ellenberg.

13         MR. ELLENBERG:  Yes, Your Honor.

14         With respect to Exhibit A and particularly in light

15  of your last ruling are you so ordering today the relief we've

16  requested?

17         THE COURT:  Well, I think that the parties should

18  have an opportunity to see the form of an order and there was

19  some question as to what planes are really on Exhibit A and

20  what planes aren't.  So I'd ask you to try to see if you can

21  agree on the form of an order this afternoon and I'll enter the

22  order as soon as you have an agreement.

23         If there is any delay we can make the date today

24  rather than the date of entry of the order.

25         MR. ELLENBERG:  Thank you, Your Honor.

1          THE COURT:  Thank you very much.

2                    * * * * *

1                          * * * * *

2       I certify that the foregoing is a transcript from an

3   electronic sound recording of the proceedings in the above-

4   entitled matter.

5

6

7                          SHARI RIEMER

8

9   Dated:  October 8, 2005

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## EXHIBIT C

**(Northwest October 19, 2005 Transcript)**

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2
    ----------------------------------------X
 3                                          :
    In re:                                  :    Case No. 05-17930
 4                                          :
        NORTHWEST AIRLINES CORPORATION,     :
 5                                          :    One Bowling Green
                                            :    New York, NY
 6                              Debtor.      :    October 19, 2005
    ----------------------------------------X
 7

 8                       TRANSCRIPT OF MOTIONS
                  BEFORE THE HONORABLE ALLAN L. GROPPER
 9                    UNITED STATES BANKRUPTCY JUDGE

10
    APPEARANCES:
11
    For the Debtor:              GREGORY M. PETRICK, ESQ.
12                               CADWALADER, WICKERSHAM & TAFT, LLP
                                 One World Financial Center
13                               New York, New York  10281-0006

14                               MARK C. ELLENBERG
                                 CADWALADER, WICKERSHAM & TAFT, LLP
15                               1201 F Street N.W.
                                 Washington, D.C.  20004
16
    For The Committee for
17  Unsecured Creditors:         LORENZO MARINUZZI, ESQ.
                                 TODD M. GOREN, ESQ.
18                               OTTERBOURG, STEINDLER, HOUSTON &
                                 ROSEN
19                               230 Park Avenue
                                 New York, New York  100169-0075
20
    For the U.S. Trustee:        BRIAN MASUMOTO, ESQ.
21
    For U.S. Bank and
22  U.S. Bank Trust:             RICHARD HIERSTEINER, ESQ.
                                 PALMER & DODGE
23                               111 Huntington Avenue at Prudential
                                 Center
24                               Boston, Massachusetts  02199-7613

25
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3    For GE Commercial
      Aviation Services:        RICHARD P. KRASNOW, ESQ.
 4                              WEIL, GOTSHAL & MANGES, LLP
                                767 Fifth Avenue
 5                              New York, New York  10153

 6    For Pacific Gas and
      Chromalloy:               JULIE D. DYAS, ESQ.
 7                              HALPERIN BATTAGLIA RAICHT, LLP
                                55 Madison Avenue, 9th Floor
 8                              New York, New York  10022

 9    For National City
      Leasing Corporation:      HEATHER LENNOX, ESQ.
10                              JONES DAY
                                North Point, 901 Lakeside Avenue
11                              Cleveland, Ohio  44114-1190

12    For the Ad Hoc Committee
      of Public Aircraft
13    Finance Creditors:        RISA M. ROSENBERG, ESQ.
                                MILBANK, TWEED, HADLEY & MC CLOY
14                              One Chase Manhattan Plaza
                                New York, New York  10005-1413
15
      For Bank of America;
16    MBIA Insurance Company;
      Goldman Sachs Credit Partners;
17    Halifax Bank, PLC;
      Sumotomo Bank; and
18    Transamerica Aviation:    JOHN I. KARESH, ESQ.
                                VEDDER, PRICE KAUFMAN & KAMMHOLZ
19                              805 Third Avenue
                                New York, New York  10022
20
      For Wachovia Bank:        JASON H. WATSON, ESQ.
21                              ALSTON & BIRD, LLP
                                One Atlantic Center
22                              1201 West Peachtree Street
                                Atlanta, Georgia  30309-3424
23
      For UBS and
24    Morgan Stanley:           MARK FUSEY, ESQ.

25
```

                        UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF NEW YORK

 3   For Lehman Brothers,
     et al:                    JAMES L. BROMLEY, ESQ.
 4                             CLEARY GOTTLIEB STEEN & HAMILTON
                               One Liberty Plaza
 5                             New York, New York  10008-1470

 6

 7   Court Transcriber:        LISA LUCIANO
                               TypeWrite Word Processing Service
 8                             356 Eltingville Boulevard
                               Staten Island, New York 10312

 9

          Proceedings recorded by electronic sound recording,
          transcript produced by transcription service.

THE COURT:  Northwest Airlines.

May I have appearances, please?

MR. ELLENBERG:  If the Court, please, Mark Ellenberg, Cadwalader, Wickersham & Taft, on behalf of the debtor.

MR. MARINUZZI:  Good morning, Your Honor.  Lorenzo Marinuzzi and Todd Goren from Otterbourg, Steindler, Houston & Rosen on behalf of the official committee of unsecured creditors.

MR. MASUMOTO:  Brian Masumoto for the Office of the United States Trustee.  Good morning,  Your Honor.

MR. HIERSTEINER:  Good morning, Your Honor.  Richard Hiersteiner, Palmer & Dodge on behalf of U.S. Bank and U.S. Bank Trust as indentured trustee.

MR. KRASNOW:  Good morning, Your Honor.  Richard Krasnow, Weil, Gotshal & Manges, on behalf of GE Commercial Aviation Services.

MS. DYAS:  Good morning, Your Honor.  Julie Dyas with Halperin Battaglia Raicht, on behalf of Pacific Gas and Chromalloy.

THE COURT:  All right.  Anyone who is going to appear is welcome to sit up front.  I'm sure you bought a seat at the table.

MS. LENNOX:  Good morning, Your Honor.  Heather Lennox of Jones Day on behalf National City Leasing Corporation.

MS. ROSENBERG:  Good morning, Your Honor.  Risa

Rosenberg from Milbank Tweed on behalf of the ad hoc committee of public aircraft finance creditors.

THE COURT:  I assume the ad hoc committee has filed a statement pursuant to bankruptcy Rule 2019?

MS. ROSENBERG:  We are in the process of working on that, Your Honor, but it will be filed promptly.

THE COURT:  All right.  But I know you're representing a group of creditors.

MS. ROSENBERG:  Yes, Your Honor.

THE COURT:  Thank you.

MR. KARESH:  Good morning, Your Honor.  John Karesh of Vedder Price for the Bank of America, MBIA Insurance Company, Goldman Sachs Credit Partners, Halifax Bank, PLC: Sumotomo Bank [Ph.], and Transamerica Aviation.

MR. WATSON:  Your Honor, Jason Watson from Alston & Bird on behalf of Wachovia Bank, N.A. as equipment trust trustee.

THE COURT:  All right.

MR. FUSEY:  Good morning, Your Honor.  Mark Fusey [Ph.] from [inaudible] & Cutcheon [Ph.] on behalf of UBS & Morgan Stanley.

THE COURT:  All right.  Mr. Ellenberg?  Mr. Petrick.

MR. PETRICK:  Good morning, Your Honor.  I apologize for being late.

THE COURT:  No, I thought with Mr. Ellenberg here

alone that we were perhaps going to have a more-simplified

hearing, but perhaps it will be a bit simplified.  I do

appreciate the debtor's efforts to get me an agenda, which is on

-- put on our system, but our system was down because of the

enormous number of filings last week and the fact that they had

to be digested before we could go into the new system.

I think in the future you're filing your agendas the

day before the hearing and that will be available to all who

are interested in what is actually on the calendar.

MR. PETRICK:  Thank you, Your Honor.  Gregory Petrick

of Cadwalader, Wickersham & Taft, on behalf of Northwest.

Your Honor, there are a number of items on the agenda

today, most of which are being adjourned to another date.  Your

Honor, the contested matter on the calendar relates to the

rejection of the so-called Exhibit B aircraft and Mr. Ellenberg

will be addressing that.

If I may, Your Honor, I would like to run through the

remainder of the agenda and let you know where we stand with

respect to the other matters.

THE COURT:  Are you objecting to going over the

agenda, Counsel?

COUNSEL:  I'm not objecting to anything, Your Honor.

We just can't hear anything.

THE COURT:  All right.  Well, come forward.

COUNSEL:  I think maybe the microphone [inaudible].

THE COURT:  You can -- I'm sure you could sit next to
Mr. Ellenberg without any concessions that -- I'm afraid you
have to -- that may or may not work.  If it does, I will
appreciate whoever is able to -- good.  Well, thank you.

But if you talk right into the microphone --

MR. PETRICK:  Yes, Your Honor.

Your Honor, the debtor's motion authorizing the use of
existing bank accounts and to maintain existing cash-management
systems was approved by the Court subject to a limited
objection by Fifth Third Bank.  We are continuing our
discussions with Fifth Third Bank regarding a fifteen-thousand-
dollar cash collateral account that they hold, an account that
they say is subject to cash collateral and we want to move --
continue that objection from today until October 27th.

THE COURT:  All right.  Then we're adjourning that
last piece of the cash management order to October 27th.  I
think you've given me a final cash management order.  Actually,
I signed one.

I had one question.  In the heading of the cash
management order there's a reference to a super-priority status
for inter-company receivables.  Was that actually maintained in
the order as finally entered?

MR. PETRICK:  I believe it was, Your Honor.

THE COURT:  It is?  All right.  I'd just appreciate
your checking that.

MR. PETRICK:  I will check that, Your Honor.

THE COURT:  So we're just adjourning then --

MR. PETRICK:  The limited objection of --

THE COURT:  -- small piece.  Right.

MR. PETRICK:  -- Fifth Third Bank's objection.

THE COURT:  All right.

MR. PETRICK:  Your Honor, the next matter is the debtor's motion to reject certain unexpired non-residential real property leases.  We had received one objection from the Metropolitan Airport Commission.  We have resolved that objection.  The objection related to the effective date of the rejection and the parties have agreed that it will occur no later than October 7th, 2005, and otherwise reserve their rights to contest -- to argue about what the proper date is.  We have a stipulation that has been executed by the debtors.

THE COURT:  All right.  You can hand that up to the PN.

MR. PETRICK:  Thank you, Your Honor.

Your Honor, the next matter on the agenda is the debtor's motion to establish reclamation procedures.  There was one objection we received from Chromalloy Gas Turbine Corporation and Pacific Gas Turbine Center.  Both those objections have been resolved and there are no other objections and so we would pose to submit an order to approve those procedures.

THE COURT:  All right.  Does anybody wish to be heard with regard to the reclamation procedures?

[No response.]

THE COURT:  Then that order will be entered.

MR. PETRICK:  Thank you, Your Honor.

Your Honor, the next matters on the agenda are a number of interim retention orders for debtor's professionals. All had objection dates of October 17th, I believe, and with respect to all the debtor's -- all the professionals, no objections were received.

At the request of the United States Trustee's office we are withholding presentment of a final order with respect to professionals The Paul Hastings Firm [Ph.] and the Huron Consulting Firm [Ph.] so that the United States Trustee has certain questions about their applications that are not yet resolved.  So we would propose to submit final orders for the retention of the Cadwalader firm, Arnold & Porter, the Groom Law Group [Ph.], The Boyce Schiller firm. [Ph.], Dorsey & Whitney [Ph.], and Curtis Malay [Ph.], none of whom have objected and all of whose issues with the United States Trustee's office has been resolved.

THE COURT:  Well, all right.  Does anybody wish to be heard with regard to the entry of final orders with regard to the law firms and other professionals who have just been named?

[No response.]

THE COURT:  We will enter, then, those orders on a final basis.  The two firms whose orders are being held will be entered, unless any party wishes to be heard, after the United States Trustee's questions are resolved and assuming they're resolved.

I also received on my desk this morning a proposed interim order with regard to the retention of Ernst & Young, LLP as accountants and auditors for the debtors.  The practice -- earlier in the case, it was at an earlier stage -- was to enter retention orders on an interim basis giving all parties an opportunity to object to the retention of the firm on a final basis after they'd had an opportunity to review the order.  I would propose to proceed in that same fashion and that's apparently what the debtors are asking me to do unless anyone wishes to be heard at this stage since, obviously, we have a committee now and we have many other interested counsel.

[No response.]

THE COURT:  If no one objects, then, I will, assuming the papers are in order and the United States Trustee has no question, I'll enter the retention of Ernst & Young on an interim basis and set it down for a hearing.  I think our next hearing date is probably too soon, it's October 27th, and after that I believe we have November 16th.  Is that right?

THE CLERK:  That's right.

THE COURT:  So those are the next dates coming up.

MR. PETRICK:  Thank you, Your Honor.

Your Honor, the next application is the debtor's application to employ ordinary course professionals.  The application basically excludes from the normal Chapter 11 process professionals who are expected to bill less than $50,000 per month.  There have been no objections to that motion either, Your Honor.  I'd ask that that be approved as well.

THE COURT:  Does anybody wish to be heard?

Did we enter an order on an interim basis?

MR. PETRICK:  Yes, Your Honor.

THE COURT:  We did and this would be the final order.  All right.  As long as White & Case isn't one of the firms I'm approving, as it was earlier, I'll approve it, there being no objections.  You may certainly apply for retention of White & Case if you wish, but another judge will have to deal with it.

MR. PETRICK:  Yes, Your Honor.

THE COURT:  This was actually for Mexico.  It was the White & Case Mexican office.

MR. PETRICK:  Your Honor, the next matter is the debtors have a -- the Court has entered an interim order establishing procedures for compensation of professionals.  We have reviewed that order and -- with the United States Trustee's office.  There are no objections to that motion.  I then would enter -- we'd ask that that order be entered on a final basis as

well.

THE COURT:  Does anybody wish to be heard?

[No response.]

THE COURT:  All right.  I'll enter that order on a final basis and we'll state that I think it's important, as I have stated in other large cases, that the debtor review the applications of all professionals with the same care that any company would use in the ordinary course of business and I assume someone has been or will be designated within the corporation to review these applications with the same care, at a minimum, that the corporation would review all bills that it would be expected to pay of a legal or a professional nature; that that person be charged with the responsibility and that bills be reviewed on a current basis because it's always seemed to me that the best time to look at bills is as the amounts are being incurred.  It's unfair to the professional and unfair to all parties to have huge amounts accrue and the matter to come up years later.  The time to take steps to keep bills reasonable is as the amounts are being incurred.

I'm sure the company will do that, but I state that at the time I enter all interim-fee orders and think it's obviously particularly important in a case such as this, which is one where the amounts may appear high and they certainly may appear high in the press, rightly or wrongly.

MR. PETRICK:  Yes, Your Honor.  Certain to remind the

company of Your Honor's comments.

          THE COURT:  Goes for the committee as well,
obviously.

          MR. MARINUZZI:  Your Honor, we will be reviewing fee
applications, yes.

          MR. PETRICK:  Your Honor, the next matter on the
agenda is the adversary proceeding commenced by Northwest
against American Express.  We have now, in fact, reached a
settlement with American Express.  That settlement is being
reviewed by the committee and we would hope to bring it to the
Court for approval on the next October 27th hearing date.

          THE COURT:  All right.

          MR. PETRICK:  Your Honor, the next several matters on
the agenda are all adjourned matters.  The first is the debtor's
motion to establish procedures for claims trading and this,
Your Honor, is going to take a little bit of explanation.

          We received -- the debtors received, in connection
with the trading objection, objections from thirteen parties.
We have had extensive negotiations with a large number of
parties that have taken a great deal of time.  I believe that
we have probably resolved about ninety percent of the
objections, although there are still significant issues that
remain outstanding and we have not been able to bridge the gap.

          Late last week on Friday we were asked by the
committee to -- we had just began to review the existing orders

and the issues -- to adjourn today's hearing from today to October 27th, which we agreed to do.

We would like, Your Honor, obviously, for the interim order to be continued from now until October 27th, which has caused some issues with respect to the interim relief that's appropriate. What we would propose to do, Your Honor, is to -- we received some comments from parties late yesterday and from the committee last night. We would like to -- we have revised what I would call the new-and-improved interim order and we'd like the opportunity to circulate that to the parties who have raised objections and to have Your Honor enter that new-and-improved interim order which basically addresses many of the concerns raised in the objections.

The one issue that we have with respect to that, Your Honor, is that if we can't get consensus that this new-and-improved order is what should be entered on an interim basis, we will need an interim order to carry us from today until whenever we can get everybody on board that order. It would be our intent to try to get to the Court a new interim order that addresses, I would say, ninety percent of the concerns of the parties who have objected.

There is an additional issue, Your Honor, with respect to certain objections, certain objectors who have obligations that they undertook to take in securities of Northwest Airlines that will mature in the next week and that

is causing them, they say, certain issues with respect to the interim relief.

What I would suggest, Your Honor, is that before Your Honor agrees to close consideration of this adjournment, that we deal with the rest of the agenda so that I may have some more opportunity to talk to my colleagues from Cleary out in the hall to see if we can find a mechanism to adjourn -- so we can have their consent for the adjournment of this hearing from now until October 27th and then come back to you at the conclusion of the hearing, to either argue it before you or let us report to you what we've been able to resolve.

THE COURT:  Well, has everyone who is interested in the matter had a chance to review the order in its amended form?  Does everybody know what we're dealing with?

MR. PETRICK:  Yes, we -- I think --

THE COURT:  Everyone who is interested.

MR. PETRICK:  Yes, Your Honor.

There was an order circulated Friday.  The version that will be circulated today includes comments from the committee, which everybody has not seen, and that's the reason we want some additional time to try to circulate that order so that everybody can --

THE COURT:  That's fine.  I can certainly adjourn it until the end of the hearing today.  I can adjourn it until tomorrow if the parties want to use the twenty-four hours to

see if the issues can be narrowed and then we can adjourn it
until next week.

MR. PETRICK:  Well, perhaps, Your Honor, if we can
continue the existing interim order for twenty-four hours, I
think that might give us the opportunity to try to solve the
problems that remain.  I can circulate the revised order and
also try to address the remaining issue.

THE COURT:  All right.  Does anybody wish to be heard
on that point?

COUNSEL:  I do, Your Honor.

THE COURT:  If you say no, then I'll just adjourn it
until the end of the hearing today and we'll see where we are in
an hour.

COUNSEL:  No.

THE COURT:  All right.  We'll see where we are in an
hour.

COUNSEL:  Thank you, Your Honor.

MR. PETRICK:  Thank you, Your Honor.

Your Honor, the next adjourned matter is the motion
of the Greater Orlando Aviation Authority to compel the debtor
to segregate passenger facility charges.  That motion was
joined in by virtually every airport in the United States.  We
have I think made some progress to try to resolve that
objection and we would ask that that matter be put over to the
October 27th hearing.

THE COURT:  Does anybody wish to be heard?

[No response.]

THE COURT:  Then we'll do that.

MR. PETRICK:  Your Honor, the next items on the agenda are a large number of applications for payment of adequate protection.  All of those motions have been adjourned.  The vast majority of them have been adjourned to the November 16th date.  There are certain adjourned dates -- motions which have been adjourned but for which we did not have adjourn dates.

I could, if Your Honor wishes, read down the list of the motions which we have specific adjourn dates, and also indicate those for which we do not have an adjourn date.

THE COURT:  Was there any reason not to adjourn them all to October 16th -- pardon me, November 16th?

MR. ELLENBERG:  If the Court please, Mark Ellenberg.

Your Honor, it would, with one exception, it would certainly be agreeable to the debtor if they were all extended to November 16th.  There are seven motions filed which consist of six motions filed by Milbank New York, Ms. Rosenberg's clients, and one filed by UBS, which -- I'm sorry, U.S. Bank which requested that it only be a two-week adjournment.  If you could persuade them to go to November 16th, we would certainly agree to that.

There is one additional motion, Your Honor, which is

filed by UBS involving a single aircraft to which there is not
1110 protection and they would like to schedule a hearing date
on that motion, which would thirty to forty-five days from
today.

THE COURT:  Well, we can certainly schedule a hearing
date if we need one.  I'm not in the persuasion business, I'm in
the ruling business, so someone can tell me as to why their
matter should be adjourned until October 27th, but I don't want
to take everybody's time unnecessarily.

Is there some compelling reason why I should adjourn
this to October 27th, Ms. Rosenberg?

MS. ROSENBERG:  Thank you, Your Honor.

Well, first of all, because we were asked for a two-
week extension and that's what we agreed to --

THE COURT:  That's not the question I asked you.  Is
there a compelling reason why this needs to be heard on October
27th?

MS. ROSENBERG:  I can't give you a compelling reason
other than --

THE COURT:  Well, then I guess we'll hear it on
November 16th.

MS. ROSENBERG:  But I do have one thing to add to it.

THE COURT:  Yes?

MS. ROSENBERG:  I believe Mr. Ellenberg will agree.
The adjournment is on the same terms as the prior adjournment

that Mr. Ellenberg put on the record, with one clarification, and that clarification is the debtor's agreement not to swap engines, except in the ordinary course of maintenance or to put engines back on the right aircraft for return also applies to parts. They're not going to be swapping parts out of the aircraft during the adequate-protection period.

I believe Mr. Ellenberg, on behalf of the debtors, has agreed with that.

MR. ELLENBERG: Except in the ordinary course.

MS. ROSENBERG: Yes, on the same terms.

MR. ELLENBERG: That is correct

THE COURT: All right. Anyone else?

[No response.]

THE COURT: All right. Then we'll hear them all -- if I'm unfortunate enough, we'll hear them all on November 16th or we'll see how the matter can be resolved.

Is November 16th the right -- November 16th is probably the 60th day.

MR. ELLENBERG: It's two days after the 16th day, Your Honor, and with the exception of the UBS motion that I mentioned, I think virtually all of these have 1110 coverage, so -- actually there's one other group that doesn't, but we're hoping that because most of them involve 1110, that by November 16th we actually will have dealt with the aircraft in a more complete way.

            THE COURT:  So November 16th is a good date for our
next hearing.  I can obviously hear any party as to what an
appropriate date is.  I think we set that date without counting
the days from the date of the filing.

            MR. ELLENBERG:  Well, we had asked for one which was
after November 14th and that's the one we got.

            THE COURT:  All right.  Then it's November 16th and if
we need hearings in the mean time, I'm open for business most
days.

            Mr. Petrick?

            MR. PETRICK:  Thank you, Your Honor.

            THE COURT:  Anyone else?

            MR. FUSEY:  Your Honor, Mark Fusey for UBS.

            I don't want to take the Court's time, but we do need
a hearing on our particular client --

            THE COURT:  You'll get one.  Why don't you talk to the
debtor and call chambers and we'll get you a date.

            Anyone else?

                        [No response.]

            THE COURT:  All right.

            MR. PETRICK:  Thank you, Your Honor.

            The last two matters that I have to report on, there
were two motions filed, one by Conoco Phillips and one by
Valero Marketing for reconsideration of the fuel supply order.
 Those motions have both been resolved by the debtor.  I

understand that Conoco and Valero will both be withdrawing those motions.

THE COURT:  All right.

MR. PETRICK:  Your Honor, thank you.  That's all I have for this morning, subject to coming back on the trading order adjournment.

THE COURT:  All right.  You're welcome to use my room right next door here.

MR. PETRICK:  Thank you.

THE COURT:  Anybody who wishes to use it, they can go straight through to the room.

All right.  Now we're turning to the motion to reject the Exhibit B planes or aircraft and engines.

MR. ELLENBERG:  If the Court please, Mark Ellenberg.

Yes, Your Honor, we're here to address the rejection/abandonment motion that was filed on the first day of the case.  That motion had requested authority with respect to two categories of aircraft, Exhibit A aircraft and Exhibit B aircraft.

We had a hearing on October 7th with respect to Exhibit A and Exhibit B was continued to today.

THE COURT:  Right.  I entered an order on Exhibit A. I had considered, notwithstanding the date of the order -- it was entered until the next day and I'd considered all of the letters I received.  The order did not, as originally entered,

attach Exhibits A and Exhibit B.  So yesterday I signed an
identical order that simply attached -- virtually identical
amended order that simply attaches Exhibit A and Exhibit B.  I'm
sure all parties knew whether their aircraft was on Exhibit A
or Exhibit B.

        So that's the state of the record as of the moment.

        MR. ELLENBERG:  Thank you, Your Honor.

        Your Honor, our original request --

        MR. KRASNOW:  I'm sorry, Mr. Ellenberg.

        Your Honor said Exhibits A and B?

        THE COURT:  Or maybe Exhibit -- was Exhibit A the
only exhibit -- anyway, there was no exhibit on the order as
entered.  We didn't enter relief as to what was originally
Exhibit B and I don't -- what was the status of the order as
entered, the amended order?  Was there an Exhibit B?

        MR. ELLENBERG:  Yes, Your Honor, but only to schedule
it for today.

        THE COURT:  And that adjourned.  All it did was
adjourn the --

        MR. ELLENBERG:  That's right.

        MR. KRASNOW:  Thank you.

        THE COURT:  Adjourned the hearing to today.

        MR. ELLENBERG:  That's correct, Your Honor.

        Your Honor, our original request with respect to
Exhibit B aircraft was that the Court determined that the

debtors have authority to reject or abandon those transactions based on their current terms and that the debtor then have forty-five days within which to file an actual notice that would trigger the rejection or abandonment because the debtor believes that it is possible that if it could change some of the terms through negotiation, that it could retain some of those aircraft.

At the last hearing on October 7th Your Honor suggested that rather than have to tackle the issue as to whether that kind of contingent rejection authority was appropriate, that what we should do instead was essentially request a procedures order which would defer the determination as to the debtor's authority with respect to any particular transaction or aircraft, but that we could bring that on two-or-three days' notice.

So what we have done, Your Honor, and what we are requesting today is that the relief be modified.  We submitted an order to Your Honor last night which modifies the relief that is being requested and that order has been circulated to all of the objectors.  We began circulating that order on Monday and it went through several iterations before it arrived in the form that was delivered to Your Honor last night.  There is not consent to that order, Your Honor, which I'll get to in a minute.

What we are now requesting, Your Honor, is that we be

able to reject or abandon aircraft on two-or-three days' -- I'm sorry, on three days' notice which would be sent by electronic mail. We've been asked to add overnight mail to that this morning, which we're certainly prepared to do.

There are, I think, two categories of disputes that remain as to this order, Your Honor. The main dispute goes to the three days. The objectors, with one exception, had asked for notice periods ranging from ten to fifteen days. Of course, if we simply did nothing and just walked in with a motion, the local rules would give us ten days automatically, so it was hard for us to understand why to go beyond that. But in any even, Your Honor, we believe that the three-day notice period under the facts of the circumstances is a fair and reasonable approach, given that we do have an 1110 deadline ticking against us and that we want to exhaust all our ability to negotiate, but at the same time have the ability to let go the aircraft if we can't reach acceptable restructuring of the transactions.

So we have proposed the three-day period. The proposal is that if there are no objections within the three days, then the rejection or abandonment would be automatically effective without further order of the Court, but that if there were objections the Court would hold a hearing on the third day or the first available date after that.

THE COURT: How many aircraft are we talking about on

the -- it's now -- that are now provisionally on Exhibit B?
What was Exhibit B?  I think it's Schedule 1 to the new order.
Approximately.

      MR. ELLENBERG:  It's approximately 100.

      THE COURT:  About 100.  A large number.  And how many
individual -- individually-represented lessors -- let's do it by
lawyer.  That might be the easiest way.

      MR. ELLENBERG:  Ten or less, I think.

      MR. HIERSTEINER:  I don't know about lessors, Your
Honor.  The trustee, U.S. Bank and U.S. Bank Trust as
indentured trustee or in other capacities is involved with in
excess of ninety of those --

      THE COURT:  Ninety of them?  And GECC has how many?

      MR. KRASNOW:  Your Honor, I was going to point
something out to the Court.  Your Honor has asked a question
with respect to Exhibit B to this motion.  I think in answering
the question, and I don't know if people can answer the
question, Your Honor should take into account the fact that
Northwest has filed yet a second motion seeking to stop the
same procedures and, by my count, and I'm a lawyer so you
shouldn't count on me for accuracy as to the numbers, it's
something like 134 aircraft so that in the context of these
three days you're basically talking about something in the area
of 221 aircraft which accounts for, by our calculations,
something like a third of the fleet.

I just don't know whether or not everybody in this courtroom can say that they represent everybody --

THE COURT:  No, I just wanted an idea of how many we're talking about.

MR. KRASNOW:  No, that's why I was -- wanted to have --

THE COURT:  And how many do you have of the 234?  How many does GECC have?

MR. KRASNOW:  Your Honor, I really can't answer the question.

THE COURT:  All right.  Okay.  Please, go ahead, Mr. Ellenberg.

MR. ELLENBERG:  And there is a second motion, Your Honor, and we filed it in the same form that we filed the first motion asking for the contingent forty-five-day relief.  Our intention would be to confirm that order to what --

THE COURT:  And that motion is returnable formally when?

MR. ELLENBERG:  The 27th.

THE COURT:  The 27th.  All right.

MR. ELLENBERG:  So in any event, Your Honor, the period of notice is hotly in dispute.

THE COURT:  All right.  That's the one -- one of the main issues?

MR. ELLENBERG:  Yes.

THE COURT:  The second?

MR. ELLENBERG:  Your Honor, there have been
additional requests and, frankly, I don't know at this point how
many there are because I heard a wholly new one for the first
time this morning, that people want added to the motion going
to really return conditions, in my view.  Our position on that
is that we are going to be reasonable, as it were said, and
that we don't necessarily disagree with some of the things that
have been requested, but we don't think they belong in this
order.

We think this order is not about return conditions,
we think this order is about the effectiveness of a rejection
or an abandonment.  Every time I add one thing that somebody
requests that kind of expands us into the return-condition
mode, somebody then asks for something else.

THE COURT:  I stated before that I read all of the --
or had read to me all of the objections to the entry of the
order and I entered the order in the form that it was entered.
 That order was entered as to Exhibit A only.  I can certainly
hear any party who is concerned for some theoretical, abstract
reason that there's some vagueness or inconsistency or something
confusing about that order.

I stated on the record before and I will repeat today
and the order says as clearly as any order could say as far as
I'm concerned, that parties' rights to request an administrative

expense for their aircraft or engines are reserved, as is the debtor's ability to object to that.  I will hear, if I have to, motions in this regard at an appropriate time in the case.

The only way to determine the propriety of an administrative claim is on a case-by-case basis.  I would be delighted to do it on a general basis, but I think I would be doing a disservice to the debtors and I'd be doing a disservice to the parties.

That having been said, parties will have to convince me that the order already entered as to Exhibit A is truly inappropriate as to Exhibit B.  The notice period is a different issue.  That's a new issue --

MR. ELLENBERG:  Thank you, Your Honor.

THE COURT:  -- but I'll hear from any party who wishes to be heard.  I'll hear about all of your nervousness and concerns if you wish to put it on the record today.

MR. ELLENBERG:  Thank you, Your Honor.

And indeed, we already expanded this order somewhat beyond the Exhibit A order to try and address some of those concerns.

Your Honor, just one last point.  After I circulated the order that we delivered to the Court last night, some of my colleagues were good enough to point out some inadvertent errors that we had made.  So I have a moderately-revised order with just a few, I believe, technical corrections.