PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile:  212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al.*, | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF DEBTORS' MOTION FOR AUTHORIZATION**
**PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULES 6004, 6006 AND 9019 TO (I) ASSUME CODE-SHARE**
**AGREEMENT, AS AMENDED, WITH US AIRWAYS, INC., (II) SETTLE**
**CERTAIN CLAIMS OF THE DEBTORS AGAINST US AIRWAYS, INC.**
**AND (III) SELL CERTAIN RELATED ASSETS TO US AIRWAYS, INC.**

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")

of Mesa Air Group Inc., and certain of its subsidiaries and affiliates, as debtors and debtors in

possession (collectively, the "Debtors") in the chapter 11 cases filed in the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), pursuant to

sections 363(b) and 365(a) of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 9019,

for authorization to (i) assume, as amended, that certain code-share agreement with US Airways,

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

Inc. ("US Airways"), (ii) settle certain claims of the Debtors against US Airways, and (iii) sell certain related assets to US Airways, all as set forth in more detail in the Motion, will be held before the Honorable Martin Glenn at the United States Bankruptcy Court, Alexander Hamilton Customs House, One Bowling Green, New York, New York, 10004, Courtroom 501 **on November 18, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that any response or objection to the Motion must be filed with the Bankruptcy Court and served upon: (i) the chambers of the Honorable Martin Glenn, One Bowling Green, New York, New York 10004, Courtroom 501; (ii) Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111 (Attn: Debra I. Grassgreen and Joshua M. Fried), and Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017 (Attn: Maria A. Bove), attorneys for the Debtors, (iii) Mesa Air Group, Inc., Law Department 410 N. 44th St. Suite 700, Phoenix, Arizona 85008, (Attn: Brian S. Gillman, Esq.), (iv) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Andrea B. Schwartz); (v) Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Brett Miller and Lorenzo Marinuzzi), attorneys for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases; (vi) Latham & Watkins, 885 Third Avenue, New York, New York, 10022 (Attn: D.J. Baker) and Latham & Watkins, 355 S. Grand Ave, Los Angeles, California 90004 (Attn: Robert A. Klyman) attorneys for US Airways; and (vii) any person or entity with a particularized interest in the subject matter of the Motion, on or before **November 11, 2010, at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  October 27, 2010
      New York, New York          PACHULSKI STANG ZIEHL & JONES LLP

                         */s/ Debra Grassgreen*
                         Richard M Pachulski
                         Laura Davis Jones
                         Debra I. Grassgreen
                         Maria A. Bove
                         John W. Lucas

                         780 Third Avenue, 36th Floor
                         New York, New York 10017
                         Telephone:  (212) 561-7700
                         Facsimile:  (212) 561-7777

                         Attorneys for Debtors
                         and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[2] | (Jointly Administered) |

**DEBTORS' MOTION FOR AUTHORIZATION PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004, 6006 AND 9019 TO (I) ASSUME CODE-SHARE AGREEMENT, AS AMENDED, WITH US AIRWAYS, INC., (II) SETTLE CERTAIN CLAIMS OF THE DEBTORS AGAINST US AIRWAYS, INC. AND (III) SELL CERTAIN RELATED ASSETS TO US AIRWAYS, INC.**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries in the

above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"Debtors"), hereby file this motion (the "Motion") and represent as follows:

---

[2] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

**Preliminary Statement**

1.      Since the commencement of these chapter 11 cases, the Debtors have been engaged in an extensive restructuring of their air carrier business.  As of January 5, 2010 (the "Petition Date"), the Debtors maintained a fleet of approximately 178 aircraft.  In addition to their independent operations in Hawaii as *go!* Mokulele, the Debtors provided services to these principal carriers:  US Airways, Inc. ("US Airways"), United Airlines, Inc. ("United"), and Delta Air Lines, Inc. ("Delta").  The Debtors had three stated goals at the outset of these chapter 11 cases: (i) shed excess aircraft and aircraft equipment; (ii) restructure aircraft agreements; and (iii) renegotiate and extend their code-share agreements.

2.      The Debtors have nearly completed the first goal.  A substantial number of aircraft that were no longer necessary for the Debtors' business plan were rejected or abandoned.  To date, approximately 102 aircraft and 12 aircraft engines have either been rejected or abandoned.

3.      The second goal – renegotiation of their aircraft finance agreements – is well underway.  The Debtors have identified aircraft and aircraft engines as being a necessary component of their fleet and operations going forward and obtained the Court's authorization to enter into long term agreements for the continued use of certain aircraft equipment.  As part of this aspect of their restructuring, the Debtors are negotiating the final form of other aircraft equipment agreements and will seek the Court's authorization to enter into such agreements.

4.      The third goal of the Debtors' operational restructuring – the extension of certain code-share agreements – is the subject of this Motion.  The Debtors are party to code-share agreements with US Airways and United[3] pursuant to which they provide air transportation

---

[3] Earlier this year, the United States District Court for the Northern District of Georgia determined that the Debtors' code-share agreement with Delta was properly terminated prior to the Petition Date.  *See Mesa Air Group, Inc. and*

services to the applicable principal carrier's customers on various flight routes, using the principal carrier's flight designator codes and its livery and service marks. During the past several months, the Debtors have been engaged in discussions with US Airways regarding certain amendments to the code-share agreement, which includes a 39-month extension. The Debtors and US Airways have agreed to amend certain terms and conditions in the code-share agreement, including: (1) extending the term for an additional 39 months; (2) settling the claims of the Debtors against US Airways; (3) settling the various proofs of claims filed by US Airways against the Debtors' estates;[4] and (4) providing for the sale of certain related assets to US Airways.

5.     US Airways is the Debtors' largest customer and represents approximately 70% of the revenue generated by the Debtors. The US Airways Agreement (defined below) is beneficial to the Debtors because it extends the term of the agreement for an additional 39 months. The US Airways Agreement is a critical piece of the Debtors' reorganization and it is imperative that the Debtors maintain and continue their relationship with US Airways. For that reason alone, rejection of the US Airways Agreement is simply not an option. Accordingly, the Debtors request (1) authorization to assume the US Airways Agreement, as amended, and (2) approval of the related settlement and equipment sale, all as more fully set forth below.

### Background

6.     On the Petition Date, the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The

---

*Freedom Airlines, Inc. v. Delta Air Lines, Inc.*, Case No. 08-1334 (CC) (N.D. Ga. May 17, 2010). The Debtors and Delta entered into a transition agreement pursuant to which the Debtors continued to operate aircraft for Delta until August 31, 2010. *In re Mesa Air Group, et al.*, Case No. 10-10018 (MG) (Bankr. S.D.N.Y. May 25, 2010) [Docket No. 770].

[4] Claim No. 1062, Claim No. 1063, and Claim No. 1064 (collectively, the "US Airways Proofs of Claim").

Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8.     On January 14, 2010, the United States Trustee formed an Official Committee of Unsecured Creditors in the Debtors' cases (the "Committee"), which Committee comprises Bombardier, Inc., Embraer-Empresa Brasilieire de Aeronautica S.A., US Bank National Association, AT&T Capital Services, Wilmington Trust Company, IHI Corporation, and Air Line Pilots Association.  No trustee or examiner has been appointed in the Debtors' cases.

### Mesa's Business

9.     Mesa is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service.  The Debtors' airline operations serve approximately 91 cities in 33 states, the District of Columbia, Canada, and Mexico.  The Debtors operate a fleet of approximately 77 aircraft with approximately 490 daily system departures.  The Debtors employ approximately 2,782 full and part-time employees.

10.    Certain of the Debtors operate regional jet and turboprop aircraft under the names of regional carriers of certain major airlines pursuant to code-share agreements.  Specifically, Mesa Airlines, Inc. ("Mesa Airlines") operates (1) as US Airways Express under code-share agreements with US Airways, (2) as United Express under a code-share agreement with United, and (3) independently in Hawaii as *go!* Mokulele.  The remaining Debtors operate businesses, or

own interests in businesses, that facilitate or enhance the Debtors' regional or independent air carrier services. Nilchii, Inc. and Patar, Inc. hold investments.

11. The Debtors' consolidated 2009 revenues were approximately $968 million. Approximately 96% of the Debtors' consolidated passenger revenues for the fiscal year ending September 30, 2009, were derived from operations associated with code-share agreements, which includes the code-share agreement with US Airways.

## Jurisdiction

12. This Court has jurisdiction to consider this motion pursuant to 28 USC. §§ 157 and 1334. This is a core proceeding pursuant to 28 USC. § 157(b). Venue is proper before this Court pursuant to 28 USC. §§ 1408 and 1409.

## Relief Requested

13. The Debtors request, pursuant to sections 363(b) and (f) and 365(a) of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 9019, authorization to (i) assume, as amended, and perform all obligations under, the US Airways Agreement, (ii) settle the Debtors' claims against US Airways arising under the US Airways Agreement, and (iii) sell certain related assets to US Airways free and clear of any liens, interests, or other encumbrances.

14. For the reasons discussed herein, the Debtors submit that the relief sought herein is reasonable, represents an appropriate exercise of their sound business judgment, and is in the best interest of their estates and all stakeholders in these chapter 11 cases.

## The Debtors' Code-Share Agreement With US Airways

### A. General Background

15. As set forth above, under their code-share agreements, the Debtors generally provide air transportation services to the applicable principal carrier's customers on various

flight routes, using the principal carrier's flight designator codes and its livery and service marks.[5]  In exchange for providing flights and other services pursuant to the applicable code-share agreement, the Debtors receive compensation (including minimum monthly amounts and additional amounts based on, for example, number of flights and block hours performed during the month) from the principal carriers and are also reimbursed for certain expenses by the principal carriers.  In some instances, the principal carriers also provide certain customer services, ground handling services and/or other functions to the Debtors in connection with the foregoing.

16.     The principal carriers also have code-share agreements with other airlines (including members of their respective SkyTeam and Star Alliances), whereby one airline markets and sells air transportation to its passengers in conjunction with the scheduled services provided by another airline, and in doing so, each party is permitted to use the other air carrier's flight designator code.  These agreements afford customers the options and flexibility of traveling on multiple airlines while being treated as a customer of a single airline.  Through these arrangements, the applicable carriers and their respective code-share counterparties are able to offer passenger services between cities by making available one-stop service via cities served among the Debtors, the principal carriers, and the other carriers.

**B.     The US Airways Agreement**

17.     Mesa Airlines and America West Airlines, Inc. ("AWA") entered into a Code Share and Revenue Sharing Agreement (as amended, the "US Airways Agreement") as of March 20, 2001, with its effectiveness retroactive to February 1, 2001, pursuant to which, among other things, Mesa Airlines agreed to provide certain scheduled air transportation services to AWA and

_____

[5] The Debtors also have a code-share agreement with United.  This Motion deals only with the Debtors' code-share agreement with US Airways.  The Debtors reserve all their rights with respect to their code-share agreement with United.

then to US Airways pursuant to certain amendments. Mesa Airlines subcontracted the performance of certain services required under the US Airways Agreement to certain other Debtors – Freedom Airlines, Inc. ("Freedom") and Air Midwest, Inc. ("AM") – and these affiliates of Mesa Airlines are parties to certain of the amendments to the US Airways Agreement.[6] Pursuant to that certain Seventh Amendment to Code Share and Revenue Sharing Agreement and Settlement, Assignment and Assumption Agreement entered into as of September 10, 2007, among other things, AWA assigned and transferred to US Airways, AWA's rights, titles and interests in and to the US Airways Agreement, and US Airways assumed all of AWA's liabilities and obligations under the US Airways Agreement, as part of the integration of AWA's and US Airways' operations. Since this time, the US Airways Agreement has been amended twice.[7]

18.     The US Airways Agreement is an integral part of the Debtors' operations. It represents approximately 70% of the revenue generated by their various operations. As a result, it is critical for the Debtors to assume the US Airways Agreement. In connection with such assumption, the Debtors and US Airways will enter into a tenth amendment to the US Airways

---

[6] Recently, Freedom operated regional jet aircraft in connection only with the Debtors' code-share agreement with Delta, and AM's operations ceased in 2008.

[7] Specifically, US Airways and the Mesa Group are parties to that certain Code Share and Revenue Sharing Agreement, dated as of February 1, 2001, as amended by: (1) the First Amendment to Code Share and Revenue Sharing Agreement, dated to be effective April 27, 2001; (2) the Second Amendment to Code Share and Revenue Sharing Agreement, dated as of October 24, 2002; (3) the Third Amendment to Code Share and Revenue Sharing Agreement, dated as of January 29, 2003; (4) the Fourth Amendment to Code Share and Revenue Sharing Agreement and Release, dated as of September 5, 2003; (5) the Fifth Amendment to Code Share and Revenue Agreement, dated as of January 28, 2005; (6) the Sixth Amendment to Code Share and Revenue Sharing Agreement and Settlement Agreement, dated as of July 27, 2005; (7) the Seventh Amendment to Code Share and Revenue Sharing Agreement and Settlement, Assignment and Assumption Agreement; (8) the Eighth Amendment to Code Share Agreement and Settlement Agreement, dated as of May 12, 2008; and (9) the Ninth Amendment to Code Share and Revenue Sharing Agreement, dated as of March 30, 2009.

Agreement, based upon a term sheet, attached hereto as <u>Exhibit A</u>,[8] with the following principal terms and conditions (the "<u>Term Sheet</u>"):[9]

- **<u>Extension of Term for CRJ-900s</u>**:  With respect to the Debtors' CRJ-900 aircraft, the term will be extended based on a schedule established by US Airways, which amounts to 39 months on average per aircraft, from June 30, 2012 to September 30, 2015. US Airways will have three (3) options to extend the US Airways Agreement with respect to all or none of the CRJ-900 aircraft each for an additional one (1) year.  Each option is exercisable upon twelve-months' written notice (the "<u>Term Extension Option</u>").  US Airways will have the option to extend each CRJ-900 aircraft on an individual aircraft basis for up to 6 additional months upon 6 months notice on terms and conditions of the Agreement as amended by the Amendment.

  With respect to aircraft other than CRJ-900s, the term shall remain June 30, 2012 and be unaffected by the Amendment and any Term Extension Option.

- **<u>Rates</u>**:  With effect from July 1, 2010, the payment rates for each type of aircraft providing flight services will be reduced and the revenue share percentage will be adjusted upward to meet a minimum utilization threshold.

- **<u>Elimination of Right to Reduce CRJ-900 Fleet</u>**:  US Airways may not initiate fleet reductions in the CRJ-900 subfleet.

- **<u>CRJ-900 Aircraft Modifications</u>**:  (i) the Debtors will install certain air-to-ground informational retrieval systems (without printers) on the CRJ-900 aircraft at their sole cost no later than April 29, 2011, (ii) the Debtors will complete agreed upon internal upgrades for each CRJ-900 at their sole cost, (iii) US Airways will pay a contribution amount towards the Debtors' cost for the upgrades (the "<u>Upgrade Contribution</u>").

- **<u>Return of Aircraft</u>**:  Unless extended by written exercise of the Term Extension Option described above, the expiration of the term and the redelivery of the CRJ-900 aircraft will be phased according to a schedule established by US Airways, such that each aircraft will be redelivered on a date not earlier than April 1, 2015 and not

---

[8] <u>Exhibit A</u> is a redacted copy of the Term Sheet.  The Debtors have concurrently filed herewith a motion to file under seal portions of the Term Sheet containing confidential business and financial information.

[9] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet.  The terms and conditions set forth herein are only intended to provide a brief summary.  To the extent there are any inconsistencies between the terms and conditions set forth herein and the Term Sheet, the terms and conditions of the Term Sheet are controlling.

alter than March 31, 2016. If the term is extended, the expiration of the term and the redelivery of the CRJ-900 aircraft will be phased according to a schedule established by US Airways and consistent with the initial term redelivery dates, but extended to reflect the duration of the extended term.

- **Releases and Settlement of Disputed Amounts**:  The Debtors and US Airways agree to resolve the various claims that the Debtors have against US Airways relating to property taxes, fuel charges, true-ups, and other miscellaneous charges and the US Airways Proofs of Claim asserted against the Debtors in exchange for a settlement of $4,000,000 (the "Effective Date Payment").  US Airways will pay the Effective Date Payment and Upgrade Contribution in 38 equal installments, payable upon satisfactory completion of RON upgrades for each CRJ-900 aircraft.

   US Airways will release the Debtors and any of the Debtors' current or former subsidiaries, affiliates, officers, directors, stockholders, employees, professionals or agents from all claims US Airways has or had against the parties, which arose or accrued in whole prior to the date that is two years before the execution date of the Amendment.  The Debtors will release US Airways and any of US Airways' current or former subsidiaries, affiliates, officers, directors, stockholders, employees, professionals or agents from all claims that the Debtors have or had against the parties, which arose or accrued on or before the Amendment Execution Date.

   The property taxes payable by US Airways for the years 2008 and 2009 will be audited by US Airways on a mutually agreeable time table and subsequently paid.  US Airways will have the right to audit Debtors' property taxes for tax years prior to 2008.  If the pre-2008 audit reveals that US Airways overpaid for such year, Debtors will credit the difference to US Airways.  The Debtors and US Airways will develop a new property tax true-up procedure for tax years from and after 2010.

   The Debtors shall pay US Airways all available fuel sales tax refunds for North Carolina beginning from 2006 collectible by the Debtors within 10 business days of receipt.

   The Debtors shall remain obligated to pay US Airways for any properly claimed amounts arising after July 1, 2008 not specifically identified in the Amendment.

- **Sale of Assets**:  The Debtors agree to sell US Airways that will no longer be utilized in the Debtors' operation.

- **Aircraft Cleaning**:  The Debtors will provide at its expense RON cleaning for all of the Debtors' aircraft.  In cases where US

Airways provides the RON cleaning, whether directly or through its vendor, the Debtors will reimburse US Airways for the actual costs, without markup, of that cleaning service. The aircraft will be cleaned in accordance with US Airways' RON cleaning standards and procedures, but the Debtors may select the RON vendors. Any amounts owed by the Debtors to US Airways as of and after July 1, 2010 will be paid by the Debtors within 10 days after the Approval Order Date.

- **Operational Performance**: The existing operational performance criteria under the US Airways Agreement have been modified to mutually agreed upon service levels. The adjusted performance criteria will take effect February 1, 2011.

- **Notes**: The Mesa Plan shall provide for not more than $61 million in non-ordinary course indebtedness (the "Notes") as follows: (1) $50 million to the Debtors' unsecured creditors; (2) $5.5 million to the Debtors' senior management; and (3) $5.5 million to US Airways. The Notes shall provide for an annual all-in interest rate not to exceed 10%, shall not mature prior to December 31, 2015, and shall be guaranteed by each of the Debtors' corporate subsidiaries and affiliates.

  Notwithstanding the foregoing, Mesa may issue additional notes (the "Bondholder Notes") to holders of the 2012, 2023 and 2024 Notes on terms identical to the Notes, provided that (i) the total principal of the Notes shall not exceed the sum of $76.5 million and the amount of Notes issued to US Airways and (ii) the principal amount of Notes issued to US Airways shall remain 55/610ths of the aggregate principal amount of Notes. Up to $21 million of the Bondholder Notes may continue to be guaranteed by Nilchii (the entity that owns Mesa's interest in Spirit Airlines described above) or obtain some other structural payment and collection preference related to Nilchii, provided that any of the Spirit Proceeds in excess of the amount necessary to redeem the Bondholder Notes shall be used first to pay down the Notes held by US Airways, second to pay down the Notes held by Mesa's general unsecured creditors, and third to pay down the Notes held by management.

- **Capital Stock**: The Mesa Plan shall provide for the issuance of a single class of common stock as follows: (1) 80% to the Debtors' unsecured creditors; (2) 10% to the Debtors' management; and (3) 10% to US Airways, subject to an investor rights agreement that must be finalized prior to court approval of the Disclosure Statement.

- **Conditions Precedent**: The Amendment is subject to conditions precedent associated with confirmation of the Mesa Plan.

19.     The US Airways Agreement currently affects approximately 145 flight routes, serving approximately 68 cities throughout the United States, predominantly in the Phoenix, Arizona and Charlotte, North Carolina hubs.  The Debtors currently operate approximately 51 aircraft under the US Airways Agreement.  The Debtors currently utilize approximately 443 aircraft pilots, 356 flight attendants, and over 893 maintenance, customer service and support staff, to provide services under or in connection with the US Airways Agreement.  Further, the US Airways Agreement has historically been a source of a substantial portion of the Debtors' revenues, and will constitute approximately 70% of the Debtors' consolidated passenger revenues, effective September 2010.  At that point, the aircraft used in connection with the US Airways Agreement will constitute approximately 68% of the Debtors' entire operating fleet.[10]

20.     The Court is not being asked to make a finding at this time as to whether there are any existing defaults under the US Airways Agreement because US Airways is consenting to the relief sought by the Debtors in the Motion.  However, in the event that the conditions to effectiveness of the US Airways Agreement do not occur, the Debtors and US Airways reserve all of their rights in this regard.  The Debtors believe they are current under the US Airways Agreement (*i.e.*, no amounts are overdue and payable).[11]  Subject to the entry of an order

---

[10] There is a contractually planned scale-down in the Debtors' services under the Debtors' code-share agreement with United (as amended, the "United Agreement"), as a result of which, from that point, the revenue from the US Airways Agreement will be approximately 70% of total passenger revenues, and the aircraft used to provide services under the US Airways Agreement will constitute 68% of the Debtors' operating fleet.

[11] On the Petition Date, the Debtors filed a motion to honor and satisfy prepetition obligations (if any) under certain industry related agreements, including the Debtors' code-share agreements, and to continue honoring such agreements in the ordinary course of business [Docket No. 10] (the "Industry Agreement Motion").  The Debtors have been paying any amounts owed to US Airways under the US Airways Agreement in the ordinary course of business, pursuant to the Court's interim order [Docket No. 38] and final order [Docket No. 175] on the Industry Agreement Motion entered on January 5 and January 26, 2010, respectively.

authoring the Debtors' assumption of the US Airways Agreement, the Debtors will continue to honor the US Airways Agreement in the ordinary course of business.

21.     The Debtors believe they have a net claim against US Airways arising under the US Airways Agreement relating to unpaid property taxes, fuel charges, true-ups, government charges, and other miscellaneous other charges.  As discussed in greater detail below, the Debtors and US Airways have agreed to settle this claim.

**Assumption of the US Airways Agreement is Supported by the Debtors' Business Judgment, is in the Debtors' Best Interests, and Should Be Approved By the Court**

22.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 USC. § 365(a).  *See also NLRB v. Bildisco & Bildisco*, 465 US 513, 521 (1984); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (reaffirming that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to renounce title to and abandon burdensome property.") (internal quotations and citation omitted).

23.     The standard to be applied by a court in determining whether assumption of an executory contract pursuant to section 365(a) should be approved is the "business judgment" test, which requires that the debtor determine that the requested assumption would be beneficial to its estate.  *See, e.g., In re Group of Inst. Investors, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 US 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp.*, 4 F.3d at 1098-99 (to decide a motion to assume, the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996) (decision to assume was exercise

of good business judgment); *In re Nat'l Sugar Refining Co.*, 26 B.R. 765, 767 (Bankr. S.D.N.Y. 1983) (debtor seeking to assume a profitable contract should be allowed to do so).

24.     Upon finding that the debtor has exercised sound business judgment in determining that the assumption of an executory contract is in the best interests of the debtor, the court should approve such assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997); *In re Bradlees Stores, Inc.*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). A debtor's decision to assume an executory contract based on its business judgment will generally not be disturbed "absent a showing of bad faith or abuse of business discretion." *In re Chipwich, Inc.*, 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985).

25.     The Debtors' assumption of the US Airways Agreement is clearly in the best interest of the estates. Revenue under the US Airways Agreement will constitute approximately 70% of the Debtors' consolidated passenger revenues, effective September 2010.[12] Thus, it is a critical piece of the Debtors' reorganization and it is imperative that the Debtors maintain and continue their relationship with US Airways.

26.     In addition, the Debtors' assumption of the US Airways Agreement will have important workforce consequences. The Debtors currently utilize the services of approximately 1,700 workers to provide services under or in connection with the US Airways Agreement. As a result, assumption of the US Airways Agreement will preserve jobs for this workforce (and, among other things, also minimize termination or rejection related claims against the estates that would otherwise arise).

---

[12] As noted above, over a couple months, there will be a contractually planned scale-down in the Debtors' services under the United Agreement, as a result of which, from that point, the revenue from the US Airways Agreement will be approximately 70% of total passenger revenues.

27.     Upon assumption of the US Airways Agreement, the Debtors will continue to receive substantial revenues from the air transportation services they provide to US Airways, and the Amendment to the US Airways Agreement provides a steady revenue stream for an additional thirty-nine months beyond June 2012.  Given the key role of such arrangements in the Debtors' business in general and the importance of the US Airways Agreement in particular, the assumption of the US Airways Agreement positively impacts the Debtors' ability to successfully reorganize their business and emerge from these chapter 11 cases.

28.     Given the critical importance of a debtor's code-share or related agreements in the airline industry, various courts have authorized the assumption of such or similar agreements by debtors.  *See, e.g., In re Northwest Airlines Corporation, et al.*, Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Oct. 7, 2005) [Docket No. 619]; *In re US Airways, Inc., et al.*, Case No. 04-13819 (SSM) (Bankr. E.D. Va. Sept. 14, 2004) [Docket No. 103]; *In re Hawaiian Airlines, Inc., et al.*, Case No. 03-00817 (RJF) (Bankr. D. Haw. Mar. 24, 2003) [Docket No. 84]; *In re UAL Corp., et al.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 10, 2002) [Docket No. 200]; *In re GP Express Airlines, Inc.*, 200 B.R. 222 (Bankr. D. Neb. 1996).

29.     Further, as discussed above, the Court is not being asked to make a finding at this time as to whether there are any existing defaults under the US Airways Agreement because US Airways is consenting to the relief sought by the Debtors in the Motion.  Accordingly, no adequate assurance of the Debtors' future performance needs to be provided by the Debtors.  It is well-established that if a debtor has not defaulted under an executory contract, it need not provide adequate assurance of future performance under section 365(b)(1)(C).  *See, e.g.,* 11 USC. § 365(b)(2).  For example, in the chapter 11 cases of United Airlines, Inc., the Court of Appeals of the Seventh Circuit held that

> [Counterparty] concedes that United has never defaulted on its obligations under the agreement but nonetheless contends that the bankruptcy judge should have required United to provide the same assurances that would have been required had it done so. That would effectively remove the "if" clause from subsection (b)(1) and make adequate assurances a universal requirement. The bankruptcy judge was right to rebuff such a proposal for amending the statute; it was directed to the wrong branch of government. . . . A bankruptcy judge properly may withhold approval of assumption when an executory contract is no longer in the debtor's interest, or the debtor is unlikely to perform its obligations, but not on an open-ended ground such as "unreasonable" risk to the other contracting party.

*In re United Airlines Inc.*, 368 F.3d 720, 726 (7th Cir. 2004). Similarly, other bankruptcy courts have held that "[b]ecause the Court finds that there has been no default under the Servicing Agreement, the cure and adequate assurance provisions of § 365(b) are inapplicable." *In re Commonwealth Mortgage Co., Inc.*, 149 B.R. 4, 8 n.24 (Bankr. D. Mass. 1992); *see, also In re Grayhall Resources, Inc.*, 63 B.R. 382, 389 (Bankr. D. Colo. 1986) (recognizing the inapplicability of section 365(b)(1) and holding that if "there are no defaults under the contract sought to be assumed, there is no statutory mandate for the debtor to have to provide 'adequate assurance of future performance' before assumption."); *In re Ridgewood Sacramento, Inc.*, 20 B.R. 443, 445 (Bankr. E.D. Cal. 1982) ("because the executory obligation was not in default on the date that the debtor assumed it, subsection (b) [of section 365] is inapplicable to the facts of this case and the debtor is not required to provide adequate assurances to the creditor"); *In re Perretta*, 7 B.R. 103, 105 (Bankr. N.D. Ill. 1980) (holding that section 365(b)(1)(C) inapplicable because "lessor has failed to show that the debtor defaulted upon his lease obligations").

30.     The effectiveness of the Amendment is conditioned upon the Debtors receiving approval by US Airways, no later than October 22, 2010, of (i) the Mesa Plan and Disclosure Statement and (ii) the Debtors' business plan, capital structure, board and management structure, cash flow projections and other reasonably required information (the "Reorganization Information"). In addition, the effectiveness of the Amendment requires: (a) execution of the

definitive documents for the Amendment, as mutually agreed to by the parties; (b) approval of the Amendment by the parties' respective Boards of Directors; (b) the filing by the Committee of a statement of support for the Mesa Plan and Amendment within seven (7) days of the date the Debtors file this Motion; and (4) the Court entering a final order approving this Motion on or before November 20, 2010 (the "Approval Order Date") and either the time for appeal has expired and no appeal has been taken or, if an appeal has been taken, the order has not been stayed.[13]  As of the date of the filing of this Motion, US Airways has approved the Reorganization Information subject to review of a revised Mesa Plan incorporating the terms of the Amendment.

31.      The continued effectiveness of the Amendment and US Airways' obligation to make the Effective Date Payment is further subject to the following: (i) the Disclosure Statement being approved by the Bankruptcy Court no later than November 20, 2010; (ii) the Mesa Plan being confirmed by the Bankruptcy Court no later than January 17, 2011, in a form that provides no consideration to the Debtors' unsecured creditors other than (a) the Notes and common stock (as described above), (b) cash payments to holders of *de minimis* general unsecured claims as provided in the Mesa Plan, and (c) waiver of certain avoidance actions, and that does not contain any material change to the capital and ownership structure included in the Mesa Plan previously approved by US Airways, and is otherwise in a form that is consistent with the Debtors' obligations under the US Airways Agreement and the Amendment; (iii) the Mesa Plan being effective no later than February 17, 2011; (iv) no material occurrence, development or change to the Debtors' business shall have occurred after the Amendment Execution Date; and (v) no default or event of default exists under the Amendment.

---

[13] The Debtors, US Airways, and the Committee are currently discussing the deadlines regarding (i) completion of the definitive documentation of the Amendment and (ii) the filing by the Committee of a statement of support for the Mesa Plan and Amendment.

32.     If the Mesa Plan is not confirmed on or before January 17, 2011 despite the Debtors' best efforts to obtain confirmation of the Mesa Plan by such date, the January 17, 2011 deadline may be extended to March 18, 2011.  Further, if the Mesa Plan has become effective on or before February 17, 2011 despite Mesa's best efforts to achieve the effective date of the Mesa Plan by such date, the February 17, 2011 deadline may be extended to April 15, 2011.

33.     If the Mesa Plan is not confirmed by January 17, 2011 in a form as described above, or the Mesa Plan has not become effective by February 17, 2011, or the Amendment is approved by the Bankruptcy Court and is thereafter modified, vacated, stayed or amended without US Airways' consent (collectively, the "Mesa Plan Conditions"), US Airways shall have the right to declare the Bankruptcy Court's order approving this Motion vacated and of no further effect (a "Vacatur Declaration").  Commencing on a date 30 days after the occurrence of a Mesa Plan Condition, if US Airways has not made a Vacatur Declaration, the Debtors shall have the right to make a Vacatur Declaration.

34.     Upon a Vacatur Declaration by either US Airways or the Debtors, (i) US Airways shall retain all amounts under the Amendment that would have otherwise been due to the Debtors had the Bankruptcy Court's order approving this Motion not been entered and such amounts shall not be subject to disgorgement, set-off, offset, recovery or return, (ii) US Airways and the Debtors shall have all of their respective rights under the existing agreements (including the Debtors' right to assume the agreements and US Airways' right to contest such assumption) and (iii) except as set forth in paragraph 35 below, the new payment rates shall survive any assumption of the existing agreement and remain in effect without modification.

35.     Upon a Vacatur Declaration by US Airways, US Airways may extend the redelivery date of 38 CRJ-900 aircraft over 18 months beyond June 30, 2012 at the new payment

rates (the "18 Month Redelivery Period"). In the event US Airways exercises the option set forth in this paragraph and the Debtors have not exercised their extension option (see below), then US Airways will pay the Debtors the rates and other amounts due as if there had been no Amendment for the period from July 1, 2011 through June 30, 2012.

36.     Upon a Vacatur Declaration by US Airways, the Debtors shall have the right to extend the Agreement by one year under the Agreement (*e.g.*, the 18 Month Redelivery Period will commence in July 2013 instead of July 2012) but (i) the new payment rates will continue without modification through the 18 Month Redelivery Period instead of ending on June 30, 2011 and (ii) all other terms and conditions under the Amendment shall remain in full force and effect through the 18 Month Redelivery Period. The Debtors shall have the right to exercise the foregoing extension only until the date that is 30 days following the date US Airways makes a Vacatur Declaration.

37.     Based on the foregoing, assumption of the US Airways Agreement is in the best interests of the Debtors' estates and creditors and constitutes a proper exercise of the Debtors' sound business judgment. Accordingly, the assumption of the US Airways Agreement should be approved.

### The Settlement of the Parties' Claims Is Fair and Equitable, Reasonable, and in the Best Interests of the Debtors' Estates

38.     Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 US 414, 428 (1968). A settlement of claim by a debtor, however, constitutes a disposition of property of the estate. *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 350 (3d Cir. 1999). If a settlement falls outside the ordinary course of business of the debtor, it requires approval of the bankruptcy court pursuant to section 363(b) of the Bankruptcy

Code. *Id.* at 351. Typically, in addition to approval under section 363(b) of the Bankruptcy Code, Bankruptcy Rule 9019 requires a motion, notice and hearing as a prerequisite of approval.

39. To approve a compromise or settlement under Bankruptcy Rule 9019(a), a court should find that the compromise or settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate. *See, e.g., In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). In determining whether to approve a settlement, the court must make an independent determination that the settlement is fair and reasonable. *Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y 1993). The court may consider the opinions of the trustee or debtor in possession that the settlement is fair and reasonable. *Id.*; *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). In addition, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Nellis v. Shugrue*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process.").

40. In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal quotations omitted); *see also In re Purofied Down Prods.*, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation.").

41. "The 'reasonableness' of a settlement depends upon all factors, including probability of success, the length and cost of the litigation, and the extent to which the settlement

is truly the product of 'arms-length' bargaining, and not fraud or collusion." *In re Ionosphere Clubs, Inc.*, 156 B.R. at 426-27.

42.     During the term of the US Airways Agreement, the Debtors accrued various claims against US Airways relating to property taxes, fuel charges, true-ups, government charges, and other miscellaneous charges.  The Debtors estimate they have claims against US Airways that aggregate approximately $13.9 million (the "Mesa Code-Share Claims").  As noted above, US Airways filed the US Airways Proofs of Claim against the Debtors in the aggregate approximate amount of $11.5 million.

43.     US Airways have been disputing the Mesa Code-Share Claims and the Debtors and US Airways have not been able to consensually reconcile their disagreement until now.  US Airways has agreed to pay the Debtors $4.0 million (plus an additional $1 million toward certain CRJ900 aircraft upgrades) and waive the US Airways Proofs of Claim in full satisfaction of the Mesa Code-Share Claims.  The Debtors believe that this is a fair settlement because they are uncertain they would be able to recover the Mesa Code-Share Claims in full.  Moreover, any attempt to recover such claim would likely require the Debtors to incur significant litigation fees and expenses.

44.     Accordingly, the Debtors and US Airways have agreed to settle the Mesa Code-Share Claims and the US Airways Proofs of Claim in exchange for $4.0 million (plus an additional $1 million toward certain CRJ900 aircraft upgrades), payable in 38 equal installments. Significantly, the settlement also eliminates any other disputes between the Debtors and US Airways and paves the way for the Debtors' assumption of the US Airways Agreement on a consensual basis.  The Debtors have not released US Airways with respect to claims that arose or accrued, in whole or in part, within two (2) years before the Amendment Execution Date.  Thus,

not only does the settlement guarantee $5.0 million for the Debtors' estates but it also ensures that the Debtors will continue to bring in revenue under US Airways Agreement at least through September 2015.

### The Sale of Certain Related Assets Is Supported By the Debtors' Business Judgment

45.     Section 363(b)(1) of the Bankruptcy Code empowers courts to allow debtors to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 USC. § 363(b)(1).  A debtor's decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *see also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ttd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting that standard for determining a section 363(b) motion is a "good business reason").

46.     The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

47.     As part of the Amendment, the Debtors and US Airways agreed to transition certain aircraft related operations to US Airways.  Accordingly, certain related assets will no longer be required by the Debtors.  As a result, the Debtors have determined the best course of action is to sell these assets to US Airways.  US Airways has agreed to purchase the assets for fair market value.  This sale is beneficial to the Debtors' estate because it allows the Debtors to bring cash into the estates in exchange for assets that will no longer be beneficial to their estates.

48.     Accordingly, the Debtors respectfully request that the Court approve such sale pursuant to section 363(b) of the Bankruptcy Code.

### **Request for Waiver of Stay**

49.     Further, to implement the foregoing successfully, the Debtors seek a waiver of the fourteen-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h) to the extent that such rule applies.

### **Notice**

50.     The Debtors have served notice of this motion on the following parties, or on their counsel if known: (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to the Committee, (iii) US Airways, and (v) those parties that have requested notice in these cases.

51.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors requests entry of the order annexed hereto as <u>Exhibit B</u>, granting the relief requested herein and such other and further relief as is just.

Dated:   October 27, 2010
           New York, New York        PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Debra Grassgreen*
Richard M Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

Attorneys for Debtors and Debtors in Possession

# EXHIBIT A

## (Redacted Term Sheet)

<div align="center">

**Term Sheet for Proposed Amendment**
**to**
**Code Share and Revenue Sharing Agreement**
**between**
**US Airways, Inc. and Mesa Airlines, Inc.**

</div>

| | |
|---|---|
| Parties: | US Airways, Inc. ("US Airways") and Mesa Airlines, Inc. ("Mesa"). US Airways and Mesa are sometimes collectively referred to herein as the "parties". |
| Purpose: | This Term Sheet outlines the basic terms of a proposed Amendment (the "Amendment") to the Code Share and Revenue Sharing Agreement, dated February 1, 2001, and as thereafter amended (the "Agreement"). |
| Non-Binding Effect: | With the exception of the provisions specifically identified in the last section hereof as creating legally binding obligations, this Term Sheet is not binding, but is intended as guideline for the parties' good faith negotiation of a definitive and binding Amendment. |
| Extension of Term for CRJ-900s: | The term of the Agreement, as it relates to the CRJ-900 aircraft, will be extended based on a schedule established by US Airways, which amounts to 39 months on average per aircraft, from June 30, 2012 to September 30, 2015 (the "Term"). US Airways will have three options (to be exercised in writing and in US Airways' sole discretion) to extend the Term with respect to all or none of the CRJ-900 aircraft each for an additional one year. Each option (the "Term Extension Option") shall be exercisable upon 12 months' written notice, on the terms and conditions of the Agreement as amended by the Amendment. <br><br> The term of the Agreement as it relates to aircraft other than CRJ-900s shall remain June 30, 2012 and be unaffected by the Amendment and any Term Extension Option. |
| Return of Aircraft: | Unless extended by written exercise of the Term Extension Option described above, the expiration of the Term and the redelivery of the CRJ-900 aircraft will be phased according to a schedule established by US Airways, such that each aircraft will be redelivered on a date not earlier than April 1, 2015 and not later than March 31, 2016 (the "Initial Term Redelivery Dates"). If the Term is extended by written exercise of the Term Extension Option described above, the expiration of the Term and the redelivery of the CRJ-900 aircraft will be phased according to a schedule established by US Airways and consistent with the Initial Term Redelivery Dates described above but extended to reflect the duration of the extended Term. <br><br> In addition to the Term Extension Option, US Airways will have the option to extend each CRJ-900 aircraft on an individual aircraft basis for up to 6 additional months upon 6 months notice on the terms and conditions of the Agreement as amended by the Amendment. |

<div align="center">1</div>

| | |
|---|---|
| Elimination of Right to Reduce CRJ-900 Fleet: | Notwithstanding the terms of Section 2.2.4 of the Agreement (as amended by the 4th Amendment), US Airways may not initiate fleet reductions in the CRJ-900 subfleet. |
| Rates: | With effect from July 1, 2010, the [*] for each aircraft type used in providing the Flight Services will be reduced as follows: |

<div style="margin-left:2em;">

- CRJ-900:  reduce the amounts specified in **Exhibit C** of the Agreement (as amended by the 7th Amendment) by [*] per month per aircraft
- CRJ-200:  reduce the amounts specified in Exhibit C of the Agreement (as amended by the 6th Amendment) by [*] per month per aircraft (as further adjusted downward as provided in the attached Revised Exhibit C – page 2)
- Dash-8:  reduce the amounts specified in **Exhibit C** of the Agreement by [*] reduction per month per aircraft

With effect from July 1, 2010, the [*] for each type of aircraft as set forth in Section 7.6 of the Agreement will be changed from a percentage to the [*] as follows:

- CRJ-900:  [*]%, not to exceed [*] per month per aircraft
- CRJ-200:  [*]%, not to exceed [*] per month per aircraft
- Dash-8:    [*]%, not to exceed [*] per month per aircraft

The revenue share percentage for each aircraft type will be adjusted proportionally upward to the extent actual utilization (total block hours divided by aircraft in fleet divided by days in month) for that aircraft type falls below [*] hours for the CRJ-900, [*] hrs for the CRJ-200, or [*] hrs for the Dash-8.

Although the payment rates set forth in this section shall be in effect beginning on July 1, 2010, US Airways shall continue making the payments calculated under the Agreement until the Approval Order Date (as defined below).  From and after the Approval Order Date, US Airways shall pay Mesa at the payment rates set forth in this section (the "New Payment Rates").  Promptly following the Approval Order Date, Mesa shall pay to US Airways the amount by which the payments made under the Agreement for the period from July 1, 2010 until the Approval Order Date exceed the payments due under the Amendment for such period (the "Retroactive Payments").  The Retroactive Payments shall be retained indefeasibly by US Airways and US Airways shall have no obligation to refund or otherwise credit Mesa with the Retroactive Payments under any circumstances.

Any credits resulting from the reduction in rates for [*] and [*] for the period of July 1, 2010 until the Approval Order Date will be applied to

</div>

| | |
|---|---|
| | payments US Airways would otherwise be obligated to make under the Agreement as amended.<br><br>In addition, in accordance with **Exhibit C** of the Agreement (as amended by Exhibit 6 and as set forth in Revised Exhibit C – Page 2), to the extent Mesa's actual costs for the [*] aircraft are or have been at any point less than the amounts paid by US Airways for such aircraft, the difference will be credited promptly to US Airways. |
| [*]: | [*]<br><br>[*] |
| Definitive Documentation; Court Approval of Amendment | The parties agree to use their best commercial efforts to complete and execute the definitive documentation of the Amendment as promptly as practicable, but in any event in time for Mesa to file the Approval Motion (as defined below) so that the hearing date to approve the Amendment can occur on regular notice on or before the Approval Order Date (as defined below) (the "<u>Documentation Deadline</u>")<br><br>Promptly after execution of the documented Amendment, Mesa will file a motion (the "<u>Approval Motion</u>") with the Bankruptcy Court for authorization to assume the Agreement as amended by the Amendment and, in accordance with the Amendment, to (i) settle the Disputed Amounts (defined below), and (ii) sell the ground service equipment, and seek a hearing for approval on or before the Approval Order Date.  Such date may be extended by written agreement of the parties, such agreement to be granted or withheld in each party's respective sole discretion.<br><br>The Approval Motion and the order approving such motion (the "<u>Approval Order</u>") shall be in form and substance consistent with the Term Sheet or, to the extent not addressed by this Term Sheet, reasonably acceptable to US Airways.  Once Mesa and US Airways agree to the form and substance of the Approval Order, any material modifications thereto must be acceptable to US Airways in US Airways' sole discretion.<br><br>US Airways shall advise Mesa no later than October 22, 2010 (the "<u>Mesa Plan Approval Date</u>") whether the Mesa Plan of Reorganization (as may be amended from time to time consistent with the terms of the Term Sheet and Amendment) the "<u>Mesa Plan</u>") is in a form and substance consistent with this Term Sheet or otherwise acceptable to US Airways (in US Airways' sole discretion).  Following the Mesa Plan Approval Date, any material modifications to the Mesa Plan must be acceptable to US Airways in its sole discretion.  The order confirming the Mesa Plan (the "<u>Confirmation Order</u>") shall be in form and substance reasonably acceptable to US Airways.  Once Mesa and US Airways agree to the form and substance of the Confirmation Order, any material modifications thereto must be acceptable to US Airways in US Airways' sole discretion. |

3

| | |
|---|---|
| Releases and Settlement of Disputed Amounts: | Upon the Approval Order Date or as soon as practicable thereafter and subject to the occurrence of a Vacatur Declaration (as hereafter defined): |

(i) US Airways will

(a) pay $4.0 million to Mesa (the "<u>Effective Date Payment</u>") to settle the claims listed on **<u>Exhibit B</u>**, payable in installments as further described below in the section entitled "CRJ-900 Aircraft Modifications";

(b) release Mesa and any of Mesa's current or former subsidiaries, affiliates, officers, directors, stockholders, employees, professionals or agents (collectively, the "<u>US Airways Released Parties</u>") from any and all claims that US Airways has or had against the US Airways Released Parties, whether legal or equitable, known or unknown, liquidated or contingent, matured or inchoate, which arose or accrued in whole prior to the date that is two years before the execution date of the Amendment (such execution date, the "<u>Amendment Execution Date</u>"), including without limitation the disputed payment claims between the parties listed in **<u>Exhibit B</u>** to this Term Sheet (collectively, the "<u>US Airways Released Claims</u>"). The US Airways Released Claims shall not include, and US Airways shall not be deemed to release, any claims US Airways has against any of the Mesa Released Parties that arose or accrued, in whole or in part, within two years before the Amendment Execution Date. Any US Airways claims that are not specifically identified as US Airways Released Claims shall be obligations of Mesa assumed under the Amendment and shall not be discharged or modified by any Mesa Plan.

(ii) Mesa will release US Airways and any of US Airways' current or former subsidiaries, affiliates, officers, directors, stockholders, employees, professionals or agents (collectively, the "<u>Mesa Released Parties</u>") from any and all claims that Mesa has or had against the Mesa Released Parties, whether legal or equitable, known or unknown, liquidated or contingent, matured or inchoate, which arose or accrued on or before the Amendment Execution Date, including without limitation the disputed payment claims between the parties listed in **<u>Exhibit B</u>** to this Term Sheet and any right of set-off or offset against US Airways (collectively, the "<u>Mesa Released Claims</u>").

(iii) US Airways will audit Mesa property taxes for tax years 2008 and 2009 on a mutually agreed to timetable and Mesa will provide all information (including, without limitation, access to Mesa accountants, lawyers, professionals, the relevant executives in charge of property taxes for Mesa and other Mesa employees and executives) reasonably requested by US Airways in connection with such audit. Any pre-payments made by US Airways related to such taxes will be reconciled in accordance with the procedures established in the Agreement.

(iv) In addition, US Airways will have the right to audit property taxes for tax years prior to 2008 and Mesa will provide all information

| | |
|---|---|
| | (including, without limitation, access to Mesa accountants, lawyers, professionals, the relevant executives in charge of property taxes for Mesa and other Mesa employees and executives) reasonably requested by US Airways in connection with such audit.  If such audit reveals that US Airways overpaid for such years (including the portions of the $4.0 million payment allocated to property taxes as set forth in **Exhibit B**), Mesa will credit the difference to US Airways ("Tax Credits"). Notwithstanding the definition of US Airways Released Claims, any claims that US Airways has or may have related to overpayment of property taxes shall not be included in the US Airways Released Claims.<br><br>For the avoidance if doubt, if US Airways elects to audit years prior to 2008 and such audit reveals an underpayment by US Airways, US Airways shall not be obligated to make any additional payment to Mesa in respect of such underpayment.<br><br>Mesa and US Airways will use their best commercial efforts to develop, and include in the Amendment, new mutually acceptable Property Tax true-up procedures for tax years from and after 2010.<br><br>(v) In addition to the Tax Credits, Mesa shall be obligated to pay US Airways for (a) any properly claimed amounts arising after July 1, 2008 not specified in **Exhibit B** (the "Post-July 2008 Claims"), and (b) all available Fuel Sales Tax refunds for North Carolina beginning from 2006 collectible by Mesa (the "Fuel Sales Tax Refunds") within 10 business days of receipt.  Mesa will use its best commercial efforts to collect the Fuel Sales Tax Refunds in a timely manner at Mesa's sole expense as soon as practicable after the date hereof (and not commencing as of the Effective Date).  Mesa will reasonably cooperate with US Airways in connection with the collection of the Fuel Sales Tax Refunds (including, without limitation, access to Mesa accountants, lawyers, professionals, the relevant executives in charge of the Fuel Sales Tax Refunds for Mesa and other Mesa employees and executives) reasonably requested by US Airways.  Mesa will not settle or compromise any Fuel Sales Tax Refunds without the prior written consent of US Airways.  Any claims related to the Post-July 2008 Claims or the Fuel Sales Tax Refunds shall not be included in the definition of US Airways Released Claims. |
| CRJ-900 Aircraft Modifications: | Mesa will, at its sole cost, install ACARS (without printers) on all CRJ-900 aircraft and such systems will be fully functioning on all such aircraft (in accordance with mutually agreed to specifications) no later than April 29, 2011.<br><br>Mesa will, at its sole cost complete internal upgrades for each CRJ-900 aircraft incorporating each item in **Exhibit A** to this Term Sheet.  The items in **Exhibit A** that are to be completed at RON are defined as "RON Upgrades" and the items in **Exhibit A** that are to be completed at C-checks are defined as "C-check Upgrades".  Together the RON Upgrades and C-check Upgrades are defined as "Upgrades."  Mesa will complete |

| | the Upgrades on the mutually agreed timetable set forth in **Exhibit A**.  US Airways will provide the standard for reasonable approval of the Upgrades. |
| --- | --- |
| | Mesa will commence work on the Upgrades as soon as practicable after the date hereof.  US Airways will pay the Effective Date Payment, plus an additional [*] as a contribution towards Mesa's cost for the Upgrades (collectively with the Effective Date Payment, the "Upgrade Contribution"), in 38 equal installments, payable upon satisfactory completion of the RON Upgrades for each CRJ-900 aircraft.  In the event Mesa completes one or more RON Upgrades (in a manner satisfactory to US Airways in US Airways' sole discretion) during the Pre-Effective Date Period, US Airways will pay the pro rata portion of the Upgrade Contribution for each such RON Upgrade at the time such RON Upgrade has been approved by US Airways (each such payment, a "Pre-Effective Date Upgrade Payment").  In the event US Airways makes one or more Pre-Effective Date Upgrade Payments and the Mesa Plan is not filed or confirmed or does not become effective by the respective deadlines set forth herein, US Airways shall be entitled to credit such Pre-Effective Date Upgrade Payments against amounts US Airways otherwise owes Mesa. |
| Operational Performance: | The Amendment will include applicable [*], [*] (controllable [*] within [*] minutes of [*]) and other operational service commitments set forth on **Exhibit C** and the corresponding incentives, liquidated damages, default levels and remedies (including termination of the Agreement) related to Mesa's operational performance that are satisfactory to both parties in the sole discretion of each.  The performance criteria will take effect [*] 1, 2011. |
| Aircraft Cleaning: | Immediately following execution of the definitive documents for the Amendment on terms consistent with this Term Sheet and as may be mutually agreed to by the parties, but effective as of July 1, 2010, and for the remainder of the term of the Agreement, Mesa will provide at its expense (either directly or through a third-party vendor) RON cleaning for all Mesa aircraft. In cases where US Airways provides the RON cleaning, whether directly or through its vendor, Mesa will reimburse US Airways for the actual costs, without markup, of that cleaning service.  Mesa shall have the option to select all vendors in connection with its RON cleaning. The aircraft will be cleaned in accordance with US Airways' RON cleaning standards and procedures, consistent with Section 2.8.2 of the Agreement.  Any amounts owed by Mesa to US Airways pursuant to this Section as of and after July 1, 2010 will be paid by Mesa within 10 days after the Approval Order Date. |
| Notes: | The Mesa Plan shall provide for not more than $61 million in non-ordinary course indebtedness (the "Notes") as follows:<br>• $50 million to Mesa's unsecured creditors;<br>• $5.5 million to Mesa's senior management; and<br>• $5.5 million to US Airways. |

|  | The following provisions shall apply to the Notes:<br><br>• The Notes shall be issued in a single class (except to the extent US Airways consents, such consent to be granted or withheld in US Airways' sole discretion) and be unsecured obligations of Mesa;<br>• The Notes shall provide for the accrual or payment of interest in-kind at an annual all-in rate not to exceed 10% but may not provide for the payment of cash interest until maturity or permitted pre-payment (see below);<br>• The Notes shall not amortize, and shall not have a maturity date prior to December 31, 2015, absent an event of default;<br>• The Notes shall be structured in a tax efficient manner for both Mesa and US Airways;<br>• The Notes may not be prepaid, except only that the Notes, together with accrued interest, may be pre-paid on a pro-rata basis from the proceeds received by Mesa from the sale of its debt and equity investment in Spirit Airlines, Inc. (the "Spirit Proceeds"), and from casualty events and sales of material assets;<br>• The Notes will contain representations and warranties, covenants and other provisions, including provisions protecting the rights of Noteholders, customary for unsecured debt obligations of this kind (including, without limitation, covenants (affirmative, negative and financial), defaults, debt baskets etc.). The terms of the Notes will not be modified or amended without the written approval of US Airways, which approval may be given in US Airways' sole discretion. Mesa shall not enter into any agreement with any Noteholder (in respect of that Noteholder's Notes) unless US Airways is a party to that agreement and consents to its terms (such consent to be granted or withheld in US Airways' sole discretion); and<br>• The Notes shall be guaranteed by each of Mesa's corporate subsidiaries and affiliates.<br><br>Notwithstanding the foregoing, Mesa may issue up to an additional $21 million in Notes (the "Bondholder Notes") to holders of the 2012 Notes on terms identical to the Notes, provided that (i) the total principal of the Notes shall not exceed the sum of $76.5 million and the amount of Notes issued to US Airways and (ii) the principal amount of Notes issued to US Airways shall remain 55/610ths of the aggregate principal amount of Notes. The Bondholder Notes may continue to be guaranteed by Nilchii (the entity that owns Mesa's interest in Spirit Airlines described above) or obtain some other structural payment and collection preference related to Nilchii, provided that if any of the Spirit Proceeds are used to pay off any of the Bondholder Notes, Mesa shall use any Spirit Proceeds in excess of the amounts necessary to pay off the Bondholder Notes to pay down the Notes held by US Airways. Once the Notes held by US Airways have been paid in full, Mesa may use any remaining Spirit Proceeds to pay down the Notes held by Mesa's general unsecured creditors, and then to pay down the Notes held by management. |
| Capital Stock: | The Mesa Plan shall provide for the issuance of a single class of common stock as follows: |

| | |
|---|---|
| | • 80% to Mesa's unsecured creditors;<br>• 10% to Mesa's management; and<br>• 10% to US Airways.<br><br>Upon the Plan Effective Date, Mesa and US Airways shall enter into an investor rights agreement containing at a minimum provisions consistent with those described in **Exhibit D**. The terms of such agreement shall be reasonably satisfactory to US Airways and shall be negotiated and finalized prior to the Disclosure Statement Approval Date. Once US Airways provides its approval of such agreement, its terms may not be modified or amended prior to or after confirmation of the Mesa Plan without the approval of US Airways, which approval may be given or withheld in US Airway's sole discretion. |
| Conditions Precedent: | US Airways' and Mesa's agreement to enter into the Amendment and the effectiveness of the Amendment is subject to the following conditions precedent:<br><br>• Approval by US Airways, by no later than the Mesa Plan Approval Date, in its sole discretion, of (i) the Mesa Plan and related disclosure statement (the "<u>Disclosure Statement</u>"), and (ii) Mesa's business plan, capital and ownership structure, board of directors, management structure, cash flow projections and other information reasonably required by US Airways (collectively, the "<u>Reorganization Information</u>"). The Reorganization Information has already or will be provided to US Airways as soon as possible;<br>• Negotiation and execution of the definitive documents for the Amendment on terms consistent with this Term Sheet and as may be mutually agreed to by the parties (the "<u>Definitive Documentation</u>");<br>• Approval of the Amendment by the parties' respective Boards of Directors;<br>• The filing by Mesa's Creditors' Committee (the "<u>Committee</u>") of a statement of support for the Mesa Plan and Amendment (the "<u>Committee Support Statement</u>") within seven days of the date Mesa files the Approval Motion (the "<u>Committee Support Date</u>"); and<br>• The Bankruptcy Court shall have entered a final order approving the Approval Motion on or before November 20, 2010 (the "<u>Approval Order Date</u>"), and either the time for appeal has expired and no appeal has been taken or, if an appeal has been taken, the order has not been stayed (the "<u>Approval Order</u>"). However, the Approval Order Date shall be extended to December 20, 2010 if (a) the Bankruptcy Court moves the Approval Order Date beyond November 20, 2010 following notice and a hearing pursuant to a motion or request by the Committee or other third party and (b) such motion or request has been opposed in good faith by Mesa.<br><br>The continued effectiveness of the Amendment and US Airways' obligation to make the Plan Effective Date Payment is further subject to the conditions subsequently set forth in the following bullet points (the "<u>Conditions to Continued Effectiveness</u>"): |

- The Disclosure Statement is approved by the Bankruptcy Court by order entered on or before November 20, 2010 (the "Disclosure Statement Approval Date").

- The Mesa Plan is confirmed by the Bankruptcy Court (by order entered on or before January 17, 2011 the "Confirmation Date"), in a form that provides no consideration to Mesa's unsecured creditors other than (i) the Notes and common stock (as described above), (ii) cash payments to holders of *de minimis* general unsecured claims as provided in the Plan, and (iii) waiver of certain avoidance actions, and that does not contain any material change to the capital and ownership structure included in the Plan previously approved by US Airways, and is otherwise in a form that is consistent with Mesa's obligations under the Agreement and the Amendment. Such date (the "Confirmation Date") may be extended by the parties in writing in each party's sole discretion. If the Confirmation Date does not occur on or before January 17, 2011 despite Mesa's best efforts to obtain confirmation of the Mesa Plan by such date, the Confirmation Date may be extended to March 18, 2011.

- The Plan has become effective on or before February 17, 2011 (the "Plan Effective Date"). If the Plan Effective Date does not occur on or before February 17, 2011 despite Mesa's best efforts to achieve the effective date of the Mesa Plan by such date, the Plan Effective Date may be extended to April 15, 2011.

- No occurrence, development or change shall have occurred after the Amendment Execution Date that, in the commercially reasonable judgment of US Airways had or could be reasonably expected to have a material adverse effect upon the business, operations, performance, properties, business prospects or financial condition of Mesa and its direct and indirect subsidiaries, taken as a whole.

- US Airways not becoming aware after the Amendment Execution Date of any new or inconsistent information or other matter not previously disclosed to US Airways in writing relating to Mesa or its direct or indirect subsidiaries or the transactions contemplated by the Amendment which US Airways, in its commercially reasonable judgment, deems material and adverse relative to the information or other matters disclosed to US Airways in writing by Mesa prior to the Amendment Execution Date.

- The accuracy in all material respects of all representations and warranties in the Amendment and the Mesa Plan.

- No default or event of default under the Amendment.

The Approval Order shall be expressly conditioned on the satisfaction of the Conditions to Continued Effectiveness.

| | |
|---|---|
| Withdrawal or | If (a) the Definitive Documentation is not executed and delivered by US |

| | |
|---|---|
| Extension | Airways and Mesa on or before the Documentation Deadline, (b) the Committee Support Statement is not filed on before the Committee Support Date or (c) the Amendment is not approved by the Bankruptcy Court by the Approval Date (the "Pre-Approval Date Conditions"), then US Airways shall have the option (in its sole discretion) to withdraw its agreement with respect to this Term Sheet and/or the Amendment (the "Withdrawal").  Upon the Withdrawal, US Airways and Mesa shall have all of their respective rights under the existing agreements (including Mesa's right to assume the agreements and US Airways' right to contest such assumption).<br><br>If (a) the Mesa Plan is not confirmed by the Confirmation Date in a form approved by US Airways as described above or (b) the Mesa Plan has not become effective on or before the Plan Effective Date (collectively, the "Mesa Plan Conditions") or (c) the Amendment is approved by the Bankruptcy Court and at is thereafter modified, vacated, stayed or amended without US Airways' consent (such consent to be granted or withheld in US Airways' sole discretion) (the "Bankruptcy Court Approval Condition"), US Airways shall have the right to declare the Approval Order vacated and of no further effect (a "Vacatur Declaration").  Commencing on a date 30 days after the occurrence of the Mesa Plan Conditions, if US Airways has not made a Vacatur Declaration, Mesa shall have the right to make a Vacatur Declaration.  Upon a Vacatur Declaration by either US Airways or Mesa, (x) US Airways shall retain all amounts under the Amendment that would have otherwise been due to Mesa had the Approval Order not been entered and such amounts shall not be subject to disgorgement, set-off, offset, recovery or return, (y) US Airways and Mesa shall have all of their respective rights under the existing agreements (including Mesa's right to assume the agreements and US Airways' right to contest such assumption) and (z) the New Payment Rates shall survive any assumption of the existing agreement and remain in effect without modification.<br><br>Upon a Vacatur Declaration by US Airways:<br><br>(a) US Airways will have the option (to be exercised in US Airways' sole discretion) to extend (ratably and on a schedule to be agreed upon in the definitive documentation for the Amendment) the redelivery date of 38 CRJ-900 aircraft over 18 months beyond June 30, 2012 at the New Payment Rates (the "18 Month Redelivery Period").  In the event US Airways exercises the option set forth in this section (a) and Mesa has not exercised its option under section (b) below, then US Airways will pay Mesa the rates and other amounts due as if there had been no Amendment for the period from July 1, 2011 through June 30, 2012.<br><br>(b) Mesa shall have the right to extend the Agreement by one year under the Agreement (e.g., the 18 Month Redelivery Period will commence in July 2013 instead of July 2012) but (i) the New Payment Rates will continue without modification through the 18 Month Redelivery Period |

10

| | |
|---|---|
| | instead of ending on June 30, 2011 and (ii) all other terms and conditions under the Amendment shall remain in full force and effect through the 18 Month Redelivery Period. Mesa shall have the right to exercise the foregoing extension only until the date that is 30 days following the date US Airways makes a Vacatur Declaration. |
| Third Party Negotiations | Upon execution of this term sheet, US Airways shall not meet with, enter into discussions with or negotiate with any third party over the terms of a plan of reorganization for Mesa or the acquisition of all or substantially all of Mesa's assets (including, without limitation, relating to the assumption and/or assignment of the Agreement) unless:<br><br>(a) the Documentation Deadline is missed; or<br>(b) the Committee Support Date is missed; or<br>(c) the Approval Order Date is missed; or<br>(d) the Confirmation Date does not occur by the dates set forth above; or<br>(e) the Plan Effective Date does not occur by the dates set forth above; or<br>(f) at any time Mesa no longer has the exclusive or co-exclusive (with the Creditors' Committee) right to propose or solicit votes on a plan of reorganization or liquidation (unless the Creditors' Committee agrees to only propose or solicit votes with respect to a plan that has the support of Mesa and US Airways).<br><br>In the event that any of the above described deadlines are missed or dates do not occur, then Mesa hereby irrevocably consents to any such meeting, discussion and/or negotiation by US Airways with any such third party. |

| | |
|---|---|
| Binding Provisions: | • *Confidentiality and Public Disclosure.* Pending execution of the Amendment, except as required by law, neither party will disclose to any third party (including by making a public announcement) the terms of this Term Sheet or the existence of the proposed transaction without the other's written approval. Notwithstanding the foregoing, Mesa and US Airways may disclose this Term Sheet to the Creditors' Committee and to their respective professionals, officers, directors and executives. This Term Sheet, all attachments and exhibits hereto, and all information received by either party from or related to the other shall be treated as Confidential Information subject to the confidentiality provisions of the Agreement. Except as required and following reasonable notice (and the opportunity to review and comment) to US Airways, any public disclosure or press release related to the Agreement (whether before or after the date the parties execute the Amendment) shall be subject to US Airways' reasonable approval.<br><br>• *No Assumption.* Mesa agrees that it will take no action with respect to the Agreement, including without limitation, any action intended to assume the Agreement or seek Bankruptcy Court approval for that assumption, prior to October 25, 2010. In the event Mesa takes action to assume the Agreement or seek Bankruptcy Court approval for that assumption without the consent of US Airways (to be granted or withheld at US Airways' sole discretion), Mesa will reasonably cooperate with US Airways in developing a discovery and trial schedule with respect to such assumption (e.g., not less than the stipulated timetable for Delta discovery/litigation).<br><br>• *Good Faith.* Each party will negotiate in good faith with a view to executing the definitive documentation for the Amendment in a timely manner, and each party will use its best commercial efforts to satisfy the conditions precedent set forth herein and in the Amendment. Each party will negotiate in good faith with a view to obtain support from the creditors' committee for the Amendment and the Mesa Plan by the Committee Support Date.<br><br>• *Costs.* Each party is responsible for all of its own costs and expenses incurred in connection with the proposed transaction.<br><br>• No third party shall be a beneficiary of, or be entitled to rely upon, this Term Sheet.<br><br>• *Governing Law.* This Term Sheet is governed by the laws of Arizona, without regard to its choice of law rules. |
| Date: | This Term Sheet is dated as of October 18, 2010 and will expire by its terms if Mesa does not execute and deliver this Term Sheet by October 19, 2010 at 5:00 p.m. prevailing Eastern Time. |

US Airways, Inc.                          Mesa Airlines, Inc.


By:_____         By:_____
    Its:_____             Its:_____

# EXHIBIT A
## (Interior Refurbish Requirements)

| | |
|---|---|
| **RON UPGRADES** | |
| Timing: | Pacing item - Leather/Cushion |
| | Mesa to place order no later than Approval of Codeshare - or when spec is provided if later |
| | Estimated 5 months for cert approval plus 10 weeks to install. |

| Area | Description |
|---|---|
| Seats | Install US spec leather seat covers |
| Seats | Replace seat cushions and backs w/ US spec |
| Seats | Repaint seat arm plastics rows 1, 15, 16 |
| Seat belts | Replace 16G covers, IRAN[1] all others |
| Interior lights | Replace lights covers |
| Lavs | Replace shrouds and lids as required |

| | |
|---|---|
| **SPECIAL VISIT / C CHECK UPGRADES** | |
| Timing: | Pacing Item - Laminate for windscreen |
| | Mesa to place order no later than Approval of Codeshare - or when spec is provided if later |
| | Estimate to complete based on special visit availability to be provided by US Air |

| Area | Description |
|---|---|
| Windows | Replace as needed |
| Windows | Repair/replace aft window shades |
| Windscreens | Replace forward laminates with US spec |
| Interior lights | Replace lights |
| Dado carpet | Replace |
| Bag bins | Replace warped door units, paint as needed |

| | |
|---|---|
| **C CHECK UPGRADE** | |
| Timing: | Pacing Item - Aft Laminate |
| | Mesa to place order no later then Approval of Codeshare - or when spec is provided if later |
| | Estimate to complete based on C Check schedule for the 38 a/c once material is received |

| | |
|---|---|
| Seats | IRAN seats at heavy checks |
| Windows | Replace all as needed |
| Carpet replace | Replace including under seats |
| Windscreens | Replace aft laminates with US spec |

**US Airways will be given full audit rights to inspect completed work to ensure conditions meet specifications of a reconditioned interior**

[1] **IRAN - Inspect and Replace as Needed**

# EXHIBIT B
## (Disputed Claims Amounts)

| | Claimed Amount | Settlement Amount | Percent |
|---|---|---|---|
| *Items Claimed by Mesa* | | | |
| Property Tax [*] | $ [*] | - | - |
| Property Tax [*] | $ [*] | $ [*] | [*] |
| Property Tax [*] | $ [*] | $ [*] | [*] |
| [*] True-up Amounts Claimed by Mesa | $ [*] | $ [*] | [*] |
| 2005 - 2006 [*] True Up & [*] | $ [*] | $ [*] | [*] |
| Government Mandated Charges | $ [*] | - | - |
| Dash 8 [*] Removal | $ [*] | - | - |
| Other (Rent, Security, Landing Fees, etc.) | $ [*] | $ [*] | [*] |
| [*] payment 2007 | $ [*] | $ [*] | [*] |
| [*] 2004 - 2006 | $ [*] | $ [*] | [*] |
| Total Receivables | $ [*] | $ [*] | |
| | | | |
| *Items Claimed by US Airways* | | | |
| [*] cleans 2003 - June 2010 | $ [*] | $ [*] | [*] |
| [*] 2007 - 2009 | $ [*] | $ [*] | [*] |
| Total Payables | $ [*] | $ [*] | |
| | | | |
| Total Due to/(from) Mesa | $ [*] | $ [*] | [*] |

**EXHIBIT C**
(Operational Performance Levels – Page 1)

Default Levels

      1 - Applies to entire [*] not [*] only
      2 – [*] changed to [*] with a cure level of [*]
      3 – [*] replaces [*]; default set at [*] with a cure of [*]

Penalties and Incentives

      1 - Applies to entire [*] not [*] only.
      2 - Measured Quarterly
      3 - Amounts are multiplied by number of [*] that are over/under target levels:
      4 - Level 2 penalty amounts are additive to Level 1 penalty amounts

|  | [*] | [*] |
|---|---|---|
| Penalty Level 1 | [*] | [*] |
| Penalty Amt/Flt | [*] | [*] |
| Penalty Level 2 | [*] | [*] |
| Penalty Amt/Flt | [*] | [*] |
| Incentive Level | [*] | [*] |
| Incentive Amt/Flt | [*] | [*] |

Conditions:

[*] spare a/c for each hub ([*] or [*]).

Right for Mesa to use [*] or [*] as support spare at Mesa's sole expense on a limited basis.

Valid for current hubs - PHX and CLT and linear flying only and provided schedules are reasonably consistent with past practice US scheduling parameters for Utilization, RON Mtc time, Turn Times, Recovery Time.

# EXHIBIT D

(Investor Rights Agreement Provisions)

Mesa and US Airways will enter into an Investor Rights Agreement in customary form and reasonably satisfactory to US Airways, including the following key terms:

US Airways will be provided with the following rights under the Investor Rights Agreement:

- Customary registration rights, including the following:
  - Piggyback registration rights on all registrations by Mesa (except S-4 and S-8), pro rata based on shares owned, subject to standard underwriter cut-back;
  - S-3 registration rights subject to the shares being registered having an anticipated aggregate price to the public of at least $500,000; and
  - Standard expense provisions, with Mesa paying the expenses of registrations other than underwriting discounts and commissions.
  - The registration rights are in addition to the exemption provided by Section 1145, and do not constitute as admission that US Airways will be an affiliate of Mesa.
- Financial information, including the following:
  - Annual and quarterly financial statements and any of other financial statements provided to any stockholder;
  - Annual and quarterly financial statement obligation may be satisfied by timely SEC fillings of 10-K and 10-Q;
  - US Airways may at any time at its elect to terminate its receipt of material non-public information under this provision.
- Approval right over the following transactions:
  - related party transactions, other than normal compensation transactions approved by a majority of the independent directors;
  - dividends or other distributions to stockholders, or repurchases of shares; provided, however, that US Airways shall be deemed to approve dividends or other distributions to stockholders only from the Spirit Proceeds if and to the extent the Spirit Proceeds (inclusive of any amounts used to repay the Notes) exceeds $125 million
  - non pro rata payment with respect to or retirement of any of the notes issued under the Mesa Plan (this provision may be satisfied by including it in the indenture relating to the notes);
  - amendment to Mesa's charter documents that adversely affects US Airways relative to the other stockholders (including any issuance of preferred stock); and
  - expansion of shares eligible for grant under equity based compensation programs.

The registration rights will remain effective unless and until such time as (a) Mesa common stock is traded on the NYSE or Nasdaq, and (b) all shares of Mesa common stock held by US Airways have had all restrictive legends removed, and may be resold by US Airways into the public market without volume, manner of sale or other contractual or legal restriction.

The other rights above will terminate if (a) Mesa common stock is traded on the NYSE or Nasdaq, and (b) US Airways and/or its affiliates no longer continues to hold the greater of (x)

62.5 percent of the shares issued to it under the Mesa Plan or (y) 4.9 percent of the shares of common stock then outstanding.

If any other protective provisions are established through negotiation with other stockholders, US Airways will be entitled to be included in that covenant and vote its shares on any matter covered by the protective provisions  If there are none, Mesa will so confirm in the definitive documents.

In addition, if any other party receiving a number of shares of common stock equal to or less than that being issued to US Airways is granted the right to approve the following, such action will also benefit, or require the approval of, US Airways, as the case may be:

- Appoint a director or board observer
- Approve the exercise of drag along rights
- Approve:
    - a public offering or similar transaction;
    - the issuance of material indebtedness;
    - the issuance of preferred stock;
    - the amendment to the certificate of incorporation or bylaws;
    - adoption or amendment to the business plan in place at the time of emergence from bankruptcy;
    - approval of the annual budget;
    - acquisition or other significant corporate transaction;
    - commitment to material capital expenditures;
    - sale of the Company or any similar transaction; or
    - hiring of a CEO or CFO.

**EXHIBIT B**

**(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 6004, 6006 AND 9019
AUTHORIZING DEBTORS TO (I) ASSUME CODE-SHARE AGREEMENT,
AS AMENDED, WITH US AIRWAYS, INC., (II) SETTLE CERTAIN
CLAIMS OF THE DEBTORS AGAINST US AIRWAYS, INC.
AND (III) SELL CERTAIN RELATED ASSETS TO US AIRWAYS, INC.**

Upon the motion, dated October 27, 2010 (the "Motion")[2] of Mesa Air Group,

Inc. and its affiliated debtors and debtors in possession (the "Debtors"), pursuant to sections

363(b) and 365(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004,

6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for

authorization to (i) assume the US Airways Agreement as amended, (ii) settle certain claims of

the Debtors against US Airways, and (iii) sell certain related assets (the "Assets") to US

Airways; and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 USC. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 USC. § 157(b)(2); and due and proper

notice of the Motion having been provided and that no other or further notice is necessary; and

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest; and the Court having found that (a) there is no uncured default by the Debtors under the US Airways Agreement, and thus, no adequate assurance of future performance by the Debtors is required under section 365(b) of the Bankruptcy Code, (b) the Debtors' settlement of the Mesa Code-Share Claims is reasonable and in the best interests of the estate, and (c) the sale of the Assets is supported by the sound exercise of the Debtors' business judgment; and that the legal and factual bases set forth in the Motion, the arguments of Debtors' counsel at the hearing on the Motion, and the evidence provided at the hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Motion is expressly conditioned on the satisfaction of the Conditions to Continued Effectiveness; and it is further

ORDERED that, pursuant to section 365 of the Bankruptcy Code, the Debtors are authorized to assume the US Airways Agreement in its current form or as amended effective as of the date of this Order; and it is further

ORDERED that no amounts are due and owed by the Debtors and there are not any other defaults under the US Airways Agreement that are required to be cured by the Debtors pursuant to section 365(b)(1) of the Bankruptcy Code; and it is further

ORDERED that the Debtors are authorized to enter into any agreements contemplated by and on the terms set forth in the US Airways Agreement, as amended, and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions that may be reasonably necessary or appropriate to

2

implement the US Airways Agreement, as amended, and perform all obligations contemplated thereunder; and it is further

ORDERED that any person or entity that did not timely object to the Motion is deemed to consent to the Debtors' assumption of the of the US Airways Agreement in its current form, or as amended; and it is further

ORDERED that the Debtors are authorized to settle the Mesa Code-Share Claims in the amount of $4,000,000 (plus an additional $1 million toward certain CRJ900 aircraft upgrades) and to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions that may be reasonably necessary or appropriate to implement such settlement; and it is further

ORDERED that the Debtors are authorized, pursuant to section 363(b) of the Bankruptcy Code to sell the Assets in exchange for a cash purchase price equivalent to their fair market value; and it is further

ORDERED that, pursuant to section 363(f)(2) of the Bankruptcy Code, upon consummation of the sale of the Assets, such Assets shall be transferred to US Airways with all right, title, and interest in the Assets free and clear of any liens, claims, or interests; and it is further

ORDERED that notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective immediately upon entry; and it is further

ORDERED that this Court shall retain jurisdiction (i) to enforce and implement the terms and provisions of the US Airways Agreement in its current form, or as amended, and any subsequent amendments thereto, (ii) to resolve any disputes arising under or related to the

US Airways Agreement or Term Sheet, and (iii) to interpret, implement and enforce the

provisions of this Order.

Dated: November __, 2010
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE