# EXHIBIT B

**(Blackline of Second Amended Disclosure Statement)**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>  MESA AIR GROUP, INC., *et al.*,<br><br>          Debtors.[1] | Chapter 11<br><br>Case No. 10-10018 (MG)<br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED JOINT PLAN OF REORGANIZATION OF MESA AIR GROUP, INC. AND AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile: 212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for Debtors
and Debtors in Possession

Dated: November 4,[ ], 2010

---

[1] The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND OVERVIEW ................................................................ 1
   A.   Introduction ................................................................................................ 1
   B.   Disclaimers ................................................................................................ 2
   C.   Overview of Chapter 11 ............................................................................ 5
   D.   Overview of the Plan ................................................................................ 6
   E.   Voting Instructions .................................................................................... 9
       1.   How to Vote ...................................................................................... 9
       2.   Who Is Being Solicited to Vote ...................................................... 10
       3.   Voting Record Date .......................................................................... 11
       4.   Voting Procedures ............................................................................ 11
       5.   Brokerage Firms, Banks, and Other Nominees ................................ 12
       6.   Withdrawal of Votes on the Plan .................................................... 12
       7.   Solicitation Agent ............................................................................ 13
   F.   Confirmation ............................................................................................ 13
II. HISTORY, ORGANIZATION AND OPERATIONS OF THE DEBTORS ...... 15
   A.   Description of the Debtors' Businesses and Operations ............................ 15
       1.   In General ........................................................................................ 15
   B.   Corporate Structure .................................................................................. 16
   C.   Employees and Management .................................................................... ~~16~~17
   D.   Regulation ................................................................................................ 17
   E.   Significant Indebtedness .......................................................................... 18
       1.   The 2012 Notes ................................................................................ ~~18~~19
       2.   The 2023 Notes ................................................................................ ~~18~~19
       3.   The 2024 Notes ................................................................................ 19
       4.   The Debtors' Owned and Leased Aircraft Fleet .............................. 19
           ~~a.   CRJ Owned Aircraft Financing~~ ............................................ ~~19~~
           ~~b.   Leased Aircraft Obligations~~ .................................................. ~~19~~
           ~~c.   Beech Aircraft Financing~~ ...................................................... ~~20~~
           ~~d.   Master Purchase Agreement and Obligations to Bombardier~~ .. ~~20~~
       5.   Ordinary Course Trade Debt ............................................................ 20
   F.   Equity ...................................................................................................... ~~20~~21
   G.   Significant Assets .................................................................................... 21
       1.   In General ........................................................................................ 21
       2.   Cash ................................................................................................ 21
       3.   Real Property .................................................................................... 21
       4.   Potential Claims and Causes of Action .......................................... ~~21~~22
   H.   Events Prior to the Bankruptcy Filings .................................................... ~~21~~22
       1.   Aviation Bankruptcies / New Code-Share Agreements .................... ~~21~~22
       2.   The Debtors' Fleet and Code-Share Requirements ........................ ~~22~~23
       3.   Code-Share Litigation ...................................................................... 24
           ~~a.   Delta Litigation~~ .................................................................... ~~24~~
           ~~b.   United Litigation~~ .................................................................. ~~25~~
       4.   Kunpeng Joint Venture .................................................................... 25

　　　5.　*go!* Mokulele ................................................................................ 26
　I.　Commencement of Chapter 11 Cases ......................................................... 27
III. SIGNIFICANT POSTPETITION EVENTS .......................................................... 27
　A.　Restructuring Overview ........................................................................... 27
　B.　Certain Significant Events and Initiatives During the Chapter 11 Cases ......... 27
　　　1.　Automatic Stay ................................................................................ 27
　　　2.　Significant First Day Motions and Orders ........................................ 28
　　　3.　Debtors' Retention of Professionals ................................................. 29
　　　4.　Ordinary Course Professionals ....................................................... ~~29~~30
　　　5.　Appointment of Committee ............................................................. 30
　　　6.　Interim Compensation of Professionals ............................................ 30
　　　7.　Letter of Credit Facility .................................................................. 30
　　　8.　Labor Cost Restructurings and Certain Other Initiatives ................... 31
　　　　　a.　~~Unionized Labor Cost Restructuring~~ ....................................... ~~31~~
　　　　　b.　~~Non-Unionized Labor Cost Restructuring~~ ............................... ~~31~~
　　　9.　Assumption and Rejection of Nonresidential Real Property Leases/365(d)(4) Extension 31
　　　10.　Exclusivity Extension .................................................................... ~~31~~32
　　　11.　De Minimis Asset Sales Procedures ................................................ 32
　　　12.　Settlement Procedures In Connection With Claims and Causes of Action Brought or Threatened by or Against the Debtors In Judicial, Administrative, Arbitral or Other Actions or Proceedings ............................................................ ~~32~~33
　　　13.　Reclamation Procedures ................................................................ 33
　　　14.　Committee's Motion for Establishment of Procedures Under 11 U.S.C. § 1102(b)(3) 33
　C.　Fleet Rationalization and Restructuring / Section 1110 Agreements ............. 34
　　　1.　Raytheon Aircraft Credit Corporation – Beech 1900D Aircraft and Related Aircraft Equipment .................................................................... 36
　　　2.　Settlement Procedures for Section 1110(b) Rejection Damages Claims of Certain Aircraft Lessors ................................................................. 36
　　　3.　Assumption of Aircraft and Aircraft Equipment Leases ..................... 37
　　　4.　Postpetition Engine Lease Agreements & Security Agreements .......... 37
　D.　Code-Share Issues/Status .......................................................................... 38
　　　1.　Delta .............................................................................................. 38
　　　2.　United ........................................................................................... 39
　　　3.　~~U.S.~~US Airways .............................................................................. 39
　E.　Summary of Claims Process, Claims Bar Date and Claims Filed ................... 40
　　　1.　Filing of Schedules and Claims Bar Date ......................................... 40
　　　2.　Claims Objection Procedures .......................................................... 40
　F.　Negotiation of the Plan ............................................................................. 42
　　　1.　Overview ....................................................................................... 42
　　　2.　Negotiations with Committee / Committee Support of Plan ............... 42
　　　3.　No Substantive Consolidation ......................................................... 43
　　　4.　Equal Treatment of Classes ............................................................ 43
　　　　　a.　~~Restructured Unsecured Equity~~ ............................................. ~~44~~
　　　　　b.　~~New 8% Notes (Series A)~~ ..................................................... ~~44~~
　　　　　c.　~~New 8% Notes (Series B)~~ ..................................................... ~~44~~
　G.　The Debtors' Liabilities ............................................................................. 47

|   |     |                                                            |       |
|---|-----|------------------------------------------------------------|-------|
|   | 1.  | Administrative Claims                                      | 47    |
|   | 2.  | Priority Tax Claims                                        | 48    |
|   | 3.  | Secured Tax Claims                                         | 48    |
|   | 4.  | Priority Non-Tax Claims                                    | 48    |
|   | 5.  | Secured Claims                                             | 48    |
|   | 6.  | General Unsecured Claims                                   | 48    |
|   | 7.  | De Minimis Convenience Claims                              | 49    |
|   | 8.  | 510(a) Subrogation Claims                                  | 49    |
|   | 9.  | 2012 Noteholder Claims                                     | 49    |

IV. DESCRIPTION OF THE PLAN ........................................................ 49

A. Unclassified Claims ........................................................ 49
  1. Administrative Claims ........................................................ 50
  2. Allowed Priority Tax Claims ........................................................ 50
  3. Allowed Secured Tax Claims ........................................................ 51
    a. ~~Generally~~ ........................................................ ~~51~~
    b. ~~Section 1124(2) Reinstatement.~~ ........................................................ ~~51~~
    c. ~~Determination of Applicable Treatment.~~ ........................................................ ~~51~~
  4. Claims for Professional Fees ........................................................ 52
  5. Indenture Trustee Fees and Expenses ........................................................ 52

B. Classification of Claims and Interests ........................................................ 52

C. Treatment of Claims and Interests Against the Reorganized Debtors ........................................................ ~~57~~56
  1. Priority Non-Tax Claims Classes 1(a)- 1(*l*) ........................................................ ~~57~~56
  2. Secured Claims Classes 2(a)-2(*l*) ........................................................ 57
  3. General Unsecured Claims Classes 3(a)-3(*l*) ........................................................ ~~59~~58
    a. ~~U.S. Citizens.~~ ........................................................ ~~59~~
    b. ~~Non-U.S. Citizens.~~ ........................................................ ~~59~~
  4. De Minimis Convenience Claims Classes 4(a)-4(*l*) ........................................................ 59
  5. 510(a) Subrogation Claims Class 5(a) and 5(b) ........................................................ ~~60~~59
  6. 2012 Noteholder Classes 6(a)-(*l*) ........................................................ 60
  7. Interests Classes 7(a)-(*l*) ........................................................ 60
  8. Nonconsensual Confirmation ........................................................ ~~60~~61

D. Implementation of the Plan ........................................................ ~~60~~61
  1. Continued Corporate Existence; Ongoing Operations of the Reorganized Debtors and Wind-Up of Liquidating Debtors ........................................................ 61
  2. Intercompany Claims ........................................................ 62
  3. Management ........................................................ 62
    a. ~~Reorganized Mesa Air Group~~ ........................................................ ~~62~~
    b. ~~Other Debtors~~ ........................................................ 63
  4. Management Notes and Management Equity Pool ........................................................ 63
  5. Corporate Action ........................................................ ~~63~~64
  6. Funding of the Reorganized Debtors on and After the Effective Date ........................................................ 65
  7. No Substantive Consolidation ........................................................ 65
  8. Revesting of Estate Assets ........................................................ 65
  9. Retained Causes of Action and/or Defenses ........................................................ ~~65~~66
  10. Issuance of Restructured Equity and New Notes<u>; Shareholders Agreement</u> ........................................................ 66
  11. Securities Law and Air Carrier Regulatory Matters ........................................................ ~~67~~68

    12. Restrictions on Resale of Securities to Protect Net Operating Losses ........ ~~69~~70

    13. Cancellation of Existing Notes, Securities and Agreements ........ ~~69~~70

    14. Committee Dissolution – Post-Effective Date Committee ........ ~~69~~70

    15. Final Decree ........ ~~70~~71

E.   Provisions Governing Distributions ........ ~~70~~71

    1. Distributions by the Debtors ........ ~~70~~71

    2. Distributions on Account of Claims Allowed as of the Effective Date ........ ~~70~~71

    3. Estimation ........ ~~70~~71

    4. Distributions on Account of Claims Allowed After the Effective Date ........ 71

      ~~a. Distribution Record Date~~ ........ 71

      ~~b. Distributions on Account of Disputed Claims and Estimated Claims~~ ........ 71

      ~~c. Distributions of New Common Stock and New Warrants~~ ........ 71

      ~~d. Distributions on account of Noteholder Claims~~ ........ 71

      ~~e. No Distributions Pending Allowance~~ ........ 71

      ~~f. Objection Deadline~~ ........ 72

      ~~g. Disputed and Estimated Claims Reserve~~ ........ 72

        ~~i. Cash Reserve~~ ........ 72

        ~~ii. Restructured Unsecured Equity/New 8% Notes (Series A) and New 8% Notes (Series B) Reserves~~ ........ 72

      ~~h. Settling Disputed Claims~~ ........ 73

    5. Distributions in Cash ........ ~~73~~74

    6. Undeliverable Distributions ........ ~~73~~74

    7. Unclaimed Distributions ........ ~~73~~74

    8. Setoff ........ 74

    9. Taxes ........ ~~74~~75

    10. De Minimis Distributions ........ ~~74~~75

    11. Surrender of Notes and Other Instruments ........ ~~74~~75

    12. Fractional Shares ........ ~~75~~76

F.   Executory Contracts and Unexpired Leases and Other Agreement/Program Matters ........ ~~75~~76

    1. Assumption ........ ~~75~~76

    2. Rejection ........ ~~75~~76

    3. Assumption Obligations ........ ~~76~~77

    4. Effect of Confirmation Order ........ ~~76~~77

    5. Post-Petition Agreements ........ ~~76~~77

    6. Modifications to Plan Supplement ........ ~~77~~78

    7. Code-Share Agreements ........ ~~77~~78

    8. Fleet ........ ~~77~~78

    9. CRJ 700 Aircraft Leases and CRJ 900 Aircraft Leases ........ 78

    10. Collective Bargaining Agreements ........ ~~78~~79

    11. Key Employment Agreements ........ ~~78~~79

    12. ACE Insurance Program ........ ~~78~~79

    13. Debtors' Indemnification Obligations ........ ~~79~~80

    14. Post-Petition Aircraft Agreements ........ ~~79~~80

    15. Customer Programs ........ ~~79~~80

G.  Conditions Precedent ........ ~~80~~81

H.  Effects of Confirmation ........ ~~80~~81

|  | 1. | Binding Effect | ~~80~~81 |
|  | 2. | Property Revests Free and Clear | ~~81~~82 |
|  | 3. | Discharge and Permanent Injunction | ~~81~~82 |
|  | 4. | Releases | ~~81~~ |
|  |  | a. ~~Release by the Debtors~~ | ~~81~~ |
|  |  | b. ~~Voluntary Releases by Holders of Claims~~ | 82 |
|  | 5. | Limitation of Liability | ~~82~~83 |
|  | 6. | Exoneration and Reliance | ~~83~~84 |
| I. | Retention of Jurisdiction | | ~~83~~84 |
| J. | Amendment and Withdrawal of the Plan | | ~~83~~84 |
| K. | Miscellaneous | | ~~84~~85 |
|  | 1. | Effectuating Documents; Further Transactions; Timing | ~~84~~85 |
|  | 2. | Exemption from Transfer Taxes | ~~84~~85 |
|  | 3. | Modification of Payment Terms | ~~84~~85 |
|  | 4. | Quarterly Fees to the United States Trustee/Post-Confirmation Status Reports | ~~84~~85 |
|  | 5. | Successors and Assigns | ~~84~~85 |
|  | 6. | Severability of Plan Provisions | ~~85~~86 |
|  | 7. | Conflict of Terms | ~~85~~86 |
| V. OTHER IMPORTANT INFORMATION REGARDING THE PLAN | | | ~~85~~86 |
| A. | Potential Litigation | | ~~85~~86 |
|  | 1. | Avoidance Action Waiver | ~~85~~86 |
|  | 2. | Other Potential Litigation Recoveries | ~~85~~86 |
|  | 3. | Estimation of Claims | ~~86~~87 |
| B. | Risk Factors | | ~~86~~87 |
|  | 1. | The Chapter 7 Liquidation Analysis and Financial Projections Are Based on Estimates and Numerous Assumptions | ~~87~~88 |
|  | 2. | The Debtors May Not Be Successful With Respect to Contested Claims | ~~87~~88 |
|  | 3. | Litigation Recoveries and Results Are Highly Speculative and Uncertain | ~~87~~88 |
|  | 4. | Risks Related to Any Securities Issued Pursuant to the Plan | ~~87~~88 |
|  | 5. | There is a Risk that the Plan will not be Confirmed if the Debtors Cannot Satisfy Administrative Expense Claims in the Manner Required by the Bankruptcy Code | ~~88~~89 |
|  | 6. | Risks Related to the US Airways Tenth Amendment | ~~89~~90 |
|  | 7. | Sublease Projections for CRJ 700 Aircraft | ~~89~~90 |
| C. | Certain Federal Income Tax Consequences of the Plan | | ~~90~~91 |
|  | 1. | Introduction | ~~90~~91 |
|  | 2. | U.S. Federal Tax Consequences to the Debtors | 92 |
|  |  | a. ~~General~~ | 92 |
|  |  | b. ~~Tax Consequences Resulting from the Cancellation of Debt~~ | 92 |
|  |  | c. ~~Limitation of Net Operating Loss Carryovers and Other Tax Attributes~~ | 93 |
|  |  | i. ~~General Section 382 Limitations~~ | 93 |
|  |  | ii. ~~Overview of Certain Prepetition Section 382 Matters~~ | 94 |
|  |  | iii. ~~Special Bankruptcy Exceptions to Section 382~~ | 95 |
|  |  | d. ~~Alternative Minimum Tax~~ | 96 |
|  | 3. | U.S. Federal Tax Consequences to Creditors and Holders of Interests | 97 |
|  |  | a. ~~Consequences to Creditors~~ | 97 |
|  |  | i. ~~General~~ | 97 |

      ii.    Consequences to Holders of Claims That Do Not Constitute Securities ..... 97
      iii.  Consequences to Holders of Claims That Constitute Securities ..... 97
      iv.  Distributions in Discharge of Accrued But Unpaid Interest ..... 98
      v.   Market Discount ..... 99
   b.   U.S. Federal Tax Consequences to the Holders of Interests in the Debtors ..... 99
   c.   Information Reporting and Back-up Withholding ..... 100

VI. REQUIREMENTS FOR CONFIRMATION ..... ~~100~~101
  A.   Good Faith and Compliance with Law ..... ~~100~~101
  B.   Best Interests ..... ~~100~~101
  C.   Plan Acceptance ..... ~~100~~101
  D.   Confirmation of the Plan Without Acceptance by All Impaired Classes ..... ~~101~~102
  E.   Feasibility ..... ~~102~~103

VII. LIQUIDATION ANALYSIS ..... ~~103~~104

VIII. CONCLUSION ..... ~~106~~107

LIST OF EXHIBITS ..... ~~107~~108

Mesa Air Group and its affiliated debtors and debtors in possession have proposed the Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code (as may be amended, the "Plan"), under chapter 11 of title 11 of the Bankruptcy Code, and submit this Disclosure Statement in support of the Plan (the "Disclosure Statement"). The definitions contained in the Bankruptcy Code are incorporated in this Disclosure Statement by this reference, and the definitions set forth in the Plan will apply to capitalized terms used in the Disclosure Statement.

# I.
# INTRODUCTION AND OVERVIEW

## A.  **Introduction**

Mesa Air Group is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service.

On January 5, 2010, Mesa Air Group, Mesa Airlines, Freedom, Mesa Air New York, Mesa In-Flight, MPD, RHMC, RASI, Air Midwest, MAGAIM, Nilchii, and Patar each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes. The Debtors remain in possession of and manage their assets as debtors in possession.

This Disclosure Statement, submitted in accordance with Section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement describes the Plan and contains information concerning, among other matters, (i) the history, businesses, results of operations, assets and liabilities of the Debtors; (ii) the Chapter 11 Cases; (iii) a discussion of the Plan's feasibility and liquidation analysis setting forth what holders of Claims and Interests against the Debtors could potentially recover if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (iv) the assets available for distribution to Creditors under the Plan. The Debtors urge you to carefully review the contents of the Disclosure Statement and Plan before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

On November 18, 2010, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor, typical of holders of Claims and Interests receiving this Disclosure Statement, to make an informed judgment about the Plan. Under Section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, reviewed the Plan, nor conducted a detailed investigation regarding the contents of this Disclosure Statement.

Your vote on the Plan is important. This Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. Absent

acceptance of the Plan, there may be protracted delays, a chapter 7 liquidation, or the confirmation of another plan. The Debtors have examined various alternatives and, based on the information contained in this Disclosure Statement and for the reasons set forth below, the Debtors have concluded that the Plan provides the most favorable recovery to holders of Allowed Claims of such alternatives. The Committee was heavily involved in the negotiation and the formulation of the Plan and believes that, subject to the resolution of certain open issues and the exercise of its fiduciary duties, the Plan represents the best alternative available to Creditors. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than the Voting Deadline, 4:00 p.m. Eastern time on **December 23, 2010**. The Voting Deadline is set forth in the Disclosure Statement Approval Order, a copy of which accompanies the Disclosure Statement.

Attached as Exhibits to the Disclosure Statement are copies of the following documents:

- A diagram showing the general corporate structure of the Debtors is attached hereto as **Exhibit A**.

- The Plan - **Exhibit B**.

- The Disclosure Statement Approval Order that, among other things, approved this Disclosure Statement and forms of ballots, established certain voting procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, and scheduled the Confirmation Hearing - **Exhibit C**.

- The Debtors' Chapter 7 Liquidation Analysis - **Exhibit D**.

- The Debtors' Financial Projections - **Exhibit E**.

In addition, a ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to those holders of Claims that the Debtors believe are entitled to vote to reject or accept the Plan.

## B.  **Disclaimers**

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THIS DISCLOSURE STATEMENT IS CURRENT AS OF NOVEMBER 1, 2010. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IN THE DISCLOSURE STATEMENT IS CORRECT AS OF ANY TIME AFTER SUCH DATE, OR THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE DEBTORS AS OF SUCH LATER DATE.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "INTEND," AND "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY FORWARD-LOOKING STATEMENTS. ALTHOUGH THE DEBTORS BELIEVE THAT THEIR ESTIMATES AND ASSUMPTIONS REFLECTED IN THOSE FORWARD-LOOKING STATEMENTS ARE REASONABLE, THE DEBTORS CAN GIVE NO ASSURANCE THAT THESE ESTIMATES AND ASSUMPTIONS WILL BE REALIZED. FORWARD-LOOKING STATEMENTS ARE BASED ON ASSUMPTIONS THAT ARE UNAVOIDABLY AND INHERENTLY IMPRECISE. ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS WILL LIKELY DIFFER MATERIALLY FROM THOSE CONTEMPLATED, EXPRESSED, OR IMPLIED BY THE FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, WHETHER AS A RESULT OF NEW DEVELOPMENTS OR OTHERWISE.

IN CONNECTION WITH THE VALUATION OF THE INTEREST IN SPIRIT AIRLINES HELD BY INDIGO, THE ONLY NON-PUBLIC INFORMATION PROVIDED BY INDIGO OR SPIRIT AIRLINES CONSISTED OF HISTORICAL FINANCIAL INFORMATION OF SPIRIT AIRLINES. IN PARTICULAR, THE DEBTORS WERE NOT PROVIDED WITH ANY INTERNAL PROJECTIONS OR OTHER FORECASTS OF THE FUTURE PERFORMANCE OF SPIRIT AIRLINES, WHETHER PREPARED BY INDIGO OR SPIRIT AIRLINES. ACCESS TO SUCH INTERNAL, NON-PUBLIC INFORMATION COULD RESULT IN A MATERIAL CHANGE IN THE VALUATION OF THE DEBTORS' OWNERSHIP POSITION IN INDIGO.

THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND IN ANY EXHIBITS TO THE DISCLOSURE STATEMENT, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE. REASONABLE EFFORT HAS BEEN MADE, HOWEVER, TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED

WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

ALL PROFESSIONALS TO THE DEBTORS HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH PROFESSIONALS FOR THE DEBTORS HAVE PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, THE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED IN OR ATTACHED TO THE DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBMITTED FOR APPROVAL UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON THE SEC AND THE SEC HAS BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE DISCLOSURE STATEMENT, NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS TO THE DISCLOSURE STATEMENT OR THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE. CREDITORS SHOULD CONSULT THEIR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING THEIR CLAIMS.

UNLESS YOUR CLAIM IS ALLOWED, IN WHOLE OR IN PART, UNDER THE PLAN, THE ABILITY OF THE DEBTORS TO OBJECT TO YOUR CLAIM IN ACCORDANCE WITH THE PLAN AND APPLICABLE LAW IS BEING PRESERVED AND NOT WAIVED UNDER THE PLAN. MOREOVER, ANY RIGHTS OF ACTION AGAINST YOU IN FAVOR OF THE DEBTORS ARE BEING PRESERVED UNDER THE PLAN. THE DEBTORS DO NOT BELIEVE THAT THIS RESERVATION OF RIGHTS SHOULD AFFECT YOUR DECISION ON HOW TO VOTE ON THE PLAN. ALTHOUGH THE

DEBTORS BELIEVE THAT THE CONFIRMATION OF THE PLAN IS IN THE INTERESTS OF CREDITORS OF THE DEBTORS, THIS ADVISORY IS PROVIDED TO ENSURE THAT YOU DO NOT ASSUME, BY THE DEBTORS' SOLICITATION OF YOUR VOTE, BY THE ESTIMATES CONTAINED IN THE DISCLOSURE STATEMENT, OR BY ANY OTHER PROVISIONS OF THE PLAN OR DISCLOSURE STATEMENT (OTHER THAN AN EXPRESS PROVISION OF THE PLAN ALLOWING YOUR CLAIM OR WAIVING SPECIFIED RIGHTS OF ACTION AGAINST YOU) THAT THE DEBTORS, THE REORGANIZED DEBTORS, OTHER CREDITORS, OR OTHER PARTIES IN INTEREST WILL NOT OBJECT TO YOUR CLAIM OR INTEREST OR THAT THE DEBTORS WILL NOT PURSUE ANY RIGHT OF ACTION AGAINST YOU. INSTEAD, FOR THE PURPOSE OF DECIDING HOW TO VOTE ON THE PLAN, IF YOUR CLAIM IS NOT EXPRESSLY ALLOWED UNDER THE PLAN, YOU SHOULD ASSUME THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR RESPECTIVE SUCCESSORS OR REPRESENTATIVES WILL (A) OBJECT TO YOUR CLAIM AND (B) ASSERT ALL SETOFFS, RECOUPMENTS, RIGHTS TO SUBORDINATE, OR AFFIRMATIVE CLAIMS THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR RESPECTIVE SUCCESSORS MAY HAVE WITH RESPECT TO YOU AND/OR YOUR CLAIMS AGAINST THE DEBTORS.

The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote to accept or reject the Plan, and nothing stated herein will constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Debtors or Creditors.

Summaries of certain provisions of agreements referenced in this Disclosure Statement do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the full text of the applicable agreement, including the definitions of terms contained in such agreement.

## C. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and equity interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person

acquiring property under the plan, and any creditor, interest holder, or general partner in the debtor. The provisions of the Debtors' Plan are summarized in Section IV of the Disclosure Statement.

As noted above, certain holders of claims against and equity interests in a debtor are permitted to vote to accept or reject a plan. Prior to soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor and any other plan proponents to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and Interests in the Debtors to satisfy the requirements of section 1125.

## D.    Overview of the Plan

The Plan effectuates a reorganization of these Debtors through the ultimate corporate parent's – Reorganized Mesa Air Group –issuance of (i) New 8% Notes (Series A) to the holders of the 2012 Noteholder ~~Claim~~Claims and (ii)(a) New Common Stock,[2] New Warrants to acquire shares of the New Common Stock, and New 8% Notes (Series B) to the holders of General Unsecured Claims and Subrogation Claims and (b) the U.S. Air Note to ~~U.S.~~US Airways, which will preserve the Debtors' business operations and going concern value. Holders of Interests will neither receive, nor retain, any property under the Plan. The Plan will be funded by way of the Debtors' cash on hand, revenues from ordinary course operations and proceeds of asset sales. There will be no substantive consolidation of the Debtors' Estates under the Plan.

In addition, as consideration for entry into the ~~U.S.~~US Airways Code-Share Tenth Amendment, ~~U.S.~~US Airways will receive approximately ten percent (10%) of the New Common Stock and the Management Equity Pool shall be reserved for distribution under the management/employee equity incentive plan that will be established by the Reorganized Board.

As set forth herein and in the exhibits hereto, the Debtors have estimated, based on certain hypothetical operating projections and an assessment of other available assets, the value to be realized from the Debtors' Estates under the Plan. Pursuant to the Plan, each holder of an Allowed General Unsecured Claim who is a U.S. Citizen will be allocated its share of New Common Stock (after giving effect to the shares of New Common Stock reserved for issuance under the Management Equity Pool and ~~U.S.~~US Airways) and the New 8% Notes (Series B). Each holder of an Allowed General Unsecured Claim who is a Non-U.S. Citizen will be allocated its share of New Warrants (after giving effect to the shares of New Common Stock reserved for issuance under the Management Equity Pool and ~~U.S.~~US Airways) and the New 8% Notes (Series B).

Under the Plan, there will also be a separate convenience class comprising De Minimis Convenience Claims (general unsecured claims in the amount of $100,000 or less), which will receive Cash payments in the percentages set forth in **Exhibit D** to the Plan. Other than Noteholders, unsecured creditors will be allowed to opt into the De Minimis Convenience Claims class if desired. The Debtors believe that such convenience class is reasonable and

---

[2] On the Effective Date, Reorganized Mesa Air Group will be deemed to own all of the ownership interests in each other Reorganized Debtor.

necessary for administrative convenience because, among other things, such structure reduces the number of unsecured creditors who may otherwise receive Restructured Unsecured Equity under the Plan and thus minimize or avoid governmental agency registration, reporting and regulation costs as well as potential breaches of ownership restriction provisions in the United Code-Share Agreement and ~~U.S.~~US Airways Code-Share Agreement.

All existing Interests in Mesa Air Group will be extinguished and the holders of such Interests will not receive or retain any property on account of such Interests. Reorganized Mesa Air Group will be vested directly or indirectly with the Interests in the (i) Reorganized Debtor Subsidiaries and (ii) the Liquidating Debtors (*e.g.*, RHMC, Patar, and Air Midwest).

Intercompany Claims will be taken into account in assessing the value of the respective Debtors, but Holders of Intercompany Claims will not directly receive or retain any property on account of such Claims under the Plan.

Finally, all other (senior) Allowed Claims, such as Administrative Claims, Secured Tax Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims will be paid or otherwise satisfied pursuant to the terms of the Plan.

The following chart briefly summarizes the treatment on a consolidated basis of Creditors and holders of Interests under the Plan. The amounts listed below are based principally on the Schedules and proofs of Claim filed with the Bankruptcy Court and other information collected or reviewed subsequent to the filing of the Schedules and proofs of Claim, and are only estimates based on various assumptions. Actual Claims and Distributions to the holders of Allowed Claims will vary depending upon the outcome of objections to Claims and the collection and liquidation of Proceeds. For a complete description of the treatment of Allowed Claims, Creditors should review the Plan.

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS (CONSOLIDATED BASIS) | ESTIMATED RECOVERY PERCENTAGE | SUMMARY OF TREATMENT |
|---|---|---|---|---|
| N/A | Administrative Claims | $19,100,000 | 100% | Full payment. |
| N/A | Priority Tax Claims | $7,324,000 | 100% | Paid over time in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code subject to the Debtors' right to prepay at anytime. |
| N/A | Secured Tax Claims | $4,544,000 | 100% | Paid over time in accordance with Section 1129(a)(9)(D) of the Bankruptcy Code subject to the Debtors' right to prepay at anytime. |
| 1(a)-(*l*) | Priority Non-Tax Claims | *de minimis* | 100% | Paid in full on the Effective Date, when Allowed or as agreed to the extent not already satisfied pursuant to a First Day Order. |

| | | | | |
|---|---|---|---|---|
| 2(a)-(l) | Secured Claims[3] | $1,476,000 | 100% | Unless reinstated, on the Effective Date one of the following alternative treatments at the Debtors' election: (a) abandonment or surrender of property or (b) cash payment.<br><br>Allowed Unsecured Deficiency Claim will be treated in accordance with Section 4.4.2 of the Plan. |
| 3(a)-(l) | General Unsecured Claims | $2,035,691,000[4] | Class 3(a) – Mesa Air Group 5.84.1%<br>Class 3(b) – Mesa Air New York 100%<br>Class 3(c) – Mesa In-Flight 0%<br>Class 3(d) – Freedom 7.7%<br>Class 3(e) – Mesa Airlines 5.76.2%<br>Class 3(f) – MPD 100%<br>Class 3(g) – RASI 0%<br>Class 3(h) – MAGAIM 100%<br>Class 3(i) – Nilchii 100%<br>Class 3(j) – Air Midwest 3.6%<br>Class 3(k) – RHMC 0%<br>Class 3(l) – Patar 0% | Pro rata share of the Restructured Unsecured Equity and New 8% Notes (Series B). |
| 4(a)-(l) | De Minimis Convenience Claims | $8,225,000 | 0% - 100%[5] | On the Effective Date, payment in Cash equal to the distribution percentage set forth in **Exhibit D** of Plan. |

---

[3] Each holder of a Secured Claim will be in its own separate subclass.☐

[4] These are estimates only and are based on the Debtors' preliminary claim analysis. If the Debtors are unsuccessful on some the anticipated claims objections, the estimates of General Unsecured Claims could increase by $500 million.☐

[5] Equal to the estimated recovery percentage of claims against the applicable Debtor as set forth on Exhibit D of Plan and Class 3. See the description of the potential distributions in Section III.G.6 herein.

| | | | | Pro rata share of the Restructured Unsecured Equity or New 8% Notes. The Debtors are currently reviewing the 510(a) Subrogation Claims and do not have an estimate for such claims. Numerous creditors have filed protective 510(a) Subrogation Claims but at this time it is not known whether such creditors have fulfilled the necessary subrogation requirements that would entitle them to an Allowed 510(a) Subrogation Claim. In any event, to the extent such 510(a) Subrogation Claims are Allowed there should not be any net-increase in the pool of General Unsecured Claims because the allowance of such claims will reduce the primary General Unsecured Claims in Class 3 by the same amount. |
|---|---|---|---|---|
| 5(a)-(b) | 510(a) Subrogation Claims | See summary. | To be determined, see summary. | |
| 6(a)-(*l*) | 2012 Noteholder Claims | $19,400,000 | 100% | Pro rata share of New 8% Notes (Series A). |
| 7(a)-(*l*) | Interests | N/A | 0% | All existing Interests in Mesa Air Group will be deemed extinguished and the holders of such Interests will not receive or retain any property on account of such Interests under the Plan. Reorganized Mesa Air Group will be vested, directly or indirectly, with the Interests in the Reorganized Debtor Subsidiaries on the Effective Date. |

### E. Voting Instructions

The Disclosure Statement Approval Order, a copy of which is annexed hereto as **Exhibit C**, sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and applicable procedures for tabulating ballots.

### 1. How to Vote

A ballot is enclosed herewith for Creditors to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or reject the Plan, provide the requested information, sign your name, and mail the ballot in the envelope provided for this purpose. Further, applicable ballots contain instructions on: (i) how to opt into Classes 4(a)-*(l)* (De Minimis Convenience Claims), if desired; and (ii) how to opt out of the Releases, if desired.

In order to be counted, ballots must be properly completed, signed, and returned so that they are actually **received no later than 4:00 p.m., prevailing Eastern time, on the Voting Deadline, December 23, 2010,** by the Solicitation Agent at the following applicable address:

**BY U.S. MAIL:**

Mesa Air Group, Inc. Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 5014 FDR Station
New York, NY 10150-5014

**BY COURIER/HAND DELIVERY:**

Mesa Air Group, Inc. Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

**IF YOU MUST RETURN YOUR BALLOT TO YOUR AGENT, YOU MUST RETURN YOUR BALLOT TO YOUR AGENT WITH SUFFICIENT TIME FOR IT/HIM/HER TO PROCESS YOUR BALLOT AND RETURN IT TO THE SOLICITATION AGENT BY THE VOTING DEADLINE.**

Ballots must be received by the Solicitation Agent at its address set forth on the applicable ballot. To be counted for purposes of voting on the Plan, all of the information requested on the ballot must be provided. If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to this same address.

2.    **Who Is Being Solicited to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of claims that are impaired are entitled to vote to accept or reject a proposed plan. Classes of claims in which the holders are unimpaired are deemed to have accepted a plan and are not entitled to vote to accept or reject a plan. Under the Plan, Administrative Claims, ~~Secured Tax Claims,~~ Secured Tax Claims, and Priority Tax Claims are unclassified and are not entitled to vote.

Classes 1(a)-*(l)* are not impaired under the Plan and are deemed to have accepted the Plan. Classes 2(a)-*(l)*, Classes 3(a)-*(l)*, Classes 4(a)-*(l)*, Classes 5(a)-(b), and Classes 6(a)-*(l)* are impaired under the Plan and entitled to vote to accept or reject the Plan. Classes 7(a)-*(l)* are impaired under the Plan, but are presumed to reject the Plan. For a detailed description of the treatment of Claims under the Plan, *see* Section IV of this Disclosure Statement.

The ballot form that you received does not constitute a proof of Claim. If you are in any way uncertain whether or if your Claim has been correctly scheduled, you should review the Debtors' Schedules that are on file with the Bankruptcy Court located at United States Customs House, One Bowling Green, New York, New York 10009. The Debtors' Schedules may also be viewed free of charge on the Solicitation Agent's website at: www.dm.epiq11.com/mesa. In accordance with an order of the Bankruptcy Court (discussed in Section III.E.1 hereof), (i) May 21, 2010 was established as the Bar Date by which Creditors (other than governmental units) must file proofs of claim against the Debtors and (ii) July 6, 2010 was established as the Bar Date by which Creditors that are governmental units must file proofs of claim against the Debtors.

### 3. Voting Record Date

THE VOTING RECORD DATE FOR VOTING ON THE PLAN IS **November 18, 2010**. To be entitled to vote to accept or reject the Plan, a holder of a Claim against the Debtors must be the record holder of such Claim at the close of business on the Voting Record Date. Holders who acquire Claims against the Debtors after the Voting Record Date must arrange with their seller to receive a proxy from the holder of record of such Claim on the Voting Record Date.

### 4. Voting Procedures

All votes to accept or reject the Plan must be cast by using the ballot. As described further in the Approval Order and Section I.E.5. of the Disclosure Statement, entitled "Brokerage Firms, Banks and Other Nominees," a brokerage firm, commercial bank, trust company, or other nominee may provide each of its beneficial owners with a so called "prevalidated" ballot, that the beneficial owner is to complete and return directly to the Solicitation Agent. Votes that are cast in any other manner will not be counted. Ballots must be received by the Solicitation Agent no later than **4:00 p.m., prevailing Eastern time, on the Voting Deadline, which is December 23, 2010**.

Parties who elect to vote on the Plan should complete and sign the ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

In addition, each Ballot advises Creditors that Creditors who (a) vote to accept or reject the Plan and (b) do not elect to opt out of the release provisions contained in Section 9.3.2 of the Plan shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the all Agents of the Debtors, their Estates and/or the Reorganized Debtors from any and all Causes of Action and Defenses whatsoever, including derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Agent thereof, and/or the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, which Causes of Action and Defenses are based in whole or in part on any act, omission, transaction, event or other occurrence (except for willful misconduct, ultra vires acts, or gross negligence) taking place before the Effective Date.

**BALLOTS THAT ARE PROPERLY EXECUTED BUT FAIL TO INDICATE WHETHER THE VOTING PARTY ACCEPTS OR REJECTS THE PLAN WILL CONSTITUTE ABSTENTIONS BY SUCH PARTY WITH RESPECT TO A VOTE ON THE PLAN. ABSTENTIONS WILL NOT BE COUNTED AS EITHER ACCEPTANCES OR REJECTIONS OF THE PLAN. FAILURE BY A HOLDER TO DELIVER A DULY COMPLETED AND SIGNED BALLOT WILL ALSO CONSTITUTE AN ABSTENTION BY SUCH HOLDER WITH RESPECT TO A VOTE ON THE PLAN. BECAUSE**

**ABSTENTIONS WILL HAVE NO EFFECT ON VOTING WITH RESPECT TO THE PLAN, IT IS EXTREMELY IMPORTANT THAT YOU INDICATE WHETHER YOU ACCEPT OR REJECT THE PLAN ON THE BALLOT.**

**A CREDITOR WHO (A)(1) VOTES TO ACCEPT OR REJECT THE PLAN AND (2) DOES NOT ELECT TO OPT OUT OF THE RELEASES SET FORTH IN SECTION 9.3.2 OF THE PLAN OR (B) FAILS TO PROPERLY COMPLETE AND EXECUTE A BALLOT ON THE PLAN SHALL BE DEEMED TO OPT INTO THE RELEASES SET FORTH IN SECTION 9.3.2 OF THE PLAN. A CREDITOR WHO DOES NOT CAST A BALLOT ON THE PLAN OR WHO IS NOT ENTITLED TO CAST A BALLOT ON THE PLAN SHALL BE DEEMED TO HAVE OPTED OUT OF THE RELEASES SET FORTH IN SECTION 9.3.2 OF THE PLAN.**

### 5. Brokerage Firms, Banks, and Other Nominees

A brokerage firm, commercial bank, trust company, or other nominee that is the registered holder of the Notes for a beneficial owner, or that is a participant in a securities clearing agency and is authorized to vote in the name of such securities clearing agency pursuant to an omnibus proxy and that is acting for a beneficial owner, can vote on behalf of such beneficial owner by (i) distributing a copy of this Disclosure Statement and all appropriate ballots to such owner, (ii) collecting all such ballots, and (iii) transmitting such completed ballots to the Solicitation Agent. A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of such beneficial owner. A brokerage firm, commercial bank, trust company, or other nominee may prevalidate a beneficial owner's ballot by indicating on the ballot the record holder of the Notes to be voted and the appropriate account numbers through which the beneficial owner's holdings are derived, and distribute the prevalidated ballot with a copy of the Disclosure Statement to the beneficial owner for voting, with such beneficial owner then completing the prevalidated ballot and returning it directly to the Solicitation Agent in the enclosed preaddressed, postage prepaid envelope.

### 6. Withdrawal of Votes on the Plan

The solicitation of acceptances of the Plan will expire on the Voting Deadline. A properly submitted ballot may be withdrawn by delivering a written notice of withdrawal to the Solicitation Agent at its address set forth on the ballot at any time prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must (i) specify the name of the holder who submitted the vote on the Plan to be withdrawn, (ii) contain the description of the Claim to which it relates and the amount of such Claim, and (iii) be signed by the holder in the same manner as on the ballot. The Debtors reserve the right to contest the timeliness or validity of any such withdrawals of votes on the Plan.

In addition to withdrawal as specified above, any holder who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed ballot may revoke and

change such vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted for purposes of determining whether acceptances sufficient to seek Confirmation of the Plan have been received.

### 7.    Solicitation Agent

Epiq has been appointed as Solicitation Agent for the Plan. Questions and requests for assistance and requests for additional copies of this Disclosure Statement or ballots should be directed to the Solicitation Agent at its address set forth on the ballots or at 646-282-2400.

## F.    Confirmation

"Confirmation" is the technical term for a bankruptcy court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtors must demonstrate that they have met the requirements of Section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of Section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtors believe that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code.

Your vote on the Plan is important. Rejection of the Plan may lead to a conversion of the Debtors' cases to chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtors by a trustee who would be appointed as of the date of such conversion. This alternative may not provide for a distribution of as much value to holders of Allowed Claims under the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot so as to be received no later than **4:00 p.m., prevailing Eastern time, on December 23, 2010**.

Voting is tabulated by Class. An impaired Class of Claims that votes will have accepted the Plan if (a) the holders (other than any holder designated by the Bankruptcy Court based on their vote or its solicitation not being in good faith under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims actually voting in such Class have voted to accept the Plan.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code, or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests. Under that statute, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. *See* Section VI.D. of the Disclosure Statement, "Confirmation of the Plan Without Acceptance by All Impaired Classes."

The Bankruptcy Court has set **January 10, 2011, at 10:00 a.m.** prevailing Eastern time, for the Confirmation Hearing at which it will determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on respective counsel for the Debtors and the Committee, and the Office of the U.S. Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Bankruptcy Rule 3007 and Local Bankruptcy Rule 3018-1 govern the form of any such objection.

The parties on whom objections must be served are:

Counsel for the Debtors:

Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Tel:    (415) 263-7000
Fax:    (415) 263-7010
Attn:   Debra I. Grassgreen, Esq.
        John W. Lucas, Esq.

-and-

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 36th Floor
New York, NY 10017
Tel:    (212) 561-7700
Fax:    (212) 561-7777
Attn:   Maria A. Bove, Esq.

Counsel for the Committee:
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
Tel:    (212) 468-8000
Fax:    (212) 468-7900
Attn:   Brett H. Miller, Esq.
        Lorenzo Marinuzzi, Esq.
        Todd M. Goren, Esq.

Office of the U.S. Trustee:
Tracy Hope Davis, ~~Acting~~ United States Trustee
33 Whitehall Street, 21ˢᵗ Floor
New York, NY 10004
Tel:    (212) 212-510-0500
Fax:    (212) 668-2255
Attn:   Andrea B. Schwartz, Trial Attorney

## II.
## HISTORY, ORGANIZATION AND OPERATIONS OF THE DEBTORS

### A.    Description of the Debtors' Businesses and Operations[6]

### 1.    In General

Mesa Air Group is a holding company whose principal direct and indirect subsidiaries operate as regional air carriers providing scheduled passenger and airfreight service.  As of November 1, 2010, the Debtors' airline operations serve approximately 91 cities in 33 states, the District of Columbia, Canada, and Mexico, and the Debtors operate a fleet of approximately 77 aircraft (down from 130 as of the Petition Date) with approximately 490 daily system departures.

Historically, Mesa Airlines has operated regional jet and turboprop aircraft and operates under the names of regional carriers of certain major airlines pursuant to code-share agreements. Mesa Airlines currently (i) operates as ~~U.S.~~US Airways Express under the U.S. Air Code-Share Agreement with ~~U.S.~~US Airways, (ii) operates as United Express under the United Code-Share Agreement with United, and (iii) provides services to Mo-Go in Hawaii as *go!* Mokulele.[7] *go!* Mokulele is not subject to a code-sharing agreement with a major carrier.

As of November 1, 2010, the Debtors have consolidated assets[8] of approximately $146.6 million, and consolidated liabilities of approximately $2.08 billion.  In addition, as of November 1, 2010, approximately 92% of the Debtors' consolidated passenger revenues are derived from their code-share "revenue guarantee" agreements[9] with their Principal Carriers as follows:

---

[6] Additional historical information regarding the Debtors' business operations and financial results may be found in Mesa Air Group's filings with the SEC at www.sec.gov. □

[7] *go!* Mokulele is not a debtor in these Chapter 11 Cases.□

[8] At book value.□

[9] There are different types of code-share agreements but they can generally be grouped into two broad categories – "Pro-Rate" and "Revenue-Guarantee."  Under a "Pro-Rate" agreement, passenger revenue generated on a code-share flight is divided by the carriers participating in the agreement, typically based upon a formula taking into account the distance traveled and the fare paid by the passenger. Under a "Revenue-Guarantee" agreement, one code-share partner effectively purchases all the seats of the other carrier and keeps all revenue from ticket sales in exchange for paying the other code-share partner an agreed upon amount for each flight operated. All of the Debtors' current code-share agreements are "Revenue Guarantee" agreements.□

~~U.S.~~US Airways (70%); and United (22%).[10] The Debtors' remaining passenger revenues are generated from their independent *go!* Mokulele operations in Hawaii.

Under the code-share agreements, the Debtors provide air transportation services to the Principal Carriers' customers on various flight routes, using the Principal Carriers' flight designator codes and the Principal Carriers' livery and service marks. In exchange for providing flights and other services pursuant to the code-share agreements, the Debtors receive compensation (including minimum monthly amounts and additional amounts based on, for example, number of flights and block hours performed during the month) from the Principal Carriers and are also reimbursed for certain expenses by the Principal Carriers. In some cases, the Principal Carriers also provide certain customer service, ground handling service and/or other functions to the Debtors in connection with the foregoing.

The "revenue guarantee" that the Debtors charge the Principal Carrier is intended to cover 100% of the Debtors' costs. The Debtors charge a margin on top of these amounts as profit. The margin percentage can change based on how reliably the Debtors operate their aircraft. As part of the fees paid to the Debtors for operating aircraft, certain significant costs (aircraft, fuel, airport fees and aircraft insurance) are a direct pass through to the Principal Carriers. Accordingly, the Debtors are not impacted by varying prices for these costs. Additionally, because the Principal Carriers pay the Debtors a "revenue guarantee," the Debtors are not impacted by changes in fares or by the number of passengers carried on each flight. Lastly, the code-share agreements can be terminated if certain minimum operating thresholds are not met.

Except as indicated above, the remaining Debtors operate businesses, or own interests in businesses, that facilitate or enhance the Debtors' regional or independent air carrier services. Nilchii holds an interest in non-debtor Indigo for the purpose of investing in Spirit Airlines.

## B.     Corporate Structure

A diagram showing the general corporate structure of the Debtors is attached hereto as **Exhibit A**. As indicated in **Exhibit A**, Mesa Air Group is the direct parent of twelve (12) wholly-owned subsidiaries and two (2) indirect subsidiaries. Mesa also owns a 75% direct equity interest in Mo-Go, which contracts with Mesa Airlines to service the *go!* Mokulele operations in Hawaii. Republic Airways and certain minority investors own the remaining 25% equity interest in Mo-Go and are each not affiliated with the Debtors and not Debtors in the Chapter 11 Cases.

## C.     Employees and Management

As of November 1, 2010, the Debtors employ approximately 2,782 people in an active status, working in both full and part-time positions, both domestically and abroad, including pilots, mechanics, aviation maintenance support personnel, flight attendants, reservation sales agents, customer service agents, analysts, engineers, other technical and professional personnel,

---

[10] Until August 31, 2010, Freedom operated regional jet aircraft and operated as "Delta Connection" under the Delta Temporary Agreement. As set forth below in Section II.H.3.a, the Georgia District Court entered a decision on May 27, 2010 finding that Delta properly terminated the Delta Code-Share Agreement prior to the Petition Date. Mesa Air Group, Freedom and Delta subsequently entered into and obtained Bankruptcy Court approval of the Delta Temporary Agreement to enable Mesa Air Group and Freedom to wind down their operations involving Delta through August 31, 2010.

supervisors, managers, administrative support staff and other personnel. As of November 1, 2010, approximately 56% of the Debtors' employees were represented by unions, including 912 pilots represented by ALPA and 637 flight attendants represented by AFA.

The Debtors' senior management is composed of: Jonathan G. Ornstein, Chairman and Chief Executive Officer; Michael J. Lotz, President and Chief Financial Officer; Brian S. Gillman, Executive Vice President and General Counsel; and Paul E. Foley, Executive Vice President and Chief Operating Officer. Each of these individuals is also a holder of Interests.

## D. **Regulation**

The Debtors are subject to various federal, international and local laws and regulations governing, among other things, aviation security, environmental matters, baggage liability, consumer protection and labor relations.

While the Airline Deregulation Act of 1978, as amended, eliminated domestic economic regulation of passenger and freight air transportation in many regards, the industry, nevertheless, remains regulated in a number of areas. The DOT has jurisdiction over international route authorities and various consumer protection matters, such as advertising, denied boarding compensation, baggage liability and access for persons with disabilities. The Debtors are subject to regulations of the DOT and the FAA because it holds certificates of public convenience and necessity, air carrier operating certificates and other authority granted by those agencies. The FAA regulates flight operations, including air space control and aircraft standards, maintenance, ground facilities, transportation of hazardous materials and other technical matters. The DOJ has jurisdiction over airline competition matters, including mergers and acquisitions, under federal antitrust laws. The TSA regulates airline and airport security. Other federal agencies have jurisdiction over postal operations, use of radio facilities by aircraft and certain other aspects of the Debtors operations.

The Debtors are also subject to federal labor regulation through the RLA. The RLA governs the labor relations of employers and employees engaged in the airline industry. Comprehensive provisions are set forth in the RLA establishing the right of airline employees to organize and bargain collectively along craft or class lines and imposing a duty upon air carriers and their employees to exert every reasonable effort to make and maintain collective bargaining agreements.

The RLA contains detailed procedures that must be exhausted before a lawful work stoppage may occur. Pursuant to the RLA, the Debtors have has collective bargaining agreements with two domestic unions representing two separate employee groups -- pilots and flight attendants.

The Debtors are also subject to FAA jurisdiction pertaining to aircraft maintenance and operations, including equipment, dispatch, communications, training, flight personnel and other matters affecting air safety. To ensure compliance with its regulations, the FAA requires all United States airlines to obtain operating, airworthiness and other certificates, which are subject to suspension or revocation for cause.

Under FAA regulations, the Debtors have established, and the FAA has approved, maintenance programs for all aircraft operated by the Debtors. These programs provide for the ongoing maintenance of the Debtors' aircraft, ranging from frequent routine inspections to major overhauls. The Debtors' aircraft require various levels of maintenance or "checks" and periodically undergo complete overhauls. Maintenance programs are monitored closely by the FAA, with FAA representatives routinely present at the Debtors' maintenance facilities. The FAA issues airworthiness directives, which mandate changes to an air carrier's maintenance program. These airworthiness directives (which include requirements for structural modifications to certain aircraft) are issued to ensure that the nation's transport aircraft fleet remains airworthy. The Debtors are currently, and expects to remain, in compliance with all applicable requirements under all airworthiness directives and the FAA-approved maintenance programs.

Further, a combination of FAA and Occupational Safety and Health Administration regulations on both the federal and state levels apply to all of the Debtors' ground-based operations in the United States.

The Debtors are also subject to regulation under various environmental laws and regulations, including the Clean Air Act, the Clean Water Act and Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, many state and local governments have adopted environmental laws and regulations to which the Debtors' operations are subject. Environmental laws and regulations are administered by numerous federal and state agencies.

The most recent biannual audit completed by the IATA in July 2010 affirms the Debtors' commitment to strict safety standards and risk management. The IATA Operational Safety Audit (IOSA) program is an internationally recognized and accepted evaluation system designed to assess the operational management and control systems of an airline. IOSA's quality audit principles are designed to conduct audits in a standardized manner. Following the recent IOSA audit, the Debtors were informed that the audit team identified zero findings over 2400 audited standards. The Debtors understand from the IOSA audit team and the FAA that such an outcome is extremely rare, if not unprecedented.

## E.     Significant Indebtedness

The Debtors' debt structure consists of (i) three issuances of notes outstanding, all of which are general unsecured obligations of Mesa Air Group and jointly and severally guaranteed by certain wholly-owned subsidiaries, (ii) leveraged leases relating to the majority of the Debtors' aircraft, (iii) secured financings relating to the purchase of aircraft that make up the remaining portion of the Debtors' fleet, and (iv) ordinary course trade debt.

### 1.     The 2012 Notes

Mesa Air Group, as borrower, issued the 2012 Notes pursuant to an agreement, dated February 10, 2009, between Mesa Air Group and U.S. Bank National Association in its capacity as indenture trustee. The 2012 Notes were issued in conjunction of the restructuring of certain of

the 2023 Notes and 2024 Notes.  As of the Petition Date, approximately $~~20.94~~19.4 million (inclusive of prepetition interest) was outstanding under the 2012 Notes.

## 2. The 2023 Notes

Mesa Air Group, as borrower, issued the 2023 Notes pursuant to an agreement, dated June 16, 2003, between Mesa Air Group and U.S. Bank National Association in its capacity as indenture trustee.  The 2023 Notes resulted in gross proceeds of approximately $100 million.  Mesa Air Group used the net proceeds of the 2023 Notes to fund general working capital requirements.

The outstanding amounts under the 2023 Notes were reduced through a series of transactions with certain holders of the 2023 Notes in which Mesa Air Group agreed to pay cash, issue shares of common stock, and issue the 2012 Notes.  After the consummation of these transactions, and as of the Petition Date, approximately $6.8 million (inclusive of prepetition interest) was outstanding under the 2023 Notes.

## 3. The 2024 Notes

Mesa Air Group, as borrower, issued the 2024 Notes pursuant to an agreement, dated February 10, 2004, between Mesa Air Group and U.S. Bank National Association in its capacity as indenture trustee.  The 2024 Notes resulted in gross proceeds of approximately $100 million.  Mesa Air Group used the net proceeds of the 2024 Notes to fund general working capital requirements.

The outstanding amounts under the 2024 Notes were reduced through a series of transactions with certain holders of the 2024 Notes in which Mesa Air Group agreed to pay cash, issue shares of common stock, and issue the 2012 Notes.  After the consummation of these transactions, and as of the Petition Date, approximately $1.9 million (inclusive of prepetition interest) was outstanding under the 2024 Notes.

## 4. The Debtors' Owned and Leased Aircraft Fleet

### a. CRJ Owned Aircraft Financing

The Debtors' fleet also includes CRJs.  Prior to the Petition Date, the Debtors owned two (2) CRJ 200s, eight (8) CRJ 700s, and fourteen (14) CRJ 900s.  These aircraft are subject to security agreements and the aggregate outstanding principal balance as of December 31, 2009 with respect to these aircraft was approximately $393 million.  The CRJ 700s are operated in connection with the Debtors' United Codeshare Agreement.  The CRJ 900s are operated in connection with the Debtors' ~~U.S.~~US Airways Codeshare Agreement.

As set forth below in Section III.C, as of November 1, 2010, the Debtors will have abandoned one (1) CRJ 200 aircraft and restructured the security agreement subject to the other CRJ 200 aircraft.  Pursuant to Section 4.2.1 of the Plan, the Debtors intend to reinstate their secured financing obligations with respect to the applicable CRJ 700 aircraft and CRJ 900 aircraft.

### b.    Leased Aircraft Obligations

Prior to the Petition Date, the remainder of the Debtors' fleet consisted of leased CRJs, ERJs, and Dash 8s. The Debtors leased forty-six (46) CRJ 200s, twelve (12) CRJ 700s, and twenty-four (24) CRJ 900s, thirty-six (36) ERJ 145s, and sixteen (16) Dash 8s. These aircraft are subject to leases with certain owner trustees. The aggregate amount outstanding with respect to these aircraft was approximately $1.62 billion.

As of November 1, 2010, the Debtors will have rejected all of the leases governing their CRJ 200s and will have rejected the thirty-six (36) ERJ leases. The Debtors have entered or will enter into restructured leases with respect to thirteen (13) airframes and twenty-six (26) engines for their CRJ 200 aircraft with various aircraft counterparties. The Debtors have assumed amended leases with respect to four (4) Dash 8s and intend to assume the prepetition leases with respect to the two (2) remaining Dash 8s in their fleet.

Pursuant to Sections 7.1, 7.3, and 7.9 of the Plan, the Debtors intend to assume the twelve (12) leases governing the CRJ 700s and twenty-four (24) leases governing the CRJ 900s.

### c.    Beech Aircraft Financing

As of the Petition Date, the Debtors' fleet included twenty (20) Beech Model 1900D aircraft that were financed by RACC pursuant to a series of airliner negotiable promissory notes, each of which is supported by an airliner aircraft security agreement. The outstanding principal balance as of December 14, 2009 for all twenty (20) aircraft was approximately $33.6 million. As set forth in Section III.C, after the Petition Date the Debtors have abandoned and returned the twenty (20) Beech Model 1900D aircraft and settled RACC's claims arising under such agreements.

### d.    Master Purchase Agreement and Obligations to Bombardier

In 2001, Mesa Air Group and Bombardier entered into the Bombardier Master Purchase Agreement for the purchase of Bombardier aircraft. Between 2001 and the Petition Date, the Debtors purchased thirty-eight (38) CRJ-900 and twenty (20) CRJ-700 aircraft from Bombardier pursuant to the Bombardier MPA. As of the Petition Date, the Debtors and Bombardier owed each other amounts under the Bombardier MPA pursuant to amendments to the Bombardier MPA and for the future purchase of aircraft. Bombardier has also guaranteed certain aircraft leases.

### 5.    Ordinary Course Trade Debt

In addition to the institutional debt described above, the Debtors incur trade debt in the ordinary course of their business. Inasmuch as the Debtors were generally paying their debts as due prior to the Petition Date, the outstanding trade debt is not substantial in relation to the Debtors' other debt obligations. Specifically, as of November 1, 2010, the Debtors estimate that they have approximately $61 million in non-aircraft related trade claims.[11] The Debtors are in

---

[11] Certain trade claims, including certain asserted Secured Claims, have been paid by the Debtors during the Chapter 11 Cases pursuant to Bankruptcy Court orders.

the process of reviewing and reconciling trade claims and are subject to further objections. In addition, the Debtors are matching certain scheduled claims with Proofs of Claim that were filed to determine whether such scheduled claims have been superseded. The Debtors' estimate of trade claims will increase to the extent that such scheduled claims have not been superseded and such claims are Allowed.

## F. Equity

On the Petition Date, Mesa Air Group had 900,000,000 authorized shares of common stock, no par value, of which 175,217,249 shares were outstanding. Approximately 1% of the equity is held by certain directors and officers of the Debtors.

After the Petition Date, NASDAQ delisted Mesa Air Group's securities effective March 1, 2010. The delisting of Mesa Air Group's stock is a formality and has not affected the trading of such securities over-the-counter on "Pink Sheets."

## G. Significant Assets

### 1. In General

As reflected in the Schedules, the principal assets of the Debtors consist of (i) cash and cash equivalents, (ii) accounts receivable, (iii) Mesa Air Group's equity in the Debtor Subsidiaries, and (iv) personal property.

### 2. Cash

As of November 1, 2010, the Debtors project a total of approximately $50.5 million in cash or cash equivalents, which are not encumbered by any liens, claims or other interests.

### 3. Real Property

As of the Petition Date, RHMC owned the Del Rio Hotel located in Maricopa County, Arizona. The Debtors operated the Del Rio Hotel as an employee dormitory. The Del Rio Hotel was encumbered by a prepetition first mortgage note payable to the Pesakovic Lenders, which note was guaranteed by Mesa Air Group. As of the Petition Date, the outstanding principal amount owed by RHMC under the mortgage note was approximately $721,000. After the Petition Date, the Debtors analyzed each of their options with respect to the Del Rio Hotel and concluded that there was insufficient equity in the property and such property was burdensome to RHMC's estate. Accordingly, pursuant to a notice of abandonment filed in the Chapter 11 Cases on June 11, 2010, RHMC has abandoned its interest in the Del Rio Hotel effective as of July 7, 2010, and has transferred title to the Pesakovic Lenders pursuant to a deed in lieu of foreclosure in exchange for a release of all claims against RHMC and Mesa Air Group.

### 4. Potential Claims and Causes of Action

The Debtors are investigating causes of action against third parties, including, without limitation, the Causes of Action and Defenses listed on **Exhibit C** to the Plan. At this time, except for Avoidance Actions under section 547 of the Bankruptcy Code, which are waived

under the Plan, all claims, causes of action, and rights of the Debtors and third parties with respect thereto are preserved. The Debtors, their successors or their appointed representatives under the Plan (as applicable) will conduct appropriate investigation and analysis of all such matters. At this juncture, the Debtors cannot accurately estimate the potential recoveries from Causes of Action and Defenses.

### H. Events Prior to the Bankruptcy Filings

#### 1. Aviation Bankruptcies / New Code-Share Agreements

While the Debtors had successfully grown, they were not immune from the forces affecting the aviation industry. Following September 2001, the airline industry began to experience continued financial difficulties including reduced demand, increased costs, sustained lower yields, and fundamental shifts in business travel and booking transparency. In addition, the market experienced a marked shift in demand from 50-seat aircraft to larger regional jets. These combined forces exerted tremendous strain on the aviation industry – a situation which was further exacerbated with record fuel prices. These challenges pushed many carriers beyond their breaking point, resulting in a record number of airline bankruptcies including nearly all of the legacy carriers and all of the Debtors' code-share partners except America West Airlines (now U.S. US Airways, which merged with America West Airlines as part of U.S. US Airways' second recent chapter 11 cases).

The Debtors' difficulties increased significantly following U.S. US Airways' second set of chapter 11 cases in 2004. In those cases, U.S. US Airways rejected the Debtors' code-share agreement, which resulted in the rejection of 59 aircraft and caused significant strain on the Debtors' liquidity.

The Debtors worked diligently to overcome these challenges, and were able to successfully negotiate agreements with United and Delta during their respective chapter 11 cases. The United agreement was for thirty (30) fifty seat aircraft with an expiration in April 2010, had reduced margins, and included a $30 million payment by the Debtors to United. The Delta agreement was for 30 aircraft through November 2012 with an option for Delta to remove eight (8) aircraft by May 2009. Additionally, the Debtors agreed to reimburse Delta for lease obligations on Fairchild Dornier aircraft. In March 2007 the Delta agreement was increased from thirty (30) to thirty-six (36) fifty seat aircraft with early out options on fourteen (14) aircraft on a short-term basis. Beginning August 2008, the Debtors and Delta agreed to reduce the fleet by three (3) aircraft per month for a total of eight (8). These two agreements resulted in the Debtors successfully mitigating some of the financial exposure resulting from the rejection of the regional jets during the U.S. US Airways bankruptcy albeit under significantly less favorable terms.

#### 2. The Debtors' Fleet and Code-Share Requirements

Prior to the Petition Date, the Debtors' fleet significantly exceeded their code-share fleet requirements. Approximately fifty-two (52) aircraft were parked and not being used as of the Petition Date. In addition, as of the Petition Date the Debtors anticipated that twenty-five (25) additional aircraft were not needed to service the Debtors' code-share partners. As a result, the

Debtors needed to reduce and rationalize their fleet to eliminate the significant costs associated with retaining, maintaining, and storing the excess aircraft.

The following table sets forth the Debtors' fleet composition by aircraft type and identifies the status of aircraft on the Petition Date.

| Fleet Composition as of the Petition Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| | CRJ-200 | ERJ-145 | CRJ-900 | CRJ-700 | B-1900 | Dash-8 | Total |
| U.S.US Airways | 8 | - | 38 | - | - | 6 | 52 |
| United | 18 | - | - | 20 | - | 7 | 45 |
| Delta | - | 22 | - | - | - | - | 22 |
| *go!* Mokulele | 5 | - | - | - | - | - | 5 |
| Sublease | - | 2 | - | - | - | - | 2 |
| Excess Aircraft | 17 | 12 | - | - | 20 | 3 | **52** |
| Total Owned/Leased | 48 | 36 | 38 | 20 | 20 | 16 | 178 |
| Passenger Capacity | 50 | 50 | 86 | 66 | 19 | 37 | - |

The terms of the Debtors' code-share agreements were not matched to the leasehold and ownership obligations associated with aircraft in service under such agreements. As is typical in the regional airline industry, the Debtors acquired aircraft that were financed primarily through long-term leveraged leases with the exception of eight short term leases. The terms of these long-term lease obligations exceed the duration of the Debtors' various code-share agreements. As a result, as certain flight operations under code-share agreements come to an end, the Debtors remain obligated for remaining lease and installment payments and maintenance expenses for such aircraft – in some cases for significant periods of time. These risks were recognized at the time these aircraft were leased but given the fundamental changes to the aviation industry and the more recent downturn in the credit markets during 2009, it was not foreseeable that demand for certain regional aircraft would literally evaporate in less than three years.

The Debtors worked diligently to develop contingency plans to place aircraft into alternative service, including the creation of its *go!* Mokulele operations in Hawaii, Kunpeng (as defined and discussed below), and other attempts to sublease the aircraft to operators in the United States and around the world. *go!* Mokulele did provide a vehicle for the mitigation of excess aircraft but *go!* Mokulele's capacity to absorb excess aircraft was limited. The Kunpeng venture, which was intended to operate twenty (20) excess aircraft, was unsuccessful and ceased operations in 2009.

While the Debtors pursued opportunities to operate, sublease, or sell their excess aircraft, these efforts have likewise been unsuccessful, as were attempts to negotiate terms under which these aircraft would be returned to their manufacturers or lessors.

In addition, under the terms of the United Code-Share Agreement, United had the option to extend the term covering twenty-six (26) CRJ 200 aircraft for an additional five (5) years provided such notice was issued by October 31, 2009. United elected not to exercise its renewal rights covering the twenty-six (26) CRJ 200 aircraft. The Debtors made numerous attempts to negotiate mutually agreeable terms under which United would exercise its extension rights for these aircraft but such efforts were unsuccessful. The Debtors had intended for up to 20 of these aircraft to be placed into service at Kunpeng; however, with the failure of the Kunpeng joint venture and the applicable lessors' unwillingness to allow the sublease and operation of such aircraft in China, the Debtors were unable to place these aircraft into revenue service.

In response to these industry and company challenges, and as part of their ongoing efforts to reduce costs and maximize fleet flexibility, the Debtors reviewed the terms of their leases and security agreements to determine which aircraft have no utility or value. As of the Petition Date, the Debtors had taken fifty-two (52) aircraft out of service because they were not generating any value for the Debtors' estates. Idle aircraft (*i.e.*, parked aircraft not under an operating contract) require significant ongoing monthly lease, insurance, and storage costs without generating any benefit or value for the Debtors or their estates. Thus, the excess aircraft and the corresponding contractual obligations were burdensome to the Debtors and no longer beneficial to them.

In addition to the foregoing, a certain share of the market shifted away from the Debtors as a result of the changing model among code-share partners and a shift in demand from 50-seat aircraft to larger regional jets. For example, certain of the Debtors' competitors have negotiated extensions or amendments to their code-share agreements by providing their codes-share counterparties with (i) consideration in the form of equity ownership or cash, (ii) secured term loans, or (iii) a deferral of payment of significant claims owed to the regional carrier.

### 3. Code-Share Litigation

#### a. Delta Litigation

On or about April 7, 2008, Mesa Air Group commenced the Delta ERJ Litigation in the Georgia District Court to prevent Delta from attempting to terminate the Delta Code-Share Agreement as to certain ERJ-145 aircraft. Following an evidentiary hearing ending on May 29, 2008, the Georgia District Court issued a preliminary injunction against Delta prohibiting it from terminating the agreement and finding that Delta acted in bad faith. Delta appealed the preliminary injunction, and on July 2, 2009, the Court of Appeals for the Eleventh Circuit affirmed the issuance of the injunction, finding that Mesa had demonstrated a substantial likelihood of success on the merits.

On or about August 19, 2009, Delta commenced the Delta MFN Litigation against Mesa Air Group and Freedom in the Georgia District Court alleging that Mesa Air Group and Freedom breached certain "most favored nations" provisions of the Delta Code-Share Agreement covering the ERJ aircraft. Delta sought a declaratory judgment that, among other things, Mesa Air Group and Freedom were in material breach of the Delta Code-Share Agreement.

Following the commencement of the Delta ERJ Litigation, Delta terminated a separate agreement between Mesa Air Group and Delta relating to certain CRJ-900 aircraft, which were

owned by Delta but operated by Mesa Air Group. These aircraft were returned to Delta upon termination of the agreement. On March 20, 2009, Mesa Air Group and Freedom commenced the Delta CRJ Litigation in the Georgia District Court seeking damages, including lost profits and costs associated with the re-training of pilots. Delta filed a counterclaim alleging breach of contract for failing to meet certain contract conditions, which allegations are disputed by the Debtors.

On August 6, 2008, Mesa Air Group and Freedom commenced the Delta Engine Litigation against Delta in the Arizona District Court seeking the return of seven aircraft engines that Delta had improperly retained following the termination of an engine maintenance memorandum of understanding among Mesa Air Group, Freedom and Delta. On August 12, 2008, Delta agreed to return the engines to the Debtors and on August 22, 2008, Delta filed a mechanic's lien on the engines along with a counterclaim seeking to foreclose on the liens. Mesa Air Group and Freedom moved for judgment on the pleadings as to Delta's liens due to Delta's failure to comply with the Georgia lien statute. On November 14, 2008, the Court ruled that Delta had forfeited its lien claims. On November 20, 2008, Delta filed a notice of appeal to the Ninth Circuit Court of Appeals. The issues raised by Delta on appeal were fully briefed and awaiting decision by the Court of Appeals. During the pendency of the appeal, the parties concluded discovery on the substantive claims, and the Debtors' motion for summary judgment was pending.

A description of the present status of the Delta ERJ Litigation, the Delta MFN Litigation, the Delta CRJ Litigation, and the Delta Engine Litigation is set forth below in Section III.D.

### b.    **United Litigation**

The Debtors were defendants in the United Litigation filed by United prior to the Petition Date in the Illinois District Court seeking a determination as to whether Mesa Air Group's notice to United of Mesa Air Group's intent to exercise certain rights was in compliance with the terms of the United Code-Share Agreement as amended. As set forth below in Section III.E., the United Litigation has since been dismissed pursuant to a stipulation among the parties as approved by the Bankruptcy Court.

### 4.    **Kunpeng Joint Venture**

On December 22, 2006, Mesa Air Group's subsidiaries, Ping Shan and Shan Yue, entered into the Kungpeng Joint Venture Agreement with Shenzhen Airlines, pursuant to which the parties agreed to form Kunpeng, an equity joint venture company organized under the laws of China. Kunpeng commenced common carrier passenger service on September 28, 2007.

As of September 30, 2008, Mesa Air Group had contributed $6.5 million in capital to Kunpeng. Under the terms of the Kungpeng Joint Venture Agreement, Shenzhen Airlines and Mesa Air Group were obligated to contribute an additional RMB 204,000,000 and RMB 196,000,000, respectively (approximately $29.8 million and $28.6 million, respectively), to Kunpeng, no earlier than September 30, 2008 and no later than May 16, 2009 and in accordance with Kunpeng's operational requirements as determined by Kunpeng's board of directors.

As part of Mesa Air Group's agreement to fund the start-up of Kunpeng, Kunpeng agreed to utilize 20 fifty seat aircraft to be provided by Mesa Air Group. After the fifth aircraft was put into service by Kunpeng, Kunpeng refused to accept any additional fifty (50) seat aircraft.

Ultimately, Kunpeng was unprofitable, and Mesa Air Group concluded that the joint venture was not viable and the additional risk of aircraft-related obligations was unwarranted. Accordingly, instead of making the scheduled capital contributions, in April 2009, Mesa Air Group divested its 49% indirect interest in Kunpeng by selling to the nominees of Shenzhen Airlines all of Mesa Air Group's interest in each of Ping Shan and Shan Yue, both organized under the laws Barbados having limited liability. Kunpeng also agreed to pay $4.4 million for its outstanding aircraft lease obligations to the Mesa Air Group. In total, Mesa Air Group received $4.5 million, which included $100,000 for Mesa Air Group's interests in Ping Shan and Shan Yue. Additionally, the five aircraft were returned to Mesa Air Group. This resulted in a loss of $4.4 million in the second quarter of 2009.

### 5. *go!* Mokulele

In 2006, Mesa Air Group launched *go!* Mokulele, an independent airline serving the Hawaiian inter-island market. Upon its formation, Mesa Air Group was able to place a limited number of its excess aircraft into revenue generating service at *go!* Mokulele from the rejection of the U.S. US Airways Code-Share Agreement.

Unfortunately, several early factors degraded revenues from the *go!* Mokulele operation, including legal setbacks with certain competitors, high aircraft ownership expense, a protracted fare war, the entry of new competitors to the market, a sizable reduction in tourist demand within the Hawaiian market, and unpredictable fuel expenses. As a result of the global economic turbulence and local factors, *go!* Mokulele and one of its primary competitors in the region, Mokulele Airlines/Republic Airways, were unable to operate their businesses profitably and decided to combine their operations in an effort to eliminate unnecessary costs and to garner a larger share of the Hawaiian inter-island market.

On October 13, 2009, Mesa Air Group entered into agreements with Mokulele Flight Services Inc. d/b/a/ Mokulele Airlines and its majority shareholder, Republic Airways, to create Mo-Go, a joint venture, to provide Hawaii inter-island airline service under the *go!* Mokulele brand names. Under the terms of joint venture agreements, Mesa Air Group owns 75% of the joint venture equity and the Mokulele shareholders own the remaining 25%. Both parties agreed to make initial cash contributions totaling $1 million, with total required cash contributions of up to $6 million on a *pro rata* basis. Concurrently with the execution of the joint venture agreement, the joint venture entity entered into a services agreement with Mesa Air Group pursuant to which Mesa Air Group is responsible for operating the inter-island service on behalf of the joint venture and is entitled to be reimbursed for all of its costs and expenses of such operations. The *go!* Mokulele brand creates the second largest airline serving the inter-island market and offers a strong competitive force and a platform for successful operations.

The Debtors' restructuring of its aircraft leases will have a material impact on the financial performance of Mo-Go, drastically reducing its monthly operating costs. The Debtors

also anticipate that as the economy improves, tourist demand within the Hawaiian market will recover and Mo-Go's fares and load factors will continue to improve along with its financial health. However, changes in fuel costs and other economic factors could have an impact on Mo-Go going forward.

## I.    Commencement of Chapter 11 Cases

On the Petition Date, each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Pursuant to an order entered on the Petition Date, the Bankruptcy Court directed the joint administration of the Chapter 11 Cases under docket no. 10-10018 (MG). Since the Petition Date, the Debtors have been managing their assets and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

## III.
## SIGNIFICANT POSTPETITION EVENTS

Since the Petition Date, significant events in the Debtors' Chapter 11 Cases have included the following filings and entered orders. Copies of all relevant court papers are on file with the Bankruptcy Court and can be obtained free of charge by accessing the Solicitation Agent's website at: www.dm.epiq11.com/mesa.

## A.    Restructuring Overview

Shortly after the Petition Date, the Debtors began executing a restructuring plan intended to reduce and rationalize the Debtors' aircraft fleet to eliminate the significant costs associated with retaining, maintaining, and storing the excess aircraft. In that regard, since the Petition Date, the Debtors and their advisors have dedicated significant time and resources to rationalizing the Debtors' fleet and reducing their debt obligations in connection therewith. In addition, the Debtors have devoted significant resources to (a) establishing a claims reconciliation and objection process, including procedures for the classification of, and objection to, thousands of claims; (b) continuing the process of analyzing hundreds of leases and executory contracts to identify those that are beneficial to the Debtors' estates and renegotiating or rejecting those with terms unfavorable to the Debtors; and (c) finding, securing, negotiating and entering into new and amended business relationships with various vendors and other service providers.

## B.    Certain Significant Events and Initiatives During the Chapter 11 Cases

### 1.    Automatic Stay

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by Creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of pre-petition litigation against the Debtors. With certain limited exceptions, the automatic stay remains in effect until the Effective Date of the Plan.

During these Chapter 11 Cases, the Debtors have entered into certain stipulations (subsequently approved by the Bankruptcy Court) with certain parties in interest in order to facilitate the resolution of prepetition disputes without materially affecting the Debtors and their assets, including stipulations with certain individual plaintiffs modifying the automatic stay to allow them to proceed with certain prepetition state court litigation in order to conduct discovery and attempt to claim only against available liability insurance proceeds, if any.

2.    **Significant First Day Motions and Orders**

On the Petition Date, the Debtors filed numerous "first day" motions seeking various relief intended to ensure a seamless transition between the Debtors' prepetition and postpetition business operations and to facilitate the smooth administration of the Chapter 11 Cases. The relief requested in these orders, among other things, allowed the Debtors to continue certain normal business activities that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code may have otherwise required additional Bankruptcy Court approval. Substantially all of the relief requested in the Debtors' "first day" motions was granted by the Bankruptcy Court. These motions and orders are available for review and download free of charge at the Debtors' case information website maintained by the Solicitation Agent (located at www.dm.epiq11.com/mesa).

The orders entered pursuant to the Debtors' "first day" motions authorized the Debtors to, among other things:

- establish certain notice, case management and administrative procedures;

- obtain an extension of time to file their schedules of assets and liabilities, statements of financial affairs and other reports required by Bankruptcy Rule 2015;

- pay pre-petition employee wages and benefits and allow employees to proceed with outstanding workers' compensation claims;

- continue use of existing cash management system, bank accounts and business forms;

- establish notification and hearing procedures for trading in claims and equity securities;

- honor pre-petition obligations to customers and honor customer programs;

- establish procedures pursuant to which utilities are prohibited from discontinuing service except in certain circumstances;

- pay pre-petition sales and use taxes, transportation taxes, airport fees, passenger facility charges, fuel taxes, employment taxes and other similar taxes and fees;

- continue and renew their liability, property, casualty and other insurance programs;

- pay pre-petition claims of certain critical vendors;

- comply with interline agreements and other industry agreements and pay certain prepetition claims in connection therewith in the ordinary course of business;

- pay pre-petition obligations to foreign creditors;

- continue and renew their surety bond programs; and

- honor fuel supply contracts, storage fuel contracts, into-plane service contracts and other fuel service arrangements and pay certain prepetition claims in connection therewith.

### 3. Debtors' Retention of Professionals

The Debtors obtained authority to retain various professionals to represent and assist them during the Chapter 11 Cases. These professionals include:

(a) PSZJ, as their bankruptcy counsel;

(b) Imperial, as their financial advisors and investment bankers;

(c) Epiq, as their Solicitation Agent;

(ed) Deloitte & Touche Tax as their tax advisors;

(de) Deloitte & Touche LLP as their auditors;

(ef) DLA Piper LLP (US) as their special corporate counsel; and

(eg) Smith, Gambrell & Russell, LLP as their special aviation counsel.

### 4. Ordinary Course Professionals

The Debtors obtained authority to retain, employ, and pay certain professionals used by the Debtors in the ordinary course of business to assist them with matters unrelated to the administration of the Chapter 11 Cases, subject to monthly payment caps, on the terms and conditions set forth in the order entered by the Bankruptcy Court on January 16, 2010.

### 5. Appointment of Committee

On January 14, 2010, the United States Trustee for the Southern District of New York appointed the Committee. The members of the Committee are: Bombardier; Embraer-Empresa Brasileira de Aeronautica S.A.; IHI Corporation; U.S. Bank National Association; AT&T

Capital Services; Wilmington Trust Company; ALPA; and AFA (*ex-officio* member). The Committee retained Morrison & Foerster LLP as its legal advisor and Macquarie Capital (USA) Inc. as its financial advisor and investment banker.

Since the formation of the Committee, the Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases. The Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Committee to the extent its constituency would be affected by proposed actions and transactions outside of the ordinary course of the Debtors' businesses. The Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations and formulating the terms of the Plan.

### 6. Interim Compensation of Professionals

Given the size and complexity of the Debtors' Chapter 11 Cases and the amounts of fees and expenses that will likely be incurred by the Debtors' and Committee's professionals, the Debtors sought and obtained entry of the Interim Compensation Order, which establishes an orderly, regular process for the monthly compensation and reimbursement of such professionals that are consistent with the procedures adopted by courts for the interim compensation of professionals in other large chapter 11 cases.

### 7. Letter of Credit Facility

In the normal course of their business operations, the Debtors are required to provide letters of credit to secure the payment or performance of certain of the Debtors' obligations, including, without limitation: (a) workers' compensation obligations; (b) obligations owed to municipalities; (c) obligations associated with foreign operations; (d) contractual or permit obligations; (e) fuel and liquor taxes; (f) airport obligations; and (g) U.S., Canadian or other customs requirements. Prior to the Petition Date, Compass Bank ("Compass") issued letters of credit on behalf of the Debtors pursuant to a prepetition letter of credit facility.

On February 2, 2010, the Debtors filed an emergency motion with the Bankruptcy Court seeking authorization to enter into a new letter of credit facility in the amount of $11,904,719 with Compass, assume a prepetition purchasing card agreement with Compass, and validate Compass' liens and claims arising under the prepetition agreements with Compass. On February 4, 2010, the Bankruptcy Court entered an order approving the relief requested in the motion on an interim basis. On March 5, 2010, the Bankruptcy Court entered an order approving the relief requested in the motion on a final basis.

### 8. Labor Cost Restructurings and Certain Other Initiatives

The Debtors have implemented a series of carefully planned workforce reductions and obtained prepetition and postpetition wage and benefit concessions from their employees and labor unions, as described below.

### a.    Unionized Labor Cost Restructuring

*ALPA*

Mesa Airlines and Freedom are parties with ALPA, on behalf of the 912 pilots employed by Mesa Airlines and Freedom, to the ALPA Collective Bargaining Agreement.  In December 2008, the Debtors' pilots, as represented by ALPA, ratified amendments to the ALPA Collective Bargaining Agreement effective as of December 10, 2008 (amendable December 10, 2010).

*AFA*

Mesa Airlines and Freedom are parties with AFA, on behalf of the 637 flight attendants employed by Mesa Airlines and Freedom, to the AFA Collective Bargaining Agreement.  The AFA Collective Bargaining Agreement is amendable again on February 18, 2012.

### b.    Non-Unionized Labor Cost Restructuring

The Debtors have also restructured their non-unionized labor costs.  As of September 30, 2010, the Debtors employ 2,782 employees, down from 3,303 employees on the Petition Date.

### 9.    Assumption and Rejection of Nonresidential Real Property Leases/365(d)(4) Extension

On February 3, 2010, the Bankruptcy Court entered an order authorizing the Debtors to reject two unexpired leases of nonresidential real property.  Subsequently, by order dated April 13, 2010, the Bankruptcy Court extended the time for the Debtors to assume or reject their remaining approximately 120 unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including August 3, 2010.

By orders entered on August 3, 2010, the Debtors obtained (a) authority to reject sixteen leases of nonresidential real property and assume 123 leases of nonresidential real property and (b) approval of further extensions of time to assume or reject six nonresidential real property leases pursuant to the applicable lessors' written consents.  As of September 30, 2010, the Debtors have entered into stipulations with applicable lessors under four of the extended deadline leases either to assume or further extend the time to assume or reject such leases.  The Debtors expect to have assumed or rejected, as appropriate for their businesses, the remaining two extended deadline leases by the earlier of the Effective Date and November 30, 2010.

### 10.    Exclusivity Extension

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under Chapter 11 of the Bankruptcy Code, during which only the debtor may file a plan of reorganization.  If the debtor files such a plan within that initial 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods, within certain limitations, "for cause."  Without further order of the Bankruptcy Court, the

Debtors' initial exclusive period to file a plan would have expired on May 5, 2010. However, by an order entered on April 15, 2010, the Bankruptcy Court extended the Debtors' exclusive period within which to file a plan of reorganization through and including September 2, 2010 and the Debtors' exclusive period within which to seek acceptance of such plan through and including November 3, 2010.

To permit the Debtors to continue negotiating with the Committee regarding the terms of a consensual plan of reorganization, on July 28, 2010, the Debtors filed their second motion to extend their exclusive periods for an additional 90 days. After negotiations with the Committee, the Debtors agreed to modify their request by limiting the extension of their exclusive period within which to file a plan of reorganization to October 21, 2010 and their exclusive period within which to seek acceptance of such plan to December 21, 2010, subject to further extensions in the event the Committee does not object thereto by October 8, 2010. On August 12, 2010, the Bankruptcy Court entered an order granting such relief.

On or around October 8, 2010, the Debtors and the Committee agreed that any further extensions of the exclusivity periods beyond December 1, 2010 and February 1, 2011, respectively, would be subject to co-exclusivity between the Debtors and the Committee beginning February 10, 2011 and April 13, 2011, respectively. The Debtors intend to file motion seeking a further extension of their exclusivity periods subject to the foregoing arrangement with the Committee.

### 11.     De Minimis Asset Sales Procedures

The Debtors moved the Bankruptcy Court for an order establishing procedures for the sale to non-insiders of assets of *de minimis* value (not more than $750,000 per transaction), including but not limited to small aircraft, free and clear of any liens, claims and encumbrances pursuant to Bankruptcy Code Section 363(f). The Debtors proposed streamlined procedures under which the Debtors could sell or abandon such assets, on an individual basis or in groups of such assets, subject to certain notice requirements. On March 1, 2010, the Bankruptcy Court entered an order approving such procedures.

As of November 1, 2010, the Debtors have filed notices of sales of five aircraft (Beech-Raytheon Model No. A36) and obtained approvals of such sales. The sales of these De Minimis Assets have generated approximately $479,800.00 for the Estates.

### 12.     Settlement Procedures In Connection With Claims and Causes of Action Brought or Threatened by or Against the Debtors In Judicial, Administrative, Arbitral or Other Actions or Proceedings

The Debtors moved the Bankruptcy Court for an order authorizing the Debtors to settle certain claims and causes of action threatened or brought by or against the Debtors in judicial, administrative, arbitral or other actions or proceedings in accordance with the notice procedures set forth in the motion. On February 25, 2010, the Bankruptcy Court entered an order approving such procedures. Pursuant to the order, the Debtors may settle claims (a) with respect to a settled value that is equal to or less than $250,000 on any reasonable terms and may enter into, execute and consummate a written agreement of settlement that will be binding on it and its estate

without notice by the Debtors to any third party or further action by the Bankruptcy Court; and (b) with respect to any settled value that is greater than $250,000 but does not exceed $2,000,000, upon the notice procedures set forth in the order. By its terms, the order does not apply to the settlement of any litigation with Delta, ~~U.S.~~US Airways or United.

### 13.    **Reclamation Procedures**

The Debtors moved the Court for an order authorizing the Debtors to establish and implement procedures to reconcile and resolve all unpaid reclamation claims. On March 1, 2010, the Bankruptcy Court entered an order approving the requested procedures as the sole means for the resolution of reclamation claims asserted against the Debtors. Pursuant to the reclamation procedures, on May 27, 2010, the Debtors filed a reclamation report that describes the treatment of reclamation claims asserted against the Debtors. Of the $336,000 in claims asserted against the Debtors as either reclamation claims or section 503(b)(9) claims, the Debtors have resolved such claims as follows: (i) $82,242 as valid reclamation claims, (ii) $68,532 as valid general unsecured claims, and (iii) $10,990 representing goods that have been returned to the vendor and not resulting in any claim. The remainder of the claims were asserted against the Debtors under section 503(b)(9) of the Bankruptcy Code and such claims will be reconciled through the claims reconciliation process described below in Section III.F.2.

### 14.    **Committee's Motion for Establishment of Procedures Under 11 U.S.C. § 1102(b)(3)**

On February 8, 2010, the Committee filed a motion to establish procedures under which the Committee will be deemed to be in compliance with the requirements under Bankruptcy Code Section 1102(b)(3). Generally, under this statute, an appointed creditors' committee is to provide creditors in the case with access to information. Given the ambiguity of the scope of this statute, in order to protect confidential and/or sensitive information relating the Debtors and other matters while satisfying the statute's requirements, the Committee moved for the implementation of certain procedures and other relief, including (1) the establishment of (i) a website to make certain non-confidential information available to general unsecured creditors and (ii) a special email address and protocol whereby unsecured creditors can submit questions and comments in connection with the Debtors' cases, and (2) authorization for the Committee to enter into confidentiality agreements with creditors and parties in interest for purposes of sharing confidential information. The Committee's motion, as amended pursuant to an agreement with the Debtors, was granted by the Court pursuant to an order entered on February 25, 2010. Pursuant thereto, a separate website has been set up by the Committee's counsel –www.dm.epiq11.com/mesa – which contains certain information regarding the Debtors and their cases.

### C.    **Fleet Rationalization and Restructuring / Section 1110 Agreements**

On the Petition Date, the Debtors' fleet consisted of 178 aircraft, consisting of 48 CRJ-200s, 20 CRJ-700s, 38 CRJ-900s, 36 ERJ-145s, 16 Dash-8s, and 20 Beech 1900s. Of the 178 aircraft, 52 of them were parked and not in service on the Petition Date. In addition, as of the Petition Date, the market values of many of the Debtors' aircraft had declined substantially since the aircraft were originally leased or financed. Consequently, the Debtors were paying above

market costs for many of their aircraft. The Debtors analyzed their code-share contractual needs and aircraft fleet, the projected demand for air travel, maintenance requirements, labor costs, operating costs and other business goals and objectives. Based on this analysis, the Debtors developed a plan to rationalize costs relating to their 50-seat aircraft lease and debt obligations and to match their aircraft fleet to future operating needs. Bringing the ongoing ownership cost for their aircraft in line with current market values and the Debtors' operations has been a central element of the Debtors' restructuring efforts.

Many of the Debtors' aircraft, and related pieces of aircraft equipment, were covered by leases or security agreements and subject to section 1110 of the Bankruptcy Code. Section 1110 terminates the automatic stay, and lets lessor and lenders take possession of aircraft and aircraft equipment, on the 60th day after a bankruptcy case commences, unless the debtor either agrees to perform all future obligations under the applicable agreements and to cure existing defaults or enters into agreements with the relevant lessors and lenders to extend the 60-day period. Both agreements to perform obligations and cure defaults and agreements to extend the 60-day period are subject to the approval of the Bankruptcy Court.

On January 25, 2010, the Debtors filed a motion seeking to establish procedures authorizing them, subject to subsequent court approval: (a) to agree to perform obligations and cure defaults pursuant to section 1110(a) of the Bankruptcy Code; and (b) to enter into agreements to extend the 60-day period specified in section 1110(a) pursuant to section 1110(b) of the Bankruptcy Code. On February 23, 2010, the Court entered the Section 1110 Procedures Order granting the motion and establishing the Section 1110 Procedures, as modified pursuant to the Debtors' negotiations with certain aircraft lessors and lenders, and additionally authorizing the Debtors to enter into agreements to provide adequate protection with respect to interests in aircraft and aircraft equipment pursuant to section 1110(b). In accordance with the Section 1110 Procedures, and in order to address the fleet-related issues raised by section 1110, the Debtors filed eight (8) notices of election pursuant to section 1110(a) of the Bankruptcy code to perform under the terms of certain aircraft related agreements that govern thirty-four (34) aircraft and thirteen (13) aircraft engines. In addition, pursuant to the Section 1110 Procedures and after extensive arms-length, good-faith negotiations with various aircraft counterparties, the Debtors entered into twenty-five (25) Section 1110(b) Stipulations pursuant to section 1110(b) of the Bankruptcy Code with respect to 124 aircraft and sixteen (16) engines.

The Section 1110(b) Stipulations , which were filed under seal, permit the Debtors to continue operating certain aircraft on terms that the Debtors believe are fair, equitable, and in the best interest of the Debtors' estates and all stakeholders. The Section 1110(b) Stipulations generally provide that the Debtors may continue utilizing these aircraft in exchange for making certain agreed upon payments and contain customary terms and conditions. Since the entry into the Section 1110(b) Stipulations, the Debtors have either rejected certain of the aircraft leases or abandoned certain of the owned aircraft governed by these agreements. Accordingly, it was not necessary for the Debtors to extend the terms of such agreements and in each case the Section 1110(b) Stipulations expired by their own terms. The Debtors also have extended the terms of six (6) Section 1110(b) Stipulation with the applicable controlling aircraft parties. The remaining Section 1110(b) Stipulations have not expired and the Debtors continue to perform in accordance with the terms of each such stipulation.

On January 25, 2010, the Debtors also filed a motion to establish procedures for the rejection of aircraft and aircraft equipment leases and procedures for the return of aircraft and aircraft equipment subject to such leases. On February 23, 2010, the Bankruptcy Court entered the Section 1110 Rejection/Abandonment Procedures Order establishing the Section 1110 Rejection/Abandonment Procedures or otherwise. In accordance with the Section 1110 Rejection/Abandonment Procedures, as of November 1, 2010, the Debtors: (a) have abandoned, pursuant to an agreed form of order, twenty (20) Beech 1900D aircraft and related equipment owned by Mesa Airlines; and (b) have filed twenty-three (23) notices of rejection or abandonment (inclusive of the notices under the Section 1110 Rejection/Abandonment Procedures Order ) with respect to (i) twelve (12) engine leases, (ii) eighty-two (82) aircraft leases, and (iii) one (1) owned aircraft.

As discussed in more detail below, the Debtors will no longer operate aircraft for Delta beyond August 31, 2010. On July 30, 2010, the Debtors filed their twentieth (20th) and twenty-first (21st) notice of rejection, which together rejected twenty-four (24) leases that governed the ERJ-145 aircraft. One August 31, 2010, the Debtors filed their twenty-second (22nd) notice of rejection, which rejected eleven (11) leases that governed certain ERJ-145 aircraft. On September 24, 2010, the Debtors rejected their last lease governing one certain ERJ-145 aircraft.

The Debtors have restructured the obligations arising from their fleet by rejecting or abandoning obligations representing approximately 67% of their prepetition fleet and entering into new leases for certain aircraft. The forty-four (44) aircraft owned by the Debtors as of the Petition Date accounted for approximately $39.2 million in annual aircraft ownership obligations. Of these aircraft, the Debtors have abandoned twenty-one (21) owned aircraft (which includes twenty (20) Beech 1900s and one (1) CRJ 200) and restructured the obligations with respect to one (1) CRJ 200. As a result of the abandonment and restructuring, the Debtors have achieved approximately $5.2 million in annual aircraft ownership reductions, including interest, and depreciation expense.

Similarly, the 134 aircraft leased by the Debtors as of the Petition Date accounted for approximately $203.9 million in annual aircraft lease obligations. Of these aircraft, the Debtors have rejected ninety (96) aircraft leases, have entered into or will enter into seventeen (17) amended aircraft leases (13 CRJ 200s and 4 Dash-8s), and intend to assume the leases relating to the CRJ 700 and CRJ 900 aircraft. As a result of the foregoing lease restructuring, the Debtors have achieved approximately $102.3 million in annual aircraft lease reductions. Together, the owned and leased fleet restructuring has contributed to the significant deleveraging of the Debtors' balance sheet, including $48.4 million in debt and $715.8 million in capitalized leases. These reductions have significantly increased the Debtors' flexibility and enabled the achievement of restructuring goals. Some of the more significant agreements for the restructuring of the fleet implemented by the Debtors during the Chapter 11 Cases are described below.

1.  **Raytheon Aircraft Credit Corporation – Beech
    1900D Aircraft and Related Aircraft Equipment**

On the Petition Date, the Debtors moved the Bankruptcy Court for authority to establish procedures to abandon and satisfy return conditions with respect to twenty (20) Beech 1900D

aircraft and aircraft equipment financed by RACC pursuant to prepetition promissory notes and security agreements by and between Mesa Air Group and Mesa Airlines, on the one hand, and RACC, on the other hand. On January 19, 2010, the Court entered an order granting the relief requested in the motion on an interim basis, the form of which was agreed to by the Debtors and RACC.

On January 26, 2010, the Court entered an order approving the settlement by and among Mesa Air Group, Mesa Airlines, and RACC regarding, *inter alia*, the abandonment and surrender and return conditions of certain aircraft and related equipment. Pursuant to such order, (i) Mesa Air Group and Mesa Airlines ratified and confirmed that the aggregate value of the aircraft securing Mesa Air Group's and Mesa Airlines' obligations under the applicable aircraft agreements is $14 million, and (ii) for purposes of such order, RACC stipulated with Mesa Air Group and Mesa Airlines to the value ascribed to such aircraft by the Debtors.

On May 12, 2010, RACC, Mesa Air Group and Mesa Airlines entered into a stipulation in settlement and resolution of all claims of or involving RACC, which provides that RACC shall have an allowed general unsecured claim against Mesa Air Group and Mesa Airlines in the aggregate amount of $17,973,795.57 on account of RACC's claims arising under or in connection with the applicable aircraft agreements, provided that RACC shall elect in connection with the solicitation of the Plan whether to assert such claim against Mesa Air Group or Mesa Airlines and in no event shall RACC be permitted to assert such claim against both such entities. The Bankruptcy Court approved the stipulation on June 11, 2010.

## 2. Settlement Procedures for Section 1110(b) Rejection Damages Claims of Certain Aircraft Lessors

With respect to eleven (11) of the twenty-five (25) Section 1110(b) Stipulations entered into during the Chapter 11 Cases, the Debtors and the Settling Aircraft Counterparties agreed to a methodology for the determination, settlement, and allowance of prepetition, general unsecured claims arising from the Debtors' rejection of aircraft related leases. On April 21, 2010, the Debtors filed a motion requesting authority to establish the Aircraft Rejection Damages Claim Settlement Procedures to implement the agreed-upon methodology for calculating such claims. On May 13, 2010, the Bankruptcy Court entered an order approving such procedures. Pursuant to the procedures, upon rejection, a Settling Aircraft Counterparty's prepetition general unsecured claims for rejection of thirty-six (36) aircraft leases will be calculated pursuant to the methodology established under the Aircraft Rejection Damages Claim Settlement Procedures. The Aircraft Rejection Damages Claim Settlement Procedures provide for a negotiation and notice process pursuant to which rejection damages claims may be settled by the Debtors and Aircraft Settling Parties without further involvement of the Bankruptcy Court unless objections are filed in accordance with the procedures.

The claims arising from an additional eight (8) rejected aircraft leases were intended to be governed by the methodology discussed above but the remedy provisions of these leases contained different terms than the other leases discussed above. As a result, the Debtors and the applicable Settling Aircraft Counterparty intend to liquidate the claims arising from the rejection of the eight (8) leases in a manner that reflects the actual damages caused by the rejection.

### 3. Assumption of Aircraft and Aircraft Equipment Leases

Prior to the Petition Date, Mesa Air Group and Mesa Airlines leased six (6) spare engines in which Willis Lease Finance Corporation or WEST Engine Funding LLC was the interest holder. The leases for two such engines were rejected or deemed rejected pursuant to the Section 1110 Rejection/Abandonment Procedures. The Debtors assessed various aircraft engine lease and purchase options, determined that assuming the remaining four (4) leases was critical to their operations, and accordingly filed a motion to assume such leases on April 12, 2010. The Bankruptcy Court approved such relief pursuant to an order entered on May 13, 2010.

In addition, prior to the Petition Date, Mesa Airlines leased four (4) DHC-8-202 aircraft from Wells Fargo Northwest, National Association in which Avmax International Aircraft Leasing Inc. was the interest holder with respect to three (3) of the aircraft and Northstar Avlease Aircraft Trust was the interest holder with respect to one (1) of the aircraft. Without assuming these leases, as amended, the Debtors would have been required to locate four (4) DHC-8-202, which are in very high demand. On May 26, 2010, the Debtors filed a motion requesting authority to assume such leases, as amended, and make certain payments to cure prepetition defaults under the leases. On June 10, 2010, the Bankruptcy Court entered an order granting such relief. As a result, the Debtors will be able to continue flying the aircraft that are necessary to satisfy their commitments under the ~~U.S.~~US Airways Code-Share Agreement.

### 4. Postpetition Engine Lease Agreements & Security Agreements

On March 2, 2010, the Debtors filed a motion seeking authority to enter into and perform under new short-term aircraft engine lease agreements in the ordinary course of business in accordance with the same practices and procedures as in effect immediately prior to the Petition Date, and perform all obligations contemplated thereunder. On March 5, 2010, the Bankruptcy Court entered an order approving such relief. The Debtors have entered into short-term postpetition leases of engines as necessary since the entry of such order.

In addition, on June 23, 2010, the Debtors filed a motion requesting authority to enter into (i) certain engine lease agreements with U.S. Bank National Association as indenture trustee and (ii) a certain debt restructuring agreement with Manufacturer and Traders Trust Company with respect to certain aircraft equipment owned by the Debtors. Under such motion, the Debtors sought authorization to enter into (i) new lease agreements with respect to four (4) aircraft engines the Debtors plan to use in connection with their code-share operations with ~~U.S.~~US Airways and (ii) restructuring the financing with respect to one CRJ-200 aircraft that is owned by the Debtors. On July 8, 2010, the Bankruptcy Court entered an order approving the motion.

To the extent not completed by the date hereof, the Debtors intend to enter into aircraft leases that will govern thirteen (13) CRJ 200 aircraft and six (6) Dash-8 aircraft. The Debtors also intend to assume the twelve (12) leases governing the CRJ 700s and twenty-four (24) leases governing the CRJ 900s but have engaged in discussions with the lessors regarding modifying the terms so that the Debtors can obtain an extension of their codeshare agreements with United and ~~U.S.~~US Airways. Similarly, the Debtors intend to reinstate their secured financing obligations with respect to the applicable eight (8) CRJ 700 aircraft and fourteen (14) CRJ 900

aircraft but have been engaged in discussions with the counterparties regarding modifying the terms so that the Debtors can obtain an extension of their codeshare agreements with United and U.S.US Airways.

The Debtors will have successfully completed their fleet rationalization by November 1, 2010. The table below describes the aircraft the Debtor will operate pursuant to new leases, assumed leases, and restructured security agreements:

| Fleet Composition as of November 1, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | CRJ-200 | ERJ-145 | CRJ-900 | CRJ-700 | B-1900 | Dash-8 | Total |
| U.S.US Airways | 7 | - | 38 | - | - | 6 | 51 |
| United | - | - | - | 20 | - | - | 20 |
| *go!* Mokulele | 5 | - | - | - | - | - | 5 |
| Total Owned/Leased | 13 | - | 38 | 20 | - | 6 | 77 |
| Rejected/Abandoned Aircraft | 48 | 36 | 0 | 0 | 20 | 10 | 112 |

## D.    Code-Share Issues/Status

### 1.    Delta

On January 19, 2010, the Debtors filed a motion to assume the Delta Code-Share Agreement.

As contemplated in the Delta CMO, the Delta ERJ Litigation went to trial in the Georgia District Court on April 20–23, 2010. On May 17, 2010, the Georgia District Court issued its Findings of Fact and Conclusions of Law in which the Georgia District Court ruled in favor of Delta and found that Delta had the right to and did terminate the Delta Code-Share Agreement prior to the Petition Date, on March 28, 2008. On the same date, the Georgia District Court entered a judgment in favor of Delta. Mesa Air Group and Freedom have not appealed the Georgia District Court's findings and judgment.

Although the adverse decision in the ERJ Litigation has resulted in the loss of jobs and additional claims arising from the rejection of more aircraft leases, the Delta Code-Share Agreement was a marginal contract financially.

After the entry of the findings and judgment, Mesa Air Group, Freedom and Delta negotiated the terms of the Delta Temporary Agreement to provide for an orderly wind-down of Mesa Air Group's and Freedom's Delta operations. The Delta Temporary Agreement provides, among other things, that Freedom will continue to provide Delta's connection services on the same terms as the Delta Code-Share Agreement, except that the Delta Temporary Agreement shall (a) expire at 11:59 p.m. EDT on August 31, 2010 (unless earlier terminated by the Debtors) and (b) only apply to the aircraft identified in the Delta Temporary Agreement. The Delta Temporary Agreement also provides that Delta shall make all payments due to Mesa Air Group and Freedom at the times, and in the amounts, provided for in the Delta Code-Share Agreement without setoff or recoupment of any amounts that Delta contends are due and were actually or

allegedly incurred prior to the date of the Delta Temporary Agreement. The Debtors obtained authority to enter into the Delta Temporary Agreement by the entry of an order of the Bankruptcy Court on May 25, 2010.

The Delta MFN Litigation remains pending in the Bankruptcy Court. The Debtors are presently negotiating with Delta regarding a potential settlement of the claims asserted in such action.

After the submission by Mesa Air Group and Delta of a stipulation staying all deadlines in the Delta CRJ Action, the Georgia District Court closed the action subject to reopening it at the conclusion of these cases upon the request of either party.

After negotiations with Delta, the Debtors and Delta agreed dismiss the Delta Engine Litigation without prejudice and submitted a stipulation to the Arizona District Court. On June 24, 2010, the Arizona District Court approved the dismissal, without prejudice, of the Delta Engine Litigation, subject to the Bankruptcy Court's approval. On that same date, the Debtors filed with the Bankruptcy Court a proposed order authorizing their entry into the stipulation dismissing the Delta Engine Litigation. On July 16, 2010, the Bankruptcy Court entered an order authorizing the Debtors' entry into such stipulation.

## 2. United

On June 14, 2010, the Debtors and United entered into a settlement and release agreement with respect to the United Litigation described above in Section II.H.3.b and, on June 22, 2010, the Debtors filed notice with the Bankruptcy Court of a stipulation by and between Mesa Air Group and United providing for the dismissal of the United Litigation with prejudice. The Bankruptcy Court entered an order authorizing Mesa Air Group's entry into such stipulation on July 16, 2010, and the stipulation was filed in the Illinois District Court on July 22, 2010.

## 3. U.S.US Airways

As discussed in greater detail in Section IV.F.7 below, the Debtors will assume the U.S.US Airways Code-Share Agreement as modified by the U.S.US Airways Tenth Amendment by separate motion and continue to provide services for U.S.US Airways through September 2015.

## E. Summary of Claims Process, Claims Bar Date and Claims Filed

## 1. Filing of Schedules and Claims Bar Date

On March 26, 2010, in accordance with a second extension of time granted by the Bankruptcy Court pursuant to an order on March 26, 2010, the Debtors filed their Schedules with the Bankruptcy Court. Interested parties may review these Schedules by visiting: www.dm.epiq11.com/mesa.

On March 26, 2010, the Bankruptcy Court entered an order establishing procedures and set deadlines for filing proofs of claim and approved the form and manner of the notice thereof. Pursuant to such order, the Bar Date for certain persons and entities to file Proofs of Claim in the

Chapter 11 Cases was May 21, 2010. The Notice of the Bar Date was published in USA Today at least 28 days prior to the Bar Date and copies were served on, among others, Creditors and potential Creditors appearing in the Schedules.

To date, over 1,445 Proofs of Claim have been against the Debtors, which in the Debtors' estimate are in the aggregate approximately $2.08 billion, which amount excludes duplicates and claims that have been superseded. As described in Section I.D above, the Proofs of Claim can be broken down as follows: (i) approximately $19.1 million in Administrative Expense Claims, (ii) approximately $7.3 million in Priority Tax Claims, (iii) approximately $4.5 million in Secured Tax Claims, (iv) Priority Non-Tax Claims in a *de minimis* amount, (v) approximately $1.4 million in Secured Claims, (vi) approximately $2.03 billion in General Unsecured Claims, (vii) approximately $8.2 million in De Minimis Convenience Claims, and (viii) approximately $19.4 million in 2012 Noteholder Claims. These are estimates only and are based on the Debtors' preliminary claim analysis. If the Debtors are unsuccessful on some the anticipated claims objections, the estimates of General Unsecured Claims could increase by $500 million.

The Administrative Expense Claims relate to (i) professional fees ($16.5 million), (ii) claims asserted pursuant to section 503(b)(9) ($2,330,000), (ii) reclamation claims ($78,000), and (iii) other expenses ($185,000) that were incurred during the Chapter 11 Cases. In addition, certain aircraft counterparties have asserted Administrative Expense Claims in the aggregate amount of ($45,825,000) in connection with the Debtors' rejection of certain aircraft equipment leases and other asserted postpetition breaches. As described below, the Debtors are contesting the validity of the aircraft related Administrative Expense Claims and have filed objections to certain of these claims and intend to object to the others in the near term. As for the remainder of the Claims (other than the Reclamation Claims), the Debtors are in the process of analyzing these Claims and have filed objections or are in the process of preparing objections to the foregoing claims as to their validity among other defects.

## 2. Claims Objection Procedures

The Debtors have begun the process of analyzing and reconciling filed Claims. On July 7, 2010, the Bankruptcy Court entered the Claims Settlement Procedures Order approving the Debtors' motion to establish certain procedures for objecting to and settling Claims in the Chapter 11 Cases. The Debtors believe that many of the Claims filed in the Chapter 11 Cases are invalid, untimely, duplicative and/or overstated, and they are in the process of objecting to such Claims.

On August 16, 2010, the Debtors filed Omnibus Objection to Certain Late-Filed Claims and Authorization to Disallow and Expunge Such Claims (Omnibus Objection No. 1). By such objection, the Debtors objected to twenty-eight (28) claims on the basis that such claims were filed after the Bar Date. The aggregate value of the claims subject to such objection is approximately $191,730. On October 27, 2010, the Bankruptcy Court granted Omnibus Objection No. 1.

On August 18, 2010, the Debtors filed Omnibus Objection Seeking to Expunge and Disallow Certain Duplicate Claims (Omnibus Objection No. 2). By such objection, the Debtors objected to fifty-one (51) claims on the basis that such claims are duplicates of another claim

filed against the same Debtor in these Chapter 11 Cases. The aggregate value of the claims subject to such objection is approximately $37,151,121. On October 27, 2010, the Bankruptcy Court granted Omnibus Objection No. 2. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 2 on any other basis.

On August 18, 2010, the Debtors filed Omnibus Objection Seeking to Expunge and Disallow Certain Amended and Superseded Claims (Omnibus Objection No. 3). By such objection, the Debtors objected to forty (40) claims on the basis that such claims were expressly or effective amended or superseded by other claims filed in the Chapter 11 Cases. The aggregate value of the claims subject to such objection is approximately $70,563,254. On October 27, 2010, the Bankruptcy Court granted Omnibus Objection No. 3. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 3 on any other basis.

On September 21, 2010, the Debtors filed Omnibus Objection Seeking to Reclassify Certain Claims as General Unsecured Claims (Omnibus Objection No. 4). By such objection, the Debtors objected to forty-one (41) claims on the basis that such claims were classified improperly when filed against the Debtors. On October 28, 2010, the Bankruptcy Court granted Omnibus Objection No. 4. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 4 on any other basis.

On October 20, 2010, the Debtors filed the Objection to the Request by Engine Lease Finance Corporation and Deucalion Engine Leasing (Ireland) Limited for Allowance and Payment of Administrative Expense Pursuant to Section 503(b) and 507(a)(2) of the Bankruptcy Code. Engine Lease Finance Corporation and Deucalion Engine Leasing (Ireland) Limited are seeking an Administrative Expense Claim in the approximate amount of $558,000 on account of the Debtors' surrender and return of certain aircraft parts and the records related to certain parts. The Debtors believe that if there is a valid claim that such claim is a prepetition general unsecured claim that is not entitled to priority pursuant to section 503(b) of the Bankruptcy Code.

On October 21, 2010, the Debtors filed the Objection to (1) the Alleged Administrative Portions of Claims 1430 and 1431 of U.S. Bank National Association, as Security Trustee, on Behalf of Agencia Especial De Financiamento Industrial-Finame and (2) Claims that were Amended and Superseded by Claims 1430 and 1431. U.S. Bank National Association is asserting Administrative Expense Priority Claims in the approximate amount of $11 million on account of the Debtors' surrender and return of certain aircraft parts and the records related to certain parts. The Debtors believe that if there is a valid claim that such claim is a prepetition general unsecured claim that is not entitled to priority pursuant to section 503(b) of the Bankruptcy Code.

On October 29, 2010, the Debtors filed Omnibus Objection to Claims of holders of 2012 Notes that are duplicative of Claims filed by the applicable Indenture Trustee (Omnibus Objection No. 5). By such objection, the Debtors objected to thirty-six (36) claims on the basis that claims on account of the 2012 Notes were to be filed by the Indenture Trustee, not the beneficial holders of such notes. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 5 on any other basis.

On October 29, 2010, the Debtors filed Omnibus Objection to Unsubstantiated Administrative Expense Claims Asserted by Holders of Claims Arising from the Rejection of Aircraft Equipment Leases or the Abandonment of Aircraft Equipment (Omnibus Objection No. 6). By such objection, the Debtors objected to 157 claims on the basis that the holders of such administrative expense claims have not provided any supporting information demonstrating they are entitled to such claims. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 6 on any other basis.

The Debtors are continuing to review Claims and expect to file additional objections to such claims and reserve all rights therefor. The last day by which the Debtors may file objections to Claims, which day shall be the latest of (a) 175 days after the Effective Date, (b) 60 days after the filing of a proof of claim for, or request for payment of, such Claim, or (c) such other date as the Bankruptcy Court may order. The filing of a motion to extend the Claims Objection Deadline by any party shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, the Claims Objection Deadline shall be the later of the then current Claims Objection Deadline (as previously extended, if applicable) or 28 days after entry of a Final Order denying the motion to extend the Claims Objection Deadline.

## F. Negotiation of the Plan

### 1. Overview

A detailed description of the Plan is set forth in Section IV of this Disclosure Statement. In this Section, however, certain key provisions of the Plan are summarized in additional detail.

### 2. Negotiations with Committee / Committee Support of Plan

The Plan is the product of extensive arm's length negotiations among the Debtors, the Committee and their respective legal, financial and operational professionals. Through the consensual Plan, the Debtors believe they have developed a structure that respects the separate and distinct value of each Debtor entity (and the separate and distinct claims against such entities), while maximizing the value of distributions available to creditors. Subject to the resolution of certain open issues and the exercise of its fiduciary duties, the Committee supports the Plan.

### 3. No Substantive Consolidation

In general, substantive consolidation is the pooling of two or more debtors' assets and liabilities so that each of the debtor's liabilities are satisfied from the common pool of assets created by the substantive consolidation. Because it is an equitable remedy, substantive consolidation is used to afford creditors equitable treatment. While various other factors may be considered by courts, generally, bankruptcy courts order substantive consolidation of multiple debtors if it is demonstrated that (i) the operational and financial affairs of the debtors are so entangled that the accurate identification and allocation of assets and liabilities cannot be

achieved, or (ii) creditors dealt with the debtors as a single economic unit and did not rely on the separate identity of an individual debtor in extending credit.

During the course of negotiating possible Plan terms, the Debtors and the Committee (through their professionals) contemplated whether substantive consolidation of the Debtors' Estates might be in order. However, the following facts, among others, militated against substantive consolidation: The Debtors maintained separate financial statements for each Debtor entity, which data can be readily identified and reconciled on a Debtor by Debtor basis. The Debtors maintained intercompany balances with respect to transactions conducted by and between Debtor entities, recording the same as "payables" or "receivables" depending upon whether the applicable Debtor maintained a positive or negative balance from such transactions. The Debtors' operations were structured such that individual Debtor entities served separate purposes and functions and, accordingly, had separate bases for existence and different assets and liabilities. In addition, historically, creditors of the various Debtors and their non-debtor subsidiaries transacted business with the Debtors in a manner that respected the separateness of such entities. All of these facts, among others, militated against the extraordinary remedy of substantive consolidation.

If some or all of the Estates were to be substantively consolidated, the potential recoveries for creditors from Estate Assets and proceeds thereof would likely materially differ from the potential recoveries for creditors set forth in **Exhibit D** hereof, with some creditors receiving a potentially lower recovery than as set forth in **Exhibit D** and some creditors receiving potentially higher recovery.

### 4. <u>Equal Treatment of Classes</u>

Having determined that substantive consolidation was not in order, the Debtors and the Committee (through their professionals) analyzed potential structures for respecting the separate values of each of the Debtor estates (and the separate values of claims asserted against those estates).

The Debtors and the Committee (through their professionals) jointly developed the proposed value-distribution structure set forth in the Plan. The Plan provides for General Unsecured Creditors in Classes 3(a)-3(l) and 5(a) and 5(b) to receive distributions of Restructured Unsecured Equity and New 8% Notes as follows:

### a. <u>Restructured Unsecured Equity</u>

Each holder of an Allowed General Unsecured Claim shall receive its Actual Pro Rata Share of Restructured Unsecured Equity. The Actual Pro Rata Share of Restructured Unsecured Equity is, as of the date on which the final distribution of Restructured Unsecured Equity is made, the amount of the Restructured Unsecured Equity (either in the form of New Common Stock or New Warrants, as applicable pursuant to Section 4.3.2 and 4.5.2 of the Plan) necessary to permit the holder of such Allowed Claim to hold a percentage of the Restructured Unsecured Equity obtained by dividing (i) the Aggregate Distribution Share applicable to such holder's claims by (ii) the Aggregate Distribution Share of holders of all Claims entitled to receive Restructured Unsecured Equity under the Plan. For the purpose of calculations under the Plan,

each New Warrant, together with the corresponding share of New Common Stock to be acquired upon exercise of the New Warrant, shall equal 1.1 units of Restructured Unsecured Equity.

As discussed in greater detail in Section IV.E.4.c below, for the avoidance of doubt, only those holders of Class 3 and 5 Claims who are U.S. Citizens shall receive shares of New Common Stock under Section 4.3.2 and 4.5.2 of the Plan, and only those holders of Class 3 and 5 Claims who are Non-U.S. Citizens shall receive New Warrants pursuant to Section 4.3.2 and 4.5.2 of the Plan. Holders of Allowed Class 3 and 5 Claims will be required to complete a Citizenship Declaration that discloses whether the holder of such claim is a U.S. Citizen or a Non-U.S. Citizen.

### b. New 8% Notes (Series A)

Each holder of an Allowed 2012 Noteholder Claim shall receive its *pro rata* share of the New 8% Notes (Series A). The terms and conditions of the New 8% Notes (Series A) is described below in Section IV.C.6 hereof.

### c. New 8% Notes (Series B)

Each holder of an Allowed General Unsecured Claim shall also receive its Actual Pro Rata Share of New 8% Notes (Series B). The Actual Pro Rata Share of New 8% Notes (Series B) is, as of the date on which the final distribution of New 8% Notes (Series B) is made, an amount of New 8% Notes (Series B) necessary to permit the holder of such Allowed Claim to hold a percentage of the New 8% Notes (Series B) obtained by dividing (i) the Aggregate Distribution Share applicable to such holder's claims by (ii) the Aggregate Distribution Share of holders of all Claims entitled to receive New 8% Notes (Series B) under the Plan.

The foregoing value-distribution structure may be best understood through the following hypothetical example:

Assume for the sake of this example that there are only three debtors (A – C) and three creditors: a US-based creditor with allowed claims at each debtor, a US-based noteholder with a claim at one debtor, and a foreign creditor with allowed claims at each of the three debtors.

## Mesa Air Group, Inc. - Example POR Distributions

| ($ in millions, except per share) | | Debtor A | | Debtor B | | Debtor C | | Total | Row # |
|---|---|---|---|---|---|---|---|---|---|
| Unadjusted Individual Estimated Value | $ | 100.0 | $ | 25.0 | $ | 25.0 | $ | 150.0 | 1 |
| Less: US Airways and Management Notes | | (8.2) | | (2.0) | | (2.0) | | (12.3) | 2 |
| Less: US Airways and Management Equity | | (10.0) | | (2.5) | | (2.5) | | (15.0) | 3 |
| Less: Adjustment for Series A Notes to 2012 Holders | | (20.0) | | | | | | (20.0) | 4 |
| Less: Adjustment for Warrant Conversion Ratio | | (4.3) | | - | | (0.7) | | (5.0) | 5 |
| Individual Estimated Value | $ | 57.5 | $ | 20.5 | $ | 19.7 | $ | 97.7 | 6 |
| | | | | | | | | | 7 |
| US Creditor Claims | $ | 400.0 | $ | 5.5 | $ | 100.0 | $ | 505.5 | 8 |
| Noteholder Claims | | - | | 15.0 | | - | | 15.0 | 9 |
| Foreign Creditor Claims | | 600.0 | | - | | 100.0 | | 700.0 | 10 |
| Allowed General Unsecured Claims | $ | 1,000.0 | $ | 20.5 | $ | 200.0 | $ | 1,220.5 | 11 |
| | | | | | | | | | 12 |
| Individual Debtor Distribution Percentage - US | | 40.0% | | 26.7% | | 50.0% | | | 13 |
| Individual Debtor Distribution Percentage - Noteholder | | 0.0% | | 73.3% | | 0.0% | | | 14 |
| Individual Debtor Distribution Percentage - Foreign | | 60.0% | | 0.0% | | 50.0% | | | 15 |
| Total | | 100.0% | | 100.0% | | 100.0% | | | 16 |
| | | | | | | | | | 17 |
| Individual Debtor Distribution Share - US | $ | 23.0 | $ | 5.5 | $ | 9.9 | $ | 38.3 | 18 |
| Individual Debtor Distribution Share - Noteholder | | - | | 15.0 | | - | | 15.0 | 19 |
| Individual Debtor Distribution Share - Foreign | | 34.5 | | - | | 9.9 | | 44.4 | 20 |
| Total | $ | 57.5 | $ | 20.5 | $ | 19.7 | $ | 97.7 | 21 |
| | | | | | | | | | 22 |
| Aggregate Distribution Percentage - US | | | | | | | | 39.2% | 23 |
| Aggregate Distribution Percentage - Noteholder | | | | | | | | 15.4% | 24 |
| Aggregate Distribution Percentage - Foreign | | | | | | | | 45.4% | 25 |
| Total | | | | | | | | 100.0% | 26 |
| | | | | | | | | | 27 |

| | | | Row # |
|---|---|---|---|
| New Shares to Issue (in millions) | | 10.0 | 28 |
| Shares to US Airways | | (1.0) | 29 |
| Shares to Management | | (1.0) | 30 |
| Less 10% Conversion Premium on Foreign Warrants | | (0.7) | 31 |
| Net Shares to Issue to Creditors | | 7.3 | 32 |
| Hypothetical Value per Share | $ | 7.50 | 33 |

| | | | | | | Row # |
|---|---|---|---|---|---|---|
| | | | | | Value | 34 |
| | | Shares | | Percent | of Shares | 35 |
| | | | | | | 36 |
| US Creditor | | 2.9 | | 28.7% | $ 21.6 | 37 |
| Noteholder | | 1.1 | | 11.3% | 8.4 | 38 |
| Foreign Creditor | | 4.0 | | 40.0% | 30.0 | 39 |
| US Airways | | 1.0 | | 10.0% | 7.5 | 40 |
| Management | | 1.0 | | 10.0% | 7.5 | 41 |
| Total | | 10.0 | | 100.0% | $ 75.0 | 42 |
| | | | | | | 43 |
| New Notes | $ | 75.0 | | | | 44 |

| | | | | | Notes + | | | Row # |
|---|---|---|---|---|---|---|---|---|
| | | Notes | | Percent | Share Value | | Percent | 45 |
| | | | | | | | | 46 |
| US Creditor | $ | 16.8 | | 22.4% | $ 38.3 | | 25.6% | 47 |
| Noteholder | | 6.6 | | 8.7% | 15.0 | | 10.0% | 48 |
| Foreign Creditor | | 19.4 | | 25.9% | 49.4 | | 32.9% | 49 |
| 2012 Noteholder | | 20.0 | | 26.7% | 20.0 | | 13.3% | 50 |
| US Airways | | 6.8 | | 9.0% | 14.3 | | 9.5% | 51 |
| Management | | 5.5 | | 7.3% | 13.0 | | 8.7% | 52 |
| Total | $ | 75.0 | | 100.0% | $ 150.0 | | 100.0% | 53 |

In our example we begin with the calculation of Individual Estimated Value for each of the three debtors, as adjusted for the value provided to certain parties pursuant to the Plan. Row 1 in the table above shows a hypothetical unadjusted Individual Estimated Value totaling $150 million (the actual methodology used to arrive at Individual Estimated Values will be based on a formal valuation analysis for each debtor performed by the debtors' investment banker, as fully described in the Plan and Disclosure Statement). Rows 2 – 5 show the adjustments made for notes and equity provided to US Airways and Management pursuant to the Plan, notes provided to 2012 Noteholders pursuant to the Plan, and an adjustment for the 1.1x warrant conversion ratio. Row 6 shows the adjusted "Individual Estimated Value" for each debtor, which totals $97.7 million in this example.

The claims against each debtor by our three hypothetical claimants are shown in Rows 8 – 10. Based on these claims, the Individual Debtor Distribution Percentages are calculated for each creditor in Rows 13 – 15. This percentage is then applied to the Individual Estimated Value to calculate the Individual Debtor Distribution Share in Rows 18 – 20.

Note in this example that the noteholder has a claim of $15.0 million against debtor B and that debtor B is solvent, i.e. the Individual Estimated Value for debtor B shown in Row 6 is equal to the Allowed Unsecured Claims against debtor B in Row 11. Thus, the Individual Debtor Distribution Share for the noteholder in Row 19 is equal to 100% of its claim of $15.0 million.

The Aggregate Distribution Percentage by creditor is calculated in Rows 23 – 25 based on the proportional ownership of the Distribution Share values, and this percentage is utilized to calculate the distribution of shares and notes. Assuming a total of 10.0 million shares are issued (or issuable via warrants) pursuant to the Plan, Rows 29 – 31 show the shares issued to US Airways and Management and the additional shares to issue to the foreign creditor on account of the 1.1x warrant conversion ratio. The remaining 7.3 million shares shown in Row 32 are allocated in rows 37 – 39 based on the Aggregate Distribution Percentages shown in rows 23-25. Note that the total shares for the foreign creditor reflect an additional 0.7 million shares for the warrant conversion premium.

The Aggregate Distribution Percentage is also utilized to apportion notes as shown in Rows 47 – 49. The total value of notes and equity received by all parties is shown in Rows 47 – 52. In this example, the noteholder receives shares with a value of $8.4 million (as shown in Row 38) and notes with a value of $6.6 million (Row 48) in full satisfaction of its $15.0 million claim.

As can be seen from the example above, Creditors with Allowed Claims in Classes 3(a)-(l), to the extent allowed against the same Debtor, receive the same distribution percentage on account of their Allowed Claims. Creditors in Classes 3(a)-(l) who have a basis for asserting their Claims against more than one Debtor may receive a larger aggregate distribution due to recovering on multiple Allowed Claims. This does not alter the fact, however, that with respect to Claims against a specific Debtor entity, each class recovers the same percentage on account of Claims against such entity.

A further description of the Plan and its distribution provisions can be found in Section IV of this Disclosure Statement. A summary of the Debtors' current projections with respect to potential distributions can be found in **Exhibit D** to the Disclosure Statement.

## G. The Debtors' Liabilities

The Debtors have set forth in **Exhibit D** estimates of certain of their liabilities. In connection with voting on the Plan, confirmation of the Plan, or other purpose, the Debtors may file with the Bankruptcy Court a motion or motions to have disputed, contingent and/or unliquidated Claims estimated by the Bankruptcy Court pursuant to Section 502(c) of the Bankruptcy Code. The estimates of the liabilities below are on a consolidated basis. The liquidation analysis breaks down the liabilities on a Debtor-by-Debtor basis.

THE DEBTORS ARE NOT WAIVING UNDER THE PLAN OR IN THIS DISCLOSURE STATEMENT ANY RIGHT TO, AMONG OTHER THINGS, OBJECT TO THE CLAIM OF ANY CREDITOR. IN VOTING ON THE PLAN, CREDITORS SHOULD ASSUME THAT THEIR CLAIM MIGHT BE OBJECTED TO BY THE DEBTOR, OTHER CREDITORS, THE POST-EFFECTIVE DATE DEBTORS, OR OTHER PARTIES IN INTEREST.

### 1. Administrative Claims

The Plan provides for the payment as an Administrative Claim of the actual and necessary costs or expenses of preserving the Debtors' Estates or conducting the affairs of the Debtors. Certain expenses have arisen during the Chapter 11 Cases that would constitute Administrative Claims that have not been paid in the ordinary course of the Debtors' post-Petition Date affairs. Further, the Plan provides that fees and expenses for the Professionals retained by the Debtors and the Committee for services rendered and costs incurred after the Petition Date and prior to the Effective Date will be paid following approval by the Bankruptcy Court after notice and a hearing or pursuant to another order of the Bankruptcy Court. The Debtors estimate that Administrative Claims will total approximately $19,100,000 as of the Effective Date.[12] The Administrative Claims can be categorized as follows:

| | |
|---|---|
| Professional Fees and Expenses: | $16,500,000[13] |
| Other Administrative Expenses: | $2,600,000 |
| Total: | $19,100,00[14] |

---

[12] The Professional Fees also include the fees and expenses to be paid to the Indenture Trustees pursuant to Section 2.5 of the Plan.☐

[13] The estimate of professional fees and expenses includes amounts incurred to date and estimates through December 31, 2010. A substantial portion of such professional fees and expenses will have been paid by the Debtors prior to the Effective Date in accordance with the Interim Compensation Order.☐

[14] As discussed in greater detail in Sections III.E and V.B.5 of this Disclosure Statement, the Debtors are contesting the validity of certain Administrative Expense Claims that are not included in this amount.

### 2. Priority Tax Claims

Allowed Priority Tax Claims are entitled to priority in right of payment under sections 507(a)(8) and 1129(a)(9)(C) of the Bankruptcy Code are to be paid in full under the Plan and are estimated to total $7,324,000 on the Effective Date.

### 3. Secured Tax Claims

Allowed Secured Tax Claims are to be paid in full under the Plan and are estimated to total $4,544,000 on the Effective Date. Allowed Secured Tax Claims would also be entitled to priority under sections 507(a)(8) absent their secured status as provided under section 1129(a)(9)(D) of the Bankruptcy Code.

### 4. Priority Non-Tax Claims

Allowed Priority Non-Tax Claims are to be paid in full under the Plan on the Effective Date and are estimated to total a *de minimis* amount to the extent they have not already been paid pursuant to a First Day Order. Priority Non-Tax Claims comprise Claims entitled to priority under section 507(a)(4) and (5) of the Bankruptcy Code.

### 5. Secured Claims

The Debtors are aware of (i) certain asserted Secured Claims related to aircraft agreements and (ii) certain financed equipment.

Pursuant and subject to certain orders entered by the Bankruptcy Court (discussed in Section III.C.9 above), the Debtors are authorized, in their discretion, to pay, and have been paying in the ordinary course of business, valid Secured Claims. The Debtors expect to continue to pay valid Secured Claims in the ordinary course pursuant to such orders.

Under the Plan, Creditors with Allowed Secured Claims that have not been paid or otherwise satisfied will be paid in full, will have the applicable collateral abandoned or surrendered to them, or their respective claims will otherwise be unimpaired under the Plan. Subject to all qualifications and conditions set forth herein and in **Exhibit D**, the Debtors have used an estimate of approximately $1,476,000 in Secured Claims as of the Effective Date. This estimated amount excludes (i) certain Secured Claims that are assumed to be paid in the ordinary course over the projection period (ii) claims that are partially secured by deposits that have or will have been applied to reduce the claim leaving a General Unsecured Claim.

### 6. General Unsecured Claims

The Debtors estimate having approximately $2,035,691,000 in General Unsecured Claims as of the Effective Date. Approximately $61 million in trade related claims. The Debtors are still reconciling approximately $17 million of claims that were scheduled against Mesa Airlines as neither contingent, unliquidated, nor disputed with proofs of claims filed against certain Debtors. The Debtors believe that after completing the reconciliation that all or

substantially all of such scheduled claims will be superseded by proofs of claims filed by the associated creditor.

### 7. De Minimis Convenience Claims

The Debtors estimate that the total amount of Class 4 Proofs of Claims on a consolidated basis is approximately $8.2 million. A Debtor-by-Debtors estimate of the De Minimis Convenience Claims is annexed hereto as **Exhibit F**. Such summary sets forth the estimated claims by Debtor and the estimated Cash payment to each Class.

The Debtors have not reviewed all De Minimis Convenience Claims and they all remain subject to further review and potential objections. The Debtors estimate that the Cash distributions to the holders of Allowed De Minimis Convenience Claims is approximately $208,000, which is expected to decrease to the extent such claims are consensually resolved or the objections thereto sustained. In certain instances, the holders De Minimis Convenience Claims failed to identify the Debtor they are asserting the Claim against. Until such reconciliation is complete, the Debtors have assumed that such De Minimis Convenience Claims are against Mesa Airlines and the summary annexed hereto as **Exhibit F** reflects such assumption.

### 8. 510(a) Subrogation Claims

The Debtors are currently reviewing the 510(a) Subrogation Claims and do not have an estimate for such claims. Numerous creditors have filed protective 510(a) Subrogation Claims but at this time it is not known whether such creditors have fulfilled the necessary subrogation requirements that would entitle them to an Allowed 510(a) Subrogation Claim. In any event, to the extent such 510(a) Subrogation Claims are Allowed there should not be any net-increase in the pool of General Unsecured Claims because the allowance of such claims will reduce the primary General Unsecured Claims in Class 3 by the same amount.

### 9. 2012 Noteholder Claims

The Debtors estimate having approximately $19.4 million in 2012 Noteholder Claims as of the Effective Date. Under the Plan, the holders of Allowed 2012 Noteholder Claims will receive their pro rata share of the New 8% Notes (Series A), which the Debtors estimate to satisfy such claims in full.

### IV.
### DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan that follows constitutes a summary only and should not be relied upon for voting purposes. You are urged to read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Debtors. If any inconsistency exists between this summary and the Plan, the terms of the Plan will control.

## A. Unclassified Claims

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with Article 2 of the Plan and in accordance with the requirements set forth in Section 1129(a)(9) of the Bankruptcy Code.

### 1. Administrative Claims

All requests for payment of Administrative Claims (except with respect to Professional Fees, which will instead be subject to the Professional Fees Bar Date and Claims arising under the Rejection Procedures Order, which are subject to the procedures and deadlines set forth therein) must be filed by the Administrative Claim Bar Date (the thirty-fifth (35th) day after the Effective Date of the Plan) or the holders thereof will be forever barred from asserting such Administrative Claims against the Debtors or from sharing in any distribution under the Plan.

Each Allowed Administrative Claim (except for Professional Fees, which will be treated as set forth in Section 2.4 of the Plan) will, unless the holder of such Claim will have agreed to different treatment of such Claim, be paid in full in Cash by the Reorganized Debtors on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the fourteenth (14th) Business Day after such Claim is Allowed, or as soon thereafter as practicable; (d) such date as the holder of such Claim and the Reorganized Debtors may agree; and (e) the date such Claim is otherwise due according to its terms.

Notwithstanding anything in Section 2.2.1 of the Plan to the contrary, holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtors' businesses following the applicable Petition Date will not be required to comply with the Administrative Claims Bar Date, provided, however, that such holders have otherwise submitted an invoice, billing statement or other evidence of indebtedness to the applicable Debtor in the ordinary course of business, and provided, further, that the Debtors, to the extent of any disagreement with any such invoice, billing statement or other evidence of indebtedness, may file with the Bankruptcy Court an objection to such invoice, billing statement or other evidence of indebtedness as though the claimant thereunder had filed an Administrative Claim with the Bankruptcy Court.

### 2. Allowed Priority Tax Claims

Each Allowed Priority Tax Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable non-bankruptcy law or at a rate to be agreed upon by the Debtors and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; provided, however, that the Debtors may elect in their sole discretion to pay any or all such Claims at any time, without premium or penalty, in which case the payment

shall not include interest if paid on the Effective Date. The payment of each Allowed Priority Tax Claim shall be made in equal quarterly installments with the first installment due on the latest of: (i) the first day following the end of the first full calendar quarter following the Effective Date, (ii) the first day following the end of the first full calendar quarter following the date an order allowing such claim becomes a Final Order, and (iii) such other time or times as may be agreed with the holder of such claim. Each installment shall include interest in accordance with section 511 of the Bankruptcy Code on the unpaid balance of the Allowed Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed to or determined in accordance with the foregoing.

### 3. Allowed Secured Tax Claims

#### a. Generally

Each holder of an Allowed Claim held by a governmental unit that is secured by an interest in the Debtors' property shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable non-bankruptcy law or at a rate to be agreed upon by the Debtors and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; provided, however, that the Debtors may elect in their sole discretion to pay any or all such Claims at any time, without premium or additional penalty, if any, in which case the payment shall not include interest if paid on the Effective Date. The payment of each Allowed Priority Tax Claim shall be made in equal quarterly installments with the first installment due on the latest of: (i) the first day following the end of the first full calendar quarter following the Effective Date, (ii) the first day following the end of the first full calendar quarter following the date an order allowing such claim becomes a Final Order, and (iii) such other time or times as may be agreed with the holder of such claim. Each installment shall include interest in accordance with section 511 of the Bankruptcy Code on the unpaid balance of the Allowed Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed to or determined in accordance with the foregoing.

#### b. Section 1124(2) Reinstatement.

The Debtors may elect in their sole discretion, on the Effective Date, to cure and reinstate the applicable Allowed Secured Tax Claims as of the first date when last payable without interest, fees or penalties, and, as so cured and reinstated, shall receive a lump sum payment in full on the Effective Date. Under this alternative treatment, the holder of an Allowed Secured Tax Claim shall be paid Cash on the Effective Date equal to the amount of such Allowed Secured Tax Claim due as of the first date when last payable without interest, fees or penalty, plus, to the extent required by section 1124(2) of the Bankruptcy Code any interest thereupon from such date until payment at the rate of interest determined under the applicable nonbankruptcy law and any fees incurred in reasonable reliance on timely receipt of the tax, but exclusive of any penalty amounts thereof at any time incurred or charged (see Bankruptcy Code sections 1123(a)(5)(G) & 1124(2)).

###### c. **Determination of Applicable Treatment.**

The first treatment indicated above in Section IV.A.3.a shall be applicable to each holder of an Allowed Secured Tax Claim, unless, the Debtors elect to reinstate the applicable Secured Tax Claims as provided in Section IV.A.3.b. The Debtors' election to treat Allowed Secured Tax Claims pursuant to Section IV.A.3.b will be provided in the Plan Supplement.

###### 4. **Claims for Professional Fees**

Each Professional seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Professional Fees Bar Date; and (b) if the Bankruptcy Court grants such an award, each such Person will be paid in full in Cash by the Reorganized Debtors as soon as practicable following the first day after such order has been entered by the Bankruptcy Court and not stayed. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order.

###### 5. **Indenture Trustee Fees and Expenses**

The fair and reasonable fees and expenses of the Indenture Trustee and its professionals and provided for under each Indenture will be paid by the Debtors pursuant to the Confirmation Order on the later of the Effective Date or thirty (30) days following receipt of detailed documentation of such fees and expenses without the need for the Indenture Trustee to file an application for allowance. Upon payment of the fees and expense of the Indenture Trustee and its professionals in full, the Indenture Trustee will be deemed to have released its liens, including its charging lien against distributions to Noteholders, securing payment of its fees and expenses for all fees and expenses payable through the Effective Date.

###### B. **Classification of Claims and Interests**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors (except those Claims receiving treatment as set forth in Article 2 of the Plan) and holders of Interests are placed in the Classes described in Sections 4.1 through 4.6 of the Plan for all purposes, including voting on, confirmation of, and distribution under, the Plan. The following tables identify the Classes of Claims against and Interests in each of the Debtors:

###### Class 1(a) – (*l*): Priority Non-Tax Claims.

| Class 1(a) | Priority Non-Tax Claims against Mesa Air Group | Unimpaired, deemed to accept |
| --- | --- | --- |
| Class 1(b) | Priority Non-Tax Claims against Mesa Air New York | Unimpaired, deemed to accept |
| Class 1(c) | Priority Non-Tax Claims against Mesa In-Flight | Unimpaired, deemed to accept |
| Class 1(d) | Priority Non-Tax Claims against Freedom | Unimpaired, deemed to accept |

| Class 1(e) | Priority Non-Tax Claims against Mesa Airlines | Unimpaired, deemed to accept |
|---|---|---|
| Class 1(f) | Priority Non-Tax Claims against MPD | Unimpaired, deemed to accept |
| Class 1(g) | Priority Non-Tax Claims against RASI | Unimpaired, deemed to accept |
| Class 1(h) | Priority Non-Tax Claims against MAGAIM | Unimpaired, deemed to accept |
| Class 1(i) | Priority Non-Tax Claims against Nilchii | Unimpaired, deemed to accept |
| Class 1(j) | Priority Non-Tax Claims against Air Midwest | Unimpaired, deemed to accept |
| Class 1(k) | Priority Non-Tax Claims against RHMC | Unimpaired, deemed to accept |
| Class 1(*l*) | Priority Non-Tax Claims against Patar | Unimpaired, deemed to accept |

## Class 2(a) – (*l*): Secured Claims.

| Class 2(a) | Secured Claims against Mesa Air Group (each secured creditor in a separate class identified as Class 2(a)-A, Class 2(a)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
|---|---|---|
| Class 2(b) | Secured Claims against Mesa Air New York (each secured creditor in a separate class identified as Class 2(b)-A, Class 2(b)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(c) | Secured Claims against Mesa In-Flight (each secured creditor in a separate class identified as Class 2(c)-A, Class 2(c)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(d) | Secured Claims against Freedom (each secured creditor in a separate class identified as Class 2(d)-A, Class 2(d)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(e) | Secured Claims against Mesa Airlines (each secured creditor in a separate class identified as Class 2(e)-A, Class 2(e)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(f) | Secured Claims against MPD (each secured creditor in a separate class identified as Class 2(f)-A, Class 2(f)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |