| Class 2(g) | Secured Claims against RASI (each secured creditor in a separate class identified as Class 2(h)-A, Class 2(h)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
|---|---|---|
| Class 2(h) | Secured Claims against MAGAIM (each secured creditor in a separate class identified as Class 2(j)-A, Class 2(j)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(i) | Secured Claims against Nilchii (each secured creditor in a separate class identified as Class 2(k)-A, Class 2(k)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(j) | Secured Claims against Air Midwest (each secured creditor in a separate class identified as Class 2(i)-A, Class 2(i)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(k) | Secured Claims against RHMC (each secured creditor in a separate class identified as Class 2(g)-A, Class 2(g)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |
| Class 2(l) | Secured Claims against Patar (each secured creditor in a separate class identified as Class 2(l)-A, Class 2(l)-B, etc.) | Impaired, entitled to vote (Other than Aircraft Secured Claims Reinstated pursuant to Sections 4.2.1 through 4.2.3 of Plan) |

## Class 3(a) – (*l*): General Unsecured Claims.

| Class 3(a) | General Unsecured Claims against Mesa Air Group | Impaired, entitled to vote |
|---|---|---|
| Class 3(b) | General Unsecured Claims against Mesa Air New York | Impaired, entitled to vote |
| Class 3(c) | General Unsecured Claims against Mesa In-Flight | Impaired, entitled to vote |
| Class 3(d) | General Unsecured Claims against Freedom | Impaired, entitled to vote |
| Class 3(e) | General Unsecured Claims against Mesa Airlines | Impaired, entitled to vote |
| Class 3(f) | General Unsecured Claims against MPD | Impaired, entitled to vote |
| Class 3(g) | General Unsecured Claims against RASI | Impaired, entitled to vote |
| Class 3(h) | General Unsecured Claims against MAGAIM | Impaired, entitled to vote |

| Class 3(i) | General Unsecured Claims against Nilchii | Impaired, entitled to vote |
|---|---|---|
| Class 3(j) | General Unsecured Claims against Air Midwest | Impaired, entitled to vote |
| Class 3(k) | General Unsecured Claims against RHMC | Impaired, entitled to vote |
| Class 3*(l)* | General Unsecured Claims against Patar | Impaired, entitled to vote |

## Class 4(a) – (*l*): De Minimis Convenience Claims.

| Class 4(a) | De Minimis Convenience Claims against Mesa Air Group | Impaired, entitled to vote |
|---|---|---|
| Class 4(b) | De Minimis Convenience Claims against Mesa Air New York | Impaired, entitled to vote |
| Class 4(c) | De Minimis Convenience Claims against Mesa In-Flight | Impaired, entitled to vote |
| Class 4(d) | De Minimis Convenience Claims against Freedom | Impaired, entitled to vote |
| Class 4(e) | De Minimis Convenience Claims against Mesa Airlines | Impaired, entitled to vote |
| Class 4(f) | De Minimis Convenience Claims against MPD | Impaired, entitled to vote |
| Class 4(g) | De Minimis Convenience Claims against RASI | Impaired, entitled to vote |
| Class 4(h) | De Minimis Convenience Claims against MAGAIM | Impaired, entitled to vote |
| Class 4(i) | De Minimis Convenience Claims against Nilchii | Impaired, entitled to vote |
| Class 4(j) | De Minimis Convenience Claims against Air Midwest | Impaired, entitled to vote |
| Class 4(k) | De Minimis Convenience Claims against RHMC | Impaired, entitled to vote |
| Class 4*(l)* | De Minimis Convenience Claims against Patar | Impaired, entitled to vote |

## Class 5(a) – (*l*): 510(a) Subrogation Claims.

| Class 5(a) | 510(a) Subrogation Claims against Mesa Air Group | Impaired, entitled to vote |
|---|---|---|
| Class 5(b) | 510(a) Subrogation Claims against Mesa Air New York | Impaired, entitled to vote |

## Class 6(a)-(l): 2012 Noteholder Claims.

| Class 6(a) | 2012 Noteholder Claims against Mesa Air Group | Impaired, entitled to vote |
|---|---|---|
| Class 6(b) | 2012 Noteholder Claims against Mesa Air New York | Impaired, entitled to vote |
| Class 6(c) | 2012 Noteholder Claims against Mesa In-Flight | Impaired, entitled to vote |

| Class 6(d) | 2012 Noteholder Claims against Freedom | Impaired, entitled to vote |
| Class 6(e) | 2012 Noteholder Claims against Mesa Airlines | Impaired, entitled to vote |
| Class 6(f) | 2012 Noteholder Claims against MPD | Impaired, entitled to vote |
| Class 6(g) | 2012 Noteholder Claims against RASI | Impaired, entitled to vote |
| Class 6(h) | 2012 Noteholder Claims against MAGAIM | Impaired, entitled to vote |
| Class 6(i) | 2012 Noteholder Claims against Nilchii | Impaired, entitled to vote |
| Class 6(j) | 2012 Noteholder Claims against Air Midwest | Impaired, entitled to vote |
| Class 6(k) | 2012 Noteholder Claims against RHMC | Impaired, entitled to vote |
| Class 6(*l*) | 2012 Noteholder Claims against Patar | Impaired, entitled to vote |

**Class 7(a) – (*l*): Interests.**

| Class 7(a) | Interests in Mesa Air Group | Impaired, deemed to reject |
| Class 7(b) | Interests in Mesa Air New York | Impaired, deemed to reject |
| Class 7(c) | Interests in Mesa In-Flight | Impaired, deemed to reject |
| Class 7(d) | Interests in Freedom | Impaired, deemed to reject |
| Class 7(e) | Interests in Mesa Airlines | Impaired, deemed to reject |
| Class 7(f) | Interests in MPD | Impaired, deemed to reject |
| Class 7(g) | Interests in RASI | Impaired, deemed to reject |
| Class 7(h) | Interests in MAGAIM | Impaired, deemed to reject |
| Class 7(i) | Interests in Nilchii | Impaired, deemed to reject |
| Class 7(j) | Interests in Air Midwest | Impaired, deemed to reject |
| Class 7(k) | Interests in RHMC | Impaired, deemed to reject |
| Class 7(*l*) | Interests in Patar | Impaired, deemed to reject |

Holders of General Unsecured Claims against the Debtors have been placed into one or more separate Classes. The Debtors believe that there are material distinctions among these Classes of Claims, justifying separate classification thereof, or in the case of Classes (3)(a)-3(*l*), on the one hand, and Classes 4(a)-4(*l*), on the other hand, separate Classes of smaller general unsecured claims is warranted and reasonable for administrative convenience for purposes of section 1122(b) of the Bankruptcy Code. In no event have the Debtors separately classified general unsecured claims in order to create or "gerrymander" an assenting impaired Class (voting in favor of the Plan).

**C.     Treatment of Claims and Interests Against the Reorganized Debtors**

**1.      Priority Non-Tax Claims Classes 1(a)- 1(*l*)**

Classes 1(a)-1(*l*) are unimpaired under the Plan. Holders of Priority Non-Tax Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

Each holder of an Allowed Priority Non-Tax Claim will, unless the holder of such Claim will have agreed to different treatment of such Claim, receive, in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Priority Non-Tax Claim, a Cash payment in an amount equal to the difference between: (a) such Allowed Priority Non-Tax Claim, and (b) the amount of any Permitted Payments made to the holder of such Claim, on the latest of: (i) the Effective Date, or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the holder of such Claim and the Reorganized Debtors may agree.

## 2. Secured Claims Classes 2(a)-2(*l*)

(a) *Unimpaired Aircraft Secured Claims and Voting.* Except to the extent that a holder of an Allowed Aircraft Secured Claim agrees to different treatment, in the sole discretion of the Debtors or Reorganized Debtors, on the Effective Date, each Allowed Aircraft Secured Claim set forth in the Plan Supplement or identified below shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such Allowed Aircraft Secured Claim to demand or receive payment of such Allowed Aircraft Secured Claim from and after the occurrence of a default. Such holders of Allowed Aircraft Secured Claims are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

(b) *Unimpaired CRJ Equipment Trust Aircraft Secured Claims.* Unless otherwise agreed to between the Debtors and the controlling counterparty, on the Effective Date, the CRJ Equipment Trust Aircraft Secured Claim shall be Allowed and the Debtors' obligations under the CRJ Equipment Trust Loan Documents relating to the CRJ Equipment Trust Aircraft Equipment shall be reinstated as provided in Section 4.2.1 of the Plan and leaving the rights of CRJ Equipment Trust Secured Claim unimpaired. The holders of the CRJ Equipment Trust Aircraft Secured Claim will retain their security interest against the CRJ Equipment Trust Equipment and the CRJ Equipment Trust Guaranty will be an obligation of Reorganized Mesa Air Group on and after the Effective Date.

Any dispute with respect to the amount of the CRJ Equipment Trust Aircraft Secured Claim, including, without limitation, disputes as to default interest, fees, and expenses, will be determined by the Bankruptcy Court, and the amounts payable, if any, as so determined, shall be made in accordance with the determination made by the Bankruptcy Court.

The holders of CRJ Equipment Trust Aircraft Secured Claims are reinstated in accordance with section 1124(2) of the Bankruptcy Code and unimpaired and presumed to have accepted the Plan.

(c) *Unimpaired EDC Aircraft Secured Claims.* Unless otherwise agreed to between the Debtors and the controlling counterparty, on the Effective Date, the EDC Aircraft Secured Claim shall be Allowed and the Debtors' obligations under the Credit Agreement Documents relating to the EDC Credit Agreement Equipment shall be reinstated as provided in Section 4.2.1

of the Plan and leaving the rights of the holders of the EDC Aircraft Secured Claims unimpaired. The holders of the EDC Aircraft Secured Claim will retain their security interest against the EDC Credit Agreement Equipment and the EDC Credit Agreement Guaranty will be an obligation of Reorganized Mesa Air Group on and after the Effective Date.

Any dispute with respect to the amount of the EDC Aircraft Secured Claim, including, without limitation, disputes as to default interest, fees, and expenses, will be determined by the Bankruptcy Court, and the amounts payable, if any, as so determined, shall be made in accordance with the determination made by the Bankruptcy Court.

The holders of EDC Aircraft Secured Claims are reinstated in accordance with section 1124(2) of the Bankruptcy Code and unimpaired and presumed to have accepted the Plan.

(d) *Impaired Secured Claims and Voting.* All Secured Claims in Classes 2(a) – 2(*l*) (other than the Aircraft Secured Claims reinstated pursuant to Sections 4.2.1 through 4.2.3 of the Plan) are impaired under the Plan. Holders of Secured Claims are entitled to vote on the Plan. For purposes of distributions under the Plan, each holder of a Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of the Plan.

On or as soon as practicable following the Effective Date, the Reorganized Debtors will select, in their discretion, one of the following alternative treatments for each Allowed Secured Claim in Class 2 (other than the Secured Claims that are reinstated pursuant to Section 4.2.1 of the Plan), which treatment will be in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Secured Claim:

(i) *Abandonment or Surrender.* The Reorganized Debtors will abandon or surrender to the holder of such Secured Claim the property securing such Secured Claim, in full satisfaction and release of such Secured Claim, without representation or warranty by or recourse against the Debtors or Reorganized Debtors.

(ii) *Cash Payment.* The Reorganized Debtors will pay to the holder of such Secured Claim Cash equal to the amount of such Secured Claim, or such lesser amount to which the holder of such Secured Claim and the applicable Reorganized Debtor will agree, in full satisfaction and release of such Secured Claim.

Distributions to the holders of Allowed Secured Claims under the treatment option set forth in Section 4.2.2(b) of the Plan will be paid by the Reorganized Debtors.

Any Unsecured Deficiency Claim asserted by a holder of an Allowed Secured Claim in Class 2 must be filed with the Bankruptcy Court within thirty five (35) days following the date of the abandonment or surrender of such Creditor's collateral or such Creditor's receipt of its distribution under the Plan. Any such Allowed Unsecured Deficiency Claim will be treated in accordance with Section 4.4.2 of the Plan.

### 3. General Unsecured Claims Classes 3(a)-3(*l*)

Classes 3(a)-3*(l)* are impaired under the Plan. Holders of General Unsecured Claims are entitled to vote on the Plan.

#### a. U.S. Citizens.

On or as soon as practicable following the Effective Date, on the Initial Distribution Date, the Interim Distribution Date, and/or the Final Distribution Date, unless the holder of such Claim shall have agreed to different treatment of such Claim, each holder of an Allowed General Unsecured Claim, which holder is a U.S. Citizen, shall receive, in respect of all of its Allowed General Unsecured Claims, distribution(s) of its Aggregate Distribution Percentage of the New Common Stock (after giving effect to the shares of New Common Stock reserved for issuance under the Management Equity Pool and shares of New Common Stock issuable to US Airways) and the New 8% Notes (Series B). Such distributions shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed General Unsecured Claims held by such holder.

#### b. Non-U.S. Citizens.

On or as soon as practicable following the Effective Date, on the Initial Distribution Date, the Interim Distribution Date, and/or the Final Distribution Date, unless the holder of such Claim shall have agreed to different treatment of such Claim, each holder of an Allowed General Unsecured Claim, which holder is a Non-U.S. Citizen, shall receive, in respect of all of its Allowed General Unsecured Claims, distribution(s) of its Aggregate Distribution Percentage of the New Warrants and the New 8% Notes (Series B). For purposes of calculating distributions to Non-U.S. Citizens, each Non-U.S. Citizen shall receive New Warrants for 110% of the shares of New Common Stock that such Creditor would be entitled to receive if such Creditor was a U.S. Citizen. Such distributions shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed General Unsecured Claims held by such holder.

### 4. De Minimis Convenience Claims Classes 4(a)-4(*l*)

Classes 4(a)-4*(l)* are impaired under the Plan. Holders of De Minimis Convenience Claims are entitled to vote on the Plan.

On or as soon as practicable following the Effective Date, the Reorganized Debtors will, in full and final satisfaction, settlement, release, and discharge of, and exchange for, such De Minimis Convenience Claim, pay to each holder of a De Minimis Convenience Claim Cash equal the percentage of the Allowed amount of such Claim as set forth on **Exhibit D** attached to the Plan.

### 5. 510(a) Subrogation Claims Class 5(a) and 5(b)

Classes 5(a)-5(b) are impaired under the Plan. Holders of 510(a) Subrogation Claims are entitled to vote on the Plan.

The Debtors shall provide the holders of 510(a) Subrogation Claims the same distributions of Restructured Unsecured Equity and New 8% Notes (Series B) that would have otherwise been made to such holders of Allowed 510(a) Subrogation Claims if such Claims were treated as Allowed General Unsecured Claims and provided the treatment set forth in Section 4.3.2 of the Plan. The Debtors shall not be required to review or give effect to any subrogation or subordination agreement and, instead, the holders of 510(a) Subrogation Claims shall receive distributions as if their claims were not subject to any such agreements and the burden shall be on the holders of 510(a) Subrogation Claims to honor and give effect to any such agreements.

6.    **2012 Noteholder Classes 6(a)-(_l_)**

Classes 6(a)-(_l_) are impaired under the Plan. Holders of 2012 Noteholder Claims are entitled to vote on the Plan.

On or as soon as practicable following the Effective Date, on the Initial Distribution Date, the Interim Distribution Date, and/or the Final Distribution Date, unless the holder of such Claim shall have agreed to different treatment of such Claim, each holder of an Allowed 2012 Noteholder Claim shall receive, in respect of all of its Allowed 2012 Notedholder Claims, _pro rata_ distribution(s) of the New 8% Notes (Series A). Such distributions shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed 2012 Noteholder Claims held by such holder.

The New 8% Notes (Series A) are unsecured non-amortized notes that will be issued by Reorganized Mesa Air Group and guaranteed by the other Post-Effective Date Debtors, subject to the terms and conditions in the Plan (as will be described in greater detail in the New Notes Indenture). The New 8% Notes (Series A) will be on identical terms with the other New Notes except for the principal amount and certain payment priority provisions set forth in the Plan. The New 8% Notes (Series A) will be issued in the aggregate principal amount of $19.4 million, accrue interest at a rate of 8% per annum, and are due five (5) years from the Effective Date, with no principal or interest payments due prior to maturity, except to the extent there is a Spirit Liquidity Event. As defined under the Plan, a Spirit Liquidity Event is triggered by the sale of common stock of or payment on notes from Spirit Airlines that are each beneficially owned by Nilchii. In such case, the net proceeds of a Spirit Liquidity Event will be used to satisfy the New 8% Notes (Series A) in accordance with the terms and conditions of the Plan (as will be described in greater detail in the New Notes Indenture). In addition to the standard and customary terms and conditions of indentures, the New Notes Indenture provides for certain payment priorities among the New 8% Notes (Series A), the New 8% Notes (Series B), the US Airways Note and the Management Notes. Thus, in the event of a Spirit Liquidity Event, the net proceeds shall be used first to pay the New 8% Notes (Series A), second, the US Airways Note, third, New 8% Notes (Series B), and fourth, the Management Notes. However, the New 8% Notes (Series A), the New 8% Notes (Series B), and the US Airways Note shall be of equal priority if redeemed or paid in any other scenario.

## 7. Interests Classes 7(a)-(*l*)

Classes 7(a)-(*l*) are impaired under the Plan. Holders of Interests are deemed to reject the Plan under Section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

Upon the Effective Date, all existing Interests in Mesa Air Group will be deemed extinguished and the holders of such Interests will not receive or retain any property on account of such Interests under the Plan. Reorganized Mesa Air Group will be vested, directly or indirectly, with the Interests in the Reorganized Debtor Subsidiaries and the Liquidating Debtors on the Effective Date.

## 8. Nonconsensual Confirmation

To the extent necessary, the Debtors hereby request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

## D. Implementation of the Plan

The Plan will be implemented on the Effective Date. In addition to the provisions set forth elsewhere in the Plan regarding means of execution, the following will constitute the principal means for the implementation of the Plan.

### 1. Continued Corporate Existence; Ongoing Operations of the Reorganized Debtors and Wind-Up of Liquidating Debtors

As of the Effective Date, each Debtor shall, as a Reorganized Debtor or Liquidating Debtor, as applicable, continue to maintain its separate legal existence for all purposes under the Plan, with each Reorganized Debtor and Liquidating Debtor, as applicable, retaining all the powers of a legal entity under applicable law.

The respective articles or certificate of incorporation and bylaws (or other applicable formation documents) in effect prior to the Effective Date for each Debtor shall continue to be in effect after the Effective Date, except (i) with respect to Reorganized Mesa Air Group, which Reorganized Debtor shall be subject to the Reorganized Mesa Charter and the Reorganized Mesa bylaws and (ii) such Debtor's articles or certificate of incorporation or bylaws (or other formation documents) as amended pursuant to ~~this~~the Plan.

From and after the Effective Date, the Reorganized Debtors shall continue to engage in business, and the Liquidating Debtors shall continue to engage in business only to the extent reasonably necessary to wind up their affairs in an orderly manner and make the distributions under ~~this~~the Plan, or enter into Alternative Transactions to the extent necessary for the purpose of avoiding unnecessary costs and expenses associated with a potential liquidation or as they deem appropriate for other purposes so long as not otherwise inconsistent with the Plan.

Specifically with regard to the Liquidating Debtors, the Liquidating Debtors shall have full authority, and shall take any action necessary, to wind up the affairs, liquidate, transfer or abandon assets, and dissolve and terminate the existence of the Liquidating Debtors in a manner

and in accordance with the best means to maximize assets and minimize expenses or costs associated with such liquidation under applicable state laws and in accordance with the rights, powers and responsibilities conferred by the Bankruptcy Code, ~~this~~the Plan and any order of the Bankruptcy Court; *provided, however*, that the Reorganized Debtors may elect to forego any liquidation of the Liquidating Debtors if they determine, in their sole discretion prior to or after the Effective Date, that costs and expenses associated with liquidation would outweigh the benefits of maintaining the corporate existence of such Liquidating Debtors or entering into an Alternative Transaction.

The actions necessary to effect the Alternative Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Debtors, Reorganized Debtors, or Liquidating Debtors may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Debtors, Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Alternative Transactions. If and to the extent necessary, any controlling organization or formation documents or agreements for the Reorganized Debtors or Liquidating Debtors shall be deemed amended to authorize the foregoing.

Subject to Articles 5, 6 and 7 hereof, the Reorganized Debtors shall continue such business, and the Liquidating Debtors shall maintain operations as provided above, without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The Reorganized Debtors and the Liquidating Debtors shall be authorized, without limitation, to use and dispose of the Estate Assets of the Reorganized Debtors and the Liquidating Debtors, as applicable, to acquire and dispose of other property, to insure the Estate Assets of the Reorganized Debtors and the Liquidating Debtors, to borrow money, to employ and compensate Agents, to reconcile and object to Claims, to enter into Alternative Transactions, and to make distributions to Creditors in accordance with the Plan.

As set forth in Section 7.8 hereof, the Debtors shall assume the US Airways Code-Share Agreement (as modified by the US Airways Tenth Amendment) and the United Code-Share Agreement pursuant to Section 365 of the Bankruptcy Code, effective as of the Effective Date. The US Airways Code-Share Agreement will be assumed as modified by the US Airways Tenth Amendment pursuant to a separate motion and presented to the Court for approval on November 18, 2010. The United Code-Share Agreement will be assumed pursuant to Section 7.8 of the Plan. As part of their ongoing businesses, the Reorganized Debtors shall continue to operate their fleet of aircraft, including those aircraft related to the US Airways Amended Code-Share Agreement (including the US Airways Tenth Amendment) and the United Code-Share Agreement.

2.      **Intercompany Claims**

On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be reinstated in full or in part or cancelled, discharged in full or in part or contributed, distributed or otherwise transferred between and among the Debtors in full or in part, in each case, to the extent determined appropriate by the Post-Effective Date Debtors.

3.      **Management**

a.      **Reorganized Mesa Air Group**

Reorganized Mesa Air Group shall be operated and governed in accordance with the Reorganized Mesa Charter Documents. The existing officers of Mesa Air Group shall remain in their existing positions. As set forth in Section 7.10 hereof, the Key Employment Agreements and the related guarantees thereof shall be deemed assumed, as amended, effective as of the Effective Date. The initial board of directors of Reorganized Mesa Air Group shall consist of a nine (9) members. The Committee shall select six (6) members and the Debtors shall select three (3) members. The initial board members of Reorganized Mesa Air Group will be identified in the Plan Supplement. The appointment of the initial board members of the Reorganized Debtors shall be deemed to be in compliance with any restrictions, if any, in the Code-Share Agreements and/or other key contracts of the Debtors and all applicable Federal regulations restricting the level of ownership/control in a United States air carrier by Non-U.S. Citizens. Each of the directors and officers of Reorganized Mesa Air Group shall serve in accordance with applicable non-bankruptcy law and the Reorganized Mesa Charter Documents, as the same may be amended from time to time. From and after the Effective Date, the directors and officers of Reorganized Mesa Air Group shall be selected and determined in accordance with the provisions of applicable law and the Reorganized Mesa Charter Documents.

b.      **Other Debtors**

The existing officers of the other Reorganized Debtors (other than Mesa Air Group) shall remain in their existing positions. The initial directors of such other Debtors shall be selected and identified by the Debtors and the Committee in the Plan Supplement and subject to any related restrictions, if any, in the Code-Share Agreements and/or other key contracts of the Debtors and in compliance with all applicable Federal regulations restricting the level of ownership in a United States air carrier by Non-U.S. Citizens. Each of the directors and officers of the Debtors (other than Mesa Air Group) shall serve in accordance with applicable non-bankruptcy law and the Post-Effective Date Debtors' Charter Documents, as the same may be amended from time to time. From and after the Effective Date, the directors and officers of the Reorganized Debtors and the Liquidating Debtors shall be selected and determined in accordance with the provisions of applicable law and the Post-Effective Date Debtors' Charter Documents.

Upon the Effective Date, and without any further action by the shareholders, directors and/or officers of the Reorganized Debtors and the Liquidating Debtors, the Post-Effective Date Debtors' Charter Documents shall be deemed amended (a) to the extent necessary, to incorporate the provisions of the Plan, and (b) to prohibit the issuance by the Reorganized Debtors and the Liquidating Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the

Bankruptcy Code, subject to further amendment of such Charter Documents as permitted by applicable law.

### 4. Management Notes and Management Equity Pool

On or as soon as practicable after the Effective Date, Reorganized Mesa Air Group shall issue the Management Notes to selected members of the Debtors' management in place on and after the Effective Date, other than the amounts of Management Notes to be issued to Jonathan G. Ornstein and Michael J. Lotz, the Reorganized Board shall determine the manner in which the remaining Management Notes are allocated. Reorganized Mesa Air Group shall also issue shares of New Common Stock out of the Management Equity Pool to selected members of the Debtors' management in place on and after the Effective Date in amounts to be determined by the Reorganized Board, provided, however, that the minimum amount of New Common Stock to be issued to Jonathan G. Ornstein and Michael J. Lotz shall be 3.75% and 2.25%, respectively. Messrs. Ornstein's and Lotz's New Common Stock shall be subject to a vesting schedule to be negotiated with the Committee and disclosed in the Plan Supplement. The shares of New Common Stock issued pursuant to the Management Equity Pool shall be subject to the terms of the Shareholders Agreement.

### 5. Corporate Action

On the Effective Date, the adoption, filing, approval and ratification, as necessary, of all corporate or related actions contemplated under the Plan with respect to each of the Reorganized Debtors and the Liquidating Debtors shall be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may include: (i) the adoption and filing of the Reorganized Mesa Charter Documents and/or the Post-Effective Date Charter Documents; (ii) the election or appointment, as the case may be, of directors and officers for the Reorganized Debtors and the Liquidating Debtors; and (iii) the issuance of the Restructured Equity, the New Notes, or (iv) any Alternative Transactions.

All matters provided for herein involving the corporate structure of any Debtor, Reorganized Debtor, or Liquidating Debtor, or any corporate action required by any Debtor, Reorganized Debtor, or Liquidating Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, directors or officers of such Debtor, Reorganized Debtor, or Liquidating Debtor or by any other stakeholder.

From and after the Effective Date, the Reorganized Debtors shall continue to engage in business, and the Liquidating Debtors shall continue to engage in business only to the extent reasonably necessary to wind up their affairs in an orderly manner and make the distributions under this the Plan, or enter into an Alternative Transactions to the extent necessary for the purpose of avoiding unnecessary cost and expenses associated with a potential liquidation.

Specifically with regard to the Liquidating Debtors, the Liquidating Debtors shall have full authority, and shall take any action necessary, to wind up the affairs, liquidate, transfer or abandon assets, and dissolve and terminate the existence of the Liquidating Debtors in a manner and in accordance with the best means to maximize assets and minimize expenses or costs

associated with such liquidation under applicable state laws and in accordance with the rights, powers and responsibilities conferred by the Bankruptcy Code, ~~this~~the Plan and any order of the Bankruptcy Court; *provided*, *however*, the Reorganized Debtors may elect to forego any liquidation of the Liquidating Debtors if they determine, in their sole discretion prior to or after the Effective Date, that costs and expenses associated with liquidation would outweigh the benefits of maintaining the corporate existence of such Liquidating Debtors or entering into an Alternative Transaction.

The actions necessary to effect the Alternative Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Debtors, Reorganized Debtors, or Liquidating Debtors may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Debtors, Reorganizing Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions. If and to the extent necessary, any controlling organization or formation documents or agreements for the Reorganizing Debtors or Liquidating Debtors shall be deemed amended to authorize the foregoing.

On or after the Effective Date, the appropriate officers of each Reorganized Debtor and Liquidating Debtor and members of the board of directors (or equivalent body) of each Reorganized Debtor and Liquidating Debtor are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan in the name of and on behalf of such Reorganized Debtor or Liquidating Debtor and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**6.**      **Funding of the Reorganized Debtors on and After the Effective Date**

Funding for the Reorganized Debtors and the Liquidating Debtors from and after the Effective Date shall be provided by cash on hand, proceeds from operations and disposition, if any, of assets, and such other sources as the Reorganized Debtors determine appropriate.

**7.**      **No Substantive Consolidation**

Nothing in the Plan is intended to substantively consolidate the Estates of the Debtors, and each such entity will maintain its separate corporate existence and its separate and distinct Estate Assets.

## 8. Revesting of Estate Assets

Upon the Effective Date, the Reorganized Debtors and Liquidating Debtors will be vested with all right, title and interest in the applicable respective Estate Assets of the Debtors and such property will become the property of the Reorganized Debtors and Liquidating Debtor, as applicable, free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as set forth in the Plan. For the avoidance of doubt, each Reorganized Debtor and Liquidating Debtor will be vested on the Effective Date with the particular Estate Assets belonging to that Debtor prior to the Effective Date, including any Interests in other Debtors.

## 9. Retained Causes of Action and/or Defenses

As set forth above in Section II.G.4, as additional consideration to General Unsecured Creditors, the Debtors waive the right to pursue Avoidance Actions, pursuant to Section 547 of the Bankruptcy Code. Unless any Causes of Action and Defenses are expressly waived, relinquished, released, compromised, or settled in the Plan, any Final Order, or the US Airways Tenth Amendment (including, without limitation, the Confirmation Order), the Debtors, the Reorganized Debtors, and the Liquidating Debtors expressly reserve all such Causes of Action and Defenses for later adjudication by the Reorganized Debtors and Liquidating Debtors, as applicable, including, but not limited to the any Causes of Action listed on **Exhibit C** hereto. The reservation set forth in this Section 5.6 shall include, without limitation, a reservation by the Debtors, the Reorganized Debtors, and the Liquidating Debtors of any Causes of Action and Defenses not specifically identified in the Plan or Disclosure Statement, or of which the Debtors and/or the Restructured Unsecured Equity Holders may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors and/or the Restructured Unsecured Equity Holders at this time or facts or circumstances that may change or be different from those that the Debtors and/or the Restructured Unsecured Equity Holders now believe to exist and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to such Causes of Action and Defenses upon or after the Confirmation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action and Defenses have been expressly waived, relinquished, released, compromised, or settled in the Plan or a Final Order. Following the Effective Date, the Reorganized Debtors and Liquidating Debtors may assert, compromise or dispose of any Causes of Action and Defenses without further notice to Creditors or authorization of the Bankruptcy Court. Notwithstanding the foregoing or anything to the contrary elsewhere in ~~this~~the Plan, nothing in ~~this~~the Plan or the Confirmation Order shall prejudice or affect (1) any rights of any Person to assert Claims, including Administrative Claims, against the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transferee thereof, by way of offset, recoupment, or counterclaim to the extent permitted by applicable law; and/or (2) any defense to any Causes of Action and Defenses or any other claims asserted by the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transferee thereof.

**10.  Issuance of Restructured Equity and New Notes; Shareholders Agreement**

On the Effective Date, the Reorganized Debtors and Liquidating Debtors shall be authorized and directed to take any and all necessary and appropriate actions to issue and deliver the Restructured Equity and the New Notes in accordance with ~~this~~the Plan.  The Restructured Equity shall be issued in the form of New Common Stock and New Warrants. The Restructured Unsecured Equity shall represent 80% of the ownership interests in Reorganized Mesa Air Group (after giving effect to the shares of New Common Stock issuable under the Management Equity Pool and ~~US Airways).~~ to US Airways).  Any holder of five percent (5%) or more of the then issued and outstanding shares of New Common Stock (determined at the time such holder acquires such shares), whether such holder acquires such shares (i) as of the Effective Date, (ii) subsequent to the Effective Date as a result of the issuance of additional shares of New Common Stock on account of Allowed Claims, (iii) upon exercise of New Warrants issued as of the Effective Date, or (iv) upon the exercise of New Warrants issued subsequent to the Effective Date on account of Allowed Claim, such holder shall be required to enter into the Shareholders Agreement.  The term of the Shareholders Agreement shall be the earlier of the exercise of 80% or more of the New Warrants issued under the Plan or five (5) years.  The Shareholders Agreement shall require a holder to vote all shares of New Common Stock of the Company registered in their respective names or beneficially owned by them, and any transferee thereof, in accordance with a majority of the Board of Directors of Reorganized Mesa Air Group on such matters thereafter requiring or submitted for shareholder approval, provided, however, that such voting requirement shall only apply to those shares of New Common Stock that exceed such holder's Estimated Initial Pro Rata Share of Restructured Unsecured Equity.  For purposes of example only, if a holder of an Allowed Claim that is entitled to receive shares of New Common Stock on the Effective Date equal ten percent (10%) of Restructured Unsecured Equity (i.e., 1,000,000 shares based on 10,000,000, shares reserved for issuance under the Plan) and on such date only 3,000,000 shares of New Common Stock are actually issued and outstanding, then such holder shall be required to vote 700,000 of the 1,000,000 shares held by such holder in accordance with the Shareholders Agreement and shall be free to vote the remaining 300,000 shares (i.e., 10% of the 3,000,000 shares issued and outstanding) in its sole discretion.

The terms of the New Notes shall be subject to the terms and conditions of the Plan and set forth in greater detail in the New Notes Indenture and related documents to be submitted as part of the Plan Supplement.  Other than the principal amount, the terms of the New 8% Notes (Series A), the New 8% Notes (Series B), the Management Notes, and the US Airways Note shall be ~~substantially similar; *provided, however,* that~~identical except for principal amount and (a) the Management Notes shall be subordinated to the New 8% Notes (Series A), the New 8% Notes (Series B) and the US Airways Note, and (b) the New 8% Notes (Series A) and the US Airways Notes shall be subject to priority prepayment upon the occurrence, if ever, of a Spirit Liquidity Event as set forth in the Plan (and as will be described in greater detail in the New Notes Indenture).

The Reorganized Mesa Charter shall include restrictions on transfers of the Restructured Equity (including shares issuable upon exercise of the New Warrants) (i) to Non-U.S. Citizens, (ii) that would result in Reorganized Mesa Air Group having ~~300~~500 or greater holders of record

and therefore becoming subject to the reporting obligations under the Securities Exchange Act of 1934, as amended, (iii) that would result in a change in control of Reorganized Mesa Air Group under its then existing Code-Share Agreements, and (iv) that would result in the loss of Reorganized Mesa Air Group's net operating loss; *provided, however,* in the event that the Reorganized Board determines to list Reorganized Mesa Air Group on a public exchange or the Reorganized Debtors otherwise become subject to the reporting obligations under the Securities Exchange Act of 1934, then the restrictions of subsection (ii) shall not apply.

The New Common Stock when issued or distributed as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable. Each distribution and issuance of such New Common Stock shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person receiving such distribution or issuance.

The Debtors (and each of their respective affiliates, agents, directors, officers, members, managers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable law with regard to the distribution of the New Common Stock and the New Warrants under the Plan (including, without limitation, any awards made under the Management Equity Pool), and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Upon entry of the Confirmation Order, all provisions of the Plan addressing distribution of the New Common Stock and New Warrants shall be deemed necessary and proper.

11. **Securities Law and Air Carrier Regulatory Matters**

It is integral and essential to the Plan that (i) the issuance of the New Common Stock, the New Warrants, and the New 8% Notes pursuant to ~~this~~the Plan shall be exempt from registration under the Securities Act, pursuant to Section 1145 of the Bankruptcy Code and from registration under state securities laws, and (ii) the Debtors shall be in compliance with any and all applicable Federal statutes and regulations restricting the level of ownership of a United States air carrier by Non-U.S. Citizens. Any Restructured Equity issued to an "affiliate" of the Debtors within the meaning of the Securities Act or any Person the Debtors reasonably determined to be an "underwriter" within the meaning of the Securities Act, and which does not agree to resell such securities only in "ordinary trading transactions," within the meaning of Section 1145(b)(1) of the Bankruptcy Code, shall be subject to such transfer restrictions and bear such legends as shall be appropriate to ensure compliance with the Securities Act. In addition, under Section 1145 of the Bankruptcy Code any securities contemplated by the Plan, including without limitation, the shares of New Common Stock, will be freely tradable by the recipients thereof, subject to (i) the provisions of Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (ii) the restrictions, if any, on the transferability of such securities and instruments; and (iii) applicable regulatory approval. Further, the New Common Stock, New Warrants, and

New 8% Notes shall be subject to certain restrictions and limitations as set forth in the Reorganized Mesa Charter Documents and New Notes Indenture, respectively, to ensure compliance with applicable Federal regulations relating to air carriers. Nothing in ~~this~~the Plan is intended to preclude the SEC or any other governmental agency from exercising its police and regulatory powers relating to the Debtors or any other entity.

So long as (i) any New 8% Notes (Series A) are outstanding (unless defeased in a legal defeasance), (ii) any New 8% Notes (Series B) are outstanding (unless defeased in a legal defeasance), (iii) the US Airways Note is outstanding (unless defeased in a legal defeasance), or (iv) any shares of New Common Stock are outstanding, Reorganized Mesa Air Group will have its annual financial statements audited by a nationally recognized firm of independent accountants and will provide interim financial statements to the holders of New Notes, New Common Stock, and New Warrants within 120 days after the end of each fiscal year of Reorganized Mesa Air Group and within 60 days after the end of each of the first three fiscal quarters of each fiscal year of Reorganized Mesa Air Group, quarterly and annual financial statements prepared in accordance with GAAP that would be required to be contained in a filing with the SEC Forms 10-Q and 10-K if Reorganized Mesa Air Group were required to file those Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, with respect to the annual information only, a report on the annual financial statements by Reorganized Mesa Air Group's certified independent accountants. To the extent that Reorganized Mesa Air Group does not file such information with the SEC, Reorganized Mesa Air Group will distribute (or cause the Trustee to distribute in the case of the New Notes) such information and such reports electronically to (a) any Holder of the New Notes, or shares of New Common Stock or New Warrants, (b) any beneficial owner of New Notes, New Common Stock, or New Warrants who provides its email address to Reorganized Mesa Air Group and certifies that it is a beneficial owner thereof, (c) to any prospective investor who provides its email address to Reorganized Mesa Air Group or (d) any securities analyst who provides its email address to Reorganized Mesa Air Group and certifies that it is a securities analyst. US Airways shall be entitled to such other information as is required to be distributed under the terms of the US Airways Investor Rights Agreement.

WHETHER ANY PARTICULAR PERSON WILL FALL WITHIN ANY CATEGORY OF "UNDERWRITER" WITH RESPECT TO ANY SECURITY, IF ANY, TO BE ISSUED PURSUANT TO THE PLAN, OR WHETHER ANY PARTICULAR PERSON WILL BE ABLE TO RESELL SUCH SECURITY PURSUANT TO AN EXEMPTION OTHER THAN PROVIDED BY SECTION 1145, DEPENDS UPON VARIOUS FACTS AND CIRCUMSTANCES. GIVEN THE COMPLEXITY AND FACTUAL NATURE OF SUCH ISSUES, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PARTICULAR PERSON TO TRADE IN THE SECURITIES, IF ANY, TO BE DISTRIBUTED PURSUANT TO THE PLAN. FURTHERMORE, THE DEBTORS HAVE NOT SOUGHT AND DO NOT EXPECT TO RECEIVE ANY NO-ACTION POSITION FROM THE SEC WITH RESPECT TO ANY SECURITIES REGULATORY MATTERS CONCERNING THE PLAN, AND NO ASSURANCE CAN BE GIVEN THAT THE SEC OR "BLUE SKY" SECURITIES REGULATORY AUTHORITIES WILL NOT TAKE A POSITION WITH RESPECT TO SUCH MATTERS THAT IS INCONSISTENT WITH THOSE OF THE DEBTORS AS DESCRIBED HEREIN. POTENTIAL RECIPIENTS OF THE SECURITIES, IF ANY, DISTRIBUTED PURSUANT TO THE PLAN ARE STRONGLY

URGED TO CONSULT THEIR OWN COUNSEL WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

NEITHER THIS DISCLOSURE STATEMENT, NOR ANY PORTION THEREOF INCLUDING THIS SECTION IV, HAS BEEN SUBMITTED FOR APPROVAL UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THIS SECTION IV.  CREDITORS AND INTEREST HOLDERS SHOULD CONSULT THEIR OWN LEGAL COUNSEL AND ADVISORS AS TO ANY SECURITIES LAW RELATED MATTERS.

12. **Restrictions on Resale of Securities to Protect Net Operating Losses**

To avoid adverse federal income tax consequences resulting from an ownership change (as defined in Section 382 of the Internal Revenue Code), the articles of incorporation of Reorganized Mesa Air Group , which shall be subject to approval by the Committee and US Airways, shall restrict the transfer of (i) Restructured Equity and (ii) Claims prior to their Allowance without the consent of the Reorganized Board for ~~two~~three (~~2~~3) years after the Effective Date, ~~subject to extension for up to 3 additional years if the Reorganized Board determines in its reasonable discretion that such restrictions are necessary to preserve the value of the Reorganized Debtors' NOLs,~~ such that (a) no holder of ~~5~~5.0% or more of the ~~equity~~Restructured Equity of Reorganized Mesa Air Group may transfer any ~~securities~~Restructured Equity, (b) no transfer will be permitted if it would cause the transferee to hold 4.75% or more of the equity of Reorganized Mesa Air Group ~~and~~(as determined in accordance with Section 382 of the Tax Code), (c) no transfer will be permitted if it would increase the percentage ~~equity~~Restructured Equity ownership of any person who already holds 4.75% or more of the ~~equity~~Restructured Equity of Reorganized Mesa Air Group (as determined in accordance with Section 382 of the Tax Code), and (d) no transfer of a Claim will be permitted if it would cause the transferee to hold 4.75% or more of Restructured Equity upon the Allowance of such Claim (as determined in accordance with Section 382 of the Tax Code), except as may be otherwise agreed to by Reorganized Board if it determines in its reasonable discretion that such restrictions are not necessary to preserve the value of the Reorganized Debtors' NOLs.

13. **Cancellation of Existing Notes, Securities and Agreements**

Except to the extent reinstated or unimpaired under the Plan, or solely for purposes of evidencing a right to distribution under the Plan or to perform necessary administrative functions related thereto or as otherwise provided hereunder, subject to the surrender requirements (if applicable) set forth in Section 6.11 of the Plan, on the Effective Date, all the agreements and other documents evidencing any Claims or rights of any holder of a Claim against the Debtors, including all indentures and notes evidencing such Claims (including any and all Notes) and any options or warrants to purchase Interests or any other capital stock of the Debtors, shall be cancelled.

### 14.  Committee Dissolution – Post-Effective Date Committee

On the Effective Date, the Committee shall be dissolved and the members of the Committee shall be released and discharged from any further authority, duties, responsibilities, liabilities and obligations related to, or arising from, the Chapter 11 Cases, except that the Committee shall continue in existence and have standing and capacity to prepare and prosecute (i) applications or objections for the payment of fees and reimbursement of expenses incurred by the Committee or any of the estates' Professionals, and (ii) any motions or other actions seeking enforcement or implementation of the provisions of ~~this~~the Plan or the Confirmation Order or pending appeals of Orders entered in the Chapter 11 Cases.

On the Effective Date, there shall be formed a Post-Effective Date Committee with its duties limited to the oversight of certain actions of the Reorganized Debtors, which actions shall remain the sole responsibility of the Reorganized Debtors, including: (a) overseeing the General Unsecured Claims' reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors pursuant to the Settlement Procedures Order or Aircraft Rejection Damages Claim Settlement Procedures, as applicable; (b) overseeing (i) the establishment and (ii) the maintenance of the Distribution Reserve; (c) overseeing the distributions to the holders of General Unsecured Claims under ~~this~~the Plan; (d) appearing before and being heard by the Bankruptcy Court and other Courts of competent jurisdiction in connection with the above duties; and (e) such other matters as may be agreed upon between the Reorganized Debtors and the Post-Effective Date Committee or specified in ~~this~~the Plan. The Post-Effective Date Committee shall consist of not less than three nor more than five members to be appointed by the Creditors' Committee and may adopt by-laws governing its conduct. For so long as the claims reconciliation process shall continue, the Reorganized Debtors shall make regular reports to the Post-Effective Date Committee as and when the Reorganized Debtors and the Post-Effective Date Committee may reasonably agree upon. The Post-Effective Date Committee may employ, without further order of the Court, professionals to assist it in carrying out its duties as limited above, including any professionals retained in these Reorganization Cases, and the Reorganized Debtors shall pay the reasonable costs and expenses of the Post-Effective Date Committee, including reasonable professional fees, in the ordinary course without further order of the Court. In the event that, on the Effective Date, an objection to any Claim by the Creditors Committee is pending, the Post-Effective Date Committee shall have the right to continue prosecution of such objection.

### 15.  Final Decree

At any time following the Effective Date, the Reorganized Debtors will be authorized to file a motion for the entry of a final decree closing the Chapter 11 Cases of the Reorganized Debtors pursuant to Section 350 of the Bankruptcy Code.

### E.  Provisions Governing Distributions

### 1.  Distributions by the Debtors

The Reorganized Debtors will administer Claims and make distributions in respect of Allowed Claims. Distributions to be made by the Reorganized Debtors may be made by any

Person designated or retained by the Reorganized Debtors to serve as disbursing agent without the need for any further order of the Bankruptcy Court.

## 2. Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed by the relevant parties, distributions on account of Allowed Claims that become Allowed prior to the Effective Date will be made by the Post-Effective Date Debtors on or as soon as reasonably practicable after the Effective Date.

## 3. Estimation

In order to establish reserves under ~~this~~the Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Debtors, the Reorganized Debtors, and the Liquidating Debtors, in consultation with the Committee or Post-Effective Date Committee, will have the right to seek an order of the Bankruptcy Court pursuant to Section 502(c) of the Bankruptcy Code, estimating the amount of any Claim.

## 4. Distributions on Account of Claims Allowed After the Effective Date

### a. Distribution Record Date

On the Distribution Record Date, the claims register shall be closed and any transfer on any Claim therein shall be prohibited. The Debtors, any party designated by the Debtors, and the Indenture Trustees shall be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holder stated on the claims register or other similar ledger regarding the Notes, as applicable, as of the close of business on the Distribution Record Date.

### b. Distributions on Account of Disputed Claims and Estimated Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed by the relevant parties, distributions on account of Disputed Claims and Estimated Claims that become Allowed after the Effective Date will be made by the Post-Effective Date Debtors, in consultation with the Post-Effective Date Committee, at such periodic intervals as such entities determine to be reasonably prudent.

### c. Distributions of New Common Stock and New Warrants

The Debtors will distribute (i) New Common Stock to the holders of Allowed Class 3 Claims and Allowed Class 5 Claims that are U.S. Citizens and (ii) New Warrants to all holders of Allowed Class 3 Claims or Allowed Class 5 Claims that are Non-U.S. Citizens. To effectuate distributions in accordance with the federal law restrictions and the Plan, the Debtors will send a Citizenship Declaration to the holders of Class 3 Claims and Class 5 Claims that will require them to provide and verify the following information: (i) name of Creditor, (ii) amount of Allowed Claim, and (iii) whether such person or entity is a U.S. Citizen or Non-U.S. Citizen as defined by title 49 of the United States Code. If any holder of a Class 3 Claim or Class 5 Claim does not return a properly completed Citizenship Declaration prior to the deadline set forth therein, the holder of such Class 3 Claim or Class 5 Claim will be deemed a Non-U.S. Citizen and will receive New Warrants on account of such Claims.

### d. Distributions on account of Noteholder Claims

Distributions on account of 2012 Noteholder Claims, 2023 Noteholder Claims, and 2024 Noteholder Claims shall be made to the applicable Indenture Trustee for the 2012 Notes, 2023 Notes, and 2024 Notes, respectively, to be applied in accordance with the applicable Indentures.

### e. No Distributions Pending Allowance

Notwithstanding anything herein or the Plan to the contrary: (a) no distribution will be made with respect to any Disputed Claim or Estimated Claim until such Claim becomes an Allowed Claim, and (b) unless determined otherwise by the Post-Effective Date Debtors, in consultation with the Post-Effective Date Committee, no distribution will be made to any Person that holds both an Allowed Claim and either a Disputed Claim or an Estimated Claim until such Person's Disputed Claims and Estimated Claims have been resolved by settlement or Final Order.

### f. Objection Deadline

The Post-Effective Date Debtors will file all objections to Disputed Claims, and will file all motions to estimate Claims under Section 502(c) of the Bankruptcy Code, on or before the Claims Objection Deadline.

### g. Disputed and Estimated Claims Reserve

#### i. Cash Reserve

On and after the Effective Date, the Post-Effective Date Debtors will shall maintain in reserve such Cash as they estimate to be necessary to satisfy any Cash distributions required to be made to Creditors (other than Creditors in Class 4 3 and Class 5) under the Plan if each for Class 1, Class 2 and Class 4 Disputed Claim Claims and Estimated Claim Claims against the Debtors becomes an Allowed Claim against the Post-Effective Date Debtors.

## ii. Restructured Unsecured Equity/New 8% Notes (Series A) and New 8% Notes (Series B) Reserves

On or as soon as practicable after the Effective Date, the Post-Effective Date Debtors shall distribute to those holders of Allowed Claims that are entitled to receive Restructured Unsecured Equity, New 8% Notes (Series A) and/or New 8% Notes (Series B) on the Effective Date a distribution of each such holder's Estimated Initial Pro Rata Share of Restructured Unsecured Equity and Estimated Initial Pro Rata Share of New 8% Notes, respectively. With respect to any Disputed Claim or Estimated Claim that becomes an Allowed Claim entitled to receive Restructured Unsecured Equity, New 8% Notes (Series A) and/or New 8% Notes (Series B) after the Effective Date, on the next Distribution Date, as applicable, following the date on which such Disputed Claim or Estimated Claim becomes an Allowed Claim, the Post-Effective Date Debtors shall distribute to the holder of such Allowed Claim its Estimated Additional Pro Rata Share of Restructured Unsecured Equity and/or its Estimated Additional Pro Rata Share of New 8% Notes (Series A) and/or New 8% Notes (Series B), as applicable. On each Interim Distribution Date, the Post-Effective Date Debtors shall distribute to the holders of Restructured Unsecured Equity a True-Up Equity Distribution and/or to the holders of New 8% Notes (Series A) and/or New 8% Notes (Series B) a True-Up Note Distribution, as applicable. After all Disputed Claims and Estimated Claims have become Allowed Claims or otherwise been disallowed, on the Final Distribution Date, the Post-Effective Date Debtors shall make a final distribution of Restructured Unsecured Equity, New 8% Notes (Series A) and/or New 8% Notes (Series B) such that (i) each holder of Restructured Unsecured Equity (including any holder of an Allowed Claim who first becomes entitled to receive Restructured Unsecured Equity on such distribution date) has received its Actual Pro Rata Share of Restructured Unsecured Equity and (ii) each holder of New 8% Notes (Series A) and/or New 8% Notes (Series B) (including any holder of an Allowed Claim who first becomes entitled to receive New 8% Notes (Series A) and/or New 8% Notes (Series B) on such distribution date) has received its Actual Pro Rata Share of such Notes. The Reorganized Mesa Charter Documents shall be structured in a manner that authorizes the issuance of and/or reserve a sufficient number of shares comprising the Restructured Equity, to permit the distributions set forth above. For the avoidance of doubt, distributions of New 8% Notes (Series A) and/or New 8% Notes (Series B) to any Person holding a Disputed Claim or Estimated Claim against the Debtors that becomes an Allowed Claim after the Effective Date shall be made together with any and all interest and amounts accrued under the New 8% Notes (Series A) and/or New 8% Notes (Series B) from the Effective Date until the date of payment thereof.

## h. Settling Disputed Claims

The Reorganized Debtors will be authorized to settle, or withdraw any objections to, any Disputed Claims following the Effective Date without further order of the Bankruptcy Court, subject to the consent of the Post-Effective Date Committee consistent with the terms of the Settlement Procedures Order or the Aircraft Rejection Damages Claim Settlement Procedures, as applicable.

## 5. Distributions in Cash

The Reorganized Debtors will make any required Cash payments to the holders of Allowed Claims: in U.S. dollars by check, draft or warrant, drawn on a domestic bank selected by the Post-Effective Date Debtors, in their sole discretion, or by wire transfer from a domestic bank, at the Post-Effective Date Debtors' option; and by first-class mail (or by other equivalent or superior means as determined by the Post-Effective Date Debtors).

## 6. Undeliverable Distributions

If any distribution under the Plan is returned as undeliverable, no further distributions to such Person shall be made unless and until the Post-Effective Date Debtors or other appropriate disbursing agent is notified in writing of such holder's then-current address, at which time the undelivered distributions shall be made to such holder without interest or dividends. Undeliverable distributions shall be returned to the Post-Effective Date Debtors until such distributions are claimed.

## 7. Unclaimed Distributions

Any entity which fails to claim any Cash within one hundred twenty (120) days from the date upon which a distribution is first made to such entity will forfeit all rights to any distribution under the Plan and the Post-Effective Date Debtors will be authorized to cancel any distribution that is not timely claimed. Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) will revert to the applicable Post-Effective Date free of any restrictions under the Plan, the Bankruptcy Code, or the Bankruptcy Rules. Upon forfeiture, the claim of any Creditor with respect to such funds will be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary, and such Creditors will have no claim whatsoever against the Debtors or the Post-Effective Date Debtors or any holder of an Allowed Claim to whom distributions are made by the Post-Effective Date Debtors.

## 8. Setoff

Nothing contained in the Plan ~~will~~shall constitute a waiver or release by the Debtors of any right of setoff or recoupment the Debtors may have against any Creditor. To the extent permitted by applicable law, the Post-Effective Date Debtors may~~, but are not required to, set off~~ setoff or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtors may have against the holder of such Claim or Interest. Notwithstanding the foregoing or anything to the contrary elsewhere in the Plan, nothing in the Plan or the Confirmation Order ~~will~~shall prejudice ~~or~~, affect:, or limit (1) any rights of any Person to assert or effectuate rights of setoff under section 553 of the Bankruptcy Code or otherwise assert Claims, including Administrative Claims, against the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transferee thereof, by way of offset, recoupment, or counterclaim to the extent permitted by applicable law; ~~and/~~or (2) any defense to any Causes of Action ~~or~~and Defenses or any other claims asserted by the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transferee thereof.

### 9. Taxes

Pursuant to Section 346(f) of the Bankruptcy Code, the Post-Effective Date Debtors will be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. The Post-Effective Date Debtors will be authorized to take all actions necessary to comply with applicable withholding and recording requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that has received a distribution of Cash will have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest, if any.

### 10. De Minimis Distributions

If any interim distribution under the Plan to the holder of an Allowed Claim would be less than $100.00 or a fractional number of New Common Stock or New Warrants, the Post-Effective Date Debtors may withhold such distribution until the next Interim Distribution Date or the final distribution, as applicable, is made to such holder. If any final distribution under the Plan to the holder of an Allowed Claim would be less than $25.00, the Post-Effective Debtors may cancel such distribution. Any unclaimed distributions as described in this paragraph 10 shall be treated as unclaimed property under Section 6.7 of the Plan.

### 11. Surrender of Notes and Other Instruments

Unless waived by the Debtors, as a condition to receiving any distribution pursuant to the Plan, each Person holding an instrument evidencing an existing Claim against a Debtor, including, without limitation, any Note, in which case the applicable Note shall be surrendered to the applicable Indenture Trustee, or in the event such Note is held in the name of, or by a nominee of, the Depository Trust Company, the Debtors will follow the applicable procedures of the Depository Trust Company for book-entry transfer of the applicable Notes to the applicable Indenture Trustee, must surrender such instrument or an affidavit of loss and indemnity satisfactory to the Reorganized Debtors or other applicable distribution agent; provided, however, that, in the event such Person fails to surrender such instrument within one year of the Effective Date, that Person shall be deemed to have forfeited his, her or its right to receive any distribution under the Plan on account of the subject Claim and such Person shall be forever barred from asserting any such Claim against the Debtors, the Post-Effective Date Debtors, or their property; and provided further that, in such event as described above, any Restructured Equity, together with any dividends or interest that may be attributable thereto, held for distribution on account of such Claim shall revert to Reorganized Mesa Air Group, notwithstanding any federal or state escheat laws to the contrary. Notwithstanding any of the foregoing, the provisions in the operative agreements and documents governing the Notes relating to the surrender and cancellation of such Notes shall continue to bind and govern such matters in the case of these Notes as of the Effective Date.

## 12. Fractional Shares

No fractional shares of the Restructured Equity shall be issued or distributed under the Plan. The actual distribution of shares of New Common Stock or New Warrants shall be rounded to the next higher or lower whole number as follows: (i) fractions less than one-half (½) shall be rounded to the next lower whole number and (ii) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number. The total number of shares of New Common Stock or number of New Warrants to be distributed hereunder shall be adjusted as necessary to account for such rounding. No consideration shall be provided in lieu of fractional shares that are rounded down.

## F. Executory Contracts and Unexpired Leases and Other Agreement/Program Matters

### 1. Assumption

On the Effective Date, pursuant to Section 1123(b)(2) of the Bankruptcy Code, the Post-Effective Date Debtors will assume the executory contracts and unexpired leases of the Debtors that: (a) have been expressly identified in the Plan Supplement (together with any additions, deletions, modifications or other revisions to such exhibit as may be made by the Debtors prior to the Confirmation Date), and (b) are specified in Article 7 of the Plan. Each executory contract and unexpired lease listed in the Plan Supplement will include any modifications, amendments and supplements to such agreement, whether or not listed in the Plan Supplement.

### 2. Rejection

Except as set forth in Article 7 of the Plan, on the Effective Date, pursuant to Section 1123(b)(2) of the Bankruptcy Code, the Reorganized Debtors will reject any and all executory contracts and unexpired leases of the Debtors otherwise not identified in Section 7.1 of the Plan, including, without limitation, those executory contracts and unexpired leases expressly identified for rejection in the Plan Supplement (together with any additions, deletions, modifications or other revisions to such exhibit as may be made by the Debtors prior to the Effective Date). Any Person asserting any Claim for damages arising from the rejection of an executory contract or unexpired lease of the Debtors under the Plan will file such Claim on or before the Rejection Claim Bar Date, or be forever barred from: (a) asserting such Claim against the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Estate Assets; and (b) sharing in any distribution under the Plan.

### 3. Assumption Obligations

The Reorganized Debtors will satisfy all Assumption Obligations, if any, by making a Cash payment in the manner provided in Section 2.2 of the Plan or as otherwise permitted by Section 365(b)(1)(B) of the Bankruptcy Code, equal to the amount specified in the Plan Supplement, unless an objection to such proposed amount is filed with the Bankruptcy Court and served on counsel to the Debtors on or prior to the date set by the Bankruptcy Court for filing objections to Confirmation of the Plan and the Bankruptcy Court, after notice and hearing, determines that the applicable Debtor is obligated to pay a different amount under Section 365 of the Bankruptcy Code, in which case, the applicable Debtor will have the right to remove such

executory contract or lease from the list of assumed contracts pursuant to Section 7.7 of the Plan, or, if following the Effective Date, file a motion within ten (10) days after such determination to seek an order of the Bankruptcy Court rejecting such executory contract or unexpired lease. Any Person that fails to object to the Assumption Obligation specified in the Plan Supplement on or prior to the date set by the Bankruptcy Court for filing objections to Confirmation of the Plan will be forever barred from: (a) asserting any other, additional or different amount on account of such obligation against the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Estate Assets, and (b) sharing in any other, additional, or different distribution under the Plan on account of such obligation. In the event the Debtors are required to provide adequate assurance of future performance pursuant to section 365(b) of the Bankruptcy Code, objections to such assurances must be filed on or before objection deadline of the Plan.

4. **Effect of Confirmation Order**

The Confirmation Order will constitute an order of the Bankruptcy Court approving, as of the Effective Date, the assumption or rejection by the Post-Effective Date Debtors, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of all executory contracts and unexpired leases identified under Article 7 of the Plan. The contracts and leases identified in the Plan will be assumed or rejected, respectively, only to the extent that such contracts or leases constitute pre-petition executory contracts or unexpired leases of the Debtors, and the identification of such agreements under the Plan does not constitute an admission with respect to the characterization of such agreements or the existence of any unperformed obligations, defaults, or damages thereunder. The Plan does not affect any executory contracts or unexpired leases that: (a) have been assumed, rejected or terminated prior to the Confirmation Date, or (b) are the subject of a pending motion to assume, reject or terminate as of the Confirmation Date.

5. **Post-Petition Agreements**

Unless inconsistent with the provisions of the Plan, all contracts, leases and other agreements entered into or restated by the Debtors on or after the Petition Date, or previously assumed by any of the Debtors prior to the Confirmation Date (or the subject of a pending motion to assume by either of the Debtors as of the Confirmation Date that is granted by the Bankruptcy Court), which have not expired or been terminated in accordance with their terms, shall be performed by the Debtors in the ordinary course of business and shall survive and remain in full force and effect following the Effective Date.

6. **Modifications to Plan Supplement**

The Debtors shall have the right, any time prior to the Effective Date, to make additions, deletions, modifications and/or other revisions to the identification of executory contracts and leases to be assumed or rejected by the Debtors; provided, however, that any party to such contract or lease or affected by such action shall be provided notice of such action and an opportunity to object, and if any objection is filed, such action will not be effective until such objection is resolved by order of the Bankruptcy Court.

## 7. Code-Share Agreements

The Code-Share Agreements will be assumed either by separate motions or as provided in this Section. Upon assumption, the Code-Share Agreements shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of ~~this~~the Plan or any order of the Bankruptcy Court previously entered with respect to such Code-Share Agreement. Nothing in ~~this~~the Plan or the Confirmation Order shall be deemed a violation of such Code-Share Agreements.

Notwithstanding anything in ~~this~~the Plan to the contrary, the Debtors will assume the US Airways Code-Share Agreement as modified by the US Airways Tenth Amendment (which as of November 1, 2010 is being finalized) pursuant to a separate motion to be presented to the Court for approval in advance of confirmation of the Plan, and such assumption shall be subject to the conditions set forth in the US Airways Tenth Amendment. The assumption of the US Airways Code-Share Agreement as modified by the US Airways Tenth Amendment will be effective as of the Effective Date. In consideration for the US Airways Tenth Amendment, US Airways shall receive (i) 10% of the New Common Stock of the Reorganized Mesa Air Group on a fully diluted basis, subject the Shareholders Agreement, and (ii) the US Airways Note. Upon the occurrence or non-occurrence of certain events, both the Debtors and US Airways may exercise certain rights that materially affect the terms of the US Airways Tenth Amendment. A description of these ~~risk~~risks are set forth in Section V.B.6 below.

Notwithstanding anything in ~~this~~the Plan to the contrary, the United Code-Share Agreement shall be deemed assumed effective as of the Effective Date.

## 8. Fleet

The Debtors will reject leases and provide for the return of any unnecessary aircraft and aircraft equipment under leases that have not previously been rejected prior to the Effective Date. Among other things, the Debtors will reject leases of all CRJ-200 aircraft (and enter into new restructured leases for aircraft necessary for the Reorganized Debtors to provide services under the assumed ~~U.S.~~US Airways Code-Share Agreement as amended by the ~~U.S.~~US Airways Tenth Amendment and the United Code-Share Agreement), thirty-six (36) ERJ-145 aircraft and ten (10) Dash-8 aircraft.

## 9. CRJ 700 Aircraft Leases and CRJ 900 Aircraft Leases

The CRJ 700 Aircraft Leases and CRJ 900 Aircraft Leases will be assumed as provided under Section 7 of the Plan. Upon assumption, the CRJ 700 Aircraft Leases and CRJ 900 Aircraft Leases shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with the applicable terms of the foregoing leases. ~~.~~

## 10. Collective Bargaining Agreements

Notwithstanding anything in ~~this~~the Plan to the contrary, each Collective Bargaining Agreement shall be deemed assumed effective as of the Effective Date. Each Collective Bargaining Agreement assumed pursuant to this Section shall vest in and be fully enforceable by

the applicable Post-Effective Date Debtor in accordance with its terms, except as modified by the provisions of ~~this~~the Plan or any order of the Bankruptcy Court previously entered with respect to such Collective Bargaining Agreement. The Assumption Obligations for each of the Collective Bargaining Agreements shall be satisfied by the Reorganized Debtors paying in the ordinary course all obligations arising under the Collective Bargaining Agreements, including grievance settlements and arbitration awards~~; *provided, however,* that any payments on account of the *Settlement Agreement and Mutual Releases*~~ unless otherwise agreed between the Debtors and the ~~ALPA, dated May 2010 shall be limited to distributions provided under the Plan~~counterparty to the Collective Bargaining Agreement.

### 11. Key Employment Agreements

Notwithstanding anything in ~~this~~the Plan to the contrary, each Key Employment Agreement shall be deemed assumed along with the guarantees thereof by the other Reorganized Debtors, each as modified pursuant to terms agreed upon among the Debtors, the Committee, and the affected employee, effective as of the Effective Date. The guarantee of the Key Employment Agreements by Nilchii shall be subordinate to the payment of the New 8% Notes (Series A), US Airways Notes, New 8% Notes (Series B) and Management Notes. The prepetition amounts in the Deferred Compensation Plan Accounts shall remain in place for the benefit of the employees for which such accounts were established. As a result of such assumption, the beneficiaries of such Key Employment Agreements will be paid outstanding prepetition payments on the Effective Date and all other prepetition contingent claims (*i.e.*, those arising from the modification) of the officers that are parties to such agreements shall be deemed satisfied to the extent not satisfied by the Management Equity Pool. Each Key Employment Agreement and the guarantees thereof shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of ~~this~~the Plan or any order of the Bankruptcy Court previously entered with respect to such Key Employment Agreement.

### 12. ACE Insurance Program

Notwithstanding anything to the contrary in the Plan or Confirmation Order (including, without limitation, any other provision that (i) purports to be preemptory or supervening or grants an injunction or release or (ii) provides for an Administrative Claim Bar Date or requires a creditor to file an objection to proposed Assumption Obligations), on the Effective Date (a) the ACE Insurance Program and the Debtors' obligations thereunder shall be deemed and treated as executory contracts and assumed under the Plan by the Debtors pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code and shall continue as obligations of the Reorganized Debtors (b) the ACE Companies' claims under the ACE Insurance Program whether arising prior to the Petition Date, during the Chapter 11 Cases, or after the Effective Date (i) shall continue to be secured by any and all collateral and/or security provided by the Debtors in accordance with the terms and conditions of the ACE Insurance Program, (ii) shall be paid by and enforceable against the Reorganized Debtors in the ordinary course of business after the Effective Date pursuant to and in accordance with the terms and conditions of the ACE Insurance Program, (iii) shall not be discharged, impaired or released by the Plan or Confirmation Order, and (iv) shall be subject to all of the Debtors', the Reorganized Debtors' and the ACE Companies' rights, claims, defenses and remedies under the ACE Insurance Program and applicable non-bankruptcy law; (c) nothing in the Plan or Confirmation Order shall be construed as, or is, a determination as to coverage

under the ACE Insurance Program and all rights of the Debtors, Reorganized Debtors, and the ACE Companies shall be preserved to seek or contest such coverage, as applicable; and (d) nothing in the Plan or the Confirmation Order in any way: (i) precludes or limits the rights of the ACE Companies, the Debtors, or the Reorganized Debtors to contest and/or litigate with any party, including, without limitation, the Debtors, Reorganized Debtors, or the ACE Companies, as applicable, the existence, primacy and/or scope of available coverage under any alleged applicable policy under the ACE Insurance Program; (ii) alters the Debtors', Reorganized Debtors', and the ACE Companies' rights and obligations under the ACE Insurance Program or modifies the coverage provided thereunder; or (iii) alters the rights and obligations of the Debtors and the Reorganized Debtors under the ACE Insurance Program, including, without limitation, any duty to defend, at their own expense, against claims asserted under the ACE Insurance Program.

### 13. Debtors' Indemnification Obligations

Any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements entered into any time prior to the Effective Date, to indemnify past and current directors, officers, employees and/or other Agents with respect to present and future actions, suits and proceedings against the Debtors or such directors, officers, employees and/or other Agents, based upon any act or omission by such individuals, shall not be discharged or impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors pursuant to the Plan and shall continue as obligations of the Post-Effective Date Debtors.

### 14. Post-Petition Aircraft Agreements

Notwithstanding anything in the Plan to the contrary, subject to the Debtors' right to terminate or reject any Post-Petition Aircraft Agreement pursuant to the terms of such Post-Petition Aircraft Agreement: (i) each Post-Petition Aircraft Agreement shall remain in place after the Effective Date; and (ii) the Post-Effective Date Debtors shall continue to honor each such agreement according to its terms.

### 15. Customer Programs

Except as otherwise provided in the Plan, the Debtors and the Post-Effective Date Debtors, in their sole and absolute discretion, may honor, in the ordinary course of business, any and all of the Debtors' customer and loyalty programs, corporate incentive programs, travel credit programs, and similar and other customer-related programs, as such programs may be amended from time to time.

### G. Conditions Precedent

The following are conditions precedent to Confirmation of the Plan:

(i)     The Bankruptcy Court will have entered a Final Order approving a Disclosure Statement with respect to the Plan in form and substance satisfactory to the Debtors; and

(ii)     The Confirmation Order will be in a form and substance acceptable to the Debtors and reasonably acceptable to the Committee.

The following are conditions precedent to the occurrence of the Effective Date:

(a)     The Confirmation Date will have occurred;

(b)     The Confirmation Order will be a Final Order;

(c)     No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, if made, remains pending;

(ed)     The Debtors (in consultation with the Committee or Post-Effective Date Committee) will have determined that all Disputed Claims and Estimated Claims have been sufficiently resolved or estimated so as to establish the Distribution Reserve;

(fe)     All actions, documents and agreements necessary to implement the Plan shall have been effected or executed as determined by the Debtors in their sole and absolute discretion; and

(gf)     The Debtors will have received any authorization, consent, regulatory approval, ruling, letter, opinion or other documents that may be necessary to implement the Plan or that is required by any law, regulation or order.

Conditions to Confirmation and the Effective Date may be waived, in whole or in part, by the Debtors at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation of the Plan.

## H.     **Effects of Confirmation**

### 1.     **Binding Effect**

The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the Debtors, the Reorganized Debtors, the Liquidating Debtors, and the Estate Assets. The distributions made pursuant to the Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made. Confirmation of the Plan shall bind and govern the acts of the Post-Effective Date Debtors and all holders of all Claims against, and Interests in the Debtors, whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

### 2.     **Property Revests Free and Clear**

Upon the Effective Date, title to all remaining Estate Assets of the Debtors shall vest in the Post-Effective Date Debtors for the purposes contemplated under the Plan and shall no longer

constitute property of the Debtors' Estates. Except as otherwise provided in the Plan, upon the Effective Date, all Estate Assets shall be free and clear of all Claims and Interests, including Liens, charges or other encumbrances of Creditors of the Debtors.

### 3. **Discharge and Permanent Injunction**

Except as otherwise set forth in the Plan and the US Airways Tenth Amendment, Confirmation of the Plan shall discharge the Debtors and the Reorganized Debtors from all Claims or other debts that arose at any time before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim has accepted the Plan. As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full extent provided under Section 524(a) of the Bankruptcy Code, from "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability" of the Debtors or the Reorganized Debtors, except as otherwise set forth in thisthe Plan. Nothing contained in the foregoing discharge shall, to the full extent provided under Section 524(e) of the Bankruptcy Code, affect the liability of any other entity on, or the property of any other entity for, any debt of the Debtors that is discharged under the Plan.

### 4. **Releases**

#### a. **Release by the Debtors**

As of the Effective Date, the Debtors, their Estates, the Reorganized Debtors and the Liquidating Debtors release all of their respective Agents from any and all Causes of Action and Defenses (other than the rights, if any, of the Debtors, the Reorganized Debtors or the Liquidating Debtors to enforce applicable post-petition agreements (including, without limitation, any settlement agreements), any order entered in the Chapter 11 Cases, the Plan and any agreements, instruments or other documents delivered thereunder, and the Plan Supplement) held, assertable on behalf of or derivative from the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on or relating to or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, and/or the business or contractual arrangements between any Debtor and any Agent thereof, and/or the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, which Causes of Action and Defenses are based in whole or in part on any act, omission, transaction, event or other occurrence (except for willful misconduct, ultra vires acts, or gross negligence) taking place before the Effective Date. Notwithstanding the foregoing, if an Agent of the Debtors, their Estates, the Reorganized Debtors and/or the Liquidating Debtors directly or indirectly brings or asserts any Claim or Cause of Action and Defense in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against the Debtors, the Reorganized Debtors, the Liquidating Debtors or any of their Agents, then the release set forth in

this Section 9.3.1 of the Plan (but not any release or exoneration or any other rights or claims granted under any other section of the Plan or under any other document or agreement) shall automatically and retroactively be null and void *ab initio* with respect to such Agent; provided, however, the immediately preceding clause shall not apply to the prosecution in this Court (or any appeal therefrom) of the amount, priority or secured status of any pre-petition Claim or ordinary course Administrative Claim against the Debtors.

### b.    Voluntary Releases by Holders of Claims

For good and valuable consideration, as of the Effective Date, holders of Claims who (a)(i) voted to accept or reject the Plan and (ii) did not elect (as permitted on the applicable ballots) to opt out of the release described in this Section 9.3.2 of the Plan or (b) failed to properly complete and execute a ballot in connection with voting on the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged all Agents of each of the Debtors, their Estates, the Reorganized Debtors and/or the Liquidating Debtors from any and all Causes of Action and Defenses whatsoever, including derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Agent thereof, and/or the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, which Causes of Action and Defenses are based in whole or in part on any act, omission, transaction, event or other occurrence (except for willful misconduct, ultra vires acts, or gross negligence) taking place before the Effective Date; *provided, however*, the releases in this Section 9.3.2 shall not otherwise affect the limited release as provided under the US Airways Tenth Amendment. The vote or election of a trustee or other agent under this Section 9.3.2 of the Plan acting on behalf of or at the direction of a holder of a Claim shall bind such holder to the same extent as if such holder had itself voted or made such election. A holder of a Claim who did not cast a ballot on the Plan or who was not entitled to cast a ballot shall be deemed to have opted out of the release set forth in this Section 9.3.2.

### 5.    Limitation of Liability

The Debtors, the Reorganized Debtors, the Liquidating Debtors, and each of their respective Agents will have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

### 6.    Exoneration and Reliance

The Debtors, the Reorganized Debtors, the Liquidating Debtors, the Committee, the Indenture Trustees, and each of their respective Agents, shall not be liable, other than for gross negligence, willful misconduct, acts taken in violation of an Order of the Bankruptcy Court entered in the Chapter 11 Cases, or under Section 549 of the Bankruptcy Code, to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection

with the Chapter 11 Cases or the negotiation, formulation, development, proposal, disclosure, Confirmation or implementation of the Plan. The Debtors, the Reorganized Debtors, the Liquidating Debtors, the Committee, the Indenture Trustees, and each of their respective Agents may reasonably rely upon the opinions of their respective counsel, accountants, and other experts and professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or willful misconduct; *provided, however*, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or willful misconduct.

## I.     Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases after the Effective Date to the extent legally permissible, including, without limitation, jurisdiction as to the enumerated matters set forth in Article 10 of the Plan.

## J.     Amendment and Withdrawal of the Plan

At any time before the Confirmation Date, the Debtors may alter, amend, or modify the Plan in consultation with the Committee, subject only to the restrictions on modifications set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. After the Confirmation Date, the Debtors may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, or as otherwise may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Plan; provided, however, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

The Debtors reserve the right to revoke or withdraw the Plan in consultation with the Committee. If the Plan is withdrawn or revoked, then the Plan will be deemed null and void, and nothing contained in the Plan will be deemed a waiver of any Claims by or against the Debtors or any other Person in any further proceedings involving the Debtors or an admission of any sort, and the Plan and any transaction contemplated thereby will not be admitted into evidence in any proceeding.

## K.     Miscellaneous

### 1.     Effectuating Documents; Further Transactions; Timing

The Debtors and the Post-Effective Date Debtors will be authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. All transactions required to occur on the Effective Date under the terms of the Plan will be deemed to have occurred simultaneously.

2.    **Exemption from Transfer Taxes**

In accordance with Section 1146(c) of the Bankruptcy Code, the making, delivery, or recording of a deed or other instrument of transfer under the Plan will not be subject to any stamp tax or similar tax and the appropriate state or local government officials or agents, including, without limitation, the FAA, will be directed to forego the collection of any such tax and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax.

3.    **Modification of Payment Terms**

The Post-Effective Date Debtors may modify the treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such Claim or Interest at any time after the Effective Date upon the prior written consent of the Person whose Allowed Claim or Interest treatment is being adversely affected.

4.    **Quarterly Fees to the United States**
      **Trustee/Post-Confirmation Status Reports**

All fees payable under 28 U.S.C. § 1930(a)(6), and interest and penalties payable under 31 U.S.C. §3717, will be paid by the Debtors in the amounts and at the times such ~~fees~~amounts may become due up to and including the Effective Date. Thereafter, the Post-Effective Date Debtors will pay all fees payable under 28 U.S.C. § 1930(a)(6), and interest and penalties payable under 31 U.S.C. §3717, until the Chapter 11 Cases are closed, dismissed or converted. Upon the Effective Date, the Post-Effective Date Debtors will be relieved from the duty to make the reports required by Bankruptcy Rules 2015 and 2015.3. Notwithstanding the foregoing, the Post-Effective Date Debtors will file and serve the post-confirmation status reports at such times and for such period as required pursuant to Local Bankruptcy Rule 3021-1. The status reports will be made, and the fees will be payable, on a consolidated basis by the Post-Effective Date Debtors.

5.    **Successors and Assigns**

The Plan is binding upon and will inure to the benefit of the Debtors, the Post-Effective Date Debtors, and each of their respective Agents, successors, and assigns, including, without limitation, any bankruptcy trustees or estate representatives.

6.    **Severability of Plan Provisions**

If, prior to Confirmation, any non-material term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may

have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. In addition, in the event that certain Debtors are excluded from the scope of the Plan or the Plan is determine to be invalid, void or unenforceable as to such Debtors, the remaining provisions of the Plan will remain valid and enforceable against the remaining Debtors to the Plan.

### 7. Conflict of Terms

In the event of a conflict between the terms of the Plan and this Disclosure Statement, the terms of the Plan will control.

**V.**
**OTHER IMPORTANT INFORMATION REGARDING THE PLAN**

### A. Potential Litigation

### 1. Avoidance Action Waiver

The Debtors filed their Schedules listing all transfers that the Debtors made within ninety days of the Petition Date and all transfers to insiders made by the Debtors within one year of the Petition Date, which may be the subject of an Avoidance Action. A preliminary evaluation led the Debtors to believe that any potential recoveries from Avoidance Actions are very uncertain in light of, among other things, the various defenses that would likely be asserted and are not aware of any possible Avoidance Actions that could materially increase the recovery of the General Unsecured Creditors in the aggregate. Accordingly, in connection with the formulation of the terms of the Plan, and as additional consideration to the General Unsecured Creditors thereunder, the Debtors and the Committee have agreed to waive the right to pursue Avoidance Actions under section 547 of Bankruptcy Code and such right to pursue Avoidance Actions shall be deemed waived as of the Effective Date.

### 2. Other Potential Litigation Recoveries

The Debtors and the Committee have been reviewing available information regarding potential causes of action against third parties, which review is ongoing and which will continue to be conducted by the Debtors and/or their respective successors or representatives after the Effective Date. Due to the size and scope of the business operations of the Debtors and the multitude of business transactions therein, there may be various causes of action that currently exist or may subsequently arise in addition to any matters identified herein. The potential net proceeds from the potential causes of action identified herein or that may subsequently arise or be pursued are speculative and uncertain.

Existing or potential causes of action that may be pursued by the Debtors and/or their respective successors or representatives (as applicable) include, without implied limitation, the following: (a) all Causes of Action and Defenses identified in **Exhibit C** to the Plan;[15] (b) any

---

[15] Exhibit C to the Plan is a non-exclusive list of potential or actual Causes of Action and Defenses that the Debtors, the Reorganized Debtors and/or the Liquidating Debtors have asserted or may potentially assert. The Debtors reserve their right to modify such list to amend such Causes of Action and Defenses or otherwise update the list, but disclaim any obligation to do so.

other causes of action against current or former officers, directors, and/or employees of the Debtors, including without implied limitation, any pending or potential claims with respect to directors and officers' insurance coverage for the Debtors' current or former officers and directors; (c) any and all causes of action relating to the matters listed on the Debtors' Schedules; (d) any other litigation, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation: disputes with vendors and customers, overpayments, any amounts owed by any creditor, vendor or other entity, employee, management, or operational matters, disputes with current or former employees, financial reporting, environmental matters, insurance matters, accounts receivable, contractual obligations, or tort claims that may exist or subsequently arise; and (e) any causes of action not expressly identified in **Exhibit C** to the Plan.

### 3. Estimation of Claims

The Debtors and/or their respective successors or representatives under the Plan may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Reorganized Debtors, and/or their successors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors and/or their respective successors or representatives under the Plan may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

### B. Risk Factors

Although the Debtors believe that the Plan is confirmable, there are some risks to the performance of the Plan. Certain specific risks to performance of the Plan are described below. Additionally, because of the significant issues that must be addressed with respect to the allowance of Claims, there may be significant delay before any distribution is made on account of Allowed Claims. However, the Debtors believe the very same risks described herein are present in, and significantly greater to Creditors in, Chapter 7 cases.

### 1. The Chapter 7 Liquidation Analysis and Financial Projections Are Based on Estimates and Numerous Assumptions

Underlying the Chapter 7 Liquidation Analysis attached hereto as **Exhibit D** and the Financial Projections attached hereto as **Exhibit E** are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to economic, business and competitive uncertainties and contingencies beyond the Debtors' control. Accordingly, there can be no assurance that the values assumed in the Chapter 7 Liquidation Analysis or Financial Projections will be realized. Further, the Financial Projections and related

information are based upon a hypothetical business model, and the projections underlying **Exhibit E** do not take into account present values.

### 2.    The Debtors May Not Be Successful With Respect to Contested Claims

If the Debtors, the Reorganized Debtors, and/or their successors or representatives under the Plan are unsuccessful in their objections to contested and contingent Claims that have been filed against the Estates or their Avoidance Actions, the Estates' total liabilities will be greater than expected, and there may be less cash available for distribution to holders of unsecured non-priority Claims. The Debtors and their successors intend to vigorously oppose the allowance of all Claims that they believe are either entirely or in part without merit and prosecute avoidance and other actions not waived pursuant to the Plan. However, if the Debtors' or their successors' objections and actions are not upheld by the Bankruptcy Court, and the applicable Claims are allowed in amounts in excess of the amounts that have been accrued by the Debtors, the total liabilities of the Debtors will be greater than expected, and there will be less cash than expected available for distribution to Creditors.

### 3.    Litigation Recoveries and Results Are Highly Speculative and Uncertain

The success of the Debtors and/or their respective successors or representatives under the Plan in pursuing Avoidance Actions and/or other Causes of Action and Defenses is speculative and uncertain. Litigation may be complex and involve significant expense and delay. Furthermore, even if successful in the causes of action, in some cases, the Debtors and/or their respective successors or representatives under the Plan may encounter difficulty in collection. Although potential litigation recoveries are not included in the Debtors' Financial Projections or Chapter 7 Liquidation Analysis, such recoveries may have a significant impact upon the distributions that may be made to Creditors.

### 4.    Risks Related to Any Securities Issued Pursuant to the Plan

As discussed above in Section IV.D.11-12 and IV.E.4.c, the Restructured Equity may be subject to certain ownership change restrictions. Such restrictions may potentially limit a holder's ability to freely sell his/her/its securities and may hamper the development of any market for the Restructured Equity. The Debtors cannot ensure that any market for the Restructured Equity and/or any other securities, if any, issued pursuant to the Plan (including, without limitation, any Restructured Equity that are reserved for purposes of management/employee compensation or incentives, if and to the extent they are deemed to constitute securities under applicable law) will develop in the foreseeable future.

Further, as discussed in Section IV.D.10 hereof, the Debtors and/or their respective successors or representatives may be required to adhere to certain reporting, registration and/or filing requirements under federal and state securities laws, the Trust Indenture Act of 1939, as amended, and/or other applicable statutes and regulations. Such requirements may potentially delay the occurrence of the Effective Date and/or the implementation of certain provisions of the Plan.

**5. There is a Risk that the Plan will not be
Confirmed if the Debtors Cannot Satisfy Administrative
Expense Claims in the Manner Required by the Bankruptcy Code**

There is risk that the Bankruptcy Court could delay confirmation of the Plan until the Debtors resolve certain Administrative Expense Claims asserted against the Debtors. As of the date of this Disclosure Statement, approximately $45.8 million of Administrative Expense Claims had been asserted against the Debtors' estates on account of surrender and return condition claims asserted pursuant to section 1110 of the Bankruptcy Code and other asserted postpetition breaches (collectively, the "Asserted Aircraft Administrative Claims"). See Section III.E. The Debtors anticipate that certain aircraft counterparties will assert additional Asserted Administrative Claims. As of November 1, 2010, the Debtors project they will hold approximately $50.5 million in Cash on Hand. See Section II.G.2.

In certain instances, the holders of the Asserted Aircraft Administrative Claims indicate that such claims were filed as a protective measure but provide no specific dollar amount or factual support for such claim. The Debtors have objected to such claims. See Section III.E.2. The holders of approximately $45.8 million of Asserted Aircraft Administrative Claims provided the Debtors with detailed reports or other information in support of their claims that catalogued the asserted deficiencies (and accompanying claim amounts) with respect to the surrender and return of certain aircraft and other asserted postpetition breaches. The Debtors believe that the aircraft-related Asserted Aircraft Administrative Claims are without merit and believe they will be successful in contesting the validity of such claims. There is a possibility that the litigation to contest such claims could be a multi-month process (if not longer with the possibility of appeals) that could delay the confirmation process and that the costs to the estates will further diminish the Cash on Hand. If the Debtors are not successful in contesting the Asserted Aircraft Administrative Claims, or reaching a consensual resolution with the holders of the Asserted Administrative Expense Claims to reduce such claims and/or to accept treatment other than payment in full in cash, there is a possibility that Confirmation of the Plan could be delayed so that the Debtors can address Asserted Aircraft Administrative Claims and the requirements under section 1129(a)(9) of the Bankruptcy Code.[16]

Absent a successful resolution of litigation to reduce the Asserted Aircraft Administrative Claims or a consensual resolution prior to the Confirmation Hearing, it is anticipated that at least certain holders of Asserted Aircraft Administrative Claims will object to confirmation of the Plan and/or request that the Bankruptcy Court require the Debtors to reserve cash in an amount equal to 100% of the Asserted Administrative Claims. However, in light of the Debtors' belief that the Asserted Aircraft Administrative Claims are without merit and the impact any delay could have on the Debtors' business operations, the Debtors reserve their rights to seek to have the Bankruptcy Court estimate Asserted Aircraft Administrative Claims for purposes of Confirmation. Certain claimants are likely to object to any estimation of their Asserted Aircraft Administrative Claims.

---

[16] Pursuant to section 1129(a)(9) of the Bankruptcy Code, unless the holder of an administrative agrees otherwise, a plan must provide that, on the effective date of the plan, the holder of such administrative claim will receive on account of such claim cash equal to the allowed amount of such claim. 11 U.S.C. § 1129(a)(9).

## 6. Risks Related to the US Airways Tenth Amendment

As provided under the US Airways Tenth Amendment, if (a) the Plan is not confirmed by the January 17, 2011 (which date may be extended to March 18, 2011 if the Plan has not been confirmed despite the Debtors' best efforts) in a form approved by US Airways as described in the US Airways Tenth Amendment or (b) the Plan has not become effective on or before February 17, 2011 or (c) the US Airways Tenth Amendment is approved by the Bankruptcy Court and is thereafter modified, vacated, stayed or amended without US Airways' consent (such consent to be granted or withheld in US Airways' sole discretion), US Airways shall have the right to declare the order approving the US Airways Tenth Amendment vacated and of no further effect.

Commencing on a date 30 days after the occurrence of the (a) or (b) in the immediately preceding paragraph, if US Airways has not elected to vacate the order approving the US Airways Tenth Amendment, the Debtors shall have the right to make the same vacatur. Upon a vacatur by either US Airways or the Debtors, (x) US Airways shall retain all amounts under the US Airways Tenth Amendment that would have otherwise been due to the Debtors had the order approving the US Airways Tenth Amendment not been entered and such amounts shall not be subject to disgorgement, set-off, offset, recovery or return, (y) US Airways and the Debtors shall have all of their respective rights under the US Airways Code-Share Agreement (including the Debtors' right to assume the US Airways Code-Share Agreement and US Airways' right to contest such assumption) and (z) the new payment terms under the US Airways Tenth Amendment shall survive any assumption of the US Airways Agreement and remain in effect without modification.

## 7. Sublease Projections for CRJ 700 Aircraft

In the event the United Code-Share Agreement is not extended or the related aircraft are not put into service by the Debtors with another carrier, the Debtors intend to sublet their CRJ 700 aircraft. If such aircraft are sublet, the Debtors have assumed the monthly sublease rate of $150,000 per aircraft in determining projected sublease revenue for CRJ 700 aircraft. This assumption is based in part upon market lease rate estimates provided by a third-party consultant that show a monthly lease rate range between $140,000 and $155,000 for aircraft of the same vintage as the Debtors' CRJ 700 aircraft. The Debtors believe their CRJ-700 aircraft should command comparable or even slightly higher lease rates due to the dual-class seating configuration. Most major airlines, including United, Delta, and American Airlines, have moved to offer dual-class seating on routes served by CRJ-700 aircraft.

The projected sublease revenues also include maintenance reserves to be paid by the sublessee based upon utilization levels of the aircraft. The maintenance reserve rates are consistent with maintenance reserves currently paid by the Debtors for their leased engines. In addition, the utilization levels for the CRJ 700 aircraft are consistent with those currently flown under the United Code-Share Agreement.

After CRJ 700 aircraft are removed from revenue service with United, the Debtors have assumed an average three (3) month period before such aircraft could be placed into service

under a new sublease. This time will be necessary to complete maintenance and preparation work prior to subletting.

A sensitivity analysis of the financial impact to the Debtors' projections from changes to its sublease assumptions is shown in the chart below. As an example, if the idle time on average was only one (1) month and the average sublease rate was $155,000 per month, the Debtors' projected income would improve by $6.9 million. If, however, the idle time is five (5) months on average and the sublease rate is $140,000 per month, the Debtors' projected income would be reduced by $8.7 million.

| POR Projections: Impact to CRJ-700 Sublease Income | | | | | |
|---|---|---|---|---|---|
| ($ in millions) | | | | | |
| | | | Idle Months | | |
| Sublease Rate | 1 | 2 | 3 | 4 | 5 |
| $140,000 | ($0.3) | ($2.4) | ($4.5) | ($6.6) | ($8.7) |
| 145,000 | 2.1 | (0.1) | (2.2) | (4.4) | (6.6) |
| 150,000 | 4.5 | 2.3 | 0.0 | (2.2) | (4.5) |
| 155,000 | 6.9 | 4.6 | 2.3 | (0.1) | (2.4) |

## C. Certain Federal Income Tax Consequences of the Plan

### 1. Introduction

The following discussion summarizes the material Federal income tax consequences of the transactions that are described herein and in the Plan to the holders of Allowed Claims and holders of Interests. This disclosure is provided for information purposes only; it is not intended to constitute legal or tax advice to any person. The disclosure does not take into account those facts and circumstances specific to individual Creditors and/or holders of Interests that may affect the tax consequences to them of the Plan. This summary is based upon the Tax Code, the Treasury Regulations, judicial authority and current administrative rulings and practice now in effect.

This summary does not apply to a holder of Claims or Interests that is not a "United States person" (as defined in the Tax Code). This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. Federal income taxation that may be relevant to holders of Claims and Interest in light of their individual circumstances or to holders of Claims and Interests that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees, persons who received their Claims as compensation, persons who hold Claims or Interests or who will hold the New Common Stock or New Warrants, persons using a mark-to-market method of accounting, and holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this summary assumes that each holder of a Claim or Interest holds only Claims or Interests in a single Class and holds such Claims or Interests only as a "capital asset" (within the meaning of Section 1221 of the Tax Code).

Under the Tax Code and Treasury Regulations, there are certain significant Federal income tax consequences associated with the Plan for the Debtors, Creditors, and holders of Interests in the Debtors. Due to the lack of definitive judicial or administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. Certain tax consequences described below are subject to significant uncertainty due to (i) the complexity of the transactions contemplated by the Plan, (ii) the uncertainty as to the tax consequences of events in prior years, (iii) the differences in nature of the Claims of the various Creditors, their taxpayer status, residence and methods of accounting, and (iv) the possibility that events or legislation subsequent to the date hereof could change the Federal tax consequences of the transactions. As noted above, there may also be state, local, or foreign tax issues that may affect particular Creditors and holders of Interests. No opinion of counsel has been obtained, the Debtors do not intend to seek a ruling from the IRS as to any such tax consequences, and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

In addition, this discussion assumes that the Claims, the New 8% Notes, Management Notes, and ~~U.S.~~US Airways Note, constitute debt and the New Warrants should be treated as stock, each for U.S. Federal tax purposes. As discussed above in section IV.D.5, the Debtors are exploring Alternative Transactions to maximize the going concern value of the Reorganized Debtors and Liquidating Debtors estates.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT HIS, HER, OR ITS TAX ADVISOR CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**PURSUANT TO <u>U.S. TREASURY DEPARTMENT CIRCULAR 230</u>, WE ARE INFORMING YOU THAT (A) THIS DISCUSSION IS NOT INTENDED AND WAS NOT WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE U.S. FEDERAL TAX LAWS THAT MAY BE IMPOSED ON THE TAXPAYER, (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE DEBTORS SOLICITING ACCEPTANCES OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT, AND (C) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### 2. <u>U.S. Federal Tax Consequences to the Debtors</u>

#### a. <u>General</u>

For U.S. Federal income tax purposes, the Debtors are members of the Mesa Tax Group. The Mesa Tax Group reported consolidated NOL carryforwards as of its tax year ending September 30, 2009 for U.S. Federal income tax purposes of over $250,000,000. The Mesa Tax Group may report additional tax losses for its taxable year ending September 30, 2010, which are

dependent upon both operating results and appropriate tax consequences of certain extraordinary transactions that have occurred during the pendency of Chapter 11 Cases. As of the date of this Disclosure Statement, the Debtors have not determined the amount of the Mesa Tax Group's NOL carryforwards and other tax attributes which remain subject to further review. In this regard, the amount of the Mesa Tax Group's NOL carryforwards and current year losses are not known but are expected to be reduced. In addition, the Mesa Tax Group's subsequent utilization of any NOL carryforwards remaining and possibly certain other tax attributes may be restricted prior to and following the Effective Date due to, for example, one or more limitations imposed under section 382 of the Tax Code.

### b. Tax Consequences Resulting from the Cancellation of Debt

As a result of the Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor recognizes COD income upon discharge of its outstanding indebtedness for an amount of consideration less than its adjusted issue price. The Tax Code provides that a debtor in a bankruptcy case may exclude COD income from income but generally must reduce certain of its tax attributes by the amount of any COD income realized as a result of consummation of a plan of reorganization.

The exact amount of COD income that the Debtors will realize is unclear. The amount of COD income realized by a taxpayer is generally the excess of (i) the adjusted issue price of any indebtedness discharged, over (ii) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other consideration (including any stock and warrants) given in exchange therefor, subject to certain statutory and judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled indebtedness would have given rise to a tax deduction). The extent of such COD income realized by the Debtors (and the resulting tax attribute reduction) will therefore depend significantly on the value of the New Common Stock and New Warrants distributed pursuant to the Plan. These values cannot be known with certainty until after the Effective Date. Thus, although it is expected that there will be a material reduction in the Debtors' tax attributes as a result of the Debtors' COD income, the exact amount of such reduction cannot be predicted with certainty.

In general, tax attributes must be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (e) foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Tax Code, with any remaining balance applied to the other tax attributes in the order stated above. At this time it is not clear whether the Debtors will make the election under section 108(b)(5) of the Tax Code with respect to any portion of the COD income.

In the context of a consolidated group of corporations, like the Debtors, the Tax Code provides for a complex ordering mechanism to determine how the tax attributes of one member can be reduced in respect of the COD income of another member of that same group. The reduction in tax attributes occurs only after the determination of the debtor's tax for the year in which the discharge of indebtedness occurs. To the extent that the amount of excluded COD income exceeds a Debtor's tax attributes available for reduction, the remaining excluded COD

income may reduce tax attributes (e.g., NOLs) of other Debtors within the Mesa Tax Group. To the extent that COD income of all Debtors within the Mesa Tax Group exceeds attributes available for reduction under these rules, the excess COD income is nevertheless generally excluded from the Debtors' taxable income.

At this time, it is not known the extent to which the Debtors' NOL carryforwards and other tax attributes will be preserved or eliminated under the application of these rules. Accordingly, it is not known what portion of Debtor tax attributes, including NOLs, will or will not be available to offset any future taxable income of the Reorganized Debtors.

Under section 108(i) of the Tax Code and applicable guidance, the Debtors can, in certain circumstances, elect to defer, rather than exclude, any portion of realized COD income from taxable income. Deferred COD income under this rule would be included in the Debtors' taxable income ratably over the five taxable-year period starting in 2014. This election is irrevocable. To the extent COD income is designated to be deferred under this rule, the Debtors would not be required to reduce their tax attributes but would have COD income includible in gross income in future tax years. A determination has not yet been made as to whether or the extent to which such an election will be made on behalf of any Debtor realizing COD.

### c. Limitation of Net Operating Loss Carryovers and Other Tax Attributes

#### i. General Section 382 Limitations

Under section 382 of the Tax Code, if a corporation or a consolidated group of corporations with NOLs (a "loss corporation") undergoes an ownership change, the loss corporation's use of its pre-change NOLs (and certain other tax attributes) generally will be subject to an annual limitation in the post-change period. In general, an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty (50) percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "Ownership Change"). The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a loss corporation's use of its pre-change NOLs (and certain other tax attributes) is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the loss corporation's outstanding· stock immediately before the Ownership Change (excluding certain capital contributions). If a loss corporation has net unrealized built-in gain ("NUBIG") immediately prior to the Ownership Change, the annual limitation may be increased as certain gains are recognized during the subsequent five-year period. If a loss corporation has a net unrealized built-in loss ("NUBIL") immediately prior to the Ownership Change, certain losses recognized during the subsequent five-year period also would be subject to the annual limitation and thus would reduce the amount of pre-change NOLs that could used by the loss corporation during the five-year period.

A NUBIG or NUBIL is generally the difference between the fair market value of a loss corporation's assets and its tax basis in the assets, subject to a statutorily-defined threshold amount. The amount of a loss corporation's NUBIG or NUBIL must be adjusted for built-in items of income or deduction that would be attributable to a pre-change period if recognized during the five-year period beginning on: the Ownership Change date (the "<u>Recognition Period</u>"). The NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules.

If a loss corporation has a NUBIG immediately prior to an Ownership Change, any recognized built-in gains ("<u>RBIGs</u>") will increase the annual limitation in the taxable year the RBIG is recognized. An RBIG generally is any gain (and certain income) with respect to an asset held at the time of the Ownership Change that is recognized in any taxable year any portion of which is within the Recognition Period. The amount of an RBIG is limited to the lesser of (i) the excess of the fair market value of the asset over its tax basis immediately prior to the Ownership Change or (ii) the NUBIG less the amount of RBIGs from prior years ending during the Recognition Period. On the other hand, if a loss corporation has a NUBIL immediately prior to an Ownership Change, any recognized built-in losses ("<u>RBILs</u>") will be subject to the annual limitation in the same manner as pre-change NOLs. An RBIL generally is any loss (and certain deductions) with respect to an asset held at the time of the Ownership Change that is recognized in any taxable year any portion of which is within the Recognition Period. The amount of an RBIL is limited to the lesser of (i) the excess of the tax basis of the asset over its fair market value immediately prior to the Ownership Change or (ii) the NUBIL less the amount of the RBILs from prior years ending during the Recognition Period.

## ii.     <u>Overview of Certain Prepetition Section 382 Matters</u>

The Debtors believe they experienced an Ownership Change during February 2009. As a result of such change, the Debtors' use of their consolidated NOLs and AMT NOLs (and possibly other tax attributes) is subject to an annual limitation.

Further Ownership Changes prior to the Effective Date would also result in an annual limitation on the Debtors' use of their consolidated NOLs and AMT NOLs (and possibly other tax attributes) attributable to the period prior to such date (including those tax attributes generated prior to the February 2009 Ownership Change). The Debtors are in the process of evaluating whether one or more Ownership Changes in addition to the February 2009 Ownership Change occurred or is expected to occur prior to the Effective Date.

## iii.     <u>Special Bankruptcy Exceptions to Section 382</u>

The consummation of the Plan is expected to cause an Ownership Change with respect to the Debtors on the Effective Date. Accordingly, IRC Section 382 would generally apply to limit the Debtors' use of any remaining pre-change NOLs after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD income and the consequences any prior Ownership Changes. The Ownership Change resulting from the consummation of the Plan is subject to one

of the special bankruptcy rules of IRC Section 382(l)(5) or IRC Section 382(l)(6) described below.

Under IRC Section 382(l)(5), an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's pre-change NOLs if the stockholders or qualified creditors of the debtor receive at least 50% of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor. Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the effective date of the bankruptcy reorganization. However, if any pre-change NOLs (and certain other tax attributes) of the debtor already are subject to an annual usage limitation under IRC Section 382 at the time of an Ownership Change subject to IRC Section 382(l)(5), those NOLs (and certain other tax attributes) will continue to be subject to such limitation(s).

A qualified creditor is any creditor who has held the debt of the debtor for at least eighteen (18) months prior to the petition date or who has held "ordinary course indebtedness" at all times since it has been outstanding. A creditor who does not become a direct or indirect five (5) percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt owned immediately before the Ownership Change, unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period.

A debtor may elect not to apply IRC Section 382(l)(5) to an Ownership Change that otherwise satisfies its requirements. This election must be made on the debtor's Federal income tax return for the taxable year in which the Ownership Change occurs. If section 382(l)(5) of the Tax Code applies to an Ownership Change (and the debtor does not elect out), any subsequent Ownership Change of the debtor within a two (2) year period will result in the debtor being unable to use any pre-change losses in any tax year ending after such subsequent Ownership Change to offset future taxable income. In this regard, the exchange of New Common Stock and New Warrants and any subsequent transfers thereof may increase the likelihood of an Ownership Change.

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of Section 382(l)(5) of the Tax Code, or if a debtor elects not to apply IRC Section 382(l)(5), the debtor's use of its pre-change NOLs (and certain other tax attributes) will be subject to an annual limitation as determined under IRC Section 382(l)(6). In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (3.99% for September 2010) and the value of the debtor's outstanding stock immediately *after the* bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. As described above, depending on whether the debtor has a NUBIG or NUBIL immediately prior to the Ownership Change, the annual limitation would be increased by any RBIGs, or would also apply to any RBILs, during the Recognition Period. However, if any pre-change NOLs (and certain other tax attributes) of the debtor already are subject to one or more annual limitations at

the time of an Ownership Change subject to IRC Section 382(*l*)(6), those NOLs (and certain other tax attributes) will be subject to the lowest of the applicable annual limitations.

The Debtors are unable to determine at this time whether the Ownership Change expected to result from the consummation of the Plan may satisfy the requirements of section 382(*l*)(5) of the Tax Code, as such determination will depend on the extent to which holders of General Unsecured Claims immediately prior to consummation of the Plan may be treated as qualified creditors for purposes of section 382(*l*)(5) of the Tax Code. If section 382(*l*)(6) of the Tax Code applies, the Debtors' pre-change NOLs and certain other tax attributes remaining after reduction for excluded COD income will be subject to an annual limitation generally equal to the product of the long-term tax-exempt rate for the month of the Effective Date and the value of the Debtors' outstanding stock immediately after consummation of the Plan, prior to giving effect to the NUBIG and NUBIL rules described above. Additionally, the Debtors NOLs and other tax attributes may also be subjected to a limitation imposed on one or more ownership changes preceding the Ownership Change resulting from the consummation of the Plan. At this time, the Debtors are unable to predict whether they will have a NUBIG or NUBIL that will exceed the statutorily-defined threshold amount on the Effective Date. NOLs (and certain other tax attributes) not utilized in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates. To the extent the Reorganized Debtors' annual limitation exceeds the consolidated group's taxable income in a given year, the excess will increase the annual limitation in future taxable years.

### d. **Alternative Minimum Tax**

In general, an AMT is imposed on a corporation's U.S. Federal AMTI at a 20% tax rate to the extent such tax exceeds the corporation's regular Federal income tax for the taxable year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation is generally allowed to offset 90% of its AMTI by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an Ownership Change and has a NUBIL (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the ownership change date. The IRS has taken the position that this provision would apply even if a corporation otherwise qualifies for, and avails itself of, the special bankruptcy provision to the annual limitation rules of section 382 discussed in the previous section.

Any AMT that a U.S. corporation pays generally will be allowed as a nonrefundable credit against its regular Federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

3.  **U.S. Federal Tax Consequences to Creditors and Holders of Interests**

    a.  **Consequences to Creditors**

        i.  **General**

Whether a debt instrument constitutes a "security" for U.S. Federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for Federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. However, each holder of a Claim should consult with its own tax advisor to determine whether or not the debt instrument underlying its Claim is a "security" for U.S. Federal income tax purposes.

        ii. **Consequences to Holders of
            Claims That Do Not Constitute Securities**

Pursuant to the Plan, each holder of an Allowed Claim will receive, in full and final satisfaction of such Claim (i) a combination of New Common Stock and New 8% Notes (Series B) (Class 3 and Class 5), (ii) New Warrants and New Notes (Class 3 and Class 5), (iii) New 8% Notes (Series A) (Class 6), (iv) cash (Class 2 and Class 4). Whether a holder of such Claims recognizes gain or loss, in whole or in part, as a result of the exchange under the Plan depends, in part, on whether (a) the debt instrument constituting a surrendered Claim constitutes a "security" for U.S. Federal income tax purposes, (b) the New Notes and New Warrants constitute a "security" for U.S. Federal income tax purposes, (c) the holder of the Claim purchased such Claim at a discount, (d) the holder of the Claim has previously included in income any accrued but unpaid interest with respect to the surrendered Claim, and (e) the holder has claimed a bad debt deduction or worthless security deduction with respect to the surrendered Claim.

For a discussion of the tax consequences of any Claim for accrued but unpaid interest, *see* Section V.C.3.iv, below ("Distributions in Discharge of Accrued But Unpaid Interest").

        iii. **Consequences to Holders of Claims That Constitute Securities**

A Holder of a General Unsecured Claim that receives Cash, New Common Stock, or New Warrants, if the debt instrument constituting the surrendered Claim is treated as a "security" for purposes of the reorganization provisions of the Tax Code (see below, "Treatment of a Debt Instrument as a Security") generally will not recognize loss with respect to the exchange and will not recognize any gain except (i) to the extent any of the Cash, New Common Stock, or New Warrants is treated as received in satisfaction of accrued but unpaid interest on the debt

instruments underlying the surrendered Claim (see "Accrued Interest" below ) and (ii) to the extent not treated as received in satisfaction of accrued but unpaid interest pursuant to the preceding clause, in an amount equal to the amount of Cash received (but not in excess of the amount of realized gain). Such holder should obtain a tax basis in its New Common Stock or New Warrants equal to its tax basis in the debt instruments constituting the Claim surrendered therefor, increased by the amount of gain recognized pursuant to clause (ii) of the preceding sentence, and such holder should have a holding period for its New Common Stock or New Warrants that includes the holding period of the debt instruments constituting the Claim surrendered therefor; provided, that a holder's tax basis in any New Common Stock or New Warrants is treated as received in satisfaction off accrued interest should equal the amount of such accrued interest, and the holding period for any such New Common Stock or New Warrants should not include the holding period of the debt instruments constituting the surrendered Claim.

It should be noted, however, that a tax-free treatment of an exchange of a "security" for purposes of the reorganization provisions of the Tax Code is dependent upon the Plan qualifying as a reorganization under the Tax Code. It is uncertain whether the exchange of a security held by creditors of a subsidiary member of a consolidated group of debtors, such as the Mesa Tax Group, for consideration that included voting stock of the parent corporation can be considered a reorganization.

A holder of a General Unsecured Claim (who holds only a General Unsecured Claim) whose debt instrument constituting such holder's Claim is not treated as a security for purposes of the reorganization provisions of the Tax Code will be treated as exchanging its Claim in a fully taxable exchange. In that case, a holder should recognize (a) gain or loss equal to the difference between (i) the fair market value as of the Effective Date of any consideration received for such Claim that is not allocable to accrued interest and (ii) the holder's tax basis in the debt instruments constituting the Claim surrendered therefor. Such gain or loss should be capital in nature (subject to the rules described below in "Market Discount") and should be long-term capital gain or loss if the surrendered Claim was held for more than one year by the holder. To the extent that any amount of New Common Stock, New Warrants, or Cash received in the exchange is allocable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the holder may recognize ordinary interest income (see below "Accrued Interest"). A holder's tax basis in any New Common Stock or New Warrants received on the Effective Date should equal the fair market value of such New Common Stock or New Warrants as of the Effective Date and a Holder's holding period for any New Common Stock or New Warrants received on the Effective Date should begin on the day following the Effective Date.

iv.     **Distributions in Discharge of Accrued But Unpaid Interest**

To the extent that any amount received by a holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the holder as ordinary interest income to the extent not already taken into income by the holder. Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, write-off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the holder's gross income but was not paid in full by the applicable Debtor(s). Such loss may be ordinary, but the law is unclear on this point.

The extent to which an amount received by a holder of a Claim will be attributable to accrued interest on the debt instrument constituting the Claim is unclear. Certain Treasury Regulations treat a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such claim, to the extent otherwise permitted and as determined for U.S. Federal income tax purposes; and thereafter to the remaining portion of such Claim, if any. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

v.     <b><u>Market Discount</u></b>

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" that accrued on the debt instruments constituting the Claim while held by the holder. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument with original issue discount, its adjusted issue price, in the case of (i) and (ii), by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

To the extent the debt instruments constituting a surrendered Claim had been acquired with mark discount and are exchanged for any New Common Stock or New Warrants in a reorganization, any market discount that accrued on such debt instruments but was not recognized by the holder may cause any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such New Common Stock or New Warrants to be treated as ordinary income to the· extent of the accrued but unrecognized 'market discount with respect to the exchanged Claim.

b.     <b>U.S. Federal Tax Consequences to<br>the Holders of Interests in the Debtors</b>

Holders of Interests, which is being cancelled under the Plan, generally will be entitled to claim a worthless stock deduction (assuming that the taxable year that includes the Plan is the same taxable year in which the Interests first became worthless) in an amount equal to the holder's adjusted basis in the Interests. A worthless stock deduction is a deduction allowed to a holder of a corporation's stock (that is a capital asset in the hands of such holder) for the taxable year in which such stock becomes worthless, for the amount of the loss resulting therefrom. A worthless stock deduction is treated as a loss from the sale or exchange of a capital asset.

SINCE THE FINAL TAX TREATMENT OUTCOME DEPENDS ON EACH INTEREST HOLDER'S SPECIFIC SITUATION, HOLDERS OF INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE TAX IMPLICATIONS

TO THEM WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN AND THEIR SPECIFIC SITUATION.

### c.     **Information Reporting and Back-up Withholding**

Payments under the Plan in respect of Allowed Claims may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding of taxes will generally apply to payments in respect of an Allowed Claims under the Plan if the holder of such Claim fails to timely provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. Federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS (generally, a Federal income tax return).

## VI.
## REQUIREMENTS FOR CONFIRMATION

Section 1129 of the Bankruptcy Code sets forth the requirements that must be satisfied to confirm a plan of reorganization. A number of the more significant Confirmation requirements are discussed in this Section VI of the Disclosure Statement. The Debtors believe that they have complied or will comply with each of these requirements.

### A.     **Good Faith and Compliance with Law**

The Bankruptcy Code requires that a plan of reorganization be proposed in good faith and disclose certain relevant information regarding payments due and the nature of compensation to insiders. The Debtors believe that they have satisfied these requirements and will seek a ruling to that effect from the Bankruptcy Court in connection with Confirmation of the Plan.

### B.     **Best Interests**

Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired Class, each member of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of its Claim or Interest property of a value, as of the Effective Date, that is at least equal to the amount that such member of the Class would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan meets this test and will seek appropriate findings from the Bankruptcy Court in connection with the Confirmation of the Plan. *See* Section VII and **Exhibit C** of the Disclosure Statement.

### C.     **Plan Acceptance**

The Bankruptcy Code requires, subject to an exception described in Section VI.D. of the Disclosure Statement entitled "Confirmation of the Plan Without Acceptance by All Impaired Classes," that the Plan be accepted by all impaired Classes of Claims and Interests.

The Bankruptcy Code defines acceptance of a plan of reorganization by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in

number of the allowed claims in that class, but for this purpose counts only those claims that have been voted on the plan. Holders of Claims who fail to vote or who abstain will not be counted to determine the acceptance or rejection of the Plan by any impaired class of Claims. Additionally, the vote of any holder will not be counted if the holder is designated by the Bankruptcy Court based on its vote or its solicitation not being in good faith under Bankruptcy Code Section 1126(e).

The Debtors will solicit the votes of holders of Claims in Classes 2(a)-2(l), Classes 3(a)-3(l), Classes 4(a)-4(l), and Classes 5(a)-5(b). Classes of claims that are not impaired (unimpaired) under a plan are deemed to have accepted the plan and are not entitled to vote. Classes 1(a) – 1(l) are unimpaired and deemed to have accepted the Plan. Classes 6(a)-6(l) will not receive or retain any property under the Plan and are presumed to have rejected the Plan pursuant to Bankruptcy Code Section 1126(g).

**D.    Confirmation of the Plan Without Acceptance by All Impaired Classes**

The Bankruptcy Code provides an exception to the requirement that every class must accept a plan of reorganization. This exception is commonly known as the "cram down" provision. This provision allows the Debtors to confirm the Plan notwithstanding the rejection by any Class that votes on the Plan or is deemed to reject the Plan pursuant to section 1126(f) or (g) of the Bankruptcy Code. If the Debtors can demonstrate to the Bankruptcy Court that the Plan satisfies the requirements of the "cram down" provision, each impaired Class that voted to reject the Plan or that is deemed to reject the Plan would be bound to the treatment afforded to that Class under the Plan.

To obtain Confirmation of the Plan using the "cram down" provision, the Debtors must demonstrate to the Bankruptcy Court that, as to each Class that has rejected the Plan, the treatment afforded to such Class under the Plan "does not discriminate unfairly" and is "fair and equitable."

In general, a plan does not discriminate unfairly if it provides a treatment to the class that is substantially equivalent to the treatment that is provided to other classes that have equal rank. In determining whether a plan discriminates unfairly, courts will take into account a number of factors, including the effect of applicable subordination agreements between parties. Accordingly, two classes of unsecured creditors could be treated differently without unfairly discriminating against either class.

In general, the Bankruptcy Code applies a different test to holders of secured claims, unsecured claims, and interests to determine whether the treatment proposed in a plan of reorganization is "fair and equitable." In general, a plan of reorganization is "fair and equitable" to a holder of:

- secured claims if the plan provides that the holder (i) will retain the lien or liens securing its claim and (ii) will receive cash payments, normally evidenced by a note, that total at least the amount of its claim, with such payments having a present value at least equal to the value of the collateral securing the claim;

- unsecured claims if the plan provides that the holder (i) will retain property equal to the amount of its claim or (ii) no holder of a claim or interest that is junior to the creditor receives any value under the plan of reorganization; and

- equity interests if the plan provides that the holder (i) will retain property equal to the greatest of the allowed amount of any liquidation preference to which such holder is entitled, any redemption price to which such holder is entitled or the value of such interest or (ii) no holder of an interest that is junior to the holder will receive any value under the plan of reorganization.

As set forth above, the Plan may be confirmed if certain conditions are met even if the Plan is not accepted by each Class of Claims entitled to vote. The Debtors reserve the right to modify the terms of the Plan as necessary for the Confirmation of the Plan without acceptance by any Impaired Classes. Such modification could result in a less favorable treatment to holders of certain Classes of Claims or Interests than the treatment currently provided in the Plan.

## E.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors, with the assistance of Imperial, have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses, taking into account the Debtors' Financial Projections submitted as **Exhibit E** hereto.

As noted in **Exhibit E**, the Financial Projections present information with respect to all the Post-Effective Date Debtors on a consolidated basis. The Post-Effective Date Debtors' operations are to be funded after the Effective Date from a combination of Cash on hand, proceeds of ongoing operations, and asset dispositions. The Financial Projections indicate that the Reorganized Debtors will be able to make all distributions required to be made on the Effective Date.

Prior to the hearing to approve the Disclosure Statement, the Debtors may replace the Financial Projections with revised Financial Projections. These Financial Projections do not reflect the impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code."

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable Creditors to make an informed judgment about the Plan and the Financial Projections should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests

in, the Debtors. The estimated amount of Claims set forth in the Financial Projections is subject to further reconciliation by the Debtors and their professionals and, accordingly, may be higher or lower than the amounts listed. The Financial Projections are subject to change over time and the Debtors disclaim any obligation to update them on any basis (including new information or discovery of mistake).

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the financial results. Therefore, the actual results achieved throughout the Projection Period (as defined therein) may vary from the Financial Projections and the variations may be material. Also, as noted above, the Financial Projections currently do not reflect the impact of any "fresh start reporting," and its impact on the Post-Effective Date Debtors "Consolidated Balance Sheets" and prospective "Results of Operations" may be material. All holders of Claims in the Impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by the Debtors' liquidation or need for further restructuring.

## VII.
## LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code Section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtors must demonstrate, and the Bankruptcy Court must determine that, with respect to such Class, each holder of a Claim will receive property of a value, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "Best Interests Test." For the reasons set forth herein and the annexed Chapter 7 Liquidation Analysis, the Debtors believe the Plan satisfies the Best Interests Test.

In a chapter 7 liquidation, holders of Allowed Claims receive distributions based on the liquidation or collection of the Debtors' assets. Such assets would include the same assets to be sold or collected (as applicable) under the Plan – or which have already been sold or collected during the Chapter 11 Cases. Here, as set forth in the annexed Chapter 7 Liquidation Analysis, conversion of the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code and the appointment or election of a chapter 7 trustee could constitute a change of ownership under the United Code-Share Agreement and ~~U.S.~~US Airways Code-Share Agreement, which could permit United and ~~U.S.~~US Airways to terminate such agreements. Accordingly, under chapter 7 there is a material risk that the debtors would be unable to assume such agreements, which are the Debtors' core assets.

In addition, the net proceeds from the collection and sale of property of the Estates available for distribution to Creditors would be reduced by the commission payable to the chapter

7 trustee and the trustee's attorneys and accounting fees, in addition to the administrative costs of the Chapter 11 Cases. In a chapter 7 case, the trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee to Creditors, even though the Debtors have already accumulated a significant amount of monies and they have already incurred the expense associated with generating those funds. Pursuant to the Bankruptcy Code's guidelines for compensation to chapter 7 trustees, based on certain assumptions, a trustee could be entitled to seek many millions of dollars in compensation for distribution of funds in a chapter 7 case, as set forth more fully in **Exhibit D**. Although under section 326 of the Bankruptcy Code the trustee's compensation is capped by this sliding scale, and the trustee should be required to demonstrate the reasonableness of commissions in relation to work actually performed or results obtained, the Debtors cannot predict whether the trustee will seek or obtain a straight commission based solely on distributions or some lesser amount. Nonetheless, whatever the amount of compensation for a trustee, there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtors because the chapter 7 trustee would be entitled to receive a commission in some amount for distributing the funds "handed over" to the trustee by the Debtors.

In addition, a chapter 7 trustee would employ legal counsel and other professionals and advisors such as accountants. If the Debtors' current counsel and advisors were not retained by the chapter 7 trustee or they decided not to take on such engagements, the chapter 7 trustee would employ new professionals who would have to expend significant time and resources to "get up to speed" with respect to the Debtors, their businesses and assets, and the cases. These additional administrative expenses would in likelihood be substantial and would be paid ahead of general unsecured creditors.

It must also be noted that the Debtors' business affairs are complex. Matters of accounting and account reconciliation are best handled by the Debtors' own experienced staff. These persons are especially important because of their knowledge of the Debtors and their collective memory of events and issues that cannot easily be accessed by a trustee reading "cold" records. In addition, there is no assurance the staff would remain available in a chapter 7 liquidation.

Holders of all Allowed Claims will receive under the Plan proposed by the Debtors property of a value that is not less than the amount such Creditors would receive in a chapter 7 case. However, the Plan proposed by the Debtors presents a better alternative to Creditors than a chapter 7 liquidation because, among other factors, the Post-Effective Date Debtors will in all likelihood be able to manage, and realize upon the Debtors' assets more expeditiously and cost-effectively than a trustee and his or her professionals and agents who are unfamiliar with the Debtors' businesses, assets and liabilities.

Further, as suggested above, the Debtors are doubtful that a chapter 7 trustee could analyze and pursue causes of action as successfully and economically as the Debtors, because the trustee would not have the knowledge and information possessed by the Debtors and their successors and their respective professionals.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in the payments to Creditors. Among other things, a chapter 7 case would trigger a new bar date for

filing Claims that would be more than ninety days following conversion of the Chapter 11 Cases to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distribution but also raise the prospect of additional claims that were not asserted in the Chapter 11 Cases.

The Debtors have prepared the hypothetical Chapter 7 Liquidation Analysis attached as **Exhibit D** to the Disclosure Statement to assist holders of Impaired Claims and Interests to reach their determination as to whether to accept or reject the Plan. The liquidation analysis indicates the estimated values which may be obtained by Classes of Claims and of Interests if the assets of the Debtors are liquidated pursuant to chapter 7, as an alternative to the scenario proposed by the Plan. The liquidation analysis is provided solely to disclose the effects of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code, subject to the assumptions set forth in **Exhibit D**.

Underlying the analyses set forth in **Exhibit D** are a number of estimates and assumptions that, although developed and considered reasonable by management of the Debtors, are inherently subject to economic and business uncertainties and contingencies beyond the control and knowledge of the Debtors. The values underlying estimates and assumptions are subject to further reconciliation by the Debtors and their professionals and, accordingly, may be higher or lower than those set forth in **Exhibit D**. Accordingly, there can be no assurance that the values assumed in the Chapter 7 Liquidation Analysis would be realized. In addition, any liquidation that would be undertaken would necessarily take place in future circumstances which cannot currently be predicted. While the liquidation analysis is necessarily presented with numerical specificity, if the Debtors were liquidated under chapter 7, the actual liquidation proceeds could vary, perhaps substantially, from the amounts set forth in **Exhibit D**. No representation or warranty can be or is being made with respect to the actual proceeds that could be received in a chapter 7 liquidation and/or under the Plan. Nothing contained in the analyses set forth in **Exhibit D** is intended or may constitute a concession or admission of the Debtors for any other purpose.

# VIII.
## CONCLUSION

The Debtors believe, based on the foregoing, that the Debtors and their successors are in the best position to bring the greatest return to Creditors pursuant to the Plan.

Dated:  November 4,[ ], 2010          MESA AIR GROUP, INC. AND
                                       ITS DEBTOR AFFILIATES


                                  By:    /s/ Michael J. Lotz
                                       _____

                                       Authorized Representative



Respectfully submitted by,

PACHULSKI STANG ZIEHL
     & JONES LLP


By:      /s/ Debra I. Grassgreen
       _____
         Richard M. Pachulski
         Laura Davis Jones
         Debra I. Grassgreen
         Maria A. Bove
         John W. Lucas

         Attorneys for Debtors and Debtors in Possession

## LIST OF EXHIBITS

| Exhibit | | Description |
|---------|---|-------------|
| A | ............................................ | **Diagram showing general corporate structure of Debtors** |
| B | ............................................ | **Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code** |
| C | ............................................ | **Disclosure Statement Approval Order** |
| D | ............................................ | **Chapter 7 Liquidation Analysis** |
| E | ............................................ | **Financial Projections** |

# EXHIBIT A

## (General Corporate Structure Diagram)

<u>EXHIBIT B</u>

**(Joint Plan of Reorganization of Mesa Air Group, Inc.
and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code)**

# **EXHIBIT C**

## **(Disclosure Statement Approval Order)**

# EXHIBIT D

## (Liquidation Analysis)

# **EXHIBIT E**

## **(Financial Projections)**

Document comparison by Workshare Professional on Wednesday, November 17, 2010 11:48:04 AM

| Input: | |
|---|---|
| Document 1 ID | pcdocs://docs_sf/74171/6 |
| Description | #74171 v6 - Mesa - Disclosure Statement |
| Document 2 ID | pcdocs://docs_sf/74685/4 |
| Description | #74685 v4 - Mesa - Second Amended Disclosure Statement |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 255 |
| Deletions | 268 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 529 |