**<u>EXHIBIT C</u>**

**(Summary of Plan and Disclosure Statement Revisions)**

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | **DEFINITIONS** | |
| 1. | Deletion of: "Actual Pro Rata of New 8% Notes" | ~~With respect to any Allowed General Unsecured Claim that is entitled to receive New 8% Notes under the Plan, the term "Actual Pro Rata Share of New 8% Notes" shall mean, as of the date on which the final distribution of New 8% Notes is being made, an amount of New 8% Notes necessary to permit the holder of such Allowed Claim to hold a percentage of the New 8% Notes obtained by dividing (i) the Aggregate Distribution Share applicable to such holder's Allowed Claims by (ii) the Aggregate Distribution Share of holders of all Allowed Claims entitled to receive New 8% Notes under the Plan~~ | Deleted on account of the elimination of the "New 8% Notes" due to the "New 8% Notes (Series A)" and "New 8% Notes (Series B)," which will be distributed to the holders of Allowed Claims in Class 3/5 and Class 6, respectively. |
| 2. | "ACE Companies" – Plan § 1.9 | Collectively, ACE American Insurance Company, Indemnity Insurance Company of North America, and each of their respective affiliates. | New definition added to address the assumption of the policies under the ACE Insurance Program pursuant to Section 7.12 of the Plan. |
| 3. | "ACE Insurance Program" – Plan § 1.10 | All insurance policies and agreements, documents, or instruments relating thereto including, without limitation, claims servicing agreements, that have been issued or entered into by one or more of the ACE Companies with one or more of the Debtors and their respective predecessors and /or affiliates. | New definition added to address the assumption of the policies under the ACE Insurance Program pursuant to Section 7.12 of the Plan. |
| 4. | "Administrative Claims Bar Date" – Plan § 1.13. | The thirty-fifth (35th) day after the Effective Date, by which date certain entities asserting an Administrative Claim (excluding Professional Fee Claims) against any of the Debtors must have filed a request for payment with the Bankruptcy Court under Section 503(a) of the Bankruptcy Code, or be forever barred from asserting an Administrative Claim against the Debtors and/or sharing in any distribution under the Plan; *provided, however,* the foregoing deadline shall not apply to claims arising under section 503(b)(9) of the Bankruptcy Code, which are subject to the Bar Date, or to claims arising from the rejection of unexpired leases or executory contracts or the abandonment of property, which are subject | Revised to clarify that such deadline does not extend or amend the deadline for other administrative claims fixed pursuant to separate orders of the Court. |

---

[3] Those provisions of the Initial Disclosure Statement that have been modified are blacklined to reflect the change. Any change that is entirely new to the Second Amended Disclosure Statement is reflected above without the aforementioned tracking.

56772-002\DOCS_SF:74794.4

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | to orders authorizing such rejection. | |
| 5. | "Agent" – Plan § 1.16 | Any former or current shareholder, <u>non-Debtor</u> affiliate, director, officer, employee, partner, member, agent, attorney, accountant, advisor or other representative of any person or entity (solely in their respective capacities as such, and not in any other capacity). | Revised to clarify the scope of the releases under Section 9.3.2 of the Plan. |
| 6. | "Aircraft Secured Claim" – Plan § 1.23 | A Secured Claim secured by a valid, perfected and enforceable Lien on any of the Debtors' Aircraft Equipment. | New definition added for the purpose of defining the claims secured by certain of the Debtors' owned aircraft that will be reinstated pursuant to Section 4.2 of the Plan. |
| 7. | "Bar Date" – Plan § 1.36 | The date or dates fixed by the Bankruptcy Court by which all Persons (except holders of Claims that appear in the Schedules and are **not** scheduled as disputed, contingent or unliquidated) asserting a Claim against the Debtors <del>(except, inclusive of claims arising under section 503(b)(9) of the Bankruptcy Code but excluding other Administrative Claims)</del>, must file a proof of claim or be forever barred from asserting a Claim against the Debtors or their property, voting on the Plan, and sharing in distributions under the Plan. | Revised to clarify that claims asserted against the Debtors pursuant to section 503(b)(9) of the Bankruptcy Code are subject to the general Bar Date. |
| 8. | "Class 6 Distribution Date" – Plan § 1.51 | (i) The Initial Distribution Date, (ii) each Interim Distribution Date, and/or (iii) the Final Distribution Date. | New definition added to reflect that the distributions made to holders of Allowed Class 6 Claims (Plan § 4.6) will coincide with the general distribution dates under the Second Amended Plan (Plan § 6). |
| 9. | "CRJ 700 Aircraft Leases" – Plan § 1.64. | Collectively, the (i) eight (8) lease transactions (inclusive of all "Operative Documents" as defined under the respective lease transactions) between Mesa Airlines and Wells Fargo Bank Northwest, NA in its capacity as owner trustee and AFS Investments XLIV LLC as owner participant governing the airframes bearing U.S. Registration Numbers N503MJ, N504MJ, N505MJ, N506MJ, N507MJ, N508MJ, N510MJ, and N511MJ, (ii) two (2) lease transactions (inclusive of all "Operative Documents" as defined under the respective lease transactions) between Mesa Airlines and Wells Fargo Bank Northwest, NA in its | New definition added for the purposes of defining the certain aircraft leases that the Debtors will assume pursuant to Section 7.9 of the Plan. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | capacity as lessor and AFS Investments XLII LLC in its capacity as owner participant governing the airframes bearing U.S. Registration Numbers N501MJ and N502MJ, and (iii) two (2) lease transactions (inclusive of all "Operative Documents" as defined under the respective lease transactions) between Mesa Airlines and Bombardier Capital Inc. in its capacity as lessor and Sun Trust Leasing Corporation as owner participant governing the airframes bearing U.S. Registration Numbers N521LR and N522LR. | |
| 10. | "CRJ 900 Aircraft Leases" – Plan § 1.65 | Collectively, the (i) fifteen (15) lease transactions (inclusive of all "Operative Documents" as defined under the respective lease transactions) between Mesa Airlines and RASPRO Trust 2005 as lessor governing the airframes bearing U.S. Registration Numbers N922FJ, N923FJ, N924FJ, N925FJ, N926LR, N927LR, N928LR, N929LR, N930LR, N931LR, N932LR, N934FJ, N935LR, and N938LR and (ii) nine (9) lease transactions (inclusive of all "Operative Documents" as defined under the respective lease transactions) between Mesa Airlines and Wells Fargo Bank Northwest, NA in its capacity as owner trustee and AFS Investments XLIV LLC in its capacity as owner participant governing the airframes bearing U.S. Registration Numbers N902FJ, N903FJ, N904FJ, N905FJ, N906FJ, N907FJ, N908FJ, N909FJ, and N910FJ. | New definition added for the purposes of defining the certain aircraft leases that the Debtors will assume pursuant to Section 7.9 of the Plan. |
| 11. | "CRJ Equipment Trust" – Plan § 1.66 | CRJ Equipment Trust 2004 | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.2 of Plan. |
| 12. | "CRJ Equipment Trust Aircraft Equipment" – Plan § 1.67 | All Aircraft Equipment related to the five (5) CRJ 700 aircraft and eleven (11) CRJ 900 aircraft, with the airframes bearing U.S. Registration Numbers N509MJ, N512MJ, N513MJ, N514MJ, N515MJ, N911FJ, N912FJ, N913FJ, N914FJ, N915FJ, N916FJ, N917FJ, N918FJ, N919FJ, N920FJ and N921FJ that are subject to that certain Section 1110(a) agreement dated March 4, 2010 with respect to such Aircraft Equipment. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.2 of Plan. |
| 13. | "CRJ Equipment Trust Aircraft Secured Claim" – Plan § 1.68 | Collectively, any and all Claims arising from or relating to all indebtedness and obligations now or hereafter owed under or in connection with the CRJ Equipment Trust Loan Documents. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.2 of Plan. |

56772-002\DOCS_SF:74794.4

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| 14. | "CRJ Equipment Trust Guarantee" – Plan § 1.69 | The Guaranty, dated as of January 29, 2003 of Mesa Air Group, and all amendments and supplements related thereto in connection with the financing of the CRJ Equipment Trust Aircraft Equipment. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.2 of Plan. |
| 15. | "CRJ Equipment Trust Guarantee Claim" – Plan § 1.70 | Collectively, any and all Claims against the Debtors arising from or relating to guarantees of payment and performance of all indebtedness and obligations that are now or hereafter owed to CRJ Equipment Trust under and in connection with the CRJ Equipment Trust Loan Documents. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.2 of Plan. |
| 16. | "CRJ Equipment Trust Credit Agreement" – Plan § 1.71 | That certain Credit Agreement, dated January 29, 2004, including the related operative documents, among Mesa Airlines, as borrower, Mesa Air Group, as guarantor, CRJ Equipment Trust, as lender, and Wells Fargo Bank Northwest, National Association, as security agent. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.2 of Plan. |
| 17. | "CRJ Equipment Trust Loan Documents" – Plan § 1.72 | Collectively, any and all agreements (including, without limitation, the CRJ Equipment Trust Credit Agreement and the CRJ Equipment Trust Guaranty), promissory notes, guaranties, mortgages, deeds of trust, indemnity deeds of trust, security agreements, Uniform Commercial Code financing statements, instruments and other documents (collectively, as amended, restated, supplemented or otherwise modified from time to time), executed and/or delivered with, to or in favor of CRJ Equipment Trust or Wells Fargo Bank Northwest, National Association, as security agent, in connection with the CRJ Equipment Trust Credit Agreement. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.2 of Plan. |
| 18. | "Distribution Dates" – Plan § 1.86 | The Initial Distribution Date, the Interim Distribution Date and the Final Distribution Date. | New definition added to collectively define the various distribution dates under the Second Amended Plan. |
| 19. | "EDC Aircraft Secured Claim" – Plan § 1.91 | Collectively, any and all Claims arising from or relating to all indebtedness and obligations now or hereafter owed under or in connection with the EDC Credit Agreement. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.3 of Plan. |
| 20. | "EDC Credit Agreement" – Plan § 1.92 | That certain Credit Agreement, dated as of January 31, 2007, and related operative documents, among Mesa Airlines as borrower, Mesa Air Group as guarantor, Export Development Canada as senior lender, Bombardier Capital | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to |

10

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Inc. as the subordinated lender, and Wilmington Trust Company as loan trustee. | Section 4.2.3 of Plan. |
| 21. | "EDC Credit Agreement Equipment" – Plan § 1.93 | All Aircraft Equipment related to the three (3) CRJ 700 aircraft and three (3) CRJ 900 aircraft bearing U.S. Registration Numbers N516LR, N518LR, N519LR, N939LR, N942LR, and N956LR. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.3 of Plan. |
| 22. | "EDC Credit Agreement Guaranty" – Plan § 1.94 | The Guaranties of Mesa Air Group, and all amendments and supplements related thereto in connection with the financing of the EDC Credit Agreement. | New definition added on account of the Secured Aircraft Claims being reinstated pursuant to Section 4.2.3 of Plan. |
| 23. | "Estimated Additional Pro Rata Share of New 8% Notes (Series A)" – Plan § 1.101. | With respect to any 2012 Noteholder Claim that becomes an Allowed Claim after the Effective Date and is entitled to receive (but has not yet received) New 8% Notes (Series A) under the Plan with respect to such Allowed Claim, the term "Estimated Additional Pro Rata Share of New 8% Notes (Series A)" shall mean, as of any Class 6 Distribution Date, an amount of the New 8% Notes (Series A) necessary to permit the holder of such Allowed Claim to receive its Pro Rata distribution of the New 8% Notes (Series A) distributed to Class 6 Creditors as of that date. | New definition added to reflect the distribution procedures that apply to the holders of the Allowed 2012 Noteholder Claims who will receive their pro rata share of the New 8% Notes (Series A) (Plan § 4.6). |
| 24. | "Estimated Additional Pro Rata Share of New 8% Notes (Series B)" – Plan § 1.102 | With respect to any General Unsecured Claim that becomes an Allowed Claim after the Effective Date and is entitled to receive (but has not yet received) New 8% Notes (Series B) under the Plan with respect to such Allowed Claim, the term "Estimated Additional Pro Rata Share of New 8% Notes (Series B)" shall mean, as of any Class 3 Distribution Date or Class 5 Distribution Date, as applicable, an amount of the New 8% Notes (Series B) necessary to permit the holder of such Allowed Claim to receive a percentage of the New 8% Notes (Series B) obtained by dividing (i) the Aggregate Distribution Share applicable to such holder's Allowed Claims by (ii) the aggregate of (A) the Aggregate Distribution Share of holders of all other previously Allowed Claims that have received New 8% Notes under the Plan prior to such distribution date plus (B) the Aggregate Distribution Share of holders of all then Allowed Claims entitled to receive New 8% Notes (Series B) under the Plan on such distribution date plus (C) the Aggregate Distribution Share of holders of all Disputed Claims that the Debtors then estimate may become Allowed Claims entitled to receive New 8% Notes (Series B) under the Plan. | Revised to reflect the distribution procedures that will apply to the holders of Allowed Class 3 and Class 5 Claims who will receive their pro rata share of the New 8% Notes (Series B) (Plan §§ 4.3 and 4.5). |

11

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| 25. | "Estimated Initial Pro Rata Share of New 8% Notes (Series A)" – Plan § 1.104. | With respect to any 2012 Noteholder Claim that is entitled to receive New 8% Notes (Series A) under the Plan, the term "Estimated Initial Pro Rata Share of New 8% Notes (Series A)" shall mean, as of the Effective Date, an amount of the New 8% Notes (Series A) necessary to permit the holder of such Allowed Claim to hold receive its Pro Rata share of the New 8% Notes (Series A), distributed as of such date. | New definition added to reflect the distribution procedures that will apply to the holders of the Allowed 2012 Noteholder Claims (Class 6) who will receive their pro rata share of the New 8% Notes (Series A) (Plan § 4.6). |
| 26. | "Estimated Initial Pro Rata Share of New 8% Notes (Series B)" – Plan § 1.105 | With respect to any Allowed General Unsecured Claim that is entitled to receive New 8% Notes (Series B) under the Plan, the term "Estimated Initial Pro Rata Share of New 8% Notes (Series B)" shall mean, as of the Effective Date, an amount of the New 8% Notes (Series B) necessary to permit the holder of such Allowed Claim to hold a percentage of the New 8% Notes (Series B) obtained by dividing (i) the Aggregate Distribution Share applicable to such holder's Allowed Claims by (ii) the aggregate of (A) the Aggregate Distribution Share of holders of all then Allowed Claims entitled to receive New 8% Notes (Series B) under the Plan plus (B) the Aggregate Distribution Share of holders of all Disputed Claims that the Debtors then estimate may become Allowed Claims entitled to receive New 8% Notes (Series B) under the Plan. | Revised to reflect the distribution procedures that will apply to the holders of Allowed Class 3 and Class 5 Claims who will receive their pro rata share of the New 8% Notes (Series B) (Plan §§ 4.3 and 4.5). |
| 27. | "Estimated Pro Rata Share of New 8% Notes (Series B)" – Plan § 1.107 | With respect to any holder of New 8% Notes (Series B) under the Plan, the term "Estimated Pro Rata Share of New 8% Notes (Series B)" shall mean, on any Class 3 Distribution Date or Class 5 Distribution Date, as applicable, an amount of New 8% Notes (Series B) necessary to permit such holder to realize its Estimated Initial Pro Rata Share of New 8% Notes (Series B) plus its Estimated Additional Pro Rata Share of New 8% Notes (Series B). | Revised to reflect the distribution procedures that will apply to the holders of Allowed Class 3 and Class 5 Claims who will receive their pro rata share of the New 8% Notes (Series B) (Plan §§ 4.3 and 4.5). |
| 28. | "Estimated Pro Rata Share of Restructured Unsecured Equity" – Plan § 1.108 | With respect to any holder of Restructured Unsecured Equity under the Plan, the term "Estimated Pro Rata Share of Restructured Unsecured Equity" shall mean, on any Class 3 Distribution Date or Class 5 Distribution Date, as applicable, an amount of Restructured Unsecured Equity necessary to permit such holder to realize its Estimated Initial Pro Rata Share of Restructured Unsecured Equity plus its Estimated Additional Pro Rata Share of Restructured Unsecured Equity. | Revised to reflect that these distributions procedures will also apply to Class 5. |
| 29. | "Excess Spirit Sale Proceeds" – Plan § 1.109 | The proceeds, if any, from a Spirit Liquidity Event existing after the payment in full of the New 8% Notes (Series A). | New definition added for purpose of defining those assets that will |

12

56772-002\DOCS_SF:74794.4

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | | fund distributions to the holders of the New 8% Notes (Series A) (Plan § 4.6), New 8% Notes (Series B) (Plan §§ 4.3 and 4.5), US Airways Notes (Plan § 7.8.1), and Management Notes (Plan § 5.2.3) beneficiaries upon a Spirit Liquidity Event. |
| 30. | "General Unsecured Claim" – Plan § 1.115 | Any Claim against any Debtor that is *not* (a) an Administrative Claim, (b) a Priority Non-Tax Claim, (c) a Priority Tax Claim, (d) a Secured Claim, (e) a De Minimis Convenience Claim, or (f) a 510(a) Subrogation Claim or (g) a 2012 Noteholder Claim. For the avoidance of doubt, the term "General Unsecured Claim" shall include (except to the extent that such Claims are treated as De Minimis Convenience Claims) any Claim against any Debtor arising under Section 502(h) of the Bankruptcy Code, a 2012 Noteholder Claim, a 2023 Noteholder Claim, and a 2024 Noteholder Claim, and may include an Intercompany Claim. | Revised to reflect the removal of the 2012 Noteholder Claims from Class 3 on account of the creation of Class 6, who will receive their pro rata share of the New 8% Notes (Series A). |
| 31. | "Individual Estimated Value" – Plan § 1.124 | For each Debtor, the estimated value allocated to such Debtor entity by the Debtors (in consultation with the Committee) as set forth in the Plan Supplement (taking into consideration the payment on the 2012 Notes and any dilution on account of the Management Equity Pool, Management Notes, U.S. US Airways Note, the New Common Stock distributed to U.S. US Airways, and the 1.1 conversion ration of the New Warrants) Each Individual Estimated Value has been prepared based on, *inter alia*, the Debtors' estimates of the value of the applicable Debtor's assets, including Interests, if any, in other Debtors, and Intercompany Claims that may be owed to the applicable Debtor. | Revised to reflect the reduction in amount of the New 8% Notes (Series B) as a result of the New 8% Notes (Series A) payable to the holders of the 2012 Noteholder Claims. |
| 32. | "Initial Distribution Date" – Plan § 1.125 | The day selected by the Debtors in their sole discretion that is as soon as reasonably practicable after, but no later than sixty (60) calendar days after, Initial Distribution Date shall be the Effective Date. | Revised to reflect that the Initial Distribution Date will on the Effective Date. |
| 33. | "Management Notes" – Plan § 1.139 | The series of unsecured, subordinated, non-amortized notes to be issued by Reorganized Mesa Air Group to members of the Debtors' management in place on and after the Effective Date, and guaranteed by the Reorganized Debtors, pursuant to the Management Notes Agreement subject to the terms and conditions set forth in the Plan (as will be described in more detail in the New | Revised to reflect that the subordination of payment with respect to the New 8% Notes (Series A), New 8% Notes (Series B), and US Airways Note, and the |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Notes Indenture to be filed with the Bankruptcy Court as part of the Plan Supplement), in the aggregate principal amount of $5.5 million and due five (5) years from the Effective Date, as fully set forth in the ~~Management~~ New Notes ~~Agreement~~ Indenture.  The terms and conditions of the ~~note and the Management Note Agreement~~ Notes shall be ~~substantially similar~~ identical to the terms and conditions of the New 8% Notes (Series A), New 8% Notes Indenture (Series B) and ~~U.S.~~ the US Airways Note, except that the Management Notes shall be subordinated to the New 8% Notes and ~~U.S. Airways Note~~ (Series A), New 8% Notes (Series B), and the US Airways Note, and subject to payment priorities set forth in the Plan (as will be described in greater detail in the New Notes Indenture).  In the event there are Excess Spirit Sale Proceeds following a Spirit Liquidity Event and the New 8% Notes (Series A), US Airways Note, and New 8% Notes (Series B) are paid in full, Reorganized Mesa Air Group shall be required to use such proceeds to pay the Management Notes.  At least $2 million and $1.5 million of the Management Notes shall be allocated to Jonathan G. Ornstein and Michael J. Lotz, respectively. | Management Notes, and that each of the foregoing will be governed by the New Notes Indenture. |
| 34. | Deletion of: "Management Notes Agreement" | ~~That certain agreement governing the issuance and terms of the Management Notes (to be filed with the Bankruptcy Court as part of the Plan Supplement).~~ | Deleted to reflect that New 8% Notes (Series A), New 8% Notes (Series B), US Airways Note, and Management Notes will be governed under the New Notes Indenture. |
| 35. | "New Notes" – Plan § 1.149 | Collectively, the New 8% Notes (Series A) and New 8% Notes (Series B), the US Airways Note and the Management Notes. | Added for the purposes of collectively defining New 8% Notes (Series A), New 8% Notes (Series B), US Airways Note, and Management Note. |
| 36. | "New 8% Notes" – Plan § 1.150 | ~~The unsecured non-amortized notes to be issued by Reorganized Mesa Air Group for the benefit of Class 3 and Class 5 Creditors, and guaranteed by the other Post-Effective-Date Debtors, pursuant to the New 8% Notes Indenture (to be filed with the Bankruptcy Court as part of the Plan Supplement), in the aggregate principal amount of $50 million and due five (5) years from the Effective Date, with no payments due prior to maturity, as fully set forth in the New 8% Notes Indenture.~~ Collectively, the New 8% Notes (Series A) and New | Revised to reflect that such New 8% Notes include both the New 8% Notes (Series A) and New 8% Notes (Series B). |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | 8% Notes (Series B). | |
| 37. | "New 8% Notes (Series A)" – Plan § 1.151 | The unsecured non-amortized notes to be issued by Reorganized Mesa Air Group for the benefit of holders of a 2012 Noteholder Claim, and guaranteed by the other Post-Effective Date Debtors, subject to the terms and conditions set forth in the Plan (as will be described in more detail in the New Notes Indenture to be filed with the Bankruptcy Court as part of the Plan Supplement), in the aggregate principal amount of $19.4 million and due five (5) years from the Effective Date, with no payments due prior to maturity, except to the extent there is a Spirit Liquidity Event, which shall be subject to payment priorities in the Plan (as will be described in greater detail in the New Notes Indenture). | Added for the purpose of defining that the New 8% Notes (Series A) will be distributed to the holders of Allowed 2012 Noteholder Claims (Plan § 4.6) |
| 38. | "New 8% Notes (Series B)" – Plan § 1.152 | The unsecured non-amortized notes to be issued by Reorganized Mesa Air Group for the benefit of Class 3 and Class 5 Creditors (exclusive of the holders of a 2012 Noteholder Claim), and guaranteed by the other Post-Effective Date Debtors, subject to the terms and conditions set forth in the Plan (as will be described in more detail in the New Notes Indenture to be filed with the Bankruptcy Court as part of the Plan Supplement), in the aggregate principal amount of $43.2 million and due five (5) years from the Effective Date, with no payments due prior to maturity, as fully set forth in the New Notes Indenture; *provided, however*, that in the event there are any Excess Spirit Sale Proceeds following a Spirit Liquidity Event and the New 8% Notes (Series A) and US Airways Notes are paid in full, Reorganized Mesa Air Group shall be required to use such proceeds to prepay the New 8% Notes (Series B), which shall be subject to payment priorities in the Plan (as will be described in greater detail in the New Notes Indenture). | Added for the purpose of defining that the New 8% Notes (Series B) will be distributed to the holders of Allowed Class 3 and Class 5 Claims (Plan §§ 4.3 and 4.5). |
| 39. | "New Notes Indenture" – Plan § 1.153 | The indenture governing the New 8% following series of notes: the New 8% Notes (Series A), the New 8% Notes (Series B), the US Airways Note and the Management Notes (to be filed with the Bankruptcy Court as part of the Plan Supplement), which such indenture shall provide for the mandatory prepayment of the New Notes following a Spirit Liquidity Event in the following priority: first, New 8% Notes (Series A); second, the US Airways Note; third, New 8% Notes (Series B); and fourth, the Management Notes. The New 8% Notes (Series A), the New 8% Notes (Series B), and the US Airways Note shall be of equal priority if redeemed or paid in any other scenario. | Revised to reflect that the New 8% Notes (Series A), New 8% Notes (Series B), and US Airways Note and the Management Notes will all be governed by New Notes Indenture. |

56772-002\DOCS_SF:74794.4

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| 40. | "New Preferred Stock" – Plan § 1.154 | 2,000,000 shares of the no par value blank check preferred stock of Reorganized Mesa Air Group authorized under the Reorganized Mesa Charter Documents, of which no shares shall be initially issued under the Plan, and which ~~shall~~be subject to the terms and conditions of the US Airways Investor Rights Agreement and (ii) have the voting, dividend, conversion and/or other rights to be determined by the board of directors of Reorganized Mesa Air Group as permitted under the Reorganized Mesa Charter Documents. | Revised to reflect that the issuance of the New Preferred Stock will be subject to the terms and conditions of the US Airways Investors Rights Agreement (Plan § 1.229). |
| 41. | "Shareholder Agreement" – Plan § 1.212 | That agreement by and among Reorganized Mesa Air Group and each holder of an Allowed Claim who holds five percent (5%) of the issued and outstanding shares of New Common Stock, whether as of the Effective Date or subsequent thereto as a result of the issuance of additional shares of New Common Stock pursuant to Allowed Claims or upon exercise of New Warrants, which agreement shall provide for the voting obligations set forth in Section 5.9 of the Plan. | New definition added to reflect the Shareholder Agreement that will govern certain rights and obligations of the holders of New Common Stock. |
| 42. | "Spirit Liquidity Event" – Plan § 1.215 | The sale of common stock of or payment on notes from Spirit Airlines, the net proceeds of which are distributed by Indigo to Niichii in accordance with the terms of that certain Amended and Restated Limited Liability Company Agreement of Indigo Miramar LLC, as thereafter amended. | New definition added for the purpose of defining the event that would trigger the prepayment rights of the holders of the New 8% Notes (Series A), New 8% Notes (Series B), and US Airways Note, and the Management Notes. |
| 43. | "True-Up Note Distribution" – Plan § 1.220 | On any Class 3 Distribution Date, Class 5 Distribution Date, or Class 5 6 Distribution Date, "True-Up Note Distribution" means, with respect to any holder of an Allowed Claim entitled to receive New 8% Notes (Series A) and/or New 8% Notes (Series B) under the Plan, as the case may be, a distribution of an additional amount of New 8% Notes (Series A) and/or New 8% Notes (Series B), as applicable, necessary to cause such holder to have received aggregate distributions of New 8% Notes (Series A) and/or New 8% Notes (Series B), as applicable, under the Plan equal to its then current Estimated Pro Rata Share of New 8% Notes. (Series A) or (Series B). | Revised to reflect that this distribution procedure will apply only to the New 8% Notes (Series A) and New 8% Notes (Series B) as provided for under Class 3, Class 5, and Class 6. |
| 44. | "United Code-Share Agreement" – Plan § 1.224 | That certain United Express® Agreement dated as of January 28, 2004 and all amendments thereto and related ancillary agreements identified in the Plan Supplement, between Mesa Air Group and United, pursuant to which, *inter alia,* | Revised to reflect the agreements to be assumed pursuant to Section 7.8.1 of the Second Amended |

16

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Mesa Air Group agreed to provide (through itself and its subsidiaries) certain regional air transportation services under certain trademarks, including the United Express mark, to United. | Plan. |
| 45. | "US Airways Investor Rights Agreement" – Plan § 1.229 | That agreement between Reorganized Mesa Air Group and US Airways with respect to the shares of New Common Stock issued to US Airways in accordance with the terms of the Plan. The US Airways Investor Rights Agreement will be filed as part of the Plan Supplement. | Added for the purposes of defining the stockholder agreement between the Debtors and US Airways. |
| 46. | "US Airways Note" – Plan § 1.230 | The unsecured, non-amortized note to be issued by Reorganized Mesa Air Group for the benefit of ~~U.S.~~US Airways, and guaranteed by the other Reorganized Debtors, ~~pursuant to the U.S. Airways Note Agreement~~subject to the terms and conditions set forth in the Plan (as will be described in more detail in the New Notes Indenture to be filed with the Bankruptcy Court as part of the Plan Supplement), in the aggregate principal amount of ~~$5.5~~6.8 million and due five (5) years from the Effective Date, with no payments due prior to maturity, as fully set forth in the ~~U.S. Airways Note Agreement~~Plan (as will be described in greater detail in the New Notes Indenture). The terms of the note and the ~~U.S.~~US Airways Note Agreement shall be ~~substantially similar to the~~have identical terms and conditions of the New 8% Notes ~~and New 8% Notes Indenture~~. | Revised to reflect the new principal amount, the payment priorities among the New 8% Notes (Series A), New 8% Notes (Series B), and US Airways Note amount the other New Notes, and the conditions under which the US Airways Note is subject to prepayment. |
| 47. | Deletion of: "US Airways Note Agreement" | ~~The agreement governing the issuance and terms of the U.S. Airways Note (to be filed with the Bankruptcy Court as part of the Plan Supplement~~ | Removed on account of the New Notes Indenture governing the terms of all the New Notes. |
| 48. | "Voting Record Date" – Plan § 2.33 | November 18, 2010. | Revised to reflect the new date and defined term. |
| | **DISCLOSURE STATEMENT CHANGES** | | |
| 49. | Disclosure Statement § I.D – Overview of the Plan | The Plan effectuates a reorganization of these Debtors through ~~the issuance of New Common Stock by~~ the ultimate corporate parent'_s_ – Reorganized Mesa Air Group –issuance of (i) New 8% Notes (Series A) to the holders of the 2012 Noteholder Claims and (ii)(a) New Common Stock,[2] – New 8% Notes and U.S. | The overview section in the Second Amended Disclosure Statement has been revised to reflect that the holders of Allowed Claims in Class 3 and Class 5 will |

---

[2] On the Effective Date, Reorganized Mesa Air Group will be deemed to own all of the ownership interests in each other Reorganized Debtor.

17

56772-002\DOCS_SF:74794.4

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | ~~Air Note issued by Reorganized Mesa Air Group, and~~ New Warrants to acquire shares of the New Common Stock, and ~~the preservation of~~ New 8% Notes (Series B) to the holders of General Unsecured Claims and Subrogation Claims and (b) the U.S. Air Note to US Airways, which will preserve the Debtors' business operations and going concern value. Holders of Interests will neither receive, nor retain, any property under the Plan. The Plan will be funded by way of the Debtors' cash on hand, revenues from ordinary course operations and proceeds of asset sales. There will be no substantive consolidation of the Debtors' Estates under the Plan. | not receive New 8% Notes (Series B) and the holders of Allowed Claims in Class 6 will receive New 8% Notes (Series A). In addition, there is a new reference to De Minimis Convenience Claims and a description that the Secured Tax Claims will not be classified or impaired but paid pursuant to section 1129(a)(9)(D) of the Bankruptcy Code. |
| | | In addition, as consideration for entry into the ~~U.S~~ US Airways Code-Share Tenth Amendment, ~~U.S.~~ US Airways will receive approximately ten percent (10%) of the New Common Stock and the Management Equity Pool shall be reserved for distribution under the management/employee equity incentive plan that will be established by the Reorganized Board. | |
| | | As set forth herein and in the exhibits hereto, the Debtors have estimated, based on certain hypothetical operating projections and an assessment of other available assets, the value to be realized from the Debtors' Estates under the Plan. Pursuant to the Plan, each holder of an Allowed General Unsecured Claim who is a U.S. Citizen will be allocated its share of New Common Stock (after giving effect to the shares of New Common Stock reserved for issuance under the Management Equity Pool and ~~U.S.~~ US Airways) and the New 8% Notes (Series B). Each holder of an Allowed General Unsecured Claim who is a Non-U.S. Citizen will be allocated its share of New Warrants (after giving effect to the shares of New Common Stock reserved for issuance under the Management Equity Pool and ~~U.S.~~ US Airways) and the New 8% Notes (Series B). | |
| | | Under the Plan, there will also be a separate convenience class comprising De Minimis Convenience Claims (general unsecured claims in the amount of $100,000 or less), which will receive Cash payments in the percentages set forth in **Exhibit D** to the Plan. Other than Noteholders, unsecured creditors will be allowed to opt into ~~this convenience claim~~the De Minimis Convenience Claims class if desired. The Debtors believe that such convenience class is reasonable | |

18

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | and necessary for administrative convenience because, among other things, such structure reduces the number of unsecured creditors who may otherwise receive Restructured Unsecured Equity under the Plan and thus minimize or avoid governmental agency registration, reporting and regulation costs as well as potential breaches of ownership restriction provisions in the United Code-Share Agreement and ~~U.S.~~US Airways Code-Share Agreement. | |
| | | All existing Interests in Mesa Air Group will be extinguished and the holders of such Interests will not receive or retain any property on account of such Interests. Reorganized Mesa Air Group will be vested directly or indirectly with the Interests in the (i) Reorganized Debtor Subsidiaries and (ii) the Liquidating Debtors (~~i.e.~~e.g., RHMC, Patar, and Air Midwest). | |
| | | Intercompany Claims will be taken into account in assessing the value of the respective Debtors, but Holders of Intercompany Claims will not directly receive or retain any property on account of such Claims under the Plan. | |
| | | Finally, all other (senior) Allowed Claims, such as Administrative Claims, Secured Tax Claims, Priority Non-Tax Claims, and Secured Claims will be paid or otherwise satisfied pursuant to the terms of the Plan. | |
| | | The following chart briefly summarizes the treatment on a consolidated basis of Creditors and holders of Interests under the Plan. The amounts listed below are based principally on the Schedules and proofs of Claim filed with the Bankruptcy Court and other information collected or reviewed subsequent to the filing of the Schedules and proofs of Claim, and are only estimates based on various assumptions. Actual Claims and Distributions to the holders of Allowed Claims will vary depending upon the outcome of objections to Claims and the collection and liquidation of Proceeds. For a complete description of the treatment of Allowed Claims, Creditors should review the Plan. | |
| 50. | Disclosure Statement § I.D – Overview of the Plan | Class 3(a) – Mesa Air Group ~~44~~41.1%      100%<br>Class 3(b) – Mesa Air New York<br>Class 3(c) – Mesa In-Flight      0%<br>Class 3(d) – Freedom      7.7% | Chart summarizing the treatment of Creditors and holders of Interests under the Plan revised with respect to Class 3 (a)-(l) to |

19

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Class 3(e) – Mesa Airlines     2.46.2%<br>Class 3(f) – MPD     100%<br>Class 3(g) – RASI     0%<br>Class 3(h) – MAGAIM     100%<br>Class 3(i) – Nilchii     100%<br>Class 3(j) – Air Midwest     3.6%<br>Class 3(k) – RHMC     0%<br>Class 3(l) – Patar     0% | reflect revised Liquidation Analysis filed on November 4, 2010. |
| 51. | Disclosure Statement § I.E.4 – Voting Instructions | **A CREDITOR WHO (A)(I) VOTES TO ACCEPT OR REJECT THE PLAN AND (2) DOES NOT ELECT TO OPT OUT OF THE RELEASES SET FORTH IN SECTION 9.3.2 OF THE PLAN OR (B) FAILS TO PROPERLY COMPLETE AND EXECUTE A BALLOT ON THE PLAN SHALL BE DEEMED TO OPT INTO THE RELEASES SET FORTH IN SECTION 9.3.2 OF THE PLAN. A CREDITOR WHO DOES NOT CAST A BALLOT ON THE PLAN OR WHO IS NOT ENTITLED TO CAST A BALLOT ON THE PLAN SHALL BE DEEMED TO HAVE OPTED OUT OF THE RELEASES SET FORTH IN SECTION 9.3.2 OF THE PLAN.** | At the request of the Office of the United Trustee, voting instructions clarified with respect to opt-out release set forth in section 9.3.2 of the Plan. |
| 52. | Disclosure Statement § II.E.4.a | The Debtors' fleet also includes CRJs. Prior to the Petition Date, the Debtors owned two (2) CRJ 200s, eight (8) CRJ 700s, and fourteen (14) CRJ 900s. These aircraft are subject to security agreements and the aggregate outstanding principal balance as of December 31, 2009 with respect to these aircraft was approximately $393 million. The CRJ 700s are operated in connection with the Debtors' United Codeshare Agreement. The CRJ 900s are operated in connection with the Debtors' ~~US~~ US Airways Codeshare Agreement.<br><br>As set forth below in Section III.C, as of ~~September 30,~~ November 1, 2010, the Debtors will have abandoned one (1) CRJ 200 aircraft and restructured the security agreement subject to the other CRJ 200 aircraft. The~~Pursuant to Section 4.2.1 of the Plan,~~ the Debtors intend to reinstate their secured financing obligations with respect to the applicable CRJ 700 aircraft and CRJ 900 aircraft ~~but have been engaged in discussions with the counterparties regarding modifying the terms so that the Debtors can obtain an extension of the Code-Share Agreements with United and U.S. Airways~~. | Revised to reflect the Debtors' intent to reinstate certain Aircraft Secured Claims pursuant to section 4.2 of the Plan. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| 53. | Disclosure Statement § II.E.4.b | Prior to the Petition Date, the remainder of the Debtors' fleet consisted of leased CRJs, ERJs, and Dash 8s. The Debtors leased forty-six (46) CRJ 200s, twelve (12) CRJ 700s, and twenty-four (24) CRJ 900s, thirty-six (36) ERJ 145s, and sixteen (16) Dash 8s. These aircraft are subject to leases with certain owner trustees. The aggregate amount outstanding with respect to these aircraft was approximately $1.62 billion.<br><br>As of September 30,~~November 1~~, 2010, the Debtors will have rejected all of the leases governing their CRJ 200s and will have rejected ~~or commenced the process to reject~~ the thirty-six (36) ERJ leases. The Debtors have entered or will enter into restructured leases with respect to thirteen (13) airframes and twenty-six (26) engines for their CRJ 200 aircraft with various aircraft counterparties. The Debtors have assumed amended leases with respect to four (4) Dash 8s and intend to assume the prepetition leases with respect to the two (2) remaining Dash 8s in their fleet.<br><br>~~In addition,~~Pursuant to Sections 7.1, 7.3, and 7.9 of the Plan, the Debtors intend to assume the twelve (12) leases governing the CRJ 700s and twenty-four (24) leases governing the CRJ 900s ~~but have engaged in discussions with the lessors regarding modifying the terms so that the Debtors can obtain an extension of their codeshare agreements with United and U.S. Airways.~~ | Revised to reflect the Debtors' intent to assume the CRJ 700 Aircraft Leases and the CRJ 900 Aircraft Leases pursuant to section 7.9 of the Plan. |
| 54. | Disclosure Statement § III.B.10 – Certain Significant Events and Initiatives During the Chapter 11 Cases | To permit the Debtors to continue negotiating with the Committee regarding the terms of a consensual plan of reorganization, on July 28, 2010, the Debtors filed their second motion to extend their exclusive periods for an additional 90 days. After negotiations with the Committee, the Debtors agreed to modify their request by limiting the extension of their exclusive period within which to file a plan of reorganization to October 21, 2010 and their exclusive period within which to seek acceptance of such plan to December 21, 2010, subject to further extensions in the event the Committee does not object thereto by October 8, 2010. ~~In the event the Committee does not object on or before October 8, 2010, the Debtors' exclusivity periods will be automatically extended through and including December 1, 2010 and February 1, 2011.~~ On August 12, 2010, the | Added to reflect the agreement between the Debtors and the Committee regarding further extensions of the exclusivity periods pursuant to section 1121(d) of the Bankruptcy Code. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Bankruptcy Court entered an order granting such relief.<br><br>On or around October 8, 2010, the Debtors and the Committee agreed that any further extensions of the exclusivity periods beyond December 1, 2010 and February 1, 2011, respectively, would be subject to co-exclusivity between the Debtors and the Committee beginning February 10, 2011 and April 13, 2011, respectively. The Debtors intend to file motion seeking a further extension of their exclusivity periods subject to the foregoing arrangement with the Committee. | |
| 55. | Disclosure Statement § III.D.3 | ~~The~~As discussed in greater detail in Section IV.E.7 below, the Debtors will assume the ~~U.S.~~US Airways Code-Share Agreement as modified by the US Airways Tenth Amendment by separate motion and continue to provide services for ~~U.S.~~US Airways through ~~June 2012~~September 2015. | Revised to reflect the Debtors' intent to assume the US Airways Code-Share Agreement as modified by the US Airways Tenth Amendment pursuant to section 7.8.1 of the Second Amended Plan. |
| 56. | Disclosure Statement § III.E.1 – Summary of Claims Process | ~~To date, over 1,400 Proofs of Claim have been filed against the Debtors in an aggregate face amount exceeding $5.3 billion, including approximately $121 million in asserted administrative expense claims and approximately $1 billion in asserted secured claims.~~<br><br>To date, over 1,445 Proofs of Claim have been filed against the Debtors, which in the Debtors' estimate are in the aggregate approximately $2.08 billion, which amount excludes duplicates and claims that have been superseded. As described in Section I.D above, the Proofs of Claim can be broken down as follows: (i) approximately $19.1 million in Administrative Expense Claims, (ii) approximately $7.3 million in Priority Tax Claims, (iii) approximately $4.5 million in Secured Tax Claims, (iv) Priority Non-Tax Claims in a de minimis amount, (v) approximately $1.4 million in Secured Claims, (vi) approximately $2.03 billion in General Unsecured Claims, (vii) approximately $8.2 million in De Minimis Convenience Claims, and (viii) approximately $19.4 million in 2012 Noteholder Claims. These are estimates only and are based on the Debtors' preliminary claim analysis. If the Debtors are unsuccessful on some the anticipated claims objections, the estimates of General Unsecured Claims could increase by $500 million. | Revised to reflect the Debtors' current estimate of Claims asserted against the Estates. |

22

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | The Administrative Expense Claims relate to (i) professional fees ($16.5 million), (ii) claims asserted pursuant to section 503(b)(9) ($2,330,000), (ii) reclamation claims ($78,000), and (iii) other expenses ($185,000) that were incurred during the Chapter 11 Cases. In addition, certain aircraft counterparties have asserted Administrative Expense Claims in the aggregate amount of ($45,825,000) in connection with the Debtors' rejection of certain aircraft equipment leases and other asserted postpetition breaches. As described below, the Debtors are contesting the validity of the aircraft related Administrative Expense Claims and have filed objections to certain of these claims and intend to object to the others in the near term. As for the remainder of the Claims (other than the Reclamation Claims), the Debtors are in the process of analyzing these Claims and have filed objections or are in the process of preparing objections to the foregoing claims as to their validity among other defects. | |
| 57. | Disclosure Statement § III.E.2 – Summary of Claims Process | On September 21, 2010, the Debtors filed Omnibus Objection Seeking to Reclassify Certain Claims as General Unsecured Claims (Omnibus Objection No. 4). By such objection, the Debtors objected to forty-one (41) claims on the basis that such claims were classified improperly when filed against the Debtors. On October 28, 2010, the Bankruptcy Court granted Omnibus Objection No. 4. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 4 on any other basis.

On October 20, 2010, the Debtors filed the Objection to the Request by Engine Lease Finance Corporation and Deucalion Engine Leasing (Ireland) Limited for Allowance and Payment of Administrative Expense Pursuant to Section 503(b) and 507(a)(2) of the Bankruptcy Code. Engine Lease Finance Corporation and Deucalion Engine Leasing (Ireland) Limited are seeking an Administrative Expense Claim in the approximate amount of $558,000 on account of the Debtors' surrender and return of certain aircraft parts and the records related to certain parts. The Debtors believe that if there is a valid claim that such claim is a prepetition general unsecured claim that is not entitled to priority pursuant to section 503(b) of the Bankruptcy Code.

On October 21, 2010, the Debtors filed the Objection to (1) the Alleged Administrative Portions of Claims 1430 and 1431 of U.S. Bank National Association, as Security Trustee, on Behalf of Agencia Especial De Financamiento Industrial-Finame and (2) Claims that were Amended and Superseded by Claims 1430 and 1431. U.S. Bank National Association is | Added to reflect the most recently filed objection to claims. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | asserting Administrative Expense Priority Claims in the approximate amount of $11 million on account of the Debtors' surrender and return of certain aircraft parts and the records related to certain parts. The Debtors believe that if there is a valid claim that such claim is a prepetition general unsecured claim that is not entitled to priority pursuant to section 503(b) of the Bankruptcy Code

On October 29, 2010, the Debtors filed Omnibus Objection to Claims of holders of 2012 Notes that are duplicative of Claims filed by the applicable Indenture Trustee (Omnibus Objection No. 5). By such objection, the Debtors objected to thirty-six (36) claims on the basis that claims on account of the 2012 Notes were to be filed by the Indenture Trustee, not the beneficial holders of such notes. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 5 on any other basis.

On October 29, 2010, the Debtors filed Omnibus Objection to Unsubstantiated Administrative Expense Claims Asserted by Holders of Claims Arising from the Rejection of Aircraft Equipment Leases or the Abandonment of Aircraft Equipment (Omnibus Objection No. 6). By such objection, the Debtors objected to 157 claims on the basis that the holders of such administrative expense claims have not provided any supporting information demonstrating they are entitled to such claims. The Debtors' rights are reserved to object to the Claims subject to Omnibus Objection No. 6 on any other basis. | |
| 58. | Disclosure Statement § III.F.4.b - New 8% Notes (Series A) | Each holder of an Allowed 2012 Noteholder Claim shall receive its *pro rata* share of the New 8% Notes (Series A). The terms and conditions of the New 8% Notes (Series A) is described below in Section IV.C.6 hereof. | Added to reflect the consideration to be provided (New 8% Notes (Series A) to the holders of Allowed 2012 Noteholder Claims pursuant to section 4.6 of the Second Amended Plan. |
| 59. | Disclosure Statement § III.F.4.c – New 8% Notes (Series B) | Each holder of an Allowed General Unsecured Claim shall also receive its Actual Pro Rata Share of New 8% Notes (Series B). The Actual Pro Rata Share of New 8% Notes (Series B) is, as of the date on which the final distribution of New 8% Notes (Series B) is made, an amount of New 8% Notes (Series B) necessary to permit the holder of such Allowed Claim to hold a percentage of the New 8% Notes (Series B) obtained by dividing (i) the Aggregate Distribution Share applicable to such holder's claims by (ii) the Aggregate Distribution Share of holders of all Claims entitled to receive New 8% Notes (Series B) under the | Revised to reflect the consideration to be provided (New 8% Notes (Series B) to the holders of Allowed Class 3 and Class 5 Claims pursuant to sections 4.3 and 4.5 of the Second Amended Plan. |

24

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| 60. | Disclosure Statement § III.F.4.c – Distribution Example | Plan.<br><br>In our example we begin with the calculation of Individual Estimated Value for each of the three debtors, as adjusted for the value provided to certain parties pursuant to the Plan. Row 1 in the table above shows a hypothetical unadjusted Individual Estimated Value totaling $150 million (the actual methodology used to arrive at Individual Estimated Values will be based on a formal valuation analysis for each debtor performed by the debtors' investment banker, as fully described in the Plan and Disclosure Statement). Rows 2 – 4<u>5</u> show the adjustments made for notes and equity provided to US Airways and Management pursuant to the Plan, notes provided to 2012 Noteholders pursuant to the Plan, and an adjustment for the 1.1x warrant conversion ratio. Row 5<u>6</u> shows the adjusted "Individual Estimated Value" for each debtor, which totals $113.7<u>97.7</u> million in this example.<br><br>The claims against each debtor by our three hypothetical claimants are shown in Rows 7<u>8</u> – 9<u>10</u>. Based on these claims, the Individual Debtor Distribution Percentages are calculated for each creditor in Rows 12<u>13</u> – 14<u>15</u>. This percentage is then applied to the Individual Estimated Value to calculate the Individual Debtor Distribution Share in Rows 17<u>18</u> – 19<u>20</u>.<br><br>Note in this example that the noteholder has a claim of $15.0 million against debtor B and that debtor B is solvent, i.e. the Individual Estimated Value for debtor B shown in Row 5<u>6</u> is equal to the Allowed Unsecured Claims against debtor B in Row 10<u>11</u>. Thus, the Individual Debtor Distribution Share for the noteholder in Row 18<u>19</u> is equal to 100% of its claim of $15.0 million.<br><br>The Aggregate Distribution Percentage by creditor is calculated in Rows 22<u>23</u> – 24<u>25</u> based on the proportional ownership of the Distribution Share values, and this percentage is utilized to calculate the distribution of shares and notes. Assuming a total of 10.0 million shares are issued (or issuable via warrants) pursuant to the Plan, Rows 28<u>29</u> – 30<u>31</u> show the shares issued to US Airways and Management and the additional shares to issue to the foreign creditor on account of the 1.1x warrant conversion ratio. The remaining 7.2<u>7.3</u> million | Revised to reflect the changes made to the distribution example on account of the 2012 Noteholders Claims being removed from Class 3 and designated in Class 6. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | shares shown in Row 31:32 are allocated in rows 36:37 – 38:39 based on the Aggregate Distribution Percentages shown in rows 22–24:23-25. Note that the total shares for the foreign creditor reflect an additional 0.80.7 million shares for the warrant conversion premium. | |
| | | The Aggregate Distribution Percentage is also utilized to apportion notes as shown in Rows 46:47 – 48:49. The total value of notes and equity received by all parties is shown in Rows 46:47 – 50:52. In this example, the noteholder receives shares with a value of $8.4 million (as shown in Row 37:38) and notes with a value of $6.6 million (Row 47:48) in full satisfaction of its $15.0 million claim. | |
| | | As can be seen from the example above, Creditors with Allowed Claims in Classes 3(a)-(l), to the extent allowed against the same Debtor, receive the same distribution percentage on account of their Allowed Claims. Creditors in Classes 3(a)-(l) who have a basis for asserting their Claims against more than one Debtor may receive a larger aggregate distribution due to recovering on multiple Allowed Claims. This does not alter the fact, however, that with respect to Claims against a specific Debtor entity, each class recovers the same percentage on account of Claims against such entity. | |
| | | A further description of the Plan and its distribution provisions can be found in Section IV of this Disclosure Statement. A summary of the Debtors' current projections with respect to potential distributions can be found in **Exhibit D** to the Disclosure Statement. | |
| 61. | Disclosure Statement § III.G.1 – Administrative Claims | The Debtors estimate that Administrative Claims will total approximately $20,700,00019,100,000 as of the Effective Date. [11]12 The Administrative Claims can be categorized as follows:<br><br>• Professional Fees and Expenses: $16,500,000[12]13 | Revised to reflect the Debtors' current estimate of Administrative Claims |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | • Other Administrative Expenses: $4,200,000 $2,600,000 | |
| | | TOTAL: $26,70,000 $19,100.00[14] | |
| | | [14][12] The Professional Fees also include the fees and expenses to be paid to the Indenture Trustees pursuant to Section 2.5 of the Plan. | |
| | | [12][13] The estimate of professional fees and expenses includes amounts incurred to date and estimates through December 31, 2010. A substantial portion of such professional fees and expenses will have been paid by the Debtors prior to the Effective Date in accordance with the Interim Compensation Order. | |
| | | [14] As discussed in greater detail in Sections III.E and V.B.5 of this Disclosure Statement, the Debtors are contesting the validity of certain Administrative Expense Claims that are not included in this amount. | |
| 62. | Disclosure Statement § III.G.2-4 | Priority Tax Claims | Revised to reflect the new estimates for such claims. |
| | | Allowed Priority Tax Claims are entitled to priority in right of payment under sections 507(a)(8) and 1129(a)(9)(C) of the Bankruptcy Code are to be paid in full under the Plan and are estimated to total $7,324,000 on the Effective Date. | |
| | | Secured Tax Claims | |
| | | Allowed Secured Tax Claims are to be paid in full under the Plan and are estimated to total $4,544,000 on the Effective Date. Allowed Secured Tax Claims would also be entitled to priority under sections 507(a)(8) absent their secured status as provided under section 1129(a)(9)(D) of the Bankruptcy Code. | |
| | | Priority Non-Tax Claims | |
| | | Allowed Priority Non-Tax Claims are to be paid in full under the Plan on the | |

27

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Effective Date and are estimated to total a *de minimis* amount to the extent they have not already been paid pursuant to a First Day Order. Priority Non-Tax Claims comprise Claims entitled to priority under section 507(a)(4) and (5) of the Bankruptcy Code. | |
| 63. | Disclosure Statement § III.G.5 | Under the Plan, Creditors with Allowed Secured Claims that have not been paid or otherwise satisfied will be paid in full, will have the applicable collateral abandoned or surrendered to them, or their respective claims will otherwise be unimpaired under the Plan. Subject to all qualifications and conditions set forth herein and in **Exhibit D**, the Debtors have used an estimate of approximately $5,045,000 1,476,000 in Allowed Secured Claims as of the Effective Date. This estimated amount excludes (i) certain Secured Claims that are assumed to be paid in the ordinary course over the projection period (ii) claims that are partially secured by deposits that have or will have been applied to reduce the claim leaving a General Unsecured Claim. | Revised to reflect the new estimate for such claims. |
| 64. | Disclosure Statement § III.G.9 | The Debtors estimate having approximately $19.4 million in 2012 Noteholder Claims as of the Effective Date. Under the Plan, the holders of Allowed 2012 Noteholder Claims will receive their pro rata share of the New 8% Notes (Series A), which the Debtors estimate to satisfy such claims in full. | Added to reflect the estimate of such claims. |
| 65. | Disclosure Statement § IV.A.2. – Priority Tax Claims Plan – § 2.3 | Each Allowed Priority Tax Claim will, at the option of the Reorganized Debtors shall, unless the holder of such Claim will shall have agreed to different treatment of such Claim: (a) be paid in full in Cash, without interest, by the Reorganized Debtors on the latest of: (i) the Effective Date, or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the holder of such Claim and the Reorganized Debtors may agree; or (b), receive deferred cash payments to the extent permitted by Section section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable non-bankruptcy law or at a rate to be agreed upon by the Reorganized Debtors and the appropriate governmental unit or, if they are unable to agree, to | Revised to reflect that holders of Allowed Priority Tax Claims will be paid pursuant to section 1129(a)(9)(C) of the Bankruptcy Code but subject to the Debtors' right to prepay at any time on or after the Effective Date of the Second Amended Plan. |

28

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
|  |  | be determined by the Bankruptcy Court; provided, however, that the Reorganized Debtors may prepay~~pre~~elect in their sole discretion to pay any or all such Claims at any time, without premium or penalty. ~~For the purpose of option (b),~~ the, in which case the payment shall not include interest if paid on the Effective Date. The payment of each Allowed Priority Tax Claim will~~shall~~ be made in equal quarterly installments with the first installment due on the latest of: (i) the first day following the end of the first full calendar quarter following the Effective Date, (ii) the first day following the end of the first full calendar quarter following the date an order allowing such claim becomes a Final Order, and (iii) such other time or times as may be agreed with the holder of such claim. Each installment will include simple interest~~shall~~ include interest in accordance with section 511 of the Bankruptcy Code on the unpaid balance of the Allowed Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed to or determined ~~under option (b)~~, in accordance with the foregoing. |  |
| 66. | Disclosure Statement § IV.A.3. – Secured Tax Claims" | Allowed Secured Tax Claims<br><br>a.     Generally<br><br>Each holder of an Allowed Claim held by a governmental unit that is secured by an interest in the Debtors' property shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable non-bankruptcy law or at a rate to be agreed upon by the Debtors and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; provided, however, that the Debtors may elect in their sole discretion to pay any or all such Claims at any time, without premium or additional penalty, if any, in which case the payment shall not include interest if paid on the Effective Date. The payment of each Allowed Priority Tax Claim shall be made in equal quarterly installments with the first installment due on the latest of: (i) the first day following the end of the first full calendar quarter following the Effective Date, (ii) the first day following the end of the first full calendar quarter following the date an order allowing such claim becomes a | Revised to reflect that the holders of allowed Secured Tax Claims will be paid pursuant to section 1129(a)(9)(D) of the Bankruptcy Code but subject to the Debtors' right to prepay at any time on or after the Effective Date of the Plan. In addition, the changes also reflect that such Secured Tax Claims are not classified under Class 2 but will be unclassified and deemed unimpaired. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Final Order, and (iii) such other time or times as may be agreed with the holder of such claim. Each installment shall include interest in accordance with section 511 of the Bankruptcy Code on the unpaid balance of the Allowed Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed to or determined in accordance with the foregoing. | |
| | | <u>b.</u>      Section 1124(2) Reinstatement. | |
| | | The Debtors may elect in their sole discretion, on the Effective Date, to cure and reinstate the applicable Allowed Secured Tax Claims as of the first date when last payable without interest, fees or penalties, and, as so cured and reinstated, shall receive a lump sum payment in full on the Effective Date. Under this alternative treatment, the holder of an Allowed Secured Tax Claim shall be paid Cash on the Effective Date equal to the amount of such Allowed Secured Tax Claim due as of the first date when last payable without interest, fees or penalty, plus, to the extent required by section 1124(2) of the Bankruptcy Code any interest thereupon from such date until payment at the rate of interest determined under the applicable nonbankruptcy law and any fees incurred in reasonable reliance on timely receipt of the tax, but exclusive of any penalty amounts thereof at any time incurred or charged (see Bankruptcy Code sections 1123(a)(5)(G) & 1124(2)). | |
| | | <u>c.</u>      Determination of Applicable Treatment. | |
| | | The first treatment indicated above in Section IV.A.3.a shall be applicable to each holder of an Allowed Secured Tax Claim, unless, the Debtors elect to reinstate the applicable Secured Tax Claims as provided in Section IV.A.3.b. The Debtors' election to treat Allowed Secured Tax Claims pursuant to Section IV.A.3.b will be provided in the Plan Supplement. | |
| 67. | Disclosure Statement § IV.C.2 – Secured Claims Classes - 2(a)-2(l) | (a)    *Unimpaired Aircraft Secured Claims and Voting.* Except to the extent that a holder of an Allowed Aircraft Secured Claim agrees to different treatment, | Revised to reflect that the aircraft claims related to the Debtors' owned CRJ 700s and CRJ 900s |

30

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | Plan – §§ 4.2 | in the sole discretion of the Debtors or Reorganized Debtors, on the Effective Date, each Allowed Aircraft Secured Claim set forth in the Plan Supplement or identified below shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such Allowed Aircraft Secured Claim to demand or receive payment of such Allowed Aircraft Secured Claim from and after the occurrence of a default.  Such holders of Allowed Aircraft Secured Claims are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

(b)    *Unimpaired CRJ Equipment Trust Aircraft Secured Claims.*  Unless otherwise agreed to between the Debtors and the controlling counterparty, on the Effective Date, the CRJ Equipment Trust Aircraft Secured Claim shall be Allowed and the Debtors' obligations under the CRJ Equipment Trust Loan Documents relating to the CRJ Equipment Trust Aircraft Equipment shall be reinstated as provided in Section 4.2.1 of the Plan and leaving the rights of CRJ Equipment Trust Secured Claim unimpaired.  The holders of the CRJ Equipment Trust Aircraft Secured Claim will retain their security interest against the CRJ Equipment Trust Equipment and the CRJ Equipment Trust Guaranty will be an obligation of Reorganized Mesa Air Group on and after the Effective Date.

Any dispute with respect to the amount of the CRJ Equipment Trust Aircraft Secured Claim, including, without limitation, disputes as to default interest, fees, and expenses, will be determined by the Bankruptcy Court, and the amounts payable, if any, as so determined, shall be made in accordance with the determination made by the Bankruptcy Court.

The holders of CRJ Equipment Trust Aircraft Secured Claims are reinstated in accordance with section 1124(2) of the Bankruptcy Code and unimpaired and presumed to have accepted the Plan.

(c)    *Unimpaired EDC Aircraft Secured Claims.*  Unless otherwise agreed to between the Debtors and the controlling counterparty, on the Effective Date, the EDC Aircraft Secured Claim shall be Allowed and the Debtors' obligations | will be reinstated pursuant to Section 4.2.2 and 4.2.3 of the Plan. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | under the Credit Agreement Documents relating to the EDC Credit Agreement Equipment shall be reinstated as provided in Section 4.2.1 of the Plan and leaving the rights of the holders of the EDC Aircraft Secured Claims unimpaired. The holders of the EDC Aircraft Secured Claim will retain their security interest against the EDC Credit Agreement Equipment and the EDC Credit Agreement Guaranty will be an obligation of Reorganized Mesa Air Group on and after the Effective Date. | |
| | | Any dispute with respect to the amount of the EDC Aircraft Secured Claim, including, without limitation, disputes as to default interest, fees, and expenses, will be determined by the Bankruptcy Court, and the amounts payable, if any, as so determined, shall be made in accordance with the determination made by the Bankruptcy Court. | |
| | | The holders of EDC Aircraft Secured Claims are reinstated in accordance with section 1124(2) of the Bankruptcy Code and unimpaired and presumed to have accepted the Plan. | |
| | | (d)  *Impaired Secured Claims and Voting.*  All Secured Claims in Classes 2(a)~~-24~~ - 2(l) (other than the Aircraft Secured Claims reinstated pursuant to Sections 4.2.1 through 4.2.3 of the Plan) are impaired under the Plan.  Holders of Secured Claims are entitled to vote on the Plan.  For purposes of distributions under the Plan, each holder of a Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of the Plan. | |
| 68. | Disclosure Statement § IV.C.3 – General Unsecured Claims - Classes 3(a)-3(*l*)<br><br>Plan – § 4.3 | a.  U.S. Citizens.<br><br>On or as soon as practicable following the Effective Date, on the Initial Distribution Date, the Interim Distribution Date, and/or the Final Distribution Date, unless the holder of such Claim shall have agreed to different treatment of such Claim, each holder of an Allowed General Unsecured Claim, which holder is a U.S. Citizen, shall receive, in respect of all of its Allowed General | Revised to reflect that the holders of Allowed Claims in Class 3 will receive New 8% Notes (Series B) on account of the removal of the 2012 Noteholder Claims and the separate consideration provided to them pursuant to Class 6. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Unsecured Claims, distribution(s) of its Aggregate Distribution Percentage of the New Common Stock (after giving effect to the shares of New Common Stock reserved for issuance under the Management Equity Pool and shares of New Common Stock issuable to US Airways) and the New 8% Notes (Series B). Such distributions shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed General Unsecured Claims held by such holder.<br><br>    b. Non-U.S. Citizens.<br><br>On or as soon as practicable following the Effective Date, on the Initial Distribution Date, the Interim Distribution Date, and/or the Final Distribution Date, unless the holder of such Claim shall have agreed to different treatment of such Claim, each holder of an Allowed General Unsecured Claim, which holder is a Non-U.S. Citizen, shall receive, in respect of all of its Allowed General Unsecured Claims, distribution(s) of its Aggregate Distribution Percentage of the New Warrants and the New 8% Notes (Series B). For purposes of calculating distributions to Non-U.S. Citizens, each Non-U.S. Citizen shall receive New Warrants for 110% of the shares of New Common Stock that such Creditor would be entitled to receive if such Creditor was a U.S. Citizen. Such distributions shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed General Unsecured Claims held by such holder. | |
| 69. | Disclosure Statement § IV.C.5 – 510 Subrogation Claims - Classes 5(a) and 5(b)<br><br>Plan – § 4.5 | The Debtors shall provide the holders of 510(a) Subrogation Claims the same distributions of Restructured Unsecured Equity and New 8% Notes (Series B) that would have otherwise been made to such holders of Allowed 510(a) Subrogation Claims if such Claims were treated as Allowed General Unsecured Claims and provided the treatment set forth in Section 4.3.2 of the Plan. The Debtors shall not be required to review or give effect to any subrogation or subordination agreement and, instead, the holders of 510(a) Subrogation Claims shall receive distributions as if their claims were not subject to any such agreements and the burden shall be on the holders of 510(a) Subrogation Claims to honor and give effect to any such agreements. | Revised to reflect that holders of Allowed Claims in Class 5 will receive New 8% Notes (Series B) |

33

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| 70. | Disclosure Statement § IV.C.5 – 2012 Noteholder Claims – Classes 6(a)-6(l)

Plan – § 4.6 | Classes 6(a)-(l) are impaired under the Plan. Holders of 2012 Noteholder Claims are entitled to vote on the Plan.

On or as soon as practicable following the Effective Date, on the Initial Distribution Date, the Interim Distribution Date, and/or the Final Distribution Date, unless the holder of such Claim shall have agreed to different treatment of such Claim, each holder of an Allowed 2012 Noteholder Claim shall receive, in respect of all of its Allowed 2012 Noteholder Claims, *pro rata* distribution(s) of the New 8% Notes (Series A). Such distributions shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed 2012 Noteholder Claims held by such holder.

The New 8% Notes (Series A) are unsecured non-amortized notes that will be issued by Reorganized Mesa Air Group and guaranteed by the other Post-Effective Date Debtors, subject to the terms and conditions in the Plan (as will be described in greater detail in the New Notes Indenture). The New 8% Notes (Series A) will be on identical terms with the other New Notes except for the principal amount and certain payment priority provisions set forth in the Plan. The New 8% Notes (Series A) will be issued in the aggregate principal amount of $19.4 million, accrue interest at a rate of 8% per annum, and are due five (5) years from the Effective Date, with no principal or interest payments due prior to maturity, except to the extent there is a Spirit Liquidity Event. As defined under the Plan, a Spirit Liquidity Event is triggered by the sale of common stock of or payment on notes from Spirit Airlines that are each beneficially owned by Nilchii. In such case, the net proceeds of a Spirit Liquidity Event will be used to satisfy the New 8% Notes (Series A) in accordance with the terms and conditions of the Plan (as will be described in greater detail in the New Notes Indenture). In addition to the standard and customary terms and conditions of indentures, the New Notes Indenture provides for certain payment priorities among the New 8% Notes (Series A), the New 8% Notes (Series B), the US Airways Note and the Management Notes. Thus, in the event of a Spirit Liquidity Event, the net proceeds shall be used first to pay the New 8% Notes (Series A), second, the US Airways Note, third, New 8% Notes (Series B), and | Revised to reflect the holders of Allowed 2012 Noteholder Claims will receive their pro rata share of the New 8% Notes (Series A). |

34

56772-002\DOCS_SF:74794.4

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | fourth, the Management Notes. However, the New 8% Notes (Series A), the New 8% Notes (Series B), and the US Airways Note shall be of equal priority if redeemed or paid in any other scenario. | |
| 71. | Disclosure Statement § IV.D.3.a – Reorganized Mesa Air Group<br><br>Plan § 5.2.1 | Reorganized Mesa Air Group shall be operated and governed in accordance with the Reorganized Mesa Charter Documents. The existing officers of Mesa Air Group shall remain in their existing positions. As set forth in Section 7.10 of the Plan hereof, the Key Employment Agreements and the related guarantees thereof shall be deemed assumed, as amended, effective as of the Effective Date. The initial board of directors of Reorganized Mesa Air Group will shall consist of a nine (9) member board members. The Committee will shall select six (6) members and the Debtors will shall select three (3) members. The initial board members of Reorganized Mesa Air Group will be identified in the Plan Supplement and subject to any related. The appointment of the initial board members of the Reorganized Debtors shall be deemed to be in compliance with any restrictions, if any, in the Code-Share Agreements and/or other key contracts of the Debtors and in compliance with all applicable Federal regulations restricting the level of ownership/control in a United States air carrier by Non-U.S. Citizens. Each of the directors and officers of Reorganized Mesa Air Group shall serve in accordance with applicable non-bankruptcy law and the Reorganized Mesa Charter Documents, as the same may be amended from time to time. From and after the Effective Date, the directors and officers of Reorganized Mesa Air Group shall be selected and determined in accordance with the provisions of applicable law and the Reorganized Mesa Charter Documents. | Revised to clarify the process of appointing new directors and that such actions will be deemed to be in accordance with the terms and conditions of the Code-Share Agreements. |
| 72. | Disclosure Statement § IV.D.4 – Management Notes and Management Equity Pool<br><br>Plan § 5.2.3 | On or as soon as practicable after the Effective Date, Reorganized Mesa Air Group shall issue the Management Notes to selected members of the Debtors' management in place on and after the Effective Date, other than the amounts of Management Notes to be issued to Jonathan G. Ornstein and Michael J. Lotz, the Reorganized Board shall determine the manner in which the remaining Management Notes are allocated. Reorganized Mesa Air Group shall also issue shares of New Common Stock out of the Management Equity Pool to selected members of the Debtors' management in place on and after the Effective Date in | Revised to reflect that the New Common Stock distributed to Management will be subject to the terms and conditions of the Shareholder Agreement. |

35

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language³ | Explanation |
|---|---|---|---|
| | | amounts to be determined by the Reorganized Board, provided, however, that the minimum amount of New Common Stock to be issued to Jonathan G. Ornstein and Michael J. Lotz shall be 3.75% and 2.25%, respectively. Messrs. Ornstein's and Lotz's New Common Stock shall be subject to a vesting schedule to be negotiated with the Committee and disclosed in the Plan Supplement. The shares of New Common Stock issued pursuant to the Management Equity Pool shall be subject to the terms of the Shareholders Agreement. | |
| 73. | Disclosure Statement § IV.D.9 - Retained Causes of Action and/or Defenses<br><br>Plan – § 5.6 | As set forth above in Section II.G.4, as additional consideration to General Unsecured Creditors, the Debtors waive the right to pursue Avoidance Actions, pursuant to sectionSection 547 of the Bankruptcy Code. Unless any Reorganizing Debtor Retained Claim and/or Defense isCauses of Action and Defenses are expressly waived, relinquished, released, compromised, or settled in the Plan or, any Final Order, or the US Airways Tenth Amendment (including, without limitation, the Confirmation Order), the Debtors and, the Reorganized Debtors, and the Liquidating Debtors expressly reserve all such Causes of Action and Defenses set forth in Exhibit C to the Plan for later adjudication by the Reorganized Debtors and Liquidating Debtors, as applicable, including, but not limited to the any Causes of Action listed on Exhibit C hereto. The reservation set forth herein and in this Section 5.6 of the Plan willshall include, without limitation, a reservation by the Debtors and, the Reorganized Debtors, and the Liquidating Debtors of any Causes of Action and/or Defenses not specifically identified in the Plan or Disclosure Statement, or of which the Debtors and/or the Restructured Unsecured Equity Holders may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors and/or the Restructured Unsecured Equity Holders at this time or facts or circumstances that may change or be different from those that the Debtors and/or the Restructured Unsecured Equity Holders now believe to exist and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to such Causes of Action and/or Defenses upon or after the Confirmation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action and/or Defenses have been expressly waived, relinquished, | Revised to reflect the settlement components of the Debtors' assumption of the US Airways Code-Share Tenth Amendment pursuant to Section 7.8.1 of the Plan. |

36

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | released, compromised, or settled in the Plan or a Final Order. Following the Effective Date, the Reorganized Debtors and Liquidating Debtors may assert, compromise or dispose of theany Causes of Action and/or Defenses without further notice to Creditors or authorization of the Bankruptcy Court. Notwithstanding the foregoing and/or anything to the contrary elsewhere in the Plan, nothing in the Plan or the Confirmation Order willshall prejudice or affect: (1) any rights of any Person to assert Claims, including Administrative Claims, against the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transfereestransferee thereof, by way of offset, recoupment, or counterclaim to the extent permitted by applicable law; and/or (2) any defense to any Causes of Action orand Defenses or any other claims asserted by the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transferee thereof. | |
| 74. | Disclosure Statement § IV.D.10 – Issuance of Restructured Equity and New Notes<br><br>Plan – § 5.7 | On the Effective Date, the Reorganized Debtors and Liquidating Debtors shall be authorized and directed to take any and all necessary and appropriate actions to issue and deliver the Restructured Equity, and the New 8% Notes, the Management Notes, and the U.S. Airways NoteNotes in accordance with the Plan. The Restructured Equity shall be issued in the form of New Common Stock and New Warrants. The New Common Stock to be initially issued pursuant to the Plan and upon exercise of the New WarrantsRestructured Unsecured Equity shall represent 80% of the ownership interests in Reorganized Mesa Air Group (after giving effect to the shares of New Common Stock issuable under the Management Equity Pool and to U.S. Airways). The terms of the New 8%US Airways). Any holder of five percent (5%) or more of the then issued and outstanding shares of New Common Stock (determined at the time such holder acquires such shares), whether such holder acquires such shares (i) as of the Effective Date, (ii) subsequent to the Effective Date as a result of the issuance of additional shares of New Common Stock on account of Allowed Claims, (iii) upon exercise of New Warrants issued as of the Effective Date, or (iv) upon the exercise of New Warrants issued subsequent to the Effective Date on account of Allowed Claim, such holder shall be required to enter into the Shareholders Agreement. The term of the Shareholders Agreement shall be the earlier of the exercise of 80% or more | Revised to reflect the changes regarding the issuance of Restructured Equity and the payment priorities among the New 8% Notes (Series A), New 8% Notes (Series B), US Airways Notes, and Management Notes. |

37

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | of the New Warrants issued under the Plan or five (5) years. The Shareholders Agreement shall require a holder to vote all shares of New Common Stock of the Company registered in their respective names or beneficially owned by them, and any transferee thereof, in accordance with a majority of the Board of Directors of Reorganized Mesa Air Group on such matters thereafter requiring or submitted for shareholder approval, provided, however, that such voting requirement shall only apply to those shares of New Common Stock that exceed such holder's Estimated Initial Pro Rata Share of Restructured Unsecured Equity. For purposes of example only, if a holder of an Allowed Claim that is entitled to receive shares of New Common Stock on the Effective Date equal ten percent (10%) of Restructured Unsecured Equity (i.e., 1,000,000 shares based on 10,000,000 shares reserved for issuance under the Plan) and on such date only 3,000,000 shares of New Common Stock are actually issued and outstanding, then such holder shall be required to vote 700,000 of the 1,000,000 shares held by such holder in accordance with the Shareholders Agreement and shall be free to vote the remaining 300,000 shares (i.e., 10% of the 3,000,000 shares issued and outstanding) in its sole discretion. | |
| | | The terms of the New Notes shall be subject to the terms and conditions of the Plan and set forth in greater detail in the New 8% Notes Indenture and related documents to be submitted as part of the Plan Supplement. The terms of the Management Note shall be set forth in the Management Notes Agreement and related documents to be submitted as part of the Plan Supplement. The terms of the U.S. Airways Note shall be set forth in the U.S. Airways Note AgreementNotes Indenture and related documents to be submitted as part of the Plan Supplement. Other than the principal amount, the terms of the New 8% Notes, (Series A), the New 8% Notes (Series B), the Management Notes, and U.S.the US Airways Note shall be substantially similaridentical except thatfor principal amount and (a) the Management NoteNotes shall be subordinated to the New 8% Notes (Series A), the New 8% Notes (Series B) and the U.S. Airways NoteUS Airways Note, and (b) the New 8% Notes (Series A) and the US Airways Notes shall be subject to priority prepayment upon the occurrence, if ever, of a Spirit Liquidity Event as set forth in the Plan (and as will be | |

38

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language³ | Explanation |
|---|---|---|---|
| | | described in greater detail in the New Notes Indenture). | |
| | | The Reorganized Mesa Charter shall include restrictions on transfers of the ~~New Common Stock~~Restructured Equity (including shares issuable upon exercise of the New Warrants) (i) to Non-U.S. Citizens, (ii) that would result in Reorganized Mesa Air Group having ~~300~~500 or greater ~~shareholders~~holders of record and therefore becoming subject to the reporting obligations under the Securities Exchange Act of 1934, as amended, (iii) that would result in a change in control of Reorganized Mesa Air Group under its then existing Code-Share Agreements, and (iv) that would result in the loss of Reorganized Mesa Air Group's net operating loss; *provided, however,* in the event that the Reorganized Board determines to list Reorganized Mesa Air Group on a public exchange or the Reorganized Debtors otherwise become subject to the reporting obligations under the Securities Exchange Act of 1934, ~~as amended,~~ then the restrictions of subsection (ii) shall not apply. | |
| | | The New Common Stock when issued or distributed as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable. Each distribution and issuance of such New Common Stock shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person receiving such distribution or issuance. | |
| | | The Debtors (and each of their respective affiliates, agents, directors, officers, members, managers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable law with regard to the distribution of the New Common Stock and the New Warrants under the Plan (including, without limitation, any awards made under the Management Equity Pool), and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Upon | |

39

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | entry of the Confirmation Order, all provisions of the Plan addressing distribution of ~~Restructured Equity~~ the New Common Stock and New Warrants shall be deemed necessary and proper. | |
| 75. | Disclosure Statement § IV.D.12 – Restrictions on the Resale of Securities to Protect Net Operating Losses<br><br>Plan § 5.9 | To avoid adverse federal income tax consequences resulting from an ownership change (as defined in Section 382 of the Internal Revenue Code), the articles of incorporation of Reorganized Mesa Air Group , which shall be subject to approval by the Committee and US Airways, shall restrict the transfer of (i) Restructured Equity and (ii) Claims prior to their Allowance without the consent of the Reorganized Board for twelve (12 ~~three (3~~) years after the Effective Date, ~~subject to extension for up to 3 additional years if the Reorganized Board determines in its reasonable discretion that such restrictions are necessary to preserve the value of the Reorganized Debtors' NOLs~~ such that (a) no holder of ~~5~~5.0% or more of the ~~equity~~ Restructured Equity of Reorganized Mesa Air Group may transfer any ~~securities~~ Restructured Equity, (b) no transfer will be permitted if it would cause the transferee to hold 4.75% or more of the equity of Reorganized Mesa Air Group (as determined in accordance with Section 382 of the Tax Code), (c) no transfer will be permitted if it would increase the percentage ~~equity~~ Restructured Equity ownership of any person who already holds 4.75% or more of the ~~equity~~ Restructured Equity of Reorganized Mesa Air Group (as determined in accordance with Section 382 of the Tax Code), and (d) no transfer of a Claim will be permitted if it would cause the transferee to hold 4.75% or more of Restructured Equity upon the Allowance of such Claim (as determined in accordance with Section 382 of the Tax Code), except as may be otherwise agreed to by Reorganized Board if it determines in its reasonable discretion that such restrictions are not necessary to preserve the value of the Reorganized Debtors' NOLs. | Revised to reflect the Restructured Equity and Claims transferring restrictions necessary to protect the Debtors' net operating losses. |
| 76. | Disclosure Statement § IV.E.4.g.i – Cash Reserve<br><br>Plan § 6.4.7(a) | On and after the Effective Date, the Post-Effective Date Debtors ~~will~~ shall maintain in reserve such Cash as they estimate to be necessary to satisfy any Cash distributions required to be made to Creditors (other than Creditors in Class 4~~3~~ and Class 5) under the Plan ~~if each~~ for Class 1, Class 2 and Class 4 | Revised to reflect the Cash Reserve requirements pursuant to section 6 of the Second Amended Plan. |

40

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| 77. | Disclosure Statement § IV.E.4.g.ii – Restructured Unsecured Equity/New 8% Notes (Series A) and New 8% Notes (Series B) Reserves<br><br>Plan § 6.4.7(b) | Disputed ~~Claim~~Claims and Estimated ~~Claim~~Claims against the Debtors ~~becomes an Allowed Claim against the Post-Effective Date Debtors~~.<br><br>On or as soon as practicable after the Effective Date, the Post-Effective Date Debtors shall distribute to those holders of Allowed Claims that are entitled to receive Restructured Unsecured Equity, New 8% Notes (Series A) and/or New 8% Notes (Series B) on the Effective Date a distribution of each such holder's Estimated Initial Pro Rata Share of Restructured Unsecured Equity and Estimated Initial Pro Rata Share of New 8% Notes, respectively. With respect to any Disputed Claim or Estimated Claim that becomes an Allowed Claim entitled to receive Restructured Unsecured Equity, New 8% Notes (Series A) and/or New 8% Notes (Series B) after the Effective Date, on the next ~~Class-3~~ ~~Distribution Date or Class 5~~ Distribution Date, as applicable, following the date on which such Disputed Claim or Estimated Claim becomes an Allowed Claim, the Post-Effective Date Debtors shall distribute to the holder of such Allowed Claim its Estimated Additional Pro Rata Share of Restructured Unsecured Equity and/or its Estimated Additional Pro Rata Share of New 8% Notes (Series A) and/or New 8% Notes (Series B), as applicable. On each Interim Distribution Date, the Post-Effective Date Debtors shall distribute to the holders of Restructured Unsecured Equity a True-Up Equity Distribution and/or to the holders of New 8% Notes (Series A) and/or New 8% Notes (Series B) a True-Up Note Distribution, as applicable. After all Disputed Claims and Estimated Claims have become Allowed Claims or otherwise been disallowed, on the Final Distribution Date, the Post-Effective Date Debtors shall make a final distribution of Restructured Unsecured Equity ~~and New 8%~~ ~~Notes~~, New 8% Notes (Series A) and/or New 8% Notes (Series B) such that (i) each holder of Restructured Unsecured Equity (including any holder of an Allowed Claim who first becomes entitled to receive Restructured Unsecured Equity on such distribution date) has received its Actual Pro Rata Share of Restructured Unsecured Equity and (ii) each holder of New 8% Notes (Series A) and/or New 8% Notes (Series B) (including any holder of an Allowed Claim who first becomes entitled to receive New 8% Notes (Series A) and/or New 8% Notes (Series B) on such distribution date) has received its Actual | Revised to reflect the reserve requirements for distributions New 8% Notes (Series A) and New 8% Notes (Series B) pursuant to section 6 of the Second Amended Plan. |

41

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Pro Rata Share of ~~New 8%~~such Notes. The Reorganized Mesa Charter Documents shall be structured in a manner that authorizes the issuance of and/or reserve a sufficient number of shares ~~of New Common Stock, including shares of New Common Stock issuable upon exercise of the New Warrants~~comprising the Restructured Equity, to permit the distributions set forth above. For the avoidance of doubt, distributions of New 8% Notes (Series A) and/or New 8% Notes (Series B) to any Person holding a Disputed Claim or Estimated Claim against the Debtors that becomes an Allowed Claim after the Effective Date shall be made together with any and all interest and amounts accrued under the New 8% Notes (Series A) and/or New 8% Notes (Series B) from the Effective Date until the date of payment thereof. | |
| 78. | Disclosure Statement § IV.E.8 - Setoff | Nothing contained in the Plan ~~will~~shall constitute a waiver or release by the Debtors of any right of setoff or recoupment the Debtors may have against any Creditor. To the extent permitted by applicable law, the Post-Effective Date Debtors may, ~~but are not required to, set-off~~ setoff or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtors may have against the holder of such Claim or Interest. Notwithstanding the foregoing or anything to the contrary elsewhere in the Plan, nothing in the Plan or the Confirmation Order ~~will~~shall prejudice ~~or~~, affect, or limit (1) any rights of any Person to assert or effectuate rights of setoff under section 553 of the Bankruptcy Code or otherwise assert Claims, including Administrative Claims, against the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transferee thereof, by way of offset, recoupment, or counterclaim to the extent permitted by applicable law; ~~and~~or (2) any defense to any Causes of Action or~~and~~ Defenses or any other claims asserted by the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates, or any transferee thereof. | Revised to clarify the setoff limitations under the Second Amended Plan. |
| 79. | Disclosure Statement § IV.F.7 – Executory Contracts and Unexpired Leases | The Code-Share Agreements will be assumed either by separate motions or as provided in this Section. Upon assumption, the Code-Share Agreements shall | Revised to reflect the assumption of the Tenth Amendment to the US Airways Code-Share |

42

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language³ | Explanation |
|---|---|---|---|
| | Plan – § 7.8.1 | vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of ~~this~~the Plan or any order of the Bankruptcy Court previously entered with respect to such Code-Share Agreement. Nothing in ~~this~~the Plan or the Confirmation Order shall be deemed a violation of such Code-Share Agreements.<br><br>Notwithstanding anything in ~~this~~the Plan to the contrary, the Debtors will assume the ~~U.S.~~US Airways Code-Share Agreement as modified by the ~~U.S.~~US Airways Tenth Amendment (which as of ~~September 17,~~November 1, 2010 is being finalized) pursuant to a separate motion to be presented to the Court for approval in connection with~~advance~~ of confirmation of the Plan, and such assumption shall be subject to the conditions set forth in the US Airways Tenth Amendment. The assumption of the ~~U.S.~~US Airways ~~Amended~~ Code-Share Agreement as modified by the ~~U.S.~~US Airways Tenth Amendment will be effective as of the Effective Date. In consideration for the ~~U.S.~~US Airways Tenth Amendment, ~~U.S.~~US Airways shall receive (i) 10% of the New Common Stock of the Reorganized Mesa Air Group on a fully diluted basis, subject the Shareholders Agreement, and (ii) the ~~U.S. Airways Note.~~US Airways Note. Upon the occurrence or non-occurrence of certain events, both the Debtors and US Airways may exercise certain rights that materially affect the terms of the US Airways Tenth Amendment. A description of these risks are set forth in Section V.B.6 below. | Agreement and the related claims settlement thereunder pursuant to section 7.8.1 of the Second Amended Plan. |
| 80. | Disclosure Statement § IV.F.9 – Executory Contracts and Unexpired Leases<br><br>Plan – § 7.9 | The CRJ 700 Aircraft Leases and CRJ 900 Aircraft Leases will be assumed as provided under Section 7 of the Plan. Upon assumption, the CRJ 700 Aircraft Leases and CRJ 900 Aircraft Leases shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with the applicable terms of the foregoing leases. | Added to reflect the Debtors' assumption of the leases governing their CRJ 700 and CRJ 900 Aircraft. |
| 81. | Disclosure Statement § IV.F.10 – Executory Contracts and Unexpired Leases<br><br>Plan – § 7.10 | Notwithstanding anything in the Plan to the contrary, each Collective Bargaining Agreement shall be deemed assumed effective as of the Effective Date. Each Collective Bargaining Agreement assumed pursuant to this Section shall vest in and be fully enforceable by the applicable Post-Effective Date Debtor in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court previously entered with respect to such | Revised to reflect the Debtors' cure obligations regarding claims under the Collective Bargaining Agreements. |

43

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Collective Bargaining Agreement. The Assumption Obligations for each of the Collective Bargaining Agreements shall be satisfied by the Reorganized Debtors paying in the ordinary course all obligations arising under the Collective Bargaining Agreements, including grievance settlements and arbitration awards, ~~provided, however, that any payments on account of the Settlement Agreement and Mutual Releases~~ unless otherwise agreed between the Debtors and the ~~ALPA, dated May 2010 shall be limited to distributions provided under the Plan~~counterparty to the Collective Bargaining Agreement. | |
| 82. | Disclosure Statement § IV.F.11 –Key Employment Agreements<br><br>Plan § 7.11 | Notwithstanding anything in th~~is~~the Plan to the contrary, each Key Employment Agreement shall be deemed assumed along with the guarantees thereof by the other Reorganized Debtors, each as modified pursuant to terms agreed upon among the Debtors, the Committee, and the affected employee, effective as of the Effective Date. The guarantee of the Key Employment Agreements by Nilchii shall be subordinate to the payment of the New 8% Notes (Series A), US Airways Notes, New 8% Notes (Series B) and Management Notes. The prepetition amounts in the Deferred Compensation Plan Accounts shall remain in place for the benefit of the employees for which such accounts were established. As a result of such assumption, the beneficiaries of such Key Employment Agreements will be paid outstanding prepetition payments on the Effective Date and all other prepetition contingent claims (*i.e.*, those arising from the modification) of the officers that are parties to such agreements shall be deemed satisfied to the extent not satisfied by the Management Equity Pool. Each Key Employment Agreement and the guarantees thereof shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of th~~is~~the Plan or any order of the Bankruptcy Court previously entered with respect to such Key Employment Agreement. | Revised to reflect the subordination of payment provisions subject to the Key Employment Agreements. |
| 83. | Disclosure Statement § IV.F.12- Executory Contracts and Unexpired Leases<br><br>Plan – § 7.12 | Notwithstanding anything to the contrary in the Plan or Confirmation Order (including, without limitation, any other provision that (i) purports to be preemptory or supervening or grants an injunction or release or (ii) provides for an Administrative Claim Bar Date or requires a creditor to file an objection to proposed Assumption Obligations), on the Effective Date (a) the ACE Insurance Program and the Debtors' obligations thereunder shall be deemed and treated as executory contracts and assumed under the Plan by the Debtors pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code and shall continue as | Added to reflect the Debtors' assumption of the insurance policies under the ACE Insurance Program pursuant to section 7.12 of the Second Amended Plan. |

44

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | obligations of the Reorganized Debtors (b) the ACE Companies' claims under the ACE Insurance Program whether arising prior to the Petition Date, during the Chapter 11 Cases, or after the Effective Date (i) shall continue to be secured by any and all collateral and/or security provided by the Debtors in accordance with the terms and conditions of the ACE Insurance Program, (ii) shall be paid by and enforceable against the Reorganized Debtors in the ordinary course of business after the Effective Date pursuant to and in accordance with the terms and conditions of the ACE Insurance Program, (iii) shall not be discharged, impaired or released by the Plan or Confirmation Order, and (iv) shall be subject to all of the Debtors', the Reorganized Debtors' and the ACE Companies' rights, claims, defenses and remedies under the ACE Insurance Program and applicable non-bankruptcy law; (c) nothing in the Plan or Confirmation Order shall be construed as, or is, a determination as to coverage under the ACE Insurance Program and all rights of the Debtors, Reorganized Debtors, and the ACE Companies shall be preserved to seek or contest such coverage, as applicable; and (d) nothing in the Plan or the Confirmation Order in any way: (i) precludes or limits the rights of the ACE Companies, the Debtors, or the Reorganized Debtors to contest and/or litigate with any party, including, without limitation, the Debtors, Reorganized Debtors, or the ACE Companies, as applicable, the existence, primacy and/or scope of available coverage under any alleged applicable policy under the ACE Insurance Program; (ii) alters the Debtors', Reorganized Debtors', and the ACE Companies' rights and obligations under the ACE Insurance Program or modifies the coverage provided thereunder; or (iii) alters the rights and obligations of the Debtors and the Reorganized Debtors under the ACE Insurance Program, including, without limitation, any duty to defend, at their own expense, against claims asserted under the ACE Insurance Program. | |
| 84. | Disclosure Statement § IV.H.3 - Discharge and Permanent Injunction  Plan – § 9.4 | Except as otherwise set forth in the Plan and the US Airways Tenth Amendment, Confirmation of the Plan shall discharge the Debtors and the Reorganized Debtors from all Claims or other debts that arose at any time before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim has accepted the Plan.  As of the Effective Date, all entities | Revised to reflect the limited release and discharge of the rights and obligations between the Debtors and US Airways as modified pursuant to Tenth Amendment to the US Airways Code-Share Agreement. |

45

56772-002\DOCS_SF:74794.4

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full extent provided under Section 524(a) of the Bankruptcy Code, from "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability" of the Debtors or the Reorganized Debtors, except as otherwise set forth in ~~the~~ this Plan. Nothing contained in the foregoing discharge shall, to the full extent provided under Section 524(e) of the Bankruptcy Code, affect the liability of any other entity on, or the property of any other entity for, any debt of the Debtors that is discharged under the Plan. | |
| 85. | Disclosure Statement § IV.H.4.b - Voluntary Releases by Holders of Claims<br><br>Plan – § 9.3.2 | For good and valuable consideration, as of the Effective Date, holders of Claims who (a)(i) voted to accept or reject the Plan and (ii) did not elect (as permitted on the applicable ballots) to opt out of the release described in this Section 9.3.2 of the Plan or (b) failed to properly complete and execute a ballot in connection with voting on the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged all Agents of each of the Debtors, their Estates, the Reorganized Debtors and/or the Liquidating Debtors from any and all Causes of Action and Defenses whatsoever, including derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Agent thereof, and/or the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, which Causes of Action and Defenses are based in whole or in part on any act, omission, transaction, event or other occurrence (except for willful misconduct, ultra vires acts, or gross negligence) taking place before the Effective Date; _provided, however_, the releases in this Section 9.3.2 shall not otherwise affect the limited release as provided under the US Airways Tenth Amendment. The vote or election of a trustee or other agent under this Section 9.3.2 of the Plan acting on behalf of or at the direction of a holder of a Claim shall bind such holder to the same extent as if such holder had itself voted or | Revised to reflect the limited release and discharge of the rights and obligations between the Debtors and US Airways as modified pursuant to Tenth Amendment to the US Airways Code-Share Agreement. |

46

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | made such election. A holder of a Claim who did not cast a ballot on the Plan or who was not entitled to cast a ballot shall be deemed to have opted out of the release set forth in this Section 9.3.2 of the Plan 9.3.2. | |
| 86. | Disclosure Statement §IV.H.3-6<br><br>Plan –§§ 9.3-9.6 | Releases / Discharge and Permanent Injunction / Limitation of Liability / Exculpation and Reliance | Text underlined in accordance with requirements set forth in Bankruptcy Rule 3016. |
| 87. | Disclosure Statement § IV.K.4 – Quarterly Fees to the United States Trustee/Post-Confirmation Status Report<br><br>Plan – § 12.6 | All fees payable under 28 U.S.C. § 1930(a)(6), and interest and penalties payable under 31 U.S.C. § 3717, will be paid by the Debtors in the amounts and at the times such fees amounts may become due up to and including the Effective Date. Thereafter, the Post-Effective Date Debtors will pay all fees payable under 28 U.S.C. § 1930(a)(6), and interest and penalties payable under 31 U.S.C. § 3717, until the Chapter 11 Cases are closed, dismissed or converted. Upon the Effective Date, the Post-Effective Date Debtors will be relieved from the duty to make the reports required by Bankruptcy Rules 2015 and 2015.3. Notwithstanding the foregoing, the Post-Effective Date Debtors will file and serve the post-confirmation status reports at such times and for such period as required pursuant to Local Bankruptcy Rule 3021-1. The status reports will be made, and the fees will be payable, on a consolidated basis by the Post-Effective Date Debtors. | At the request of the Office of the United States Trustee, payment of interest and penalties under 31 U.S.C. § 3717 added. |
| 88. | Disclosure Statement § V.B.5 – Risk Factors | There is risk that the Bankruptcy Court could delay confirmation of the Plan until the Debtors resolve certain Administrative Expense Claims asserted against the Debtors. As of the date of this Disclosure Statement, approximately $45.8 million of Administrative Expense Claims had been asserted against the Debtors' estates on account of surrender and return condition claims asserted pursuant to section 1110 of the Bankruptcy Code and other asserted postpetition breaches (collectively, the "Asserted Aircraft Administrative Claims"). See Section III.E. The Debtors anticipate that certain aircraft counterparties will assert additional Asserted Administrative Claims. As of November 1, 2010, the Debtors project they will hold approximately $50.5 million in Cash on Hand. See Section II.G.2.<br><br>In certain instances, the holders of the Asserted Aircraft Administrative Claims indicate that such claims were filed as a protective measure but provide no | Added to describe the potential delay of Confirmation on account of the Asserted Aircraft Administrative Claims |

47

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | specific dollar amount or factual support for such claim. The Debtors have objected to such claims. See Section III.E.2. The holders of approximately $45.8 million of Asserted Aircraft Administrative Claims provided the Debtors with detailed reports or other information in support of their claims that catalogued the asserted deficiencies (and accompanying claim amounts) with respect to the surrender and return of certain aircraft and other asserted postpetition breaches. The Debtors believe that the aircraft-related Asserted Aircraft Administrative Claims are without merit and believe they will be successful in contesting the validity of such claims. There is a possibility that the litigation to contest such claims could be a multi-month process (if not longer with the possibility of appeals) that could delay the confirmation process and that the costs to the estates will further diminish the Cash on Hand. If the Debtors are not successful in contesting the Asserted Aircraft Administrative Claims, or reaching a consensual resolution with the holders of the Asserted Administrative Expense Claims to reduce such claims and/or to accept treatment other than payment in full in cash, there is a possibility that Confirmation of the Plan could be delayed so that the Debtors can address Asserted Aircraft Administrative Claims and the requirements under section 1129(a)(9) of the Bankruptcy Code.

Absent a successful resolution of litigation to reduce the Asserted Aircraft Administrative Claims or a consensual resolution prior to the Confirmation Hearing, it is anticipated that at least certain holders of Asserted Aircraft Administrative Claims will object to confirmation of the Plan and/or request that the Bankruptcy Court require the Debtors to reserve cash in an amount equal to 100% of the Asserted Aircraft Administrative Claims. However, in light of the Debtors' belief that the Asserted Aircraft Administrative Claims are without merit and the impact any delay could have on the Debtors' business operations, the Debtors reserve their rights to seek to have the Bankruptcy Court estimate Asserted Aircraft Administrative Claims for purposes of Confirmation. Certain claimants are likely to object to any estimation of their Asserted Aircraft Administrative Claims. | |
| 89. | Disclosure Statement § V.B.6 – Risk Factors | As provided under the US Airways Tenth Amendment, if (a) the Plan is not confirmed by the January 17, 2011 (which date may be extended to March 18, 2011 if the Plan has not been confirmed despite the Debtors' best efforts) in a form approved by US Airways as described in the US Airways Tenth | Added to describe that consummation of the Tenth Amendment to the US Airways Code-Share Agreement is subject |

48

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Amendment or (b) the Plan has not become effective on or before February 17, 2011 or (c) the US Airways Tenth Amendment is approved by the Bankruptcy Court and is thereafter modified, vacated, stayed or amended without US Airways' consent (such consent to be granted or withheld in US Airways' sole discretion), US Airways shall have the right to declare the order approving the US Airways Tenth Amendment vacated and of no further effect.<br><br>Commencing on a date 30 days after the occurrence of the (a) or (b) in the immediately preceding paragraph, if US Airways has not elected to vacate the order approving the US Airways Tenth Amendment, the Debtors shall have the right to make the same vacatur. Upon a vacatur by either US Airways or the Debtors, (x) US Airways shall retain all amounts under the US Airways Tenth Amendment that would have otherwise been due to the Debtors had the order approving the US Airways Tenth Amendment not been entered and such amounts shall not be subject to disgorgement, set-off, offset, recovery or return, (y) US Airways and the Debtors shall have all of their respective rights under the US Airways Code-Share Agreement (including the Debtors' right to assume the US Airways Code-Share Agreement and US Airways' right to contest such assumption) and (z) the new payment terms under the US Airways Tenth Amendment shall survive any assumption of the US Airways Agreement and remain in effect without modification. | to various deadlines related to confirmation of the Second Amended Plan and the parties' rights upon such deadlines to alter the terms and conditions of the Tenth Amendment to the US Airways Code-Share Agreement. |
| 90. | Disclosure Statement § V.B.7 – Risk Factors | In the event the United Code-Share Agreement is not extended or the related aircraft are not put into service by the Debtors with another carrier, the Debtors intend to sublet their CRJ 700 aircraft. If such aircraft are sublet, the Debtors have assumed the monthly sublease rate of $150,000 per aircraft in determining projected sublease revenue for CRJ 700 aircraft. This assumption is based in part upon market lease rate estimates provided by a third-party consultant that show a monthly lease rate range between $140,000 and $155,000 for aircraft of the same vintage as the Debtors' CRJ 700 aircraft. The Debtors believe their CRJ-700 aircraft should command comparable or even slightly higher lease rates due to the dual-class seating configuration. Most major airlines, including United, Delta, and American Airlines, have moved to offer dual-class seating on routes served by CRJ-700 aircraft. | Added to describe the Debtors' assumptions regarding sublease of the CRJ-700 Aircraft if the United Code-Share Agreement is not extended. |

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | The projected sublease revenues also include maintenance reserves to be paid by the sublessee based upon utilization levels of the aircraft. The maintenance reserve rates are consistent with maintenance reserves currently paid by the Debtors for their leased engines. In addition, the utilization levels for the CRJ 700 aircraft are consistent with those currently flown under the United Code-Share Agreement.<br><br>After CRJ 700 aircraft are removed from revenue service with United, the Debtors have assumed an average three (3) month period before such aircraft could be placed into service under a new sublease. This time will be necessary to complete maintenance and preparation work prior to subletting.<br><br>A sensitivity analysis of the financial impact to the Debtors' projections from changes to its sublease assumptions is shown in the chart below. As an example, if the idle time on average was only one (1) month and the average sublease rate was $155,000 per month, the Debtors' projected income would improve by $6.9 million. If, however, the idle time is five (5) months on average and the sublease rate is $140,000 per month, the Debtors' projected income would be reduced by $8.7 million. | |
| 91. | Disclosure Statement § V.C.2.iii – Certain Federal Income Tax Consequences of the Plan | The consummation of the Plan is expected to cause an Ownership Change with respect to the Debtors on the Effective Date. Accordingly, IRC Section 382 would generally apply to limit the Debtors' use of any remaining pre-change NOLs after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD income and the consequences any prior Ownership Changes. The Ownership Change resulting from the consummation of the Plan is subject to one of the special bankruptcy rules of IRC Section 382(l)(5) or IRC Section 382(l)(6) described below. | Revised to reflect the Debtors' tax disclosures regarding NOLs. |
| 92. | Disclosure Statement § V.C.c.iii – Special Bankruptcy Exceptions to Section 382 | The consummation of the Plan is expected to cause an Ownership Change with respect to the Debtors on the Effective Date. Accordingly, IRC Section 382 would generally apply to limit the Debtors' use of any remaining pre-change NOLs after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD income and the consequences any prior Ownership | Added to reflect the Debtors' projections regarding Section 382 matters. |

50

| Item No. | Disclosure Statement/ Plan Section | Amended/Revised Language[3] | Explanation |
|---|---|---|---|
| | | Changes. The Ownership Change resulting from the consummation of the Plan is subject to one of the special bankruptcy rules of IRC Section 382(l)(5) or IRC Section 382(l)(6) described below. | |

51