PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York  10017
Telephone: 212-561-7700
Facsimile:  212-561-7777
Richard M. Pachulski
Laura Davis Jones
Debra I. Grassgreen
Maria A. Bove
John W. Lucas

Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MESA AIR GROUP, INC., *et al*., | Case No. 10-10018 (MG) |
| Debtors.[1] | (Jointly Administered) |

**PLAN SUPPLEMENT TO SECOND AMENDED JOINT PLAN**
**OF REORGANIZATION OF MESA AIR GROUP, INC. AND**
**AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: December 28, 2010

---

[1] The Debtors are:  Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group ‒ Airline Inventory Management, LLC (2015); Nilchii, Inc. (5531); and Patar, Inc. (1653).

## EXHIBIT A

**(Mesa Air Group Charter Documents)**

**(Mesa Air Group Restated Articles of Incorporation)**

56772-002\DOCS_SF:75217.1

## RESTATED

## ARTICLES OF INCORPORATION

## OF

## MESA AIR GROUP, INC.

FIRST:  The name of the corporation is:

Mesa Air Group, Inc. (the "Corporation").

SECOND:  The address of the registered office of the Corporation in the State of Nevada is located at 6100 Neil Road, Suite 500, in the City of Reno, County of Washoe.  The name of the registered agent at such address is The Corporation Trust Company.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the laws of the State of Nevada.

FOURTH:  The Corporation is authorized to issue two classes of stock, to be designated "Common Stock," no par value per share, and "Preferred Stock," no par value per share.  The total number of shares of Common Stock that the Corporation shall have authority to issue is Fifteen Million (15,000,000), and the total number of shares of Preferred Stock that the Corporation shall have authority to issue is Two Million (2,000,000).

The board of directors of the Corporation (the "Board") is authorized, subject to any limitations prescribed by law, to provide for the issuance of shares of Preferred Stock in series and, by filing a certificate pursuant to the applicable law of the State of Nevada, to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences and rights of the shares of each such series and any qualifications, limitations or restrictions thereon.  The number of authorized shares of any class of capital stock of the Corporation may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the outstanding shares of Common Stock, without a vote of the holders of the Preferred Stock, or of any series thereof, unless a vote of any such holders is required pursuant to the certificate or certificates establishing any series of Preferred Stock.

FIFTH:  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  In addition to the powers and authority expressly conferred upon them by statute or by these Restated Articles of Incorporation or the Bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.  Election of directors need not be by written ballot, unless the Bylaws so provide.

SIXTH:  The Board of Directors is authorized to make, adopt, amend, alter or repeal the Bylaws of the Corporation.

56772-002\DOCS_SF:75217.1

SEVENTH:  The name and mailing address of the incorporator is:

> Gregory R. Hall, Esq.
> DLA Piper LLP (US)
> 2525 East Camelback Road
> Suite 1000
> Phoenix, AZ  85016-4232

EIGHTH:  To the fullest extent allowable under the Nevada Revised Statutes, no director or officer shall have personal liability to the Corporation or its shareholders, or to any other person or entity, for monetary damages for breach of his fiduciary duty as a director, except where there has been:  (a) acts or omissions which involve intentional misconduct, fraud or knowing violation of law; or (b) authorization of the unlawful payment of a dividend or other distribution on the Corporation's capital stock, or the unlawful purchase of its capital stock.  If the Nevada Revised Statutes are hereafter amended to authorize further elimination of liability of a director or officer, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the Nevada Revised Statutes, as so amended.

NINTH:  The Corporation may, to the fullest extent permitted by the provisions of Section 78.751 of the Corporation Code of the Nevada Revised Statutes, as the same may be amended and supplemented, indemnify all persons whom it shall have power to indemnify under such section from and against any and all of the expenses, liabilities or other matters referred to in or covered by such section, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any Bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.  The Corporation shall pay or otherwise advance all expenses of officers and directors incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding as such expenses are incurred and in advance of the final disposition of the action, suit or proceeding, provided that the indemnified officer or director undertakes to repay the amounts so advanced if a court of competent jurisdiction ultimately determines that such officer or director is not entitled to be indemnified by the Corporation.  Nothing herein shall be construed to affect any rights to advancement of expenses to which personnel other than officers or directors of the Corporation may be entitled under any contract or otherwise by law.  Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection existing at the time of, or increase the liability with respect to any acts or omissions occurring prior to, such repeal or modification.

TENTH:  Pursuant to Section 78.434 of the Corporation Code of the Nevada Revised Statutes, as the same may be amended and supplemented, the Corporation elects not be governed by Sections 78.411 to 78.444 inclusive of the Nevada Revised Statutes.

ELEVENTH:

(a)     *Definitions.*  As used in this Article Eleventh, the following capitalized terms have the following meanings when used herein with initial capital letters (and any references to any portions of Treasury Regulation § 1.382-2T shall include any successor provisions):

(1)     *"4.75-percent Transaction"* means any Transfer described in clause (i) or (ii) of paragraph (b)(1) of this Article Eleventh.

(2)     *"4.75-percent Stockholder"* a Person who owns 4.75% or more of the aggregate of (i) the Corporation's then-outstanding Common Stock and (ii) the Corporation's Stock.  For this purpose (i) a Person's ownership will be measured and determined pursuant to Section 382 of the Code, or any successor provision or replacement provision and the Treasury Regulations thereunder (ii) a Person's ownership includes direct and indirect ownership and (iii) a Person's ownership will include shares such Person would be deemed to constructively own or which otherwise would be aggregated with shares owned by such Person pursuant to Section 382 of the Code, or any successor provision or replacement provision and the Treasury Regulations thereunder (substituting 5 percent with 4.75 percent where relevant),

(3)     *"Agent"* has the meaning set forth in paragraph (e) of this Article Eleventh.

(4)     *"Change of Control"* means any "person" or "group" (each as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act) either becomes the beneficial owner (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of voting securities of the Corporation (or securities convertible into or exchangeable for such voting securities) representing 50% or more of the combined voting power of all voting securities of the Corporation (on a fully diluted basis) or otherwise has the ability, directly or indirectly, to elect a majority of the Board of Directors of the Corporation or any person or two or more persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence on the management or policies of the Corporation.

(5)     *"Common Stock"* means any interest in Common Stock, no par value per share, of the Corporation that would be treated as "stock" of the Corporation pursuant to Treasury Regulation § 1.382-2T(f)(18).

(6)     *"Code"* means the United States Internal Revenue Code of 1986, as amended from time to time, and the rulings issued thereunder.

(7)     *"Corporation Security"* or *"Corporation Securities"* means (i) shares of Common Stock, (ii) shares of Preferred Stock issued by the Corporation (other than preferred stock described in Section 1504(a)(4) of the Code), (iii) warrants, rights, options (including options within the meaning of Treasury Regulation § 1.382-2T(h)(4)(v) or Treasury Regulation §1.382-4(d)(9)) to purchase Securities of the Corporation, and (iv) any Stock.

(8)      *"Effective Date"* means the date of filing of this Amended and Restated Articles of Incorporation of the Corporation with the Secretary of State of the State of Nevada.

(9)      *"Excess Securities"* has the meaning given such term in paragraph (d) of this Article Eleventh.

(10)      *"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(11)      *"Expiration Date"* means the earlier of (i) the repeal of Section 382 of the Code or any successor statute if the Board of Directors determines that this Article Eleventh is no longer necessary for the preservation of Tax Benefits, (ii) the beginning of a taxable year of the Corporation to which the Board of Directors determines that no Tax Benefits may be carried forward, (iii) such date as the Board of Directors shall fix in accordance with paragraph (l) of this Article Eleventh, or (iv) such date as the Company completes an initial public offering of its common stock.

(12)      *"Percentage Stock Ownership"* means the percentage Stock Ownership interest of any Person or group (as the context may require) for purposes of Section 382 of the Code as determined in accordance with the Treasury Regulation § 1.382-2T(g), (h), (j) and (k) or any successor provision.  For purposes of applying Treasury Regulation § 1.382-2T(k)(2), the Corporation shall be treated as having "actual knowledge" of the beneficial ownership of all outstanding shares of Stock that would be attributed to any Person.

(13)      *"Person"* means any individual, firm, corporation or other legal entity, including a group of persons treated as an entity pursuant to Treasury Regulation § 1.382-3(a)(1)(i); and includes any successor (by merger or otherwise) of such entity.

(14)      *"Prohibited Distributions"* means any and all dividends or other distributions paid by the Corporation with respect to any Excess Securities received by a Purported Transferee.

(15)      *"Prohibited Transfer"* means any Transfer or purported Transfer of Corporation Securities to the extent that such Transfer is prohibited and/or void under this Article Eleventh.

(16)      *"Purported Transferee"* has the meaning set forth in paragraph (d) of this Article Eleventh.

(17)      *"Securities"* and *"Security"* each has the meaning set forth in paragraph (g) of this Article Eleventh.

(18)      *"Stock"* means any Common Stock or Preferred Stock that would be treated as "stock" of the Corporation pursuant to Treasury Regulation § 1.382-2T(f)(18) and any nonstock instruments treated as stock for purposes of Section 382 of the Code inclusive of nonstock instruments treated as stock pursuant to Treasury Regulation § 1.382-2T(f)(18) and the Corporation's Warrants [will need to add to definition] and other options (within the meaning of Treasury Regulation § 1.382-4(d)(9)) to the extent characterized as stock under Treasury

Regulation § 1.382-4(d) or under general principles of U.S. federal income tax law. To the extent substantial uncertainty exists as to the designation of a particular nonstock instrument as Stock for this purpose, such instrument will be included in or excluded from the definition of Stock for a Person in a manner most likely to preserve Tax Benefits.

(19)     *"Stock Ownership"* means any direct or indirect ownership of Stock, including any ownership by virtue of application of constructive ownership rules, with such direct, indirect, and constructive ownership determined under the provisions of Section 382 of the Code and the regulations thereunder.

(20)     *"Tax Benefits"* means the net operating loss carryforwards, capital loss carryforwards, general business credit carryforwards, alternative minimum tax credit carryforwards and foreign tax credit carryforwards, as well as any loss or deduction attributable to a "net unrealized built-in loss" of the Corporation or any direct or indirect subsidiary thereof, within the meaning of Section 382 of the Code.

(21)     *"Transfer"* means, any direct or indirect sale, transfer, assignment, conveyance, claim of worthlessness subject to Section 382(g)(4)(D) of the Code, pledge or other disposition or other action taken by a Person, other than the Corporation, that alters the Percentage Stock Ownership of any Person. A Transfer also shall include the creation or grant of an option (including an option within the meaning of Treasury Regulation § 1.382-2T(h)(4)(v) or Treasury Regulation §1.382-4(d)(9)). For the avoidance of doubt, a Transfer shall not include the creation or grant of an option by the Corporation, nor shall a Transfer include the issuance of Stock by the Corporation.

(22)     *"Transferee"* means any Person to whom Corporation Securities are Transferred.

(23)     *"Treasury Regulations"* means the regulations, including temporary regulations or any successor regulations promulgated under the Code, as amended from time to time.

(b)     *Transfer And Ownership Restrictions.*

(1)     In order to preserve the Tax Benefits, from and after the Effective Date of this Article Eleventh any attempted Transfer of Corporation Securities prior to the Expiration Date and any attempted Transfer of Corporation Securities pursuant to an agreement entered into prior to the Expiration Date, shall be prohibited and void *ab initio* to the extent that, as a result of such Transfer (or any series of Transfers of which such Transfer is a part) (i) any Person or Persons would become a 4.75-percent Stockholder (ii) the Percentage Stock Ownership in the Corporation of any 4.75-percent Stockholder would be increased, or (iii) the Percentage Stock Ownership in the Corporation of any 4.75 -percent Stockholder would be decreased (whether or not the Transferee is or would be a 4.75-percent Stockholder).

(2)     In order to ensure the Corporation's code share agreements are not subject to early termination, from and after the Effective Date any attempted Transfer of Corporation Securities shall be prohibited and void *ab initio* to the extent that, as a result of such Transfer (or series of Transfers of which such Transfer is a part), a Change of Control would occur.

10-10018-mg   Doc 1335   Filed 12/28/10   Entered 12/28/10 16:43:51   Main Document
Pg 9 of 232

(3)     In order to ensure the Corporation does not become subject to the reporting obligations under the Exchange Act, from and after the Effective Date any attempted Transfer of Corporation Securities shall be prohibited and void *ab initio* to the extent that, as a result of such Transfer (or any series of Transfers of which such Transfer is a part), the Corporation would have 500 or more shareholders of record.

(4)     In order to ensure the Corporation does not lose its status as a "U.S. citizen" within the meaning of 49 U.S.C. Section 40102(a)(15), as in effect on the date in question, or any successor statute or regulation, as interpreted by the U.S. Department of Transportation in applicable precedent, from and after the Effective Date any attempted Transfer of Corporation Securities shall be prohibited and void *ab initio* to the extent, as a result of such Transfer (or series of Transfers of which such Transfer is a part), such transfer the Corporation's Securities would cause the Corporation to lose its status as a U.S. citizen.

(c)     *Exceptions.*

(1)     The restrictions set forth in paragraph (b)(1) through (4) of this Article Eleventh shall not apply to certain transactions approved by the Board of Directors, including, but not limited to, a merger or consolidation, in which all holders of Common Stock (and/or Corporation Securities) receive or are offered the same opportunity to receive, cash or other consideration for all such Common Stock (and/or Corporation Securities), and upon the consummation of which the acquirer will own at least a majority of the outstanding shares of Common Stock (and/or Corporation Securities), (B) a tender or exchange offer by the Corporation to purchase Corporation Securities, (C) a purchase program effected by the Corporation on the open market and not the result of a privately-negotiated transaction, or (D) any optional or required redemption of a Corporation Security pursuant to the terms of such security.

(2)     The restrictions set forth in paragraph (b)(1) through (4) of this Article Eleventh shall not apply to an attempted Transfer (including, without limitation, a 4.75-percent Transaction) if the transferor or the Transferee obtains the written approval of the Board of Directors or a duly authorized committee thereof. As a condition to granting its approval pursuant to this paragraph (c) of Article Eleventh, the Board of Directors, may, in its discretion, require (at the expense of the transferor and/or transferee) reasonable documentation, including, without limitation, an opinion of counsel or other tax advisor selected by the Board of Directors that the Transfer should not result in the application of any Section 382 of the Code limitation on the use of the Tax Benefits; provided that the Board may grant such approval notwithstanding the effect of such approval on the Tax Benefits if it determines that the approval is in the best interests of the Corporation. The Board of Directors may impose any conditions that it deems reasonable and appropriate in connection with such approval, including, without limitation, restrictions on the ability of any Transferee to Transfer Stock acquired through a Transfer. The Board of Directors, to the fullest extent permitted by law, may exercise the authority granted by this Article Eleventh through duly authorized officers or agents of the Corporation. Nothing in this paragraph (c) of this Article Eleventh shall be construed to limit or restrict the Board of Directors in the exercise of its fiduciary duties under applicable law.

(d)     *Excess Securities*.

(1)     No employee or agent of the Corporation shall record any Prohibited Transfer, and the purported transferee of such a Prohibited Transfer (the *"Purported Transferee"*) shall not be recognized as a stockholder of the Corporation for any purpose whatsoever in respect of the Corporation Securities which are the subject of the Prohibited Transfer (the *"Excess Securities"*). Until the Excess Securities are acquired by another person in a Transfer that is not a Prohibited Transfer, the Purported Transferee shall not be entitled with respect to such Excess Securities to any rights as a stockholder of the Corporation, including, without limitation, the right to vote such Excess Securities and to receive dividends or distributions, whether liquidating or otherwise, in respect thereof, if any, and the Excess Securities shall be deemed to remain with the transferor unless and until the Excess Securities are transferred to the Agent pursuant to paragraph (e) of this Article Eleventh or until an approval is obtained under paragraph (c) of this Article Eleventh. After the Excess Securities have been acquired in a Transfer that is not a Prohibited Transfer, the Corporation Securities shall cease to be Excess Securities. For this purpose, any Transfer of Excess Securities not in accordance with the provisions of paragraphs (d) or (e) of this Article Eleventh shall also be a Prohibited Transfer.

(2)     The Corporation may require as a condition to the registration of the Transfer of any Corporation Securities or the payment of any distribution on any Corporation Securities that the proposed Transferee or payee furnish to the Corporation all information reasonably requested by the Corporation with respect to its direct or indirect ownership interests in such Corporation Securities. The Corporation may make such arrangements or issue such instructions to its stock transfer agent as may be determined by the Board of Directors to be necessary or advisable to implement this Article Eleventh, including, without limitation, authorizing such transfer agent to require an affidavit from a Purported Transferee regarding such Person's actual and constructive ownership of stock and other evidence that a Transfer will not be prohibited by this Article Eleventh as a condition to registering any transfer.

(e)     *Transfer To Agent; Recession*.  If the Board of Directors determines that an attempted Transfer of Corporation Securities constitutes a Prohibited Transfer then, upon written demand by the Corporation sent within thirty days of the date on which the Board of Directors determines that the attempted Transfer would result in Excess Securities, then, at the election of the Board of Directors, (1) the Purported Transferee and the transferor shall take all steps necessary to rescind the Prohibited Transfer or (ii) shall transfer or cause to be transferred any certificate or other evidence of ownership of the Excess Securities within the Purported Transferee's possession or control, together with any Prohibited Distributions, to an agent designated by the Board of Directors (the *"Agent"*). The Agent shall thereupon sell to a buyer or buyers, which may include the Corporation, the Excess Securities transferred to it in one or more arm's-length transactions (on the public securities market on which such Excess Securities are traded, if possible, or otherwise privately); *provided, however*, that any such sale must not constitute a Prohibited Transfer and, *provided, further,* that the Agent shall effect such sale or sales in an orderly fashion and shall not be required to effect any such sale within any specific time frame if, in the Agent's discretion, such sale or sales would disrupt the market for the Corporation Securities or otherwise would adversely affect the value of the Corporation Securities. If the Purported Transferee has resold the Excess Securities before receiving the

Corporation's demand to surrender Excess Securities to the Agent, the Purported Transferee shall be deemed to have sold the Excess Securities for the Agent, and shall be required to transfer to the Agent any Prohibited Distributions and proceeds of such sale, except to the extent that the Corporation grants written permission to the Purported Transferee to retain a portion of such sales proceeds not exceeding the amount that the Purported Transferee would have received from the Agent pursuant to paragraph (f) of this Article Eleventh if the Agent rather than the Purported Transferee had resold the Excess Securities.

(f)    *Application Of Proceeds And Prohibited Distributions.*  The Agent shall apply any proceeds of a sale by it of Excess Securities and, if the Purported Transferee has previously resold the Excess Securities, any amounts received by it from a Purported Transferee, together, in either case, with any Prohibited Distributions, as follows: (a) first, such amounts shall be paid to the Agent to the extent necessary to cover its costs and expenses incurred in connection with its duties hereunder; (b) second, any remaining amounts shall be paid to the Purported Transferee, up to the amount paid by the Purported Transferee for the Excess Securities (or the fair market value at the time of the Transfer, in the event the purported Transfer of the Excess Securities was, in whole or in part, a gift, inheritance or similar Transfer) which amount shall be determined at the discretion of the Board of Directors; and (c) third, any remaining amounts shall be paid to one or more organizations qualifying under section 501(c)(3) of the Code (or any comparable successor provision) selected by the Board of Directors. The Purported Transferee of Excess Securities shall have no claim, cause of action or any other recourse whatsoever against any transferor of Excess Securities. The Purported Transferee's sole right with respect to such shares shall be limited to the amount payable to the Purported Transferee pursuant to this paragraph (f) of Article Eleventh. In no event shall the proceeds of any sale of Excess Securities pursuant to this paragraph (f) of Article Eleventh inure to the benefit of the Corporation or the Agent, except to the extent used to cover costs and expenses incurred by Agent in performing its duties hereunder.

(g)    *Modification Of Remedies For Certain Indirect Transfers.*  In the event of any Transfer which does not involve a transfer of securities of the Corporation within the meaning of Nevada law (*"Securities,"* and individually, a *"Security"*) but which would cause a 4.75-percent Stockholder to violate a restriction on Transfers provided for in this Article Eleventh, the application of paragraphs (e) and (f) of this Article Eleventh shall be modified as described in this paragraph (g) of this Article Eleventh. In such case, no such 4.75-percent Stockholder shall be required to dispose of any interest that is not a Security, but such 4.75-percent Stockholder and/or any Person whose ownership of Securities is attributed to such 4.75-percent Stockholder shall be deemed to have disposed of and shall be required to dispose of sufficient Securities (which Securities shall be disposed of in the inverse order in which they were acquired) to cause such 4.75-percent Stockholder, following such disposition, not to be in violation of this Article Eleventh. Such disposition shall be deemed to occur simultaneously with the Transfer giving rise to the application of this provision, and such number of Securities that are deemed to be disposed of shall be considered Excess Securities and shall be disposed of through the Agent as provided in paragraphs (e) and (f) of this Article Eleventh, except that the maximum aggregate amount payable either to such 4.75-percent Stockholder, or to such other Person that was the direct holder of such Excess Securities, in connection with such sale shall be the fair market value of such Excess Securities at the time of the purported Transfer. All expenses incurred by the Agent in disposing of such Excess Stock shall be paid out of any amounts due such 4.75-percent

Stockholder or such other Person. The purpose of this paragraph (g) of Article Eleventh is to extend the restrictions in paragraphs (b) and (e) of this Article Eleventh to situations in which there is a 4.75-percent Transaction without a direct Transfer of Securities, and this paragraph (g) of Article Eleventh, along with the other provisions of this Article Eleventh, shall be interpreted to produce the same results, with differences as the context requires, as a direct Transfer of Corporation Securities.

(h)      *Legal Proceedings; Prompt Enforcement.*  If the Purported Transferee fails to rescind the transaction or surrender the Excess Securities or the proceeds of a sale thereof to the Agent within thirty days from the date on which the Corporation makes a written demand pursuant to paragraph (e) of this Article Eleventh (whether or not made within the time specified in paragraph (e) of this Article Eleventh), then the Corporation shall promptly take all cost effective actions which it believes are appropriate to enforce the provisions hereof, including the institution of legal proceedings to compel the surrender. Nothing in this paragraph (h) of Article Eleventh shall (i) be deemed inconsistent with any Transfer of the Excess Securities provided in this Article Eleventh being void *ab initio*, (ii) preclude the Corporation in its discretion from immediately bringing legal proceedings without a prior demand or (iii) cause any failure of the Corporation to act within the time periods set forth in paragraph (e) of this Article Eleventh to constitute a waiver or loss of any right of the Corporation under this Article Eleventh. The Board of Directors may authorize such additional actions as it deems advisable to give effect to the provisions of this Article Eleventh.

(i)      *Liability.*  To the fullest extent permitted by law, any stockholder subject to the provisions of this Article Eleventh who knowingly violates the provisions of this Article Eleventh and any Persons controlling, controlled by or under common control with such stockholder shall be jointly and severally liable to the Corporation for, and shall indemnify and hold the Corporation harmless against, any and all damages suffered as a result of such violation, including but not limited to damages resulting from a reduction in, or elimination of, the Corporation's ability to utilize its Tax Benefits, and attorneys' and auditors' fees incurred in connection with such violation.

(j)      *Obligation To Provide Information.*  As a condition to the registration of the Transfer of any Stock, any Person who is a beneficial, legal or record holder of Stock, and any proposed Transferee and any Person controlling, controlled by or under common control with the proposed Transferee, shall provide such information as the Corporation may reasonably request from time to time in order to determine compliance with this Article Eleventh or the status of the Tax Benefits of the Corporation.

(k)      *Legends.*  The Board of Directors may require that any certificates issued by the Corporation evidencing ownership of shares of Stock that are subject to the restrictions on transfer and ownership contained in this Article Eleventh bear the following legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN TRANSFER RESTRICTIONS SET FORTH IN THE RESTATED ARTICLES OF INCORPORATION (AS THERETOFORE AMENDED, THE "CHARTER"), OF THE CORPORATION.  A COPY OF THE CHARTER CONTAINING SUCH

TRANSFER RESTRICTIONS IS AVAILABLE UPON WRITTEN REQUEST TO THE CORPORATION'S CORPORATE SECRETARY AT ITS PRINCIPAL PLACE OF BUSINESS."

(l)    *Authority Of Board Of Directors.*

(1)    The Board of Directors shall have the power to determine all matters necessary for assessing compliance with this Article Eleventh, including, without limitation, (i) the identification of 4.75-percent Stockholders, (ii) whether a Transfer is a 4.75-percent Transaction or a Prohibited Transfer, (iii) the Percentage Stock Ownership in the Corporation of any 4.75-percent Stockholder, (iv) whether an instrument constitutes a Corporation Security or Stock, (v) the amount (or fair market value) due to a Purported Transferee pursuant to paragraph (f) of this Article Eleventh, and (vi) any other matters which the Board of Directors determines to be relevant; and the good faith determination of the Board of Directors on such matters shall be conclusive and binding for all the purposes of this Article Eleventh. In addition, the Board of Directors may, to the extent permitted by law, from time to time establish, modify, amend or rescind by-laws, regulations and procedures of the Corporation not inconsistent with the provisions of this Article Eleventh (including, without limitation, for purposes of determining whether any Transfer of Corporation Securities would jeopardize the Corporation's ability to preserve and use the Tax Benefits) and for the orderly application, administration and implementation of this Article Eleventh.

(2)    Nothing contained in this Article Eleventh shall limit the authority of the Board of Directors to take such other action to the extent permitted by law as it deems necessary or advisable to protect the Corporation and its stockholders in preserving the Tax Benefits or otherwise. Without limiting the generality of the foregoing, in the event of a change in law making one or more of the following actions necessary or desirable, the Board of Directors may, by adopting a written resolution, (i) accelerate or extend the Expiration Date, (ii) modify the ownership interest percentage in the Corporation or the Persons or groups covered by this Article Eleventh, (iii) modify the definitions of any terms set forth in this Article Eleventh or (iv) modify the terms of this Article Eleventh as appropriate, in the instance of the restriction in (b)(1) of the Article Eleventh only, in order to prevent an ownership change for purposes of Section 382 of the Code as a result of any changes in applicable Treasury Regulations or otherwise; *provided, however*, that in such instance only the Board of Directors shall not cause there to be such acceleration, extension or modification unless it determines, by adopting a written resolution, that such action is reasonably necessary or advisable to preserve the Tax Benefits or that the continuation of these restrictions is no longer reasonably necessary for the preservation of the Tax Benefits. Stockholders of the Corporation shall be notified of such determination through a filing with the Securities and Exchange Commission or such other method of notice as the Secretary of the Corporation shall deem appropriate.

(3)    In the case of an ambiguity in the application of any of the provisions of this Article Eleventh, including any definition used herein, the Board of Directors shall have the power to determine the application of such provisions with respect to any situation based on its reasonable belief, understanding or knowledge of the circumstances. In the event this Article Eleventh requires an action by the Board of Directors but fails to provide specific guidance with respect to such action, the Board of Directors shall have the power to determine

the action to be taken so long as such action is not contrary to the provisions of this Article Eleventh. All such actions, calculations, interpretations and determinations which are done or made by the Board of Directors in good faith shall be conclusive and binding on the Corporation, the Agent, and all other parties for all other purposes of this Article Eleventh. The Board of Directors may delegate all or any portion of its duties and powers under this Article Eleventh to a committee of the Board of Directors as it deems necessary or advisable and, to the fullest extent permitted by law, may exercise the authority granted by this Article Eleventh through duly authorized officers or agents of the Corporation. Nothing in this Article Eleventh shall be construed to limit or restrict the Board of Directors in the exercise of its fiduciary duties under applicable law.

(m)     *Reliance.*  To the fullest extent permitted by law, the Corporation and the members of the Board of Directors shall be fully protected in relying in good faith upon the information, opinions, reports or statements of the chief executive officer, the chief financial officer, the chief accounting officer or the corporate controller of the Corporation and the Corporation's legal counsel, independent auditors, transfer agent, investment bankers or other employees and agents in making the determinations and findings contemplated by this Article Eleventh. The members of the Board of Directors shall not be responsible for any good faith errors made in connection therewith. For purposes of determining the existence and identity of, and the amount of any Corporation Securities which are described in Rule 13d-1(d) of Regulation 13D-G and are owned by any stockholder, the Corporation is entitled to rely on the existence and absence of filings of Schedule 13D or 13G under the Securities and Exchange Act of 1934, as amended (or similar filings), as of any date, subject to its actual knowledge of the ownership of Corporation Securities.

(n)     *Benefits Of This Article Eleventh.*  Nothing in this Article Eleventh shall be construed to give to any Person other than the Corporation or the Agent any legal or equitable right, remedy or claim under this Article Eleventh. This Article Eleventh shall be for the sole and exclusive benefit of the Corporation and the Agent.

(o)     *Severability.*  If any provision of this Article Eleventh or the application of any such provision to any Person or under any circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Article Eleventh.

(p)     *Waiver.*  With regard to any power, remedy or right provided herein or otherwise available to the Corporation or the Agent under this Article Eleventh, (i) the Board of Directors shall have full power and authority to waive any condition or provision on behalf of the Corporation or the Agent; (ii) no waiver will be effective unless expressly contained in a writing signed by the waiving party; and (iii) no alteration, modification or impairment will be implied by reason of any previous waiver, extension of time, delay or omission in exercise, or other indulgence.

TWELFTH.  Except as expressly provided in this Restated Articles of Incorporation, the Corporation reserves the right to amend, alter, change or repeal any provision contained in this Restated Articles of Incorporation, in the manner now or hereafter prescribed by the laws of

Nevada and this Restated Articles of Incorporation, and all rights and powers conferred herein upon stockholders and directors are granted subject to this reservation.

This Restated Articles of Incorporation of the Corporation was duly adopted in accordance with the provisions of Sections 78.390 and 78.403 of the General Corporation Law of the State of Nevada.

I, the undersigned officer of Mesa Air Group, Inc., a corporation of the State of Nevada, hereby certify that the foregoing is a true, correct and complete copy of the Restated Articles of Incorporation said Corporation as at present in force.

IN WITNESS WHEREOF, I have hereunto subscribed by name and affixed the seal of this Corporation this _____ day of _____, 2011.

<div style="margin-left:50%">

MESA AIR GROUP, INC.

BY:   /s/
Name:
Title:  General Counsel

</div>

**(Mesa Air Group By-Laws)**

56772-002\DOCS_SF:75217.1

**BYLAWS**
**OF**
**MESA AIR GROUP, INC.**


**ARTICLE I**
**SHAREHOLDERS**

1.1     Place of Meetings.  All meetings of shareholders shall be held at such place (if any) within or without the State of Nevada as may be determined from time to time by the Board of Directors or, if not determined by the Board of Directors, by the Chairman of the Board, the President or the Chief Executive Officer; provided that the Board of Directors may, in its sole discretion, determine that any meeting of shareholders shall not be held at any place but shall be held solely by means of remote communication in accordance with Section 1.13.

1.2     Annual Meeting.  The annual meeting of shareholders for the election of directors and for the transaction of such other business as may properly be brought before the meeting shall be held on a date to be fixed by the Board of Directors at a time to be fixed by the Board of Directors and stated in the notice of the meeting.  If for any reason directors are not elected at an annual meeting of shareholders, they may be elected at any special meeting of shareholders which is called and held for that purpose.

1.3     Special Meetings.  Special meetings of shareholders may be called at any time by any two directors, the Chairman of the Board, the Chief Executive Officer, or the President or the holders of record of not less than 50% of all shares entitled to cast votes at the meeting, for any purpose or purposes prescribed in the notice of the meeting and shall be held on such date and at such time as the Board may fix.  Business transacted at any special meeting of shareholders shall be confined to the purpose or purposes stated in the notice of meeting.

Upon a request in writing sent by registered mail to the Secretary of the corporation by any shareholder or shareholders entitled to request a special meeting of shareholders pursuant to this Section 1.3, which request contains the information required pursuant to Sections 1.10 and 2.15, as applicable, and upon a determination by the Secretary of the validity of such request, it shall be the duty of the Secretary to present the request to the Board of Directors, whereupon the Board of Directors (a) shall determine a place and time for such meeting, which time shall be not less than 100 nor more than 120 days after the receipt of such request, and (b) shall fix, in accordance with Section 4.5, a record date for the determination of shareholders entitled to vote at such meeting.  Upon Board action as provided in this Section 1.3, the Secretary of the corporation shall cause notice to be given to the shareholders, in accordance with Section 1.4 hereof, that a meeting will be held for the purposes set forth in the shareholder's request, as well as any additional purpose or purposes determined by the Board of Directors in accordance with this Section 1.3.

1.4     Notice of Meetings.

(a)     Written notice of each meeting of shareholders, whether annual or special, shall be given not less than 10 nor more than 60 days before the date on which the meeting is to

56772-002\DOCS_SF:75295.2

be held, to each shareholder entitled to vote at such meeting as of the record date fixed by the Board of Directors for determining the shareholders entitled to notice of the meeting, except as otherwise provided herein or as required by law (meaning here and hereafter, as required from time to time by the Nevada Revised Statutes or the Amended and Restated Articles of Incorporation of the corporation (the "Articles of Incorporation")).  The notice of any meeting shall state the place, if any, date, hour and purposes or purposes of the meeting, and the means of remote communication, if any, by which shareholders and proxy holders may be deemed to be present in person and vote at such meeting.

(b)      Notice to shareholders may be given by personal delivery, mail, or, with the consent of the shareholder entitled to receive notice, by facsimile or other means of electronic transmission.  If mailed, such notice shall be delivered by postage prepaid envelope directed to each shareholder at such shareholder's address as it appears in the records of the corporation and shall be deemed given when deposited in the United States mail.  Notice given by electronic transmission pursuant to this subsection shall be deemed given: (1) if by facsimile telecommunication, when directed to a facsimile telecommunication number at which the shareholder has consented to receive notice; (2) if by electronic mail, when directed to an electronic mail address at which the shareholder has consented to receive notice; (3) if by posting on an electronic network together with separate notice to the shareholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and (4) if by any other form of electronic transmission, when directed to the shareholder.  An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the corporation that the notice has been given by personal delivery, by mail, or by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

(c)      Notice of any meeting of shareholders need not be given to any shareholder if waived by such shareholder either in a writing signed by such shareholder or by electronic transmission, whether such waiver is given before or after such meeting is held.  If such a waiver is given by electronic transmission, the electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the shareholder.

1.5      Voting List.  The officer who has charge of the stock ledger of the corporation shall prepare, at least 10 days before each meeting of shareholders, a complete list of the shareholders entitled to vote at the meeting; the list shall reflect the shareholders entitled to vote as of the tenth day before the meeting date, showing the mailing address of each shareholder and the number of shares registered in the name of each shareholder.  The corporation shall not be required to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any such shareholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting: (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, (b) during ordinary business hours at the principal place of business of the corporation, or (c) in any other manner provided by law.  The stock ledger shall be the only evidence as to the shareholders who are entitled to examine the list required by this Section 1.5 or to vote in person or by proxy at any meeting of shareholders.

2

1.6     Quorum.  Except as otherwise provided by law or these Bylaws, the holders of a majority of the shares of the capital stock of the corporation entitled to vote at the meeting, present in person or represented by proxy, regardless of whether the proxy has authority to vote on all matters, shall constitute a quorum for the transaction of business.  Where a separate class vote by a class or classes or series is required, a majority of the shares of such class or classes or series present in person or represented by proxy shall constitute a quorum entitled to take action with respect to that vote on that matter.

1.7     Adjournments.  Any meeting of shareholders may be adjourned to any other time and to any other place at which a meeting of shareholders may be held under these Bylaws by the chairman of the meeting or, in the absence of such person, by any officer entitled to preside at or to act as secretary of such meeting, or by the holders of a majority of the shares of stock present or represented at the meeting and entitled to vote, although less than a quorum.  When a meeting is adjourned to another place, date or time, written notice need not be given of the adjourned meeting if the date, time, and place, if any, thereof, and the means of remote communication, if any, by which shareholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting, are announced at the meeting at which the adjournment is taken; provided, however, that if the date of any adjourned meeting is more than 30 days after the date for which the meeting was originally noticed, or if the Board of Directors fixes a new record date for determining the shareholders entitled to vote at the adjourned meeting in accordance with Section 4.5, written notice of the place, if any, date, and time of the adjourned meeting and the means of remote communications, if any, by which shareholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting, shall be given in conformity herewith.  The board of directors must fix a new record date if the meeting is adjourned to a date more than 60 days later than the date set for the original meeting.  At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.

1.8     Voting and Proxies.  Each shareholder shall have one vote for each share of stock entitled to vote held of record by such shareholder and a proportionate vote for each fractional share so held, unless otherwise provided by law or in the Articles of Incorporation.  Each shareholder of record entitled to vote at a meeting of shareholders may vote in person or may authorize any other person or persons to vote or act for such shareholder by a written proxy executed by the shareholder or the shareholder's authorized agent or by an electronic transmission permitted by law and delivered to the Secretary of the corporation.  Any copy, facsimile transmission or other reliable reproduction of the writing or electronic transmission created pursuant to this section may be substituted or used in lieu of the original writing or electronic transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile transmission or other reproduction shall be a complete reproduction of the entire original writing or electronic transmission.

1.9     Action at Meeting.

(a)     At any meeting of shareholders for the election of one or more directors at which a quorum is present, the election shall be determined by a plurality of the votes cast by the shareholders entitled to vote at the election.  For purposes of these Bylaws, a share present at a meeting, but for which there is an abstention or as to which a shareholder gives no authority or

3

direction as to a particular matter or director nominee, shall be counted as present for the purpose of establishing a quorum but shall not be counted as a vote cast.

(b)     All other matters shall be approved if the number of votes cast in favor of the action exceeds the number of votes cast in opposition to the action (or if there are two or more classes of stock entitled to vote as separate classes, then in the case of each such class, a majority of the votes cast on such matter by each such class present in person or represented by proxy and entitled to vote on the matter), provided that a quorum is present, except when a different vote is required by express provision of law, the Articles of Incorporation or these Bylaws.

(c)     All voting, including on the election of directors, but excepting where otherwise required by law, may be by a voice vote, provided, however, that upon demand therefor by a shareholder entitled to vote or the shareholder's proxy, a vote by ballot shall be taken.  Each ballot shall state the name of the shareholder or proxy voting and such other information as may be required under the procedure established for the meeting.  The corporation may, and to the extent required by law, shall, in advance of any meeting of shareholders, appoint one or more inspectors to act at the meeting and make a written report thereof.  The corporation may designate one or more persons as an alternate inspector to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of shareholders, the person presiding at the meeting may, and to the extent required by law, shall, appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his duties, shall take and sign an oath to faithfully execute the duties of inspector with strict impartiality and according to the best of his ability.

1.10     Notice of Shareholder Business.

(a)     At an annual or special meeting of the shareholders, only such business shall be conducted as shall have been properly brought before the meeting.  To be properly brought before an annual meeting, business must be (i) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors, (ii) properly brought before the meeting by or at the direction of the Board of Directors, or (iii) properly brought before the meeting by a shareholder of record.  The foregoing clause (iii) shall be the exclusive means for a shareholder to propose business (other than business included in the corporation's proxy materials pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) at an annual meeting of shareholders.  For business to be properly brought before an annual meeting by a shareholder, whether or not the shareholder is seeking to have a proposal included in the corporation's proxy statement or information statement, it must be a proper matter for shareholder action under the Nevada Revised Statutes, and the shareholder must have given timely notice thereof in writing to the Secretary of the corporation.  To be timely, a shareholder proposal to be presented at an annual meeting shall be received at the corporation's principal executive offices not earlier than the close of business on the 120th day, nor later than the close of business on the 90th day, prior to the first anniversary of the date of the preceding year's annual meeting as first specified in the corporation's notice of meeting (without regard to any postponements or adjournments of such meeting after such notice was first sent), except that if no annual meeting was held in the previous year or the date of the annual meeting is more than 30 days earlier or later than such anniversary date, notice by the

4

shareholders to be timely must be received not later than the close of business on the later of the 90th day prior to the annual meeting or the 10th day following the date on which public announcement of the date of such meeting is first made. "Public announcement" for purposes hereof shall have the meaning set forth in Section 2.15(c) of these Bylaws.  In no event shall the public announcement of an adjournment or postponement of an annual meeting commence a new time period (or extend any time period) for the giving of a shareholder's notice as described above.  For business to be properly brought before a special meeting by a shareholder, the business must be limited to the purpose or purposes set forth in a request under Section 1.3.

(b)     A shareholder's notice to the Secretary of the corporation shall set forth as to each matter the shareholder proposes to bring before the meeting (i) a brief description of the business desired to be brought before the meeting and the text of the proposal or business, including the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend the Bylaws of the corporation, the language of the proposed amendment, and the reasons for conducting such business at the annual meeting, (ii) the name and address, as they appear on the corporation's books, of the shareholder proposing such business and the names and addresses of the beneficial owners, if any, on whose behalf the business is being brought, (iii) a representation that the shareholder is a holder of record of stock of the corporation entitled to vote at the meeting on the date of such notice and intends to appear in person or by proxy at the meeting to propose the business specified in the notice, (iv) any material interest of the shareholder and such other beneficial owner in such business, and (v) the following information regarding the ownership interests of the shareholder or such other beneficial owner and any Shareholder Associated Person (as defined below) or any member of such beneficial shareholder's immediate family sharing the same household, which shall be supplemented in writing by the shareholder not later than 10 days after the record date for voting at the meeting to disclose such interests as of such record date: (A) the class and number of shares of the corporation that are owned beneficially and of record by such person; (B) any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the corporation or with a value derived in whole or in part from the value of any class or series of shares of the corporation, whether or not such instrument or right shall be subject to settlement in the underlying class or series of capital stock of the corporation or otherwise and any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the value of shares of the corporation (a "Derivative Instrument") directly or indirectly owned beneficially by such person; (C) any proxy, contract, arrangement, understanding, or relationship pursuant to which such person has a right to vote any shares of any security of the corporation; (D) whether and the extent to which any hedging or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including, but not limited to any short interest in any security of the corporation (for purposes of this Section 1.10 and Section 2.15, a person shall be deemed to have a short interest in a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security)) has been made, the effect or intent of which is to mitigate loss or increase profit to or manage the risk or benefit of stock price changes for, or to increase or decrease the voting power of, such person (each, a "Relevant Hedge Transaction"); (E) any rights to dividends on the shares of the corporation owned beneficially by such shareholder that are separated or separable from the

5

underlying shares of the corporation; (F) any proportionate interest in shares of the corporation, Derivative Instruments or Relevant Hedge Transaction held, directly or indirectly, by a general or limited partnership in which such person is a general partner or, directly or indirectly, beneficially owns an interest in a general partner; and (G) any performance-related fees (other than an asset-based fee) to which such person is entitled based on any increase or decrease in the value of shares of the corporation, Derivative Instruments or Relevant Hedge Transaction, if any, as of the date of such notice, including, without limitation, any such interests held by members of such person's immediate family sharing the same household.

For purposes of these Bylaws, "Shareholder Associated Person" of any shareholder shall mean (i) any person controlling or controlled by, directly or indirectly, or acting in concert with, such shareholder, (ii) any beneficial owner of such shares of stock of the corporation owned of record or beneficially by such shareholders and (iii) any person controlling, controlled by or under common control with such Shareholder Associated Person.

(c) Notwithstanding the foregoing provisions of this Section 1.10, a shareholder shall also comply with all applicable requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations thereunder with respect to the matters set forth in this Section 1.10.

(d) Nothing in this Section 1.10 shall affect the right of a stockholder to request inclusion of a proposal in the corporation's proxy statement or information statement pursuant to Rule 14a-8 under the Exchange Act.

1.11 <u>Conduct of Business</u>. At every meeting of the shareholders, the Chairman of the Board, or, in his absence, the Chief Executive Officer, or, in his absence, such other person as may be appointed by the Board of Directors, shall act as chairman. The Secretary of the corporation or a person designated by the chairman of the meeting shall act as secretary of the meeting. Unless otherwise approved by the chairman of the meeting, attendance at the shareholders' meeting is restricted to shareholders of record, persons authorized in accordance with Section 1.8 of these Bylaws to act by proxy, and officers of the corporation.

The chairman of the meeting shall call the meeting to order, establish the agenda, and conduct the business of the meeting in accordance therewith or, at the chairman's discretion, the business of the meeting may be conducted otherwise in accordance with the wishes of the shareholders in attendance. The date and time of the opening and closing of the polls for each matter upon which the shareholders will vote at the meeting shall be announced at the meeting.

The chairman shall also conduct the meeting in an orderly manner, rule on the precedence of, and procedure on, motions and other procedural matters, and exercise discretion with respect to such procedural matters with fairness and good faith toward all those entitled to take part. Without limiting the foregoing, the chairman may (a) restrict attendance at any time to bona fide shareholders of record and their proxies and other persons in attendance at the invitation of the presiding officer or Board of Directors, (b) restrict use of audio or video recording devices at the meeting, and (c) impose reasonable limits on the amount of time taken up at the meeting on discussion in general or on remarks by any one shareholder. Should any person in attendance become unruly or obstruct the meeting proceedings, the chairman shall have

6

the power to have such person removed from the meeting. Notwithstanding anything in the Bylaws to the contrary, no business shall be conducted at a meeting except in accordance with the procedures set forth in this Section 1.11 and Section 1.10 above. The chairman of a meeting may determine and declare to the meeting that any proposed item of business was not brought before the meeting in accordance with the provisions of this Section 1.11 and Section 1.10 above and if he should so determine, he shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

1.12    Shareholder Action Without Meeting. Any action required or permitted to be taken by the shareholders of the corporation must be effected at a duly called annual or special meeting of shareholders of the corporation and may not be effected by any consent in writing by such shareholders.

1.13    Meetings by Remote Communication. If authorized by the Board of Directors, and subject to such guidelines and procedures as the Board may adopt, shareholders and proxy holders not physically present at a meeting of shareholders may, by means of remote communication, participate in the meeting and be deemed present in person and vote at the meeting, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (a) the corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a shareholder or proxy holder, (b) the corporation shall implement reasonable measures to provide such shareholders and proxy holders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the shareholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (c) if any shareholder or proxy holder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation.

## ARTICLE II
## BOARD OF DIRECTORS

2.1    General Powers. The business and affairs of the corporation shall be managed by or under the direction of a Board of Directors, who may exercise all of the powers of the corporation except as otherwise provided by law or the Articles of Incorporation. In the event of a vacancy on the Board of Directors, the remaining directors, except as otherwise provided by law, may exercise the powers of the full Board until the vacancy is filled. Directors need not be shareholders of the corporation. Any member of the Board of Directors who is, or recently has been, affiliated in any way with any union operating at the company, aircraft finance party doing business with the company or supplier to the company ("Interested Director"), shall abstain from any and all Board of Director meetings, or meetings of any Committee of the Board of Directors on which such Interested Director sits, where matters involving such related party are taking place and shall be prohibited from receiving any sensitive information provided to members of the Board of Directors regarding the corporation that is reasonably related to such relevant party.

2.2    Number and Term of Office. Subject to the rights of the holders of any series of preferred stock to elect directors under specified circumstances, the number of directors shall initially be nine (9) and, thereafter, shall be fixed from time to time exclusively by the Board of

7

Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board for adoption).  The directors, other than those who may be elected by the holders of any series of preferred stock under specified circumstances, shall be divided into three classes, with the term of office of the first class to expire at the first annual meeting of shareholders held after the date of filing of these Articles of Incorporation ("Effective Date"); the term of office of the second class to expire at the second annual meeting of shareholders held after the Effective Date; the term of office of the third class to expire at the third annual meeting of shareholders held after the Effective Date; and thereafter for each such term to expire at each third succeeding annual meeting of shareholders after such election.  All directors shall hold office until the expiration of the term for which elected and until their respective successors are elected, except in the case of the death, resignation or removal of any director.  At each annual meeting of shareholders commencing with the first annual meeting held after the Effective Date, (i) directors elected to succeed those directors whose terms expire shall be elected for a term of office to expire at the third succeeding annual meeting of shareholders after their election, with each director to hold office until his successor shall have been duly elected and qualified, and (ii) if authorized by a resolution of the Board of Directors, directors may be elected to fill any vacancy on the Board of Directors, regardless of how such vacancy shall have been created.

2.3    Vacancies and Newly Created Directorships.  Subject to the rights of the holders of any series of preferred stock then outstanding, newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, retirement, disqualification or other cause (including removal from office by a vote of the shareholders) may be filled only by a majority vote of the directors then in office, though less than a quorum, or by the sole remaining director, or, to the extent required by the Articles of Incorporation or if there are no directors, by the shareholders, and directors so chosen shall hold office for a term expiring at the next annual meeting of shareholders at which the term of office of the class to which they have been elected expires or until such director's successor shall have been duly elected and qualified.  No decrease in the number of authorized directors shall shorten the term of any incumbent director.

2.4    Resignation.  Any director may resign by delivering notice in writing or by electronic transmission to the President, Chief Executive Officer, Chairman of the Board or Secretary.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

2.5    Removal.  Subject to the rights of the holders of any series of preferred stock then outstanding, any directors, or the entire Board of Directors, may be removed from office at any time, but only for cause, by the affirmative vote of the holders of two-thirds of the voting power of all of the outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class.  Vacancies in the Board of Directors resulting from such removal may be filled by a majority of the directors then in office, though less than a quorum, or by the sole remaining director.  Directors so chosen shall hold office until the next annual meeting of shareholders at which the term of office of the class to which they have been elected expires.

8

2.6     <u>Regular Meetings</u>.  Regular meetings of the Board of Directors may be held without notice at such time and place, either within or without the State of Nevada, as shall be determined from time to time by the Board of Directors; provided that any director who is absent when such a determination is made shall be given notice of the determination.  A regular meeting of the Board of Directors may be held without notice immediately after and at the same place as the annual meeting of shareholders.

2.7     <u>Special Meetings</u>.  Special meetings of the Board of Directors may be called by the Chairman of the Board, the Chief Executive Officer, the President or two or more directors and may be held at any time and place, within or without the State of Nevada.

2.8     <u>Notice of Special Meetings</u>.  Notice of any special meeting of directors shall be given to each director by whom it is not waived by the Secretary or by the officer or one of the directors calling the meeting.  Notice shall be duly given to each director by (a) giving notice to such director in person or by telephone, electronic transmission or voice message system at least 24 hours in advance of the meeting, (b) sending a facsimile to his last known facsimile number, or delivering written notice by hand to his last known business or home address, at least 24 hours in advance of the meeting, or (c) mailing written notice to his last known business or home address at least three days in advance of the meeting.  A notice or waiver of notice of a meeting of the Board of Directors need not specify the purposes of the meeting.  Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

2.9     <u>Participation in Meetings by Telephone Conference Calls or Other Methods of Communication</u>.  Directors or any members of any committee designated by the directors may participate in a meeting of the Board of Directors or such committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation by such means shall constitute presence in person at such meeting.

2.10    <u>Quorum</u>.  A majority of the total number of authorized directors shall constitute a quorum at any meeting of the Board of Directors.  In the absence of a quorum at any such meeting, a majority of the directors present may adjourn the meeting from time to time without further notice other than announcement at the meeting, until a quorum shall be present.  Interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or at a meeting of a committee which authorizes a particular contract or transaction.

2.11    <u>Action at Meeting</u>.  At any meeting of the Board of Directors at which a quorum is present, the vote of a majority of those present shall be sufficient to take any action, unless a different vote is specified by law, the Articles of Incorporation or these Bylaws.

2.12    <u>Action by Written Consent</u>.  Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee of the Board of Directors may be taken without a meeting if all members of the Board or committee, as the case may be, consent to the action in writing or by electronic transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper

56772-002\DOCS_SF:75295.2

form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

2.13   Committees.  The Board of Directors may designate one or more committees, each committee to consist solely of one or more of the directors of the corporation, with such lawfully delegated powers and duties as it therefor confers, to serve at the pleasure of the Board. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members of the committee present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent provided in the resolution of the Board of Directors and subject to the provisions of the Nevada Revised Statutes, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation and may authorize the seal of the corporation to be affixed to all papers which may require it.  Each such committee shall keep minutes and make such reports as the Board of Directors may from time to time request.  Except as the Board of Directors may otherwise determine, any committee may make rules for the conduct of its business, but unless otherwise provided by such rules, its business shall be conducted as nearly as possible in the same manner as is provided in these Bylaws for the Board of Directors.

2.14   Compensation of Directors.  Directors may be paid such compensation for their services and such reimbursement for expenses of attendance at meetings as the Board of Directors may from time to time determine.  No such payment shall preclude any director from serving the corporation or any of its parent or subsidiary corporations in any other capacity and receiving compensation for such service.

2.15   Nomination of Director Candidates.

(a)   In addition to any other applicable requirements, only persons who are nominated in accordance with the following procedures shall be eligible for election as directors. Subject to the rights of holders of any class or series of Preferred Stock then outstanding, nominations for the election of directors may be made at an annual meeting by (i) the Board of Directors or a duly authorized committee thereof or (ii) any shareholder entitled to vote in the election of directors generally who complies with the procedures set forth in this Bylaw and who is a shareholder of record at the time notice is delivered to the Secretary of the corporation.  The foregoing clause (ii) shall be the exclusive means for a shareholder to make nominations at an annual meeting of shareholders.  A shareholder who complies with the notice procedures set forth below is permitted to present the nomination at the meeting of shareholders but is not entitled to have a nominee included in the corporation's proxy statement or information statement in the absence of an applicable rule of the Securities and Exchange Commission requiring the corporation to do so.  Any shareholder entitled to vote in the election of directors generally may nominate one or more persons for election as directors at an annual meeting only if timely notice of such shareholder's intent to make such nomination or nominations has been given in writing to the Secretary of the corporation.  To be timely, a shareholder nomination for a director to be elected at an annual meeting shall be received at the corporation's principal

10

executive offices not earlier than the close of business on the 120th day, nor later than the close of business on the 90th day, prior to the first anniversary of the date of the preceding year's annual meeting as first specified in the corporation's notice of meeting (without regard to any postponements or adjournments of such meeting after such notice was first sent), except that if no annual meeting was held in the previous year or the date of the annual meeting is more than 30 days earlier or later than such anniversary date, notice by the shareholders to be timely must be received not later than the close of business on the later of the 90th day prior to the annual meeting or the 10th day following the date on which public announcement of the date of such meeting is first made.  Each such notice shall set forth (i) the name and address, as they appear on the corporation's books, of the shareholder who intends to make the nomination and the names and addresses of the beneficial owners, if any, on whose behalf the nomination is being made and of the person or persons to be nominated, (ii) a representation that the shareholder is a holder of record of stock of the corporation entitled to vote for the election of directors on the date of such notice and intends to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice, (iii) the following information regarding the ownership interests of the shareholder and any Shareholder Associated Person, which shall be supplemented in writing by the shareholder not later than 10 days after the record date for notice of the meeting to disclose such interests as of such record date: (A) the class and number of shares of the corporation that are owned beneficially and of record by such person; (B) whether and the extent to which any Derivative Instrument is directly or indirectly owned beneficially owned by such person; (C) whether and the extent to which any Relevant Hedge Transaction has been entered into by such person; (D) any proxy, contract, arrangement, understanding, or relationship pursuant to which such person has a right to vote any shares of any security of the corporation; (E) any short interest in any security of the corporation; (F) any rights to dividends on the shares of the corporation owned beneficially by such person that are separated or separable from the underlying shares of the corporation; (G) any proportionate interest in shares of the corporation, Derivative Instruments or Relevant Hedge Transaction held, directly or indirectly, by a general or limited partnership in which such shareholder or any such beneficial owner is a general partner or, directly or indirectly, beneficially owns an interest in a general partner; and (H) any performance-related fees (other than an asset-based fee) to which such person is entitled based on any increase or decrease in the value of shares of the corporation, Derivative Instruments or Relevant Hedge Transaction, if any, as of the date of such notice, including, without limitation, any such interests held by members of such shareholder's or beneficial owner's immediate family sharing the same household, (iv) a description of all arrangements or understandings between such person and each nominee and any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the shareholder, (v) a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among such person, if any, and their respective affiliates and associates, or others acting in concert therewith, on the one hand, and each proposed nominee, and his respective affiliates and associates, or others acting in concert therewith, on the other hand, including, without limitation all information that would be required to be disclosed pursuant to Rule 404 promulgated under Regulation S-K if the shareholder making the nomination and any beneficial owner on whose behalf the nomination is made, if any, or any affiliate or associate thereof or person acting in concert therewith, were the "registrant" for purposes of such rule and the nominee were a director or executive officer of such registrant, (vi)

11

such other information regarding each nominee proposed by such shareholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission, had the nominee been nominated, or intended to be nominated, by the Board of Directors, and (vii) the consent of each nominee to serve as a director of the corporation if so elected.  In no event shall the public announcement of an adjournment or postponement of an annual meeting commence a new time period (or extend any time period) for the giving of a shareholder's notice as described above.  Notwithstanding anything in this Section 2.15(a) to the contrary, in the event that the number of directors to be elected at an annual meeting is increased and there is no public announcement by the corporation naming the nominees for the additional directorships at least 100 days prior to the first anniversary of the date of the preceding year's annual meeting as first specified in the corporation's notice of meeting (without regard to any postponements or adjournments of such meeting after such notice was first sent), a shareholder's notice required by this Section 2.15(a) shall also be considered timely, but only with respect to nominees for the additional directorships, if it shall be delivered to the Secretary at the principal executive offices of the corporation not later than the close of business on the 10th day following the day on which such public announcement is first made by the corporation.

(b)     Nominations of persons for election to the Board of Directors may be made at a special meeting of shareholders at which directors are to be elected pursuant to the corporation's notice of meeting (i) by or at the direction of the Board of Directors or a committee thereof or (ii) by any shareholder of the corporation who is entitled to vote at the meeting, who complies with the notice procedures set forth in this Bylaw and who is a shareholder of record at the time such notice is delivered to the Secretary of the corporation.  In the event the corporation calls a special meeting of shareholders for the purpose of electing one or more directors to the Board of Directors, any such shareholder may nominate a person or persons (as the case may be), for election to such position(s) as are specified in the corporation's notice of meeting, if the shareholder's notice as required by Section 2.15(a) is delivered to the Secretary at the principal executive offices of the corporation not earlier than the 90th day prior to such special meeting and not later than the close of business on the later of the 70th day prior to such special meeting or the 10th day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting.  In no event shall the public announcement of an adjournment or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a shareholder's notice as described above.  The foregoing clause (ii) shall be the exclusive means for a shareholder to make nominations at a special meeting of shareholders.  A shareholder who complies with the notice procedures set forth in Section 2.15(a) is permitted to present the nomination at the special meeting of shareholders but is not entitled to have a nominee included in the corporation's proxy statement or information statement in the absence of an applicable rule of the Securities and Exchange Commission requiring the corporation to do so.

(c)     For purposes of these Bylaws, "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed or furnished by the corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act.

12

(d)      Notwithstanding the foregoing provisions of this Section 2.15, a shareholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Bylaw.

(e)      Only persons nominated in accordance with the procedures set forth in this Section 2.15 shall be eligible to serve as directors.  Except as otherwise provided by law, the chairman of the meeting shall have the power and duty (i) to determine whether a nomination was made in accordance with the procedures set forth in this Section 2.15 and (ii) if any proposed nomination was not made in compliance with this Section 2.15, to declare that such nomination shall be disregarded.

(f)      If the chairman of the meeting for the election of directors determines that a nomination of any candidate for election as a director at such meeting was not made in accordance with the applicable provisions of this Section 2.15, such nomination shall be void; provided, however, that nothing in this Section 2.15 shall be deemed to limit any voting rights upon the occurrence of dividend arrearages provided to holders of Preferred Stock pursuant to the Preferred Stock designation for any series of Preferred Stock.

### ARTICLE III
### OFFICERS

3.1      Enumeration.  The officers of the corporation shall consist of a Chief Executive Officer, a President, a Secretary, a Treasurer, a Chief Financial Officer and such other officers with such other titles as the Board of Directors shall determine, including, at the discretion of the Board of Directors, a Chairman of the Board and one or more Vice Presidents and Assistant Secretaries.  The Board of Directors may appoint such other officers as it may deem appropriate.

3.2      Election.  Officers shall be elected annually by the Board of Directors at its first meeting following the annual meeting of shareholders.  Officers may be appointed by the Board of Directors at any other meeting.

3.3      Qualification.  No officer need be a shareholder.  Any two or more offices may be held by the same person.

3.4      Tenure.  Except as otherwise provided by law, by the Articles of Incorporation or by these Bylaws, each officer shall hold office until his successor is elected and qualified, unless a different term is specified in the vote appointing the officer, or until his earlier death, resignation or removal.

3.5      Resignation and Removal.  Any officer may resign by delivering his written resignation to the corporation at its principal office or to the President or Secretary.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.  Any officer elected by the Board of Directors may be removed at any time, with or without cause, by the Board of Directors.

3.6      Chairman of the Board.  The Board of Directors may appoint a Chairman of the Board.  If the Board of Directors appoints a Chairman of the Board, he shall perform such duties and possess such powers as are assigned to the Chairman by the Board of Directors and these

13

56772-002\DOCS_SF:75295.2

Bylaws.  Unless otherwise provided by the Board of Directors, he shall preside at all meetings of the Board of Directors.

3.7    Chief Executive Officer.  The Chief Executive Officer of the corporation shall, subject to the direction of the Board of Directors, have general supervision, direction and control of the business and the officers of the corporation.  He shall preside at all meetings of the shareholders and, in the absence or nonexistence of a Chairman of the Board, at all meetings of the Board of Directors.  He shall have the general powers and duties of management usually vested in the chief executive officer of a corporation, including general supervision, direction and control of the business and supervision of other officers of the corporation, and shall have such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.

3.8    President.  Subject to the direction of the Board of Directors and such supervisory powers as may be given by these Bylaws or the Board of Directors to the Chairman of the Board or the Chief Executive Officer, if such titles be held by other officers, the President shall have general supervision, direction and control of the business and supervision of other officers of the corporation.  Unless otherwise designated by the Board of Directors, the President shall be the Chief Executive Officer of the corporation.  The President shall have such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.  He shall have power to sign stock certificates, contracts and other instruments of the corporation which are authorized and shall have general supervision and direction of all of the other officers, employees and agents of the corporation, other than the Chairman of the Board and the Chief Executive Officer.

3.9    Vice Presidents.  Any Vice President shall perform such duties and possess such powers as the Board of Directors, the Chief Executive Officer or the President may from time to time prescribe.  In the event of the absence, inability or refusal to act of the President, the Vice President (or if there shall be more than one, the Vice Presidents in the order determined by the Board of Directors) shall perform the duties of the President and when so performing shall have all the powers of and be subject to all the restrictions upon the President.  The Board of Directors may assign to any Vice President the title of Executive Vice President, Senior Vice President or any other title selected by the Board of Directors.

3.10    Secretary and Assistant Secretaries.  The Secretary shall perform such duties and shall have such powers as the Board of Directors or the President may from time to time prescribe.  In addition, the Secretary shall perform such duties and have such powers as are set forth in these Bylaws and as are incident to the office of the Secretary, including, without limitation, the duty and power to give notices of all meetings of shareholders and special meetings of the Board of Directors, to keep a record of the proceedings of all meetings of shareholders and the Board of Directors, to maintain a stock ledger and prepare lists of shareholders and their addresses as required, to be custodian of corporate records and the corporate seal and to affix and attest to the same on documents.

Any Assistant Secretary shall perform such duties and possess such powers as the Board of Directors, the Chief Executive Officer, the President or the Secretary may from time to time prescribe.  In the event of the absence, inability or refusal to act of the Secretary, the Assistant Secretary (or if there shall be more than one, the Assistant Secretaries in the order determined by the Board of Directors) shall perform the duties and exercise the powers of the Secretary.

14

In the absence of the Secretary or any Assistant Secretary at any meeting of shareholders or directors, the person presiding at the meeting shall designate a temporary secretary to keep a record of the meeting.

3.11    Treasurer.  The Treasurer shall perform such duties and have such powers as are incident to the office of treasurer, including without limitation, the duty and power to keep and be responsible for all funds and securities of the corporation, to maintain the financial records of the corporation, to deposit funds of the corporation in depositories as authorized, to disburse such funds as authorized, to make proper accounts of such funds, and to render as required by the Board of Directors accounts of all such transactions and of the financial condition of the corporation.

3.12    Chief Financial Officer.  The Chief Financial Officer shall perform such duties and shall have such powers as may from time to time be assigned to the Chief Financial Officer by the Board of Directors, the Chief Executive Officer or the President.  Unless otherwise designated by the Board of Directors, the Chief Financial Officer shall be the Treasurer of the corporation.

3.13    Salaries.  Officers of the corporation shall be entitled to such salaries, compensation or reimbursement as shall be fixed or allowed from time to time by the Board of Directors.

3.14    Delegation of Authority.  The Board of Directors may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

## ARTICLE IV
## CAPITAL STOCK

4.1    Issuance of Stock.  Subject to the provisions of the Articles of Incorporation, the whole or any part of any unissued balance of the authorized capital stock of the corporation or the whole or any part of any unissued balance of the authorized capital stock of the corporation held in its treasury may be issued, sold, transferred or otherwise disposed of by vote of the Board of Directors in such manner, for such consideration and on such terms as the Board of Directors may determine.

4.2    Certificates of Stock.  The shares of the corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution or resolutions that some or all of any class or series of stock of the corporation shall be uncertificated shares; provided, however, that no such resolution shall apply to shares represented by a certificate until such certificate is surrendered to the corporation.  Every holder of stock of the corporation represented by certificates, and, upon written request to the corporation's transfer agent or registrar, any holder of uncertificated shares, shall be entitled to have a certificate, in such form as may be prescribed by law and by the Board of Directors, certifying the number and class of shares of stock owned by such shareholder in the corporation.  Each such certificate shall be signed by, or in the name of the corporation by, the Chairman or Vice Chairman, if any, of the Board of Directors, or the President or a Vice President, and the Treasurer or an Assistant

15

Treasurer, or the Secretary or an Assistant Secretary of the corporation.  Any or all of the signatures on the certificate may be a facsimile.

Each certificate for shares of stock which are subject to any restriction on transfer pursuant to the Articles of Incorporation, the Bylaws, applicable securities laws or any agreement among any number of shareholders or among such holders and the corporation shall have conspicuously noted on the face or back of the certificate either the full text of the restriction or a statement of the existence of such restriction.

4.3     Transfers.  Except as otherwise established by rules and regulations adopted by the Board of Directors, and subject to applicable law, shares of stock may be transferred on the books of the corporation: (i) in the case of shares represented by a certificate, by the surrender to the corporation or its transfer agent of the certificate representing such shares properly endorsed or accompanied by a written assignment or power of attorney properly executed, and with such proof of authority or authenticity of signature as the corporation or its transfer agent may reasonably require; and (ii) in the case of uncertificated shares, upon the receipt of proper transfer instructions from the registered owner thereof.  Except as may be otherwise required by law, the Articles of Incorporation or the Bylaws, the corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect to such stock, regardless of any transfer, pledge or other disposition of such stock until the shares have been transferred on the books of the corporation in accordance with the requirements of these Bylaws.

4.4     Lost, Stolen or Destroyed Certificates.  The corporation may issue a new certificate of stock in place of any previously issued certificate alleged to have been lost, stolen, or destroyed, or it may issue uncertificated shares if the shares represented by such certificate have been designated as uncertificated shares in accordance with Section 4.2, upon such terms and conditions as the Board of Directors may prescribe, including the presentation of reasonable evidence of such loss, theft or destruction and the giving of such indemnity as the Board of Directors may require for the protection of the corporation or any transfer agent or registrar.

4.5     Record Dates.  The Board of Directors may fix in advance a record date for the determination of the shareholders entitled to vote at any meeting of shareholders.  Such record date shall not precede the date on which the resolution fixing the record date is adopted and shall not be more than 60 nor less than 10 days before the date of such meeting.

If no record date is fixed by the Board of Directors, the record date for determining the shareholders entitled to notice of or to vote at a meeting of shareholders shall be the close of business on the day before the day on which notice is given, or, if notice is waived, the close of business on the day before the day on which the meeting is held.

A determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the determination of shareholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for shareholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of shareholders entitled to vote in accordance with the foregoing provisions.

16

The Board of Directors may fix in advance a record date (a) for the determination of shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights in respect of any change, concession or exchange of stock, or (b) for the purpose of any other lawful action.  Any such record date shall not precede the date on which the resolution fixing the record date is adopted and shall not be more than 60 days prior to the action to which such record date relates.  If no record date is fixed by the Board of Directors, the record date for determining shareholders entitled to express consent to corporate action in writing without a meeting when no prior action by the Board of Directors is necessary shall be the date on which the first written consent is expressed.  The record date for determining shareholders for any other purpose shall be the close of business on the day on which the Board of Directors adopts the resolution relating to such purpose.

## ARTICLE V
## GENERAL PROVISIONS

5.1     Fiscal Year.  The fiscal year of the corporation shall be as fixed by the Board of Directors.

5.2     Corporate Seal.  The corporate seal shall be in such form as shall be approved by the Board of Directors.

5.3     Waiver of Notice.  Whenever any notice whatsoever is required to be given by law, by the Articles of Incorporation or by these Bylaws, a waiver of such notice either in writing signed by the person entitled to such notice or such person's duly authorized attorney, or by electronic transmission or any other method permitted under the Nevada Revised Statutes, whether before, at or after the time stated in such waiver, or the appearance of such person or persons at such meeting in person or by proxy, shall be deemed equivalent to such notice. Neither the business nor the purpose of any meeting need be specified in such a waiver. Attendance at any meeting shall constitute waiver of notice except attendance for the sole purpose of objecting to the timeliness or manner of notice.

5.4     Actions with Respect to Securities of Other Corporations.  Except as the Board of Directors may otherwise designate, the Chief Executive Officer or President or any officer of the corporation authorized by the Chief Executive Officer or President shall have the power to vote and otherwise act on behalf of the corporation, in person or by proxy, and may waive notice of, and act as, or appoint any person or persons to act as, proxy or attorney-in-fact to this corporation (with or without power of substitution) at any meeting of shareholders or shareholders (or with respect to any action of shareholders) of any other corporation or organization, the securities of which may be held by this corporation and otherwise to exercise any and all rights and powers that this corporation may possess by reason of this corporation's ownership of securities in such other corporation or other organization.

5.5     Evidence of Authority.  A certificate by the Secretary, or an Assistant Secretary, or a temporary Secretary, as to any action taken by the shareholders, directors, a committee or any officer or representative of the corporation shall as to all persons who rely on the certificate in good faith be conclusive evidence of such action.

17

56772-002\DOCS_SF:75295.2

5.6     Articles of Incorporation. All references in these Bylaws to the Articles of Incorporation shall be deemed to refer to the Articles of Incorporation of the corporation, as amended and in effect from time to time.

5.7     Severability. Any determination that any provision of these Bylaws is for any reason inapplicable, illegal or ineffective shall not affect or invalidate any other provision of these Bylaws.

5.8     Pronouns. All pronouns used in these Bylaws shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

5.9     Notices. Except as otherwise specifically provided herein or required by law, all notices required to be given to any shareholder, director, officer, employee or agent of the corporation shall be in writing and may in every instance be effectively given by hand delivery to the recipient thereof, by depositing such notice in the mails, postage paid, or by sending such notice by commercial courier service, or by facsimile or other electronic transmission, provided that notice to shareholders by electronic transmission shall be given in the manner provided in Section 78.370 of the Nevada Revised Statutes. Any such notice shall be addressed to such shareholder, director, officer, employee or agent at his last known address as the same appears on the books of the corporation. The time when such notice shall be deemed to be given shall be the time such notice is received by such shareholder, director, officer, employee or agent, or by any person accepting such notice on behalf of such person, if delivered by hand, facsimile, other electronic transmission or commercial courier service, or the time such notice is dispatched, if delivered through the mails. Without limiting the manner by which notice otherwise may be given effectively, notice to any shareholder shall be deemed given: (a) if by facsimile, when directed to a number at which the shareholder has consented to receive notice; (b) if by electronic mail, when directed to an electronic mail address at which the shareholder has consented to receive notice; (c) if by a posting on an electronic network together with separate notice to the shareholder of such specific posting, upon the later of (i) such posting and (ii) the giving of such separate notice; (d) if by any other form of electronic transmission, when directed to the shareholder; and (e) if by mail, when deposited in the mail, postage prepaid, directed to the shareholder at such shareholder's address as it appears on the records of the corporation.

5.10     Reliance Upon Books, Reports and Records. Each director, each member of any committee designated by the Board of Directors, and each officer of the corporation shall, in the performance of his duties, be fully protected in relying in good faith upon the books of account or other records of the corporation as provided by law, including reports made to the corporation by any of its officers, by an independent certified public accountant, or by an appraiser selected with reasonable care.

5.11     Time Periods. In applying any provision of these Bylaws which require that an act be done or not done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

18

5.12    Facsimile Signatures.  In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the corporation may be used whenever and as authorized by the Board of Directors or a committee thereof.

## ARTICLE VI
## AMENDMENTS

6.1    By the Board of Directors.  Except as otherwise set forth in these Bylaws, these Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of a majority of the directors present at any regular or special meeting of the Board of Directors at which a quorum is present.

6.2    By the Shareholders.  Except as otherwise set forth in these Bylaws, these Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of the holders of at 66 2/3% of the voting power of all of the shares of capital stock of the corporation issued and outstanding and entitled to vote generally in any election of directors, voting together as a single class.  Such vote may be held at any annual meeting of shareholders, or at any special meeting of shareholders provided that notice of such alteration, amendment, repeal or adoption of new Bylaws shall have been stated in the notice of such special meeting.

## ARTICLE VII
## INDEMNIFICATION OF DIRECTORS AND OFFICERS

7.1    Right to Indemnification.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative ("proceeding"), by reason of the fact that he or a person of whom he is the legal representative, is or was a director or officer of the corporation or is or was serving at the request of the corporation as a director or officer of another corporation, or as a controlling person of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action in an official capacity as a director or officer, or in any other capacity while serving as a director or officer, shall be indemnified and held harmless by the corporation to the fullest extent authorized by the Nevada Revised Statutes, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than such law permitted the corporation to provide prior to such amendment) against all expenses, liability and loss reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of his heirs, executors and administrators; provided, however, that except as provided in Section 7.2 of this Article VII, the corporation shall indemnify any such person seeking indemnity in connection with a proceeding (or part thereof) initiated by such person only if (a) such indemnification is expressly required to be made by law, (b) the proceeding (or part thereof) was authorized by the Board of Directors, (c) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the Nevada Revised Statutes, or (d) the proceeding (or part thereof) is brought to establish or enforce a right to indemnification or advancement under an indemnity agreement or any other statute or law or otherwise as required under

19

56772-002\DOCS_SF:75295.2

Section 78.7502 of the Nevada Revised Statutes.  The rights hereunder shall be contract rights and shall include the right to be paid expenses incurred in defending any such proceeding in advance of its final disposition; provided, however, that the payment of such expenses incurred by a director or officer of the corporation in his capacity as a director or officer (and not in any other capacity in which service was or is tendered by such person while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of such proceeding, shall be made only upon delivery to the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it should be determined ultimately by final judicial decision from which there is no further right to appeal that such director or officer is not entitled to be indemnified under this section or otherwise.

7.2    Right of Claimant to Bring Suit.  If a claim under Section 7.1 is not paid in full by the corporation within 60 days after a written claim has been received by the corporation, or 20 days in the case of a claim for advancement of expenses, the claimant may at any time thereafter bring suit against the corporation to recover the unpaid amount of the claim and, if such suit is not frivolous or brought in bad faith, the claimant shall be entitled to be paid also the expense of prosecuting such claim.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to this corporation) that the claimant has not met the standards of conduct which make it permissible under the Nevada Revised Statutes for the corporation to indemnify the claimant for the amount claimed.  Neither the failure of the corporation (including its Board of Directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the Nevada Revised Statutes, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its shareholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.  In any suit brought by the corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the corporation shall be entitled to recover such expenses upon a final judicial decision from which there is no further right to appeal that the indemnitee has not met any applicable standard for indemnification set forth in the Nevada Revised Statutes.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, shall be on the corporation.

7.3    Indemnification of Employees and Agents.  The corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and to the advancement of related expenses, to any employee or agent of the corporation to the fullest extent of the provisions of this Article VII with respect to the indemnification of and advancement of expenses to directors and officers of the corporation.

7.4    Non-Exclusivity of Rights.  The rights conferred on any person in this Article VII shall not be exclusive of any other right which such persons may have or hereafter acquire under

20

56772-002\DOCS_SF:75295.2

any statute, provision of the Articles of Incorporation, Bylaw, agreement, vote of shareholders or disinterested directors or otherwise.

7.5     Indemnification Contracts.  The Board of Directors is authorized to enter into a contract with any director, officer, employee or agent of the corporation, or any person serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including employee benefit plans, providing for indemnification rights equivalent to or, if the Board of Directors so determines, greater than, those provided for in this Article VII.

7.6     Insurance.  The corporation may maintain insurance to the extent reasonably available, at its expense, to protect itself and any such director, officer, employee or agent of the corporation or another corporation, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the corporation would have the power to indemnify such person against such expense, liability or loss under the Nevada Revised Statutes.

7.7     Effect of Amendment.  Any amendment, repeal or modification of any provision of this Article VII shall not adversely affect any right or protection of an indemnitee or his successor in respect of any act or omission occurring prior to such amendment, repeal or modification.

56772-002\DOCS_SF:75295.2

## EXHIBIT B

### (Individual Estimated Value)

Based on the allocation of values described in the Liquidation Analysis annexed to the Disclosure Statement as Exhibit D, the Debtors and the Committee have determined that the Individual Estimated Value for each Debtor is as follows:

| Debtor | Individual Estimated Value |
| --- | --- |
| Mesa Air Group, Inc. | $40,543,000 |
| Mesa Airlines, Inc. | $62,785,000 |
| Freedom Airlines, Inc. | $521,000 |
| MPD, Inc. | n/a[1] |
| MAG – AIM, LLC | $9,608,000 |
| Nilchii | n/a[2] |
| Ritz Hotel Management Corp. | $0 |
| Patar, Inc. | $0 |
| Mesa In-Flight, Inc. | $0 |
| Regional Aircraft Services, Inc. | $0 |
| Mesa Air New York, Inc. | n/a[3] |
| Air Midwest, Inc. | $5,000 |

---

[1] All general unsecured claims of MPD, Inc. are De Minimis Convenience Class Claims and are estimated to receive a 100% distribution.

[2] The Claims of the 2012 Noteholders and intercompany claims are not shown as they are being satisfied in full by the New 8% Notes (Series A) and the residual value is upstreamed to Mesa Air Group, Inc.

[3] All general unsecured claims of Mesa Air New York, Inc. are De Minimis Convenience Class Claims and are estimated to receive a 100% distribution.

## EXHIBIT C

### (New Common Stock Vesting Schedule)

As set forth in the Plan in Section 1.138 and 5.2.3, the vesting schedule for the Common Stock issued pursuant to the Management Equity Pool (i) shall not be less than three (3) years and subject to the terms and conditions of the definitive documentation of the Key Employment Agreements or (ii) shall be subject to the restrictions established board of directors of the Reorganized Mesa Air Group for the Common Stock that is not governed by a Key Employment Agreement.

# EXHIBIT D

## (New Notes Indenture)

56772-002\DOCS_SF:75217.1

**FORM OF INDENTURE**

**MESA AIR GROUP, INC.,**
as Issuer,

**THE GUARANTORS NAMED ON THE SIGNATURE PAGES HERETO,**
as Guarantors

to

**U.S. BANK NATIONAL ASSOCIATION,**
as Trustee

**INDENTURE**

**Dated as of _____ _____, 201__**

**Providing for Issuance of**
**8% Notes (Series A)**
**8% Notes (Series B)**
**US Airways Notes**
**Management Notes**

Reconciliation and tie between Indenture, dated as of _____ _____, 201__, and the Trust Indenture Act of 1939, as amended.

| Trust Indenture Act of 1939 Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.10; 6.11; 6.12 |
| (a)(2) | 6.12 |
| (a)(3) | TIA |
| (a)(4) | Not Applicable |
| (a)(5) | TIA |
| (b) | 4.6; 6.4; 6.10; 6.12; TIA |
| | |
| 311(a) | 6.4; 6.16; TIA |
| (b) | TIA |
| (c) | Not Applicable |
| | |
| 312(a) | 6.8 |
| (b) | 1.16; TIA |
| (c) | 1.16; TIA |
| | |
| 313(a) | |
| (b) | 6.3; 6.7; TIA |
| (c) | 6.3; 6.7; TIA |
| (d) | 6.3; 6.7; TIA |
| | 6.3; 6.7; TIA |
| | |
| 314(a) | 9.5; 9.7; TIA |
| (b) | Not Applicable |
| (c)(1) | 1.2; 4.1; 4.6; 5.7; 7.1; 9.5 |
| (c)(2) | 1.2; 4.1; 4.6; 7.1; 9.5 |
| (c)(3) | Not Applicable |
| (d) | Not Applicable |
| (e) | 9.8; TIA |
| (f) | TIA |
| | |
| 315(a) | 6.1; 6.3; TIA |
| (b) | 6.2 |
| (c) | TIA |
| (d)(1) | TIA |
| (d)(2) | 6.1; TIA |
| (d)(3) | 6.1; TIA |
| (e) | 6.10; TIA |
| | |
| 316(a) (last sentence) | 1.1 |
| (a)(1)(A) | 5.2; 5.8 |
| (a)(1)(B) | 5.7 |

| Trust Indenture Act of 1939 Section | Indenture Section |
|---|---|
| (b) | 5.9; 5.10 |
| (c) | 1.4; TIA |
| | |
| 317(a)(1) | 5.3; 6.3 |
| (a)(2) | 5.4; 6.3 |
| (b) | 6.3; 9.3 |
| | |
| 318(a) | 1.11 |
| (b) | TIA |
| (c) | 1.11; TIA |

This reconciliation and tie Section does not constitute part of the Indenture.

WEST\222568871.14

**TABLE OF CONTENTS**

**Page**

Article 1 ...............................................Definitions and Other Provisions of General Application 2
    Section 1.1.......................................................................... Definitions 2
    Section 1.2.......................................... Compliance Certificates and Opinions 9
    Section 1.3.......................................... Form of Documents Delivered to Trustee 9
    Section 1.4.......................................................... Acts of Holders 10
    Section 1.5.......................... Notices, etc., to Trustee, Company, and Guarantors 11
    Section 1.6...................................................... Notice to Holders; Waiver 12
    Section 1.7................................................Headings and Table of Contents 12
    Section 1.8.................................................... Successors and Assigns 12
    Section 1.9........................................................................ Separability 13
    Section 1.10.............................................. Benefits of Indenture 13
    Section 1.11...................................................... Governing Law 13
    Section 1.12...................................................Legal Holidays 13
    Section 1.13.................................... Trustee to Establish Record Dates 13
    Section 1.14.   8% Notes (Series A), 8% Notes (Series B), and US Airways Notes
        Relative to the Management Notes................................................ 13
    Section 1.15.... No Personal Liability of Directors, Officers, Employees and Stockholders 13
    Section 1.16............................................ Communication by Holders with Other Holders 14
    Section 1.17............................................ Company Responsible for Making Calculations 14
Article 2 .............................................................................Security Forms 14
    Section 2.1.................................................. Forms Generally 14
    Section 2.2.............................. Form of Trustee's Certificate of Authentication 15
    Section 2.3.................................................. Notes in Global Form 15
    Section 2.4..............................................................Global Note Legend 15
Article 3 ............................................................................. The Securities 16
    Section 3.1.................................................. Aggregate Amounts; Issuance 16
    Section 3.2......................................................Denominations 17
    Section 3.3.............................Execution, Authentication, Delivery and Dating 17
    Section 3.4.................................................. Temporary Notes 18
    Section 3.5............................Registration, Registration of Transfer and Exchange 19
    Section 3.6.................................................. Replacement Notes 21
    Section 3.7.................................................. Paying Agent 22
    Section 3.8.................................. Paying Agent to Hold Money in Trust 22
    Section 3.9.............................Payment of Interest; Interest Rights Preserved 22
    Section 3.10.............................................. Persons Deemed Owners 22
    Section 3.11...................................................... Cancellation 23
    Section 3.12.............................................. Computation of Interest 23
    Section 3.13.............................................. CUSIP Numbers 23
Article 4 ............................................Satisfaction, Discharge and Defeasance 24
    Section 4.1............................ Termination of Company's Obligations Under the Indenture 24
    Section 4.2......................................................Application of Trust Funds 25
    Section 4.3................... Company's Option to Effect Defeasance or Covenant Defeasance 25
    Section 4.4.................................................. Defeasance and Discharge 25
    Section 4.5......................................................Covenant Defeasance 26

            WEST\222568871.14

**TABLE OF CONTENTS**

(continued)

Page

Section 4.6...........................................Conditions to Defeasance or Covenant Defeasance 26

Section 4.7................ Deposited Money and Government Obligations to Be Held in Trust 28

Section 4.8.................................................................................................... Reinstatement 28

Article 5 ................................................................................................ Defaults and Remedies 28

Section 5.1................................................................................................ Events of Default 28

Section 5.2..........................................................Acceleration; Rescission and Annulment 30

Section 5.3.......... Collection of Indebtedness and Suits for Enforcement by Trustee 31

Section 5.4.......................................................... Trustee May File Proofs of Claim 31

Section 5.5..............................Trustee May Enforce Claims Without Possession of Notes 32

Section 5.6................................................................................. Delay or Omission Not Waiver 32

Section 5.7.............................................................................. Waiver of Past Defaults 32

Section 5.8................................................................................. Control by Majority 32

Section 5.9................................................................................Limitation on Suits by Holders 33

Section 5.10......................................................Rights of Holders to Receive Payment 33

Section 5.11...................................................... Application of Money Collected 33

Section 5.12........................................................Restoration of Rights and Remedies 34

Section 5.13........................................................Rights and Remedies Cumulative 34

Section 5.14......................................................................Undertaking for Costs 34

Section 5.15...................................................... Waiver of Stay or Extension Laws 34

Article 6 ....................................................................................................... The Trustee 35

Section 6.1....................................................Certain Duties and Responsibilities 35

Section 6.2....................................................................................Notice of Defaults 36

Section 6.3........................................................................................Rights of Trustee 36

Section 6.4....................................................................Trustee May Hold Notes 37

Section 6.5....................................................................Money Held in Trust 37

Section 6.6..........................................................................Trustee's Disclaimer 37

Section 6.7.......................................................... Reports by Trustee to the Holders 37

Section 6.8.................................................................Securityholder Lists 37

Section 6.9.........................................................Compensation and Indemnity 38

Section 6.10......................................................................Replacement of Trustee 39

Section 6.11...................................................... Acceptance of Appointment by Successor 40

Section 6.12........................................................ Disqualification; Eligibility 41

Section 6.13......................Merger, Conversion, Consolidation or Succession to Business 41

Section 6.14.......................................................... Appointment of Authenticating Agent 41

Section 6.15..............................Trustee's Application for Instructions from the Company 43

Section 6.16...................................... Preferential Collection of Claims Against Company 43

Article 7 .............................................. Consolidation, Merger or Sale by the Company 43

Section 7.1......................Consolidation, Merger or Sale of Assets Only on Certain Terms 43

Article 8 .................................................................................. Supplemental Indentures 44

Section 8.1...................................... Supplemental Indentures Without Consent of Holders 44

Section 8.2......................................................................... With Consent of Holders 45

Section 8.3.......................................................... Compliance with Trust Indenture Act 46

Section 8.4.......................................................... Execution of Supplemental Indentures 46

Section 8.5.......................................................... Effect of Supplemental Indentures 46

                                                    WEST\222568871.14

**TABLE OF CONTENTS**
(continued)

**Page**

Section 8.6.................................................Reference in Notes to Supplemental Indentures 46
Section 8.7................................................................................................................Notice 47
Section 8.8....................................................................Revocation and Effect of Consents 47
Article 9 .........................................................................................................Covenants 47
Section 9.1.......................................Payment of Principal, Premium, if any, and Interest 47
Section 9.2........................................................................ Maintenance of Office or Agency 47
Section 9.3.............................Money for Notes to Be Held in Trust; Unclaimed Property 48
Section 9.4.................................................................................Corporate Existence 49
Section 9.5.................................................................Provision of Financial Information 49
Section 9.6.................................................................................... Notice of Default 50
Section 9.7..............................................................................Compliance Certificates 50
Section 9.8................................................................................Further Instruments and Acts 50
Section 9.9................................................................. Changes in Organization Documents 50
Section 9.10.......................................................................... Affiliate Transactions 50
Section 9.11...........................................Limitation on Additional Debt Incurred by Nilchii 51
Section 9.12.......................................................................... Use of Spirit Proceeds 51
Article 10 ........................................................................................................Redemption 51
Section 10.1.........................................................................Notice of Redemption 51
Section 10.2...........................................................Deposit of Redemption Price 52
Section 10.3........................................................... Notes Payable on Redemption Date 53
Section 10.4.................................................................................Notes Redeemed in Part 53
Section 10.5...................................................................................Repurchase Option 53
Section 10.6.......................................................................... Mandatory Redemption 53
Article 11 ............................................................................................ Note Guarantee 54
Section 11.1.................................................................................Guarantee 54
Section 11.2....................................................... Limitation on Guarantor Liability 56
Section 11.3.................................................. Execution and Delivery of a Note Guarantee 56
Section 11.4......................................Guarantor May Consolidate, etc., on Certain Terms 56
Section 11.5........................................ Subrogation of Noteholders and Guarantors 57
Section 11.6......................................................................... Additional Guarantors 57
Article 12 ..................................................SUBORDINATION OF MANAGEMENT NOTES 58
Section 12.1............................................................... Agreement to Subordinate 58
Section 12.2................................................................ Trustee to Effectuate Subordination 58
Section 12.3......................................................... Subordination May Not Be Impaired 58

WEST\222568871.14

Exhibits

| | |
|---|---|
| Exhibit A | Form of 8% Notes (Series A) |
| Exhibit B | Form of 8% Notes (Series B) |
| Exhibit C | Form of US Airways Note |
| Exhibit D | Form of Management Note |
| Exhibit E | Form of Notation of Guarantee |

WEST\222568871.14

INDENTURE, dated as of _____ _____, 201___, among MESA AIR GROUP, INC., a Nevada corporation (the "Company"), the guarantors executing a signature page hereto (each a "Guarantor" and collectively, the "Guarantors") and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as Trustee (the "Trustee").

Recitals

On January 5, 2010, the Company and certain of its directly and indirectly wholly owned subsidiaries filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

The Company and certain of its directly and indirectly wholly owned subsidiaries filed a Joint Plan of Reorganization (the "Plan"), which was approved by the Bankruptcy Court on _____ _____, 201__.

Pursuant to the Plan, the Company is required to issue the 8% Notes (Series A), 8% Notes (Series B), US Airways Notes and Management Notes (each as defined herein).

The Company has duly authorized the issuance of the (i) 8% Notes (Series A), (ii) 8% Notes (Series B), (iii) US Airways Notes, and (iv) Management Notes (together, the "Notes"), and to provide therefor, the Company has duly authorized the execution and delivery of this Indenture.

The entire aggregate principal amount of the 8% Notes (Series A) will be issued to or for the benefit of holders of a 2012 Noteholder Claim (as such term is defined under the Plan), as set forth under the Plan.

The entire aggregate principal amount of the 8% Notes (Series B) will be issued to or for the benefit of Class 3 and Class 5 Creditors (as such terms are defined under the Plan), as set forth under the Plan.

The entire aggregate principal amount of the US Airways Notes will be issued to or for the benefit of US Airways, as set forth under the Plan.

The entire aggregate principal amount of the Management Notes will be issued to or for the benefit of certain members of the senior management of the Company, as set forth under the Plan.

All things necessary to make the Notes, when executed by the Company and authenticated and delivered hereunder and duly issued by the Company, the valid obligations of the Company, and to make this Indenture a valid agreement of the Company, in accordance with its terms.

For and in consideration of the premises and the acquisition of the Notes by the Holders thereof, it is mutually covenanted and agreed as follows for the equal and ratable benefit of the Holders of the Notes:

WEST\222568871.14

ARTICLE 1

Definitions and Other Provisions
of General Application

Section 1.1.    Definitions.

(a)      For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(1)      the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(2)      all other terms used herein which are defined in the Trust Indenture Act, either directly or by reference therein, and not otherwise defined herein have the meanings assigned to them therein;

(3)      all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles; and

(4)      the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision.

"8% Notes (Series A)" means $19,400,000 in aggregate original principal amount of 8% Notes (Series A) of the Company issued on the date hereof, as well as (i) any Notes issued in exchange therefor or upon transfer thereof and (ii) any increase in the principal amount thereof pursuant to paragraph 1 of such Notes.  All such Notes shall be considered one series.

"8% Notes (Series B)" means $43,200,000 in aggregate original principal amount of 8% Notes (Series B) of the Company issued on the date hereof, as well as (i) any Notes issued in exchange therefor or upon transfer thereof and (ii) any increase in the principal amount thereof pursuant to paragraph 1 of such Notes.  All such Notes shall be considered one series.

"Additional Notes" shall mean the principal amount of Notes issued in lieu of interest on any Interest Payment Date pursuant to Section 3.9 of this Indenture and Section 1 of the Notes.

"Affiliate" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person.  For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means any Paying Agent or Registrar.

"Authenticating Agent" means any authenticating agent appointed by the Trustee pursuant to Section 6.14.

WEST\222568871.14                                         2

"Authorized Newspaper" means a newspaper in New York, New York, Washington, D.C. and Chicago, Illinois in the English language, customarily published on each Business Day whether or not published on Saturdays, Sundays or holidays, and of general circulation in the place in connection with which the term is used or in the financial community of such place. Whenever successive publications in an Authorized Newspaper are required hereunder they may be made (unless otherwise expressly provided herein) on any Business Day and in the same or different Authorized Newspapers.

"Bankruptcy Law" means Title 11 of the U.S. Code or any similar federal, state or foreign law for the relief of debtors.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person," as such term is used in Section 13(d)(3) of the Securities Exchange Act, such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.

"Board" or "Board of Directors" means the Board of Directors of the Company, the Executive Committee thereof or any other duly authorized committee thereof.

"Board Resolution" means a copy of a resolution of the Board of Directors, certified by the Corporate Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Business Day", means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York, New York or U.S. governmental agencies are authorized or obligated by applicable law or executive order to remain closed.

"Commission" means the Securities and Exchange Commission, as from time to time constituted, created under the Securities Exchange Act, or, if at any time after the execution of this Indenture such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties at such time.

"Company" means the Person named as the Company in the first paragraph of this Indenture until one or more successor Persons replaces it pursuant to the applicable provisions of this Indenture, and thereafter means such successor(s).

"Company Order" and "Company Request" mean, respectively, a written order or request signed in the name of the Company by the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, or any Executive Vice President, signing alone, by any Vice President signing together with the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary of the Company, or, with respect to Section 3.3, Section 3.4 and Section 3.5, any Assistant Secretary of the Company.

"Corporate Trust Office" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date hereof is

located at U.S. Bank National Association, Corporate Trust Services, U.S. Bank Center, 101 North First Avenue, Suite 1600, Phoenix, Arizona 85003, Attention:  Mary J. Ambriz-Reyes.

"corporation" includes corporations, associations, companies and business trusts.

"Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

"Default" means any event which is, or after notice or passage of time, or both, would be, an Event of Default.

"Depositary", when used with respect to the Notes issuable or issued in whole or in part in global form, means the Person designated as Depositary by the Company pursuant to Section 3.1 until a successor Depositary shall have become such pursuant to the applicable provisions of this Indenture, and thereafter shall mean or include each Person which is then a Depositary hereunder, and if at any time there is more than one such Person, shall be a collective reference to such Persons.

"Dollar" means the coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"Fundamental Change" means the occurrence of any of the following:  (a) any sale, conveyance, transfer or disposition of more than 50% of the property or assets of the Company and its Subsidiaries on a consolidated basis (measured either by book value in accordance with generally accepted accounting principles consistently applied or by fair market value determined in the reasonable good faith judgment of the Board) in any transaction or series of related transactions (other than sales in the ordinary course of business); (b) any merger or consolidation to which the Company is a party, except for (x) a merger which is effected solely to change the state of incorporation of the Company or (y) a merger in which the Company is the surviving Person, the terms of the Notes are not changed or altered in any respect, the Notes are not exchanged for cash, securities or other property or assets and, after giving effect to such merger, the holders of the capital stock of the Company as of the date of such merger shall continue to own the outstanding capital stock of the Company possessing the voting power (under ordinary circumstances) to elect a majority of the Board; or (c) the Company's approval of a plan of liquidation or dissolution.

"Government Obligations" means securities which are (i) direct obligations of the United States for the payment of which its full faith and credit is pledged or (ii) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States, the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States, which, in either case, are not callable or redeemable at the option of the issuer thereof unless, assuming the call thereof at the earliest possible date, there shall be sufficient funds available to pay the Notes without giving effect to any re-investment of the proceeds of such call.  Government Obligations shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such Government Obligation or a specific payment of interest on or principal of any such Government Obligation held by such custodian for the account of the holder of a depository receipt, provided that (except as required by law)

such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the Government Obligation evidenced by such depositary receipt.  In order to have money available on a payment date to pay the Notes, the Government Obligations shall be payable as to principal, premium, if any, or interest on or before such payment date in such amounts as will provide the necessary money.

"Guarantor" means each Subsidiary listed as a signatory to this Indenture and any other Subsidiary that has become a Guarantor in accordance with Section 11.6 hereof.

"Holder" means a Person in whose name a Note is registered on the Register.

"Indenture" means this Indenture as originally executed or as amended or supplemented from time to time.

"Interest Payment Date", when used with respect to any Note, means the first day of each calendar quarter, or, if such day is not a business day, the next day that is a business day, up to and including the date of Stated Maturity with respect to such Note.

"Management Notes" means $5,500,000 in aggregate original principal amount of Management Notes of the Company issued on the date hereof, as well as (i) any Notes issued in exchange therefor or upon transfer thereof and (ii) any increase in the principal amount thereof pursuant to paragraph 1 of such Notes.  All such Notes shall be considered one series.

"Maturity", when used with respect to any Note, means the date on which the principal of such Note or an installment of principal becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Nilchii" means Nilchii, Inc., a Nevada corporation.

"Note" or "Notes" has the meaning set forth in the fourth recital of this Indenture and more particularly means any Note or Notes of the Company issued, authenticated and delivered under this Indenture.

"Note Guarantee" means the guarantee by any Guarantor as set forth in Section 11.1, as evidenced by the Form of Notation of Guarantee annexed hereto as Exhibit E, to be attached to each Note.

"Officer" means the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, any Executive Vice President, any Senior Vice President, any Vice President, the Treasurer, the Corporate Secretary, or any Assistant Treasurer or any Assistant Secretary of the Company.

"Officers' Certificate" means a certificate signed by the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, any Executive Vice President or any Senior Vice President signing alone or by any Vice President signing together with the Corporate Secretary, any Assistant Secretary, the Treasurer, or any Assistant Treasurer of the Company, and delivered to the Trustee.

"Opinion of Counsel" means a written opinion of legal counsel, who may be (a) the most senior attorney serving in the capacity of general counsel employed by the Company, (b) DLA Piper LLP (US), or (c) other counsel designated by the Company and who shall be acceptable to the Trustee.

"Outstanding", when used with respect to Notes, means, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

(i)     Notes theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)    Notes, or portions thereof, for which payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company) in trust or set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent) for the Holders of such Notes provided that if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provisions therefor satisfactory to the Trustee have been made;

(iii)   Notes, except to the extent provided in Section 4.4 and Section 4.5, with respect to which the Company has effected defeasance and/or covenant defeasance as provided in Article 4; and

(iv)    Notes which have been surrendered pursuant to Section 3.6 or in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture.

provided, however, that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder, or for the purpose of making the calculations required by Section 313 of the Trust Indenture Act, Notes owned by the Company, any Guarantor or any other obligor upon the Notes or any Affiliate of the Company, any Guarantor or such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in making such calculation or in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes which the Trustee knows to be so owned as a result of written notice being provided to that effect by the Company, by any Guarantor, by any such other obligor upon the Notes or any such Affiliate of any of the foregoing, as the case may be, to the Trustee shall be so disregarded.

"Paying Agent" means any Person authorized by the Company to pay the principal of, premium, if any, or interest on any Notes on behalf of the Company.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof, or any other entity.

"Place of Payment", when used with respect to Notes of or within any series, means the place or places where, subject to the provisions of Section 9.2, the principal of, premium, if any, and interest on such Notes are payable as specified in such Notes.

"Redemption Date", when used with respect to any Note to be redeemed, means the date fixed for such redemption by or pursuant to this Indenture.

"Redemption Price", when used with respect to any Note to be redeemed, in whole or in part, means the price at which such Note or part thereof is to be redeemed pursuant to this Indenture.

"Register" has the meaning set forth in Section 3.5.

"Registrar" has the meaning set forth in Section 3.5.

"Regular Record Date" for the interest payable on any Interest Payment Date on the Notes of any series means the date specified on the face of such Note.

"Responsible Officer", when used with respect to the Trustee, shall mean any officer within the Corporate Trust Office of the Trustee with direct responsibility for the administration of this Indenture, including any vice president, any assistant vice president, any senior trust officer, any trust officer, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers, respectively, and also means, with respect to a particular corporate trust matter, any other officer to whom such corporate trust matter is referred because of his or her knowledge of and familiarity with the particular subject.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

"Special Record Date" for the payment of any Defaulted Interest on the Notes of any series means a date fixed by the Trustee pursuant to Section 3.7.

"Spirit Liquidity Event", the net proceeds, if any, received by Nilchii from the sale of common stock of or payment on notes from Spirit Airlines distributed by Indigo to Nilchii in accordance with the terms of that certain Amended and Restated Limited Liability Company Agreement of Indigo Miramar LLC, dated as of _____ ___, 2009, as may have been thereafter amended.

"Stated Maturity", when used with respect to any Note or any installment of interest thereon means the date specified in such Note as the original date on which the principal of such Note or such installment of interest is due and payable.  The Stated Maturity of the principal amount of the 8% Notes (Series A) shall be _____ ___, 2016.  The Stated Maturity of the principal amount of the 8% Notes (Series B) shall be _____ ___, 2016.  The stated Maturity of the principal amount of the US Airways Notes shall be _____ ___, 2016.  The Stated Maturity of the principal amount of the Management Notes shall be _____ ___, 2016.

"Subsidiary" means (i) any corporation of which the Company at the time owns or controls, directly or indirectly, the shares of outstanding stock having more than 50% of general voting power under ordinary circumstances to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), (ii) a partnership in which the Company holds a majority interest in the voting equity capital or profits of such partnership, or (iii) any other Person (other than a corporation or a partnership) in which the Company, directly or indirectly, at the date of determination has (x) at least a majority voting ownership interest or (y) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Trust Indenture Act" or "TIA" means the Trust Indenture Act of 1939, as amended, as in effect on the date of this Indenture, except as provided in Section 8.3.

"Trustee" means the party named as such in the first paragraph of this Indenture until a successor Trustee replaces it pursuant to the applicable provisions of this Indenture, and thereafter means such successor Trustee and if, at any time, there is more than one Trustee, "Trustee" as used with respect to the Notes shall mean the Trustee with respect to the Notes.

"United States" means the United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"US Airways Notes" means $6,800,000 in aggregate original principal amount of US Airways Notes of the Company issued on the date hereof, as well as (i) any Notes issued in exchange therefor or upon transfer thereof and (ii) any increase in the principal amount thereof pursuant to paragraph 1 of such Notes.  All such Notes shall be considered one series.

(b)      The following terms shall have the meanings specified in the Sections referred to opposite such term below:

| **Term** | **Section** |
| --- | --- |
| "Act" | Section 1.4(a) |
| "covenant defeasance" | Section 4.5 |
| "CUSIP" | Section 3.11 |
| "Defaulted Interest" | Section 3.7(b) |
| "defeasance" | Section 4.4 |
| "DTC" | Section 2.4 |
| "Event of Default" | Section 5.1 |
| "Notice of Default" | Section 5.1(4) |
| "Plan" | Recitals |
| "Securities Exchange Act" | Section 1.1(a) |

(c)      Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference and is made a part of this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes;

"indenture security holder" means a Holder of a Note;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Notes and the Note Guarantees means the Company and the Guarantors, respectively, and any successor obligor upon the Notes and the Note Guarantees, respectively.

Section 1.2.   Compliance Certificates and Opinions.   Upon any application or request by the Company to the Trustee to take any action under any provision of this Indenture, the Company shall furnish to the Trustee such certificates and opinions as may be required under Section 314(c) of the Trust Indenture Act, each such certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and each such opinion stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with.   Each such certificate or opinion shall be given in the form of an Officers' Certificate, if to be given by an Officer of the Company, or an Opinion of Counsel, if to be given by counsel, and shall comply with the requirements of Section 314(c) of the Trust Indenture Act and any other requirements set forth in this Indenture.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)      a statement that each individual signing such certificate or opinion has read such condition or covenant and the definitions herein relating thereto;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)      a statement that, in the opinion of each such individual, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such condition or covenant has been complied with; and

(4)      a statement as to whether, in the opinion of each such individual, such condition or covenant has been complied with.

Section 1.3.   Form of Documents Delivered to Trustee.   In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations as to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 1.4.    <u>Acts of Holders</u>.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are received by the Trustee in accordance with the provisions of this Indenture and, where it is hereby expressly required, to the Company.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.1) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems reasonably sufficient.

(c)    The ownership of Notes shall be proved by references to the Register or in any other reasonable manner which the Trustee deems sufficient.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Note.

However, any such Holder or subsequent Holder may revoke the consent as to such Holder's Note if the Trustee receives written notice of revocation before the date such action becomes effective.

(e)       If the Company shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to an Officers' Certificate delivered to the Trustee, fix in advance a record date (which shall not be more than sixty (60) days prior to the date of such solicitation) for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act in the circumstances permitted by the Trust Indenture Act, but the Company shall have no obligation to do so.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the Outstanding Notes shall be computed as of such record date; <u>provided</u> that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of clause (a) of this Section 1.4 not later than six months after the record date.  If not set by the Company with respect to solicitations by the Company as described in this paragraph 1.4(e) or by the Trustee pursuant to Section 1.13 prior to the first solicitation of a Holder of Notes of such series made by any Person in respect of any such Act, or, in the case of any such vote, prior to such vote, the record date for any such Act or vote shall be the 30th day (or, if later, the date of the most recent list of Holders required to be provided pursuant to Section 6.8) prior to such first solicitation or vote, as the case may be.  With regard to any record date for an Act to be taken by the Holders of one or more series of Notes, only the Holders of Notes of such series on such date (or their duly designated proxies) shall be entitled to give or take, or vote on, the relevant action.

Section 1.5.    <u>Notices, etc., to Trustee, Company, and Guarantors</u>.  Any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with,

(a)       the Trustee by any Holder, by the Company or by any Guarantor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Trustee at its Corporate Trust Office.

(b)       the Company by the Trustee, by any Guarantor or by any Holder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to the Company addressed to it at Mesa Air Group, Inc., 410 North 44th Street, Suite 700, Phoenix, Arizona 85008. Attention: General Counsel, or at any other address previously furnished in writing to the Trustee by the Company, or

(c)       any Guarantor by the Trustee, by the Company or by any Holder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to such Guarantor addressed to it at c/o Mesa Air Group,

Inc., 410 North 44th Street, Suite 700, Phoenix, Arizona 85008. Attention: General Counsel, or at any other address previously furnished in writing to the Trustee by the Guarantor.

Section 1.6.    Notice to Holders; Waiver.  Where this Indenture provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, registered mail, return receipt requested, to each such Holder at its address as it appears in the Register, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice and, in those cases where notice by publication is expressly permitted or expressly required by the terms of this Indenture or the TIA, such notice shall be sufficiently given (unless otherwise herein expressly provided) if published once in an Authorized Newspaper.

In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders of Notes given as provided herein.  In any case where notice is given to any Holder by publication pursuant to the express provisions of this Indenture (unless otherwise herein expressly provided), neither the failure to publish such notice, nor any defect in any notice so published, shall affect the sufficiency of any notice by mail to other Holders of Notes given as provided herein.  Any notice mailed to a Holder in the manner herein prescribed shall be conclusively deemed to have been received by such Holder, whether or not such Holder actually receives such notice.

If by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice as provided above, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.  If it is impossible or, in the opinion of the Trustee, impracticable to give any notice by publication in the manner herein required, then such publication in lieu thereof as shall be made with the approval of the Trustee shall constitute a sufficient publication of such notice.

Any request, demand, authorization, direction, notice, consent or waiver required or permitted under this Indenture shall be in the English language.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be equivalent of such notice.  Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Section 1.7.    Headings and Table of Contents.  The Article and Section headings herein, the cross-reference sheet and the Table of Contents are for convenience only and are not intended to be considered a part hereof and shall not affect the construction hereof.

Section 1.8.    Successors and Assigns.  All covenants and agreements in this Indenture by the Company shall bind its successors and assigns, whether so expressed or not.  All covenants and agreements in this Indenture by any Guarantor shall bind such Guarantor's successors and assigns, whether so expressed or not.

WEST\222568871.14                              12

Section 1.9.    Separability.  In case any provision of this Indenture or the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 1.10.    Benefits of Indenture.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder and the Holders, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 1.11.    Governing Law.  THIS INDENTURE, THE NOTES AND THE NOTE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.  This Indenture is subject to the Trust Indenture Act and if any provision hereof limits, qualifies, or conflicts with a provision of the Trust Indenture Act that is required hereunder to be a part of and govern this Indenture, the Trust Indenture Act shall control.  If any provision of this Indenture modifies or excludes any provision of the Trust Indenture Act that may be so modified or excluded, then such provision of the Trust Indenture Act shall be deemed to apply to this Indenture as so modified or to be excluded, as the case may be.

Section 1.12.    Legal Holidays.  In any case where any Interest Payment Date, Redemption Date, or Stated Maturity of any principal of any Note shall not be a Business Day, then payment of principal, premium, if any, or interest need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on such date; provided that no interest shall accrue on the amount so payable for the period from and after such Interest Payment Date, Redemption Date, or Stated Maturity, as the case may be.

Section 1.13.    Trustee to Establish Record Dates.  The Trustee may (or, at the request of Holders holding a majority in aggregate principal amount of Notes, shall) fix a record date for the purpose of determining the Holders entitled to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders; provided that the record date for any such action solicited by the Company shall be governed by Section 1.4(e).  If such a record date is fixed, the Holders on such record date and only such Holders, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holders remain Holders after such record date.

Section 1.14.    8% Notes (Series A), 8% Notes (Series B), and US Airways Notes Relative to the Management Notes.  The 8% Notes (Series A), 8% Notes (Series B), and US Airways Notes shall be senior and prior in right of payment to the Management Notes as provided in Article 12 hereof.  The 8% Notes (Series A), 8% Notes (Series B), US Airways Notes and Management Notes shall be subject to mandatory prepayment following a Spirit Liquidity Event in the priority set forth in Section 10.6 of this Indenture.

Section 1.15.    No Personal Liability of Directors, Officers, Employees and Stockholders.  No past, present or future director, officer, employee, incorporator or stockholder of the

Company or any Guarantor, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, this Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.  The waiver may not be effective to waive liabilities under the federal securities laws.

Section 1.16.   <u>Communication by Holders with Other Holders</u>.  Holders of Notes may communicate pursuant to Section 312(b) of the TIA with other Holders with respect to their rights under this Indenture or the Notes.  The Company, the Trustee, the Registrar and anyone else shall have the protection of Section 312(c) of the TIA.

Section 1.17.   <u>Company Responsible for Making Calculations</u>.  Unless otherwise specified in this Indenture, the Company will be responsible for making all calculations called for under this Indenture and the Notes.  These calculations include, but are not limited to, determination of the amount of accrued and unpaid interest payable on the Notes and the amount of Additional Notes issuable in lieu of interest pursuant to this Indenture and Section 1 of the Notes.  The Company will make these calculations in good faith, and, absent bad faith or manifest error, these calculations will be final and binding on the Holders.  Promptly after the calculation thereof, the Company will provide to the Trustee an Officers' Certificate setting forth a schedule of its calculations, and the Trustee is entitled to conclusively rely upon the accuracy of such calculations without independent verification.  The Trustee will forward the Company's calculations to any Holder upon the request of such Holder.

ARTICLE 2

Security Forms

Section 2.1.    <u>Forms Generally</u>.  The Notes are issuable in global form pursuant to Section 2.3 or, pursuant to Section 3.5, the Notes may be issued in the form of certificated Notes in registered form, in each case substantially in the form set forth in <u>Exhibit A</u> with respect to the 8% Notes (Series A), substantially in the form of <u>Exhibit B</u> with respect to the 8% Notes (Series B), substantially in the form of <u>Exhibit C</u> with respect to the US Airways Notes, and substantially in the form of <u>Exhibit D</u> with respect to the Management Notes.  The Notes may have notations, legends or endorsements required by law, stock exchange rule or depository rule or usage.  The Company and the Trustee shall approve the form of the Notes and any notation, legend or endorsement thereon.  Each Note shall be dated the date of its issuance and shall show the date of its authentication.

If temporary Notes of any series are issued as permitted by Section 3.4, the temporary Notes shall be substantially in the form of the definitive Notes, but may have variations that the Company, with the consent of the Trustee, considers appropriate for temporary Notes.  Without unreasonable delay, the Company shall prepare and the Trustee shall authenticate and deliver the definitive Notes in exchange for temporary Notes.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Company, the

Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

The permanent Notes shall be printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner, all as determined by the Officers executing such Notes, as evidenced by their execution of such Notes.

Section 2.2.   Form of Trustee's Certificate of Authentication.  The Trustee's certificate of authentication shall be in substantially the following form:

This is one of the [  ] Notes referred to in the within-mentioned Indenture.

> U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely as Trustee
>
> _____
>
> By:   _____
> Authorized Signatory

Section 2.3.   Notes in Global Form.  Any Note issued in global form shall represent such of the Outstanding Notes of any series as shall be specified therein and may provide that it shall represent the aggregate amount of Outstanding Notes from time to time endorsed thereon and that the aggregate amount of Outstanding Notes represented thereby may from time to time be reduced to reflect exchanges or redemptions of such Notes or increased to reflect the issuance of Additional Notes.  Any endorsement of a Note in global form to reflect the amount of or any increase or decrease in the amount of Outstanding Notes represented thereby, shall be made by the Trustee in such manner and upon instructions given in the Company Order to be delivered to the Trustee pursuant to Section 3.3 or Section 3.4. Subject to the provisions of Section 3.3 and, if applicable, Section 3.4, the Trustee shall deliver and redeliver any Note in global form in the manner and upon instructions given in the applicable Company Order. Any instructions by the Company with respect to endorsement or delivery or redelivery of a Note in global form shall be in writing but need not comply with Section 1.2 hereof and need not be accompanied by an Opinion of Counsel.

The provisions of the last paragraph of Section 3.3 shall apply to any Note in global form if such Note was never issued and sold by the Company and the Company delivers to the Trustee the Note in global form together with written instructions (which need not comply with Section 1.2 and need not be accompanied by an Opinion of Counsel) with regard to the reduction in the principal amount of Notes represented thereby, together with the written statement contemplated by the last paragraph of Section 3.3.

Section 2.4.   Global Note Legend.  The following legend shall appear on the face of all global Notes issued under this Indenture:

"UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN CERTIFICATED FORM, TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED

TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK ("DTC"), CEDE & CO. OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE.  UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

Notwithstanding the provisions of Section 2.1 and Section 3.7, payment of principal of, premium, if any, and interest on any Note in permanent global form shall be made to the Person or Persons specified therein.

ARTICLE 3

The Securities

Section 3.1.    Aggregate Amounts; Issuance.

(a)    The aggregate principal amount of 8% Notes (Series A) which may be authenticated and delivered under this Indenture is $[19,400,000], subject to increase as provided in Section 3.9 and 9.1 hereof and paragraph 1 of the 8% Notes (Series A).

(b)    The aggregate principal amount of 8% Notes (Series B) which may be authenticated and delivered under this Indenture is $[43,200,000], subject to increase as provided in Section 3.9 and 9.1 hereof and paragraph 1 of the 8% Notes (Series B).

(c)    The aggregate principal amount of US Airways Notes which may be authenticated and delivered under this Indenture is $[6,800,000], subject to increase as provided in Section 3.9 and 9.1 hereof and paragraph 1 of the US Airways Notes.

(d)    The aggregate principal amount of Management Notes which may be authenticated and delivered under this Indenture is $5,500,000, subject to increase as provided in Section 3.9 and 9.1 hereof and paragraph 1 of the Management Notes.

(e)    If the Notes are issued in whole or in part in temporary or permanent global form, the Company shall notify the Trustee and the initial Depositary for such Notes.

(f)    Subject to the payment subordination provisions in Section 10.6 and Article 12 hereof, all Notes shall be substantially identical except as to denomination, Stated Maturity and the date from which interest, if any, shall accrue.  All Notes of any one series need not be issued at the same time and, unless otherwise provided, a series may be reopened, without the consent

of the Holders, for issuances of additional Notes of such series in accordance with the terms of this Indenture.

Section 3.2.   <u>Denominations</u>.  Any Notes shall be issuable in registered form without coupons in denominations of $1,000 and any integral multiple thereof.

Section 3.3.   <u>Execution, Authentication, Delivery and Dating</u>.  The Notes shall be executed on behalf of the Company by the Chairman, President, Chief Executive Officer or Chief Financial Officer under its corporate seal reproduced thereon and attested to by the Secretary or any Assistant Secretary of the Company.  The signatures of such Officers on the Notes may be manual or facsimile.  The Notes bearing the manual or facsimile signatures of individuals who were at any time the proper Officers of the Company shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Notes of any series executed by the Company to the Trustee for authentication, together with a Company Order for the authentication, and make available for delivery such Notes, and the Trustee in accordance with the Company Order shall authenticate and deliver such Notes.

Prior to the issuance of the Notes of any series after the date of this Indenture, the Trustee shall receive and (subject to Section 6.1) shall be fully protected in relying upon an Opinion of Counsel complying with Section 1.2 which shall also state:

(i)   that the form of such Notes has been established in conformity with the provisions of this Indenture;

(ii)   that the terms of such Notes have been established in conformity with the provisions of this Indenture;

(iii)   that such Notes, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Company, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles;

(iv)   that the Note Guarantees attached to such Notes will constitute the valid and legally binding obligation of the Guarantors, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles;

(v)   that all laws and requirements in respect of the execution and delivery by the Company of the Notes and the execution and delivery by the Guarantors of the Note Guarantees have been complied with; and

WEST\222568871.14                               17

(vi)     such other matters as the Trustee may reasonably request.

If the Notes of a series are to be issued in whole or in part in global form, then the Company shall execute and the Trustee shall, in accordance with this Section and the Company Order with respect to such series, authenticate and deliver one or more Notes in global form that (i) shall represent and shall be denominated in an amount equal to the aggregate principal amount of the Outstanding Notes of such series to be represented by such Note in global form, (ii) shall be registered in the name of the Depositary for such Note or Notes in global form or the nominee of such Depositary and (iii) shall be delivered by the Trustee to such Depositary or pursuant to such Depositary's instruction.

Each Depositary designated by the Company for a Note in global form must, at the time of its designation and at all times while it serves as Depositary, be a clearing agency registered under the Securities Exchange Act and any other applicable statute or regulation.  The Trustee shall have no responsibility to determine if the Depositary is so registered.  Each Depositary shall enter into an agreement with the Company governing the respective duties and rights of such Depositary and the Company with regard to Notes issued in global form.

No Note shall be entitled to any benefits under this Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of one of the authorized signatories of the Trustee or an Authenticating Agent.  Such signature upon any Note shall be conclusive evidence and the only evidence, that such Note has been duly authenticated and delivered under this Indenture and is entitled to the benefits of this Indenture.

Notwithstanding the foregoing, if any Note shall have been authenticated and delivered hereunder but never issued and sold by the Company, and the Company shall deliver such Note to the Trustee for cancellation as provided in Section 3.9 together with a written statement (which need not comply with Section 1.2 and need not be accompanied by an Opinion of Counsel) stating that such Note has never been issued and sold by the Company, for all purposes of this Indenture such Note shall be deemed never to have been authenticated and delivered hereunder and shall not be entitled to the benefits of this Indenture.

Section 3.4.    Temporary Notes.  Pending the preparation of definitive Notes of any series, the Company may execute and, upon Company Order, the Trustee shall authenticate and deliver temporary Notes of such series which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor and form of the definitive Notes in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the Officers executing such Notes may determine, as conclusively evidenced by their execution of such Notes. In the case of Notes of any series, such temporary Notes may be in global form.

Except in the case of temporary Notes in global form, each of which shall be exchanged in accordance with the provisions thereof, if temporary Notes of any series are issued, the Company will cause permanent Notes of such series to be prepared without unreasonable delay. After preparation of such permanent Notes of such series, the temporary Notes of such series shall be exchangeable for such permanent Notes of such series of like tenor upon surrender of the temporary Notes of such series at the office or agency of the Company pursuant to Section 9.2 in

WEST\222568871.14                                        18

a Place of Payment for such series, without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes of any series, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a like principal amount of permanent Notes of the same series of authorized denominations and of like tenor.  Until so exchanged, the temporary Notes of any series shall in all respects be entitled to the same benefits under this Indenture as permanent Notes of such series.

Section 3.5.    Registration, Registration of Transfer and Exchange.  The Company shall cause to be kept at one of its offices or agencies to be maintained in accordance with Section 9.2 in a Place of Payment a register (the "Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Notes and the registration of transfers and exchanges of Notes and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Trustee is hereby appointed as the initial "Registrar" for the purpose of registering Notes and transfers and exchanges of Notes as herein provided.

Upon surrender for registration of transfer of any Note of any series at the office or agency maintained pursuant to Section 9.2 in a Place of Payment for that series, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees one or more new Notes of the same series, of any authorized denominations and of a like aggregate principal amount and tenor.

At the option of the Holder of any series, Notes (except a Note in global form) may be exchanged for other Notes of the same series, of any authorized denominations and of a like aggregate principal amount containing identical terms and provisions, upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Notes which the Holder making the exchange is entitled to receive.

Notwithstanding any other provision (other than the provisions set forth in the sixth and seventh paragraphs of this Section) of this Section, unless and until it is exchanged in whole or in part for Notes in certificated form, a Note in global form representing all or a portion of the Notes of a series may not be transferred except as a whole by the Depositary for such series to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor Depositary for such series or a nominee of such successor Depositary.

If at any time the Depositary for the Notes of a series notifies the Company that it is unwilling or unable to continue as Depositary for the Notes of such series or if at any time the Depositary for the Notes of such series shall no longer be eligible under Section 3.3, the Company shall appoint a successor Depositary with respect to the Notes of such series.  If a successor Depositary for the Notes of such series is not appointed by the Company within ninety (90) days after the Company receives such notice or becomes aware of such ineligibility, the Company shall execute, and the Trustee, upon receipt of a Company Order for the authentication and delivery of certificated Notes of such series of like tenor, shall authenticate and deliver Notes of such series of like tenor in certificated form, in authorized denominations and in an aggregate

principal amount equal to the principal amount of the Note of Notes of such series of like tenor in global form in exchange for such Note or Notes in global form.

The Company may at any time in its sole discretion determine that Notes of a series issued in global form shall no longer be represented by such Notes in global form.  In such event the Company shall execute, and the Trustee, upon receipt of a Company Order for the authentication and delivery of certificated Note or Notes of such series of like tenor, shall authenticate and deliver, Notes of such series of like tenor in certificated form, in authorized denominations and in an aggregate principal amount equal to the principal amount of the Note or Notes of such series of like tenor in global form in exchange for such Note or Notes in global form.

The Depositary may surrender a Note in global form in exchange in whole or in part for Notes of such series in certificated form on such terms as are acceptable to the Company and such Depositary.  Thereupon, the Company shall execute, and the Trustee shall authenticate and deliver, without service charge,

     (i)     to each Person specified by such Depositary a new certificated Note or Notes of the same series, of like tenor, of any authorized denomination as requested by such Person in aggregate principal amount equal to and in exchange for such Person's beneficial interest in the Note in global form; and

     (ii)     to such Depositary a new Note in global form of like tenor in a denomination equal to the difference, if any, between the principal amount of the surrendered Note in global form and the aggregate principal amount of certificated Notes delivered to Holders thereof.

Upon the exchange of a Note in global form for Notes in certificated form, such Note in global form shall be cancelled by the Trustee.  Notes in certificated form issued in exchange for a Note in global form pursuant to this Section shall be registered in such names and in such authorized denominations as the Depositary for such Note in global form, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee.  The Trustee shall deliver such Notes to the Persons in whose names such Notes are so registered.

Whenever any Notes are surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Notes which the Holder making the exchange is entitled to receive.

All Notes issued upon any registration of transfer or upon any exchange of Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or for exchange shall (if so required by the Company, the Registrar or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to those of the Company, the Registrar and the Trustee requiring such written instrument of transfer duly executed by the Holder thereof or such Holder's attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or for any exchange of Notes, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration or transfer or exchange of Notes, other than exchanges pursuant to Section 3.4 or Section 10.6 not involving any transfer.

The Company shall not be required (i) to issue, register the transfer of, or exchange any Notes for a period beginning at the opening of business fifteen (15) days before the day of the mailing of a notice of redemption of Notes of that series selected for redemption under Section 10.3 and ending at the close of business on the day of such mailing; or (ii) to register the transfer of or exchange any Note so selected for redemption, in whole or in part, except the unredeemed portion of any Note being redeemed in part.

Section 3.6.    <u>Replacement Notes</u>.  If a mutilated Note is surrendered to the Trustee, together with such security or indemnity as may be required by the Company or the Trustee to save each of them harmless, the Company shall execute and the Trustee shall authenticate and deliver a replacement Notes of the same series, principal amount and Stated Maturity, if the Trustee's requirements are met.

If there shall be delivered to the Company and the Trustee (i) evidence to their satisfaction of the destruction, loss or theft of any Note and (ii) such security or indemnity as may be required by them to save each of them and any agent of either of them harmless, then, in the absence of notice to the Company or the Trustee that such Note has been acquired by a bona fide purchaser, the Company shall execute and the Trustee shall authenticate and deliver in lieu of any such destroyed, lost or stolen Note, a replacement Note of the same series, principal amount and Stated Maturity containing identical terms and provisions and bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Note has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Note, pay such Note.

Upon the issuance of any new Note under this Section, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note of any series issued pursuant to this Section in lieu of any destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes of that series duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 3.7.   Paying Agent.  The Company shall maintain an office or agency in accordance with Section 9.2 in a Place of Payment where the Notes may be presented for payment to the Paying Agent.  The Company may have one or more additional Paying Agents.  The term "Paying Agent" includes any additional paying agent.  Neither the Company nor any Affiliate or Guarantor may act as Paying Agent.

If the Company shall appoint any Agent not a party to this Indenture, the Company shall enter into an appropriate agency agreement with such Agent.  The agreement shall implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee of the name and address of such Agent.  If the Company fails to maintain a Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such.

The Trustee is hereby appointed as the initial Paying Agent.  The Trustee may appoint such agents as it deems appropriate to act for it in performing such capacities.

Section 3.8.   Paying Agent to Hold Money in Trust.  Not later than [10:00 A.M. New York time] each due date of the principal and interest on any Notes, the Company or the Guarantors, as the case may be, shall deposit with a Paying Agent money sufficient to pay such principal, premium, if any, and interest so becoming due.  Each Paying Agent shall hold in trust for the benefit of Noteholders or the Trustee all money held by such paying Agent for the payment of principal, premium, if any, or interest on the Notes, and shall notify the Trustee of any default by the Company (or by the Guarantors) in making any such payment.  The Company at any time, and the Trustee at any time during the continuance of any Default, may require a Paying Agent to pay all money held by it to the Trustee.  Upon doing so the Paying Agent shall have no further liability for the money.

Section 3.9.   Payment of Interest; Interest Rights Preserved.

(a)      Interest, if any, on any Note which is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Note (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest at the office or agency maintained for such purpose pursuant to Section 9.2.  In the case of an installment of interest which is due on any Interest Payment Date (excluding the final Stated Maturity), interest shall be paid by issuing Additional Notes in aggregate principal amount equal to the amount of interest due on the applicable Interest Payment Date in accordance with the terms of this Indenture and the Notes mailed to the address of the Person entitled thereto as it shall appear on the Register of Holders of Notes.  Anything contained herein to the contrary notwithstanding, all payments of interest that shall become due and payable on the final Stated Maturity with respect to any Note shall be payable in cash in the manner set forth herein.

(b)      Subject to the foregoing provisions of this Section 3.9 and Section 3.5, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Notes.

Section 3.10.   Persons Deemed Owners.  Prior to due presentment of any Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Note is registered as the owner of such Note for the purpose of receiving payment of principal of, premium, if any, and (subject to Section 3.9) interest on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

None of the Company, the Trustee or any agent of the Company or the Trustee shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Note in global form, or for maintaining supervising or reviewing any records relating to such beneficial ownership interests.  Notwithstanding the foregoing, with respect to any Note in global form, nothing herein shall prevent the Company or the Trustee, or any agent of the Company or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by any Depositary (or its nominee), as a Holder, with respect to such Note in global form or impair, as between such Depositary and owners of beneficial interests in such Note in global form, the operation of customary practices governing the exercise of the rights of such Depositary (or its nominee) as Holder of such Note in global form.

Section 3.11.   Cancellation.  All Notes surrendered for payment, redemption or registration of transfer or exchange shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and, upon receipt, shall be promptly cancelled by it.  The Company at any time may deliver Notes previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever, and may deliver to the Trustee (or any other Person for delivery to the Trustee, on its behalf) for cancellation any Notes previously authenticated hereunder which the Company has not issued and sold, and all Notes so delivered shall be promptly cancelled by the Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section, except as expressly permitted by this Indenture.  All cancelled Notes held by the Trustee shall be disposed of as directed by a Company Order at the sole expense of the Company.

Section 3.12.   Computation of Interest.  Interest on any Notes shall be computed on the basis of a 360-day year, consisting of twelve 30-day months.

Section 3.13.   CUSIP Numbers.  The Company in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers (in addition to the other identification numbers printed on the Notes) in notices of redemption as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.

ARTICLE 4

Satisfaction, Discharge and Defeasance

Section 4.1.   Termination of Company's Obligations Under the Indenture.  This Indenture shall upon Company Request cease to be of further effect with respect to Notes of any series (except as to any surviving rights of registration of transfer or exchange of such Notes as herein expressly provided for) and the Trustee, at the cost and expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to Notes of any series (the Company, however, hereby agreeing to reimburse the Trustee for any costs and expenses thereafter incurred by the Trustee in connection with this Indenture or the Notes) when

    (1)    either

    (A)    all such Notes previously authenticated and delivered (other than (i) such Notes which have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 3.6, and (ii) such Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust, as provided in Section 9.3) have been delivered to the Trustee for cancellation; or

    (B)    all Notes of any series  not theretofore delivered to the Trustee for cancellation

    (i)    have become due and payable, or

    (ii)    will become due and payable at their Stated Maturity within one year, or

    (iii)    if redeemable at the option of the Company, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company; and the Company or any Guarantor, in the case of (i), (ii) or (iii) above, has deposited irrevocably or caused to be deposited irrevocably with the Trustee as trust funds in trust, which shall be immediately due and payable, for the purpose an amount sufficient to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal, premium, if any, and interest to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or Redemption Date, as the case may be provided, however, that there shall not exist on the date of such deposit a Default or Event of Default; provided, further, that such deposit shall not result in a breach or violation of, or constitute a Default under this Indenture or a default under any other agreement or instrument to which the Company or the Guarantor is a party or to which the Company or the Guarantor is bound;

    (2)    the Company or any Guarantor has paid or caused to be paid all other sums payable hereunder by the Company; and

24

(3)    the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture as to such series have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the obligation of the Company to the Trustee and any predecessor Trustee under Section 6.9, the obligations of the Company to any Authenticating Agent under Section 6.14 and, if money shall have been deposited with the Trustee pursuant to subclause (B) of clause (1) of this Section, the obligations under Sections 3.3, 3.5, 3.6, 3.10, and 4.2, the last paragraph of Section 9.3 and Article 5 as it relates to the above-mentioned Sections and Articles shall survive until the Notes have been indefeasibly paid in full; provided, however, that the Company shall reimburse the Trustee for any costs and expenses incurred by the Trustee in connection with effectuating the provisions of Sections 4.2 and 9.3.

Section 4.2.    Application of Trust Funds.  Subject to the provisions of the last paragraph of Section 9.3, all money deposited with the Trustee pursuant to Section 4.1 shall be held in trust in the form of cash or Government Obligations and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal, premium, if any, and any interest for whose payment such money has been deposited with or received by the Trustee, but such money need not be segregated from other funds except to the extent required by law.

Section 4.3.    Company's Option to Effect Defeasance or Covenant Defeasance.  The Company may at its option by Board Resolution, at any time, with respect to the Notes and the Note Guarantees related to such Notes, elect to have Section 4.4 (if applicable) or Section 4.5 (if applicable) be applied to such Outstanding Notes and the Note Guarantees related to such Notes upon compliance with the conditions set forth below in this Article 4.

Section 4.4.    Defeasance and Discharge.  Upon the Company's exercise of the option specified in Section 4.3 applicable to this Section with respect to the Notes of a series, the Company and the Guarantors shall be deemed to have been discharged from their obligations with respect to such Notes of such series and the Note Guarantees related to such Notes on and after the date the conditions set forth in Section 4.6 are satisfied (hereinafter "defeasance").  For this purpose, such defeasance means that the Company shall be deemed to have paid and discharged the entire indebtedness represented by such Notes and the Note Guarantees related to such Notes which shall thereafter be deemed to be "Outstanding" only for the purposes of Section 4.7 and the other Sections of this Indenture referred to in clause (ii) of this Section, and to have satisfied all its other obligations under such Notes, such Note Guarantees and this Indenture insofar as such Notes and such Note Guarantees are concerned (and the Trustee, at the cost and expense of the Company, shall on Company Order execute proper instruments acknowledging the same), except the following which shall survive until otherwise terminated or discharged hereunder: (i) the rights of Holders of Outstanding Notes of such series to receive, solely from the trust funds described in Section 4.6(a) and as more fully set forth in such Section, payments in respect of the principal of, premium, if any, and interest, if any, on such Notes when such payments are due; (ii) the Company's obligations with respect to such Notes under Section

3.4, Section 3.5, Section 3.6, Section 9.2 and Section 9.3 and such obligations as shall be ancillary thereto; (iii) the rights, powers, trusts, duties and immunities of the Trustee hereunder; and (iv) this Article 4.  Subject to compliance with this Article 4, the Company may exercise its option under this Section notwithstanding the prior exercise of its option under Section 4.5 with respect to such Notes and the Note Guarantee related to such Notes.  Following a defeasance, payment of such Notes may not be accelerated because of an Event of Default.

Section 4.5.    Covenant Defeasance.  Upon the Company's exercise of the option specified in Section 4.3 applicable to this Section with respect to any Notes of a series, the Company shall be released from its obligations under Section 7.1 and Section 9.5 with respect to such Notes and the Note Guarantees related to such Notes on and after the date the conditions set forth in Section 4.6 are satisfied (hereinafter, "covenant defeasance"), and such Notes shall thereafter be deemed to be not "Outstanding" for the purposes of any direction, waiver, consent or declaration or Act of Holders (and the consequences of any thereof) in connection with Section 7.1 and Section 9.5 but shall continue to be deemed "Outstanding" for all other purposes hereunder.  For this purpose, such covenant defeasance means that, with respect to such Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such Section, whether directly or indirectly, by reason of any reference elsewhere herein to any such Section or such other covenant or by reason of reference in any such Section or such other covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 5.1(4) or otherwise, as the case may be, but, except as specified above, the remainder of this Indenture and such Notes and the Note Guarantees related to such Notes shall be unaffected thereby.

Section 4.6.    Conditions to Defeasance or Covenant Defeasance.  The following shall be the conditions to application of Section 4.4 or Section 4.5 to any Notes of a series:

(a)    The Company shall have deposited or caused to be deposited irrevocably with the Trustee (or another trustee satisfying the requirements of Section 6.11 who shall agree to comply with, and shall be entitled to the benefits of, the provisions of Section 4.3 through Section 4.8 inclusive and the last paragraph of Section 9.3 applicable to the Trustee, for purposes of such Sections also a "Trustee") as trust funds in trust for the purpose of making the payments referred to below, specifically pledged as security for, and dedicated solely to, the benefit of the Holders of such Notes, with instructions to the Trustee as to the application thereof, (i) cash in United States dollars in an amount or (ii) Government Obligations which through the payment of interest and principal in respect thereof in accordance with their terms will provide, not later than one day before the due date of any payment, cash in United States dollars in an amount or (iii) a combination of cash in United States dollars and Government Obligations in an amount, sufficient, in each case, in the opinion of a nationally recognized firm of independent certified public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge, and which shall be applied by the Trustee to pay and discharge, the principal of, premium, if any, and interest, if any, on such Notes on the Maturity of such principal or installment of principal or interest on the day on which such payments are due and payable in accordance with the terms of this Indenture and such Notes.  Before such a deposit the Company may make arrangements satisfactory to the Trustee for the redemption of Notes at a future date or dates in accordance with Article 10 which shall be given effect in applying the foregoing.

(b)      Such defeasance or covenant defeasance shall not result in a breach or violation of, or constitute a Default or Event of Default under, this Indenture or result in a breach or violation of, or constitute a default under, any other material agreement or instrument to which the Company is a party or by which it is bound.

(c)      In the case of an election under Section 4.4, the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, in each case in form and substance reasonably satisfactory to the Trustee, stating that (i) the Company has received from, or there has been published by, the Internal Revenue Service a ruling, or (ii) since the date of execution of this Indenture, there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such opinion shall confirm that, the Holders of such Notes will not recognize income, gain or loss for Federal income tax purposes as a result of such defeasance and will be subject to Federal income tax on the same amount and in the same manner and at the same times, as would have been the case if such deposit, defeasance and discharge had not occurred.

(d)      In the case of an election under Section 4.5, the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that the Holders of such Notes will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and covenant defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred.

(e)      The Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, in each case in form and substance reasonably satisfactory to the Trustee, each stating that all conditions precedent to the defeasance under Section 4.4 or the covenant defeasance under Section 4.5 (as the case may be) have been complied with and an Opinion of Counsel to the effect that either (i) as a result of a deposit pursuant to subsection (a) above and the related exercise of the Company's option under Section 4.4 or Section 4.5 (as the case may be), registration is not required under the Investment Company Act of 1940, as amended, by the Company, with respect to the trust funds representing such deposit or by the trustee for such trust funds or (ii) all necessary registrations under said act have been effected.

(f)      The Company shall have delivered to the Trustee an Officers' Certificate, in form and substance reasonably satisfactory to the Trustee, stating that it has been informed by the relevant securities exchange(s) that the Notes, if then listed on any such securities exchange, will not be delisted as a result of such deposit.

(g)      No Default or Event of Default with respect to the Notes of any series shall have occurred and be continuing (A) on the date of such deposit or (B) insofar as Section 5.1(5) and Section 5.1(6) are concerned, at any time during the period ending on the 121st day after the date of such deposit or, if longer, ending on the day following the expiration of the longest preference period applicable to the Company in respect of such deposit (it being understood that the condition in this condition shall not be deemed satisfied until the expiration of such period).

(h)      Such defeasance or covenant defeasance shall not (A) cause the Trustee for the Notes of such series to have a conflicting interest as defined in Section 6.12 or for purposes of Section 310(b) of the Trust Indenture Act with respect to any securities of the Company or (B)

WEST\222568871.14                                27

result in the trust arising from such deposit to constitute, unless it is qualified as, a regulated investment company under the Investment Company Act of 1940, as amended.

Section 4.7.    Deposited Money and Government Obligations to Be Held in Trust. Subject to the provisions of the last paragraph of Section 9.3, all money and Government Obligations (including the proceeds thereof) deposited with the Trustee pursuant to Section 4.6 in respect of any Notes of any series shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, if any, but such money need not be segregated from other funds except to the extent required by law.

The Company shall indemnify the Trustee against any tax, fee or other charge, cost or expense imposed on or assessed against the money or non-callable Government Obligations deposited pursuant to Section 4.7 or the principal and interest received in respect thereof.

Anything herein to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon Company Request any money or Government Obligations held by it as provided in this Section 4.7 which, in the opinion of a nationally recognized firm of independent public accountants satisfactory to the Trustee (including, without limitation, compliance with any applicable Financial Accounting Standards Board or Commission pronouncements, rules and regulations and computations set forth therein) expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof which would then be required to be deposited to effect an equivalent defeasance or covenant defeasance.

Section 4.8.    Reinstatement.  If the Trustee or the Paying Agent is unable to apply any money in United States dollars or Government Obligations in accordance with Section 4.4 or Section 4.5 by reason of any order or judgment or any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under the Notes of such series shall be revived and reinstated as though no deposit had occurred pursuant to this Article 4 until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 4.4 or Section 4.5; provided, however, that if the Company makes any payment of principal of (and premium, if any) or interest on any such Notes following the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or the Paying Agent.

ARTICLE 5

Defaults and Remedies

Section 5.1.    Events of Default.  An "Event of Default" occurs with respect to the Notes of any series if (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(1)     subject to Section 3.9 hereof, the Company defaults in the payment of interest on any Notes when the same becomes due and payable and such Default continues for a period of thirty (30) days;

(2)     the Company defaults in the payment of the principal of or any premium on any Notes when the same becomes due and payable at its Maturity or on redemption or otherwise;

(3)     the Company fails to provide notice of a Fundamental Change pursuant to Section 10.5 or a Spirit Liquidity Event pursuant to Section 10.6 or fails to comply with the requirements of such provisions following a Fundamental Change or Sprint Liquidity Event, as the case may be;

(4)     the Company defaults in the performance of, or breaches, any covenant or warranty of the Company in this Indenture with respect to any Note or Note Guarantee related to such Notes, as the case may be (other than a covenant or warranty a default in whose performance or whose breach is elsewhere in this Section 5.1 specifically dealt with), and such Default or breach continues for a period of sixty (60) days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in aggregate principal amount of the Outstanding Notes, a written notice specifying such Default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; provided, however, that if the Company defaults in the performance of, or breaches, any covenant or warranty of the Company contained in Article 7 or Section 9.10, such Default will be an Event of Default immediately, without any action by the Holders;

(5)     the Company or any Guarantor pursuant to or within the meaning of any Bankruptcy Law (A) commences a voluntary case or proceeding, (B) consents to the entry of an order for relief against it in an involuntary case or proceeding or the commencement of any case against it, (C) consents to the appointment of a Custodian of it or for all or substantially all of its property, or (D) makes a general assignment for the benefit of its creditors;

(6)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any Guarantor in an involuntary case or proceeding, or adjudicates the Company or any Guarantor insolvent or bankrupt, (B) appoints a Custodian of the Company for all or substantially all of its respective property, or (C) orders the winding up or liquidation of the Company or any Guarantor; and in each case the order or decree remains unstayed and in effect for sixty (60) days; or

(7)     any Note Guarantee ceases to be in full force and effect or is declared null and void or any Guarantor denies that it has any further liability under any Note Guarantee, or gives notices to such effect (other than by reason of the termination of this Indenture or the release of any such Note Guarantee in accordance with this Indenture), and such condition shall have continued for a period of thirty (30) days after written notice of such failure requiring such Guarantor or the Company to remedy the same shall

have been given to the Company by the Trustee or the Company and the Trustee by the Holders of 25% in the aggregate principal amount at maturity of the Notes Outstanding. For purposes of clarification, this 30-day grace period is in place of and not in addition to the 60-day grace period in Section 5.1(4) above; or

(8)      [the Company or any Guarantor defaults in any payment of principal of or interest on any other obligation or guarantee for money borrowed (or any lease capitalized under GAAP, any obligation under a conditional sale or other title retention agreement, any obligation issued or assumed as full or partial payment for property whether or not secured by a purchase money security interest or any obligation under notes payable or drafts accepted representing extensions of credit) beyond any period of grace provided with respect thereto, or the Company or any Guarantor fails to perform or observe any other agreement, term or condition contained in any agreement under which such obligation is created (or if any other event thereunder or under any such agreement shall occur and be continuing) and the effect of such failure or other event is to cause such obligation to become due prior to any stated maturity; provided that the aggregate amount of all obligations as to which such a payment default shall occur and be continuing or such a failure or other event causing acceleration shall occur and be continuing exceeds $[____].]

Section 5.2.    Acceleration; Rescission and Annulment.  If an Event of Default with respect to the Notes Outstanding (other than an Event of Default specified in Sections 5.1(5) and 5.1(6)) occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of all of the Outstanding Notes, by written notice to the Company (and, if given by the Holders, to the Trustee), may declare the principal of and premium, if any, accrued and unpaid interest on, and all other amounts due with respect to all the Notes to be due and payable and upon any such declaration such principal, premium, interest and other amounts shall be immediately due and payable.  In case an Event of Default specified in Sections 5.1(5) or 5.1(6) occurs and is continuing, the principal of, premium, if any, accrued and unpaid interest on, and all other amounts with respect to the Notes shall be automatically due and payable immediately without any declaration or other act on the part of the Trustee or the Holders.

At any time after a declaration of acceleration under the first sentence of the immediately preceding paragraph with respect to Notes has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter in this Article 5 provided, the Holders of a majority in aggregate principal amount of the Outstanding Notes, by written notice to the Trustee, may rescind and annul such declaration and its consequences if:

(1)      the Company has paid or deposited with the Trustee additional Notes or a sum sufficient to pay:

(A)      all overdue installments of interest on all Outstanding Notes,

(B)      the principal of (and premium, if any, on, and all other amounts due with respect to) any Outstanding Notes which have become due otherwise than by such declaration of acceleration and interest thereon at the rate borne by the Notes,

(C)     to the extent that payment of such interest is lawful, interest upon overdue installments of interest at the rate specified in the Notes, and

(D)     all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(2)     all existing Defaults and Events of Default with respect to Notes, other than the non-payment of the principal of and premium, if any, on, and other amounts due with respect to the Notes which have become due solely by such declaration of acceleration, have been cured or waived as provided in Section 5.7.  No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3.     Collection of Indebtedness and Suits for Enforcement by Trustee.  The Company covenants that if an Event of Default specified in Section 5.1(1) or (2) occurs, the Company will, upon demand of the Trustee, pay to it, for the benefit of the Holders of such Notes, the whole amount then due and payable on such Notes for principal, premium, if any, and interest with interest on any overdue principal, premium, if any, and, to the extent that payment of such interest shall be legally enforceable, on any overdue interest, at the rate or rates prescribed therefor in such Notes and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

If the Company fails to pay such amount forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceeding to judgment or final decree, and may enforce the same against the Company, any Guarantor or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company, any Guarantor or any other obligor upon the Notes, wherever situated.

If an Event of Default with respect to Notes occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of Holders of Notes by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

Section 5.4.     Trustee May File Proofs of Claim.  In case of any judicial proceeding directly involving the Company (or any Guarantor or any other obligor upon the Notes), its property or its creditors acting as such, the Trustee shall be entitled and empowered, by intervention in such proceeding or otherwise, to take any and all actions authorized under Section 317(a)(2) of the Trust Indenture Act or otherwise in order to have claims of the Holders and the Trustee allowed in any such proceeding.  In particular, the Trustee shall be authorized to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same; and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent

to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 6.9.

No provision of this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 5.5.   <u>Trustee May Enforce Claims Without Possession of Notes</u>.  All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any proceeding relating thereto.  Any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes in respect of which such judgment has been recovered.

Section 5.6.   <u>Delay or Omission Not Waiver</u>.  No delay or omission by the Trustee or any Holder of any Notes to exercise any right or remedy accruing upon an Event of Default shall impair any such right or remedy or constitute a waiver of or acquiescence in any such Event of Default.  Every right and remedy given by this Article 5 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 5.7.   <u>Waiver of Past Defaults</u>.  The Holders of a majority in aggregate principal amount of Outstanding Notes by notice to the Trustee may waive on behalf of the Holders of all Notes a past Default or Event of Default and its consequences except (i) a Default or Event of Default in the payment of the principal of, premium, if any, or interest on any Note or (ii) in respect of a covenant or provision hereof which pursuant to Section 8.2 cannot be amended or modified without the consent of the Holder of each Outstanding Note adversely affected.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  The Company shall deliver to the Trustee an Officers' Certificate stating that the requisite percentage of Holders have consented to such waiver and attach copies of such consents.  In case of any such waiver, the Company, the Trustee and the Holders shall be restored to their former positions and rights hereunder and under the Notes, respectively.

Section 5.8.   <u>Control by Majority</u>.  The Holders of a majority in aggregate principal amount of the Outstanding Notes shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on it with respect to Notes of that series; <u>provided</u>, <u>however</u>, that the Trustee may refuse to follow any direction that (i) conflicts with law or this Indenture, (ii) is (in the Trustee's reasonable judgment) prejudicial to the rights of another Holder or the Trustee or (iii) in the Trustee's reasonable judgment, may involve the Trustee in personal liability (unless the Trustee is offered indemnity, reasonably satisfactory to it, against the costs, expenses and

liabilities the Trustee may incur to comply with such direction).  Notwithstanding the foregoing, the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with any such direction.

Section 5.9.    Limitation on Suits by Holders.  No Holder of any Note shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a Custodian, or for any other remedy hereunder, unless:

(1)     the Holder has previously given written notice to the Trustee of a continuing Event of Default with respect to the Note;

(2)     the Holders of at least 25% in aggregate principal amount of the Outstanding Notes have made a written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(3)     such Holder or Holders have offered to the Trustee reasonable indemnity and security against any loss, liability or expense to be, or which may be, incurred by the Trustee in complying with such request;

(4)     the Trustee for sixty (60) days after its receipt of such notice, request and the offer of indemnity has failed to institute any such proceedings; and

(5)     during such 60-day period, the Holders of a majority in aggregate principal amount of the Outstanding Notes of that series have not given to the Trustee a direction inconsistent with such written request.

No one or more Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice, the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all of such Holders.

Section 5.10.   Rights of Holders to Receive Payment.  Notwithstanding any other provision of this Indenture, any Holder of a Note shall have the right, which is absolute and unconditional, (i) to receive payment of principal of, premium, if any, and, subject to Section 3.5 and Section 3.7, interest on the Note, on or after the respective Stated Maturities expressed in the Note (or, in case of redemption, on the Redemption Dates) and (ii) to bring suit for the enforcement of any such payment on or after such respective dates, and such rights shall not be impaired or affected without the consent of such Holder.

Section 5.11.   Application of Money Collected.  If the Trustee collects any money pursuant to this Article 5, it shall pay out the money in the following order, at the date or dates fixed by the Trustee and, in case of the distribution of such money on account of principal, premium, if any, or interest, upon presentation of the Notes and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

First:  to the Trustee for amounts due under Section 6.9;

Second:  subject to Sections 10.6 and Article 12, to Holders of Notes in respect of which or for the benefit of which such money has been collected for amounts due and unpaid on such Notes for principal of, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on such Notes for principal, premium, if any, and interest, respectively; and

Third:  to the Company.

Section 5.12.   Restoration of Rights and Remedies.  If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 5.13.   Rights and Remedies Cumulative.  Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in the last paragraph of Section 3.6, no right or remedy herein conferred upon or reserved to the Trustee or the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.14.   Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, suffered or omitted by it as Trustee, a court may require any party litigant in such suit to file an undertaking to pay the costs of such suit, and may assess costs against any such party litigant, in the manner and to the extent provided in Section 315(e) of the Trust Indenture Act; provided, that neither this Section nor the Trust Indenture Act shall be deemed to authorize any court to require such an undertaking or to make such an assessment in any suit instituted by the Company, by the Trustee, by a Holder pursuant to Section 5.10 or by Holders of more than 10% in principal amount of Outstanding Notes.

Section 5.15.   Waiver of Stay or Extension Laws.  Each of the Company and each Guarantor covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which would prohibit or forgive the Company or any Guarantor from paying all or any portion of the principal of or premium on any Notes when the same becomes due and payable at Maturity or on redemption, repurchase at the option of Holders or otherwise as contemplated herein, or may affect the covenants contained herein or any usury or other law or the performance of this Indenture and each of the Company and any Guarantor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder,

delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 6

The Trustee

Section 6.1.    Certain Duties and Responsibilities.

(a)    Except during the continuance of an Event of Default:

(1)    The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)    In the absence of negligence or willful misconduct on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.

(b)    In case an Event of Default has occurred and is continuing with respect to the Notes, the Trustee shall exercise such of the rights and powers vested in it by this Indenture with respect to the Notes, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)    this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(2)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in aggregate principal amount of the Outstanding Notes relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture with respect to the Notes.

(d)    No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder,

or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

Section 6.2.    Notice of Defaults.  If a Default occurs and is continuing with respect to the Notes of any such series and if it is known to a Responsible Officer of the Trustee, the Trustee shall, within the earlier of ninety (90) days after it occurs or thirty (30) days after it actually becomes known to the Trustee, transmit, to the Holders, in the manner and to the extent provided in Section 313(c) of the Trust Indenture Act, notice of such Default; provided, however, that, in the case of a Default other than a Default in any payment on the Notes, the Trustee may withhold the notice if and so long as the board of directors, the executive committee or a committee of its Responsible Officers in good faith determines that withholding such notice is in the interests of Holders of Notes; provided further that, in the case of any Default or breach of the character specified in Section 5.1(4) with respect to the Notes, no such notice to Holders shall be given until at least thirty (30) days after the occurrence thereof.

Section 6.3.    Rights of Trustee.  Subject to the provisions of Section 6.1 and Sections 313, 315 and 317 of the Trust Indenture Act:

(a)     The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)     Any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order (other than delivery of any Note, to the Trustee for authentication and delivery pursuant to Section 3.3, which shall be sufficiently evidenced as provided therein) and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution.

(c)     Whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of negligence or willful misconduct on its part, rely upon an Officers' Certificate.

(d)     The Trustee may consult with counsel of its selection and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(e)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have offered to the Trustee security or indemnity reasonably

satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(f)      The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note or other paper or document, unless requested in writing to do so by the Holders of not less than a majority in aggregate principal amount of the Notes at the time Outstanding, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company and the Guarantor, personally or by agent or attorney.

(g)      The Trustee may act through agents or attorneys and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with reasonable care by it hereunder.

Section 6.4.    Trustee May Hold Notes.  The Trustee, any Paying Agent, any Registrar or any other agent of the Company, in its individual or any other capacity, may become the owner or pledgee of Notes and, subject to Sections 310(b) and 311 of the Trust Indenture Act, may otherwise deal with the Company, an Affiliate or Subsidiary with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

Section 6.5.    Money Held in Trust.  Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing with the Company.

Section 6.6.    Trustee's Disclaimer.  The recitals contained herein and in the Notes, except the Trustee's certificate of authentication, shall be taken as the statements of the Company, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or adequacy of this Indenture or the Notes.  The Trustee shall not be accountable for the Company's use of the proceeds from the Notes or for monies paid over to the Company pursuant to the Indenture.  The Trustee shall be charged with no knowledge of or duties under the Plan.

Section 6.7.    Reports by Trustee to the Holders.  Within sixty (60) days after each May 15 of each year commencing with the first May 15 after the first issuance of Notes pursuant to this Indenture, the Trustee shall transmit by mail to all Holders of Notes as provided in Section 313(c) of the Trust Indenture Act a brief report dated as of such May 15 if required by Section 313(a) of the Trust Indenture Act.  The Trustee also shall comply with Section 313(b) and (d) of the Trust Indenture Act; provided that with respect to the Trustee's obligation to file any report with a stock exchange, the Company will have provided prompt written notice to the Trustee that any such Notes are listed on a stock exchange within a reasonable period of time prior to the issuance of any such reports by the Trustee and at all other times the Company will reasonably promptly notify the Trustee when any Notes are listed on any stock exchange.

Section 6.8.   Securityholder Lists.  The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders of the Notes.  Every Holder of Notes, by receiving and holding the same, agrees with the Company and the Trustee that neither the Company nor the Trustee nor any agent of either of them shall be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to Section 312(a) of the Trust Indenture Act.  If the Trustee is not the Registrar, the Company shall furnish to the Trustee semiannually on or before the last day of June and December in each year, and at such other times as the Trustee may request in writing, a list, in such form and as of such date as the Trustee may reasonably require, containing all the information in the possession of the Registrar, the Company or any of its Paying Agents other than the Trustee as to the names and addresses of the Holders of Notes.

Section 6.9.   Compensation and Indemnity.

(a)   The Company covenants and agrees to pay to the Trustee from time to time, and the Trustee shall be entitled to, such compensation as shall be agreed to in writing between the Company and the Trustee for all services rendered by it hereunder.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall pay or reimburse the Trustee upon request for all reasonable out-of-pocket costs or expenses or other charges, fees, fines or advances incurred or made by it in connection with the performance of its duties under this Indenture, except any such expense as may be attributable to its negligence or willful misconduct.  Such expenses shall include the reasonable compensation and expenses of the Trustee's agents and counsel.

(b)   The Company and each Guarantor shall indemnify the Trustee (including in its individual capacity, and its officers, agents, directors and employees) for, and hold it harmless against, any loss, liability or expense incurred by it without negligence or willful misconduct on its part arising out of or in connection with its acceptance or administration of the trust or trusts hereunder.  The Trustee shall notify the Company reasonably promptly of any claim for which it may seek indemnity; provided that any failure to provide such notice shall not affect the Trustee's right to indemnification hereunder.  The Company or the Guarantors shall defend the claim and the Trustee shall reasonably cooperate in the defense (it being understood that the Company will promptly upon request by the Trustee reimburse the Trustee for any out-of-pocket costs or expenses incurred by the Trustee in connection with such claim).  The Trustee may have separate counsel and the Company or any Guarantors shall pay the reasonable fees and expenses of such counsel.  Neither the Company nor any Guarantors  need pay for any settlement made without its consent.

(c)   The Company need not reimburse any expense or indemnify against any loss or liability incurred by the Trustee through negligence or willful misconduct.

(d)   To secure the payment obligations of the Company and the Guarantors pursuant to this Section 6.9, the Trustee shall have a lien prior to the Notes of any series on all money or property held or collected by the Trustee, except such money or property held in trust to pay principal, premium, if any, and interest on particular Notes.

(e)     When the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 5.1(5)or Section 5.1(6), the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable Bankruptcy Law.

(f)     The provisions of this Section shall survive the termination of this Indenture.

Section 6.10.   Replacement of Trustee.

(a)     The resignation or removal of the Trustee and the appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in Section 6.11.

(b)     The Trustee may resign at any time with respect to the Notes of any series by giving written notice thereof to the Company.  If the instrument of acceptance by a successor Trustee required by Section 6.11 shall not have been delivered to the Trustee within thirty (30) days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Notes of such series.

(c)     The Holders of a majority in aggregate principal amount of the Outstanding Notes may remove the Trustee by so notifying the Trustee and the Company and may appoint a successor Trustee with the Company's consent (which consent shall not be unreasonably withheld or delayed); provided that no such consent on the part of the Company shall be required if an Event of Default shall have occurred and is continuing.

(d)     If at any time:

(1)     the Trustee fails to comply with Section 310(b) of the Trust Indenture Act after written request therefor by the Company or by any Holder who has been a bona fide Holder of a Note for at least six months;

(2)     the Trustee shall cease to be eligible under Section 310(a) of the Trust Indenture Act and shall fail to resign after written request therefor by the Company or by any Holder of a Note who has been a bona fide Holder of a Note for at least six months; or

(3)     the Trustee becomes incapable of acting, is adjudged a bankrupt or an insolvent or a Custodian or public officer takes charge of the Trustee or its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (i) the Company by or pursuant to a Board Resolution may remove the Trustee with respect to all Notes, or (ii) subject to Section 315(e) of the Trust Indenture Act, any Holder who has been a bona fide Holder of a Note for at least six months may, on behalf of itself and all other similarly situated, petition any court of competent jurisdiction for the removal of the Trustee with respect to all Notes and the appointment of a successor Trustee or Trustees.

(e)      If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, with respect to the Notes, the Company, by or pursuant to Board Resolution, shall promptly appoint a successor Trustee with respect to the Notes (it being understood that at any time there shall only be one Trustee with respect to the Notes) and shall comply with the applicable requirements of Section 6.11.  If, within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Trustee with respect to the Notes has not been appointed by the Company and accepted such appointment, then a successor Trustee shall be appointed by Act of the Holders of a majority in aggregate principal amount of the Outstanding Notes delivered to the Company and the retiring Trustee, the successor Trustee so appointed shall, forthwith upon its acceptance of such appointment in accordance with the applicable requirements of Section 6.11, become the successor Trustee with respect to the Notes and to that extent supersede the successor Trustee with respect to the Notes appointed by the Company.  If no successor Trustee of such series shall have been so appointed by the Company or the Holders and accepted appointment in the manner required by Section 6.11, any Holder who has been a bona fide Holder of a Note for at least six months may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Notes.

Section 6.11.   Acceptance of Appointment by Successor.

(a)      In case of the appointment hereunder of a successor Trustee, every such successor Trustee shall execute, acknowledge and deliver to the Company and to the retiring Trustee an instrument accepting such appointment.  Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee, without further act, deed or conveyance, shall become vested with all the rights, powers and duties of the retiring Trustee; but, on the request of the Company or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.

(b)      In case of the appointment hereunder of a successor Trustee, the Company, the retiring Trustee and such successor Trustee shall execute and deliver an indenture supplemental hereto wherein such successor Trustee shall accept such appointment and which shall contain such provisions as shall be necessary or desirable to transfer and confirm to, and to vest in, such successor Trustee all the rights, powers, trusts and duties of the retiring Trustee and upon the execution and delivery of such supplemental indenture the resignation or removal of the retiring Trustee shall become effective to the extent provided therein and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on request of the Company or any successor Trustee, such retiring Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.

(c)      Upon request of any such successor Trustee, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts referred to in paragraph (a) or (b) of this Section, as the case may be.

(d)      No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under Section 310 of the Trust Indenture Act.

(e)      The Company shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee in the manner provided for notices to the Holders of Notes in Section 1.6.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust office.

Section 6.12.   Disqualification; Eligibility.

(a)      If the Trustee has or shall acquire a conflicting interest within the meaning of Section 310(b) of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provision of Section 310(b) of the Trust Indenture Act and this Indenture.

(b)      There shall at all times be a Trustee hereunder which shall be eligible pursuant to Section 310 of the Trust Indenture Act to act as Trustee and shall have a combined capital and surplus of at least $100,000,000.  If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of Federal, State, Territorial or District of Columbia supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article 6.

Section 6.13.   Merger, Conversion, Consolidation or Succession to Business.  Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation shall be otherwise qualified and eligible under this Article 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Notes shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.14.   Appointment of Authenticating Agent.  The Trustee may appoint an Authenticating Agent or Agents with respect to one or more series of Notes which shall be authorized to act on behalf of the Trustee to authenticate Notes of such series issued upon original issue and upon exchange, registration of transfer or partial redemption thereof, and Notes so authenticated shall be entitled to the benefits of this Indenture and shall be valid and obligatory for all purposes as if authenticated by the Trustee hereunder.  Any such appointment shall be evidenced by an instrument in writing signed by a Responsible Officer of the Trustee, a copy of which instrument shall be promptly furnished to the Company.  Wherever reference is made in this Indenture to the authentication and delivery of Notes by the Trustee or the Trustee's

certificate of authentication, such reference shall be deemed to include authentication and delivery on behalf of the Trustee by an Authenticating Agent and a certificate of authentication executed on behalf of the Trustee by an Authenticating Agent.  Each Authenticating Agent shall be acceptable to the Company and shall at all times be a bank or trust company or corporation organized and doing business and in good standing under the laws of the United States of America or of any State or the District of Columbia, authorized under such laws to act as Authenticating Agent, having a combined capital and surplus of not less that $100,000,000 and subject to supervision or examination by Federal, State, Territorial or District of Columbia authorities.  If such Authenticating Agent publishes reports of condition at least annually, pursuant to law or the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Authenticating Agent shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  In case at any time an Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section, such Authenticating Agent shall resign immediately in the manner and with the effect specified in this Section.

Any corporation into which an Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which such Authenticating Agent shall be a party, or any corporation succeeding to all or substantially all of the corporate agency or corporate trust business of an Authenticating Agent shall continue to be an Authenticating Agent, provided such corporation shall be otherwise eligible under this Section, without the execution or filing of any paper or further act on the part of the Trustee or the Authenticating Agent.

An Authenticating Agent for any series of Notes may at any time resign by giving written notice of resignation to the Trustee for such series and to the Company.  The Trustee of any series of Notes may at any time terminate the agency of an Authenticating Agent by giving written notice of termination to such Authenticating Agent and to the Company.  Upon receiving such a notice of resignation or upon such a termination, or in case at any time such Authenticating Agent shall cease to be qualified and eligible in accordance with the provisions of this Section, the Trustee for such series may appoint a successor Authenticating Agent which shall be acceptable to the Company and shall give notice of such appointment to all Holders of Notes of the series with respect to which such Authenticating Agent will serve in the manner set forth in Section 1.6.  Any successor Authenticating Agent upon acceptance of its appointment hereunder shall become vested with all the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an Authenticating Agent herein.  No successor Authenticating Agent shall be appointed unless eligible under the provisions of this Section.

The Company agrees to pay to each Authenticating Agent from time to time reasonable compensation including reimbursement of its reasonable expenses for its services under this Section.

If an appointment with respect to one or more series is made pursuant to this Section, the Notes of such series may have endorsed thereon, in addition to or in lieu of the Trustee's certificate of authentication, an alternate certificate of authentication substantially in the following form:

WEST\222568871.14                                     42

This is one of the [    ] Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL
ASSOCIATION, not in its individual
capacity but solely in its capacity as
Trustee

By: _____
as Authenticating Agent

By: _____
Authorized Officer

Section 6.15.   Trustee's Application for Instructions from the Company.  Any application by the Trustee for written instructions from the Company may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective.  The Trustee shall not be liable to the Company for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than fifteen Business Days after the date any officer of the Company actually receives such application, unless any such officer shall have consented in writing to any earlier date) unless prior to taking any such action (or the effective date in the case of an omission), the Trustee shall have received written instructions in response to such application specifying the action to be taken or omitted.

Section 6.16.   Preferential Collection of Claims Against Company.  If and when the Trustee shall be or become a creditor of the Company (or the Guarantor or any other obligor upon the Notes), the Trustee shall be subject to the provisions of Section 311(a) of the Trust Indenture Act regarding the collection of claims against the Company (or the Guarantor or any such other obligor).

ARTICLE 7

Consolidation, Merger or Sale by the Company

Section 7.1.   Consolidation, Merger or Sale of Assets Only on Certain Terms.  The Company shall not merge or consolidate with or into any other Person, or sell, convey, transfer, lease or otherwise dispose of all or substantially all of its assets to any Person, whether in a single transaction or a series of transactions, unless (i) (A) in the case of a merger or consolidation, the Company is the surviving Person or (B) in the case of a merger or consolidation where the Company is not the surviving Person and in the case of any such sale, conveyance, transfer, lease or other disposition, the successor or acquiring corporation is a corporation organized and existing under the laws of the United States or a State thereof and such corporation expressly assumes by supplemental indenture all the obligations of the Company under the Notes and under this Indenture, (ii) immediately thereafter, giving effect to such merger or consolidation, or such sale, conveyance, transfer, lease or other disposition, no

WEST\222568871.14                              43

Default or Event of Default shall have occurred and be continuing, and (iii) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel each stating that such merger or consolidation, or such sale, conveyance, transfer, lease or other disposition complies with this Article 7 and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture complies with this Article 7 and Article 8 and that all conditions precedent herein provided for or relating to such transaction have been complied with. Subject to the mandatory redemption provisions of Section 10.5, in the event of the assumption by a successor corporation of the obligations of the Company as provided in clause (i)(B) of the immediately preceding sentence as a result of a merger or consolidation, such successor corporation shall succeed to and be substituted for the Company hereunder and under the Notes and all such obligations of the Company shall terminate; provided, however, that no sale, conveyance, transfer, lease or disposition shall have the effect of releasing the Person named as the "Company" in the first paragraph of this Indenture or any successor Person which shall theretofore have become such in the manner prescribed in this Article from its liability as obligor and maker on any of the Notes.

ARTICLE 8

Supplemental Indentures

Section 8.1.   Supplemental Indentures Without Consent of Holders.  Without the consent of any Holders, the Company, when authorized by a Board Resolution, the Guarantors and the Trustee, at any time and from time to time, may enter into indentures supplemental hereto, in form reasonably satisfactory to the Trustee, for any of the following purposes:

(1)      to evidence the succession of another Person to the Company and the assumption by any such successor of the covenants of the Company herein and in the Notes in accordance with Section 7.1;

(2)      to add to the covenants of the Company for the benefit of the Holders of all or any series of Notes (and if such covenants are to be for the benefit of less than all series of Notes, stating that such covenants are expressly being included solely for the benefit of such series; provided that such covenants may not adversely affect Holders of the other series of Notes) or to surrender any right or power herein conferred upon the Company;

(3)      to add any additional Events of Default with respect to all or any series of Notes;

(4)      to add to or change any of the provisions of this Indenture solely to such extent as shall be necessary to facilitate the issuance of Notes in global form;

(5)      to secure the Notes or Note Guarantees;

(6)      to comply with the requirements of the Commission in order to effect or maintain qualification of this Indenture under the TIA;

(7)      to evidence and provide for the acceptance of appointment hereunder by a successor Trustee with respect to the Notes of one or more series and to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Section 6.10 and Section 6.11; or

(8)      to cure any ambiguity, correct any mistake or correct or supplement any provision herein which may be defective or inconsistent with any other provision herein or to make any other provisions with respect to matters or questions arising under this Indenture which shall not be inconsistent with the provisions of this Indenture, provided such other provisions shall not adversely affect the interests of the Holders of Notes.

Section 8.2.      With Consent of Holders.  With the written consent of the Holders of not less than a majority in aggregate principal amount of the Outstanding Notes, by Act of said Holders delivered to the Company and the Trustee, the Company, when authorized by a Board Resolution, the Guarantors and the Trustee may enter into an indenture or indentures supplemental hereto to add any provisions to or to change or eliminate any provisions of this Indenture or of any other indenture supplemental hereto or to modify the rights of the Holders of Notes and the Note Guarantees; provided, however, that without the consent of the Holder of each Outstanding Note affected thereby, an amendment, change or modification under this Section 8.2 may not:

(1)      change the Stated Maturity of the principal of, or time of payment of any installment of principal of or interest on, any Note, or reduce the principal amount thereof or the rate of interest thereon or any premium payable upon the redemption thereof, or change the coin or currency in which, any Notes or any premium or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the Redemption Date);

(2)      reduce the percentage in principal amount of the Outstanding Notes of any series, the consent of whose Holders is required for any such supplemental indenture, or the consent of whose Holders is required for any waiver (of compliance with certain provisions of this Indenture or certain Defaults hereunder and their consequences) provided for in this Indenture;

(3)      change any obligation of the Company to maintain an office or agency in the places and for the purposes specified in Section 9.2;

(4)      make any change in Section 5.7 or this Section 8.2 except to increase any percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holders of each Outstanding Note affected thereby;

(5)      modify the ranking or priority of any Note or the Note Guarantees in respect thereof of the Company or the Guarantors, as the case may be, in any manner adverse to the Holders of the Notes;

(6)     release any Guarantor from any of its obligations under its Note Guarantee or this Indenture or otherwise make any amendment, change or modification to Article 11 of this Indenture that would materially adversely affect Noteholders;

(7)     reduce the Redemption Price of any Notes;

(8)     make the Notes payable in money or securities other than as stated in the Note;

(9)     make any amendment, change or modification to this Section 8.2 ;

(10)    make any change that materially adversely affects the right of a Holder to require the Company to purchase the Notes in accordance with Section 10.5, or to redeem the Notes in accordance with the terms of Section 10.6; or

(11)    impair the right to institute suit for the enforcement of any payment with respect to the Notes or under the Note Guarantees.

Notwithstanding the foregoing, no amendment, change or modification of any of the rights or obligations of the Trustee or any of its agents under this Indenture or the Note Guarantees shall be effective unless consented to by the Trustee in writing.

It is not necessary under this Section 8.2 for the Holders to consent to the particular form of any proposed supplemental indenture, but it is sufficient if they consent to the substance thereof.

Section 8.3.    Compliance with Trust Indenture Act.  Every supplemental indenture executed pursuant to this Article 8 shall comply with the requirements of the Trust Indenture Act as then in effect.

Section 8.4.    Execution of Supplemental Indentures.  In executing or accepting the additional trusts created by, any supplemental indenture permitted by this Article 8 or the modification thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 8.5.    Effect of Supplemental Indentures.  Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; a supplemental indenture becomes effective in accordance with its terms and every Holder of Notes theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.6.    Reference in Notes to Supplemental Indentures.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Company shall so determine, new Notes of

any series so modified as to conform, in the opinion of the Trustee and the Company, to any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for Outstanding Notes of any series.

Section 8.7.    Notice.  After an amendment or supplement under this Article 8 becomes effective, the Company shall (or shall cause the Trustee to) promptly mail to the Holders affected thereby a notice briefly describing the amendment or supplement.  Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment or supplement.

Section 8.8.    Revocation and Effect of Consents.  Until an amendment or supplement under this Article 8 becomes effective, a consent to it by a Noteholder is a continuing consent by the Noteholder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Noteholder or subsequent Holder may revoke the consent as to the Note or portion of a Note if the Trustee receives notice of the revocation before the date of the amendment or supplement becomes effective.

ARTICLE 9

Covenants

Section 9.1.    Payment of Principal, Premium, if any, and Interest.  The Company covenants and agrees for the benefit of the Holders of each series of Notes that it will duly and punctually pay on the dates and in the manner provided in the Notes the principal of, premium, if any, and interest on the Notes in accordance with the terms of such Notes and this Indenture.  An installment of principal or interest shall be considered paid on the date it is due if the Paying Agent holds as of 10:00 a.m., New York City time, on that date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal of, premium, if any, and interest, if any, on the Notes then due, or, in the case of an installment of interest which is due on any Interest Payment Date (excluding the final Stated Maturity), Additional Notes in an aggregate principal amount equal to the amount of the installment of interest which is due and payable on the relevant Interest Payment Date.  The Company shall, to the fullest extent permitted by law, pay interest on overdue principal (including premium, if any) and overdue installments of interest (without regard to any applicable grace period) at the rate borne by Notes plus 2% per annum.  All such interest on overdue amounts shall be payable in Additional Notes upon demand.

Section 9.2.    Maintenance of Office or Agency.  The Company will maintain in each Place of Payment for any series of Notes an office or agency where Notes of that series may be presented or surrendered for payment, where Notes of that series may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Company in respect of the Notes of that series and this Indenture may be served.  The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such Place of Payment.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the

Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

The Company may also from time to time designate one or more other offices or agencies where the Notes of one or more series may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in each Place of Payment for Notes of any series for such purposes.  The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Trustee shall initially serve as Paying Agent.

Section 9.3.    Money for Notes to Be Held in Trust; Unclaimed Property.  If the Company shall at any time act as its own Paying Agent with respect to any series of Notes, it will, on or before 12:00 noon, Eastern Standard time on each due date of the principal of, premium, if any, or interest on any of the Notes of that series, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal, premium, if any, or interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided and will promptly notify the Trustee and Paying Agent, if applicable, in writing of its action or failure so to act.

Whenever the Company shall have one or more Paying Agents for any series of Notes, it will, prior to each due date of the principal of or any premium or interest on any Notes of that series deposit with the applicable Paying Agent a sum sufficient to pay such amount, such sum to be held as provided by Section 317(b) of the Trust Indenture Act, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of its action or failure so to act.

The Company will cause each Paying Agent for any series of Notes other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that such Paying Agent will:

(1)    hold all sums held by it for the payment of the principal of, premium, if any, or interest on Notes of that series in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided;

(2)    give the Trustee notice of any Default by the Company (or any other obligor upon the Notes of that series) in the making of any payment of principal, premium, if any, or interest on the Notes; and

(3)    at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Company may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent,

such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Any money Notes deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of any principal, premium or interest on any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid or delivered to the Company on Company Request, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company and the Guarantors for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in an Authorized Newspaper, or cause to be mailed to such Holder, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than thirty (30) days from the date of such publication or mailing, any unclaimed balance of such money then remaining will be repaid to the Company.

Section 9.4.    Corporate Existence.  Subject to Article 7, and without limiting any of, and subject to, the Company's obligations under Article 10, each of the Company and the Guarantors will at all times do or cause to be done all things necessary to preserve and keep in full force and effect its respective corporate existence; provided that nothing in this Section 9.4 shall prevent the abandonment or termination of any right or franchise of the Company or any Guarantor if the Board of Directors of the Company or of any Guarantor, as the case may be, shall determine that such abandonment or termination is in the best interests of the Company or any Guarantor, as the case may be, and does not materially adversely affect the ability of the Company or any Guarantor, as the case may be, to operate its business or to fulfill its obligations hereunder.

Section 9.5.    Provision of Financial Information.  So long as any Notes are outstanding (unless defeased pursuant to Section 4.3 hereof), the Company will have its annual financial statements audited, and its interim financial statements reviewed, by a nationally recognized firm of independent accountants and will furnish to the Holders of Notes, within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending September 30, 2010) and within 60 days after the end of each of the first three fiscal quarters of each fiscal year of the Company, quarterly and annual financial statements prepared in accordance with GAAP that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Company were required to file those Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, with respect to the annual information only, a report on the annual financial statements by the Company's certified independent accountants.  To the extent that the Company does not file such information with the Commission, the Company will distribute (or cause the Trustee to distribute) such information and such reports (as well as the details regarding the conference call described below) electronically to (a) any Holder of the Notes, (b) any Beneficial Owner of the Notes who provides its email address to the Company and certifies that it is a Beneficial Owner of Notes or

(c) any securities analyst who provides its email address to the Company and certifies that it is a securities analyst.

The Company shall provide the Trustee with a sufficient number of copies of all reports and other documents and information and, if requested by the Company, the Trustee will deliver such reports to the Holders under this Section 9.5.

Section 9.6.   Notice of Default.  The Company shall file with the Trustee written notice of occurrence of any Event of Default promptly, but in any event no later than five (5) Business Days of its becoming aware of any such Event of Default.

Section 9.7.   Compliance Certificates.  The Company shall deliver to the Trustee, within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending September 30, 2011), an Officers' Certificate as to the signer's knowledge of the Company's compliance with all conditions and covenants on its part contained in this Indenture and stating whether or not the signer knows of any Default or Event of Default.  If such signer knows of such a Default or Event of Default, the Officers' Certificate shall describe the Default or Event of Default and the efforts to remedy the same.  For the purposes of this Section 9.7, compliance shall be determined without regard to any grace period or requirement of notice provided pursuant to the terms of this Indenture.

Section 9.8.   Further Instruments and Acts.  Upon request of the Trustee, each of the Company and the Guarantors will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out the purposes of this Indenture.

Section 9.9.   Changes in Organization Documents.  The Company shall not amend its certificate of incorporation, bylaws, or other similar organizational document, other than any amendment that is not adverse in any material respect to the rights of the Holders hereunder.

Section 9.10.   Affiliate Transactions.

(a)      The Company will not, and will not permit any Guarantor to, directly or indirectly, enter into any material transaction including, without limitation, the purchase, sale or exchange of property or the rendering of any service, with any of their Affiliates unless (i) such transaction is on terms that are no less favorable to the Company or the relevant Guarantor than those that would have been obtained in a comparable transaction by the Company or such Guarantor on an arms-length basis with an unrelated Person and (ii) the Company delivers to the Trustee (A) with respect to any transaction or series of related transactions involving aggregate consideration (or the fair market value of the property the subject of such transaction is) in excess of $_____ million, a resolution of the Board of Directors, approved prior to the consummation thereof, set forth in an Officers' Certificate certifying that such transaction complies with clause (i) of this Section 9.10(a) and that such transaction has been approved, prior to the consummation thereof, by a majority of the disinterested members of the Board of Directors, and (B) with respect to any transaction or series of related transactions involving aggregate consideration (or the fair market value of the property the subject of such transaction is) in excess of $_____ million, an opinion as to the fairness to the Company or such Guarantor

of such transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing (and which opinions delivered to the Trustee).

(b)     The following items will not be deemed to be subject to the provisions of this Section 9.10:

(i)     transactions between or among the Company and/or any of its wholly owned Subsidiaries;

(ii)     transactions with a Person that is an Affiliate of the Company solely because the Company owns, directly or through a Subsidiary, capital stock in, or controls, such Person;

(iii)     payment of reasonable directors' fees to directors of the Company and other reasonable fees, compensation, benefits and indemnities paid or entered into by the Company or its Subsidiaries to or with the officers, directors, employees or consultants of the Company and any Subsidiary of the Company; and

(iv)     any issuance of capital stock of the Company to Affiliates of the Company.

Section 9.11.   Limitation on Additional Debt Incurred by Nilchii.  The Company will not, and will not permit Nilchii to, directly or indirectly, create, incur, permit, assume, guarantee, or suffer to exist any debt obligation by Nilchii that is senior or *pari passu* in right of payment to the Notes or any lien on the assets of Nilchii.

Section 9.12.   Use of Spirit Proceeds.  In the event of a Spirit Liquidity Event, the Company shall (i) provide prompt written notice to the Trustee and the Holders thereof and (ii) cause Nilchii to pay the proceeds thereof directly to the Trustee on its behalf and for its benefit for distribution in accordance with the provisions of Section 10.6.

Section 9.13.   Transfer of Assets.  After the date of this Indenture, neither the Company nor any Guarantor will transfer, or cause the transfer, of any material amount of assets to a Subsidiary that was not formed under the laws of the United States or any state or political subdivision thereof or the District of Columbia or has not otherwise become a Guarantor under the Indenture in accordance with the provisions of this Indenture for the addition of Guarantors.

ARTICLE 10

Redemption

Section 10.1.   Notice of Redemption.  If the Company is required to redeem the Notes pursuant to the mandatory redemption provisions of Section 10.6, notice of redemption (the "Redemption Notice") shall be given in the manner provided in this Article 10 and Section 1.6 not less than thirty (30) days nor more than sixty (60) days prior to the Redemption Date to the Holders of the Notes to be redeemed.

All Redemption Notices shall be prepared by the Company and shall identify the Notes to be redeemed and shall state:

    (1)    the Redemption Date;

    (2)    the Redemption Price and accrued interest to, but excluding, the Redemption Date;

    (3)    that the Company will notify the Trustee in writing prior to the Redemption Date of the principal amount of notes that the Company will redeem and, that the Trustee shall redeem the Notes in the payment priority established in Section 10.6 of the Indenture;

    (4)    in case any Note is to be redeemed in part only, the notice which relates to such Note shall state that on and after the Redemption Date, upon surrender of such Note, the Holder will receive, without a charge, a new Note or Notes of authorized denominations for the principal amount thereof remaining unredeemed;

    (5)    the Place or Places of Payment where such Notes maturing after the Redemption Date may be surrendered for payment for the Redemption Price and accrued interest to, but excluding, the Redemption Date;

    (6)    the applicable priority with respect to right of payment for each series of Notes being redeemed;

    (7)    that the Holders of any series of Notes shall not be entitled to receive any payment in connection with such redemption unless and until the Holders of each series of Notes senior in right of payment have been paid in full;

    (8)    that that Notes called for redemption must be surrendered to the Paying Agent to collect the Redemption Price;

    (9)    that, on the Redemption Date, the Redemption Price and accrued interest to, but excluding, the Redemption Date will become due and payable upon each such Note, or the portion thereof, to be redeemed and, if applicable, that interest thereon will cease to accrue on and after said date;

    (10)    the clause of this Indenture pursuant to which the redemption shall occur; and

    (11)    the CUSIP Number of such Notes; provided that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

Redemption Notices shall be given by the Company or, at the Company's request, by the Trustee in the name and at the expense of the Company.  In the event that the Company elects to deliver such Redemption Notices to the Holders (rather than through the Trustee), the Company shall concurrently therewith deliver a copy of such notice to the Trustee.

Section 10.2.   <u>Deposit of Redemption Price</u>.  On or prior to any Redemption Date (and in any case no later than 10:00 a.m., New York City time, on such Redemption Date), the Company shall deposit with the Paying Agent an amount of cash in immediately available funds sufficient to pay on the Redemption Date the Redemption Price of, and interest accrued to but not including the Redemption Date on, all Notes or portions thereof which are to be redeemed on that date (including any cash to be paid in lieu of fractional shares, as described below).  Prior to the occurrence of an Event of Default (and upon the occurrence and continuance of an Event of Default, at the direction of the Holders of at least a majority of the principal amount of the Outstanding Notes), the Paying Agent shall promptly return to the Company any money deposited with the Paying Agent by the Company in excess of the amounts necessary to pay the Redemption Price of, and accrued interest on, all Notes to be redeemed.

Section 10.3.   <u>Notes Payable on Redemption Date</u>.  Redemption Notices having been given as aforesaid, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after such date (unless the Company shall default in the payment of the Redemption Price and accrued interest) such Notes shall cease to bear interest.  Upon surrender of any such Note for redemption in accordance with said Redemption Notice, such Note shall be paid by the Company at the Redemption Price, together with accrued interest to but not including the Redemption Date; <u>provided</u>, <u>however</u>, that installments of interest whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Notes, or one or more Predecessor Securities, registered as such at the close of business on the relevant Regular Record Dates according to their terms and the provisions of Section 3.7.

If any Note called for redemption shall not be so paid upon surrender thereof for redemption, the principal and any premium shall, until paid, bear interest from the Redemption Date at the rate prescribed therefor in the Note.

Section 10.4.   <u>Notes Redeemed in Part</u>.  Upon surrender of a Note that is redeemed in part at any Place of Payment therefor (with, if the Company so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company duly executed by, the Holder thereof or its attorney duly authorized in writing), the Company shall execute and the Trustee shall authenticate and deliver to the Holder of that Note, without service charge, a new Note or Notes, the same form and the same Stated Maturity in any authorized denomination equal in aggregate principal amount to the unredeemed portion of the principal of the Note surrendered.

Section 10.5.   <u>Repurchase Option</u>.  In the event that a Fundamental Change shall occur, the Company shall provide prompt written notice to the Trustee and the Holders thereof (the "<u>Repurchase Notice</u>").  Each Holder shall have the right, at the Holder's option, to require the Company to repurchase all of such Holder's Notes, or any portion of the principal amount thereof that is an integral multiple of $1,000 (provided that no single Note may be repurchased in part unless the portion of the principal amount of such Notes to be outstanding after such repurchase is equal to $1,000 or an integral multiple of $1,000), on the date (the "<u>Repurchase Date</u>") that is not later than forty-five (45) business days after the date of the occurrence of a Fundamental Change at a purchase price equal to 100% of the principal amount plus interest accrued and unpaid to the Repurchase Date (the "<u>Repurchase Price</u>"); <u>provided</u> that the repurchase of the Notes shall be subject to and in accordance with the priority in right of

payment set forth in Section 1.14.  Within twenty (20) days of receiving a Repurchase Notice from the Company, each Holder must deliver to the Company the form attached to the Notes labeled OPTION OF HOLDER TO ELECT REPURCHASE.  The Company shall notify the Trustee at least fifteen (15) days prior to the Repurchase Date (unless a shorter notice shall be satisfactory to the Trustee) of the principal amount of Notes that the Holders have elected to repurchase.

Section 10.6.  Mandatory Redemption.  Upon a Spirit Liquidity Event, the Company shall use the proceeds therefrom to redeem the Notes at a Redemption Price of 100% of the principal amount thereof plus accrued but unpaid interest thereon to but not including the applicable Redemption Date, in the following order of priority:

(1)     First, to the Holders of 8% Notes (Series A), until paid in full;

(2)     Second, to the Holders of US Airways Notes, until paid in full;

(3)     Third, to the Holders of 8% Notes (Series B), until paid in full;

(4)     Fourth, to the Holders of Management Notes, until paid in full;

(5)     Fifth, to the Company;

provided that if the proceeds of a Spirit Liquidity Event are insufficient to pay off any series of Notes in full, the proceeds shall be distributed pro rata to the Holders of such series of Notes and provided further that the Holders of any series of Notes shall not be entitled to receive any proceeds from a Spirit Liquidity Event unless and until the Holders of each series of Notes senior in right of payment pursuant to this Section 10.6 shall have been paid in full.

Any Redemption Notice issued pursuant to this Section 10.6 shall be made in accordance with Section 10.1.  The Company shall notify the Trustee in writing at least fifteen (15) days prior to the Redemption Date (unless a shorter notice shall be satisfactory to the Trustee) of the principal amount of Notes that the Company will redeem.  Any redemption pursuant to this Section 10.6 shall be made in compliance with the provisions of Sections 10.1, 10.2, 10.3 and 10.4 hereof.

ARTICLE 11

Note Guarantee

Section 11.1.  Guarantee.

(a)     Subject to this Article 11, each of the Guarantors, jointly and severally, hereby unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity, regularity or enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder, that:

(1)     the principal of, premium, if any, and interest on the Notes will be promptly paid in full when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(2)     in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration, redemption or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be obligated, jointly and severally, to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b)     Each Guarantor hereby agrees that its obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety, including but not limited to: (A) any right to require any of the Trustee, the Holders or the Company (each a "Benefited Party"), as a condition of payment or performance by a Guarantor, to (1) proceed against such Guarantor, the Company or any other Person, (2) proceed against or exhaust any security held from such Guarantor, the Company or any other Person or (3) proceed against or have to resort to any balance of any deposit account or credit on the books of any Benefited Party in favor of the Guarantor, the Company or any other Person, and (B) any defense based on or arising out of the lack of validity or the unenforceability of the obligations under this Note Guarantee or any agreement or instrument relating hereto. Each Guarantor hereby waives the benefits of diligence, presentment, demand for payment and filing of claims with a court in the event of insolvency or bankruptcy of the Company and any right to require a proceeding first against the Company or any other Person, protest, notice and all demands whatsoever, and covenants that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(c)     If any Holder or the Trustee is required by any court or otherwise to return to the Company, any Guarantor or any Custodian acting in relation to either the Company or such Guarantor, any amount paid by either to the Trustee or such Holder, or any such amount paid is rescinded or reduced in amount, this Note Guarantee, to the extent theretofore discharged, will continue to be effective or be reinstated, as the case may be, and be in full force and effect all as though such amount had not been paid.

(d)     Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment and performance in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as

between such Guarantor, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 5 hereof for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 5 hereof, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantor for the purpose of this Note Guarantee.

(e)     Each Guarantor hereby agrees to pay any and all costs and expenses incurred by the Trustee or the Holders in enforcing their respective rights under the Note Guarantee.

(f)     The Note Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Company for liquidation or reorganization, should the Company become insolvent or make an assignment for the benefit of creditors or should a Custodian be appointed for all or any significant part of the Company's assets.

Section 11.2.   Limitation on Guarantor Liability.  Each Guarantor and, by its acceptance of Notes, each Holder hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to the Note Guarantee.  To effectuate the foregoing intention, the Trustee, the Holders and each Guarantor hereby irrevocably agree that the obligations of such Guarantor under its Note Guarantee and this Article 11 shall be limited to the greater of (i) the amount of any value received by such Guarantor and (ii) the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, result in the obligations of such Guarantor under its Note Guarantee not constituting a fraudulent transfer or conveyance.

Section 11.3.   Execution and Delivery of a Note Guarantee.  To evidence the Note Guarantee, each Guarantor hereby agrees that a notation of such Note Guarantee substantially in the form attached as Exhibit E hereto will be endorsed by an Officer of the Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture will be executed on behalf of the Guarantor by one of its Officers.

Each Guarantor hereby agrees that the Note Guarantee will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

If an Officer whose signature is on this Indenture or on the Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee will be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, will constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantor.

Section 11.4.   Guarantor May Consolidate, etc., on Certain Terms.

(a)      Except as otherwise provided in this Section 11.4, a Guarantor may not sell, convey, transfer or otherwise dispose of all or substantially all of its property or assets to, or consolidate with or merge with or into another Person, other than the Company, unless:

(1)      immediately after giving effect to such transaction, no Default or Event of Default exists or shall be caused by such transaction; and

(2)      either:

(A)      the applicable Guarantor is the surviving Person; or

(B)      the Person acquiring the property or assets in any such sale, conveyance, transfer or disposition or the Person formed by or surviving any such consolidation or merger unconditionally assumes all the obligations of the Guarantor pursuant to a supplemental indenture executed and delivered to the Trustee, in form satisfactory to the Trustee, under the Notes, this Indenture and the Note Guarantee on the terms set forth herein or therein.

In case of any such consolidation, merger, sale, conveyance, transfer or disposition and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by such Guarantor, such successor Person will succeed to and be substituted for such Guarantor with the same effect as if it had been named herein as the Guarantor; provided, however, that no such sale, conveyance, transfer or disposition shall have the effect of releasing the Person named as the "Guarantor" of this Indenture or any successor Person which shall theretofore have become such in the manner prescribed in this Article 11 from its liability as obligor on the Note Guarantee.  Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee.  All the Note Guarantees so issued will in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

Nothing contained in this Indenture or in any of the Notes will prevent any consolidation or merger of a Guarantor with or into the Company, or will prevent any sale, conveyance, transfer or disposition of the property of the Guarantor as an entirety or substantially as an entirety to the Company.

Section 11.5.  <u>Subrogation of Noteholders and Guarantors</u>.  Until all the Notes are paid in full, no Guarantor shall exercise any rights that it may acquire by way of subrogation under this Article 11 by any payment made hereunder or otherwise, including the right to ask, demand, sue for, take or receive from the Company such subrogation rights.  If any amount shall be paid to any Guarantor on account of such subrogation rights in violation of the preceding sentence, such amount shall be held in trust for the benefit of the Trustee and the Noteholders and shall

forthwith be paid to the Trustee to be credited and applied upon such Notes, in accordance with the terms hereof.

Section 11.6.   Additional Guarantors.  If the Company, after the date of this Indenture, acquires or forms any Subsidiary under the laws of the United States or any state or political subdivision thereof or the District of Columbia the Company shall cause any such Subsidiary to become a Guarantor by executing and delivering to the Trustee (a) a supplemental indenture, in form satisfactory to the Trustee, which subjects such Subsidiary to the provisions of this Indenture as a Guarantor and (b) an opinion of counsel to the effect that such supplemental indenture has been duly authorized and executed by such Subsidiary.

ARTICLE 12

SUBORDINATION OF MANAGEMENT NOTES

Section 12.1.   Agreement to Subordinate.  The Company covenants and agrees, and each Holder of Management Notes issued hereunder and under any supplemental indenture by such Holder's acceptance thereof likewise covenants and agrees, that all Management Notes shall be issued subject to the provisions of this Article 12; and each Holder of a Management Note, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions.

The payment by the Company of the principal of, premium, if any, and interest on all Management Notes issued hereunder and under any supplemental indenture shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full of all the 8% Notes (Series A), 8% Notes (Series B), and US Airways Notes, whether outstanding at the date of this Indenture or thereafter incurred.

No provision of this Article 12 shall prevent the occurrence of any default or Event of Default hereunder.

Section 12.2.   Trustee to Effectuate Subordination.  Each Holder of a Management Note by such Holder's acceptance thereof authorizes and directs the Trustee on such Holder's behalf to take such action as may be necessary or appropriate to effectuate the subordination provided in this Article 12 and appoints the Trustee such Holder's attorney-in-fact for any and all such purposes.

Section 12.3.   Subordination May Not Be Impaired.  No right of any present or future Holder of any the 8% Notes (Series A), 8% Notes (Series B), or US Airways Notes to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company, as the case may be, or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company, as the case may be, with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof that any such holder may have or otherwise be charged with.

This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, and their respective corporate seals to be hereunto affixed and attested, all as of the day and year first above written.

MESA AIR GROUP, INC.

By: _____
Name: _____
Title: _____


MESA AIRLINES, INC.
MPD, INC.
REGIONAL AIRCRAFT SERVICES, INC.
MESA AIR GROUP – AIRCRAFT INVENTORY
    MANAGEMENT, LLC
NILCHII, INC.
MESA IN-FLIGHT, INC., as GUARANTORS

By: _____
Name: _____
Title: _____


U.S. BANK NATIONAL ASSOCIATION, Not in its individual capacity but solely in its capacity as TRUSTEE

By: _____
Name: _____
Title: _____

WEST\222568871.14

**EXHIBIT A**

**[FORM OF NOTE]**

**[INSERT GLOBAL NOTE LEGEND AS SPECIFIED IN SECTION 2.4,
IF APPLICABLE]**

CUSIP No.: _____

MESA AIR GROUP, INC.

8% NOTES (SERIES A)

No. A-___                                                                     $[19,400,000]

MESA AIR GROUP, INC., a Nevada corporation (the "Company," which term includes any successor entity), for value received promises to pay to Cede & Co. or registered assigns, the principal sum of NINETEEN MILLION FOUR HUNDRED THOUSAND DOLLARS, on _____ ___, 2016.

Interest Payment Dates:  March 31, June 30, September 30 and December 31, beginning on _____ ___, 20___.

Record Dates:  March 15, June 15, September 15 and December 15.

Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officers and a facsimile of its corporate seal to be affixed hereto or imprinted hereon.

MESA AIR GROUP, INC.

By:      _____
Name:
Title:

By:      _____
Name:
Title:

WEST\222568871.14                          A-1

A-2

Certificate of Authentication

       This is one of the 8% Notes (Series A) referred to in the within-mentioned Indenture.

<div align="right">

U.S. BANK NATIONAL
ASSOCIATION, not in its individual
capacity but solely in its capacity as
TRUSTEE

</div>

Dated: _____ _____, 201__        By:   _____

                                           Authorized Signatory

(REVERSE OF SECURITY)

8% NOTES (SERIES A)

(1)        <u>Interest</u>.  Mesa Air Group, Inc., a Nevada corporation (the "Company"), promises to pay interest on the principal amount of this Note as follows:  Interest will accrue on this Note at a rate of 8% per annum from the most recent date on which interest has been paid or, if no interest has been paid, from _____ ____, 201__ and shall be payable in Additional Notes having an aggregate principal amount equal to the amount of the installment of interest which is due on such Interest Payment Date quarterly in arrears on each Interest Payment Date, excluding the final Stated Maturity.  All interest will be computed on the basis of a 360-day year, consisting of twelve 30-day months.

The Company shall pay interest in Additional Notes on overdue principal and on overdue installments of interest (without regard to any applicable grace periods and to the extent lawful) from time to time on demand at the rate borne by the Notes plus 2.0% per annum.

(2)        <u>Method of Payment</u>.  The Company shall pay interest on the Notes (except Defaulted Interest) to the Persons who are the registered Holders at the close of business on the Regular Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Regular Record Date.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Company shall pay principal, premium, if any, and interest at the office or agency maintained by the Company for such purpose under the Indenture, in money (except as provided in paragraph 1 above) of the United States that at the time of payment is legal tender for payment of public and private debts ("U.S. Legal Tender").  However, the Company may pay interest by its check payable in such U.S. Legal Tender.  The Company may deliver any such interest payment to the Paying Agent (and in case the Trustee shall then be acting as Paying Agent, the Company shall deposit the aggregate amount of such interest payment with the Trustee no later than 10:00 a.m., New York City time, on such scheduled payment date, in immediately available funds and designated for and sufficient to pay all interest on the Notes then due) or to a Holder at the Holder's registered address set forth in the Register.

(3)        <u>Paying Agent and Registrar</u>.  Initially, U.S. Bank National Association, a national banking association, not in its individual capacity but solely as trustee (the "Trustee"), will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

(4)        <u>Indenture</u>.  The Company issued the Notes under an Indenture, dated as of _____ ____, 201__ (the "Indenture"), by and among the Company, the Guarantors, and the Trustee.  This Note is one of a duly authorized issue of Notes of the Company designated as its 8% Notes (Series A).  Except as provided in paragraph 1 above, the Notes are limited in aggregate principal amount to $[19,400,000].  Capitalized terms herein are used as defined in the Indenture unless otherwise defined herein.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa–77bbbb) (the "TIA"), as in effect on the date of the Indenture.  Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and

Holders of Notes are referred to the Indenture and the TIA for a statement of them.  To the extent any provision of these Notes conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.  The Notes are general unsecured obligations of the Company.

(5)        Repurchase Option.  Section 10.5 of the Indenture provides that, in the event of a Fundamental Change, and subject to the further limitations contained therein, the Company will repurchase, at the Holder's option, all of such Holder's Notes.

(6)        [RESERVED.]

(7)        Mandatory Redemption.  Section 10.6 of the Indenture provides that, upon the occurrence of a Spirit Liquidity Event, and subject to further limitations contained therein, the Company will make an offer to redeem the Notes in accordance with the procedures set forth in the Indenture.

(8)        Notice of Redemption.  Notice of redemption shall be mailed at least thirty (30) days but not more than sixty (60) days before the Redemption Date to each Holder of Notes to be redeemed at such Holder's registered address set forth in the Register.  Notes in denominations larger than $1,000 may be redeemed in part.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date, then, unless the Company defaults in the payment of such Redemption Price plus accrued interest, if any, the Notes called for redemption will cease to bear interest from and after such Redemption Date and the only right of the Holders of such Notes will be to receive payment of the Redemption Price plus accrued interest, if any.

(9)        Denominations; Transfer; Exchange.  The Notes are in registered form, without coupons, in denominations of $1,000 or any integral multiple thereof.  A Holder shall register the transfer of or exchange Notes in accordance with the Indenture.  The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay certain transfer taxes or similar governmental charges payable in connection therewith as permitted by the Indenture.  The Registrar need not register the transfer of or exchange of any Notes or portions thereof selected for redemption.

(10)       Persons Deemed Owners.  The registered Holder of a Note shall be treated as the owner of it for all purposes.

(11)       Unclaimed Property.  If money or additional Notes for the payment of principal or interest remains unclaimed for two years, the Trustee and/or the Paying Agent will pay the money or deliver the additional Notes back to the Company.  After that, all liability of the Trustee and such Paying Agent with respect to such money or additional Notes or Common Stock shall cease.

(12)       Discharge Prior to Redemption or Maturity.  If the Company at any time deposits with the Trustee U.S. Legal Tender or Government Obligations sufficient to pay the principal of and interest on the Notes to redemption or Maturity and complies with the other

provisions of the Indenture relating thereto, the Company will be discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding its obligation to pay the principal of and interest on the Notes).

(13)     Amendment; Supplement; Waiver.  Subject to certain exceptions, the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then Outstanding, and any existing Default or Event of Default or noncompliance with any provision of the Indenture or the Notes may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then Outstanding.  Without notice to or consent of any Holder, the parties thereto may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity or correct or supplement any provision in the Indenture which may be defective or inconsistent with any other provision therein.

(14)     Restrictive Covenants.  The Indenture imposes certain limitations on the ability of the Company to, among other things, merge or consolidate with any other Person, sell, convey, transfer or otherwise dispose of all or substantially all of its property or assets.  Such limitations are subject to a number of important qualifications and exceptions.

(15)     Defaults and Remedies.  If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then Outstanding may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture.  Holders of Notes may not enforce the Indenture or the Notes except as provided in the Indenture.  Subject to the terms of the Indenture, the Trustee is not obligated to enforce the Indenture or the Notes unless it has received indemnity reasonably satisfactory to it.  The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then Outstanding to direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) in accordance with the provisions of the Indenture if it determines that withholding notice is in their interest.  The Company is required to file periodic reports and certificates with the Trustee as to the absence of Default.

(16)     Trustee Dealings with Company.  The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

(17)     No Recourse Against Others.  No stockholder, director, officer, employee or incorporator, as such, of the Company or the Guarantor shall have any liability for any obligation of the Company or the Guarantor under the Notes, the Note Guarantee or the Indenture or for any claim based on, in respect of or by reason of, such obligations or their creation.  Each Holder of a Note by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.

(18)     Authentication.  This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

(19)      <u>Governing Law</u>.  The laws of the State of New York shall govern this Note and the Indenture, without regard to principles of conflicts of law.

(20)      <u>Abbreviations and Defined Terms</u>.  Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN CON (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(21)      <u>CUSIP Numbers</u>.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed hereon.

(22)      <u>Indenture</u>.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

(23)      <u>Guarantee</u>.  The Guarantors have unconditionally guaranteed, jointly and severally, to the extent set forth in the Indenture, the due and punctual payment of the principal of, premium, if any, and interest on the Notes when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, and all other obligations of the Company to the Holders or the Trustee under the Indenture and the Notes.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture, which has the text of this Note in larger type.  Requests may be made to:  Mesa Air Group, Inc., 410 North 44th Street, Suite 700, Phoenix, Arizona 85008, Attn:  General Counsel.

A-7

**ASSIGNMENT FORM**

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

_____

(Print or type name, address and zip code and social security or tax ID number of assignee) and irrevocably appoint , agent to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Dated: _____            Signed: _____

(Sign exactly as name appears on the other side of this Note)

Signature
Guarantee:        _____

A-8

**(OPTION OF HOLDER TO ELECT REPURCHASE)**

If you want to elect to have this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, check the box below:

If you want to elect to have only part of this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, state the amount you elect to have repurchased:

$ _____

Dated: _____

_____
NOTICE: The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature
Guarantee: _____

A-8

**EXHIBIT B**

**[FORM OF NOTE]**

**[INSERT GLOBAL NOTE LEGEND AS SPECIFIED IN SECTION 2.4,
IF APPLICABLE]**

CUSIP No.: _____

MESA AIR GROUP, INC.

8% NOTES (SERIES B)

No. B-___                                                                    $[43,200,000]

MESA AIR GROUP, INC., a Nevada corporation (the "Company," which term includes any successor entity), for value received promises to pay to Cede & Co. or registered assigns, the principal sum of FORTY THREE MILLION TWO HUNDRED THOUSAND DOLLARS, on _____ ___, 2016.

Interest Payment Dates:  March 31, June 30, September 30 and December 31, beginning on _____ ___, 20___.

Record Dates:  March 15, June 15, September 15 and December 15.

Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officers and a facsimile of its corporate seal to be affixed hereto or imprinted hereon.

MESA AIR GROUP, INC.

By: _____
Name:
Title:

By: _____
Name:
Title:

Certificate of Authentication

       This is one of the 8% Notes (Series B) referred to in the within-mentioned Indenture.

<table>
<tr><td></td><td>U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely in its capacity as TRUSTEE</td></tr>
<tr><td>Dated: _____ _____, 201__</td><td>By:      _____<br>Authorized Signatory</td></tr>
</table>

(REVERSE OF SECURITY)

8% NOTES (SERIES B)

(1)    <u>Interest</u>.  Mesa Air Group, Inc., a Nevada corporation (the "Company"), promises to pay interest on the principal amount of this Note as follows:  Interest will accrue on this Note at a rate of 8% per annum from the most recent date on which interest has been paid or, if no interest has been paid, from _____ ____, 201__ and shall be payable in Additional Notes having an aggregate principal amount equal to the amount of the installment of interest which is due on such Interest Payment Date quarterly in arrears on each Interest Payment Date, excluding the final Stated Maturity.  All interest will be computed on the basis of a 360-day year, consisting of twelve 30-day months.

The Company shall pay interest in Additional Notes on overdue principal and on overdue installments of interest (without regard to any applicable grace periods and to the extent lawful) from time to time on demand at the rate borne by the Notes plus 2.0% per annum.

(2)    <u>Method of Payment</u>.  The Company shall pay interest on the Notes (except Defaulted Interest) to the Persons who are the registered Holders at the close of business on the Regular Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Regular Record Date.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Company shall pay principal, premium, if any, and interest at the office or agency maintained by the Company for such purpose under the Indenture, in money (except as provided in paragraph 1 above) of the United States that at the time of payment is legal tender for payment of public and private debts ("U.S. Legal Tender").  However, the Company may pay interest by its check payable in such U.S. Legal Tender.  The Company may deliver any such interest payment to the Paying Agent (and in case the Trustee shall then be acting as Paying Agent, the Company shall deposit the aggregate amount of such interest payment with the Trustee no later than 10:00 a.m., New York City time, on such scheduled payment date, in immediately available funds and designated for and sufficient to pay all interest on the Notes then due) or to a Holder at the Holder's registered address set forth in the Register.

(3)    <u>Paying Agent and Registrar</u>.  Initially, U.S. Bank National Association, a national banking association, not in its individual capacity but solely as trustee (the "Trustee"), will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

(4)    <u>Indenture</u>.  The Company issued the Notes under an Indenture, dated as of _____ ____, 201__ (the "Indenture"), by and among the Company, the Guarantors, and the Trustee.  This Note is one of a duly authorized issue of Notes of the Company designated as its 8% Notes (Series B).  Except as provided in paragraph 1 above, the Notes are limited in aggregate principal amount to $[43,200,000].  Capitalized terms herein are used as defined in the Indenture unless otherwise defined herein.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa–77bbbb) (the "TIA"), as in effect on the date of the Indenture.  Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and

Holders of Notes are referred to the Indenture and the TIA for a statement of them.  To the extent any provision of these Notes conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.  The Notes are general unsecured obligations of the Company.

(5)     Repurchase Option.  Section 10.5 of the Indenture provides that, in the event of a Fundamental Change, and subject to the further limitations contained therein, the Company will repurchase, at the Holder's option, all of such Holder's Notes.

(6)     [RESERVED.]

(7)     Mandatory Redemption.  Section 10.6 of the Indenture provides that, upon the occurrence of a Spirit Liquidity Event, and subject to further limitations contained therein, the Company will make an offer to redeem the Notes in accordance with the procedures set forth in the Indenture.

(8)     Notice of Redemption.  Notice of redemption shall be mailed at least thirty (30) days but not more than sixty (60) days before the Redemption Date to each Holder of Notes to be redeemed at such Holder's registered address set forth in the Register.  Notes in denominations larger than $1,000 may be redeemed in part.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date, then, unless the Company defaults in the payment of such Redemption Price plus accrued interest, if any, the Notes called for redemption will cease to bear interest from and after such Redemption Date and the only right of the Holders of such Notes will be to receive payment of the Redemption Price plus accrued interest, if any.

(9)     Denominations; Transfer; Exchange.  The Notes are in registered form, without coupons, in denominations of $1,000 or any integral multiple thereof.  A Holder shall register the transfer of or exchange Notes in accordance with the Indenture.  The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay certain transfer taxes or similar governmental charges payable in connection therewith as permitted by the Indenture.  The Registrar need not register the transfer of or exchange of any Notes or portions thereof selected for redemption.

(10)    Persons Deemed Owners.  The registered Holder of a Note shall be treated as the owner of it for all purposes.

(11)    Unclaimed Property.  If money or additional Notes for the payment of principal or interest remains unclaimed for two years, the Trustee and/or the Paying Agent will pay the money or deliver the additional Notes back to the Company.  After that, all liability of the Trustee and such Paying Agent with respect to such money or additional Notes or Common Stock shall cease.

(12)    Discharge Prior to Redemption or Maturity.  If the Company at any time deposits with the Trustee U.S. Legal Tender or Government Obligations sufficient to pay the principal of and interest on the Notes to redemption or Maturity and complies with the other

provisions of the Indenture relating thereto, the Company will be discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding its obligation to pay the principal of and interest on the Notes).

(13)     Amendment; Supplement; Waiver.  Subject to certain exceptions, the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then Outstanding, and any existing Default or Event of Default or noncompliance with any provision of the Indenture or the Notes may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then Outstanding.  Without notice to or consent of any Holder, the parties thereto may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity or correct or supplement any provision in the Indenture which may be defective or inconsistent with any other provision therein.

(14)     Restrictive Covenants.  The Indenture imposes certain limitations on the ability of the Company to, among other things, merge or consolidate with any other Person, sell, convey, transfer or otherwise dispose of all or substantially all of its property or assets.  Such limitations are subject to a number of important qualifications and exceptions.

(15)     Defaults and Remedies.  If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then Outstanding may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture.  Holders of Notes may not enforce the Indenture or the Notes except as provided in the Indenture.  Subject to the terms of the Indenture, the Trustee is not obligated to enforce the Indenture or the Notes unless it has received indemnity reasonably satisfactory to it. The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then Outstanding to direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) in accordance with the provisions of the Indenture if it determines that withholding notice is in their interest. The Company is required to file periodic reports and certificates with the Trustee as to the absence of Default.

(16)     Trustee Dealings with Company.  The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

(17)     No Recourse Against Others.  No stockholder, director, officer, employee or incorporator, as such, of the Company or the Guarantor shall have any liability for any obligation of the Company or the Guarantor under the Notes, the Note Guarantee or the Indenture or for any claim based on, in respect of or by reason of, such obligations or their creation.  Each Holder of a Note by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.

(18)     Authentication.  This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

(19)     Governing Law.  The laws of the State of New York shall govern this Note and the Indenture, without regard to principles of conflicts of law.

(20)     Abbreviations and Defined Terms.  Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN CON (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(21)     CUSIP Numbers.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed hereon.

(22)     Indenture.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

(23)     Guarantee.  The Guarantors have unconditionally guaranteed, jointly and severally, to the extent set forth in the Indenture, the due and punctual payment of the principal of, premium, if any, and interest on the Notes when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, and all other obligations of the Company to the Holders or the Trustee under the Indenture and the Notes.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture, which has the text of this Note in larger type.  Requests may be made to:  Mesa Air Group, Inc., 410 North 44th Street, Suite 700, Phoenix, Arizona 85008, Attn:  General Counsel.

## ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

_____

(Print or type name, address and zip code and social security or tax ID number of assignee) and irrevocably appoint , agent to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Dated: _____        Signed: _____

(Sign exactly as name appears on the other side of this Note)

Signature
Guarantee:        _____

## (OPTION OF HOLDER TO ELECT REPURCHASE)

If you want to elect to have this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, check the box below:

If you want to elect to have only part of this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, state the amount you elect to have repurchased:

$ _____

Dated: _____

_____
NOTICE: The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature
Guarantee: _____

**EXHIBIT C**

**[FORM OF NOTE]**

**[INSERT GLOBAL NOTE LEGEND AS SPECIFIED IN SECTION 2.4,
IF APPLICABLE]**

CUSIP No.: _____

MESA AIR GROUP, INC.

U.S. AIRWAYS NOTES

No. U.S.-___                                                                              $[6,800,000]

MESA AIR GROUP, INC., a Nevada corporation (the "Company," which term includes any successor entity), for value received promises to pay to Cede & Co. or registered assigns, the principal sum of SIX MILLION EIGHT HUNDRED THOUSAND DOLLARS, on _____ ___, 2016.

Interest Payment Dates:  March 31, June 30, September 30 and December 31, beginning on _____ ___, 20___.

Record Dates:  March 15, June 15, September 15 and December 15.

Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officers and a facsimile of its corporate seal to be affixed hereto or imprinted hereon.

MESA AIR GROUP, INC.

By: _____
Name:
Title:

By: _____
Name:
Title:

C-2

Certificate of Authentication

   This is one of the U.S. Airways Notes referred to in the within-mentioned Indenture.

<div align="right">

U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity but solely in its capacity as TRUSTEE

</div>

Dated: _____ _____, 201__      By:   _____

                       Authorized Signatory

(REVERSE OF SECURITY)

U.S. AIRWAYS NOTES

(1)      Interest.  Mesa Air Group, Inc., a Nevada corporation (the "Company"), promises to pay interest on the principal amount of this Note as follows:  Interest will accrue on this Note at a rate of 8% per annum from the most recent date on which interest has been paid or, if no interest has been paid, from _____ ____, 201__ and shall be payable in Additional Notes having an aggregate principal amount equal to the amount of the installment of interest which is due on such Interest Payment Date quarterly in arrears on each Interest Payment Date, excluding the final Stated Maturity.  All interest will be computed on the basis of a 360-day year, consisting of twelve 30-day months.

The Company shall pay interest in Additional Notes on overdue principal and on overdue installments of interest (without regard to any applicable grace periods and to the extent lawful) from time to time on demand at the rate borne by the Notes plus 2.0% per annum.

(2)      Method of Payment.  The Company shall pay interest on the Notes (except Defaulted Interest) to the Persons who are the registered Holders at the close of business on the Regular Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Regular Record Date.  Holders must surrender Notes to a Paying Agent to collect principal payments.  The Company shall pay principal, premium, if any, and interest at the office or agency maintained by the Company for such purpose under the Indenture, in money (except as provided in paragraph 1 above) of the United States that at the time of payment is legal tender for payment of public and private debts ("U.S. Legal Tender").  However, the Company may pay interest by its check payable in such U.S. Legal Tender.  The Company may deliver any such interest payment to the Paying Agent (and in case the Trustee shall then be acting as Paying Agent, the Company shall deposit the aggregate amount of such interest payment with the Trustee no later than 10:00 a.m., New York City time, on such scheduled payment date, in immediately available funds and designated for and sufficient to pay all interest on the Notes then due) or to a Holder at the Holder's registered address set forth in the Register.

(3)      Paying Agent and Registrar.  Initially, U.S. Bank National Association, a national banking association, not in its individual capacity but solely as trustee (the "Trustee"), will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

(4)      Indenture.  The Company issued the Notes under an Indenture, dated as of _____ ____, 201__ (the "Indenture"), by and among the Company, the Guarantors, and the Trustee.  This Note is one of a duly authorized issue of Notes of the Company designated as its U.S. Airways Notes.  Except as provided in paragraph 1 above, the Notes are limited in aggregate principal amount to $[6,800,000].  Capitalized terms herein are used as defined in the Indenture unless otherwise defined herein.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa–77bbbb) (the "TIA"), as in effect on the date of the Indenture.  Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and

Holders of Notes are referred to the Indenture and the TIA for a statement of them. To the extent any provision of these Notes conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are general unsecured obligations of the Company.

(5)     Repurchase Option. Section 10.5 of the Indenture provides that, in the event of a Fundamental Change, and subject to the further limitations contained therein, the Company will repurchase, at the Holder's option, all of such Holder's Notes.

(6)     [RESERVED.]

(7)     Mandatory Redemption. Section 10.6 of the Indenture provides that, upon the occurrence of a Spirit Liquidity Event, and subject to further limitations contained therein, the Company will make an offer to redeem the Notes in accordance with the procedures set forth in the Indenture.

(8)     Notice of Redemption. Notice of redemption shall be mailed at least thirty (30) days but not more than sixty (60) days before the Redemption Date to each Holder of Notes to be redeemed at such Holder's registered address set forth in the Register. Notes in denominations larger than $1,000 may be redeemed in part.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date, then, unless the Company defaults in the payment of such Redemption Price plus accrued interest, if any, the Notes called for redemption will cease to bear interest from and after such Redemption Date and the only right of the Holders of such Notes will be to receive payment of the Redemption Price plus accrued interest, if any.

(9)     Denominations; Transfer; Exchange. The Notes are in registered form, without coupons, in denominations of $1,000 or any integral multiple thereof. A Holder shall register the transfer of or exchange Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay certain transfer taxes or similar governmental charges payable in connection therewith as permitted by the Indenture. The Registrar need not register the transfer of or exchange of any Notes or portions thereof selected for redemption.

(10)     Persons Deemed Owners. The registered Holder of a Note shall be treated as the owner of it for all purposes.

(11)     Unclaimed Property. If money or additional Notes for the payment of principal or interest remains unclaimed for two years, the Trustee and/or the Paying Agent will pay the money or deliver the additional Notes back to the Company. After that, all liability of the Trustee and such Paying Agent with respect to such money or additional Notes or Common Stock shall cease.

(12)     Discharge Prior to Redemption or Maturity. If the Company at any time deposits with the Trustee U.S. Legal Tender or Government Obligations sufficient to pay the principal of and interest on the Notes to redemption or Maturity and complies with the other

provisions of the Indenture relating thereto, the Company will be discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding its obligation to pay the principal of and interest on the Notes).

(13)    Amendment; Supplement; Waiver.  Subject to certain exceptions, the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then Outstanding, and any existing Default or Event of Default or noncompliance with any provision of the Indenture or the Notes may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then Outstanding.  Without notice to or consent of any Holder, the parties thereto may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity or correct or supplement any provision in the Indenture which may be defective or inconsistent with any other provision therein.

(14)    Restrictive Covenants.  The Indenture imposes certain limitations on the ability of the Company to, among other things, merge or consolidate with any other Person, sell, convey, transfer or otherwise dispose of all or substantially all of its property or assets.  Such limitations are subject to a number of important qualifications and exceptions.

(15)    Defaults and Remedies.  If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then Outstanding may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture.  Holders of Notes may not enforce the Indenture or the Notes except as provided in the Indenture.  Subject to the terms of the Indenture, the Trustee is not obligated to enforce the Indenture or the Notes unless it has received indemnity reasonably satisfactory to it. The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then Outstanding to direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) in accordance with the provisions of the Indenture if it determines that withholding notice is in their interest. The Company is required to file periodic reports and certificates with the Trustee as to the absence of Default.

(16)    Trustee Dealings with Company.  The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

(17)    No Recourse Against Others.  No stockholder, director, officer, employee or incorporator, as such, of the Company or the Guarantor shall have any liability for any obligation of the Company or the Guarantor under the Notes, the Note Guarantee or the Indenture or for any claim based on, in respect of or by reason of, such obligations or their creation.  Each Holder of a Note by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.

(18)    Authentication.  This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

(19)     <u>Governing Law</u>.  The laws of the State of New York shall govern this Note and the Indenture, without regard to principles of conflicts of law.

(20)     <u>Abbreviations and Defined Terms</u>.  Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN CON (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(21)     <u>CUSIP Numbers</u>.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed hereon.

(22)     <u>Indenture</u>.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

(23)     <u>Guarantee</u>.  The Guarantors have unconditionally guaranteed, jointly and severally, to the extent set forth in the Indenture, the due and punctual payment of the principal of, premium, if any, and interest on the Notes when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, and all other obligations of the Company to the Holders or the Trustee under the Indenture and the Notes.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture, which has the text of this Note in larger type.  Requests may be made to:  Mesa Air Group, Inc., 410 North 44th Street, Suite 700, Phoenix, Arizona 85008, Attn:  General Counsel.

**ASSIGNMENT FORM**

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

_____

(Print or type name, address and zip code and social security or tax ID number of assignee) and irrevocably appoint , agent to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Dated: _____          Signed: _____

(Sign exactly as name appears on the other side of this Note)

Signature
Guarantee:          _____

### (OPTION OF HOLDER TO ELECT REPURCHASE)

If you want to elect to have this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, check the box below:

If you want to elect to have only part of this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, state the amount you elect to have repurchased:

$ _____

Dated:  _____

_____

NOTICE: The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature
Guarantee:  _____

C-8

**EXHIBIT D**

**[FORM OF NOTE]**

**[INSERT GLOBAL NOTE LEGEND AS SPECIFIED IN SECTION 2.4,
IF APPLICABLE]**

CUSIP No.:  _____

MESA AIR GROUP, INC.

MANAGEMENT NOTES

No. M-___                                                                     $[5,500,000]

MESA AIR GROUP, INC., a Nevada corporation (the "Company," which term includes any successor entity), for value received promises to pay to Cede & Co. or registered assigns, the principal sum of FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS, on _____ ___, 2016.

Interest Payment Dates:  March 31, June 30, September 30 and December 31, beginning on _____ ___, 20___.

Record Dates:  March 15, June 15, September 15 and December 15.

Reference is made to the further provisions of this Note contained herein, which will for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officers and a facsimile of its corporate seal to be affixed hereto or imprinted hereon.

MESA AIR GROUP, INC.

By:  _____
Name:
Title:

By:  _____
Name:
Title:

D-2

Certificate of Authentication

This is one of the Management Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL
ASSOCIATION, not in its individual
capacity but solely in its capacity as
TRUSTEE

Dated: _____ _____, 201__          By: _____

Authorized Signatory

(REVERSE OF SECURITY)

MANAGEMENT NOTES

(1)    Interest.  Mesa Air Group, Inc., a Nevada corporation (the "Company"), promises to pay interest on the principal amount of this Note as follows:  Interest will accrue on this Note at a rate of 8% per annum from the most recent date on which interest has been paid or, if no interest has been paid, from _____ ____, 201__ and shall be payable in Additional Notes having an aggregate principal amount equal to the amount of the installment of interest which is due on such Interest Payment Date quarterly in arrears on each Interest Payment Date, excluding the final Stated Maturity.  All interest will be computed on the basis of a 360-day year, consisting of twelve 30-day months.

The Company shall pay interest in Additional Notes on overdue principal and on overdue installments of interest (without regard to any applicable grace periods and to the extent lawful) from time to time on demand at the rate borne by the Notes plus 2.0% per annum.

(2)    Method of Payment.  The Company shall pay interest on the Notes (except Defaulted Interest) to the Persons who are the registered Holders at the close of business on the Regular Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Regular Record Date. Holders must surrender Notes to a Paying Agent to collect principal payments.  The Company shall pay principal, premium, if any, and interest at the office or agency maintained by the Company for such purpose under the Indenture, in money (except as provided in paragraph 1 above) of the United States that at the time of payment is legal tender for payment of public and private debts ("U.S. Legal Tender").  However, the Company may pay interest by its check payable in such U.S. Legal Tender.  The Company may deliver any such interest payment to the Paying Agent (and in case the Trustee shall then be acting as Paying Agent, the Company shall deposit the aggregate amount of such interest payment with the Trustee no later than 10:00 a.m., New York City time, on such scheduled payment date, in immediately available funds and designated for and sufficient to pay all interest on the Notes then due) or to a Holder at the Holder's registered address set forth in the Register.

(3)    Paying Agent and Registrar.  Initially, U.S. Bank National Association, a national banking association, not in its individual capacity but solely as trustee (the "Trustee"), will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

(4)    Indenture.  The Company issued the Notes under an Indenture, dated as of _____ ____, 201__ (the "Indenture"), by and among the Company, the Guarantors, and the Trustee.  This Note is one of a duly authorized issue of Notes of the Company designated as its Management Notes.  Except as provided in paragraph 1 above, the Notes are limited in aggregate principal amount to $[5,500,000].  Capitalized terms herein are used as defined in the Indenture unless otherwise defined herein.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa–77bbbb) (the "TIA"), as in effect on the date of the Indenture. Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and

Holders of Notes are referred to the Indenture and the TIA for a statement of them. To the extent any provision of these Notes conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are general unsecured obligations of the Company.

(5)     Repurchase Option. Section 10.5 of the Indenture provides that, in the event of a Fundamental Change, and subject to the further limitations contained therein, the Company will repurchase, at the Holder's option, all of such Holder's Notes.

(6)     [RESERVED.]

(7)     Mandatory Redemption. Section 10.6 of the Indenture provides that, upon the occurrence of a Spirit Liquidity Event, and subject to further limitations contained therein, the Company will make an offer to redeem the Notes in accordance with the procedures set forth in the Indenture.

(8)     Notice of Redemption. Notice of redemption shall be mailed at least thirty (30) days but not more than sixty (60) days before the Redemption Date to each Holder of Notes to be redeemed at such Holder's registered address set forth in the Register. Notes in denominations larger than $1,000 may be redeemed in part.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date, then, unless the Company defaults in the payment of such Redemption Price plus accrued interest, if any, the Notes called for redemption will cease to bear interest from and after such Redemption Date and the only right of the Holders of such Notes will be to receive payment of the Redemption Price plus accrued interest, if any.

(9)     Denominations; Transfer; Exchange. The Notes are in registered form, without coupons, in denominations of $1,000 or any integral multiple thereof. A Holder shall register the transfer of or exchange Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay certain transfer taxes or similar governmental charges payable in connection therewith as permitted by the Indenture. The Registrar need not register the transfer of or exchange of any Notes or portions thereof selected for redemption.

(10)     Persons Deemed Owners. The registered Holder of a Note shall be treated as the owner of it for all purposes.

(11)     Unclaimed Property. If money or additional Notes for the payment of principal or interest remains unclaimed for two years, the Trustee and/or the Paying Agent will pay the money or deliver the additional Notes back to the Company. After that, all liability of the Trustee and such Paying Agent with respect to such money or additional Notes or Common Stock shall cease.

(12)     Discharge Prior to Redemption or Maturity. If the Company at any time deposits with the Trustee U.S. Legal Tender or Government Obligations sufficient to pay the principal of and interest on the Notes to redemption or Maturity and complies with the other

provisions of the Indenture relating thereto, the Company will be discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding its obligation to pay the principal of and interest on the Notes).

(13)    Amendment; Supplement; Waiver.  Subject to certain exceptions, the Indenture or the Notes may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then Outstanding, and any existing Default or Event of Default or noncompliance with any provision of the Indenture or the Notes may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then Outstanding.  Without notice to or consent of any Holder, the parties thereto may amend or supplement the Indenture or the Notes to, among other things, cure any ambiguity or correct or supplement any provision in the Indenture which may be defective or inconsistent with any other provision therein.

(14)    Restrictive Covenants.  The Indenture imposes certain limitations on the ability of the Company to, among other things, merge or consolidate with any other Person, sell, convey, transfer or otherwise dispose of all or substantially all of its property or assets.  Such limitations are subject to a number of important qualifications and exceptions.

(15)    Defaults and Remedies.  If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then Outstanding may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture.  Holders of Notes may not enforce the Indenture or the Notes except as provided in the Indenture.  Subject to the terms of the Indenture, the Trustee is not obligated to enforce the Indenture or the Notes unless it has received indemnity reasonably satisfactory to it.  The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then Outstanding to direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) in accordance with the provisions of the Indenture if it determines that withholding notice is in their interest.  The Company is required to file periodic reports and certificates with the Trustee as to the absence of Default.

(16)    Trustee Dealings with Company.  The Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

(17)    No Recourse Against Others.  No stockholder, director, officer, employee or incorporator, as such, of the Company or the Guarantor shall have any liability for any obligation of the Company or the Guarantor under the Notes, the Note Guarantee or the Indenture or for any claim based on, in respect of or by reason of, such obligations or their creation.  Each Holder of a Note by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.

(18)    Authentication.  This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

(19)   <u>Governing Law</u>.  The laws of the State of New York shall govern this Note and the Indenture, without regard to principles of conflicts of law.

(20)   <u>Abbreviations and Defined Terms</u>.  Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN CON (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(21)   <u>CUSIP Numbers</u>.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed hereon.

(22)   <u>Indenture</u>.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

(23)   <u>Guarantee</u>.  The Guarantors have unconditionally guaranteed, jointly and severally, to the extent set forth in the Indenture, the due and punctual payment of the principal of, premium, if any, and interest on the Notes when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, and all other obligations of the Company to the Holders or the Trustee under the Indenture and the Notes.

The payment by the Company of the principal of, premium, if any, and interest on all Management Notes issued under the Indenture and under any supplemental indenture shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full of all the 8% Notes (Series A), 8% Notes (Series B), and US Airways Notes, whether Outstanding at the date of the Indenture or thereafter incurred.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture, which has the text of this Note in larger type.  Requests may be made to:  Mesa Air Group, Inc., 410 North 44th Street, Suite 700, Phoenix, Arizona 85008, Attn:  General Counsel.

**ASSIGNMENT FORM**

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

_____

(Print or type name, address and zip code and social security or tax ID number of assignee) and irrevocably appoint  , agent to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Dated: _____          Signed: _____

(Sign exactly as name appears on the other side of this Note)

Signature
Guarantee:        _____

**(OPTION OF HOLDER TO ELECT REPURCHASE)**

If you want to elect to have this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, check the box below:

If you want to elect to have only part of this Note repurchased by the Company pursuant to Section 10.5 of the Indenture, state the amount you elect to have repurchased:

$ _____

Dated: _____

| | |
|---|---|
| | _____ |
| | NOTICE: The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker. |

Signature
Guarantee: _____

D-8

**EXHIBIT E**

## FORM OF NOTATION OF GUARANTEE

For value received, the Guarantor (which term includes any successor Person under the Indenture) has unconditionally guaranteed, to the extent set forth in the Indenture (the "Indenture") among Mesa Air Group, Inc. (the "Company"), each Guarantor and U.S. Bank National Association, as trustee (the "Trustee"), (a) the due and punctual payment of the principal of, premium, if any, and interest on the Notes (as defined in the Indenture), whether at maturity, by acceleration, redemption or otherwise, the due and punctual payment of interest on overdue principal of and interest on the Notes, if any, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms of the Indenture and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.  The obligations of the Guarantor to the Holders of Notes and to the Trustee pursuant to the Note Guarantee and the Indenture are expressly set forth in Article 11 of the Indenture and reference is hereby made to the Indenture for the precise terms of the Note Guarantee.

MESA AIR GROUP, INC.

By: _____
Name:
Title:

MESA AIRLINES, INC.
MPD, INC.
REGIONAL AIRCRAFT SERVICES, INC.
MESA AIR GROUP – AIRCRAFT INVENTORY
    MANAGEMENT, LLC
NILCHII, INC.
MESA IN-FLIGHT, INC., as GUARANTORS

By: _____
Name: _____
Title: _____

WEST\222568871.10

# EXHIBIT E

## (New Warrant Agreement)

WEST\222568871.10

**[FORM OF WARRANT]**

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS WARRANT NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.    THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT OR ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SAID ACT.    THE EXERCISE OF THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE HEREOF ARE SUBJECT TO THE RESTRICTIONS SET FORTH IN THE COMPANY'S AMENDED AND RESTATED ARTICLES OF INCORPORATION AND THE TERMS OF THE SHAREHOLDERS AGREEMENT REQUIRED TO BE EXECUTED PURSUANT TO THE TERMS OF THE COMPANY'S SECOND AMENDED JOINT PLAN OF REORGANIZATION FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (THE "SHAREHOLDERS AGREEMENT").**

**MESA AIR GROUP, INC.**

**WARRANT TO PURCHASE COMMON STOCK**

Warrant No.: _____
Number of Shares of Common Stock: _____
Date of Issuance: _____, 2011 ("Issuance Date")

         Mesa Air Group, Inc., a Nevada corporation (the "Company"), hereby certifies that, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [BUYER], the registered holder hereof or its permitted assigns (the "Holder"), is entitled, subject to the terms set forth below, to purchase from the Company, at the Exercise Price (as defined below) then in effect, upon surrender of this Warrant to Purchase Common Stock (including any Warrants to purchase Common Stock issued in exchange, transfer or replacement hereof, the "Warrant"), at any time or times on or after the Issuance Date, but not after 11:59 p.m., New York Time, on the Expiration Date (as defined below), _____ (_____ ) fully paid and nonassessable shares of Common Stock (as defined below) (the "Warrant Shares").  Except as otherwise defined herein, capitalized terms in this Warrant shall have the meanings set forth in Section 16.  This Warrant is one of the Warrants to purchase Common Stock (the

"Warrants") issued to Non-U.S Citizens (as defined in the Plan) pursuant to the Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors under Chapter 11 of the Bankruptcy Code as filed in the United States Bankruptcy for the Southern District of New York on September 20, 2010 (as theretofore amended, the "Plan").

1.      EXERCISE OF WARRANT.

        (a)      Mechanics of Exercise.  Subject to the terms and conditions hereof, this Warrant may be exercised by the Holder on any day on or after the date hereof in whole or in part, by (i) delivery of a written notice, in the form attached hereto as Exhibit A (the "Exercise Notice"), of the Holder's election to exercise this Warrant, and (ii) (A) payment to the Company of an amount equal to the applicable Exercise Price multiplied by the number of Warrant Shares as to which this Warrant is being exercised (the "Aggregate Exercise Price") in cash or wire transfer of immediately available funds or (B) by notifying the Company that this Warrant is being exercised pursuant to a Cashless Exercise (as defined in Section 1(c)).  The Holder shall not be required to deliver the original Warrant in order to effect an exercise hereunder.  Execution and delivery by the Holder of an Exercise Notice with respect to less than all of the Warrant Shares shall be deemed to be a request by such Holder to cancel the original Warrant and issue a new Warrant evidencing the right to purchase the remaining number of Warrant Shares, which request shall be satisfied by the Company.  On or before the first (1st) Business Day following the date on which the Company has received each of the Exercise Notice and the Aggregate Exercise Price (or notice of a Cashless Exercise) (the "Exercise Delivery Documents"), the Company shall transmit by facsimile an acknowledgment of confirmation of receipt of the Exercise Delivery Documents to the Holder and the Company's transfer agent (the "Transfer Agent").  On or before the third (3rd) Trading Day following the date on which the Company has received all of the Exercise Delivery Documents (the "Share Delivery Date"), the Company shall (X) provided that the Transfer Agent is participating in The Depository Trust Company ("DTC") Fast Automated Securities Transfer Program, upon the request of the Holder, credit such aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit Withdrawal Agent Commission system which balance account shall be specified in the Exercise Notice, or (Y) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and dispatch by overnight courier to the address as specified in the Exercise Notice, a certificate, registered in the Company's share register in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder is entitled pursuant to such exercise.  Upon delivery of the Exercise Delivery Documents or notification to the Company of a Cashless Exercise referred to in Section 1(c), the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date such Warrant Shares are credited to the Holder's DTC account or the date of delivery of the certificates evidencing such Warrant Shares, as the case may be.  If this Warrant is submitted in connection with any exercise pursuant to this Section 1(a) and the number of Warrant Shares represented by this Warrant submitted for exercise is greater than the number of Warrant Shares being acquired upon such exercise as specified in the Exercise Notice, then the Company shall as soon as practicable and in no event later than five (5) Business Days after such exercise and at its own expense, issue a new Warrant (in accordance with Section 7(d)) representing the right to

purchase the number of Warrant Shares purchasable immediately prior to such exercise under this Warrant, less the number of Warrant Shares with respect to which this Warrant is exercised as specified in the Exercise Notice. No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but rather the number of shares of Common Stock to be issued shall be rounded up to the nearest whole number.  The Company shall pay any and all taxes which may be payable with respect to the issuance and delivery of Warrant Shares upon exercise of this Warrant.

(b)     Exercise Price.  For purposes of this Warrant, "Exercise Price" means $0.01 per Warrant Share, subject to adjustment as provided herein.

(c)     Cashless Exercise.  Notwithstanding anything contained herein to the contrary, the Holder may, in its sole discretion, exercise this Warrant in whole or in part and, in lieu of making the cash payment otherwise contemplated to be made to the Company upon such exercise in payment of the Aggregate Exercise Price, elect instead to receive upon such exercise the "Net Number" of shares of Common Stock determined according to the following formula (a "Cashless Exercise"):

$$\text{Net Number} = \frac{(A \times B) - (A \times C)}{B}$$

For purposes of the foregoing formula:

A = the total number of shares with respect to which this Warrant is then being exercised.

B = the Closing Sale Price of the shares of Common Stock on the Trading Day immediately preceding the date of the Exercise Notice.

C = the Exercise Price then in effect for the applicable Warrant Shares at the time of such exercise.

(d)     Disputes.  In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the Warrant Shares, the Company shall promptly issue to the Holder the number of Warrant Shares that are not disputed and resolve such dispute in accordance with Section 12.

(e)     Restriction on Exercise.  Holder may not exercise this Warrant to Purchase Common Stock if (i) to the extent doing so would violate the restrictions set forth in Article Eleven of the Company's Amended and Restated Articles of Incorporation; (ii) the Holder is not a "citizen of the United States" as defined in 49 U.S.C. Section 40102(a)(15); or (iii) if the exercise this Warrant would cause the Holder to become a holder of five percent (5%) or more of the then issued and outstanding shares of Common Stock of the Company if such Holder has not executed and delivered the Shareholders Agreement to the Company.

WEST\222885829.1                              3

2.      ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT SHARES. The Exercise Price and the number of Warrant Shares shall be adjusted from time to time as follows:

(a)      Adjustment upon Subdivision or Combination of shares of Common Stock. If the Company at any time on or after the Issuance Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision will be proportionately reduced and the number of Warrant Shares issuable upon exercise of this Warrant will be proportionately increased.  If the Company at any time on or after the Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such combination will be proportionately increased and the number of Warrant Shares issuable upon exercise of this Warrant will be proportionately decreased. Any adjustment under this Section 2(a) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(b)      Other Events.  Anything herein to the contrary notwithstanding, no adjustment in the Exercise Price shall be required unless such adjustment would require an increase or decrease of at least 1% in such price; provided, however, that any adjustments which by reason of this Section 2(b) are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations under this Section 2 shall be made by the Company in good faith and shall be made to the nearest cent or to the nearest one hundredth of a share, as applicable.  No adjustment need be made for a change in the par value of the Company's Common Stock.

3.      RIGHTS UPON DISTRIBUTION OF ASSETS.  If the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "Distribution"), at any time after the issuance of this Warrant, then, in each such case:

(a)      any Exercise Price in effect immediately prior to the close of business on the record date fixed for the determination of holders of shares of Common Stock entitled to receive the Distribution shall be reduced, effective as of the close of business on such record date, to a price determined by multiplying such Exercise Price by a fraction of which (i) the numerator shall be the Closing Bid Price of the shares of Common Stock on the Trading Day immediately preceding such record date minus the value of the Distribution (as determined in good faith by the Company's Board of Directors) applicable to one share of Common Stock, and (ii) the denominator shall be the Closing Bid Price of the shares of Common Stock on the Trading Day immediately preceding such record date; and

(b)      the number of Warrant Shares shall be increased to a number of shares equal to the number of shares of Common Stock obtainable immediately prior to the close of business on the record date fixed for the determination of holders of shares of Common Stock entitled to

receive the Distribution multiplied by the reciprocal of the fraction set forth in the immediately preceding paragraph (a); provided that in the event that the Distribution is of shares of common stock ("Other Shares of Common Stock") of a company whose common shares are traded on a national securities exchange or a national automated quotation system, then the Holder may elect to receive a warrant to purchase Other Shares of Common Stock in lieu of an increase in the number of Warrant Shares, the terms of which shall be identical to those of this Warrant, except that such warrant shall be exercisable into the number of shares of Other Shares of Common Stock that would have been payable to the Holder pursuant to the Distribution had the Holder exercised this Warrant immediately prior to such record date and with an aggregate exercise price equal to the product of the amount by which the exercise price of this Warrant was decreased with respect to the Distribution pursuant to the terms of the immediately preceding paragraph (a) and the number of Warrant Shares calculated in accordance with the first part of this paragraph (b).

4.     PURCHASE RIGHTS; FUNDAMENTAL TRANSACTIONS.

(a)     Purchase Rights.  In addition to any adjustments pursuant to Section 2 above, if at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of shares of Common Stock (the "Purchase Rights"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(b)     Fundamental Transactions.  The Company shall not enter into or be party to a Fundamental Transaction unless the Successor Entity assumes all of the obligations of the Company under this Warrant in accordance with the provisions of this Section (4)(b).  Upon the occurrence of any Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Warrant referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Warrant with the same effect as if such Successor Entity had been named as the Company herein.  Upon consummation of the Fundamental Transaction, the Successor Entity shall deliver to the Holder confirmation that there shall be issued upon exercise of this Warrant at any time after the consummation of the Fundamental Transaction, in lieu of the shares of the Common Stock (or other securities, cash, assets or other property) purchasable upon the exercise of the Warrant prior to such Fundamental Transaction, such shares of the publicly traded Common Stock (or its equivalent) of the Successor Entity (including its Parent Entity) which the Holder would have been entitled to receive upon the happening of such Fundamental Transaction had this Warrant been converted immediately prior to such Fundamental Transaction, as adjusted in accordance with the provisions of this Warrant.  In addition to and not in substitution for any other rights hereunder, prior to the consummation of any Fundamental Transaction pursuant to

which holders of shares of Common Stock are entitled to receive securities or other assets with respect to or in exchange for shares of Common Stock (a "Corporate Event"), the Company shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon an exercise of this Warrant at any time after the consummation of the Corporate Event but prior to the Expiration Date, in lieu of the shares of the Common Stock (or other securities, cash, assets or other property) purchasable upon the exercise of the Warrant prior to such Corporate Event, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights) which the Holder would have been entitled to receive upon the happening of such Corporate Event had the Warrant been exercised immediately prior to such Corporate Event.  The provisions of this Section shall apply similarly and equally to successive Fundamental Transactions and Corporate Events and shall be applied without regard to any limitations on the exercise of this Warrant.

5.    NONCIRCUMVENTION.    The Company hereby covenants and agrees that the Company will not, by amendment of its charter, bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder.  Without limiting the generality of the foregoing, the Company (i) shall not increase the par value of any shares of Common Stock receivable upon the exercise of this Warrant above the Exercise Price then in effect, (ii) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant, and (iii) shall, so long as any of the Warrants are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock, solely for the purpose of effecting the exercise of the Warrants, one hundred percent (100%) of the number of shares of Common Stock as shall from time to time be necessary to effect the exercise of the Warrants then outstanding (without regard to any limitations on exercise).

6.    WARRANT HOLDER NOT DEEMED A STOCKHOLDER.    Except as otherwise specifically provided herein, the Holder, solely in such Person's capacity as a holder of this Warrant, shall not be entitled to vote or receive dividends or be deemed the holder of share capital of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, solely in such Person's capacity as the Holder of this Warrant, any of the rights of a shareholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise, prior to the issuance to the Holder of the Warrant Shares which such Person is then entitled to receive upon the due exercise of this Warrant.  In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a shareholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.  Notwithstanding this Section 6, the Company shall provide the Holder with copies of the same notices and other information given to the stockholders of the Company generally, contemporaneously with the giving thereof to the stockholders.

7.      REISSUANCE OF WARRANTS.

(a)      Transfer of Warrant.  If this Warrant is to be transferred, the Holder shall surrender this Warrant to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Warrant (in accordance with Section 7(d)), registered as the Holder may request, representing the right to purchase the number of Warrant Shares being transferred by the Holder and, if less than the total number of Warrant Shares then underlying this Warrant is being transferred, a new Warrant (in accordance with Section 7(d)) to the Holder representing the right to purchase the number of Warrant Shares not being transferred.

(b)      Lost, Stolen or Mutilated Warrant.  Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Warrant, the Company shall execute and deliver to the Holder a new Warrant (in accordance with Section 7(d)) representing the right to purchase the Warrant Shares then underlying this Warrant.

(c)      Exchangeable for Multiple Warrants.  This Warrant is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Warrant or Warrants (in accordance with Section 7(d)) representing in the aggregate the right to purchase the number of Warrant Shares then underlying this Warrant, and each such new Warrant will represent the right to purchase such portion of such Warrant Shares as is designated by the Holder at the time of such surrender; provided, however, that no Warrants for fractional shares of Common Stock shall be issued.

(d)      Issuance of New Warrants.  Whenever the Company is required to issue a new Warrant pursuant to the terms of this Warrant, such new Warrant (i) shall be of like tenor with this Warrant, (ii) shall represent, as indicated on the face of such new Warrant, the right to purchase the Warrant Shares then underlying this Warrant (or in the case of a new Warrant being issued pursuant to Section 7(a) or Section 7(c), the Warrant Shares designated by the Holder which, when added to the number of shares of Common Stock underlying the other new Warrants issued in connection with such issuance, does not exceed the number of Warrant Shares then underlying this Warrant), (iii) shall have an issuance date, as indicated on the face of such new Warrant which is the same as the Issuance Date, and (iv) shall have the same rights and conditions as this Warrant.

8.      NOTICES.  Whenever notice is required to be given under this Warrant, unless otherwise provided herein, such notice shall be given as follows:

If to the Company:

Mesa Air Group, Inc.
410 North 44th Street, Suite 700
Phoenix, Arizona 85008

Attention:  General Counsel
Facsimile:  (602) 685-4352

with a copy to:

DLA Piper LLP (US)
2525 East Camelback Road, Suite 1000
Phoenix, Arizona  85016-4232
Attention:  Gregory R. Hall, Esq.
Facsimile:  (480) 606-5528

If to the Holder, to its address and facsimile number set forth on the Schedule of Holders attached to this Warrant to Purchase Common Stock, with copies to such Holders representatives as set forth on such Schedule, or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change.  The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Warrant, including in reasonable detail a description of such action and the reason therefore.  Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) promptly following any adjustment of the Exercise Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least fifteen (15) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the shares of Common Stock, (B) with respect to any grants, issuances or sales of any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property to holders of shares of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

9.    AMENDMENT AND WAIVER.  Except as otherwise provided herein, the provisions of this Warrant may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Required Holders; provided that no such action may increase the exercise price of any Warrant or decrease the number of shares or class of stock obtainable upon exercise of any Warrant without the written consent of the Holder.  No such amendment shall be effective to the extent that it applies to less than all of the holders of the Warrants then outstanding.

10.    GOVERNING LAW.  This Warrant shall be governed by and construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Warrant shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

11.    CONSTRUCTION; HEADINGS.  This Warrant shall be deemed to be jointly drafted by the Company and counsel to the unsecured creditors committee under the Plan and shall not be

construed against any person as the drafter hereof. The headings of this Warrant are for convenience of reference and shall not form part of, or affect the interpretation of, this Warrant.

12.    DISPUTE RESOLUTION.  In the case of a dispute as to the determination of the Exercise Price or the arithmetic calculation of the Warrant Shares, the Company shall submit the disputed determinations or arithmetic calculations via facsimile within two (2) Business Days of receipt of the Exercise Notice giving rise to such dispute, as the case may be, to the Holder.  If the Holder and the Company are unable to agree upon such determination or calculation of the Exercise Price or the Warrant Shares within three (3) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile (a) the disputed determination of the Exercise Price, the Closing Bid Price or the Closing Sale Price to an independent, reputable investment bank selected by the Company and approved by the Holder or (b) the disputed arithmetic calculation of the Warrant Shares to the Company's independent, outside accountant.  The Company shall cause at its expense the investment bank or the accountant, as the case may be, to perform the determinations or calculations and notify the Company and the Holder of the results no later than ten Business Days from the time it receives the disputed determinations or calculations.  Such investment bank's or accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

13.    TRANSFER.  This Warrant may be offered for sale, sold, transferred or assigned without the consent of the Company, subject to the restrictions set forth in Article Eleventh of the Company's Amended and Restated Article of Incorporation.

14.    SEVERABILITY. If any provision of this Warrant is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Warrant so long as this Warrant as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.  The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

15.    CERTAIN DEFINITIONS.  For purposes of this Warrant, the following terms shall have the following meanings:

(a)    "Bloomberg" means Bloomberg Financial Markets.

(b)    "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

WEST\222885829.1                                          9

(c)     "Closing Bid Price" and "Closing Sale Price" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the "pink sheets" (the "Pink Sheets") by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.).  If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder.  If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 12.  All such determinations shall be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

(d)     "Common Stock" means (i) the Company's shares of Common Stock, no par value per share, and (ii) any share capital into which such Common Stock shall have been changed or any share capital resulting from a reclassification of such Common Stock.

(e)     "Convertible Securities" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(f)     "Expiration Date" means the date [sixty (60) months] after the Issuance Date or, if such date falls on a day other than a Business Day or on which trading does not take place on the Principal Market (a "Holiday"), the next date that is not a Holiday.

(g)     "Fundamental Transaction" means that (A) the Company shall directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person in any transaction in which the holders of the Company's Common Stock prior to such transaction do not hold a majority of the Company Stock after such transaction, (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company to another Person, or (iii) allow another Person to make a purchase, tender or exchange offer that is accepted by the holders of more than 50% of either the outstanding shares of Common Stock (not including any shares of Common Stock held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (iv) consummate a

stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock purchase agreement or other business combination), or (B) allow any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), to become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock.

(h)      "Options" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(i)      "Parent Entity" of a Person means an entity that, directly or indirectly, controls the applicable Person.

(j)      "Person" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(k)      "Principal Market" means the Pink Sheets.

(l)      "Required Holders" means Holders holding Warrants at least equal to a majority of the Warrant Shares issuable upon exercise of all outstanding Warrants.

(m)      "Successor Entity" means the Person (or, if so elected by the Required Holders, the Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or the Person (or, if so elected by the Required Holders, the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(n)      "Trading Day" means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded; provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York Time).

[Signature Page Follows]

IN WITNESS WHEREOF, the Company has caused this Warrant to Purchase Common Stock to be duly executed as of the Issuance Date set forth above.

MESA AIR GROUP, INC.


By:_____

Name:

Title:

EXHIBIT A

EXERCISE NOTICE

TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS
WARRANT TO PURCHASE COMMON STOCK

MESA AIR GROUP, INC.

TO: CHIEF FINANCIAL OFFICER

The undersigned holder hereby exercises the right to purchase            of the shares of Common Stock ("Warrant Shares") of Mesa Air Group, Inc., a Nevada corporation (the "Company"), evidenced by the attached Warrant to Purchase Common Stock (the "Warrant"). Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1.      Form of Exercise Price.  The Holder intends that payment of the Exercise Price shall be made as:

           †        _____ a "Cash Exercise" with respect to_____ Warrant Shares; and/or

           †        [_____ a "Cashless Exercise" with respect to_____ Warrant Shares.]

2.      Payment of Exercise Price.  In the event that the holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the holder shall pay the Aggregate Exercise Price in the sum of $_____  to the Company in accordance with the terms of the Warrant.

3.      Delivery of Warrant Shares.  The Company shall deliver to the holder _____ Warrant Shares in accordance with the terms of the Warrant.

4.      Certification.  The undersigned hereby certifies that this exercise of the Warrant does not violate Section 1(e) of the Warrant.

Date: _____,_____

_____
   Name of Registered Holder

By_____
   Name:

   Title:

ACKNOWLEDGMENT

The Company hereby acknowledges this Exercise Notice and hereby directs [TRANSFER AGENT] to issue the above indicated number of shares of Common Stock in accordance with the Transfer Agent Instructions dated [_____] [__], 20[__] from the Company and acknowledged and agreed to by [TRANSFER AGENT].

MESA AIR GROUP, INC.


By: _____
    Name:
    Title:

## EXHIBIT F

**(US Airways Investor Rights Agreement)**

WEST\222885829.1

**INVESTOR RIGHTS AGREEMENT**

THIS INVESTOR RIGHTS AGREEMENT (the "**Agreement**") is made as of _____, 2011, by and between MESA AIR GROUP, INC., a Nevada corporation (the "**Company**"), and US AIRWAYS, INC., a Delaware corporation (the "**Investor**").

RECITALS**:**

The Company's wholly owned subsidiary, Mesa Airlines, Inc., a Nevada corporation ("**Mesa**")**,** and the Investor have entered into an Amendment to the Code Share and Revenue Sharing Agreement, dated February 1, 2001, as amended (the "**Amendment**"), of even date herewith, which provides that the Company shall issue to the Investor, pursuant to the Company's Plan of Reorganization, as amended from time to time (the "**Mesa Plan**"), [_____] shares (the "**Shares**") of the Company's common stock, no par value per share (the "**Common Stock**"), representing ten percent of the equity capitalization of the Company on a fully-diluted basis.  The Amendment further provides that the Company and the Investor shall enter into this Agreement in order to provide the Investor with, among other things, certain rights to register shares of the Common Stock held by such Investor, rights to receive information pertaining to the Company and other rights, as further set forth herein.

AGREEMENT**:**

The parties agree as follows:

1.        Registration Rights; Other Matters Relating to the SharesCertain DefinitionsAs used in this Agreement, the following terms have the following respective meanings:

"**Affiliate**" means, with respect to a specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person. For purposes of  this definition, the term "control," including the terms "controlling," "controlled by" and "under common control," means possession, direct or indirect, of power to direct or cause the direction of the management or policies, whether through ownership of voting securities or otherwise.

"**Board**" means the board of directors of the Company.

"**Commission**" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any similar successor federal statute, and the rules and regulations thereunder, all as the same shall be in effect from time to time.

"**Holder**" means (i) the Investor and (ii) any Person holding Registrable Securities to whom the rights under this Agreement have been transferred in accordance with Section 1.11 hereof.

"**Indenture**" shall have the definition set forth in Section 2.3(f).

"**Initiating Holder(s)**" means any Holder or Holders who propose to register securities, the aggregate offering price of which, net of underwriting discounts and commissions, is at least $500,000.

"**Notes**" shall have the definition set forth in Section 2.3(f) of this Agreement.

"**Other Stockholders**" means Persons other than Holders who, by virtue of agreements with the Company, are entitled to include their securities in certain registrations hereunder.

"**Person**" shall mean any individual, partnership, limited liability company, corporation, trust, unincorporated organization, government or agency or political subdivision thereof.

The terms "**register**," "**registered**" and "**registration**" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness of such registration statement by the Commission.

"**Registration Expenses**" shall mean all expenses incurred by the Company in complying with Section 1 hereof, including, without limitation, all registration, qualification, listing and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company, blue sky fees and expenses, and the expense of any special audits incident to or required by any such registration (but excluding the compensation of regular employees of the Company, which shall be paid in any event by the Company), but shall not include Selling Expenses.

"**Registrable Securities**" shall mean (i) the Shares and (ii) any securities of the Company issued as a dividend or other distribution with respect to or in exchange for or in replacement of the Shares.

"**Rule 144**" means Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

"**Rule 145**" means Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

"**Sale of the Company**" means, at any time following the date of this Agreement, the occurrence of any of the following:  (i) the consummation of any transaction or series of related transactions in which any "person" or "group" (as such terms are used in Section 13(d)(3) of the Exchange Act) "beneficially owns" (as such term is defined in Section 13(d)(3) of the Exchange Act) more than 50% of the Common Stock (calculated on an as-if-converted and fully diluted basis), (ii) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its subsidiaries, taken as a whole, to any "person" or "group" (as such terms are used in Section 13(d)(3) of the Exchange Act), or

2

WEST\222873106. 2

(iii) the consummation of any transaction, or series of related transactions (including, without limitation, any merger or consolidation), the result of which is that any "person" or "group" (as such terms are used in Section 13(d)(3) of the Exchange Act) becomes the "beneficial owner" (as such term is used in Section 13(d)(3) of the Exchange Act), directly or indirectly, of more than 50% of the Common Stock or, as applicable, more than 50% of the equity of the entity surviving such transaction.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or any similar federal statute and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"**Selling Expenses**" shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of the Registrable Securities by the Holders, and fees and disbursements of counsel for any Holder.

1.2      Registration on Form S-3Request for Registration on Form S-3.  If at any time when it is eligible to use a Form S-3 registration statement, the Company shall receive from the Initiating Holder(s) a written request that the Company effect a registration on Form S-3, the Company will:

(i)      Promptly deliver written notice of the proposed registration to all other Holders; and

(ii)      As soon as practicable, use its reasonable best efforts to effect such registration, qualification or compliance (including, without limitation, the execution of an undertaking to file post-effective amendments, appropriate qualification under applicable blue sky or other state securities laws, and appropriate compliance with applicable regulations issued under the Securities Act and any other governmental requirements or regulations) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request delivered to the Company within 20 days after delivery of such written notice from the Company; provided, however, that the Company shall not be obligated to take any action to effect any such registration, qualification or compliance pursuant to this Section 1.2:

(A)      In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification, or compliance unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act; or

(B)      If in the good faith judgment of the Board, such registration would be materially detrimental to the Company and the Board concludes, as a result, that it is essential to defer the filing of such registration statement at such time, and the Company thereafter delivers to Initiating Holder(s) a certificate, signed by the President or Chief Executive Officer of the Company, stating that in the good faith judgment of the Board it would be seriously

3

detrimental to the Company or its stockholders for a registration statement to be filed in the near future, then the Company's obligation to use its reasonable best efforts to register, qualify, or comply under this Section 1.2 shall be deferred for a period not to exceed 90 days from the date of delivery of the written request from the Initiating Holder(s); provided, however, that the Company may not invoke this right more than once in any 12-month period.

(b)      The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Section 1.2(a) after the Company has effected two registrations pursuant to Section 1.2(a).  A registration shall not be counted as "effected" for purposes of this Section 1.2(b) until such time as the applicable registration statement has been declared effective by the Commission, unless the Initiating Holders withdraw their request for such registration, elect not to pay the registration expenses therefor, and forfeit their right to one demand registration statement, in which case such withdrawn registration statement shall be counted as "effected" for purposes of this Section 1.2(b).

(c)      Underwriting; Procedures.  If the Initiating Holder(s) intend to distribute the Registrable Securities covered by the request by means of an underwriting, the right of any Holder to registration pursuant to this Section 1.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  If the Initiating Holder(s) intend to distribute the Registrable Securities by means of an underwriting, they shall so advise the Company as part of their request made pursuant to Section 1.2 and the Company shall include such information in the written notice referred to in Section 1.2(a)(i).  In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  A Holder may elect to include in such underwriting all or a part of the Registrable Securities held by such Holder.  The Company shall (together with all Holders or other Persons proposing to distribute their securities through such underwriting) enter into and perform its obligations under an underwriting agreement, in a form reasonably acceptable to the counsel representing the Holders, with the managing underwriter selected for such underwriting by a majority in interest of the Initiating Holder(s) (which managing underwriter shall be reasonably acceptable to the Company).  Notwithstanding any other provision of this Section 1.2, if the managing underwriter advises the Initiating Holder(s) in writing that marketing factors require a limitation of the number of shares to be underwritten, the number of shares to be included in the underwriting or registration shall be allocated as set forth in Section 1.12.  Any Registrable Securities and/or other securities so excluded or withdrawn shall also be withdrawn from registration.

(d)      Subject to the foregoing, the Company shall file a registration statement covering the Registrable Securities as soon as practicable (but in any event within 45 days) after receipt of the request or requests of the Holders.

1.3      Company RegistrationNotice of Registration.  If the Company shall determine to register any of its securities, either for its own account or the account of a security holder or holders other than (A) a registration pursuant to Section 1.2 hereof, (B) a registration relating solely to employee benefit plans, (C) a registration relating solely to a Rule 145

4

transaction, (D) a registration on any registration form that does not permit secondary sales, the Company will or (E) a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered.

(i)    Promptly (but in any event at least 10 days prior to the filing of any registration statement) deliver to each Holder written notice thereof in accordance with Section 3.4; and

(ii)    Use its reasonable best efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in Section 1.3(b) below, and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests made by any Holder and delivered to the Company within 20 days after the written notice is delivered by the Company.  Such written request may include all or a portion of a Holder's Registrable Securities.

(b)    <u>Underwriting; Procedures</u>.  If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 1.3(a)(i).  In such event, the right of any Holder to registration pursuant to this Section 1.3 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the other holders distributing their securities through such underwriting) enter into and perform their obligations under an underwriting agreement in the form agreed to between the Company and the managing underwriter selected for such underwriting by the Company and in customary form. Notwithstanding any other provision of this Section 1.3, if the managing underwriter determines in good faith that marketing factors require a limitation of the number of shares to be underwritten, the managing underwriter may limit the number of Registrable Securities to be included in the registration and underwriting to an amount not less than 20% of the securities included in such registration and underwriting.  The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in the registration and underwriting shall be allocated as set forth in Section 1.12.  If any Person who has requested inclusion in such registration as provided above disapproves of the terms of the underwriting, such Person shall be excluded therefrom by written notice delivered by the Company or the managing underwriter.  Any Registrable Securities and/or other securities so excluded or withdrawn shall also be withdrawn from registration.

(c)    <u>Right to Terminate Registration</u>.  The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 1.3 prior to the effectiveness of such registration, whether or not any Holder has elected to include securities in such registration, and shall promptly notify any Holder that has elected to include shares in such registration of such termination or withdrawal.

1.4    <u>Registration Procedures</u>In the case of each registration, qualification, or compliance effected by the Company pursuant to this Section 1, the Company will keep each Holder advised in writing as to the initiation of each registration, qualification, and compliance

5

and as to the completion thereof and, at its expense, the Company will use its reasonable best efforts to:

(a)      Prepare and file with the Commission a registration statement with respect to such securities and use its reasonable best efforts to cause such registration statement to become and remain effective for a period of at least 120 days or until the distribution described in the registration statement has been completed, whichever occurs first; provided, however, that (i) such 120-day period shall be extended for a period of time equal to the period the Holder refrains from selling any securities included in such registration at the request of an underwriter of Common Stock or other securities of the Company, and (ii) in the case of any registration of Registrable Securities on Form S-3 which are intended to be offered on a continuous or delayed basis, subject to compliance with applicable Commission rules, such 120-day period shall be extended for up to an additional 90 days to keep the registration statement effective until all such Registrable Securities are sold;

(b)      Furnish to the Holders participating in such registration and to the underwriters of the securities being registered such reasonable number of copies of the registration statement, preliminary prospectus, final prospectus, and such other documents as such Holders or such underwriters may reasonably request in order to facilitate the public offering of such securities;

(c)      Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statements as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

(d)      Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing, and at the request of any such seller, prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchaser of such shares, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing;

(e)      Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions;

6

WEST\222873106. 2

(f)      Cause all such Registrable Securities to be listed, not later than the effectiveness of such registration, on each securities exchange on which similar securities issued by the Company are then listed;

(g)      Provide a transfer agent and registrar for all Registrable Securities and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(h)      In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering; and

(i)      Furnish, at the request of any Holder requesting registration of Registrable Securities pursuant to this Section 1, on the date that such Registrable Securities are delivered to the underwriters for sale in connection with a registration pursuant to this Section 1, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities and (ii) to the extent such a letter may be delivered in accordance with then-applicable professional standards, a "comfort" letter, dated such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities (to the extent the then-applicable standards of professional conduct permit said letter to be addressed to the Holders); provided, however, that only Investor, and not any assignee of Investor or other Holder, shall be entitled to receive the opinion provided for in clause (i).

1.5      Information from HolderIt shall be a condition precedent to the obligations of the Company to take any action pursuant to this Section 1 with respect to the Registrable Securities of any selling Holder that such Holder or Holders of Registrable Securities furnish to the Company such information regarding such Holder or Holders, the Registrable Securities held by them, and the distribution proposed by such Holder or Holders as the Company may reasonably request in writing for purposes of complying with the Securities Act and as shall be reasonably required in connection with any registration, qualification or compliance referred to in this Section 1.

1.6      IndemnificationTo the extent permitted by law, the Company will indemnify and hold harmless each Holder, each of its officers, directors, partners, members, officers, stockholders, legal counsel, accountants, and each Person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this Section 1, and each underwriter (as defined in the Securities Act), if any, and each Person who controls any underwriter within the meaning of Section 15 of the Securities Act, against all expenses, claims, losses, damages or liabilities (joint or several) (or actions, proceedings or settlements in respect thereof) arising out

7

of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, prospectus, offering circular, or other document (including any related registration statement, notification, or the like), or any amendment or supplement thereto, incident to any such registration, qualification, or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, or any violation by the Company of the Securities Act or any rule or regulation promulgated under the Securities Act, the Exchange Act or state securities laws applicable to the Company in connection with any such registration, qualification or compliance, and the Company will reimburse each such Holder, each of its officers, directors, partners, members, officers, stockholders, legal counsel and accountants, and each Person controlling such Holder, each such underwriter and each Person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating, preparing, defending or settling any such claim, loss, damage, liability or action, as such expenses are incurred, provided, however, that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission or alleged untrue statement or omission, made in reliance upon and in conformity with written information furnished to the Company by such Holder, controlling Person, underwriter, or other aforementioned Person and stated to be specifically for use therein.  It is agreed that the indemnity agreement contained in this Section 1.6 shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld).

(a)     Each Holder will (severally and not jointly), if Registrable Securities held by such Holder are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify and hold harmless the Company, each of its directors, officers, partners, legal counsel and accountants, and each underwriter, if any, of the Company's securities covered by such a registration statement, each Person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, and each other such Holder, each of their officers, directors, and partners and each Person controlling such Holder within the meaning of Section 15 of the Securities Act, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular, or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, directors, officers, partners, legal counsel and accountants, underwriters or control Persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, as such expenses are incurred, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein, provided, however, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); and

8

provided that that in no event shall any indemnity under this Section 1.6 exceed the net proceeds received by such Holder in such offering.

(b)      Each party entitled to indemnification under this Section 1.6 (the "**Indemnified Party**") shall give written notice to the party required to provide indemnification (the "**Indemnifying Party**") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense, and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 1.6 unless the failure to give such notice is materially prejudicial to an Indemnifying Party's ability to defend such action.  No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation.  Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with the defense of such claim and litigation resulting therefrom.

(c)      If the indemnification provided for in this Section 1.6 is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any claim, loss, damage, liability or expense referred to therein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such claim, loss, damage, liability or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and the Indemnified party, on the other hand, in connection with the statements or omissions that resulted in such claim, loss, damage, liability, or expense, as well as any other relevant equitable considerations.  The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact related to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.  The Company and the Holders agree that it would not be just and equitable if contribution pursuant to this Section 1.6 were based solely upon the number of entities from whom contribution was requested or by any other method of allocation which does not take account of the equitable considerations referred to above.  In no event shall any contribution by a Holder under this Section 1.6 exceed the net proceeds received by such Holder in such offering.

(d)      The amount paid or payable by an Indemnified Party as a result of the losses, claims, damages, and liabilities referred to above in this Section 1.6 shall be deemed to include any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such action or claim, subject to the provisions of Section 1.6(c).  No Person guilty of fraudulent misrepresentation (within the meaning of the

9

Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(e)     The obligations of the Company and Holders under this Section 1.6 shall survive the completion of any offering of Registrable Securities in a registration statement.

1.7     Expenses of RegistrationAll Registration Expenses incurred in connection with any registration effected pursuant to this Section 1 shall be borne by the Company.  All Selling Expenses relating to securities registered on behalf of the Holders shall be borne by the holders of the registered securities included in such registration, pro rata on the basis of the number of shares so registered.

1.8     Rule 144 Reporting.  With a view to making available to the Holders the benefits of Rule 144 and any other rule or regulation of the Commission that may at any time permit such Holders to sell securities of the Company to the public without registration, the Company agrees to use its reasonable best efforts to:

(a)     Make and keep current public information available, as those terms are understood and defined in Rule 144;

(b)     File with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements); and

(c)     So long as a Holder owns any Registrable Securities, to furnish to the Holder forthwith upon request, to the extent accurate, a written statement by the Company as to its compliance with the reporting requirements of Rule 144 and of any other reporting requirements of the Securities Act and the Exchange Act, a copy of the most recent annual or quarterly report of the Company so filed by the Company, and such other reports and documents of the Company so filed by the Company and such other information in the possession of or reasonably obtainable by the Company as a Holder may reasonably request in availing itself of Rule 144 or any other rule or regulation of the Commission allowing a Holder to sell any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Exchange Act).

1.9     Affiliate Status.  Nothing in this Agreement shall be construed as an acknowledgment or admission with respect to any Holder's status as an Affiliate of the Company.

1.11     Transfer of Registration RightsThe rights to cause the Company to register securities granted to any party hereto under Section 1 may be assigned by a Holder provided that the Company is given written notice at the time of or within a reasonable time after such transfer or assignment, stating the name and address of the transferee or assignee and identifying the securities with respect to which such registration rights are being transferred or assigned.  Such transferees (i) may not be competitors of the Company in any respect other than by virtue of an acquisition of Holder, and (ii) in the case of any transfer to an entity that is not an Affiliate of a Holder, shall be limited to two such transferees.

<div align="center">10</div>

1.12    Procedure for Underwriter CutbacksIn any circumstance in which all of the Registrable Securities and other shares of Common Stock of the Company with registration rights (the "**Other Shares**") requested to be included in a registration on behalf of Holders or Other Stockholders cannot be so included as a result of limitations of the aggregate number of shares of Registrable Securities and Other Shares that may be so included, the number of shares of Registrable Securities and Other Shares that may be so included shall be allocated (a) first, pro rata among the Initiating Holder(s), based on the number of Registrable Securities held by such Initiating Holder(s), or in such other proportions as shall mutually be agreed to by all such Initiating Holder(s), and (b) second, pro rata among all selling Holders that are not Initiating Holder(s), to the extent that any Registrable Securities may be sold by selling Holders in such underwriting in excess of the number of Registrable Securities sold by the Initiating Holder(s).

1.13    Limitations on Subsequent Registration RightsFrom and after the date of this Agreement, the Company shall not, without the prior written consent of the Investor, enter into any agreement with any holder or prospective holder of any securities of the Company which would allow such holder or prospective holder to include such securities in any registration statement filed by the Company, unless under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of his, her or its securities will not reduce the amount of the Registrable Securities of the Holders which is included.

1.14    Termination of RightsThe rights of any particular Holder to cause the Company to register securities under Sections 1.2 and 1.3 shall terminate and be of no further force and effect at such time as (a) the Common Stock is listed on the New York Stock Exchange or The Nasdaq Stock Market; (b) no Registrable Securities held by such Holder bear any restrictive legends, and (c) such Holder's Registrable Securities may be sold into the public market without regard to any contractual restriction or any volume, manner of sale or other restriction under Rule 144.

1.15    Section 1145 of the Bankruptcy Code. The Company hereby covenants and agrees that the initial issuance of the Shares pursuant to the Mesa Plan is exempt from the registration requirements of the Securities Act pursuant to Section 1145 of the Bankruptcy Code, and as such the certificates representing the Shares shall not be stamped or otherwise imprinted with any legends.   The rights of any Holder to cause the Company to register Registrable Securities pursuant to this Section 1 shall apply without regard to the application of Section 1145 of the Bankruptcy Code to the initial issuance of the Shares.

2.    Affirmative Covenants of the CompanyThe Company hereby covenants and agrees as follows:

2.1    Financial InformationThe Company will furnish to the Investor the following:

(i)    As soon as practicable after the end of each fiscal year, and in any event within 90 days thereafter, consolidated balance sheets of the Company and its subsidiaries, if any, as of the end of such fiscal year, and consolidated statements of income and cash flows of the Company and its subsidiaries, if any, for such year, prepared in accordance

11

with generally accepted accounting principles ("**GAAP**") consistently applied, all in reasonable detail and certified by independent certified public accountants of national standing selected by the Company and approved by the Board; provided, however, that the delivery requirement set forth in this Section 2.1(a)(i) shall be deemed satisfied by the Company's timely filing of such information in an Annual Report on Form 10-K filed with the Commission in compliance with the requirements of the Exchange Act; and

(ii)    As soon as practicable after the end of each of the first three quarters of each fiscal year, and in any event within 45 days thereafter, consolidated balance sheets of the Company and its subsidiaries, if any, as of the end of such fiscal quarter, and consolidated statements of income and cash flow for such period and for the current fiscal year to date; provided, however, that the delivery requirement set forth in this Section 2.1(a)(ii) shall be deemed satisfied by the Company's timely filing of such information in a Quarterly Report on Form 10-Q filed with the Commission in compliance with the requirements of the Exchange Act.

(b)    The Investor may elect to terminate its right to receive financial information pursuant to this Section 2.1 at any time, temporarily or permanently, by giving notice of such election to the Company pursuant to Section 3.4.

2.2    Investor Approval Rights.  Neither the Company nor any subsidiary of the Company shall, without the prior written consent of the Investor:

(a)    Enter into any transaction with a related person (as defined in Item 404 of Regulation S-K promulgated under the Exchange Act), except for compensation transactions in the ordinary course of business that have been approved by a majority of the Company's independent directors;

(b)    Pay dividends or make other distributions to stockholders, or repurchase, redeem or retire any shares of capital stock of the Company (except pursuant to the Company's or any subsidiary's employee equity incentive plans); provided, however, that the Investor shall be deemed to have approved the payment of dividends or other distributions to stockholders solely from the net cash proceeds actually received by the Company from the sale of its debt and equity investment in Spirit Airlines, Inc. (the "**Spirit Proceeds**") if and to the extent the Spirit Proceeds (including any amounts used to repay the Notes) exceed $125,000,000;

(c)    Make any payment with respect to the Notes or redeem, repurchase or retire any Notes other than on a pro rata basis in accordance with the priority of such Notes established by the Indenture;

(d)    Amend the Company's certificate of incorporation or bylaws in any manner that would adversely affect the Investor relative to any other security holder of the Company (including in connection with the issuance of preferred stock);

(e)    Increase the number of shares available for grant under the Company's or any subsidiary's equity incentive plans; or

12

(f)      Enter into any amendment or waiver to the terms of the Indenture (the "**Indenture**")  among the Company, the subsidiary guarantors signatory thereto, and US Bank National Association, as trustee, governing the issuance of the Company's 8% Notes (Series A), 8% Notes (Series B), US Airways Notes and Management Notes (collectively, the "**Notes**"), whether through a supplemental indenture, consent of the noteholders, or otherwise, if such amendment, waiver or other action would adversely impact the rights of the Investor under the US Airways Notes.

2.3      "Most Favored Nation" Covenant.

(a)      The Company shall not agree to any protective provision benefiting any other stockholder of the Company unless (1) the Company shall have granted to the Investor rights at least as favorable as those proposed to be granted to any such stockholder, and (2) such protective provision entitles the Investor to vote its shares of Common Stock with respect to the matter(s) covered thereby.

(b)      In addition to the foregoing, the Company shall not grant any of the following rights to any party receiving [_____] or fewer shares of Common Stock in connection with the Mesa Plan, unless equivalent or greater rights shall have been granted to the Investor:

(i)      Any right to appoint a member of the Board or to attend meetings of the Board or any committee thereof; or

(ii)      Approval rights with respect to:

(A)      the exercise of drag-along rights;

(B)      any public offering or similar transaction with respect to the Company's securities;

(C)      the incurrence of any material indebtedness;

(D)      the issuance of preferred stock of the Company;

(E)      the amendment of the Company's certificate of incorporation or bylaws;

(F)      the adoption of a business plan of the Company, or any amendment to a business plan in place at the time the Company emerges from bankruptcy;

(G)      the annual budget of the Company;

(H)      any significant acquisition by the Company or any subsidiary, the Sale of the Company or any other significant corporate transaction;

13

(I)      the Company's or any subsidiary's commitment to material capital expenditures; or

(J)      the appointment of a Chief Executive Officer or Chief Financial Officer of the Company.

2.4      <u>Confirmation Regarding Certain Agreements</u>.The Company confirms to Investor that, except as otherwise set forth on a schedule to this Agreement, neither it nor any of its subsidiaries is a party to any agreement or other understanding providing to any stockholder of the Company any contractual protection provision or similar veto or consent right to the taking of any action by the Company.

2.5      <u>Termination of Covenants</u>The covenants set forth in this Section 2 shall terminate and be of no further force or effect at such time as (a) the Common Stock is listed on the New York Stock Exchange or The Nasdaq Stock Market, and (b) the Investor and/or its Affiliates collectively no longer hold the greater of (i) 62.5% of the Shares or (ii) 4.9% of the Company's Common Stock then outstanding; <u>provided</u>, <u>however</u>, that Sections 2.2(c) and (f) shall survive and remain effective for so long as Investor holds any US Airways Notes.

3.      <u>Miscellaneous</u><u>Governing Law</u>This Agreement shall be governed in all respects by the laws of the State of Nevada without regard to choice of laws or conflict of laws provisions thereof.

3.2      <u>Successors and Assigns</u>Except as otherwise specifically set forth in this Agreement, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors, and administrators of the parties hereto.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided by this Agreement.

3.3      <u>Entire Agreement</u>This Agreement constitutes the full and entire understanding and agreement among the parties with regard to the subjects hereof.

3.4      <u>Notices, Etc</u>Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon delivery, when delivered personally or by overnight courier or sent by fax (upon customary confirmation of receipt), or five days after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, addressed (a) if to the Investor, at the Investor's address set forth on the signature page of this Agreement, or at such other address as the Investor shall have furnished to the Company in writing, or (b) if to any other holder of any Shares, at such address as such holder shall have furnished the Company in writing, or, until any such holder so furnishes an address to the Company, then to and at the address of the last holder of such Shares who has so furnished an address to the Company, or (c) if to the Company, at its address set forth on the signature page of this Agreement, or at such other address as the Company shall have furnished to the Investor.  Unless specifically stated otherwise, if notice is provided by mail, it shall be deemed to be delivered five days after proper deposit in a mailbox, and if notice is delivered by hand or by messenger, it shall be deemed to be delivered upon actual delivery.

14

3.5     Delays or OmissionsNo delay or omission to exercise any right, power or remedy accruing to the Investor upon any breach or default of the Company under this Agreement shall impair any such right, power or remedy of the Investor, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing or as provided in this Agreement.  All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

3.6     Dispute Resolution FeesIf any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and disbursements in addition to any other relief to which such party may be entitled.

3.7     CounterpartsThis Agreement may be executed in any number of counterparts and signatures may be delivered by facsimile, each of which may be executed by less than all parties, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

3.8     SeverabilityIf any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement and the balance of this Agreement shall be enforceable in accordance with its terms.

3.9     Titles and SubtitlesThe titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

3.10    Amendment and WaiverAny provision of this Agreement may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Investor.

3.11    Waiver of Jury TrialEach party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, the transactions contemplated hereby, or the subject matter hereof (whether based on contract, tort or any other theory).

(SIGNATURE PAGE FOLLOWS)

15

WEST\222873106. 2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**COMPANY:**

**MESA AIR GROUP, INC.**


By:    _____
            Name:
            Title:

Address for Notice:

410 North 44th Street, Suite 100
Phoenix, Arizona 85008

WEST\222873106.2

**INVESTOR:**

**US AIRWAYS, INC.**

By:_____
   Name:
   Title:

<u>Address for Notice</u>:

111 West Rio Salado Parkway
Tempe, Arizona  85281
Attention:  Stephen L. Johnson

**EXHIBIT G**

**(Reinstated Secured Tax Claims)**

**NONE.**

## **EXHIBIT H**

**(Shareholders' Agreement)**

WEST\222873106.2

## SHAREHOLDERS' AGREEMENT

This Shareholders' Agreement (this "Agreement") is made effective as of _____ ___, 2011 (the "Effective Date"), by and among Mesa Air Group, Inc., a Nevada corporation (the "Company"), and each of those persons and entities whose names are set forth on the signature pages hereto (individually, a "Key Stockholder," and collectively, together with any subsequent Transferee (defined below) who become parties hereto as a Key Stockholder pursuant to Section 3(a), the "Key Stockholders"). Unless otherwise defined herein, all capitalized terms shall have the meaning assigned to them in the Plan (defined below).

## RECITALS:

A.    On January 5, 2010, the Company and certain of its directly and indirectly wholly owned subsidiaries filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

B.    The Company and certain of its directly and indirectly wholly-owned subsidiaries filed with the Bankruptcy Court a Second Amended Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code (as amended, the "Plan") and related Disclosure Statement In Support of Second of the Plan, which was approved by the Bankruptcy Court on _____ ____, 2011.

C.    Under the terms of the Plan, the Company has authorized the issuance of up to 10,000,000 shares of Common Stock, no par value per share (referred to in the Plan as "New Common Stock" and hereinafter referred to in this Agreement as the "Common Stock"), and warrants to purchase shares of Common Stock (referred to in the Plan as "New Warrants" and hereinafter referred to as the "Warrants") to certain holders of Allowed Claims (as defined in the Plan) in the Company's Bankruptcy proceedings.

D.    The Plan further provides that each holder of an Allowed Claim who holds five percent (5%) or more of the issued and outstanding shares of Common Stock (hereinafter, a "Key Stockholder"), whether as of the Effective Date (as defined in the Plan) of the Plan or subsequent thereto as a result of the issuance of the Company's issuance of additional shares of Common Stock pursuant to Allowed Claims or upon exercise of Warrants issued on account of Allowed Claims, shall agree to the voting obligations set forth in Section 5.7 of the Plan, which are hereinafter summarized as follows: a Key Stockholder shall agree to vote all shares of Common Stock of the Company registered in its name or beneficially owned by him, her or it, and any transferee thereof, in accordance with a majority of the Board of Directors of the Company on such matters requiring or submitted for shareholder approval, *provided, however,* that such voting requirement shall only apply to those shares of Common Stock that exceed such Key Stockholder's Estimated Initial Pro Rata Share of Restructured Unsecured Equity (the "Excess Voting Shares"). The term "Estimated Initial Pro Rata Share of Restructured Unsecured Equity" shall mean, as of the Effective Date, an amount of Restructured Unsecured Equity (either in the form of New Common Stock or New Warrants, as applicable pursuant to Sections 4.3.2 and 4.5.2 of the Plan) necessary to permit the holder of such Allowed Claim to hold a percentage of the Restructured Unsecured Equity obtained by dividing (i) the Aggregate

sd-542298

Distribution Share applicable to such holder's Allowed Claims by (ii) the aggregate of (A) the Aggregate Distribution Share of holders of all then Allowed Claims entitled to receive Restructured Unsecured Equity under the Plan plus (B) the Aggregate Distribution Share of holders of all Disputed Claims that the Debtors then estimate may become Allowed Claims entitled to receive Restructured Unsecured Equity under the Plan.  [For the purpose of calculations hereunder, each New Warrant, together with the corresponding share of New Common Stock to be acquired upon exercise of the New Warrant, shall equal one and one-tenth unit of Restructured Unsecured Equity.]

For purposes of example only, if a Key Stockholder of an Allowed Claim that is entitled to receive shares of Common Stock on the Effective Date equal ten percent (10%) of Restructured Unsecured Equity (*i.e.*, 1,000,000 shares based on 10,000,000 shares reserved for issuance under the Plan) and on such date only 3,000,000 shares of Common Stock are issued and outstanding, then such holder shall be required to vote 700,000 of the 1,000,000 shares held by such holder in accordance with this Shareholders Agreement and may vote the remaining 300,000 shares (*i.e.*, 10% of the 3,000,000 shares issued and outstanding) in its sole discretion.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and the consummation of the sale and purchase of Purchased Assets by the Company pursuant to the Purchase Agreement, and for other valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    ***<u>Voting of Common Stock</u>.  During the Term (defined below), at every meeting of the stockholders of the Company called subsequent to the Effective Date, and at every adjournment or postponement thereof, and on every action or approval by written consent, if any, of the stockholders of the Company (collectively, the "<u>Company Actions</u>"), Key Stockholder (in Key Stockholder's capacity as such) shall appear at the meeting or otherwise cause the Common Stock to be present thereat for purposes of establishing a quorum and, to the extent not voted by the persons appointed as proxies pursuant to this Agreement, each Key Stockholder agrees to vote all Excess Voting Shares then held by such Key Stockholder with respect to any and all Company Actions in such manner as directed by a majority of the Board of Directors of the Company. Notwithstanding the foregoing, until the expiration of the Term, each Key Stockholder shall be permitted to vote any Common Stock that he, she or it hold in its sole discretion that does not consist of Excess Voting Shares.***

2.    ***<u>Irrevocable Proxy</u>.  To secure each Key Stockholder's obligations to vote such Key Stockholder's shares of Common Stock in accordance with Section 1, each Key Stockholder hereby appoints each member of the Company's Board of Directors and any of them, in their capacities as officers of the Company (the "<u>Grantees</u>"), as such Key Stockholder's true and lawful proxy and attorney, with the power to act alone and with full power of substitution, for and in the name, place and stead of such Key Stockholder, to vote all of such Key Stockholder's Common Stock or to instruct nominees or record holders to vote the Common Stock in accordance with <u>Section 1</u> hereof and, in the discretion of the Grantees, with respect to any proposed adjournments or postponements of***

sd-542298                                    2

*any meeting of stockholders of the Company at which any of the Company Actions are to be considered.  The proxy and power granted by each Key Stockholder pursuant to this Section 2 are coupled with an interest and are given to secure the performance of such party's duties under Section 1.  Each such proxy and power will be irrevocable for the Term.  The proxy and power, so long as any party hereto is an individual, will survive the death, incompetency and disability of such party or any other individual affiliate holder of the Common Stock and, so long as any party hereto is an entity, will survive the merger or reorganization of such party or any other entity holding any Common Stock.*

3.      **Transfer of Shares**  *A Key Stockholder shall be permitted to transfer shares of Common Stock, subject to the restrictions set forth herein and in the Company's Amended and Restated Certificate of Incorporation, to one or more transferees (each a "Transferee"). Notwithstanding anything set forth above, as a condition precedent to any transfer of shares of Common Stock, whether voluntarily or by operation of law, the Transferee in such transfer shall be or shall have become a party to this Agreement and shall have agreed in writing to be bound by all of the terms and conditions hereof applicable to the transferring Key Stockholder to the same extent as if such transferee were a Key Stockholder hereunder, by executing a counterpart signature page to this Agreement; and no Key Stockholder shall transfer any shares of Common Stock to a Transferee unless such Key Stockholder provides a written instrument to the Company notifying the Company of such transfer and agreeing in writing to be bound by the terms of this Agreement.  Notwithstanding anything to the contrary contained in this Section 3(a), no Key Stockholder shall be permitted at any time to transfer to any person any shares of Common Stock if such transfer would not be in compliance with the Securities Act of 1933, as amended, and the regulations promulgated thereunder, or any applicable state securities laws.  For purposes of this Agreement, a "transfer" shall mean, with respect to any security, the direct or indirect assignment, sale, transfer, tender, exchange, pledge, hypothecation, or the gift, placement in trust, or other disposition of such security.*

4.      <u>Representations and Warranties of Key Stockholder.</u>

(a)      Key Stockholder hereby represents and warrants to the Company as follows:  (i) Key Stockholder is the beneficial or record owner of the Common Stock indicated on the signature page of this Agreement free and clear of any and all pledges, liens, security interests, mortgage, claims, charges, restrictions, options, title defects or encumbrances, in each case that would impair or adversely affect Key Stockholder's ability to perform its obligations under this Agreement; (ii) Key Stockholder has full power and authority to make, enter into and carry out the terms of this Agreement and to grant the irrevocable proxy as set forth in <u>Section 2</u>; and (iii) this Agreement has been duly and validly executed and delivered by Key Stockholder and constitutes a valid and binding agreement of Key Stockholder enforceable against Key Stockholder in accordance with its terms.  Key Stockholder agrees to notify the Company promptly of any transfers of Common Stock after the date of this Agreement.  If the Key Stockholder is a married individual and the Key Stockholder's Common Stock constitute community property or otherwise need spousal approval in order for this Agreement to be a

sd-542298                                                    3

legal, valid and binding obligation of the Key Stockholder, this Agreement has been duly authorized, executed and delivered by, and constitutes a legal, valid and binding obligation of, the Key Stockholder's spouse, enforceable against such spouse in accordance with its terms.

(b)      As of the date hereof and for so long as this Agreement remains in effect, except for this Agreement or as otherwise permitted by this Agreement, Key Stockholder has full legal power, authority and right to vote all of the Common Stock then owned of record or beneficially by Key Stockholder without the consent or approval of, or any other action on the part of, any other person.  Without limiting the generality of the foregoing, Key Stockholder has not entered into any voting agreement (other than this Agreement) with any person with respect to any of the Common Stock, granted any person any proxy (revocable or irrevocable) or power of attorney with respect to any of the Common Stock, deposited any of the Common Stock in a voting trust or entered into any arrangement or agreement with any person limiting or affecting Key Stockholder's legal power, authority or right to vote the Common Stock on any matter.

(c)      The execution and delivery of this Agreement and the performance by Key Stockholder of Key Stockholder's agreements and obligations hereunder will not result in any breach or violation of or be in conflict with or constitute a default under any term of any agreement, judgment, injunction, order, decree, law, regulation or arrangement to which Key Stockholder is a party or by which Key Stockholder (or any of Key Stockholder's assets) is bound, except for any such breach, violation, conflict or default which, individually or in the aggregate, would not impair or adversely affect Key Stockholder's ability to perform Key Stockholder's obligations under this Agreement or render inaccurate any of the representations made by Key Stockholder herein.

(d)      Key Stockholder understands and acknowledges that the Company has issued shares of Common Stock and/or Warrants to Key Stockholder in accordance with the Plan in reliance upon Key Stockholder's execution and delivery of this Agreement and the representations and warranties of Key Stockholder contained herein.

5.      ***Termination*.  *This Agreement shall terminate upon the earlier of (a) the exercise of 80% or more of the Warrants issued under the Plan, (b) five (5) years after the Effective Date of the Plan; or (c) following an initial public offering of the Company (the "*Term*").  Notwithstanding the foregoing, such term may be extended by a Key Stockholder with respect to such Key Stockholder by written notice of such Key Stockholder to the Company.***

6.      ***Restrictive Legend*.  *All certificates representing Common Stock owned or hereafter acquired by the Key Stockholders or any transferee of the Key Stockholders is bound by this Agreement shall have affixed thereto a legend substantially in the following form:***

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A SHAREHOLDERS' AGREEMENT, AS AMENDED FROM TIME TO TIME, A COPY OF WHICH IS AVAILABLE FOR INSPECTION AT THE OFFICES OF THE SECRETARY OF THE COMPANY."

7.     **_General._**

(a)     <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(b)     <u>Specific Performance</u>.  In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each party hereto shall be entitled to specific performance of the agreements and obligations of the Key Stockholders hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.  The Company shall not be required to prove actual damages or post a bond with respect to such proceedings.

(c)     <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEVADA OTHER THAN CONFLICT OF LAWS PRINCIPLES THEREOF DIRECTING THE APPLICATION OF ANY LAW OTHER THAN THAT OF NEVADA. COURTS WITHIN THE STATE OF NEVADA WILL HAVE JURISDICTION OVER ALL DISPUTES BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY.  THE PARTIES HEREBY CONSENT TO AND AGREE TO SUBMIT TO THE JURISDICTION OF SUCH COURTS.  EACH OF THE PARTIES HERETO WAIVES, AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, (II) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (III) ANY LITIGATION COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.

(d)     <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION OR AGREEMENT CONTEMPLATED HEREBY OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

(a)     <u>Attorneys' Fees</u>.  If any action that law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to recover reasonable attorneys' fees and other costs incurred in such proceeding, in addition to any relief which such party may be entitled.

(b)     <u>Notices</u>.  All notices, requests, claims, demands or other communications that are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been duly given (a) when delivered, if delivered by hand, (b) one Business Day after transmitted, if transmitted by a nationally recognized overnight courier

sd-542298                                        5

service, (c) when telecopied, if telecopied (which is confirmed), or (d) three Business Days after mailing, if mailed by registered or certified mail (return receipt requested), to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7(f)):

    (i)    If to Company:

> Mesa Air Group, Inc.
> 410 N. 44th Street, Suite 700
> Phoenix, Arizona 85008
> Attention:   General Counsel
> Telephone:   (602) 685-4000
> Fax:  (602) 685-4350

> With a simultaneous copy to:

> DLA Piper LLP (US)
> 2525 E. Camelback Road, Suite 1000
> Phoenix, Arizona 85016
> Attention:  Gregory R. Hall, Esq.
> Tel:  (480) 606-5128
> Fax:  (480) 606-5528

    (ii)    If to the address specified on the signature page hereto.

    (c)    <u>Complete Agreement</u>.  This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings relating to such subject matter.

    (d)    <u>Amendments and Waivers</u>.  This Agreement may not be amended or terminated and the observance of any term hereunder may not be waived with respect to any Key Stockholder without the written consent of the Board of Directors of the Company.  Any term hereof may be amended and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by the written consent of the Board of Directors of the Company and the Key Stockholders holding at least a majority of the then outstanding shares of Common Stock of the Company held by all Key Stockholders.  Any amendment, termination or waiver effected in accordance with this Section 7(h) shall be binding on all parties hereto, even if they do not execute such consent.  No waivers of or exceptions to any term, condition or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision.

    (e)    <u>Pronouns</u>.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

    (f)    <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which

sd-542298

together shall constitute one and the same document.  This Agreement may be executed by facsimile or PDF electronic signatures.

(g)     Section Headings and References.  The section headings are for the convenience of the parties and in no way alter, modify, amend, limit or restrict the contractual obligations of the parties.  Any reference in this agreement to a particular section or subsection shall refer to a section or subsection of this Agreement, unless specified otherwise.

(h)     Successors and Assigns.  Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon the parties hereto and their respective successors, assigns, heirs, executors and administrators and shall inure to the benefit of and be enforceable by each person who shall be a holder of the Common Stock from time to time; provided, however, that prior to the receipt by the Company of adequate written notice of the transfer of any Common Stock to a Transferee specifying the full name and address of such Transferee, the Company may deem and treat the person listed as the holder of such Common Stock in its records as the absolute owner and holder of such Common Stock for all purposes.

(i)     Third Parties.  Nothing in this Agreement, express or implied, is intended to confer upon any person, other than the parties to this Agreement and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement except as expressly provided in this Agreement.

(j)     Additional Key Stockholders.  Upon the transfer of Common Stock pursuant to the terms of Section 3(a) to a Transferee or the exercise of a Warrant by a person who, upon such exercise, constitutes a Key Stockholder, the Company, without prior action on the part of any Key Stockholder shall require each such Transferee or Key Stockholder to execute and deliver this Agreement.  Each such party, upon execution and delivery of this Agreement by the Company and such party, shall be deemed a Key Stockholder hereunder.

*[Remainder of Page Intentionally Left Blank]*

sd-542298                                                    7

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

**COMPANY:**

**Mesa Air Group, Inc.**

By:_____

Name:_____

Its: _____

**STOCKHOLDER:**

_____

Address:

_____

_____

Common Stock:

_____ shares of Common Stock

## <u>EXHIBIT I</u>

### (Reinstated Allowed Aircraft Secured Claims)

As set forth in the Plan in Sections, 4.2.1, 4.2.2, and 4.2.3, the Debtors have reinstated the following Allowed Aircraft Secured Claims:

**CRJ Equipment Aircraft Secured Claim**

**EDC Aircraft Secured Claim**

sd-542298

**EXHIBIT J**

**(Initial Board of Directors of Reorganized Mesa Air Group)**

As contemplated by Section 5.2.1 of the Plan, the Debtors and the Committee have selected the following nine (9) individuals to serve as the initial members of the board of directors of Reorganized Mesa Air Group beginning on the Effective Date.

The members of the board of directors will be:

Jonathan G. Ornstein
Chairman and Chief Executive Officer of Mesa Air Group, Inc.

Daniel J. Altobello
Director of Arlington Investment Corp.

Mark J. Schulte
Head of Transportation Investment Banking at Dahlman Rose & Co.

Ellen Artist
Independent Aviation Finance Consultant

Dana Lockhart
Independent Aerospace and Aviation Consultant

Harvey Schiller
Vice Chairman and President of Sports, Media, and Entertainment Practice of Diversified
    Search Odgers Berndtson

Don Skiados
President of Leadership Communications and Training, and Meetings-Nine One One

Grant Lyon
Founder and President of Odyssey Capital Group

Mitchell Gordon
President Morpheus Capital Advisors

All of these individuals have expressed their willingness to serve on the board of directors.

sd-542298

## **EXHIBIT K**

### Schedule of Executory Contracts
### And Unexpired Leases to Be Assumed Pursuant to the Plan

This Exhibit K lists certain executory contracts and unexpired leases entered into by the Debtors[5] prior to the Petition Date that the Debtors presently intend to assume pursuant to the Plan.

**Notes:**

1.   This Assumption Schedule lists the executory contracts and unexpired leases to be assumed by the Debtors under the Plan as referenced in Section 7.1 of the Plan and the Assumption Obligations therefor as referenced in Section 7.3 of the Plan.

2.   In most instances there are numerous documents that govern the terms and conditions of the Debtors' use of aircraft equipment and it would be burdensome for the Debtors to list each and every agreement. The aircraft equipment related agreements to be assumed on this Assumption Schedule shall be identified by: (i) the applicable aircraft equipment (U.S. Registration No. or serial number); and (ii)(a) the aircraft equipment lease and/or participation agreement or (b) the financing transaction for aircraft equipment. The identification of such aircraft equipment and related agreements shall be deemed to include all of the "Operative Documents," "Operative Agreements," or other documents that are integral to such transaction (collectively, the "Operative Documents"); *provided*, *however*, that such Operative Documents will not include agreements that were rejected by the Debtors that have cross-default provisions related to an Operative Document.

---

[5]   Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the *Second Amended Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code*, dated November 23, 2010 [Docket No. 1241] (as amended from time to time, the "Plan").

3.      Neither the inclusion or exclusion of a contract or lease by the Debtors on this

Assumption Schedule shall constitute an admission by the Debtors that any such

contract or lease is an executory contract or unexpired lease or that the Debtors have

any liability thereunder.

4.      If you are a counterparty to an executory contract or unexpired lease listed on this

Assumption Schedule and there is no Assumption Obligation listed or the

Assumption Obligation is listed as $0.00, the Debtors have determined there is no

cure amount or other obligation owing with respect to such executory contract or

unexpired lease.  The Debtors have made this determination because (i) there are no

defaults under the applicable agreement, (ii) you have previously executed an

agreement waiving or otherwise resolving defaults under the applicable agreement, or

(iii) you filed a proof of claim for prepetition amounts owing under an executory

contract or unexpired lease and such claim was previously satisfied by the Debtors.

5.      Any accrued but unbilled charges not yet due as of the filing of this Assumption

Schedule which come due under an assumed lease or executory contract prior to or

after the Confirmation Date for charges that are valid and due under the applicable

agreement shall be billed to and paid by (or, in the case of a credit balance, shall be

given to) the Debtors in compliance with the terms of such assumed executory

contract or unexpired lease.

6.      Pursuant to Section 7.3 of the Plan, parties to executory contracts and unexpired

leases listed on this Assumption Schedule shall have until 4:00 p.m. (Prevailing

Eastern Time) on January 4, 2011 to object to the proposed Assumption Obligations.

Pursuant to Section 7.3 of the Plan, if you do not object to the proposed Assumption

Obligations set forth on Exhibit K by 4:00 p.m. (Prevailing Eastern Time) on January

4, 2011, you shall be forever barred from: (a) asserting any other, additional or

different amount on account of such obligation against the Debtors, the Reorganized

Debtors, the Liquidating Debtors, or the Estate Assets; and (b) sharing in any other,

additional or different distribution under the Plan on account of such obligation.

7. The Post-Effective Date Debtors shall satisfy all Assumption Obligations, if any, by

making a Cash payment in the manner provided in Section 2.2 of the Plan or as

otherwise permitted by Section 365(b)(1)(B) of the Bankruptcy Code, equal to the

amounts specified in this Assumption Schedule (as such amounts may be modified),

unless an objection to such proposed amount is filed with the Bankruptcy Court and

served on counsel to the Debtors on or prior to January 4, 2011 at 4:00 p.m.

(Prevailing Eastern Time) and the Bankruptcy Court, after notice and hearing,

determines that the applicable Debtor is obligated to pay a different amount under

Section 365 of the Bankruptcy Code, in which case, the applicable Debtor shall have

the right to remove such executory contract or lease from the Assumption Schedule,

or, if following the Effective Date, file a motion within ten (10) days after such

determination to seek an order of the Bankruptcy Court rejecting such executory

contract or unexpired lease.

8. Each executory contract and unexpired lease assumed pursuant to the Plan includes

all modifications and amendments that affect such contract or lease; *provided

however*, that master terms and conditions agreements are treated as separate

contracts from the annexes, statements of work, schedules and other documents that

identify particular goods or services and the prices therefor, and the listing of any

agreement on this Assumption Schedule does not mean that all related annexes, statements of work, schedules and other ordering documents are also being assumed. The listing of a contract with a particular counterparty shall not be deemed as the assumption of any other contract with such counterparty.

9.  Collective Bargaining Agreements are addressed in Section 7.9 of the Plan and are not included on this Assumption Schedule.

10.  The Debtors' Code-Share Agreements have or will be assumed either by separate motion(s) or as provided in Section 7.7 of the Plan and are not included on this Assumption Schedule.

11.  The Debtors reserve their rights to amend this Assumption Schedule (and the amount of any Assumption Obligations) as permitted by the Plan.

56772-002\DOCS_SF:75217.1

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | AAR AIRCRAFT & ENGINE SALES & LEASING, INC. | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | AIRCRAFT PARTS CONSIGNMENT ACCESS AGREEMENT CONTRACT NO. 27428 CRJ700 AND CRJ900 | TBD (NEGOTIATIONS PENDING) |
| MESA AIR GROUP, INC. | AAR AIRCRAFT & ENGINE SALES & LEASING, INC. | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | AMENDED AND RESTATED AIRCRAFT PARTS CONSIGNMENT ACCESS AGREEMENT BETWEEN AAR AIRCRAFT & ENGINE SALES & LEASING, INC. ("CONSIGNOR") AND MESA AIR GROUP, INC. ("AIRLINE") CONTRACT NO. 27427-R CRJ200 AIRFRAME PARTS | SEE ABOVE |
| MESA AIR GROUP, INC. | AAR AIRCRAFT & ENGINE SALES & LEASING, INC. | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | FIRST AMENDMENT TO AIRCRAFT PARTS CONSIGNMENT ACCESS AGREEMENT CONTRACT NO. 27427-1 BOMBARDIER CRJ200 AIRCRAFT | SEE ABOVE |
| MESA AIR GROUP, INC. | AAR AIRCRAFT COMPONENT SERVICES - NEW YORK, A DIVISION OF AAR ALLEN SERVICES, INC. | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | AMENDED AND RESTATED COMPONENT MAINTENANCE AGREEMENT (CRJ200) CONTRACT NO. 27430-R CRJ200 AIRCRAFT | SEE ABOVE |
| MESA AIR GROUP, INC. | AAR AIRCRAFT COMPONENT SERVICES - NEW YORK, A DIVISION OF AAR ALLEN SERVICES, INC. | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | COMPONENT MAINTENANCE AGREEMENT CONTRACT NO. 27431 CRJ700/900 | SEE ABOVE |
| MESA AIR GROUP, INC. | AAR AIRCRAFT COMPONENT SERVICES - NEW YORK, A DIVISION OF AAR ALLEN SERVICES, INC. | ATTN RICHARD J. POULTON, VP/CFO/TREASURER ONE AAR PLACE 1100N. WOOD DALE RD WOOD DALE, IL 60191 | FIRST AMENDMENT TO AMENDED AND RESTATED COMPONENT MAINTENANCE AGREEMENT (27430-R-1) CONTRACT NO. 27430-R-1 | SEE ABOVE |
| MESA AIR GROUP, INC. | AAR AIRCRAFT COMPONENT SERVICES - NEW YORK, A DIVISION OF AAR ALLEN SERVICES, INC. | ONE AAR PLACE 110 N. WOOD DALE ROAD WOOD DALE, IL 60191 | FIRST AMENDMENT TO COMPONENT MAINTENANCE AGREEMENT (27430-1) CONTRACT NO. 27430-1 BOMBARDIER CRJ200 AIRCRAFT | SEE ABOVE |
| MESA AIR GROUP, INC. | AAR AIRCRAFT COMPONENT SERVICES - NEW YORK, A DIVISION OF AAR ALLEN SERVICES, INC. | ONE AAR PLACE 110 N. WOOD DALE ROAD WOOD DALE, IL 60191 | SECOND AMENDMENT TO COMPONENT MAINTENANCE AGREEMENT (27430-2) CONTRACT NO. 27430-2 CRJ200 | SEE ABOVE |
| MESA AIRLINES, INC. | AAR AIRCRAFT SERVICES | ATTN R. RICK FEURACE, VP SALES, MARKETING & CUSTOMER SUPPORT ONE AAR PLACE 110 N. WOOD DALE ROAD WOOD DALE, IL 60191 | ADDENDUM TO CONTRACT # 26707, DATED OCT 3, 2003 (SCHEDULE 1 - 2005 DASH 8 PRICING MENU) CONTRACT NO 26707 | SEE ABOVE |
| MESA AIRLINES, INC. | AAR AIRCRAFT SERVICES | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | ADDENDUM TO CONTRACT #26707, DATED OCTOBER 3, 2003 | SEE ABOVE |
| MESA AIRLINES, INC. | AAR AIRCRAFT SERVICES - OKLAHOMA | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | SECOND AMENDMENT | SEE ABOVE |
| MESA AIRLINES, INC. | AAR AIRCRAFT SERVICES, A DIVISION OF AAR DISTRIBUTION, INC. | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | ADDENDUM TO CONTRACT #26707, DATED OCTOBER 3, 2003 CRJ-200 | SEE ABOVE |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | AAR AIRCRAFT SERVICES, A DIVISION OF AAR DISTRIBUTION, INC. | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | AGREEMENT | SEE ABOVE |
| MESA AIRLINES, INC. | AAR AIRCRAFT SERVICES-OKLAHOMA | ATTN LEGAL DEPARTMENT ONE AAR PLACE 1100 N. WOOD DALE ROAD WOOD DALE, IL 60191 | AMENDMENT TO CONTRACT #26707 DATED OCTOBER 3, 2003 / SCHEDULE 2 - SCHEDULE OF CHARGES CONTRACT #26707 | SEE ABOVE |
| MESA AIR GROUP, INC. | AAR, CORP. | ATTN RICHARD J. POULTON, VP/CFO/TREASURER ONE AAR PLACE 1100N. WOOD DALE RD WOOD DALE, IL 60191 | UMBRELLA AGREEMENT (27427-R, 27429-R, 27430-R, 27432-R AMENDS FOUR DIFFERENT AGREEMENTS: AMENDED AND RESTATED AIRCRAFT PARTS CONSIGNMENT ACCESS AGREEMENT CONTRACTS NO. 27427-R DTD 8/1/2008; AMENDED AND RESTATED AIRCRAFT PARTS CONSIGNMENT ACCESS AGREEMENT CONTRACT 27429-R DTD 8/1/2008; AMENDED AND RESTATED COM ERJ1145 AIRFRAME PARTS & CRJ200 AIRFRAME PARTS | SEE ABOVE |
| MESA AIRLINES, INC. | ACCESSORY OVERHAUL GROUP, INC. | 902 S. PINE HILL RD. GRIFFIN, GA 30224 | MEMORANDUM OF UNDERSTANDING BY & BETWEEN AOG & MESA AIR GROUP, INC. AOG PROVIDER OF WHEELS/TIRES/BRAKES MAINTENANCE & REPAIR CRJ200, CRJ700, CRJ900, ERJ145 | $141,166.68 |
| AIR MIDWEST, INC. | ACCESSORY OVERHAUL GROUP, INC. | ATTN RONALD M. BYRD, JR. - PRESIDENT PO BOX 925 VIENNA, VA 22182 | ASSET PURCHASE AGREEMENT PURCHASE OF GOODS | SEE ABOVE |
| AIR MIDWEST, INC. | ACE/ESIS | STEPHANIE DUNSTON 215-640-2873 436 WALNUT ST PHILADELPHIA, PA 19106 | WORKERS' COMPENSATION POLICY # C4WLR398019 | $0.00 |
| MESA AIRLINES, INC. | ACE/ESIS | STEPHANIE DUNSTON 215-640-2874 437 WALNUT ST PHILADELPHIA, PA 19106 | WORKERS' COMPENSATION POLICY # C4WLR433978 | $0.00 |
| MESA AIR GROUP, INC. | ACE/ESIS | STEPHANIE DUNSTON 215-640-2875 438 WALNUT ST PHILADELPHIA, PA 19106 | WORKERS' COMPENSATION POLICY # C4WLR445677 ALL STATES POLICY # C4WLR445678 CA | $0.00 |
| MESA AIRLINES, INC. | ACE/ESIS | STEPHANIE DUNSTON 215-640-2876 439 WALNUT ST PHILADELPHIA, PA 19106 | WORKERS' COMPENSATION POLICY # C4WLR447836 ALL STATES POLICY # C4WLR447840 CA | $0.00 |
| MESA AIRLINES, INC. | ADP, INC. | ATTN TIMOTHY D LAMB, PRESIDENT, NATIONAL ACCOUNT SERVICES 5800 WINDWARD PARKWAY ALPHARETTA, GA 30005 | ADP, INC. NATIONAL ACCOUNT SERVICES, MASTER SERVICES AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | AERODATA | 14988 NORTH 78TH WAY SUITE 214 SCOTTSDALE, AZ 85260 | AERODATA COMPUTE SERVER SYSTEM WITH ACARS ACCES PROPOSAL CL600-2C10 (CRJ700); CL600-2B19 A AND B ENGINE AIRCRAFT (CRJ200/100) | $13,825.06 |
| MESA AIR GROUP, INC. | AERONAUTICAL RADIO, INC. | ATTN S.M. PERRY - DIRECTOR SERVICES 2551 RIVA RD ANNAPOLIS, MD 21401 | ARINC SERVICE AGREEMENT AGREEMENT NO. 5776 | $0.00 |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | AERONAUTICAL RADIO, INC. | ATTN CONTRACTS DEPARTMENT<br>2551 RIVA RD<br>ANNAPOLIS, MD 21401 | AVINET SERVICE SUPPLEMENT NO. 63<br>SERVICE SUPPLEMENT NO. 63; SERVICE AGREEMENT NO. 5776; CO# 12009 | $0.00 |
| MESA AIR GROUP, INC. | AERONAUTICAL RADIO, INC. | ATTN CONTRACTS DEPARTMENT<br>2551 RIVA RD<br>ANNAPOLIS, MD 21401 | PART OF AGREEMENT 5776, SUPPLEMENT 27<br>SUPPLEMENT 27 | $0.00 |
| MESA AIR GROUP, INC. | AERONAUTICAL RADIO, INC. | ATTN WILLIAM B. SCHMIDT - SR. DIRECTOR, MARKETING<br>2551 RIVA RD<br>ANNAPOLIS, MD 21401 | SERVICE AGREEMENT<br>AGREEMENT NO. 5776 | $0.00 |
| MESA AIRLINES, INC. | AERONAUTICAL RADIO, INC. | ATTN CONTRACTS DEPARTMENT<br>2551 RIVA RD<br>ANNAPOLIS, MD 21401 | GLOBALINK/VHF DATA COMMUNICATION SERVICE<br>SUPPLEMENT 60 | $0.00 |
| MESA AIR GROUP, INC. | AERONAUTICAL RADIO, INC. | ATTN CONTRACTS DEPARTMENT<br>2551 RIVA RD<br>ANNAPOLIS, MD 21401 | COCKPIT ACCESS SECURITY SYSTEM (CASS)<br>SUPPLEMENT 62 | $0.00 |
| MESA AIRLINES, INC. | AEROSOFT PMI SYSTEMS, LLC | ATTN NIKO E. SISMANIDIS, DIRECTOR SALES & SERVICES<br>5945 AIRPORT ROAD SUITE 254<br>MISSISSAUGA,  L4V 1R9<br>CANADA | PROPOSAL TO MESA AIR GROUP, INC. FOR "FREEDOM AIRLINES INC" TO APPEAR ON WORK PACKAGE ACCOUNTABILITY AND PMI JC/NRJC FORMS - FEATURE #162 | $0.00 |
| MESA AIRLINES, INC. | AIRCRAFT BRAKING SYSTEMS CORPORATION | ATTN DIRECTOR, CONTRACT MANAGEMENT<br>1204 MASSILLON RD<br>AKRON, OH 44306-4186 | AGREEMENT FOR CRJ-/200/700/900 WHEEL AND BRAKE BETWEEN MESA AIRLINES, INC. AND AIRCRAFT BRAKING SYSTEMS CORPORATION<br>REF: RWH0804-154<br>CRJ200, CRJ700 AND CRJ900 | $0.00 |
| MESA AIRLINES, INC. | AIRCRAFT BRAKING SYSTEMS CORPORATION | ATTN DIRECTOR, CONTRACT MANAGEMENT<br>1204 MASSILLON RD<br>AKRON, OH 44306-4186 | AGREEMENT FOR CRJ-/200/700900 WHEEL AND BRAKE<br>REF: RWH0305-126, REV-2<br>CRJ-/200/700/900 WHEEL AND BRAKE | $0.00 |
| MESA AIRLINES, INC. | AIRCRAFT BRAKING SYSTEMS CORPORATION | ATTN DIRECTOR, CONTRACT MANAGEMENT<br>1204 MASSILLON RD<br>AKRON, OH 44306-4186 | DIRECT PURCHASE AUTHORIZATION POLICY<br>GENERAL POLICY 1.3.1 REV. F, DTED 10/16/06 | $0.00 |
| MESA AIRLINES, INC. | AIRCRAFT SERVICE INTERNATIONAL, INC. | ATTN CONTRACTS<br>201 S. ORANGE AVENUE<br>SUITE 1100A<br>ORLANDO, FL 32801 | GROUND SUPPORT EQUIPMENT MAINTENANCE AND FUELING AGREEMENT FOR CINCINNATI/ NORTHERN KENTUCKY INTERNATIONAL AIRPORT (CVG) ERLANGER, KENTUCKY | $13,392.83 |
| MESA AIRLINES, INC. | AIRCRAFT SERVICE INTERNATIONAL, INC. | ATTN CONTRACTS<br>201 SOUTH ORANGE AVE, SUITE 1100A<br>ORLANDO, FL 32801 | GROUND SUPPORT EQUIPMENT MAINTENANCE AGREEMENT | SEE ABOVE |
| MESA AIRLINES, INC. | AIRCRAFT SERVICE INTERNATIONAL, INC. | ATTN CONTRACTS<br>201 S. ORANGE AVENUE<br>SUITE 1100A<br>ORLANDO, FL 32801 | WASHINGTON DULLES INTERNATIONAL AIRPORT FUEL SYSTEM AGREEMENT FOR INTO-PLANE FUELING | SEE ABOVE |
| MESA AIRLINES, INC. | AIRLINES CLEARING HOUSE, INC. | LORI TULLY<br>1301 PENNSYLVANIA AVE, N.W.<br>SUITE 1100<br>WASHINGTON, D.C. 20004 | AGREEMENT ESTABLISHING ASSOCIATE MEMBERSHIP IN THE AIRLINES CLEARING HOUSE, INC. FOR THE SETTLEMENT OF INTERLINE ACCOUNTS | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | AIRLINES CLEARING HOUSE, INC. | LORI TULLY<br>1302 PENNSYLVANIA AVE, N.W.<br>SUITE 1101<br>WASHINGTON, D.C. 20004 | AGREEMENT RELATING TO THE SETTLEMENT OF INTERLINE ACCOUNTS THROUGH AIRLINES CLEARING HOUSE, INC. | $0.00 |
| MESA AIRLINES, INC. | AIRLINES REPORTING CORPORATION (ARC) | ATTN LEGAL DEPARTMENT<br>4100 NORTH FAIRFAX DRIVE<br>SUITE 600<br>ARLINGTON, VA 22203 | CARRIER SERVICES AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | AIRLINES REPORTING CORPORATION (ARC) | ATTN LEGAL DEPARTMENT<br>4100 NORTH FAIRFAX DRIVE<br>SUITE 600<br>ARLINGTON, VA 22203 | ARC COMPASS REPORT AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | AIRLINES REPORTING CORPORATION (ARC) | ATTN LEGAL DEPARTMENT<br>4100 NORTH FAIRFAX DRIVE<br>SUITE 600<br>ARLINGTON, VA 22203 | ELECTRONIC DATA LEASE AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | AIRLINES REPORTING CORPORATION (ARC) | ATTN LEGAL DEPARTMENT<br>4100 NORTH FAIRFAX DRIVE<br>SUITE 600<br>ARLINGTON, VA 22203 | 1099 PROCESSING SERVICE | $0.00 |
| MESA AIRLINES, INC. | ALL NIPPON AIRWAYS CO., LTD | 1-5-2 HIGASHI-SHIMBASHI, MINATOR-KU<br>TOKYO,  105-7133<br>JAPAN<br><br>WITH COPY TO UNITED AIRLINES<br>77 WEST WACKER DR.<br>CHICAGO, IL 60603 | CODE SHARE AGREEMENT BETWEEN MESA AIRLINES (AS A UNITED EXPRESS CARRIER) AND ALL NIPPON AIRWAYS, CO., LTD. | $0.00 |
| MESA AIR GROUP, INC. | ALLIANZ GLOBAL RISKS | 317 MADISON AVE<br>NEW YORK, NY 10017 | AVIATION HULL & LIABILITY<br>A1AL000019109AM | $0.00 |
| MESA AIR GROUP, INC. | ALLIANZ MEXICO | BLVD. MANUEL A. CAMACHO NO. 164<br>COL. LOMAS DE BARRILACO<br>C.P. 11010<br>MEXICO, D.F. 52013000 | AVIATION LIABILITY MEXICAN<br>AVIMATR/00008052 | $0.00 |
| MESA AIRLINES, INC. | ALOHA CONTRACT SERVICES, LLC | 111 KEEHI PLACE<br>HONOLULU, HI 96819 | IATA STANDARD GROUND HANDLING AGREEMENT (HNL) | $118,967.23 (PER SETTLEMENT AGREEMENT) |
| MESA AIRLINES, INC. | ALOHA CONTRACT SERVICES, LLC | 111 KEEHI PLACE<br>HONOLULU, HI 96819 | IATA STANDARD GROUND HANDLING AGREEMENT (ITO) | SEE ABOVE |
| MESA AIRLINES, INC. | ALOHA CONTRACT SERVICES, LLC | 111 KEEHI PLACE<br>HONOLULU, HI 96819 | IATA STANDARD GROUND HANDLING AGREEMENT (KOA) | SEE ABOVE |
| MESA AIRLINES, INC. | ALOHA CONTRACT SERVICES, LLC | 111 KEEHI PLACE<br>HONOLULU, HI 96819 | IATA STANDARD GROUND HANDLING AGREEMENT (LIH) | SEE ABOVE |
| MESA AIRLINES, INC. | ALOHA CONTRACT SERVICES, LLC | 111 KEEHI PLACE<br>HONOLULU, HI 96819 | IATA STANDARD GROUND HANDLING AGREEMENT (OGG) | SEE ABOVE |
| MESA AIRLINES, INC. | AMENDMENT TO METLIFE AUTO AND HOME GROUP INSURANCE PROGRAM AGREEMENT | METLIFE VOLUNTARY BENEFITS GROUP<br>10 SOUTH LASALLE STREET<br>SUITE 3350<br>CHICAGO, IL 60603 | AMENDMENT TO METLIFE AUTO AND HOME GROUP INSURANCE PROGRAM AGREEMENT<br>AMENDMENT | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | AMERICA WEST AIRLINES, INC. | ATTN  PATRICK T. SAKOLE, VICE PRESIDENT, SAFETY<br>4000 E SKY HARBOR BLVD<br>PHOENIX, AZ 85034 | EMERGENCY ASSISTANCE SERVICES AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | AMERICA WEST AIRLINES, INC. | ATTN VP PLANNING & DISTRIBUTION<br>111 WEST RIO SALADO PARKWAY<br>TEMPE, AZ 85281 | SLOT SUBSTITUTION AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | AMERICAN EXPRESS TRAVEL RELATED SERVICES INC. | ATTN GENERAL COUNSEL<br>200 VESEY STREET<br>49TH FLOOR<br>NEW YORK, NY 10285 | CREDIT CARD MERCHANT AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | AMERICAN EXPRESS TRAVEL RELATED SERVICES INC. | ATTN GENERAL COUNSEL<br>201 VESEY STREET<br>50TH FLOOR<br>NEW YORK, NY 10286 | PURCHASING CARD AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | AON RISK SERVICES, INC. | 75 REMITTANCE DRIVE, SUITE 1943<br>CHICAGO, IL 60675 | AVIATION HULL & LIABILITY | $0.00 |
| FREEDOM AIRLINES, INC. | ARCH INSURANCE CO. | C/O INT'L AEROSPACE INS SERVICES<br>1005 MARK AVENUE<br>CARPINTERIA, CA 93013 | AVIATION HULL & LIABILITY<br>11CAA5477803 | $0.00 |
| MESA AIR GROUP, INC. | ARIZONA FUELING FACILITIES CORPORATION & PHOENIX FUEL COMMITTEE | QUARELS & BRADY ATTN:  DANIEL L. MUCHOW<br>ONE RENNISANCE SQUARE 2 NORTH CENTRAL AVE.<br>PHOENIX, AZ 85004 | AMENDED & RESTATED COST SHARING AGREEMENT DATED AS OF DECEMBER 1, 1991 | $0.00 |
| MESA AIR GROUP, INC. | ARIZONA FUELING FACILITIES CORPORATION & PHOENIX FUEL COMMITTEE | QUARELS & BRADY ATTN:  DANIEL L. MUCHOW<br>ONE RENNISANCE SQUARE 2 NORTH CENTRAL AVE.<br>PHOENIX, AZ 85004 | ADDITION OF AIRLINE AS PARTY TO AMENDED & RESTATED COSE SHARING AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | ARIZONA FUELING FACILITIES CORPORATION & PHOENIX FUEL COMMITTEE | QUARELS & BRADY ATTN:  DANIEL L. MUCHOW<br>ONE RENNISANCE SQUARE 2 NORTH CENTRAL AVE.<br>PHOENIX, AZ 85004 | SUBSCRIPTION AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | AUSTRIAN AIRLINES | OSTERREICHISCHE LUFTVERKEHRS AG<br>FONTANASTRASSE 1<br>1107 VIENNA,<br>AUSTRIA<br><br>WITH COPY TO UNITED AIRLINES<br>77 WEST WACKER DR.<br>CHICAGO, IL 60602 | CODE SHARE AGREEMENT BETWEEN MESA AIRLINES (AS A UNITED EXPRESS CARRIER) AND AUSTRIAN AIRLINES | $0.00 |
| MESA AIR GROUP, INC. | AVIATION DATA GROUP, LLC | ATTN BRIAN KULMAN, CHIEF TECHNICAL OFFICER<br>497 BIRD AVE<br>LOS GATOS, CA 95032 | SUBSCRIPTION AGREEMENT<br>SERVICE AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | AVIATION GROUND INTEGRATED LOGISTICS ENTERPRISE, INC. | ATTN MICHAEL S. FRIEDMAN<br>1516 23RD ST SOUTH<br>ARLINGTON, VA 22202 | NON-DISCLOSURE AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | AVIZENT/FRANK GATES | MICHELLE CHAMBERS 1-800-890-7418 EXT 25512<br>5353 N. 16TH ST.<br>STE 250<br>PHOENIX, AZ 85016 | WORKERS' COMPENSATION<br>POLICY # NWA0119201-03 | $0.00 |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | AVIZENT/FRANK GATES | MICHELLE CHAMBERS 1-800-890-7418 EXT 25513<br>5354 N. 16TH ST.<br>STE 250<br>PHOENIX, AZ 85016 | WORKERS' COMPENSATION<br>POLICY # NWA0119201-03 | $0.00 |
| MESA AIRLINES, INC. | AVIZENT/FRANK GATES | MICHELLE CHAMBERS 1-800-890-7418 EXT 25514<br>5355 N. 16TH ST.<br>STE 250<br>PHOENIX, AZ 85016 | WORKERS' COMPENSATION<br>POLICY # NWA0119201-05 | $0.00 |
| MESA AIR GROUP, INC. | AVIZENT/FRANK GATES | MICHELLE CHAMBERS 1-800-890-7418 EXT 25515<br>5356 N. 16TH ST.<br>STE 250<br>PHOENIX, AZ 85016 | WORKERS' COMPENSATION<br>POLICY # NWA0119201-03 | $0.00 |
| MESA AIRLINES, INC. | AVIZENT/FRANK GATES | MICHELLE CHAMBERS 1-800-890-7418 EXT 25516<br>5357 N. 16TH ST.<br>STE 250<br>PHOENIX, AZ 85016 | WORKERS' COMPENSATION<br>POLICY # NWA0119201-02 | $0.00 |
| MESA AIR GROUP, INC. | AVIZENT/FRANK GATES | MICHELLE CHAMBERS 1-800-890-7418 EXT 25517<br>5358 N. 16TH ST.<br>STE 250<br>PHOENIX, AZ 85016 | WORKERS' COMPENSATION<br>POLICY # NWA0119201-01 | $0.00 |
| MESA AIRLINES, INC. | BOMBARDIER, INC. | C/O MICHAEK BURKE<br>SIDLEY AUSTIN LLP<br>787 SEVENTH AVENUE<br>NEW YORK, NY 10019 | DATA LICENSE AGREEMENT NO 1221<br>AGREEMENT NO. 1221<br>BOMBARDER REGIONAL JET AIRCRAFT SERIES 100/200 | $0.00 |
| MESA AIRLINES, INC. | BRITISH MIDLAND AIRWAYS LTD. | 6 ADAM STREET<br>LONDON,  WC2N 6AA<br>ENGLAND, UK<br><br>WITH COPY TO UNITED AIRLINES<br>77 WEST WACKER DR.<br>CHICAGO, IL 60602 | CODE SHARE AGREEMENT BETWEEN MESA AIRLINES (AS A UNITED EXPRESS CARRIER) AND BRITISH MIDLAND AIRWAYS LIMITED | $0.00 |
| FREEDOM AIRLINES, INC. | BUSINESS ASSOCIATE AGREEMENT FOR HEALTH PLAN (UMR) | UMR, INC. C/O JAY ANKLER<br>11 SCOTT STREET<br>SUITE 100<br>WAUSAU, WI 54403 | HEALTH BENEFITS PROVIDER | $0.00 |
| MESA AIR GROUP, INC. | CAE INC. | ATTN PAUL G. RENAUD<br>8585 COTE-DE-LIESSE<br>MONTREAL, QC H4T 1G6<br>CANADA | FLIGHT TRAINING SYSTEMS AND SERVICES AGREEMENT<br>MESA AGREES TO LEASE HOURS ON SIMULATORS TO CATS | TBD (NEGOTIATIONS PENDING) |
| MESA AIRLINES, INC. | CHARTIS | TRISHA MINNICK 646-857-1126<br>EXECUTIVE OFFICES 175 WATER ST.<br>NEW YORK, NY 10032 | WORKERS' COMPENSATION<br>POLICY # WC564-6570 ALL STATES<br>POLICY # WC564-6371 CA | $0.00 |
| MESA AIR GROUP, INC. | CHARTIS | TRISHA MINNICK 646-857-1126<br>EXECUTIVE OFFICES 175 WATER ST.<br>NEW YORK, NY 10032 | WORKERS' COMPENSATION<br>POLICY # 341869 | $0.00 |
| MESA AIR GROUP, INC. | CHARTIS | TRISHA MINNICK 646-857-1125<br>EXECUTIVE OFFICES 175 WATER ST.<br>NEW YORK, NY 10032 | WORKERS' COMPENSATION<br>POLICY # WC564-6334 ALL STATES<br>POLICY # WC564-6335 CA | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | CHARTIS | TRISHA MINNICK 646-857-1126 EXECUTIVE OFFICES 175 WATER ST. NEW YORK, NY 10032 | WORKERS' COMPENSATION POLICY # 341912 | $0.00 |
| MESA AIR GROUP, INC. | CHARTIS (AIG) | EXECUTIVE OFFICES 175 WATER ST. NEW YORK, NY 10032 | D&O 01-841-82-44 | $0.00 |
| MESA AIR GROUP, INC. | CHARTIS (AIG) | EXECUTIVE OFFICES 175 WATER ST. NEW YORK, NY 10032 | D&O 01-841-82-44 | $0.00 |
| MESA AIR GROUP, INC. | COMAIR INC | ATTN DIRECTOR OF SUPPLY CHAIN 77 COMAIR BLVD ERLANGER, KY 41018 | AIRCRAFT MAINTENANCE SERVICES AGREEMENT SERVICER PROVIDES ON CALL MAINTENANCE | $0.00 |
| MESA AIRLINES, INC. | COMAIR INC | ATTN DEANNA SEITHER, DIRECTOR OF SUPPLY CHAIN 77 COMAIR BLVD. ERLANGER, KY 41018-1274 | SPARE PARTS LOAN AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | COMMERCE & INDUSTRY INS. CO. | C/O CHARTIS AVIATION 100 COLONY SQUARE, 1175 PEACHTREET STREET NE SUITE 1000 ATLANTA, GA 30361 | AVIATION HULL & LIABILITY HL185327206 | $0.00 |
| MESA AIRLINES, INC. | COMPASS BANK | ATTN LEGAL DEPARTMENT 2009 BELTLINE ROAD SW DECATUR, AL 35601 | PURCHASING CARD AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50314-0302 | AIRCRAFT MAINTENANCE PURCHASE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50315-0302 | AIRCRAFT MAINTENANCE PURCHASE AGREEMENT | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50314-0302 | AIRCRAFT MAINTENANCE PURCHASE AGREEMENT MAINTENANCE SERVICE AGREEMENT W/ RESPECT TO MESA OPERATIONS AT DES MOINES AIRPORT | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50314-0302 | AMENDMENT 1 TO ON-CALL MAINTENANCE AGREEMENT AMENDS ON-CALL MAINTENANCE AGREEMENT DTD 12/1/2999 | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50315-0302 | AMENDMENT FOUR TO ON-CALL MAINTENANCE AGREEMENT AMENDMENT FOUR CRJ200 AND CRJ900 | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50315-0302 | AMENDMENT ONE TO ON-CALL MAINTENANCE AGREEMENT AMENDMENT SETTING FORTH FURTHER AGREEMENT RELATIVE TO INSURANCE REQUIREMENTS DEFINUDE UNTER ARTICE VI OF THE AGREEMENT | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50315-0302 | AMENDMENT THREE TO ON-CALL MAINTENANCE AGREEMENT CRJ700; CRJ900 | SEE ABOVE |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50315-0302 | AMENDMENT TWO TO ON-CALL MAINTENANCE AGREEMENT CRJ200 FLEET MAINTENANCE | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50314-0302 | ON-CALL MAINTENANCE AGREEMENT | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50315-0302 | ON-CALL MAINTENANCE AGREEMENT AGREEMENT FOR ON-CALL AIRCRAFT MAINTENANCE SERVICES W/ RESPECT TO MESA OPERATIONS IN DES MOINES | SEE ABOVE |
| MESA AIRLINES, INC. | DES MOINES FLYING SERVICE, INC. | ATTN JOHN LOWE, PRESIDENT PO BOX 35126 DES MOINES, IA 50315-0302 | ON-CALL MAINTENANCE AGREEMENT AGREEMENT FOR ON-CALL AIRCRAFT MAINTENANCE SERVICES W/ RESPECT TO MESA OPERATIONS IN DES MOINES | SEE ABOVE |
| MESA AIRLINES, INC. | DEUTSCHE LUFTHANSA AG | LUFTHANSA BASIS FRA EL/K FRANKFURT, GERMANY 60546  WITH COPY TO UNITED AIRLINES 77 WEST WACKER DR. CHICAGO, IL 60602 | CODE SHARE AGREEMENT BETWEEN MESA AIRLINES (AS A UNITED EXPRESS CARRIER) AND DEUTCHE LUFTHANSA AKTIENGESELLSCHAFT | $0.00 |
| MESA AIRLINES, INC. | DISCOVER CARD SERVICES, INC. | ATTN LEGAL DEPARTMENT 1500 LAKE COOK ROAD RIVERWOODS, IL 60015  WITH COPY TO UNITED AIRLINES 77 WEST WACKER DR. CHICAGO, IL 60601 | CREDIT CARD MERCHANT AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | EXPEDIA, INC., INDIVIDUALLY AND AS AGENT FOR TRAVELSCAPE, LLC | SVP, STRATEGIC ACCOUNTS 3150 139TH AVE SE BELLEVUE, WA 98005 | TICKETING AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | EXPEDIA, INC., INDIVIDUALLY AND AS AGENT FOR TRAVELSCAPE, LLC | ATTN GENERAL COUNSEL 3150 139TH AVE SE BELLEVUE, WA 98005 | TICKETING AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | EXPEDITORS INTERNATIONAL OF WASHINGTON, INC. | CORPORATE HEADQUARTERS 1015 THIRD AVE. 12TH FLOOR SEATTLE, WA 98104 | CUSTOMS POWER OF ATTORNEY | $0.00 |
| MESA AIR GROUP, INC. | FAA | DEPT OF TRANSPORTATION, 800 INDEPENDENCE AVE, SW WASHINGTON, DC 20591 | WAR RISK INSURANCE POLICY # PWR-09012009- YV | $0.00 |
| MESA AIR GROUP, INC. | FAA | DEPT OF TRANSPORTATION, 800 INDEPENDENCE AVE, SW WASHINGTON, DC 20591 | WAR RISK INSURANCE POLICY # PWR-09012009- YV | $0.00 |
| MESA AIRLINES, INC. | FEDERAL COMMUNICATIONS COMMISSION WIRELESS TELECOMMUNICATIONS BUREAU | 445 12TH STREET SW WASHINGTON, DC 20554 | RADIO STATION AUTHORIZATION FRN: 00093238460/ FILE NO. 0001666145 | $0.00 |
| MESA AIR GROUP, INC. | FEDERAL EXPRESS CORPORATION | ATTN LEGAL DEPARTMENT 6075 POPLAR AVE. SUITE 401 MEMPHIS, TN 38119 | US CUSTOMS POWER OF ATTORNEY, DESIGNATION AS EXPORT FORWARDING AGENT AND TERMS & CONDITIONS | TBD (NEGOTIATIONS PENDING) |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | FEDERAL EXPRESS CORPORATION | ATTN LEGAL DEPARTMENT<br>6075 POPLAR AVE.<br>SUITE 401<br>MEMPHIS, TN 38119 | FEDEX EXPRESS FREIGHT PRICING PROGRAM AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | FEDERAL EXPRESS CORPORATION | ATTN LEGAL DEPARTMENT<br>6075 POPLAR AVE.<br>SUITE 401<br>MEMPHIS, TN 38119 | MASTER POWERSHIP AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | FIRST NATIONAL BANK ASSOCIATION (US BANK) | ATTN V.P. MERCHANT BANKCARDS<br>120 SOUTH SIXTH STREET<br>MINNEAPOLIS, MN 55402 | CREDIT CARD MERCHANT AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | FLIGHT DATA SERVICES INCORPORATED. | ATTN JOHN FLEMMING, EXECUTIVE VICE PRESIDENT<br>2375 EAST CAMELBACK RD 5TH FLOOR<br>PHOENIX, AZ 85016 | AGREEMENT FOR FLIGHT DATA SERVICES INCORPORATED TO PROVIDE FLIGHT DATA ANALYSIS SERVICES TO MESA AIR GROUP INC<br>FLIGHT DATA SERVICES INC TO PROVIDE FLIGHT DATA ANALYSIS SERVICES<br>CRJ 100, CRJ 200, CRJ 700, CRJ 900, ERJ 145, DHC 8 | TBD (NEGOTIATIONS PENDING) |
| MESA AIRLINES, INC. | FLIGHT DIMENSIONS INTERNATIONAL INC D/B/A FLIGHT EXPLORER | PO BOX 630650<br>BALTIMORE, MD 21263-0650 | SALES ORDER FOR MESA AIRLINES - OPERATIONS | $10,234.83 |
| MESA AIRLINES, INC. | FLIGHT EXPLORER | 4835 CORDELL AVE<br>SUITE 150<br>BETHESDA, MD 20814 | SALES ORDER FOR: MESA AIRLINES - OPERATIONS<br>USERID: 9X YVPHXSOC; 8X YVPHX | $0.00 |
| MESA AIR GROUP, INC. | FOKKER SERVICES, INC. | ATTN LEON KOUTERS, PRESIDENT<br>5169 SOUTHRIDGE PARKWAY<br>SUITE 100<br>ATLANTA, GA 30349 | AIRCRAFT PARTS CONSIGNMENT ACCESS AND COMPONENT MAINTENANCE AGREEMENT<br>CONTRACT NO. 2008-APCAM-MESA/FSI<br>BOMBARDIER DHC8-200 | TBD (NEGOTIATIONS PENDING) |
| MESA AIR GROUP, INC. | FOKKER SERVICES, INC. | ATTN LEON KOUTERS, PRESIDENT<br>5169 SOUTHRIDGE PARKWAY<br>SUITE 100<br>ATLANTA, GA 30349 | AIRCRAFT PARTS CONSIGNMENT ACCESS AND COMPONENT MAINTENANCE AGREEMENT<br>CONTRACT NO. 2008-APCAM-MESA/FSI | SEE ABOVE |
| MESA AIR GROUP, INC. | FOKKER SERVICES, INC. | ATTN LEON KOUTERS, PRESIDENT<br>5169 SOUTHRIDGE PARKWAY<br>SUITE 100<br>ATLANTA, GA 30349 | AIRCRAFT PARTS CONSIGNMENT ACCESS AND COMPONENT MAINTENANCE AGREEMENT<br>CONTRACT NO. 2008-APCAM-MESA/FSI | SEE ABOVE |
| MESA AIR GROUP, INC. | FOKKER SERVICES, INC. | ATTN LEON KOUTERS, PRESIDENT<br>5169 SOUTHRIDGE PARKWAY<br>SUITE 100<br>ATLANTA, GA 30349 | EQUIPMENT SALES AGREEMENT AG-001286<br>AG-001286<br>DHC8-200 INVENTORY PARTS | SEE ABOVE |
| MESA AIR GROUP AIRLINE INVENTORY MANAGEMENT, LLC | FOKKER SERVICES, INC. | ATTN LEON KOUTERS, PRESIDENT<br>5169 SOUTHRIDGE PARKWAY<br>SUITE 100<br>ATLANTA, GA 30349 | EQUIPMENT SALES AGREEMENT AG-001286<br>AG-001286<br>DHC8-200 INVENTORY PARTS | SEE ABOVE |
| MESA AIRLINES, INC. | GA TELESIS | 6900 S. PARK AVENUE<br>TUCSON, AZ 85756 | PROPERTY SUBLEASE RENTAL AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | GALILEO INTERNATIONAL | ATTN LEGAL DEPARTMENT<br>400 INTERPACE PKWY<br>BUILDING A<br>PARSIPPANY, NJ 07054 | TICKETING INFORMATION DATA TRANSFER AGREEMENT | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | GE AIRCRAFT ENGINES | ATTN STEVE MCMANUS<br>ONE NEUMANN WAY<br>ROOM 111<br>CINCINNATI, OH 45215 | LETTER REGARDING DESIGNATION OF IHI TO ACT ON MESA AIR GROUP'S BEHALF | $0.00 |
| MESA AIRLINES, INC. | GE CAPITAL AVIATION SERVICES, INC. | ATTN WILLIAM SALOMON<br>201 HIGH RIDGE RD<br>STAMFORD, CT 06905 | CONFIDENTIALITY AGREEMENT DATED SEPTEMBER 2009 | $0.00 |
| MESA AIR GROUP, INC. | GENERAL ELECTRIC COMPANY | 1000 WESTERN AVE<br>LYNN, MA 01910 | OMNIBUS ENGINE WARRANTY ASSIGNMENT<br>RE: THE GENERAL TERMS AGREEMENT, CONTRACT NO. CF34-0801-055 ENTERED INTO AS OF 11/15/2002 | $0.00 |
| MESA AIR GROUP, INC. | GENERAL ELECTRIC COMPANY - GE-AVIATION | ATTN VP COMMERCIAL ENGINE OPERATION<br>1 NEUMANN WAY<br>CINCINNATI, OH 45215 | STANDARD DIAGNOSTICS SERVICES AGREEMENT FOR CF34-3 AND CF34-8 SERIES ENGINES<br>REFERENCE NO. 7-1-236102840<br>CF34-3 AND CF34-8 SERIES ENGINES | $0.00 |
| MESA AIR GROUP, INC. | GENERAL ELECTRIC COMPANY ACTING THROUGH ITS TRANSPORTATION-AIRCRAFT ENGINE OPERATING COMPONENT | ATTN COMMERCIAL CONTRACTS DIRECTOR<br>1 NEUMANN WAY<br>MAIL DROP: J165<br>CINCINNATI, OH 45215 | AMENDMENT NO.1<br>AGREEMENT NO. CF34-0801-055<br>CF34-8 PROPULSION SYSTEMS, CRJ-200 & CRJ100/200 | $0.00 |
| MESA AIR GROUP, INC. | GENERAL ELECTRIC COMPANY THROUGH GE AIRCRAFT ENGINES | ATTN MICHAEL H. CARR, COUNSEL COMMERCIAL CONTRACTS & TRANSACTIONS<br>ONE NEUMANN WAY<br>CINCINNATI, OH 45215-1988 | AMENDMENT NO. 1 TO GENERAL TERMS AGREEMENT NO. CF34-0801-055<br>AMENDMENT NO. 1 TO GENERAL TERMS AGREEMENT NO. CF34-0801-055<br>CF34-8 ENGINES AND EQUIPMENT | $0.00 |
| MESA AIR GROUP, INC. | GENERAL ELECTRIC COMPANY / GE AIRCRAFT ENGINES | ATTN MANAGER, CONTRACTS<br>1000 WESTERN AVE<br>MAIL DROP 34005<br>LYNN, MA 01910 | GENERAL TERMS AGREEMENT FOR CF34-8 TURBOFAN ENGINES AND SUPPORT<br>CONTRACT NO. CF34-0801-055<br>GE CF34-8 PROPULSION SYSTEMS | $0.00 |
| MESA AIRLINES, INC. | GENERAL SERVICES ADMINISTRATION, FEDERAL ACQUISITION SERVICE, OFFICE OF TRAVEL & TRANSPORTATION | ACQUISITION SUPPORT<br>SUITE 300 (QMAD)<br>2200 CRYSTAL DRIVE<br>ARLINGTON, VA 22202 | AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT<br>MODIFICATION OF CONTRACT/ORDER NO. GS-33F-V0007, DATED 06/30/2008; AMENDMENT NO. PO02 | $0.00 |
| MESA AIR GROUP, INC. | GROUP VISION CARE POLICY | VISION SERVICE PLAN INSURANCE COMPANY<br>3333 QUALITY DRIVE<br>RANCHO CORDOVA, CA 95607 | GROUP VISION CARE POLICY<br>VISION BENEFITS | $0.00 |
| MESA AIRLINES, INC. | GSA, FAS, QMAD | ATTN KIM JAREMBACK - CONTRACTING OFFICER<br>2200 CRYSTAL DRIVE<br>SUITE 300<br>ARLINGTON, VA 22202 | SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS<br>CONTRACT GS-33F-V0007 (SOLICITATION NO. FBG-KJ-080001-N | $0.00 |
| MESA AIR GROUP, INC. | HAWAII FUELING FACILITIES CORPORATION | C/O AIRCRAFT SERVICE INTERNATIONAL GROUP;<br>ATTN: AREA GENERAL MANAGER<br>HONOLULU INTERNATIONAL AIRPORT<br>3201 AOLELE STREET<br>HONOLULU, HI 96819 | NON-CONTRACTING USER AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | HAWTHORNE AVIATION, LLC D/B/A LANDMARK AVIATION | ATTN JIM HOPKIN, VICE PRESIDENT, FBO OPERATIONS<br>1524 W. 14TH ST, SUITE 110<br>TEMPE, AZ 85281 | INTO-PLANE FUEL SERVICE AGREEMENT | $13,083.87 |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | HONEYWELL INTERNATIONAL, INC. D/B/A HONEYWELL AEROSPACE ELECTRONIC SYSTEMS EXCHANGE AND RENTAL BUSINESS (ERB) | 21111 N. 19TH AVE PHOENIX, AZ 85207 | HONEYWELL AIRLINE EXCHANGE ("AL/EX") AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | HUSKY MARKETING AND SUPPLY COMPANY | ATTN JASON HAZEN 5550 BLAZER PARKWAY SUITE 200 DUBLIN, OH 43017 | SALES AGREEMENT HUSKY CONTRACT NUMBER MAI09S001 | $0.00 |
| MESA AIRLINES, INC. | HUSKY MARKETING AND SUPPLY COMPANY | ATTN JASON HAZEN 5550 BLAZER PARKWAY SUITE 200 DUBLIN, OH 43017 | SALES AGREEMENT HUSKY CONTRACT NUMBER MAI09T001 | $0.00 |
| MESA AIRLINES, INC. | IKON FINANCIAL SERVICES | CHRISTINE ETHERIDGE 1738 BASS ROAD MACON, GA 31210 | IMAGE MANAGEMENT AGREEMENT | $35,177.91 (PER SETTLEMENT AGREEMENT) |
| MESA AIR GROUP, INC. | IMPERIAL CAPITAL, LLC | ATTN MARC BILBAO, MANAGING DIRECTOR 2000 AVE OF THE START, 9TH FLOOR LOS ANGELES, CA 90067 | LETTER AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | IMPERIAL CAPITAL, LLC | ATTN MARC BILBAO, MANAGING DIRECTOR 2000 AVENUE OF THE STARS 9TH FLOOR SOUTH LOS ANGELES, CA 90067 | LETTER AGREEMENT ENGAGES IMPERIAL CAPITAL, LLC AS FINANCIAL ADVISOR | $0.00 |
| MESA AIR GROUP, INC. | IMPERIAL CAPITAL, LLC | ATTN: MARC BILBAO, MANAGING DIRECTOR 2000 AVENUE OF THE STARS, 9TH FLOOR SOUTH LOS ANGELES, CA 90067 | LETTER AGREEMENT TO AMEND THE ENGAGEMENT LETTER DATED AS OF JULY 2, 2009 | $0.00 |
| MESA AIRLINES, INC. | INDIANAPOLIS FUEL FACILITIES LLC | ATTN: DANIEL R. DEBORD, FUEL COMMITTEE CHAIRPERSON C/O DELTA AIR LINES 2700 LONE OAK PARKWAY, DEPT. A4192 EAGAN, MN 55121-1534 | NON-CONTRACTING USER AGREEMENT | $0.00 |
| NILCHII, INC. | INDIGO MIRAMAR LLC | 2525 E. CAMELBACK ROAD, SUITE 800 PHOENIX, AZ 85016 | LIMITED LIABILITY COMPANY AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | INTERNATIONAL AIR TRANSPORT ASSOCIATION | MANAGER INTERLINE AND CODE ADMINISTRATION 800 PLACE VICTORIA P.O. BOX 113 MONTREAL, QUEBEC H4Z1M1 CANADA | IATA MEMBERSHIP AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | INTERNATIONAL FIDELITY INSURANCE COMPANY | ONE NEWARK CENTER 20TH FLOOR WARREN, NJ 7059 | UNITED STATES OF AMERICA   IMPORTER OR BROKER CUSTOMS BOND CUSTOMS BOND #460308332 460308332 | $0.00 |
| MESA AIR GROUP, INC. | IRONSHORE INDEMNITY INS. CO. | C/O  STARR AVIATION AGENCY 3353 PEACHTREE ROAD NE SUITE 1000 ATLANTA, GA 30326 | AVIATION HULL & LIABILITY IHM100013-01 | $0.00 |
| MESA AIRLINES, INC. | ITA SOFTWARE, INC | 141 PORTLAND STREET 7TH FLOOR CAMBRIDGE, MA 2139 | AVAILABILITY DATA AGREEMENT | $0.00 |

56772-002\DOCS_NY:22953v1

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | J SAMUELS SIGNATURE HOMES LLC | ATTN MANI FRANCES KIRSTIC<br>3133 WAIALAE AVE #3925<br>HONOLULU, HI 96816 | GO! AND J. SAMUELS SIGNATURE HOMES MARKETING AGREEMENT | $0.00 |
| MPD, INC. | J.F. OBERLIN UNIVERSITY | ATTN DR. BRUCE L. BATTEN, VP FOR INTERNATIONAL RELATIONS<br>3758 TOKIWA-MACHI<br>MACHIDA-SHI<br>TOKYO,  194-0294<br>JAPAN | MEMORANDUM OF UNDERSTANDING<br>FLIGHT TRAINING | $0.00 |
| MESA AIR GROUP AIRLINE INVENTORY MANAGEMENT, LLC | JCB INTERNATIONAL CREDIT CARD CO, LTD | 700 SOUTH FLOWER STREET<br>SUITE 1000<br>LOS ANGELES, CA 90017 | CREDIT CARD MERCHANT AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | JEPPESEN SANDERSON, INC. | ATTN THOMAS WEDE, SR. VP & GENERAL MANAGER, AVIATION<br>55 INVERNESS DRIVE EAST<br>ENGLEWOOD, CO 80112 | TAILORED ELECTRONIC FLIGHT INFORMATION SERVICES SUPPLEMENT CONTRACT NO: MES-10781 | TBD (NEGOTIATIONS PENDING) |
| MESA AIRLINES, INC. | JETBLUE AIRWAYS CORPORATION | ATTN FRANK BURATTI, DIRECTOR OF AIRCRAFT MAINTENANCE<br>118-29 QUEENS BLVD<br>FOREST HILLS, NY 11375 | ON-CALL MAINTENANCE AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | JP MORGAN CHASE BANK | ATTN LEGAL DEPARTMENT<br>270 PARK AVE.<br>NEW YORK, NY 10017 | AIRLINES CLEARING HOUSE INTERNET STATEMENT SERVICE AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | K&S HELICOPTERS DBA PARADISE HELICOPTERS DBA TROPICAL HELICOPTERS | ATTN STEVEN V KITTRELL, ASST CHIEF PILOT<br>PO BOX 5371<br>73-341 U'U ST<br>KAILUA-KONA, HI 96740 | RECIPROCAL COCKPIT JUMPSEAT AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | KENYON INTERNATIONAL EMERGENCY SERVICES, INC. | ATTN MARK KIRCHESSNER, DIRECTOR OF SALES<br>15180 GRAND POINT DRIVE<br>HOUSTON, TX 77090-6307 | SERVICE AGREEMENT (2010) | $0.00 |
| MESA AIR GROUP, INC. | LLOYD'S LONDON | C/O AON<br>8 DEVONSHIRE SQ.<br>LONDON,  EC2M 4PL<br>UK | AVIATION HULL & LIABILITY<br>AM0902181 | $0.00 |
| NILCHII, INC. | LONG BAR MIRAMAR | 2525 E. CAMELBACK ROAD, SUITE 800<br>PHOENIX, AZ 85016 | LIMITED LIABILITY COMPANY AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | MAGI INSURANCE LTD. | C/O TOWNER MANAGEMENT GROUP<br>ST. JAMES HOUSE, SECOND STREET HOLETOWN<br>ST. JAMES, BARBADOS | AVIATION HULL & LIABILITY REINSURANCE<br>AM0902182 | $0.00 |
| MESA AIR GROUP, INC. | MATTHEWS, GOLD, KENNEDY & SNOW, INC. | MATTHEWS, GOLD, KENNEDY & SNOW, INC.<br>6530 NORTH 16TH STREET<br>PHOENIX, AZ 85016 | 401K PLAN CONSULTING SERVICES | $4,300.00 |
| MESA AIR GROUP, INC. | MESA AIR GROUP AIRLINE INVENTORY MANAGEMENT, L.L.C. | 410 NORTH 44TH SREET<br>SUITE 700<br>PHOENIX, AZ 85008 | LIMITED LIABILITY COMPANY OPERATING AGREEMENT | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY | METLIFE VOLUNTARY BENEFITS GROUP 477 MARTINSVILLE RD 4TH FLOOR LIBERTY CORNER, NJ 07938 | METPAY PROGRAM AGREEMENT SUPPLEMENTAL VOLUNTARY BENEFITS | $0.00 |
| MESA AIRLINES, INC. | MHMSA GROUP PLAN (HAWAII INSURANCE) BLUE CROSS & BLUE SHIELD OF HAWAII | BLUE CROSS AND BLUE SHIELD OF HAWAII 818 KEEAUMOKU STREET 6-AMS HONOLULU, HI 96814 | INSURANCE AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | NATIONAL FIRE & MARINE INS CO | C/O STARR AVIATION AGENCY 3353 PEACHTREE ROAD NE SUITE 1000 ATLANTA, GA 30326 | AVIATION HULL & LIABILITY 92CVS101807 | $0.00 |
| MESA AIR GROUP, INC. | NATIONWIDE TRUST COMPANY, FSB | NATIONWIDE TRUST COMPANY, FSB THREE NATIONWIDE PLAZA COLUMBUS, OH 43215 | PROGRAM AGREEMENT (INCLUDING FUND ACCESS SCHEDULE, ER STOCK FUND SCHEDULE, TERMINATION CHARGE SCHEDULE AND FUND SELECTION SCHEDULE | $0.00 |
| MESA AIR GROUP, INC. | NATIONWIDE TRUST COMPANY, FSB | NATIONWIDE TRUST COMPANY, FSB THREE NATIONWIDE PLAZA COLUMBUS, OH 43215 | GROUP ANNUITY CONTRACT NO. GA-P PA43 | $0.00 |
| MESA AIR GROUP, INC. | NATIONWIDE TRUST COMPANY, FSB | NATIONWIDE TRUST COMPANY, FSB THREE NATIONWIDE PLAZA COLUMBUS, OH 43215 | DIRECTED TRUST AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | NEWAIR, INC. | NEWAIR, INC. 7345 EAST EVANS ROAD SUITE 16 SCOTTSDALE, AZ 85260 | COURSEWARE LICENSE AGREEMENT THE PRODUCT IS COMPUTER BASED AND/OR WEB BASED TRAINING COURSEWARE | $379.04 |
| MESA AIRLINES, INC. | ONETRAVEL.COM | TOM SPAGNOLA 1050 E. FLAMINGO ROAD SUITE E-120 LAS VEGAS, NV 89119 | NET FARE AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | ORACLE CORPORATION | ORACLE CORPORATION, ATTN LEGAL DEPARTMENT 500 ORACLE PARKWAY REDWOOD CITY, CA 94065 | SOFTWARE LICENSE AND SERVICES AGREEMENT | $14,250.00 |
| MESA AIRLINES, INC. | ORBITZ WORLDWIDE, LLC | ATTN VP, BUSINESS DEVELOPMENT 500 WEST MADISON STREET SUITE 1000 CHICAGO, IL 60661 | COMMISSION AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | ORBITZ WORLDWIDE, LLC | ATTN LEGAL DEPARTMENT 500 WEST MADISON STREET SUITE 1000 CHICAGO, IL 60661 | COMMISSION AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | P&K ENTERPRISES LLC | 11419 E. LA MARCHE DR. SCOTTSDALE, AZ 85259 | LEASE AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | PILOT AIR FREIGHT | 314 N. MIDDLETOWN ROAD LIMA, PA 19037 | CUSTOMS POWER OF ATTORNEY | TBD (NEGOTIATIONS PENDING) |

56772-002\DOCS_NY:22953v1

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | PLANEBUSINESS, LLC & HOLLY HEGEMAN | PERKINS COIE BROWN AND BAIN, P.C.  C/O DANIEL C. BARR<br>2901 N. CENTRAL AVE<br>STE 2000<br>PHOENIX, AZ 85012-2788 | SETTLEMENT AND RELEASE AGREEMENT DATED MARCH 19, 2009 | $0.00 |
| MESA AIRLINES, INC. | RELIANCE INSUANCE COMPANY | C/O DREXEL HARRIS<br>75 BROAD STREET<br>10TH FLOOR<br>NEW YORK, NY 10004 | WORKERS'  COMP - INSURANCE POLICIES - #NWA0119405-00; NWA0110208-00; NWA0119207-00; NWA0119206-00; NWA0119202-00; NWA0119201-00; NWA0119208-01;  NWA0119207-01; NWA0119206-01; NWA0119202-01; NWA0119201-01; NWA0119208-02; NWA0119207-02; NWA0119206-02; NWA0119201-02; NWA0119208-03; NWA0119207-03; NWA0119206-03; NWA0119202-03; NWA0119201-03; NWA0119207-04; NWA0119206-04; NWA0119201-04 | $0.00 |
| MESA AIRLINES, INC. | RENE PEREZ & ASSOCIATES, INC. (EREV) | ATTN LEGAL DEPARTMENT<br>5901 SOUTHWEST 74TH STREET<br>SUITE 310<br>MIAMI, FL 33143 | LEASE AND SUPPORT AGREEMENT: APPLICATION SOFTWARE | $1,290.32 |
| MESA AIR GROUP, INC. | REPUBLIC AIRWAYS HOLDINGS INC. | 8909 PURDUE ROAD, SUITE 300<br>INDIANAPOLIS, IN 46268 | LIMITED LIABILITY COMPANY OPERATING AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | RPA/AIRLINE AUTOMATION SERVICES INC | ATTENTION LEGAL DEPARTMENT<br>5945 AIRPORT ROAD<br>SUITE 254<br>MISSISSAUGA, ONTARIO L4V1R9<br>CANADA | LICENSE AND SUPPORT AGREEMENT<br>MESA A NON-EXCLUSIVE, PERPETUAL RIGHT AND LICENSE TO USE AND COPY, FOR SECURITY AND ARCHIVE PURPOSES. | $0.00 |
| MESA AIRLINES, INC. | RPA/AIRLINE AUTOMATION SERVICES INC | ATTENTION LEGAL DEPARTMENT<br>5945 AIRPORT ROAD<br>SUITE 254<br>MISSISSAUGA, ONTARIO L4V1R9<br>CANADA | OBJECT CODE APPLICATION SOFTWARE PURCHASE & SUPPORT AGREEMENT ADDENDUM A<br>ADDENDUM A<br>RE: OBJECT CODE APPLICATION SOFTWARE PURCHASE & SUPPORT AGREEMENT DTD 6/30/1999 | $0.00 |
| MESA AIRLINES, INC. | RPA/AIRLINE AUTOMATION SERVICES INC | ATTENTION LEGAL DEPARTMENT<br>5945 AIRPORT ROAD<br>SUITE 254<br>MISSISSAUGA, ONTARIO L4V1R9<br>CANADA | OBJECT CODE APPLICATION SOFTWARE PURCHASE & SUPPORT AGREEMENT ADDENDUM B<br>ADDENDUM B<br>RE: OBJECT CODE APPLICATION SOFTWARE PURCHASE & SUPPORT AGREEMENT DTD 6/30/1999 | $0.00 |
| MESA AIR GROUP, INC. | SABRE INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES<br>3150 SABRE DRIVE<br>SOUTHLAKE, TX 76092 | MASTER AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| MESA AIR GROUP, INC. | SABRE INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES<br>3150 SABRE DRIVE<br>SOUTHLAKE, TX 76092 | WORK ORDER 12 TO MASTER AGREEMENT<br>RE: MASTER AGREEMENT DTD 9/1/2005 | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES<br>3150 SABRE DRIVE<br>SOUTHLAKE, TX 76092 | WORK ORDER NO. 14 TO MASTER AGREEMENT BETWEEN SABRE INC. AND MESA AIR GROUP, INC. SABRESONIC WEB<br>SABRE PROVIDES CUSTOMER WITH ACCESS & USE OF THE SABRE SONIC WEB | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES<br>3150 SABRE DRIVE<br>SOUTHLAKE, TX 76092 | WORK ORDER NO. 15 TO THE MASTER AGREEMENT BETWEEN SABRE INC. & MESA AIR GROUP, INC.<br>SABRE WILL PROVIDE CUSTOMER 2 ADDITIONAL SABRE IBE SITES | SEE ABOVE |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | SABRE INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER NUMBER 13 TO MASTER AGREEMENT BETWEEN SABRE INC & MESA AIR GROUP, INC. SABRESONIC RES SABRE PROVIDES USE OF SYSTEMS | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER NUMBER 16 TO MASTER AGREEMENT SABRE INC. & MESA AIR GROUP, INC. SABRE WILL PROVIDE SERVICES | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER NUMBER 17 TO MASTER AGREEMENT BETWEEN SABRE INC. AND MESA AIR GROUP, INC. SABRE WILL PROVIDE WEB SERVICES | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE TRAVEL INTERNATIONAL LIMITED | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | SABRE PARTICIPATING CARRIER DISTRIBUTION AND SERVICES AGREEMENT | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE TRAVEL INTERNATIONAL LIMITED | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | TICKET CONTROL NUMBER (TCN) DATA OPTIONAL SERVICES ADDENDUM | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE TRAVEL NETWORK | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | LETTER RE: SELECTED OPTIONAL SERVICES | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | CHANGE ORDER TO MASTER AGREEMENT WITH AN EFFECTIVE DATE OF SEPTEMBER 1, 2005 WORK ORDER #13 FOR SABRESONIC RES EFFECTIVE MAY 7, 2007 | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #1 TO MASTER AGREEMENT DATED SEPTEMBER 1, 2005 FLIGHT CONTROL SUITE | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #18 | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #19 | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #2 TO MASTER AGREEMENT DATED SEPTEMBER 1, 2005 FLIGHT CONTROL SUITE | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #20A | SEE ABOVE |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #21 | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #22 TO MASTER AGREEMENT DATED SEPTEMBER 1, 2005 PAY & ALLOWANCES SYSTEM WITH MANAGEMENT INFORMATION | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #23 TO MASTER AGREEMENT DATED SEPTEMBER 1, 2005 CODESHARE | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3150 SABRE DRIVE SOUTHLAKE, TX 76092 | WORK ORDER #24 TO MASTER AGREEMENT FOR SOFTWARE LICENSE AND PROFESSIONAL SERVICES INTERLINE ELECTRONIC TICKETING | SEE ABOVE |
| MESA AIR GROUP, INC. | SABRE, INC. | ATTENTION LEGAL DEPT. AND PRESIDENT AIRLINE PRODUCTS & SERVICES 3151 SABRE DRIVE SOUTHLAKE, TX 76093 | SIDE LETTER AGREEMENT RE:  ELECTRONIC TICKETING | SEE ABOVE |
| MESA AIR GROUP, INC. | SIBSON CONSULTING | SIBSON CONSULTING, A DIVISION OF THE SIEGAL COMPANY 1230 WEST WASHINGTON STREET STE 501 TEMPE, AZ 85281 | HEALTH AND WELFARE BENEFIT CONSULTANTS | $12,396.80 |
| MESA AIR GROUP, INC. | SIGNATURE FLIGHT SUPPORT CORPORATION | ATTN KEITH P. RYAN, VP OPERATIONS 201 SOUTH ORANGE AVE SUITE 1100S ORLANDO, FL 32801 | AMENDMENT TO THE MASTER INTO-PLANE FUELING SERVICE AGREEMENT AMENDS MASTER INTO-PLANE FUELING SERVICE AGREEMENT DTD 8/1/2006 | $24,150.72 |
| MESA AIR GROUP, INC. | SIGNATURE FLIGHT SUPPORT CORPORATION | ATTN KEITH P. RYAN, VP OPERATIONS 201 SOUTH ORANGE AVE SUITE 1100S ORLANDO, FL 32801 | AMENDMENT TO THE MASTER INTO-PLANE FUELING SERVICE AGREEMENT | SEE ABOVE |
| MESA AIR GROUP, INC. | SIGNATURE FLIGHT SUPPORT CORPORATION | ATTN KEITH P. RYAN, VP OPERATIONS 201 SOUTH ORANGE AVE SUITE 1100S ORLANDO, FL 32801 | AMENDMENT TO THE MASTER INTO-PLANE FUELING SERVICE AGREEMENT | SEE ABOVE |
| MESA AIR GROUP, INC. | SIGNATURE FLIGHT SUPPORT CORPORATION | ATTN KEITH P. RYAN, VP OPERATIONS 201 SOUTH ORANGE AVE SUITE 1100S ORLANDO, FL 32801 | AMENDMENT TO THE MASTER INTO-PLANE FUELING SERVICE AGREEMENT | SEE ABOVE |
| MESA AIR GROUP, INC. | SIGNATURE FLIGHT SUPPORT CORPORATION | ATTN STEPHEN W. LEE, VP 201 SOUTH ORANGE AVE SUITE 1100S ORLANDO, FL 32801 | AMENDMENT TO THE MASTER INTO-PLANE FUELING SERVICE AGREEMENT AMENDS MASTER INTO-PLANE FUELING SERVICE AGREEMENT DTD 8/1/2006 | SEE ABOVE |
| MESA AIR GROUP, INC. | SIGNATURE FLIGHT SUPPORT CORPORATION | ATTN CONTRACTS 201 SOUTH ORANGE AVE SUITE 1100S ORLANDO, FL 32801 | MASTER INTO-PLANE FUELING SERVICE AGREEMENT | SEE ABOVE |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | SKYWEST AIRLINES, INC. | 444 SOUTH RIVER RD<br>ST. GEORGE, UT 84790 | DEICING AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | SOUTHWEST AIRLINES CO. | ATTN CAPT. CHUCK MAGILL, VICE PRESIDENT, FLIGHT OPERATIONS<br>HDQ-8FO<br>P.O BOX 36611<br>DALLAS, TX 75235-1611 | RECIPROCAL JUMPSEAT CREWMEMBER TRAVEL AGREEMENT | $732.33 |
| MESA AIR GROUP, INC. | SPRAGUE ENERGY CORP. | ATTN: CONTRACT ADMINISTRATION<br>TWO INTERNATIONAL DRIVE, SUITE 200<br>PORTSMOUTH, NH 03801 | JET AVIATION FUEL AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | STARNET INSURANCE CO. | C/O BERKLEY AVIATION<br>3780 STATE STREET<br>SUITE C<br>SANTA BARBARA, CA 93105 | AVIATION HULL & LIABILITY<br>BA09A1112S | $0.00 |
| MPD, INC. | TALON SYSTEMS, LLC | PO BOX 610906<br>DALLAS, TX 75261 | ADDENDUM TO AGREEMENT BETWEEN TALON SYSTEMS, LLC AND MESA PILOT DEVELOPMENT, INC. DATED MARCH 16, 2008 | $2,475.00 |
| MPD, INC. | TALON SYSTEMS, LLC | ATTN BERNARD STECKLEIN - PRESIDENT<br>1290 SOUTH MAIN ST<br>SUITE 104<br>GRAPEVINE, TX 76051 | PROPOSAL FOR AN EDUCATION AND TRAINING ADMINISTRATION SYSTEM | SEE ABOVE |
| MESA AIRLINES, INC. | TALX CORPORATION | TALX CORPORATION<br>11432 LACKLAND ROAD<br>ST. LOUIS, MO 63146 | AMENDMENT TO THE UNIVERSAL SERVICES AGREEMENT | $188.60 |
| MESA AIR GROUP, INC. | TALX THE WORK NUMBER | TALX CORPORATION<br>11432 LACKLAND ROAD<br>ST. LOUIS, MO 63146 | SERVICES AGREEMENT UNDER THE UNIVERSAL SERVICES AGREEMENT RELATED TO EMPLOYMENT VERIFICATION SERVICES<br>EMPLOYMENT VERIFICATION SERVICE | SEE ABOVE |
| MESA AIR GROUP, INC. | TEXAS AIR COMPOSITES INC. | 102 EZELL DR.<br>DALLAS, TX 37801 | LETTER OF INTENT<br>MAINTENANCE SERVICES PROVIDED<br>CRJ THRUST REVERSER | TBD (NEGOTIATIONS PENDING) |
| MESA AIRLINES, INC. | TIME AMERICA, INC. | TIME AMERICA, INC.<br>8840 EAST CHAPARRAL ROAD<br>SCOTTSDALE, AZ 85250 | APPLICATION SERVICE PROVIDER (ASP) AGREEMENT FOR NETTIME | $0.00 |
| MESA AIR GROUP, INC. | TRAVELERS | ONE TOWER SQUARE<br>HARTFORD, CT 06183 | VEHICLE INSURANCE<br>P-810-4824A638-COF-10 | $0.00 |
| MESA AIR GROUP, INC. | TRAVELERS | ONE TOWER SQUARE<br>HARTFORD, CT 06183 | COMMERCIAL PROPERTY<br>P-630-4824A638-TIL-10 | $0.00 |
| MESA AIR GROUP, INC. | TRAVELERS | ONE TOWER SQUARE<br>HARTFORD, CT 20591 | CRIME<br>412CF0754 | $0.00 |
| MESA AIRLINES, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT<br>1200 EAST ALGONQUIN RD<br>ELK GROVE TOWNSHIP, IL 60007 | STANDARD GROUND HANDLING AGREEMENT<br>UNITED CONTRACT 151790; AHM 810 | $0.00 |
| MESA AIRLINES, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT<br>1200 EAST ALGONQUIN RD<br>ELK GROVE TOWNSHIP, IL 60007 | STANDARD GROUND HANDLING AGREEMENT - MAIN AGREEMENT | $0.00 |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | UNITED AIRLINES IATA STANDARD GROUND HANDLING AGREEMENT - ANNEX B | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1209 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | UNITED EXPRESS SPACE AVAILABLE EMPLOYEE TRAVEL AGREEMENT DATED JUNE 1, 2009 UNITED CONTRACT NUMBER 163647 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1209 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | UNITED EXPRESS POSITIVE SPACE EMPLOYEE TRAVEL AGREEMENT DATED MAY 1, 2008 UNITED CONTRACT NUMBER 163647 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1194 EAST ALGONQUIN RD CHICAGO, IL 60601 | UNITED EXPRESS INTERLINE AGREEMENT SPACE AVAILABLE PLEASURE TRAVEL PROGRAM CONTRACT NO. 178365 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1198 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | AMENDED AND RESTATED UNITED EXPRESS AGREEMENT UNITED CONTRACT NO. 163872 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | AMENDMENT TO UNITED EXPRESS AGREEMENT  (DATED JUNE 3, 2005) UNITED CONTRACT NO. 163872-1 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | FOURTH AMENDMENT TO UNITED EXPRESS AGREEMENT 4TH AMENDMENT OF CONTRACT #163872 RJ-70 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | SEVENTH AMENDMENT TO UNITED EXPRESS AGREEMENT UNITED CONTRACT NO. 163872-7 DH2; RJ-50; AND RJ-70 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | SIXTH AMENDMENT TO UNITED EXPRESS AGREEMENT 6TH AMENDMENT TO THE 'AMENDED AND RESTATED UNITED EXPRESS AGREEMENT DTD 1/28/2004 UNITED CRJ200 AND CRJ700 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | THIRD AMENDMENT TO UNITED EXPRESS AGREEMENT 3RD AMENDMENT OF CONTRACT #163872 RJ-50 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | FIFTH AMENDMENT TO UNITED EXPRESS AGREEMENT UNITED CONTRACT # 163872 RJ-50 AIRCRAFT | $0.00 |
| MESA AIRLINES, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | IATP STANDARD TECHNICAL HANDLING AGREEMENT UNITED CONTRACT NO. 151790-16 | $0.00 |
| MESA AIRLINES, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | UNITED AIRLINES IATA STANDARD GROUND HANDLING AGREEMENT AMENDMENT, ANNEX B - LOCATION(S), AGREED SERVICES, CHARGES AND SUPPLEMENTARY CONDITIONS UNITED CONTRACT NO. 151790-9 ANNEX B.3.2 | $0.00 |
| MESA AIRLINES, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1200 EAST ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | UNITED AIRLINES IATA STANDARD GROUND HANDLING AGREEMENT AMENDMENT, ANNEX B - LOCATION(S), AGREED SERVICES, CHARGES AND SUPPLEMENTARY CONDITIONS UNITED CONTRACT NO. 151790-8 ANNEX B.2.2 CRJ AIRCRAFT | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1199 EAST ALGONQUIN RD CHICAGO, IL 60666 | EMERGENCY RESPONSE SERVICES AGREEMENT UNITED CONTRACT NO. 163649 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | ATTN LEGAL DEPARTMENT 1199 EAST ALGONQUIN RD CHICAGO, IL 60666 | SECOND AMENDMENT TO UNITED EXPRESS AGREEMENT UNITED CONTRACT NO. 163872 | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 77 WEST WACKER DRIVE CHICAGO, IL 60601 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER (NO. 178457) AMONG MESA AIR GROUP, AER LINGUS LIMITED AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 77 WEST WACKER DRIVE CHICAGO, IL 60601 | LETTER AGREEMENT REGARDING UNITED CONTRACT NUMBER 163872 (COSTS RE BMI) | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 78 WEST WACKER DRIVE CHICAGO, IL 60602 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, SOUTH AFRICAN AIRWAYS AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 78 WEST WACKER DRIVE CHICAGO, IL 60602 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, AIR CANADA AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 78 WEST WACKER DRIVE CHICAGO, IL 60602 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, QATAR AIRWAYS Q.C.S.C. AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 79 WEST WACKER DRIVE CHICAGO, IL 60603 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, TRANSPORTES AEREOS PORTUGUESES ("TAP") AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 80 WEST WACKER DRIVE CHICAGO, IL 60604 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, TACA INTERNATIONAL AIRLINES S.A. AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 81 WEST WACKER DRIVE CHICAGO, IL 60605 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, JET AIRWAYS AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 82 WEST WACKER DRIVE CHICAGO, IL 60606 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, SCANDINAVIAN AIRLINES SYSTEM AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 83 WEST WACKER DRIVE CHICAGO, IL 60607 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, ASIANA AIRLINES, INC. AND UNITED AIR LINES | $0.00 |
| MESA AIR GROUP, INC. | UNITED AIR LINES, INC. | 84 WEST WACKER DRIVE CHICAGO, IL 60608 | UNITED EXPRESS CODE SHARE AGREEMENT LETTER AMONG MESA AIRLINES, CONTINENTAL AIRLINES, INC. AND UNITED AIR LINES | $0.00 |
| MESA AIRLINES, INC. | UNIVERSAL AIR TRAVEL PLAN | 1301 PENNSYLVANIA AVE, N.W. WASHINGTON, DC 20004 | AMENDED AND RESTATED UATP PARTICIPATION AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | UNUM PROVIDENT GROUP INSURANCE POLICY (NUMBER 590284 001) | UNUM LIFE INSRUANCE COMPANY OF AMERICA 2211 CONGRESS STREET PORTLAND, ME 04122 | GROUP INSURANCE POLICY - NON PARTICIPATING SHORT/LONG TERM DISABILITY AND LIFE INSURANCE | $0.00 |
| MESA AIR GROUP, INC. | US AIRWAYS, INC. | ATTN CAPT. LYLE HOGG, VP FLIGHT OPERATIONS 4000 E. SKY HARBOR BLVD PHOENIX, AZ 85034 | RECIPROCAL JUMP SEAT TRAVEL AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | US AIRWAYS, INC. | ATTN VP US AIRWAYS, PRESIDENT US AIRWAYS EXPRESS 111 W. RIO SALADO PARKWAY TEMPE, AZ 85281 | US AIRWAYS EMPLOYEE TRAVEL PROGRAM FOR MESA AIRLINES | $0.00 |
| MESA AIRLINES, INC. | US AIRWAYS, INC. | 111 W. RIO SALADO PARKWAY TEMPE, AZ 85281 | CODESHARE AGREEMENT DATED MAY 21, 2004 (RE US AIRWAYS DESIGNATOR CODE ON UNITED AIRLINES FLIGHTS OPERATED BY MESA AS UNITED EXPRESS) | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIRLINES, INC. | US AIRWAYS, INC. | 111 W. RIO SALADO PARKWAY<br>TEMPE, AZ 85281 | LETTER AGREEMENT REGARDING AFFILIATE STATUS UNDER THE US AIRWAYS/SINGAPORE AIRLINES ("SINGAPORE") CODE SHARE AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | US AIRWAYS, INC. | 111 W. RIO SALADO PARKWAY<br>TEMPE, AZ 85281 | US EXPRESS CARRIERS' CODE SHARE AGREEMENT LETTER (LUFTHANSA) | $0.00 |
| MESA AIRLINES, INC. | US AIRWAYS, INC. | 111 W. RIO SALADO PARKWAY<br>TEMPE, AZ 85281 | LETTER AGREEMENT REGARDING AFFILIATE STATUS UNDER THE US AIRWAYS TRANSPORTES AEROS PORTUGUESES, S.A. ("TAP") CODE SHARE AGREMENET EFFECTIVE APRIL 6, 2006 | $0.00 |
| MESA AIRLINES, INC. | US AIRWAYS, INC. | 111 W. RIO SALADO PARKWAY<br>TEMPE, AZ 85281 | LETTER AGREEMENT REGARDING AFFILIATE STATUS UNDER THE US AIRWAYS, ASIANA AIRLINES, INC. ("ASIANA") CODE SHARE AGREMENET EFFECTIVE OCTOBER 1, 2007 | $0.00 |
| MESA AIRLINES, INC. | US AIRWAYS, INC. | 111 W. RIO SALADO PARKWAY<br>TEMPE, AZ 85281 | LETTER AGREEMENT REGARDING AFFILIATE STATUS UNDER THE US AIRWAYS, TACA INTERNATIONAL AIRLINES ("TACA") CODE SHARE AGREMENET EFFECTIVE OCTOBER 9, 2009 | $0.00 |
| MESA AIRLINES, INC. | US AIRWAYS, INC. | 111 W. RIO SALADO PARKWAY<br>TEMPE, AZ 85281 | LETTER AGREEMENT REGARDING AFFILIATE STATUS UNDER THE US AIRWAYS, EVA AIRWAYS CORPORATION ("EVA") CODE SHARE AGREMENET EFFECTIVE NOVEMBER 12, 2009 | $0.00 |
| MESA AIR GROUP, INC. | VERIZON BUSINESS NETWORK SERVICES INC. | 22001 LOUDOUN COUNTY PKWY<br>ASHBURN, VA 20147 | VERIZON BUSINESS SERVICE AGREEMENT<br>CONTRACT ID: 605494-07 | $2,538.93 |
| MESA AIRLINES, INC. | WASTE MANAGEMENT OF COLORADO INC | 1227 WINTERS AVE<br>GRAND JUNCTION, CO 81501 | SERVICE AGREEMENT NON-HAZARDOUS WASTES<br>CUSTOMER ACCOUNT 007-30144 | $800.34 |
| MESA AIRLINES, INC. | WORLD ACCESS SERIVCE CORP | WORLD ACCESS SERIVCE CORP<br>2805 NORTH PARHAM RD<br>RICHMOND, VA 23294 | MARKETING AGREEMENT BY & BETWEEN WORLD ACCESS SERVICE CORP. & MESA AIRLINES, INC.<br>MARKETING AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | WORLD FUEL SERVICES, INC. | 9800 NW 41ST, SUITE 400<br>MIAMI, FL 33178 | AVIATION FUEL SALES AGREEMENT<br>JET A MEETING ASTM D-1655 SPECIFICATION | $0.00 |
| MESA AIR GROUP, INC. | WORLD FUEL SERVICES, INC. | ATTN MR JONATHAN R LEAK, SVP - RISK MANAGEMENT<br>9800 NW 41ST ST<br>SUITE 400<br>MIAMI, FL 33178 | RISK MANAGEMENT TRANSACTION CONFIRMATION AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | WORLD FUEL SERVICES, INC. | SUITE 400<br>9800 NW 41ST ST<br>MIAMI, FL 33178 | WORLD FUEL SERVICES GROUP OF COMPANIES AVIATION FUEL SALES AGREEMENT | $0.00 |
| MESA AIRLINES, INC. | WORLDSPAN, LP | 7310 TIFFANY SPRINGS PARKWAY<br>KANSAS CITY, MO 64153 | ACCESSPLUSS ADDENDUM | $0.00 |
| MESA AIRLINES, INC. | WORLDSPAN, LP | 7310 TIFFANY SPRINGS PARKWAY<br>KANSAS CITY, MO 64153 | ELECTRONIC TICKETING ADDENDUM | $0.00 |
| MESA AIRLINES, INC. | WORLDSPAN, LP | 7310 TIFFANY SPRINGS PARKWAY<br>KANSAS CITY, MO 64153 | REVENUE ACCOUNTING DATA (TCN) ADDENDUM | $0.00 |
| MESA AIRLINES, INC. | WORLDSPAN, LP | 7310 TIFFANY SPRINGS PARKWAY<br>KANSAS CITY, MO 64153 | WORLDSPAN PARTICIPATING CARRIER AGREEMENT | $0.00 |
| MESA AIR GROUP, INC. | XL SPECIALTY | ONE WORLD FINANCIAL CENTER<br>200 LIBERTY STREET, 21ST FLOOR<br>NEW YORK, NY 1281 | D&O EXCESS<br>ELU111113-09 | $0.00 |

EXHIBIT K
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | XL SPECIALTY | ONE WORLD FINANCIAL CENTER 200 LIBERTY STREET, 21ST FLOOR NEW YORK, NY 1281 | D&O EXCESS ELU111113-09 | $0.00 |
| MESA AIR GROUP, INC. | XL SPECIALTY | ONE WORLD FINANCIAL CENTER 200 LIBERTY STREET, 21ST FLOOR D&O EXCESS, ELU111113-09 | D&O EXCESS | $0.00 |
| MESA AIR GROUP, INC. | XL SPECIALTY | ONE WORLD FINANCIAL CENTER 200 LIBERTY STREET, 21ST FLOOR D&O EXCESS SIDE A,  ELU111114-09 | D&O EXCESS | $0.00 |
| MESA AIR GROUP, INC. | XL SPECIALTY INSURANCE CO. | ONE WORLD FINANCIAL CENTER 200 LIBERTY STREET 21ST FLOOR NEW YORK, NY 1281 | AVIATION HULL & LIABILITY UA00002888AV09A | $0.00 |
| MESA AIR GROUP, INC. | XL SPECIALTY INSURANCE CO. | ONE WORLD FINANCIAL CENTER 200 LIBERTY STREET 21ST FLOOR NEW YORK, NY 1281 | AVIATION HULL DEDUCTIBLE UA00002889AV08A | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-HORRY COUNTY DEPARTMENT OF AIRPORTS, RENT AND LANDING FEES AT THE MYRTLE BEACH INTERNATIONAL AIRPORT 08690549 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-MARYLAND AVIATION ADMINISTRATION, LANDING FEES AND OTHER AIPORT USE FEES 08133621 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-SPOKANE AIRPORT BOARD, PERFORMANCE AND PAYMENT BOND FOR SECURITY REQUIRED FOR LANDING FEES AND CHARGES PER USE. 08715160 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-HER MAJESTY THE QUEEN, HER HEIRS & SUCCESSORS, AS REPRESENTED BY THE MINISTRY OF NATIONAL REVENUE, NON-RESIDENT GOODS AND SERVICE TAX BOND 6305358 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-SALT LAKE CITY DEPARTMENT OF AIRPORTS, RENT AND LANDING FEES 08633122 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-JACKSON HOLE AIRPORT BOARD, LEASE OF AIRPORT FACILITIES 08715182 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-COMMONWEALTH OF VIRGINIA, FUEL TAX BOND 08826857 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-COMMONWEALTH OF VIRGINIA, FUEL TAX BOND LPM8848084 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-BIRMINGHAM INTERNATIONAL AIRPORT, AIRPORT OPERATIONS AND LEASED SPACE 08133618 | $0.00 |

EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-THE COUNTY OF WAYNE, DETROIT METROPOLITAN WAYNE COUNTY AIRPORT, LEASE OF AIRPORT FACILITIES AT THE DETROIT METROPOLITAN WAYNE COUNTY AIRPORT; CONTRACT # S06-061A 08826871 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-DIRECTOR OF AIRPORTS, KERN COUNTY AIRPORTS, AIRPORT OPERATIONS AND LEASED SPACE 8848091 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-MONTEREY PENINSULA AIRPORT DISTRICT, FOUR (4) MONTHS RENT FOR SPACE AT MONTEREY PENINSULA AIRPORT 08133634 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-CITY OF LOS ANGELES AND ITS BOARD OF AIRPORT COMMISSIONERS, FEES AND CHARGES ASSOCIATED WITH OPERATIONS AT ONTARIO INTERNATIONAL AIRPORT 08633105 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-MONROE COUNTY AIRPORT AUTHORITY, RENT AND LANDING FEES 08633133 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-ROANOKE REGIONAL AIRPORT COMMISSION, UTILIZE THE FACILITIES OF THE ROANOKE REGIONAL AIRPORT AND OPERATE AS A NON-SIGNATIRY COMMERCIAL AIRLINE LPM8848093 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-LITTLE ROCK MUNICIPAL AIRPORT COMMISSION, LANDING FEES AND PASSENGER FACILITY CHARGE AT LITTLE ROCK NATIONAL AIRPORT, ADAMS FIELD 08133623 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-METROPOLITAN NASHVILLE AIRPORT AUTHORITY, AIRPORT OPERATIONS AND LEASED SPACE 08715181 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-TUCSON AIRPORT AUTHORITY, THREE MONTHS ESTIMATED FEES, RATES AND CHARGES INCLUDING PASSENGER FACILITY CHARGES 08133648 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-JACKSONVILLE AVIATION AUTHORITY, LEASE OF AIRPORT FACILITIES AT THE JACKSONVILLE INTERNATIONAL AIRPORT 08826874 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-RALEIGH-DURHAM AIRPORT AUTHORITY, OPERATE A SCHEDULED AIRLINE PASSENGER BUSINESS AT RALEIGH-DURHAM INTERNATIONAL AIRPORT 08826866 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-STATE OF HAWAII, DEPARTMENT OF TRANSPORTATION, USE OF AIRPORT FACILITIES AT THE HONOLULU INTERNATIONAL AIRPORT 08826869 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-STATE OF HAWAII, DEPARTMENT OF TRANSPORTATION, USE OF PREMISES, FACILITIES AND OPERATIONS AT THE HONOLULU INTERNATIONAL AIRPORT, THE KAHULUI AIRPORT, THE LIHUE AIRPORT, THE KONA INTERNATIONAL AIRPORT AT KEAHOLE AND THE HILO INTERNATIONAL AIRPORT (AIRPORT-AIRLINE LEASE NO. DOT-A-05-0227) 08826873 | $0.00 |

**EXHIBIT K**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Non-Aircraft)

| Debtor | Counterparty Name | Address | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-US CUSTOMS  SERVICE, CUSTOMS BOND #15980093 - INTERNATIONAL CARRIER CUSTOMS BOND LPM0007096 | $0.00 |
| MESA AIR GROUP, INC. | ZURICH INSURANCE GROUP | 1400 AMERICAN LANE SCHAUMBURG, IL 61960 | BOND-LE SECRETATIA DE COMMUNICATION, AIRPORT TAXES LPM8006991 | $0.00 |

56772-002\DOCS_NY:22953v1

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N902FJ | 15002 | Lease Agreement N902FJ Dated as of April 29, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N902FJ Dated as of April 29, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N903FJ | 15003 | Lease Agreement N903FJ Dated as of April 28, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N903FJ Dated as of April 28, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N904FJ | 15004 | Lease Agreement N904FJ Dated as of December 22, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N904FJ Dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N905FJ | 15005 | Lease Agreement N905FJ Dated as of December 22, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N905FJ Dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N906FJ | 15006 | Lease Agreement N906FJ Dated as of December 22, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.  Participation Agreement N906FJ Dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N907FJ | 15007 | Lease Agreement N907FJ Dated as of December 22, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N907FJ Dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N908FJ | 15008 | Lease Agreement N908FJ Dated as of December 22, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N908FJ Dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N909FJ | 15009 | Lease Agreement N909FJ Dated as of December 22, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N909FJ Dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| AFS investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest,  NA,<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N910FJ | 15010 | Lease Agreement N910FJ Dated as of December 22, 2003 Between Wells Fargo Bank Northwest, National Association, Owner Trustee and Mesa Airlines, Inc, Lessee.<br><br>Participation Agreement N910FJ Dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investment XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee. | $0.00 |
| CRJ Equipment Trust; c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1Y8;<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N911FJ | 15011 | Mortgage and Security Agreement dated as of January 29, 2004 between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement 4 dated January 29, 2004. | $0.00 |
| CRJ Equipment Trust; c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West; Montreal, Quebec<br>Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N912FJ | 15012 | Mortgage and Security Agreement dated as of January 29, 2004 between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement 7 dated January 29, 2004. | $0.00 |

**EXHIBIT K**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| CRJ Equipment Trust; c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N913FJ | 15013 | Mortgage and Security Agreement dated as of January 29, 2004 between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement 2 dated January 29, 2004. | $0.00 |
| CRJ Equipment Trust; c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West"<br>Montreal, Quebec<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N914FJ | 15014 | Mortgage and Security Agreement dated as of January 29, 2004 between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement 3 dated January 29, 2004.<br><br>Mortgage Supplement 10 dated January 29, 2004. | $0.00 |
| CRJ Equipment Trust; c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N915FJ | 15015 | Mortgage and Security Agreement dated as of January 29, 2004 between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement 11 dated March 1, 2004. | $0.00 |
| CRJ Equipment Trust<br>c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N916FJ | 15016 | Mortgage and Security Agreement dated as of January 29, 2004 between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement 12 dated March 16, 2004. | $0.00 |

## EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| CRJ Equipment Trust c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer Attn: Senior VP and General Counsel 800 Rene-Levesque Boulevard West Montreal, Quebec Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trustee Department 299 South Main Street, 12th Floor Salt Lake City, UT 84111 | N917FJ | 15017 | Mortgage and Security Agreement dated as of January 29, 2004, by Mesa Airlines, Inc. in favor of Wells Fargo Bank Northwest, National Association, as Security Agent, as supplemented by Mortgage Supplement Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9 dated January 29, 2004, recorded on February 26, 2004, as Conveyance No. XX026149, Mortgage Supplement No. 10 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031684, Mortgage Supplement No. 11 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031685 and Mortgage Supplement No. 12 dated March 16, 2004, recorded on April 8, 2004, as Conveyance No. H110922.<br><br>Mortgage Supplement 13 dated October 29, 2004.<br><br>Mortgage and Security Amendment #1 dated October 29, 2004 | $0.00 |
| CRJ Equipment Trust c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer Attn: Senior VP and General Counsel 800 Rene-Levesque Boulevard West Montreal, Quebec Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trustee Department 299 South Main Street, 12th Floor Salt Lake City, UT 84111 | N918FJ | 15018 | Mortgage and Security Agreement dated as of January 29, 2004, by Mesa Airlines, Inc. in favor of Wells Fargo Bank Northwest, National Association, as Security Agent, as supplemented by Mortgage Supplement Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9 dated January 29, 2004, recorded on February 26, 2004, as Conveyance No. XX026149, Mortgage Supplement No. 10 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031684, Mortgage Supplement No. 11 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031685 and Mortgage Supplement No. 12 dated March 16, 2004, recorded on April 8, 2004, as Conveyance No. H110922.<br><br>Mortgage Supplement 14 dated October 29, 2004.<br><br>Mortgage and Security Amendment #1 dated October 29, 2004 | $0.00 |
| CRJ Equipment Trust c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer Attn: Senior VP and General Counsel 800 Rene-Levesque Boulevard West Montreal, Quebec Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trustee Department 299 South Main Street, 12th Floor Salt Lake City, UT 84111 | N919FJ | 15019 | Mortgage and Security Agreement dated as of January 29, 2004, by Mesa Airlines, Inc. in favor of Wells Fargo Bank Northwest, National Association, as Security Agent, as supplemented by Mortgage Supplement Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9 dated January 29, 2004, recorded on February 26, 2004, as Conveyance No. XX026149, Mortgage Supplement No. 10 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031684, Mortgage Supplement No. 11 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031685 and Mortgage Supplement No. 12 dated March 16, 2004, recorded on April 8, 2004, as Conveyance No. H110922.<br><br>Mortgage Supplement 15 dated October 29,2004.<br><br>Mortgage and Security Amendment #1 dated October 29, 2004 | $0.00 |
| CRJ Equipment Trust c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer Attn: Senior VP and General Counsel 800 Rene-Levesque Boulevard West Montreal, Quebec Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trustee Department 299 South Main Street, 12th Floor Salt Lake City, UT 84111 | N920FJ | 15020 | Mortgage and Security Agreement dated as of January 29, 2004, by Mesa Airlines, Inc. in favor of Wells Fargo Bank Northwest, National Association, as Security Agent, as supplemented by Mortgage Supplement Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9 dated January 29, 2004, recorded on February 26, 2004, as Conveyance No. XX026149, Mortgage Supplement No. 10 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031684, Mortgage Supplement No. 11 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031685 and Mortgage Supplement No. 12 dated March 16, 2004, recorded on April 8, 2004, as Conveyance No. H110922.<br><br>Mortgage Supplement 16 dated October 29, 2004.<br><br>Mortgage and Security Amendment #1 dated January 29, 2004. | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| CRJ Equipment Trust<br>c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N921FJ | 15021 | Mortgage and Security Agreement dated as of January 29, 2004, by Mesa Airlines, Inc. in favor of Wells Fargo Bank Northwest, National Association, as Security Agent, as supplemented by Mortgage Supplement Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9 dated January 29, 2004, recorded on February 26, 2004, as Conveyance No. XX026149, Mortgage Supplement No. 10 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031684, Mortgage Supplement No. 11 dated March 1, 2004, recorded on April 9, 2004, as Conveyance No. GG031685 and Mortgage Supplement No. 12 dated March 16, 2004, recorded on April 8, 2004, as Conveyance No. H110922.<br><br>Mortgage Supplement 17 dated October 29, 2004.<br><br>Mortgage and Security Amendment #1 dated January 29, 2004. | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N922FJ | 15022 | Aircraft Mortgage and Security Agreement dated December 22, 2004 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Omnibus Amendment to Aircraft Mortgage and Security Agreements (N922FJ, N923FJ, N924FJ, N925FJ, N926LR and N927LR) dated as of January 31, 2005 among Mesa Airlines, Inc. as Mortgagor, Mesa Air Group, Inc. as Security Deposit Mortgagor and Wells Fargo Bank Northwest, N.A. as Security Trustee and Mortgagee.<br><br>Term Loan Agreement(15022) dated December 22, 2004 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N923FJ | 15023 | 'Aircraft Mortgage and Security Agreement dated December 22, 2004 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Omnibus Amendment to Aircraft Mortgage and Security Agreements (N922FJ, N923FJ, N924FJ, N925FJ, N926LR and N927LR) dated as of January 31, 2005 among Mesa Airlines, Inc. as Mortgagor, Mesa Air Group, Inc. as Security Deposit Mortgagor and Wells Fargo Bank Northwest, N.A. as Security Trustee and Mortgagee.<br><br>Term Loan Agreement (15023) dated December 22, 2004 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |

**EXHIBIT K**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N924FJ | 15024 | 'Aircraft Mortgage and Security Agreement dated December 22, 2004 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Omnibus Amendment to Aircraft Mortgage and Security Agreements (N922FJ, N923FJ, N924FJ, N925FJ, N926LR and N927LR) dated as of January 31, 2005 among Mesa Airlines, Inc. as Mortgagor, Mesa Air Group, Inc. as Security Deposit Mortgagor and Wells Fargo Bank Northwest, N.A. as Security Trustee and Mortgagee.<br><br>Term Loan Agreement (15024) dated December 22, 2004 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N925FJ | 15025 | 'Aircraft Mortgage and Security Agreement dated December 22, 2004 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Omnibus Amendment to Aircraft Mortgage and Security Agreements (N922FJ, N923FJ, N924FJ, N925FJ, N926LR and N927LR) dated as of January 31, 2005 among Mesa Airlines, Inc. as Mortgagor, Mesa Air Group, Inc. as Security Deposit Mortgagor and Wells Fargo Bank Northwest, N.A. as Security Trustee and Mortgagee.<br><br>Term Loan Agreement (15025) dated December 22, 2004 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |

**EXHIBIT K**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N926LR | 15026 | 'Aircraft Mortgage and Security Agreement dated December 22, 2004 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Omnibus Amendment to Aircraft Mortgage and Security Agreements (N922FJ, N923FJ, N924FJ, N925FJ, N926LR and N927LR) dated as of January 31, 2005 among Mesa Airlines, Inc. as Mortgagor, Mesa Air Group, Inc. as Security Deposit Mortgagor and Wells Fargo Bank Northwest, N.A. as Security Trustee and Mortgagee.<br><br>Term Loan Agreement (15026) dated December 22, 2004 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N927LR | 15027 | Aircraft Mortgage and Security Agreement dated January 28, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Omnibus Amendment to Aircraft Mortgage and Security Agreements (N922FJ, N923FJ, N924FJ, N925FJ, N926LR and N927LR) dated as of January 31, 2005 among Mesa Airlines, Inc. as Mortgagor, Mesa Air Group, Inc. as Security Deposit Mortgagor and Wells Fargo Bank Northwest, N.A. as Security Trustee and Mortgagee.<br><br>Term Load Agreement (15027) dated January 28, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |

## EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N928LR | 15028 | Aircraft Mortgage and Security Agreement dated January 31, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15028) dated January 31, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Services Corporation (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N929LR | 15029 | Aircraft Mortgage and Security Agreement dated April 19, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15029) dated April 19, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Services Corporation (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee<br><br>Transfer Agreement dated December 30, 2005 among Wachovia Capital Markets, LLC ("Transferor") and Everen Capital Corporation ("Transferee") in connection with the Participation Agreement (RASPRO Trust No. 2005-5) dated September 23, 2006 (the "Participation Agreement") among: i RASPRO Trust 2005; ii.  Bombardier Services Corporation and Bombardier Corporation; iii.  Wells Fargo Bank Northwest, N.A.; and iv.  Wilmington Trust Company. | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N930LR | 15030 | Aircraft Mortgage and Security Agreement dated March 21, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15030) dated March 21, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Services Corporation (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |

**EXHIBIT K**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N931LR | 15031 | Aircraft Mortgage and Security Agreement dated March 30, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15031) dated March 30, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Services Corporation (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N932LR | 15032 | 'Aircraft Mortgage and Security Agreement dated April 6, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15032) dated April 6, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Services Corporation (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N933LR | 15033 | Aircraft Mortgage and Security Agreement dated April 19, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15033) dated April 19, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Services Corporation (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee<br><br>Transfer Agreement dated December 30, 2005 among Wachovia Capital Markets, LLC ("Transferor") and Everen Capital Corporation ("Transferee") in connection with the Participation Agreement (RASPRO Trust No. 2005-5) dated September 23, 2006 (the "Participation Agreement") among: i RASPRO Trust 2005; ii.  Bombardier Services Corporation and Bombardier Corporation; iii.  Wells Fargo Bank Northwest, N.A.; and iv.  Wilmington Trust Company. | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N934FJ | 15034 | Aircraft Mortgage and Security Agreement dated April 26, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15034) dated April 26, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Services Corporation (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee<br><br>Transfer Agreement dated December 30, 2005 among Wachovia Capital Markets, LLC ("Transferor") and Everen Capital Corporation ("Transferee") in connection with the Participation Agreement (RASPRO Trust No. 2005-5) dated September 23, 2006 (the "Participation Agreement") among: i RASPRO Trust 2005; ii.  Bombardier Services Corporation and Bombardier Corporation; iii.  Wells Fargo Bank Northwest, N.A.; and iv.  Wilmington Trust Company. | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Services<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N935LR | 15035 | Aircraft Mortgage and Security Agreement dated July 19, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15035) dated July 19, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |
| Bombardier Services Corporation<br>Attn: Director, Aircraft Securitization Servicing<br>261 Mountain View Drive<br>PO Box 991<br>Colchester, VT 05446<br><br>Bombardier Inc.<br>Attn: SVP & General Counsel<br>800 Rene Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1YB<br><br>RASPRO Trust 2005<br>c/o Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890-0001 | N938LR | 15038 | 'Aircraft Mortgage and Security Agreement dated July 19, 2005 among Mesa Airlines, Inc. (as Mortgagor), Mesa Air Group, Inc. (as Security Deposit Mortgagor) and Wells Fargo Bank Northwest, National Association (as Security Trustee and Mortgagee)<br><br>Term Loan Agreement (15038) dated July 19, 2005 among Mesa Airlines, Inc. as guaranteed by Mesa Air Group, Inc. ("Borrower"), Export Development Canada, Bombardier Capital, Inc. (each a "Lender" and collectively "Lenders") and Wells Fargo Bank as Security Trustee | $0.00 |
| Export Development Canada<br>Attn: Loans Services & Asset Management - Transportation<br>151 O'Connor Street<br>Ottawa, Ontario, Canada K1A 1K3<br><br>Bombardier Capital Inc.<br>Attn: Director, Aircraft Financing<br>261 Mountain View Drive<br>P.O. Box 991<br>Colchester, VT 05446<br><br>Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Ref: Mesa Airlines 2007<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890-0001 | N939LR | 15039 | Security Agreement and Chattel Mortgage dated January 31, 2007 between Mesa Airlines, Inc. ("Borrower") and Wilmington Trust Company ("Loan Trustee")<br><br>Mortgage Supplement No. 4 (N939LR) dated January 31, 2007<br><br>Credit Agreement dated January 31, 2007 among Mesa Airlines, Inc. ("Borrower"), Mesa Air Group, Inc. ("Guarantor"), Export Development Canada ("Initial Senior Lender"), Bombardier Capital, Inc. (Initial Subordinated Lender) and Wilmington Trust Company (as "Loan Trustee")<br><br>Senior Note dated January 31, 2007 between Mesa Airlines, Inc. ("Maker") and Export Development Canada ("Payee") | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Export Development Canada Attn: Loans Services & Asset Management - Transportation 151 O'Connor Street Ottawa, Ontario, Canada K1A 1K3 <br><br> Bombardier Capital Inc. Attn: Director, Aircraft Financing 261 Mountain View Drive P.O. Box 991 Colchester, VT 05446 <br><br> Wilmington Trust Company Attn: Corporate Trust Administration Ref: Mesa Airlines 2007 Rodney Square North 1100 North Market Street Wilmington, DE 19890-0001 | N942LR | 15042 | Security Agreement and Chattel Mortgage dated January 31, 2007 between Mesa Airlines, Inc. ("Borrower") and Wilmington Trust Company ("Loan Trustee") <br><br> Mortgage Supplement No. 5 (N942LR) dated January 31, 2007 <br><br> Credit Agreement dated January 31, 2007 among Mesa Airlines, Inc. ("Borrower"), Mesa Air Group, Inc. ("Guarantor"), Export Development Canada ("Initial Senior Lender"), Bombardier Capital, Inc. (Initial Subordinated Lender) and Wilmington Trust Company (as "Loan Trustee") <br><br> Senior Note dated January 31, 2007 between Mesa Airlines, Inc. ("Maker") and Export Development Canada ("Payee") <br><br> Subordinated Note dated January 31, 2007 between Mesa | $0.00 |
| Export Development Canada Attn: Loans Services & Asset Management - Transportation 151 O'Connor Street Ottawa, Ontario, Canada K1A 1K3 <br><br> Bombardier Capital Inc. Attn: Director, Aircraft Financing 261 Mountain View Drive P.O. Box 991 Colchester, VT 05446 <br><br> Wilmington Trust Company Attn: Corporate Trust Administration Ref: Mesa Airlines 2007 Rodney Square North 1100 North Market Street Wilmington, DE 19890-0001 | N956LR | 15056 | Security Agreement and Chattel Mortgage dated January 31, 2007 between Mesa Airlines, Inc. ("Borrower") and Wilmington Trust Company ("Loan Trustee") <br><br> Mortgage Supplement No. 6 (N956LR) dated January 31, 2007 <br><br> Credit Agreement dated January 31, 2007 among Mesa Airlines, Inc. ("Borrower"), Mesa Air Group, Inc. ("Guarantor"), Export Development Canada ("Initial Senior Lender"), Bombardier Capital, Inc. (Initial Subordinated Lender) and Wilmington Trust Company (as "Loan Trustee") <br><br> Senior Note dated January 31, 2007 between Mesa Airlines, Inc. ("Maker") and Export Development Canada ("Payee") <br><br> Subordinated Note dated January 31, 2007 between Mesa Airlines, Inc ("Maker") and Bombardier Capital, Inc. ("Payee") | $0.00 |
| AFS Investments XLII LLC c/o GE Capital Aviation Services, Inc. Attn: Head of Portfolio and Risk Management 201 High Ridge Road Stamford, CT 06927 <br><br> Wells Fargo Bank Northwest, NA Attn: Corporate Trust Department 299 South Main Street Salt Lake City, UT 84111 <br><br> DVB Bank AG Loan Administration Friedrick-Ebert-Anlage 2-14 60325 Frankfurt Germany <br><br> DVB Bank AG New York Representative Office Aviation Finance 609 Fifth Avenue New York, NY 10017 | N501MJ | 10047 | Lease Agreement N501MJ Dated as of March 31, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee. <br><br> Lease Supplement 1 dated March 31, 2003 <br><br> Participation Agreement N501MJ dated as of March 31, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLII LLC, Owner Participant, DVB Bank AG, Series A Loan Participant, Citicorp Leasing, Inc., Series B Loan Participant, Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee and Wilmington Trust Company, in its individual capacity and as Indenture Trustee. | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Citicorp Leasing, Inc.<br>Attn: AFG-SI Credit Head<br>450 Mamaroneck Avenue<br>Harrison, NY 10528<br><br>Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890 | | | | |
| AFS Investments XLII LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111<br><br>DVB Bank AG<br>Loan Administration<br>Friedrick-Ebert-Anlage 2-14<br>60325 Frankfurt<br>Germany<br><br>DVB Bank AG<br>New York Representative Office<br>Aviation Finance<br>609 Fifth Avenue<br>New York, NY 10017<br><br>Citicorp Leasing, Inc.<br>Attn: AFG-SI Credit Head<br>450 Mamaroneck Avenue<br>Harrison, NY 10528<br><br>Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890 | N502MJ | 10050 | Lease Agreement N502MJ Dated as of March 31, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement 1 dated March 31, 2003<br><br>Participation Agreement N502MJ dated as of March 31, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLII LLC, Owner Participant, DVB Bank AG, Series A Loan Participant, Citicorp Leasing, Inc., Series B Loan Participant, Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee and Wilmington Trust Company, in its individual capacity and as Indenture Trustee. | $0.00 |
| AFS Investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N503MJ | 10058 | Lease Agreement N503MJ Dated as of April 28, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement 1 dated April 28, 2003<br><br>Participation Agreement N503MJ dated as of April 28, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee | $0.00 |
| AFS Investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N504MJ | 10066 | Lease Agreement N504MJ Dated as of April 28, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement 1 dated April 28, 2003<br><br>Participation Agreement N504MJ dated as of April 28, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee and Wilmington Trust Company, in its individual capacity and as Indenture Trustee. | |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| AFS Investments XLIV LLC c/o GE Capital Aviation Services, Inc. Attn: Head of Portfolio and Risk Management 201 High Ridge Road Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trust Department 299 South Main Street Salt Lake City, UT 84111 | N505MJ | 10070 | Lease Agreement N505MJ Dated as of April 28, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement 1 dated April 28, 2003<br><br>Participation Agreement N505MJ dated as of April 28, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee and Wilmington Trust Company, in its individual capacity and as Indenture Trustee. | $0.00 |
| AFS Investments XLIV LLC c/o GE Capital Aviation Services, Inc. Attn: Head of Portfolio and Risk Management 201 High Ridge Road Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trust Department 299 South Main Street Salt Lake City, UT 84111 | N506MJ | 10073 | Lease Agreement N506MJ Dated as of April 29, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement 1 dated April 29, 2003<br><br>Participation Agreement N506MJ dated as of April 29, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee and Wilmington Trust Company, in its individual capacity and as Indenture Trustee. | $0.00 |
| AFS Investments XLIV LLC c/o GE Capital Aviation Services, Inc. Attn: Head of Portfolio and Risk Management 201 High Ridge Road Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trust Department 299 South Main Street Salt Lake City, UT 84111 | N507MJ | 10077 | Lease Agreement N507MJ Dated as of April 29, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement 1 dated April 29, 2003<br><br>Participation Agreement N507MJ dated as of April 29, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee and Wilmington Trust Company, in its individual capacity and as Indenture Trustee. | $0.00 |
| AFS Investments XLIV LLC c/o GE Capital Aviation Services, Inc. Attn: Head of Portfolio and Risk Management 201 High Ridge Road Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trust Department 299 South Main Street Salt Lake City, UT 84111 | N508MJ | 10087 | Lease Agreement N508MJ Dated as of April 29, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement 1 dated April 29, 2003<br><br>Participation Agreement N508MJ dated as of April 29, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor. AFS Investments XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner Trustee and Wilmington Trust Company, in its individual capacity and as Indenture Trustee. | $0.00 |
| CRJ Equipment Trust c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer Attn: Senior VP and General Counsel 800 Rene-Levesque Boulevard West Montreal, Quebec Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA Attn: Corporate Trustee Department 299 South Main Street, 12th Floor Salt Lake City, UT 84111 | N509MJ | 10094 | Mortgage and Security Agreement dated as of January 29, 2004 between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement 9 dated January 29, 2004.<br><br>Term Loan Agreement dated June 1, 2003 between Mesa Air Group, Inc., Borrower, and Bombardier Capital Inc., Lender. | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| AFS Investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N510MJ | 10101 | Lease Agreement N510MJ dated as of April 29, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement No. 1 dated April 29, 2003.<br><br>Participation Agreement N510MJ dated as of April 29, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investments XLIV LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner | $0.00 |
| AFS Investments XLIV LLC<br>c/o GE Capital Aviation Services, Inc.<br>Attn: Head of Portfolio and Risk Management<br>201 High Ridge Road<br>Stamford, CT 06927<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trust Department<br>299 South Main Street<br>Salt Lake City, UT 84111 | N511MJ | 10104 | Lease Agreement N511MJ dated as of December 22, 2003 Between Wells Fargo Northwest, National Association, Owner Trustee Lessor and Mesa Airlines, Inc., Lessee.<br><br>Lease Supplement No. 1 dated April 29, 2003.<br><br>Participation Agreement N511MJ dated as of December 22, 2003 among Mesa Airlines, Inc., Lessee, Mesa Air Group, Inc., Guarantor, AFS Investments 60 LLC, Owner Participant and Wells Fargo Bank Northwest, National Association, in its individual capacity and as Owner | $0.00 |
| CRJ Equipment Trust<br>c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N512MJ | 10109 | Mortgage and Security Agreement dated as of January 29, 2004, between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement No. 8 dated January 29, 2004. | $0.00 |
| CRJ Equipment Trust<br>c/o Wilmington Trust Company, as Issuer Trustee<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Bombardier, Inc., as Servicer<br>Attn: Senior VP and General Counsel<br>800 Rene-Levesque Boulevard West<br>Montreal, Quebec<br>Canada H3B 1Y8<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Corporate Trustee Department<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111 | N513MJ | 10111 | Mortgage and Security Agreement dated as of January 29, 2004, between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.<br><br>Mortgage Supplement No. 5 dated January 29, 2004. | $0.00 |

**EXHIBIT K**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| CRJ Equipment Trust c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890  Bombardier, Inc., as Servicer Attn: Senior VP and General Counsel 800 Rene-Levesque Boulevard West Montreal, Quebec Canada H3B 1Y8  Wells Fargo Bank Northwest, NA Attn: Corporate Trustee Department 299 South Main Street, 12th Floor Salt Lake City, UT 84111 | N514MJ | 10116 | Mortgage and Security Agreement dated as of January 29, 2004, between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.  Mortgage Supplement No. 1 dated January 29, 2004. | $0.00 |
| CRJ Equipment Trust c/o Wilmington Trust Company, as Issuer Trustee Rodney Square North 1100 N. Market Street Wilmington, DE 19890  Bombardier, Inc., as Servicer Attn: Senior VP and General Counsel 800 Rene-Levesque Boulevard West Montreal, Quebec Canada H3B 1Y8  Wells Fargo Bank Northwest, NA Attn: Corporate Trustee Department 299 South Main Street, 12th Floor Salt Lake City, UT 84111 | N515MJ | 10117 | Mortgage and Security Agreement dated as of January 29, 2004, between Mesa Airlines, Inc., Borrower and Wells Fargo Bank Northwest, National Association, Security Agent.  Mortgage Supplement No. 6 dated January 29, 2004. | $0.00 |
| Export Development Canada Attn: Loans Services & Asset Management - Transportation 151 O'Connor Street Ottawa, Ontario, Canada K1A 1K3  Bombardier Capital Inc. Attn: Director, Aircraft Financing 261 Mountain View Drive P.O. Box 991 Colchester, VT 05446  Wilmington Trust Company Attn: Corporate Trust Administration Ref: Mesa Airlines 2007 Rodney Square North 1100 North Market Street Wilmington, DE 19890-0001 | N516LR | 10258 | Aircraft Mortgage and Security Agreement between Mesa Airlines, Inc. and Bombardier Capital Inc. dated as of September 26, 2006.  Mortgage Supplement No. 1 dated January 31, 2007.  Term Loan Agreement dated September 26, 2006 between Mesa Airlines, Inc., as guaranteed by Mesa Air Group, Inc., Borrower, and Bombardier Capital Inc., Lender. | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Export Development Canada<br>Attn: Loans Services & Asset Management - Transportation<br>151 O'Connor Street<br>Ottawa, Ontario, Canada K1A 1K3<br><br>Bombardier Capital Inc.<br>Attn: Director, Aircraft Financing<br>261 Mountain View Drive<br>P.O. Box 991<br>Colchester, VT 05446<br><br>Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Ref: Mesa Airlines 2007<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890-0001 | N518LR | 10259 | Aircraft Mortgage and Security Agreement between Mesa Airlines, Inc and Bombardier Capital Inc. dated as of October 5, 2006<br><br>Mortgage Supplement No. 2 dated January 31, 2007.<br><br>Credit Agreement dated as of January 31, 2007 among Mesa Airlines, Inc., Borrower, Mesa Air Group, Inc., Guarantor, Export Development Canada, Initial Senior Lender, Bombardier Capital Inc., Initial Subordinated Lender and Wilmington Trust Company, not in its individual capacity, except as expressly stated herein, but solely as Loan Trustee.<br><br>Senior Note dated January 31, 2007 between Mesa Airlines, Inc as Maker and Export Development Canada as Payee.<br><br>Subordinated Note dated January 31, 2007 between Mesa Airlines, Inc. as Maker and Bombardier Capital Inc as Payee.<br><br>Term Loan Agreement dated October 5, 2006 between Mesa Airlines, Inc., as guaranteed by Mesa Air Group, Inc., Borrower, and Bombardier Capital Inc., Lender. | $0.00 |
| Export Development Canada<br>Attn: Loans Services & Asset Management - Transportation<br>151 O'Connor Street<br>Ottawa, Ontario, Canada K1A 1K3<br><br>Bombardier Capital Inc.<br>Attn: Director, Aircraft Financing<br>261 Mountain View Drive<br>P.O. Box 991<br>Colchester, VT 05446<br><br>Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Ref: Mesa Airlines 2007<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890-0001 | N519LR | 10260 | Aircraft Mortgage and Security Agreement between Mesa Airlines, Inc. and Bombardier Capital Inc. dated as of September 26, 2006.<br><br>Mortgage Supplement No. 3 dated January 31, 2007.<br><br>Credit Agreement dated as of January 31, 2007 among Mesa Airlines, Inc., Borrower, Mesa Airlines, Inc., Guarantor, Export Development Canada, Initial Senior Lender, Bombardier Capital Inc., Initial Subordinated Lender and Wilmington Trust Company, not in its individual capacity, except as expressly stated herein, but solely as Loan Trustee.<br><br>Senior Note dated January 31, 2007 between Mesa Airlines, Inc as Maker and Export Development Canada as Payee.<br><br>Subordinated Note dated January 31, 2007 between Mesa Airlines, Inc. as Maker and Bombardier Capital Inc as Payee.<br><br>Term Loan Agreement dated September 26, 2006 between Mesa Airlines, Inc., as guaranteed by Mesa Air Group, Inc., Borrower, and Bombardier Capital Inc., Lender. | $0.00 |

# EXHIBIT K

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Bombardier Capital Inc.<br>Attn: Director, Aircraft Financing<br>261 Mountain View Drive<br>P.O. Box 991<br>Colchester, VT 05446<br><br>Bombardier Aerospace, Regional Aircraft<br>Attn: Dir., Contracts<br>123 Garratt Boulevard, M/S N17-27<br>Downsview, Ontario, Canada, M3k 1Y5<br><br>SunTrust Leasing Corporation<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Michael Arsenault Assistant VP<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111<br><br>Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890-0001<br><br>Export Development Canada<br>Attn: Loans Administration<br>151 O'Connor Street<br>Ottawa, Ontario, Canada K1A 1K3 | N521LR | 10261 | Lease Agreement dated April 30, 2007 between Bombardier Capital Inc. Lessor, and Mesa Airlines, Inc., Lessee. | $0.00 |
| Bombardier Capital Inc.<br>Attn: Director, Aircraft Financing<br>261 Mountain View Drive<br>P.O. Box 991<br>Colchester, VT 05446<br><br>Bombardier Aerospace, Regional Aircraft<br>Attn: Dir., Contracts<br>123 Garratt Boulevard, M/S N17-27<br>Downsview, Ontario, Canada, M3k 1Y5<br><br>SunTrust Leasing Corporation<br><br>Wells Fargo Bank Northwest, NA<br>Attn: Michael Arsenault Assistant VP<br>299 South Main Street, 12th Floor<br>Salt Lake City, UT 84111<br><br>Wilmington Trust Company<br>Attn: Corporate Trust Administration<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890-0001<br><br>Export Development Canada<br>Attn: Loans Administration<br>151 O'Connor Street<br>Ottawa, Ontario, Canada K1A 1K3 | N522LR | 10262 | Aircraft Lease Agreement dated as of April 30, 2007 between Bombardier Capital Inc. and Mesa Airlines, Inc. | $0.00 |
| Wells Fargo Bank Northwest, NA<br>(formerly First Security Bank)<br>Attn: Corporate Trust Department<br>79 South Main Street<br>Salt Lake City, UT 84111<br><br>M&T Credit Service LLC<br>(formerly known as The First National Bank of Maryland)<br>One M&T Plaza, Buffalo, NY 14203<br><br>Export Development Canada<br>Attn: Loans Administration<br>151 O'Connor Street<br>Ottawa, Ontario, Canada K1A 1K3 | N434YV | 434 | Lease Agreement (434YV) dated as of July 31, 1996 between First Security Bank, National Association, Owner Trustee Lessor and Mesa Air Group, Inc. Lessee.<br><br>Participation Agreement (N434YV) dated as of July 31, 1996 among Mesa Air Group, Inc., Lessee, The First National Bank of Maryland, Owner Participant, Export Development Corporation, Loan Participant, First Security Bank, National Association, In its individual capacity and as Owner Trustee, Fleet National Bank, In its individual Capacity and as Indenture Trustee. | $0.00 |

**EXHIBIT K**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan (Aircraft)

| Counterparty Name | FAA Reg. No. | Serial No. | Agreement Description | Assumption Obligation |
|---|---|---|---|---|
| Wells Fargo Bank Northwest, NA (formerly First Security Bank) Attn: Corporate Trust Department 79 South Main Street Salt Lake City, UT 84111<br><br>M&T Credit Service LLC (formerly known as The First National Bank of Maryland) One M&T Plaza, Buffalo, NY 14203<br><br>Export Development Canada Attn: Loans Administration 151 O'Connor Street Ottawa, Ontario, Canada K1A 1K3 | N436YV | 436 | Lease Agreement (436YV) dated as of July 31, 1996 between First Security Bank, National Association, Owner Trustee Lessor and Mesa Air Group, Inc. Lessee.<br><br>Lease Supplement No. 1 dated August 7, 1996 between First Security Bank, National Association, not in its individual capacity but solely as Owner Trustee, Lessor, and Mesa Air Group, Inc., Lessee.<br><br>Participation Agreement (N436YV) dated as of July 31, 1996 among Mesa Air Group, Inc., Lessee, The First National Bank of Maryland, Owner Participant, Export Development Corporation, Loan Participant, First Security Bank, National Association, In its individual capacity and as Owner Trustee, Fleet National Bank, In its individual Capacity and as Indenture Trustee. | $0.00 |