UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| MESA AIR GROUP, INC., et al., | ) | Case No. 10-10018 (MG) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors.[1] | ) | |
| | ) | |

**PRE-TRIAL BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
IN REPLY TO OBJECTION OF BF CLAIMS HOLDINGS I LLC**

      The Official Committee of Unsecured Creditors (the "Committee") of Mesa Air Group, Inc. ("Mesa") and certain of its direct and indirect subsidiaries in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby provides the following Pre-Trial Brief of the Official Committee of Unsecured Creditors in Reply to the Objection of BF Claims Holdings I LLC. In support of the Response, the Committee respectfully states as follows:

**Introduction**

      1.      At the outset of this case, the future of the Debtors was uncertain as they were in litigation regarding the termination of one of their code share agreements and had sixty days to contend with their aircraft providers pursuant to Section 1110 of the Bankruptcy Code. The Committee, comprised of many veterans of other airline bankruptcy cases, immediately accepted its mandate as the fiduciary for all unsecured creditors, and began working with the Debtors in

---

[1]  The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

an effort to solve the myriad of complex problems that confront an airline in bankruptcy. Tackling these issues brought the Debtors and the Committee together, and while there was a bit of turbulence at times, in the end the parties agreed that a stand alone, debt for equity plan was in the best interest of creditors. The major issue with such a plan was the need to balance the equality of like creditors under the Bankruptcy Code with the strict foreign ownership prohibitions of the Federal Aviation Administration (the "<u>FAA</u>"). The proposed Plan of Reorganization (the "<u>Plan</u>") essentially presents a hybrid debt for equity structure, which accomplishes the necessary balance without discriminating against either the domestic or foreign creditors, as explained herein. As such, the Committee fully supports the Plan, as it will produce the highest and best possible recovery for the Debtors' economic stakeholders.

2. Other than contract counter-parties objecting to their cure amounts and tax authorities seeking clarification of certain tax provisions, only one other party-in-interest has objected to confirmation of the Plan, BF Claims Holdings I LLC ("<u>Brigade</u>").[2] As described in more detail below, Brigade's objection should be seen for what it is: an attempt by a creditor (who will likely hold, if its claims are allowed, less than 5% of the fully-diluted equity of the Reorganized Debtors) to have a seat on the Reorganized Debtors' Board of Directors (the "<u>Board</u>") and dictate the provisions of the Debtors' corporate governance documents, when they have no right under bankruptcy or corporate law to do so.[3] The Committee, as the fiduciary for all unsecured creditors, selected six of the nine members of the Board to represent the interests of

---

[2] The Committee has requested information regarding the claims that were recently purchased by Brigade and is unable to determine the exact amount of the claims and whether Brigade is a domestic or foreign creditor. Clearly a Cayman Islands affiliate of Brigade was involved in the purchase of these claims and filed the requisite notice related to the Trading Order. No Rule 3001 notices have been filed with regard to these claims. If Brigade is deemed to be a foreign creditor, it will receive warrants, not stock, under the Plan and would not be subject to the Shareholder Agreement at issue in the objection.

[3] Brigade's true intent becomes clear here from an e-mail exchange between Brigade's principal, Neal P. Goldman, with the Debtors' financial advisor, Marc Bilbao in which Bilbao asks Mr. Goldman: "What is the issue? BOD?" and Mr. Goldman responds "Yes. My seat". A true and correct copy of the e-mail correspondence is attached as <u>Exhibit A</u>.

all unsecured stakeholders, and negotiated corporate governance documents with the Debtors to accomplish this result. The dissatisfaction of one minority creditor (which only recently acquired its claims) with the Committee's and Debtors' sound choices provides no basis to prevent confirmation of the Plan.

### Background

3.      On January 5, 2010 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed.

4.      On January 13, 2010, the Office of the United States Trustee (the "Trustee") appointed the Committee. The members of the Committee are: AT&T Capital Services; the Air Line Pilots Association; Bombardier, Inc.; Embraer-Empresa Brasileira de Aeronautica S.A.; IHI Corporation; U.S. Bank National Association; Wilmington Trust Company; and the Association of Flight Attendants – CWA (ex-officio member).[4]

5.      On September 17, 2010, the Debtors filed the Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code and related disclosure statement [Docket No. 1059].

6.      On November 23, 2010, the Debtors filed their proposed Second Amended Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code [Docket No. 1241] (the "Plan") and the Bankruptcy Court approved the Debtors' Disclosure Statement to the Second Amended Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code (the "Disclosure

---

[4]  Each member of the Committee retained individual counsel and such counsel participated in the Committee deliberations. Each of these firms filed a Notice of Appearance.

Statement") by Order dated November 23, 2010 [Docket No. 1243] (the "Disclosure Statement Order").

7.     On January 4, 2011, Brigade filed its objection to the Plan (the "Brigade Objection").[5]

8.     Upon information and belief, all voting classes of creditors approved the Plan. The Debtors will be filing the appropriate Declaration with the voting results.

## Argument

9.     In its objection, Brigade argues that (i) the new Board selected by the Committee and Debtors does not represent the interests of shareholders, (ii) the proposed Shareholders Agreement is an unreasonable restriction on the rights of shareholders, (iii) the existence of so-called "blank check preferred stock" in the Reorganized Debtors' corporate charter is "at odds with the interest of shareholders generally", and (iv) various other provisions of the Reorganized Debtors Bylaws (the "Bylaws") unfairly restrict the rights of shareholders.

10.     As will be explained in further detail below, Brigade is off base with respect to all of its objections, and, even if correct, their assertions provide no basis to prevent confirmation of the Plan under the Bankruptcy Code.   The Board members selected by the Committee were selected with the express intent that they will represent the interests of all stakeholders of the Reorganized Debtors.   With respect to the Shareholders Agreement, while it is admittedly an unusual requirement, it was necessitated by the large number of foreign creditors that are unable to hold voting securities in the Debtors due only to restrictions imposed by the FAA.[6]   Without

---

[5]  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan.

[6]  Under the Federal Aviation Act of 1958, any entity wishing to provide air transportation in the United States must be a "citizen of the United States" in order to be a granted a certificate of public convenience and necessity by the Department of Transportation.  A corporation is a citizen of the United States if:

the Shareholders Agreement, small economic stakeholders would be able to control the direction of the Reorganized Debtors – apparently just the result Brigade desires. The Shareholders Agreement is no different from voting trusts, which have been previously approved by Bankruptcy Courts as a reasonable restriction on shareholder voting rights.

11.     Finally, with respect to the balance of the corporate governance provisions, they are all provisions that were in the Debtors' Charter and Bylaws prior to the Petition Date, and are not nearly as rare as Brigade paints them to be. In fact, based upon publicly available information, there are three (3) other companies in which Brigade currently holds a 5% or greater ownership stake and those companies all have corporate governance provisions similar to what Brigade complains of today. Specifically, all three companies authorize the issuance of "blank check preferred", two have a classified or staggered Board, two do not specify any requirement for an annual meeting, and all permit the Board to unilaterally amend the Bylaws. A chart detailing each of companies in which Brigade holds a 5% or greater stake and the relevant corporate governance provisions is attached as <u>Exhibit B</u>. Notwithstanding the reasonable nature of the corporate governance provisions, as explained below, the Committee and Debtors have agreed to modify several of the provisions Brigade complains of in an effort to address their concerns.

**<u>Board Selection Process</u>**

12.     Brigade alleges in its objection that the proposed Board "does not contain meaningful representation of non-insider economic stakeholders whose only way to benefit

---

[T]he president and at least two-thirds (2/3) of the board of directors and other managing officers are citizens of the United States...[it] is under the actual control of citizens of the United States, and ... at least 75 percent of the voting interest is owned or controlled by persons that are citizens of the United States.

directly from the Reorganized Company's future success is through stock appreciation" (Brigade Objection at ¶ 14) and therefore the proposed Board violates Section 1123(a)(7) of the Bankruptcy Code because it is not "consistent with the interests of creditors . . . with respect to the manner of selection of any officer, director or trustee under the plan.". *See* Brigade Objection at ¶ 13; 11 U.S.C. § 1123.  Brigade's criticism of the Board appears to be based more on its admitted desire to appoint its own member of the Board, than with any real concerns with the members of the Board selected by the Debtors and the Committee.

13.    The Committee is the fiduciary appointed by the Office of the United States Trustee to represent the interests of all unsecured creditors.  Together, its seven members represent a vast array of interests, which will both continue to do business with the Debtors and several of which are not expected to have any ongoing relationship with the Debtors.[7]  In the aggregate, the Committee members hold or represent almost $1 billion in claims, which the Committee expects to equate to approximately 35% of the fully diluted equity in the Reorganized Debtors.  Clearly, the Committee has a significant interest in appointing a Board that will maximize the value of the equity being distributed to unsecured creditors.

14.    As part of the negotiations on the Plan, the Committee and the Debtors agreed that the Committee would appoint six (6) members of the Board and the Debtors would appoint three (3) members.  In order to select the creditor representatives for the Board, the Committee solicited nominations for candidates to the Board from its members and professionals.  The Committee also considered candidates nominated by the Debtors, and other third-parties and

---

[7] For example, Embraer's business relationship with the Debtors was terminated as a result of the termination of the Delta Code Share; AT&T Capital is an owner partipant on aircraft leases that have been rejected by the Debtors and thus has no continuing relationship with the Debtors; and U.S. Bank, as indenture trustee for the Debtors' noteholders, represents interest holders that have no continuing business relationship with the Debtors.  Further, Wilmington Trust and Bombardier, while having a smaller continuing interest in business with the Debtors, will be among the largest holders of unsecured claims in these case.

creditors that contacted the Committee (the Committee also considered each of the current directors as well). The Committee appointed a Board Composition sub-committee comprised of U.S. Bank, National Association and the Air Line Pilots Association, two (2) domestic parties-in-interest, which, in the end considered approximately (30) potential candidates, carefully reviewed each of their qualifications and background, and selected the following six (6) members, which were subsequently ratified by the full Committee: Ellen Artist, Dana Lockhart, Harvey Schiller, Don Skiados, Grant Lyon, and Mitchell Gordon.[8] A copy of the curriculum vitae for each of the proposed Committee designees to the Board is attached as <u>Exhibit C</u>. None of these proposed directors has any existing ties to the Debtors or their management team and each has significant experience in the aviation industry and/or serving on boards of directors.[9]

15. The Committee selected these directors because it believes that they will collectively represent the interests of all stakeholders (rather than a single minority stakeholder as Brigade would apparently prefer). Brigade has not cited a single case in which a Court has refused to confirm a Plan because it found that the proposed board of directors violates Section 1123(a)(7) as not in the best interests of creditors, and the Committee has not been able to locate any cases so holding. Brigade's argument is even more specious because in this case the Committee, as the fiduciary for all unsecured creditors, selected six (6) members of the Board. Thus, Brigade's assertion that the Committee's selection of the Board is inconsistent with the interests of creditors and thus violates Section 1123(a)(7) is completely erroneous – the six members appointed by the Committee were selected by the Committee specifically to represent

---

[8] The Debtors selected Jonathan G. Ornstein (the Debtors' CEO), Daniel Altobello (a current director) and Mark J. Schulte.
[9] A copy of a letter outling the Board selection process utilized by the Committee in more detail, which was recently sent to Brigade's counsel in an effort to consensually resolve their objection is annexed as <u>Exhibit D</u>.

the interests of creditors.  Accordingly, Brigade's criticisms of the Board are without merit and its opposition to the Plan on these grounds should be dismissed.

**Shareholders Agreement**

16.     In order to reorganize these Debtors, a debt for equity transaction was required as there is insufficient cash to satisfy the claims of unsecured creditors. The problem faced by the Debtors and the Committee was that while the Bankruptcy Code is premised on the equal treatment of like creditors, the FAA has significant restrictions on foreign ownership of domestic airlines. Therefore, the parties had to figure out a way to provide a fair distribution scheme without violating the FAA rules and regulations. The Plan accomplishes this by providing domestic creditors with stock and foreign creditors with warrants that are convertible to stock on a 1.1:1 basis.

17.     The problem this solution presented is that, upon emergence, until the foreign creditors are able to sell their warrants and claims are reconciled in the Debtors' estates, a large portion of the Debtors' voting stock will not have been distributed.[10]  This leads to the result (apparently desired by Brigade) that a minority stakeholder might be in a position to direct the Company upon emergence simply by happenstance of the amount and type of equity being issued pursuant to the Plan.  The Committee and the Debtors, however, did not believe such a result was fair or appropriate, and thus concluded that the Shareholders Agreement was a reasonable restriction to place on the voting power of shareholders.

---

[10]  For example, it appears that U.S. Airways (which is receiving 10% of the fully diluted equity under the Plan) could hold 40-50% of the voting securities upon emergence.  When the Company approached U.S. Airways to discuss this issue, U.S. Airways advised that it would only consider a voting restriction if it was applicable to all other large holders.

18.    Brigade, though while crying discrimination in its objection, actually seeks favorable treatment for the domestic creditors as a result of the foreign ownership issues.[11]  The very protections that are the basic tenant of bankruptcy law – equality – that are included in the Plan in the form of the Shareholders Agreement are attacked by Brigade as discriminatory.  To modify the Plan as Brigade proposes would severely discriminate against the foreign creditors and other creditors waiting for their claims to be allowed, by permitting those domestic creditors who happen to receive their equity upon emergence to undo the protections crafted in the Plan (which, as noted above, was overwhelming approved by all classes of creditors) by the Debtors and Committee to fairly protect the interests of all creditors.

19.    Brigade complains, without support, that the restrictions placed upon shareholders pursuant to the Shareholders Agreement violate the "spirit" of Section 1123(a)(6), which prohibits the issuance of non-voting securities.  In contrast, the Committee and the Debtors believe that the Shareholders Agreement actually embodies the spirit of Section 1123(a)(6).  As Colliers notes:  "It is thus not enough to determine merely which of the new securities will be entitled to vote; the securities must be distributed so that the allocation of voting power--i.e., the control of the company--properly recognizes the respective position of the claimants and stockholders according to their rank and rights they surrender." Colliers on Bankruptcy ¶ 1123.01[6].  Were it not for the FAA foreign ownership restrictions, there would be no question that the Bankruptcy Code would entitle foreign creditors to an equal say in the governance of the Reorganized Debtors.  The FAA's restrictions, however, prevent this result.  The Shareholders

---

[11]  Brigade argues that the Plan violates the equal treatment requirements of Section 1123(a)(4) of the Bankruptcy Code because it is only applicable to 5%+ holders, and that therefore the Plan should have separately classified holders that are required to execute the Shareholders Agreement.  While the Committee and Debtors disagree with this assertion, they have agreed to modify the Plan to make the Shareholders Agreement equally applicable to all shareholders.  Further, in an effort to address Brigade's concerns, the Debtors and Committee have also agreed to reduce the term of the Shareholders Agreement to three (3) years (from five (5) years as currently drafted).

Agreement, is thus an attempt by the Debtors and the Committee to respect the basic tenet of bankruptcy law that voting power should be consistent with the "respective position of the claimants" and that the Plan should not provide disproportionate voting power to minority stakeholders. While the Plan could theoretically have proposed that foreign creditors be given only a note for their claims, the amount of additional debt required to provide foreign creditors with a meaningful recovery would have been unsupportable by the Debtors' operations and would have further diminished the value of the equity available for domestic creditors.

20.     Brigade does not cite a single case in support of its position that the Shareholders Agreement violates Section 1123(a)(6) – likely because none exists. Rather, case law states that "there is a wide difference between disenfranchising a class of stockholders completely, and designating trustees to exercise the voting power of the class in the interest of that class." *In re Ahead Communications Systems*, Inc., 395 B.R. 512, 518 (D. Conn. 2008) (Internal citations omitted). The only difference between the voting trusts discussed in *Ahead* and the Shareholders Agreement here is that the Debtors and Committee determined to put the power to exercise the votes at issue in the hands of a Board predominantly selected by creditors, rather than a third-party trustee. *See also In re Quaker City Cold Storage Co.*, 71 F. Supp. 124, 131-132 (E.D. Pa. 1947) ("Congress recognized the voting trust as a useful instrument in reorganization and intended it to be used when called for…[Voting trusts can be] a desirable necessary part of [a] plan").

21.     When bankruptcy collides with other federal statutes, especially those of agencies like the FAA, parties in a bankruptcy reorganization must heed those regulations and find solutions. The Debtors and Committee did not hatch a nefarious plot to discriminate against domestic creditors. They simply used the tools they had at their disposal to craft a sensible and

fair treatment for all of the Debtors' unsecured creditors, providing good corporate governance for Reorganized Mesa. Accordingly, Brigade's assertion that the Shareholders Agreement causes the Plan to violate Section 1129(a)(3)'s good faith requirement is without foundation.

### New Preferred Stock

22.     Further, with respect to the New Preferred Stock (which Brigade refers to as "blank check preferred stock"), Brigade only suggests that the issuance of such stock is "disfavored" and that it might be used by the Board as a "poison pill" to prevent a hostile takeover. While these concerns might have merit in situations where there is an entrenched management team and insider board, in the case of the Reorganized Debtors, as noted above, eight (8) of the nine (9) members of the Board are independent directors (with six (6) appointed by the Committee to represent the interests of stakeholders). Further, the Debtors' charter already contains restrictions on significant stock transfers to protect the Debtors' Code-Share Agreements and their valuable NOL. Thus, there is almost no possibility that the Board would ever have to utilize the New Preferred Stock to implement a poison pill.

23.     Rather, the Committee and the Debtors concluded that it was appropriate to provide the Board with maximum flexibility to structure a capital raise if necessary and the New Preferred Stock allows the Board to do so, consistent with the exercise of their fiduciary duties. Furthermore, there is nothing in the Bankruptcy Code that requires that each and every future shareholder agree to Reorganized Debtors' corporate governance provisions. The Plan was approved by the requisite number and amount of creditors in all classes as required by the Bankruptcy Code. The fact that one dissident creditor disagrees with the Debtors and Committees sound judgment (as ratified by creditors) provides no basis whatsoever to find that

the Plan violates Section 1129's good faith requirements, and Brigade does not cite a single case holding otherwise.[12]

**Other Corporate Governance Provisions**

24.     With respect to the balance of Brigade's concerns, while the Committee believes that the Bylaws as drafted are fair and reasonable, the Committee and Debtors have consulted and determined to make the following additional changes to the Bylaws to address Brigade's concerns:

- **Annual Meeting** – Section 1.2 of the Bylaws will be amended to provide that an initial shareholders meeting will be held not later than fifteen (15) months following the Effective Date of the Debtors' Plan of Reorganization, and thereafter every twelve (12) months.

- **Special Meetings** – Section 1.3 of the Bylaws will be amended to provide that shares representing the lesser of (i) twenty-five per cent (25%) of the fully-diluted equity (*i.e.* shares initially issued or reserved for issuance pursuant to the Plan) of Reorganized Mesa, and (ii) fifty per cent (50%) of the shares entitled to vote at the meeting may call a special shareholders meeting.

- **Amendment of Bylaws** – Section 6.2 of the Bylaws will be amended to reduce the required shareholder approval to amend the Bylaws from 66 2/3% to a majority of shares issued, outstanding and entitled to vote and to provide that the Board may not, without also obtaining shareholder approval, modify the provisions of the Bylaws regarding annual or special meetings, or the requisite approval of amendments to the Bylaws.

25.     These modifications should remove any doubt that ultimate control of the Reorganized Debtors will remain where it belongs – with the shareholders.  The Bylaws and other corporate governance documents contain reasonable provisions negotiated by the Debtors and Committee to permit the Board and Company to operate on a day-to-day basis and to ensure

---

[12] Brigade also complains that the New Preferred Stock should have been set forth in detail in the Disclosure Statement.  In fact, the ability to issue the New Preferred Stock under the Reorganized Debtors' Charter has been in the Plan since it was initially filed on September 17, 2010.

the fair treatment of all stakeholders. Brigade's opposition of the Plan provides no basis whatsoever to modify these provisions.[13]

### Conclusion

26. Despite Brigade's assertions to the contrary, the Plan was a good faith effort by the Debtors and Committee to craft a Plan that treated both foreign and domestic creditors fairly, while remaining subject to the FAA's foreign ownership restrictions. This was no easy task given the significant number of foreign creditors and the strict requirement placed upon their ownership of equity by the FAA. Accordingly, the Plan should be approved, and Brigade's opposition to confirmation of the Plan overruled.

Dated: New York, New York
   January 12, 2011

       /s/ Brett H. Miller
       MORRISON & FOERSTER LLP
       Brett H. Miller
       Lorenzo Marinuzzi
       Todd M. Goren
       1290 Avenue of the Americas
       New York, NY 10104
       Telephone: (212) 468-8000
       Facsimile: (212) 468-7900

       *Attorneys for the Official Committee of Unsecured*
       *Creditors of Mesa Air Group, Inc., et al.*

---

[13] The only issue with the Bylaws raised by Brigade not addressed by these changes is the issue of the staggered or classified Board, in which Board members serve 3 year terms with three (3) of the nine (9) Board seats coming up each year. As set forth in the Debtors' confirmation brief, the Committee believes that a staggered board is a reasonably exercise of the parties' judgment designed to, among other things, ensure continuity of leadership, enhance director independence and enable the Reorganized Debtors to attract strong candidates to serve on the Board.

**EXHIBIT A**

**E-mail Correspondence Between Marc Bilbao and Neal Goldman**

From: "Marc Bilbao" <mbilbao@imperialcapital.com>
To: "Neal Goldman" <NG@brigadecapital.com>
Subject: RE:
Date: Tuesday, December 28, 2010 10:17 AM


If it is any help you are not the largest holder

-----Original Message-----
From: Neal Goldman [mailto:NG@brigadecapital.com]
Sent: Mon 12/27/2010 1:33 PM
To: Marc Bilbao
Subject: Re:

Yes. My seat

----- Original Message -----
From: Marc Bilbao [mailto:mbilbao@imperialcapital.com]
Sent: Monday, December 27, 2010 04:11 PM
To: Neal Goldman; ashmead@sewkis.com <ashmead@sewkis.com>
Subject: Re:

What is the issue?  BOD?

This message and any attachments are for the confidential use of the intended recipient.  If you
received this communication in error, please notify the sender by replying to this message or by
sending an email to compliance@imperialcapital.com and delete the message and any
attachments.  All email communications of Imperial Capital, LLC are subject to review by its
compliance department pursuant to SEC and FINRA requirements.

----- Original Message -----
From: Neal Goldman <NG@brigadecapital.com>
To: Marc Bilbao; 'ashmead@sewkis.com' <ashmead@sewkis.com>
Sent: Mon Dec 27 12:45:54 2010
Subject: Re:

He is not being cooperative.

----- Original Message -----
From: Marc Bilbao [mailto:mbilbao@imperialcapital.com]
Sent: Monday, December 27, 2010 03:41 PM
To: Neal Goldman; ashmead@sewkis.com <ashmead@sewkis.com>
Subject: Re:

Where are you guys with Brett?

This message and any attachments are for the confidential use of the intended recipient.  If you
received this communication in error, please notify the sender by replying to this message or by

sending an email to compliance@imperialcapital.com and delete the message and any attachments. All email communications of Imperial Capital, LLC are subject to review by its compliance department pursuant to SEC and FINRA requirements.

----- Original Message -----
From: Neal Goldman <NG@brigadecapital.com>
To: Marc Bilbao
Sent: Mon Dec 27 06:51:30 2010
Subject: Re:

Thx

----- Original Message -----
From: Marc Bilbao [mailto:mbilbao@imperialcapital.com]
Sent: Monday, December 27, 2010 09:38 AM
To: Neal Goldman
Cc: ashmead@sewkis.com <ashmead@sewkis.com>
Subject: Re:

Let me see what exactly we are filing tomorrow..I will be back to you shortly.

This message and any attachments are for the confidential use of the intended recipient. If you received this communication in error, please notify the sender by replying to this message or by sending an email to compliance@imperialcapital.com and delete the message and any attachments. All email communications of Imperial Capital, LLC are subject to review by its compliance department pursuant to SEC and FINRA requirements.

----- Original Message -----
From: Neal Goldman <NG@brigadecapital.com>
To: Marc Bilbao
Cc: 'ashmead@sewkis.com' <ashmead@sewkis.com>
Sent: Mon Dec 27 06:35:10 2010
Subject: Re:

Can we pls get a copy asap.

----- Original Message -----
From: Marc Bilbao [mailto:mbilbao@imperialcapital.com]
Sent: Monday, December 27, 2010 09:30 AM
To: Neal Goldman
Subject: Re:

Hold on. I am told the governance documents are being filed tomorrow... Let me confirm..

This message and any attachments are for the confidential use of the intended recipient. If you received this communication in error, please notify the sender by replying to this message or by sending an email to compliance@imperialcapital.com and delete the message and any

attachments. All email communications of Imperial Capital, LLC are subject to review by its compliance department pursuant to SEC and FINRA requirements.

----- Original Message -----
From: Neal Goldman <NG@brigadecapital.com>
To: Marc Bilbao
Sent: Mon Dec 27 06:20:07 2010
Subject: Re:

Any further dialogue w brett or macquarie?

----- Original Message -----
From: Marc Bilbao [mailto:mbilbao@imperialcapital.com]
Sent: Monday, December 27, 2010 08:45 AM
To: Neal Goldman
Subject: RE:

If you are asking for shareholder agmts etc. they have not been negotiated yet.

-----Original Message-----
From: Neal Goldman [mailto:NG@brigadecapital.com]
Sent: Monday, December 27, 2010 5:34 AM
To: Marc Bilbao
Subject:

Can I pls get copies of the corp gov docs?

# EXHIBIT B

**Corporate Governance Provisions of U.S. Public Companies**
**Associated with Brigade Capital**

## CORPORATE GOVERNANCE PROVISIONS OF U.S. PUBLIC COMPANIES ASSOCIATED WITH BRIGADE CAPITAL

|  | *Trump Entertainment Resorts, Inc.* | *Skilled Healthcare Group, Inc.* | *Visteon Corp.* |
|---|---|---|---|
| **State of Incorporation** | Delaware | Delaware | Delaware |
| **Relationship with Brigade Capital** | Brigade member of ad hoc committee of second lien note holders; co. emerged from Chap 11 in Oct. 2010; as of Sept. 2010, held a 7.4% interest | As of July 2010, held a 6.7% interest. | Emerged from Chapter 11 in Oct 2010; Brigade was part of a vocal group of stockholders holding an aggregate of approx 7% of equity; as of Sept 2010 still held 2,860,000 shares |
| **Brigade Capital Board Representation** | None | None | None |
| **Provision Permitting Blank Check Preferred Stock** | Yes | Yes | Yes |
| **Classified/Staggered Board of Directors** | Yes | Yes | No |
| **Annual Meeting of Stockholders** | Not specified; Delaware default provisions apply | Annual meeting must be held "each year"; no set time period specified | Not specified; Delaware default provisions apply |
| **Requirements for Stockholders to Call Special Meetings** | Written request by holders of shares representing not less than 30% of common stock entitled to vote | Special meetings may not be called by stockholders | Written request of holders of at least 20% of the voting power of shares entitled to vote on election of directors |
| **Board Authorized to Unilaterally Amend Bylaws** | Yes | Yes | Yes |
| **Stockholder Vote Required to Amend Bylaws** | Majority of the outstanding common stock | Majority of the votes cast on the proposal | Majority of the votes present and entitled to vote, voting as a single class |

# EXHIBIT C

## Curriculum Vitae of Reorganized Mesa Board Nominees



# Grant Lyon, Odyssey Capital Group

One Renaissance Square
Two North Central Ave., Suite 720
Phoenix, AZ 85004
Main (602) 257-8400
Fax (602) 257-8600
glyon@odycap.com

Grant is the founder and President of Odyssey Capital Group. During more than 20 years of distressed management experience, he has been the financial advisor for numerous corporate restructuring engagements.

Grant's skills and qualifications cover the full range of distressed situations including: Out-of-court Restructuring; Liquidation Trustee; Claims Analysis; Securities Valuation; Plan Feasibility (Debtor and Creditor); Debtor-in-Possession Financing; Business Valuation; Solvency Analysis; Liquidation Analysis; Single Asset Bankruptcy Analysis; Litigation Support; and Fraudulent Transfer Actions.

## SELECT RECENT ENGAGEMENTS

- Advised $800 million residential home builder regarding company's operations, strategic plans, cash flow, liquidity alternatives, negotiation with secured lenders, and restructuring alternatives.
- Chapter 11 Trustee in $1 billion commercial mortgage bankruptcy case. Represented estate with over $20 million in claims.
- Advised manufacturer of gaming supplies in Chapter 11 owing more than $130 million in debt. Assisted in obtaining $45 million DIP facility and acquisition of post-confirmation financing facility.
- Accountant to the Liquidation Agent of a $600 million grocery store chain requiring solvency analysis, expert testimony, and negotiations with creditors to finalize the Chapter 11 bankruptcy estate.
- Advised national airline and Chapter 11 trustee regarding business plans, negotiations with creditors, liquidation analyses, and preparation of disclosure statements.

## EDUCATION/CERTIFICATIONS

- B.S. in Accounting from Brigham Young University
- M.B.A. from Brigham Young University
- Certified Public Accountant

# Mitchell I. Gordon

# Biography

Mitchell Gordon is President of Morpheus Capital Advisors, a leading boutique investment banking firm and has served as both an investment banker and a senior corporate executive. Prior to joining Morpheus, he was Chief Financial Officer, Executive Vice President and a member of the Office of the President of Interpool (NYSE: IPX)—one of the world's largest lessors of transportation equipment. During his tenure as CFO, Interpool stock outperformed the S&P 500 by 60%. Interpool was sold in 2007 to Fortress Investment Group for $2.4 billion.

Previous to Interpool, Mr. Gordon was President and Founder of Atlas Capital Partners, a private equity investment firm, and a Managing Director and Co-Head of Salomon Smith Barney's Transportation Group. He has also served as a Senior Vice President and Head of the Transportation and Automotive Groups at Furman Selz as well as a Vice President at Needham & Company. Mr Gordon started his business career at the American Broadcasting Company, where he was Manager of Strategic Planning.

Mr. Gordon served on the public company Boards of Directors of Interpool and Indigo Aviation and on the Global Advisory Board of Nedship Bank Group. He also was a member of the Board of Directors of Almedica, Inc., a privately held pharmaceutical services company.

Mr. Gordon currently serves on the Boards of Directors of Student Sponsor Partners, a New York City-based educational mentoring and scholarship organization, and the Best-Shot Foundation, which is focused on decreasing childhood deaths from pneumonia worldwide.

**Education:**
Washington University, BS, BA
Harvard Business School, MBA

Mitchell Gordon
President
Morpheus Capital + Advisors LLC
100 Park Avenue
New York, NY 10017
p: 212-557-9700
c: 917-922-5757
f: 917-591-9020
mg@morpheuscap.com

December 2010

Resume

# DANA J. LOCKHART

## BRIEF

Over forty years of commercial experience with aerospace and aviation-related companies. Employers have included Fortune 50, Fortune 500 and leading international companies. Accomplished strategist and negotiator. Structured, negotiated and closed over $15 Billion of aircraft sales and financing agreements. Experienced, through two economic cycles, in representing aerospace supplier interests during airline in- and out-of-court restructurings. Extensive practical experience in managing and leading internal and external resources to achieve results: corporate staff, inside and outside counsel, commercial and investment banks, lease advisors and other specialists.

## AREAS OF ACCOMPLISHMENT

### Selling to Airlines

Represented three civil aircraft manufacturers as integral member of commercial teams marketing and selling large jet and turboprop aircraft to major and regional airlines in the US and other countries around the world. At Airbus Americas, during a 20+ year career, contributed to major account wins that helped grow Airbus world market share from less than 20 percent to consistently +/- 50 percent since 1999. Contributed to development of commercial strategy and tactics, marketing and proposal development, contract negotiation and documentation and airline account administration.

### Aircraft Financing and Leasing

Held executive positions in customer financing role at three commercial aircraft manufacturers and managed/led staffs responsible for structuring, negotiating, documenting and implementing billions of dollars of aircraft financing commitments and completed transactions for major and regional airlines. Transaction formats included asset-backed (EETC) structures, US and cross-border leveraged leases, conditional sales, operating leases, export credit (US Eximbank and European ECA), mortgaged debt and pre-delivery payment (PDP) financing. Contributed in key roles to the establishment and development of three manufacturer captive aircraft finance subsidiaries.

### Workout, Restructuring and Bankruptcy

Represented Airbus interests in out-of-court and court-supervised restructurings of US and Canadian airline customers, including as member of Chapter 11 creditors committees in cases for Northwest, United, TWA, America West and Pan Am. Served as creditor committee chair in United and Northwest cases. Also active in the Eastern, Continental, Braniff, Air Canada and Independence Air bankruptcies. Prior to Airbus, also gained workout/restructuring experience with Lockheed and Fairchild customers.

# PROFESSIONAL HISTORY

Mr. Lockhart is presently an independent contractor offering advisory services in financing and procurement of civil aircraft, capital markets and in- and out-of-court restructuring. During 2008/09 he was head of capital markets for GMT Global Republic Aviation, an international strategic aviation company based in Dublin, Ireland, that acquires, leases and manages commercial aircraft. He was responsible for sourcing senior and subordinated debt financing to support the company's acquisition of aircraft assets and to refinance debt backing the aircraft portfolio, working with incumbent bank and investment fund lenders in Europe, the Middle East and Australia.

Mr. Lockhart joined Airbus Americas (then Airbus North America) in 1987 as a sales finance negotiator and assumed management of the sales finance team two years later. As a senior member of the commercial team, he contributed to Airbus's 30+ percentage point market share growth over the ensuing 10 years. He was responsible for structuring, negotiating and implementing aircraft financing commitments and transactions for Airbus's U.S. and Canadian customers, across a broad range of methodologies: U.S. leveraged and cross-border leases, export credit, enhanced equipment trust structures, swaps and hedging and secured loans. He also supervised administration of a multi-billion dollar portfolio of aircraft financing transactions, including a liability management program to refinance, restructure and sell off finance receivables. Promoted in 2002 to Chief Financial Officer, Mr. Lockhart assumed added responsibilities for all accounting, treasury, financial planning and corporate finance functions. He also represented the company as an interface with Wall Street analysts and investment companies and as a frequent speaker at industry forums and conferences.

Mr. Lockhart was recruited in 1982 to develop and manage Fairchild Industries' new captive subsidiary responsible for sales financing of the company's regional aircraft. In that role, he established and implemented new processes and procedures for related corporate functions: cash management, tax, risk management, legal and finance/accounting. After leaving the company to pursue other interests, Mr. Lockhart returned in 1987 as a financial advisor to assist Fairchild in the sale of the finance subsidiary in an LBO transaction.

In 1979 Mr. Lockhart became a founding executive of Lockheed Finance Corporation, formed to expand the direct resources available to provide customer financing for Lockheed's L-1011 and C-130/L100 programs. He served as chief officer responsible for transaction structuring and negotiation during a ten-fold buildup and diversification of the finance receivables portfolio. He executed transactions in the U.S., Europe, Africa, Middle East, Asia and South America.

After joining Lockheed Corporation while in college, Mr. Lockhart progressed through corporate finance assignments in cost accounting, budgeting, forecasting and project pricing for U.S. DoD contracts. Moving to the L-1011 Tristar program, Mr. Lockhart worked in business/credit analysis and sales proposal support before being promoted to management responsibility for arranging export credit supported and conventional aircraft financing for domestic and international customers.

Mr. Lockhart has an MBA from Pepperdine University and a BS in Business Administration from California State University.

Mr. Lockhart is a member of the board of trustees of the ISTAT Foundation.

Contact:  Mobile:  (571) 291-1039;  E-mail:  DJLockhart@verizon.net

# HARVEY W. SCHILLER

*75 Rockefeller Plaza, 27th fl.*      *Tel: 212-445-6260*
*New York, NY 10019*      *Cell: 917-543-8112*

*schillerh@aol.com*

Place of Birth: New York, NY

Education:

BS in Chemistry, The Citadel, 1960

MS in Chemistry, The University of Michigan, 1962

PhD in Chemistry, The University of Michigan, 1970

Thesis: "The Preparation of Diphosphine and its Borane Adducts"

Doctor of Humanities, Northern Michigan University, 1992

Doctor of Military Science, The Citadel, 1991

Military Education:

United States Air Force (USAF) Pilot Training

Survival Training

Air Ground Operations School

Squadron Officers School

Armed Forces Staff College

Industrial college of Armed Forces (correspondence)

Contract Negotiators course

Army Airborne (Paratrooper)

Foreign Internal Defense (Anti-terrorism)

Combat Crew Training

Military service:

Brigadier- General, USAF, Ret.

1962-1963 USAF Pilot training, Moody AFB, GA

1963-1965 Pilot and Air Operations Officer, Holloman AFB, NM

1966-1967 Pilot 309th Air Command Squadron, Saigon, Vietnam

1967-1968 Instructor, USAF Academy, CO

1968-1970 Ph.D. Student, University of Michigan

1970-1972 Operations Officer, Warner Robbins AFB, GA

1972-1975 Faculty, USAF Academy, CO

1975-1976 Student, Air Forces Staff College, VA

1976-1978 Pilot, Operations Officer, 319th Bomb Wing, Grand Forks AFB, ND

1978-1986 Permanent Professor and Department Head, USAF Academy, CO
(Presidential Appointment)


## Work Experience

1986-1990 Commissioner, Southeastern Conference, Birmingham, AL

1990-1994 Executive Director, US Olympic Committee, Colorado Springs, CO

1994-2000 President Turner Sports, President Atlanta Thrashers NHL Club, Vice
President Programming Turner Broadcasting, Atlanta, GA

2000-2002 Chairman and CEO, YankeeNets, New York, NY

2002-2004 Chairman and CEO, Assante USA, New York, NY

2004-Present Chairman and CEO, GlobalOptions Group, New York, NY

2010-Present Vice Chairman and President of the Sports, Media, and Entertainment Practice
of Diversified Search Odgers Berndtson


## Sport Experience

1980 Consultant to U.S. State Department, Nairobi, Kenya

1981-84 Consultant, 1984 Los Angeles Olympic Games

1982-90 NCAA Executive and Championship Committees

1984-85 President, Western Athletic Conference

1986-89 Board of Directors, College Football Association

1990-94 IOC Broadcasting and Marketing Committees

1990-94 Board of Directors, Atlanta Olympic Games and Salt    Lake City Games


1990-94 Vice President, Pan American Sports Organization

1995-present Harris Interactive College Football Poll (BCS)

1997-99 NHL Board of Governors

2000-05  Chairman, Executive Committee, New York 2012 Bid    Committee

2006  Chairman of Board, DIRT Motor Sports

2007-09 President, International Baseball Federation

2007-09 Steering Committee, World Baseball Classic

2009-present  Co-Chair, Business of Sports School Advisory Board

2010 Board of Directors, National Baseball Hall of Fame

2010 Advisory Board, Pinstripe Bowl, Yankee Stadium

2010 Advisory Board, USA Taekwondo 's Membership    Development Task Force

2010 USA Canoe/Kayak CEO Search Committee

Present Consultant, Vancouver Canucks NHL Club

## Other Appointments (partial listing)

1995-2000 National Board of Directors, Boys & Girls Clubs of America

1996-2000 Distinguished Visiting Professor, Goizueta School of Business,  Emory University, GA

2000-03  Director, IDT Corporation

2002-04 Member, Independent Commission of the USOC created by the  Senate Commerce Committee

2004 Vice Chair, New York City Host Committee of the 2004  Republican National Convention

2005-present Advisory Board to Falconhead Partners

2006-08 White House Commission on Presidential Scholars

2008-present Board of Directors of Competitor Group

2008-present Advisory Partner to Millennium Technology Partners II

2008 Appointed to USAFA Endowment Board

2010 USAFA Superintendent's Advisory Group (Honor Committee)

## Decorations and Awards (partial listing):

Distinguished Flying Cross, Legion of Merit, Air Medals, Meritorious Service and Commendation Medals, Vietnam Awards and others. Right to Play, Ellis Island Award, Olympic Order, Eagle Award, Citadel Athletic Hall of Fame, USA Swimming, USA Baseball, and others.

Other:

Extensive public speaking and publication experience.

Personal:

Dr. Schiller is married to Marcia K. Schiller. They have two children, Derek and Erika, and three grandchildren: Carlin Tucker, and Carson & Luke Schiller.



**LC&T Leadership Communications & Training**

1594 Lupine Den Court • Vienna VA. 22182
Phone: 571.436.7242 •Email:don.skiados@gmail.com

# Vitae

## Don Skiados, President

Don Skiados is President of two LLC's, Leadership Communications and Training and Meetings-Nine One One.  Both firms provide leadership services and training to Corporations, Associations and Unions. Mr. Skiados has worked as an aviation industry consultant for fifteen years. His specialty is working with volunteer Boards of Directors on proper governance procedures and effective and efficient responsibilities, conflict resolution and strategic planning.
Meetings-Nine One One provides site selection, contract negotiations and meeting planning services. LC&T and M911 both provide state of the art training programs in Leadership, Board Governance, Public Speaking, Media Relations, Communications, Video Production and Meeting Planning.

Prior to retiring in June, 2009 Mr. Skiados served as Executive Director of the Air Line Pilots Association. Mr. Skiados was responsible for the administration, policy development, strategic planning, action planning, dissemination of information to the Association's 55,000 pilot members and for overseeing external communications to the Congress, the media, financial institutions and the public on safety and aviation related issues involving the piloting profession. These functions involved the coordination of volunteer committees, professional staff and consultants in what is frequently a politically charged environment.

Prior to becoming the Executive Director, Mr. Skiados served as the Association's Director of Communication. In this role he introduced state-of-the-art techniques to include web and social networking sites, media and public speaking training, production of nationwide teleconferences, and development and production of newspaper, radio and television ads promoting the Association.  He directed the ALPA communications/media response to the 9-11 terrorist attacks working directly with the White House, Department of Transportation, Homeland Security, Federal Aviation Administration, Federal Bureau of Investigations and the airports and airlines.

## OTHER MAJOR ACCOMPLISHMENTS:

- Elected President of the Council on Aviation Accreditation (currently dba Aviation Accreditation Board, International or AABI)

- Elected Chairman of the Board, Greater Washington Society of Association Executives.

- Elected Chairman of the Board, Greater Washington Society of Association Executives Educational Foundation.

- Developed a nationwide grass-roots campaign, "Operation USA" (Unity for Safe Air Travel), which prompted the Reagan Administration to issue regulations on security screening.

- Appointed as member of the Walt Disney World council of advisors and meeting World Advisory Board.

- Received the International Association of Business Communicator's "Silver Inkwell Award of Excellence" for best overall communications program – Aloha Flight 243.

- Received the Richard W. Taylor Industry Award

- Received the Paul Whalen Education Award


## EDUCATION:

Wharton School of Business, University of Pennsylvania; Graduate, Executive Development Program

## ORGANIZATIONAL AFFILIATIONS:

- American Society of Association Executives

- National Press Club

- Aviation Accreditation Board, International

- Aero Club of Washington

- Wings Club of New York

**Ellen N. Artist**
**ENA Advisors, LLC**

Ms. Artist has 30 years experience in aviation finance as a bankruptcy trustee, financial advisor, investment principal and commercial lender. She presently operates her consulting agreements under the name ENA Advisors, LLC.

## Liquidation Trustee – Advisory Experience

***FLYi & Independence Air Distribution Trust***: Ms. Artist led the out of court restructuring of lease and loan obligations of Independence Air. Following the bankruptcy and subsequent shutdown of the airline, at the request of counsel to the Creditors Committee, ENA Advisors, LLC was appointed Chapter 11 Distribution Trustee for the FLYi and Independence Air Distribution Trust.

***Skybus Creditor Trust:*** Following the shutdown of Skybus Airlines, Inc. ENA Advisors was approached by counsel to the Creditors Committee to act in the capacity of wind down consultant to the Skybus Creditor Trust.

Important areas of experience include:
- **Claims Resolution.** Reviewing each claim individually to assess its accuracy. Includes not only trade claims, but all lease and executor contract damage claims. Work with claims agent to develop custom reporting to enable Trusts to evaluate status of claims resolution process. Work with counsel on Omnibus Claims Objections and individual objections.
- **Trust Accounting.** Handling of day to day accounting for Trust activities, including setting up all the needed trust entities, bill paying, distribution accounting, quarterly tax reporting. Also preparing all bankruptcy court filing requirements, including monthly operating reports and quarterly trustee reporting.
- **Litigation.** Experienced in claims litigation and resolution; discovery process; deposition process and ultimate settlement.
- **Interaction with Counsel.** Work effectively with bankruptcy counsel on preparation of court filings; review each motion for comment.
- **Interaction with Claims and Distribution Agent.** Work effectively with distribution agent to facilitate proper distributions. Provided needed files to calculate amounts due by claimant.

## Aviation Finance and Restructuring Experience

Ms. Artist led the out of court restructuring of lease and loan obligations of American Airlines in May 2003, where the overall program included reduction of payments exceeding $175 million per annum.

Ms. Artist has significant aircraft purchase order expertise. She led the negotiating team for Independence Air's purchase of A320 family aircraft, was part of negotiating team for Midway Airline's purchase of 737-700 aircraft, assisted jetBlue Airways in its acquisition of Embraer 190 aircraft and assisted Chautauqua Airlines in its acquisition of Embraer 50-seat aircraft.

She also has extensive aircraft lease financing expertise, involved in the financing of Embraer 190 aircraft for JetBlue, financing of Embraer 140 and 145 aircraft for Chautauqua Airlines and was involved in the first EETC financing transactions for Continental Airlines. She has arranged financing for billions of dollars of equipment utilizing leveraged lease structures as well as advising lessors in these structured financings.

## Business Partnerships and Employment Background

Ms. Artist was formerly a founding partner at both The Seabury Group, LLC and SkyWorks Capital, LLC. She was previously employed in Fieldstone Private Capital Group's Structured Finance Group from its inception, where she was instrumental in ensuring the successful execution of several billion dollars in aviation financings.

Prior to joining Fieldstone she had been employed by Bankers Trust Company for 11 years, holding senior responsibilities for the last two years in the Lease and Project Finance Group. Ms. Artist's responsibilities at this time included both debt and equity distribution as well as origination of transactions primarily involving financing for major airline companies.

## Education

Ms. Artist is a graduate of Northwestern University with a B.A. in Economics and received an M.B.A. with distinction from New York University.

## EXHIBIT D

**January 7, 2011 Letter from Brett H. Miller to John Ashmead**

1290 AVENUE OF THE AMERICAS
NEW YORK
NEW YORK 10104-0050

TELEPHONE:212.468.8000
FACSIMILE:212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

NORTHERN VIRGINIA, DENVER,
SACRAMENTO, WALNUT CREEK

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

January 7, 2011

Writer's Direct Contact
212.468.8051
BrettMiller@mofo.com

John R. Ashmead, Esq.
Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004

Re: Mesa Air Group, Inc. – Subject to Rule 408 of the FRE

Dear John:

The Official Committee of Unsecured Creditors (the "Committee")[1] has consistently had one goal during this bankruptcy case – to maximize the value for creditors. In fulfilling their fiduciary duties, the Committee members have endured a year of weekly calls, numerous in-person meetings and discussions with the Debtors and interested third parties regarding possible restructuring transactions. The attacks on the Committee are unfair and your allegations, as you shall see, are unfounded. Rather than go through the costly, in terms of time and money, exercise of formal discovery, we offer up the following facts as informal discovery of the board selection process in hopes that your client's concerns will be answered. Further, we will refrain from seeking formal discovery from your client, short of asking for a limited number of documents at the end of this letter that perhaps you can provide without the need for taking depositions and interrogatories. If you are unwilling to comply, we will provide a formal request.

In June of 2010, the Committee and the Debtors began discussions regarding a standalone plan of reorganization. These discussions were based upon, and required, commitments from the Debtors' code share partners. Because of the significant number of foreign creditors of the Debtors and the magnitude of their claims, the applicable foreign ownership rules were always at the forefront of the negotiations.

As part of the negotiations, the Debtors initially demanded that they appoint the new board in consultation with the Committee. This was a non-starter for the Committee and by early

---

[1] Your Objection states that a "majority of the OCC is comprised of trade vendors and a union representative." The composition of the Committee is: a single trade vendor (IHI), a union representative (ALPA), two indenture trustees (US Bank and Wilmington Trust), an aircraft finance party (AT&T), and two aircraft suppliers (Bombardier and Embraer). Contrary to your assertions, not all of these creditors have an "ongoing relationship" with the Debtors.

July, an agreement was been reached for the new board to have nine members, with the Committee selecting six members and the Debtors' selecting three members. Contemporaneous with the negotiations with the Debtors, the Committee's advisors asked for nominations of potential board candidates from the Committee. On the Committee conference calls on July 1, 15 and 22, the topic of potential members was discussed and on July 29th the Committee appointed a Board Composition Subcommittee (the "Subcommittee"), comprised of US Bank, ALPA and the Committee's advisors.

In connection with the search for candidates, the Debtors' financial advisor, Imperial Capital, provided the Committee with an information packet with the names and bios of ten potential new nominees, two members of senior management and the seven existing "independent" directors of Mesa. While the Committee considered these materials, the Subcommittee came up with a list of ten additional potential candidates suggested by members of the Committee and the Committee's advisors for consideration by the Committee. By the end of August, after the Subcommittee had vetted each of the candidates, with Committee counsel taking the lead in having discussions with each of the nominees, a recommendation was made by the Subcommittee to the Committee that the six proposed committee designees (Ellen Artist, Mitchell Gordon, Dana Lockhart, Grant Lyon, Harvey Schiller and Don Skiados) be approved and presented to the Debtors. The Committee unanimously approved the Subcommittee's recommendation.

In light of the foreign ownership concerns mentioned above, the Committee did not have a foreign creditor on the Subcommittee and did not accept any board nominations from foreign creditors (in fact, no names were offered by the foreign creditors). Further, after the filing of your objection, a vote was taken by the Committee, with the foreign creditors being recused, and the domestic creditors unanimously approved the proposed board slate.

With regard to some of your questions regarding the proposed board: NONE of the Committee's candidates was involved in the negotiation of the corporate documents (they were sent the Plan Supplement only AFTER it was filed); NONE of the candidates was even aware of the length of the term of his/her board seat; NONE of the candidates has had discussions with management to our knowledge; and there were no calls organized for the candidates to speak among themselves or with the Committee.

Since the approval of the Disclosure Statement, the Committee has received inquiries regarding the board from a few creditors and at least three bios of potential board candidates, including your nomination of Cezar Froelich. Even after considering these expressions of interest, the Committee determined to keep the proposed slate.

Therefore, all told, the Committee considered in excess of 30 candidates, in selecting its proposed designees. NONE of the proposed designees is an "insider"; NONE has a

MORRISON | FOERSTER

relationship with management; NONE has any illusions of being "entrenched"; and NONE was designated by a foreign creditor. What is clear is that ALL of them are independent and absolutely qualified to protect the interests of the stakeholders going forward, including your client.

Our requests of your client are simple:

1.      Please provide us with the information you have that the Committee's proposed board slate includes members who (a) are "insiders"; (b) "have substantial legitimate interests that are tied to an ongoing relationship with the Debtors"; (c) do not have a goal of "maximizing the value of the New Common Stock"; (d) do not represent "non-economic stakeholders whose only way to benefit directly from the Reorganized Company's future success is through stock appreciation"; and (e) are unable to act as fiduciaries.

2.      Please provide us with the underlying agreements evidencing the purchase of the claims by your client, including but not limited to any agreement(s) to purchase aircraft that were flown by the Debtors.

3.      Please provide us with information regarding any investment made by your client in the last five years where its stake was for 10% or less of the common stock of the company and your client appointed a member of the board.

4.      Please provide us with the applicable corporate governance documents for each of the companies where your client in the past five years either sits (or sat) on or has appointed a member of the board of directors.

At your convenience, we will be available to discuss all of the facts set forth in this letter.

Sincerely,

Brett H. Miller

cc:     Mesa Airlines
        Official Committee of Unsecured Creditors