**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MESA AIR GROUP, INC., et al.,[1]<br><br>                Debtors. | <u>NOT FOR PUBLICATION</u><br><br>Chapter 11<br><br>Case No. 10-10018 (MG)<br><br>(Jointly Administered) |

**MEMORANDUM OPINION OVERRULING OBJECTION TO**
**CONFIRMATION OF BF CLAIMS HOLDINGS I LLC**

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

The Court is being asked to confirm the Debtors' *Third Amended Joint Plan of Reorganization of Mesa Air Group, Inc. and Affiliated Debtors Under Chapter 11 of the Bankruptcy Code*, dated January 19, 2011 (ECF # 1437, the "Plan"). A confirmation hearing was held on January 14, 2011 (the "Confirmation Hearing"). The Debtors submitted a memorandum in support of confirmation, along with supporting declarations which were admitted into evidence without objection, asserting that they have met all requirements of the Bankruptcy Code to confirm the Plan. (ECF ## 1381, 1383, 1384.) The Debtors obtained the requisite votes to confirm the Plan. BF Claims Holdings I LLC ("BF Claims Holdings") objected to confirmation of the Plan on several grounds, arguing that the Plan is not confirmable because it violates: (i) section 1129(a)(1) of the Bankruptcy Code because it fails to comply with sections 1123(a)(4), 1123(a)(6), 1123(a)(7) and 1129(a)(5)(A); and (ii) the section 1129(a)(3) "good faith" requirement, as a result of post-emergence corporate governance mechanisms proposed by the Debtors. (ECF # 1358, the "Objection.") BF Claims Holdings also argues that

---

[1]      The Debtors are: Mesa Air Group, Inc. (2351); Mesa Air New York, Inc. (3457); Mesa In-Flight, Inc. (9110); Freedom Airlines, Inc. (9364); Mesa Airlines, Inc. (4800); MPD, Inc. (7849); Ritz Hotel Management Corp. (7688); Regional Aircraft Services, Inc. (1911); Air Midwest, Inc. (6610); Mesa Air Group Airline Inventory Management, LLC (2015); Nilchi, Inc. (5531); and Patar, Inc. (1653).

changes made to the Plan after creditor voting – changes designed to address some of BF Claims

Holdings' objections – are material adverse changes, in violation of section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, requiring resolicitation and balloting.  Debtors

responded to the Objection, arguing in part that BF Claims Holdings lacks standing to object to

the Plan since it acquired its claims without complying with the transfer notice requirements of

the Bankruptcy Rules and a trading order in place in these chapter 11 cases.  Several other parties

raised formal or informal objections to the Plan, which were either resolved by modification or

stipulation, or overruled at the Confirmation Hearing.  The Court heard testimony and legal

argument in connection with the Objection during the Confirmation Hearing and took the matter

under submission.

     This Memorandum Opinion, containing findings of fact and conclusions of law pursuant

to Fed. R. Bankr. P. 7052, addresses the BF Claims Holdings standing and the merits of the

Objection.  As an initial matter, the Court concludes that BF Claims Holdings lacks standing to

object to the Plan for failure to comply with the *Order Pursuant to Sections 105, 362 and 541 of

the Bankruptcy Code and Bankruptcy Rule 3001 Establishing Notification and Hearing

Procedure for Trading in Claims and Equity Securities*.  (ECF # 180, the "Trading Order.")

Notwithstanding BF Claims Holdings' lack of standing, the Court must undertake an

independent analysis of the Plan and associated documents.  The Court concludes that the Plan

complies with all sections required for confirmation.  The Objection is overruled for lack of

standing and on the merits.  The Court will enter a separate order confirming the Plan with

findings of fact and conclusions of law on all other plan confirmation issues.

### A.    Background

At the outset, the Court notes that this is an unusual case – the Debtors include a U.S. air carrier, having been issued a certificate of public convenience and necessity by the U.S. Department of Transportation and an Air Operator Certificate by the Federal Aviation Administration.  Accordingly, the Debtors are required to comply with title 49 of the United States Code (the "Transportation Code"), in addition to the requirements of the Bankruptcy Code as debtors in a chapter 11 case.  For example, the Transportation Code requires that United States "citizens," a defined term in the Transportation Code, hold 75% of the voting interest of the Debtors.  The Debtors' Plan, of necessity, must comply with both the Bankruptcy Code and the Transportation Code through the operation of various corporate governance mechanisms proposed by the Debtors.

Under the Plan, unsecured creditors that are U.S. Citizens will receive a combination of New Notes and New Common Stock, while unsecured creditors that are Non-U.S. Citizens will receive a combination of New Notes and New Warrants. [2]  The New Warrants to be distributed to Non-U.S. Citizens are transferable penny warrants that can only be exercised by U.S. Citizens.  *See* Plan § 1.156.  The formulation of this unique distribution scheme was necessary to ensure compliance with the Transportation Code because a large amount of General Unsecured Claims are held by foreign creditors.  To assure compliance with the Transportation Code, the Debtors must be able to monitor the distribution of voting rights as between U.S. Citizens and Non-U.S. Citizens.  The fact that the Debtors are required to comply with two concurrent regulatory schemes and will distribute New Common Stock and New Warrants to General Unsecured Creditors as the post-Effective Date claims resolution process takes place makes this an unusual framework within which the Court considers the merits of the Objection.

---

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

B.    **The Confirmation Hearing**

At the Confirmation Hearing, the Court heard testimony from Michael Lotz, the President and Chief Financial Officer of the Debtors, and Marc Bilbao, the Debtors' financial advisor, regarding the corporate governance mechanisms that were established by the Debtors in consultation with the Official Committee of Unsecured Creditors (the "Creditors Committee" or the "Committee").  Specifically, Mr. Lotz testified about the proposed bylaws of Mesa Air Group, Inc. (the "Bylaws"), restated articles of incorporation of Mesa Air Group, Inc. (the "Articles of Incorporation") and a Shareholders' Agreement filed with the plan supplement (the "Shareholders' Agreement," and together with the Bylaws and the Articles of Incorporation, the "Corporate Governance Documents").  The proposed Bylaws govern, among other things, the frequency of annual meetings (Section 1.2), the shareholders' ability to call special meetings (Section 1.3), the Board of Directors' and the shareholders' ability to amend certain provisions of the Bylaws (Sections 6.1 and 6.2), and the manner of selection and terms of the members of the board of directors of Mesa Air Group, Inc. (the "Board of Directors" or the "Board") (Article II generally).  Mr. Lotz testified regarding the decision to institute a staggered board structure and described the process by which the Debtors and the Committee agreed that the initial Board of Directors would be comprised of three (3) members proposed by the Debtors and six (6) members proposed by the Committee.  Both the prepetition and post-petition versions of the Articles of Incorporation authorize the issuance of "blank check preferred" stock which gives the company the ability to use defensive procedures to avoid a hostile takeover.

The Shareholders' Agreement, which after a post-balloting modification now applies to each recipient of New Common Stock, requires that holders of New Common Stock agree to vote all "excess shares" of New Common Stock in accordance with a majority of the Board of

Directors on such matters requiring or submitted for shareholder approval.  The voting restriction

on the "excess shares" applies only to those shares of New Common Stock issued under the Plan

that exceed the shareholders' voting power relative to the size of their Allowed Claim.

According to the Debtors, the purpose of the Shareholders' Agreement is to ensure that each

shareholder is granted voting power equal to the pro rata size of its Allowed Claim for a period

of time.  Termination of the Shareholders' Agreement will occur upon the earlier of (a) the

exercise of 80% or more of the New Warrants issued under the Plan, (b) three (3) years after the

Effective Date of the Plan, or (c) following an initial public offering of the company.

Mr. Bilbao primarily testified about the 10% "premium" being provided to Non-U.S.

Citizens who are receiving New Warrants in exchange for their General Unsecured Claims under

the Plan.  Section 4.3.2(b) of the Plan provides that for purposes of calculating distribution to

Non-U.S. Citizens, "each Non-U.S. Citizen shall receive New Warrants for 110% of the shares

of New Common Stock that such Creditor would be entitled to receive if such Creditor was a

U.S. Citizen."  Plan § 4.3.2(b).  Mr. Bilbao testified that this "premium" was a mechanism to

establish parity between the New Common Stock and New Warrants; the New Warrants would

properly be valued at a discount from the New Common Stock.  According to Mr. Bilbao, a 10%

"premium" was necessary to account for the difficulties associated with marketing, selling and

exercising the New Warrants.

As a result of the Objection, the Debtors modified the Corporate Governance Documents

to: (1) decrease the term of the Shareholders' Agreement from five (5) years to three (3) years;

(2) require that the Shareholders' Agreement applies to *all* Class 3 creditors, rather than only

those holding 5% or more of New Common Stock; (3) amend the Bylaws to provide that a

shareholders' meeting shall be required within fifteen (15) months of the Effective Date and

annually thereafter; (4) the threshold required to call a special shareholders' meeting has been reduced from a majority to the lesser of 25% of Mesa Air Group, Inc.'s shares determined on a fully-diluted basis or 50% of Mesa Air Group, Inc.'s shares; and (5) require shareholder consent for certain changes to be made to the Bylaws.

At the hearing, the Court raised concerns that the effect of the Corporate Governance Documents was a long-term (approximately 5-6 years) separation of ownership and control.  The Debtors, after consultation with the Committee and U.S. Airways, then proposed a further amendment to the Bylaws to provide that the term of office of all three classes of directors (all nine (9) directors) shall expire at the third annual meeting of the shareholders held after the Effective Date which shall occur between thirty-six (36) and thirty-nine (39) months following the Effective Date (the "Full Board Election Date").  The Court directed that this further amendment be filed with the Court, which it was on January 19, 2011.  (ECF # 1436.)  The further amendment also provides that the Board of Directors will remain a staggered board with the directors divided into three (3) classes with the term of office of the first class to expire at the first annual meeting of shareholders held after the Full Board Election Date, the term of office of the second class to expire at the second annual meeting of shareholders held after the Full Board Election Date, the term of office of the third class to expire at the third annual meeting of shareholders held after the Full Board Election Date, and thereafter for such term to expire at each third succeeding annual meeting of shareholders after such election.  The amended Bylaws also make clear that the Debtors intend to hold the third annual meeting held after the Effective Date following expiration of the Shareholders' Agreement.

C.      **Standing**

The Debtors contend that BF Claims Holdings lacks standing to object to confirmation of

the Plan.  Specifically, the Debtors assert that BF Claims Holdings violated Bankruptcy Rule

3001(e)(2) and the Trading Order when it acquired its claims.  The Trading Order, common in

many large chapter 11 cases, was entered to protect the Debtors' very large net operating losses

("NOLs").  Any purchase, sale or other transfer that fails to comply with the requirements of the

Trading Order "shall be null and void *ab initio* as an act in violation of the automatic stay under

sections 362 and 105(a) of the Bankruptcy Code."  Trading Order at 2.

Bankruptcy Rule 3001(e)(2) states, in pertinent part, that "[i]f a claim . . . has been

transferred other than for security after the proof of claim has been filed, evidence of the transfer

shall be filed by the transferee."  FED. R. BANKR. P. 3001(e)(2).  Moreover, the Trading Order

mandates that a proposed claims acquirer file a Notice of Intent to Purchase, Acquire or

Otherwise Accumulate a Claim (a "Claims Acquisition Notice").  *See* Trading Order at 4.  Also

pursuant to the Trading Order, at least thirty (30) calendar days notice must be given before a

transaction is effectuated or the Debtors may waive such requirement in their discretion.  *Id.* at 5,

10.  The Debtors also have thirty (30) calendar days to file an objection to a proposed transfer.

*Id.* at 5.

There are two transfers at issue here.  Initially, Kitty Hawk Onshore Fund LP, Kitty

Hawk Master Fund Ltd., Kitty Hawk Master Fund II Ltd., and Brigade Leveraged Capital

Structures Fund Ltd. (the "Brigade Affiliates") filed eight (8) Claims Acquisition Notices to

acquire certain claims (the "BF Claims") on December 23, 2010.  The Debtors did not object to

this proposed transactions and Debtors' counsel represented at the Confirmation Hearing that the

thirty-day (30) notice period was waived.  However, the Debtors contend that the Brigade

7

Affiliates subsequently transferred the BF Claims to BF Claims Holdings sometime between

December 23, 2010 and the Confirmation Hearing without filing the appropriate transfer notices

and Claims Acquisition Notices in contravention of Bankruptcy Rule 3001(e)(2) and the Trading

Order, respectively.  The Trading Order expressly provides that transfers of claims made in

violation of the order are "null and void *ab initio*."  Trading Order at 2.  Consequently, the

Debtors assert that BF Claims Holdings did not validly hold the BF Claims at the time the

Objection was filed and, accordingly, does not have standing to bring an objection to the Plan.

With regard to the transfer from the Brigade Affiliates to BF Claims Holdings, a review

of the docket shows that BF Claims Holdings filed four (4) *Notices of Transfer of Claims*

*Pursuant to Rule 3001(e)(2)* on January 12, 2011, the same day that the Debtors raised the

standing issue in their pre-trial memorandum, indicating the transfer of claims from U.S. Bank

National Association to BF Claims Holdings I LLC.  (ECF ## 1398–1401.)  However, as of the

date hereof, BF Claims Holdings has not filed Claims Acquisition Notices as required by the

Trading Order.  Because the Trading Order requires that at least thirty (30) calendar days notice

be given to the Debtors before a transfer is effectuated, the acquisition of the BF Claims by BF

Claims Holdings from the Brigade Affiliates is not effective, and BF Claims Holdings does not

have standing to prosecute the Objection.

Notwithstanding BF Claims Holdings' lack of standing to bring the Objection, the Court

must still undertake an independent analysis of the contents of the Plan to determine whether the

Plan satisfies the confirmation requirements of the Bankruptcy Code.

### D.    Modification of the Plan

At the Confirmation Hearing, BF Claims Holdings argued that the eleventh hour

modification to the Plan that the Shareholders' Agreement applied to all Class 3 creditors, rather

8

than just those receiving 5% or more of the New Common Stock, was a material modification

that required resolicitation.  According to BF Claims Holdings, the application of the

Shareholders' Agreement to *all* Class 3 creditors receiving New Common Stock might cause

creditors to change their vote.  In response, the Debtors submit that the modification is not

material and no resolicitation is required because the change only affects a small number of

sophisticated creditors in an administrative fashion.

Section 1127(a) of the Bankruptcy Code provides that "[t]he proponent of a plan may

modify such plan at any time before confirmation, but may not modify such plan so that such

plan as modified fails to meet the requirements of sections 1122 and 1123 of this title."  11

U.S.C. § 1127(a).  The disclosure requirements of section 1125 must also be met.  *See* 11 U.S.C.

§ 1127(c).  Bankruptcy Rule 3019 provides, in relevant part, that in a chapter 11 case,

> after a plan has been accepted and before its confirmation, the
> proponent may file a modification to the plan.  If the court finds
> after hearing . . . that the proposed modification does not adversely
> change the treatment of the claim of any creditor or the interests of
> any equity security holder who has not accepted in writing the
> modification, it shall be deemed accepted by all creditors and
> equity security holders who have previously accepted the plan.

FED. R. BANKR. P. 3019.  Simply stated, "if a modification is nonmaterial, no resolicitation is

required."  7 COLLIER ON BANKRUPTCY ¶ 1127.02[3] (16th ed. 2010).

BF Claims Holdings directs the Court to two decisions that addressed the issue of post-

solicitation, pre-confirmation plan modifications, *In re Frontier Airlines, Inc.*, 93 B.R. 1014

(Bankr. D. Colo. 1988), and *In re Am. Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988).

The *Frontier* case stands for the proposition that "[i]f the modification adversely affects the

interests of a creditor who has previously accepted the plan, in more than a purely ministerial de

minimis manner, that creditor should have the opportunity to reconsider and change his or her

9

vote." 93 B.R. at 1023.  The facts of *Frontier* are readily distinguishable from the case at bar.

There, the modifications to the plan were significant – the modified plan altered the treatment of

creditors to provide for a distribution of a combination of cash and notes if the creditor did not

elect to receive payment in cash for their claims, whereas initially creditors were to receive cash

in the amount of their allowed claim.  *Id.*  Such a wholesale modification is not present here.

The *American Solar King* case undermines BF Claims Holdings' argument and favors the

Debtors' contention that the Plan modifications are not material.  90 B.R 823–26.  There, the

court was asked to consider whether modifying the treatment of a specific creditor, which had

the effect of increasing the number of shares issued under the plan thereby diluting the value of

such shares, was a material modification that required resolicitation.  *Id.* at 822–26.  The court

concluded that the modifications were not material because "the only adverse impact flowing

from this modification is a miniscule dilution of the stock issue."  *Id.* at 826.  In so holding, the

court rejected a strict reading of Bankruptcy Rule 3019 because "[a] literal reading . . . would

prevent a modified plan from being deemed accepted if it adversely affected the treatment of *any*

claim in *any* way."  *Id.* at 825 (emphasis in original) ("Requiring [resolicitation] in the face of a

merely technical negative impact heightens the risk of plan failure without satisfying any

countervailing public policy.").  As did the *American Solar King* court, the Court here looks to

whether the modification "materially" impacts a claimant's treatment to determine whether the

change is sufficiently adverse to require resolicitation.  *Id.* at 826.

The Court concludes that the modifications made to the Shareholders' Agreement prior to

the Confirmation Hearing are not material modifications that require resolicitation.  First, the

modification only affects a small number of creditors that will be entitled to receive New

Common Stock (estimated by the Debtors to be about 100).  Because of the high convenience

class threshold of $100,000, New Common Stock will primarily be distributed to sophisticated aircraft parties who will continue doing business with the Debtors in the future.  The practical effect of the application of the Shareholders' Agreement to *all* Class 3 creditors is likely more of an administrative burden than a change in treatment.  While the shareholders holding less than 5% of the voting shares will now be subject to the same voting dilution as larger shareholders for up to three (3) years, the Court concludes that this will have a de minimis effect on their voting rights and no effect on the economic value of what such creditors will receive under the Plan.  The additional administrative burden does not amount to an "adverse" change in treatment that would require resolicitation as contemplated by Bankruptcy Rule 3019.  Finally, the Debtors adequately described the mechanics of the Shareholders' Agreement in the Disclosure Statement, putting all parties who were eligible to vote on notice regarding the procedure in place to ensure that shareholder voting would be consistent with the value of one's claim.  *See, e.g.*, *In re Young Broad. Inc.*, 430 B.R. 99, 120–21 (Bankr. S.D.N.Y. 2010).  The Court now turns to the merits of the Objection.

### E.    Section 1129(a)(1)

BF Claims Holdings' first confirmation objection contends that the Debtors have not satisfied section 1129(a)(1) of the Bankruptcy Code which requires that the Plan comply with the applicable provisions of title 11.  *See* 11 U.S.C. § 1129(a)(1).  More specifically, BF Claims Holdings argues that the Debtors have not complied with the mandatory provisions of sections 1123(a)(4), 1123(a)(6) and 1123(a)(7) (and the related provision of 1129(a)(5)(A)) through the combined effect of several corporate governance mechanisms.

1. Section 1123(a)(4)

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). "Without question, the 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money." *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992). Further, courts have recognized that "the key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity." *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008); *see also In re Quigley Co., Inc.*, 437 B.R. 102, 146–48 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.").

BF Claims Holdings asserts that the requirement that any creditor who receives more than 5% of the New Common Stock execute the Shareholders' Agreement results in disparate treatment as between those creditors who receive more than 5% and those who receive less than 5% in violation of section 1123(a)(4). *See* BF Claims Holdings I LLC's Pretrial Memorandum (the "BF Claims Pretrial Memo") at 11 ("The practical effect of this outcome is that any creditor with more than 5% of the New Common Stock is given something different and less valuable in exchange for its claims once it hits the 5% threshold."). BF Claims Holdings also argues that section 1123(a)(4) is violated because certain U.S. Citizens will receive less than Non-U.S. Citizens because Non-U.S. Citizens are slated to receive a 10% premium at the time of execution of the New Warrants above the value of the New Common Stock being issued to U.S. Citizens as of the Effective Date. In response to BF Claims Holdings' initial objection, the Debtors

12

amended the Plan to ensure compliance with section 1123(a)(4) – the modified Shareholders'

Agreement, filed along with the Debtors' *Pretrial Memorandum of Law and Response to BF*

*Claims Holdings I LLC's Objection to Plan Confirmation and Approval of Related Plan*

*Supplement Documents* (ECF # 1392 (the "Debtors' Pretrial Memo") now requires that *all*

creditors receiving New Common Stock execute the Shareholders' Agreement.  Thus, all

creditors, including both U.S. Citizens and Non-U.S. Citizens will have the same "opportunity"

as all holders of New Common Stock will be subject to the voting restrictions provided for in the

Shareholders' Agreement.  *See Dana*, 415 B.R. at 62.

BF Claims Holdings' second argument, that certain U.S. Citizens will receive less than

equal treatment in comparison to Non-U.S. Citizens because Non-U.S. Citizens receive New

Warrants for 110% of the shares of New Common Stock issued to U.S. Citizens, is likewise

unpersuasive.  The inquiry under section 1123(a)(4) is not whether U.S. Citizens and Non-U.S.

Citizens receive the "same amount of money," *see Joint Eastern and Southern Dist. Asbestos*

*Litig.*, 982 F.2d at 749, but whether U.S. Citizens and Non-U.S. Citizens are given the "same

opportunity."  *See Dana*, 415 B.R at 62.  At the Confirmation Hearing, Mr. Bilbao testified as to

the Debtors' rationale for providing a 10% premium to recipients of New Warrants.  Mr.

Bilbao's uncontroverted testimony is that the premium was necessary to equate the value

between the New Common Stock and the New Warrants based on how the two securities would

trade on the open market.  If anything, the testimony shows that the premium is necessary to

ensure equal treatment under section 1123(a)(4).  Based on the modifications made to the Plan

and Shareholders' Agreement, all creditors receiving New Common Stock or New Warrants that

can be exercised for New Common Stock are subject to the same voting restrictions and there is

no unequal treatment in violation of section 1123(a)(4).  Thus, the Court concludes that the Plan

satisfies section 1123(a)(4) and the Objection is overruled on this basis.

> 2.  <u>Section 1123(a)(6)</u>

BF Claims Holdings also argues that the Plan violates the "spirit" of section 1123(a)(6).

Section 1123(a)(6) provides, in relevant part, that the Plan

> provide for the inclusion in the charter of the debtor, if the debtor
> is a corporation, . . . of a provision prohibiting the issuance of
> nonvoting equity securities.

11 U.S.C. § 1123(a)(6).  Collier recognizes that "[t]his section codifies a position long supported

by the Securities Exchange Commission that participation in, and control of, the selection of the

management of a reorganized debtor must be considered as a part of a fair and equitable plan and

provided for accordingly."  7 COLLIER ON BANKRUPTCY ¶ 1123.01[6].  "The securities must be

distributed so that the allocation of voting power properly recognizes the respective position of

the claimants and the stockholders."  *Id.*  This section "prevents the issuance of a class of stock

*without the possibility of exercising any vote*."  *Id.* at ¶ 1123.01[6][a] (emphasis added); *see also*

*In re Ahead Commc'ns*, 395 B.R. 512, 518 (D. Conn. 2008).

Both parties rely on *In re Ahead Communications*, a recent 2008 decision from the

District of Connecticut.  There, the court was asked to determine whether the restrictions placed

on the new common stock issued under the debtor's plan violated sections 1123(a)(6) and

1123(a)(7).  *Id.* at 517–20.  The new common stock that would have been issued to the secured

creditor was held in escrow and "subject to a voting restriction which provided that no voting

rights would be exercisable by the creditor unless the debtor defaulted on the monthly payments

[of an unsecured note] or the balloon payment, or repaid the note in full."  *Id.* at 515.  Though the

14

court ultimately concluded that the voting restrictions were akin to the issuance of non-voting securities, the restrictions placed on the stock in that case are not present here.

The New Common Stock to be issued pursuant to the Plan does not proscribe voting; the shareholders here will, at all times, be able to vote.  The voting restrictions make certain that the shareholders are not able to vote more than their respective Allowed Claims relative to the estimated claims pool.  Unlike *Ahead Communications*, the New Common Stock is not being placed in escrow – on the Effective Date, New Common Stock will be issued to Class 3 creditors who are U.S. Citizens, including a critical party-in-interest, U.S. Airways, and transferable New Warrants will be issued to Non-U.S. Citizens which permit U.S. Citizens to exercise such warrants.  Recipients of New Common Stock will be able to vote on matters that come up for a shareholder vote after the Effective Date, albeit with restrictions on the weight of such votes for a period of time.  *See* 7 COLLIER ON BANKRUPTCY ¶ 1123.01[6] (preventing the issuance of stock "without the possibility of exercising any vote.").  In light of the multi-layered statutory scheme under which the Debtors operate, it is clear that these restrictions to allocate voting power that "recognizes the respective position of the claimants and the stockholders" are reasonable under the circumstances and do not violate section 1123(a)(6).  *Id.* at ¶ 1123.01[6][a].

BF Claims Holdings also argues that the ability to issue preferred stock to implement a "poison pill" violates the "spirit" of the voting stock requirements of section 1123(a)(6) of the Bankruptcy Code.  This argument is without merit.  The provisions regarding issuance of blank check preferred stock are consistent with public policy, particularly in light of the fact that the proposed Board of Directors will be comprised of primarily independent members.  Nevada state law specifically permits boards to take protective action to mitigate the possibility of hostile takeover attempts.  *See* NEV. REV. STAT. § 78.195.5 ("The provisions of this section do not

restrict the directors of a corporation from taking action to protect the interests of the corporation and its stockholders, including, but not limited to, adopting or signing plans, arrangements or instruments that grant or deny rights, privileges, power or authority to a holder or holders of a specified number of shares or percentage of share ownership or voting power.").  In addition, Mr. Lotz testified that the Debtors' prepetition articles of incorporation, filed in 1996, authorized the issuance of blank check preferred stock.  The Court cannot conclude that giving the proposed Board of Directors the right to issue blank check preferred stock somehow violates the "spirit" of section 1123(a)(6).

In sum, BF Claims Holdings' objection on the basis of the Debtors' failure to satisfy section 1123(a)(6) is overruled.

3.   Sections 1123(a)(7) and 1129(a)(5)(A)

BF Claims Holdings raises legitimate concerns regarding the combined effect of certain corporate governance provisions in the context of compliance with section 1123(a)(7).  Section 1123(a)(7) allows a plan to contain only "provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).[3]  Section 1123(a)(7) is often read in conjunction with section 1123(a)(6) relating to issuance of non-voting securities and section 1129(a)(5), which requires, as a condition of confirmation, that the proponent of the plan disclose the identity and affiliation of any individuals proposed to serve, after confirmation of the plan, as directors, officers or voting trustees of the debtor, of an affiliate of the debtor or of a successor to

---

[3]    The Debtors argue that this provision only relates to post-confirmation selection of the board of directors. However, section 1123(a)(7) makes clear that the selection of officers, directors or trustee *under the plan* must be consistent with the interests of creditors and equity security holders.  On its face, section 1123(a)(7) applies to both pre-confirmation and post-confirmation selection of officers, directors or trustees.

the debtor under the plan.  *See* 7 COLLIER ON BANKRUPTCY ¶ 1123.01[7].  Section

1129(a)(5)(A)(ii) requires that "the appointment to, or continuance in, such office of such

individual, is consistent with the interests of creditors and equity security holders and with public

policy."  11 U.S.C. § 1129(b)(5)(A).  The Court of Appeals for the Ninth Circuit has recognized

that sections 1123(a)(6) and 1123(a)(7) are often read together.  *In re Acequia, Inc.*, 787 F.2d

1352, 1361 (9th Cir. 1986).  Further, the Ninth Circuit established certain factors to determine if

plan provisions violate these sections, including, *inter alia*, "the shareholders' interest in

participating in the corporation, the desire to preserve the debtor's reorganization, and the overall

fairness of the provisions."  *Id.* at 1362 (citations omitted).

Few cases have interpreted section 1123(a)(7).  A case relied on by both parties, *In re

Machne Menachem, Inc.*, 304 B.R. 140 (Bankr. M.D. Pa. 2003), is instructive.  There, the debtor

was a non-for-profit corporation under the laws of the State of New York.  *Id.* at 141.  The

debtor's plan provided for the replacement of directors of the not-for-profit corporation in

violation of New York corporate law which specified that replacement be done by vote of the

membership or vote of the directors or action of the state attorney general.  *Id.* at 143.  The court

found that the removal or selection of the debtor's directors was contrary to public policy

because it violated New York state law.  *Id.*  Thus, the plan violated section 1123(a)(7) and

sections 1129(a)(1) and (2) of the Bankruptcy Code.  *Id.*  ("If 'public policy' requires compliance

with New York corporate law, then, clearly, the plan's wholesale replacement of the Board of

Directors exercises an option unavailable under that law and presumably against traditional

concepts of 'public policy.'").  The court was also persuaded that the plan violated section

1123(a)(7) because one of the directors was "attempting to circumvent" New York state law by

hand-picking successors.  *Id.* at 144.  To determine if section 1123(a)(7) had been violated, the

17

court in *Machne Menachem* focused on the plan's compliance with *applicable state law* on corporate governance matters.

        a.   *The Shareholders' Agreement*

BF Claims Holdings asserts that the Shareholders' Agreement violates public policy in violation of section 1123(a)(7) and 1129(a)(5)(A) because it is "designed to empower and entrench the majority of the Board (appointed by the Members of the OCC [the Creditors Committee]) for up to five years." BF Claims Pretrial Memo at 10. BF Claims Holdings overstates its case here. While the Shareholders' Agreement does in fact raise legitimate concerns regarding a shareholder's ability to participate in the future corporate governance of the post-emergence Debtors, the purpose and intent of the Shareholders' Agreement was not to disenfranchise voting. Looking to the factors announced in *Acequia*, the Court concludes that the shareholders will be able to participate in the corporation, even in the first five (now three) years, even though their votes will be given weight consistent with the value of their Allowed Claim relative to the total of the Allowed Claims. In addition, the execution of the Shareholders' Agreement will result in an overall fairness to all creditors slated to receive the New Common Stock or New Warrants because all shareholders will be able to vote an amount commensurate with the amount of their Allowed Claim. Finally, consistent with the reasoning of the *Mechne Menachem* court, the Shareholders' Agreement does not violate Nevada state corporate law and there is no indication that the Debtors are attempting to circumvent applicable state law on corporate governance matters.

Though the Court understands BF Claims Holdings' concerns regarding the lockup of the proposed Board of Directors for a period of about five years (including re-election of the last one-third of the Board of Directors for an additional three (3) years), the additional modifications

to the Bylaws announced on the record at the Confirmation Hearing and later filed with the Court that provide for a shareholder vote on all nine (9) directors after three years post-emergence satisfy the Court that the combined corporate governance mechanisms do not violate the interest of creditors, equity holders and public policy.  The maximum three (3) year term of the Shareholders' Agreement and the amendment to the Bylaws that requires a shareholder vote on all members of the Board after the third year permits the shareholders to meaningfully participate in the corporate governance of the reorganized company within a reasonable period of time post-emergence.  During the period that the Shareholders' Agreement is in effect, the members of the Board of Directors will be subject to and are expected to act in accordance with their fiduciary duties when exercising the voting rights turned over to them.  The Shareholders' Agreement is a fair and practical solution to ensuring compliance with both the Transportation Code and the Bankruptcy Code.  Accordingly, under the unique facts of this case where a majority of the General Unsecured Creditors will receive warrants rather than common stock at the outset, the requirement that all recipients of New Common Stock execute the Shareholders' Agreement does not trip sections 1123(a)(7) or 1129(a)(5)(A).

    b.  *Board Selection*

    BF Claims Holdings also argues in its Objection that the proposed Board of Directors "does not contain meaningful representation of non-insider economic stakeholders whose only way to benefit directly from the Reorganized Company's future success is through stock appreciation" and therefore violates section 1123(a)(7) of the Bankruptcy Code.  *See* BF Claims Holdings I LLC's Objection to Plan Confirmation and Approval of Related Plan Supplement Documents, ECF # 1358, at 14.  In response, the Committee describes in detail the process by which the proposed Board was selected, including solicitation of nominations from members of

the Creditors Committee, appointment of a board composition sub-committee and consideration

of approximately thirty (30) potential candidates, and eventually selecting six members, all of

whom were ratified by the full Creditors Committee.  Pre-Trial Brief of the Official Committee

of Unsecured Creditors in Reply to Objection of BF Claims Holdings I LLC, ECF # 1393, at 7.

BF Claims Holdings has not cited any cases, and the Court was unable to locate any, where a

plan was not confirmed because members of a proposed board failed to have an economic

interest in the success of the company.  In fact, the approach taken by the Creditors Committee is

consistent with their fiduciary duty to all unsecured creditors.  As noted above, the members of

the Board of Directors, including those selected by the Debtors and the Committee will be

subject to applicable state law regarding corporate fiduciary duties.  The Board selection process

undertaken by the Creditors Committee does not compel a finding that the Plan provisions are

not consistent with the interest of creditors and equity holders and public policy under sections

1123(a)(7) and 1129(a)(5)(A).

> c.  *Staggered Board*

BF Claims Holdings also takes issue with the staggered board structure that the Debtors

propose.  Specifically, BF Claims Holdings makes the bald assertion that the type of staggered

board contemplated is "disfavored in the investor community" because it reduces the value of the

firm and insulates top management in violation of sections 1123(a)(7) and 1129(a)(5)(A).  BF

Claims Pretrial Memo at 17.  BF Claims Holdings' assertion is belied by their inability to cite

any applicable case law and fails to recognize, as the Debtors do, that staggered boards are

specifically contemplated by Nevada state law.  *See* NEV. REV. STAT. § 78.330(2).  Further, the

Debtors have established, and BF Claims Holdings has failed to put forth any evidence to the

contrary, that a staggered Board is appropriate in these circumstances.  Specifically, the Debtors

believe that a classified board is consistent with the interests of creditors, shareholders and public policy as required by section 1123(a)(7) to promote continuity and stability, accountability, independence, value protection, and director commitment.  Debtors' Pretrial Memo at 22.  BF Claims Holdings' objection on this basis is overruled.

d. *Annual Shareholder Meetings, Special Shareholder Meetings and Amendment of Bylaws*

The other corporate governance issues raised by BF Claims Holdings have all been appropriately addressed by the Debtors.  With regard to annual shareholder meetings, a shareholder meeting will be held within the first fifteen (15) months following the Effective Date and each successive meeting will be held every twelve (12) months thereafter.  These time periods are consistent with Nevada state law and do not violate section 1123(a)(7).

The Debtors have also reduced the percentage of shareholders necessary to call a special shareholder meeting to the lesser of (i) twenty-five per cent (25%) of the fully-diluted New Common Stock (*i.e.*, shares initially issued or reserved for issuance pursuant to the Plan) of Reorganized Mesa Air Group, Inc., and (ii) fifty per cent (50%) of the shares entitled to vote. The proposed reduction is consistent with public policy under section 1123(a)(7).

Finally, the Debtors have agreed to revise the Bylaws to reduce the percentage of shareholders necessary to amend the bylaws from 66 2/3% to a majority of the voting power. The Debtors have also eliminated the Board's ability to amend sections of the Bylaws relating to annual and special shareholder meetings without obtaining shareholder approval.  Additionally, the Debtors have eliminated the Board's ability to amend the section relating to shareholder amendments of the Bylaws.  BF Claims Holdings has not provided any authority indicating that these provisions are inappropriate.

Thus, the Court concludes that these amendments are in the best interests of creditors and equity holders and consistent with public policy. The objection of BF Claims Holdings on this basis is overruled.

**F.      Section 1129(a)(3)**

BF Claims Holdings asserts that the Debtors have not engaged in good faith negotiations regarding the corporate governance provisions referenced above in violation of section 1129(a)(3) of the Bankruptcy Code. The good faith test of section 1129(a)(3) means that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Kane v. Johns-Manville (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (citing *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)). Counsel for BF Claims Holdings repeatedly stated at the Confirmation Hearing that BF Claims Holdings was not questioning the Debtors' "intentions" in proposing the Corporate Governance Documents. Though BF Claims Holdings may disagree with the corporate governance provisions proposed by the Debtors with the agreement of the Committee, it has not set forth any evidence that the Plan was not negotiated and proposed with honesty and good intentions.

## CONCLUSION

Based on the facts of this unique case where: (1) the Debtors are subject to both the Transportation Code and the Bankruptcy Code; and (2) have developed a distribution scheme that provides for distribution of New Common Stock to U.S. Citizens and New Warrants to Non-U.S. Citizens while the claims resolution process takes place, the Debtors have met their burden of proving all elements of section 1129 necessary for confirmation of the Plan.  For the reasons discussed above, the Objection is overruled.  A separate order will be entered confirming the Plan.

Dated: January 20, 2011
        New York, New York


                                    _____/s/Martin Glenn_____
                                        MARTIN GLENN
                                    United States Bankruptcy Judge